**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| CHRISTOPHER MOEHRL, on behalf of himself and all others similarly situated,<br><br>        Plaintiffs,<br><br>   v.<br><br>THE NATIONAL ASSOCIATION OF REALTORS, REALOGY HOLDINGS CORP., HOMESERVICES OF AMERICA, INC., RE/MAX HOLDINGS, INC., and KELLER WILLIAMS REALTY, INC.<br><br>        Defendants. | Civil Action No.: _____<br><br>**COMPLAINT- CLASS ACTION**<br><br>JURY TRIAL DEMANDED |

## CLASS ACTION COMPLAINT

## TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................3

II.     JURISDICTION AND VENUE ....................................................................6

III.    TRADE AND COMMERCE ..........................................................................7

IV.     THE PARTIES ..................................................................................................8

    a.   Plaintiff..............................................................................................................8

    b.   Defendants.........................................................................................................8

    c.   Co-Conspirators and Agents .........................................................................9

V.      BACKGROUND ON THE REAL ESTATE INDUSTRY ...........................10

VI.     ANTI-COMPETITIVE NAR RULES ....................................................13

VII.    NAR HAS REQUIRED LOCAL ASSOCIATIONS TO COMPLY  WITH ITS ANTI-COMPETITIVE RULES.......................................................................14

VIII.   DEFENDANT FRANCHISORS DESIGNED AND  HAVE PARTICIPATED IN THE CONSPIRACY.....................................................................................16

IX.     FRANCHISEES AND LOCAL NAR ASSOCIATIONS HAVE COMPLIED WITH AND ENFORCED NAR'S RULES IN THE AREAS IN WHICH THE COVERED MLSs OPERATE.......................................................................................................18

X.      EFFECTS OF THE CONSPIRACY............................................................18

XI.     MARKET POWER ........................................................................................21

XII.    CONTINUOUS ACCRUAL.........................................................................23

XIII.   CLAIM FOR RELIEF...................................................................................25

    Claim 1: Violation of Section 1 of the Sherman Act, 15 U.S.C § 1 ................................25

XIV.    REQUESTED RELIEF .................................................................................27

## I.      INTRODUCTION

1.      Plaintiffs, home sellers who listed their homes on one of twenty Multiple Listing Services (identified below), bring this action against Defendants—the National Association of Realtors and the four largest national real estate broker franchisors, Realogy Holdings Corp., HomeServices of America, Inc., RE/MAX Holdings, Inc., and Keller Williams Realty, Inc. ("NAR" and "Defendant Franchisors" respectively or "Defendants" collectively)—for conspiring to require home sellers to pay the broker representing the buyer of their homes, and to pay at an inflated amount, in violation of federal antitrust law.

2.      Defendants' conspiracy has centered around NAR's adoption and implementation of a rule that requires all brokers to make a blanket, non-negotiable offer of buyer broker compensation (the "Buyer Broker Commission Rule") when listing a property on a Multiple Listing Service ("MLS").

3.      Defendants and their co-conspirators collectively possess market power in local markets for real estate broker services through their control of the local MLS.  An MLS is a database of properties listed for sale in a particular geographic region and the marketplace on which the vast majority of homes in the United States are sold.  Brokers must list a property for sale on an MLS to effectively market that property to prospective buyers, and in any event, are required to list all properties on the MLS if they are members of the MLS.  Most MLSs (including all MLSs at issue in this case) are controlled by local NAR associations, and access to such MLSs is conditioned on brokers following all mandatory rules set forth in NAR's Handbook on Multiple Listing Policy.  The Buyer Broker Commission Rule is a mandatory rule in NAR's Handbook.

4.      The conspiracy has saddled home sellers with a cost that would be borne by the buyer in a competitive market.  Moreover, because most buyer brokers will not show

homes to their clients where the seller is offering a lower buyer broker commission, or will show homes with higher commission offers first, sellers are incentivized when making the required blanket, non-negotiable offer to procure the buyer brokers' cooperation by offering a high commission.

5.     This method of setting the buyer broker commission is wholly different from the method that would exist absent the Buyer Broker Commission Rule.  Absent this rule, buyer brokers would be paid by their clients and would compete to be retained by offering a lower commission.  The Buyer Broker Commission Rule ensures that price competition among buyer brokers is restrained because the person retaining the buyer broker, the buyer, does not negotiate or pay his or her broker's commission.  In addition, the seller's inflated commission offer cannot be reduced by buyers or their brokers, as Defendants also prohibit buyer brokers from making home purchase offers contingent on the reduction of the buyer broker commission.  Real estate brokers handle most residential real estate sales in the United States.  In a typical transaction, separate brokers will represent the seller and the buyer of a home.  Both the buyer broker and seller broker (also known as the listing broker) are paid a percentage of the property's sales price.  Currently, total broker compensation in the United States is typically five to six percent of the home sales price, with approximately half of that amount—and increasingly more than half—paid to the buyer broker.

6.     Defendants use their control of the MLSs, and Defendant Franchisors use their agreements with their local franchisees, to require brokers in local residential real estate markets to adhere to NAR's rules, including the Buyer Broker Commission Rule.

