# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| CHRISTOPHER MOEHRL, MICHAEL COLE, STEVE DARNELL, VALERIE NAGER, JACK RAMEY, SAWBILL STRATEGIC, INC., DANIEL UMPA, and JANE RUH, on behalf of themselves and all others similarly situated,<br><br>     Plaintiffs,<br><br> v.<br><br>THE NATIONAL ASSOCIATION OF REALTORS, REALOGY HOLDINGS CORP., HOMESERVICES OF AMERICA, INC., BHH AFFILIATES, LLC, HSF AFFILIATES, LLC, THE LONG & FOSTER COMPANIES, INC., RE/MAX LLC, and KELLER WILLIAMS REALTY, INC.<br><br>     Defendants. | Civil Action No.: 1:19-cv-01610 and Civil Action No.: 1:19-cv--2544<br><br>**CLASS ACTION**<br><br>JURY TRIAL DEMANDED<br><br>HON. ANDREA R. WOOD |

THIS DOCUMENT RELATES TO ALL
ACTIONS

## CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

**TABLE OF CONTENTS**

I.  INTRODUCTION ....................................................................................................1

II.  JURISDICTION AND VENUE .............................................................................12

III.  TRADE AND COMMERCE....................................................................................12

IV.  THE PARTIES ........................................................................................................13
    A.  Plaintiff ......................................................................................................13
    B.  Defendants .................................................................................................15
    C.  Co-Conspirators.........................................................................................16

V.  BACKGROUND ON THE REAL ESTATE INDUSTRY ......................................17

VI.  THE ANTI-COMPETITIVE AGREEMENT WITH NAR. ....................................20

VII.  NAR HAS REQUIRED LOCAL ASSOCIATIONS TO AGREE TO THESE ANTI-
    COMPETITIVE RESTRAINTS..............................................................................41

VIII.  CORPORATE DEFENDANTS PARTICIPATE IN, FACILITATE, AND
    IMPLEMENT THE CONSPIRACY .......................................................................43

IX.  EFFECTS OF THE CONSPIRACY.........................................................................53

X.  MARKET POWER...................................................................................................59

XI.  CONTINUOUS ACCRUAL ...................................................................................62

XII.  CLASS ACTION ALLEGATIONS ........................................................................62

XIII.  CLAIM FOR RELIEF .............................................................................................64

XIV.  REQUESTED RELIEF.............................................................................................66

## I.   INTRODUCTION

1.     Plaintiffs, home sellers who listed their homes on one of twenty Multiple Listing Services (identified below), bring this action against the National Association of Realtors ("NAR") and the four largest national real estate brokers in the United States (collectively, "Corporate Defendants") for agreeing, combining and conspiring to impose, implement and enforce anticompetitive restraints that cause home sellers to pay inflated commissions on the sale of their homes, in violation of federal antitrust law.  Defendants' unlawful conduct is also the subject of an active investigation by the Antitrust Division of the United States Department of Justice, which is examining practices in the residential real estate brokerage business, with a focus on compensation paid to brokers, as well as other conduct.

2.     NAR, the Corporate Defendants and their co-conspirators collectively possess market power in local markets for real estate brokerage services through their control of the local Multiple Listing Services ("MLSs").  An MLS is a database of properties listed for sale in a particular geographic region and the marketplace on which the vast majority of homes in the United States are sold.  Brokers must list a property for sale to effectively market that property to prospective buyers, and in any event, are required to list all properties on the MLS if they are members of the MLS.  All MLSs at issue in this case are controlled by local NAR associations, and access to such MLSs is conditioned on brokers' agreement to follow all mandatory rules set forth in NAR's Handbook on Multiple Listing Policy, including the rules at issue here.

3.     Pursuant to Defendants' conspiracy, NAR allows brokers representing home sellers and home buyers to use NAR's MLSs only if those brokers agree to adhere

1

to and help implement terms that significantly restrain competition. Specifically, NAR and its co-conspirators require *every* seller's broker (the "seller-broker"), when listing a property on a Multiple Listing Service, to make a "*blanket unilateral offer[] of compensation*" to any broker who may find a buyer for the home (the "buyer-broker"). This requirement, and related terms implementing the requirement, are set forth at pages 34-35 of NAR's Handbook on Multiple Listing Policy and is hereafter referred to as the Buyer Broker Commission Rule or "the Rule".

4.      Defendants' implementation of and adherence to this agreement is manifestly anticompetitive:

- The Rule compels the seller to make an offer of payment to compensate the buyer-broker even though the buyer-broker is working on behalf of the buyer, not the seller.

- It requires that this be a blanket offer – i.e., the exact same compensation terms must be simultaneously offered to every buyer-broker without regard to their experience, the services they are providing to the buyer, or the financial arrangement they have made with the buyer.

- Because this blanket offer must be made available to every buyer-broker using the MLS (i.e., virtually all buyer-brokers) and can be compared by the buyer-broker with the blanket offers that every other seller must post on the MLS, *the Rule creates tremendous pressure on sellers to offer a high commission that has long been*

2

*maintained in this industry* so that buyer-brokers will not "steer" buyers to properties offering higher buyer-broker commissions.

- The Rule *encourages and facilitates anticompetitive "steering"* by buyer-brokers because it allows them to compare the terms offered for buyer-broker compensation and steer their clients to properties where the seller-broker is offering higher commissions. (The prevalence of such steering, including its anticompetitive impact on consumers and exclusionary impact on brokers trying to compete with alternative, lower-cost models, is widely recognized in the economic literature).

- These effects are magnified by the Rule's requirement that the offer of compensation be expressed as a percentage of the gross selling price of the home or a definite dollar amount and the Rule's prohibition on "general invitations by listing [i.e., seller] brokers to other participants to discuss terms and conditions of possible cooperative relationships."

- The anticompetitive effects are further magnified by NAR's rules providing that after the seller has received purchase offers, the seller-broker is prohibited from attempting to unilaterally modify the buyer-broker commission that was offered on the MLS. NAR Standard of Practice 3-2 states: "Any change in compensation offered for cooperative services must be communicated to the other REALTOR® prior to the time that REALTOR® submits an

3

offer to purchase/lease the property. After a REALTOR® has submitted an offer to purchase or lease property, the listing broker may not attempt to unilaterally modify the offered compensation with respect to that cooperative transaction." As a result, a seller cannot respond to a purchase offer with a counteroffer that is conditional on reducing the buyer-broker commission. Nor can the seller, after receiving purchase offers, decide to unilaterally reduce or eliminate the buyer broker commission offered on the MLS.

- The anticompetitive effects are compounded by the fact that buyer-brokers and their clients have access to very different information from the MLS: The Buyer-brokers are able to learn the amount of the commission buyer-brokers can receive for every available property, but this information is not available to their clients. Thus, homebuyers are unlikely to know whether their brokers are only showing them properties where they will be paid the highest commission amounts. (The obfuscation of this reality for buyers is made even worse by NAR's ethical rule expressly permitting buyer-brokers to represent to buyers that their services are "free" for the buyer).

5. There is no pro-competitive justification for this agreement and, to the contrary, the agreement's purpose and effect is to restrain competition. As one industry participant has acknowledged, "[i]t does not make sense for listing brokers to pay

4

buyers' brokers for the services the latter provide to buyers. This is a bit like the lawyers working for one side in a transaction paying the lawyers working for the other side."[1] Stephen Brobeck, the Executive Director of the Consumer Federation of America has testified that "[i]n a rational price system, home sellers and buyers would each pay for real estate brokerage services they receive."[2] "The simple fact is that, for decades, the dominant real estate firms and their trade association have tried, with much success, to maintain high, uniform prices within different geographic areas."[3]

6.      Each of the Corporate Defendants plays an active role in NAR and has *required* franchisees, brokerages and individual realtors to join and implement this anticompetitive agreement in order to secure the benefit of each Corporate Defendant's brand, brokerage infrastructure and other support. Indeed, because these are the leading brokers in the United States, their participation in the conspiracy and implementation and enforcement of its terms is essential to the success of the conspiracy. The unlawful restraints implemented and enforced by the conspirators benefit NAR and the Corporate Defendants and further their common goals by allowing brokers to impose supra-competitive charges on home sellers and restrain competition by forestalling competition from lower-priced alternatives.

---

[1] Brian N. Larson, *The End of MLS as We Know It*, INMAN (Aug. 15, 2006), https://www.inman.com/2006/08/15/end-mls-we-know-it/.

[2] Stephen Brobeck, *Residential Real Estate Brokerage Services: A Cockamamie System That Restricts Competition and Consumer Choice*, CONSUMER FEDERATION OF AMERICA, 4 (2006), http://archives-financialservices.house.gov/media/pdf/072506sb.pdf.

[3] *Id.*

7. Defendants use their control of the MLSs, and Corporate Defendants their franchise agreements, employee policy and procedures manuals, and leadership roles in NAR and local realtor associations, to require brokers in local residential real estate markets to adhere to NAR's rules, including the Buyer Broker Commission Rule, and thereby help implement and enforce the conspiracy. The Corporate Defendants further implement the conspiracy alleged herein by reviewing and reissuing NAR's rules, including the Buyer Broker Commission Rule, at yearly NAR meetings, and by serving on the boards and committees that enforce compliance with NAR's rules.

8. By participating in an association that prevents member institutions from allowing its employees and realtors to compete with each other to offer lower commissions, requiring franchisees, groups and individuals to join and adhere to the anticompetitive agreement alleged herein, and taking numerous steps in furtherance of the conspiracy, the Corporate Defendants have agreed to participate in, facilitate, and implement the conspiracy.

9. The conspiracy has saddled home sellers with costs that would be borne by buyers in a competitive market. Moreover, because most buyer-brokers will not show homes to their clients where the seller is offering a lower buyer-broker commission, or will show homes with higher commission offers first, sellers are incentivized when making required blanket offers to procure the buyer-brokers' cooperation by offering high commissions. Thus, the conspiracy: (a) requires sellers to pay overcharges for services provided by buyer-brokers; (b) raises, fixes and maintains buyer-broker compensation at levels that would not exist in a competitive marketplace; and (c) encourages and facilitates steering and other actions that impede entry and

6

market success by lower-cost real estate brokerage services.

10. This method of setting buyer-broker commissions is wholly different from the practices that would exist absent the Buyer Broker Commission Rule. Absent the Rule, buyer-brokers would be paid by their clients, not the sellers, and would compete to be retained by offering lower commissions to their prospective clients for their services. The Buyer Broker Commission Rule causes price competition among buyer-brokers is restrained because the client retaining the buyer-broker, i.e., home buyers have little incentive or ability to reduce their broker's commission because they are not paying the commissions.

11. In more competitive foreign markets, homebuyers pay their brokers if they choose to use one, and they pay less than half the rate paid to buyer-brokers in the United States. In comparable international markets without a rule like the Buyer Broker Commission Rule, such as the United Kingdom, Germany, Israel, Australia, and New Zealand, buyer-brokers, when they are used, are paid directly by home buyers, rather than by home sellers. As an article in the *Wall Street Journal* recently explained, real estate brokers have "shielded themselves with a skein of anticompetitive 'practices" that "have kept the high fees they charge unchanged since 1991."[4] The total broker fees that have been imposed are "significantly higher than those paid elsewhere in the developed world," and, if they were instead paid at a competitive level, American consumers would save tens of billions of dollars annually.[5]

---

[4] Jack Ryan & Jonathan Friedland, *When You Buy or Sell a Home, Realty Bites*, WALL ST. J. (Mar. 3, 2019), https://www.wsj.com/articles/when-you-buy-or-sell-a-home-realty-bites-11551649734.

[5] *Id.*

12. Defendants' conspiracy has maintained broker commission levels at remarkably stable and inflated levels for the past two decades, despite the advent of the Internet and the diminishing role of buyer-brokers. Between 2000 and 2017, the average commission nationally has been stable at a supra-competitive rate of between 5 and 5.4 percent with little or no regard to changing market conditions. Approximately one half or more of this amount is the commission for the buyer-broker. At an industry event in 2016, the Chief Executive Officer of Defendant Keller Williams reported to other industry participants that Keller Williams' buyer-brokers were charging an average commission of 2.71% in 2015, an amount virtually unchanged from the 2.8% it reported that it had charged in 2002.

13. Moreover, because housing prices have increased substantially during this period (at a rate significantly exceeding inflation), and commissions are charged on a percentage of a home's sale price, the actual dollar commissions imposed on home sellers "increased substantially because housing prices were much higher. . . . For example, between 2001 and 2017, the average price of new homes in current dollars sold rose from $213,200 to $384,900, according to U.S. Census Bureau Statistics."[6] As the Consumer Federation of America has observed, "[b]ecause the industry functions as a cartel, it is able to overcharge consumers tens of billions of dollars a year. . . .

---

[6] Brobeck, Comments of Stephen Brobeck, Executive Director Consumer Federation of America Before the Department of Justice-Federal Trade Commission Public Workshop on Competition Issues, CONSUMER FEDERATION OF AMERICA, 2 n.4 (2018), https://consumerfed.org/wp-content/uploads/2018/06/CFA-comments-DOJ-FTC-public-workshop-on-competition-issues.pdf.

