# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

CHRISTOPHER MOEHRL, MICHAEL　　)
COHL, STEVE DARNELL, VALERIE　　)
NAGER, JACK RAMEY, DANIEL UMPA,)
and JANE RUH, on behalf of　　　　)
themselves and all others similarly situated,　)
　　　　　　　　　　　　　　　　)
　　　　Plaintiffs,　　　　　　　)
　　　　　　　　　　　　　　　　)　　Case No: 1:19-cv-01610
　　　　　　　　　　　　　　　　)
v.　　　　　　　　　　　　　　　)　　Judge Andrea Wood
　　　　　　　　　　　　　　　　)
THE NATIONAL ASSOCIATION OF　　)
REALTORS, REALOGY HOLDINGS　　)
CORP., HOMESERVICES OF AMERICA,)
INC., HSF AFFILIATES, LLC,　　　　)
BHH AFFILIATES, LLC,　　　　　　)
THE LONG & FOSTER COMPANIES,　)
INC., RE/MAX, LLC, and KELLER　　)
WILLIAMS REALTY, INC.　　　　　)
　　　　　　　　　　　　　　　　)
　　　　Defendants.　　　　　　　)
_____)

# BRIEF IN SUPPORT OF THE MOTION OF THE
## NATIONAL ASSOCIATION OF REALTORS® TO DISMISS THE CONSOLIDATED
### AMENDED COMPLAINT FOR FAILURE TO STATE A CAUSE OF ACTION

# TABLE OF CONTENTS

INTRODUCTION AND SUMMARY OF ARGUMENT ............................................................ 1

RELEVANT ALLEGATIONS AND NAR RULES ...................................................... 3

      A.    Plaintiffs ...................................................................................... 3

      B.    The MLS System ...................................................................... 4

      C.    Plaintiffs' Allegations of Anticompetitive Behavior ............................... 5

      D.    Relevant NAR Policies That May Be Considered On A Motion To Dismiss ...................................................................................... 6

STANDARD OF REVIEW ...................................................................... 8

ARGUMENT ...................................................................... 9

    I.    THE COMPLAINT DOES NOT ALLEGE FACTS THAT, IF PROVEN, WOULD VIOLATE THE ANTITRUST LAWS. ................................. 9

      A.    The CAC Fails To Allege Facts To Support Plaintiffs' Claim That NAR Rules Artificially Inflate Commission Levels. ............................ 9

          1.    The CAC Alleges No Facts Showing That NAR Rules Create Artificial Pressure On Listing Brokers To Make "Inflated" Offers Of Compensation. ............................ 10

          2.    The CAC Alleges No Facts To Support Plaintiffs' Claim That NAR Rules Encourage Or Enable Anticompetitive "Steering." ............................................................................ 14

          3.    The CAC Alleges No Facts To Support Plaintiffs' Claim That Section 2-G-1 Prevents Home-Buyers From Paying For Their Broker Services. ............................................... 16

          4.    The CAC Alleges No Facts Demonstrating That NAR Rules "Effectively Prohibit" Negotiation Over Cooperative Commissions. ......................................................... 18

      B.    Plaintiffs' Allegations That NAR Rules Harm Competition Are Economically Implausible And Contrary To Long-Established Precedent. ...................................................................... 20

          1.    Several Courts Have Found The Challenged NAR Rules To Be Procompetitive. ............................................................. 21

          2.    Plaintiffs' Claim That The Challenged NAR Rules Injure Competition Is Unsupported By Alleged Facts And Does Not Make Economic Sense. ........................................... 22

    II.    PLAINTIFFS FAIL TO ALLEGE FACTS SHOWING THAT THEY WERE INJURED BY THE ALLEGED RESTRAINT OF TRADE. ................. 24

# TABLE OF CONTENTS
(continued)

**Page**

CONCLUSION.......................................................................................................................... 25

# TABLE OF AUTHORITIES

**Cases**

*Alberto-Culver Co. v. Andrea Dumon, Inc.*,
   295 F. Supp. 1155 (N.D. Ill. 1969),
   *aff'd in part, rev'd in part on other grounds*,
   466 F.2d 705 (7th Cir. 1972) ................................................................................................ 12

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ................................................................................................................ 8

*BCB Anesthesia Care, Ltd. v. Passavant Mem'l Area Hosp. Ass'n*,
   36 F.3d 664 (7th Cir. 1994) ................................................................................................. 9

*Bell Atlantic v. Twombly*,
   550 U.S. 554 (2007) ......................................................................................................... 8, 13

*Brown v. Visa U.S.A.*,
   674 F. Supp. 249 (N.D. Ill. 1987) ................................................................................ 17, 23

*Cal. Dental Ass'n v. FTC*,
   526 U.S. 756 (1999) .............................................................................................................. 15

*Car Carriers, Inc. v. Ford Motor Co.*,
   745 F.2d 1101 (7th Cir. 1984) ................................................................................. 9, 12, 24

*Clark v. Winnebageo [sic] County, Ill.*,
   No. 92 C 20131, 1992 WL 188325
   (N.D. Ill. July 24, 1992) ...................................................................................................... 13

*Cortelco Sys. of Puerto Rico Inc. v. Phoneworks, Inc.*,
   Civil No. 09–1371CCC, 2009 WL 4046794 (D.P.R. November 20, 2009) ............................ 23

*Dial A Car, Inc. v. Transportation, Inc.*,
   884 F. Supp. 584 (D.D.C. 1995) ......................................................................................... 15

*Greater Rockford Energy & Tech. Corp. v. Shell Oil Co.*,
   998 F.2d 391 (7th Cir. 1993) ..................................................................................... 3, 24, 25

*JTC Petroleum Co. v. Piasa Motor Fuels, Inc.*,
   190 F.3d 775 (7th Cir. 1999) .............................................................................................. 22

*Kochert v. Greater Lafayette Health Servs., Inc.*,
   463 F.3d 710 (7th Cir. 2006) .............................................................................................. 25

*Limestone Dev. Corp. v. Vill. of Lemont*,
520 F.3d 797 (7th Cir. 2008) ............................................... 9

*Mason v. Am. Tobacco Co.*,
346 F.3d 36 (2d Cir. 2003) ................................................. 13

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
475 U.S. 574 (1986)............................................................ 22

*McReynolds v. Merrill Lynch & Co.*,
694 F.3d 873 (7th Cir. 2012) ................................................. 8

*Murphy v. Alpha Realty*,
Case No. 76 C 2446, 1978 WL 1451 (N.D. Ill. Dec. 7, 1978) ......................................... 15, 21

*O'Neill v. Coca-Cola Co.*,
669 F. Supp. 217 (N.D. Ill. 1987) ..................................... 12, 24

*O'Riordan v. Long Island Bd. of Realtors*,
707 F. Supp. 111 (E.D.N.Y. 1988) ...................................... 5, 21

*Pirard v. Bank of America*,
No. 12 C 2901, 2013 WL 1154294
(N.D. Ill. March 19, 2013) ........................................ 12, 14, 23

*Reifert v. South Cent. Wisconsin MLS Corp.*,
450 F.3d 312 (7th Cir. 2006) ................................... 1, 5, 15, 21

*Rocha v. FedEx Corp., et al.*,
15 F. Supp. 3d 796 (N.D. Ill. 2014) ..................................... 14