7.     In more competitive foreign markets, home buyers pay their brokers if they choose to use one, and they pay less than half the rate paid to buyer brokers in the United

States. In comparable international markets without a rule like the Buyer Broker Commission Rule, such as the United Kingdom, Germany, Israel, Australia, and New Zealand, buyer brokers, when they are used, are paid directly by home buyers, rather than by home sellers.

8. Defendants' conspiracy has kept buyer broker commissions in the 2.5 to 3.0 percent range for many years despite the diminishing role of buyer brokers. A majority of home buyers no longer locate prospective homes with the assistance of a broker, but rather independently through online services. Buyer brokers increasingly have been retained after their client has already found the home the client wishes to buy. Despite their diminishing role, buyer brokers continue to receive 2.5 to 3.0 percent of the sales price due to Defendants' conspiracy.

9. The conspiracy's effect can be seen in the disconnect between buyer broker costs and commissions. Buyer broker costs are similar regardless of the price of the home, yet buyer brokers are paid, for example, four times more when their client buys a million-dollar home rather than a $250,000 home.

10. The conspiracy has inflated buyer broker commissions, which, in turn, have inflated the total commissions paid by home sellers such as Plaintiff and the other class members. Plaintiff and the other class members have each incurred, on average, thousands of dollars in damages as a result of Defendants' conspiracy. For example, a class member who sold a house for $500,000 paid in the range of $12,500 to $15,000 in additional commissions due to the conspiracy. In a competitive market, the seller would pay nothing to the buyer broker, who would be paid instead by the buyer, and the commission paid by the seller would be set at a level to compensate the seller broker only.

11. Plaintiff, on behalf of himself and the class defined herein, sues for

5

Defendants' violations of the federal antitrust laws as alleged herein, and seeks treble damages, injunctive relief, and the costs of this lawsuit, including reasonable attorneys' fees.

12.     Plaintiff brings this lawsuit as a class action on behalf of home sellers who paid a broker commission in the last four years in connection with the sale of residential real estate listed on one of the following MLSs (the "Covered MLSs"):

- o   The Bright MLS (including the metropolitan areas of Baltimore, Maryland; Philadelphia, Pennsylvania; Richmond, Virginia; Washington, D.C.);

- o   My Florida Regional MLS (including the metropolitan areas of Tampa, Orlando, and Sarasota);

- o   The five MLSs in the Mid-West that cover the following metropolitan areas: Cleveland, Ohio; Columbus, Ohio; Detroit, Michigan; Milwaukee, Wisconsin; Minneapolis, Minnesota;

- o   The six MLSs in the Southwest that cover the following metropolitan areas: Austin, Texas; Dallas, Texas; Houston, Texas; Las Vegas, Nevada; Phoenix, Arizona; San Antonio Texas;

- o   The three MLSs in the Mountain West that cover the following metropolitan areas: Colorado Springs, Colorado; Denver, Colorado; Salt Lake City, Utah;

- o   The four MLSs in the Southeast that cover the following metropolitan areas: Fort Myers, Florida; Miami, Florida; Charlotte, North Carolina; and Raleigh, North Carolina.

## II.     JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction under 28 U.S.C. §1332(d)(2),

because the classes contain more than 100 persons, the aggregate amount in controversy exceeds $5,000,000, and at least one member of each class is a citizen of a State different from Defendants.

14.     This Court has personal jurisdiction over Defendants.  Defendants have: (1) transacted business in the United States, including in this District; (2) transacted with members of the Classes throughout the United States, including in this District; (3) had substantial contacts with the United States, including in this District; and (4) committed substantial acts in furtherance of its unlawful scheme in the United States, including in this District.

15.     Venue is proper in this District under 28 U.S.C. §1391(b), (c), and (d).  Each Defendant transacted business, was found, had agents and/or resided in this District; a substantial part of the events giving rise to Plaintiffs' claims arose in this District; and a substantial portion of the affected interstate trade and commerce described herein has been carried out in this District.

## III.     TRADE AND COMMERCE

16.     The Buyer Broker Commission Rule and other anticompetitive NAR rules apply and have been implemented by Defendants and co-conspirators, nationwide.  These rules govern the conduct of local NAR associations, local brokers, and local sales agents nationwide.  Defendants' conduct alleged herein has inflated buyer broker commissions nationwide including in the areas in which the Covered MLSs operate, and has injured home sellers in those areas and nationwide.  Defendant NAR, through its members and other co-conspirators, and Defendant Franchisors, through their franchisees and other co-conspirators, are engaged in interstate commerce, and are engaged in activities affecting interstate commerce, in the United States.

## IV.     THE PARTIES

### a.  <u>Plaintiff</u>

17.     Christopher Moehrl is a resident of Shorewood, Minnesota.  On November 15, 2017, he sold a home located in the Minneapolis metropolitan area.  The home was listed on the Northstar MLS.  In that sales transaction, Mr. Moehrl was represented by a RE/MAX franchisee, and the buyer was represented by a Keller Williams franchisee.  As part of the sales transaction, Mr. Moehrl paid a total broker commission of six percent, and 2.7 percentage points of the six percentage points were paid to the buyer broker.