Consumers are increasingly wondering why they are often charged more to sell a home than to purchase a new car."[7]

14. Indeed, Defendants have successfully stabilized buyer-broker commissions (and significantly increased the dollar cost) charged despite the diminishing role of buyer-brokers. According to data from NAR, many homebuyers no longer locate prospective homes with the assistance of a broker, but rather independently through online services. Buyer-brokers increasingly have been retained after their client has already found the home the client wishes to buy. Despite their diminishing role, buyer-brokers continue to receive the same artificially elevated percentage of the sales price due to Defendants' conspiracy. Defendants' success in maintaining (and, in inflation-adjusted dollar terms, substantially increasing) the charge imposed by buyer-brokers despite the advent of new technologies stands in stark contrast to other industries. "[I]n almost every other consumer industry -- booksellers, retailers, home appliances, insurance, banking, stock brokers -- the introduction of Internet and discount sellers has been a phenomenal financial benefit to customers. Discount airlines have cut airfares by 60% or more, to the economic benefit of everyone with the exception of the incumbent competitors. . . . Economists call this process of squeezing out transaction costs 'disintermediation.' If any industry is ripe for this, it is the $70 billion-a-year real estate brokerage market."[8] Instead, "[e]ven as housing prices have changed over time and technological advances have arguably made the broker's

---

[7] Glen Justice, *Lobbying to Sell Your House*, N.Y. TIMES (Jan. 12, 2006), https://www.nytimes.com/2006/01/12/business/lobbying-to-sell-your-house.html.

[8] *The Realtor Racket*, WALL ST. J. (Aug. 12, 2005), https://www.wsj.com/articles/SB112381069428011613 .

job *easier*, commission rates in the industry have remained remarkably steady at around five to six percent."[9]

15.     The conspiracy's effect can also be seen in the disconnect between buyer-broker costs and commissions.  Buyer-broker costs are similar regardless of the price of the home, yet buyer-brokers are paid, for example, four times more when their client buys a million-dollar home rather than a $250,000 home.  As the *Wall Street Journal* has explained, "many, if not most, of the services that Realtors provide don't vary with the sales price, so the percentage fee should fall as home price rises."[10] Instead, the commissions imposed on home sellers are "unrelated to either the quantity or quality of the service rendered or even to the value provided."[11]

16.     The conspiracy has inflated buyer-broker commissions, which, in turn, have inflated the total commissions paid by home sellers such as Plaintiffs and the other class members.  Plaintiffs and the other class members have each incurred, on average, thousands of dollars in oversharges as a result of Defendants' conspiracy.  In a competitive market, sellers would pay nothing to buyer-brokers, who would be paid instead by their clients, and the commissions paid by sellers would be set at a level to compensate seller-brokers only.

17.     Plaintiffs, on behalf of themselves and the class, sue for Defendants'

---

[9] Beth Nagalski, *Ending the Uniformity of Residential Real Estate Brokerage Services: Analyzing the National Association of Realtors' Multiple Listing Service Under the Sherman Act*, 73 BROOKLYN L. REV. 771, 781-82 (2008).

[10] The Realtor Racket, *supra* note 8.

[11] Mark S. Nadel, *A Critical Assessment of the Traditional Residential Real Estate Broker Commission Rate Structure*, 5 CORNELL REAL ESTATE R. 1, 1 (2007).

violations of the federal antitrust laws as alleged herein, and seek treble damages, injunctive relief, and the costs of this lawsuit, including reasonable attorneys' fees.

18. Plaintiffs bring this lawsuit as a class action on behalf of home sellers who paid a broker commission during the four-year period prior to the filing of this action in connection with the sale of residential real estate listed on one of the following MLSs (the "Covered MLSs"):

- The Bright MLS (including the metropolitan areas of Baltimore, Maryland; Philadelphia, Pennsylvania; Richmond, Virginia; Washington, D.C.);

- My Florida Regional MLS (including the metropolitan areas of Tampa, Orlando, and Sarasota);

- The five MLSs in the Mid-West that cover the following metropolitan areas: Cleveland, Ohio; Columbus, Ohio; Detroit, Michigan; Milwaukee, Wisconsin; Minneapolis, Minnesota;

- The six MLSs in the Southwest that cover the following metropolitan areas: Austin, Texas; Dallas, Texas; Houston, Texas; Las Vegas, Nevada; Phoenix, Arizona; San Antonio Texas;

- The three MLSs in the Mountain West that cover the following metropolitan areas: Colorado Springs, Colorado; Denver, Colorado; Salt Lake City, Utah;

- The four MLSs in the Southeast that cover the following metropolitan areas: Fort Myers, Florida; Miami, Florida; Charlotte, North Carolina; and Raleigh, North Carolina.

11

## II.     JURISDICTION AND VENUE

19.     This Court has subject matter jurisdiction under 28 U.S.C. §1332(d)(2), because the classes contain more than 100 persons, the aggregate amount in controversy exceeds $5,000,000, and at least one member of each class is a citizen of a State different from Defendants.  The Court also has subject matter jurisdiction over this action pursuant to 15 U.S.C. §§ 4, 16 and 28 U.S.C. §§ 1331, 1337.

20.     This Court has personal jurisdiction over Defendants. Defendant NAR resides in this District and used its headquarters in Chicago to implement and coordinate the restraints of trade described below.  In addition, Defendants:  (1) have been properly served; (2) transact substantial business in the United States, including in this District; (3) transacted with members of the Class throughout the United States, including in this District; and (4) committed substantial acts in furtherance of the unlawful scheme in the United States, including in this District.

21.     Venue is proper in this District under 15 U.S.C. § 22 and 28 U.S.C. §1391(b), (c), and (d).   Each Defendant transacted business, was found, and/or resided in this District; a substantial part of the events giving rise to Plaintiffs' claims arose in this District; and a substantial portion of the affected interstate trade and commerce described herein has been carried out in this District.

## III.     TRADE AND COMMERCE

22.     The Buyer Broker Commission Rule and other anticompetitive NAR rules apply and have been implemented and enforced by Defendants and co-conspirators nationwide.  These rules govern the conduct of local NAR associations, local brokers, and local realtors nationwide. Defendants' conduct alleged herein has

inflated buyer-broker commissions nationwide including in the areas in which the Covered MLSs operate, and has injured home sellers in those areas and nationwide. Defendant NAR, through its members and other coconspirators, and Defendant Corporations, through their franchisees, brokers and other coconspirators, are engaged in interstate commerce, and are engaged in activities affecting interstate commerce, in the United States.

## IV.     THE PARTIES

### A.     <u>Plaintiffs</u>

23.     Michael Cole is a resident of Parker, Colorado. On May 18, 2017, he sold a home located in the Denver metropolitan area.     The home was listed on the REColorado MLS.     In that sales transaction, Mr. Cole was represented by RE/MAX and the buyer was represented by All Pro Realty of Denver.     As part of the sales transaction, Mr. Cole paid a substantial buyer-broker commission.

24.     Steve Darnell is a resident of Park, Texas. On June 1, 2016, he sold a home located in the Austin metropolitan area.     The home was listed on the Central Texas Realty Information Services MLS.     In that sales transaction, Mr. Darnell was represented by a Coldwell Banker United realtor.     As part of the sales transaction, Mr. Darnell paid a substantial buyer-broker commission.

25.     Christopher Moehrl is a resident of Shorewood, Minnesota.     On November 15, 2017, he sold a home located in the Minneapolis metropolitan area.     The home was listed on the Northstar MLS.     In that sales transaction, Mr. Moehrl was represented by a RE/MAX franchisee, and the buyer was represented by a Keller Williams franchisee.     As part of the sales transaction, Mr. Moehrl paid a substantial

buyer-broker commission.

26.     Valerie Nager is a resident of Dublin, California.  On September 26, 2017, she sold a home located in the Tampa metropolitan area.   The home was listed on the My Florida Regional MLS.   In that sales transaction, Ms. Nager was represented by a RE/MAX franchisee, and the buyer was represented by a different broker. As part of the sales transaction, Ms. Nager paid a substantial buyer-broker commission.

27.     Jack Ramey is a resident of Martinsburg, West Virginia. On May 8, 2015, he sold a home located in the Baltimore metropolitan area.  The home was listed on the Bright MLS.  In that sales transaction, Mr. Ramey was represented by a Century 21 franchisee, and the buyer was represented by a different agent. As part of the sales transaction, Mr. Ramey paid a substantial buyer-broker commission.

28.     Jane Ruh is a resident of Caledonia, Wisconsin.  On September 26, 2018, she sold a home located in the Milwaukee metropolitan area.  The home was listed on Metro MLS.  In that sales transaction, Ms. Rus was represented by a RE/MAX franchisee, and the buyer was represented by a different broker.  As part of the sales transaction, Ms. Ruh paid a substantial buyer-broker commission.

29.     Sawbill Strategic, Inc. ("SSI") is a Minnesota corporation with its principal and registered offices at 200 Chestnut St. E, Suite 203, Stillwater, Minnesota. On July 18, 2016, SSI sold a home located at 7148 Jorgenson Lane S, Cottage Grove, Minnesota, which is in the Minneapolis/St. Paul metropolitan area.  This home was listed on Northstar MLS.  In the transaction, SSI was represented by Collopy Real Estate, Inc. d/b/a Re/Max Results, a RE/MAX International, Inc. (d/b/a RE/MAX) franchisee.  The buyer was represented by Edina Realty, Inc.  As part of the sales

14

transaction, SSI paid a substantial buyer-broker commission.

30.     Daniel Umpa is a resident of Rockville, Maryland.   On October 30, 2017, he sold a home located in the Washington, D.C. metropolitan area.   The home was listed on the Bright MLS.   In that sales transaction, Mr. Umpa was represented by Long and Fosters, and the buyer was represented by a different agent.  As part of the sales transaction, Mr. Umpa paid a substantial buyer-broker commission.

31.     As set forth below, the Defendants' unlawful conduct and conspiracy has caused home sellers, including each of the Plaintiffs in this action, to pay a buyer-broker-commission and has also increased the amount of the buyer-broker commission over the amount that would be charged to the buyer in a competitive marketplace absent the conspiracy.

### B.     **Defendants**

32.     Defendant National Association of Realtors ("NAR") has over 1.2 million individual members and is one of the largest lobbying groups in the country, advocating for the interests of real estate brokers.   Its fifty-four state and territorial realtor associations and over 1,200 local realtor associations are members of, and overseen by, NAR. NAR is headquartered in Chicago, Illinois.

33.     Defendant Realogy Holdings Corp. ("Realogy") is the nation's largest real estate brokerage company.  It is headquartered in Madison, NJ.  It is a publicly-traded corporation with a market value in excess of $4 billion.  It owns, operates, and franchises many real estate brokerage firms, including Century 21, Coldwell Banker, Sotheby's International Realty, The Corcoran Group, Better Homes and Garden Real Estate, ZipRealty, ERA Real Estate, Citi Habitats, and Climb Real Estate.

15

34. Defendant HomeServices of America, Inc. ("HSA") is "the second-largest residential real estate brokerage firm in the United States."[12]  HSA is a majority owner of Defendant HSF Affiliates, LLC ("HSF Affiliates").  HSF Affiliates operates many real estate franchise networks, including HomeServices, Prudential Real Estate, and Real Living.  Additionally, in 2017, HSA acquired Defendant The Long & Foster Companies, Inc. ("L&F"), a large private residential real estate company in the United States.  BHH Affiliates, LLC is a subsidiary of HSF Affiliates LLC and offers real estate brokerage services.  This Complaint will refer to HSA, HSF Affiliates, L&F, their predecessors, BHH Affiliates, LLC and their wholly-owned or controlled subsidiaries or affiliates as "HomeServices."

35. Defendant RE/MAX, LLC franchises local RE/MAX brokers around the country, which have approximately 6,800 offices and more than 100,000 sales associates.  This Complaint will refer to RE/MAX, LLC, its predecessors, and its wholly-owned or controlled subsidiaries or affiliates as "RE/MAX."

36. Defendant Keller Williams Realty, Inc. ("Keller Williams") is one of the nation's largest real estate brokerages.  It is headquartered in Austin, Texas.   It is a privately-held company.  It franchises local Keller Williams brokers around the country, which have approximately 700 offices and more than 120,000 sales associates.

**C.** **Co-Conspirators.**

37. Multiple local realtor associations not named as Defendants participated as co-conspirators in the violations alleged herein and performed acts and

---

[12] BHE Form 10-K filed on February 25, 2019

made statements in furtherance thereof. Specifically, each of the local realtor associations that own and operate the twenty Covered MLSs (among other realtor associations in other areas of the country) agreed to, complied with, and implemented the Buyer Broker Commission Rule.

38. The Covered MLSs, among others, have participated as co-conspirators in the violations alleged herein and performed acts and made statements in furtherance thereof, including by adopting the Buyer Broker Commission Rule in their own respective rules and regulations.