*Schachar v. Am. Acad. of Ophthalmology, Inc.*,
870 F.2d 397 (7th Cir. 1989) ......................................... 14, 23

*Shuffle Tech Int'l, LLC v. Scientific Games Corp.*, No. 15 C 3702,
2015 WL 5934834 (N.D. Ill. Oct. 20, 2015) ........................... 25

*Silha v. ACT, Inc.*,
807 F.3d 169 (7th Cir. 2015) ............................................... 24

*Supermarket of Homes v. San Fernando
Valley Bd. of Realtors*, No. CV 80-1888 PAR, 1983 WL 2199
(C.D. Cal. Sept. 1, 1983), *aff'd*, 786 F.2d 1400 (9th Cir. 1986).................................... 1, 15, 21

*Tamayo v. Blagojevich*,
526 F.3d 1074 (7th Cir. 2008) ............................................. 17

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)..................................................................................................... 6

*U.S. v. Nat'l Ass'n of Realtors*,
    No. 1:05-cv-05140 (N.D. Ill. Nov. 18, 2008) ........................................................... 2

*U.S. v. Nat'l Ass'n of Realtors*, No. 1:05-cv-05140
    (N.D. Ill. Nov. 18, 2008)........................................................................................... 22

*Venture Assocs. Corp. v. Zenith Data Sys. Corp.*,
    987 F.2d 429 (7th Cir. 1993) ...................................................................................... 6

*Venture Res. Grp, Inc. v. Greater New Jersey Reg'l Multiple Listing Serv., Inc.*,
    Civ. A No. 95-1401, 1995 WL 866841 (D.N.J. Aug. 24, 1995) .............................. 21

## **Statutes**

15 U.S.C. § 15.................................................................................................................... 24

42 U.S.C. § 1395w-4......................................................................................................... 11

## **Rules**

Rule 12(b)(6)........................................................................................................................ 8

## INTRODUCTION AND SUMMARY OF ARGUMENT

Nothing in the Consolidated Amended Complaint ("CAC") changes, or could change, the conclusion that the challenged rules of the National Association of Realtors® ("NAR") do not suppress competition and therefore do not violate the antitrust laws. The essence of plaintiff home-sellers' original complaint was that NAR and the corporate defendants violated Section 1 of the Sherman Act by enforcing a so-called "Buyer Broker Commission Rule" that allegedly compels sellers to pay "inflated" commissions by preventing buyers brokers from negotiating the terms of the "blanket, unilateral" offers of compensation that listing brokers make to all other members of the Multiple Listing Service ("MLS") when they list a home for sale. But as NAR pointed out in its motion to dismiss the original complaint, that allegation was a complete mischaracterization of NAR rules – which do not prevent brokers from negotiating the amount of compensation offered by the listing broker in the listing.

In the CAC, plaintiffs now grudgingly acknowledge that post-listing negotiations of the commission offered to buyers brokers are, in fact, permitted by NAR rules – although they say, albeit without citing any support, that NAR rules "discourage" such negotiations. *See* CAC at ¶¶ 80-93. Despite this concession, plaintiffs continue to claim that NAR rules artificially inflate broker commissions to supra-competitive levels. This time, they base their claim on the NAR requirement that a listing broker must make an offer of cooperation and compensation to any buyers broker who produces a ready, willing, and able purchaser – a basic aspect of the MLS system that has existed for decades. This system, and the rules upon which it has been based, have repeatedly been upheld by the courts. *See, e.g.*, *Reifert v. South Cent. Wisconsin MLS Corp.*, 450 F.3d 312, 321 (7th Cir. 2006); *Supermarket of Homes v. San Fernando Valley Bd. of Realtors*, No. CV 80-1888 PAR, 1983 WL 2199, at *7 (C.D. Cal. Sept. 1, 1983), *aff'd*, 786 F.2d 1400, 1407-08 (9th Cir. 1986). It was explicitly permitted by the Department of Justice in a consent decree that

expressly authorizes NAR to limit membership in an MLS to persons who make offers of cooperation and compensation to other members of the MLS – a decree that was approved by Judge Kennelly of this Court. *See U.S. v. Nat'l Ass'n of Realtors*, No. 1:05-cv-05140 (N.D. Ill. Nov. 18, 2008).

In order to make their claim, plaintiffs must ignore what the challenged NAR rule actually provides. In pertinent part, the rule provides only that:

- When placing a listing on an MLS, a listing broker must make a blanket, unilateral offer of cooperation and compensation to buyers brokers;

- This offer can be expressed as either a percentage of the sales price or as a specific amount of money; and

- Listing brokers must do more than make a "general invitation" to other brokers to discuss possible cooperation terms.

*See* CAC at ¶ 60; *see also* Johnson Decl., Ex. A at 34-36. Significantly, the rule says nothing about the ***amount*** of commission that must be offered. It permits listing brokers to frame their offers either as a percentage of the sale price or as a specific amount. That amount can be as little as one cent.

Plaintiffs also claim that the challenged NAR rule encourages buyers brokers to "steer" home buyers towards listings that offer higher commissions. But this pejorative characterization overlooks the fact that the commission offered to buyers brokers in any given transaction is set by the home-seller in consultation with the listing broker. Plaintiffs' claim of "steering" amounts to nothing more than a claim that many home-sellers attempt to encourage buyer broker cooperation by offering favorable commission terms to them. This is simply a common-sense effort by sellers to attract buyers for their homes. Far from being anticompetitive, it is the free market at work.

Finally, plaintiffs claim that NAR rules somehow prevent home-buyers from paying for their brokers' services directly by requiring the listing broker to compensate the buyer's broker

through a sharing of commission.  But requiring a listing broker to make an offer of compensation of as little as one cent in no way precludes, or even discourages, buyers from paying their brokers for their services.  Thus, the notion that NAR rules prevent buyers from paying their brokers has no merit.

Quite apart from the substance of their antitrust claim, plaintiffs have failed to plead facts showing that the challenged NAR rules were the cause of the injury that they claim.  *See Greater Rockford Energy & Tech. Corp. v. Shell Oil Co.*, 998 F.2d 391, 401 (7th Cir. 1993) (explaining that a private plaintiff must show that, "but for" the alleged violation, the alleged injury would not have occurred).  No plaintiff alleges anything more than the recent sale of a home which involved payment of a broker's commission by the listing broker.  Tellingly, no plaintiff makes any factual allegations that the relevant NAR rules in any way (1) prevented them from negotiating with their listing broker for a lower commission rate; (2) prevented them from insisting that their listing broker make only a nominal compensation offer to buyers brokers; (3) prevented their home buyers from utilizing a broker paid directly by the buyer; or (4) decreased the net proceeds that the plaintiff received from the sale of the home.  Plaintiffs have thus pleaded no facts that they were injured by the NAR rules they challenge.

In order to survive a motion to dismiss their antitrust claim, plaintiffs must allege ***facts*** – that are not squarely refuted by the CAC itself or by documents referenced in the CAC and that are not just conclusory allegations – that, if proven, would show (1) an agreement that unlawfully suppresses competition and (2) that has injured them in a manner violative of the antitrust laws. They have failed to do either.  The CAC must be dismissed.