### b.  <u>Defendants</u>

18.     Defendant National Association of Realtors has over 1.2 million individual members and is one of the largest lobbying groups in the country, advocating for the interests of real estate brokers.  Its fifty-four state and territorial realtor associations and over 1,200 local realtor associations are members of, and overseen by, NAR.  NAR is headquartered in Chicago, Illinois.

19.     Defendant Realogy Holdings Corp. ("Realogy") is the nation's largest real estate brokerage company.  It is headquartered in Madison, NJ.  It is a publicly-traded corporation with a market value in excess of $4 billion.  It owns, operates, and franchises many real estate brokerage firms, including Century 21, Coldwell Banker, Sotheby's International Realty, The Corcoran Group, Better Homes and Garden Real Estate, ZipRealty, ERA Real Estate, Citi Habitats, and Climb Real Estate.

20.     Defendant HomeServices of America, Inc. ("HomeServices of America") is one of the nation's largest real estate brokerages.  It is headquartered in Minneapolis, Minnesota.  HomeServices of America is an affiliate of Berkshire Hathaway.  It owns, operates, and franchises many real estate brokerage firms, including HomeServices, Prudential Real Estate, Long & Foster, Real Living, and Edina Realty.

21.     Defendant RE/MAX Holdings, Inc. ("RE/MAX") is one of the nation's largest real estate brokerages. It is headquartered in Denver, Colorado. RE/MAX is publicly traded and has a market value of approximately one billion dollars. It franchises local RE/MAX brokers around the country, which have approximately 6,800 offices and more than 100,000 sales associates.

22.     Defendant Keller Williams Realty, Inc. ("Keller Williams") is one of the nation's largest real estate brokerages. It is headquartered in Austin, Texas. It is a privately-held company. It franchises local Keller Williams brokers around the country, which have approximately 700 offices and more than 120,000 sales associates.

**c.   Co-Conspirators and Agents**

23.     Multiple local realtor associations not named as Defendants participated as co-conspirators in the violations alleged herein and performed acts and made statements in furtherance thereof. Specifically, each of the local realtor associations that own and operate the twenty Covered MLSs (among other realtor associations in other areas of the country) complied with and implemented the Buyer Broker Commission Rule.

24.     The Covered MLSs, among others, have participated as co-conspirators in the violations alleged herein and performed acts and made statements in furtherance thereof, including by adopting the Buyer Broker Commission Rule in their own respective rules and regulations.

25.     Multiple franchisees of Defendant Franchisors participated as co-conspirators in the violations alleged herein and performed acts and made statements in furtherance thereof. Specifically, each of those franchisees complied with and implemented the Buyer Broker Commission Rule in the geographic areas in which the Covered MLSs operate. In addition, other brokers in these areas have participated as co-conspirators in the

violations alleged herein and performed acts and made statements in furtherance thereof. These other brokers complied with and implemented the Buyer Broker Commission Rule in these geographic areas.

26.     Defendants are jointly and severally liable for the acts of their co-conspirators whether named or not named as defendants in this Complaint.

## V.     BACKGROUND ON THE REAL ESTATE INDUSTRY

27.     State licensing laws regulate who can represent sellers and buyers in the real estate market.  There are two licensee categories: (1) the real estate broker (also known as a "brokerage firm"); and (2) the individual real estate licensee or agent.  Real estate brokers license individual real estate agents and are legally responsible for the activities of the agents they license.

28.     Licensed brokers are the only entities permitted by state law to be paid to represent buyers or sellers in a real estate transaction.  For that reason, all real estate brokerage contracts with sellers and buyers are required to be with brokers, not agents, and all payments to agents must pass through brokers.

29.     According to NAR, 92% of sellers sold their home with the assistance of a real estate broker in 2017, and 87% of buyers purchased their home with the assistance of a real estate broker in 2017.

30.     The standard practice in the residential real estate industry is to compensate brokers and agents with commissions that are calculated as a percentage of a home's sale price.  Commissions are paid when the home sells.

31.     Most brokers and their agents occupy dual roles: they operate as seller brokers for some home sales and as buyer brokers for other home sales.

32.     A seller broker's compensation is specified in a listing agreement, a contract

between the seller and the seller broker that details the terms of the listing. A listing agreement typically states that the seller broker has the exclusive right to market the seller's home. The listing agreement specifies the total commission that a home seller will pay to the seller broker, often with a portion of that amount earmarked to be paid to the buyer broker in the event the buyer has a broker.

33.    If the buyer has a broker, the seller or the seller broker pays the buyer broker a commission out of the total commission paid by the seller. In other words, buyer brokers—who assist their clients in negotiating against the seller—receive their compensation from the total commission paid by the seller, not from the buyer they represent. In fact, a standard of conduct in NAR's Code of Ethics permits and encourages buyer brokers to tell their clients that their services are free.

34.    In the listing agreement, the seller sets the total commission to be paid to the seller broker with the expectation that a portion of the commission will be paid to a buyer broker because buyers are represented by brokers for the overwhelming majority of home sales. If, as would happen in the absence of the Buyer Broker Commission Rule, buyers paid their brokers, (i) sellers would agree to pay a commission solely to compensate the seller broker because sellers have no incentive to compensate a buyer broker negotiating against their interests, and (ii) the seller broker commission would be about half or less of the amount that sellers have paid as a total commission to compensate both the buyer broker and the seller broker.