39. Multiple franchisees and brokers of Defendant Corporations participated as co-conspirators in the violations alleged herein and performed acts and made statements in furtherance thereof. Specifically, each complied with and implemented the Buyer Broker Commission Rule in the geographic areas in which the Covered MLSs operate. In addition, other brokers in these areas have participated as co-conspirators in the violations alleged herein and performed acts and made statements in furtherance thereof. These other brokers complied with and implemented the Buyer Broker Commission Rule in these geographic areas.

40. Defendants are jointly and severally liable for the acts of their co-conspirators whether named or not named as defendants in this Complaint.

## V. BACKGROUND OF THE REAL ESTATE INDUSTRY

41. State licensing laws regulate who can represent sellers and buyers in the real estate market. There are two licensee categories: (1) the real estate broker (also known as a "brokerage firm"); and (2) the individual real estate licensee or agent. Real estate brokers license individual realtors and are legally responsible for the activities of

the realtors they license.

42.     Licensed brokers are the only entities permitted by state law to be paid to represent buyers or sellers in a real estate transaction.  For that reason, all real estate brokerage contracts with sellers and buyers are required to be with brokers, not agents, and all payments to individual realtors must pass through brokers.

43.     According to NAR, 92% of sellers sold their home with the assistance of a real estate broker in 2017, and 87% of buyers purchased their home with the assistance of a real estate broker in 2017.

44.     The standard practice in the residential real estate industry is to compensate brokers and agents with commissions that are calculated as a percentage of a home's sale price.  Commissions are paid when the home sells.

45.     Most brokers and their individual realtors occupy dual roles: they operate as seller-brokers for some home sales and as buyer-brokers for other home sales.

46.     A seller-broker's compensation is specified in a listing agreement, a contract between the seller and the seller-broker that details the terms of the listing.  A listing agreement typically states that the seller-broker has the exclusive right to market the seller's home.  The listing agreement specifies the total commission that a home seller will pay to the seller-broker, often with a portion of that amount earmarked to be paid to the buyer-broker in the event the buyer has a broker (and the seller may retain that overcharge even if a buyer-broker is not used or the buyers-broker attempts to negotiate a different fee for the buyer-broker's services).

47.     If the buyer has a broker, the seller or the seller-broker pays the buyer-broker a commission out of the total commission paid by the seller.  In other words,

18

buyer-brokers—who assist their clients in negotiating against the seller—receive their compensation from the total commission paid by the seller, not from the buyer they represent. In fact, a standard of conduct in NAR's Code of Ethics permits and encourages buyer-brokers to tell their clients that their services are free.

48. In the listing agreement, the seller sets the total commission to be paid to the seller-broker with the expectation that a portion of the commission will be paid to a buyer-broker. If, as would happen in the absence of the Buyer Broker Commission Rule, buyers paid their brokers, (i) sellers would agree to pay a commission solely to compensate the seller-broker because sellers have no incentive to compensate a buyer-broker negotiating against their interests, and (ii) the seller-broker commission would be about half or less of the amount that sellers have paid as a total commission to compensate both the buyer-broker and the seller-broker.

49. When a buyer retains a broker, the buyer enters into a contract with that broker. The contract typically discloses that the buyer-broker will be compensated by receiving a commission from the seller-broker.

50. An MLS is a database of properties listed for sale in a defined region that is accessible to real estate brokers and their individual realtors that comply with the rules of the MLS. The Covered MLSs are owned and operated by local realtor associations that are members of, and governed by, NAR. Seller-brokers list their client's property on an MLS as required by a NAR rule, and to ensure that buyer-brokers and prospective buyers are aware of the property. If a seller-broker does not list a client's property on an MLS, most buyer-brokers will not show that property to prospective buyers. MLSs also act as the main source of listings for online websites,

such as Zillow, through which many prospective homebuyers find homes. A home that is not listed on an MLS is very hard to find for prospective homebuyers.

51.     The Buyer Broker Commission Rule obligates a seller-broker, on behalf of the seller, to make blanket, unilateral offers of compensation to buyer-brokers when listing a home on an MLS owned by a local NAR association. If a buyer represented by a broker purchases the home, the buyer-broker receives the offered compensation.

52.     The following example illustrates how this process typically works:

- A homeowner enters into a contract with a seller-broker, in which the seller agrees to pay the seller-broker six percent in total commissions in exchange for marketing and facilitating the sale of the home.

- The seller-broker then makes a blanket, unilateral offer of a three percent commission to every buyer-broker when it lists the home on the local MLS.

- A buyer-broker shows the property to a buyer client, who buys the home for $500,000.

- The seller-broker receives six percent of the sales price ($30,000) from the seller. The seller-broker then pays three percent of the sales price ($15,000) to the buyer-broker.

## VI.     THE ANTICOMPETITIVE AGREEMENT WITH NAR

53.     Prior to adoption of the Buyer Broker Commission Rule in November 1996, NAR played the central role in implementing and enforcing, through the MLS

system, a market structure in which *all* brokers involved in residential home sales represented the seller either as the seller's broker or the "sub-agent" of the seller's broker. Under this "almost universal sub agency system . . . brokers, even those working solely with buyers, were legally obligated to represent the interests of sellers."[13] Because "nearly all brokers involved in transactions represented the seller either as the seller's agent or as the subagent of the listing [i.e., seller's] broker," the seller's broker got paid by the seller and would then compensate the subagent working with the buyer.[14] In fact, "[a]s a rule, MLS's required that offers of compensation be contingent on the cooperating broker acting as a subagent of the listing broker, rather than an agent of the buyer. Subagency allowed cooperating brokers who worked with buyers to collect a share of the commissions paid by sellers without actually representing buyers in an agency capacity."[15]

54.     Under the sub-agency system, homebuyers commonly proceeded on the mistaken understanding that the subagent broker was working on the buyer's behalf (even though the broker, instead owed a fiduciary obligation to *the seller*). "When this sub agency system, in which brokers working with buyers were legally obligated to

---

[13] Stephen Brobeck & Patrick Woodall, *How the Real Estate Cartel Harms Consumers and How Consumers Can Protect Themselves*, CONSUMER FED'N OF AM., 3 (2006), https://consumerfed.org/pdfs/Real_Estate_Cartel_Study061906.pdf.

[14] Larson, *supra* note 1

[15] Matt Carter, *From Subagency to Non-Agency: A History*, INMAN (Feb. 17, 2012), https://www.inman.com/2012/02/17/from-subagency-non-agency-a-history/; *See* Ann Morales Olazabal*, Redefining Realtor Relationships and Responsibilities: The Failure of State Regulatory Responses*, 40 Harv. J. on Legis. 65, 71 (2003) (explaining that for years, the "dominant real estate exchanges" – i.e., the MLS's – permitted cooperating or selling agents (those working with buyers) to split the commission to be paid by the seller only if the cooperating agent agreed to be a subagent of the seller").

pass on information disadvantageous to their clients to sellers, was exposed through press coverage, it collapsed almost overnight."[16]

55.     With the emergence of brokers who were no longer sub-agents of the seller's broker, but were instead working for the buyer, there was no justification for requiring the seller to pay this cost.  As one industry participant acknowledged, "[w]ith the demise of subagency, there is little reason to keep interbroker compensation. . . . It does not make sense for listing brokers to pay buyers' brokers for the services the latter provides to buyers."[17]

56.     Instead of adjusting to this fundamental change in the market – and, in particular, the fact that the buyer's broker was now working for the buyer – the Defendants have implemented and enforced a scheme designed to maintain supra-competitive commissions and impede lower-priced competition.[18]  In November 1996,

---

[16] Brobeck & Woodall, *supra* note 13.

[17] Larson, *supra* note 1

[18] The NAR, Local Realtor Boards, and MLSs have a long history of anticompetitive actions designed to maintain broker commissions and impede entry by lower-cost alternatives.  NAR's predecessor, the National Association of Real Estate Exchanges "institutionalized a commission rate norm when it adopted its first Code of Ethics in 1913.  It stated that `an agent should always exact the regular real estate commission prescribed by the board or exchange of which he is a member.'"  P. Barwick, P. Parag, A. Pathak & M. Wong, *Conflicts of Interest and the Realtor Commission Puzzle*, NAT'L BUREAU OF ECON. RESEARCH, 4 (2015), https://www.nber.org/papers/w21489.pdf.  In 1950, NAR's code of ethics stated that "every Realtor . . . should maintain the standard rates of commission adopted by the board and no business should be solicited at lower rates."  After a 1950 Supreme Court decision found brokers guilty of price-fixing in violation of the Sherman Act, *United States v. Nat'l Assn. of Realtors,* 339 U.S. 485, 488, 494-95 (1950), local realtor associations continued to fix prices "for the next twenty-eight years" by recommending or suggesting commission rate schedules or establishing minimum prices.  David Barry, *Nine Pillars of the Citadel*, Report Submitted to the FTC/DOJ Workshop on Competition Policy and the Real Estate Industry, 26-27 (2005), https://www.justice.gov/sites/default/files/atr/legacy/2005/12/05/213351.pdf.  Since that

22

NAR adopted the Buyer Broker Commission Rule as part of its Handbook on Multiple Listing Policies.

57.     The NAR Board of Directors, and the Multiple Listing Issues and Policies Committee reporting to it, periodically determines whether to modify any policies in the Handbook on Multiple Listing Policies (for example, certain changes to MLS policies were approved by the Board of Directors and made in 2017 and 2018). The policies that are retained (and any modifications thereto) are set forth in new editions of the Handbook on Multiple Listing Policies that are issued on or about an annual basis. The Board of Directors, and the Handbook on Multiple Listing Policy, have consistently and repeatedly retained the Buyer Broker Commission Rule.

58.     In setting forth the MLS terms, NAR has successfully invited the Defendants and other coconspirators to participate in the following agreement,

---

time, NAR, its affiliates, and other MLSs have continued to implement illegal policies designed to restrain competition. *See, e.g.*, *United States v. Realty Multi-List, Inc.*, 629 F.2d 1351 (5th Cir. 1980) (holding that MLS was enforcing unreasonable membership criteria restricting access to MLS); *Thompson v. Metropolitan Multi-List, Inc.*, 934 F.2d 1566 (11th Cir. 1991) (finding MLS requirement restricting access anticompetitive and unlawful); *Freeman v. San Diego Ass'n of Realtors*, 322 F.3d 1133 (9th Cir. 2003) (finding MLS fee for access anticompetitive and unlawful); *In the Matter of MiRealSource, Inc.*, No. 9321 (F.T.C. 2007) (Consent Order regarding MLS rules limiting alternative business models); *United States v. Nat'l Ass'n of Realtors*, No. 05 C 5140, 2006 WL 3434263 (N.D. Ill. Nov. 27, 2006) (Consent Decree forbidding policies adopted by NAR imposing restraints on Virtual Office Websites).
The Wall Street Journal has reported that "[i]n its own internal documents," NAR "acknowledges that the purpose of state lobbying is to keep competition out and fees high. In an April 22 memo to its state affiliates, the national office urged members to keep agitating for `state laws that are designed to replace competition with regulation.' The memo added that `Realtors have the right to lobby for legislative and regulatory action – even if the effect of such action would be anti-competitive." *The Realtor Racket*, *supra* note 8. As set forth in this complaint, NAR has acted with the same animus outside the lobbying context, through imposition and enforcement of the Buyer Broker Commission Rule and its agreement that the MLS will be made available to brokers who adhere to and enforce these anti-competitive restraints.

combination and conspiracy: They can participate in the MLS, and gain the benefits provided by NAR and the MLS, but only if they agree to adhere to and enforce the anticompetitive restraints set forth in the Handbook on Multiple Listing Policy.

59. NAR's Handbook on Multiple Listing Policy provides that "Association and Association-owned MLSs must conform their governing documents to the mandatory MLS policies established by the National Association's Board of Directors to ensure continued status as members boards and to ensure coverage under the master professional liability insurance program."

60. The Handbook states the Buyer Broker Commission Rule as follows: "In filing a property with the multiple listing service of an association of REALTORS®, the participant of the service is making blanket unilateral offers of compensation to the other MLS participants, and shall therefore specify on each listing filed with the service, the compensation being offered to the other MLS participants." The Handbook further states that "multiple listing services shall not publish listings that do not include an offer of compensation expressed as a percentage of the gross selling price or as a definite dollar amount, nor shall they include general invitations by listing brokers to other participants to discuss terms and conditions of possible cooperative relationships."