### RELEVANT ALLEGATIONS AND NAR RULES

### A.    Plaintiffs

The CAC identifies eight plaintiffs: seven individual home sellers (Michael Cole, Steve

Darnell, Christopher Moehrl, Valerie Nager, Jack Ramey, Jane Ruh and Daniel Umpa) and one corporation (Sawbill Strategic, Inc.).[1]  CAC ¶¶ 23-31.  In eight largely identical paragraphs, the CAC describes (1) where each plaintiff lives; (2) where and when they sold their home; (3) which MLS listed their home; and (4) which brokerage represented them and the home buyers.  *Id.* Although plaintiffs purport to sue over anticompetitive behavior in 20 distinct MLSs (*id.* at ¶¶ 18, 133-34), their factual allegations implicate only 6 of those MLSs: (1) the REColorado MLS (plaintiff Cole, ¶ 23); (2) the Central Texas Realty Information Systems MLS (plaintiff Darnell, ¶ 24); (3) the Northstar MLS (plaintiffs Moehrl and Sawbill, ¶¶ 25 and 29); (4) the My Florida Regional MLS (plaintiff Nager, ¶ 26); (5) the Bright MLS (plaintiffs Ramey and Umpa, ¶¶ 27 and 30); and the Metro MLS (plaintiff Ruh, ¶ 28).

Each of these paragraphs ends with the conclusory assertion that "[a]s part of the sales transaction, [plaintiff] paid a substantial buyer-broker commission."  *Id.*  Those largely conclusory allegations are all that the CAC says about the plaintiffs and the sale of their homes.  The CAC contains no allegations of fact regarding how the commission paid to either the listing or buyer broker was determined or negotiated; the extent to which any commission paid was allegedly "inflated" by the supposed misconduct alleged in the complaint; or indeed any reference whatsoever to NAR rules in any of the relevant transactions.

### B.    The MLS System

An MLS is a joint venture of real estate brokers which features a database of properties listed for sale in a particular geographic region that conveys relevant information about listed properties to all brokers participating in the MLS.  CAC at ¶ 2.  Because of the efficiency of the

---

[1] Sawbill Strategic recently filed a notice of voluntary dismissal of its complaint.  *See* ECF No. 107.

system, the vast majority of home transactions in the United States are consummated through an MLS. As several courts have noted, the purpose of an MLS is to encourage communication and cooperation among brokers in order to incentivize all MLS participants to come forward with a buyer for the listed property – and thereby to increase market transparency and efficiency. *See, e.g.*, *Reifert*, 450 F.3d at 321; *O'Riordan v. Long Island Bd. of Realtors*, 707 F. Supp. 111, 115 (E.D.N.Y. 1988) (noting that MLSs function "like an exchange and provide[] wide dissemination of market information"). This increase in market efficiency ensures that participating brokers have the same access to necessary knowledge about listed properties and offers, which benefits both buyers and sellers.

Plaintiffs allege that most MLSs (including the MLSs at issue in the complaint) are administered by local Realtor® associations. CAC ¶¶ 50-51. They also allege that a broker's right to list homes on these MLSs is conditioned on the broker following the rules set forth in the NAR Handbook and the NAR Code of Ethics. *Id.* at ¶¶ 58-59, 94-101.

## C. <u>Plaintiffs' Allegations of Anticompetitive Behavior</u>

Plaintiffs challenge an alleged agreement to "impose, implement and enforce anticompetitive restraints that cause home sellers to pay inflated commissions on the sale of their homes . . . ." *Id.* at ¶ 1. The mechanism for this agreement, according to plaintiffs, is an NAR rule that requires every listing broker to make a blanket unilateral offer of compensation to any other MLS participant who finds a buyer for the home. *Id.* at ¶¶ 3, 60. Plaintiffs are referring to Section 1 of Part 2-G of the NAR Handbook on Multiple Listing Policy, which they persist in (inaccurately) calling the "Buyer Broker Commission Rule," but in this brief is referenced by its actual designation as NAR Handbook Section 2-G-1 ("Section 2-G-1").

Unlike plaintiffs' original complaint, the CAC does not allege that Section 2-G-1 requires the commission offer in the MLS listing to be "non-negotiable." *See, e.g.*, *id.* at ¶ 60. While

plaintiffs still inaccurately complain that other NAR rules "impede effective negotiation" over commission offers by limiting the circumstances in which brokers can raise the issue, *see* CAC at ¶¶ 82-93, plaintiffs have abandoned their original, demonstrably false theory that NAR rules prohibit post-listing commission negotiations altogether.

Instead, plaintiffs now claim that Section 2-G-1 injures competition merely by requiring that a listing broker make a blanket commission offer to buyers brokers when making an MLS listing. *Id.* at ¶¶ 4. They assert that simply requiring an offer – of an amount that the seller is free to determine in consultation with the listing broker – is somehow "manifestly anticompetitive," because it encourages listing brokers to make high commission offers as a means of encouraging buyers brokers to show the listed home to their clients. *Id.* Plaintiffs' new theory, in other words, is that NAR is somehow ***restraining*** competition by encouraging listing brokers ***to engage in competition*** for the attention of buyers brokers.

Plaintiffs have also failed to allege ***facts*** to support their claim that NAR rules unlawfully inflate commissions or otherwise injure competition in any local market for residential real estate. Instead, they rely largely on quotations from news articles, editorials, and statements from critics of the American real estate industry. *See, e.g.*, *id.* at ¶¶ 5 11, 13-14, 56, 61-65, 67, 73, 78-81. As explained below, these citations are insufficient as a matter of law to support plaintiffs' claims.

### D.  Relevant NAR Policies That May Be Considered On A Motion To Dismiss

The CAC purports to describe both the NAR Handbook and NAR's Code of Ethics and Standards of Practice. *See, e.g.*, CAC ¶¶ 4, 60, 79, 87-91.[2] In particular, plaintiffs focus on Section

---

[2]  When a complaint relies on documents not attached to the complaint, the Court may consider the entire document – not just the portions cited by the plaintiff – when deciding a motion to dismiss. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Venture Assocs. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 431 (7th Cir. 1993), *overruled on other grounds*. True and correct copies of the 2019 versions of the NAR Handbook on Multiple Listing

2-G-1 of the NAR Handbook.[3]  Plaintiffs claim that this provision "compels" listing brokers to make offers of significant compensation to buyers brokers.  *Id.* at ¶¶ 3-4, 60.  But Section 2-G-1 does nothing of the kind.  It provides only that (1) listing brokers must make a blanket, unilateral offer of cooperative compensation to buyer brokers, (2) expressed as either a percentage of the sales price or as a specific amount of money, and (3) consisting of more than a "general invitation" to discuss terms.  Johnson Decl., Ex. A at 34.  Neither Section 2-G-1 nor any other NAR rule requires, or even encourages, listing brokers to make offers of compensation of any particular amount.  Commission offers as low as one cent – tantamount to an offer of no compensation at all – are permitted.

The CAC also references Standard of Practice ("SOP") 3-2 and 16-16 from the NAR Code of Ethics.[4]  CAC at ¶¶ 4, 88-90.  Plaintiffs claim that these SOPs prohibit home buyers and sellers from attempting to lower commission rates.  *Id.*  This allegation is baseless.

SOP 16-16 provides as follows:

> REALTORS® acting as subagents or buyer/tenant representatives or brokers, shall not use the terms of an offer to purchase/lease to attempt to modify the listing broker's offer of compensation to subagents or buyer/tenant representatives or brokers nor make the submission of an executed offer to purchase/lease contingent on the listing broker's agreement to modify the offer of compensation.