35.    When a buyer retains a broker, the buyer enters into a contract with that broker. The contract typically discloses that the buyer broker will be compensated by receiving a commission from the seller broker.

36.    An MLS is a database of properties listed for sale in a defined region that is

11

accessible to real estate brokers and their agents that comply with the rules of the MLS. The Covered MLSs are owned and operated by local realtor associations that are members of, and governed by, NAR. Seller brokers list their client's property on an MLS as required by a NAR rule, and to ensure that buyer brokers and prospective buyers are aware of the property. If a seller broker does not list a client's property on an MLS, most buyer brokers will not show that property to prospective buyers. MLSs also act as the main source of listings for online websites, such as Zillow, through which many prospective home buyers find homes. A home that is not listed on an MLS is very hard to find for prospective home buyers.

37. The Buyer Broker Commission Rule obligates a seller broker, on behalf of the seller, to make a blanket, non-negotiable offer of compensation to buyer brokers when listing a home on an MLS owned by a local NAR association. If a buyer represented by a broker purchases the home, the buyer broker receives the offered compensation.

38. The following example illustrates how this process typically works:

- A homeowner enters into a contract with a seller broker, in which the seller agrees to pay the seller broker six percent in total commissions in exchange for marketing and facilitating the sale of the home.

- As required by the Buyer Broker Commission Rule, the seller broker makes a blanket, non-negotiable offer of a three percent commission to the buyer's broker when it lists the home on the local MLS.

- A buyer broker shows the property to a buyer client, who buys the home for $500,000.

- The seller broker receives six percent of the sales price ($30,000) from the seller. The seller broker then pays three percent of the sales price

($15,000) to the buyer broker.

## VI.     ANTI-COMPETITIVE NAR RULES

39.     NAR adopted the Buyer Broker Commission Rule in November 1996 as part of its Handbook on Multiple Listing Policy, and the rule has been continuously in effect ever since.

40.     The Handbook states the Buyer Broker Commission Rule as follows: "In filing a property with the multiple listing service of an association of Realtors®, the participant of the service is making blanket unilateral offers of compensation to the other MLS participants, and shall therefore specify on each listing filed with the service, the compensation being offered to the other MLS participants." The Handbook further states that "Multiple listing services shall not publish listings that do not include an offer of compensation expressed as a percentage of the gross selling price or as a definite dollar amount, nor shall they include general invitations by listing brokers to other participants to discuss terms and conditions of possible cooperative relationships."

41.     As alleged above, the Buyer Broker Commission Rule shifts a cost to the seller that would be paid by the buyer in a competitive market. Moreover, by requiring the seller to make a blanket, non-negotiable offer, the rule incentivizes sellers to procure the cooperation of buyer brokers by offering a high buyer broker commission. Many buyer brokers will not show a home offering a lower buyer broker commission or will show other homes first.

42.     The Buyer Broker Commission Rule by itself leaves the possibility of buyers seeking to reduce their broker's commission by making that reduction a condition of a home purchase offer. However, NAR specifically adopted a rule to foreclose this possibility. NAR's Code of Ethics, Standard of Practice 16-16, states: "REALTORS, acting as subagents

or buyer/tenant representatives or brokers, shall not use the terms of an offer to purchase/lease to attempt to modify the listing broker's offer of compensation to subagents or buyer/tenant representatives or brokers nor make the submission of an executed offer to purchase/lease contingent on the listing broker's agreement to modify the offer of compensation."

43.     In the absence of the Buyer Broker Commission Rule, buyers rather than sellers would pay buyer broker commissions, and brokers would compete with each other by offering lower commissions to prospective buyer clients.

## VII.     NAR HAS REQUIRED LOCAL ASSOCIATIONS TO COMPLY WITH ITS ANTI-COMPETITIVE RULES

44.     NAR successfully requires its members, including state and local realtor associations, as well as non-member brokers and agents operating in areas with MLSs owned by local realtor associations, to fully comply with the above anti-competitive rules, and with other rules contained in the NAR Handbook and the NAR Code of Ethics.

45.     NAR requires its members that own an MLS to comply with the mandatory provisions in NAR's Handbook on Multiple Listing Policy and with NAR's Code of Ethics. The Handbook states that an agreement by an association for the establishment of an MLS must include "roles and responsibilities of each association for enforcement of the Code of Ethics" and the "intent of the multiple listing service(s) to operate in compliance with the multiple listing policies of the National Association."

46.     NAR threatens its individual and associational members with expulsion for failing to comply with the Code of Ethics. NAR's Code of Ethics states that "[a]ny Member Board which shall neglect or refuse to maintain and enforce the Code of Ethics with respect to the business activities of its members may, after due notice and opportunity for hearing,

be expelled by the Board of Directors from membership in the National Association."

47.     A local realtor association owns each of the Covered MLSs, and those realtor associations are required by NAR to ensure that its MLS and the MLS's participants adhere to the mandatory provisions in NAR's Handbook on Multiple Listing Policy. Because access to the Covered MLSs, and other MLSs, is a commercial necessity for all brokers and agents, all brokers and agents must comply with the mandatory provisions in NAR's Handbook.  Without access to a local MLS, including the Covered MLSs, a broker or agent would be unable to list properties for sale in the centralized database or receive offers of compensation for finding a buyer for a listed property.