61. The Buyer Broker Commission Rule shifts a cost to the seller that would be paid by the buyer in a competitive market. As the Consumer Federation of America has explained, "[i]n a rational pricing system, home sellers and buyer would each pay for real estate brokerage services they receive."[19] The Rule, however, imposes

---

[19] Brobeck, *supra* note 2, at 4.

a financial overcharge on home sellers by requiring them to make a "blanket unilateral offer of compensation" to the buyer-broker as a condition of participating on the MLS.[20] As a result of the Rule, seller-brokers must make "blanket, unilateral, unconditional offers of compensation to their adversarial buyer brokers. Every MLS in the U.S. requires that listing brokers offer compensation to buyer brokers."[21] As the *Wall Street Journal* recently reported, "[h]omeowners are required to hire a buying agent if they employ a selling agent through a multiple listing service – a potentially illegal tying arrangement under the Sherman Anti-Trust Act that keeps buying agents paid though they offer almost no useful services."[22]

62.    With the demise of the sub-agency system, there is no pro-competitive justification for imposing this overcharge on home sellers. As one commentator has written: the practice of "sellers' brokers specifying the fees that buyers' brokers charge to the latter's own clients, should be recognized" as "at least an attempt to fix market prices. . . . There is no longer any reason to permit listing brokers [i.e., seller-brokers] to set the default prices that these competing buyers' brokers charge to serve their own customers. . . . The elimination of interbroker compensation would diminish the ability of traditional brokers to frustrate vigorous price competition, and thus likely lead to a

---

[20] *Id.* at 3

[21] Douglas R. Miller, *Letter to DOJ/FTC*, CONSUMER ADVOCATES IN AMERICAN REAL ESTATE (CAARE), 5 (2018), https://www.ftc.gov/system/files/documents/public_comments/2018/07/00052-147606.pdf.

[22] Ryan & Friedland, *supra* note 4.

25

dramatic fall in broker revenues."[23]

63.     Further, by requiring that this be a "blanket" offer, the Rule compels home sellers to make this financial offer without regard to the experience of the buyer-broker or the services or value they are providing. The same fee must be offered to a new buyer-broker with little or no experience, as that offered to a buyer-broker with many years of experience. As a result, there is a significant level of uniformity in the payments that sellers must pay to buyer-brokers. "One implication of fairly uniform rates is that there is little or no relationship between commission level and service quality. Skilled, experienced agents and brokers charge about the same price as agents with little experience and limited knowledge of how to best serve the consumer clients. In a price-competitive market, less experienced and less skilled agents would be offering consumers lower commission rates, but we know of no compelling evidence that they are doing so."[24]

64.     Because the blanket offer must be made available to every buyer-broker using the MLS (i.e., virtually all buyer-brokers), and can be compared to the blanket offers that every other seller-broker must post to participate on the MLS, the Rule is designed to create tremendous pressure on sellers to offer the high, standard commission that has long been maintained in this industry. Seller-brokers know that if the published, blanket offer is less than the standard commission, many buyer-brokers

---

[23] Nadel, *supra* note 11, at 64-65. *See also* B. Kaufman, *Why the Class Action Lawsuit Against NAR and the Big Brokers Makes Sense* (June 3, 2019), https://www.inman.com/2019/06/03/why-the-class-action-lawsuit-against-nar -and-the-big-brokers-makes sense/ (recent article by real estate broker explaining that the buyer-broker commission has been "locked in" at 2.5 – 3 percent).

[24] Brobeck, *supra* note 6, at 3.

will "steer" home-buyers to the residential properties that provide the higher standard commission. As discussed in more detail below, the prevalence of such steering has been widely reported in government reports, economic research and the trade press and is well understood by NAR, the Corporate Defendants, and their co-conspirators. Indeed, according to course materials provided at Keller Williams University, offering less than three percent in buyer-broker commission on an MLS "will reduce the number of willing and qualified buyers that will see your home."

65. The entirely foreseeable result of the Buyer Broker Commission Rule is that the "blanket" offers of compensation to buyer-brokers are overwhelmingly made at or near the high level that prevails in the industry and Defendants are acting to sustain. The Consumer Federation of America has explained, "Typically, on either a 5% or 6% commission, 3% will be offered to brokers with buyer clients, and that commission split is disclosed to brokers on real estate firm and multiple listing service databases." The listing of the 3% split "then acts as a powerful force to discourage lower splits of 2% or even 1% because listing brokers, and their sellers, fear that properties carrying these lower splits will not be shown. As a result, "a listing broker lists a split below" the standard industry level "at their, and their clients', peril because of the risk that traditional brokers working with buyers will avoid this property. . . . This informal discrimination against price competitors is the most important factor that allows dominant brokers to maintain high and uniform prices."[25]

66. Defendant Keller Williams, for example, instructs seller-brokers to tell

---

[25] Brobeck, *supra* note 2, at 3-4.

27

home sellers that "[t]he standard real estate commission has stabilized, over the years, at right around 6 percent" and that "[y]ou're putting yourself at a disadvantage competitively when you reduce your commission." This is a message that Keller Williams has also broadcast to the entire industry, including its purported competitor brokerages. At a major industry event in 2016, the CEO of Keller Williams disclosed the actual commissions it was charging (5.37% the year before, including a buyer-broker commission of 2.71%), and reported a statement by a discounter that offering a lower rate was giving away money.

67. The Buyer Broker Commission Rule facilitates anticompetitive steering away from brokers who deviate significantly from "the standard real estate commission" by enabling buyer-brokers to identify and compare the buyer-broker compensation offered by every seller in the MLS and then steer clients to homes offering higher commissions. As one commentator has explained: "[t]he effects of steering, and its efficiency in curtailing price competition because of the importance of cooperating in the residential real estate industry, have been widely discussed. Brokers are able to engage in steering because 'an MLS listing gives brokers information on the commission that will be paid to the broker who brings the buyer to that property.'"[26]

68. By encouraging and facilitating steering, the Buyer Broker Commission

---

[26] Bradford W. Muller, *Encouraging Price Competition Among New Jersey's Residential Real Estate Brokers*, 39 SETON HALL L. REV. 665, 682-683, 683 n.100 (2009). *See also* Barwick, Pathak & Wong, *supra* note 18, at 1 ("In the conventional compensation arrangement where sellers pay for the commissions of their listing agents and potential buyers' agents, the latter have an incentive to prioritize properties that offer higher commissions. This kind of steering is thought to lead to uniformly high commissions.")

28

Rule deters downward departures from the standard commission and enables brokers to avoid doing business with or otherwise retaliate against buyer-brokers who try to compete by offering significant discounts. One discounter recently explained in an FTC/DOJ workshop that after it offered a lower commission on the MLS, "[w]e've had bricks thrown through car windows. We've had our cars egged. We've had hate mail sent to our sellers." The discounter estimated that "40% of agents will go out of their way, above and beyond, and push hard not to show or sell your home if you don't offer a 2.8% or 3% commission."[27] As another commentator has explained: "Essentially, the MLS listing acts *as a tool which competing brokers can use to help enforce a near-uniform commission rate and drive out discounters.*"[28]

69.     Thus, in his 2016 presentation to competing brokerages and other participants at a major industry event, Defendant Keller William's CEO reported that his firm's research had found that "[l]imited service, discount broker, market share in the United States, is at an all-time low," and he enthusiastically reported that efforts to gain business by offering discounted commissions had become "irrelevant."

70.     The Defendant Corporations' franchisees and brokers, and other co-conspirators, have also utilized software technology to help facilitate steering based on

---

[27] Statement of Joshua Hunt, *What's New in Residential Real Estate Brokerage Competition – An FTC-DOJ Workshop (Segment 2)*, FTC, 7 (2018), https://www.ftc.gov/system/files/documents/videos/whats-new-residential-real-estate-brokerage-competition-part-2/ftc-doj_residential_re_brokerage_competition_workshop_transcript_segment_2.pdf.

[28] Muller, *supra* note 28, n.100 (emphasis added). *See also* Barwick, Pathak & Wong, *supra* note 18, at 1 ("In the conventional compensation arrangement where sellers pay for the commissions of their listing agents and potential buyers' agents, the latter have an incentive to prioritize properties that offer higher commissions. This kind of steering is thought to lead to uniformly high commissions.")

MLS commission data and to impede buyers from learning about properties that offer discount buyer-broker commissions. For example, NAR's affiliate, the Greater Las Vegas Association of Realtors ("GLVAR") uses for its MLS a software program called Matrix, which was designed and sold by CoreLogic. CoreLogic provides software and data services to most, if not all, of the Covered MLSs. Matrix allows brokers to provide tailored electronic listings to their buyer clients. Matrix automatically generates and regularly sends emails to buyer clients that describe properties for sale that match their search criteria. When brokers set up the Matrix program for their buyer clients, one of the fields in the software allows the brokers to filter listings according to the value of the buyer-broker commission being offered. In other words, brokers can program the software to only send property listings to buyers that promise buyer-broker commissions above a specified value.

71. GLVAR elected to adopt a version of the Matrix software that permitted brokers to *exclude* properties offering discount buyer-broker commissions from Matrix-generated emails to buyer clients. A not insignificant number of franchisees and brokers of the Corporate Defendants in Greater Las Vegas (and potentially other markets) have trained their realtors to insert 2.5 percent or higher as the minimum permissible buyer-broker commission when using the Matrix system to send property listings to buyer clients. As a consequence, unbeknownst to them, buyer clients of those realtors often do not receive Matrix-generated emails that include properties offering a buyer-broker commission of less than 2.5 percent or higher, even if that property perfectly matches the buyers' search criteria.

72. The United States Department of Justice's Antitrust Division is now

30

actively "investigating potentially anti-competitive practices in the residential real estate brokerage business, with a focus on compensation to brokers and restrictions on their access to listings."[29] The Antitrust Division has recently served Civil Investigative Demands ("CIDs") pursuant to its investigation into "[p]ractices that may unreasonably restrain competition in the provision of residential real-estate brokerage services."[30] For example, a CID served on CoreLogic directs it to produce "all documents relating to any MLS member's search of, or ability to search, MLS listings on any of the Company's multiple listing platforms, based on (i) the amount of compensation offered by listing brokers to buyer brokers; or (ii) the type of compensation, such as a flat fee, offered by listing brokers to buyer brokers."[31]

73.     The Buyer Broker Commission Rule's facilitation of steering is also magnified by the Rule's requirement that the compensation that home sellers offer to buyer-brokers on MLSs *must* be offered as a percentage of the gross selling price or a definite dollar amount and by the Rule's prohibition on "general invitations by listing [i.e., seller] brokers to other participants to discuss terms and conditions of possible cooperative relationships."  By requiring that offers of compensation be expressed in specific dollar or percentage terms, the Rule ensures that buyer-brokers can easily compare the financial compensation offered to them by home sellers and steer buyers

---

[29] David McLaughlin & Patrick Clark, *U.S. Opens Antitrust Probe of Real Estate Brokerage Industry*, Bloomberg (May 22, 2019), https://www.bloomberg.com/news/articles/2019-05-22/u-s-opens-antitrust-probe-of-real-estate-brokerage-industry.

[30] Civil Investigative Demand to CoreLogic, U.S. Dep. of Just., No. 29938 (dated May 16, 2019).

[31] *Id.*

away from properties offering materially less than the "standard real estate commission."[32]

74.    By encouraging and facilitating steering, and adherence to the "standard real estate commission," the Buyer Broker Commission Rule deters downward departures from the standard commission and enables brokers to avoid doing business with or otherwise retaliate against buyer-brokers who try to compete by offering significant discounts.

75.    The anticompetitive effects of the Buyer Broker Commission Rule are further magnified by the fact that neither the buyer nor the seller is even permitted to view the universe of buyer-broker commission terms and thus is unlikely to know whether the buyer-broker is engaged in steering to higher commission properties. The MLSs utilize hidden fields that only *realtors* (i.e., brokers) subscribed to the MLS can see. Two of these hidden fields address compensation to buyer-brokers. The first field consists of the unilateral offer of buyer-broker commission that must be supplied as a condition of listing a home on the MLS. The second field is called "private remarks," and seller-brokers often include additional financial incentives for buyer-brokers in the "private remarks" field. For example, one "private remark" offered buyer-brokers a

---

[32] Lawrence White, from the Stern School of Business at New York University, has explained that "a fixed percentage fee announced by most or all brokers in a metropolitan area prevents the inherent quality differences that surely exist among brokers from being rewarded. It has frequently been noted that sellers that are attempting to coordinate their pricing behavior at above-competitive levels will usually favor simple pricing schedules over more complex ones, even if this simplicity means that quality differences go unrewarded." Laurence J. White, *The Residential Real Estate Brokerage Industry: What Would More Vigorous Competition Look Like*, Stern School of Business, 8 (2006) (Revised Draft).

vacation in Mexico if the buyer-broker purchased three homes from the seller-broker.

76. Sellers and buyers (and the general public) are precluded from accessing the hidden fields and seeing the universe of buyer-broker commissions and other financial incentives being offered on the MLS. NAR's Handbook on Multiple Listing Policy states: "Any information provided by the Multiple Listing Service to the Participants shall be considered official information of the service. Such information shall be considered confidential and exclusively for the use of Participants and real estate licensees affiliated with such Participants and those Participants who are licensed or certified by an appropriate state regulatory agency to engage in the appraisal of real property and licensed or certified appraisers affiliated with such Participants."