As this text makes clear, SOP 16-16 applies only to brokers – not to the parties to the transaction.

---

Policy, Code of Ethics and Standards of Practice, and Case Interpretations, each referenced in and central to the complaint, are attached to this motion.  *See* Declaration of Katie Johnson (Johnson Decl.), Ex. A, Ex. B, and Ex. C.

[3]  The NAR Handbook is "intended to guide member associations of Realtors® in the operation of multiple listing services consistent with the policies established by the National Association's Board of Directors."  *See* Johnson Decl., Ex. A at iii.

[4]  The NAR Code of Ethics establishes obligations that Realtors® must follow when carrying out their duties.  Its seventeen Articles, the application of which are further explained in Standards of Practice, address the duties that Realtors® owe towards clients, customers, the public and each other.  *See* Johnson Decl., Ex. B.

It merely prohibits buyers brokers from employing a tactic that could jeopardize a home sale (and their client's interests), *i.e.* conditioning submission of a purchase offer on the listing broker's agreement to increase the compensation offered to the buyer's broker. *Id.*

In all contexts other than making a purchase offer contingent upon a modification in the commission set forth in the listing, a buyers broker is free to negotiate the amount of the commission that was offered in the listing. That can be done before a purchase offer is submitted or after such an offer is submitted. And the actual seller and buyer are free to negotiate commission levels at any time.

## STANDARD OF REVIEW

"[A]lthough the complaint's factual allegations are accepted as true at the pleading stage, allegations in the form of legal conclusions are insufficient to survive a Rule 12(b)(6) motion." *McReynolds v. Merrill Lynch & Co.*, 694 F.3d 873, 885 (7th Cir. 2012) (internal citations omitted). Thus, pleadings "supported by mere conclusory statements, do not suffice." *Id.* Rather, a plaintiff must assert factual allegations that are "enough to raise a right to relief above the speculative level . . . ." *Bell Atlantic v. Twombly*, 550 U.S. 544, 555 (2007). A complaint does not suffice "if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 557). "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *McReynolds*, 694 F.3d at 885 (internal citations omitted).

The requirement that complaints be based on facts, not conclusions or speculation, is especially important in potentially burdensome and expensive cases like this one. As the Seventh Circuit has explained: "In a complex antitrust or RICO case, a fuller set of factual allegations than found in the sample complaints in the civil rules' Appendix of Forms may be necessary to show that the plaintiff's claim is not largely groundless." *Limestone Dev. Corp. v. Vill. of Lemont*, 520

F.3d 797, 803 (7th Cir. 2008) (internal citations and quotations omitted). *See also BCB Anesthesia Care, Ltd. v. Passavant Mem'l Area Hosp. Ass'n*, 36 F.3d 664, 669 (7th Cir. 1994) (affirming dismissal of a Sherman Act § 1 case and noting "judicial concern with avoiding burdensome litigation unless there is an apparent justification for it"); *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1110 (7th Cir. 1984) (affirming dismissal of a Sherman Act § 1 case).

## ARGUMENT

## I.     THE COMPLAINT DOES NOT ALLEGE FACTS THAT, IF PROVEN, WOULD VIOLATE THE ANTITRUST LAWS.

In order to survive a motion to dismiss, plaintiffs must plead factual content that, if proven, would make out a violation of the antitrust laws.  Plaintiffs have not done so.

### A.     The CAC Fails To Allege Facts To Support Plaintiffs' Claim That NAR Rules Artificially Inflate Commission Levels.

Plaintiffs' new theory is that, by requiring that listing brokers offer compensation to buyers brokers when listing a property on an MLS, NAR rules artificially inflate the commissions paid by home sellers.  *See* CAC at ¶¶ 3-4.  Plaintiffs seem to identify four distinct ways in which NAR rules supposedly cause this "inflation."  *First*, they claim that Section 2-G-1 creates "tremendous" pressure on listing brokers to make significant cooperative compensation offers.  *Id.* at ¶¶ 4, 60-65.  *Second*, they claim that Section 2-G-1 facilitates unnatural "steering" by buyers brokers.  *Id.* at ¶¶ 4, 67-78.  *Third*, they claim that NAR rules somehow prevent home buyers from paying their brokers directly.  *Id.* at ¶¶ 10-11, 48, 61, 79-81.  *Fourth*, they claim that NAR rules "impede effective negotiation" over commission amounts.  *Id.* at ¶¶ 82-92.  As explained below, all of these theories fail because plaintiffs have not alleged, and cannot allege, facts to support them.

1.	**The CAC Alleges No Facts Showing That NAR Rules Create Artificial Pressure On Listing Brokers To Make "Inflated" Offers Of Compensation**.

Plaintiffs have not alleged a single specific fact to support their claim that Section 2-G-1, or any other NAR Rule, causes listing brokers to offer buyer brokers cooperative commissions around 3%. *See, e.g.*, CAC at ¶¶ 4, 60-65.

Although the CAC repeatedly makes the conclusory assertion that Section 2-G-1 causes "an overcharge on home sellers" by forcing listing brokers to make substantial commission offers in MLS listings,[5] it alleges no ***facts*** to connect Section 2-G-1 to any particular offer amount. The text of the Rule itself does not support such a connection. Moreover, plaintiffs also ignore the fact that listing brokers are agents of sellers. The seller decides how much commission to pay to the broker and, in consultation with that broker (acting as the seller's agent), how much commission to offer to buyers brokers. This decision is part of the competitive process in which brokers compete to be retained by sellers.

Further, as the text makes clear, Section 2-G-1 requires only that listing brokers make ***some*** offer of compensation. It says nothing about how large or small that offer can or should be. *See* Johnson Decl., Ex. A at 34-35. A seller, in consultation with the listing broker, can decide to offer a minimal commission to the broker who finds a buyer for the listed property. A listing broker who offers compensation as low as one cent is in full compliance with Section 2-G-1.[6] Nothing in Section 2-G-1 forces home sellers to bear the actual cost, or any significant portion, of the buyer

---

[5] *See, e.g.*, CAC at ¶¶ 61-62.

[6] Plaintiffs complain about the manner in which cooperative compensation offers can be searched for, or displayed in, MLSs, *see* CAC at ¶¶ 70-72, and the manner in which certain brokers are allegedly trained to discuss commissions with clients. *See id.* at ¶ 85. These allegations have nothing to do with NAR rules. Nor do they support plaintiffs' suggestion that NAR rules are the reason that commission rates are supposedly "inflated."

broker's compensation.[7]  And plaintiffs have not alleged any facts that, if proven, would show that it is the text of Section 2-G-1 – rather than market forces – that has supposedly caused listing brokers to often offer cooperative compensation in the range of 2-3%.

Notably, plaintiffs themselves acknowledge that sellers negotiate their commissions with listing brokers in the listing agreement and that those listing agreements often specify (1) how much commission the listing broker will offer as compensation to the buyer's broker, and (2) what will happen to the buyer-broker's commission if the buyer's broker is compensated in some other way.  CAC at ¶ 46.  Plaintiffs make no factual allegations that NAR rules, or anything else done by NAR, limits or restrains the ability of sellers to bargain for lower commissions.