48.     NAR has established and disseminated model rules for local realtor associations, and for the MLSs that these local associations own and operate, and those model rules require adherence to both NAR's Code of Ethics and the Handbook on Multiple Listing Policy.

49.     One of the many benefits NAR provides to its realtor associations and the MLSs owned by those associations is professional liability insurance.  To be eligible for this insurance, realtor associations and their MLSs must comply with the mandatory provisions in the Handbook on Multiple Listing Policy.  NAR threatens to withhold these valuable insurance benefits from realtor associations and MLSs that fail to comply with these mandatory provisions.  NAR's Handbook states that "[t]hose associations or multiple listing services found by the National Association to be operating under bylaws or rules and regulations not approved by the National Association are not entitled to errors and omissions insurance coverage and their charters are subject to review and revocation."

50.     NAR reviews the governing documents of its local realtor associations to ensure compliance with its rules.  NAR requires its local realtor associations to demonstrate

their compliance with these rules by periodically sending their governing documents to NAR for review.

## VIII.   DEFENDANT FRANCHISORS DESIGNED AND HAVE PARTICIPATED IN THE CONSPIRACY

51.     Defendant Franchisors orchestrated and have participated in the conspiracy alleged herein in three ways: (1) they have required their franchisees (and the agents employed by those franchisees) to comply with NAR rules including the Buyer Broker Commission Rule; (2) their executives have supervised NAR's operations including NAR's adoption, maintenance, and enforcement of the Buyer Broker Commission Rule; and (3) their franchisees have influenced local realtor associations that adopted and enforced NAR's rules, including the Buyer Broker Commission Rule.

52.     First, Defendant Franchisors implemented the conspiracy by requiring that their franchisees in the geographic areas in which the Covered MLSs operate, and elsewhere, and the agents employed by those franchisees, comply with NAR's rules, including the Buyer Broker Commission Rule.  Franchise agreements between Defendant Franchisors and their franchisees located in the areas in which the Covered MLSs operate, and throughout the United States, require those franchisees and their agents to (1) comply with NAR's Code of Ethics; (2) join and comply with the rules of the local realtor association; and (3) participate in and comply with the rules of the local MLS, which include the mandatory provisions of NAR's Handbook on Multiple Listing Policy.

53.     For example, the franchise agreement between Defendant RE/MAX and a RE/MAX franchisee in Las Vegas states: "You agree that you and each of your Sales Associates will join and remain a member in good standing and comply with the by-laws and rules and regulations of a local Board of REALTORS© (or comparable organization) and, where available, you will become and remain a participant in a board owned multiple

listing service. You also agree that you and your Sales Associates will abide by the Code of Ethics of the National Association of REALTORS©."

54. Second, executives from Defendant Franchisors, the four largest real estate brokerage franchisors in the country, have actively participated in the management and operation of NAR. NAR's board of directors promulgated the rules in NAR's Handbook and in its Code of Ethics, including the Buyer Broker Commission Rule, and many of those rules were developed and drafted by NAR's Professional Standards Committee. Senior executives of Defendant Franchisors have served on NAR's governing board of directors. For example, both Ronald J. Peltier, the Executive Chairman of HomeServices of America, and Nancy Nagy, CEO of Berkshire Hathaway HomeServices KoenigRubloff Realty Group, currently serve as directors of NAR, and Bruce Aydt, Senior Vice President and General Counsel of Berkshire Hathaway HomeServices Alliance Real Estate, is the former Chair of NAR's Professional Standards Committee.

55. Executives of franchisees of Defendant Franchisors also dominated the 2018 eight-person Leadership Team that managed NAR's day-to-day operations. For example, the immediate past President of NAR, Elizabeth Mendenhall, is the CEO of RE/MAX Boone Realty in Columbia, Missouri. The President of NAR is John Smaby, a sales agent at Edina Realty, which is a HomeServices of America company. NAR's Vice President of Association Affairs, Colleen Badagliacco, is an agent for Legacy Real Estate & Associates, which is a franchisee of a Realogy firm. The 2019 leadership team includes John Smaby and Elizabeth Mendenhall, as well as Charlie Oppler, First Vice President and COO of a Sotheby's International Realty franchisee, and Tracy Kasper, Vice President of Advocacy and a broker/owner of a Berkshire Hathaway franchisee.

56. Third, executives of franchisees of Defendant Franchisors have participated

in the governance of the local realtor associations that own and operate the Covered MLSs (and participate in the governance of other local realtor associations), and they implemented the conspiracy through those associations. Those executives and local realtor associations required compliance with the NAR rules, including the Buyer Broker Commission Rule, and adopted standard form contracts implementing the NAR rules.

57.     Defendant Franchisors actively encouraged their franchisees to be involved in local realtor association governance. For example, Keller Williams' "Policy & Guidelines Manual" states that "[w]e encourage you to be actively involved to the greatest possible extent" in state NAR associations and that "[w]e encourage you to take an active role in" local realtor associations. The manual further states: "Please be very cooperative with other REALTORS® for they hold the key to a great deal of information. With their help, you can become very successful. We cooperate and live by the spirit of cooperation with all other REALTORS® and brokers."