77. NAR has also instituted a series of rules which ensure that commission offers and private remarks are not disclosed through data sharing agreements with third-party websites or other MLS syndication services.

78. Simultaneously, the NAR rules *mandate* price information sharing among brokers through its MLS rules. This type of one-way information exchange agreement prevents price competition that benefits consumers while allowing brokers to put upward pressure on pricing and to punish brokers who deviate downwards. Moreover, because home sellers and homebuyers, unlike brokers, do *not* have access to the universe of "blanket unilateral offers of compensation" being made to buyer-brokers, their ability to detect steering by buyer-brokers is significantly impeded. As one commentator has explained, "Buyers are never aware they are being steered. The buyer agent makes a selection of homes to show, and since the public sources of homes never shows the commission offered, buyers are never aware when their agents select

33

out the homes with lower priced commission offerings."[33]

79.     This obfuscation is compounded by NAR's ethical rule expressly permitting buyer-brokers to tell buyers that their services are free.  NAR's Code of Ethics Standard 12-2 states that "REALTORS may represent their services as `free' or without cost if they expect to receive compensation from a source other than their client provided that the potential for the REALTOR to obtain a benefit from a third party is clearly disclosed at the same time."  Because buyer-brokers governed by NAR rules technically receive their compensation from listing brokers, those buyer-brokers can always tell their buyer clients that their services are free.  As a result, "most buyers . . . don't really think that they're paying anything for their brokerage services."[34]

80.     By disingenuously marketing their services as free, buyer-brokers are able to discourage home buyers from (1) engaging in any negotiations over buyer-broker commissions and (2) searching for alternative buyer-brokers who might offer discounts or rebates from the commissions they receive.

81.     The Defendants' anticompetitive restraints have had their intended

---

[33] Magura, *supra* note 27, at n.21.  *See also* Peng Liu & Richard Weidel III, *Compensation Structure of Buyer Brokers and Residential Real Estate Transactions*, 7 CORNELL REAL ESTATE REV. 74, 79 (2009) ("The ability to `steer' clients is aided by the practice of never publicly showing the commission rate offered.  Only licensed real estate agents have access to the commission rate information, such that a consumer would never know that a broker screened listings based on commission rates.").

[34] Statement of Stephen Brobeck, *What's New in Residential Real Estate Brokerage Competition – And FTC-DOJ Workshop (Segment 3)*, FTC, 9 (2018), https://www.ftc.gov/system/files/documents/videos/whats-new-residential-real-estate-brokerage-competition-part-3/ftc-doj_residential_re_brokerage_competition_workshop_transcript_segment_3.pdf. *See also* Nadel, *supra* note 11, at 22 (explaining that most home buyers "have accepted the pervasive myth that their brokers' services cost them nothing, thus reducing the incentive to negotiate over fees").

effect of diminishing price competition and stabilizing and fixing the buyer-broker charges imposed on home sellers at or near the "standard real state commission" level and—because the actual dollar charge is calculated as a percentage of rising home prices—*substantially elevating* the actual overcharge. In 2006, the Consumer Federation of America warned that "for decades, the dominant real estate firms and their trade association have tried, with much success, to maintain high, uniform prices within different geographic areas."[35] That conclusion remains true today, as these overcharges have varied within a limited range and are typically imposed with little or no regard to the quality of the buyer-broker, the work involved, the value of the house being sold, or prevailing market conditions.

82. Although NAR has widely claimed that real estate commissions are "negotiable," this claim disregards the adverse market impact of the conspiracy's anticompetitive restraints that impede effective negotiation. For the home seller, this is the case for many reasons including, but not limited to, the following.

83. First, the conspiracy's actions have the purpose and effect of elevating the baseline for any negotiations that could follow. Thus, just as an unlawful agreement to fix list prices (or an agreement to increase price announcement terms) is potentially subject to negotiation by some purchasers, the conspiracy's actions are anticompetitive and unlawful because they elevate the base-line for negotiations.

84. Second, by requiring sellers to make unilateral blanket offers of buyer-broker compensation as a precondition for listing properties on MLSs, the Buyer Broker

---

[35] Brobeck, *supra* note 2, at 2.

Commission Rule compels sellers to offer high buyer-broker commissions to attract potential buyers. Sellers who attempt to negotiate down the amount of buyer-broker commission to be offered on an MLS are customarily informed by seller-brokers that reducing that amount will result in materially fewer potential buyers learning about or viewing the property for sale.

85.     In fact, seller-brokers are trained to dissuade home sellers from reducing the buyer-broker commission. For example, Defendant Keller Williams operates Keller Williams University to train its realtors, and some courses at Keller Williams are mandatory. One of the course materials provided to enrollees is a "Script Catalog" for "Working with Sellers," which consists of a collection of recommended scripts for listing brokers to use when communicating with sellers. The "Script Catalog" includes the following recommended script:

## Explaining How Commission Is Used: Script #4

| | |
|---|---|
| SELLER: | *Can you reduce your commission?* |
| AGENT: | Of course. As you know, commissions are negotiable. But let me ask you—what are you trying to accomplish by getting me to reduce the commission? |
| SELLER: | *I'm trying to save money.* |
| AGENT: | I understand. Do you know how a commission structure works? |
| SELLER: | *Not really. I just know that I have to pay you a certain amount of what I receive for my house, and that means I get to keep less.* |
| AGENT: | Let me explain what happens when you reduce a commission. First of all, half of the commission usually goes to a cooperating agent. When you reduce the commission, you reduce the incentive for that agent to bring a buyer to your house. If an agent has ten different houses, nine of which come with a 3 percent commission, one of which comes with 2.5 percent commission, which houses do you think they're going to show? |
| SELLER: | *The ones with the larger commission.* |
| AGENT: | Absolutely. You're putting yourself at a disadvantage competitively when you reduce your commission, wouldn't you agree? |
| SELLER: | *I guess that's true.* |

86.     Third, because NAR requires the seller-broker to make a financial offer to the buyer-broker, sellers will build this cost into the total commission they charge the seller.  Because the total commission is then a term of contract between the home seller and the seller-broker, NAR has created a "Catch 22" and warns MLS participants that actions by the buyer-broker to reduce the total commission could constitute unlawful interference with contract.  As a result, if the buyer negotiates a lower commission with a buyer-broker, the seller's agent is still permitted to charge and receive the full amount of the originally negotiated commission from the seller.

87.     Fourth, as explained above, the NAR Code of Ethics permits buyer-

brokers to tell buyers that their services are free to the homebuyer. As a result, homebuyers are effectively told they have no reason to seek a reduction in the buyer-broker commission.

88. Fifth, NAR has taken additional actions to restrain such negotiations even further. NAR's ethical rules (and subsequent interpretations) expressly prohibit buyer-brokers from attempting to reduce buyer-broker commissions offered on MLSs through the submission of purchase offers. NAR's Standard of Practice 16-16 states: "REALTORS, acting as subagents or buyer/tenant representatives or brokers, shall not use the terms of an offer to purchase/lease to attempt to modify the listing broker's offer of compensation to subagents or buyer/tenant representatives or brokers nor make the submission of an executed offer to purchase/lease contingent on the listing broker's agreement to modify the offer of compensation." In other words, it is an unequivocal violation of NAR's ethics rules for a buyer-broker to even present an offer to a seller that is conditional on the seller reducing the buyer-broker commission.

89. NAR's Case Interpretations not only underscore the prohibition on purchase offers that reduce buyer-broker commissions, but also illogically instruct buyer-brokers who seek to modify buyer-broker commissions to attempt those modifications *before even showing* the property to any potential buyers. NAR's Case Interpretation #16-15 states: "The Hearing Panel's decision noted that REALTOR® B was indeed entitled to negotiate with REALTOR® A concerning cooperating broker compensation *but that such negotiation should be completed prior to the showing of the property* by Realtor® B. The decision indicated that REALTOR® B was entitled to show property listed by REALTOR® A on the terms offered by the listing broker in the

MLS." (Emphasis added). By requiring buyer-brokers seeking to reduce buyer-broker commissions to request those reductions prior to even showing the property to a potential buyer, NAR forecloses virtually all negotiation over the buyer-broker commission. That requirement implausibly contemplates that a buyer-broker will unilaterally contact a selling-broker to request a reduction to the buyer-broker commission before a potential buyer has even seen, let alone expressed an interest in purchasing, the property. Furthermore, even in such highly unusual circumstances, the seller-broker is permitted by NAR rules to respond to the request by reducing the buyer-broker commission but simultaneously *increasing* the seller-broker's commission by the amount of the reduction, thereby boosting the potential compensation to the seller-broker without altering the total commission that the seller has already contractually agreed to pay.

90.     NAR's rules also restrain negotiation of the buyer-broker commission by providing that after the seller has received purchase offers, the seller-broker is prohibited from attempting to unilaterally modify the buyer-broker commission that was offered on the MLS. NAR Standard of Practice 3-2 states: "Any change in compensation offered for cooperative services must be communicated to the other REALTOR® prior to the time that REALTOR® submits an offer to purchase/lease the property. After a REALTOR® has submitted an offer to purchase or lease property, the listing broker may not attempt to unilaterally modify the offered compensation with respect to that cooperative transaction." As a result, a seller cannot respond to a purchase offer with a counteroffer that is conditional on reducing the buyer-broker commission. Nor can the seller, after receiving purchase offers, decide to unilaterally

39

reduce the buyer-broker commission offered on the MLS. Indeed, MLSListings Inc., one of the largest MLSs in Northern California, states the following on its website to help explain the governing NAR rules:

> **Can I change my offer of compensation that I had offered to the cooperating agent in the MLS after the agent produces an offer signed by the buyer?**
>
> No. In no event shall the listing broker revoke or modify the offer of compensation later than the time the cooperating broker produces a prospective buyer who has signed an offer to purchase the property for which the compensation has been offered through the MLS (9.8).

91.     NAR has imposed yet another restraint on negotiation by interpreting its rules to make it unethical for a buyer-broker to urge the buyer to negotiate directly with the seller to reduce commissions. As the vast majority of homebuyers have limited or no familiarity with this market (and, as noted above, are told that the buyer-broker's services to them are "free"), imposing such a restriction on the ability of their fiduciary to take any action encouraging such negotiation, further restrains such negotiations.

92.     In light of the foregoing restraints, it is not surprising that downward negotiation of the buyer-broker commission is extremely limited and the buyer-broker commission has been maintained at a supra-competitive level (and substantially increased in actual dollars charged) for many years. Indeed, seller-brokers who initially list property with a buyer-broker commission at 2.5% or above almost always stay at a high commission rate (and, if a seller-broker who initially offers a lower buyer-broker commission decides to change the amount, the change ordinarily involves imposition of an *increased* buyer-broker commission).

93.     In short, the Buyer Broker Commission Rule adopted, implemented and enforced by the conspiracy has achieved exactly what it is designed to do: it has

imposed significant overcharges on home sellers, it has maintained (and even increased) those overcharges over time notwithstanding technology changes that should have substantially reduced commissions, and it has significantly impeded the ability of lower-cost alternatives to create a more competitive marketplace.

## VII. NAR HAS REQUIRED LOCAL ASSOCIATIONS TO AGREE TO THESE ANTICOMPETITIVE RESTRAINTS

94. NAR successfully requires its members, including state and local realtor associations, as well as non-member brokers and individual realtors operating in areas with MLSs owned by local realtor associations, to fully comply with the above anticompetitive rules, and with other rules contained in the NAR Handbook on Multiple Listing Policy and the NAR Code of Ethics.

95. NAR requires its members that own an MLS to comply with the mandatory provisions in NAR's Handbook on Multiple Listing Policy and with NAR's Code of Ethics. The Handbook states that an agreement by an association for the establishment of an MLS must include "roles and responsibilities of each association for enforcement of the Code of Ethics" and the "intent of the multiple listing service(s) to operate in compliance with the multiple listing policies of the National Association."

96. NAR threatens its individual and associational members with expulsion for failing to comply with the Code of Ethics. NAR's Code of Ethics states that "[a]ny Member Board which shall neglect or refuse to maintain and enforce the Code of Ethics with respect to the business activities of its members may, after due notice and opportunity for hearing, be expelled by the Board of Directors from membership in the National Association."

41

97.     A local realtor association owns each of the Covered MLSs, and those realtor associations are required by NAR to ensure that its MLS and the MLS's participants adhere to the mandatory provisions in NAR's Handbook on Multiple Listing Policy.   Thus, each local realtor association and MLS agrees to the anticompetitive restraints challenged herein, and plays a central role in implementation and enforcement of those restraints.

98.     Because access to the Covered MLSs, and other MLSs, is a commercial necessity for all brokers and individual realtors, all brokers and individual realtors must comply with the mandatory provisions in NAR's Handbook. Without access to a local MLS, including the Covered MLSs, a broker or agent would be unable to list properties for sale in the centralized database or receive offers of compensation for finding a buyer for a listed property.

99.     NAR has established and disseminated model rules for local realtor associations, and for the MLSs that these local associations own and operate, and those model rules require adherence to both NAR's Code of Ethics and the Handbook on Multiple Listing Policy.