Indeed, plaintiffs have not alleged any facts demonstrating that any other NAR rules require, or even encourage, listing brokers to make substantial commission offers to the other MLS participants when listing a property on an MLS.  To the contrary, Section 2-A of the NAR Handbook specifically provides that:

> Boards and associations of REALTORS® and their MLSs shall not:
>
> 1.  Fix, control, recommend, or suggest the commissions or fees charged for real estate brokerage services (Interpretation 14).
>
> 2.  Fix, control, recommend, or suggest the cooperative compensation offered by listing brokers to potential cooperating brokers . . . .

---

[7] Plaintiffs also complain that blanket offers of cooperative compensation result in skilled buyer brokers receiving the same offers their less-skilled colleagues, CAC at ¶ 63.  But this fact only serves to underscore that the offer of compensation is intended to benefit the seller by incentivizing MLS participants to find a buyer for the property.  The experience of the buyer's broker is of little interest to the seller.  Moreover, plaintiffs ignore the fact that any buyers broker who feels that his or her skill justifies higher compensation is free to seek a higher commission from the listing broker or additional compensation from the buyer client.  In any event, it is common in our economy to offer the same payment to all service providers regardless of their skill level.  Thus, for example, Medicare pays all physicians the same amount regardless of their experience.  *See* 42 U.S.C. § 1395w-4.

*See* Johnson Decl., Ex. A at 7 (NAR Handbook Section 2-A).  Plaintiffs have thus failed to allege facts to support their claim that Section 2-G-1, or anything else in the NAR Handbook, unreasonably restrains how commission offers are set or negotiated, or how much must be offered.

None of the CAC's conclusory accusations of anticompetitive effect are supported by ***factual*** allegations sufficient to overcome the plain language of Sections 2-G-1 and 2-A.  For example, while the CAC contains the bare assertion that Section 2-G-1 "has maintained broker commission levels at remarkably stable and inflated levels for the past two decades, . . ." CAC at ¶ 12, plaintiffs have pleaded no facts to support a link between that Section, on the one hand, and commission levels, on the other.[8]  Simply claiming that commissions have been "inflated" during the time period that Section 2-G-1 was in place – which is all the CAC does – is not sufficient to demonstrate that the latter caused the former.  *See, e.g.*, *Pirard v. Bank of America*, No. 12 C 2901, 2013 WL 1154294, at *2 (N.D. Ill. March 19, 2013) (dismissing antitrust complaint that failed to allege facts linking alleged wrongdoing to alleged anticompetitive effect).[9]

Nor have plaintiffs pleaded facts to support their bare assertion that current commission rates are "supra-competitive."  CAC at ¶ 12.  Instead, they offer excerpts from opinion pieces, quoting – for example – a 2006 editorial in the New York Times, *id.* at ¶ 13, or snippets from 2006

---

[8] Plaintiffs occasionally allege their claims in terms not specific to Section 2-G-1 – *see, e.g.*, CAC at ¶ 56 ("Defendants have implemented and enforced a scheme designed to maintain supra-competitive commissions and impede lower-priced competition") – but Section 2-G-1, as interpreted in NAR SOP's, appears to be the only NAR rule they actually identify as purportedly anticompetitive.

[9] *See also Car Carriers, Inc.*, 745 F.2d at 1106-07 (explaining that a failure to sufficiently allege anticompetitive effects of an alleged violation typically warrants dismissal of the antitrust claim); *O'Neill v. Coca-Cola Co.*, 669 F. Supp. 217, 224 (N.D. Ill. 1987) (granting defendant's motion to dismiss complaint upon finding that plaintiff's conclusory allegations were not sufficient to establish antitrust injury); *Alberto-Culver Co. v. Andrea Dumon, Inc.*, 295 F. Supp. 1155, 1157 (N.D. Ill. 1969), *aff'd in part, rev'd in part on other grounds*, 466 F.2d 705 (7th Cir. 1972) (dismissing counterclaim for lack of specificity where it was supported solely by conclusory allegations of antitrust injury).

testimony to a Congressional committee. *Id.* at ¶ 65. These expressions of opinion cannot substitute for properly alleged facts. *See Clark v. Winnebago County, Ill.*, No. 92 C 20131, 1992 WL 188325, at *1 (N.D. Ill. July 24, 1992) (stating that "legal conclusions, deductions or opinions couched as factual allegations are not given a presumption of truthfulness"); *Mason v. Am. Tobacco Co.*, 346 F.3d 36, 39 (2d Cir. 2003) (same). Plaintiffs offer similarly deficient support for their claim that commission-based payment systems are, somehow, inherently anticompetitive; the only "support" for this claim is a Wall Street Journal editorial and some law review articles. CAC at ¶ 15. Again, citations to these kinds of "authorities" cannot substitute for proper factual allegations. *See id.*; *see also Twombly*, 550 U.S. at 545 (stating that "[f]actual allegations must be enough to raise a right to relief above the speculative level . . . .").

Ironically, plaintiffs themselves have alleged facts demonstrating that Section 2-G-1 permits listing brokers to engage in discounting, *i.e.*, offering their services for lower than "typical" commission rates. Specifically, they allege that there currently are brokers who offer discounted rates on MLSs, and an entire market segment occupied by "limited service, discount broker[s]." *See* CAC at ¶¶ 68-69. Plaintiffs cannot claim that NAR rules somehow prohibit listing brokers from offering discounted services while simultaneously alleging that certain listing brokers offer precisely such services.

This Court cannot draw a reasonable inference that NAR rules compel or even encourage listing brokers to charge "inflated" commissions. Nothing in Section 2-G-1 or in any other NAR rule says anything at all about commission levels. To the contrary, it is incontrovertible that NAR rules explicitly prohibit MLSs from fixing or controlling cooperative commission offers. And plaintiffs themselves suggest that some listing brokers charge less than others. *See* CAC at ¶¶ 64-65. In sum, plaintiffs have alleged no facts connecting commission levels to the requirements, or

existence, of Section 2-G-1. *See Pirard*, 2013 WL 1154294, at *2; *see also Rocha v. FedEx Corp., et al.*, 15 F. Supp. 3d 796, 811 (N.D. Ill. 2014) (rejecting allegation that plaintiff was forced to buy a product when the contract relied on by plaintiff stated that plaintiff was not required to do so). The CAC must be dismissed because NAR rules directly contradict plaintiffs' central claim and antitrust theory – and do not require listing brokers to offer more than one cent in commission. *See Schachar v. Am. Acad. of Ophthalmology, Inc.*, 870 F.2d 397, 397 (7th Cir. 1989) ("There can be no restraint of trade without a restraint.").

### 2. The CAC Alleges No Facts To Support Plaintiffs' Claim That NAR Rules Encourage Or Enable Anticompetitive "Steering."

Plaintiffs also seem to claim that Section 2-G-1 encourages, if not requires, listing brokers to make "inflated" commission offers by facilitating what plaintiffs call "steering." *See, e.g.*, CAC at ¶¶ 67-74. In essence, plaintiffs claim that Section 2-G-1 allows buyers brokers to compare listings based on compensation offers, which makes it easier for those brokers to "steer" home buyers towards listings that offer better compensation for the buyer broker. *Id.* These allegations get plaintiffs nowhere.