## IX.     FRANCHISEES AND LOCAL NAR ASSOCIATIONS HAVE COMPLIED WITH AND ENFORCED NAR'S RULES IN THE AREAS IN WHICH THE COVERED MLSs OPERATE

58.     In each of the areas in which the Covered MLSs operate (and elsewhere), franchisees of Defendant Franchisors collaborated with local realtor associations to implement, comply with, and enforce NAR's rules, including the Buyer Broker Commission Rule, in furtherance of the conspiracy alleged herein.

## X.     EFFECTS OF THE CONSPIRACY

59.     Defendants' conspiracy has had the following anticompetitive effects, among others, in each area in which a Covered MLS operates, and nationwide:

- Home sellers have been forced to pay commissions to buyer brokers—
  their adversaries in negotiations to sell their homes—thereby

substantially inflating the cost of selling their homes.

- Home sellers have been compelled to set a high buyer broker commission to induce buyer brokers to show their homes to the buyer brokers' clients.

- Home sellers have paid inflated buyer broker commissions and inflated total commissions.

- The retention of a buyer broker has been severed from the setting of the broker's commission; the home buyer retains the buyer broker, while the home seller sets the buyer broker's compensation.

- Price competition among brokers to be retained by home buyers has been restrained.

- Competition among home buyers has been restrained by their inability to compete for the purchase of a home by lowering the buyer broker commission.

- Defendant Franchisors and their franchisees have increased their profits substantially by receiving inflated buyer broker commissions and inflated total commissions.

60.     Plaintiffs are not aware of any pro-competitive effects of Defendants' conspiracy.  But if there are any, they are substantially outweighed by the conspiracy's anticompetitive effects.

61.     There is substantial economic evidence that Defendants' conspiracy has resulted in buyer broker commissions and total commissions paid by home sellers that are inflated well above a competitive level nationwide, including in the areas in which the Covered MLSs operate.

62.     Total broker commissions (*i.e.*, the aggregate commission paid to the seller broker and buyer broker) in the areas in which the Covered MLSs operate average between five and six percent.  This figure is substantially higher than in countries with competitive markets for residential real estate brokerage services.  In a 2002 study titled "International Residential Real Estate Brokerage Fees and Implications for the US," economists Natalya Delcoure and Norm Miller compared real estate commissions around the world with those in the United States.  They concluded: "Globally, we see much lower residential commission rates in most of the other highly industrialized nations, including the United Kingdom, Hong Kong, Ireland, Singapore, Australia, and New Zealand.   … In the UK, the [total] commission rates average less than 2%. . . .  In New Zealand and South Africa, [total] commission rates average 3.14%. In Singapore, the [total] commission rates also tend to run around 3%."  They also found variation within countries; in the United Kingdom, for example, Delcoure and Miller found that "1%-2% is typical; in very competitive areas 0.5-0.75%; in low priced areas [for homes] as high as 3.5%."  Ultimately, the economists concluded that, "based on global data, the [total] US residential brokerage fees should run closer to 3.0%."

63.     For years, buyer broker commissions have remained steady at two-and-a-half to three percent in the areas in which the Covered MLSs operate despite both an increase in home prices (increasing the dollar amount of the commission) and the diminishing role of buyer brokers described above.

64.     The median national housing price was $165,300 in 2000, and $325,200 in Q3 2018.  Commission dollars per home thus have roughly doubled over this time period, while the total rate of inflation was below 50% during that same period.

## XI.        MARKET POWER

65.        The relevant service market for the claims asserted herein is the bundle of services provided to home buyers and sellers by residential real estate brokers with MLS access.  Defendants' control of the Covered MLSs gives Defendants the ability to impose the Buyer Broker Commission Rule and other anticompetitive NAR rules on class members and other market participants.  Access to the Covered MLSs is critical for brokers to compete and to assist home buyers and sellers in the areas in which those MLSs operate.

66.        The relevant geographic markets for the claims asserted herein are no broader than the geographic areas in which the twenty Covered MLSs operate.  Nearly all homes sold in these geographic areas were listed on the MLS by brokers that are subject to the MLS and NAR rules and standards.  The residential real estate business is local in nature. Most sellers prefer to work with a broker who is familiar with local market conditions and who maintains an office or affiliated sales associates within a reasonable distance of the seller's property.  Likewise, most buyers seek to purchase property in a particular city, community, or neighborhood, and typically prefer to work with a broker who has knowledge of the area in which they have an interest.

67.        Defendant Franchisors, through their co-conspirator franchisees and other conspiring brokers in the areas in which the Covered MLSs operate, collectively provide the vast majority of the residential real estate broker services in these areas.

68.        Defendants and their co-conspirators collectively have market power in each relevant market through their control of the local MLS and their dominant share of the local market.

69.        Any buyer brokers in the areas in which the Covered MLSs operate who wished to compete outside of Defendants' conspiracy would face insurmountable barriers.