100.    One of the many benefits NAR provides to its realtor associations and the MLSs owned by those associations is professional liability insurance.   To be eligible for this insurance, realtor associations and their MLSs must comply with the mandatory provisions in the Handbook on Multiple Listing Policy.   NAR threatens to withhold these valuable insurance benefits from realtor associations and MLSs that fail to comply with these mandatory provisions.   NAR's Handbook states that "[t]hose associations or multiple listing services found by the National Association to be operating under bylaws

42

or rules and regulations not approved by the National Association are not entitled to errors and omissions insurance coverage and their charters are subject to review and revocation."

101.    NAR reviews the governing documents of its local realtor associations to ensure compliance with its rules. NAR requires its local realtor associations to demonstrate their compliance with these rules by periodically sending their governing documents to NAR for review.

## VIII.  CORPORATE DEFENDANTS PARTICIPATE IN, FACILITATE, AND IMPLEMENT THE CONSPIRACY

102.    The Corporate Defendants have agreed to adopt, promote, implement, and enforce the Buyer Broker Commission Rule through their intimate involvement in NAR governance and imposition of NAR rules on local real estate associations and the Corporate Defendants' affiliated franchisees, brokers and employees. By participating in an association which prevents member institutions from allowing their associates to compete with each other for commissions—and agreeing to follow and enforce its anticompetitive rules—the Corporate Defendants have joined the conspiracy and have played a central role in its implementation and enforcement.

103.    The Corporate Defendants participate in, implement, and facilitate the conspiracy in at least four ways: (1) Defendants' executives and franchisee representatives attend NAR meetings, supervise NAR's operations, and review and vote on NAR rules; (2) Defendants and their franchisees assist in NAR's enforcement of the rules; (3) Defendants and/or their franchisees participate in local realtor associations that have adopted and enforced NAR's rules, including the Buyer Broker Commission Rule; and (4) Defendant require their franchisees and realtors to join NAR and the

MLSs and comply with NAR rules, including the Buyer Broker Commission Rule.

104. First, representatives from each of the Corporate Defendants and their franchisees regularly attend biannual NAR meetings and hold leadership positions in the organization. Senior executives of the Corporate Defendants have served on NAR's governing board of directors. For example, both Ronald J. Peltier, the Executive Chairman of HomeServices of America, and Nancy Nagy, CEO of Berkshire Hathaway HomeServices KoenigRubloff Realty Group, currently serve as directors of NAR, and Bruce Aydt, Senior Vice President and General Counsel of Berkshire Hathaway HomeServices Alliance Real Estate, is the former Chair of NAR's Professional Standards Committee. Executives of franchisees and other affiliates of the Corporate Defendants also dominated the 2018 eight-person Leadership Team that managed NAR's day-to-day operations. For example, the immediate past President of NAR, Elizabeth Mendenhall, is the CEO of RE/MAX Boone Realty in Columbia, Missouri. The President of NAR is John Smaby, a sales agent at Edina Realty, which is a HomeServices of America company. NAR's Vice President of Association Affairs, Colleen Badagliacco, is an agent for Legacy Real Estate & Associates, which is a franchisee of a Realogy firm. The 2019 leadership team includes John Smaby and Elizabeth Mendenhall, as well as Charlie Oppler, First Vice President and COO of a Sotheby's International Realty franchisee, and Tracy Kasper, Vice President of Advocacy and a broker/owner of a Berkshire Hathaway franchisee. The 2017 and 2016 NAR Leadership Teams also had representatives from the Corporate Defendants' brands, including Mr. Smaby, Ms. Mendenhall, and Sherri Meadows, a Keller Williams agent who served as NAR Vice President and President of the Florida Realtors.

105. Defendant HomeServices, for example, has explained its own role as follows: "As an industry leader, we have a responsibility to actively participate in shaping our industry and its current and future business model. The HomeServices executive leadership and CEOs of our operating companies drive these important discussions as leaders within the National Association of Realtors … and at the regional and local levels of the MLS organizations."

106. The following representatives from the Corporate Defendants or their franchisees participated specifically in the NAR Multiple Listing Issues and Policies Committee, responsible for reviewing and reissuing the Handbook, in the past four years: Mike Nugent, Berkshire Hathaway; Laurie Weston Davis, Better Homes and Gardens Real Estate; Kenneth Walker, RE/MAX Paradigm Realty Group; Sue Cartun, Keller Williams; Mark Trenka, Century 21; and Sam DeBord, Coldwell Banker.

107. By virtue of their leadership positions in NAR, these and other representatives from the Corporate Defendants are responsible for formulating, reviewing, and approving rules like the Buyer Broker Commission Rule. NAR approves and issues a new MLS Handbook each year; changes to NAR's MLS policy and Professional Standards are discussed and approved at NAR's yearly meetings by NAR committees on which representatives from each Corporate Defendant serve. The NAR Board of Directors has final approval on additions and amendments to MLS rules and regulations. Although the Board has modified *other* MLS rules in connection with each reissuance (for example, in 2017 and 2018), the Board has consistently and repeatedly reissued the Buyer Broker Commission Rule and anticompetitive restraints challenged herein.

45

108.    Second, each Corporate Defendant assists NAR with ensuring compliance with the NAR rules.  Local realtor associations and the NAR Board of Directors are responsible for the enforcement of NAR's MLS rules and regulations. As noted above, representatives from the Corporate Defendants serve on NAR's Board of Directors, which considers all written complaints involving alleged violations of NAR's rules and regulations.  Representatives from the Corporate Defendants also serve on the compliance committees of local realtor organizations. For example, the Rules and Regulations Committee for the Colorado Realtors Association, which reviews compliance issues brought to the attention of the local association and reviews recommendations for NAR policy changes, includes representatives from all four Corporate Defendants or their franchisees—Berkshire Hathaway, RE/MAX, Keller Williams, and Sotheby's:

- Wendy Atkinson - Berkshire Hathaway HomeServices Innovative RE

- Beth Ann Mott - Berkshire Hathaway HomeServices Innovative RE

- Jan Reinhardt - RE/MAX Alliance

- Lauren Gardiner - Keller Williams Realty, LLC

- Kathleen Stump - Berkshire Hathaway Home Service Elevated Living Real Estate

- Steve Konecny - RE/MAX Masters Millennium

- Alan Smith - RE/MAX Professionals

- Jill Limberg - Steamboat Sotheby's International Realty

- Clay Garner - RE/MAX Partners

109. Third, in each of the areas in which the Covered MLSs operate (and elsewhere), the Corporate Defendants collaborate with local realtor associations to implement and enforce NAR's rules, including the Buyer Broker Commission Rule, in furtherance of the combination and conspiracy alleged herein. Executives of franchisees of each Corporate Defendant have participated in the governance of the local realtor associations that own and operate the Covered MLSs (and participate in the governance of other local realtor associations), and they implement the conspiracy by requiring compliance with the NAR rules, including the Buyer Broker Commission Rule, and adoption of standard form contracts implementing the NAR rules.

110. For example, half of the Bright MLS Executive Committee consists of representatives from the Corporate Defendants' franchisees and other operations. Fifteen of the twenty-four members of the Bright MLS Board of Directors are representatives from the Corporate Defendants' franchisees and other operations. These individuals include:

- Cindy Ariosa, Long & Foster Real Estate Inc., EC
- Jack Fry, RE/MAX, EC
- Frank Serio, RE/MAX, EC
- William Lublin, Century 21, EC
- Boyd Campbell, Century 21, BOD
- Charles Martin, ERA Harrington, BOD
- David Ashe, Keller Williams, BOD
- Ellen Renish, ERA Continental, BOD
- Jeff Peters, RE/MAX, BOD

47

- Jim Spagnolo, Berkshire Hathaway HomeServices, BOD

- Mark Lowham, TTR Sotheby's International Realty, BOD

- Melanie Thompson, Century 21 Redwood Realty, BOD

- Rosalie Daniels, RE/MAX Tri-County, BOD

- Scott Lederer, Berkshire Hathaway Homesale Realty, BOD

- Scott McDonald, RE/MAX Gateway, BOD

111.    Like the other MLSs encompassed herein, the Bright MLS has agreed to, implemented, and enforced the anticompetitive restraints. Consistent with the terms and objectives of the conspiracy, Bright MLS has adopted Rules and Regulations providing that "In submitting a property to Bright MLS, the Participant is making a blanket unilateral offer of compensation to other Bright MLS Participants and shall, therefore, specify on each listing submitted to Bright MLS the compensation being offered to other Bright MLS Participants."  The Rules and Regulations further require that "The compensation specified on listings published by Bright MLS shall be expressed in one of the following forms:  1) As a percentage of the gross selling/leasing price; 2) As a percentage of the `base sales price' for new construction, with the base sales price defined as the sales price before buyer upgrades. (New construction is defined as properties to be built or properties that have not previously been occupied.). The listing Participant must clearly disclose this cooperative compensation arrangement in the agent remarks section of the Bright MLS Database; 3) As a definite dollar amount; [or] 4) As a combination of one (1) and three (3), OR two (2) and three (3) above, as applicable."

112.    The Bright MLS specifically provides that every person subscribing to

48

the MLS "agrees to be subject to the Rules and Regulations and any other Bright MLS governance provision." If a participant violates the terms of this agreement, they are potentially subject to fines of as much as $15,000, suspension of their MLS rights for as much as one year, or termination of their MLS rights with no right to reapply for a period up to three years.

113. As a further illustration, in the greater Las Vegas area, four officers and directors of GLVAR are employees of the Defendants Corporations' franchisees or operations: Aldo Martinez (Berkshire Hathaway HomeServices Nevada Properties), Stephanie Grant and Christopher Bishop (Coldwell Banker Premier – Las Vegas), and Tim Kelly Kiernan (RE/MAX Excellence Las Vegas).

114. GLVAR has agreed to, and helped implement and enforce, the conspiracy's anticompetitive restraints. For example, as agreed to by the conspiracy, GLVAR has adopted the following requirement to govern the Las Vegas MLS: "In filing a property with the Multiple Listing Service of an Association of REALTORS® the Participant of the Service is making blanket unilateral offers of compensate to the other MLS Participants, and shall therefore specify, on each listing filed with the Service, the compensation being offered to the other MLS Participants. . . . Multiple Listing Services shall not publish listings that do not include an offer of compensation expressed as a percentage of the gross selling price or as a definite dollar amount, nor shall they include general invitations by listing brokers to other Participants to discuss terms and conditions of possible cooperative relationships."

115. In furtherance of the conspiracy, GLVAR has also required that brokers conceal 'detail sheets' containing information about commissions from buyers. The

detail sheet is a document that contains all the information that any broker—listing or buyer—has entered into the Las Vegas MLS about a particular property. The detail sheet specifically contains detailed information about the commissions being offered to buyer-brokers. GLVAR has fined buyer-brokers who disclose detail sheets to their buyer clients.

116. Finally, each Corporate Defendant has also agreed to participate in, implement, and/or facilitate the conspiracy by imposing NAR's rules, including the Buyer Broker Commission Rule, on its franchisees, affiliates, and realtors. Each Corporate Defendant requires its franchisees, affiliates, and realtors to join NAR and follow NAR's Code of Ethics, and join a local realtor association and/or MLS, which requires compliance with the Buyer Broker Commission Rule and the other anticompetitive NAR Standards of Practice. Each Corporate Defendant requires its realtors and franchisees to abide by NAR rules as a condition of doing business with the Corporate Defendants, and to secure the benefits of the Corporate Defendants' brands, infrastructure, and other resources that support their brokerage operations.

117. Defendant Realogy requires its franchisees and realtors to comply with NAR rules and regulations, including the Buyer Broker Commission Rule. For example, the Century 21 Alton Clark and Coldwell Banker Traditions Policies and Procedures Manuals formally require MLS membership and compliance with MLS rules. Policy and Procedures Manuals for Sotheby's, Coldwell Banker Traditions, Century 21 Alton Clark, and Better Homes and Gardens all require realtors and sales associates to become members of NAR, which entails compliance with all NAR rules. Franchise Disclosure Documents for Corcoran, Century 21, and Better Homes and

50

Gardens incorporate the NAR Code of Ethics. Realogy requires strict compliance with these policies: Realogy's 2015 Form 10-K states "[t]he franchise agreements impose restrictions on the business and operations of the franchisees and require them to comply with the operating and identity standards set forth in each brand's policy and procedures manuals. A franchisee's failure to comply with these restrictions and standards could result in a termination of the franchise agreement."