The word "steering" is just an anticompetitive-sounding epithet that plaintiffs have chosen to apply to standard market dynamics. In using that word, all that plaintiffs are alleging is that sellers and listing brokers offer MLS participants cooperative commissions as a way to incentivize those participants to show their clients the property in question. *Id.* Attempting to stimulate demand by offering more attractive terms is not anticompetitive. In fact, it is the essence of competition. Plaintiffs' "steering" theory consists entirely of allegations that standard market forces control both the incentives to offer cooperative compensation and buyer brokers' responses to those offers. Plaintiffs cannot transform this market dynamic into an unlawful restraint simply by using a pejorative antitrust buzzword to describe it. *See, e.g.*, *Dial A Car, Inc. v. Transportation,*

*Inc.*, 884 F. Supp. 584, 590 (D.D.C. 1995) (dismissing antitrust complaint that "use[d] the right antitrust buzzwords" and was "replete with the vocabulary of antitrust law," but failed to allege facts in support of claims).

Plaintiffs' steering allegation is equivalent to the notion that publishing commission offers on an MLS is inherently anticompetitive – an argument that has been specifically rejected in prior cases. *See Supermarket of Homes*, 1983 WL 2199, at *7 ("[T]he circulation of commission rates in the MLS does not violate the antitrust laws."); *Murphy v. Alpha Realty*, No. 76 C 2446, 1978 WL 1451, at *4 (N.D. Ill. Dec. 7, 1978) (finding the "practice of exchanging information concerning commission rates and the division of those commissions" insufficient to support plaintiffs' price-fixing claim). It is also contrary to accepted economic theory, since dissemination of pricing information has long been recognized as procompetitive, not anticompetitive. *See, e.g.*, *Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 773 (1999) (discussing procompetitive benefits of transparent price competition); *Reifert*, 450 F.3d at 321 (finding that Article 16 of the NAR Code of Ethics "aids competition and fulfills the purposes of the Sherman Act by providing a more transparent marketplace").

Plaintiffs' own allegations actually undermine their steering theory. That theory is that buyers brokers "steer" home buyers toward listings that offer higher buyer broker commissions. It is premised on the assumption that buyers brokers are able to steer buyers towards certain home listings and away from others, all to better serve the brokers' interests in a higher commission. But plaintiffs themselves allege that nothing of the sort is true. Specifically, they allege that "many homebuyers no longer locate prospective homes with the assistance of a broker, but rather independently through online services." CAC at ¶ 14. Indeed, plaintiffs claim that buyers brokers are often not retained until "after their client has already found the home the client wishes to buy."

*Id.*  These allegations fatally undermine plaintiffs' claim that Section 2-G-1 somehow enables buyers brokers to dictate home choices to home-buyers based on commission levels.  Plaintiffs' steering theory is contradicted by their own allegations and does not save the CAC from dismissal.

### 3. The CAC Alleges No Facts To Support Plaintiffs' Claim That Section 2-G-1 Prevents Home-Buyers From Paying For Their Broker Services.

Plaintiffs have not alleged facts that, if proven, would demonstrate that Section 2-G-1 (or any other NAR rule) somehow prevents home-buyers from paying their brokers directly.  Plaintiffs repeatedly make the bare assertion that, if Section 2-G-1 were repealed, "buyer-brokers would be paid by their clients, not the sellers, and would compete to be retained by offering lower commissions to their prospective clients . . . ."  *See, e.g.*, CAC at ¶ 10-11, 48, 61, 79-81.  But they have alleged no facts to support this allegation and, as discussed above, it finds no support in the text of the challenged Rule.

Section 2-G-1 says nothing about whether buyers brokers can be paid by their clients, and it certainly does not prohibit a broker from seeking or receiving payment directly from a buyer-client.  NAR rules do not require that listing brokers offer any significant compensation to buyers brokers.  *See* Section I.A.1, above. Nor do NAR rules in any way prevent buyers from paying their brokers or prevent buyers brokers from looking to their clients for compensation.  In this connection, it is notable that, while plaintiffs believe that compensation to buyers brokers is too high, the CAC contains not a single allegation about the widespread practice of some buyers brokers, as part of the competitive process, to offer rebates (or a portion of the compensation paid to the buyers broker) to their buyer clients.  *See, e.g.*, https://listwithclever.com/real-estate-blog/home-buyer-rebate-without-negotiating/ (showing map of 40 states where such rebates are permissible, and one broker's clear offer to make rebates to buyers it represents).  Likewise, the

CAC is silent about buyers brokers contracts by which the buyer agrees to pay its broker where the compensation offered in the listing on the MLS is deemed to be inadequate.

Plaintiffs seem to claim that removing Section 2-G-1 from the NAR handbook will cause listing brokers to stop offering cooperative compensation altogether and force buyer brokers to be paid directly by the buyer. *See, e.g.*, CAC at ¶¶ 10-11. But removing Section 2-G-1 from the NAR Handbook would not *prohibit* listing brokers from making cooperative compensation offers; it would simply make it *optional* for listing brokers to include such offers in their MLS listings. Notably, such offers are already effectively optional in that offers can be as low as one cent. And plaintiffs themselves have alleged facts demonstrating that it is market forces – not the text of Section 2-G-1 – that incentivizes sellers and listing brokers to make cooperative compensation offers in order to attract the attention of buyer brokers. *See, e.g.*, *id.* at ¶ 65 (alleging that listing brokers offer cooperative compensation at 3% because they fear that lower offers will not attract buyer brokers). The CAC alleges no facts to explain why these market incentives would disappear, or change at all, if Section 2-G-1 disappeared.

The absence of any factual allegations on this point is most telling, and requires dismissal of the CAC. *See, e.g.*, *Tamayo v. Blagojevich*, 526 F.3d 1074, 1083 (7th Cir. 2008) (explaining that a plaintiff must allege facts sufficient to "show that it is plausible, rather than merely speculative, that he is entitled to relief"); *Brown v. Visa U.S.A.*, 674 F. Supp. 249, 252-53 (N.D. Ill. 1987) (dismissing antitrust complaint that offered only speculation regarding anticompetitive effect of alleged conspiracy). If market forces really were pushing for listing brokers to offer no compensation to buyers brokers, Section 2-G-1 would not stop them from doing so: Listing brokers could simply make nominal or *de minimis* offers of cooperative compensation. Plaintiffs allege no facts to contravene the conclusion that some listing brokers currently make minimal

offers of compensation or to demonstrate that any NAR rule prevents or inhibits payment of buyers brokers by buyers.

### 4. The CAC Alleges No Facts Demonstrating That NAR Rules "Effectively Prohibit" Negotiation Over Cooperative Commissions.

Finally, plaintiffs fail to allege facts to support the claim that NAR rules prohibit "effective negotiation" between sellers and their brokers over the amount of seller's commission. CAC at ¶ 82. While the CAC devotes several paragraphs to complaining about NAR rules, *see id.* at ¶¶ 82-93, those allegations do not withstand scrutiny.

First, several of these paragraphs simply repeat plaintiffs' theory that commissions are "inflated" by the desire of sellers, and their brokers, to offer a cooperative commission high enough to encourage buyers brokers to show their clients the seller's home. *See id.* at ¶¶ 83-86. As explained above, these conclusory allegations should be disregarded because they are unsupported by any allegations of fact. Plaintiffs have alleged no facts to demonstrate that these competitive pressures are created by NAR rule, rather than standard market dynamics. *See* Sections I.A.1 and I.A.2.