Defendants' control of the Covered MLSs through their co-conspirators (*i.e.*, through their local franchisees, other local brokers, and the local realtor associations) means that non-conspiring brokers would need to establish an alternative listing service to compete with the conspiring brokers, or alternatively, attempt to compete without access to a listing service. A broker who represented a seller without using a listing service would lose access to the large majority of potential buyers, and a broker who represented a buyer without using a listing service would lose access to the large majority of sellers. Brokers cannot compete effectively without access to a listing service.

70. For an alternative listing service to compete effectively with one of the Covered MLSs, the alternative would need to have listings as comprehensive (or at least nearly so) as the Covered MLS. Brokers and their agents who currently profit from inflated buyer broker commissions and total commissions have minimal incentive to participate on an alternative listing service that would generate lower buyer broker commissions and lower total commissions. Further, many buyers would be very reluctant to retain a buyer broker operating on an alternative listing service that required them to pay the buyer broker commission, when other buyer brokers operating on the Covered MLSs are entirely compensated by home sellers. Accordingly, seller brokers on an alternative listing service would struggle to attract buyer brokers and their buyer clients. Moreover, many home sellers would not retain brokers using a new, unfamiliar alternative listing service that had no track record of success and had failed to attract sufficient buyers and buyer brokers. Accordingly, a listing service attempting to compete with any of the Covered MLSs would likely fail to attract enough property listings to operate profitably and be a competitive constraint on the incumbent MLS. The absence of listing services that compete with the Covered MLSs (or other MLSs) reflects the very substantial barriers to entry.

71.     Moreover, NAR advises MLSs to enter into non-compete agreements with third-party websites, such as Zillow, so that those websites do not become competitive rivals to MLSs.  NAR's checklist of "critical components" states that the consumer-facing website "must agree they will not compete with the brokerage firms or MLS by either becoming a licensed brokerage firm or by providing offers of cooperation and compensation."  The non-compete agreement requires the consumer-facing website to agree not to "use the data in a manner that is similar to a Multiple Listing Service."  Thus, NAR, in furtherance of the conspiracy, has advised MLSs to take affirmative steps to prevent third-party websites from becoming competitors.

## XII.     CONTINUOUS ACCRUAL

72.     During the four years preceding the filing of this complaint, Defendants, through their co-conspirator brokers in the areas in which the Covered MLSs operate, repeatedly charged and received buyer broker commissions and total commissions that were inflated as a result of the conspiracy.  These inflated commissions during the preceding four years were paid by Plaintiff and the other class members in connection with the sale of residential real estate listed on one of the Covered MLSs.  Each payment of these inflated commissions by Plaintiffs and the other class members during the last four years injured them and gave rise to a new cause of action for that injury.

73.     During the last four years, Defendants and their co-conspirators have maintained, implemented, and enforced the Buyer Broker Commission Rule and other anticompetitive NAR rules nationwide, including in the areas in which the Covered MLSs operate.

## XII.     CLASS ACTION ALLEGATIONS

74.     Pursuant to Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil

Procedure, Plaintiff brings this action on behalf of himself and the following class: all persons who paid a broker commission since March 6, 2015 in connection with the sale of residential real estate listed on one of the Covered MLSs.

75. Excluded from the Class are Defendants and their officers and directors, and the judicial officer(s) presiding over this action and the members of his/her/their immediate family and judicial staff.

76. The Class is readily ascertainable because records of the relevant transactions should exist.

77. Due to the nature of the trade and commerce involved, Plaintiff believes that the Class has many thousands of members, the exact number and their identities being known to Defendants and their co-conspirators.

78. Plaintiff's claims are typical of the claims of the members of the Class. Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff's interests are aligned with, and not antagonistic to, those of the other members of the Class.

79. There are questions of law and fact common to the members of the Class, including, but not limited to, the following:

A. Whether Defendants conspired as alleged herein;

B. Whether the conspiracy was implemented in the areas in which the Covered MLSs operate;

C. Whether the conspiracy harmed competition as alleged herein;

D. Whether the competitive harm from the conspiracy substantially outweighs any competitive benefits;

E. Whether buyer broker commissions and total commissions were inflated as a result of the conspiracy in the areas in which the Covered MLSs operate; and

F.  The appropriate class-wide measures of damages.

80.  Plaintiff has retained counsel competent and experienced in the prosecution of antitrust class action litigation to represent himself and the Class.

81.  Questions of law or fact that are common to the members of the Class predominate over any questions affecting only individual members of the Class.

82.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  The prosecution of separate actions by individual members of the Class would impose heavy burdens on the court and Defendants and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class.  A class action, on the other hand, would achieve substantial economies of time, effort, and expense, and would assure uniformity of decision as to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results.  Absent a class action, it would not be feasible for the vast majority of the members of the Class to seek redress for the violations of law alleged herein.

## XIII.  CLAIM FOR RELIEF

### Claim 1: Violation of Section 1 of the Sherman Act, 15 U.S.C § 1

83.  Plaintiff repeats and incorporates by reference each of the foregoing allegations of this Complaint.

84.  Beginning more than four years before the filing of this Complaint, Defendants engaged in a continuing contract, combination, or conspiracy to unreasonably restrain interstate trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C § 1.

85.  The contract, combination, or conspiracy alleged herein has consisted of a continuing agreement among Defendants and their co-conspirators to require home sellers

25

to pay the buyer broker and to pay an inflated amount.