118. Defendant HomeServices requires its franchisees and realtors to comply with NAR rules and regulations, including the Buyer Broker Commission Rule. For example, the Real Living Franchise Disclosure Document makes clear that MLS membership and access is required for franchisees, and the agreement requires the franchisee to provide Real Living with access to the franchisee's MLS data. A Long & Foster Policy manual states that sales associates must agree to adhere to NAR's Code of Ethics and Standards of Practice, and incorporates these NAR rules into the policy manual. A Berkshire Hathaway HomeServices Texas Realty Policy and Procedures Manual states that the company "support[s] the Realtor Code of Ethics [and] the Multiple Listing Rules," requires all associates to belong to a local realtor association and MLS, and states that the company's commission expectation will be calculated based on 3% for the listing broker and 3% on the selling side; a Berkshire Hathaway HomeServices Northwest Real Estate Policy Manual also requires associates to agree to maintain membership in the local realtor association and MLS. Similarly, the Real Living and Berkshire Hathaway HomeServices Franchise Disclosure Documents say that franchisees shall at all times comply with the NAR Code of Ethics.

119. Defendant Keller Williams requires its franchisees and realtors to

comply with NAR rules and regulations, including the Buyer Broker Commission Rule. The Keller Williams Policies and Guidelines Manual requires all associates to "become members of their local Board/Association of REALTORS and MLS" unless granted an exemption by their team leader, to adhere to the NAR Code of Ethics and Standards of Practice, and directs associates to consult with NAR materials. A 2018 Keller Williams Franchise Disclosure Document shows that MLS and NAR membership is expected by franchisees, because it includes the MLS and NAR membership fees as part of the estimated initial investment for a Keller Williams market center. And the Keller Williams training manual, which provides sample broker scenarios for realtors, shows that listing brokers are taught to tell home sellers that the sellers have to pay the buyer-broker's fee and that fee is non-negotiable.

120.     Defendant RE/MAX requires its franchisees and realtors to comply with NAR rules and regulations, including the Buyer Broker Commission Rule. For example, the franchise agreement between Defendant RE/MAX and a RE/MAX franchisee in Las Vegas states: "You agree that you and each of your Sales Associates will join and remain a member in good standing and comply with the by-laws and rules and regulations of a local Board of REALTORS© (or comparable organization) and, where available, you will become and remain a participant in a board owned multiple listing service. You also agree that you and your Sales Associates will abide by the Code of Ethics of the National Association of REALTORS©." Similarly, the RE/MAX 2019 Precision Policies and Procedures manual incorporates the NAR Code of Ethics, and a 2016 RE/MAX Independent Contractor Agreement prescribes that the contractor shall join the local realtor's association and "shall abide by the Code of Ethics

promulgated by NAR and all of the rules and regulations of each local or regional [MLS]."

121.     Thus, by developing and reissuing the Buyer Broker Commission Rule and related Standards of Practice, enforcing the rule through NAR and local realtor association leadership, imposing the rule on local realtor associations and MLSs, and requiring franchisees, realtors, and other affiliates to join NAR, local realtor associations and MLSs, and comply with their rules, each Corporate Defendant has agreed to participate in and implemented and/or facilitated the conspiracy.

## IX.     EFFECTS OF THE CONSPIRACY

122.     Defendants' conspiracy has had the following anticompetitive effects, among others, in each area in which a Covered MLS operates, and nationwide:

- Home sellers have been forced to pay commissions to buyer-brokers—their adversaries in negotiations to sell their homes—thereby substantially inflating the cost of selling their homes.

- Home sellers have been compelled to set a high buyer-broker commission to induce buyer-brokers to show their homes to home buyers.

- Home sellers have paid inflated buyer-broker commissions and inflated total commissions.

- The retention of a buyer-broker has been severed from the setting of the broker's commission; the home buyer retains the buyer-broker, while the home seller sets the buyer-broker's compensation.

- Price competition among brokers to be retained by home buyers has been restrained.

- Competition among home buyers has been restrained by their inability to compete for the purchase of a home by lowering the buyer-broker commission.

- Corporate Defendants and their franchisees have increased their profits substantially by receiving inflated buyer-broker commissions and inflated total commissions.

123. Plaintiffs are not aware of any pro-competitive effects of Defendants' conspiracy. Even assuming *arguendo*, that there was any justification for requiring such payments during the sub-agency period much earlier, "[t]here is no longer any reason to permit listing brokers to set the default prices that these competing buyers' brokers charge to serve their own customers."[36] Indeed, none of the purposes of the MLS "has anything to do with interbroker compensation. In fact, MLS's could continue providing every service of significance they provide without addressing compensation at all."[37] Moreover, even if there were any plausible pro-competitive effects, they would be substantially outweighed by the conspiracy's anticompetitive effects.

---

[36] Nadel, *supra* note 11, at 64-65.

[37] Brian N. Larson, *The End of MLS as We Know It, Redux*, LARSON SKINNER (2010), http://larsonskinner.com/2010/12/15/the-end-of-mls-as-we-know-it-redux-part-i/. *See also* B. Kaufman, *Why the Class Action Lawsuit Against NAR and the Big Brokers Makes Sense* (June 3, 2019), https://www.inman.com/2019/06/03/why-the-class-action-lawsuit-against-nar -and-the-big-brokers-makes sense/ (explaining that the idea that if buyers pay their agent's commission "this could be the end of the MLS does not make sense. The MLS's value is giving buyers and sellers a centralized place to go for listings. Its value is not in artificially keeping buyer's agents' commissions high. So, changing the way buyer's agents are paid does not reduce the value of the MLS at all.").

124.     There is substantial economic evidence that Defendants' conspiracy has resulted in buyer-broker commissions and total commissions paid by home sellers that are inflated well above a competitive level nationwide, including in the areas in which the Covered MLSs operate.

125.     Total broker commissions (*i.e.*, the aggregate commission paid to the seller-broker and buyer-broker) in the areas in which the Covered MLSs operate average between five and six percent. This figure is substantially higher than in countries with competitive markets for residential real estate brokerage services. In a 2002 study titled "International Residential Real Estate Brokerage Fees and Implications for the US," economists Natalya Delcoure and Norm Miller compared real estate commissions around the world with those in the United States. They concluded: "Globally, we see much lower residential commission rates in most of the other highly industrialized nations, including the United Kingdom (UK), Hong Kong, Ireland, Singapore, Australia, and New Zealand. . . . In the UK, the [total] commission rates average less than 2%. . . . In New Zealand and South Africa, [total] commission rates average 3.14%. In Singapore, the [total] commission rates also tend to run around 3%." They also found variation within countries; in the United Kingdom, for example, Delcoure and Miller found that "1%-2% is typical; in very competitive areas 0.5-0.75%; in low priced areas [for homes] as high as 3.5%." Ultimately, the economists concluded that, "based on global data, the [total] US residential brokerage fees should run closer to 3.0%."[38]

---

[38] Natalya Delcoure & Norm G. Miller, *International Residential Real Estate Brokerage Fees and Implications for the US Brokerage Industry*, 5 INT'L REAL ESTATE REV. 12, 13-14, 17 (2002),

126. For years, buyer-broker commissions have remained steady in the areas in which the Covered MLSs operate despite both an increase in home prices (increasing the dollar amount of the commission) and the diminishing role of buyer-brokers described above. The United States General Accounting Office review of the residential real estate market reported that "commission rates have remained relatively uniform – regardless of market conditions, home prices, or the efforts required to sell a home."[39] This remains true today. In fact, over the past two decades the average total commission on an annual basis has always been maintained between 5.02 percent and 5.4 percent. It was at virtually the same level in 2017, as it was at the time of the GAO's analysis. Similarly, in Defendant Keller Williams' presentation to competitors and other industry participants in 2016, Keller Williams reported that its average buyer-broker commission in 2015 (2.71%) was virtually the same level that was charged in 2002 (2.8%).

127. As explained above, the stability of the commission rate significantly understates the actual charges that have been imposed on home sellers. The actual dollar commission is determined by applying the rate to the sale price of a home. Since 2000, home prices have approximately doubled, while the total rate of inflation has been below 50%. As Dr. Barwick, an economist at Cornell University, recently stated at the DOJ/FTC workshop on competition in the residential real estate brokerage industry, "if

---

https://pdfs.semanticscholar.org/7f0d/e19b8729c83ce5dd1be93f1fa8ce0deaa6d9.pdf?_ga=2.121729544.265578023.1560289574-2128001628.1560289574.

[39] U.S. Gov't Accountability Office, GAO-05-947, *Real Estate Brokerage: Factors That May Affect Price Competition*, REPORT TO THE COMMITTEE ON FINANCIAL SERVICES, HOUSE OF REPRESENTATIVES 1, 1 (2005)

you look at the commission the consumers are paying today relative to 20 years ago, they're nearly paying twice as much."[40]

128.     Moreover, while "competitive pressures in an industry ordinarily force competitors to adopt fee structures that reflect their costs, this has not occurred for real estate broker fees." Instead, "broker fees are usually set without regard to either the quantity or quality of service rendered."[41]

129.     The stability and maintenance of high broker commissions (and the substantial increase in actual dollar charges for their services) stands in stark contrast to the experience in other industries since the advent of the Internet. "One would have expected that an information and communication-based industry like real estate brokerage, would enjoy tremendous cost efficiencies from the development of the Internet, Databases, and other communication technologies. Yet it appears that traditional brokers generally have not passed on their cost savings to consumers in the form of lower fees."[42]

130.     The adverse economic impact of the conspiracy's restraints on price competition have been severe. The Consumer Federation of America, which has reviewed and criticized the brokerage industry's practices for many years, has indicated that "[i]f sellers and buyers each separately negotiated compensation with their brokers, uniform 5-6% commissions would quickly disappear."[43]

---

[40] Barwick, *supra* note 35, at 10.

[41] Nadel, *supra* note 11, at 4.

[42] Nadel, *supra* note 11, at 7.

[43] Brobeck & Woodall, *supra* note 13, at 4.

131.    Brian Larson, an attorney who has represented many MLSs, has observed that "[w]ith the demise of subagency, there is little reason to keep interbroker compensation."  According to Larson, "[g]etting rid of interbroker compensation" [i.e., payments from seller-brokers to buyer-brokers] would improve the market in several areas, including:

- Buyer-broker fees can be commensurate with the skill and experience of the broker and with the buyer's needs."

- "The market benefits from price competition for buyer broker services."

- "The dangers of price fixing, and the claims by industry watchdogs that it exists now, will largely be addressed.  Brokers will really be unable to tell what their competitors are charging for services, and there will be no incentive for commissions to be 'standard.'"[44]

132.    Because of the scope and magnitude of the overcharges at issue here, the economic cost to the plaintiff class and other consumers is enormous.  Estimates of the amount of "annual broker fees consumers might save if there was effective price

---

[44] Larson, *supra* note 38 (Larson has written about the "Danger of price fixing" and explained that because of the publication of buyer-broker compensation on an MLS, "a few market-leading brokers can establish the market-rate cooperating compensation [i.e., buyer-broker commission] without ever speaking directly to each other.  They can just watch what happens on MLS.  Thanks to the MLS offer of compensation, listing brokers effectively are able to fix service prices of buyers' brokers; many buyers' brokers are loathe to collect more than what is offered in MLS, even if the broker has a written agreement with the buyer providing for a higher payment."  Although Larson recognizes that the system facilitates price-fixing, the reality – as described above – has been that it has stabilized commission levels at the "industry standard" (and elevated actual dollar commissions substantially), notwithstanding declining costs).

competition suggests as much as $30 billion or more annually."[45] Economists Hsieh and Moretti have suggested that "more than half of current commissions might be eliminated by competition."[46] Natalya Delcourse and Norm Miller "found that U.S. broker fees should equal something closer to three percent."[47]

## X.  MARKET POWER

133.    The relevant service market for the claims asserted herein is the bundle of services provided to homebuyers and sellers by residential real estate brokers with MLS access.  Defendants' control of the Covered MLSs gives Defendants the ability to impose the Buyer Broker Commission Rule and other anticompetitive NAR rules on class members and other market participants.  Access to the Covered MLSs is critical for brokers to compete and to assist home buyers and sellers in the areas in which those MLSs operate.

134.    The relevant geographic markets for the claims asserted herein are no

---

[45] Nadel, *supra* note 11, at 8.

[46] *Id.* at 8 n.28 (citing C. Hsieh & E. Moretti, Can Free Entry be Inefficient? Fixed Commissions and Social Waste in the Real Estate Industry, 111 J. Pol. Econ. 1076 (2003)).

[47] *Id.* at 9 n.28.  *See also* Brobeck & Woodall, *supra* note 13, at 4 (if sellers and buyers separately negotiated compensation with their brokers, uniform 5-6 percent commissions "would quickly disappear"); *The Realtor Racket, supra* note 8 (explaining that "in almost every other consumer industry . . . the introduction of Internet and discount sellers has been a phenomenal financial benefit to customers.  Discount airlines have cut airfares by 60% or more, to the economic benefit of everyone with the exception of the incumbent competitors.  Economists call this process of squeezing out transaction costs `disintermediation.'  If any industry is ripe for this, it is the $70 billion-a-year real estate brokerage market."); B. Kaufman, *Why the Class Action Lawsuit Against NAR and the Big Brokers Makes Sense* (June 3, 2019), https://www.inman.com/2019/06/03/why-the-class-action-lawsuit-against-nar -and-the-big-brokers-makes sense/ (explaining that if buyers paid their agent's commission this "would immediately generate" discounted options).

broader than the geographic areas in which the twenty Covered MLSs operate. Nearly all homes sold in these geographic areas were listed on the MLS by brokers that are subject to the MLS and NAR rules and standards. The residential real estate business is local in nature. Most sellers prefer to work with a broker who is familiar with local market conditions and who maintains an office or affiliated sales associates within a reasonable distance of the seller's property. Likewise, most buyers seek to purchase property in a particular city, community, or neighborhood, and typically prefer to work with a broker who has knowledge of the area in which they have an interest.