Plaintiffs also allege that NAR Standard of Practice 16-16 "restrains negotiations" by prohibiting buyers brokers from attempting to reduce their own commission rates "through the submission of purchase offers." CAC ¶ 88. This claim is without merit. First, as plaintiffs' own allegations demonstrate, SOP 16-16 merely states that brokers cannot use the making of an ***offer to purchase the home*** as a vehicle to negotiate the buyer broker's compensation. *Id.* In so doing, the SOP ensures that any negotiations between the brokers regarding the amount of the buyers broker's compensation do not disrupt the negotiation of the underlying real estate transaction.

In other words, a buyer's broker cannot seek to increase the commission that he or she will receive by holding the buyer's offer hostage until the listing broker agrees to pay more

compensation to the buyer broker. By its terms, this SOP prohibits only this one particular negotiating tactic, a tactic that would be inconsistent with buyers brokers' fiduciary obligation to place the interests of the client first. In every other way, NAR rules permit negotiation of commissions as between the listing broker and other MLS participants.

Moreover, the plain language of SOP 16-16 does not preclude a ***buyer*** from demanding a change in the amount of the buyer broker's commission. The plain language of the provision demonstrates that there is no bar against buyers asking the seller to compensate the buyer's broker, or asking the seller to deduct the amount reserved for the buyer broker's commission from the sales price in lieu of providing compensation to the buyer broker. The SOP applies only to negotiations between brokers. It is designed to protect sellers and buyers from having their deal held hostage by buyers brokers seeking larger commissions for themselves. *See* Johnson Decl., Ex B at Article 16.

Thus, in Case Interpretation #16-17, a broker was found not to be in violation of Article 16 as interpreted by SOP 16-16 when his client, the buyer, successfully demanded that the seller pay the buyer broker's commission. The Hearing Panel noted that there might have been an Article 16 problem (namely, interference with the listing broker's relationship with his seller-client) if that demand had been made by the buyer's broker or by the buyer at his broker's urging. *See* Johnson Decl., Ex. C at 90.

Plaintiffs also claim that SOP 3-2 "restrains negotiations of the buyer-broker commission" by preventing listing brokers from making unilateral changes to their cooperative commission offers after a purchase offer has been made. CAC at ¶ 90. But as noted earlier, NAR rules make it clear that SOP 3-2 prohibits only ***unilateral*** changes, not negotiated ones. Thus, SOP 3-3 explicitly provides that listing and cooperating brokers may "enter[] into an agreement to change

cooperative compensation." *See* Johnson Decl., Ex. B at 3.[10] In other words, brokers are expressly permitted to do what plaintiffs claim they may not do: Negotiate over commissions.

### B. Plaintiffs' Allegations That NAR Rules Harm Competition Are Economically Implausible And Contrary To Long-Established Precedent.

The CAC should also be dismissed because it is contrary to sound economic analysis and applicable precedent. Indeed, many of the allegations that plaintiffs make in support of their "inflation" theories actually highlight the ***procompetitive*** effects of Section 2-G-1. As plaintiffs admit, by offering a commission in the MLS listing, the listing broker incentivizes other MLS participants to show their clients the listed home and, thereby, efficiently produce a sale. *See, e.g.*, CAC at ¶¶ 9, 65. This effect is procompetitive and, as plaintiffs concede, has caused the MLS to become an effective tool for marketing homes to potential buyers. *Id.* at ¶ 133.

Significantly, plaintiffs do not, and cannot, allege facts contradicting any of the recognized procompetitive effects of NAR rules:

- Home sellers may negotiate with potential listing brokers, who are competing for the listing, over the commission that the seller will pay the listing broker, including how much of that commission will be offered to buyers brokers as an incentive to deliver a buyer.

- Home buyers may negotiate with competing brokers about how much the buyer will pay the broker in the event that the commission offered by the listing broker to the buyer's broker is deemed inadequate.

- The buyer's broker and the listing broker may agree to change cooperative compensation as offered on the MLS. For example, if the seller and buyer cannot come to terms, the buyer's broker and listing broker can agree to lower their commissions to get the deal done.

- The home seller and the home buyer may negotiate the purchase offer with full transparency and knowledge of what each party to the transaction will be paying in

---

[10] SOPs 3-2 and 3-3 interpret Article 3, which provides that "Realtors® shall cooperate with other brokers except when cooperation is not in the client's best interest. The obligation to cooperate does not include the obligation to share commissions, fees, or to otherwise compensate another broker." *See* Johnson Decl., Ex. B at 3.

commissions without the conflicts that can be caused when brokers place concerns about their compensation over the interests of the buyer and seller reaching a deal.

- When a seller elects to permit its broker to pay compensation to the buyer's broker, it frees up buyer cash, thereby potentially increasing the number of buyers able to bid for that home and the amount of funds available for the purchase price. This works particularly to the advantage of low income and first-time home buyers and promotes the goal of fair housing.

## 1. Several Courts Have Found The Challenged NAR Rules To Be Procompetitive.

These considerations and others have caused several courts to recognize the procompetitive nature of MLSs and the NAR rules that govern them. The Seventh Circuit, for example, has rejected antitrust challenges to Article 16 of the NAR Code of Ethics, concluding that: "Article 16 aids competition and fulfills the purposes of the Sherman Act by providing a more transparent marketplace." *Reifert*, 450 F.3d at 321. Other courts have ruled that the practice of disclosing in the MLS the offer of compensation to buyer's brokers is fully consistent with the antitrust laws. *See Supermarket of Homes* **Error! Bookmark not defined.**, 1983 WL 2199, at *7 ("[T]he circulation of commission rates in the MLS does not violate the antitrust laws."); *Murphy*, 1978 WL 1451, at *4 (finding the "practice of exchanging information concerning commission rates and the division of those commissions" to be insufficient to support plaintiffs' price-fixing claim).

Other attacks on the rules governing MLSs have been rejected because courts have recognized the efficiency and consumer benefits provided by MLSs. *See, e.g.*, *O'Riordan*, 707 F. Supp. at 115 (noting that MLSs are procompetitive); *Venture Res. Grp, Inc. v. Greater New Jersey Reg'l Multiple Listing Serv., Inc.*, Civ. A No. 95-0401, 1995 WL 866841, at *3 (D.N.J. Aug. 24, 1995) (noting procompetitive benefits of "encourag[ing] realtors to share listing information and to cooperate in the sale of real estate"). The Department of Justice, similarly, entered into a consent decree, approved by a Court in this District, expressly permitting NAR to maintain a rule that provides that MLS membership may be made contingent on a broker's agreement to "actively

endeavor" to "make or accept offers of cooperation and compensation" through the MLS.[11] Plaintiffs have totally ignored the long antitrust scrutiny of MLSs and the repeated judicial conclusion that MLSs and the rules that govern them are procompetitive.

### 2. Plaintiffs' Claim That The Challenged NAR Rules Injure Competition Is Unsupported By Alleged Facts And Does Not Make Economic Sense.

Plaintiffs' speculative allegations of injury to competition are not backed up by any properly alleged facts.[12] As demonstrated above, there is no factual allegation in the CAC that is inconsistent with the fact that sellers and listing brokers are free to make their own decisions about the commission rates they offer. Even plaintiffs admit that home sellers control how much they pay in commission to their brokers, including how much of that commission will be offered and paid to the other brokers involved in the transaction. *See* CAC at ¶ 46. Similarly, the CAC ignores the inescapable fact that buyers and their brokers are free to negotiate about (a) the commission that buyers will pay their brokers if the commission offered in the listing is inadequate and (b) any rebate that might be paid to the buyer by the broker if the buyer's broker seeks to compete by offering rebates. And nothing in NAR rules prohibits listing brokers and buyer brokers from negotiating commission levels.