86. In furtherance of the contract, combination, or conspiracy, Defendants and their co-conspirators have committed one or more of the following overt acts:

a) Participated in the establishment, maintenance, and implementation of the Buyer Broker Commission Rule and other anticompetitive NAR rules;

b) Participated in the establishment, maintenance, and implementation of rules by local NAR associations and MLSs that implemented the Buyer Broker Commission Rule and other anticompetitive NAR rules in the areas in which the Covered MLSs operate; and

c) Included provisions in franchise agreements with franchisees of Defendant Franchisors that required the franchisees to implement the Buyer Broker Commission Rule and other anticompetitive NAR rules in the areas in which the Covered MLSs operate.

87. In the areas in which the Covered MLSs operate, and elsewhere, Defendants' conspiracy has required sellers to pay buyer brokers, to pay an inflated buyer broker commission and an inflated total commission, and has restrained price competition among buyer brokers. This harm to competition substantially outweighs any competitive benefits arising from the conspiracy.

88. Defendants' conspiracy has caused buyer broker commissions and total commissions in the areas in which the Covered MLSs operate (and elsewhere) to be inflated. Plaintiff and the other members of the Class paid these inflated commissions during (and before) the last four years in connection with the sale of residential real estate listed on one of the Covered MLSs. Absent Defendants' conspiracy, Plaintiff and the other class members would have paid substantially lower commissions because the broker representing

the buyer of their homes would have been paid by the buyer.

89.     As a direct and proximate result of Defendants' past and continuing violation of Section 1 of the Sherman Act, Plaintiff and the other class members have been injured in their business and property and suffered damages in an amount to be proven at trial.

**XIV.     REQUESTED RELIEF**

90.     Plaintiff requests relief as follows:

A.     That the Court determine that this action may be maintained as a class action under Rules 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to members of the Class;

B.     That the Court enter an order declaring that Defendants' actions, as set forth in this Complaint, violate the law;

C.     That the Court award Plaintiff and the other members of the Class damages and/or restitution in an amount to be determined at trial;

D.     That the Court award Plaintiff pre- and post-judgment interest;

E.     That the Court award Plaintiff his costs of suit, including reasonable attorneys' fees and expenses;

F.     That the Court award Plaintiff and the Class a permanent injunction, under Section 16 of the Clayton Act, enjoining Defendants from continuing to require sellers to pay the buyer broker and from continuing to restrict competition among buyer brokers; and

G.     That the Court award such other relief as the Court may deem just and proper.

## JURY TRIAL DEMAND

Plaintiff demands a jury trial of all issues so triable.

March 6, 2019                                          Respectfully submitted,

_/s/ Carol V. Gilden_
Carol V. Gilden (Bar No. 6185530)
COHEN MILSTEIN SELLERS & TOLL PLLC
190 South LaSalle Street, Suite 1705
Chicago, IL 60603
(312) 357-0370
cgilden@cohenmilstein.com

Daniel A. Small
Kit A. Pierson
Benjamin D. Brown
Courtney A. Elgart
COHEN MILSTEIN SELLERS & TOLL PLLC
1100 New York Ave. NW ● Fifth Floor
Washington, DC 20005
(202) 408-4600
dsmall@cohenmilstein.com
bbrown@cohenmilstein.com
celgart@cohenmilstein.com

Steve W. Berman
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue ● Suite 2000
Seattle, WA 98101
(206) 623-7292
steve@hbsslaw.com

Elizabeth A. Fegan
HAGENS BERMAN SOBOL SHAPIRO LLP
455 North Cityfront Plaza Drive ● Suite 2410
Chicago, IL 60611
(708) 628-4949
beth@hbsslaw.com

Jeff D. Friedman
Rio S. Pierce
HAGENS BERMAN SOBOL SHAPIRO LLP

715 Hearst Avenue ● Suite 202
Berkeley, CA 94710
(510) 725-3000
jefff@hbsslaw.com
riop@hbsslaw.com

George Farah
HANDLEY FARAH & ANDERSON PLLC
81 Prospect Street
Brooklyn, NY 11201
(212) 477-8090
gfarah@hfajustice.com

William H. Anderson
HANDLEY FARAH & ANDERSON PLLC
4730 Table Mesa Drive
Suite G-200
Boulder, CO 80305
(303) 800-9109
wanderson@hfajustice.com

Benjamin David Elga
Brian Shearer
JUSTICE CATALYST LAW
25 Broadway ● Ninth Floor
New York, NY 10004
(518) 732-6703
belga@justicecatalyst.org
brianshearer@justicecatalyst.org

Monte Neil Stewart
Russell E. Marsh
WRIGHT MARSH & LEVY
300 S. 4th Street ● Suite 701
Las Vegas, NV 89101
(702) 382-4004
monteneilstewart@gmail.com
rmarsh@wmllawlv.com

Vildan A. Teske
Marisa C. Katz
TESKE KATZ KITZER & ROCHEL PLLP
222 South Ninth Street ● Suite 4050
Minneapolis, MN 55402
(612) 746-1558
teske@tkkrlaw.com
katz@tkkrlaw.com

Attorneys for Plaintiff Christopher
Moehrl