135. Corporate Defendants, through their coconspirator franchisees and other conspiring brokers in the areas in which the Covered MLSs operate, collectively provide the vast majority of the residential real estate broker services in these areas.

136. Defendants and their co-conspirators collectively have market power in each relevant market through their control of the local MLS and their dominant share of the local market.

137. Any buyer-brokers in the areas in which the Covered MLSs operate who wished to compete outside of Defendants' conspiracy would face insurmountable barriers. Defendants' control of the Covered MLSs through their co-conspirators (*i.e.*, through their local franchisees, other local brokers, and the local realtor associations) means that non-conspiring brokers would need to establish an alternative listing service to compete with the conspiring brokers, or alternatively, attempt to compete without access to a listing service. A seller-broker who represented a seller without using a listing service would lose access to the large majority of potential buyers, and a buyer-broker who represented a buyer without using a listing service would lose access to the

large majority of sellers. Brokers cannot compete effectively without access to a listing service.

138. For an alternative listing service to compete effectively with one of the Covered MLSs, the alternative would need to have listings as comprehensive (or at least nearly so) as the Covered MLS. Brokers and their individual realtors who currently profit from inflated buyer-broker commissions and total commissions have minimal incentive to participate on an alternative listing service that would generate lower buyer-broker commissions and lower total commissions. Further, many buyers would be very reluctant to retain a buyer broker operating on an alternative listing service that required them to pay the buyer-broker commission, when other buyer-brokers operating on the Covered MLSs are entirely compensated by home sellers. Accordingly, seller-brokers on an alternative listing service would struggle to attract buyer-brokers and their buyer clients. Moreover, many home sellers would not retain brokers using a new, unfamiliar alternative listing service that had no track record of success and had failed to attract sufficient buyers and buyer-brokers. Accordingly, a listing service attempting to compete with any of the Covered MLSs would likely fail to attract enough property listings to operate profitably and be a competitive constraint on the incumbent MLSs. The absence of listing services that compete with the Covered MLSs (or other MLSs) reflects the very substantial barriers to entry.

139. Moreover, NAR advises MLSs to enter into non-compete agreements with third-party websites, such as Zillow, so that those websites do not become competitive rivals to MLSs. NAR's checklist of "critical components" states that the consumer-facing website "must agree they will not compete with the brokerage firms

or MLS by either becoming a licensed brokerage firm or by providing offers of cooperation and compensation."   The non-compete agreement requires the consumer-facing website to agree not to "use the data in a manner that is similar to a Multiple Listing Service."   Thus, NAR, in furtherance of the conspiracy, has advised MLSs to take affirmative steps to prevent third-party websites from becoming competitors.

## XI.   CONTINUOUS ACCRUAL

140.   During the four years preceding the filing of this Complaint, Defendants, through their co-conspirator brokers in the areas in which the Covered MLSs operate, repeatedly charged and received buyer-broker commissions and total commissions that were inflated as a result of the conspiracy.   These inflated commissions during the preceding four years were paid by Plaintiffs and the other class members in connection with the sale of residential real estate listed on one of the Covered MLSs.   Each payment of these inflated commissions by Plaintiffs and the other class members during the last four years injured them and gave rise to a new cause of action for that injury.

141.   During the last four years, Defendants and their co-conspirators have maintained, implemented, and enforced the Buyer Broker Commission Rule and other anticompetitive NAR rules nationwide, including in the areas in which the Covered MLSs operate.

## XII.   CLASS ACTION ALLEGATIONS

142.   Pursuant to Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, Plaintiffs bring this action on behalf of themselves and the following class: all persons who paid a broker commission since March 6, 2015 in connection

with the sale of residential real estate listed on one of the Covered MLSs.

143.    Excluded from the Class are Defendants and their officers and directors, the judicial officers presiding over this action and the members of their immediate families and judicial staff, and Plaintiffs' counsel and employees of their law firms.

144.    The Class is readily ascertainable because records of the relevant transactions should exist.

145.    Due to the nature of the trade and commerce involved, Plaintiffs believe that the Class has many thousands of members, the exact number and their identities being known to Defendants and their coconspirators.

146.    Plaintiffs' claims are typical of the claims of the members of the Class. Plaintiffs will fairly and adequately protect the interests of the members of the Class. Plaintiffs' interests are aligned with, and not antagonistic to, those of the other members of the Class.

147.    There are questions of law and fact common to the members of the Class, including, but not limited to, the following:

A.    Whether Defendants conspired as alleged herein;

B.    Whether the conspiracy was implemented in the areas in which the Covered MLSs operate;

C.    Whether the conspiracy harmed competition as alleged herein;

D.    Whether the competitive harm from the conspiracy substantially outweighs any competitive benefits;

E.    Whether buyer-broker commissions and total commissions were inflated as a result of the conspiracy in the areas in which the Covered MLSs operate; and

F.    The appropriate class-wide measures of damages.

148.     Plaintiffs have retained counsel competent and experienced in the prosecution of antitrust class action litigation to represent themselves and the Class.

149.     Questions of law or fact that are common to the members of the Class predominate over any questions affecting only individual members of the Class.

150.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.     The prosecution of separate actions by individual members of the Class would impose heavy burdens on the court and Defendants and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class.  A class action, on the other hand, would achieve substantial economies of time, effort, and expense, and would assure uniformity of decision as to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results.  Absent a class action, it would not be feasible for the vast majority of the members of the Class to seek redress for the violations of law alleged herein.

## XIII.   CLAIM FOR RELIEF

### <u>Violation of Section 1 of the Sherman Act, 15 U.S.C § 1</u>

151.     Plaintiffs repeat and incorporate by reference each of the foregoing allegations of this Complaint.

152.     Beginning more than four years before the filing of this Complaint, Defendants engaged in a continuing contract, combination, or conspiracy to unreasonably restrain interstate trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C § 1.

153.     The contract, combination, or conspiracy alleged herein has consisted

64

of a continuing agreement among Defendants and their co-conspirators to require home sellers to pay the buyer-broker and to pay an inflated amount.

154. In furtherance of the contract, combination, or conspiracy, Defendants and their coconspirators have committed one or more of the following overt acts:

a) Participated in the establishment, implementation and enforcement of the Buyer Broker Commission Rule and other anticompetitive NAR rules;

b) Participated in the establishment, implementation and enforcement of rules by local NAR associations and MLSs that implemented the Buyer Broker Commission Rule and other anticompetitive NAR rules in the areas in which the Covered MLSs operate; and

c) Included provisions in franchise agreements, policy manuals, and other corporate agreements with franchisees, affiliates, and realtors of Corporate Defendants that required the implementation of and adherence to the Buyer Broker Commission Rule and other anticompetitive NAR rules in the areas in which the Covered MLSs operate.

155. In the areas in which the Covered MLSs operate, and elsewhere, Defendants' conspiracy has required sellers to pay buyer-brokers, to pay an inflated buyer-broker commission and an inflated total commission, and has restrained price competition among buyer-brokers. This harm to competition substantially outweighs any competitive benefits arising from the conspiracy.

156. Defendants' conspiracy has caused buyer-broker commissions and total commissions in the areas in which the Covered MLSs operate (and elsewhere) to be

inflated. Plaintiffs and the other members of the Class paid these inflated commissions during (and before) the last four years in connection with the sale of residential real estate listed on one of the Covered MLSs. Absent Defendants' conspiracy, Plaintiffs and the other class members would have paid substantially lower commissions because the broker representing the buyer of their homes would have been paid by the buyer (and buyer-broker commissions would not be at supra-competitive levels).

157. Defendants' conspiracy is a *per se* violation of Section 1 of the Sherman Act.

158. As a direct and proximate result of Defendants' past and continuing violation of Section 1 of the Sherman Act, Plaintiffs and the other class members have been injured in their business and property and suffered damages in an amount to be proven at trial.

159. In the alternative, Defendants' conspiracy violates section 1 of the Sherman Act under the Rule of Reason.

160. As a direct and proximate result of Defendants' past and continuing violation of Section 1 of the Sherman Act, Plaintiffs and the other class members have been injured in their business and property and suffered damages in an amount to be proven at trial.

## XIV.  REQUESTED RELIEF

A.  Plaintiffs request relief as follows: That the Court determine that this action may be maintained as a class action under Rules 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, and direct that notice of this action, as provided

by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to members of the Class;

        B.    That the Court enter an order declaring that Defendants' actions, as set forth in this Complaint, violate the law;

        C.    That the Court award Plaintiffs and the other members of the Class damages and/or restitution in an amount to be determined at trial;

        D.    That the Court award Plaintiffs pre- and post-judgment interest;

        E.    That the Court award Plaintiffs their costs of suit, including reasonable attorneys' fees and expenses;

        F.    That the Court award Plaintiffs and the Class a permanent injunction, under Section 16 of the Clayton Act, enjoining Defendants from continuing conduct determined to be unlawful; and

        G.    That the Court award such other relief as the Court may deem just and proper.

## JURY TRIAL DEMAND

Plaintiffs demand a jury trial of all issues so triable.

June 14, 2019

        */s/ Carol V. Gilden*
        Carol V. Gilden (Bar No. 6185530)
        cgilden@cohenmilstein.com
        COHEN MILSTEIN SELLERS & TOLL PLLC
        190 South LaSalle Street, Suite 1705
        Chicago, IL 60603
        (312) 357-0370
        Daniel A. Small
        dsmall@cohenmilstein.com
        Kit A. Pierson
        kpierson@cohenmilstein.com
        Benjamin D. Brown
        bbrown@cohenmilstein.com

Alison Deich
adeich@cohenmilstein.com
COHEN MILSTEIN SELLERS & TOLL PLLC
1100 New York Ave. NW ● Fifth Floor
Washington, DC 20005
(202) 408-4600
(202) 408-4699 Fax

Mark M. Seltzer
mseltzer@susmangodfrey.com
Steven G. Skaver
ssklaver@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, California 90067
(310) 789-3100

Matthew R. Berry
mberry@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1201 Third Avenue, Suite 3800
Seattle, Washington 98101
(206) 516-3880

Beatrice C. Franklin
bfranklin@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1301 Avenue of the Americas, 32nd Floor
New York, New York 10019
(212) 729-2021

Steve W. Berman
steve@hbsslaw.com
Jeff D. Friedman
jeff@hbsslaw.com
Rio S. Pierce
riop@hbsslaw.com
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue ● Suite 2000
Seattle, WA 98101
(206) 623-7292
(206) 623-0594 fax

George Farah
gfarah@hfajustice.com
HANDLEY FARAH & ANDERSON PLLC
81 Prospect Street
Brooklyn, NY 11201
(212) 477-8090

William H. Anderson
wanderson@hfajustice.com
HANDLEY FARAH & ANDERSON PLLC
4730 Table Mesa Drive Suite G-200
Boulder, CO 80305
(303) 800-9109

Benjamin David Elga
belga@justicecatalyst.org
Brian Shearer
brianshearer@justicecatalyst.org
JUSTICE CATALYST LAW
25 Broadway ● Ninth Floor New York, NY
10004 (518) 732-6703

Monte Neil Stewart
monteneilstewart@gmail.com
Russell E. Marsh
rmarsh@wmlawlv.com
WRIGHT MARSH & LEVY
300 S. 4th Street ● Suite 701 Las Vegas,
NV 89101
(702) 382-4004

Vildan A. Teske
teske@tkkrlaw.com
Marisa C. Katz
katz@tkkrlaw.com
TESKE KATZ KITZER & ROCHEL PLLP
222 South Ninth Street ● Suite 4050
Minneapolis, MN 55402
(612) 746-1558

Kenneth A. Wexler
kaw@wexlerwallace.com
Mark R. Miller
mrm@wexlerwallace.com
Thomas A. Doyle
tad@wexlerwallace.com
WEXLER WALLACE LLP
55 W. Monroe Street, Suite 3300
Chicago, IL 60603
(312)346-2222
(312)346-0022 Fax

Daniel E. Gustafson
dgustafson@gustafsongluek.com
Daniel C. Heldlund
dhedlund@gustafsongluek.com
Daniel J. Nordin
dnordin@gustafsongluek.com
Kaitlyn L. Dennis
kdennis@gustafsongluek.com
GUSTAFSON GLUEK PLLC
Canadian Pacific Plaza
120 South Sixth Street, Suite 2600
Minneapolis, MN 55402
(612) 333-8844
(612) 339-6622 Fax

*Attorneys for Plaintiffs*