Plaintiffs' conclusory allegations that there are lower commission rates in other countries, *see, e.g.*, CAC at ¶¶ 11, 125, do nothing to support their claims. Plaintiffs have made no allegations regarding the operations of markets in those countries – or that these countries even have an MLS system. Thus, they have made no allegation supporting the conclusion that the absence of NAR

---

[11] *See U.S. v. Nat'l Ass'n of Realtors*, No. 1:05-cv-05140 (N.D. Ill. Nov. 18, 2008). *See* Johnson Decl., Ex. D at 26 (2008 Consent Decree at Ex. B).

[12] Antitrust plaintiffs cannot proceed on claims that fail to make economic sense. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 593-97 (1986); *JTC Petroleum Co. v. Piasa Motor Fuels, Inc.*, 190 F.3d 775, 778 (7th Cir. 1999).

rules explains differences in commissions in those countries.[13]  These allegations are insufficient without such facts.  *Pirard*, 2013 WL 1154294, at *2; *see also Cortelco Sys. of Puerto Rico Inc. v. Phoneworks, Inc.*, Civil No. 09–1371CCC, 2009 WL 4046794, *3 (D.P.R. November 20, 2009) (dismissing complaint that failed to allege facts connecting alleged antitrust violation to plaintiff's injury); *Brown*, 674 F. Supp. at 252-53 (same when complaint offered only speculative links between alleged antitrust violation and effect on competition).

Plaintiffs' allegations regarding the supposed stability in commission rates over the years, *see, e.g.*, CAC at ¶¶ 12-13, 126-130, are similarly irrelevant and insufficient to support their claims. Plaintiffs, again, have alleged no facts to connect these allegedly "stable" rates to Section 2-G-1 to any other NAR rule, or to anything else done by defendants.  Plaintiffs must do more to state a Sherman Act claim than simply identify a feature of the market that they do not like.  *Schachar*, 870 F.2d at 397.  Yet that is all they have done in the CAC.

Moreover, given plaintiffs' allegation that home sellers often know what part of the commission will be paid to the buyer's broker, CAC at ¶ 46, the economically plausible conclusion is that the seller recognizes that offering attractive compensation to buyers brokers is in the seller's own economic self-interest.  It makes no economic sense to suggest that sellers can advance their interest in selling their homes by allowing the buyer to decide what commission should be paid to the buyer's broker.  Further, plaintiffs allege that many buyers do not use buyers brokers at all. CAC at ¶ 14.  If true, then the sellers' expectation that part of the commission will be paid to buyers brokers further demonstrates that extending offers of compensation is intended to further the interests of sellers – not to suppress competition.  In ruling on this motion, "the court is not required

---

[13] Nor have plaintiffs made any allegations regarding the relative efficiency of foreign markets for home sales, who bears the costs of promoting properties, how long it takes to sell a property, or any other relevant consideration.

to don blinders and to ignore commercial reality." *Car Carriers, Inc.*,**Error! Bookmark not defined.** 745 F.2d at 1110. Plaintiffs' conclusory and implausible allegations should be rejected.

In sum, plaintiffs have not made, and cannot make, any allegation that NAR rules prevent brokers from competing on commissions in order to win clients and facilitate sales of listed properties. Plaintiffs have not made, and cannot make, any allegation that commission rates are set by anything other than market forces and independent decision-making. And plaintiffs have not made, and cannot make, any allegation that NAR rules in any way dictate the amount of compensation that a listing will offer to other MLS participants. The complaint must be dismissed in light of its failure to make such allegations. *See id.* (explaining that failure to sufficiently allege anticompetitive effects of an alleged violation typically warrants dismissal of the antitrust claim); *O'Neill*, 669 F. Supp. at 224 (granting defendant's motion to dismiss complaint upon finding that plaintiff's conclusory allegations were not sufficient to establish antitrust injury).

## II. PLAINTIFFS FAIL TO ALLEGE FACTS SHOWING THAT THEY WERE INJURED BY THE ALLEGED RESTRAINT OF TRADE.

The CAC must also be dismissed on the independent ground that plaintiffs have not alleged, and cannot allege, that the relevant NAR rules were the cause of their claimed injury. In a private antitrust action, the plaintiff must allege facts that, if proven, would show that the allegedly unlawful conduct was the direct cause of the asserted injury. Injury-in-fact is both a constitutional requirement and an express requirement of the antitrust laws. *Silha v. ACT, Inc*., 807 F.3d 169, 174-75 (7th Cir. 2015); 15 U.S.C. § 15 (establishing that, to seek damages, a private plaintiff must be able to show that he was, in fact, "injured in his business or property" by the alleged antitrust violation). For antitrust injury, plaintiffs must plead and prove "a direct link between the antitrust violation and the antitrust injury . . . ." *Greater Rockford Energy*, 998 F.2d at 395. *See also Kochert v. Greater Lafayette Health Servs., Inc*., 463 F.3d 710, 718 (7th Cir.

2006); *Shuffle Tech Int'l, LLC v. Scientific Games Corp.*, No. 15 C 3702, 2015 WL 5934834, *9-10 (N.D. Ill. Oct. 20, 2015).

Plaintiffs fail to satisfy the requirement that they must allege facts that, if proven, would show that the challenged conduct was the direct cause of their claimed injury. Indeed, they have not even clearly identified their alleged injury. All eight plaintiff home-sellers rely on the same boilerplate allegation that, when they sold their homes, they "paid a substantial buyer-broker commission." CAC at ¶¶ 23-30. But they have not alleged that they even attempted to negotiate a lower commission either from their listing broker or for the buyer's broker, let alone that their broker refused to do so because that broker believed that Section 2-G-1 or any other NAR rule precluded such negotiations. Plaintiffs' conclusory boilerplate provides no support for their claim that Section 2-G-1 even came into play. *See Greater Rockford Energy*, 998 F.2d at 402 (rejecting antitrust claim when plaintiff, due to "numerous intervening economic and market factors," failed to establish but-for causation). Thus, they have not alleged any injury to them by virtue of the alleged NAR Rules.

## CONCLUSION

For the reasons stated above, the CAC should be dismissed with prejudice.

Dated: August 9, 2019

Respectfully submitted,

*/s/ Jack R. Bierig*
Jack R. Bierig
Robert J. Wierenga
Adam J. Diederich
Schiff Hardin LLP
233 South Wacker Drive, Suite 7100
Chicago, IL 60606
312-258-5500 (Phone)
jbierig@schiffhardin.com
rwierenga@schiffhardin.com
adiederich@schiffhardin.com

*Attorneys for Defendant National Association of Realtors®*

## CERTIFICATE OF SERVICE

The undersigned attorney hereby certifies that on August 9, 2019, the foregoing Brief in Support of the Motion of the National Association of Realtors® to Dismiss The Consolidated Amended Complaint For Failure To State A Cause Of Action was electronically filed with the Clerk of the Court by utilizing the CM/ECF System, which will provide electronic notification to all counsel of record:

/s/ *Jack R. Bierig*
Jack R. Bierig