**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

|  |  |  |
|---|---|---|
| CHRISTOPHER MOEHRL, MICHAEL COHL, STEVE DARNELL, VALERIE NAGER, JACK RAMEY, DANIEL UMPA, and JANE RUH, on behalf of themselves and all others similarly situated, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) ) | Case No: 1:19-cv-01610 |
| v. | ) ) | Judge Andrea Wood |
| THE NATIONAL ASSOCIATION OF REALTORS, REALOGY HOLDINGS CORP., HOMESERVICES OF AMERICA, INC., HSF AFFILIATES, LLC, BHH AFFILIATES, LLC, THE LONG & FOSTER COMPANIES, INC., RE/MAX, LLC, and KELLER WILLIAMS REALTY, INC. | ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

**DECLARATION OF KATIE JOHNSON IN SUPPORT OF THE MOTION OF THE
NATIONAL ASSOCIATION OF REALTORS® TO DISMISS THE CONSOLIDATED
AMENDED COMPLAINT FOR FAILURE TO STATE A CAUSE OF ACTION**

I, Katie Johnson, declare that the following is true:

1.      I am the General Counsel and Chief Membership Experience Officer at the National Association of REALTORS® ("NAR").  I make this declaration of my own personal knowledge and, if called to do so, could testify competently to the facts stated herein under oath.

2.      Attached as Exhibit A is a true and correct copy of the 2019 National Association of REALTORS® Handbook on Multiple Listing Policy, available at https://www.nar.realtor/sites/default/files/documents/2019-HMLP.pdf.

3.      Attached as Exhibit B is a true and correct copy of the 2019 National Association of REALTORS® Code of Ethics and Standards of Practice, available at https://www.nar.realtor/sites/default/files/documents/2019-COE.pdf.

4.      Attached as Exhibit C is a true and correct copy of the 31st Edition of the National Association of REALTORS® Interpretations of the Code of Ethics, available at https://www.nar.realtor/sites/default/files/documents/2019-NAR-Case-Interpretations.pdf.

5.      Attached as Exhibit D is a true and correct copy of the Final Judgment entered by this Court on November 18, 2008 in *United States of America v. National Association of Realtors®*, Case No. 1:05-cv-5104, available at https://www.justice.gov/atr/case-document/file/505736/download.


I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and that this declaration was executed on August 8, 2019 at Chicago, Illinois.

*K. Johnson*
_____
Katie Johnson

# EXHIBIT A

# Handbook on Multiple Listing Policy
## 2019

participants

service VOW

cooperation

sold

rules information MLS sellers listing

dispute resolution

appraisals

governance exclusive standards subscribers

buyers IDX

valuations



# Handbook on Multiple Listing Policy

NATIONAL ASSOCIATION OF REALTORS®
430 North Michigan Avenue
Chicago, Illinois 60611-4087

Thirty First Edition: 2019

The compliance classification category of each item is denoted by the following symbol:

**M** Mandatory*

**R** Recommended

**O** Optional

**I** Informational

For ease of reference, all amended
provisions are shaded to highlight additions.

Prepared for the
Multiple Listing Issues and Policies Committee
by Board Policy and Programs

*Adoption is necessary to ensure compliance with mandatory policies established by the NATIONAL ASSOCIATION OF REALTORS® Board of Directors and
coverage under the National Association's master professional liability insurance policy.

© 2019 NATIONAL ASSOCIATION OF REALTORS®
All Rights Reserved

# Preface

This *Handbook* is intended to guide member associations of REALTORS® in the operation of multiple listing services consistent with the policies established by the National Association's Board of Directors.

The *Handbook* includes model enabling provisions for insertion in association bylaws authorizing establishment of a multiple listing service and bylaws and rules and regulations for MLSs which will permit optimum service and efficiency.

Association and association-owned MLSs must conform their governing documents to the mandatory MLS policies established by the National Association's Board of Directors to ensure continued status as member boards and to ensure coverage under the master professional liability insurance program. Associations are encouraged to review any variance from these policies with their legal counsel so the legal implications and liabilities incident to such variance can be clearly ascertained.

Multiple listing is an evolving concept. For this reason, new procedures, needs, operational facilities, and organizational arrangements must evolve to respond to its role and function. It is not the purpose of the *Handbook* to arrest this evolution, rather, it is to assure that it proceeds in a manner which satisfies the requirements of the law, the needs of participating REALTORS®, and the interests of the buying and selling public.

This *Handbook* is somewhat residential in focus because most multiple listing services are residentially-oriented. However, policy information related to the operation of all types of multiple listing services and commercial information exchanges is included. Specific governing document provisions related to the establishment and operation of commercial/industrial multiples and exchanges can be found in the *Handbook on Multiple Listing Policy — Commercial/Industrial Supplement*, available on-line at www.nar.realtor.

Associations are invited to bring to the attention of the National Association any issues they have concerning the clarification or modification of the policies and other information provided in this *Handbook*.

# Table of Contents

**Page**

**Preface** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

**Chronological Listing of Multiple Listing Policy Statements** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xi

**Purpose** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**Part One:**   **Key Definitions**

            **Section 1**   Multiple Listing Service (MLS) Defined . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

            **Section 2**   Definition of MLS Participant . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

            **Section 3**   Definitions of Various Types of Listing Agreements . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

            **Section 4**   Listing Content Defined . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

**Part Two:**   **Policies**

        **A. MLS Antitrust Compliance Policy** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

        **B. Structure** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

            **Section 1**   Types of Multiple Listing Services . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

            **Section 2**   Association and MLS Compliance with National Association Policy . . . . . . . . . . . . . . 8

            **Section 3**   Multiple Listing Service Reciprocal Agreements between Association
                         Contract Service for Multiple Listing Service, or Other Association
                         Agreements Concerning the Association Multiple Listing Service . . . . . . . . . . . . . . . . 9

            **Section 4**   Relationship of Association with Independent Multiple Listing
                         Service in Association Area . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

            **Section 5**   Information Related to Listings of Commercial and Industrial Property . . . . . . . . . . . 10

            **Section 6**   Jurisdiction of Association Multiple Listing Services . . . . . . . . . . . . . . . . . . . . . . . . . . 10

        **C. Administration** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

            **Operational Issues**

            **Section 1**   Procedures to Be Followed by an Association of REALTORS® Upon
                         Demand for Access to the Association's Multiple Listing Service
                         without Association Membership . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

            **Section 2**   Prerequisites for Participation in or Access to a Commercial/Industrial
                         Multiple Listing Service of an Association of REALTORS® . . . . . . . . . . . . . . . . . . . . . 10

            **Section 3**   MLS Indoctrination Requirements Relating to Individuals Entitled to
                         Participation without Association Membership . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

            **Section 4**   Inclusion of Exclusive Agency Listings in MLS Compilations and Databases . . . . . . . 11

            **Section 5**   Effective Date of Changes in Multiple Listing Policy . . . . . . . . . . . . . . . . . . . . . . . . . . 11

            **Section 6**   Factual Data Submitted by Appraisers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

            **Section 7**   Names of Multiple Listing Services . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

            **Section 8**   Categorization of MLS Services, Information, and Products . . . . . . . . . . . . . . . . . . . . . 12

**Section 9**   Changes in MLS Rules and Regulations. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

**Section 10**  Nonmember Broker/Appraiser Access . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

**Section 11**  Removal of Listing when Participant Refuses/Fails to Timely Report
Status Changes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

**Section 12**  Real Estate Transaction Standards (RETS) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

**Section 13**  Orientation and Other Training . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

**Section 14**  Submission of Photographs or Other Graphic Representations . . . . . . . . . . . . . . . . 14

**Section 15**  Submission of Legally Required Seller Disclosure Information . . . . . . . . . . . . . . . . 14

**Section 16**  Price Change Information . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

**Section 17**  Days/Time on Market Information . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

**Section 18**  Need to Disclose if Property is a Foreclosure, is Bank-owned,
or is Real Estate Owned ("REO"). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

**Finance**

**Section 1**   Waivers of MLS Fees, Dues, and Charges . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

**Section 2**   Assessment of MLS Fees, Dues, and Charges . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

**Section 3**   Merger or Dissolution of Association or MLS . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

**Law**

**Postal Regulations**

**Section 1**   Compliance with United States Postal Codes. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

**Tax Exempt Status of An Association of REALTORS®**

**Section 2**   Limitation on Content of Association Advertising . . . . . . . . . . . . . . . . . . . . . . . . . 16

**Registered Multiple Listing Service Mark of the NATIONAL ASSOCIATION OF REALTORS®**

**Section 3**   Nature of Service Mark and Necessity to Effect License Agreement to Use . . . . . . . . . 16

**Section 4**   How to Secure Authorization to Use a Service Mark . . . . . . . . . . . . . . . . . . . . . . . . 16

**Section 5**   Special Note Concerning MLS Service Mark . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

**Section 6**   Use of MLS Logo by Nonmember Participants . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

**Other Legal Issues**

**Section 7**   Compliance with Law by Association and MLS . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

**D.  Data**

**Current Listings**

**Section 1**   Standard Forms . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

**Section 2**   Termination Dates . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

**Section 3**   Net Listings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

**Section 4**   Open Listing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

**Section 5**   Office Exclusive Listings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

**Section 6**   Listing Prices Specified . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

**Section 7**   Auction Listings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

**Section 8**   Limited Service Listing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

**Section 9**   MLS Entry-only Listings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

**Section 10**  Listings of Suspended Participants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

**Section 11**  Listings of Expelled Participants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

**Section 12**  Listings of Resigned Participants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

**Section 13**  Submission of Offers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

**Section 14**  Reporting Resolutions of Contingencies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

**Section 15**  Reporting Cancellation of Pending Sales . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

**Section 16**  Information Included in Any Association MLS Compilation . . . . . . . . . . . . . . . . . . . 19

**Section 17**  Protection Clauses in Association MLS Standard Listing Contracts . . . . . . . . . . . . . . 19

**Section 18**  Compilation of Current Listing Information . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

**Section 19**  Reproduction of MLS Information . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

**Sold/Comparable/Off-market Information**

**Section 1**  Reporting Sales to the MLS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

**Section 2**  Withdrawn Listings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

**Section 3**  Inclusion of Expired or Withdrawn Listings in an Association's
Comparable or Other Report of Statistical Information . . . . . . . . . . . . . . . . . . . . . . . . 22

**Statistical Reports**

**Section 1**  Statistical Reports  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

**Section 2**  Statistical Reports Should Be Kept . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

**Advertising**

**Print and Electronic**

**Section 1**  Internet Data Exchange (IDX) Policy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

**Section 2**  Use of MLS Information in Advertising and Other Public Representations  . . . . . . . . . 27

**Section 3**  Transmittal of Participants' Listings to Aggregators  . . . . . . . . . . . . . . . . . . . . . . . . . . 27

**Section 4**  Electronic Display of Other Participants' Listings  . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

**Homes Magazines**

**Section 5**  Regulation of Advertising in Association or Commercial Publications . . . . . . . . . . . . . 28

**E. Participants' Rights**

**Section 1**  Participation Should be Optional . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

**Section 2**  Association Membership as Prerequisite to MLS Participation . . . . . . . . . . . . . . . . . . . 28

**Section 3**  Participation in an Association Multiple Listing Service of a Branch
Office Manager Who Is Not a Principal of the Real Estate Firm . . . . . . . . . . . . . . . . . 29

**Section 4**  MLS Participation by Brokers Acting as Agents of Potential Purchasers  . . . . . . . . . . 29

**Section 5**  Facilitators/Intermediaries as MLS Participants  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

**Section 6**  Immediate Access to MLS by Association Members if Provided to Nonmember . . . . . . 29

**Section 7**  Presentation of Offers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

**Section 8**  Showings and Negotiations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

**Section 9**  Right of Cooperating Brokers in Presentation of Offers . . . . . . . . . . . . . . . . . . . . . . . . 30

**Section 10**  Right of Listing Brokers in Presentation of Counter-offers  . . . . . . . . . . . . . . . . . . . . 30

**Section 11** Code of Ethics . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

**Section 12** Arbitration. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

**Section 13** Lease of MLS Compilations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

**Section 14** Caravans . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

**Section 15** Ownership of Listing and Listing Content . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

**Section 16** Digital Millennium Copyright Act, Safe Harbor . . . . . . . . . . . . . . . . . . . . . . . 31

**F. Enforcement of Rules**

**Section 1** Appropriate Procedures for Rules Enforcement . . . . . . . . . . . . . . . . . . . . . . . . 32

**Section 2** Rules and Regulations. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

**Section 3** The Use of Fines as Part of Rules Enforcement . . . . . . . . . . . . . . . . . . . . . . . . 32

**Section 4** Financial Penalty Not to Exceed $15,000 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

**Section 5** MLS Disciplinary Guidelines . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

**G. Commission/Cooperative Compensation Offers**

**Section 1** Information Specifying the Compensation on Each Listing Filed
with a Multiple Listing Service of an Association of Realtors®. . . . . . . . . . . . . . . 34

**Section 2** Agency . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

**H. Lock Box/Key Repositories**

**Section 1** Lock Box Security Requirements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

**Section 2** Lock Box Key Deposits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

**Section 3** Centralized Key Repositories . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

**Section 4** Minimum Security Measures for Centralized Key Repositories of
Association Multiple Listing Services . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

**I. Virtual Office Websites: Policy Governing Use of MLS Data in Connection
with Internet Brokerage Services Offered by MLS Participants** . . . . . . . . . . . . . . . . . . . . 40

**Part Three: Model Governance Provisions**

**A. Model Association Bylaw Provisions Authorizing MLS as a Committee
of an All-Realtor® Association** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

**B. Model Association Bylaw Provisions Authorizing MLS as a Committee of an
Association with Realtor® and Realtor-Associate® Members**. . . . . . . . . . . . . . . . . . . 53

**C. Model Rules and Regulations for an MLS Operated as a Committee of an
Association of Realtors®** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

**D. Model Association Bylaws Provisions Authorizing a Multiple Listing Service
as a Wholly-owned Subsidiary Corporation of the Association**. . . . . . . . . . . . . . . . . . 93

**E. Model Bylaws for a Multiple Listing Service Separately Incorporated but
Wholly-owned by an Association of Realtors®** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97

**F. Model Rules and Regulations for an MLS Separately Incorporated but
Wholly-owned by an Association of Realtors®** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 105

**Part Four:**   **Appendices**

**Appendix 1**

History and Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .142

**Appendix 2**

Merging an Independent MLS with an Association of Realtors® . . . . . . . . . . . . . . . . . . . . . . . . . . . . .145

**Appendix 3**

Protecting the Tax-exempt Status of the Association of Realtors® . . . . . . . . . . . . . . . . . . . . . . . . . . . .147

**Appendix 4**

License Agreement for Use of MLS Service Mark by Member Board . . . . . . . . . . . . . . . . . . . . . . . . . .152

**Appendix 5**

Model Multiple Listing Service Subscription Waiver for Use by

Association Multiple Listing Services, National Association of Realtors® . . . . . . . . . . . . . . . . . . .153

**Appendix 6**

National Association of Realtors® Association

Donated Services Record for Committee Meetings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .154

**Appendix 7**

National Association of Realtors® Association

Donated Services Record, Miscellaneous . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .155

**Appendix 8**

Model Lock Box Authorization Addendum . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .156

**Appendix 9**

Select Interpretations from the Official Interpretations of

Article I, Section 2 of the National Association of Realtors®

Bylaws as Referred to in this *Handbook* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .157

# Table of Contents

**for Chronological Listing of Multiple Listing Policy Statements
Approved by the Board of Directors, National Association of REALTORS®**

**Page**

Statement 7.1  Lock Boxes—Deleted 05/12. MLS Policy Statement 7.31
is more current and comprehensive.

Statement 7.2  Caravans . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Statement 7.3  Statistical Reports . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Statement 7.4  Arbitration . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Statement 7.5  Code of Ethics . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Statement 7.6  Board Operation of MLS—Deleted 2005

Statement 7.7  Association Membership as Prerequisite to MLS Participation . . . . . . . . . . . . . . . 28

Statement 7.8  Services of the Board MLS—Deleted 2005

Statement 7.9  Definition of the MLS "Participant" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Statement 7.10  Compliance with Law by Association and MLS . . . . . . . . . . . . . . . . . . . . . . . . . 17

Statement 7.11  Agency . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

Statement 7.12  Tax-Exempt Status of Board Owned MLS—Deleted 2005

Statement 7.13  Use of MLS Logo by a Nonmember Participants . . . . . . . . . . . . . . . . . . . . . . . . 17

Statement 7.14  Immediate Access to MLS by Association Members if
Provided to Nonmember . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Statement 7.15  Compliance with United States Postal Statutes . . . . . . . . . . . . . . . . . . . . . . . . . 15

Statement 7.16  Revised Interpretation No. 4—Deleted November 1996

Statement 7.17  Association and MLS Compliance with National
Association Policy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Statement 7.18  MLS Provided to Nonresident Members—
Deleted November 1996

Statement 7.19  Multiple Listing Service Reciprocal Agreements
Between Associations, Contract Service for Multiple
Listing Service, or Other Association Agreements
Concerning the Association Multiple Listing Service . . . . . . . . . . . . . . . . . . . . . . 9

Statement 7.20  Relationship of Association with Independent Multiple
Listing Service in Association Area . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Statement 7.21  Appropriate Procedures for Rules Enforcement . . . . . . . . . . . . . . . . . . . . . . . . . 32

Statement 7.22  The Use of Fines as Part of Rules Enforcement . . . . . . . . . . . . . . . . . . . . . . . . . 32

Statement 7.23  Information Specifying the Compensation on Each
Listing Filed with a Multiple Listing Service of an
Association of REALTORS® . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Statement 7.24  Participation in an Association Multiple Listing Service
of a Branch Office Manager Who is Not a Principal of
the Real Estate Firm . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

**Statement 7.25** Procedures to be Followed by an Association of REALTORS®
Upon Demand for Access to the Association's
Multiple Listing Service Without Association Membership. . . . . . . . . . . . . . . . . . 10

**Statement 7.26** Prerequisites for Participation in, or Access to,
a Commercial/Industrial Multiple Listing Service
of an Association of REALTORS® . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

**Statement 7.27** No MLS Requirement for Listing Broker to Disclose
Total Negotiated Commission—Deleted 2005

**Statement 7.28** Statistical Report Including "Comparables" Should be
a Board Service—Merged into Policy Statement 7.3 in 2005

**Statement 7.29** Charges for Providing "Comparable Information
to Board Members Who Are Not MLS
Participants—Merged into Policy Statement 7.3 in 2005

**Statement 7.30** "Comparable" Information to Government
Agencies—Merged into Policy Statement 7.3 in 2005

**Statement 7.31** Lock Box Security Requirements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

**Statement 7.32** Lock Box Key Deposits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

**Statement 7.33** Information Related to Listings of Commercial and Industrial Property . . . . . . . . . 10

**Statement 7.34** Reports Relating to the Availability of Mortgage Financing—Deleted 2005

**Statement 7.35** Information Included in Any Association
MLS Compilation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

**Statement 7.36** Inclusion of Expired or Withdrawn Listings in an
Association's Comparable Report or Other Report
of Statistical Information. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

**Statement 7.37** Protection Clauses in Association MLS Standard
Listing Contracts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

**Statement 7.38** MLS Indoctrination Requirements Relating to Individuals
Entitled to Participation Without Association Membership . . . . . . . . . . . . . . . . . . . 11

**Statement 7.39** Compilations of Current Listing Information . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

**Statement 7.40** MLS Participation by Brokers Acting As Agents of
Potential Purchasers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

**Statement 7.41** Inclusion of Exclusive Agency Listings in MLS
Compilations and Databases . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

**Statement 7.42** Jurisdiction of Association Multiple Listing Service . . . . . . . . . . . . . . . . . . . . . . . 10

**Statement 7.43** Waivers of MLS Fees, Dues, and Charges . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

**Statement 7.44** Access to Comparable and Statistical
Information—Merged into Policy Statement 7.3 in 2005

**Statement 7.45** Assessment of MLS Fees, Dues, and Charges . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

**Statement 7.46** Centralized Key Repositories . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

**Statement 7.47** Minimum Security Measures for Centralized Key
Repositories of Association Multiple Listing Services . . . . . . . . . . . . . . . . . . . . . . . 39

**Statement 7.48** MLS May Permit Participants to Establish, Concurrently With the Offer of
Subagency, an Offer to Compensate Buyer Agents—Deleted 1993

**Statement 7.49** Use of Property Data Forms to Publish Features
of Special Interest to Handicapped or Elderly
Individuals—Deleted 2005

**Statement 7.50** Definitions of Various Types of Listing Agreements . . . . . . . . . . . . . . . . . . . . . . . . . 5

**Statement 7.51** Effective Date of Changes in Multiple Listing Policy . . . . . . . . . . . . . . . . . . . . . 11

**Statement 7.52** Factual Data Supplied by Appraisers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

**Statement 7.53** Facilitators/Intermediaries as MLS Participants . . . . . . . . . . . . . . . . . . . . . . . . . 29

**Statement 7.54** Names of Multiple Listing Services . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

**Statement 7.55** Nonmember Broker/Appraiser Access . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

**Statement 7.56** MLS Defined—Merged into Definitions Section in 2005

**Statement 7.57** Categorization of MLS Services, Information, and Products . . . . . . . . . . . . . . . . . 12

**Statement 7.58** Internet Data Exchange (IDX) Policy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

**Statement 7.59** Virtual Office Website (VOW) Policy—Deleted 2005

**Statement 7.60** Standard Forms . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

**Statement 7.61** Net Listings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

**Statement 7.62** Open Listings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

**Statement 7.63** Office Exclusive Listings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

**Statement 7.64** Withdrawn Listings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

**Statement 7.65** Listing Prices Specified . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

**Statement 7.66** Termination Dates . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

**Statement 7.67** Listings of Suspended Participants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

**Statement 7.68** Listings of Expelled Participants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

**Statement 7.69** Listings of Resigned Participants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

**Statement 7.70** Showings and Negotiations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

**Statement 7.71** Presentation of Offers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

**Statement 7.72** Submission of Offers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

**Statement 7.73** Rights of Cooperating Brokers and Presentation of Offers . . . . . . . . . . . . . . . . . . . 30

**Statement 7.74** Rights of Cooperating Brokers and Presentation
of Counter-offers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

**Statement 7.75** Reporting Sales to the MLS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

**Statement 7.76** Reporting Resolutions of Contingencies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

**Statement 7.77** Reporting Cancellation of Pending Sales . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

**Statement 7.78** Lease of MLS Compilation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

**Statement 7.79** Reproduction of MLS Information . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

**Statement 7.80** Use of MLS Information in Advertising and Other
Public Representations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

**Statement 7.81** Changes in MLS Rules and Regulations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

**Statement 7.82** Auction Listings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

**Statement 7.83** Limited Service Listings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

**Statement 7.84** MLS Entry-only Listings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

**Statement 7.85**  Ownership of Listing and Listing Content . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

**Statement 7.86**  Listing Content Defined . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

**Statement 7.87**  Transmittal of Participants' Listings to Aggregators . . . . . . . . . . . . . . . . . . . . . . . 27

**Statement 7.88**  Removal of Listings When Participant Refuses/Fails
to Timely Report Status Changes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

**Statement 7.89**  Financial Penalty Not to Exceed $15,000 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

**Statement 7.90**  Real Estate Transaction Standards (RETS). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

**Statement 7.91**  Virtual Office Websites: Policy Governing Use
of MLS Data in Connection With Internet Brokerage
Services Offered by MLS Participants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

**Statement 7.92**  Orientation and Other Training . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

**Statement 7.93**  Submission of Photographs or Other Graphic Representations . . . . . . . . . . . . . . . 14

**Statement 7.94**  Submission of Legally Required Seller Disclosure Information. . . . . . . . . . . . . . . 14

**Statement 7.95**  Price Change Information . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

**Statement 7.96**  Days/Time on Market Information . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

**Statement 7.97**  Need to Disclose if Property is a Foreclosure,
is Bank-owned or is Real Estate Owned ("REO") . . . . . . . . . . . . . . . . . . . . . . . . . 15

**Statement 7.98**  Electronic Display of Other Participants' Listings . . . . . . . . . . . . . . . . . . . . . . . . . 28

**Statement 7.99**  Digital Millennium Copyright Act, Safe Harbor . . . . . . . . . . . . . . . . . . . . . . . . . . 31

# Purpose

Through the facility of multiple listing, information concerning individual listings can be made known to all REALTORS® who participate in the activity. In associations of REALTORS® with few members, the actual operation can be very simple. Each REALTOR® can duplicate enough copies of the information concerning his listing to distribute to all other participants. However, when many REALTORS® are involved, the distribution of information becomes more burdensome and may require reasonable rules of procedure and efficient central office management to expedite the service. Regardless of the method, however, the basis of the multiple listing activity is the creation of a facility whereby REALTORS® may most effectively invite other brokers to enter into cooperative agreements with them for the sale of their listings and provide information necessary to permit such cooperation; by which information is accumulated and disseminated to enable authorized participants to prepare appraisals and other valuations of real property; and by which participants engaging in real estate appraisal contribute to common databases. *(Amended 4/92)* 1

1

# Part One:  Key Definitions

**Section 1**
**Multiple Listing Service**
**(MLS) Defined**

A multiple listing service is:

- a facility for the orderly correlation and dissemination of listing information so participants may better serve their clients and customers and the public

- a means by which authorized participants make blanket unilateral offers of compensation to other participants (acting as subagents, buyer agents, or in other agency or nonagency capacities defined by law)

- a means of enhancing cooperation among participants

- a means by which information is accumulated and disseminated to enable authorized participants to prepare appraisals, analyses, and other valuations of real property for bona fide clients and customers

- a means by which participants engaging in real estate appraisal contribute to common databases *(Revised 11/04)*

Entitlement to compensation is determined by the cooperating broker's performance as procuring cause of the sale (or lease). *(Revised 11/94)*

While offers of compensation made by listing brokers to cooperating brokers through MLS are unconditional,* a listing broker's obligation to compensate a cooperating broker who was the procuring cause of sale (or lease) may be excused if it is determined through arbitration that, through no fault of the listing broker and in the exercise of good faith and reasonable care, it was impossible or financially unfeasible for the listing broker to collect a commission pursuant to the listing agreement. In such instances, entitlement to cooperative compensation offered through MLS would be a question to be determined by an arbitration hearing panel based on all relevant facts and circumstances including, but not limited to, why it was impossible or financially unfeasible for the listing broker to collect some or all of the commission established in the listing agreement; at what point in the transaction did the listing broker know (or should have known) that some or all of the commission established in the listing agreement might not be paid; and how promptly had the listing broker communicated to cooperating brokers that the commission established in the listing agreement might not be paid. *(Revised 11/98)* **M**

**Section 2**
**Definition of MLS**
**Participant**
**(Policy Statement 7.9)**

Where the term Realtor® is used in this explanation of policy in connection with the word member or the word participant, it shall be construed to mean the Realtor® principal or principals, of this or any other association, or a firm comprised of Realtor® principals participating in a multiple listing service owned and operated by the board. Participatory rights shall be held by an individual principal broker unless determined by the association or MLS to be held by a firm. It shall not be construed to include individuals other than a principal or principals who are Realtor® members of this or any other association, or who are legally entitled to participate without association membership. However, under no circumstances is any individual or firm, regardless of membership status, entitled to

---

*Compensation is unconditional except where local MLS rules permit listing brokers to reserve the right to reduce compensation offers to cooperating brokers in the event that the commission established in a listing contract is reduced by court action. Refer to Part Two, G., Section 1, Information Specifying the Compensation on Each Listing Filed with a Multiple Listing Service of an Association of Realtors®, *Handbook on Multiple Listing Policy. (Adopted 11/98, Revised 11/09)*

MLS membership or participation unless they hold a current, valid real estate broker's license and offer or accept cooperation and compensation to and from other participants or are licensed or certified by an appropriate state regulatory agency to engage in the appraisal of real property. Use of information developed by or published by an association multiple listing service is strictly limited to the activities authorized under a participant's licensure(s) or certification and unauthorized uses are prohibited. *(Amended 11/08)*

Mere possession of a broker's license is not sufficient to qualify for MLS participation. Rather, the requirement that an individual or firm offers or accepts cooperation and compensation means that the participant actively endeavors during the operation of its real estate business to list real property of the type listed on the MLS and/or to accept offers of cooperation and compensation made by listing brokers or agents in the MLS. "Actively" means on a continual and ongoing basis during the operation of the participant's real estate business. The "actively" requirement is not intended to preclude MLS participation by a participant or potential participant that operates a real estate business on a part-time, seasonal, or similarly time-limited basis or that has its business interrupted by periods of relative inactivity occasioned by market conditions. Similarly, the requirement is not intended to deny MLS participation to a participant or potential participant who has not achieved a minimum number of transactions despite good faith efforts. Nor is it intended to permit an MLS to deny participation based on the level of service provided by the participant or potential participant as long as the level of service satisfies state law. *(Adopted 11/08)*

The key is that the participant or potential participant actively endeavors to make or accept offers of cooperation and compensation with respect to properties of the type that are listed on the MLS in which participation is sought. This requirement does not permit an MLS to deny participation to a participant or potential participant that operates a "Virtual Office Website" (VOW) (including a VOW that the participant uses to refer customers to other participants) if the participant or potential participant actively endeavors to make or accept offers of cooperation and compensation. An MLS may evaluate whether a participant or potential participant actively endeavors during the operation of its real estate business to offer or accept cooperation and compensation only if the MLS has a reasonable basis to believe that the participant or potential participant is in fact not doing so. The membership requirement shall be applied in a nondiscriminatory manner to all participants and potential participants. *(Adopted 11/08)*

Further, none of the foregoing is intended to convey participation or membership or any right of access to information developed by or published by an association multiple listing service where access to such information is prohibited by law. Additionally, the foregoing does not prohibit association multiple listing services, at their discretion, from categorizing non-principal brokers, sales licensees, licensed and certified appraisers and others affiliated with the MLS members or participants as users or subscribers and, holding such individuals personally subject to the rules and regulations and any other governing provisions of the MLS and to discipline for violations thereof. MLSs may, as a matter of local determination, limit participatory rights to individual principal brokers, or to their firms, and to licensed or certified appraisers, who maintain an office or Internet presence from which they are available to represent real estate sellers, buyers, lessors or lessees or from which they provide appraisal services. *(Amended 5/02)*

Where the terms subscriber or user are used in connection with a multiple listing service owned or operated by an association of REALTORS®, they refer to non-principal brokers, sales licensees, and licensed and certified real estate appraisers affiliated with an MLS participant and may, as a matter of local option, also include a participant's affiliated unlicensed administrative and clerical staff, personal assistants, and individuals seeking licensure or certification as real estate appraisers provided that any such individual is under the direct supervision of an MLS participant or the participant's licensed designee. If such access is

4

available to unlicensed or uncertified individuals, their access is subject to the rules and regulations, the payment of applicable fees and charges (if any), and the limitations and restrictions of state law. None of the foregoing shall diminish the participant's ultimate responsibility for ensuring compliance with the rules and regulations of the MLS by all individuals affiliated with the participant. *(Adopted 4/92)*

Under the Board of Choice policy, MLS participatory rights shall be available to any REALTOR® (principal) or any firm comprised of REALTORS® (principals) irrespective of where they hold primary membership subject only to their agreement to abide by any MLS rules or regulations; agreement to arbitrate disputes with other participants; and payment of any MLS dues, fees, and charges. Participatory rights granted under Board of Choice do not confer voting privileges or eligibility for office as an MLS committee member, officer, or director, except as granted at the discretion of the local board and/or MLS. *(Amended 5/97)*

The universal access to services component of Board of Choice is to be interpreted as requiring that MLS participatory rights, or to firms comprised of REALTOR® principals, irrespective of where primary or secondary membership is held. This does not preclude an MLS from assessing REALTORS® not holding primary or secondary membership locally fees, dues, or charges that exceed those or, alternatively, that are less than those charged participants holding such memberships locally or additional fees to offset actual expenses incurred in providing MLS services such as courier charges, long distance phone charges, etc., or for charging any participant specific fees for optional additional services. *(Amended 11/96)*

None of the foregoing shall be construed as requiring an association to grant MLS participatory rights, under Board of Choice, where such rights have been previously terminated by action of that association's board of directors. *(Adopted 11/95)* M

**Section 3**
**Definitions of Various**
**Types of Listing**
**Agreements**
**(Policy Statement 7.50)**

Except where state law provides otherwise, the following terms shall be defined as follows when used in rules and regulations of any multiple listing service owned or operated by one or more associations of REALTORS®. *(Amended 5/06)*

**Exclusive Right-to-Sell Listing:**  A contractual agreement under which the listing broker acts as the agent or as the legally recognized non-agency representative of the seller(s), and the seller(s) agrees to pay a commission to the listing broker, regardless of whether the property is sold through the efforts of the listing broker, the seller(s), or anyone else; and a contractual agreement under which the listing broker acts as the agent or as the legally recognized non-agency representative of the seller(s), and the seller(s) agrees to pay a commission to the listing broker regardless of whether the property is sold through the efforts of the listing broker, the seller(s), or anyone else, except that the seller(s) may name one or more individuals or entities as exemptions in the listing agreement and if the property is sold to any exempted individual or entity, the seller(s) is not obligated to pay a commission to the listing broker. *(Amended 5/06)*

**Exclusive Agency Listing:**  A contractual agreement under which the listing broker acts as the agent or as the legally recognized non-agency representative of the seller(s), and the seller(s) agrees to pay a commission to the listing broker if the property is sold through the efforts of any real estate broker. If the property is sold solely through the efforts of the seller(s), the seller(s) is not obligated to pay a commission to the listing broker. *(Amended 5/06)*

**Open Listing:**  A contractual agreement under which the listing broker acts as the agent or as the legally recognized non-agency representative of the seller(s), and the seller(s) agrees to pay a commission to the listing broker only if the property is sold through the efforts of the listing broker. *(Amended 5/06)*

**Note:** These definitions are provided to facilitate categorization of listings in MLS compilations. In any area of conflict or inconsistency, state law or regulation takes precedence. If state law permits brokers to list property, on either an exclusive or open basis, without establishing an agency relationship, listings may not be excluded from MLS compilations on the basis that the listing broker is not the seller's agent. *(Adopted 11/93, Amended 5/06)* M

**Section 4**
**Listing Content Defined**
**(Policy Statement 7.86)**

"Listing content" as used in the National Association's multiple listing policies, including the model MLS rules and regulations, includes, but is not limited to, photographs, images, graphics, audio and video recordings, virtual tours, drawings, descriptions, remarks, narratives, pricing information, and other details or information related to listed property. *(Adopted 5/06)* M

# Part Two:  Policies

## A.  MLS Antitrust Compliance Policy

The purpose of multiple listing is the orderly correlation and dissemination of listing information to participants so they may better serve the buying and selling public. Boards and associations of REALTORS® and their multiple listing services shall not enact or enforce any rule which restricts, limits, or interferes with participants in their relations with each other, in their broker/client relationships, or in the conduct of their business in the following areas.

Boards and associations of REALTORS® and their MLSs shall not:

1. Fix, control, recommend, or suggest the commissions or fees charged for real estate brokerage services (Interpretation 14).

2. Fix, control, recommend, or suggest the cooperative compensation offered by listing brokers to potential cooperating brokers.

3. Base dues, fees, or charges on commissions, listed prices, or sales prices. Initial participation fees and charges should directly relate to the costs incurred in bringing services to new participants.

4. Modify, or attempt to modify, the terms of any listing agreement; this does not prohibit administrative corrections of property information necessary to ensure accuracy or consistency in MLS compilations.

5. Refuse to include any listing in an MLS compilation solely on the basis of the listed price.

6. Prohibit or discourage participants from taking exclusive agency listings or refusing to include any listing in an MLS compilation solely on the basis that the property is listed on an exclusive agency basis.

7. Prohibit or discourage participants from taking "office exclusive" listings; certification may be required from the seller or listing broker that the listing is being withheld from the MLS at the direction of the seller.

8. Give participants or subscribers blanket authority to deal with or negotiate with buyers or sellers exclusively represented by other participants (Interpretation 10).

9. Establish, or permit establishment of, any representational or contractual relationship between an MLS and sellers, buyers, landlords, or tenants.

10. Prohibit or discourage cooperation between participants and brokers that do not participate in the MLS.

11. Prohibit or discourage participants or subscribers from participating in political activities (Interpretation 15).

12. Interfere in or restrict participants in their relationships with their affiliated licensees (Interpretations 16 and 17).

As used in this policy, "rule" includes all rules, regulations, bylaws, policies, procedures, practices, guidelines, or other governance provisions, whether mandatory or not. "Multiple listing service" and "MLS" means multiple listing service committees of boards and associations of REALTORS® and separately-incorporated multiple listing services owned by one or more boards or associations of REALTORS®.

These policy prohibitions are subject to and limited by applicable statutes, ordinances, and governmental regulations, to agreements entered into by an MLS or board or association of REALTORS® and an agency of government, and to final decrees of courts or administrative agencies.

This policy does not prohibit boards or associations of REALTORS® or their MLSs from adopting rules or policies establishing the legitimate uses of MLS information, from prohibiting unauthorized uses of MLS information, or from establishing rules or policies necessary to prevent illegal collective action, including price-fixing and boycotts.

It is the duty and responsibility of all boards and associations of REALTORS® and MLSs owned by or controlled by boards or associations of REALTORS® to ensure that all bylaws, rules, regulations, and other governance provisions comply with all mandatory multiple listing policies of the NATIONAL ASSOCIATION OF REALTORS®. Boards and associations of REALTORS® failing to conform with these policies will be required to show cause why their charters should not be revoked.

The numbered references refer to the official interpretations of Article I, Section 2 of the bylaws of the NATIONAL ASSOCIATION OF REALTORS®. *(Amended 11/04)* M

# B. Structure

**Section 1**
**Types of Multiple**
**Listing Services**

Basically, there are two types of multiple listing activities used by associations of REALTORS®. The essential characteristics of each may be summarized as follows:

1.  A multiple listing activity available for voluntary participation, but requiring members (principals) who participate to submit all listings of designated types of property, is termed "a mandatory listing service."

    The mandatory service permits each REALTOR® to decide whether or not multiple listing is consistent with the REALTOR®'s method of doing business. If a decision is made to participate in the activity, however, then all listings covered by the rules are required to be submitted.

2.  A multiple listing activity available to all members (principals), but the submission of any listing is an option of the member; this is termed "a voluntary listing service."

**Note:** Any multiple listing activity in which it is compulsory that all members of an association of REALTORS® participate and submit information on all designated types of listings would be in direct conflict with the National Association's bylaws, Article I, Section 2, which bans the adoption by associations of REALTORS® of inequitable limitations on membership. On November 15, 1960, the Board of Directors of the National Association officially adopted the following interpretation: "A requirement to participate in a multiple listing service in order to gain or maintain REALTOR® membership is an inequitable limitation on membership." I

**Section 2**
**Association and**
**MLS Compliance**
**with National**
**Association Policy**
**(Policy Statement 7.17)**

Those associations or multiple listing services found by the National Association to be operating under bylaws or rules and regulations not approved by the National Association are not entitled to errors and omissions insurance coverage and their charters are subject to review and revocation. I

**Section 3**
**Multiple Listing Service**
**Reciprocal Agreements**
**Between Associations,**
**Contract Service for**
**Multiple Listing Service,**
**or Other Association**
**Agreements Concerning**
**the Association Multiple**
**Listing Service**
**(Policy Statement 7.19)**

If an agreement is in effect or being considered between associations of REALTORS® or between MLSs for establishment of an MLS cooperative venture of any type, the agreement should be in writing including, but not limited to, the following items:

1. purpose of the agreement

2. geographic territory to be served

3. rights and responsibilities of each association and its members

4. form of governing body

5. method of appointment or election of such governing body

6. responsibilities and accountability of the governing body to the respective associations party to the agreement

7. roles and responsibilities of each association for enforcement of the Code of Ethics and for dispute resolution between MLS participants

8. intent of the multiple listing service(s) to operate in compliance with the multiple listing policies of the National Association

9. terms and procedures for resolving controversies between associations or between the association and the MLS. The agreement should also specify the terms under which the agreement may be terminated

10. rights and responsibilities of recipients of data related to relicensing of data *(Amended 11/04)* M

**Section 4**
**Relationship of**
**Association with**
**Independent Multiple**
**Listing Service in**
**Association Area**
**(Policy Statement 7.20)**

No association may make or maintain any rule prohibiting a REALTOR® from participating in an independent multiple listing service. Associations shall take every action necessary to avoid responsibility and liability for the policies, practices, conduct and activities of any unaffiliated multiple listing service not owned and operated by it. In this connection the association shall document by letter to such independent multiple listing service that the association has no relationship or agreement with the service, no jurisdiction over the service, and no responsibility for it. *(Amended 2/94)*

This policy statement is not intended to prohibit associations from entering into cooperative relationships with independent multiple listing services (that limit participation to appropriately licensed or certified individuals or firms), including reciprocity agreements, regionalization agreements, and other forms of cooperative venture. *(Adopted 2/94)*

Such agreements may limit coverage under the National Association's blanket errors and omissions insurance policy and associations will want to ascertain the extent of insurance coverage, and the availability of coverage from other sources, prior to entering into such agreements. *(Adopted 2/94)*

**Explanation:** A primary responsibility of an association of REALTORS® is to protect the interests of the association and its members. With respect to an unaffiliated independent multiple listing service not owned or controlled by the association, or that is not party to an agreement with the association, the association has no jurisdiction over such multiple listing service and can, therefore, assume no responsibility for it or its actions. Positive effort should, therefore, be made to establish clearly that there is no relationship between the association of REALTORS® and the independent multiple listing service even though some or all of the multiple listing service participants may also be members of the association, and that no direct or indirect control is exercised by the association in connection with said independent multiple listing service. Such effort by the association should be documented to provide a basis for extricating the association from any litigation which may be brought against the independent multiple listing service and which may also name the association as a party to such litigation. *(Amended 2/94)* M

**Section 5**
**Information Related to**
**Listings of Commercial**
**and Industrial Property**
**(Policy Statement 7.33)**

An association or association MLS may also publish a compilation of commercial and industrial properties listed with association or MLS members so that prospective cooperating brokers will have the opportunity to contact the listing broker to learn the terms of any cooperative relationship the listing broker wishes to establish. Such a mechanism is not a multiple listing service. If an association or association MLS provides this type of informational function (commonly referred to as a commercial information exchange or CIE) to its members, it shall not publish either the total commission negotiated between the listing broker and the seller or any offers of compensation to cooperating brokers. If a relationship is established between the listing broker and a prospective cooperating broker, it is strongly recommended that the terms and conditions be established in writing prior to the time the cooperating broker commences any efforts to produce a prospective purchaser or lessee. None of the foregoing is intended to preclude a CIE from providing, as a matter of local determination, access to information from CIE compilations to affiliate members of associations or to others engaged in recognized fields of real estate practice or in related fields. *(Revised 11/04)* M

CIE fees, dues and charges: CIE participants must be given the option of a no-cost waiver for any licensee or licensed or certified appraiser who does not use the service and who can demonstrate subscription to a different CIE or MLS where their principal is a participant. CIEs may, at local discretion, require that broker participants sign a certification for nonuse of the CIE's services by their licensees, which can include penalties and termination of the waiver if violated. *(Adopted 05/18 and Amended 08/18 [Leadership Team])* M

**Section 6**
**Service Area of Association**
**Multiple Listing Services**
**(Policy Statement 7.42)**

The service area of multiple listing services owned and operated by associations of REALTORS® is not limited to the jurisdiction of the parent association(s) of REALTORS®. Rather, associations are encouraged to establish multiple listing services that encompass natural market areas and to periodically reexamine such boundaries to ensure that they encompass the relevant market area. While associations are encouraged to work cooperatively to establish market area multiple listing services, the absence of such an agreement shall not preclude any association from establishing and maintaining a multiple listing service whose service area exceeds that of the parent association(s) jurisdiction. MLSs may not require other offices of a firm to participate in the MLS if any office of that firm participates in that MLS. *(Revised 11/17)* M

# C. Administration

## Operational Issues

**Section 1**
**Procedures to Be**
**Followed by an**
**Association of REALTORS®**
**Upon Demand for**
**Access to the**
**Association's Multiple**
**Listing Service without**
**Association Membership**
**(Policy Statement 7.25)**

In states other than California, Georgia, Alabama, and Florida, whenever an association is confronted with a request or demand by an individual for access to the association's multiple listing service without membership in the association, member associations are advised that the association should immediately advise both the state association and the Member Policy Department of the National Association, and the recommended procedures will be provided to the member association with any other pertinent information or assistance. It is important that the state association and National Association be advised immediately if such request or demand for access to the association MLS as described is received. M

**Section 2**
**Prerequisites for**
**Participation in or**
**Access to a Commercial/**
**Industrial Multiple**
**Listing Service of an**
**Association of REALTORS®**
**(Policy Statement 7.26)**

An association may require any applicant for commercial information exchange participation or commercial/industrial MLS participation and any licensee affiliated with the CIE or C/I MLS participant who has access to and use of CIE or C/I MLS-generated information to complete an orientation program of no more than twelve (12) classroom hours devoted to the CIE or C/I MLS rules and regulations and computer training related to the CIE or C/I MLS information entry and retrieval. *(Amended 11/96)*

**Note:** Associations are not required to establish prerequisites for CIE or C/I MLS participation beyond holding REALTOR® (principal) membership in an association. However, if an association wishes to establish prerequisites for CIE or C/I MLS participation or access to CIE or C/I MLS-generated information, the requirement of attendance at an orientation program is the most rigorous prerequisite that may be required. *(Amended 11/96)* M

**Section 3**
**MLS Indoctrination Requirements Relating to Individuals Entitled to Participation without Association Membership (Policy Statement 7.38)**

In processing the application of an individual entitled by law to MLS participation without REALTOR® membership, the listing information and services shall be promptly provided upon completion of the following:

1. confirmation applicant has a valid, current, real estate license or certificate

2. applicant's written application and agreement to abide by the MLS rules and regulations

3. applicant's completion of any required MLS orientation on MLS bylaws, MLS rules and regulations, other MLS related policies or procedures, and computer training related to MLS information entry and retrieval within a reasonable time not to exceed thirty (30) days, and

4. payment of all required initial MLS fees or charges

If any examination on the MLS orientation is given, it shall be an open-book, no-pass, no-fail examination for programmed learning purposes only. *(Amended 11/04)* M

**Section 4**
**Inclusion of Exclusive Agency Listings in MLS Compilations and Databases (Policy Statement 7.41)**

Multiple listing services shall not establish or maintain any rule or policy prohibiting inclusion of exclusive agency listings that would be otherwise acceptable for inclusion in the compilation of current listing information.

**Explanation:** This policy shall not be construed as requiring participants to accept exclusive agency listings if they determine acceptance is not in their best interest or the best interest of clients or customers. However, this policy does preclude collective agreements between participants affiliated with different firms or others to refuse to accept exclusive agency listings or to refuse to accept offers of compensation extended through the multiple listing service or otherwise. This policy contemplates multiple listing services will clearly distinguish between exclusive right-to-sell and exclusive agency listings in multiple listing compilations and databases to prevent confusion about the rights and obligations of brokers who cooperate in the sale of such listings. *(Amended 11/04)* M

**Section 5**
**Effective Date of Changes in Multiple Listing Policy (Policy Statement 7.51)**

To ensure consistent, uniform understanding of and compliance with the multiple listing policies of the National Association, all changes incorporated into the National Association's *Handbook on Multiple Listing Policy* become effective January 1 of the year following their approval by the Board of Directors of the National Association of REALTORS®. Unless specifically provided otherwise by the National Association's Board of Directors, associations and multiple listing services shall have sixty (60) days from the effective date of new or amended policies to adopt them locally. *(Amended 05/15)* M

**Section 6**
**Factual Data Submitted by Appraisers (Policy Statement 7.52)**

Association multiple listing services should encourage appraiser-participants to contribute factual data related to properties sold and closed which are not otherwise reported through MLS when the submission of such data is not in violation of the appraiser/client relationship. *(Adopted 2/91)* R

**Section 7**
**Names of Multiple**
**Listing Services**
**(Policy Statement 7.54)**

The names of association owned or operated multiple listing services (including multi-association and regional multiples) should rationally relate to the area served. Challenges by other associations to the appropriateness of any name utilized shall be considered and determined by the board of directors of the state association if attempts to resolve the conflict locally fail. Documentation of the attempt to resolve the conflict shall be forwarded to the state association. Challenges to the names of multiple listing services with multi-state jurisdictions shall be resolved by the National Association. The chairperson of the multiple listing policy committee shall appoint a panel of committee members to hear the challenge, and forward its recommendations to the National Association's Board of Directors for final disposition. Challenges to pre-existing names must be filed within one (1) year following the January 1, 1993 effective date. Existing in-state multiple listing services shall be grandfathered as to their names. Each state association shall have the right to override the grandfather provision by a two-thirds (2/3) vote of its board of directors. *(Amended 4/92)* ⌐I⌐

**Section 8**
**Categorization of MLS**
**Services, Information,**
**and Products**
**(Policy Statement 7.57)**

The services, information, and products that multiple listing services provide to participants and to subscribers affiliated with participants may be categorized as core, as ancillary to the core but included in a basic package of MLS services as determined locally and provided to all MLS participants and subscribers automatically or on a discretionary basis, or as optional and available to participants and subscribers at their discretion. The following will guide MLSs in categorizing their services, information, and products.

**Core:** Core MLS information, services, and products are essential to the effective functioning of MLS, as defined, and include:

• active listing information

• information communicating compensation to potential cooperating brokers

Core services include the mechanisms (print or electronic or both) by which this information is communicated between participants and the MLS.

Where MLS participation is available to non-member brokers or their firms, either by law or by local decision, the information, services, and products available to such participants may be limited to those categorized as core.

**Basic:** In addition to core services, an MLS may automatically or on a discretionary basis provide additional information, services, and products substantially related to the purpose and function of MLS such as, but not limited to:

• sold and comparable information

• pending sales information

• expired listings and "off market" information

• tax records

• zoning records/information

• title/abstract information

• mortgage information

• amortization schedules

• mapping capabilities

• statistical information

• public accommodation information (e.g., schools, shopping, churches, transportation, entertainment, recreational facilities, etc.)

• MLS computer training/orientation

• access to affinity programs

• establishment, maintenance, and promotion of public-facing websites

**Optional:** An MLS may not require a participant to use, participate in, or pay for the following optional information, services, or products:

- lockbox equipment including lockboxes (manual or electronic), combination lockboxes, mechanical keys, and electronic programmers or keycards

- advertising or access to advertising (whether print or electronic), including classified advertising, homes-type publications, and electronic compilations, including participant, subscriber, or firm homepages or websites

Notwithstanding the foregoing, where permitted by law*, an MLS may treat Optional information, services, or products as Basic provided that the MLS does not receive an economic benefit from the arrangement as demonstrated by satisfying both of the following conditions:

1) The MLS or its shareholder(s) is not the seller, lessor, or licensor of the information, service, or product (i.e., the information, service, or product is sourced from an independent third party); and

2) The MLS does not make a profit or receive a commission or rebate based on the sale, lease, or license that exceeds the operational costs of providing the information, service, or product.

While no participant can be required to use, participate in, or pay for information, services, or products defined in this policy statement as optional, an MLS may, as a matter of local determination, bill all participants (or, where appropriate, subscribers) for optional information, services, or products provided that participants (or, where appropriate, subscribers) may decline such information, services, or products and not be charged for them. In such cases, the MLS must make all participants and subscribers aware, in advance, of their right to decline any such service, product, or information.

None of the foregoing precludes an association or MLS from utilizing association or MLS reserves, dues, or fees or special assessments (as otherwise provided for in the association or MLS governing documents) to acquire assets (including hardware and software) necessary to make optional information, services, or products available to participants and subscribers, provided any funds used to acquire assets or initiate services will be reimbursed out of the proceeds realized from the sale or lease of such information, services, or products. Associations of REALTORS® and MLSs may make nominal administrative expenditures out of reserves, dues, or fees to initiate or maintain optional services and products. *(Amended 05/13)* [M]

**Section 9**
**Changes in MLS Rules and Regulations (Policy Statement 7.81)**

Amendments to MLS rules and regulations are subject to approval by the board of directors of the parent association(s) of REALTORS®. *(Adopted 11/04)* [M]

**Section 10**
**Nonmember Broker/ Appraiser Access (Policy Statement 7.55)**

MLSs may, as a matter of local discretion, make limited participation in MLS available to all brokers (principals) and firms comprised of brokers (principals) and to licensed or certified real estate appraisers (principals) and firms comprised of licensed or certified real estate appraisers. Limitations on participatory rights, if any, shall be determined locally. *(Amended 11/04)* [O]

---

*MLSs in the following states/territories may not treat Optional information, services, or products as Basic:  States within the First, Second, and Eighth United States Circuits that include Arkansas, Connecticut, Iowa, Maine, Massachusetts, Minnesota, Missouri, Nebraska, New Hampshire, New York, North Dakota, Puerto Rico, Rhode Island, South Dakota, and Vermont. *(Adopted 05/13)*

**Section 11**
**Removal of Listings**
**When Participant**
**Refuses/Fails to Timely**
**Report Status Changes**
**(Policy Statement 7.88)**

Notwithstanding the limitations established in the *Code of Ethics and Arbitration Manual* or in other National Association policy, multiple listing services operated as committees of associations of REALTORS® or as separate, wholly-owned subsidiaries of one or more associations of REALTORS® are authorized to remove any listing from the MLS compilation of current listings where the participant has refused or failed to timely report status changes. Prior to the removal of any listing from the MLS, the participant shall be advised of the intended removal so the participant can advise his or her client(s). *(Adopted 11/07)* I

**Section 12**
**Real Estate Transaction**
**Standards (RETS)**
**(Policy Statement 7.90)**

The integrity of data is a foundation to the orderly real estate market. The Real Estate Transaction Standards (RETS) provide a vendor neutral, secure approach to exchanging listing information between the broker and the MLS. In order to ensure that the goal of maintaining an orderly marketplace is maintained, and to further establish REALTOR® information as the trusted data source, MLS organizations owned and operated by associations of REALTORS® will implement the RESO Standards including: the RESO Data Dictionary by January 1, 2016; the RESO Web API by June 30, 2016 and will keep current by implementing new releases of RESO Standards within one (1) year from ratification. Compliance with this requirement can be demonstrated using the Real Estate Standards Organization (RESO) compliance Certification Process. *(Amended 11/14)* M

**Section 13**
**Orientation and**
**Other Training**
**(Policy Statement 7.92)**

Multiple listing services may, as a matter or local discretion, require applicants for MLS participation and licensees (including licensed or certified appraisers) affiliated with an MLS participant who have access to and use of MLS-generated information to complete an orientation program of no more than eight (8) classroom hours devoted to the MLS rules and regulations, computer training related to MLS information entry and retrieval, and the operation of the MLS within thirty (30) days after access has been provided. Participants and subscribers may also be required, at the discretion of the MLS, to complete additional training of not more than four (4) classroom hours in any (12) twelve month period when deemed necessary by the MLS to familiarize participants and subscribers with system changes or enhancements and/or changes to MLS rules or policies. Participants and subscribers must be given the opportunity to complete any mandated orientation and additional training remotely. *(Amended 11/17)* M

**Section 14**
**Submission of Photographs**
**or Other Graphic**
**Representations (Policy**
**Statement 7.93)**

Multiple Listing Services may, as a matter of local discretion, require submission of a reasonable number of photographs or other graphic representations that accurately depict listed property except where sellers expressly direct that photographs of their property not appear in MLS compilations. *(Adopted 5/10)* M

**Section 15**
**Submission of**
**Legally-required Seller**
**Disclosure Information**
**(Policy Statement 7.94)**

Multiple Listing Services may, as a matter of local discretion, require submission of all legally-required seller disclosure information except where sellers expressly direct that such disclosure documents not be disseminated through MLS. *(Adopted 5/10)* M

**Section 16**
**Price Change Information**
**(Policy Statement 7.95)**

MLSs are not required to track or report price change information other than the most recent increase or decrease in the price of current listings. If such information (either with respect to a current listing or to prior listings of that property) is tracked by an MLS and made available to participants and subscribers, neither it nor any information from which it may be determined shall be classified as confidential nor may participants be prohibited from making such information available to clients and customers pursuant to the same rules governing dissemination of other non-confidential data fields. Classification as non-confidential permits inclusion of such information in advertisements, including IDX display, of other participants' listings as a matter of local option. *(Adopted 5/10, Amended 5/11)* M

14

**Section 17**
**Days/Time on Market**
**Information**
**(Policy Statement 7.96)**

MLSs are not required to track or report days/time on market information (i.e., the length of time a property has been listed for sale pursuant to a current listing agreement or prior listing agreements, whether with the same or different listing brokers or firms). If such information is tracked by an MLS and made available to participants and subscribers, neither it nor any information from which it may be determined (such as the current list date, or prior list and expiration dates) shall be classified as confidential, nor may participants be prohibited from making such information available to clients or customers pursuant to the same rules governing dissemination of other non-confidential data fields. Classification as non-confidential permits inclusion of such information in advertisements, including IDX display, of other participants' listings as a matter of local option. *(Adopted 5/10, Amended 5/11)* M

**Section 18**
**Need to Disclose if**
**Property is a Foreclosure,**
**Bank-owned, or Real**
**Estate Owned ("REO")**
**(Policy Statement 7.97)**

As a matter of local discretion, Multiple Listing Services may require participants to disclose if a listed property is a foreclosure, bank-owned, or real estate owned ("REO"). *(Adopted 11/11)* O

# Finance

**Section 1**
**Waivers of MLS Fees,**
**Dues, and Charges**
**(Policy Statement 7.43)**

Recurring MLS fees, dues, and charges may be based upon the total number of real estate brokers, sales licensees, and licensed or certified real estate appraisers affiliated with or employed by an MLS participant. *(Amended 11/17)*

However, MLSs must provide participants the option of a no-cost waiver of MLS fees, dues and charges for any licensee or licensed or certified appraiser who can demonstrate subscription to a different MLS or CIE where the principal broker participates. MLSs may, at their discretion, require that broker participants sign a certification for nonuse of its MLS services by their licensees, which can include penalties and termination of the waiver if violated. *(Amended 5/18 and 8/18 [Leadership Team])* M

**Section 2**
**Assessment of MLS Fees,**
**Dues, and Charges**
**(Policy Statement 7.45)**

All MLS fees, dues, and charges, including, but not limited to, initial participation fees, recurring participation fees, listing origination fees, subscription fees, etc., may be assessed to MLS participants or to individual users or subscribers. This does not preclude an MLS participant from being reimbursed by affiliated licensees for fees or charges incurred on their behalf pursuant to any in-house agreement that may exist. If direct billing of subscribers is utilized, the ultimate responsibility for delinquent dues, fees, and charges is that of the participant, unless an MLS, by adoption of appropriate rules or bylaws, makes subscribers exclusively responsible for such financial obligations. *(Amended 2/95)* M

**Section 3**
**Merger or Dissolution**
**of Association or MLS**

In cases of merger or dissolution of an association of REALTORS® or an MLS, the advice of the organization(s) accountant or tax advisor should be sought. *(Adopted 11/04)* R

# Law

## Postal Regulations

**Section 1**
**Compliance with United**
**States Postal Codes**
**(Policy Statement 7.15)**

Associations of REALTORS® and their multiple listing services should comply with the requirements of the United States postal statutes as they relate to delivery of multiple listing service information, and in particular *Volume 39, Code of Federal Regulations, Part 320, Suspension of the Private Express Statutes; Extremely Urgent Letters*, found in the *Federal Register, Volume 44, Number 207*, Wednesday, October 24, 1979, page 61178. I

## Tax Exempt Status of an Association of REALTORS®

**Section 2**
**Limitation on Content of**
**Association Advertising**

The tax exempt status of an association of REALTORS® can be jeopardized if it includes the names of REALTORS® in advertisements it places.

Section 501(c)(6) of the Internal Revenue Code provides for the exemption of a real estate association which is not organized for profit provided no part of the net earnings of the association inures to the benefit of any private shareholder or individual.

Revenue Ruling 65-14, C.B. 1965-1, 236 holds that the publication of advertisements containing listings of the names of individual members constitutes advertising for the individuals so advertised and is thus considered the performance of particular services for such individuals rather than an activity aimed at improvement of general business conditions. Section 1.501(c)(6)-l of the Income Tax Regulations confines the activities of a real estate association exempt under Section 501(c)(6) to those directed to the improvement of business conditions of one or more lines of business rather than the performance of particular services for individual persons. *(Amended 11/04)* I

## Registered Multiple Listing Service Mark
## of the NATIONAL ASSOCIATION of REALTORS®

**Section 3**
**Nature of Service**
**Mark and Necessity**
**to Effect License**
**Agreement to Use**

The NATIONAL ASSOCIATION of REALTORS® has approved for use by chartered associations of REALTORS® and their members, a standard multiple listing service mark. However, the standard service mark may not be used without a license from the NATIONAL ASSOCIATION OF REALTORS®. Such license will be granted only to those associations of REALTORS® that own and/or control the multiple listing activity and only to such associations the governing documents of which have been approved as being in compliance with multiple listing policy of the National Association. Further, the design must not be used as a lapel pin or any type of jewelry. M

**Section 4**
**How to Secure**
**Authorization to**
**Use a Service Mark**

To secure a license to use the multiple listing service mark, please obtain two (2) copies of the license agreement for use of the MLS service mark by an association from Board Policy and Programs, National Association *(See Appendix 4)*. Complete in duplicate and mail both copies to the NATIONAL ASSOCIATION OF REALTORS®. A copy of the association's bylaws providing for a multiple listing service owned and/or controlled by the applicant association, and a copy of the multiple listing service rules and regulations must be submitted for review by the National Association.

Upon approval, the NATIONAL ASSOCIATION OF REALTORS® will complete the agreement, with appropriate signatures affixed thereto, and will return one copy to the association of REALTORS® authorizing the use of the service mark. I

**Section 5**
**Special Note Concerning**
**MLS Service Mark**

The NATIONAL ASSOCIATION OF REALTORS® grants no variation of the design of the standard MLS service mark. Further, the National Association will not review and authorize any multiple listing service insignia other than its own service mark. Further, the term REALTOR® may not, in any instance, be used in connection with any multiple listing service not owned and/or controlled by an association of REALTORS®. M

16

**Section 6**
**Use of MLS Logo**
**by Nonmember**
**Participants**
**(Policy Statement 7.13)**

In any state where law requires that brokers (principals) who are not REALTORS® be admitted to the multiple listing service of an association of REALTORS®, or in any association which has voluntarily opened its MLS to nonmember brokers and/or appraisers, the official registered multiple listing service logo of the National Association should not be used by such a non-association member. Such use would be a misrepresentation and would violate the registration rights of the NATIONAL ASSOCIATION OF REALTORS®, the lawful owner of said collective service mark. Where such non-association member advertises that he is a member of the multiple listing service of an association of REALTORS®, the multiple listing service may properly require that such participant of the service additionally indicate in his advertisement that he is not a member of the association of REALTORS®. *(Amended 11/96)* M

## Other Legal Issues

**Section 7**
**Compliance with Law by**
**Association and MLS**
**(Policy Statement 7.10)**

The multiple listing policy of the National Association shall in no instance be interpreted as requiring any constituent member association or association member to adopt or follow any policy which would contravene law applicable to such member association or association member. I

# D.  Data

## Current Listings

**Section 1**
**Standard Forms**
**(Policy Statement 7.60)**

Multiple listing services shall not require participants to enter into listing agreements using a form other than the form a participant individually chooses to use. Multiple listing services may refuse to accept any listing which fails to adequately protect the interests of the public and other participants, and shall not accept any listing which establishes a contractual relationship between the MLS and a participant's client. *(Adopted 11/04)* M

**Section 2**
**Termination Dates**
**(Policy Statement 7.66)**

All listings filed with the multiple listing service shall include the definite and final termination date as negotiated between the participant and the seller. *(Adopted 11/04)* M

**Section 3**
**Net Listings**
**(Policy Statement 7.61)**

Multiple listing services shall not include net listings in compilations of current listing information. *(Adopted 11/04)* M

**Section 4**
**Open Listings**
**(Policy Statement 7.62)**

Except where required by law, multiple listing services shall not include open listings in MLS compilations since open listings generally do not include authority to cooperate with and compensate other brokers. *(Adopted 11/04)* M

**Section 5**
**Office Exclusive Listings**
**(Policy Statement 7.63)**

If a seller withholds consent for a listing to be published in an MLS compilation of current listings, such listings shall be filed with the MLS but not disseminated to other participants. As a matter of local discretion, certification may be required from the seller or from the listing broker that the listing is being withheld from the MLS at the direction of the seller. *(Adopted 11/04)* M

**Section 6**
**Listing Prices Specified**
**(Policy Statement 7.65)**

The full gross listing price stated in each listing agreement will be published in MLS compilations of current listings except where a property is subject to auction and no listed price is specified in the agreement. *(Adopted 11/04)* M

**Section 7**
**Auction Listings**
**(Policy Statement 7.82)**

Multiple listing services may, as a matter of local discretion, accept exclusively-listed property subject to auction. Where listings subject to auction do not include a listed price, they may be published in a separate section of the MLS compilation of current listings. *(Adopted 11/04)* [O]

**Section 8**
**Limited Service Listings**
**(Policy Statement 7.83)**

MLSs may, as a matter of local discretion, categorize listings as limited service in instances where listing brokers, pursuant to their listing agreements, will not provide one or more of the following services:

a. arrange appointments for cooperating brokers to show listed properties to potential purchaser(s) but instead give cooperating brokers authority to make such appointments directly with seller(s)

b. accept and present to seller(s) offers to purchase procured by cooperating brokers but instead give cooperating brokers authority to present offers directly to seller(s)

c. advise seller(s) as to the merits of offers to purchase

d. assist seller(s) in developing, communicating, or presenting counter-offers

e. participate on seller's(s') behalf in negotiations leading to the sale of the listed property *(Adopted 11/04)* [O]

**Section 9**
**MLS Entry-only Listings**
**(Policy Statement 7.84)**

Multiple listing services may, as a matter of local discretion, categorize listings as MLS entry-only in instances where listing brokers, pursuant to their listing agreements, will not provide any of the following services:

a. arrange appointments for cooperating brokers to show a listed property to potential purchaser(s) but instead give cooperating brokers authority to make such appointments directly with seller(s)

b. accept and present to seller(s) offers to purchase procured by cooperating brokers but instead give cooperating brokers authority to present offers directly to seller(s)

c. advise seller(s) as to the merits of offers to purchase

d. assist seller(s) in developing, communicating, or presenting counter-offers

e. participate on seller's(s') behalf in negotiations leading to the sale of the listed property *(Adopted 11/04)* [O]

**Section 10**
**Listings of Suspended Participants**
**(Policy Statement 7.67)**

When an MLS participant is suspended from the MLS for failing to abide by a membership duty (i.e., violation of the Code of Ethics, association bylaws, MLS bylaws, MLS rules and regulations, or other membership duties except for failure to pay appropriate dues, fees, or charges), all listings currently filed with the MLS by the suspended participant shall, at the participant's option, be retained in the MLS until sold, withdrawn, or expired. Such listings shall not be renewed or extended by the MLS beyond the termination date of the listing agreement in effect when the suspension became effective. If a participant is suspended from an association of REALTORS® (except where MLS participation without association membership is permitted by law) or MLS (or both) for failure to pay appropriate dues, fees, or charges, the MLS is not obligated to provide MLS services, including continued inclusion of a suspended participant's listings in the MLS compilation of current listing information. Prior to removal of a suspended participant's listings from MLS, the suspended participant shall be advised in writing of the intended removal so that the suspended participant's clients can be advised. *(Adopted 11/04)* [M]

**Section 11**
**Listings of Expelled**
**Participants**
**(Policy Statement 7.68)**

When an MLS participant is expelled from the MLS for failing to abide by a membership duty (i.e., violation of the Code of Ethics, association bylaws, MLS bylaws, MLS rules and regulations, or other membership duties except for failure to pay appropriate dues, fees, or charges), all listings currently filed with the MLS by the expelled participant shall, at the participant's option, be retained in the MLS until sold, withdrawn, or expired. Such listings shall not be renewed or extended by the MLS beyond the termination date of the listing agreement in effect when the expulsion became effective. If a participant is expelled from an association of REALTORS® (except where MLS participation without association membership is permitted by law) or MLS (or both) for failure to pay appropriate dues, fees, or charges, the MLS is not obligated to provide MLS services, including continued inclusion of an expelled participant's listings in the MLS compilation of current listing information. Prior to removal of an expelled participant's listings from the MLS, the expelled participant shall be advised in writing of the intended removal so that the expelled participant's clients can be advised. *(Adopted 11/04)* M

**Section 12**
**Listings of Resigned**
**Participants**
**(Policy Statement 7.69)**

When a participant resigns from the MLS, the MLS is not obligated to provide MLS services, including continued inclusion of a resigned participant's listings in the MLS compilation of current listing information. Prior to removal of a resigned participant's listings from the MLS, the resigned participant shall be advised in writing of the intended removal so that the resigned participant's clients can be advised. *(Adopted 11/04)* O

**Section 13**
**Submission of Offers**
**(Policy Statement 7.72)**

As required by Standard of Practice 1-7, listing brokers will continue to submit written offers to their seller-clients until closing unless precluded by law, government rule or regulation, or unless agreed otherwise in writing between the seller and the listing broker. Except where a subsequent offer is contingent upon termination of an existing contract, listing brokers shall recommend that sellers obtain the advice of legal counsel prior to accepting any subsequent offer. *(Adopted 11/04)* M

**Section 14**
**Reporting Resolutions**
**of Contingencies**
**(Policy Statement 7.76)**

MLS participants shall report that any contingency on file with the MLS has been fulfilled or renewed, or the agreement cancelled within twenty-four (24) hours. *(Adopted 11/04)* M

**Section 15**
**Reporting Cancellation**
**of Pending Sales**
**(Policy Statement 7.77)**

MLS participants shall promptly report to MLS that a pending sale has been cancelled and the listing, if still in effect, will be reinstated in the MLS compilation. *(Adopted 11/04)* M

**Section 16**
**Information Included**
**in Any Association**
**MLS Compilation**
**(Policy Statement 7.35)**

The National Association recommends to its associations and their multiple listing services that the information included in any MLS compilation should be limited to information related to the sale of listed property which is objective and capable of being verified by any interested party. The MLS information should not include any subjective impressions or opinions that could be misunderstood or misconstrued. R

**Section 17**
**Protection Clauses**
**in Association**
**MLS Standard Listing**
**Contracts**
**(Policy Statement 7.37)**

Any broker protection clause which is contained in a standard listing form established and recommended by a multiple listing service for the use of MLS participants shall not contain any specific time period therein, but shall contain a blank space to indicate that the time period of such protection period is negotiable between the property owner and the listing broker. M

**Section 18
Compilation of Current
Listing Information
(Policy Statement 7.39)**

Any compilation of current listing information shall display the following notice in a conspicuous manner:

---

### *Notice to Association Members*

*Under the long-established policy of this association, the (state) association of REALTORS®, and the NATIONAL ASSOCIATION OF REALTORS®:*

*1. The broker's compensation for services rendered in respect to any listing is solely a matter of negotiation between the broker and his or her client, and is not fixed, controlled, recommended, or maintained by any persons not a party to the listing agreement.*

*2. The compensation paid by a listing broker to a cooperating broker in respect to any listing is established by the listing broker and is not fixed, controlled, recommended, or maintained by any persons other than the listing broker.* (Amended 4/92)

---

In addition, it is recommended that all associations publish this notice to their general membership at least annually. Every association operating a multiple listing service is required to certify to the National Association that the notice to association members concerning the negotiability of brokerage commissions, subagency compensation, and compensation to buyer's agents has been reproduced in their compilation of current listing information. Further, associations that do not operate an MLS shall publish the notice to association members in their newsletter or other vehicle for membership information dissemination and shall so certify to the National Association. *(Amended 11/88)* **M**

**Section 19
Reproduction of
MLS Information
(Policy Statement 7.79)**

Reproduction of MLS-generated information is subject to the following limitations:

**Option #1:** Participants or their affiliated licensees shall not reproduce any MLS compilation or any portion thereof, except in the following limited circumstances:

Participants or their affiliated licensees may reproduce from the MLS compilation and distribute to prospective purchasers a reasonable number of single copies of property listing data contained in the MLS compilation which relate to any properties in which the prospective purchasers are or may, in the judgment of the participant or their affiliated licensees, be interested.

Reproductions made in accordance with this rule shall be prepared in such a fashion that the property listing data of properties other than that in which the prospective purchaser has expressed interest, or in which the participant or the affiliated licensees are seeking to promote interest, does not appear on such reproduction.

Nothing contained herein shall be construed to preclude any participant from utilizing, displaying, distributing, or reproducing property listing sheets or other compilations of data pertaining exclusively to properties currently listed for sale with the participant.

Any MLS information, whether provided in written or printed form, provided electronically, or provided in any other form or format, is provided for the exclusive use of the participant and those licensees affiliated with the participant who are authorized to have access to such information. Such information may not be transmitted, retransmitted, or provided in any manner to any unauthorized individual, office, or firm.

None of the foregoing shall be construed to prevent any individual legitimately in possession of current listing information, sold information, comparables, or statistical information from utilizing such information to support valuations on particular properties for clients and customers. Any MLS content in data feeds available to participants for real estate brokerage purposes must also be available to participants for valuation purposes, including automated valuations. MLSs must either permit use of existing data feeds,

or create a separate data feed, to satisfy this requirement. MLSs may require execution of a third-party license agreement where deemed appropriate by the MLS. MLSs may require participants who will use such data feeds to pay the reasonably estimated costs incurred by the MLS in adding or enhancing its downloading capacity for this purpose. Information deemed confidential may not be used as supporting documentation. Any other use of such information is unauthorized and prohibited by these rules and regulations. *(Amended 05/14)*

**Option #2:**  Participants or their affiliated licensees shall not reproduce any MLS compilation or any portion thereof, except in the following limited circumstances:

Participants or their affiliated licensees may reproduce from the MLS compilation and distribute to prospective purchasers a reasonable number of single copies of property listing data contained in the MLS compilation which relate to any properties in which the prospective purchasers are or may, in the judgment of the participants or their affiliated licensees, be interested.

Nothing contained herein shall be construed to preclude any participant from utilizing, displaying, distributing, or reproducing property listing sheets or other compilations of data pertaining exclusively to properties currently listed for sale with the participant.

Any MLS information, whether provided in written or printed form, provided electronically, or provided in any other form or format, is provided for the exclusive use of the participant and those licensees affiliated with the participant who are authorized to have access to such information. Such information may not be transmitted, retransmitted, or provided in any manner to any unauthorized individual, office, or firm.

None of the foregoing shall be construed to prevent any individual legitimately in possession of current listing information, sold information, comparables, or statistical information from utilizing such information to support valuations on particular properties for clients and customers. Any MLS content in data feeds available to participants for real estate brokerage purposes must also be available to participants for valuation purposes, including automated valuations. MLSs must either permit use of existing data feeds, or create a separate data feed, to satisfy this requirement. MLSs may require execution of a third-party license agreement where deemed appropriate by the MLS. MLSs may require participants who will use such data feeds to pay the reasonably estimated costs incurred by the MLS in adding or enhancing its downloading capacity for this purpose. Information deemed confidential may not be used as supporting documentation. Any other use of such information is unauthorized and prohibited by these rules and regulations. *(Amended 05/14)* [M]

## Sold/Comparable/Off-market Information

**Section 1
Reporting Sales
to the MLS
(Policy Statement 7.75)**

Sales of listed property, including sales prices, shall be reported promptly to the MLS by listing brokers. If negotiations were carried on directly between a cooperating participant and the seller, the cooperating broker shall report the accepted offer and price to the listing broker, and the listing broker shall report that information to the MLS. Listing agreements should also include provisions expressly granting the listing broker the right to authorize dissemination of sales price information by the MLS to its participants.

**Note applicable in "disclosure" states:** In disclosure states, if the sale price of a listed property is recorded, then reporting of the sale price may be required by the MLS.

**Note applicable in "nondisclosure" states:** In states where the actual sale prices of completed transactions are not publicly accessible, failure to report sale prices can result in disciplinary action only if the MLS:

1. categorizes sale price information as confidential and

2. limits use of sale price information to participants and subscribers in providing real estate services, including appraisals and other valuations, to customers and clients; and to governmental bodies and third-party entities only as provided below.

The MLS may provide sale price information to governmental bodies only to be used for statistical purposes (including use of aggregated data for purposes of valuing property) and to confirm the accuracy of information submitted by property owners or their representatives in connection with property valuation challenges; and to third-party entities only to be used for academic research, statistical analysis, or for providing services to participants and subscribers. In any instance where a governmental body or third-party entity makes sale price information provided by the MLS available other than as provided for in this provision, a listing participant may request the sale price information for a specific property be withheld from dissemination for these purposes with written authorization from the seller, and withholding of sale price infromation from those entities shall not be construed as a violation of the requirement to report sale prices.

**Note regarding confidentiality:** As established in the Virtual Office Website ("VOW") policy, sale prices can only be categorized as confidential in states where the actual sale prices of completed transactions are not accessible from public records. *(Amended 11/11)* M

**Section 2**
**Withdrawn Listings**
**(Policy Statement 7.64)**

Listings may be withdrawn from a multiple listing service by participants prior to the listing's expiration date. As a matter of local discretion, MLSs may require that a copy of the agreement authorizing withdrawal be submitted. *(Adopted 11/04)* M

**Section 3**
**Inclusion of Expired or Withdrawn Listings in an Association's Comparable Report or Other Report of Statistical Information**
**(Policy Statement 7.36)**

Any information concerning expired or withdrawn listings included in an association's comparable report or other report of statistical information shall be clearly indicated as expired or withdrawn so that the users of such information will be aware of the actual status of such listings. M

# Statistical Reports

**Section 1**
**Statistical Reports**
**(Policy Statement 7.3)**

MLSs may, as a matter of local determination, make statistical reports, sold information, and other informational reports derived from the MLS available to REALTORS® who do not participate in the MLS but who are engaged in real estate brokerage, management, appraising, land development, or building. Additional expenses incurred in providing such information to REALTORS® who do not participate in the MLS may be included in the price charged for such information. Any information provided may not be transmitted, retransmitted, or provided in any manner to any individual, office, or firm, except as otherwise authorized in the MLS rules and regulations.

MLSs may, as a matter of local determination, provide statistical reports, sold information, and other informational reports derived from the MLS to government agencies. MLSs may, as a matter of local discretion, require that such agencies (or representatives of such agencies) hold an appropriate form of membership in the MLS or in the association of REALTORS® as a condition of such access.

It is strongly recommended that any irrelevant information such as the names of current or former owners, or information concerning the sales commission or the compensation offered or paid to cooperating brokers be deleted. *(Revised 11/04)* M

**Section 2**
**Statistical Reports**
**Should Be Kept**

The information submitted on listing and sales contracts makes it possible for an association to compile valuable market data. Therefore, an association of REALTORS® should develop and preserve its multiple listing records for that purpose. The resulting information should be

available to members and, under some conditions, to interested governmental agencies. The National Association's Department of Real Estate Research can be helpful with advice and suggestions. **R**

# Advertising

## Print and Electronic

**Section 1
Internet Data Exchange
(IDX) Policy
(Policy Statement 7.58)**

The IDX policy gives MLS participants the ability to authorize limited electronic display and delivery of their listings by other participants via the following authorized mediums under the participant's control: websites, mobile apps, and audio devices. As used throughout this policy, "display" includes "delivery" of such listings. Associations of REALTORS® and their multiple listing services must enable MLS participants to display aggregated MLS listing information by specified electronic means in accordance with this policy. Requests for IDX feeds/downloads must be acted on by the MLS within five (5) business days from receipt, barring extenuating circumstances related to an individual's qualification for MLS Participation, and review of the participant's and vendor's use of the IDX information consistent with the MLS rules, in which case an estimated time of approval or denial must be issued. *(Amended 05/17)*

For purposes of this policy "control" means participants must have the ability to add, delete, modify and update information as required by this policy. All displays of IDX listings must also be under the actual and apparent control of the participant, and must be presented to the public as being the participant's display. Actual control requires that the participant has developed the display, or caused the display to be developed for the participant pursuant to an agreement giving the participant authority to determine what listings will be displayed, and how those listings will be displayed. Apparent control requires that a reasonable consumer receiving the participant's display will understand the display is the participant's, and that the display is controlled by the participant. Factors evidencing control include, but are not limited to, clear, conspicuous, written or verbal identification of the name of the brokerage firm under which the participant operates, except as otherwise provided for in this policy (e.g., displays of minimal information). All electronic display of IDX information conducted pursuant to this policy must comply with state law and regulations, and MLS rules.  Any display of IDX information must be controlled by the participant, including the ability to comply with this policy and applicable MLS rules. *(Amended 05/17)*

To comply with this requirement MLSs must, if requested by a participant, promptly provide basic downloading of all active listings, sold* listing data starting from January 1, 2012, non-confidential pending sale listing data, and other listings authorized under applicable MLS rules. MLSs may not exclude any listings from the information which can be downloaded or displayed under IDX except those listings for which a seller has affirmatively directed that their listing or their property address not appear on the Internet or other electronic forms of display or distribution. Associations and MLSs can also offer alternative display options including framing of board, MLS, or other publicly-accessible sites displaying participants' listings (with permission of the framed site). For purposes of this policy, "downloading" means electronic transmission of data from MLS servers to participants' servers on a persistent or transient basis, at the discretion of the MLS. The MLS's IDX download must be refreshed to accurately reflect all updates and status changes no less frequently than every twelve (12) hours. *(Amended 5/17)*

MLSs that allow persistent downloading of the MLS database by participants for display or distribution on the Internet or by other electronic means may require that participants' websites

---

**\*Note:** If "sold" information is not publicly accessible, sold listings can be removed from the MLSs' IDX feeds/downloads. "Publicly accessible" sold information as used in IDX policy and rules, means data that is available electronically or in hard copy to the public from city, county, state and other government records. MLSs must provide for its Participants' IDX displays publicly accessible sold information maintained by the MLS starting January 1, 2012. *(Amended 5/17)*

(1) utilize appropriate security protection, such as firewalls, provided that any security obligations imposed on participants may not be greater than those employed concurrently by the MLS, and/or (2) maintain an audit trail of consumer activity on participants' websites and make that information available to the MLS if the MLS has reason to believe that a participant's IDX website has caused or permitted a breach in the security of the data or a violation of MLS rules related to use by consumers. This policy does not require associations or MLSs to establish publicly accessible sites displaying participants' listings. *(Amended 05/12)*

Unless state law requires prior written consent from listing brokers, listing brokers' consent for IDX display may be presumed unless a listing broker affirmatively notifies the MLS that the listing broker refuses to permit display (either on a blanket or on a listing-by-listing basis). If a participant refuses on a blanket basis to permit IDX display of that participant's listings, then that participant may not display the aggregated MLS data of other participants on an IDX site.

Alternatively, MLSs may require that participants' consent for IDX display of their listings by other participants be affirmatively established in writing. Even where participants have given blanket authority for other participants' IDX display of their listings, such consent may be withdrawn on a listing-by-listing basis as instructed by the seller. *(Amended 05/12)*

Access to MLS databases, or any part of such databases, may not be provided to any person or entity not expressly authorized such access under the MLS rules. *(Amended 11/09)*

Participants' Internet websites and other authorized display mechanisms may also provide other features, information, or services in addition to IDX information (including Virtual Office Website ["VOW"] functions) which are not subject to this policy. *(Amended 05/12)*

### Policies Applicable to Participants' IDX Websites and Displays

1. Participants must notify the MLS of their intention to display IDX information and give the MLS direct access for purposes of monitoring/ensuring compliance with applicable rules and policies. *(Amended 05/12)*

2. MLS participants may not use IDX-provided listings for any purpose other than IDX display. This does not require participants to prevent indexing of IDX listings by recognized search engines. *(Amended 05/12)*

3. Listings or property addresses of sellers who have directed their listing brokers to withhold their listing or property address from display on the Internet (including, but not limited to, publicly accessible websites or VOWs) shall not be accessible via IDX display. *(Amended 05/12)*

4. Participants may select the IDX listings they choose to display based only on objective criteria including, but not limited to, factors such as geography or location ("uptown", "downtown", etc.), list price, type of property (e.g., condominiums, cooperatives, single family detached, multi-family), cooperative compensation offered by listing brokers, type of listing (e.g., exclusive right-to-sell or exclusive agency), or the level of service provided by the listing firm. Selection of IDX listings to be displayed must be independently made by each participant. *(Amended 05/12)*

5. Participants must refresh all MLS downloads and displays automatically fed by those downloads not less frequently than every twelve (12) hours. *(Amended 11/14)*

6. Except as provided elsewhere in this policy or elsewhere in an MLS's rules and regulations, an IDX display or participant engaging in IDX display may not distribute, provide, or make any portion of the MLS database available to any person or entity. *(Amended 05/12)*

7. When displaying listing content, a participant's or user's IDX display must clearly identify the name of the brokerage firm under which they operate in a readily visible color and

24

typeface. This policy acknowledges that certain required disclosures may not be possible in displays of minimal information (e.g., "thumbnails", text messages, "tweets", etc., of 200 characters or less) or for audio delivery of listing content. Minimal displays are exempt from the disclosure requirements established in this policy but only when linked directly to a display that includes all required disclosures. Audio delivery of listing content is exempt from the disclosure requirements only when all required disclosures are subsequently delivered electronically to the registered consumer performing the property search or linked to through the device's application. *(Amended 05/17)*

8. With respect to any participant's IDX display that

    a. allows third-parties to write comments or reviews about particular listings or displays a hyperlink to such comments or reviews in immediate conjunction with particular listings, or

    b. displays an automated estimate of the market value of the listing (or hyperlink to such estimate) in immediate conjunction with the listing,

    either or both of those features shall be disabled or discontinued with respect to the seller's listing at the request of the seller. The listing broker or agent shall communicate to the MLS that the seller has elected to have one or both of these features disabled or discontinued by all participants. Except for the foregoing and subject to paragraph 9, a participant's IDX display may communicate the participant's professional judgment concerning any listing. Nothing shall prevent an IDX display from notifying customers that a particular feature has been disabled at the request of the seller. *(Amended 05/12)*

9. Participants shall maintain a means (e.g., e-mail address, telephone number) to receive comments about the accuracy of any data or information that is added by or on behalf of the participant beyond that supplied by the MLS and that relates to a specific property. The participant shall correct or remove any false data or information relating to a specific property upon receipt of a communication from the listing broker or listing agent for that property explaining why the data or information is false. However, the participant shall not be obligated to remove or correct any data or information that simply reflects good faith opinion, advice, or professional judgment. *(Amended 05/12)*

10. An MLS participant (or where permitted locally, an MLS subscriber) may co-mingle the listings of other brokers received in an IDX feed with listings available from other MLS IDX feeds, provided all such displays are consistent with the IDX rules, and the MLS participant (or MLS subscriber) holds participatory rights in those MLSs. As used in this policy, "co-mingling" means that consumers are able to execute a single property search of multiple IDX data feeds resulting in the display of IDX information from each of the MLSs on a single search results page; and that participants may display listings from each IDX feed on a single webpage or display. *(Adopted 11/14)*

11. Participants shall not modify or manipulate information relating to other participants' listings. MLS participants may augment their IDX displays of MLS data with applicable property information from other sources to appear on the same webpage or display, clearly separated from the data supplied by the MLS. The source(s) of the information must be clearly identified in the immediate proximity to such data. This requirement does not restrict the format of MLS data display or display of fewer than all of the available listings or fewer authorized fields. *(Adopted 05/15)* `M`

12. An MLS participant's IDX display must identify the listing firm in a reasonably prominent location and in a readily   visible color and typeface not smaller than the median used in the display of listing data. *(Amended 11/17))* `M`

## Policies Applicable to Multiple Listing Services

The following guidelines are recommended but not required to conform to National Association policy. MLSs may:

1. prohibit display of expired, withdrawn, or sold listings* *(Amended 11/15)*

2. prohibit display of confidential information fields intended for cooperating brokers rather than consumers including compensation offered to other MLS participants, showing instructions, property security information, etc.

3. prohibit display of the type of listing agreement, e.g., exclusive right to sell, exclusive agency, etc.

4. prohibit display of seller's(s') and occupant's(s') name(s), phone number(s), and e-mail address(es)

5. require that the identity of listing agents be displayed

6. require that any display of other participants' listings indicate the source of the information being displayed

7. require that other brokers' listings obtained from other sources, e.g., from other MLSs, from non-participating brokers, etc., display the source from which each such listing was obtained

8. require participants to indicate on their websites and in any other IDX display that the information being provided is for consumers' personal, non-commercial use and may not be used for any purpose other than to identify prospective properties consumers may be interested in purchasing. *(Amended 05/12)*

9. establish reasonable limits on the amount of data/number of listings that consumers may retrieve or download in response to an inquiry. Such number shall be determined by the MLS, but in no instance may the limit be fewer than five hundred (500) listings or fifty percent (50%) of the listings available for IDX display, whichever is less. *(Amended 11/17)*

10. limit the right to display other participants' listings to a participant's office(s) holding participatory rights in the same MLS.

11. require a notice on all MLS data displayed indicating that the data is deemed reliable but is not guaranteed accurate by the MLS. Participants' IDX sites and displays may also include other disclaimers necessary to protect the participant and/or the MLS from liability. *(Amended 05/12)*

This policy acknowledges that the disclosures required under Subsections 5, 6, 7, 8, and 11 (above) may not be possible in displays of minimal information (e.g., "thumbnails", text messages, "tweets", etc., of 200 characters or less) or for audio delivery of lising content. Minimal displays are exempt from the disclosure requirements established in this policy but only when linked directly to a display that includes all required disclosures. Audio delivery of listing content is exempt from disclosure requirements only when all required disclosures are subsequently delivered electronically to the registered consumer performing the property search or linked to through the device's application. *(Amended 5/17)*

## Additional Local Issues/Options

1. Where MLS participatory rights are available to non-member brokers or firms as a matter of law or local determination, the right to IDX display of listing information may be limited, as a matter of local option, to participants who are REALTORS®. *(Amended 05/12)*

2. MLSs may, but are not required to, limit the right to display listing information available pursuant to IDX to MLS participants licensed as real estate brokers.

3. MLSs may, but are not required to, limit the right to display listing information pursuant to IDX to MLS participants engaged in real estate brokerage. *(Amended 11/09)*

---

**\*Note:** If "sold" information is publicly accessible, display of "sold" listings may not be prohibited. *(Adopted 11/14)*

4. MLSs may, but are not required to, allow non-principal brokers and sales licensees affiliated with MLS participants to use information available through IDX to populate their own websites or to use in other IDX displays.

Even if use of information through IDX is provided to non-principal brokers and sales licensees affiliated with MLS participants, such use is subject to the affiliated participants' consent and control and the requirements of state law and/or regulation, and MLS rules. *(Amended 05/12)*

5. MLSs cannot prohibit participants from downloading and displaying or framing other brokers' listings obtained from other sources, e.g., other MLSs, non-participating brokers, etc., but can, as a matter of local option, require that listings obtained through IDX feeds from REALTOR® Association MLSs be searched separately from listings obtained from other sources. *(Amended 11/14)*

**Note:** An MLS participant (or where permitted locally, an MLS subscriber) may co-mingle the listings of other brokers received in an IDX feed with listings available from other MLS IDX feeds, provided all such displays are consistent with the IDX rules, and the MLS participant (or MLS subscriber) holds participatory rights in those MLSs. As used in this policy, "co-mingling" means that consumers are able to execute a single property search of multiple IDX data feeds resulting in the display of IDX information from each of the MLSs on a single search results page; and that participants may display listings from each IDX feed on a single webpage or display. *(Adopted 11/14)*

6. MLSs may, as a matter of local option, charge the costs of adding or enhancing their downloading capacity to participants who will download listing information. Assessment of such costs should reasonably relate to the actual costs incurred by the MLS. *(Amended 11/06)*

7. MLSs may prohibit advertising controlled by participants (including co-branding) on any pages displaying IDX-provided listings. *(Amended 05/12)*

MLSs permitting advertising (including co-branding) on pages displaying IDX-provided listings may prohibit deceptive or misleading advertising (including co-branding).

For purposes of this provision, co-branding will be presumed not to be deceptive or misleading if the participant's logo and contact information is larger than that of any third party. *(Amended 11/09)* **M**

**Section 2
Use of MLS Information
in Advertising and Other
Public Representations
(Policy Statement 7.80)**

Information from MLS compilations of current listing information, from statistical reports, and from any sold or comparable reports may be used by MLS participants as the basis for aggregated demonstrations of market share or for comparisons of firms in public mass-media advertising and other public representations. MLSs may, as a matter of local determination, prohibit advertising or representations about specific properties which are listed with other participants or which were sold by other participants (as either listing or cooperating broker).

Any print or non-print form of advertising or other public representation based in whole or in part on information supplied by the MLS must clearly disclose the source of the information and the period of time over which such claims are based. *(Adopted 11/04)* **M**

**Section 3
Transmittal of
Participants' Listings
to Aggregators
(Policy Statement 7.87)**

MLSs are not required to transmit participants' listings to third-party aggregators or to operate a public website displaying listing information. If an MLS transmits participants' listings to third-party aggregators and/or operates a public website displaying listing information, all exclusive listings, regardless of type, will be included in the data feed (unless a participant withholds consent for such transmission), except that MLSs may exclude from such data feed any listing where both of the following conditions are present:

a. the listed property's street address or a graphic display of the property's specific location will be displayed to the public; and

b. the seller displays on the property a "for sale by owner" sign or other sign or notice indicating that the seller is soliciting direct contact from buyers. *(Adopted 11/06)* M

**Section 4**
**Electronic Display**
**of Other Participants'**
**Listings (Policy Statement**
**7.98)**

MLSs may, but are not required to, give participants the ability to authorize electronic display of their listings by other participants outside the context of the Internet Data Exchange ("IDX") policy and rules and the Virtual Office Website ("VOW") policy and rules.

Participants may not be required to consent to display or distribution of their listings through non-IDX and non-VOW channels as a condition of participation in MLS or as a condition of participation in IDX, except as otherwise provided for in the IDX rules. Electronic display and distribution pursuant to this policy contemplates, but is not limited to, Short Message Services ("SMS")/texting technologies, and interactive "social media." All electronic displays and/or distribution of other participants' listings conducted pursuant to this policy must comply with state law and regulations and applicable rules. *(Amended 5/17)*

Displays addressed by this policy may be subject to technological limitations on disabling/discontinuing third-party comments/reviews, disabling/discontinuing automated displays of market value, "refreshing" displays on a periodic basis, and possibly other issues which should be taken into consideration when developing rules and policies governing such displays. *(Adopted 11/12)* M

## Homes Magazines

**Section 5**
**Regulation of**
**Advertising in**
**Association or**
**Commercial**
**Publications**

It is recommended that associations of REALTORS® discontinue and avoid any association or MLS regulation of advertising placed in a commercial advertising publication published by a commercial publisher and sponsored or endorsed by the association and that further, the association document in writing that it is not responsible for any regulation or regulations of advertising by the commercial publishers.

Further, if an association or its multiple listing service publishes a commercial advertising publication other than the regular MLS books/cards/sheets, it shall not seek to regulate the content of such advertising beyond reserving, with the advice of association legal counsel, the right to reject scurrilous advertising that might create liability to the association. *(Approved 11/77, Reaffirmed 11/85)* R

# E.  Participants' Rights

**Section 1**
**Participation Should**
**Be Optional**

No REALTORS® shall be required to participate. A requirement to participate in a multiple listing service in order to gain and maintain REALTOR® membership is an inequitable limitation on its membership (from Official Interpretation No. 1 of Bylaws, Article I, Section 2, adopted by the Board of Directors of the National Association, November 15, 1960). However, if a REALTOR® chooses to participate in the activity, the REALTOR® should be required to exchange information on the same basis, according to the same rules and costs imposed on all who participate. M

**Section 2**
**Association Membership**
**as Prerequisite to**
**MLS Participation**
**(Policy Statement 7.7)**

To the extent permitted by law, the National Association remains firmly and unequivocally committed to the principle that association membership is a reasonable condition of participation in the association's multiple listing service providing membership in the association is readily available to all eligible and qualified individuals on reasonable and nondiscriminatory terms and conditions. *(Amended 11/04)* R

**Section 3**
**Participation in an Association Multiple Listing Service of a Branch Office Manager Who Is Not a Principal of the Real Estate Firm (Policy Statement 7.24)**

In the event a REALTOR® has a principal office in one and only a branch office in another association, and the branch office manager is a REALTOR® member of the second association but is not a principal of the real estate firm with which he is affiliated, the branch manager shall be considered as standing in the shoes of the principal, and shall be eligible for participation in the multiple listing service of any association's MLS where he qualifies as a participant. *(Amended 11/96)* ⊡ I

**Section 4**
**MLS Participation by Brokers Acting as Agents of Potential Purchasers (Policy Statement 7.40)**

Since the MLS is an association service by which the participants make a blanket unilateral offer of compensation to the other participants with respect to listings for which they are an agent, no association or association MLS may make or maintain a rule which would preclude an individual or firm, otherwise qualified, from participating in an association MLS solely on the basis that the individual or firm functions, to any degree, as the agent of potential purchasers under a contract between the individual (or firm) and the prospective purchaser (client). However, in instances where the participant is representing the potential purchaser as an agent, the participant cannot function simultaneously as the subagent of the listing broker without buyer and seller consent or as provided by state law; cannot accept compensation from the listing broker without the express consent of all parties to the transaction; and must make his true position clearly known to all interested parties at first contact. *(Amended 11/96)* ⊡ M

**Section 5**
**Facilitators/ Intermediaries as MLS Participants (Policy Statement 7.53)**

In states where real estate brokers are authorized by law to act in a defined non-agency capacity such as facilitators or intermediaries, or where the state attorney general or the state authority regulating licensees indicates in writing that acting in such a capacity is consistent with state law, multiple listing services may adopt rules and procedures to enable participants, as listing brokers, to offer cooperation and compensation to such individuals or firms. *(Amended 11/94)* ⊡ O

**Section 6**
**Immediate Access to MLS by Association Members if Provided to Nonmember (Policy Statement 7.14)**

Where the multiple listing service of an association of REALTORS® is required by law to provide access to nonmembers and immediate access is provided to such nonmembers, similar immediate access shall be provided to applicants for membership in the association of REALTORS® subject to any required orientation in multiple listing policies and procedures. Otherwise, the application for association membership shall be processed in the normal manner. *(Amended 11/04)*

Such access to MLS shall be provided to applicants for association membership as described, waiving the provisions of Interpretations No. 9 and No. 18, Official Interpretations of Article I, Section 2, Bylaws of the National Association, and of Point 5 of the Membership Qualification Criteria of the National Association for Applicants for REALTOR® Members Who Are Sole Proprietors, Partners, Corporate Officers, or Branch Office Managers in a Real Estate Firm. *(Amended 11/04)*

After providing such access to MLS, the applications of such applicants for association membership should proceed on a normal basis and all association membership qualifications and all Official Interpretations of Article I, Section 2, Bylaws of the National Association have full force and effect. *(Amended 11/04)* ⊡ M

**Section 7**
**Presentation of Offers (Policy Statement 7.71)**

Consistent with Standard of Practice 1-6, MLSs may require that listing brokers make arrangements for prompt presentation of offers and, where offers cannot be presented promptly, that listing brokers explain to cooperating brokers why offers they procured could not be presented. *(Adopted 11/04)* ⊡ M

29

**Section 8**
**Showings and**
**Negotiations**
**(Policy Statement 7.70)**

As established in Official Interpretation No. 10 of the National Association's Bylaws, rules giving cooperating brokers the right to negotiate directly with an exclusively-represented seller are an inequitable limitation on REALTORS®. Appointments for showings and negotiations with sellers for the purchase of listed property published in MLS compilations shall be conducted through the listing broker, except:

1. where the listing broker gives the cooperating broker specific authority to show and/or negotiate directly, or

2. after reasonable efforts a cooperating broker cannot contact the listing broker or the listing broker's representative. However, listing brokers, at their discretion, may preclude any direct contact or negotiations by cooperating brokers. *(Adopted 11/04)* [M]

**Section 9**
**Rights of Cooperating**
**Brokers in Presentation**
**of Offers**
**(Policy Statement 7.73)**

Cooperating participants or their representatives have the right to participate in the presentation of any offer they secure to purchase or lease to the seller or lessor. They do not have the right to be present at any discussion or evaluation of the offer by the seller or lessor and the listing broker. However, if a seller or lessor gives written instructions to a listing broker that cooperating brokers may not be present when offers they procure are presented, cooperating brokers have the right to a copy of those instructions. This policy is not intended to affect listing brokers' right to control the establishment of appointments for presentation of offers.

Where the cooperating broker is not present during the presentation of the offer, the cooperating broker can request in writing, and the listing broker must provide, written affirmation stating that the offer has been submitted to the seller, or written notification that the seller has waived the obligation to have the offer presented. *(Amended 11/18)* [M]

**Section 10**
**Rights of Listing Brokers**
**in Presentation of**
**Counter-offers**
**(Policy Statement 7.74)**

Listing participants or their representatives have the right to participate in the presentation of any counter-offer made by a seller or a lessor. They do not have the right to be present at any discussion or evaluation of a counter-offer by the purchaser or lessee (except where the cooperating broker is a sub-agent). However, if a purchaser or lessee gives written instructions to the cooperating broker that the listing broker may not be present when a counter-offer is presented, the listing broker has a right to a copy of those instructions. *(Adopted 11/04)* [M]

**Section 11**
**Code of Ethics**
**(Policy Statement 7.5)**

Adherence to the Code of Ethics of the NATIONAL ASSOCIATION OF REALTORS® shall be a privilege and obligation of REALTORS® and REALTOR-ASSOCIATE®s. *(Amended 11/96)* [I]

**Section 12**
**Arbitration**
**(Policy Statement 7.4)**

Arbitration facilities of an association of REALTORS® may be invoked by a nonmember participant in the multiple listing service, who can also be compelled to arbitrate using the association's facilities. *(Amended 11/96)* [M]

**Section 13**
**Lease of MLS**
**Compilations**
**(Policy Statement 7.78)**

MLS participants are entitled to lease print or electronic copies of MLS compilations in sufficient number to provide the participant and each authorized individual affiliated with the participant with one copy of such compilation subject to payment of applicable fees and charges. *(Adopted 11/04)* [M]

**Section 14**
**Caravans**
**(Policy Statement 7.2)**

Any facility offered by the multiple listing service for the physical viewing of properties listed and filed with the multiple listing service, including MLS caravans and MLS open houses, must be made available to all participants in the multiple listing service. Nothing herein shall require an owner to use any particular facility for the viewing of his property, including but not limited to caravans and open houses. [M]

**Section 15**
**Ownership of Listing and**
**Listing Content**
**(Policy Statement 7.85)**

The listing broker owns the listing agreement. Prior to submitting a listing to the MLS, the listing broker should own, or have the authority to license all listing content (e.g., photographs, images, graphics, audio and video recordings, virtual tours, drawings, descriptions, remarks, narratives, pricing information, and other details or information related to listed property) to be published in the MLS compilation of listing information. *(Amended 5/16)*

Use of listings and listing information by MLSs for purposes other than the defined purposes of MLS requires participants' consent. Such consent cannot be required as a condition of obtaining or maintaining MLS participatory rights. MLSs may presume such consent provided that listing brokers are given adequate prior notice of any intended use unrelated to the defined purpose of MLS, and given the opportunity to affirmatively withhold consent for that use.

Participants cannot be required to transfer ownership rights (including intellectual property rights) in their listings or listing content to MLS to obtain or maintain participatory rights except that MLSs may require participants to grant the licenses necessary for storage, reproduction, compiling, and distribution of listings and listing information to the extent necessary to fulfill the defined purposes of MLS. MLSs may also require participants to warrant that they have the rights in submitted information necessary to grant these rights to MLS. *(Adopted 5/05, Amended 5/16)* M

**Section 16**
**Digital Millennium**
**Copyright Act, Safe Harbor**
**(Policy Statement 7.99)**

The Digital Millennium Copyright Act (DMCA) is a federal copyright law that enhances the penalties for copyright infringement occurring on the Internet. The law provides exemptions or "safe harbors" from copyright infringement liability for online service providers (OSP) that satisfy certain criteria. Courts construe the definition of "online service provider" broadly, which would likely include MLSs as well as participants and subscribers hosting an IDX display.

One safe harbor limits the liability of an OSP that hosts a system, network or website on which Internet users may post user-generated content. If an OSP complies with the provisions of this DMCA safe harbor, it cannot be liable for copyright infringement if a user posts infringing material on its website. This protects an OSP from incurring significant sums in copyright infringement damages, as statutory damages are as high as $150,000 per work. For this reason, it is highly recommended that MLSs, participants and subscribers comply with the DMCA safe harbor provisions discussed herein.

To qualify for this safe harbor, the OSP must:

1. Designate on its website and register with the Copyright Office an agent to receive takedown requests. The agent could be the MLS, participant, subscriber, or other individual or entity.

2. Develop and post a DMCA-compliant website policy that addresses repeat offenders.

3. Comply with the DMCA takedown procedure. If a copyright owner submits a takedown notice to the OSP, which alleges infringement of its copyright at a certain location, then the OSP must promptly remove allegedly infringing material. The alleged infringer may submit a counter-notice that the OSP must share with the copyright owner. If the copyright owner fails to initiate a copyright lawsuit within ten (10) days, then the OSP may restore the removed material.

4. Have no actual knowledge of any complained-of infringing activity.

5. Not be aware of facts or circumstances from which complained-of infringing activity is apparent.

6. Not receive a financial benefit attributable to complained-of infringing activity when the OSP is capable of controlling such activity.

Full compliance with these DMCA safe harbor criteria will mitigate an OSP's copyright infringement liability. For more information see 17 U.S.C. §512. *(Adopted 11/15)* I

31

# F.  Enforcement of Rules

**Section 1**
**Appropriate Procedures for Rules Enforcement (Policy Statement 7.21)**

In any instance where a participant in an association multiple listing service is charged with violation of the MLS bylaws or rules and regulations of the service, and such charge does not include alleged violations of the Code of Ethics or the Standards of Conduct for MLS participants, or a request for arbitration, it may be administratively considered and determined by the MLS governing committee or MLS board of directors. If a violation is determined, the committee or MLS board of directors may direct the imposition of sanction, provided that the recipient of such sanction may request a hearing before the professional standards committee of the association. If the participant refuses to accept any sanction or discipline proposed, the circumstances and the discipline proposed shall be appealed to the board of directors of the association of REALTORS® which shall, if it deems the finding of violation proper and the sanction appropriate to the offense, delay the effective date of sanction until final entry in a suit filed by the association for declaratory relief, except in those states where declaratory relief is not available, declaring that the disciplinary action and proposed sanction violates no rights of the multiple listing service participant. If the MLS committee has a procedure established to conduct hearings, the decision of the MLS committee may be appealed to the board of directors of the association of REALTORS®. If a separately incorporated MLS has an established procedure for the conduct of hearings, the decisions of the hearing tribunal shall be appealable to the board of directors of the MLS. Alleged violations of the Code of Ethics or the Standards of Conduct for MLS participants shall be referred to the association's grievance committee for processing in accordance with the professional standards procedures of the association. If the charge alleges a refusal to arbitrate, such charge shall be referred directly to the board of directors of the association of REALTORS®. *(Amended 2/98)* M

**Section 2**
**Rules and Regulations**

The rules and regulations should be designed to guide participants but must avoid arbitrary restrictions on business practices. They should be based on experience and not be restrictive upon the personal rights of participating individuals. (Rules and regulations are provided elsewhere in this *Handbook* for association of REALTORS®' review and adoption.) R

**Section 3**
**The Use of Fines as Part of Rules Enforcement (Policy Statement 7.22)**

Generally, warning, censure, and the imposition of a moderate fine is sufficient to constitute a deterrent to violation of the rules and regulations of the multiple listing service. Suspension or termination is an extreme sanction to be used in cases of extreme or repeated violation of the rules and regulations of the service. I

**Section 4**
**Financial Penalty Not to Exceed $15,000 (Policy Statement 7.89)**

Notwithstanding the limitations established in the NATIONAL ASSOCIATION OF REALTORS® *Code of Ethics and Arbitration Manual* or in other National Association policy, multiple listing services operated as committees of associations of REALTORS® or as separate, wholly-owned subsidiaries of one or more associations of REALTORS® are authorized to impose financial penalties on participants or subscribers as discipline for violations of MLS rules or other MLS governance provisions not greater than fifteen thousand ($15,000) dollars. *(Adopted 11/07)* M

**Section 5**
**MLS Disciplinary Guidelines**

Associations of REALTORS® and their multiple listing services have the responsibility of fostering awareness, understanding, and appreciation for the duties and responsibilities of MLS participants and subscribers, and of receiving and resolving complaints alleging violations of the rules and regulations. The REALTOR® organization is firmly committed to vigorous, fair, and uniform enforcement. Enforcement achieves a number of goals. Where participants or subscribers are wrongly or mistakenly charged with violations, the hearing process provides personal and professional vindication. Where violations are determined, enforcement process educates participants and subscribers about their duties and obligations, and serves as a meaningful deterrent of future violations.

32

Allegations of conduct inconsistent with the rules are often viewed by respondents as threats to their professional and personal reputations. This can result not only in their mounting vigorous defenses but also, at times, to threats of legal challenge should a violation be determined and discipline imposed. Given that MLS participation can have significant economic value, associations and their MLSs need to strictly adhere to their established procedures when considering potential violations. This caution ensures that the rights of the parties will be observed, and legal exposure of associations and their MLSs will be minimized.

At the same time, well-founded caution should not be confused with reservation, reluctance, or hesitancy. Rules become aspirations at best, and potentially meaningless, if not enforced with vigor and determination.

Fundamental to fair and consistent enforcement is reasonable and judicious use of discipline, as both an educational device and as punishment. Associations and their MLSs have a wide variety of sanctions available to them that may be imposed for violations. These range from simple letters of warning to termination of MLS rights and privileges. Between these extremes are mandatory attendance at remedial education sessions, financial penalties, probation, and suspension.

The National Association does not recommend specific penalties for certain offenses or for violations of particular rules. This is in deference to the wisdom and autonomy of the hearing panel privy to the details of complaints coming before them; in recognition of the fact that no two complaints are identical; and in view of the facts that the details of each hearing, including the experience of respondents, their history of prior violations, and mitigating or extenuating circumstances, may all come into play in determining an appropriate penalty. At the same time, there are key points to be considered with respect to imposition of discipline.

- Discipline that can be imposed is strictly limited to those forms authorized in the NATIONAL ASSOCIATION OF REALTORS® *Code of Ethics and Arbitration Manual* and to any additional form authorized by the National Association's board of directors.

- Discipline should be commensurate with the offense. Unintentional or inadvertent violations should result in penalties designed to educate respondents about the conduct expected of them. Only authorized forms of discipline may be utilized.

- Discipline should be progressive. The disciplinary emphasis on violations by new members or by long-standing members with no history of prior violations should be primarily educational. Repeated or subsequent violations should be addressed with more serious forms of discipline, including substantial fines, suspension, and termination of MLS rights and privileges.

- A gray area can exist with respect to "first time violations" that are clearly not the result of ignorance or mistake but rather demonstrate flagrant disregard for the rules. While the educational aspect of enforcement cannot be disregarded, the fact that the rules exist to protect clients and customers, the public, and to ensure effective, efficient functioning of the MLS, must also be considered in determining commensurate discipline.

- Mitigating or extenuating circumstances should be considered in determining appropriate discipline. The fact that a respondent recognizes or acknowledges inappropriate conduct or took steps to remediate or minimize harm or injury, should be considered in determining appropriate discipline.

- Respondent's records of earlier violations or, conversely, the fact that they have not violated the rules in the past, can be considered in determining appropriate discipline. Hearing panels cannot consider past violations in deciding whether the conduct currently complained of violates the rules.

Crafting appropriate, meaningful discipline can challenge panels that have concluded the rules have been violated. This discussion is offered as guidance, rather than as a hard and fast template, to assist panels in meeting their responsibility in ensuring the rules' viability and vitality through vigorous and evenhanded enforcement.

**Progressive Discipline**

Discipline imposed for violation of the rules should be progressive. The severity of discipline should increase incrementally for subsequent violations. The disciplinary emphasis where first time violations occur should be primarily educational. Repeated or subsequent violations should result in more serious forms of discipline being utilized, including substantial fines, suspension, and termination of MLS rights and privileges. At the same time, a gray area can exist where a first-time violation is not attributable to ignorance or oversight, but rather to blatant disregard for the rules. While the educational emphasis of enforcement cannot be disregarded, the fact the rules exist to protect clients and customers, the public, and to ensure the effective, efficient functioning of the MLS must be carefully considered in determining appropriate discipline.

Factors hearing panels should consider in determining appropriate discipline include, but are not necessarily limited to:

- The nature of the violation

- Harm caused by the violation. Was the violation a minor mistake causing little or no harm or, alternatively, was a client, customer, member of the public, or another participant harmed?

- Was the violation inadvertent or unintentional or, conversely, was it the result of knowing disregard for the obligations of MLS participants and subscribers?

- How much real estate experience did the violator have? Did he, or should he, have known better?

- Has the violator been found in violation of the rules previously? How often? How recently? Is the current violation related or similar to earlier violations?

- Are there mitigating or extenuating circumstances that should be considered in determining appropriate discipline?

- Did the violator acknowledge the violation? Did the violator express remorse or contrition?

- Are there other factors that ought to be considered? *(Adopted 11/07)* `1`

# G.  Commission/Cooperative Compensation Offers

**Section 1
Information Specifying
the Compensation on
Each Listing Filed with
a Multiple Listing
Service of an Association
of REALTORS®
(Policy Statement 7.23)**

In filing property with the multiple listing service, participants make blanket unilateral offers of compensation to the other MLS participants and shall therefore specify on each listing filed with the service the compensation being offered by the listing broker to the other MLS participants. This is necessary because cooperating participants have the right to know what their compensation will be prior to commencing their efforts to sell.* *(Revised 11/04)*

The listing broker retains the right to determine the amount of compensation offered to subagents, buyer agents, or to brokers acting in other agency or nonagency capacities, which may be the same or different. *(Revised 11/96)*

This shall not preclude the listing broker from offering any MLS participant compensation other than the compensation indicated on his listings as published by the MLS, provided the listing broker informs the other broker in writing in advance of their submitting an offer to purchase and provided that the modification in the specified compensation is not the result of any agreement among all or any other participants in the service. Any superseding offer

*Relates to Point No. 2 of the MLS antitrust compliance policy.

of compensation must be expressed as either a percentage of the gross sales price or as a flat dollar amount. *(Amended 05/10)*

While offers of compensation made by listing brokers to cooperating brokers through MLS are unconditional (except where MLS rules create specific exceptions as specified elsewhere in this policy statement), a listing broker's obligation to compensate a cooperating broker who was the procuring cause of sale (or lease) may be excused if it is determined through arbitration that, through no fault of the listing broker and in the exercise of good faith and reasonable care, it was impossible or financially unfeasible for the listing broker to collect a commission pursuant to the listing agreement. In such instances, entitlement to cooperative compensation offered through MLS would be a question to be determined by an arbitration hearing panel based on all relevant facts and circumstances including, but not limited to, why it was impossible or financially unfeasible for the listing broker to collect some or all of the commission established in the listing agreement; at what point in the transaction did the listing broker know (or should have known) that some or all of the commission established in the listing agreement might not be paid; and how promptly had the listing broker communicated to cooperating brokers that the commission established in the listing agreement might not be paid. *(Amended 11/98)*

The multiple listing service shall not have a rule requiring the listing broker to disclose the amount of total negotiated commission in his listing contract, and the multiple listing service shall not publish the total negotiated commission on a listing which has been submitted to the MLS by a participant. The multiple listing service shall not disclose in any way the total commission negotiated between the seller and the listing broker.

**Note 1:** The compensation specified on listings filed with the multiple listing service by the participants of the service shall be expressed as a percentage of the gross sales price or as a definite dollar amount. Multiple listing services may, as a matter of local discretion, allow participants to offer cooperative compensation as a percentage of the net sales price, with net sales price defined as the gross sales price minus buyer upgrades (new construction) and seller concessions (as defined by the MLS unless otherwise defined by state law or regulation). The essential and appropriate requirement by a multiple listing service is that the information to be published shall clearly inform the participants as to the compensation they will receive in cooperative transactions unless advised otherwise by the listing broker in writing in advance of their submitting an offer to purchase. *(Amended 5/10)*

Multiple listing services shall not publish listings that do not include an offer of compensation expressed as a percentage of the gross selling price or as a definite dollar amount, nor shall they include general invitations by listing brokers to other participants to discuss terms and conditions of possible cooperative relationships. *(Amended 11/96)*

**Note 2:** Multiple listing services, at their discretion, may adopt rules and procedures enabling listing brokers to communicate to potential cooperating brokers that gross commissions established in listing contracts are subject to court approval, and that compensation payable to cooperating brokers may be reduced if the gross commission established in the listing contract is reduced by a court. In such instances, the fact that the gross commission is subject to court approval and either the potential reduction in compensation payable to cooperating brokers or the method by which the potential reduction in compensation will be calculated must be clearly communicated to potential cooperating brokers prior to the time they submit an offer that ultimately results in a successful transaction. *(Amended 5/10)*

**Note 3:** Multiple listing services must give participants the ability to disclose to other participants any potential for a short sale. As used in MLS rules, short sales are defined as a transaction where title transfers, where the sales price is insufficient to pay the total of all liens and costs of sale, and where the seller does not bring sufficient liquid assets to the closing to cure all deficiencies. Multiple listing services

may, as a matter of local discretion, require participants to disclose short sales when participants know a transaction is a potential short sale. In any instance where a participant discloses a potential short sale, they may, as a matter of local discretion, be permitted to communicate to other participants how any reduction in the gross commission established in the listing contract required by the lender as a condition of approving the sale will be apportioned between the listing and cooperating participants. Where participants are permitted to communicate to other participants how any reduction in the gross commission established in the listing contract required by the lender as a condition of approving the sale will be apportioned between the listing and cooperating participants, multiple listing services may, as a matter of local discretion, require listing participants to disclose to cooperating participants in writing the total reduction in the gross commission and the amount by which the compensation payable to the cooperating broker will be reduced within _____ hours of receipt of notification from the lender. All confidential disclosures and confidential information related to short sales, if allowed by local rules, must be communicated through dedicated fields or confidential "remarks" available only to participants and subscribers. *(Amended 5/10)* M

**Section 2**
**Agency**
**(Policy Statement 7.11)**

In the multiple listing service of an association of REALTORS®, the cooperating broker in a cooperative real estate transaction is the subagent of the listing broker, the agent of the buyer, or is acting in another recognized agency or nonagency capacity. Such relationships must be fully disclosed to all parties to the contract and to all brokers involved. *(Amended 11/96)* I

# H.  Lock Box/Key Repositories

**Section 1**
**Lock Box Security**
**Requirements**
**(MLS Policy**
**Statement 7.31)**

Eligibility for coverage under NAR's blanket errors and omissions insurance program is contingent on compliance with the following security measures whether the system is operated by the association, its MLS, or by a recognized lock-box vendor on behalf of an association or MLS: *(Amended 5/17)*

1. **Types of keys.** Any physical or electronic key, programmer, or other device (hereinafter referred to as key) by which a lockbox can be opened, must be non-duplicative. Being non-duplicative means that it cannot be readily copied in the manner that other types of keys ordinarily are. *(Amended 5/17)*

   A mobile device (such as, a smart phone, tablet, fob, etc.) can transmit a key to access a lockbox using standard protocols, including, Bluetooth, ZigBee, infrared technology, and others. The applications and software used by mobile devices must contain security controls to allow only authorized users access to the lockbox. *(Adopted 5/17)*

   As a matter of local discretion, the listing broker or agent can issue temporary codes/ access to the lockbox and property on terms and conditions agreed to in advance by the seller. Temporary codes/access must expire within seventy-two (72) hours after being issued or must be under the control of the listing broker or agent. Temporary codes must be a minimum field size of five (5) characters. *(XX,XXX) (Adopted 5/17)*

2. **Security protocols.** Keys must be obtained from the original manufacturer, from a recognized vendor of lockbox systems or from any other legitimate source. Prior to utilizing previously used keys, lids, or boxes, associations and MLSs must obtain sufficient information from the original manufacturer and surrounding associations and MLSs in order to determine whether the key's pattern, code, or configuration is already in use. *(Amended 5/17)*

   Electronic lockboxes and electronic keys running on mobile devices must incorporate security protocols to prevent the following types of cyber-attacks:

- where an unauthorized user can override or escalate their security credentials

- where the communication session between the electronic lockbox and key are recorded and played back later to gain unauthorized access

- forging of electronic credentials that could allow an unauthorized user the ability to masquerade as an authorized user

- digitally signed updates to electronic keys running on mobile devices or electronic lockbox firmware plus a secured update process to prevent unauthorized software from being introduced into the lockbox system

- transmission(s) of frequencies to deceive the lockbox electronics into opening *(Adopted 5/17)*

3. **Availability of lockbox system and keys.** Any lockbox system must be designated as either an activity of an association of REALTORS® or an association-owned and operated MLS. *(Amended 5/17)*

   If the lockbox system is an activity of an association of REALTORS®, then every REALTOR® and REALTOR-ASSOCIATE® and every non-principal broker, sales licensee and licensed or certified appraiser affiliated with a REALTOR®, shall be eligible to hold a key subject to their execution of a lease agreement with the association. *(Amended 11/96)*

   If the lockbox system is an activity of an association-owned and operated MLS, then every MLS participant and every non-principal broker, sales licensee and licensed or certified appraiser who is affiliated with an MLS participant and who is legally eligible for MLS access shall be eligible to hold a key subject to their execution of a lease agreement with the MLS. *(Amended 5/17)*

   As a matter of local discretion, associations and MLSs can determine that key lease agreements executed by non-principal brokers, sales licensees, unlicensed personal assistants, administrative and clerical staff, and licensed, certified, or those seeking to be licensed or certified as appraisers, must also be cosigned by the designated REALTOR® or the office's broker of record. Lease agreements shall spell out the responsibilities of the parties and shall incorporate by reference any applicable rules or regulations or other governing provisions of the association or MLS that relate to the operation of the lockbox system. The lease agreement shall also provide that keys may not be used under any circumstances by anyone other than the keyholder, except as provided elsewhere in this statement of policy. *(Amended 5/17)*

   Associations and MLSs may, at their discretion, lease keys to affiliate members of associations who are actively engaged in a recognized field of real estate practice or in related fields. In such instances, the lease agreement shall be signed by the keyholder and by a principal, partner, or corporate officer of the keyholder's firm. *(Adopted 5/17)*

   Individuals may be required to pay lockbox costs as part of association dues or as part of MLS participation fees pursuant to MLS Policy Statement 7.57, Categorization of MLS Services, Information, and Products and pursuant to NAR Bylaws Official Interpretation #32. No one shall be required to lease a key from the association except on a voluntary basis. *(Adopted 5/17)*

   Associations and MLSs may refuse to sell or lease lockbox keys, may terminate existing key lease agreements, and may refuse to activate or reactivate any key held by an individual who has been convicted of a crime within the past seven (7) years under the following circumstances: *(Amended 5/17)*

   A. The association or MLS determines that the conviction(s) relates to the real estate business or puts clients, customers, other real estate professionals, or property at risk, for example through dishonest, deceptive, or violent acts; and *(Amended 5/17)*

B. The association or MLS gives the individual an opportunity to provide and the association or MLS must consider mitigating factors related to the individual's criminal history, including, but not limited to, factors such as:

   i)   the individual's age at the time of the conviction(s)

   ii)   nature and seriousness of the crime

   iii)  extent and nature of past criminal activity

   iv)  time elapsed since criminal activity was engaged in

   v)   rehabilitative efforts undertaken by the applicant since the conviction(s)

   vi)  facts and circumstances surrounding the conviction(s) and

   vii) evidence of current fitness to practice real estate *(Amended 5/17)*

Associations and MLSs should be sure to evaluate individuals uniformly, and avoid making exceptions for one individual while denying an exception to another individual with a similar criminal history. *(Amended 5/17)*

Associations or MLSs may suspend the right of lockbox keyholders to use lockbox keys following their arrest and prior to a final determination on any such charge if, in the determination of the association or MLS, the charge relates to a crime that relates to the real estate business or puts clients, customers, other real estate professionals, or property at risk. *(Amended 5/17)*

4. **Audit requirement.** Associations or MLSs shall maintain current records as to all keys issued and in inventory, including registered users accessing lockboxes through applications and software used by mobile devices. There shall be an audit, at least annually, of all keys, whether issued or in inventory. This requirement may be satisfied by a physical inventory or by receipt of a statement signed by the keyholder and the designated REALTOR®, broker of record, or, in the case of an affiliate member, by a principal, partner, or corporate officer of the keyholder's firm, attesting that the key is currently in possession of the keyholder. *(Amended 5/17)*

5. **Seller authority required.** Lockboxes may not be placed on a property without written authority from the seller. This authority may be established in the listing contract or any other written document. Inclusion in MLS compilations cannot be required as a condition of placing lockboxes on listed property. *(Amended 5/17)*

6. **Reporting missing keys.** Associations or MLSs must charge keyholders and their cosignatories with the joint obligation of immediately reporting lost, stolen, or otherwise unaccountable for keys to the association or MLS. Upon receipt of notice, the association or MLS must take any steps deemed necessary to resecure the system. *(Amended 5/17)*

7. **Rules and procedures governing lockbox systems.** Associations or MLSs must adopt written, reasonable, and appropriate rules and procedures for administration of lockbox systems which may include appropriate fines, not to exceed $15,000. Any issuing fees, recurring fees, or other administrative costs shall be established at the discretion of the association or MLS and set forth in the rules and procedures. All keyholders, whether or not they are association members or MLS participants, shall agree, as a condition of the key lease agreement, to be bound by the rules and procedures governing the operation of the lockbox system. *(Amended 5/17)*

Key lease agreements may contain a liquidated damages provision to offset some or all of the costs in reestablishing the security of the system if it is determined that the security has been compromised through the negligence or fault of the keyholder. *(Amended 11/97)*

8. **Issuing electronic programmers or keypads on temporary basis.** In the event electronic lockbox programmers or keypads are sold or leased, a designated REALTOR® principal or

an office's broker of record may purchase or lease additional programmers or keypads to be issued on a temporary basis to other keyholders in the same office in the event their programmer or keypad becomes non-functional outside normal business hours or under circumstances where a replacement programmer or keypad is not reasonably available from the issuing association or MLS. When a programmer or keypad is issued on a temporary basis, it shall be the responsibility of the REALTOR® principal or the broker of record to advise the association or MLS in writing that the programmer or keypad has been issued, to whom, and the date and time of issuance within forty-eight (48) hours. It shall also be the responsibility of the REALTOR® principal or the broker of record to advise the association or MLS in writing within two (2) business days after possession of the previously issued programmer or keypad has been reassumed. *(Amended 5/17)* M

9. **Requiring "approved" lockbox systems.** As a matter of local discretion, associations and MLSs may require placement of an "approved" lockbox on listed properties if any device giving access to real estate professionals or service providers is authorized by the seller and occupant and is placed on the property. The purpose of this requirement, if adopted by an association or MLS, is to ensure cooperating participants and subscribers have timely access to listed properties. Requiring that a lockbox or other access device be "approved" does not limit the devices that satisfy the requirement to lockboxes leased or sold by an association or MLS. The association or MLS may require that the devices be submitted in advance for approval, and the access device may be any lockbox or other access device that provides reasonable, timely access to listed property. The association or MLS also may revoke the approval or subject the participant to discipline if the device is used in a manner that fails to continue to satisfy this requirement. *(Amended 05/17)* M

**Section 2**
**Lock Box Key Deposits**
**(Policy Statement 7.32)**

Any funds accepted by a member association or association MLS as deposits for lockbox keys shall be retained by the association or its MLS in a separate account so that the funds will be available to be refunded to depositors upon return of the lockbox key to the association or its MLS. The funds deposited are to be retained for this purpose only and are not to be utilized in any other manner. The separate fund may be an interest bearing account with the interest retained by the association or association MLS unless as a requirement of law, or at the discretion of the association or association MLS, such interest shall be paid to the depositors. M

**Section 3**
**Centralized Key**
**Repositories**
**(Policy Statement 7.46)**

A centralized key repository is defined as a system operated by an association multiple listing service which enables an MLS participant to place keys to listed properties in a central location to be made available to other participants and their affiliated licensees to facilitate the showing of listed properties. Under certain circumstances and subject to strict operational rules and regulations, an association multiple listing service may choose to operate a centralized key repository in lieu of a lockbox system and still be eligible for coverage under the errors and omissions insurance program of the NATIONAL ASSOCIATION OF REALTORS®. *(Approved 2/86)* I

**Section 4**
**Minimum Security**
**Measures for Centralized**
**Key Repositories of**
**Association Multiple**
**Listing Services**
**(Policy Statement 7.47)**

1. A centralized key repository is defined as a system operated by a multiple listing service which enables a participant to place keys to listed property in a central location to be made available to other participants and their affiliated sales licensees to facilitate the showing of listed property.

2. Use of the system must be strictly limited to participants and their affiliated sales licensees.

3. Keys to listed property may not be submitted unless the property is exclusively listed by the participant and the listing agreement includes a provision whereby the seller specifically authorizes the listing participant to place keys in the system. In

lieu of such authorization in the listing agreement, the MLS may require the seller's authorization be provided on a separate document prepared by the MLS.

4. All keys to listed property must be stored in a locked, secure area in the association or MLS office.

5. All keys become the property of the association or MLS.

6. No key may be issued without the consent of the listing office. Any individual requesting a key must indicate, in writing, who in the listing office has authorized the showing.

7. All keys must be coded in a manner which prevents their identification with a particular property until issued by an authorized representative of the association or MLS.

8. Lost or stolen keys must be reported to the association or MLS as quickly as possible.

9. A police report must be filed as quickly as possible whenever a key is lost or stolen.

10. Any person losing a key must immediately advise the property owner and the listing broker and offer to have all necessary locks changed as quickly as possible.

11. The issuance of keys must be discontinued immediately upon request of the seller.

12. Keys must be issued for a specified period of time and failure to return a key within the allotted time shall be considered as a violation of the rules or procedures. When a key is more than twenty-four (24) hours overdue, the association or MLS must contact the person to whom the key was issued and the principal broker or branch manager of the firm to confirm the key has not been lost or stolen and to request its immediate return.

13. Keys must be destroyed upon expiration of the listing or upon closing (whichever occurs first) or earlier at the direction of the listing participant.

14. All rules and procedures for the operation of any centralized key repository must be in writing and be submitted to the National Association for review and approval prior to implementation.

15. Any association member or employee involved in the administration or operation of the system shall be bonded. **M**

# I. Virtual Office Websites: Policy Governing Use of MLS Data in Connection with Internet Brokerage Services Offered by MLS Participants

## I. Definitions and Scope of Policy

1. For purposes of this policy, the term "Virtual Office Website" (VOW) refers to a participant's Internet website, or a feature of a participant's Internet website, through which the participant is capable of providing real estate brokerage services to consumers with whom the participant has first established a broker-consumer relationship (as defined by state law) where the consumer has the opportunity to search MLS data, subject to the participant's oversight, supervision, and accountability.

   a. A participant may designate an "Affiliated VOW Partner" (AVP) to operate a VOW on behalf of the participant, subject to the participant's supervision and accountability and the terms of this policy.

   b. A non-principal broker or sales licensee affiliated with a participant may, with the participant's consent, operate a VOW or have a VOW operated on its behalf by an AVP. Such a VOW is subject to the participant's supervision and accountability and the terms of this policy.

40

c. Each use of the term "participant" in this policy shall also include a participant's non-principal brokers and sales licensees (with the exception of references in this section to the "participant's consent" and the "participant's supervision and accountability," and in Section III.10.a., below, to the "participant acknowledges"). Each reference to VOW or VOWs herein refers to all VOWs, whether operated by a participant, by a non-principal broker or sales licensee, or by an AVP.

2. The right to display listings in response to consumer searches is limited to display of MLS data supplied by the MLS(s) in which the participant has participatory rights. This does not preclude a firm with offices participating in different MLSs from operating a master website with links to such offices' VOWs.

3. Participants' Internet websites, including those operated for participants by AVPs, may also provide other features, information, or services, in addition to VOWs (including the "Internet Data Exchange" [IDX] function).

4. The display of listing information on a VOW does not require separate permission from the participant whose listings will be available on the VOW.

5. Except as permitted in Sections III. and IV., MLSs may not adopt rules or regulations that conflict with this policy or that otherwise restrict the operation of VOWs by participants.

## II. Policies Applicable to Participants' VOWs

1. A participant may provide brokerage services via a VOW that include making MLS active listing data available, but only to consumers with whom the participant has first established a lawful consumer-broker relationship, including completion of all actions required by state law in connection with providing real estate brokerage services to clients and customers (hereinafter "Registrants"). Such actions shall include, but are not limited to, satisfying all applicable agency, non-agency, and other disclosure obligations, and execution of any required agreement(s).

2. A participant's VOW must obtain the identity of each Registrant and obtain each Registrant's agreement to terms of use of the VOW, as follows:

   a. A Registrant must provide his or her name and a valid e-mail address. The participant must send an e-mail to the address provided by the Registrant confirming that the Registrant has agreed to the terms of use (described in Subsection c., below). The Registrant may be permitted to access the VOW only after the participant has verified that the e-mail address provided is valid and that Registrant received the terms of use confirmation.

   b. The Registrant must supply a user name and a password, the combination of which must be different from those of all other Registrants on the VOW, before being permitted to search and retrieve information from the MLS database via the VOW. The user name and password may be established by the Registrant or may be supplied by the participant, at the option of the participant. An e-mail address may be associated with only one user name and password. The Registrant's password and access must expire on a date certain, but may be renewed. The participant must, at all times, maintain a record of the name and e-mail address supplied by the Registrant, and the user name and current password of each Registrant. Such records must be kept for not less than one hundred eighty (180) days after the expiration of the validity of the Registrant's password. If the MLS has reason to believe that a participant's VOW has caused or permitted a breach in the security of the data or a violation of MLS rules related to use by one or more Registrants, the participant shall, upon request, provide to the MLS a copy of the record of the name, e-mail address, user name, current password,

and audit trail, if required, of any Registrant identified by the MLS to be suspected of involvement in the violation.

c.  The Registrant must be required affirmatively to express agreement to a "terms of use" provision that requires the Registrant to open and review an agreement that provides at least the following:

   i.  that the Registrant acknowledges entering into a lawful consumer-broker relationship with the participant

   ii.  that all data obtained from the VOW is intended only for the Registrant's personal, non-commercial use

   iii.  that the Registrant has a bona fide interest in the purchase, sale, or lease of real estate of the type being offered through the VOW

   iv.  that the Registrant will not copy, redistribute, or retransmit any of the data or information provided, except in connection with the Registrant's consideration of the purchase or sale of an individual property

   v.  that the Registrant acknowledges the MLS' ownership of and the validity of the MLS' copyright in the MLS database

After the Registrant has opened for viewing the terms of use agreement, a mouse click is sufficient to acknowledge agreement to those terms. The terms of use agreement may not impose a financial obligation on the Registrant or create any representation agreement between the Registrant and the participant.

The terms of use agreement shall also expressly authorize the MLS and other MLS participants or their duly authorized representatives to access the VOW for the purposes of verifying compliance with MLS rules and monitoring display of participants' listings by the VOW.

d.  An agreement entered into at any time between the participant and Registrant imposing a financial obligation on the Registrant or creating representation of the Registrant by the participant must be established separately from the terms of use, must be prominently labeled as such, and may not be accepted solely by mouse click.

3.  A participant's VOW must prominently display an e-mail address, telephone number, or specific identification of another mode of communication (e.g., live chat) by which a consumer can contact the participant to ask questions or get more information about properties displayed on the VOW. The participant or a non-principal broker or sales licensee licensed with the participant must be willing and able to respond knowledgeably to inquiries from Registrants about properties within the market area served by that participant and displayed on the VOW.

4.  A participant's VOW must protect the MLS data from misappropriation by employing reasonable efforts to monitor for and prevent scraping or other unauthorized accessing, reproduction, or use of the MLS database.

5.  A participant's VOW must comply with the following additional requirements.

a.  No VOW shall display the listing or property address of any seller who has affirmatively directed its listing broker to withhold its listing or property address from display on the Internet. The listing broker or agent shall communicate to the MLS that a seller has elected not to permit display of the listing or property address on the Internet. Notwithstanding the foregoing, a participant who operates a VOW may provide to consumers via other delivery mechanisms, such as e-mail, fax, or otherwise, the listing or property address of a seller who has determined not to have the listing or address for its property displayed on the Internet.

b.  A participant who lists a property for a seller who has elected not to have the property listing or the property address displayed on the Internet shall cause the seller to execute

a document that conforms to the form attached to this policy as Appendix A. The participant shall retain such forms for at least one (1) year from the date they are signed.

c. With respect to any VOW that:

    i. allows third parties to write comments or reviews about particular listings or displays a hyperlink to such comments or reviews in immediate conjunction with particular listings, or

    ii. displays an automated estimate of the market value of the listing (or hyperlink to such estimate) in immediate conjunction with the listing, the VOW shall disable or discontinue either or both of those features as to the seller's listing at the request of the seller. The listing broker or agent shall communicate to the MLS that the seller has elected to have one or both of these features disabled or discontinued on all participants' websites. Except for the foregoing and subject to Subsection d., below, a participant's VOW may communicate the participant's professional judgment concerning any listing. Nothing shall prevent a VOW from notifying its customers that a particular feature has been disabled at the request of the seller.

d. A VOW shall maintain a means (e.g., e-mail address, telephone number) to receive comments about the accuracy of any data or information that is added by or on behalf of the VOW operator beyond that supplied by the MLS and that relates to a specific property displayed on the VOW. The VOW operator shall correct or remove any false data or information relating to a specific property upon receipt of a communication from the listing broker or listing agent for that property explaining why the data or information is false. However, the VOW operator shall not be obligated to remove or correct any data or information that simply reflects good faith opinion, advice, or professional judgment.

e. Each VOW shall refresh MLS data available on the VOW not less frequently than every three (3) days.

f. Except as provided elsewhere in this policy or in MLS rules and regulations, no portion of the MLS database may be distributed, provided, or made accessible to any person or entity.

g. Every VOW must display a privacy policy that informs Registrants of the ways in which information obtained from them will be used.

h. A VOW may exclude listings from display based only on objective criteria, including, but not limited to, factors such as geography, list price, type of property, cooperative compensation offered by listing broker, or whether the listing broker is a REALTOR®.

6. A participant who intends to operate a VOW must notify the MLS of its intention to establish a VOW and must make the VOW readily accessible to the MLS and to all MLS participants for purposes of verifying compliance with this policy and any other applicable MLS rules or policies.

7. A participant may operate more than one VOW itself or through an AVP. A participant who operates a VOW itself shall not be precluded from also operating VOWs in conjunction with AVPs.

## III.  Policies Applicable to Multiple Listing Services

1. A multiple listing service shall permit MLS participants to operate VOWs or to have VOWs operated for them by AVPs, subject to the requirements of state law and this policy.

2. An MLS shall, if requested by a participant, provide basic downloading of all MLS non-confidential listing data, including, without limitation, address fields, listing types, photographs, and links to virtual tours. Confidential data includes only that which

participants are prohibited from providing to customers orally and by all other delivery mechanisms. They include fields containing the information described in Section IV.1. of this policy, provided that sold data (i.e., listing information relating to properties that have sold) shall be deemed confidential and withheld from a download only if the actual sales prices of completed transactions are not accessible from public records. For purposes of this policy, downloading means electronic transmission of data from MLS servers to a participant's or AVP's server on a persistent basis. An MLS may also offer a transient download. In such case, it shall also, if requested, provide a persistent download, provided that it may impose on users of such download the approximate additional costs incurred by it to do so.

3. This policy does not require an MLS to establish publicly accessible sites displaying participants' listings.

4. If an MLS provides a VOW-specific feed, that feed must include all of the non-confidential data included in the feed described in Subsection 2., above, except for listings or property addresses of sellers who have elected not to have their listings or addresses displayed on the Internet.

5. An MLS may pass on to those participants who will download listing information the reasonably estimated costs incurred by the MLS in adding or enhancing its downloading capacity to enable such participants to operate VOWs.

6. An MLS may require that participants:

   a. utilize appropriate security protection, such as firewalls, as long as such requirement does not impose security obligations greater than those employed concurrently by the MLS, and/or

   b. maintain an audit trail of Registrants' activity on the VOW and make that information available to the MLS if the MLS has reason to believe that any VOW has caused or permitted a breach in the security of the data or a violation of applicable MLS rules.

7. An MLS may not prohibit or regulate display of advertising or the identification of entities on VOWs (branding or co-branding), except to prohibit deceptive or misleading advertising or co-branding. For purposes of this provision, co-branding will be presumed not to be deceptive or misleading if the participant's logo and contact information (or that of at least one participant, in the case of a VOW established and operated by or for more than one participant) is displayed in immediate conjunction with that of every other party, and the logo and contact information of all participants displayed on the VOW is as large as the logo of the AVP and larger than that of any third party.

8. Except as provided in this policy, an MLS may not prohibit participants from enhancing their VOWs by providing information obtained from sources other than the MLS, additional technological services (such as mapping functionality), or information derived from non-confidential MLS data (such as an estimated monthly payment derived from the listed price), or regulate the use or display of such information or technological services on any VOW.

9. Except as provided in generally applicable rules or policies (such as the REALTOR® Code of Ethics), an MLS may not restrict the format of data display on a VOW or regulate the appearance of VOWs.

10. Subject to the provisions below, an MLS shall make MLS listing data available to an AVP for the exclusive purpose of operating a VOW on behalf of a participant. An MLS shall make MLS listing data available to an AVP under the same terms and conditions as those applicable to participants. No AVP has independent participation rights in the MLS by virtue of its right to receive data on behalf of a participant or the right to use MLS data, except in connection with operation of a VOW for a participant. AVP access

44

to MLS data is derivative of the rights of the participant on whose behalf the AVP is downloading data.

a. A participant, non-principal broker or sales licensee, or AVP may establish the AVP's right to receive and use MLS data by providing to the MLS a writing in which the participant acknowledges its or its non-principal broker's or sales licensee's selection of the AVP to operate a VOW on its behalf.

b. An MLS may not charge an AVP, or a participant on whose behalf an AVP operates a VOW, more than a participant that chooses to operate a VOW itself (including any fees or costs associated with a license to receive MLS data, as described in Subsection g., below), except to the extent that the MLS incurs greater costs in providing listing data to the AVP than the MLS incurs in providing listing data to a participant.

c. An MLS may not place data security requirements or restrictions on use of MLS listing data by an AVP that are not also imposed on participants.

d. An MLS must permit an AVP to download listing information in the same manner (e.g., via a "Real Estate Transaction Standard" [RETS] feed or via a "File Transfer Protocol" [FTP] download), at the same times and with the same frequency that the MLS permits participants to download listing information.

e. An MLS may not refuse to deal directly with an AVP in order to resolve technical problems with the data feed. However, the MLS may require that the participant on whose behalf the AVP is operating the VOW participate in such communications if the MLS reasonably believes that the involvement of the participant would be helpful in order to resolve the problem.

f. An MLS may not condition an AVP's access to a data feed on the financial terms on which the AVP provides the site for the participant.

g. An MLS may require participants and AVPs to execute license or similar agreements sufficient to ensure that participants and AVPs understand and agree that data provided by the MLS may be used only to establish and operate a VOW on behalf of the participant and not for any other purpose.

h. An MLS may not:

   i. prohibit an AVP from operating VOWs on behalf of more than one participant, and several participants may designate an AVP to operate a single VOW for them collectively,

   ii. limit the number of entities that participants may designate as AVPs for purposes of operating VOWs, or

   iii. prohibit participants from designating particular entities as AVPs, except that, if an AVP's access has been suspended or terminated by an MLS, that MLS may prevent an entity from being designated an AVP by another participant during the period of the AVP's suspension or termination.

i. Except as stated below, an MLS may not suspend or terminate an AVP's access to data:

   i. for reasons other than those that would allow an MLS to suspend or terminate a participant's access to data, or

   ii. without giving the AVP and the associated participant(s) prior notice and the process set forth in the applicable provisions of the MLS rules for suspension or termination of a participant's access.

Notwithstanding the foregoing, an MLS may immediately terminate an AVP's access to data:

   i. if the AVP is no longer designated to provide VOW services to any participant,

   ii. if the participant for whom the AVP operates a VOW ceases to maintain its status with the MLS,

      iii. if the AVP has downloaded data in a manner not authorized for participants and that hinders the ability of participants to download data, or

      iv. if the associated participant or AVP has failed to make required payments to the MLS in accordance with the MLS' generally applicable payment policies and practices.

11. An MLS may not prohibit, restrict, or impede a participant from referring Registrants to any person or from obtaining a fee for such referral.

## IV. Requirements that MLSs May Impose on the Operation of VOWs and Participants

1. An MLS may impose any, all, or none of the following requirements on VOWs, but may impose them only to the extent that equivalent requirements are imposed on participants' use of MLS listing data in providing brokerage services via all other delivery mechanisms.

    a. A participant's VOW may not make available for search by or display to Registrants the following data, intended exclusively for other MLS participants and their affiliated licensees:

      i. expired, withdrawn, or pending listings

      ii. sold data, unless the actual sales price of completed transactions is accessible from public records

      iii. the compensation offered to other MLS participants

      iv. the type of listing agreement, i.e., exclusive-right-to-sell or exclusive agency

      v. the seller(s) and occupant(s) name(s), phone number(s) and e-mail address(es), where available

      vi. instructions or remarks intended for cooperating brokers only, such as those regarding showing or security of the listed property

    b. The content of MLS data that is displayed on a VOW may not be changed from the content as it is provided in the MLS. MLS data may be augmented with additional data or information not otherwise prohibited from display as long as the source of such other data or information is clearly identified. This requirement does not restrict the format of MLS data display on VOWs or display of fewer than all of the listings or fewer authorized data fields.

    c. There shall be a notice on all MLS data displayed indicating that the data is deemed reliable, but is not guaranteed accurate by the MLS. A participant's VOW may also include other appropriate disclaimers necessary to protect the participant and/or the MLS from liability.

    d. Any listing displayed on a VOW shall identify the name of the listing firm in a readily visible color, and reasonably prominent location, and in typeface not smaller than the median typeface used in the display of listing data.

    e. The number of current or, if permitted, sold listings that Registrants may view, retrieve, or download on or from a VOW in response to an inquiry may be limited to a reasonable number. Such number shall be determined by the MLS, but in no event may the limit be fewer than five hundred (500) listings or fifty percent (50%) of the listings in the MLS, whichever is less. *(Amended 11/17)*

    f. Any listing displayed on a VOW shall identify the name of the listing agent.

2. An MLS may also impose the following other requirements on the operation of VOWs.

    a. Participants displaying other brokers' listings obtained from other sources, e.g., other MLSs, non-participating brokers, etc., shall display the source from which each such listing was obtained.

    b. A maximum period, no shorter than ninety (90) days and determined by the MLS, during which Registrants' passwords are valid, after which such passwords must be changed or reconfirmed.

3. An MLS may not prohibit participants from downloading and displaying or framing listings obtained from other sources, e.g., other MLSs or from brokers not participating in that MLS, etc., but may require either:

    a. that such information be searched separately from listings obtained from other sources, including other MLSs, or

    b. if such other sources are searched in conjunction with searches of the listings available on the VOW, that any display of listings from other sources identify such other source.

## V. Effective Date

MLSs have until not later than February 16, 2009 to adopt rules implementing the foregoing policies and to comply with the provisions of Section III., above, and participants shall have until not later than one hundred eighty (180) days following adoption and implementation of rules by an MLS in which they participate to cause their VOW to comply with such rules.

See Appendix A for Seller Opt-out Form.

## Appendix A

---

### Seller Opt-out Form

1. Check one.

    a. ☐ I have advised my broker or sales agent that I do not want the listed property to be displayed on the Internet.

    b. ☐ I have advised my broker or sales agent that I do not want the address of the listed property to be displayed on the Internet.

2. I understand and acknowledge that if I have selected Option a., consumers who conduct searches for listings on the Internet will not see information about the listed property in response to their searches.

_____
Initials of Seller

---

# Part Three:  Model Governance Provisions

## A.  Model Association Bylaw Provisions Authorizing MLS as a Committee of an All-REALTOR® Association

**Section 1**
**Authority**

The association of REALTORS® shall maintain for the use of its members a multiple listing service, which shall be subject to the bylaws of the association of REALTORS® and such rules and regulations as may be hereinafter adopted. **M**

**Section 2**
**Purpose**

A multiple listing service is a means by which authorized participants make blanket unilateral offers of compensation to other participants (acting as subagents, buyer agents, or in other agency or nonagency capacities defined by law); by which cooperation among participants is enhanced; by which information is accumulated and disseminated to enable authorized participants to prepare appraisals, analyses, and other valuations of real property for bona fide clients and customers; by which participants engaging in real estate appraisal contribute to common databases; and is a facility for the orderly correlation and dissemination of listing information so participants may better serve their clients and the public. Entitlement to compensation is determined by the cooperating broker's performance as procuring cause of sale (or lease). *(Amended 11/04)* **M**

**Section 3**
**Participation**

Any REALTOR® of this or any other association who is a principal, partner, corporate officer, or branch office manager acting on behalf of a principal, without further qualification, except as otherwise stipulated in these bylaws, shall be eligible to participate in multiple listing upon agreeing in writing to conform to the rules and regulations thereof and to pay the costs incidental thereto.* However, under no circumstances is any individual or firm, regardless of membership status, entitled to multiple listing service membership or participation unless they hold a current, valid real estate broker's license and offer or accept compensation to and from other participants or are licensed or certified by an appropriate state regulatory agency to engage in the appraisal of real property.** Use of information developed by or published by an association multiple listing service is strictly limited to the activities authorized under a

---

*Optional qualifications which may be adopted at the local association's discretion: Any applicant for MLS participation and any licensee (including licensed or certified appraisers) affiliated with an MLS participant who has access to and use of MLS-generated information shall complete an orientation program of no more than eight (8) classroom hours devoted to MLS rules and regulations and computer training related to MLS information entry and retrieval within thirty (30) days after access has been provided. *(Amended 11/96)*

Associations are not required to establish prerequisites for MLS participation beyond holding REALTOR® (principal) membership in an association. However, if the association wishes to establish these requirements for MLS participation or for access to MLS-generated information, the requirement of attendance at an orientation program is the most rigorous requirement that may be established. *(Amended 2/94)*

**Generally, associations of REALTORS®, when there is more than one principal in a real estate firm, define the chief principal officer of the firm as the MLS participant. If each principal is defined as a participant, then each shall have a separate vote on MLS matters. Brokers or salespersons other than principals are not considered participants in the service, but have access to and use of the service through the principal(s) with whom they are affiliated.

participant's licensure(s) or certification and unauthorized uses are prohibited. Further, none of the foregoing is intended to convey participation or membership or any right of access to information developed by or published by an association multiple listing service where access to such information is prohibited by law. *(Amended 11/08)*

Mere possession of a broker's license is not sufficient to qualify for MLS participation. Rather, the requirement that an individual or firm offers or accepts cooperation and compensation means that the participant actively endeavors during the operation of its real estate business to list real property of the type listed on the MLS and/or to accept offers of cooperation and compensation made by listing brokers or agents in the MLS. "Actively" means on a continual and ongoing basis during the operation of the participant's real estate business. The "actively" requirement is not intended to preclude MLS participation by a participant or potential participant that operates a real estate business on a part-time, seasonal, or similarly time-limited basis or that has its business interrupted by periods of relative inactivity occasioned by market conditions. Similarly, the requirement is not intended to deny MLS participation to a participant or potential participant who has not achieved a minimum number of transactions despite good faith efforts. Nor is it intended to permit an MLS to deny participation based on the level of service provided by the participant or potential participant as long as the level of service satisfies state law. *(Adopted 11/08)*

The key is that the participant or potential participant actively endeavors to make or accept offers of cooperation and compensation with respect to properties of the type that are listed on the MLS in which participation is sought. This requirement does not permit an MLS to deny participation to a participant or potential participant that operates a "Virtual Office Website" (VOW) (including a VOW that the participant uses to refer customers to other participants) if the participant or potential participant actively endeavors to make or accept offers of cooperation and compensation. An MLS may evaluate whether a participant or potential participant actively endeavors during the operation of its real estate business to offer or accept cooperation and compensation only if the MLS has a reasonable basis to believe that the participant or potential participant is in fact not doing so. The membership requirement shall be applied in a nondiscriminatory manner to all participants and potential participants. *(Adopted 11/08)*

**Optional Provision for Establishing Nonmember Participatory Rights (Open MLS)\***
A nonmember applicant for MLS participation who is a principal, partner, corporate officer, or branch office manager acting on behalf of a principal, shall supply evidence satisfactory to the membership committee that he has no record of recent or pending bankruptcy; has no record of official sanctions involving unprofessional conduct; agrees to complete a course of instruction (if any) covering the MLS rules and regulations and computer training related to MLS information entry and retrieval, and shall pass such reasonable and non-discriminatory written examination thereon as may be required by the MLS; and shall agree that if elected as a participant, he will abide by such rules and regulations and pay the MLS fees and dues, including the nonmember differential (if any), as from time to time established. Under no circumstances is any individual or firm entitled to MLS participation or membership unless they hold a current, valid real estate broker's license and offer or accept compensation to and from other participants, or are licensed or certified by an appropriate state regulatory agency to engage in the appraisal of real property. Use of information developed by or published by an association multiple listing service is strictly limited to the activities authorized under a participant's licensure(s) or certification and unauthorized uses

---

\*Only adopt the following paragraph if the association's MLS is open to nonmember participants (otherwise qualified individuals who do not hold REALTOR® membership anywhere).

are prohibited. Further, none of the foregoing is intended to convey participation or membership or any right of access to information developed by or published by an association multiple listing service where access to such information is prohibited by law. *(Amended 11/08)*

Mere possession of a broker's license is not sufficient to qualify for MLS participation. Rather, the requirement that an individual or firm offers or accepts cooperation and compensation means that the participant actively endeavors during the operation of its real estate business to list real property of the type listed on the MLS and/or to accept offers of cooperation and compensation made by listing brokers or agents in the MLS. "Actively" means on a continual and ongoing basis during the operation of the participant's real estate business. The "actively" requirement is not intended to preclude MLS participation by a participant or potential participant that operates a real estate business on a part-time, seasonal, or similarly time-limited basis or that has its business interrupted by periods of relative inactivity occasioned by market conditions. Similarly, the requirement is not intended to deny MLS participation to a participant or potential participant who has not achieved a minimum number of transactions despite good faith efforts. Nor is it intended to permit an MLS to deny participation based on the level of service provided by the participant or potential participant as long as the level of service satisfies state law. *(Adopted 11/08)*

The key is that the participant or potential participant actively endeavors to make or accept offers of cooperation and compensation with respect to properties of the type that are listed on the MLS in which participation is sought. This requirement does not permit an MLS to deny participation to a participant or potential participant that operates a "Virtual Office Website" (VOW) (including a VOW that the participant uses to refer customers to other participants) if the participant or potential participant actively endeavors to make or accept offers of cooperation and compensation. An MLS may evaluate whether a participant or potential participant actively endeavors during the operation of its real estate business to offer or accept cooperation and compensation only if the MLS has a reasonable basis to believe that the participant or potential participant is in fact not doing so. The membership requirement shall be applied in a nondiscriminatory manner to all participants and potential participants. *(Adopted 11/08)*

**Note 1:** The requirements of (1) no record of recent or pending bankruptcy; (2) no record of official sanctions involving unprofessional conduct; and (3) completion of a course of instruction on the MLS rules and regulations and computer training related to MLS information entry and retrieval may be deleted from this section at the option of each association. In states where law requires non-association members be admitted to the MLS of an association of REALTORS®, any limitations or restrictions imposed on participation or membership shall be no more stringent than permissible under the National Association's membership qualification criteria. However, in states where non-association member access to the MLS is not a requirement of state law, associations may, at their discretion, establish additional qualifications for non-association member participation and membership in the MLS. *(Amended 11/96)*

**Note 2:** An association may also choose to have the membership committee consider the following in determining a nonmember applicant's qualifications for MLS participation or membership:

- all final findings of Code of Ethics violations and violations of other membership duties in any other association within the past three (3) years

- pending ethics complaints (or hearings)

- unsatisfied discipline pending

- pending arbitration requests (or hearings)

- unpaid arbitration awards or unpaid financial obligations to this or any other association or association MLS `M`

**Section 4 Supervision**

The activity shall be operated under the supervision of the multiple listing committee in accordance with the rules and regulations, subject to the approval of the board of directors of the association of REALTORS®. `R`

**Section 5 Appointment of Committee**

The president shall appoint, subject to confirmation by the board of directors, a multiple listing committee of REALTOR® members. All members of the committee shall be participants in multiple listing except, at the option of the local association, REALTORS® affiliated with participants may be appointed to serve in such numbers as determined by the local association. The committee members so named shall serve two-year staggered terms.* The committee shall select its chairperson from among the members thereof. (The chairperson may be designated by the president.) `R`

**Section 6 Vacancies**

Vacancies in unexpired terms shall be filled as in the case of original appointees. `R`

**Section 7 Attendance**

Any committee member who fails to attend three (3) consecutive regular or special meetings of the committee, without excuse acceptable to the chairperson of the committee, shall be deemed to have resigned from the committee and the vacancy shall be filled as herein provided for original appointees. `R`

**Section 8 Subscribers**

Subscribers (or users) of the MLS include non-principal brokers, sales associates, and licensed and certified appraisers affiliated with participants. (*Optional provision:* Subscribers also include affiliated unlicensed administrative and clerical staff, personal assistants, and individuals seeking licensure or certification as real estate appraisers who are under the direct supervision of an MLS participant or the participant's licensed designee.) (*Adopted 4/92*) `R`

---

*Associations have the option to establish a longer or shorter term for service on the committee and need not provide for staggered terms for committee appointments. (*Adopted 11/96*)

## B. Model Association Bylaw Provisions Authorizing MLS as a Committee of an Association with REALTOR® and REALTOR-ASSOCIATE® Members

**Section 1**
**Authority**

The association of REALTORS® shall maintain for the use of its members a multiple listing service, which shall be subject to the bylaws of the association of REALTORS® and such rules and regulations as may be hereinafter adopted. **M**

**Section 2**
**Purpose**

A multiple listing service is a means by which authorized participants make blanket unilateral offers of compensation to other participants (acting as subagents, buyer agents, or in other agency or nonagency capacities defined by law); by which cooperation among participants is enhanced; by which information is accumulated and disseminated to enable authorized participants to prepare appraisals, analyses, and other valuations of real property for bona fide clients and customers; by which participants engaging in real estate appraisal contribute to common databases; and is a facility for the orderly correlation and dissemination of listing information so participants may better serve their clients and the public. Entitlement to compensation is determined by the cooperating broker's performance as a procuring cause of the sale (or lease) *(Amended 11/04)* **M**

**Section 3**
**Participation**

Any REALTOR® of this or any other association who is a principal, partner, corporate officer, or branch office manager acting on behalf of a principal, without further qualification, except as otherwise stipulated in these bylaws, shall be eligible to participate in multiple listing upon agreeing in writing to conform to the rules and regulations thereof and to pay the costs incidental thereto.* However, under no circumstances is any individual or firm, regardless of membership status, entitled to multiple listing service membership or participation unless they hold a current, valid real estate broker's license and offer or accept compensation to and from other participants or are licensed or certified by an appropriate state regulatory agency to engage in the appraisal of real property.** Use of information developed by or published by an association multiple listing service is strictly limited to the activities authorized under a participant's licensure(s) or certification and unauthorized uses are prohibited. Further, none of the foregoing is intended to convey participation or membership or any right of access to information developed by or published by an association multiple listing service where access to such information is prohibited by law. *(Amended 11/08)*

---

*Optional qualifications which may be adopted at the local association's discretion: Any applicant for MLS participation and any licensee (including licensed or certified appraisers) affiliated with an MLS participant who has access to and use of MLS-generated information shall complete an orientation program of no more than eight (8) classroom hours devoted to the MLS rules and regulations and computer training related to MLS information entry and retrieval within thirty (30) days after access has been provided. *(Amended 11/96)*

Associations are not required to establish prerequisites for MLS participation beyond holding REALTOR® (principal) membership in an association. However, if the association wishes to establish these requirements for MLS participation or for access to MLS-generated information, the requirement of attendance at an orientation program is the most rigorous requirement that may be established. *(Amended 2/94)*

**Generally, associations of REALTORS®, when there is more than one principal in a real estate firm, define the chief principal officer of the firm as the MLS participant. If each principal is defined as a participant, then each shall have a separate vote on MLS matters. Brokers or salespersons other than principals are not considered participants in the service, but have access to and use of the service through the principal(s) with whom they are affiliated.

Mere possession of a broker's license is not sufficient to qualify for MLS participation. Rather, the requirement that an individual or firm offers or accepts cooperation and compensation means that the participant actively endeavors during the operation of its real estate business to list real property of the type listed on the MLS and/or to accept offers of cooperation and compensation made by listing brokers or agents in the MLS. "Actively" means on a continual and ongoing basis during the operation of the participant's real estate business. The "actively" requirement is not intended to preclude MLS participation by a participant or potential participant that operates a real estate business on a part-time, seasonal, or similarly time-limited basis or that has its business interrupted by periods of relative inactivity occasioned by market conditions. Similarly, the requirement is not intended to deny MLS participation to a participant or potential participant who has not achieved a minimum number of transactions despite good faith efforts. Nor is it intended to permit an MLS to deny participation based on the level of service provided by the participant or potential participant as long as the level of service satisfies state law. *(Adopted 11/08)*

The key is that the participant or potential participant actively endeavors to make or accept offers of cooperation and compensation with respect to properties of the type that are listed on the MLS in which participation is sought. This requirement does not permit an MLS to deny participation to a participant or potential participant that operates a "Virtual Office Website" (VOW) (including a VOW that the participant uses to refer customers to other participants) if the participant or potential participant actively endeavors to make or accept offers of cooperation and compensation. An MLS may evaluate whether a participant or potential participant actively endeavors during the operation of its real estate business to offer or accept cooperation and compensation only if the MLS has a reasonable basis to believe that the participant or potential participant is in fact not doing so. The membership requirement shall be applied in a nondiscriminatory manner to all participants and potential participants. *(Adopted 11/08)*

### Optional Provision for Establishing Nonmember Participatory Rights (Open MLS)*

A nonmember applicant for MLS participation who is a principal, partner, corporate officer, or branch office manager acting on behalf of a principal, shall supply evidence satisfactory to the membership committee that he has no record of recent or pending bankruptcy; has no record of official sanctions involving unprofessional conduct; agrees to complete a course of instruction (if any) covering the MLS rules and regulations and computer training related to MLS information entry and retrieval, and shall pass such reasonable and non-discriminatory written examination thereon as may be required by the MLS; and shall agree that if elected as a participant, he will abide by such rules and regulations and pay the MLS fees and dues, including the nonmember differential (if any), as from time to time established. Under no circumstances is any individual or firm entitled to MLS participation or membership unless they hold a current, valid real estate broker's license and offer or accept compensation to and from other participants, or are licensed or certified by an appropriate state regulatory agency to engage in the appraisal of real property. Use of information developed by or published by an association multiple listing service is strictly limited to the activities authorized under a participant's licensure(s) or certification and unauthorized uses are prohibited. Further, none of the foregoing is intended to convey participation or membership or any right of access to information developed by or published by an association multiple listing service where access to such information is prohibited by law. *(Amended 11/08)*

---

*Only adopt this paragraph if the association's MLS is open to nonmember participants (otherwise qualified individuals who do not hold REALTOR® membership anywhere).

Mere possession of a broker's license is not sufficient to qualify for MLS participation. Rather, the requirement that an individual or firm offers or accepts cooperation and compensation means that the participant actively endeavors during the operation of its real estate business to list real property of the type listed on the MLS and/or to accept offers of cooperation and compensation made by listing brokers or agents in the MLS. "Actively" means on a continual and ongoing basis during the operation of the participant's real estate business. The "actively" requirement is not intended to preclude MLS participation by a participant or potential participant that operates a real estate business on a part-time, seasonal, or similarly time-limited basis or that has its business interrupted by periods of relative inactivity occasioned by market conditions. Similarly, the requirement is not intended to deny MLS participation to a participant or potential participant who has not achieved a minimum number of transactions despite good faith efforts. Nor is it intended to permit an MLS to deny participation based on the level of service provided by the participant or potential participant as long as the level of service satisfies state law. *(Adopted 11/08)*

The key is that the participant or potential participant actively endeavors to make or accept offers of cooperation and compensation with respect to properties of the type that are listed on the MLS in which participation is sought. This requirement does not permit an MLS to deny participation to a participant or potential participant that operates a "Virtual Office Website" (VOW) (including a VOW that the participant uses to refer customers to other participants) if the participant or potential participant actively endeavors to make or accept offers of cooperation and compensation. An MLS may evaluate whether a participant or potential participant actively endeavors during the operation of its real estate business to offer or accept cooperation and compensation only if the MLS has a reasonable basis to believe that the participant or potential participant is in fact not doing so. The membership requirement shall be applied in a nondiscriminatory manner to all participants and potential participants. *(Adopted 11/08)*

**Note 1:** The requirements of (1) no record of recent or pending bankruptcy; (2) no record of official sanctions involving unprofessional conduct; and (3) completion of a course of instruction on the MLS rules and regulations and computer training related to MLS information entry and retrieval may be deleted from this section at the option of each association. In states where law requires non-association members be admitted to the MLS of an association of REALTORS®, any limitations or restrictions imposed on participation or membership shall be no more stringent than permissible under the National Association's membership qualification criteria. However, in states where non-association member access to the MLS is not a requirement of state law, associations may, at their discretion, establish additional qualifications for non-association member participation and membership in the MLS. *(Amended 11/96)*

**Note 2:** An association may also choose to have the membership committee consider the following when determining a nonmember applicant's qualifications for MLS participation or membership:

- all final findings of Code of Ethics violations and violations of other membership duties in any other association within the past three (3) years

- pending ethics complaints (or hearings)

- unsatisfied discipline pending

- pending arbitration requests (or hearings)

- unpaid arbitration awards or unpaid financial obligations to this or any other association or association MLS  M

55

**Section 4**
**Supervision**

The activity shall be operated under the supervision of the multiple listing committee in accordance with the rules and regulations, subject to the approval of the board of directors of the association of REALTORS®. **R**

**Section 5**
**Appointment**
**of Committee**

The president shall appoint, subject to confirmation by the board of directors, a multiple listing committee of _____ REALTOR® members. All members of the committee shall be participants in multiple listing except, at the option of the local association, REALTORS® or REALTOR-ASSOCIATE®s affiliated with participants may be appointed to serve in such numbers as determined by the local association. The committee members so named shall serve two-year staggered terms.* The committee shall select its chairperson from among the members thereof. (The chairperson may be designated by the president.) **R**

**Section 6**
**Vacancies**

Vacancies in unexpired terms shall be filled as in the case of original appointees. **R**

**Section 7**
**Attendance**

Any committee member who fails to attend three (3) consecutive regular or special meetings of the committee, without excuse acceptable to the chairperson of the committee, shall be deemed to have resigned from the committee and the vacancy shall be filled as herein provided for original appointees. **R**

**Section 8**
**Subscribers**

Subscribers (or users) of the MLS include non-principal brokers, sales associates, and licensed and certified appraisers affiliated with participants. (*Optional provision:* Subscribers also include affiliated unlicensed administrative and clerical staff, personal assistants, and individuals seeking licensure or certification as real estate appraisers who are under the direct supervision of an MLS participant or the participant's licensed designee.) *(Adopted 4/92)* **R**

---

*Associations have the option to establish a longer or shorter term for service on the committee and need not provide for staggered terms for committee appointments. *(Adopted 11/96)*

## C. Model Rules and Regulations for an MLS Operated as a Committee of an Association of REALTORS®

## Listing Procedures

**Section 1**
**Listing Procedures**

Listings of real or personal property of the following types, which are listed subject to a real estate broker's license, and are located within the service area of the multiple listing service, and are taken by participants on *(indicate form[s] of listing[s] accepted by the Service— See Notes 1 and 2)* shall be delivered to the multiple listing service within _____ (usually 48) hours after all necessary signatures of seller(s) have been obtained: *(Amended 11/17)*

a. single family homes for sale or exchange

b. vacant lots and acreage for sale or exchange

c. two-family, three-family, and four-family residential buildings for sale or exchange

**Note 1:** The multiple listing service shall not require a participant to submit listings on a form other than the form the participant individually chooses to utilize provided the listing is of a type accepted by the service, although a property data form may be required as approved by the multiple listing service. However, the multiple listing service, through its legal counsel:

- may reserve the right to refuse to accept a listing form which fails to adequately protect the interests of the public and the participants

- assure that no listing form filed with the multiple listing service establishes, directly or indirectly, any contractual relationship between the multiple listing service and the client (buyer or seller)

The multiple listing service shall accept exclusive right-to-sell listing contracts and exclusive agency listing contracts, and may accept other forms of agreement which make it possible for the listing broker to offer compensation to the other participants of the multiple listing service acting as subagents, buyer agents, or both. *(Amended 11/96)*

The listing agreement must include the seller's written authorization to submit the agreement to the multiple listing service. *(Amended 11/96)*

The different types of listing agreements include:

- exclusive right-to-sell
- exclusive agency
- open
- net

The service may not accept **net listings** because they are deemed unethical and, in most states, illegal. **Open listings** are not accepted, except where required by law, because the inherent nature of an open listing is such as to usually not include the authority to cooperate and compensate other brokers and inherently provides a disincentive for cooperation. *(Amended 4/92)*

The **exclusive right-to-sell** listing is the conventional form of listing submitted to the multiple listing service in that the seller authorizes the listing broker to cooperate with and to compensate other brokers. *(Amended 4/92)*

The **exclusive agency** listing also authorizes the listing broker, as exclusive agent, to offer cooperation and compensation on blanket unilateral bases, but also reserves to the seller the general right to sell the property on an unlimited or

restrictive basis. Exclusive agency listings and exclusive right-to-sell listings with named prospects exempt should be clearly distinguished by a simple designation such as a code or symbol from exclusive right-to-sell listings with no named prospects exempt, since they can present special risks of procuring cause controversies and administrative problems not posed by exclusive right-to-sell listings with no named prospects exempt. Care should be exercised to ensure that different codes or symbols are used to denote exclusive agency and exclusive right-to-sell listings with prospect reservations. *(Amended 4/92)*

**Note 2:** A multiple listing service does not regulate the type of listings its members may take. This does not mean that a multiple listing service must accept every type of listing. The multiple listing service shall decline to accept open listings (except where acceptance is required by law) and net listings, and it may limit its service to listings of certain kinds of property. But, if it chooses to limit the kind of listings it will accept, it shall leave its members free to accept such listings to be handled outside the multiple listing service.

**Note 3:** A multiple listing service may, as a matter of local option, accept exclusively listed property that is subject to auction. If such listings do not show a listed price, they may be included in a separate section of the MLS compilation of current listings. *(Adopted 11/92)* M

**Section 1.1**
**Types of Properties**

Following are some of the types of properties that may be published through the service, including types described in the preceding paragraph that are required to be filed with the service and other types that may be filed with the service at the participant's option provided, however, that any listing submitted is entered into within the scope of the participant's licensure as a real estate broker: *(Amended 11/91)* O

- residential
- residential income
- subdivided vacant lot
- land and ranch
- business opportunity

- motel-hotel
- mobile homes
- mobile home parks
- commercial income
- industrial

**Section 1.1.1**
**Listings Subject to Rules and Regulations of the Service**

Any listing taken on a contract to be filed with the multiple listing service is subject to the rules and regulations of the service upon signature of the seller(s). R

**Section 1.2**
**Detail on Listings Filed with the Service**

A listing agreement or property data form, when filed with the multiple listing service by the listing broker, shall be complete in every detail which is ascertainable as specified on the property data form. R

**Section 1.2.1**
**Limited Service Listings**

Listing agreements under which the listing broker will not provide one, or more, of the following services:

a. arrange appointments for cooperating brokers to show listed property to potential purchasers but instead gives cooperating brokers authority to make such appointments directly with the seller(s)

b. accept and present to the seller(s) offers to purchase procured by cooperating brokers but instead gives cooperating brokers authority to present offers to purchase directly to the seller(s)

c. advise the seller(s) as to the merits of offers to purchase

d. assist the seller(s) in developing, communicating, or presenting counter-offers

e. participate on the seller's(s') behalf in negotiations leading to the sale of the listed property

will be identified with an appropriate code or symbol (e.g., LR or LS) in MLS compilations so potential cooperating brokers will be aware of the extent of the services the listing broker will provide to the seller(s), and any potential for cooperating brokers being asked to provide some or all of these services to listing brokers' clients, prior to initiating efforts to show or sell the property.

**Note:** Adoption of Section 1.2.1, Limited Service Listings, is optional and a matter to be determined by each MLS. *(Adopted 5/01)* **O**

**Section 1.2.2**
**MLS Entry-only Listings**

Listing agreements under which the listing broker will not provide any of the following services:

a. arrange appointments for cooperating brokers to show listed property to potential purchasers but instead gives cooperating brokers authority to make such appointments directly with the seller(s)

b. accept and present to the seller(s) offers to purchase procured by cooperating brokers but instead gives cooperating brokers authority to present offers to purchase directly to the seller(s)

c. advise the seller(s) as to the merits of offers to purchase

d. assist the seller(s) in developing, communicating, or presenting counter-offers

e. participate on the seller's(s') behalf in negotiations leading to the sale of the listed property

will be identified with an appropriate code or symbol (e.g., EO) in MLS compilations so potential cooperating brokers will be aware of the extent of the services the listing broker will provide to the seller(s), and any potential for cooperating brokers being asked to provide some or all of these services to listing brokers' clients, prior to initiating efforts to show or sell the property.

**Note:** Adoption of Section 1.2.2, MLS Entry-only Listings, is optional and a matter to be determined by each MLS. *(Adopted 5/01)* **O**

**Section 1.3**
**Exempt Listings**

If the seller refuses to permit the listing to be disseminated by the service, the participant may then take the listing (office exclusive) and such listing shall be filed with the service but not disseminated to the participants. Filing of the listing should be accompanied by certification signed by the seller that he does not desire the listing to be disseminated by the service.

**Note:** Section 1.3 is not required if the service does not require all *(indicate type[s] of listing[s] accepted by the service)* listings to be submitted by a participant to the service. **M**

**Section 1.4**
**Change of Status**
**of Listing**

Any change in listed price or other change in the original listing agreement shall be made only when authorized in writing by the seller and shall be filed with the service within twenty-four (24) hours (excepting weekends, holidays, and postal holidays) after the authorized change is received by the listing broker. **R**

**Section 1.5**
**Withdrawal of Listing**
**Prior to Expiration**

Listings of property may be withdrawn from the multiple listing service by the listing broker before the expiration date of the listing agreement, provided notice is filed with the service, including a copy of the agreement between the seller and the listing broker which authorizes the withdrawal.

Sellers do not have the unilateral right to require an MLS to withdraw a listing without the listing broker's concurrence. However, when a seller(s) can document that his or her exclusive relationship with the listing broker has been terminated, the multiple listing service may remove the listing at the request of the seller. *(Adopted 11/96)* M

**Section 1.6**
**Contingencies**
**Applicable to Listings**

Any contingency or conditions of any term in a listing shall be specified and noticed to the participants. R

**Section 1.7**
**Listing Price Specified**

The full gross listing price stated in the listing contract will be included in the information published in the MLS compilation of current listings, unless the property is subject to auction. *(Amended 11/92)* M

**Section 1.8**
**Listing Multiple**
**Unit Properties**

All properties which are to be sold or which may be sold separately must be indicated individually in the listing and on the property data form. When part of a listed property has been sold, proper notification should be given to the multiple listing service. O

**Section 1.9**
**No Control of**
**Commission Rates**
**or Fees Charged**
**by Participants**

The multiple listing service shall not fix, control, recommend, suggest, or maintain commission rates or fees for services to be rendered by participants. Further, the multiple listing service shall not fix, control, recommend, suggest, or maintain the division of commissions or fees between cooperating participants or between participants and nonparticipants. M

**Section 1.10**
**Expiration of Listings**

Listings filed with the multiple listing service will automatically be removed from the compilation of current listings on the expiration date specified in the agreement, unless prior to that date the MLS receives notice that the listing has been extended or renewed. *(Amended 11/01)*

If notice of renewal or extension is received after the listing has been removed from the compilation of current listings, the extension or renewal will be published in the same manner as a new listing. Extensions and renewals of listings must be signed by the seller(s) and filed with the service. *(Amended 11/01)* M

**Section 1.11**
**Termination Date**
**on Listings**

Listings filed with the service shall bear a definite and final termination date, as negotiated between the listing broker and the seller. M

**Section 1.12**
**Service Area**

Only listings of the designated types of property located within the service area of the MLS are required to be submitted to the service. Listings of property located outside the MLS's service area will (or will not) be accepted if submitted voluntarily by a participant, but cannot be required by the service. *(Amended 11/17)*

**Note:** Associations must choose whether the service will accept listings from beyond its service area into the MLS compilation. *(Amended 11/17)* M

**Section 1.13**
**Listings of Suspended**
**Participants**

When a participant of the service is suspended from the MLS for failing to abide by a membership duty (i.e., violation of the Code of Ethics, association bylaws, MLS bylaws, MLS rules and regulations, or other membership obligations except failure to pay appropriate dues, fees, or charges), all listings currently filed with the MLS by the suspended participant shall, at the participant's option, be retained in the service until sold, withdrawn or expired, and shall not be renewed or extended by the MLS beyond the termination date of the listing agreement in effect when the suspension became effective. If a participant has been suspended from the association (except where MLS participation without association membership is permitted by law) or MLS (or both) for failure to pay appropriate dues, fees, or charges, an association MLS is not obligated to provide MLS services, including continued inclusion of the suspended participant's listings in the MLS compilation of current listing information. Prior to any removal of a suspended participant's listings from the MLS, the suspended participant should be advised, in writing, of the intended removal so that the suspended participant may advise his clients. **M**

**Section 1.14**
**Listings of Expelled**
**Participants**

When a participant of the service is expelled from the MLS for failing to abide by a membership duty (i.e., violation of the Code of Ethics, association bylaws, MLS bylaws, MLS rules and regulations, or other membership obligations except failure to pay appropriate dues, fees, or charges), all listings currently filed with the MLS by the expelled participant shall, at the participant's option, be retained in the service until sold, withdrawn, or expired, and shall not be renewed or extended by the MLS beyond the termination date of the listing agreement in effect when the expulsion became effective. If a participant has been expelled from the association (except where MLS participation without association membership is permitted by law) or MLS (or both) for failure to pay appropriate dues, fees, or charges, an association MLS is not obligated to provide MLS services, including continued inclusion of the expelled participant's listings in the MLS compilation of current listing information. Prior to any removal of an expelled participant's listings from the MLS, the expelled participant should be advised, in writing, of the intended removal so that the expelled participant may advise his clients. **M**

**Section 1.15**
**Listings of Resigned**
**Participants**

When a participant of the service resigns from the MLS, the MLS is not obligated to provide services, including continued inclusion of the resigned participant's listings in the MLS compilation of current listing information. Prior to any removal of a resigned participant's listings from the MLS, the resigned participant should be advised, in writing, of the intended removal so that the resigned participant may advise his clients. **O**

## Selling Procedures

**Section 2**
**Showings and**
**Negotiations**

Appointments for showings and negotiations with the seller for the purchase of listed property filed with the multiple listing service shall be conducted through the listing broker, except under the following circumstances:

a. the listing broker gives the cooperating broker specific authority to show and/or negotiate directly, or

b. after reasonable effort, the cooperating broker cannot contact the listing broker or his representative; however, the listing broker, at his option, may preclude such direct negotiations by cooperating brokers. *(Amended 4/92)* **M**

**Section 2.1**
**Presentation of Offers**

The listing broker must make arrangements to present the offer as soon as possible, or give the cooperating broker a satisfactory reason for not doing so. *(Amended 4/92)* **M**

**Section 2.2**
**Submission of**
**Written Offers**
**and Counter-offers**

The listing broker shall submit to the seller all written offers until closing unless precluded by law, government rule, regulation, or agreed otherwise in writing between the seller and the listing broker. Unless the subsequent offer is contingent upon the termination of an existing contract, the listing broker shall recommend that the seller obtain the advice of legal counsel prior to acceptance of the subsequent offer.

Participants representing buyers or tenants shall submit to the buyer or tenant all offers and counter-offers until acceptance, and shall recommend that buyers and tenants obtain legal advice where there is a question about whether a pre-existing contract has been terminated. *(Amended 11/05)* M

**Section 2.3**
**Right of Cooperating**
**Broker in Presentation**
**of Offer**

The cooperating broker (subagent or buyer agent) or his representative has the right to participate in the presentation to the seller or lessor of any offer he secures to purchase or lease. He does not have the right to be present at any discussion or evaluation of that offer by the seller or lessor and the listing broker. However, if the seller or lessor gives written instructions to the listing broker that the cooperating broker not be present when an offer the cooperating broker secured is presented, the cooperating broker has the right to a copy of the seller's or lessor's written instructions. None of the foregoing diminishes the listing broker's right to control the establishment of appointments for such presentations. *(Amended 4/92)* M

Where the cooperating broker is not present during the presentation of the offer, the cooperating broker can request in writing, and the listing broker must provide, written affirmation stating that the offer has been submitted to the seller, or written notification that the seller has waived the obligation to have the offer presented. *(Adopted 11/18)* M

**Section 2.4**
**Right of Listing Broker**
**in Presentation of**
**Counter-offer**

The listing broker or his representative has the right to participate in the presentation of any counter-offer made by the seller or lessor. He does not have the right to be present at any discussion or evaluation of a counter-offer by the purchaser or lessee (except when the cooperating broker is a subagent). However, if the purchaser or lessee gives written instructions to the cooperating broker that the listing broker not be present when a counter-offer is presented, the listing broker has the right to a copy of the purchaser's or lessee's written instructions. *(Adopted 11/93)* M

**Section 2.5**
**Reporting Sales**
**to the Service**

Status changes, including final closing of sales and sales prices, shall be reported to the multiple listing service by the listing broker within ___ hours after they have occurred. If negotiations were carried on under Section 2 a. or b. hereof, the cooperating broker shall report accepted offers and prices to the listing broker within ___ hours after occurrence and the listing broker shall report them to the MLS within ___ hours after receiving notice from the cooperating broker. *(Amended 11/11)*

**Note 1:** The listing agreement of a property filed with the MLS by the listing broker should include a provision expressly granting the listing broker authority to advertise; to file the listing with the MLS; to provide timely notice of status changes of the listing to the MLS; and to provide sales information including selling price to the MLS upon sale of the property. If deemed desirable by the MLS to publish sales information prior to final closing (settlement) of a sales transaction, the listing agreement should also include a provision expressly granting the listing broker the right to authorize dissemination of this information by the MLS to its participants. *(Amended 11/01)*

**Note 2:** In disclosure states, if the sale price of a listed property is recorded, the reporting of the sale price may be required by the MLS.

In states where the actual sale prices of completed transactions are not publicly accessible, failure to report sale prices can result in disciplinary action only if the MLS:

62

1. categorizes sale price information as confidential and
2. limits use of sale price information to participants and subscribers in providing real estate services, including appraisals and other valuations, to customers and clients; and to governmental bodies and third-party entities only as provided below.

The MLS may provide sale price information to governmental bodies only to be used for statistical purposes (including use of aggregated data for purposes of valuing property) and to confirm the accuracy of information submitted by property owners or their representatives in connection with property valuation challenges; and to third-party entities only to be used for academic research, statistical analysis, or for providing services to participants and subscribers. In any instance where a governmental body or third-party entity makes sale price information provided by the MLS available other than as provided for in this provision, a listing participant may request the sale price information for a specific property be withheld from dissemination for these purposes with written authorization from the seller, and withholding of sale price information from those entities shall not be construed as a violation of the requirement to report sale prices. *(Adopted 11/11)*

**Note 3:** As established in the Virtual Office Website ("VOW") policy, sale prices can only be categorized as confidential in states where the actual sale prices of completed transactions are not accessible from public records. *(Adopted 11/11)* M

**Section 2.6**
**Reporting Resolutions**
**of Contingencies**

The listing broker shall report to the multiple listing service within twenty-four (24) hours that a contingency on file with the multiple listing service has been fulfilled or renewed, or the agreement cancelled. M

**Section 2.7**
**Advertising of Listings**
**Filed with the Service**

A listing shall not be advertised by any participant other than the listing broker without the prior consent of the listing broker. M

**Section 2.8**
**Reporting Cancellation**
**of Pending Sale**

The listing broker shall report immediately to the multiple listing service the cancellation of any pending sale, and the listing shall be reinstated immediately. M

**Section 2.9**
**Disclosing the**
**Existence of Offers**

Listing brokers, in response to inquiries from buyers or cooperating brokers shall, with the seller's approval, disclose the existence of offers on the property. Where disclosure is authorized, the listing broker shall also disclose if asked whether offers were obtained by the listing licensee, by another licensee in the listing firm, or by a cooperating broker. *(Amended 11/08)* O

**Section 2.10**
**Availability of**
**Listed Property**

Listing brokers shall not misrepresent the availability of access to show or inspect listed property. *(Adopted 11/05)* O

## Refusal to Sell

**Section 3**
**Refusal to Sell**

If the seller of any listed property filed with the multiple listing service refuses to accept a written offer satisfying the terms and conditions stated in the listing, such fact shall be transmitted immediately to the service and to all participants. R

# Prohibitions

**Section 4**
**Information for**
**Participants Only**

Any listing filed with the service shall not be made available to any broker or firm not a member of the MLS without the prior consent of the listing broker. **M**

**Section 4.1**
**For Sale Signs**

Only the for sale sign of the listing broker may be placed on a property. *(Amended 11/89)* **M**

**Section 4.2**
**Sold Signs**

Prior to closing, only the sold sign of the listing broker may be placed on a property, unless the listing broker authorizes the cooperating (selling) broker to post such a sign. *(Amended 4/96)* **M**

**Section 4.3**
**Solicitation of Listing**
**Filed with the Service**

Participants shall not solicit a listing on property filed with the service unless such solicitation is consistent with Article 16 of the REALTORS®' Code of Ethics, its Standards of Practice, and its Case Interpretations.

**Note:** This section is to be construed in a manner consistent with Article 16 of the Code of Ethics and particularly Standard of Practice 16-4. This section is intended to encourage sellers to permit their properties to be filed with the service by protecting them from being solicited, prior to expiration of the listing, by brokers and salespersons seeking the listing upon its expiration.

Without such protection, a seller could receive hundreds of calls, communications, and visits from brokers and salespersons who have been made aware through MLS filing of the date the listing will expire and desire to substitute themselves for the present broker.

This section is also intended to encourage brokers to participate in the service by assuring them that other participants will not attempt to persuade the seller to breach the listing agreement or to interfere with their attempts to market the property. Absent the protection afforded by this section, listing brokers would be most reluctant to generally disclose the identity of the seller or the availability of the property to other brokers.

This section does not preclude solicitation of listings under the circumstances otherwise recognized by the Standards of Practice related to Article 16 of the Code of Ethics. **M**

**Section 4.4**
**Use of the Terms MLS**
**and Multiple Listing**
**Service**

No MLS participant, subscriber or licensee affiliated with any participant shall, through the name of their firm, their URLs, their e-mail addresses, their website addresses, or in any other way represent, suggest, or imply that the individual or firm is an MLS, or that they operate an MLS. Participants, subscribers and licensees affiliated with participants shall not represent, suggest, or imply that consumers or others have direct access to MLS databases, or that consumers or others are able to search MLS databases available only to participants and subscribers. This does not prohibit participants and subscribers from representing that any information they are authorized under MLS rules to provide to clients or customers is available on their websites or otherwise. *(Adopted 11/07)* **O**

# Division of Commissions

**Section 5**
**Compensation Specified**
**on Each Listing**

The listing broker shall specify, on each listing filed with the multiple listing service, the compensation offered to other multiple listing service participants for their services in the sale of such listing. Such offers are unconditional except that entitlement to compensation is determined by the cooperating broker's performance as the procuring cause of the sale (or lease) or as otherwise provided for in this rule. The listing broker's obligation to compensate any cooperating broker as the procuring cause of the sale (or

64

lease) may be excused if it is determined through arbitration that, through no fault of the listing broker and in the exercise of good faith and reasonable care, it was impossible or financially unfeasible for the listing broker to collect a commission pursuant to the listing agreement. In such instances, entitlement to cooperative compensation offered through MLS would be a question to be determined by an arbitration hearing panel based on all relevant facts and circumstances including, but not limited to, why it was impossible or financially unfeasible for the listing broker to collect some or all of the commission established in the listing agreement; at what point in the transaction did the listing broker know (or should have known) that some or all of the commission established in the listing agreement might not be paid; and how promptly had the listing broker communicated to cooperating brokers that the commission established in the listing agreement might not be paid. *(Amended 11/98)*

In filing a property with the multiple listing service of an association of REALTORS®, the participant of the service is making blanket unilateral offers of compensation to the other MLS participants, and shall therefore specify on each listing filed with the service, the compensation being offered to the other MLS participants. Specifying the compensation on each listing is necessary, because the cooperating broker has the right to know what his compensation shall be prior to his endeavor to sell.* *(Amended 11/96)*

The listing broker retains the right to determine the amount of compensation offered to other participants (acting as subagents, buyer agents, or in other agency or nonagency capacities defined by law) which may be the same or different. *(Amended 11/96)*

This shall not preclude the listing broker from offering any MLS participant compensation other than the compensation indicated on any listing published by the MLS, provided the listing broker informs the other broker, in writing, in advance of submitting an offer to purchase, and provided that the modification in the specified compensation is not the result of any agreement among all or any other participants in the service. Any superseding offer of compensation must be expressed as either a percentage of the gross sales price or as a flat dollar amount. *(Amended 5/10)*

**Note 1:**  The multiple listing service shall not have a rule requiring the listing broker to disclose the amount of total negotiated commission in his listing contract, and the association multiple listing service shall not publish the total negotiated commission on a listing which has been submitted to the MLS by a participant. The association multiple listing service shall not disclose in any way the total commission negotiated between the seller and the listing broker.

---

*The compensation specified on listings filed with the multiple listing service shall appear in one of two forms. The essential and appropriate requirement by an association multiple listing service is that the information to be published shall clearly inform the participants as to the compensation they will receive in cooperative transactions, unless advised otherwise by the listing broker, in writing, in advance of submitting an offer to purchase. The compensation specified on listings published by the MLS shall be shown in one of the following forms:

1. by showing a percentage of the gross selling price

2. by showing a definite dollar amount *(Amended 5/10)*

**Note:**  MLSs may also, as a matter of local discretion, allow participants to offer cooperative compensation as a percentage of the net sales price, with the net sales price defined as the gross sales price minus buyer upgrades (new construction) and seller concessions (as defined by the MLS unless otherwise defined by state law or regulation). *(Adopted 5/08)*

While MLSs are not required to authorize participants to offer cooperative compensation based on net sale prices, those that do permit such offers must define "seller concessions" for purposes other than new construction, unless that term is defined by applicable state law or regulation. The following definition of "seller concessions" is suggested but not required for adoption:

Points paid by seller on behalf of buyer, seller-paid buyer closing costs, cash or cash allowances not escrowed, down payment assistance, additions or alterations not considered deferred maintenance, and personal property not usual and customary to such transactions conveyed from seller to buyer having an agreed upon monetary value. *(Adopted 05/12)*

**Note 2:** The listing broker may, from time to time, adjust the compensation offered to other multiple listing service participants for their services with respect to any listing by advance published notice to the service so that all participants will be advised. *(Amended 4/92)*

**Note 3:** The multiple listing service shall make no rule on the division of commissions between participants and nonparticipants. This should remain solely the responsibility of the listing broker.

**Note 4:** Multiple listing services, at their discretion, may adopt rules and procedures enabling listing brokers to communicate to potential cooperating brokers that gross commissions established in listing contracts are subject to court approval, and that compensation payable to cooperating brokers may be reduced if the gross commission established in the listing contract is reduced by a court. In such instances, the fact that the gross commission is subject to court approval and either the potential reduction in compensation payable to cooperating brokers or the method by which the potential reduction in compensation will be calculated must be clearly communicated to potential cooperating brokers prior to the time they submit an offer that ultimately results in a successful transaction. *(Amended 5/10)*

**Note 5:** Nothing in these MLS rules precludes a listing participant and a cooperating participant, as a matter of mutual agreement, from modifying the cooperative compensation to be paid in the event of a successful transaction. *(Adopted 11/05)*

**Note 6:** Multiple listing services must give participants the ability to disclose to other participants any potential for a short sale. As used in these rules, short sales are defined as a transaction where title transfers, where the sale price is insufficient to pay the total of all liens and costs of sale, and where the seller does not bring sufficient liquid assets to the closing to cure all deficiencies. Multiple listing services may, as a matter of local discretion, require participants to disclose potential short sales when participants know a transaction is a potential short sale. In any instance where a participant discloses a potential short sale, they may, as a matter of local discretion, also be permitted to communicate to other participants how any reduction in the gross commission established in the listing contract required by the lender as a condition of approving the sale will be apportioned between listing and cooperating participants. All confidential disclosures and confidential information related to short sales, if allowed by local rules, must be communicated through dedicated fields or confidential "remarks" available only to participants and subscribers. *(Amended 5/09)* **M**

**Section 5.0.1**
**Disclosing Potential**
**Short Sales**

**Note:** Select one of the following two options. **M**

**Option #1:** Multiple listing services that permit, but do not require, participants to disclose potential short sales should adopt the following rule.

Participants may, but are not required to, disclose potential short sales (defined as a transaction where title transfers, where the sale price is insufficient to pay the total of all liens and costs of sale and where the seller does not bring sufficient liquid assets to the closing to cure all deficiencies) to other participants and subscribers. *(Amended 5/09)*

**Option #2:** Alternatively, multiple listing services that require participants to disclose potential short sales should adopt the following rule.

Participants must disclose potential short sales (defined as a transaction where title transfers, where the sale price is insufficient to pay the total of all liens and costs of sale and where the seller does not bring sufficient liquid assets to the closing to cure all deficiencies) when reasonably known to the listing participants. *(Amended 5/09)*

**For Options #1 or #2:** As a matter of local discretion, MLSs may, but shall not be required to, adopt the following rule:

When disclosed, participants may, at their discretion, advise other participants whether and how any reduction in the gross commission established in the listing contract, required by the lender as a condition of approving the sale, will be apportioned between listing and cooperating participants. *(Adopted 5/09)*

**MLSs that adopt the discretionary provision shown immediately above may, but are not required to, adopt the following rule:** Where participants communicate to other participants how any reduction in the gross commission established in the listing contract required by the lender as a condition of approving the sale will be apportioned between the listing and cooperating participants, listing participants shall disclose to cooperating participants in writing the total reduction in the gross commission and the amount by which the compensation payable to the cooperating broker will be reduced within _____ hours of receipt of notification from the lender. *(Adopted 5/10)*

**Section 5.1**
**Participant as Principal**

If a participant or any licensee (or licensed or certified appraiser) affiliated with a participant has any ownership interest in a property, the listing of which is to be disseminated through the multiple listing service, that person shall disclose that interest when the listing is filed with the multiple listing service and such information shall be disseminated to all multiple listing service participants. **M**

**Section 5.2**
**Participant as Purchaser**

If a participant or any licensee (including licensed and certified appraisers) affiliated with a participant wishes to acquire an interest in property listed with another participant, such contemplated interest shall be disclosed, in writing, to the listing broker not later than the time an offer to purchase is submitted to the listing broker. *(Adopted 2/92)* **M**

**Section 5.3**
**Dual or Variable**
**Rate Commission**
**Arrangements**

The existence of a dual or variable rate commission arrangement (i.e., one in which the seller/landlord agrees to pay a specified commission if the property is sold/leased by the listing broker without assistance and a different commission if the sale/lease results through the efforts of a cooperating broker; or one in which the seller/landlord agrees to pay a specified commission if the property is sold/leased by the listing broker either with or without the assistance of a cooperating broker and a different commission if the sale/lease results through the efforts of a seller/landlord) shall be disclosed by the listing broker by a key, code, or symbol as required by the MLS. The listing broker shall, in response to inquiries from potential cooperating brokers, disclose the differential that would result in either a cooperative transaction or, alternatively, in a sale/lease that results through the efforts of the seller/landlord. If the cooperating broker is a buyer/tenant representative, the buyer/tenant representative must disclose such information to their client before the client makes an offer to purchase or lease. *(Amended 5/01)* **M**

## Service Charges

**Section 6**
**Service Fees**
**and Charges**

The following service charges for operation of the multiple listing service are in effect to defray the costs of the service and are subject to change from time to time in the manner prescribed:

**Initial Participation Fee:**  An applicant for participation in the service shall pay an application fee of $_____ with such fee to accompany the application.

**Note:**  The initial participation fee shall approximate the cost of bringing the service to the participant.

**Recurring Participation Fee:**  The annual participation fee of each participant shall be an amount equal to $_____ times each salesperson and licensed or certified appraiser who has access to and use of the service, whether licensed as a broker, sales licensee, or licensed or certified appraiser who is employed by or affiliated as an independent contractor with such participant. Payment of such fees shall be made on or before the first day of the fiscal year of the multiple listing service. Fees shall be prorated on a monthly basis.

However, MLSs must provide participants the option of a no-cost waiver of MLS fees, dues, and charges for any licensee or licensed or certified appraiser who can demonstrate subscription to a different MLS or CIE where the principal broker participates. MLSs may, at their discretion, require that broker participants sign a certification for nonuse of its MLS services by their licensees, which can include penalties and termination of the waiver if violated.* *(Amended 5/18 and 8/18 [Leadership Team])* M

**Note 1:**  A multiple listing service may elect to have such fees payable on a quarterly or even on a monthly basis. However, added administrative services are necessitated by increased frequency of such payments.

**Note 2:**  Multiple listing services that choose to include affiliated unlicensed administrative and clerical staff, personal assistants, and/or individuals seeking licensure or certification as real estate appraisers among those eligible for access to and use of MLS information as subscribers may, at their discretion, charge recurring fees. *(Amended 11/17)* R

**Listing Fee:**  A participant shall pay a monthly listing fee in an amount equal to the number of listings he filed with the service during the previous month, multiplied by the listing fee of $_____ per listing.

**Note:**  An alternative provision for the listing fee is: "For filing a new listing or renewal of a listing with the service, a fee of $_____ shall accompany each listing when filed with the service."

**Optional:**  It is a matter of agreement between the listing and selling brokers as to whether or not the cooperating broker shall reimburse the listing broker for the listing fee. The multiple listing service shall not be concerned because this is an arrangement between cooperating brokers, and the multiple listing service rules do not dictate the compensation offered to cooperating brokers by the listing broker. *(Amended 4/92)*

---

*Note:** Mandatory waiver provision is effective no later than July 1, 2018.

## Compliance with Rules

**Section 7
Compliance with
Rules—Authority to
Impose Discipline**

By becoming and remaining a participant or subscriber in this MLS, each participant and subscriber agrees to be subject to the rules and regulations and any other MLS governance provision. The MLS may, through the administrative and hearing procedures established in these rules, impose discipline for violations of the rules and other MLS governance provisions. Discipline that may be imposed may only consist of one or more of the following:

a. letter of warning

b. letter of reprimand

c. attendance at MLS orientation or other appropriate courses or seminars which the participant or subscriber can reasonably attend taking into consideration cost, location, and duration

d. appropriate, reasonable fine not to exceed $15,000

e. suspension of MLS rights, privileges, and services for not less than thirty (30) days nor more than one (1) year

f. termination of MLS rights, privileges, and services with no right to reapply for a specified period not to exceed three (3) years. *(Revised 11/14)* M

**Note:** A participant (or user/subscriber, where appropriate) can be placed on probation. Probation is not a form of discipline. When a participant (or user/subscriber, where appropriate) is placed on probation the discipline is held in abeyance for a stipulated period of time not longer than one (1) year. Any subsequent finding of a violation of the MLS rules during the probationary period may, at the discretion of the Board of Directors, result in the imposition of the suspended discipline. Absent any subsequent findings of a violation during the probationary period, both the probationary status and the suspended discipline are considered fulfilled, and the individual's record will reflect the fulfillment. The fact that one or more forms of discipline are held in abeyance during the probationary period does not bar imposition of other forms of discipline which will not be held in abeyance. *(Revised 05/14)* M

**Section 7.1
Compliance with Rules**

The following action may be taken for noncompliance with the rules:

a. for failure to pay any service charge or fee within one (1) month of the date due, and provided that at least ten (10) days' notice has been given, the service shall be suspended until service charges or fees are paid in full

b. for failure to comply with any other rule, the provisions of Sections 9 and 9.1 shall apply

**Note:** Generally, warning, censure, and the imposition of a moderate fine are sufficient to constitute a deterrent to violation of the rules and regulations of the multiple listing service. Suspension or termination is an extreme sanction to be used in cases of extreme or repeated violation of the rules and regulations of the service. If the MLS desires to establish a series of moderate fines, they should be clearly specified in the rules and regulations. *(Amended 11/88)* R

**Section 7.2
Applicability of
Rules to Users
and/or Subscribers**

Non-principal brokers, sales licensees, appraisers, and others authorized to have access to information published by the MLS are subject to these rules and regulations and may be disciplined for violations thereof provided that the user or subscriber has signed an agreement acknowledging that access to and use of MLS information is contingent on compliance with the rules and regulations. Further, failure of any user or subscriber to abide by the rules and/or any sanction imposed for violations thereof can subject the participant to the same or other discipline. This provision does not eliminate the participant's ultimate responsibility and accountability for all users or subscribers affiliated with the participant. *(Adopted 4/92)*

**Note:** Adoption of Section 7.2 is optional and should be adopted by multiple listing services desiring to establish authority to impose discipline on non-principal users or subscribers affiliated with MLS members or participants. *(Adopted 4/92)* O

69

# Meetings

**Section 8
Meetings of MLS
Committee**

The multiple listing service committee shall meet for the transaction of its business at a time and place to be determined by the committee or at the call of the chairperson. **R**

**Section 8.1
Meetings of
MLS Participants**

The committee may call meetings of the participants in the service to be known as meetings of the multiple listing service. **R**

**Section 8.2
Conduct of Meetings**

The chairperson or vice chairperson shall preside at all meetings or, in their absence, a temporary chairperson from the membership of the committee shall be named by the chairperson or, upon his failure to do so, by the committee. **R**

# Enforcement of Rules or Disputes

**Section 9
Consideration of
Alleged Violations**

The committee shall give consideration to all written complaints having to do with violations of the rules and regulations. By becoming and remaining a participant, each participant agrees to be subject to these rules and regulations, the enforcement of which are at the sole discretion of the Committee (Board of Directors). *(Amended 5/18)* **M**

**Section 9.1
Violation of Rules
and Regulations**

If the alleged offense is a violation of the rules and regulations of the service and does not involve a charge of alleged unethical conduct or request for arbitration, it may be administratively considered and determined by the multiple listing service committee, and if a violation is determined, the committee may direct the imposition of sanction, provided the recipient of such sanction may request a hearing before the professional standards committee of the association in accordance with the bylaws and rules and regulations of the association of REALTORS® within twenty (20) days following receipt of the committee's decision. *(Amended 11/96)*

If, rather than conducting an administrative review, the multiple listing committee has a procedure established to conduct hearings, the decision of the multiple listing committee may be appealed to the board of directors of the association of REALTORS® within twenty (20) days of the tribunal's decision being rendered. Alleged violations involving unethical conduct shall be referred to the association's grievance committee for processing in accordance with the professional standards procedures of the association. If the charge alleges a refusal to arbitrate, such charge shall be referred directly to the board of directors of the association of REALTORS®. *(Amended 2/98)* **M**

**Optional Provision for Establishing Nonmember Participatory Rights (Open MLS)\***
If the alleged offense is a violation of the rules and regulations of the service and does not involve a charge of alleged violation of one or more of the provisions of Section 16 of the rules and regulations or a request for arbitration, it may be administratively considered and determined by the MLS committee and if a violation is determined, the MLS committee may direct the imposition of sanction provided that the recipient of such sanction may request a hearing by the professional standards committee of the association in accordance with the bylaws of the association of REALTORS®. *(Amended 2/98)*

If, rather than conducting an administrative review, the MLS committee has a procedure established to conduct hearings, the decision of the hearing tribunal may be appealed to the board of directors of the association of REALTORS®. Alleged violations of Section 16 of the rules and regulations shall be referred to the association's grievance committee for processing in accordance with the professional standards procedures of the association, except that if the charge alleges a refusal to arbitrate, such charge shall be referred directly to the board of directors of the association. *(Amended 2/98)*

\*Only adopt this paragraph if the association's MLS is open to nonmember participants (otherwise qualified individuals who do not hold REALTOR® membership anywhere).

| | |
|---|---|
| **Section 9.2**<br>**Complaints of**<br>**Unethical Conduct** | All other complaints of unethical conduct shall be referred by the committee to the Professional Standards Administrator of the association of REALTORS® for appropriate action in accordance with the professional standards procedures established in the association's bylaws. *(Amended 11/88)* M |

| | |
|---|---|
| **Section 9.3**<br>**Complaints of**<br>**Unauthorized Use**<br>**of Listing Content** | Any participant who believes another participant has engaged in the unauthorized use or display of listing content, including photographs, images, audio or video recordings, and virtual tours, shall send notice of such alleged unauthorized use to the MLS. Such notice shall be in writing, specifically indentify the allegedly unauthorized content, and be delivered to the MLS not more than sixty (60) days after the alleged misuse was first identified. No participant may pursue action over the alleged unauthorized use and display of listing content in a court of law without first completing the notice and response procedures outlined in this Section 9.3 of the MLS rules. |
| | Upon receiving a notice, the committee (Board of Directors) will send the notice to the participant who is accused of unauthorized use. Within ten (10) days from receipt, the participant must either: 1) remove the allegedly unauthorized content, or 2) provide proof to the committee (Board of Directors) that the use is authorized. Any proof submitted will be considered by the Committee (Board of Directors), and a decision of whether it establishes authority to use the listing content will be made within thirty (30) days. |
| | If the Committee (Board of Directors) determines that the use of the content was unauthorized, the Committee (Board of Directors) may issue a sanction pursuant to Section 7 of the MLS rules, including a request to remove and/or stop the use of the unauthorized content within ten (10) days after transmittal of the decision. If the unauthorized use stems from a violation of the MLS rules, that too will be considered at the time of establishing an appropriate sanction. |
| | If after ten (10) days following transmittal of the Committee's (Board of Director's) determination the alleged violation remains uncured (i.e. the content is not removed or the rules violation remains uncured), then the complaining party may seek action through a court of law. *(Adopted 5/18)* M |

| | |
|---|---|
| **Section 9.4**<br>**MLS Rules Violations** | MLS participants may not take legal action against another participant for alleged rules violation(s) unless the complaining participant has first exhausted the remedies provided in these rules. *(Adopted 5/18)* M |
| | **Note:** Adoption of Sections 9.3 and 9.4 are not required if the MLS has adopted alternative procedures to address alleged misuse of listing content that includes notice to the alleged infringer. |

## Confidentiality of MLS Information

| | |
|---|---|
| **Section 10**<br>**Confidentiality of**<br>**MLS Information** | Any information provided by the multiple listing service to the participants shall be considered official information of the service. Such information shall be considered confidential and exclusively for the use of participants and real estate licensees affiliated with such participants and those participants who are licensed or certified by an appropriate state regulatory agency to engage in the appraisal of real property and licensed or certified appraisers affiliated with such participants. *(Amended 4/92)* M |

| | |
|---|---|
| **Section 10.1**<br>**MLS Not Responsible**<br>**for Accuracy of**<br>**Information** | The information published and disseminated by the service is communicated verbatim, without change by the service, as filed with the service by the participant. The service does not verify such information provided and disclaims any responsibility for its accuracy. Each participant agrees to hold the service harmless against any liability arising from any inaccuracy or inadequacy of the information such participant provides. R |

## Ownership of MLS Compilation* and Copyright

**Section 11**

By the act of submitting any property listing content to the MLS, the participant represents and warrants that he or she is fully authorized to license the property listing content as contemplated by and in compliance with this section and these rules and regulations, and also thereby does grant to the MLS license to include the property listing content in its copyrighted MLS compilation and also in any statistical report on comparables. Listing content includes, but is not limited to, photographs, images, graphics, audio and video recordings, virtual tours, drawings, descriptions, remarks, narratives, pricing information, and other details or information related to the listed property. *(Amended 5/18)* M

Each participant who submits listing content to the MLS agrees to defend and hold the MLS and every other participant harmless from and against any liability or claim arising from any inaccuracy of the submitted listing content or any inadequacy of ownership, license, or title to the submitted listing content. *(Adopted 5/18)* M

**Note:** The Digital Millennium Copyright Act (DMCA) is a federal copyright law that enhances the penalties for copyright infringement occurring on the Internet. The law provides exemptions or "safe harbors" from copyright infringement liability for online service providers (OSP) that satisfy certain criteria. Courts construe the definition of "online service provider" broadly, which would likely include MLSs as well as participants and subscribers hosting an IDX display.

One safe harbor limits the liability of an OSP that hosts a system, network or website on which Internet users may post user-generated content. If an OSP complies with the provisions of this DMCA safe harbor, it cannot be liable for copyright infringement if a user posts infringing material on its website. This protects an OSP from incurring significant sums in copyright infringement damages, as statutory damages are as high as $150,000 per work. For this reason, it is highly recommended that MLSs, participants and subscribers comply with the DMCA safe harbor provisions discussed herein.

To qualify for this safe harbor, the OSP must:

1. Designate on its website and register with the Copyright Office an agent to receive takedown requests. The agent could be the MLS, participant, subscriber, or other individual or entity.

2. Develop and post a DMCA-compliant website policy that addresses repeat offenders.

3. Comply with the DMCA takedown procedure. If a copyright owner submits a takedown notice to the OSP, which alleges infringement of its copyright at a certain location, then the OSP must promptly remove allegedly infringing material. The alleged infringer may submit a counter-notice that the OSP must share with the copyright owner. If the copyright owner fails to initiate a copyright lawsuit within ten (10) days, then the OSP may restore the removed material.

4. Have no actual knowledge of any complained-of infringing activity.

5. Not be aware of facts or circumstances from which complained-of infringing activity is apparent.

---

*The term MLS compilation, as used in Sections 11 and 12 herein, shall be construed to include any format in which property listing data is collected and disseminated to the participants, including but not limited to bound book, loose-leaf binder, computer database, card file, or any other format whatsoever.

6. Not receive a financial benefit attributable to complained-of infringing activity when the OSP is capable of controlling such activity.

Full compliance with these DMCA safe harbor criteria will mitigate an OSP's copyright infringement liability. For more information see 17 U.S.C. §512. *(Adopted 11/15)* I

**Section 11.1**

All right, title, and interest in each copy of every multiple listing compilation created and copyrighted by the _____ Association of REALTORS® and in the copyrights therein, shall at all times remain vested in the _____ Association of REALTORS®. R

**Section 11.2 Display**

Each participant shall be entitled to lease from the _____ Association of REALTORS® a number of copies of each MLS compilation sufficient to provide the participant and each person affiliated as a licensee (including licensed or certified appraisers) with such participant with one copy of such compilation. The participant shall pay for each such copy the rental fee set by the association.*

Participants shall acquire by such lease only the right to use the MLS compilation in accordance with these rules. M

---

*This section should not be construed to require the participant to lease a copy of the MLS compilation for any licensee (or licensed or certified appraiser) affiliated with the participant who is engaged exclusively in a specialty of the real estate business other than listing, selling, or appraising the types of properties which are required to be filed with the MLS and who does not, at any time, have access to or use of the MLS information or MLS facility of the association.

## Use of Copyrighted MLS Compilation

**Section 12**
**Distribution**

Participants shall, at all times, maintain control over and responsibility for each copy of any MLS compilation leased to them by the association of REALTORS®, and shall not distribute any such copies to persons other than subscribers who are affiliated with such participant as licensees, those individuals who are licensed or certified by an appropriate state regulatory agency to engage in the appraisal of real property, and any other subscribers as authorized pursuant to the governing documents of the MLS. Use of information developed by or published by an association multiple listing service is strictly limited to the activities authorized under a participant's licensure(s) or certification, and unauthorized uses are prohibited. Further, none of the foregoing is intended to convey participation or membership or any right of access to information developed or published by an association multiple listing service where access to such information is prohibited by law. *(Amended 4/92)* R

**Section 12.1**
**Display**

Participants and those persons affiliated as licensees with such participants shall be permitted to display the MLS compilation to prospective purchasers only in conjunction with their ordinary business activities of attempting to locate ready, willing, and able buyers for the properties described in said MLS compilation. M

**Section 12.2**
**Reproduction**

**Option #1:** Participants or their affiliated licensees shall not reproduce any MLS compilation or any portion thereof, except in the following limited circumstances:

Participants or their affiliated licensees may reproduce from the MLS compilation and distribute to prospective purchasers a reasonable* number of single copies of property listing data contained in the MLS compilation which relate to any properties in which the prospective purchasers are or may, in the judgment of the participant or their affiliated licensees, be interested.

Reproductions made in accordance with this rule shall be prepared in such a fashion that the property listing data of properties other than that in which the prospective purchaser has expressed interest, or in which the participant or the affiliated licensees are seeking to promote interest, does not appear on such reproduction.

Nothing contained herein shall be construed to preclude any participant from utilizing, displaying, distributing, or reproducing property listing sheets or other compilations of data pertaining exclusively to properties currently listed for sale with the participant.

Any MLS information, whether provided in written or printed form, provided electronically, or provided in any other form or format, is provided for the exclusive use of the participant and those licensees affiliated with the participant who are authorized to have access to such information. Such information may not be transmitted, retransmitted, or provided in any manner to any unauthorized individual, office, or firm.

None of the foregoing shall be construed to prevent any individual legitimately in possession of current listing information, sold information, comparables, or statistical information from utilizing such information to support valuations on particular properties for clients and customers. Any MLS content in data feeds available to participants for real estate brokerage purposes must also be available to participants for valuation purposes,

---

\*It is intended that the participant be permitted to provide prospective purchasers with listing data relating to properties which the prospective purchaser has a bona fide interest in purchasing or in which the participant is seeking to promote interest. The term reasonable, as used herein, should therefore be construed to permit only limited reproduction of property listing data intended to facilitate the prospective purchaser's decision-making process in the consideration of a purchase. Factors which shall be considered in deciding whether the reproductions made are consistent with this intent and thus reasonable in number, shall include, but are not limited to, the total number of listings in the MLS compilation, how closely the types of properties contained in such listings accord with the prospective purchaser's expressed desires and ability to purchase, whether the reproductions were made on a selective basis, and whether the type of properties contained in the property listing data is consistent with a normal itinerary of properties which would be shown to the prospective purchaser.

including automated valuations. MLSs must either permit use of existing data feeds, or create a separate data feed, to satisfy this requirement. MLSs may require execution of a third-party license agreement where deemed appropriate by the MLS. MLSs may require participants who will use such data feeds to pay the reasonably estimated costs incurred by the MLS in adding or enhancing its downloading capacity for this purpose. Information deemed confidential may not be used as supporting documentation. Any other use of such information is unauthorized and prohibited by these rules and regulations. *(Amended 05/14)*

**Option #2:**  Participants or their affiliated licensees shall not reproduce any MLS compilation or any portion thereof, except in the following limited circumstances:

Participants or their affiliated licensees may reproduce from the MLS compilation and distribute to prospective purchasers a reasonable* number of single copies of property listing data contained in the MLS compilation which relate to any properties in which the prospective purchasers are or may, in the judgment of the participants or their affiliated licensees, be interested.

Nothing contained herein shall be construed to preclude any participant from utilizing, displaying, distributing, or reproducing property listing sheets or other compilations of data pertaining exclusively to properties currently listed for sale with the participant.

Any MLS information, whether provided in written or printed form, provided electronically, or provided in any other form or format, is provided for the exclusive use of the participant and those licensees affiliated with the participant who are authorized to have access to such information. Such information may not be transmitted, retransmitted, or provided in any manner to any unauthorized individual, office, or firm.

None of the foregoing shall be construed to prevent any individual legitimately in possession of current listing information, sold information, comparables, or statistical information from utilizing such information to support valuations on particular properties for clients and customers. Any MLS content in data feeds available to participants for real estate brokerage purposes must also be available to participants for valuation purposes, including automated valuations. MLSs must either permit use of existing data feeds, or create a separate data feed, to satisfy this requirement. MLSs may require execution of a third-party license agreement where deemed appropriate by the MLS. MLSs may require participants who will use such data feeds to pay the reasonably estimated costs incurred by the MLS in adding or enhancing its downloading capacity for this purpose. Information deemed confidential may not be used as supporting documentation. Any other use of such information is unauthorized and prohibited by these rules and regulations. *(Amended 05/14)*  `M`

## Use of MLS Information

**Section 13 Limitations on Use of MLS Information**

**Option #1:**  Use of information from MLS compilation of current listing information, from the association's statistical report, or from any sold or comparable report of the association or MLS for public mass-media advertising by an MLS participant or in other public representations, may not be prohibited.

---

*It is intended that the participant be permitted to provide prospective purchasers with listing data relating to properties which the prospective purchaser has a bona fide interest in purchasing or in which the participant is seeking to promote interest. The term reasonable, as used herein, should therefore be construed to permit only limited reproduction of property listing data intended to facilitate the prospective purchaser's decision-making process in the consideration of a purchase. Factors which shall be considered in deciding whether the reproductions made are consistent with this intent and thus reasonable in number, shall include, but are not limited to, the total number of listings in the MLS compilation, how closely the types of properties contained in such listings accord with the prospective purchaser's expressed desires and ability to purchase, whether the reproductions were made on a selective basis, and whether the type of properties contained in the property listing data is consistent with a normal itinerary of properties which would be shown to the prospective purchaser.

However, any print or non-print forms of advertising or other forms of public representations based in whole or in part on information supplied by the association or its MLS must clearly demonstrate the period of time over which such claims are based and must include the following, or substantially similar, notice:

> Based on information from the association of REALTORS® (alternatively, from the _____ MLS) for the period *(date)* through *(date)*. *(Amended 11/93)*

**Option #2:** Information from MLS compilations of current listing information, from statistical reports, and from any sold or comparable report of the association or MLS may be used by MLS participants as the basis for aggregated demonstrations of market share or comparisons of firms in public mass-media advertising or in other public representations. This authority does not convey the right to include in any such advertising or representation information about specific properties which are listed with other participants, or which were sold by other participants (as either listing or cooperating broker).

However, any print or non-print forms of advertising or other forms of public representations based in whole or in part on information supplied by the association or its MLS must clearly demonstrate the period of time over which such claims are based and must include the following, or substantially similar, notice:

> Based on information from the association of REALTORS® (alternatively, from the _____ MLS) for the period *(date)* through *(date)*. *(Amended 11/97)*

**Note:** Associations are advised to select one rule for the two (2) alternatives above. **M**

# Changes in Rules and Regulations

**Section 14
Changes in Rules
and Regulations**

Amendments to the rules and regulations of the service shall be by a _____ vote of the members of the multiple listing service committee, subject to approval by the board of directors of the association of REALTORS®.

**Note:** Some associations may prefer to change the rules and regulations by a vote of the participants, subject to approval by the board of directors of the association of REALTORS®. **M**

# Arbitration of Disputes*

**Section 15
Arbitration
of Disputes**

By becoming and remaining a participant, each participant agrees to arbitrate disputes involving contractual issues and questions, and specific non-contractual issues and questions defined in Standard of Practice 17-4 of the Code of Ethics with MLS participants in different firms arising out of their relationships as MLS participants subject to the following qualifications.

a. If all disputants are members of the same association of REALTORS® or have their principal place of business within the same association's territorial jurisdiction, they shall arbitrate pursuant to the procedures of that association of REALTORS®.

b. If the disputants are members of different associations of REALTORS® or if their principal place of business is located within the territorial jurisdiction of different associations of REALTORS®, they remain obligated to arbitrate in accordance with the procedures of the _____ (state association of REALTORS®). *(Amended 11/97)*

---

*Only adopt Section 15 if the association's MLS is open to nonmember participants (otherwise qualified individuals who do not hold REALTOR® membership anywhere). If adopted, this section may not be modified.

**Interboard Arbitration Procedures:** Arbitration shall be conducted in accordance with any existing interboard agreement or, alternatively, in accordance with the interboard arbitration procedures in the *Code of Ethics and Arbitration Manual* of the NATIONAL ASSOCIATION OF REALTORS®. Nothing herein shall preclude participants from agreeing to arbitrate the dispute before a particular association of REALTORS®. *(Amended 11/98)*

**Awards:** The obligation to arbitrate includes the duty to either 1) pay an award to the party(ies) named in the award or 2) deposit the funds with the Professional Standards Administrator to be held in an escrow or trust account maintained for this purpose. Failure to satisfy the award or deposit the funds with the association within ten (10) days may be considered a violation of the MLS rules and may subject the participant to disciplinary action at the sole discretion of the MLS. *(Adopted 11/15)* [o]

| | |
|---|---|
| **Section 16** | # Standards of Conduct for MLS Participants* |
| **Standard 16.1** | MLS participants shall not engage in any practice or take any action inconsistent with exclusive representation or exclusive brokerage relationship agreements that other MLS participants have with clients. *(Amended 1/04)* [o] |
| **Standard 16.2** | Signs giving notice of property for sale, rent, lease, or exchange shall not be placed on property without consent of the seller/landlord. [o] |
| **Standard 16.3** | MLS participants acting as subagents or as buyer/tenant representatives or brokers shall not attempt to extend a listing broker's offer of cooperation and/or compensation to other brokers without the consent of the listing broker. *(Amended 1/04)* [o] |
| **Standard 16.4** | MLS participants shall not solicit a listing currently listed exclusively with another broker. However, if the listing broker, when asked by the MLS participant, refuses to disclose the expiration date and nature of such listing (i.e., an exclusive right-to-sell, an exclusive agency, open listing, or other form of contractual agreement between the listing broker and the client) the MLS participant may contact the owner to secure such information and may discuss the terms upon which the MLS participant might take a future listing or, alternatively, may take a listing to become effective upon expiration of any existing exclusive listing. [o] |
| **Standard 16.5** | MLS participants shall not solicit buyer/tenant agreements from buyers/tenants who are subject to exclusive buyer/tenant agreements. However, if asked by an MLS participant, the broker refuses to disclose the expiration date of the exclusive buyer/tenant agreement, the MLS participant may contact the buyer/tenant to secure such information and may discuss the terms upon which the MLS participant might enter into a future buyer/tenant agreement or, alternatively, may enter into a buyer/tenant agreement to become effective upon the expiration of any existing exclusive buyer/tenant agreement. *(Amended 1/98)* [o] |
| **Standard 16.6** | MLS participants shall not use information obtained from listing brokers through offers to cooperate made through multiple listing services or through other offers of cooperation to refer listing brokers' clients to other brokers or to create buyer/tenant relationships with listing brokers' clients, unless such use is authorized by listing brokers. *(Amended 11/01)* [o] |

*Only adopt the standards of conduct if the association's MLS is open to nonmember participants (otherwise qualified individuals who do not hold REALTOR® membership anywhere). Any of the standards of conduct, if adopted, may not be modified.

**Standard 16.7**  The fact that an agreement has been entered into with an MLS participant shall not preclude or inhibit any other MLS participant from entering into a similar agreement after the expiration of the prior agreement. *(Amended 1/98)* o

**Standard 16.8**  The fact that a prospect has retained an MLS participant as an exclusive representative or exclusive broker in one or more past transactions does not preclude other MLS participants from seeking such prospect's future business. *(Amended 1/04)* o

**Standard 16.9**  MLS participants are free to enter into contractual relationships or to negotiate with sellers/landlords, buyers/tenants or others who are not subject to an exclusive agreement but shall not knowingly obligate them to pay more than one commission except with their informed consent. *(Amended 1/98)* o

**Standard 16.10**  When MLS participants are contacted by the client of another MLS participant regarding the creation of an exclusive relationship to provide the same type of service, and MLS participants have not directly or indirectly initiated such discussions, they may discuss the terms upon which they might enter into a future agreement or, alternatively, may enter into an agreement which becomes effective upon expiration of any existing exclusive agreement. *(Amended 1/98)* o

**Standard 16.11**  In cooperative transactions, MLS participants shall compensate cooperating MLS participants (principal brokers) and shall not compensate nor offer to compensate, directly or indirectly, any of the sales licensees employed by or affiliated with other MLS participants without the prior express knowledge and consent of the cooperating broker. o

**Standard 16.12**  MLS participants are not precluded from making general announcements to prospects describing their services and the terms of their availability even though some recipients may have entered into agency agreements or other exclusive relationships with another MLS participant. A general telephone canvass, general mailing, or distribution addressed to all prospects in a given geographical area or in a given profession, business, club, or organization, or other classification or group is deemed general for purposes of this rule. *(Amended 1/04)*

The following types of solicitations are prohibited:

Telephone or personal solicitations of property owners who have been identified by a real estate sign, multiple listing compilation, or other information service as having exclusively listed their property with another MLS participant; and mail or other forms of written solicitations of prospects whose properties are exclusively listed with another MLS participant when such solicitations are not part of a general mailing but are directed specifically to property owners identified through compilations of current listings, for sale or for rent signs, or other sources of information intended to foster cooperation with MLS participants. *(Amended 1/04)* o

**Standard 16.13**  MLS participants, prior to entering into a representation agreement, have an affirmative obligation to make reasonable efforts to determine whether the prospect is subject to a current, valid exclusive agreement to provide the same type of real estate service. *(Amended 1/04)* o

78

**Standard 16.14**    MLS participants, acting as buyers or tenants representatives or brokers, shall disclose that relationship to the seller/landlord's representative or broker at first contact and shall provide written confirmation of that disclosure to the seller/landlord's representative or broker not later than execution of a purchase agreement or lease. *(Amended 1/04)* [O]

**Standard 16.15**    On unlisted property, MLS participants acting as buyer/tenant representatives or brokers shall disclose that relationship to the seller/landlord at first contact for that buyer/tenant and shall provide written confirmation of such disclosure to the seller/landlord not later than execution of any purchase or lease agreement. *(Amended 1/04)*

MLS participants shall make any request for anticipated compensation from the seller/landlord at first contact. [O]

**Standard 16.16**    MLS participants, acting as representatives or brokers of sellers/landlords or as subagents of listing brokers, shall disclose that relationship to buyers/tenants as soon as practicable, and shall provide written confirmation of such disclosure to buyers/tenants not later than execution of any purchase or lease agreement. *(Amended 1/04)* [O]

**Standard 16.17**    MLS participants are not precluded from contacting the client of another broker for the purpose of offering to provide, or entering into a contract to provide, a different type of real estate service unrelated to the type of service currently being provided (e.g., property management as opposed to brokerage) or from offering the same type of service for property not subject to other brokers' exclusive agreements. However, information received through a multiple listing service or any other offer of cooperation may not be used to target clients of other MLS participants to whom such offers to provide services may be made. *(Amended 1/04)* [O]

**Standard 16.18**    MLS participants, acting as subagents or buyer/tenant representatives or brokers, shall not use the terms of an offer to purchase/lease to attempt to modify the listing broker's offer of compensation to subagents or buyer/tenant representatives or brokers, or make the submission of an executed offer to purchase/lease contingent on the listing broker's agreement to modify the offer of compensation. *(Amended 1/04)* [O]

**Standard 16.19**    All dealings concerning property exclusively listed or with buyer/tenants who are subject to an exclusive agreement shall be carried on with the client's representative or broker, and not with the client, except with the consent of the client's representative or broker or except where such dealings are initiated by the client. *(Amended 1/04)*

Before providing substantive services (such as writing a purchase offer or presenting a CMA) to prospects, MLS participants shall ask prospects whether they are a party to any exclusive representation agreement. MLS participants shall not knowingly provide substantive services concerning a prospective transaction to prospects who are parties to exclusive representation agreements, except with the consent of the prospects' exclusive representatives or at the direction of prospects. *(Adopted 1/03, Amended 1/04)* [O]

**Standard 16.20**    Participants, users, and subscribers, prior to or after their relationship with their current firm is terminated, shall not induce clients of their current firm to cancel exclusive contractual agreements between the client and that firm. This does not preclude participants from establishing agreements with their associated licensees governing assignability of exclusive agreements. *(Adopted 1/98, Amended 1/10)* [O]

**Standard 16.21**      These rules are not intended to prohibit ethical, albeit aggressive or innovative business practices, and do not prohibit disagreements with other MLS participants involving commission, fees, compensation, or other forms of payment or expenses. **O**

**Standard 16.22**      MLS participants shall not knowingly or recklessly make false or misleading statements about other real estate professionals, their businesses, or their business practices. *(Amended 01/12)* **O**

**Standard 16.23**      MLS participants' firm websites shall disclose the firm's name and state(s) of licensure in a reasonable and readily apparent manner.

Websites of licensees affiliated with a participant's firm shall disclose the firm's name and the licensee's state(s) of licensure in a reasonable and readily apparent manner. *(Adopted 11/07)* **O**

**Standard 16.24**      MLS participants shall present a true picture in their advertising and representations to the public, including Internet content, images, and the URLs and domain names they use, and participants may not:

a. engage in deceptive or unauthorized framing of real estate brokerage websites;

b. manipulate (e.g., presenting content developed by others) listing and other content in any way that produces a deceptive or misleading result;

c. deceptively use metatags, keywords or other devices/methods to direct, drive, or divert Internet traffic;

d. present content developed by others without either attribution or without permission; or

e. otherwise mislead consumers, including use of misleading images. *(Amended 1/18)* **O**

**Standard 16.25**      The services which MLS participants provide to their clients and customers shall conform to the standards of practice and competence which are reasonably expected in the specific real estate disciplines in which they engage; specifically, residential real estate brokerage, real property management, commercial and industrial real estate brokerage, land brokerage, real estate appraisal, real estate counseling, real estate syndication, real estate auction, and international real estate.

MLS participants shall not undertake to provide specialized professional services concerning a type of property or service that is outside their field of competence unless they engage the assistance of one who is competent on such types of property or service, or unless the facts are fully disclosed to the client. Any persons engaged to provide such assistance shall be so identified to the client and their contribution to the assignment should be set forth. *(Adopted 11/09)* **O**

## Orientation

**Section 17
Orientation**      Any applicant for MLS participation and any licensee (including licensed or certified appraisers) affiliated with an MLS participant who has access to and use of MLS-generated information shall complete an orientation program of no more than eight (8) classroom hours devoted to the MLS rules and regulations and computer training related to MLS information entry and retrieval and the operation of the MLS within thirty (30) days after access has been provided. *(Amended 11/04)* **M**

Participants and subscribers may be required, at the discretion of the MLS, to complete additional training of not more than four (4) classroom hours in any twelve (12) month

period when deemed necessary by the MLS to familiarize participants and subscribers with system changes or enhancements and/or changes to MLS rules or policies. Participants and subscribers must be given the opportunity to complete any mandated orientation and additional training remotely. *(Amended 11/17)*

## Internet Data Exchange (IDX)

**Section 18**
**IDX Defined**

IDX affords MLS participants the ability to authorize limited electronic display and delivery of their listings by other participants via the following authorized mediums under the participant's control: websites, mobile apps, and audio devices.  As used throughout these rules, "display" includes "delivery" of such listing. *(Amended 5/17)* [M]

**Section 18.1**
**Authorization**

**Note:**  Select one of the following two options. [M]

**Option #1:**  Participants' consent for display of their listings by other participants pursuant to these rules and regulations is presumed unless a participant affirmatively notifies the MLS that the participant refuses to permit display (either on a blanket or on a listing-by-listing basis). If a participant refuses on a blanket basis to permit the display of that participant's listings, that participant may not download, frame or display the aggregated MLS data of other participants.*

**Option #2:**  Participants' consent for display of their listings by other participants pursuant to these rules and regulations must be established in writing. If a participant withholds consent on a blanket basis to permit the display of that participant's listings, that participant may not download, frame  or display the aggregated MLS data of other participants.*

**Section 18.2**
**Participation**

**Note:**  Select one of the following four options. Participation in IDX may be limited to MLS participants engaged in real estate brokerage by adopting Option #3 or Option #4. [M]

**Option #1:**  Participation in IDX is available to all MLS participants who consent to display of their listings by other participants.

**Option #2:**  Participation in IDX is available to all MLS participants who are REALTORS® and who consent to display of their listings by other participants.

**Option #3:**  Participation in IDX is available to all MLS participants engaged in real estate brokerage who consent to display of their listings by other participants. *(Amended 11/09)*

**Option #4:**  Participation in IDX is available to all MLS participants who are REALTORS® who are engaged in real estate brokerage and who consent to display of their listings by other participants. *(Amended 11/09)*

**Section 18.2.1**

Participants must notify the MLS of their intention to display IDX information and must give the MLS direct access for purposes of monitoring/ensuring compliance with applicable rules and policies. *(Amended 05/12)* [M]

**Section 18.2.2**

MLS participants may not use IDX-provided listings for any purpose other than display as provided for in these rules. This does not require participants to prevent indexing of IDX listings by recognized search engines. *(Amended 05/12)* [M]

---

*Even where participants have given blanket authority for other participants to display their listings through IDX, such consent may be withdrawn on a listing-by-listing basis where the seller has prohibited all Internet display or other electronic forms of display or distribution. *(Amended 05/17)*

**Section 18.2.3**     Listings, including property addresses, can be included in IDX displays except where a seller has directed their listing broker to withhold their listing or the listing's property address from all display on the Internet (including, but not limited to, publicly-accessible websites or VOWs) or other electronic forms of display or distribution. *(Amended 05/17)* [M]

**Section 18.2.4**     Participants may select the listings they choose to display through IDX based only on objective criteria including, but not limited to, factors such as geography or location ("uptown," "downtown," etc.), list price, type of property (e.g., condominiums, cooperatives, single-family detached, multi-family), cooperative compensation offered by listing brokers, type of listing (e.g., exclusive right-to-sell or exclusive agency), or the level of service being provided by the listing firm. Selection of listings displayed through IDX must be independently made by each participant. *(Amended 5/17)* [M]

**Section 18.2.5**     Participants must refresh all MLS downloads and IDX displays automatically fed by those downloads at least once every twelve (12) hours. *(Amended 11/14)* [M]

**Section 18.2.6**     Except as provided in the IDX policy and these rules, an IDX site or a participant or user operating an IDX site or displaying IDX information as otherwise permitted may not distribute, provide, or make any portion of the MLS database available to any person or entity. *(Amended 05/12)* [M]

**Section 18.2.7**     Any IDX display controlled by a participant must clearly identify the name of the brokerage firm under which they operate in a readily visible color and typeface. For purposes of the IDX policy and these rules, "control" means the ability to add, delete, modify and update information as required by the IDX policy and MLS rules. *(Amended 05/12)* [M]

**Section 18.2.8**     Any IDX display controlled by a participant or subscriber that

a. allows third-parties to write comments or reviews about particular listings or displays a hyperlink to such comments or reviews in immediate conjunction with particular listings, or

b. displays an automated estimate of the market value of the listing (or hyperlink to such estimate) in immediate conjunction with the listing,

either or both of those features shall be disabled or discontinued for the seller's listings at the request of the seller. The listing broker or agent shall communicate to the MLS that the seller has elected to have one or both of these features disabled or discontinued on all displays controlled by participants. Except for the foregoing and subject to Section 18.2.9, a participant's IDX display may communicate the participant's professional judgment concerning any listing. Nothing shall prevent an IDX display from notifying its customers that a particular feature has been disabled at the request of the seller. *(Adopted 05/12)* [M]

**Section 18.2.9**     Participants shall maintain a means (e.g., e-mail address, telephone number) to receive comments about the accuracy of any data or information that is added by or on behalf of the participant beyond that supplied by the MLS and that relates to a specific property. Participants shall correct or remove any false data or information relating to a specific property upon receipt of a communication from the listing broker or listing agent for the property explaining why the data or information is false. However, participants shall not be obligated to remove or correct any data or information that simply reflects good faith opinion, advice, or professional judgment. *(Amended 05/12)* [M]

**Section 18.2.10**   An MLS participant (or where permitted locally, an MLS subscriber) may co-mingle the listings of other brokers received in an IDX feed with listings available from other MLS IDX feeds, provided all such displays are consistent with the IDX rules, and the MLS participant (or MLS subscriber) holds participatory rights in those MLSs. As used in this policy, "co-mingling" means that consumers are able to execute a single property search of multiple IDX data feeds resulting in the display of IDX information from each of the MLSs on a single search results page; and that participants may display listings from each IDX feed on a single webpage or display. *(Adopted 11/14)* M

**Section 18.2.11**   Participants shall not modify or manipulate information relating to other participants listings. MLS participants may augment their IDX display of MLS data with applicable property information from other sources to appear on the same webpage or display, clearly separated by the data supplied by the MLS. The source(s) of the information must be clearly identified in the immediate proximity to such data. This requirement does not restrict the format of MLS data display or display of fewer than all of the available listings or fewer authorized fields. *(Adopted 05/15)* M

**Section 18.2.12**   All listings displayed pursuant to IDX shall identify the listing firm in a reasonably prominent location and in a readily visible color and typeface not smaller than the median used in the display of listing data.* *(Amended 05/17)* M

**Section 18.3
Display**   Display of listing information pursuant to IDX is subject to the following rules:

   **Note:**   All of the following rules are optional but, if adopted, cannot be modified. Select those rules which apply to your IDX program and number the sections accordingly.

**Section 18.3.1**    Listings displayed pursuant to IDX shall contain only those fields of data designated by the MLS. Display of all other fields (as determined by the MLS) is prohibited. Confidential fields intended only for other MLS participants and users (e.g., cooperative compensation offers, showing instructions, property security information, etc.) may not be displayed. *(Amended 05/12)* O

**Section 18.3.1.1**   The type of listing agreement (e.g., exclusive right to sell, exclusive agency, etc.) may not be displayed. *(Amended 05/12)* O

**Section 18.3.2**   Deleted May 2015.

**Section 18.3.3**   Deleted May 2017; moved to 18.2.12 May 2017.

**Section 18.3.4**   All listings displayed pursuant to IDX shall identify the listing agent. O

**Section 18.3.5**   Non-principal brokers and sales licensees affiliated with IDX participants may display information available through IDX on their own websites subject to their participant's consent and control and the requirements of state law and/or regulation. O

**Section 18.3.6**   Deleted November 2006.

---

*Displays of minimal information (e.g., "thumbnails", text messages, "tweets", etc., of two hundred [200] characters or less) are exempt from this requirement but only when linked directly to a display that includes all required disclosures. For audio delivery of listing content, all required disclosures must be subsequently delivered electronically to the registered consumer performing the property search or linked to through the device's application. *(Amended 5/17)*

**Section 18.3.7**    All listings displayed pursuant to IDX shall show the MLS as the source of the information.* *(Amended 05/17)* O

**Section 18.3.8**    Participants (and their affiliated licensees, if applicable) shall indicate on their websites that IDX information is provided exclusively for consumers' personal, non-commercial use, that it may not be used for any purpose other than to identify prospective properties consumers may be interested in purchasing, and that the data is deemed reliable but is not guaranteed accurate by the MLS. The MLS may, at its discretion, require use of other disclaimers as necessary to protect participants and/or the MLS from liability.* *(Amended 05/17)* O

**Section 18.3.9**    The data consumers can retrieve or download in response to an inquiry shall be determined by the MLS but in no instance shall be limited to fewer than five hundred (500) listings or fifty percent (50%) of the listings available for IDX display, whichever is fewer. *(Amended 11/17)* O

**Section 18.3.10**    The right to display other participants' listings pursuant to IDX shall be limited to a participant's office(s) holding participatory rights in this MLS. O

**Section 18.3.11**    Listings obtained through IDX feeds from REALTOR® Association MLSs where the MLS participant holds participatory rights must be displayed separately from listings obtained from other sources. Listings obtained from other sources (e.g., from other MLSs, from non-participating brokers, etc.) must display the source from which each such listing was obtained.* *(Amended 05/17)* O

**Note:** An MLS participant (or where permitted locally, an MLS subscriber) may co-mingle the listings of other brokers received in an IDX feed with listings available from other MLS IDX feeds, provided all such displays are consistent with the IDX rules, and the MLS participant (or MLS subscriber) holds participatory rights in those MLSs. As used in this policy, "co-mingling" means that consumers are able to execute a single property search of multiple IDX data feeds resulting in the display of IDX information from each of the MLSs on a single search results page; and that participants may display listings from each IDX feed on a single webpage or display. *(Adopted 11/14)*

**Section 18.3.12**    Display of expired, withdrawn, and sold listings** is prohibited. *(Amended 11/15)* O

**Section 18.3.13**    Display of seller's(s') and/or occupant's(s') name(s), phone number(s), and e-mail address(es) is prohibited. O

**Note:** The following Sections 18.3.14 and 18.3.15 may be adopted by MLSs that provide participants with a "persistent" download (i.e., where the MLS database resides on participants' servers) of the MLS database.

---

*Displays of minimal information (e.g., "thumbnails", text messages, "tweets", etc., of two hundred [200] characters or less) are exempt from this requirement but only when linked directly to a display that includes all required disclosures. For audio delivery of listing content, all required disclosures must be subsequently delivered electronically to the registered consumer performing the property search or linked to through the device's application. *(Amended 05/17)*

**Note:** If "sold" information is publicly accessible, display of "sold" listings may not be prohibited. *(Adopted 11/14)*

| | |
|---|---|
| **Section 18.3.14** | Participants are required to employ appropriate security protection such as firewalls on their websites and displays, provided that any security measures required may not be greater than those employed by the MLS. *(Amended 05/12)* O |

**Section 18.3.15**  Participants must maintain an audit trail of consumer activity on their website and make that information available to the MLS if the MLS believes the IDX site has caused or permitted a breach in the security of the data or a violation of MLS rules related to use by consumers. *(Amended 05/12)* O

**Section 18.3.16**  **Note:** Select one of the following two options.

**Option #1:** Advertising (including co-branding) on pages displaying IDX-provided listings is prohibited.

**Option #2:** Deceptive or misleading advertising (including co-branding) on pages displaying IDX-provided listings is prohibited. For purposes of these rules, co-branding will be presumed not to be deceptive or misleading if the participant's logo and contact information is larger than that of any third party. *(Adopted 11/09)* O

**Section 18.4 Service Fees and Charges**  Service fees and charges for participation in IDX shall be as established annually by the Board of Directors. *(Adopted 11/01, Amended 5/05)* O

**Section 19**  # Virtual Office Websites (VOWs)

**Note:** Adoption of Sections 19.1 through 19.14 is mandatory.

**Section 19.1 VOW Defined**

a. A "Virtual Office Website" (VOW) is a participant's Internet website, or a feature of a participant's website, through which the participant is capable of providing real estate brokerage services to consumers with whom the participant has first established a broker-consumer relationship (as defined by state law) where the consumer has the opportunity to search MLS listing information, subject to the participant's oversight, supervision, and accountability. A non-principal broker or sales licensee affiliated with a participant may, with his or her participant's consent, operate a VOW. Any VOW of a non-principal broker or sales licensee is subject to the participant's oversight, supervision, and accountability. M

b. As used in Section 19 of these rules, the term "participant" includes a participant's affiliated non-principal brokers and sales licensees — except when the term is used in the phrases "participant's consent" and "participant's oversight, supervision, and accountability". References to "VOW" and "VOWs" include all Virtual Office Websites, whether operated by a participant, by a non-principal broker or sales licensee, or by an "Affiliated VOW Partner" (AVP) on behalf of a participant. M

c. "Affiliated VOW Partner" (AVP) refers to an entity or person designated by a participant to operate a VOW on behalf of the participant, subject to the participant's supervision, accountability, and compliance with the VOW policy. No AVP has independent participation rights in the MLS by virtue of its right to receive information on behalf of a participant. No AVP has the right to use MLS listing information, except in connection with operation of a VOW on behalf of one or more participants. Access by an AVP to MLS listing information is derivative of the rights of the participant on whose behalf the AVP operates a VOW. M

d. As used in Section 19 of these rules, the term "MLS listing information" refers to active listing information and sold data provided by participants to the MLS and aggregated and distributed by the MLS to participants. M

85

**Section 19.2**

a. The right of a participant's VOW to display MLS listing information is limited to that supplied by the MLS(s) in which the participant has participatory rights. However, a participant with offices participating in different MLSs may operate a master website with links to the VOWs of the other offices. [M]

b. Subject to the provisions of the VOW policy and these rules, a participant's VOW, including any VOW operated on behalf of a participant by an AVP, may provide other features, information, or functions, e.g., "Internet Data Exchange" (IDX). [M]

c. Except as otherwise provided in the VOW policy or in these rules, a participant need not obtain separate permission from other MLS participants whose listings will be displayed on the participant's VOW. [M]

**Section 19.3**

a. Before permitting any consumer to search for or retrieve any MLS listing information on his or her VOW, the participant must take each of the following steps.

    i. The participant must first establish with that consumer a lawful broker-consumer relationship (as defined by state law), including completion of all actions required by state law in connection with providing real estate brokerage services to clients and customers (hereinafter, "Registrants"). Such actions shall include, but are not limited to, satisfying all applicable agency, non-agency, and other disclosure obligations, and execution of any required agreements.

    ii. The participant must obtain the name of and a valid e-mail address for each Registrant. The participant must send an e-mail to the address provided by the Registrant confirming that the Registrant has agreed to the terms of use (described in Subsection d., below). The participant must verify that the e-mail address provided by the Registrant is valid and that the Registrant has agreed to the terms of use.

    iii. The participant must require each Registrant to have a user name and a password, the combination of which is different from those of all other Registrants on the VOW. The participant may, at his or her option, supply the user name and password or may allow the Registrant to establish its user name and password. The participant must also assure that any e-mail address is associated with only one user name and password. [M]

b. The participant must assure that each Registrant's password expires on a date certain, but may provide for renewal of the password. The participant must at all times maintain a record of the name, e-mail address, user name, and current password of each Registrant. The participant must keep such records for not less than one hundred eighty (180) days after the expiration of the validity of the Registrant's password. [M]

c. If the MLS has reason to believe that a participant's VOW has caused or permitted a breach in the security of MLS listing information or a violation of MLS rules, the participant shall, upon request of the MLS, provide the name, e-mail address, user name, and current password, of any Registrant suspected of involvement in the breach or violation. The participant shall also, if requested by the MLS, provide an audit trail of activity by any such Registrant. [M]

d. The participant shall require each Registrant to review and affirmatively to express agreement (by mouse click or otherwise) to a terms of use provision that provides at least the following:

    i. that the Registrant acknowledges entering into a lawful consumer-broker relationship with the participant

    ii. that all information obtained by the Registrant from the VOW is intended only for the Registrant's personal, non-commercial use

86

iii. that the Registrant has a bona fide interest in the purchase, sale, or lease of real estate of the type being offered through the VOW

iv. that the Registrant will not copy, redistribute, or retransmit any of the information provided, except in connection with the Registrant's consideration of the purchase or sale of an individual property

v. that the Registrant acknowledges the MLS' ownership of and the validity of the MLS' copyright in the MLS database Ⓜ‌

e. The terms of use agreement may not impose a financial obligation on the Registrant or create any representation agreement between the Registrant and the participant. Any agreement entered into at any time between the participant and Registrant imposing a financial obligation on the Registrant or creating representation of the Registrant by the participant must be established separately from the terms of use, must be prominently labeled as such, and may not be accepted solely by mouse click. Ⓜ

f. The terms of use agreement shall also expressly authorize the MLS and other MLS participants or their duly authorized representatives to access the VOW for the purposes of verifying compliance with MLS rules and monitoring display of participants' listings by the VOW. The agreement may also include such other provisions as may be agreed to between the participant and the Registrant. Ⓜ

**Section 19.4**    A participant's VOW must prominently display an e-mail address, telephone number, or specific identification of another mode of communication (e.g., live chat) by which a consumer can contact the participant to ask questions or get more information about any property displayed on the VOW. The participant or a non-principal broker or sales licensee licensed with the participant must be willing and able to respond knowledgeably to inquiries from Registrants about properties within the market area served by that participant and displayed on the VOW. Ⓜ

**Section 19.5**    A participant's VOW must employ reasonable efforts to monitor for and prevent misappropriation, scraping, and other unauthorized uses of MLS listing information. A participant's VOW shall utilize appropriate security protection such as firewalls as long as this requirement does not impose security obligations greater than those employed concurrently by the MLS. Ⓜ

**Note:** MLSs may adopt rules requiring Participants to employ specific security measures, provided that any security measure required does not impose obligations greater than those employed by the MLS.

**Section 19.6**    a. A participant's VOW shall not display the listings or property addresses of any seller who has affirmatively directed the listing broker to withhold the seller's listing or property address from display on the Internet. The listing broker shall communicate to the MLS that the seller has elected not to permit display of the listing or property address on the Internet. Notwithstanding the foregoing, a participant who operates a VOW may provide to consumers via other delivery mechanisms, such as e-mail, fax, or otherwise, the listings of sellers who have determined not to have the listing for their property displayed on the Internet. Ⓜ

b. A participant who lists a property for a seller who has elected not to have the property listing or the property address displayed on the Internet shall cause the seller to execute a document that includes the following (or a substantially similar) provision. Ⓜ



**Seller Opt-out Form**

1. Check one.

   a. ☐ I have advised my broker or sales agent that I do not want the listed property to be displayed on the Internet.

   b. ☐ I have advised my broker or sales agent that I do not want the address of the listed property to be displayed on the Internet.

2. I understand and acknowledge that if I have selected Option a., consumers who conduct searches for listings on the Internet will not see information about the listed property in response to their searches.

_____
Initials of Seller

    c. The participant shall retain such forms for at least one (1) year from the date they are signed or one (1) year from the date the listing goes off the market, whichever is greater. **M**

**Section 19.7**

a. Subject to Subsection b., below, a participant's VOW may allow third-parties:

    i. to write comments or reviews about particular listings or display a hyperlink to such comments or reviews in immediate conjunction with particular listings, or

    ii. to display an automated estimate of the market value of the listing (or hyperlink to such estimate) in immediate conjunction with the listing. **M**

b. Notwithstanding the foregoing, at the request of a seller, the participant shall disable or discontinue either or both of those features described in Subsection a. as to any listing of the seller. The listing broker or agent shall communicate to the MLS that the seller has elected to have one or both of these features disabled or discontinued on all participants' websites. Subject to the foregoing and to Section 19.8, a participant's VOW may communicate the participant's professional judgment concerning any listing. A participant's VOW may notify its customers that a particular feature has been disabled at the request of the seller. **M**

**Section 19.8**

A participant's VOW shall maintain a means (e.g., e-mail address, telephone number) to receive comments from the listing broker about the accuracy of any information that is added by or on behalf of the participant beyond that supplied by the MLS and that relates to a specific property displayed on the VOW. The participant shall correct or remove any false information relating to a specific property within forty-eight (48) hours following receipt of a communication from the listing broker explaining why the data or information is false. The participant shall not, however, be obligated to correct or remove any data or information that simply reflects good faith opinion, advice, or professional judgment. **M**

**Section 19.9**

A participant shall cause the MLS listing information available on its VOW to be refreshed at least once every three (3) days. **M**

**Section 19.10**   Except as provided in these rules, in the NATIONAL ASSOCIATION OF REALTORS®' VOW policy, or in any other applicable MLS rules or policies, no participant shall distribute, provide, or make accessible any portion of the MLS listing information to any person or entity. **[M]**

**Section 19.11**   A participant's VOW must display the participant's privacy policy informing Registrants of all of the ways in which information that they provide may be used. **[M]**

**Section 19.12**   A participant's VOW may exclude listings from display based only on objective criteria, including, but not limited to, factors such as geography, list price, type of property, cooperative compensation offered by listing broker, and whether the listing broker is a REALTOR®. **[M]**

**Section 19.13**   A participant who intends to operate a VOW to display MLS listing information must notify the MLS of its intention to establish a VOW and must make the VOW readily accessible to the MLS and to all MLS participants for purposes of verifying compliance with these rules, the VOW policy, and any other applicable MLS rules or policies. **[M]**

**Section 19.14**   A participant may operate more than one VOW himself or herself or through an AVP. A participant who operates his or her own VOW may contract with an AVP to have the AVP operate other VOWs on his or her behalf. However, any VOW operated on behalf of a participant by an AVP is subject to the supervision and accountability of the participant. **[M]**

**Note:**   Adoption of Sections 19.15 through 19.19 is at the discretion of the MLS. However, if any of the following sections are adopted, **an equivalent requirement must be imposed** on participants' use of MLS listing information in providing brokerage service through all other delivery mechanisms.

**Section 19.15**   A participant's VOW may not make available for search by or display to Registrants any of the following information:

a. expired and withdrawn listings

**Note:**   Due to the 2015 changes in IDX policy and the requirement that participants be permitted to make MLS listing information available to Registrants of VOW sites where such information may be made available via other delivery mechanisms, MLSs can no longer prohibit the display of pending ("under contract") listings on VOW sites.

b. the compensation offered to other MLS participants

c. the type of listing agreement, i.e., exclusive right-to-sell or exclusive agency

d. the seller's and occupant's name(s), phone number(s), or e-mail address(es)

e. instructions or remarks intended for cooperating brokers only, such as those regarding showings or security of listed property

f. sold information **[O]**

**Note:**   If sold information is publicly accessible in the jurisdiction of the MLS, Subsection 19.15f. must be omitted. *(Revised 11/15)* **[M]**

**Section 19.16**   A participant shall not change the content of any MLS listing information that is displayed on a VOW from the content as it is provided in the MLS. The participant may, however, augment MLS listing information with additional information not otherwise prohibited by these rules or by other applicable MLS rules or policies, as long as the source of such other

information is clearly identified. This rule does not restrict the format of display of MLS listing information on VOWs or the display on VOWs of fewer than all of the listings or fewer than all of the authorized information fields. **O**

**Section 19.17**     A participant shall cause to be placed on his or her VOW a notice indicating that the MLS listing information displayed on the VOW is deemed reliable, but is not guaranteed accurate by the MLS. A participant's VOW may include other appropriate disclaimers necessary to protect the participant and/or the MLS from liability. **O**

**Section 19.18**     A participant shall cause any listing that is displayed on his or her VOW to identify the name of the listing firm and the listing broker or agent in a readily visible color, in a reasonably prominent location, and in typeface not smaller than the median typeface used in the display of listing data. **O**

**Section 19.19**     A participant shall limit the number of listings that a Registrant may view, retrieve, or download to not more than ___ current listings and not more than ___ sold listings in response to any inquiry. **O**

> **Note:** The number of listings that may be viewed, retrieved, or downloaded should be specified by the MLS in the context of this rule, but may not be fewer than five hundred (500) listings or fifty percent (50%) of the listings in the MLS, whichever is less. *(Amended 11/17)* **M**

> **Note:** Adoption of Sections 19.20 through 19.25 is at the discretion of the MLS. It is not required that equivalent requirements be established related to other delivery mechanisms.

**Section 19.20**     A participant shall require that Registrants' passwords be reconfirmed or changed every ____ days. **O**

> **Note:** The number of days passwords remain valid before being changed or reconfirmed must be specified by the MLS in the context of this rule and cannot be shorter than ninety (90) days. Participants may, at their option, require Registrants to reconfirm or change passwords more frequently. **M**

**Section 19.21**     A participant may display advertising and the identification of other entities ("co-branding") on any VOW the participant operates or that is operated on his or her behalf.  However, a participant may not display on any such VOW deceptive or misleading advertising or co-branding. For purposes of this section, co-branding will be presumed not to be deceptive or misleading if the participant's logo and contact information (or that of at least one participant, in the case of a VOW established and operated on behalf of more than one participant) is displayed in immediate conjunction with that of every other party, and the logo and contact information of all participants displayed on the VOW is as large as the logo of the AVP and larger than that of any third party. **O**

**Section 19.22**     A participant shall cause any listing displayed on his or her VOW obtained from other sources, including from another MLS or from a broker not participating in the MLS, to identify the source of the listing. **O**

**Section 19.23**    A participant shall cause any listing displayed on his or her VOW obtained from other sources, including from another MLS or from a broker not participating in the MLS, to be searched separately from listings in the MLS. [O]

**Section 19.24**    Participants and the AVPs operating VOWs on their behalf must execute the license agreement required by the MLS. [O]

**Section 19.25**    Where a seller affirmatively directs his or her listing broker to withhold either the seller's listing or the address of the seller's listing from display on the Internet, a copy of the seller's affirmative direction shall be provided to the MLS within forty-eight (48) hours. [O]

## D. Model Association Bylaw Provisions Authorizing a Multiple Listing Service as a Wholly-owned Subsidiary Corporation of the Association

## Subsidiary Multiple Listing Corporation

**Section 1**
**Authority**

The association of REALTORS® shall maintain for the use of its members a multiple listing service which shall be a lawful corporation of the state of _____, all the stock of which shall be owned by this association of REALTORS®. [M]

**Section 2**
**Purpose**

A multiple listing service is a means by which authorized participants make blanket unilateral offers of compensation to other participants (acting as subagents, buyer agents, or in other agency or nonagency capacities defined by law); by which cooperation among participants is enhanced; by which information is accumulated and disseminated to enable authorized participants to prepare appraisals, analyses, and other valuations of real property for bona fide clients and customers; by which participants engaging in real estate appraisal contribute to common databases; and is a facility for the orderly correlation and dissemination of listing information so participants may better serve their clients and the public. Entitlement to compensation is determined by the cooperating broker's performance as procuring cause of sale (or lease). *(Amended 11/04)* [M]

**Section 3**
**Governing Documents**

The board of directors shall cause any multiple listing service established by it pursuant to this article to conform its corporate charter, constitution, bylaws, rules, regulations, policies, practices, and procedures at all times to the constitution, bylaws, rules, regulations, and policies of the NATIONAL ASSOCIATION OF REALTORS®. [M]

**Section 4**
**Participation**

Any REALTOR® of this or any other association who is a principal, partner, corporate officer, or branch office manager acting on behalf of a principal, without further qualification, except as otherwise stipulated in these bylaws, shall be eligible to participate in multiple listing upon agreeing in writing to conform to the rules and regulations thereof and to pay the costs incidental thereto.* However, under no circumstances is any individual or firm, regardless of membership status, entitled to multiple listing service membership or participation unless they hold a current, valid real estate broker's license and offer or accept compensation to and from other participants or are licensed or certified by an appropriate state regulatory agency to engage in the appraisal of real property.** Use of information developed by or published by an association multiple listing service is strictly

---

*Optional qualifications which may be adopted at the local association's discretion: Any applicant for MLS participation and any licensee (including licensed or certified appraisers) affiliated with an MLS participant who has access to and use of MLS-generated information shall complete an orientation program of no more than eight (8) classroom hours devoted to the MLS rules and regulations and computer training related to MLS information entry and retrieval within thirty (30) days after access has been provided. *(Amended 11/96)*

Associations are not required to establish prerequisites for MLS participation beyond holding REALTOR® (principal) membership in an association. However, if the association wishes to establish these requirements for MLS participation or for access to MLS-generated information, the requirement of attendance at an orientation program is the most rigorous requirement that may be established. *(Amended 2/94)*

**Generally, associations of REALTORS®, when there is more than one principal in a real estate firm, define the chief principal officer of the firm as the MLS participant. If each principal is defined as a participant, then each shall have a separate vote on MLS matters. Brokers or salespersons other than principals are not considered participants in the service, but have access to and use of the service through the principal(s) with whom they are affiliated.

limited to the activities authorized under a participant's licensure(s) or certification and unauthorized uses are prohibited. Further, none of the foregoing is intended to convey participation or membership or any right of access to information developed by or published by an association multiple listing service where access to such information is prohibited by law. *(Amended 11/08)*

Mere possession of a broker's license is not sufficient to qualify for MLS participation. Rather, the requirement that an individual or firm offers or accepts cooperation and compensation means that the participant actively endeavors during the operation of its real estate business to list real property of the type listed on the MLS and/or to accept offers of cooperation and compensation made by listing brokers or agents in the MLS. "Actively" means on a continual and ongoing basis during the operation of the participant's real estate business. The "actively" requirement is not intended to preclude MLS participation by a participant or potential participant that operates a real estate business on a part-time, seasonal, or similarly time-limited basis or that has its business interrupted by periods of relative inactivity occasioned by market conditions. Similarly, the requirement is not intended to deny MLS participation to a participant or potential participant who has not achieved a minimum number of transactions despite good faith efforts. Nor is it intended to permit an MLS to deny participation based on the level of service provided by the participant or potential participant as long as the level of service satisfies state law. *(Adopted 11/08)*

The key is that the participant or potential participant actively endeavors to make or accept offers of cooperation and compensation with respect to properties of the type that are listed on the MLS in which participation is sought. This requirement does not permit an MLS to deny participation to a participant or potential participant that operates a "Virtual Office Website" (VOW) (including a VOW that the participant uses to refer customers to other participants) if the participant or potential participant actively endeavors to make or accept offers of cooperation and compensation. An MLS may evaluate whether a participant or potential participant actively endeavors during the operation of its real estate business to offer or accept cooperation and compensation only if the MLS has a reasonable basis to believe that the participant or potential participant is in fact not doing so. The membership requirement shall be applied in a nondiscriminatory manner to all participants and potential participants. *(Adopted 11/08)*

### Optional Provision for Establishing Nonmember Participatory Rights (Open MLS)*

A nonmember applicant for MLS participation who is a principal, partner, corporate officer, or branch office manager acting on behalf of a principal, shall supply evidence satisfactory to the membership committee that he has no record of recent or pending bankruptcy; has no record of official sanctions involving unprofessional conduct; agrees to complete a course of instruction (if any) covering the MLS rules and regulations and computer training related to MLS information entry and retrieval, and shall pass such reasonable and non-discriminatory written examination thereon as may be required by the MLS; and shall agree that if elected as a participant, he will abide by such rules and regulations and pay the MLS fees and dues, including the nonmember differential (if any), as from time to time established. Under no circumstances is any individual or firm entitled to MLS participation or membership unless they hold a current, valid real estate broker's license and offer or accept compensation to and from other participants, or are licensed or certified by an appropriate state regulatory agency to engage in the appraisal of real property. Use of information developed by or published by an association multiple listing

---

*Only adopt this provision if the association's MLS is open to nonmember participants (otherwise qualified individuals who do not hold REALTOR® membership anywhere).

service is strictly limited to the activities authorized under a participant's licensure(s) or certification and unauthorized uses are prohibited. Further, none of the foregoing is intended to convey participation or membership or any right of access to information developed by or published by an association multiple listing service where access to such information is prohibited by law. *(Amended 11/08)*

Mere possession of a broker's license is not sufficient to qualify for MLS participation. Rather, the requirement that an individual or firm offers or accepts cooperation and compensation means that the participant actively endeavors during the operation of its real estate business to list real property of the type listed on the MLS and/or to accept offers of cooperation and compensation made by listing brokers or agents in the MLS. "Actively" means on a continual and ongoing basis during the operation of the participant's real estate business. The "actively" requirement is not intended to preclude MLS participation by a participant or potential participant that operates a real estate business on a part-time, seasonal, or similarly time-limited basis or that has its business interrupted by periods of relative inactivity occasioned by market conditions. Similarly, the requirement is not intended to deny MLS participation to a participant or potential participant who has not achieved a minimum number of transactions despite good faith efforts. Nor is it intended to permit an MLS to deny participation based on the level of service provided by the participant or potential participant as long as the level of service satisfies state law. *(Adopted 11/08)*

The key is that the participant or potential participant actively endeavors to make or accept offers of cooperation and compensation with respect to properties of the type that are listed on the MLS in which participation is sought. This requirement does not permit an MLS to deny participation to a participant or potential participant that operates a "Virtual Office Website" (VOW) (including a VOW that the participant uses to refer customers to other participants) if the participant or potential participant actively endeavors to make or accept offers of cooperation and compensation. An MLS may evaluate whether a participant or potential participant actively endeavors during the operation of its real estate business to offer or accept cooperation and compensation only if the MLS has a reasonable basis to believe that the participant or potential participant is in fact not doing so. The membership requirement shall be applied in a nondiscriminatory manner to all participants and potential participants. *(Adopted 11/08)*

**Note 1:** The requirements of (1) no record of recent or pending bankruptcy; (2) no record of official sanctions involving unprofessional conduct; and (3) completion of a course of instruction on the MLS rules and regulations and computer training related to MLS information entry and retrieval may be deleted from this section at the option of each association. In states where law requires non-association members be admitted to the MLS of an association of REALTORS®, any limitations or restrictions imposed on participation or membership shall be no more stringent than permissible under the National Association's membership qualification criteria. However, in states where non-association member access to the MLS is not a requirement of state law, associations may, at their discretion, establish additional qualifications for non-association member participation and membership in the MLS. *(Revised 11/96)*

**Note 2:** An association may also choose to have the membership committee consider the following when determining a nonmember applicant's qualifications for MLS participation or membership:

- all final findings of Code of Ethics violations and violations of other membership duties in any other association within the past three (3) years

- pending ethics complaints (or hearings)

- unsatisfied discipline pending

- pending arbitration requests (or hearings)

- unpaid arbitration awards or unpaid financial obligations to this or any other association or association MLS **M**

**Section 5**
**Subscribers**

Subscribers (or users) of the MLS include non-principal brokers, sales associates, and licensed and certified appraisers affiliated with participants. (*Optional provision:* Subscribers also include affiliated unlicensed administrative and clerical staff, personal assistants, and individuals seeking licensure or certification as real estate appraisers who are under the direct supervision of an MLS participant or the participant's licensed designee.) *(Adopted 4/92)* **M**

**Section 6**
**Removal of Officers**
**and Directors**

In the event that an officer or director of the multiple listing service is deemed to be incapable of fulfilling the duties for which elected, but will not resign from office voluntarily, the officer or director may be removed from office under the following procedure:

1. A petition requiring the removal of an officer or director and signed by not less than one-third of the participants or a majority of all directors of the MLS shall be filed with the president of the MLS, or if the president is the subject of the petition, with the next-ranking officer, and shall specifically set forth the reasons the individual is deemed to be disqualified from further service.

2. Upon receipt of the petition, and not less than twenty (20) days or more than forty-five (45) days thereafter, a special meeting of the participants of the MLS shall be held, and the sole business of the meeting shall be to consider the charge against the officer or director, and to render a decision on such petition.

3. The special meeting shall be noticed to all participants at least ten (10) days prior to the meeting, and shall be conducted by the president of the MLS unless the president's continued service in office is being considered at the meeting. In such case, the next-ranking officer will conduct the meeting or the hearing by the participants. Provided a quorum is present, a three-fourths vote of participants present and voting shall be required for removal from office.

4. Any vote taken by the participants to remove an officer or director must ultimately be confirmed by a majority vote of the directors of the shareholder(s). Notwithstanding the foregoing, the shareholder(s) may remove an officer or director by a majority vote of the directors of the shareholder(s). *(Adopted 11/96)* **R**

## E. Model Bylaws for a Multiple Listing Service Separately Incorporated but Wholly-owned by an Association of REALTORS®*

**Article 1 Name**

The name of this organization shall be the Multiple Listing Service of the _____ Association of REALTORS®, Inc., hereinafter referred to as the service, all the shares of stock of which are solely and wholly-owned by the _____ Association of REALTORS®. [M]

**Article 2 Purpose**

A multiple listing service is a means by which authorized participants make blanket unilateral offers of compensation to other participants (acting as subagents, buyer agents, or in other agency or nonagency capacities defined by law); by which cooperation among participants is enhanced, by which information is accumulated and disseminated to enable authorized participants to prepare appraisals, analyses, and other valuations of real property for bona fide clients and customers; by which participants engaging in real estate appraisal contribute to common databases; and is a facility for the orderly correlation and dissemination of listing information so participants may better serve their clients and the public. Entitlement to compensation is determined by the cooperating broker's performance as procuring cause of the sale (or lease). *(Amended 11/04)* [M]

**Article 3 Service Area**

The service area of the MLS shall be determined by the MLS Board of Directors. [M]

**Note:** MLSs are encouraged to establish service areas that encompass natural markets and to periodically reexamine such boundaries. An MLS is not precluded from establishing and maintaining an MLS service area that exceeds the parent association(s) jurisdiction. *(Amended 11/17)*

**Article 4 Participation Defined**

Any REALTOR® of this or any other association who is a principal, partner, corporate officer, or branch office manager acting on behalf of a principal, without further qualification, except as otherwise stipulated in these bylaws, shall be eligible to participate in multiple listing upon agreeing in writing to conform to the rules and regulations thereof and to pay the costs incidental thereto.** However, under no circumstances is any individual or firm, regardless of membership status, entitled to multiple listing service membership or participation unless they hold a current, valid real estate broker's license and offer or accept compensation to and from other participants or are licensed or certified by an appropriate state regulatory agency to engage in the appraisal of real property. Use of information developed by or published by an association multiple listing service is strictly limited to the activities authorized under a participant's licensure(s) or certification and unauthorized uses are prohibited. Further, none of the foregoing is intended to convey participation or membership or any right of access to information developed by or

---

*These model bylaws for a multiple listing service, separately incorporated but wholly-owned by an association of REALTORS®, should not be adopted without review and consultation with association legal counsel to ensure that they comply with applicable state law pertaining to corporations within the state, or are appropriately modified to comply with the law.

**Optional qualifications which may be adopted at the local association's discretion: Any applicant for MLS participation and any licensee (including licensed or certified appraisers) affiliated with an MLS participant who has access to and use of MLS-generated information shall complete an orientation program of no more than eight (8) classroom hours devoted to the MLS rules and regulations and computer training related to MLS information entry and retrieval within thirty (30) days after access has been provided. *(Amended 11/96)*

Associations are not required to establish prerequisites for MLS participation beyond holding REALTOR® (principal) membership in an association. However, if the association wishes to establish these requirements for MLS participation or for access to MLS-generated information, the requirement of attendance at an orientation program is the most rigorous requirement that may be established. *(Adopted 2/94)*

published by an association multiple listing service where access to such information is prohibited by law. The REALTOR® principal of any firm, partnership, corporation, or the branch office manager designated by said firm, partnership, or corporation as the participant shall have all rights, benefits, and privileges of the service, and shall accept all obligations to the service for the participant's firm, partnership, or corporation, and for compliance with the bylaws and rules and regulations of the service by all persons affiliated with the participant who utilize the service. *(Amended 11/08)*

Mere possession of a broker's license is not sufficient to qualify for MLS participation. Rather, the requirement that an individual or firm offers or accepts cooperation and compensation means that the participant actively endeavors during the operation of its real estate business to list real property of the type listed on the MLS and/or to accept offers of cooperation and compensation made by listing brokers or agents in the MLS. "Actively" means on a continual and ongoing basis during the operation of the participant's real estate business. The "actively" requirement is not intended to preclude MLS participation by a participant or potential participant that operates a real estate business on a part-time, seasonal, or similarly time-limited basis or that has its business interrupted by periods of relative inactivity occasioned by market conditions. Similarly, the requirement is not intended to deny MLS participation to a participant or potential participant who has not achieved a minimum number of transactions despite good faith efforts. Nor is it intended to permit an MLS to deny participation based on the level of service provided by the participant or potential participant as long as the level of service satisfies state law. *(Adopted 11/08)*

The key is that the participant or potential participant actively endeavors to make or accept offers of cooperation and compensation with respect to properties of the type that are listed on the MLS in which participation is sought. This requirement does not permit an MLS to deny participation to a participant or potential participant that operates a "Virtual Office Website" (VOW) (including a VOW that the participant uses to refer customers to other participants) if the participant or potential participant actively endeavors to make or accept offers of cooperation and compensation. An MLS may evaluate whether a participant or potential participant actively endeavors during the operation of its real estate business to offer or accept cooperation and compensation only if the MLS has a reasonable basis to believe that the participant or potential participant is in fact not doing so. The membership requirement shall be applied in a nondiscriminatory manner to all participants and potential participants. *(Adopted 11/08)* **M**

**Optional Provision for Establishing Nonmember Participatory Rights (Open MLS)\***
Participation in the service is also available to nonmember principals who meet the qualifications established in the association's bylaws and MLS rules and regulations. However, under no circumstances is any individual or firm, regardless of membership status, entitled to multiple listing service participation or membership unless they hold a current, valid real estate broker's license and offer or accept compensation to and from other participants, or are licensed or certified by an appropriate state regulatory agency to engage in the appraisal of real property. Use of information developed by or published by an association multiple listing service is strictly limited to the activities authorized under a participant's licensure(s) or certification and unauthorized uses are prohibited. Further, none of the foregoing is intended to convey participation or membership or any right of access to information developed by or published by an association multiple listing service where access to such information is prohibited by law. The nonmember principal of any firm, partnership, corporation, or the branch office manager designated by said firm, partnership, or corporation as the participant shall have only those rights,benefits, and privileges as specified by the service, and shall accept all obligations to  the service for

---

\*Only adopt this provision if the association's MLS is open to nonmember participants (otherwise qualified individuals who do not hold REALTOR® membership anywhere).

the participant's firm, partnership, or corporation, and for compliance with the bylaws and rules and regulations of the service by all persons affiliated with the participant who utilize the service. *(Amended 11/08)*

Mere possession of a broker's license is not sufficient to qualify for MLS participation. Rather, the requirement that an individual or firm offers or accepts cooperation and compensation means that the participant actively endeavors during the operation of its real estate business to list real property of the type listed on the MLS and/or to accept offers of cooperation and compensation made by listing brokers or agents in the MLS. "Actively" means on a continual and ongoing basis during the operation of the participant's real estate business. The "actively" requirement is not intended to preclude MLS participation by a participant or potential participant that operates a real estate business on a part-time, seasonal, or similarly time-limited basis or that has its business interrupted by periods of relative inactivity occasioned by market conditions. Similarly, the requirement is not intended to deny MLS participation to a participant or potential participant who has not achieved a minimum number of transactions despite good faith efforts. Nor is it intended to permit an MLS to deny participation based on the level of service provided by the participant or potential participant as long as the level of service satisfies state law. *(Adopted 11/08)*

The key is that the participant or potential participant actively endeavors to make or accept offers of cooperation and compensation with respect to properties of the type that are listed on the MLS in which participation is sought. This requirement does not permit an MLS to deny participation to a participant or potential participant that operates a "Virtual Office Website" (VOW) (including a VOW that the participant uses to refer customers to other participants) if the participant or potential participant actively endeavors to make or accept offers of cooperation and compensation. An MLS may evaluate whether a participant or potential participant actively endeavors during the operation of its real estate business to offer or accept cooperation and compensation only if the MLS has a reasonable basis to believe that the participant or potential participant is in fact not doing so. The membership requirement shall be applied in a nondiscriminatory manner to all participants and potential participants. *(Adopted 11/08)*

**Note 1:**  The requirements of (1) no record of recent or pending bankruptcy; (2) no record of official sanctions involving unprofessional conduct; and (3) completion of a course of instruction on the MLS rules and regulations and computer training related to MLS information entry and retrieval may be deleted from this section at the option of each association. In states where law requires non-association members be admitted to the MLS of an association of REALTORS®, any limitations or restrictions imposed on participation or membership shall be no more stringent than permissible under the National Association's membership qualification criteria. However, in states where non-association member access to the MLS is not a requirement of state law, associations may, at their discretion, establish additional qualifications for non-association member participation and membership in the MLS. *(Amended 11/96)*

**Note 2:**  An association may also choose to have the membership committee consider the following when determining a nonmember applicant's qualifications for MLS participation or membership:

- all final findings of Code of Ethics violations and violations of other membership duties in any other association within the past three (3) years

- pending ethics complaints (or hearings)

- unsatisfied discipline pending

- pending arbitration requests (or hearings)

- unpaid arbitration awards or unpaid financial obligations to this or any other association or association MLS **[M]**

**Article 4.1**
**Application for**
**Participation**

Application for participation shall be made in such manner and form as may be prescribed by the board of directors of the service and made available to any REALTOR® principal of this or any other association requesting it. The application form shall contain a signed statement agreeing to abide by these bylaws and any other applicable rules and regulations of the service as from time to time amended or adopted. *(Amended 2/94)* **[M]**

**Article 4.2**
**Discontinuance**
**of Service**

Participants of the service may discontinue the service by giving the service _____ days' written notice and may reapply to the service after _____ months by making formal application in the manner prescribed for new applicants for participation provided all past dues and fees are fully paid. **[M]**

**Article 4.3**
**Subscribers**

Subscribers (or users) of the MLS include non-principal brokers, sales associates, and licensed and certified appraisers affiliated with participants. (*Optional provision:* Subscribers also include affiliated unlicensed administrative and clerical staff, personal assistants, and individuals seeking licensure or certification as real estate appraisers who are under the direct supervision of an MLS participant or the participant's licensed designee.) *(Adopted 4/92)* **[M]**

**Article 5**
**Service Charges**

The charges made for participation in the service shall be as determined, and as amended from time to time by the board of directors of the service, and specified in the rules and regulations of the service. **[R]**

**Article 6**
**Government of**
**the Service**

The government of the service shall be vested in a board of directors comprised of the elected officers and directors nominated and elected as described in this article. **[M]**

**Article 6.1**
**Officers of the Service**

The officers of the service, who shall also be directors, shall be a president, a vice president, and a secretary-treasurer, and shall have such duties as described in this article. **[M]**

**Article 6.2**
**Board of Directors**

There shall be a total of _____ elected directors, including the president, vice president, and secretary-treasurer of the service, to be elected from among the participants of the service, except that not more than _____ directors may be elected from among REALTORS® other than participants or from REALTOR-ASSOCIATE®s who are affiliated with participants and serve with consent of the participants as representatives of the participants with whom they are affiliated. In addition to the elected directors, the current president of the _____ Association of REALTORS® or a person appointed by the president, and the immediate past president of the service shall serve as directors, ex-officio, with full voting privileges. **[M]**

**Article 6.3**
**Nomination and Election**
**of Officers and Directors**

The officers and directors of the service shall be nominated by a vote of the participants in the service in accordance with the provisions of Article 7, meetings, of these bylaws and as set forth below.

1. **Nominating Committee:** The president of the service shall appoint a nominating committee each year, which committee shall be comprised of _____ participants of the service. The appointment of the nominating committee shall be made by such a date as to enable the committee to meet and select a proposed slate of officers and directors of the service not more than _____ nor less than _____ days prior to the date

of the meeting of the participants of the service at which nominees shall be selected by vote of the participants. The proposed slate of officers and directors shall be reported to the president and Secretary of the service.

2. **Notice of Proposed Nominees:**  The president shall cause a list of the proposed nominees selected by the nominating committee to be forwarded to the participants of the service, setting forth the time, place, and other pertinent conditions of the meeting to select the final list of nominees by vote of the participants of the service. The notice to the participants of the service concerning the meeting to select nominees for officers and directors shall be mailed on a date at least _____ days prior to the proposed meeting.

3. **Rights of Participants to Select Additional Nominees:**  The names of additional proposed nominees may be added to the list selected by the nominating committee by a petition submitted to the Secretary of the service by _____% of the participants of the service, with said petition received not less than _____ days prior to the date of meeting of the participants to select nominees for officers and directors. The names contained in such petition, if duly received and certified, shall be presented in writing to the participants at the meeting to select nominees as additional nominees for consideration for such office as specified in the petition. In addition, nominations may be made from the floor at the duly noticed meeting of the participants to select nominees for officers and directors and, if seconded, shall be added to the list of proposed nominees.

4. **Voting by Written Secret Ballot:**  Voting for selection of nominees, if other than on a motion to cast a unanimous vote for the original proposed slate shall be by secret ballot, and said ballot shall contain blank spaces for writing in additional names proposed by petition or from the floor at the meeting to select nominees.

5. **Vote to Select Nominees:**  Voting shall be in accordance with provisions of Article _____ of these bylaws.

6. **Nominees Submitted to Shareholder for Election:**  When nominees for officers and directors of the service for the forthcoming fiscal year have been selected by vote of the participants of the service, such nominees shall be submitted to the board of directors of the _____ Association of REALTORS® (shareholder) for election. Upon election by the board of directors of the _____ Association of REALTORS® (shareholder), the individuals so elected shall be considered officers-elect and directors-elect and shall assume their respective offices on *(date office is effective)*.

The term of office for officers and directors of the service shall be on a calendar year basis. In the event one (1) or more nominee(s) is/are not elected by the board of directors of the _____ Association of REALTORS® (shareholder), and upon notice of such failure of election, the president of the service shall select a proposed participant or participants, as required, subject to confirmation by the board of directors, for submission as nominee(s) to the board of directors of the _____ Association of REALTORS® (shareholder) to be considered for election to fill the vacancy or vacancies existing.

In the event that nominees are not duly and timely provided by the service to the board of directors of the _____ Association of REALTORS®, as provided in these bylaws, then the board of directors of the _____ Association of REALTORS® shall exercise rights as sole and exclusive shareholder to elect a participant or participants of the service to fill any existing vacancy or vacancies as officers or directors of the service. [M]

**Article 6.4**
**Terms of Office**

The officers shall serve for a one-year term. The elected directors shall serve for staggered three-year terms with one-third of the terms expiring each year. Officers and directors shall take office upon the effective date of their offices and shall continue until their successors are elected, qualified, and installed. No officer or director shall be nominated and elected to the same office for more than two consecutive terms. [M]

**Article 6.5
Duties of Officers
and Directors**

The duties of the officers and directors are as follows:

1. The president shall be the chief executive officer of the service and shall preside at its meetings and those of the board of directors, and shall perform all the duties of the president subject to declared policies and, as required, subject to confirmation of the board of directors.

2. The vice president shall, in the absence of the president, perform all of the duties of the president.

3. The secretary-treasurer shall be the custodian of the funds of the service and shall keep an accurate record of all receipts and disbursements. The secretary-treasurer shall provide to all members of the board of directors a quarterly statement of all accounts and financial affairs for the service, and shall have charge of the corporate seal and affix the name to all documents properly requiring such seal.

4. The board of directors of the service shall be the governing body of the service and shall have control of all the affairs of the service and shall authorize all expenditures of funds. The board of directors shall, prior to the end of each fiscal year, prepare a budget reflecting projected costs and expenses of the service for the next fiscal year, indicating projected income from all sources. The budget shall be submitted to the participants of the service for approval on a date not less than _____ days prior to the first day of the next fiscal year. The board of directors shall not incur an obligation in excess of $_____ over the total budget without the authorization by vote of a two-thirds majority of REALTOR® participants of the service present and voting unless such excess is the result of an increase in the volume of listings processed by the service over that projected in preparing the annual budget. The board of directors shall employ such executive, legal, and office personnel it deems necessary to care for and maintain the properties of the service and otherwise conduct the administrative business of the service. The board of directors shall have the right to make an audit of all books and accounts at any time without notice. The board of directors shall have the power from time-to-time to adopt such rules and regulations that they may deem appropriate subject to final approval of the board of directors of the _____ Association of REALTORS® (shareholder). Except as otherwise provided in these bylaws and rules and regulations, the action of the board of directors shall be final. **M**

**Article 6.6
Removal of
Officers and Directors**

In the event that an officer or director of the multiple listing service is deemed to be incapable of fulfilling the duties for which elected, but will not resign from office voluntarily, the officer or director may be removed from office under the following procedure: *(Adopted 11/96)*

1. A petition requiring the removal of an officer or director and signed by not less than one-third of the participants or a majority of all directors of the MLS shall be filed with the president of the MLS, or if the president is the subject of the petition, with the next-ranking officer, and shall specifically set forth the reasons the individual is deemed to be disqualified from further service. *(Adopted 11/96)*

2. Upon receipt of the petition, and not less than twenty (20) days or more than forty-five (45) days thereafter, a special meeting of the participants of the MLS shall be held, and the sole business of the meeting shall be to consider the charge against the officer or director, and to render a decision on such petition. *(Adopted 11/96)*

3. The special meeting shall be noticed to all participants at least ten (10) days prior to the meeting, and shall be conducted by the president of the MLS unless the president's continued service in office is being considered at the meeting. In such case, the next-ranking officer will conduct the meeting or the hearing by the participants. Provided a quorum is present, a three-fourths vote of participants present and voting shall be required for removal from office. *(Adopted 11/96)*

4. Any vote taken by the participants to remove an officer or director must ultimately be confirmed by a majority vote of the directors of the shareholder(s). Notwithstanding the foregoing, the shareholder(s) may remove an officer or director by a majority vote of the directors of the shareholder(s). *(Adopted 11/96)* R

**Article 7**
**Annual Meetings**

The annual meeting of participants of the service shall be held during the month of _____ at the time and place specified by the board of directors. M

**Article 7.1**
**Special Meetings**
**of the Service**

Special meetings of participants of the service may be called from time to time by the president, the board of directors, or by _____ of the participants of the service. Written notice stating the day, place, and hour of the meeting, the purpose or purposes for which the meeting is called, shall be delivered to all REALTORS® who are participants in the service not less than _____ days prior to said meeting. M

**Article 7.2**
**Quorum and Voting at**
**Meetings of the Service**

For the transaction of business, _____% of the participants of the service shall be considered a quorum. A majority vote by such participants present and voting at a meeting attended by a quorum shall be required for passage of motions. M

**Article 7.3**
**Meetings of the**
**Board of Directors**

The board of directors may meet at any time it deems advisable on the call of the president or any _____ members of the board of directors. _____ directors shall constitute a quorum. A majority vote by the directors present and voting at a meeting attended by a quorum shall be required for passage of motions. M

**Article 7.4**
**Presiding Officer**

At all meetings of the participants of the service, or of the board of directors, the president or, in the absence of the president, the vice president shall serve as presiding officer. In the absence of the president and vice president, the president shall name a temporary chairperson or, upon the president's failure to do so, the board of directors of the service shall appoint a temporary chairperson. M

**Article 8**
**Committees**

The president, with the approval of the board of directors, shall create such standing or ad hoc committees as the president deems desirable and shall appoint their members. Each committee shall consist of not less than _____ participants in the service, but may also include REALTORS® or REALTOR-ASSOCIATE®s, employed by or affiliated as independent contractors with a REALTOR® participant serving as representatives of said REALTOR® participants and with their consent, and who may serve either as a chairperson or member of a committee. M

**Article 9**
**Fiscal Year**

The fiscal year of the service shall commence on _____ and shall end on _____. M

**Article 10**
**Amendments to Bylaws**

Amendments to these bylaws shall be by the participants of the service, and shall be determined at an annual meeting or special meeting of the service in accordance with the provisions of Article _____, concerning meetings of the service. Amendments to the bylaws of the service approved by the participants shall further be subject to approval of the board of directors of the _____ Association of REALTORS® (shareholder).

When amendments to the bylaws of the service have been approved by the board of directors of the _____ Association of REALTORS® (shareholder), said amendments shall be effective immediately or as stated in the amending resolution.

If the proposed amendments to the bylaws of the multiple listing service fail approval of the board of directors of the shareholder, the board of directors of the multiple listing service shall be informed, and advised that the proposed amendment or amendments to the bylaws be further considered and resubmitted to the shareholder as approved by the participants of the multiple listing service. M

**Article 10.1**
**Amendments to Rules**
**and Regulations**

Amendments to the rules and regulations of the service shall be by consideration and approval of the board of directors of the multiple listing service in accordance with the provisions of Article _____, Section _____, concerning meetings of the board of directors, subject to final approval by the board of directors of the _____ Association of REALTORS® (shareholder).

When approved by the board of directors of the _____ Association of REALTORS® (shareholder) as described, the amendments to the rules and regulations of the multiple listing service shall be effective immediately or as stated in the amending resolution.

If the proposed amendments of the multiple listing service rules and regulations fail approval by the board of directors of the shareholder, the board of directors of the multiple listing service shall be informed, and advised that the proposed amendment or amendments must be further considered and resubmitted as approved by the board of directors of the multiple listing service to the board of directors of _____ Association of REALTORS® (shareholder). M

**Article 11**
**Dissolution**

In the event this service shall at any time terminate its activities, the board of directors of the service shall consider and adopt a plan of liquidation and dissolution with the approval of the participants thereof and of the board of directors of the _____ Association of REALTORS® (shareholder). Said plan shall provide for the collection of all assets, the payment of all liabilities, and that the remaining portions thereof be assigned to the parent corporation, namely, _____ Association of REALTORS®. M

## F.  Model Rules and Regulations for an MLS Separately Incorporated but Wholly-owned by an Association of REALTORS®

## Listing Procedures

**Section 1
Listing Procedures**

Listings of real or personal property of the following types, which are listed subject to a real estate broker's license, and are located within the service area of the multiple listing service, and are  taken by participants on *(indicate form[s] of listing[s] accepted by the service—See Notes 1 and 2)* shall be delivered to the multiple listing service within (usually 48) hours after all necessary signatures of seller(s) have been obtained: *(Amended 11/17)*

a.  single family homes for sale or exchange

b.  vacant lots and acreage for sale or exchange

c.  two-family, three-family, and four-family residential buildings for sale or exchange

**Note 1:**   The multiple listing service shall not require a participant to submit listings on a form other than the form the participant individually chooses to utilize provided the listing is of a type accepted by the service, although a property data form may be required as approved by the multiple listing service. However, the multiple listing service, through its legal counsel:

- may reserve the right to refuse to accept a listing form which fails to adequately protect the interests of the public and the participants

- assure that no listing form filed with the multiple listing service establishes, directly or indirectly, any contractual relationship between the multiple listing service and the client (buyer or seller)

The multiple listing service shall accept exclusive right-to-sell listing contracts and exclusive agency listing contracts, and may accept other forms of agreement which make it possible for the listing broker to offer compensation to the other participants of the multiple listing service acting as subagents, buyer agents, or both. *(Amended 11/96)*

The listing agreement must include the seller's written authorization to submit the agreement to the multiple listing service. *(Amended 11/96)*

The different types of listing agreements include:

- exclusive right-to-sell
- open

- exclusive agency
- net

The service may not accept **net listings** because they are deemed unethical and, in most states, illegal. **Open listings** are not accepted except where required by law because the inherent nature of an open listing is such as to usually not include the authority to cooperate and compensate other brokers and inherently provides a disincentive for cooperation. *(Amended 4/92)*

The **exclusive right-to-sell listing** is the conventional form of listing submitted to the multiple listing service in that the seller authorizes the listing broker to cooperate with and to compensate other brokers. *(Amended 4/92)*

The **exclusive agency listing** also authorizes the listing broker, as exclusive agent, to offer cooperation and compensation on blanket unilateral bases, but also reserves to the seller the general right to sell the property on an unlimited or restrictive basis. Exclusive agency listings and exclusive right-to-sell listings with named prospects exempt should be clearly distinguished by a simple designation such as a code or symbol from exclusive right-to-sell listings with no named prospects exempt, since they can present special risks of procuring cause controversies and administrative problems not posed by exclusive right-to- sell listings with no named prospects exempt. Care should be exercised to ensure that different codes or symbols are used to denote exclusive agency and exclusive right-to-sell listings with prospect reservations. *(Amended 4/92)*

**Note 2:** A multiple listing service does not regulate the type of listings its members may take. This does not mean that a multiple listing service must accept every type of listing. The multiple listing service shall decline to accept open listings (except where acceptance is required by law) and net listings, and it may limit its service to listings of certain kinds of property. But, if it chooses to limit the kind of listings it will accept, it shall leave its members free to accept such listings to be handled outside the multiple listing service.

**Note 3:** A multiple listing service may, as a matter of local option, accept exclusively listed property that is subject to auction. If such listings do not show a listed price, they may be included in a separate section of the MLS compilation of current listings. *(Adopted 11/92)* M

**Section 1.1
Types of Properties**

Following are some of the types of properties that may be published through the service, including types described in the preceding paragraph that are required to be filed with the service and other types that may be filed with the service at the participant's option provided, however, that any listing submitted is entered into within the scope of the participant's licensure as a real estate broker: *(Amended 11/91)* O

- residential
- residential income
- subdivided vacant lot
- land and ranch
- business opportunity

- motel-hotel
- mobile homes
- mobile home parks
- commercial income
- industrial

**Section 1.1.1
Listings Subject to
Rules and Regulations
of the Service**

Any listing taken on a contract to be filed with the multiple listing service is subject to the rules and regulations of the service upon signature of the seller(s). R

**Section 1.2
Detail on Listings
Filed with the Service**

A listing agreement or property data form, when filed with the multiple listing service by the listing broker, shall be complete in every detail which is ascertainable as specified on the property data form. R

**Section 1.2.1
Limited Service Listings**

Listing agreements under which the listing broker will not provide one, or more, of the following services:

a. arrange appointments for cooperating brokers to show listed property to potential purchasers but instead gives cooperating brokers authority to make such appointments directly with the seller(s)

b. accept and present to the seller(s) offers to purchase procured by cooperating brokers but instead gives cooperating brokers authority to present offers to purchase directly to the seller(s)

c. advise the seller(s) as to the merits of offers to purchase

d. assist the seller(s) in developing, communicating, or presenting counter-offers

e. participate on the seller's(s') behalf in negotiations leading to the sale of the listed property

will be identified with an appropriate code or symbol (e.g., LR or LS) in MLS compilations so potential cooperating brokers will be aware of the extent of the services the listing broker will provide to the seller(s), and any potential for cooperating brokers being asked to provide some or all of these services to listing brokers' clients, prior to initiating efforts to show or sell the property.

**Note:** Adoption of Section 1.2.1, limited service listings, is optional and a matter to be determined by each MLS. *(Adopted 05/01)* ☐O

**Section 1.2.2
MLS Entry-only Listings**

Listing agreements under which the listing broker will not provide any of the following services:

a. arrange appointments for cooperating brokers to show listed property to potential purchasers but instead gives cooperating brokers authority to make such appointments directly with the seller(s)

b. accept and present to the seller(s) offers to purchase procured by cooperating brokers but instead gives cooperating brokers authority to present offers to purchase directly to the seller(s)

c. advise the seller(s) as to the merits of offers to purchase

d. assist the seller(s) in developing, communicating, or presenting counter-offers

e. participate on the seller's(s') behalf in negotiations leading to the sale of the listed property

will be identified with an appropriate code or symbol (e.g., EO) in MLS compilations so potential cooperating brokers will be aware of the extent of the services the listing broker will provide to the seller(s), and any potential for cooperating brokers being asked to provide some or all of these services to listing brokers' clients, prior to initiating efforts to show or sell the property.

**Note:** Adoption of Section 1.2.2, MLS Entry-only Listings, is optional and a matter to be determined by each MLS. *(Adopted 05/01)* ☐O

**Section 1.3
Exempt Listings**

If the seller refuses to permit the listing to be disseminated by the service, the participant may then take the listing (office exclusive) and such listing shall be filed with the service but not disseminated to the participants. Filing of the listing should be accompanied by certification signed by the seller that he does not desire the listing to be disseminated by the service.

**Note:** Section 1.3 is not required if the service does not require all *(indicate type[s] of listing[s] accepted by the service)* listings to be submitted by a participant to the service. ☐M

**Section 1.4
Change of Status
of Listing**

Any change in listed price or other change in the original listing agreement shall be made only when authorized in writing by the seller and shall be filed with the service within twenty-four (24) hours (excepting weekends, holidays, and postal holidays) after the authorized change is received by the listing broker. ☐R

**Section 1.5**
**Withdrawal of Listing**
**Prior to Expiration**

Listings of property may be withdrawn from the multiple listing service by the listing broker before the expiration date of the listing agreement, provided notice is filed with the service, including a copy of the agreement between the seller and the listing broker which authorizes the withdrawal.

Sellers do not have the unilateral right to require an MLS to withdraw a listing without the listing broker's concurrence. However, when a seller(s) can document that his exclusive relationship with the listing broker has been terminated, the multiple listing service may remove the listing at the request of the seller. *(Adopted 11/96)* **M**

**Section 1.6**
**Contingencies Applicable**
**to Listings**

Any contingency or conditions of any term in a listing shall be specified and noticed to the participants. **R**

**Section 1.7**
**Listing Price Specified**

The full gross listing price stated in the listing contract will be included in the information published in the MLS compilation of current listings, unless the property is subject to auction. *(Amended 11/92)* **M**

**Section 1.8**
**Listing Multiple**
**Unit Properties**

All properties which are to be sold or which may be sold separately must be indicated individually in the listing and on the property data form. When part of a listed property has been sold, proper notification should be given to the multiple listing service. **O**

**Section 1.9**
**No Control of**
**Commission Rates**
**or Fees Charged**
**by Participants**

The multiple listing service shall not fix, control, recommend, suggest, or maintain commission rates or fees for services to be rendered by participants. Further, the multiple listing service shall not fix, control, recommend, suggest, or maintain the division of commissions or fees between cooperating participants or between participants and nonparticipants. **M**

**Section 1.10**
**Expiration of Listings**

Listings filed with the multiple listing service will automatically be removed from the compilation of current listings on the expiration date specified in the agreement, unless prior to that date the MLS receives notice that the listing has been extended or renewed. *(Amended 11/01)*

If notice of renewal or extension is received after the listing has been removed from the compilation of current listings, the extension or renewal will be published in the same manner as a new listing. Extensions and renewals of listings must be signed by the seller(s) and filed with the service. *(Amended 11/01)* **M**

**Section 1.11**
**Termination Date**
**on Listings**

Listings filed with the service shall bear a definite and final termination date, as negotiated between the listing broker and the seller. **M**

**Section 1.12**
**Service Area**

Only listings of the designated types of property located within the service area of the MLS are required to be submitted to the service. Listings of property located outside the MLS's service area will (or will not) be accepted if submitted voluntarily by a participant, but cannot be required by the service. *(Amended 11/17)*

**Note:** Associations must choose whether the service will accept listings from beyond its service area into the MLS compilation. *(Amended 11/17)* **M**

108

| | |
|---|---|
| **Section 1.13**<br>**Listings of Suspended**<br>**Participants** | When a participant of the service is suspended from the MLS for failing to abide by a membership duty (i.e., violation of the Code of Ethics, association bylaws, MLS bylaws, MLS rules and regulations, or other membership obligation except failure to pay appropriate dues, fees, or charges), all listings currently filed with the MLS by the suspended participant shall, at the participant's option, be retained in the service until sold, withdrawn or expired, and shall not be renewed or extended by the MLS beyond the termination date of the listing agreement in effect when the suspension became effective. If a participant has been suspended from the association (except where MLS participation without association membership is permitted by law) or MLS (or both) for failure to pay appropriate dues, fees, or charges, an association MLS is not obligated to provide MLS services, including continued inclusion of the suspended participant's listings in the MLS compilation of current listing information. Prior to any removal of a suspended participant's listings from the MLS, the suspended participant should be advised, in writing, of the intended removal so that the suspended participant may advise his clients. **M** |
| **Section 1.14**<br>**Listings of Expelled**<br>**Participants** | When a participant of the service is expelled from the MLS for failing to abide by a membership duty (i.e., violation of the Code of Ethics, association bylaws, MLS bylaws, MLS rules and regulations, or other membership obligations except failure to pay appropriate dues, fees, or charges), all listings currently filed with the MLS by the expelled participant shall, at the participant's option, be retained in the service until sold, withdrawn, or expired, and shall not be renewed or extended by the MLS beyond the termination date of the listing agreement in effect when the expulsion became effective. If a participant has been expelled from the association (except where MLS participation without association membership is permitted by law) or MLS (or both) for failure to pay appropriate dues, fees, or charges, an association MLS is not obligated to provide MLS services, including continued inclusion of the expelled participant's listings in the MLS compilation of current listing information. Prior to any removal of an expelled participant's listings from the MLS, the expelled participant should be advised, in writing, of the intended removal so that the expelled participant may advise his clients. **M** |
| **Section 1.15**<br>**Listings of Resigned**<br>**Participants** | When a participant resigns from the MLS, the MLS is not obligated to provide services, including continued inclusion of the resigned participant's listings in the MLS compilation of current listing information. Prior to any removal of a resigned participant's listings from the MLS, the resigned participant should be advised, in writing, of the intended removal so that the resigned participant may advise his clients. **O** |

## Selling Procedures

| | |
|---|---|
| **Section 2**<br>**Showings and**<br>**Negotiations** | Appointments for showings and negotiations with the seller for the purchase of listed property filed with the multiple listing service shall be conducted through the listing broker, except under the following circumstances: |

a. the listing broker gives the cooperating broker specific authority to show and/or negotiate directly, or

b. after reasonable effort, the cooperating broker cannot contact the listing broker or his representative; however, the listing broker, at his option, may preclude such direct negotiations by cooperating brokers. *(Amended 4/92)* **M**

| | |
|---|---|
| **Section 2.1**<br>**Presentation of Offers** | The listing broker must make arrangements to present the offer as soon as possible, or give the cooperating broker a satisfactory reason for not doing so. *(Amended 4/92)* **M** |

**Section 2.2**
**Submission of**
**Written Offers**
**and Counter-offers**

The listing broker shall submit to the seller all written offers until closing unless precluded by law, government rule, regulation, or agreed otherwise in writing between the seller and the listing broker. Unless the subsequent offer is contingent upon the termination of an existing contract, the listing broker shall recommend that the seller obtain the advice of legal counsel prior to acceptance of the subsequent offer.

Participants representing buyers or tenants shall submit to the buyer or tenant all offers and counter-offers until acceptance, and shall recommend that buyers and tenants obtain legal advice where there is a question about whether a pre-existing contract has been terminated. *(Amended 11/05)* Ⓜ

**Section 2.3**
**Right of Cooperating**
**Broker in Presentation of**
**Offer**

The cooperating broker (subagent or buyer agent) or his representative has the right to participate in the presentation to the seller or lessor of any offer he secures to purchase or lease. He does not have the right to be present at any discussion or evaluation of that offer by the seller or lessor and the listing broker. However, if the seller or lessor gives written instructions to the listing broker that the cooperating broker not be present when an offer the cooperating broker secured is presented, the cooperating broker has the right to a copy of the seller's or lessor's written instructions. None of the foregoing diminishes the listing broker's right to control the establishment of appointments for such presentations. *(Amended 4/92)* Ⓜ

Where the cooperating broker is not present during the presentation of the offer, the cooperating broker can request in writing, and the listing broker must provide, written affirmation stating that the offer has been submitted to the seller, or written notification that the seller has waived the obligation to have the offer presented. *(Adopted 11/18)* Ⓜ

**Section 2.4**
**Right of Listing**
**Broker in Presentation of**
**Counter-offer**

The listing broker or his representative has the right to participate in the presentation of any counter-offer made by the seller or lessor. He does not have the right to be present at any discussion or evaluation of a counter-offer by the purchaser or lessee (except when the cooperating broker is a subagent). However, if the purchaser or lessee gives written instructions to the cooperating broker that the listing broker not be present when a counter-offer is presented, the listing broker has the right to a copy of the purchaser's or lessee's written instructions. *(Adopted 11/93)* Ⓜ

**Section 2.5**
**Reporting Sales**
**to the Service**

Status changes, including final closing of sales and sales prices, shall be reported to the multiple listing service by the listing broker within ___ hours after they have occurred. If negotiations were carried on under Section 2 a. or b. hereof, the cooperating broker shall report accepted offers and prices to the listing broker within ___ hours after occurrence and the listing broker shall report them to the MLS within ___ hours after receiving notice from the cooperating broker. *(Amended 11/11)*

Note 1: The listing agreement of a property filed with the MLS by the listing broker should include a provision expressly granting the listing broker authority to advertise; to file the listing with the MLS; to provide timely notice of status changes of the listing to the MLS; and to provide sales information including selling price to the MLS upon sale of the property. If deemed desirable by the MLS to publish sales information prior to final closing (settlement) of a sales transaction, the listing agreement should also include a provision expressly granting the listing broker the right to authorize dissemination of this information by the MLS to its participants. *(Amended 11/01)*

Note 2: In disclosure states, if the sale price of a listed property is recorded, the reporting of the sale price may be required by the MLS.

110

In states where the actual sale prices of completed transactions are not publicly accessible, failure to report sale prices can result in disciplinary action only if the MLS:

1. categorizes sale price information as confidential and
2. limits use of sale price information to participants and subscribers in providing real estate services, including appraisals and other valuations, to customers and clients; and to governmental bodies and third-party entities only as provided below.

The MLS may provide sale price information to governmental bodies only to be used for statistical purposes (including use of aggregated data for purposes of valuing property) and to confirm the accuracy of information submitted by property owners or their representatives in connection with property valuation challenges; and to third-party entities only to be used for academic research, statistical analysis, or for providing services to participants and subscribers. In any instance where a governmental body or third-party entity makes sale price information provided by the MLS available other than as provided for in this provision, a listing participant may request the sale price information for a specific property be withheld from dissemination for these purposes with written authorization from the seller, and withholding of sale price information from those entities shall not be construed as a violation of the requirement to report sale prices. *(Adopted 11/11)*

**Note 3:** As established in the Virtual Office Website ("VOW") policy, sale prices can only be categorized as confidential in states where the actual sale prices of completed transactions are not accessible from public records. *(Adopted 11/11)* [M]

**Section 2.6**
**Reporting Resolutions**
**of Contingencies**

The listing broker shall report to the multiple listing service within twenty-four (24) hours that a contingency on file with the multiple listing service has been fulfilled or renewed, or the agreement cancelled. [M]

**Section 2.7**
**Advertising of Listings**
**Filed With the Service**

A listing shall not be advertised by any participant other than the listing broker without the prior consent of the listing broker. [M]

**Section 2.8**
**Reporting Cancellation**
**of Pending Sale**

The listing broker shall report immediately to the multiple listing service the cancellation of any pending sale, and the listing shall be reinstated immediately. [M]

**Section 2.9**
**Disclosing the**
**Existence of Offers**

Listing brokers, in response to inquiries from buyers or cooperating brokers, shall, with the seller's approval, disclose the existence of offers on the property. Where disclosure is authorized, the listing broker shall also disclose, if asked, whether offers were obtained by the listing licensee, by another licensee in the listing firm, or by a cooperating broker. *(Amended 11/08)* [O]

**Section 2.10**
**Availability of**
**Listed Property**

Listing brokers shall not misrepresent the availability of access to show or inspect listed property. *(Adopted 11/05)* [O]

## Refusal to Sell

**Section 3**
**Refusal to Sell**

If the seller of any listed property filed with the multiple listing service refuses to accept a written offer satisfying the terms and conditions stated in the listing, such fact shall be transmitted immediately to the service and to all participants. [R]

# Prohibitions

**Section 4**
**Information for**
**Participants Only**

Any listing filed with the service shall not be made available to any broker or firm not a member of the MLS without the prior consent of the listing broker. [M]

**Section 4.1**
**For Sale Signs**

Only the for sale sign of the listing broker may be placed on a property. *(Amended 11/89)* [M]

**Section 4.2**
**Sold Signs**

Prior to closing, only the sold sign of the listing broker may be placed on a property, unless the listing broker authorizes the cooperating (selling) broker to post such a sign. *(Amended 4/96)* [M]

**Section 4.3**
**Solicitation of Listing**
**Filed with the Service**

Participants shall not solicit a listing on property filed with the service unless such solicitation is consistent with Article 16 of the REALTORS®' Code of Ethics, its Standards of Practice, and its Case Interpretations.

**Note:** This section is to be construed in a manner consistent with Article 16 of the Code of Ethics and particularly Standard of Practice 16-4. This section is intended to encourage sellers to permit their properties to be filed with the service by protecting them from being solicited, prior to expiration of the listing, by brokers and salespersons seeking the listing upon its expiration.

Without such protection, a seller could receive hundreds of calls, communications, and visits from brokers and salespersons who have been made aware through MLS filing of the date the listing will expire and desire to substitute themselves for the present broker.

This section is also intended to encourage brokers to participate in the service by assuring them that other participants will not attempt to persuade the seller to breach the listing agreement or to interfere with their attempts to market the property. Absent the protection afforded by this section, listing brokers would be most reluctant to generally disclose the identity of the seller or the availability of the property to other brokers.

This section does not preclude solicitation of listings under the circumstances otherwise recognized by the Standards of Practice related to Article 16 of the Code of Ethics. [M]

**Section 4.4**
**Use of the Terms MLS**
**and Multiple Listing**
**Service**

No MLS participant, subscriber, or licensee affiliated with any participant shall, through the name of their firm, their URLs, their e-mail addresses, their website addresses, or in any other way represent, suggest, or imply that the individual or firm is an MLS, or that they operate an MLS. Participants, subscribers and licensees affiliated with participants shall not represent, suggest, or imply that consumers or others have direct access to MLS databases, or that consumers or others are able to search MLS databases available only to participants and subscribers. This does not prohibit participants and subscribers from representing that any information they are authorized under MLS rules to provide to clients or customers is available on their websites or otherwise. *(Adopted 11/07)* [O]

# Division of Commissions

**Section 5**
**Compensation Specified**
**on Each Listing**

The listing broker shall specify, on each listing filed with the multiple listing service, the compensation offered to other multiple listing service participants for their services in the sale of such listing. Such offers are unconditional except that entitlement to compensation is determined by the cooperating broker's performance as the procuring cause of the sale (or lease) or as otherwise provided for in this rule. The listing broker's obligation to compensate

112

any cooperating broker as the procuring cause of the sale (or lease) may be excused if it is determined through arbitration that, through no fault of the listing broker and in the exercise of good faith and reasonable care, it was impossible or financially unfeasible for the listing broker to collect a commission pursuant to the listing agreement. In such instances, entitlement to cooperative compensation offered through MLS would be a question to be determined by an arbitration hearing panel based on all relevant facts and circumstances including, but not limited to, why it was impossible or financially unfeasible for the listing broker to collect some or all of the commission established in the listing agreement; at what point in the transaction did the listing broker know (or should have known) that some or all of the commission established in the listing agreement might not be paid; and how promptly had the listing broker communicated to cooperating brokers that the commission established in the listing agreement might not be paid. *(Amended 11/98)*

In filing a property with the multiple listing service of an association of REALTORS®, the participant of the service is making blanket unilateral offers of compensation to the other MLS participants, and shall therefore specify on each listing filed with the service, the compensation being offered to the other MLS participants. Specifying the compensation on each listing is necessary, because the cooperating broker has the right to know what his compensation shall be prior to his endeavor to sell.* *(Amended 11/96)*

The listing broker retains the right to determine the amount of compensation offered to other participants (acting as subagents, buyer agents, or in other agency or nonagency capacities defined by law) which may be the same or different. *(Amended 11/96)*

This shall not preclude the listing broker from offering any MLS participant compensation other than the compensation indicated on any listing published by the MLS, provided the listing broker informs the other broker, in writing, in advance of submitting an offer to purchase, and provided that the modification in the specified compensation is not the result of any agreement among all or any other participants in the service. Any superseding offer of compensation must be expressed as either a percentage of the gross sales price or as a flat dollar amount. *(Amended 5/10)*

**Note 1:** The multiple listing service shall not have a rule requiring the listing broker to disclose the amount of total negotiated commission in his listing contract, and the association multiple listing service shall not publish the total negotiated commission on a listing which has been submitted to the MLS by a participant. The association multiple listing service shall not disclose in any way the total commission negotiated between the seller and the listing broker.

---

*The compensation specified on listings filed with the multiple listing service shall appear in one of two forms. The essential and appropriate requirement by an association multiple listing service is that the information to be published shall clearly inform the participants as to the compensation they will receive in cooperative transactions, unless advised otherwise by the listing broker, in writing, in advance of submitting an offer to purchase. The compensation specified on listings published by the MLS shall be shown in one of the following forms:

1. by showing a percentage of the gross selling price

2. by showing a definite dollar amount *(Amended 5/10)*

**Note:** MLSs may also, as a matter of local discretion, allow participants to offer cooperative compensation as a percentage of the net sales price, with the net sales price defined as the gross sales price minus buyer upgrades (new construction) and seller concessions (as defined by the MLS unless otherwise defined by state law or regulation). *(Adopted 5/08)*

While MLSs are not required to authorize participants to offer cooperative compensation based on net sale prices, those that do permit such offers must define "seller concessions" for purposes other than new construction, unless that term is defined by applicable state law or regulation. The following definition of "seller concessions" is suggested but not required for adoption:

Points paid by seller on behalf of buyer, seller-paid buyer closing costs, cash or cash allowances not escrowed, down payment assistance, additions or alterations not considered deferred maintenance, and personal property not usual and customary to such transactions conveyed from seller to buyer having an agreed upon monetary value. *(Adopted 05/12)*

**Note 2:** The listing broker may, from time to time, adjust the compensation offered to other multiple listing service participants for their services with respect to any listing by advance published notice to the service so that all participants will be advised. *(Amended 4/92)*

**Note 3:** The multiple listing service shall make no rule on the division of commissions between participants and nonparticipants. This should remain solely the responsibility of the listing broker.

**Note 4:** Multiple listing services, at their discretion, may adopt rules and procedures enabling listing brokers to communicate to potential cooperating brokers that gross commissions established in listing contracts are subject to court approval, and that compensation payable to cooperating brokers may be reduced if the gross commission established in the listing contract is reduced by a court. In such instances, the fact that the gross commission is subject to court approval and either the potential reduction in compensation payable to cooperating brokers or the method by which the potential reduction in compensation will be calculated must be clearly communicated to potential cooperating brokers prior to the time they submit an offer that ultimately results in a successful transaction. *(Amended 5/10)*

**Note 5:** Nothing in these MLS rules precludes a listing participant and a cooperating participant, as a matter of mutual agreement, from modifying the cooperative compensation to be paid in the event of a successful transaction. *(Adopted 11/05)*

**Note 6:** Multiple listing services must give participants the ability to disclose to other participants any potential for a short sale. As used in these rules, short sales are defined as a transaction where title transfers, where the sale price is insufficient to pay the total of all liens and costs of sale and where the seller does not bring sufficient liquid assets to the closing to cure all deficiencies. Multiple listing services may, as a matter of local discretion, require participants to disclose potential short sales when participants know a transaction is a potential short sale. In any instance where a participant discloses a potential short sale, they may, as a matter of local discretion, also be permitted to communicate to other participants how any reduction in the gross commission established in the listing contract required by the lender as a condition of approving the sale will be apportioned between listing and cooperating participants. All confidential disclosures and confidential information related to short sales, if allowed by local rules, must be communicated through dedicated fields or confidential "remarks" available only to participants and subscribers. *(Amended 5/09)* M

**Section 5.0.1**
**Disclosing Potential**
**Short Sales**

**Note:** Select one of the following two options. M

**Option #1:** Multiple listing services that permit, but do not require, participants to disclose potential short sales should adopt the following rule.

Participants may, but are not required to, disclose potential short sales (defined as a transaction where title transfers, where the sale price is insufficient to pay the total of all liens and costs of sale and where the seller does not bring sufficient liquid assets to the closing to cure all deficiencies) to other participants and subscribers. *(Amended 5/09)*

**Option #2:** Alternatively, multiple listing services that require participants to disclose potential short sales should adopt the following rule.

Participants must disclose potential short sales (defined as a transaction where title transfers, where the sale price is insufficient to pay the total of all liens and costs of

114

sale and where the seller does not bring sufficient liquid assets to the closing to cure all deficiencies) when reasonably known to the listing participants. *(Amended 5/09)*

**For Options #1 or #2:** As a matter of local discretion, MLSs may, but shall not be required to, adopt the following rule:

When disclosed, participants may, at their discretion, advise other participants whether and how any reduction in the gross commission established in the listing contract, required by the lender as a condition of approving the sale, will be apportioned between listing and cooperating participants. *(Adopted 5/09)*

**MLSs that adopt the discretionary provision shown immediately above may, but are not required to, adopt the following rule:** Where participants communicate to other participants how any reduction in the gross commission established in the listing contract required by the lender as a condition of approving the sale will be apportioned between the listing and cooperating participants, listing participants shall disclose to cooperating participants in writing the total reduction in the gross commission and the amount by which the compensation payable to the cooperating broker will be reduced within _____ hours of receipt of notification from the lender. *(Adopted 5/10)*

**Section 5.1**
**Participant as Principal**

If a participant or any licensee (or licensed or certified appraiser) affiliated with a participant has any ownership interest in a property, the listing of which is to be disseminated through the multiple listing service, that person shall disclose that interest when the listing is filed with the multiple listing service and such information shall be disseminated to all multiple listing service participants. **[M]**

**Section 5.2**
**Participant as Purchaser**

If a participant or any licensee (including licensed and certified appraisers) affiliated with a participant wishes to acquire an interest in property listed with another participant, such contemplated interest shall be disclosed, in writing, to the listing broker not later than the time an offer to purchase is submitted to the listing broker. *(Adopted 2/92)* **[M]**

**Section 5.3**
**Dual or Variable**
**Rate Commission**
**Arrangements**

The existence of a dual or variable rate commission arrangement (i.e., one in which the seller/landlord agrees to pay a specified commission if the property is sold/leased by the listing broker without assistance and a different commission if the sale/lease results through the efforts of a cooperating broker; or one in which the seller/landlord agrees to pay a specified commission if the property is sold/leased by the listing broker either with or without the assistance of a cooperating broker and a different commission if the sale/lease results through the efforts of a seller/landlord) shall be disclosed by the listing broker by a key, code, or symbol as required by the MLS. The listing broker shall, in response to inquiries from potential cooperating brokers, disclose the differential that would result in either a cooperative transaction or, alternatively, in a sale/lease that results through the efforts of the seller/landlord. If the cooperating broker is a buyer/tenant representative, the buyer/tenant representative must disclose such information to their client before the client makes an offer to purchase or lease. *(Amended 5/01)* **[M]**

## Service Charges

**Section 6**
**Service Fees**
**and Charges**

The following service charges for operation of the multiple listing service are in effect to defray the costs of the service and are subject to change from time to time in the manner prescribed:

**Initial Participation Fee:** An applicant for participation in the service shall pay an application fee of $_____ with such fee to accompany the application.

**Note:** The initial participation fee shall approximate the cost of bringing the service to the participant.

**Recurring Participation Fee:** The annual participation fee of each participant shall be an amount equal to $_____ times each salesperson and licensed or certified appraiser who has access to and use of the service, whether licensed as a broker, sales licensee, or licensed or certified appraiser who is employed by or affiliated as an independent contractor with such participant. Payment of such fees shall be made on or before the first day of the fiscal year of the multiple listing service. Fees shall be prorated on a monthly basis.

However, MLSs must provide participants the option of a no-cost waiver of MLS fees, dues, and charges for any licensee or licensed or certified appraiser who can demonstrate subscription to a different MLS or CIE where the principal broker participates. MLSs may, at their discretion, require that broker participants sign a certification for nonuse of its MLS services by their licensees, which can include penalties and termination of the waiver if violated.* *(Amended 5/18 and 8/18 [Leadership Team])* M

**Note 1:** A multiple listing service may elect to have such fees payable on a quarterly or even on a monthly basis. However, added administrative services are necessitated by increased frequency of such payments.

**Note 2:** Multiple listing services that choose to include affiliated unlicensed administrative and clerical staff, personal assistants, and/or individuals seeking licensure or certification as real estate appraisers among those eligible for access to and use of MLS information as subscribers may, at their discretion, charge recurring fees. *(Amended 11/17)* R

**Listing Fee:** A participant shall pay a monthly listing fee in an amount equal to the number of listings he filed with the service during the previous month, multiplied by the listing fee of $_____ per listing.

**Note:** An alternative provision for the listing fee is: "For filing a new listing or renewal of a listing with the service, a fee of $_____ shall accompany each listing when filed with the service."

**Optional:** It is a matter of agreement between the listing and selling brokers as to whether or not the cooperating broker shall reimburse the listing broker for the listing fee. The multiple listing service shall not be concerned because this is an arrangement between cooperating brokers, and the multiple listing service rules do not dictate the compensation offered to cooperating brokers by the listing broker. *(Amended 4/92)*

---

*****Note:** Mandatory waiver provision is effective no later than July 1, 2018.

# Compliance with Rules

**Section 7
Compliance with
Rules—Authority to
Impose Discipline**

By becoming and remaining a participant or subscriber in this MLS, each participant and subscriber agrees to be subject to the rules and regulations and any other MLS governance provision. The MLS may, through the administrative and hearing procedures established in these rules, impose discipline for violations of the rules and other MLS governance provisions. Discipline that may be imposed may only consist of one or more of the following:

a. letter of warning

b. letter of reprimand

c. attendance at MLS orientation or other appropriate courses or seminars which the participant or subscriber can reasonably attend taking into consideration cost, location, and duration

d. appropriate, reasonable fine not to exceed $15,000

e. suspension of MLS rights, privileges and services for not less than thirty (30) days nor more than one (1) year

f. termination of MLS rights, privileges, and services with no right to reapply for a specified period not to exceed three (3) years. *(Revised 11/14)* M

**Note:** A participant (or user/subscriber, where appropriate) can be placed on probation. Probation is not a form of discipline. When a participant (or user/subscriber, where appropriate) is placed on probation the discipline is held in abeyance for a stipulated period of time not longer than one (1) year. Any subsequent finding of a violation of the MLS rules during the probationary period may, at the discretion of the Board of Directors, result in the imposition of the suspended discipline. Absent any subsequent findings of a violation during the probationary period, both the probationary status and the suspended discipline are considered fulfilled, and the individual's record will reflect the fulfillment. The fact that one or more forms of discipline are held in abeyance during the probationary period does not bar imposition of other forms of discipline which will not be held in abeyance. *(Revised 05/14)* M

**Section 7.1
Compliance with Rules**

The following action may be taken for noncompliance with the rules:

a. for failure to pay any service charge or fee within one (1) month of the date due, and provided that at least ten (10) days' notice has been given, the service shall be suspended until service charges or fees are paid in full

b. for failure to comply with any other rule, the provisions of Sections 9 and 9.1 shall apply

**Note:** Generally, warning, censure, and the imposition of a moderate fine are sufficient to constitute a deterrent to violation of the rules and regulations of the multiple listing service. Suspension or termination is an extreme sanction to be used in cases of extreme or repeated violation of the rules and regulations of the service. If the MLS desires to establish a series of moderate fines, they should be clearly specified in the rules and regulations. *(Amended 11/88)* R

**Section 7.2
Applicability of
Rules to Users
and/or Subscribers**

Non-principal brokers, sales licensees, appraisers, and others authorized to have access to information published by the MLS are subject to these rules and regulations and may be disciplined for violations thereof provided that the user or subscriber has signed an agreement acknowledging that access to and use of MLS information is contingent on compliance with the rules and regulations. Further, failure of any user or subscriber

to abide by the rules and/or any sanction imposed for violations thereof can subject the participant to the same or other discipline. This provision does not eliminate the participant's ultimate responsibility and accountability for all users or subscribers affiliated with the participant. *(Adopted 4/92)*

**Note:** Adoption of Section 7.2 is optional and should be adopted by multiple listing services desiring to establish authority to impose discipline on non-principal users or subscribers affiliated with MLS members or participants. *(Adopted 4/92)* **O**

## Meetings

**Section 8**
**Meetings**

The meetings of the participants in the service or the board of directors of the multiple listing service for the transaction of business of the service shall be held in accordance with the provisions of Article 7, bylaws of the service. **R**

## Enforcement of Rules or Disputes

**Section 9**
**Consideration of**
**Alleged Violations**

The committee shall give consideration to all written complaints having to do with violations of the rules and regulations. By becoming and remaining a participant, each participant agrees to be subject to these rules and regulations, the enforcement of which are at the sole discretion of the Committee (Board of Directors). *(Amended 5/18)* **M**

**Section 9.1**
**Violations of Rules**
**and Regulations**

If the alleged offense is a violation of the rules and regulations of the service and does not involve a charge of alleged unethical conduct or request for arbitration, it may be administratively considered and determined by the board of directors of the service, and if a violation is determined, the board of directors may direct the imposition of sanction, provided the recipient of such sanction may request a hearing before the professional standards committee of the association in accordance with the bylaws and rules and regulations of the association of REALTORS® within twenty (20) days following receipt of the directors' decision. *(Amended 11/96)*

If, rather than conducting an administrative review, the MLS has a procedure established to conduct hearings, any appeal of the decision of the hearing tribunal may be appealed to the board of directors of the MLS within twenty (20) days of the tribunal's decision. Alleged violations involving unethical conduct shall be referred to the professional standards committee of the association of REALTORS® for processing in accordance with the professional standards procedures of the association. If the charge alleges a refusal to arbitrate, such charge shall be referred directly to the board of directors of the association of REALTORS®. *(Amended 2/98)* **M**

**Optional Provision for Establishing Nonmember Participatory Rights (Open MLS)\***

If the alleged offense is a violation of the rules and regulations of the service and does not involve a charge of alleged violation of one or more of the provisions of Section 16 of the rules and regulations or a request for arbitration, it may be administratively considered and determined by the board of directors of the MLS and if a violation is determined, the board of directors may direct the imposition of sanction provided that the recipient of such sanction may request a hearing by the professional standards committee of the association in accordance with the bylaws of the association of REALTORS®. Alleged violations of Section 16 of the rules and regulations shall be referred to the association's grievance

---

\*Only adopt this provision if the association's MLS is open to nonmember participants (otherwise qualified individuals who do not hold REALTOR® membership anywhere).

committee for processing in accordance with the professional standards procedures of the association. *(Amended 2/98)*

If, rather than conducting an administrative review, the MLS has a procedure established to conduct hearings, any appeal of the decision of the hearing tribunal may be appealed to the board of directors of the MLS within twenty (20) days of the tribunal's decision. Alleged violations involving unethical conduct shall be referred to the professional standards committee of the association of REALTORS® for processing in accordance with the professional standards procedures of the association. If the charge alleges a refusal to arbitrate, such charge shall be referred directly to the board of directors of the association of REALTORS®. *(Adopted 2/98)*

**Section 9.2**
**Complaints of**
**Unethical Conduct**

All other complaints of unethical conduct shall be referred by the board of directors of the service to the association of REALTORS® for appropriate action in accordance with the professional standards procedures established in the association's bylaws. *(Amended 11/88)* M

**Section 9.3**
**Complaints of**
**Unauthorized Use**
**of Listing Content**

Any participant who believes another participant has engaged in the unauthorized use or display of listing content, including photographs, images, audio or video recordings, and virtual tours, shall send notice of such alleged unauthorized use to the MLS. Such notice shall be in writing, specifically indentify the allegedly unauthorized content, and be delivered to the MLS not more than sixty (60) days after the alleged misuse was first identified. No participant may pursue action over the alleged unauthorized use and display of listing content in a court of law without first completing the notice and response procedures outlined in this Section 9.3 of the MLS rules.

Upon receiving a notice, the committee (Board of Directors) will send the notice to the participant who is accused of unauthorized use. Within ten (10) days from receipt, the participant must either: 1) remove the allegedly unauthorized content, or 2) provide proof to the committee (Board of Directors) that the use is authorized. Any proof submitted will be considered by the Committee (Board of Directors), and a decision of whether it establishes authority to use the listing content will be made within thirty (30) days.

If the Committee (Board of Directors) determines that the use of the content was unauthorized, the Committee (Board of Directors) may issue a sanction pursuant to Section 7 of the MLS rules, including a request to remove and/or stop the use of the unauthorized content within ten (10) days after transmittal of the decision. If the unauthorized use stems from a violation of the MLS rules, that too will be considered at the time of establishing an appropriate sanction.

If after ten (10) days following transmittal of the Committee's (Board of Director's) determination the alleged violation remains uncured (i.e. the content is not removed or the rules violation remains uncured), then the complaining party may seek action through a court of law. *(Adopted 5/18)* M

**Section 9.4**
**MLS Rules Violations**

MLS participants may not take legal action against another participant for alleged rules violation(s) unless the complaining participant has first exhausted the remedies provided in these rules. *(Adopted 5/18)* M

**Note:** Adoption of Sections 9.3 and 9.4 are not required if the MLS has adopted alternative procedures to address alleged misuse of listing content that includes notice to the alleged infringer.

# Confidentiality of MLS Information

**Section 10
Confidentiality of
MLS Information**

Any information provided by the multiple listing service to the participants shall be considered official information of the service. Such information shall be considered confidential and exclusively for the use of participants and real estate licensees affiliated with such participants and those participants who are licensed or certified by an appropriate state regulatory agency to engage in the appraisal of real property and licensed or certified appraisers affiliated with such participants. *(Amended 4/92)* M

**Section 10.1
MLS Not Responsible
for Accuracy of
Information**

The information published and disseminated by the service is communicated verbatim, without change by the service, as filed with the service by the participant. The service does not verify such information provided and disclaims any responsibility for its accuracy. Each participant agrees to hold the service harmless against any liability arising from any inaccuracy or inadequacy of the information such participant provides. R

# Ownership of MLS Compilation* and Copyright

**Section 11**

By the act of submitting any property listing content to the MLS, the participant represents and warrants that he or she is fully authorized to license the property listing content as contemplated by and in compliance with this section and these rules and regulations, and also thereby does grant to the MLS license to include the property listing content in its copyrighted MLS compilation and also in any statistical report on comparables. Listing content includes, but is not limited to, photographs, images, graphics, audio and video recordings, virtual tours, drawings, descriptions, remarks, narratives, pricing information, and other details or information related to the listed property. *(Amended 5/18)* M

Each participant who submits listing content to the MLS agrees to defend and hold the MLS and every other participant harmless from and against any liability or claim arising from any inaccuracy of the submitted listing content or any inadequacy of ownership, license, or title to the submitted listing content. *(Adopted 5/18)* M

**Note:** The Digital Millennium Copyright Act (DMCA) is a federal copyright law that enhances the penalties for copyright infringement occurring on the Internet. The law provides exemptions or "safe harbors" from copyright infringement liability for online service providers (OSP) that satisfy certain criteria. Courts construe the definition of "online service provider" broadly, which would likely include MLSs as well as participants and subscribers hosting an IDX display.

One safe harbor limits the liability of an OSP that hosts a system, network or website on which Internet users may post user-generated content. If an OSP complies with the provisions of this DMCA safe harbor, it cannot be liable for copyright infringement if a user posts infringing material on its website. This protects an OSP from incurring significant sums in copyright infringement damages, as statutory damages are as high as $150,000 per work. For this reason, it is highly recommended that MLSs, participants and subscribers comply with the DMCA safe harbor provisions discussed herein.

To qualify for this safe harbor, the OSP must:

1. Designate on its website and register with the Copyright Office an agent to receive takedown requests. The agent could be the MLS, participant, subscriber, or other individual or entity.

---

*The term MLS compilation, as used in Sections 11 and 12 herein, shall be construed to include any format in which property listing data is collected and disseminated to the participants, including but not limited to bound book, loose-leaf binder, computer database, card file, or any other format whatsoever.

2. Develop and post a DMCA-compliant website policy that addresses repeat offenders.

3. Comply with the DMCA takedown procedure. If a copyright owner submits a takedown notice to the OSP, which alleges infringement of its copyright at a certain location, then the OSP must promptly remove allegedly infringing material. The alleged infringer may submit a counter-notice that the OSP must share with the copyright owner. If the copyright owner fails to initiate a copyright lawsuit within ten (10) days, then the OSP may restore the removed material.

4. Have no actual knowledge of any complained-of infringing activity.

5. Not be aware of facts or circumstances from which complained-of infringing activity is apparent.

6. Not receive a financial benefit attributable to complained-of infringing activity when the OSP is capable of controlling such activity.

Full compliance with these DMCA safe harbor criteria will mitigate an OSP's copyright infringement liability. For more information see 17 U.S.C. §512. *(Adopted 11/15)* I

**Section 11.1**    All right, title, and interest in each copy of every multiple listing compilation created and copyrighted by the _____ Association of REALTORS® and in the copyrights therein, shall at all times remain vested in the _____ Association of REALTORS®. R

**Section 11.2 Display**    Each participant shall be entitled to lease from the _____ Association of REALTORS® a number of copies of each MLS compilation sufficient to provide the participant and each person affiliated as a licensee (including licensed or certified appraisers) with such participant with one copy of such compilation. The participant shall pay for each such copy the rental fee set by the association.*

Participants shall acquire by such lease only the right to use the MLS compilation in accordance with these rules. M

## Use of Copyrighted MLS Compilation

**Section 12 Distribution**    Participants shall, at all times, maintain control over and responsibility for each copy of any MLS compilation leased to them by the association of REALTORS®, and shall not distribute any such copies to persons other than subscribers who are affiliated with such participant as licensees, those individuals who are licensed or certified by an appropriate state regulatory agency to engage in the appraisal of real property, and any other subscribers as  authorized pursuant to the governing documents of the MLS. Use of information developed by or published by an association multiple listing service is strictly limited to the activities authorized under a participant's licensure(s) or certification, and unauthorized uses are prohibited. Further, none of the foregoing is intended to convey participation or membership or any right of access to information developed or published by an association multiple listing service where access to such information is prohibited by law. *(Amended 4/92)* R

---

*This section should not be construed to require the participant to lease a copy of the MLS compilation for any licensee (or licensed or certified appraiser) affiliated with the participant who is engaged exclusively in a specialty of the real estate business other than listing, selling, or appraising the types of properties which are required to be filed with the MLS and who does not, at any time, have access to or use of the MLS information or MLS facility of the association.

**Section 12.1**
**Display**

Participants and those persons affiliated as licensees with such participants shall be permitted to display the MLS compilation to prospective purchasers only in conjunction with their ordinary business activities of attempting to locate ready, willing, and able buyers for the properties described in said MLS compilation. **M**

**Section 12.2**
**Reproduction**

**Option #1:** Participants or their affiliated licensees shall not reproduce any MLS compilation or any portion thereof, except in the following limited circumstances:

Participants or their affiliated licensees may reproduce from the MLS compilation and distribute to prospective purchasers a reasonable* number of single copies of property listing data contained in the MLS compilation which relate to any properties in which the prospective purchasers are or may, in the judgment of the participant or their affiliated licensees, be interested.

Reproductions made in accordance with this rule shall be prepared in such a fashion that the property listing data of properties other than that in which the prospective purchaser has expressed interest, or in which the participant or the affiliated licensees are seeking to promote interest, does not appear on such reproduction.

Nothing contained herein shall be construed to preclude any participant from utilizing, displaying, distributing, or reproducing property listing sheets or other compilations of data pertaining exclusively to properties currently listed for sale with the participant.

Any MLS information, whether provided in written or printed form, provided electronically, or provided in any other form or format, is provided for the exclusive use of the participant and those licensees affiliated with the participant who are authorized to have access to such information. Such information may not be transmitted, retransmitted, or provided in any manner to any unauthorized individual, office, or firm.

None of the foregoing shall be construed to prevent any individual legitimately in possession of current listing information, sold information, comparables, or statistical information from utilizing such information to support valuations on particular properties for clients and customers. Any MLS content in data feeds available to participants for real estate brokerage purposes must also be available to participants for valuation purposes, including automated valuations. MLSs must either permit use of existing data feeds, or create a separate data feed, to satisfy this requirement. MLSs may require execution of a third-party license agreement where deemed appropriate by the MLS. MLSs may require participants who will use such data feeds to pay the reasonably estimated costs incurred by the MLS in adding or enhancing its downloading capacity for this purpose. Information deemed confidential may not be used as supporting documentation. Any other use of such information is unauthorized and prohibited by these rules and regulations. *(Amended 05/14)*

**Option #2:** Participants or their affiliated licensees shall not reproduce any MLS compilation or any portion thereof, except in the following limited circumstances:

---

*It is intended that the participant be permitted to provide prospective purchasers with listing data relating to properties which the prospective purchaser has a bona fide interest in purchasing or in which the participant is seeking to promote interest. The term reasonable, as used herein, should therefore be construed to permit only limited reproduction of property listing data intended to facilitate the prospective purchaser's decision-making process in the consideration of a purchase. Factors which shall be considered in deciding whether the reproductions made are consistent with this intent and thus reasonable in number, shall include, but are not limited to, the total number of listings in the MLS compilation, how closely the types of properties contained in such listings accord with the prospective purchaser's expressed desires and ability to purchase, whether the reproductions were made on a selective basis, and whether the type of properties contained in the property listing data is consistent with a normal itinerary of properties which would be shown to the prospective purchaser.

Participants or their affiliated licensees may reproduce from the MLS compilation and distribute to prospective purchasers a reasonable* number of single copies of property listing data contained in the MLS compilation which relate to any properties in which the prospective purchasers are or may, in the judgment of the participants or their affiliated licensees, be interested.

Nothing contained herein shall be construed to preclude any participant from utilizing, displaying, distributing, or reproducing property listing sheets or other compilations of data pertaining exclusively to properties currently listed for sale with the participant.

Any MLS information, whether provided in written or printed form, provided electronically, or provided in any other form or format, is provided for the exclusive use of the participant and those licensees affiliated with the participant who are authorized to have access to such information. Such information may not be transmitted, retransmitted, or provided in any manner to any unauthorized individual, office, or firm.

None of the foregoing shall be construed to prevent any individual legitimately in possession of current listing information, sold information, comparables, or statistical information from utilizing such information to support valuations on particular properties for clients and customers. Any MLS content in data feeds available to participants for real estate brokerage purposes must also be available to participants for valuation purposes, including automated valuations. MLSs must either permit use of existing data feeds, or create a separate data feed, to satisfy this requirement. MLSs may require execution of a third-party license agreement where deemed appropriate by the MLS. MLSs may require participants who will use such data feeds to pay the reasonably estimated costs incurred by the MLS in adding or enhancing its downloading capacity for this purpose. Information deemed confidential may not be used as supporting documentation. Any other use of such information is unauthorized and prohibited by these rules and regulations. *(Amended 05/14)* **M**

## Use of MLS Information

**Section 13 Limitations on Use of MLS Information**

**Option #1:** Use of information from MLS compilation of current listing information, from the association's statistical report, or from any sold or comparable report of the association or MLS for public mass-media advertising by an MLS participant or in other public representations, may not be prohibited.

However, any print or non-print forms of advertising or other forms of public representations based in whole or in part on information supplied by the association or its MLS must clearly demonstrate the period of time over which such claims are based and must include the following, or substantially similar, notice:

> Based on information from the association of REALTORS® (alternatively, from the _____ MLS) for the period (*date*) through (*date*). *(Amended 11/93)*

**Option #2:** Information from MLS compilations of current listing information, from statistical reports, and from any sold or comparable report of the association or MLS may

---

*It is intended that the participant be permitted to provide prospective purchasers with listing data relating to properties which the prospective purchaser has a bona fide interest in purchasing or in which the participant is seeking to promote interest. The term reasonable, as used herein, should therefore be construed to permit only limited reproduction of property listing data intended to facilitate the prospective purchaser's decision-making process in the consideration of a purchase. Factors which shall be considered in deciding whether the reproductions made are consistent with this intent and thus reasonable in number, shall include, but are not limited to, the total number of listings in the MLS compilation, how closely the types of properties contained in such listings accord with the prospective purchaser's expressed desires and ability to purchase, whether the reproductions were made on a selective basis, and whether the type of properties contained in the property listing data is consistent with a normal itinerary of properties which would be shown to the prospective purchaser.

be used by MLS participants as the basis for aggregated demonstrations of market share or comparisons of firms in public mass-media advertising or in other public representations. This authority does not convey the right to include in any such advertising or representation information about specific properties which are listed with other participants, or which were sold by other participants (as either listing or cooperating broker).

However, any print or non-print forms of advertising or other forms of public representations based in whole or in part on information supplied by the association or its MLS must clearly demonstrate the period of time over which such claims are based and must include the following, or substantially similar, notice:

> Based on information from the association of REALTORS® (alternatively, from the _____ MLS) for the period (_date_) through (_date_). *(Amended 11/97)*

**Note:** Associations are advised to select one rule for the two (2) alternatives above. M

# Changes in Rules and Regulations

**Section 14 Changes in Rules and Regulations**

Amendments to the rules and regulations of the service shall be by consideration and approval of the board of directors of the multiple listing service, subject to final approval by the board of directors of the _____ Association of REALTORS® (shareholder).

**Note:** Some associations may prefer to change the rules and regulations by a vote of the participants of the service, subject to approval of the board of directors of the service, with final approval by the board of directors of the association of REALTORS® which is the sole and exclusive shareholder of the stock of the service corporation. M

# Arbitration of Disputes*

**Section 15 Arbitration of Disputes**

By becoming and remaining a participant, each participant agrees to arbitrate disputes involving contractual issues and questions, and specific non-contractual issues and questions defined in Standard of Practice 17-4 of the Code of Ethics with MLS participants in different firms arising out of their relationships as MLS participants, subject to the following qualifications.

a. If all disputants are members of the same association of REALTORS® or have their principal place of business within the same association's territorial jurisdiction, they shall arbitrate pursuant to the procedures of that association of REALTORS®.

b. If the disputants are members of different associations of REALTORS® or if their principal place of business is located within the territorial jurisdiction of different associations of REALTORS®, they remain obligated to arbitrate in accordance with the procedures of the _____ (state association of REALTORS®). *(Amended 11/97)*

**Interboard Arbitration Procedures:** Arbitration shall be conducted in accordance with any existing interboard agreement or, alternatively, in accordance with the interboard arbitration procedures in the *Code of Ethics and Arbitration Manual* of the NATIONAL ASSOCIATION OF REALTORS®. Nothing herein shall preclude participants from agreeing to arbitrate the dispute before a particular association of REALTORS®. *(Amended 11/98)* O

**Awards:** The obligation to arbitrate includes the duty to either 1) pay an award to the party(ies) named in the award or 2) deposit the funds with the Professional Standards Administrator to be held in an escrow or trust account maintained for this purpose. Failure to satisfy the award or deposit the funds with the association within ten (10) days may be considered a

---

*Only adopt this section if the association's MLS is open to nonmember participants (otherwise qualified individuals who do not hold REALTOR® membership anywhere). If adopted, Section 15 may not be modified.

violation of the MLS rules and may subject the participant to disciplinary action at the sole discretion of the MLS. *(Adopted 11/15)* **O**

| | |
|---|---|
| **Section 16** | # Standards of Conduct for MLS Participants* |

**Standard 16.1**    MLS participants shall not engage in any practice or take any action inconsistent with exclusive representation or exclusive brokerage relationship agreements that other MLS participants have with clients. *(Amended 1/04)* **O**

**Standard 16.2**    Signs giving notice of property for sale, rent, lease, or exchange shall not be placed on property without consent of the seller/landlord. **O**

**Standard 16.3**    MLS participants acting as subagents or as buyer/tenant representatives or brokers shall not attempt to extend a listing broker's offer of cooperation and/or compensation to other brokers without the consent of the listing broker. *(Amended 1/04)* **O**

**Standard 16.4**    MLS participants shall not solicit a listing currently listed exclusively with another broker. However, if the listing broker, when asked by the MLS participant, refuses to disclose the expiration date and nature of such listing (i.e., an exclusive right-to-sell, an exclusive agency, open listing, or other form of contractual agreement between the listing broker and the client) the MLS participant may contact the owner to secure such information and may discuss the terms upon which the MLS participant might take a future listing or, alternatively, may take a listing to become effective upon expiration of any existing exclusive listing. **O**

**Standard 16.5**    MLS participants shall not solicit buyer/tenant agreements from buyers/tenants who are subject to exclusive buyer/tenant agreements. However, if asked by an MLS participant, the broker refuses to disclose the expiration date of the exclusive buyer/tenant agreement, the MLS participant may contact the buyer/tenant to secure such information and may discuss the terms upon which the MLS participant might enter into a future buyer/tenant agreement or, alternatively, may enter into a buyer/tenant agreement to become effective upon the expiration of any existing exclusive buyer/tenant agreement. *(Amended 1/98)* **O**

**Standard 16.6**    MLS participants shall not use information obtained from listing brokers through offers to cooperate made through multiple listing services or through other offers of cooperation to refer listing brokers' clients to other brokers or to create buyer/tenant relationships with listing brokers' clients, unless such use is authorized by listing brokers. *(Amended 11/01)* **O**

**Standard 16.7**    The fact that an agreement has been entered into with an MLS participant shall not preclude or inhibit any other MLS participant from entering into a similar agreement after the expiration of the prior agreement. *(Amended 1/98)* **O**

**Standard 16.8**    The fact that a prospect has retained an MLS participant as an exclusive representative or exclusive broker in one or more past transactions does not preclude other MLS participants from seeking such prospect's future business. *(Amended 1/04)* **O**

---

*Only adopt the following standards of conduct if the association's MLS is open to nonmember participants (otherwise qualified individuals who do not hold REALTOR® membership anywhere). Any of the standards of conduct, if adopted, may not be modified.

**Standard 16.9**       MLS participants are free to enter into contractual relationships or to negotiate with sellers/landlords, buyers/tenants or others who are not subject to an exclusive agreement but shall not knowingly obligate them to pay more than one commission except with their informed consent. *(Amended 1/98)* O

**Standard 16.10**      When MLS participants are contacted by the client of another MLS participant regarding the creation of an exclusive relationship to provide the same type of service, and MLS participants have not directly or indirectly initiated such discussions, they may discuss the terms upon which they might enter into a future agreement or, alternatively, may enter into an agreement which becomes effective upon expiration of any existing exclusive agreement. *(Amended 1/98)* O

**Standard 16.11**      In cooperative transactions, MLS participants shall compensate cooperating MLS participants (principal brokers) and shall not compensate nor offer to compensate, directly or indirectly, any of the sales licensees employed by or affiliated with other MLS participants without the prior express knowledge and consent of the cooperating broker. O

**Standard 16.12**      MLS participants are not precluded from making general announcements to prospects describing their services and the terms of their availability even though some recipients may have entered into agency agreements or other exclusive relationships with another MLS participant. A general telephone canvass, general mailing, or distribution addressed to all prospects in a given geographical area or in a given profession, business, club, or organization, or other classification or group is deemed general for purposes of this rule. *(Amended 1/04)*

The following types of solicitations are prohibited:

Telephone or personal solicitations of property owners who have been identified by a real estate sign, multiple listing compilation, or other information service as having exclusively listed their property with another MLS participant; and mail or other forms of written solicitations of prospects whose properties are exclusively listed with another MLS participant when such solicitations are not part of a general mailing but are directed specifically to property owners identified through compilations of current listings, for sale or for rent signs, or other sources of information intended to foster cooperation with MLS participants. *(Amended 1/04)* O

**Standard 16.13**      MLS participants, prior to entering into a representation agreement, have an affirmative obligation to make reasonable efforts to determine whether the prospect is subject to a current, valid exclusive agreement to provide the same type of real estate service. *(Amended 1/04)* O

**Standard 16.14**      MLS participants, acting as buyer or tenant representatives or brokers, shall disclose that relationship to the seller/landlord's representative or broker at first contact and shall provide written confirmation of that disclosure to the seller/landlord's representative or broker not later than execution of a purchase agreement or lease. *(Amended 1/04)* O

**Standard 16.15**      On unlisted property, MLS participants acting as buyer/tenant representatives or brokers shall disclose that relationship to the seller/landlord at first contact for that buyer/tenant and shall provide written confirmation of such disclosure to the seller/landlord not later than execution of any purchase or lease agreement. *(Amended 1/04)*

126

MLS participants shall make any request for anticipated compensation from the seller/landlord at first contact. **O**

**Standard 16.16**   MLS participants, acting as representatives or brokers of sellers/landlords or as subagents of listing brokers, shall disclose that relationship to buyers/tenants as soon as practicable, and shall provide written confirmation of such disclosure to buyers/tenants not later than execution of any purchase or lease agreement. *(Amended 1/04)* **O**

**Standard 16.17**   MLS participants are not precluded from contacting the client of another broker for the purpose of offering to provide, or entering into a contract to provide, a different type of real estate service unrelated to the type of service currently being provided (e.g., property management as opposed to brokerage) or from offering the same type of service for property not subject to other brokers' exclusive agreements. However, information received through a multiple listing service or any other offer of cooperation may not be used to target clients of other MLS participants to whom such offers to provide services may be made. *(Amended 1/04)* **O**

**Standard 16.18**   MLS participants, acting as subagents or buyer/tenant representatives or brokers, shall not use the terms of an offer to purchase/lease to attempt to modify the listing broker's offer of compensation to subagents or buyer/tenant representatives or brokers, or make the submission of an executed offer to purchase/lease contingent on the listing broker's agreement to modify the offer of compensation. *(Amended 1/04)* **O**

**Standard 16.19**   All dealings concerning property exclusively listed or with buyer/tenants who are subject to an exclusive agreement shall be carried on with the client's representative or broker, and not with the client, except with the consent of the client's representative or broker or except where such dealings are initiated by the client. *(Amended 1/04)*

Before providing substantive services (such as writing a purchase offer or presenting a CMA) to prospects, MLS participants shall ask prospects whether they are a party to any exclusive representation agreement. MLS participants shall not knowingly provide substantive services concerning a prospective transaction to prospects who are parties to exclusive representation agreements, except with the consent of the prospects' exclusive representatives or at the direction of prospects. *(Adopted 1/03, Amended 1/04)* **O**

**Standard 16.20**   Participants, users, and subscribers, prior to or after their relationship with their current firm is terminated, shall not induce clients of their current firm to cancel exclusive contractual agreements between the client and that firm. This does not preclude participants from establishing agreements with their associated licensees governing assignability of exclusive agreements. *(Adopted 1/98, Amended 1/10)* **O**

**Standard 16.21**   These rules are not intended to prohibit ethical, albeit aggressive or innovative business practices, and do not prohibit disagreements with other MLS participants involving commission, fees, compensation, or other forms of payment or expenses. **O**

**Standard 16.22**   MLS participants shall not knowingly or recklessly make false or misleading statements about other real estate professionals, their businesses, or their business practices. *(Amended 01/12)* **O**

**Standard 16.23**　　　MLS participants' firm websites shall disclose the firm's name and state(s) of licensure in a reasonable and readily apparent manner.

Websites of licensees affiliated with a participant's firm shall disclose the firm's name and the licensee's state(s) of licensure in a reasonable and readily apparent manner. *(Adopted 11/07)* O

**Standard 16.24**　　　MLS participants shall present a true picture in their advertising and representations to the public, including Internet content, images, and the URLs and domain names they use, and participants may not:

a. engage in deceptive or unauthorized framing of real estate brokerage websites;

b. manipulate (e.g., presenting content developed by others) listing and other content in any way that produces a deceptive or misleading result;

c. deceptively use metatags, keywords or other devices/methods to direct, drive, or divert Internet traffic;

d. present content developed by others without either attribution or without permission; or

e. otherwise mislead consumers, including use of misleading images. *(Amended 1/18)* O

**Standard 16.25**　　　The services which MLS participants provide to their clients and customers shall conform to the standards of practice and competence which are reasonably expected in the specific real estate disciplines in which they engage; specifically, residential real estate brokerage, real property management, commercial and industrial real estate brokerage, land brokerage, real estate appraisal, real estate counseling, real estate syndication, real estate auction, and international real estate.

MLS participants shall not undertake to provide specialized professional services concerning a type of property or service that is outside their field of competence unless they engage the assistance of one who is competent on such types of property or service, or unless the facts are fully disclosed to the client. Any persons engaged to provide such assistance shall be so identified to the client and their contribution to the assignment should be set forth. *(Adopted 11/09)* O

# Orientation

**Section 17**
**Orientation**　　　Any applicant for MLS participation and any licensee (including licensed or certified appraisers) affiliated with an MLS participant who has access to and use of MLS-generated information shall complete an orientation program of no more than eight (8) classroom hours devoted to the MLS rules and regulations and computer training related to MLS information entry and retrieval and the operation of the MLS within thirty (30) days after access has been provided. *(Amended 11/04)* M

Participants and subscribers may be required, at the discretion of the MLS, to complete additional training of not more than four (4) classroom hours in any twelve (12) month period when deemed necessary by the MLS to familiarize participants and subscribers with system changes or enhancements and/or changes to MLS rules or policies. Participants and subscribers must be given the opportunity to complete any mandated orientation and additional training remotely. *(Amended 11/17)*

# Internet Data Exchange (IDX)

**Section 18**
**IDX Defined**

IDX affords MLS participants the ability to authorize limited electronic display and delivery of their listings by other participants via the following authorized mediums under the participant's control: websites, mobile apps, and audio devices. As used throughout these rules, "display" includes "delivery" of such listing. *(Amended 5/17)* M

**Section 18.1**
**Authorization**

**Note:** Select one of the following two options. M

**Option #1:** Participants' consent for display of their listings by other participants pursuant to these rules and regulations is presumed unless a participant affirmatively notifies the MLS that the participant refuses to permit display (either on a blanket or on a listing-by-listing basis). If a participant refuses on a blanket basis to permit the display of that participant's listings, that participant may not download, frame or display the aggregated MLS data of other participants.*

**Option #2:** Participants' consent for display of their listings by other participants pursuant to these rules and regulations must be established in writing. If a participant withholds consent on a blanket basis to permit the display of that participant's listings, that participant may not download, frame or display the aggregated MLS data of other participants.*

**Section 18.2**
**Participation**

**Note:** Select one of the following four options. Participation in IDX may be limited to MLS participants engaged in real estate brokerage by adopting Option #3 or Option #4. M

**Option #1:** Participation in IDX is available to all MLS participants who consent to display of their listings by other participants.

**Option #2:** Participation in IDX is available to all MLS participants who are REALTORS® and who consent to display of their listings by other participants.

**Option #3:** Participation in IDX is available to all MLS participants engaged in real estate brokerage who consent to display of their listings by other participants. *(Amended 11/09)*

**Option #4:** Participation in IDX is available to all MLS participants who are REALTORS® who are engaged in real estate brokerage and who consent to display of their listings by other participants. *(Amended 11/09)*

**Section 18.2.1**

Participants must notify the MLS of their intention to display IDX information and must give the MLS direct access for purposes of monitoring/ensuring compliance with applicable rules and policies. *(Amended 05/12)* M

**Section 18.2.2**

MLS participants may not use IDX-provided listings for any purpose other than display as provided for in these rules. This does not require participants to prevent indexing of IDX listings by recognized search engines. *(Amended 05/12)* M

**Section 18.2.3**

Listings, including property addresses, can be included in IDX displays except where a seller has directed their listing broker to withhold their listing or the listing's property address from all display on the Internet (including, but not limited to, publicly-accessible websites or VOWs) or other electronic forms of display or distribution. *(Amended 05/17)* M

---

*Even where participants have given blanket authority for other participants to display their listings through IDX, such consent may be withdrawn on a listing-by-listing basis where the seller has prohibited all Internet display or other electronic forms of display or distribution. *(Amended 05/17)*

**Section 18.2.4**     Participants may select the listings they choose to display through IDX based only on objective criteria including, but not limited to, factors such as geography or location ("uptown," "downtown," etc.), list price, type of property (e.g., condominiums, cooperatives, single-family detached, multi-family), cooperative compensation offered by listing brokers, type of listing (e.g., exclusive right-to-sell or exclusive agency), or the level of service being provided by the listing firm. Selection of listings displayed through IDX must be independently made by each participant. *(Amended 05/17)* Ⓜ

**Section 18.2.5**     Participants must refresh all MLS downloads and IDX displays automatically fed by those downloads at least once every twelve (12) hours. *(Amended 11/14)* Ⓜ

**Section 18.2.6**     Except as provided in the IDX policy and these rules, an IDX site or a participant or user operating an IDX site or displaying IDX information as otherwise permitted may not distribute, provide, or make any portion of the MLS database available to any person or entity. *(Amended 05/12)* Ⓜ

**Section 18.2.7**     Any IDX display controlled by a participant must clearly identify the name of the brokerage firm under which they operate in a readily visible color and typeface. For purposes of the IDX policy and these rules, "control" means the ability to add, delete, modify and update information as required by the IDX policy and MLS rules. *(Amended 05/12)* Ⓜ

**Section 18.2.8**     Any IDX display controlled by a participant or subscriber that

a. allows third-parties to write comments or reviews about particular listings or displays a hyperlink to such comments or reviews in immediate conjunction with particular listings, or

b. displays an automated estimate of the market value of the listing (or hyperlink to such estimate) in immediate conjunction with the listing,

either or both of those features shall be disabled or discontinued for the seller's listings at the request of the seller. The listing broker or agent shall communicate to the MLS that the seller has elected to have one or both of these features disabled or discontinued on all displays controlled by participants. Except for the foregoing and subject to Section 18.2.9, a participant's IDX display may communicate the participant's professional judgment concerning any listing. Nothing shall prevent an IDX display from notifying its customers that a particular feature has been disabled at the request of the seller. *(Adopted 05/12)* Ⓜ

**Section 18.2.9**     Participants shall maintain a means (e.g., e-mail address, telephone number) to receive comments about the accuracy of any data or information that is added by or on behalf of the participant beyond that supplied by the MLS and that relates to a specific property. Participants shall correct or remove any false data or information relating to a specific property upon receipt of a communication from the listing broker or listing agent for the property explaining why the data or information is false. However, participants shall not be obligated to remove or correct any data or information that simply reflects good faith opinion, advice, or professional judgment. *(Amended 05/12)* Ⓜ

**Section 18.2.10**     An MLS participant (or where permitted locally, an MLS subscriber) may co-mingle the listings of other brokers received in an IDX feed with listings available from other MLS IDX feeds, provided all such displays are consistent with the IDX rules, and the MLS participant

(or MLS subscriber) holds participatory rights in those MLSs. As used in this policy, "co-mingling" means that consumers are able to execute a single property search of multiple IDX data feeds resulting in the display of IDX information from each of the MLSs on a single search results page; and that participants may display listings from each IDX feed on a single webpage or display. *(Adopted 11/14)* **M**

**Section 18.2.11**     Participants shall not modify or manipulate information relating to other participants listings. MLS participants may augment their IDX display of MLS data with applicable property information from other sources to appear on the same webpage or display, clearly separated by the data supplied by the MLS. The source(s) of the information must be clearly identified in the immediate proximity to such data. This requirement does not restrict the format of MLS data display or display of fewer than all of the available listings or fewer authorized fields. *(Adopted 05/15)* **M**

**Section 18.2.12**     All listings displayed pursuant to IDX shall identify the listing firm in a reasonably prominent location and in a readily visible color and typeface not smaller than the median used in the display of listing data.* *(Amended 05/17)* **M**

**Section 18.3**
**Display**     Display of listing information pursuant to IDX is subject to the following rules:

**Note:**  All of the following rules are optional but, if adopted, cannot be modified. Select those rules which apply to your IDX program and number the sections accordingly.

**Section 18.3.1**     Listings displayed pursuant to IDX shall contain only those fields of data designated by the MLS. Display of all other fields (as determined by the MLS) is prohibited. Confidential fields intended only for other MLS participants and users (e.g., cooperative compensation offers, showing instructions, property security information, etc.) may not be displayed. *(Amended 05/12)* **O**

**Section 18.3.1.1**     The type of listing agreement (e.g., exclusive right to sell, exclusive agency, etc.) may not be displayed. *(Amended 05/12)* **O**

**Section 18.3.2**     Deleted May 2015.

**Section 18.3.3**     Deleted May 2017; moved to 18.2.12 May 2017.

**Section 18.3.4**     All listings displayed pursuant to IDX shall identify the listing agent. **O**

**Section 18.3.5**     Non-principal brokers and sales licensees affiliated with IDX participants may display information available through IDX on their own websites subject to their participant's consent and control and the requirements of state law and/or regulation. **O**

**Section 18.3.6**     Deleted November 2006.

---

*Displays of minimal information (e.g., "thumbnails", text messages, "tweets", etc., of two hundred [200] characters or less) are exempt from this requirement but only when linked directly to a display that includes all required disclosures. For audio delivery of listing content, all required disclosures must be subsequently delivered electronically to the registered consumer performing the property search or linked to through the device's application. *(Amended 5/17)*

**Section 18.3.7**    All listings displayed pursuant to IDX shall show the MLS as the source of the information.* *(Amended 05/17)* O

**Section 18.3.8**    Participants (and their affiliated licensees, if applicable) shall indicate on their websites that IDX information is provided exclusively for consumers' personal, non-commercial use, that it may not be used for any purpose other than to identify prospective properties consumers may be interested in purchasing, and that the data is deemed reliable but is not guaranteed accurate by the MLS. The MLS may, at its discretion, require use of other disclaimers as necessary to protect participants and/or the MLS from liability.* *(Amended 05/17)* O

**Section 18.3.9**    The data consumers can retrieve or download in response to an inquiry shall be determined by the MLS but in no instance shall be limited to fewer than five hundred (500) listings or fifty percent (50%) of the listings available for IDX display, whichever is fewer. *(Amended 11/17)* O

**Section 18.3.10**    The right to display other participants' listings pursuant to IDX shall be limited to a participant's office(s) holding participatory rights in this MLS. O

**Section 18.3.11**    Listings obtained through IDX feeds from REALTOR® Association MLSs where the MLS Participant holds participatory rights must be displayed separately from listings obtained from other sources. Listings obtained from other sources (e.g., from other MLSs, from non-participating brokers, etc.) must display the source from which each such listing was obtained.* *(Amended 05/17)* O

> **Note:** An MLS participant (or where permitted locally, an MLS subscriber) may co-mingle the listings of other brokers received in an IDX feed with listings available from other MLS IDX feeds, provided all such displays are consistent with the IDX rules, and the MLS participant (or MLS subscriber) holds participatory rights in those MLSs. As used in this policy, "co-mingling" means that consumers are able to execute a single property search of multiple IDX data feeds resulting in the display of IDX information from each of the MLSs on a single search results page; and that participants may display listings from each IDX feed on a single webpage or display. *(Adopted 11/14)*

**Section 18.3.12**    Display of expired, withdrawn, and sold listings** is prohibited. *(Amended 11/15)* O

**Section 18.3.13**    Display of seller's(s') and/or occupant's(s') name(s), phone number(s), and e-mail address(es) is prohibited. O

> **Note:** The following Sections 18.3.14 and 18.3.15 may be adopted by MLSs that provide participants with a "persistent" download (i.e., where the MLS database resides on participants' servers) of the MLS database.

---

*The MLS may, at its discretion, require use of other disclaimers as necessary to protect participants and/or the MLS from liability. Displays of minimal information (e.g., "thumbnails", text messages, "tweets", etc., of two hundred [200] characters or less) are exempt from this requirement but only when linked directly to a display that includes all required disclosures. For audio delivery of listing content, all required disclosures must be subsequently delivered electronically to the registered consumer performing the property search or linked to through the device's application. *(Amended 05/17)*

**Note:** If "sold" information is publicly accessible, display of "sold" listings may not be prohibited. *(Adopted 11/14)*

**Section 18.3.14**    Participants are required to employ appropriate security protection such as firewalls on their websites and displays, provided that any security measures required may not be greater than those employed by the MLS. *(Amended 05/12)* O

**Section 18.3.15**    Participants must maintain an audit trail of consumer activity on their website and make that information available to the MLS if the MLS believes the IDX site has caused or permitted a breach in the security of the data or a violation of MLS rules related to use by consumers. *(Amended 05/12)* O

**Section 18.3.16**    **Note:** Select one of the following two options.

**Option #1:** Advertising (including co-branding) on pages displaying IDX-provided listings is prohibited.

**Option #2:** Deceptive or misleading advertising (including co-branding) on pages displaying IDX-provided listings is prohibited. For purposes of these rules, co-branding will be presumed not to be deceptive or misleading if the participant's logo and contact information is larger than that of any third party.  *(Adopted 11/09)* O

**Section 18.4**
**Service Fees and Charges**    Service fees and charges for participation in IDX shall be as established annually by the Board of Directors. *(Adopted 11/01, Amended 5/05)* O

**Section 19**    # Virtual Office Websites (VOWs)

**Note:**  Adoption of Sections 19.1 through 19.14 is mandatory.

**Section 19.1**
**VOW Defined**    a. A "Virtual Office Website" (VOW) is a participant's Internet website, or a feature of a participant's website, through which the participant is capable of providing real estate brokerage services to consumers with whom the participant has first established a broker-consumer relationship (as defined by state law) where the consumer has the opportunity to search MLS listing information, subject to the participant's oversight, supervision, and accountability. A non-principal broker or sales licensee affiliated with a participant may, with his or her participant's consent, operate a VOW. Any VOW of a non-principal broker or sales licensee is subject to the participant's oversight, supervision, and accountability. M

b. As used in Section 19 of these rules, the term "participant" includes a participant's affiliated non-principal brokers and sales licensees — except when the term is used in the phrases "participant's consent" and "participant's oversight, supervision, and accountability". References to "VOW" and "VOWs" include all Virtual Office Websites, whether operated by a participant, by a non-principal broker or sales licensee, or by an "Affiliated VOW Partner" (AVP) on behalf of a participant. M

c. "Affiliated VOW Partner" (AVP) refers to an entity or person designated by a participant to operate a VOW on behalf of the participant, subject to the participant's supervision, accountability, and compliance with the VOW policy. No AVP has independent participation rights in the MLS by virtue of its right to receive information on behalf of a participant. No AVP has the right to use MLS listing information, except in connection with operation of a VOW on behalf of one or more participants. Access by an AVP to MLS listing information is derivative of the rights of the participant on whose behalf the AVP operates a VOW. M

133

d. As used in Section 19 of these rules, the term "MLS listing information" refers to active listing information and sold data provided by participants to the MLS and aggregated and distributed by the MLS to participants. M

**Section 19.2**

a. The right of a participant's VOW to display MLS listing information is limited to that supplied by the MLS(s) in which the participant has participatory rights. However, a participant with offices participating in different MLSs may operate a master website with links to the VOWs of the other offices. M

b. Subject to the provisions of the VOW policy and these rules, a participant's VOW, including any VOW operated on behalf of a participant by an AVP, may provide other features, information, or functions, e.g., "Internet Data Exchange" (IDX). M

c. Except as otherwise provided in the VOW policy or in these rules, a participant need not obtain separate permission from other MLS participants whose listings will be displayed on the participant's VOW. M

**Section 19.3**

a. Before permitting any consumer to search for or retrieve any MLS listing information on his or her VOW, the participant must take each of the following steps.

  i. The participant must first establish with that consumer a lawful broker-consumer relationship (as defined by state law), including completion of all actions required by state law in connection with providing real estate brokerage services to clients and customers (hereinafter, "Registrants"). Such actions shall include, but are not limited to, satisfying all applicable agency, non-agency, and other disclosure obligations, and execution of any required agreements.

  ii. The participant must obtain the name of and a valid e-mail address for each Registrant. The participant must send an e-mail to the address provided by the Registrant confirming that the Registrant has agreed to the terms of use (described in Subsection d., below). The participant must verify that the e-mail address provided by the Registrant is valid and that the Registrant has agreed to the terms of use.

  iii. The participant must require each Registrant to have a user name and a password, the combination of which is different from those of all other Registrants on the VOW. The participant may, at his or her option, supply the user name and password or may allow the Registrant to establish its user name and password. The participant must also assure that any e-mail address is associated with only one user name and password. M

b. The participant must assure that each Registrant's password expires on a date certain, but may provide for renewal of the password. The participant must at all times maintain a record of the name, e-mail address, user name, and current password of each Registrant. The participant must keep such records for not less than one hundred eighty (180) days after the expiration of the validity of the Registrant's password. M

c. If the MLS has reason to believe that a participant's VOW has caused or permitted a breach in the security of MLS listing information or a violation of MLS rules, the participant shall, upon request of the MLS, provide the name, e-mail address, user name, and current password, of any Registrant suspected of involvement in the breach or violation. The participant shall also, if requested by the MLS, provide an audit trail of activity by any such Registrant. M

d. The participant shall require each Registrant to review and affirmatively to express agreement (by mouse click or otherwise) to a terms of use provision that provides at least the following:

  i. that the Registrant acknowledges entering into a lawful consumer-broker relationship with the participant

   ii. that all information obtained by the Registrant from the VOW is intended only for the Registrant's personal, non-commercial use

   iii. that the Registrant has a bona fide interest in the purchase, sale, or lease of real estate of the type being offered through the VOW

   iv. that the Registrant will not copy, redistribute, or retransmit any of the information provided, except in connection with the Registrant's consideration of the purchase or sale of an individual property

   v. that the Registrant acknowledges the MLS' ownership of and the validity of the MLS' copyright in the MLS database. **[M]**

 e. The terms of use agreement may not impose a financial obligation on the Registrant or create any representation agreement between the Registrant and the participant. Any agreement entered into at any time between the participant and Registrant imposing a financial obligation on the Registrant or creating representation of the Registrant by the participant must be established separately from the terms of use, must be prominently labeled as such, and may not be accepted solely by mouse click. **[M]**

 f. The terms of use agreement shall also expressly authorize the MLS and other MLS participants or their duly authorized representatives to access the VOW for the purposes of verifying compliance with MLS rules and monitoring display of participants' listings by the VOW. The agreement may also include such other provisions as may be agreed to between the participant and the Registrant. **[M]**

**Section 19.4**  A participant's VOW must prominently display an e-mail address, telephone number, or specific identification of another mode of communication (e.g., live chat) by which a consumer can contact the participant to ask questions or get more information about any property displayed on the VOW. The participant or a non-principal broker or sales licensee licensed with the participant must be willing and able to respond knowledgeably to inquiries from Registrants about properties within the market area served by that participant and displayed on the VOW. **[M]**

**Section 19.5**  A participant's VOW must employ reasonable efforts to monitor for and prevent misappropriation, scraping, and other unauthorized uses of MLS listing information. A participant's VOW shall utilize appropriate security protection such as firewalls as long as this requirement does not impose security obligations greater than those employed concurrently by the MLS. **[M]**

    **Note:** MLSs may adopt rules requiring Participants to employ specific security measures, provided that any security measure required does not impose obligations greater than those employed by the MLS.

**Section 19.6**  a. A participant's VOW shall not display the listings or property addresses of any seller who has affirmatively directed the listing broker to withhold the seller's listing or property address from display on the Internet. The listing broker shall communicate to the MLS that the seller has elected not to permit display of the listing or property address on the Internet. Notwithstanding the foregoing, a participant who operates a VOW may provide to consumers via other delivery mechanisms, such as e-mail, fax, or otherwise, the listings of sellers who have determined not to have the listing for their property displayed on the Internet. **[M]**

   b. A participant who lists a property for a seller who has elected not to have the property listing or the property address displayed on the Internet shall cause the seller to execute a document that includes the following (or a substantially similar) provision. **[M]**

---

**Seller Opt-out Form**

1. Check one.

   a. ☐ I have advised my broker or sales agent that I do not want the listed property to be displayed on the Internet.

   b. ☐ I have advised my broker or sales agent that I do not want the address of the listed property to be displayed on the Internet.

2. I understand and acknowledge that if I have selected Option a., consumers who conduct searches for listings on the Internet will not see information about the listed property in response to their searches.

_____
Initials of Seller

---

    c. The participant shall retain such forms for at least one (1) year from the date they are signed or one (1) year from the date the listing goes off the market, whichever is greater. <span>M</span>

**Section 19.7**

    a. Subject to Subsection b., below, a participant's VOW may allow third-parties:

        i. to write comments or reviews about particular listings or display a hyperlink to such comments or reviews in immediate conjunction with particular listings, or

        ii. to display an automated estimate of the market value of the listing (or hyperlink to such estimate) in immediate conjunction with the listing. <span>M</span>

    b. Notwithstanding the foregoing, at the request of a seller, the participant shall disable or discontinue either or both of those features described in Subsection a. as to any listing of the seller. The listing broker or agent shall communicate to the MLS that the seller has elected to have one or both of these features disabled or discontinued on all participants' websites. Subject to the foregoing and to Section 19.8, a participant's VOW may communicate the participant's professional judgment concerning any listing. A participant's VOW may notify its customers that a particular feature has been disabled at the request of the seller. <span>M</span>

**Section 19.8**

A participant's VOW shall maintain a means (e.g., e-mail address, telephone number) to receive comments from the listing broker about the accuracy of any information that is added by or on behalf of the participant beyond that supplied by the MLS and that relates to a specific property displayed on the VOW. The participant shall correct or remove any false information relating to a specific property within forty-eight (48) hours following receipt of a communication from the listing broker explaining why the data or information is false. The participant shall not, however, be obligated to correct or remove any data or information that simply reflects good faith opinion, advice, or professional judgment. <span>M</span>

**Section 19.9**

A participant shall cause the MLS listing information available on its VOW to be refreshed at least once every three (3) days. <span>M</span>

**Section 19.10**     Except as provided in these rules, in the NATIONAL ASSOCIATION OF REALTORS®' VOW policy, or in any other applicable MLS rules or policies, no participant shall distribute, provide, or make accessible any portion of the MLS listing information to any person or entity. **M**

**Section 19.11**     A participant's VOW must display the participant's privacy policy informing Registrants of all of the ways in which information that they provide may be used. **M**

**Section 19.12**     A participant's VOW may exclude listings from display based only on objective criteria, including, but not limited to, factors such as geography, list price, type of property, cooperative compensation offered by listing broker, and whether the listing broker is a REALTOR®. **M**

**Section 19.13**     A participant who intends to operate a VOW to display MLS listing information must notify the MLS of its intention to establish a VOW and must make the VOW readily accessible to the MLS and to all MLS participants for purposes of verifying compliance with these rules, the VOW policy, and any other applicable MLS rules or policies. **M**

**Section 19.14**     A participant may operate more than one VOW himself or herself or through an AVP. A participant who operates his or her own VOW may contract with an AVP to have the AVP operate other VOWs on his or her behalf. However, any VOW operated on behalf of a participant by an AVP is subject to the supervision and accountability of the participant. **M**

**Note:** Adoption of Sections 19.15 through 19.19 is at the discretion of the MLS. However, if any of the following sections are adopted, **an equivalent requirement must be imposed** on participants' use of MLS listing information in providing brokerage service through all other delivery mechanisms.

**Section 19.15**     A participant's VOW may not make available for search by or display to Registrants any of the following information:

a. expired and withdrawn listings

**Note:** Due to the 2015 changes in IDX policy and the requirement that participants be permitted to make MLS listing information available to Registrants of VOW sites where such information may be made available via other delivery mechanisms, MLSs can no longer prohibit the display of pending ("under contract") listings on VOW sites.

b. the compensation offered to other MLS participants

c. the type of listing agreement, i.e., exclusive right-to-sell or exclusive agency

d. the seller's and occupant's name(s), phone number(s), or e-mail address(es)

e. instructions or remarks intended for cooperating brokers only, such as those regarding showings or security of listed property

f. sold information **O**

**Note:** If sold information is publicly accessible in the jurisdiction of the MLS, Subsection 19.15f. must be omitted. *(Revised 11/15)* **M**

**Section 19.16**     A participant shall not change the content of any MLS listing information that is displayed on a VOW from the content as it is provided in the MLS. The participant may, however, augment MLS listing information with additional information not otherwise prohibited by these rules or by other applicable MLS rules or policies, as long as the source of such other

information is clearly identified. This rule does not restrict the format of display of MLS listing information on VOWs or the display on VOWs of fewer than all of the listings or fewer than all of the authorized information fields. O

**Section 19.17**    A participant shall cause to be placed on his or her VOW a notice indicating that the MLS listing information displayed on the VOW is deemed reliable, but is not guaranteed accurate by the MLS. A participant's VOW may include other appropriate disclaimers necessary to protect the participant and/or the MLS from liability. O

**Section 19.18**    A participant shall cause any listing that is displayed on his or her VOW to identify the name of the listing firm and the listing broker or agent in a readily visible color, in a reasonably prominent location, and in typeface not smaller than the median typeface used in the display of listing data. O

**Section 19.19**    A participant shall limit the number of listings that a Registrant may view, retrieve, or download to not more than ___ current listings and not more than ___ sold listings in response to any inquiry. O

   **Note:**  The number of listings that may be viewed, retrieved, or downloaded should be specified by the MLS in the context of this rule, but may not be fewer than five hundred (500) listings or fifty percent (50%) of the listings in the MLS, whichever is less. *(Amended 11/17)* M

   **Note:**  Adoption of Sections 19.20 through 19.25 is at the discretion of the MLS. It is not required that equivalent requirements be established related to other delivery mechanisms.

**Section 19.20**    A participant shall require that Registrants' passwords be reconfirmed or changed every ___ days. O

   **Note:**  The number of days passwords remain valid before being changed or reconfirmed must be specified by the MLS in the context of this rule and cannot be shorter than ninety (90) days. Participants may, at their option, require Registrants to reconfirm or change passwords more frequently. M

**Section 19.21**    A participant may display advertising and the identification of other entities ("co-branding") on any VOW the participant operates or that is operated on his or her behalf.  However, a participant may not display on any such VOW deceptive or misleading advertising or co-branding. For purposes of this section, co-branding will be presumed not to be deceptive or misleading if the participant's logo and contact information (or that of at least one participant, in the case of a VOW established and operated on behalf of more than one participant) is displayed in immediate conjunction with that of every other party, and the logo and contact information of all participants displayed on the VOW is as large as the logo of the AVP and larger than that of any third party. O

**Section 19.22**    A participant shall cause any listing displayed on his or her VOW obtained from other sources, including from another MLS or from a broker not participating in the MLS, to identify the source of the listing. O

138

**Section 19.23**    A participant shall cause any listing displayed on his or her VOW obtained from other sources, including from another MLS or from a broker not participating in the MLS, to be searched separately from listings in the MLS. [O]

**Section 19.24**    Participants and the AVPs operating VOWs on their behalf must execute the license agreement required by the MLS. [O]

**Section 19.25**    Where a seller affirmatively directs his or her listing broker to withhold either the seller's listing or the address of the seller's listing from display on the Internet, a copy of the seller's affirmative direction shall be provided to the MLS within forty-eight (48) hours. [O]

# Part Four:  Appendices

# Appendix 1

**Section 1**
**History and Background**

Multiple listing, in one form or another, dates back into the nineteenth century. The first boards of REALTORS® were established as real estate exchanges. On certain appointed days, the members of a board of REALTORS® gathered at the board offices and exchanged information about their listings. They, in effect, carried on an auction, as they frequently came prepared to purchase certain property desired by their principals but listed by another broker. This practice was common in the 1880s and 1890s. Shortly after the end of the nineteenth century the term multiple listing came into use. It is mentioned as an activity of boards of REALTORS® as early as 1907.

By the 1920s, multiple listing had become widely accepted. The expansion of this function continued through succeeding years and spread throughout the country with the result that today hundreds of local associations of REALTORS® provide multiple listing services, in one form or another, to their members. ☐ 1

**Section 2**
**National Association's**
**Interest**

The interest of the National Association in multiple listing is in assuring the proper operation of such an activity so that it furthers the objectives of the Code of Ethics, encourages cooperation between REALTORS®, and avoids practices which may be contrary to public policy or the law.

The recommendations of the National Association are in support of the following principles:

1. An association of REALTORS® should be representative of those engaged in the real estate business in the area which it serves. As a trade association, it should open its activities to all qualified persons and invite them to join in voluntary association for the good of the public.

2. Eligibility for association of REALTORS® membership should not require participation in a multiple listing activity if, in the opinion of the individual, such activity does not lend itself to his particular method of doing business.

3. Participation in any activity should be subject to rules that do not conflict with the public interest.

4. The association of REALTORS® should maintain its position as an organization serving a public interest and sustain its tax-exempt status.

5. Activities and services offered to REALTORS® should be under the direct supervision of the association of REALTORS® subject to the governing body of the association of REALTORS® and should not be conducted by a separate or independent group. In an instance where, in order to preserve the tax-exempt status of the association, it is necessary to organize the multiple listing service as a separate, for profit corporation, such corporation should be wholly owned by the association of REALTORS® and as such is ultimately accountable to the association of REALTORS®. ☐ 1

**Section 3**
**Reasons for Association**
**Ownership**

An association of REALTORS® exists to provide the real estate services desired and needed by members to assist them in serving the real estate needs and interests of their clients, their customers, and the community.

The association is dedicated to the promotion of continuing real estate education and to the establishment and enforcement of high standards of professional conduct in all real estate transactions. As association members, REALTORS® and REALTOR-ASSOCIATE®s are committed to the strict Code of Ethics of the NATIONAL ASSOCIATION OF REALTORS® which obligates REALTORS® to cooperate in real estate transactions whenever it is in the interest of their clients.

142

The concept of cooperation in real estate transactions can be enhanced by a mechanism such as the multiple listing service which enables a REALTOR® to cooperate with other REALTORS® by extending to them a blanket unilateral offer of compensation. If any significant group of REALTORS® desires to establish a means of extending blanket unilateral offers of compensation, the association should establish an MLS to enable them to achieve such objective. *(Amended 11/96)*

The MLS should be an association service or function for the following reasons:

The association exists. This means the service can be established less expensively and more quickly and should result in a fuller utilization of the association's personnel and equipment.

Every MLS, whether or not association affiliated, requires certain functions to be performed, including management, rule making and enforcement, and arbitration of disputes. Associations of REALTORS® have the existing organization and capacity to fulfill all these functions, and by doing so, are able to minimize the cost and improve the quality of the performance. *(Revised 11/96)*

Since REALTORS® are bound to a Code of Ethics and other obligations of association membership, it is desirable that such obligations be consistent with the obligations imposed by the MLS. This can only be assured if the MLS is subject to the control of the association, since the association cannot legally control an independent organization. Association control is especially important to avoid situations where the association is held responsible, at least in the minds of the public, for the conduct of an MLS not under its control simply because REALTORS® are members of such an MLS.

REALTORS® have worked hard to establish a reputation for integrity and professionalism; and they carry that image with them in all their transactions. If their cooperative transactions are through an association MLS, the association can better assure compliance with the applicable legal obligations and better defend the legitimate and essential rights of REALTORS® to do business.

In sum, a multiple listing service is just one of many services offered by an association of REALTORS®, but it is a useful and beneficial service to the members, their clients and customers, and the community. The association MLS offers efficiency, effectiveness, and economy of operation. It avoids duplication of effort and of cost. The community looks to the association for leadership in matters affecting real estate and hence would expect a multiple listing service to be operated by the association of REALTORS®. The association has the respect and confidence of the community it serves. Association members are committed to the Code of Ethics of the NATIONAL ASSOCIATION OF REALTORS® and to its enforcement, including disciplinary proceedings and arbitration proceedings to resolve real estate complaints and disputes consistent with state law. The association MLS promotes harmony and cooperation among association members and remains, in proper perspective, an association service. I

**Section 4
How to Organize a
Multiple Listing Service**

If a substantial number of members show an interest in the subject of multiple listing, it is prudent for the association of REALTORS® to show leadership by appointing a committee to investigate. It can be a mistake for the association of REALTORS® to ignore interest on the part of even a limited number of members, lest they undertake to establish a service outside the association.

The committee should sponsor a full discussion of the subject at one or several membership meetings. Members from nearby associations of REALTORS® with multiple listing activities should be invited to give their view and answer questions. However, their answers should be verified in terms of this *Handbook* and the policies of the National Association.

The committee should make on-site visits to various associations with multiple listing activities to learn what costs are involved and to decide on the equipment needed. Many associations find it desirable to contract all or most processing. Others do a complete processing job themselves.

If processing is done outside the association, the initial equipment needed is minor and there should be no need for a large initial participation fee.

If the association does the complete processing, it will be necessary to purchase duplicating and photographic equipment. The initial cost of starting the operation may be higher, but long-term costs and control advantages may be greater.

After the committee has made a thorough investigation of all factors involved, it should make its report and recommendations to a membership meeting. If the report favors adoption of the activity, the association should amend the bylaws to authorize the operation of the activity and to set up the machinery for operation. (See bylaw provisions located elsewhere in this *Handbook*.)

The name of association owned or operated multiple listing services (including multi-association and regional multiples) should rationally relate to the area served. (See Part Two, C., Operational Issues, Section 7, Challenges to the Names of Multiple Listing Services, for more information.)

The committee authorized to be created by the amended bylaws then should adopt supplemental rules and regulations which will outline the operating procedures of the activity. The rules and regulations, as adopted, should be submitted to the board of directors. A copy should be provided to the state association for its records and a copy should be forwarded to Board Policy and Programs, National Association, so that the rules and regulations can be reviewed to determine their compliance with applicable policy. (See the National Association's MLS Antitrust Compliance Policy, located in Part Two of this *Handbook*.) **R**

# Appendix 2

**Merging an Independent MLS with an Association of REALTORS®**

Why should a multiple listing service which functions efficiently, yet is neither owned nor operated by an association of REALTORS®, seek association affiliation? This question is one which is posed repeatedly to the National Association and one for which there is no simplistic answer. However, among the considerations which have prompted such affiliation in the past are the following:

1. The unification strengthens the position of the association in the community and contributes to harmony among REALTORS® since all are in the "same house" working together.

2. Associations are most knowledgeable on a continuing basis as to policy of the National Association (Code of Ethics, official interpretations of bylaws, MLS Antitrust Compliance Policy). In this regard, an association MLS can have its governing documents reviewed by the National Association and can obtain policy guidance as to proposed amendments. Thus, they benefit from the National Association's experience on a nationwide basis as to actions brought against multiple listing services, the interest of the Justice Department, provisions of consent decrees and, in general, evaluation on a continuing basis. This service is not provided to multiple listing services which are not owned and operated by associations of REALTORS®.

   The association MLS offers its REALTOR® participants the advantages of being able to clearly identify those persons to whom they offer compensation, knowing that they as REALTORS® and REALTOR-ASSOCIATE®s are all bound and directed by the Code of Ethics, knowing that they have agreed to arbitrate in the event of a dispute and have obligated themselves, as membership duties, to abide by the constitution and bylaws of the local association, the state and National Association. *(Amended 11/96)*

3. The association MLS can deal with MLS rule violations, or if deemed desirable, may refer violations to the professional standards committee of the association and must refer all allegations of unethical conduct to the association's professional standards committee and must refer all arbitration cases to an arbitration panel of the professional standards committee. An outside MLS must duplicate these facilities only at considerable additional cost, and in no event can enforce the Code of Ethics of the National Association to which it does not and cannot subscribe.

4. If litigation arises against an MLS under association auspices, the protection of the errors and omissions insurance provided by the National Association is available. The association MLS also may have, under appropriate circumstances, access to the legal action fund of the National Association as a back-up to the errors and omissions insurance.

5. The association MLS offers the economy of the same facilities and same staff as utilized by the association.

6. In an association MLS there is no vested interest in any one or limited group of participants. The common interest without vested individual interest is an assurance to all who participate and contributes to harmony and best operation.

7. The association MLS leaves no doubt that the service is a service and not merely a business enterprise. Policy of the National Association precludes an association-owned-and-operated MLS from functioning as an agent.

Once the numerous benefits of association affiliation are recognized and accepted, the next step is the merger itself. The National Association cannot specifically advise as to the procedural steps of combining a multiple listing service with an association without first reviewing the bylaws and constitution of the existing multiple listing service as well as the

details of its financial operation. Review of such an outside multiple's governing documents may be accomplished only after a specific request by the association president or executive officer when consideration is being given to a merger. Generally, the suggested procedure for merging an MLS operation into a service of an association of REALTORS® is somewhat as follows:

1. The association should appoint a committee to study MLS as a service of the association and work jointly with the committee from the multiple listing service.

2. The multiple listing committee should appoint a group to study the methods of dissolving the independent operation and to work with the committee of the association. One way this can be done is to transfer the equipment which is owned by the multiple listing service and needed to operate the service to the association. In return, the association can agree to admit, without payment of initiation fee, all of the shareholders of the multiple listing service (provided they are REALTOR® principals) and the remaining assets of the service can be paid to the shareholders or transferred to the association on the same basis as the furniture and equipment. In any event, when all of the assets of the multiple listing service are either transferred to the shareholders or to the association, then the multiple listing service would cause itself to be dissolved.

3. After due study, the recommendations of the joint committee should be made to the two respective groups.

4. When the recommendations favor a merger, the board of directors of both groups should take appropriate action to secure membership approval for the merger.

5. Where appropriate, the membership of the association of REALTORS® should adopt the association bylaw amendment suggested in the *Handbook*, authorizing the service and a method of supervision.

6. A committee should be appointed to study rules and regulations for operating the service. The verbatim adoption of the model rules and regulations in the *Handbook* will bring automatic compliance with the policy of the National Association.

7. The proposed rules and regulations should be referred to the board of directors of the association of REALTORS® for approval.

8. When approved as described in the preceding paragraph, the service may begin operation as a service of the association. However, to obtain the coverage of the errors and omissions insurance program of the National Association with respect to the operation of the MLS, it is necessary that the National Association review the rules and regulations adopted by the service for compliance with the multiple listing policy of the National Association. It is important that this step be taken promptly following adoption of the MLS rules and regulations. (If desired by the association, the proposed rules and regulations may be forwarded to the National Association for review and critique prior to adoption by the board of directors of the local association.)

9. An attorney should be retained to effect the dissolution of the outside service, and under counsel's direction, the assets, tangible and intangible, should be dispersed in accordance with the merger agreement.

Inquiries regarding the merger procedure should be directed to Board Policy and Programs, NATIONAL ASSOCIATION OF REALTORS®.  |I|

# Appendix 3

**Protecting the Tax-exempt Status of the Association of Realtors®**

Section 501(c)(6) of the Internal Revenue code provides for the exemption of nonprofit real estate associations whose earnings do not inure to the benefit of any private shareholders or individuals. Pursuant to Section 1.501(c)(6)-1 of the income tax regulations, a real estate association will not be entitled to an exemption unless it:

> . . . is an association of persons having some common business interest, the purpose of which is to promote such common interest and not to engage in a regular business of a kind ordinarily carried on for profit. . . . Thus, its activities should be directed to the improvement of business conditions of one or more lines of business as distinguished from the performance of particular service for individual persons. An organization whose purpose is to engage in a regular business of a kind ordinarily carried on for profit, even though the business is conducted on a cooperative basis or produces only sufficient income to be self sustaining, is not a business league.

It should be noted that this regulation does not preclude a real estate association from engaging in a regular business of a kind ordinarily carried on for profit, as long as such business does not constitute the primary purpose for the organization's existence. In fact, the regulation strongly suggests that a real estate association could engage in some business activities without loss of exemption by providing that organizations otherwise exempt from tax under this section are taxable upon their unrelated business taxable income.

Thus, the purpose of this discussion is to consider whether real estate associations operating multiple listing services can qualify for a Section 501(c)(6) exemption.

This inquiry involves two separable questions:

1. Is the operation of an MLS ordinarily a not-for-profit activity?

2. Will the operation of a profitable MLS cause the real estate association to forfeit its Section 501(c)(6) exemption?

The position of the Internal Revenue Service with respect to the first of these questions is clear. Revenue Ruling 59-234, 1959-2 C.B. 149 holds that an MLS is a business ordinarily carried on for profit and inherently designed to render particular services to individual members. The service reached this conclusion notwithstanding that the purpose of an MLS, generally, in the service's own words, is:

> (a) to assist members of the board in rendering better service to the public by creating a broader and more active market for real estate; (b) to stimulate and facilitate the transaction of business between members of the board through cooperation and exchange of exclusive listings; (c) to provide a medium through which real estate may be merchandised more efficiently and expeditiously to the advantage of both buyer and seller; and (d) to encourage Realtors® to uphold high standards of business practice and to further educate them in adhering to the principles of the Realtors® Code of Ethics.

The Court of Claims, in Evanston–North Shore Board of Realtors® v. U.S., 162 Ct. Cl. 682, 320 F.2d 375 (1963), cert. den. 376 U.S. 931 (1964), followed Rev. Rule. 59-234 in denying exempt status to a real estate association with a mandatory multiple listing service. While the court specifically found that Evanston–North Shore's MLS was operated primarily for the benefit of its members, there is dictum which suggests that a real estate association might escape the application of Rev. Rule. 59-234, given the right circumstances.

Assuming that a multiple listing service is a business ordinarily carried on for profit, it does not follow that the operation of an MLS should cause a real estate association to forfeit its Section 501(c)(6) exemption. Arguably, the operation of an MLS qualifies as a business activity ancillary to the primary purpose of a real estate association which, as required by Reg. Section 1.501(c)(6)-1, is ". . . to promote (a) common interest and . . . (improve) business conditions . . . distinguished from the performance of particular services for individual persons," rather than constituting the primary purpose for the association's existence. Thus, if the primary purpose of a real estate association is to improve business conditions as opposed to operating an MLS, the association should be eligible for a Section 501(c)(6) exemption.

The basic problem facing a real estate association operating an MLS is demonstrating that the primary purpose for its existence is to conduct activities dedicated to the improvement of local business conditions (within the meaning of Reg. Section 1.501(c)(6)-1) and that any other financial activities, including the MLS, are ancillary to such purpose.

A summary of specific methods and procedures that should be followed and adequately documented by the association to demonstrate entitlement to tax exemption is presented as follows:

1. **Association to Document Its Overall Program of Activity:** The leadership of the association should ensure that the objects of the association, as set forth in the bylaws, establish a clear and articulate picture of what the association is and what the purposes and objectives of the association are considered to be. In addition to the description found in the bylaws of the association, the leadership should ensure that it documents, in some further form, any and all participation by association members in the programs, activities, and projects of the local association, as well as those of the state association and of the National Association.

2. **Multiple Listing Service to Be Operated as Incidental Activity of the Association:** The leadership of the association should ensure that it is clearly understood by all of the association members, and particularly by those who participate in the multiple listing service, that the multiple listing service is owned and operated by the association as just one of the many activities of the association and is of an incidental nature rather than being of a predominant nature as an activity of the association.

The articles of the bylaws of the association of REALTORS® should clearly delineate the multiple listing service as being a service of the association, should describe whether it will be operated as a committee of the association or as a wholly-owned subsidiary corporation with all of the stock owned by the association of REALTORS®, and should indicate that any bylaws and/or rules and regulations of the MLS will be subject to final approval by the board of directors of the association of REALTORS®. It is important that the authorizing article in the association's bylaws spell out all of the details clearly as to the association's multiple listing service, and it is recommended to associations of REALTORS® that they adopt Article XVIII of the model bylaws recommended to member associations by the NATIONAL ASSOCIATION OF REALTORS®. The adoption of this article will ensure the appropriate authorization and implementation of an association MLS.

Whether the multiple listing service should be operated as a committee of the association or as a wholly-owned subsidiary, is a matter to be determined by the local association with advice of its accountant and its association legal counsel. In this connection, there are a variety of considerations which must be reviewed, including, of course, the differential in the tax rate applicable to unrelated business income of an association and the income of a for-profit corporation. Generally, it is recommended by the National Association that a multiple listing service be operated as a committee of the association and that all the necessary effort be made to ensure that

the association maintains its tax-exempt status. However, as indicated, it is necessary for the association and its members to be completely aware of the special effort that must be made to maintain the proper perspective of the multiple listing service as compared to overall association activity. Generally speaking, the association must be able to demonstrate that the annual budget of the MLS as compared to the overall annual budget of the association of REALTORS® is less than 50% and preferably less than 30%. Lawrence B. Jerome, a former Chief of the Exempt Organizations Branch of the Internal Revenue Service, is now retired from the Internal Revenue Service, and served as a consultant to the National Association on tax matters. Mr. Jerome, in an article published in *The Executive Officer*, September, 1974, states, "The IRS has never published a position on how significant particular services must be to cause loss of exemption," but that he generally believed that, "fairly sound guidelines" are that loss of exemption is clearly indicated if the performance of particular services exceeds 50% of an association's total activities. He further expressed an opinion that tax exemption for the association is likely to be challenged and revocation of the tax exemption becomes a strong possibility if particular services (i.e., MLS) are more than 30% of an association's activities, unless there are other issues or mitigating circumstances. Mr. Jerome warned that, "the foregoing guidelines can change drastically if the IRS modifies its interpretations or if the courts begin to take a harder or softer stand in this area." In summary, however, the safest position that an association can take is to ensure that the unrelated business income represented by funds received from the MLS operation bears the smallest feasible percentage ratio to the overall budget of an association as possible. This is the most convincing proof that a multiple listing service is, in fact, just one of the many worthwhile activities of an association of REALTORS®.

If, however, the association concludes with advice of its accountant and association legal counsel that it cannot sustain the necessary relationship of an incidental activity as a committee of the association and still preserve its tax-exempt status as an association, or if the tax consequences of such a relationship are seriously adverse, then it should consider the alternative method of operating the MLS as a wholly-owned subsidiary of the association, with all stock of the subsidiary corporation owned by the association of REALTORS® and with any bylaws and/or regulations subject to final approval by the board of directors of the association. Operated as a wholly-owned subsidiary, the multiple would maintain its own budget, separate and apart from the association, and would pay taxes on any surplus accruing at the end of its fiscal year. The operation of the multiple as a taxable, for-profit corporation would be similar in certain respects to the operation of a nonprofit corporation—for example, the multiple could still accrue and maintain a reasonable surplus for continued operation in times of economic downswings or to maintain and improve the facilities required to operate the multiple listing service.

It is specifically noted that the taxes are due and payable on any surplus of funds accruing to the MLS at the end of the fiscal year, irrespective of whether the multiple listing service is operated as a committee of the association or as a wholly-owned subsidiary. This is true because of the determination by IRS that a multiple listing service is the type of business ordinarily carried on for profit and that it provides a particular service to the member participants and, as such, the income derived is classified as unrelated business income. Hence, it is emphasized that an association must always pay tax on its MLS operation providing unrelated business income irrespective of how the MLS is structured.

In either case, whether as a committee or as a wholly-owned subsidiary corporation, action should be taken by the multiple listing service to ensure that it operates basically on a break even basis. Whenever a reasonable operating reserve has been accumulated, it is time to reduce income being generated by the MLS to a point close to break even. The multiple listing policy of the National Association establishes that charges for multiple

listing in an association service will approximate the cost incurred in providing the service to the member participants. The MLS should not be a primary source of funding for an association of REALTORS®, at least while its membership is limited exclusively or primarily to association members. Reduction or elimination of service fees, listing fees, or subscription charges should be made as necessary to operate the MLS at or close to the desirable break even point.

3. **Documentation of Staff Time Devoted to the Multiple Listing Service:** The association should be prepared to demonstrate the number of staff personnel whose time is utilized in the operation of the multiple as opposed to the total number of staff involved in the overall operations of the association. The records maintained to document this should also establish the type of personnel operating the multiple. For example, the successful effort of one association to maintain its tax-exempt status cited the fact that only three members of a staff of ten were assigned to full-time work with the multiple listing service and that these personnel were clerical type employees. The remaining members of staff had only incidental duties related to MLS, and it was indicated that minimal duties of the executive vice president of the association related to the operation of the service. This served to clearly demonstrate that a major portion of the staff's efforts were related to the overall operation of the association and that the MLS operation required only approximately 30% of staff for its operation.

4. **Value Analysis of Noncompensated Services of Members of the Association:** The association should prepare and maintain, as a continuing documentation, a comprehensive value analysis of the noncompensated time and service provided by members of the association to conduct the many and varied activities, programs, and projects of the association. In any association of REALTORS®, association activities are primarily conducted through the efforts of association members donating many valuable hours of their time. To purchase such services as are donated by the members of the association of REALTORS® would be prohibitive for most associations. These services represent value contributed by the members and value received by the association, and careful documentation can serve to establish the considerable monetary value of such activities. When the total monetary value is determined by calculation of the hours of such service provided and the establishment of a reasonable value for such services, this value can be added to the overall gross income of the association, and if appropriately verified, should prove acceptable to the Internal Revenue Service should a challenge arise to the tax-exempt status of the association. Appropriate forms for documenting this type of noncompensated time and service by association members are attached as Appendices 6 and 7 of this *Handbook*.

5. **Committees of the Association:** The multiple listing committee (if MLS is operated as a committee of the association) is only one of the many committees of the association of REALTORS®. The association should document and be prepared to demonstrate at any time the total number of committees and total number of members serving on these committees. An appropriate listing of all of the committees of the association, with attendant statement of organization and procedure, will document that in addition to multiple listing, the association provides a broad and myriad program of activity, including effective orientation programs, continuing educational programs to improve and elevate the professional status and competency of its members, community affairs programs, legislative action programs, professional standards and arbitration proceedings, equal opportunity programs, affirmative marketing programs, membership recruitment programs, and many other such activities. Similar comparative documentation can be made when the MLS is a wholly-owned subsidiary of the association and is governed by a board of directors, subject to approval of the board of directors of the association of REALTORS®.

6. **Analysis of Agenda of Board of Directors:** A ready source of authoritative documentation is available to any association of REALTORS® to substantiate the fact that it has a broad spectrum of programs and activities, of which the multiple listing service is only a part. This documentation source is the minutes of the board of directors of the association. These minutes reflect the ongoing business of the association, as discussed by the directors, and the number of times any item appears in the minutes in ratio to the number of times other items are discussed, which reflects its proportionate importance. Therefore, in most cases, it can be readily shown that such minutes reflect the discussion of many and varied items in overwhelming proportion to the times the multiple listing service is discussed. In the documentation provided to the Internal Revenue Service by one association of REALTORS®, an analysis of this type reflected that the MLS of the association was discussed 31 times in a given period of time, whereas other items of association activity were discussed 396 times. This served eloquently to reflect the fact that MLS was an incidental activity of the association in a well-rounded program of activity.

7. **Time for Association Plan to Attain or Maintain Tax-Exempt Status:** Now is the time. It has been demonstrated in several instances cited in the preceding paragraphs that careful and comprehensive documentation is essential and can be successful in obtaining and/or maintaining the tax-exempt status of an association of REALTORS® operating a multiple listing service. Compiling such records requires both planning and careful execution to ensure that they accurately demonstrate a true picture of the multiple's position as an incidental activity of the association. These records do not appear spontaneously. If your association possesses tax-exempt status as an association, or plans to apply for such exempt status in the future, the time to begin the essential record-keeping is now. It can be done and should be done on a continuing basis with advice of the association's accountant and legal counsel.

Further questions or information concerning tax-exempt status of your association should be directed to Board Policy and Programs of the National Association. Any successful effort by an association to obtain or maintain tax-exempt status is welcomed by the National Association.

It is also recommended to associations of REALTORS® having lost tax-exempt status at some point that every effort be made to regain such exempt status at the earliest possible time. I

# Appendix 4

## License Agreement for Use of
## MLS Service Mark by Member Board*

THIS AGREEMENT made and entered into by and between the NATIONAL ASSOCIATION OF REALTORS® (hereinafter the "Association") and the:

_____

Name of Association

_____

City                                    State                                    Zip

(hereinafter the "board")

WHEREAS, the Association has coined and is the owner of the Mark shown here (hereinafter "Mark"), and of the REALTOR® and of the "R and Design" marks, which form a part thereof:

NOW, THEREFORE, in consideration of the mutual covenants contained herein, the Association grants a license to the board for use of the Mark on the following terms and conditions:

1. That said license shall give the board the right to use the Mark in connection with the board's multiple listing service on a royalty-free basis only for so long as:

   a. the board shall remain a member in good standing of the association;

   b. the board shall maintain and operate its multiple listing service in accordance with the MLS Antitrust Compliance Policy of the NATIONAL ASSOCIATION OF REALTORS®, it being understood that the policy of the NATIONAL ASSOCIATION OF REALTORS® at all times means the policy as from time to time amended, including any and all supplements thereto which may hereafter, from time to time, be promulgated;

   c. the multiple listing service in connection with which the Mark is used by the board is wholly owned and operated by the board.

2. The board shall at all times present and use the Mark only exactly as shown herein, and shall at all times utilize the federal registration symbol "®" in connection therewith at the location shown herein.

3. The board shall use the Mark only on stationery, printed forms, and on the advertisements relating to its multiple listing service, and not on any lapel pins or other types of jewelry.

4. This License Agreement shall terminate automatically upon the board ceasing to become a member in good standing of the Association or upon the board's failure to fully comply with all terms and conditions contained herein.

5. The board expressly agrees that if at any time the board ceases to be a member in good standing of the Association, or if the board's multiple listing service ceases to be wholly owned and operated by the board, the board will immediately take all steps necessary to remove the Mark from any and all materials wherein the Mark is used in connection with the multiple listing service, including, but not limited to stationery, printed forms, advertisements, signs, and the like.

_____

Name of Association

_____        By: _____

Date

_____        By: _____

Date                                                              NATIONAL ASSOCIATION OF REALTORS®

*Approved by Board of Directors, NATIONAL ASSOCIATION OF REALTORS®, February 5, 1974, revised November 2004.

# Appendix 5

## Model Multiple Listing Service Subscription Waiver
## for Use by Association Multiple Listing Services,
### NATIONAL ASSOCIATION OF REALTORS®

_____

Multiple Listing Services

_____

Association of REALTORS®

The participant of the service shall be exempt from payment of multiple listing subscription fees for any individual employed by or affiliated as an independent contractor with the participant who does not actually have access to and use of the service.

Such exemption shall be effective for a period of _____. The exemption, if recommended by the multiple listing policy committee, shall be effective when approved by the board of directors. The exemption for any individual shall automatically be revoked upon the individual's utilization of the service in any manner.

**Certification of Individual Affiliated with Participant in a Multiple Listing Service:**

I, _____, associated with _____,
                Name of Individual                         Name of Participant

do not use the multiple listing service in any way at any time, and understand that if I should utilize the multiple listing service at any time, the participant with whom I am affiliated is obligated to pay an additional individual subscription fee.

_____

Signature of Individual Affiliated with Participant

_____

Name (Type/Print) of Individual Affiliated with Participant

**Certification by Participant of Association Multiple Listing Service as to Individual's Certification above:**

I agree that if _____ utilizes the multiple listing service in any way at a future
                             Name of Individual

date, I will notify the service and pay the required subscription fee of the multiple listing service.

_____

Name (Type/Print) of MLS Participant

_____

Signature of MLS Participant                                        Date

# Appendix 6

## NATIONAL ASSOCIATION OF REALTORS®
## Association Donated Services Record for Committee Meetings

| Committee name | | | | Date of meeting | | |
|---|---|---|---|---|---|---|
| Purpose of meeting | | | | | | |
| Member's name | Signature | My hourly value* | Hours worked x | Per hour value = | | Total value |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

(Attach minutes when available)

*In determining the value or hour basis, it is suggested that each committee member determine his own rate based upon what would be charged for real estate counseling service on a rate rather than a commission basis. It is further suggested that these rates be conservative.

$ _____
Grand total donated services

_____
Attested to: (executive officer)

## Appendix 7

### NATIONAL ASSOCIATION OF REALTORS®
### Association Donated Services Record, Miscellaneous

| Member's name (signature) | My hourly value* | Purpose | Date | Time in | Time out | Time (hrs.) | Total value |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

(Attach minutes when available)

*In determining the value or hour basis, it is suggested that each committee member determine his own rate based upon what would be charged for real estate counseling service on a rate rather than a commission basis. It is further suggested that these rates be conservative.

$ _____
Total value donated services for period

_____
Attested to: (executive officer)

155

# Appendix 8

## Model Lock Box Authorization Addendum*

The undersigned (**seller**) having entered into a listing agreement with _____ (**broker**)

dated _____ pertaining to the sale of _____ (**premises**)
hereby authorizes **broker** to use a lock box.

**Seller** acknowledges:

1. A lock box is designated as a repository of a key to the above premises, permitting access to the interior of the premises by participants of the multiple listing service (MLS), and their authorized licensees.

2. **Broker** advises and requests **seller** safeguarding or removal of valuables now located within said premises.

3. It is not a requirement of MLS or **broker** that a **seller** allow use of a lock box.

4. Where a tenant/lessee occupies the property, the tenant's/lessee's consent is required.

**Seller** further acknowledges that neither the listing **broker,** any subagent of the listing **broker,** or any other cooperating broker, the association of REALTORS®, or the MLS is an insurer against the loss of **sellers'** personal property; **seller** is advised to verify the existence of, or obtain personal property insurance through **sellers'** insurance agent.

Receipt of a copy is hereby acknowledged:

Date: _____          Date: _____

**Seller:** _____          **Broker:** _____
Name (Type/Print)                                              Name (Type/Print)

By: _____          By: _____
Signature                                                          Signature

**Seller:** _____
Name (Type/Print)

By: _____
Signature

**Tenant:** The **tenant** and **broker** have discussed the safeguarding and insuring during the listing period, of personal property and valuables located within said premises. The undersigned approves the above provisions and authorizes placement of a lock box on the premises.

Receipt of a copy is hereby acknowledged:

Date: _____          **Tenant:** _____
Name (Type/Print)                              Signature

*Adoption and use of this specific form is at the option of the association of REALTORS®. Association legal counsel should be consulted before this or any other form is provided by the association to association members.

156

# Appendix 9

## Select Interpretations from the Official Interpretations of Article I, Section 2 of the NATIONAL ASSOCIATION OF REALTORS® Bylaws as Referred to in this *Handbook*

### INTERPRETATION NO. 1  *(Adopted November 15, 1960)*

**"A requirement to participate in a Multiple Listing Service in order to gain and maintain REALTOR® membership is an inequitable limitation on its membership."**

When a Multiple Listing Service is available, is well operated and properly organized, it is the duty of the REALTOR® to consider thoroughly whether he can serve the best interests of his clients by participating in it. The decision, however, must be his own. As a REALTOR®, it is possible for him to conduct his business in an ethical and efficient manner without participating in a Multiple Listing Service. Therefore, his participation must not be a requirement of REALTOR® membership.

### INTERPRETATION NO. 2  *(Adopted January 24, 1961)*

**"An initiation fee in excess of three times the amount of the annual rates of dues is an inequitable limitation on its membership."**

Member Boards must not place unreasonable burdens on applicants for membership. The requirements for membership must be reasonable and nondiscriminatory.

The initiation fee, if any, charged by a Board must not constitute an unreasonable barrier to membership of a person otherwise qualified. Nor should a Board seek to finance its activities and operations from initiation fees.

The National Association deems any initiation fee in excess of three times the amount of the annual rates of dues, including state and national, to be unreasonable and therefore inequitable.

Since under Interpretation No. 1, participation in a Board Multiple Listing Service is not mandatory, the Board initiation fee, if any, must be separate from any participation fee which may be charged for the Multiple Listing Service.

### INTERPRETATION NO. 6  *(Adopted January 24, 1961)*

**"Any regulation restricting or limiting the practice of a REALTOR® in the conduct of his business, unless it concerns ethical practice, is an inequitable limitation on its membership."**

This Interpretation establishes a rather general guide to the type of rules which a Board may adopt, i.e., in furtherance and support of the Code of Ethics, but guards against the type of rules which unreasonably restrict the Member in the conduct of his business on a basis other than related to the Code of Ethics.

The intent of this Interpretation is to avoid the necessity of the Board of Directors passing upon innumerable details about which Boards constantly inquire. The administrative staff is under instruction to advise a Member Board, upon inquiry, as to whether a practice or proposed rule appears to be inconsistent with, or in violation of, the Bylaw against inequitable rules. If the Member Board then wishes to request an official interpretation by the Board of Directors, it may do so.

Any Member also is entitled to an interpretation upon request. However, as a matter of policy, the National Association prefers that inquiries come from Member Boards. It cannot, however, deny any Member the right to request an interpretation.

### INTERPRETATION NO. 9 *(Adopted January 24, 1961, Revised May 8, 1973)*

**"Requirement of a 'Waiting Period' before being considered for REALTOR® membership is not an inequitable limitation on its membership if related to the period of time necessary to process the application, not to exceed six months."**

It is consistent with assurance of ethical business practice for a Board of REALTORS® to require that an applicant for membership submit an application detailing past history. The National Association, as a matter of policy, urges thorough investigation into the background of applicants for membership. This affords the Board an opportunity to investigate the individual's business conduct and record.

An applicant is entitled to prompt consideration of his application and final disposition of such application must be made within six months.

### INTERPRETATION NO. 10 *(Adopted May 9, 1961, Revised November 12, 1988)*

**"A Board rule purporting to require a REALTOR® who holds an exclusive listing to give blanket consent to either subagents or cooperating brokers representing buyers to arrange appointments to show listed property directly with the owner or to negotiate the purchase of listed property directly with the owner, rather than through the listing broker, obstructs observance of Article 3, and thereby is an inequitable limitation on its membership."**

This Interpretation affirms the basic agency relationship between the listing broker and his principal as defined in the listing contract. A Board or MLS rule may not properly interfere with or supersede the relationship established by the terms of the agreement between the broker and his principal.

The cooperating broker as a subagent of the listing broker or as an agent of the buyer enjoys only such rights to show or sell the listing as are granted to him by the listing broker who is ultimately responsible to the principal.

### INTERPRETATION NO. 11 *(Adopted May 9, 1961)*

**"A rule of a Member Board prohibiting the acceptance of open listings by Members is an inequitable limitation on its membership."**

Although the Preamble of the Code of Ethics places upon the REALTOR® the aspirational ideal that he "urge the exclusive listing of property . . . ," it does not provide that a nonexclusive listing should not be accepted.

The REALTOR® must be free to enter into any form of listing contract mutually agreeable to the REALTOR® and the client.

### INTERPRETATION NO. 14 *(Adopted May 9, 1961, Revised January 26, 1971)*

**"A Member Board rule or practice which requires Members to adhere to a schedule of fees or commissions, or which authorizes or includes the preparation or publication of a recommended schedule of fees or commissions, is contrary to the Code of Ethics and to the policy of the NATIONAL ASSOCIATION OF REALTORS® and is an inequitable limitation on its membership."**

### INTERPRETATION NO. 15 *(Adopted May 9, 1961)*

**"A Board rule prohibiting REALTORS® or their salesmen from accepting elective or appointive public office, or requiring their resignation if they accept such office, is an inequitable limitation on its membership."**

### INTERPRETATION NO. 16  *(Adopted May 9, 1961)*

**"A Board rule prohibiting employment of married women as salespersons is an inequitable limitation on its membership."**

This Interpretation is a specific application of the general policy of Interpretation No. 20.

### INTERPRETATION NO. 17  *(Adopted November 16, 1961)*

**"A Board rule imposing an age limit upon applicants for membership is an inequitable limitation on its membership."**

Age is not a reasonable criterion for membership.

### INTERPRETATION NO. 21  *(Adopted November 12, 1962)*

**"A Board rule regulating the number of married women that may be employed is an inequitable limitation and comes within Interpretation No. 16."**

### INTERPRETATION NO. 25  *(Adopted May 11, 1965)*

**"A Board rule which prevents the participation of a REALTOR® Member, on equal terms with other REALTOR® Members, in a Multiple Listing Service sponsored, organized or sanctioned by the Board, and which is available to REALTOR® Members throughout the Board's jurisdiction, is an inequitable limitation on its membership."**

A Board rule which makes services available to some REALTOR® Members, but not to other REALTOR® Members, when such services are available generally throughout the Board's jurisdiction, is an inequitable limitation upon the membership.

### INTERPRETATION NO. 26  *(Adopted May 10, 1966, Revised November 16, 1977)*

**"A Board rule prohibiting the posting by members of 'for sale' or other similar signs on property for which the member is agent is an inequitable limitation on its membership."**

The right to display "for sale" or other similar signs reasonably designed to inform the public is protected by the First Amendment to the United States Constitution. Thus, any rule prohibiting the posting of such signs would be an unconstitutional infringement of the freedom of speech of the REALTOR® and his client. Similarly, a Board owned or operated Multiple Listing Service may not endorse any programs by municipalities, civic groups or civil rights organizations to ban or curtail signs, even if such programs are "voluntary," because of the "chilling effect" such endorsement might have on the exercise of First Amendment rights.

### INTERPRETATION NO. 29  *(Adopted May 8, 1973)*

**"Application and entrance fees for participation in an Multiple Listing Service, owned by, operated by or affiliated with a Board of REALTORS®, in excess of the approximate cost, including the accumulation and maintenance of reasonable reserves, of developing, maintaining, or improving the organization as a going concern, is an inequitable limitation on the membership."**

All services of a Board of REALTORS®, including Multiple Listing Service, should be available to all REALTOR® Members without restrictive entrance and application fees. Such fees should be related to the approximate costs of bringing the Service to the member and must not be computed on the basis of the number of listings of a Multiple Listing Service or on the basis of a pro rata share of its assets.

### INTERPRETATION NO. 30 *(Adopted May 8, 1973)*

**"Enforcement of the Code of Ethics by any group, within or without the Board of REALTORS®, other than the Professional Standards Committee and the Board of Directors of the Board of REALTORS®, is an inequitable limitation on its Members."**

Member Boards are required by Article IV of the Bylaws of the National Association to enforce membership compliance with the Code of Ethics. This obligation is properly fulfilled by the Professional Standards Committee and the Board of Directors of the Board. Delegations of this function by the Board to any other body, such as a Multiple Listing Committee, is not appropriate.

### INTERPRETATION NO. 31 *(Adopted May 8, 1973, Revised January 31, 1977)*

**"A Board rule or a rule of a Multiple Listing Service owned by, operated by or affiliated with a Board, which establishes, limits or restricts the REALTOR® in his relations with a potential purchaser, affecting recognition periods or purporting to predetermine entitlement to any award in arbitration is an inequitable limitation on its membership."**

In essence, this is a specific interpretation of the general rule established in Interpretation No. 6 that a Board may not have a rule which restricts or limits the REALTOR® in the conduct of his business unless it concerns ethical practice. Thus, a rule of a Board or Multiple Listing Service which would determine a protection period in reference to a prospective purchaser is an inequitable limitation. Further, the Board or its MLS may not establish a rule or regulation which purports to predetermine entitlement to any awards in a real estate transaction. If controversy arises as to entitlement to any awards, it shall be determined by a hearing in arbitration on the merits of all ascertainable facts in the context of the specific case of controversy.

### INTERPRETATION NO. 32 *(Adopted May 8, 1973, Revised November 11, 2013)*

**"The inclusion in the dues payable by Board Members of costs of services, products or activities of the Board which properly should be optional is an inequitable limitation on its membership."**

The dues payable by Board Members should represent the allocable costs of the services, products and facilities which are available to and benefit the Members generally, either directly or indirectly. It should not include the costs of those services, products or facilities which can be identified as optional. Thus, for example, the cost of participating in the Board's MLS should not be included as part of Board dues since whether a Member determines to participate in such an activity will depend upon the Member's particular method or type of business. The reasonable cost of meals at general membership meetings held pursuant to the Board's Bylaws may be included in Board dues since such meetings are necessary to the operation of the Board as a whole provided that no more than 35% of the local allocation of the Board's annual dues revenue may be utilized for this purpose. Associations may, at their discretion, include the costs of lockboxes and lockbox keys, programmers, fobs, smart cards, and other access devices in the association dues.

### INTERPRETATION NO. 33 *(Adopted February 5, 1974)*

**"It is an inequitable limitation to deny membership to an applicant who maintains an office for the conduct of a real estate business which is open for business during the normal business hours, recognized in the community, and who holds himself out to the public as being actively engaged in real estate business solely upon the grounds the applicant is not so engaged."**

This Interpretation does not contemplate that the broker must devote all or even a majority of his time to his real estate business or derive any particular percentage of his income from such business. It does not contemplate that the licensee shall have no other job or

occupation. It does contemplate that the licensee shall actively seek real estate business; that he shall maintain and adequately supervise a real estate office.

Where question arises as to whether or not a licensee is "actively engaged" in the real estate business, he shall be given the opportunity to present evidence concerning the actual and intended nature and scope of his business activities.

## INTERPRETATION NO. 34 *(Adopted November 12, 1974)*

**"It shall be an inequitable limitation for a Board to require a separate office in each Multiple Listing Service area where there is more than one Multiple Listing Service owned or controlled by the Board within the jurisdiction of the Board in order to participate in each such Multiple Listing Service."**

A REALTOR® is entitled to participate in any and all services and programs sponsored by the Board of REALTORS®. A Board rule which circumscribes the right to such participation restricts and limits the conditions of Board membership in violation of Article I, Section 2, of the Bylaws of the NATIONAL ASSOCIATION OF REALTORS®.

To institute a divisional Multiple Listing Service based on geographic lines within a Board's jurisdictional area limits access to Board services and activities in a way which could be deemed and adjudged arbitrary and unreasonable.

As such, it is merely an extension of Interpretation No. 25 in that it refers specifically to the right of a REALTOR® to participate in a Board-owned-and-controlled Multiple Listing Service and any geographic division thereof without the necessity of having an office within said geographic division.

# Notes

# Notes

# Notes

# Handbook on Multiple Listing Policy

This *Handbook* guides member associations of Realtors® in the operation of multiple listing services consistent with the policies established by the National Association's Board of Directors.

The *Handbook* includes model enabling provisions for insertion in association bylaws authorizing establishment of a multiple listing service, and bylaws and rules and regulations for MLSs to permit optimum service and efficiency.

Associations and association-owned MLSs must conform their governing documents to the mandatory MLS policies established by the National Association's Board of Directors to ensure continued status as member boards and to ensure coverage under the National Association's master professional liability insurance program.





©2019 NATIONAL ASSOCIATION OF REALTORS·
All Rights Reserved.

166-807-19
(01/19 VG)

*430 North Michigan Avenue • Chicago, IL 60611-4087*
*800.874.6500 • www.nar.realtor*



# EXHIBIT B

# Code of Ethics and Standards of Practice
## of the NATIONAL ASSOCIATION OF REALTORS®
### Effective January 1, 2019

Where the word REALTORS® is used in this Code and Preamble, it shall be deemed to include REALTOR-ASSOCIATE®S.

While the Code of Ethics establishes obligations that may be higher than those mandated by law, in any instance where the Code of Ethics and the law conflict, the obligations of the law must take precedence.

## Preamble

Under all is the land. Upon its wise utilization and widely allocated ownership depend the survival and growth of free institutions and of our civilization. REALTORS® should recognize that the interests of the nation and its citizens require the highest and best use of the land and the widest distribution of land ownership. They require the creation of adequate housing, the building of functioning cities, the development of productive industries and farms, and the preservation of a healthful environment.

Such interests impose obligations beyond those of ordinary commerce. They impose grave social responsibility and a patriotic duty to which REALTORS® should dedicate themselves, and for which they should be diligent in preparing themselves. REALTORS®, therefore, are zealous to maintain and improve the standards of their calling and share with their fellow REALTORS® a common responsibility for its integrity and honor.

In recognition and appreciation of their obligations to clients, customers, the public, and each other, REALTORS® continuously strive to become and remain informed on issues affecting real estate and, as knowledgeable professionals, they willingly share the fruit of their experience and study with others. They identify and take steps, through enforcement of this Code of Ethics and by assisting appropriate regulatory bodies, to eliminate practices which may damage the public or which might discredit or bring dishonor to the real estate profession. REALTORS® having direct personal knowledge of conduct that may violate the Code of Ethics involving misappropriation of client or customer funds or property, willful discrimination, or fraud resulting in substantial economic harm, bring such matters to the attention of the appropriate Board or Association of REALTORS®. *(Amended 1/00)*

Realizing that cooperation with other real estate professionals promotes the best interests of those who utilize their services, REALTORS® urge exclusive representation of clients; do not attempt to gain any unfair advantage over their competitors; and they refrain from making unsolicited comments about other practitioners. In instances where their opinion is sought, or where REALTORS® believe that comment is necessary, their opinion is offered in an objective, professional manner, uninfluenced by any personal motivation or potential advantage or gain.

The term REALTOR® has come to connote competency, fairness, and high integrity resulting from adherence to a lofty ideal of moral conduct in business relations. No inducement of profit and no instruction from clients ever can justify departure from this ideal.

In the interpretation of this obligation, REALTORS® can take no safer guide than that which has been handed down through the centuries, embodied in the Golden Rule, "Whatsoever ye would that others should do to you, do ye even so to them."

Accepting this standard as their own, REALTORS® pledge to observe its spirit in all of their activities whether conducted personally, through associates or others, or via technological means, and to conduct their business in accordance with the tenets set forth below. *(Amended 1/07)*

## Duties to Clients and Customers

## Article 1

When representing a buyer, seller, landlord, tenant, or other client as an agent, REALTORS® pledge themselves to protect and promote the interests of their client. This obligation to the client is primary, but it does not relieve REALTORS® of their obligation to treat all parties honestly. When serving a buyer, seller, landlord, tenant or other party in a non-agency capacity, REALTORS® remain obligated to treat all parties honestly. *(Amended 1/01)*

- **Standard of Practice 1-1**
  REALTORS®, when acting as principals in a real estate transaction, remain obligated by the duties imposed by the Code of Ethics. *(Amended 1/93)*

- **Standard of Practice 1-2**
  The duties imposed by the Code of Ethics encompass all real estate-related activities and transactions whether conducted in person, electronically, or through any other means.

  The duties the Code of Ethics imposes are applicable whether REALTORS® are acting as agents or in legally recognized non-agency capacities except that any duty imposed exclusively on agents by law or regulation shall not be imposed by this Code of Ethics on REALTORS® acting in non-agency capacities.

  As used in this Code of Ethics, "client" means the person(s) or entity(ies) with whom a REALTOR® or a REALTOR®'S firm has an agency or legally recognized non-agency relationship; "customer" means a party to a real estate transaction who receives information, services, or benefits but has no contractual relationship with the REALTOR® or the REALTOR®'S firm; "prospect" means a purchaser, seller, tenant, or landlord who is not subject to a representation relationship with the REALTOR® or REALTOR®'S firm; "agent" means a real estate licensee (including brokers and sales associates) acting in an agency relationship as defined by state law or regulation; and "broker" means a real estate licensee (including brokers and sales associates) acting as an agent or in a legally recognized non-agency capacity. *(Adopted 1/95, Amended 1/07)*

- **Standard of Practice 1-3**
  REALTORS®, in attempting to secure a listing, shall not deliberately mislead the owner as to market value.

- **Standard of Practice 1-4**
  REALTORS®, when seeking to become a buyer/tenant representative, shall not mislead buyers or tenants as to savings or other benefits that might be realized through use of the REALTOR®'S services. *(Amended 1/93)*

- **Standard of Practice 1-5**
  REALTORS® may represent the seller/landlord and buyer/tenant in the




same transaction only after full disclosure to and with informed consent of both parties. *(Adopted 1/93)*

- **Standard of Practice 1-6**

  REALTORS® shall submit offers and counter-offers objectively and as quickly as possible. *(Adopted 1/93, Amended 1/95)*

- **Standard of Practice 1-7**

  When acting as listing broker, REALTORS® shall continue to submit to the seller/landlord all offers and counter-offers until closing or execution of a lease unless the seller/landlord has waived this obligation in writing. Upon the written request of a cooperating broker who submits an offer to the listing broker, the listing broker shall provide a written affirmation to the cooperating broker stating that the offer has been submitted to the seller/landlord, or a written notification that the seller/landlord has waived the obligation to have the offer presented. REALTORS® shall not be obligated to continue to market the property after an offer has been accepted by the seller/landlord. REALTORS® shall recommend that sellers/landlords obtain the advice of legal counsel prior to acceptance of a subsequent offer except where the acceptance is contingent on the termination of the pre-existing purchase contract or lease. *(Amended 1/19)*

- **Standard of Practice 1-8**

  REALTORS®, acting as agents or brokers of buyers/tenants, shall submit to buyers/tenants all offers and counter-offers until acceptance but have no obligation to continue to show properties to their clients after an offer has been accepted unless otherwise agreed in writing. REALTORS®, acting as agents or brokers of buyers/tenants, shall recommend that buyers/tenants obtain the advice of legal counsel if there is a question as to whether a pre-existing contract has been terminated. *(Adopted 1/93, Amended 1/99)*

- **Standard of Practice 1-9**

  The obligation of REALTORS® to preserve confidential information (as defined by state law) provided by their clients in the course of any agency relationship or non-agency relationship recognized by law continues after termination of agency relationships or any non-agency relationships recognized by law. REALTORS® shall not knowingly, during or following the termination of professional relationships with their clients:

  1) reveal confidential information of clients; or
  2) use confidential information of clients to the disadvantage of clients; or
  3) use confidential information of clients for the REALTOR®'S advantage or the advantage of third parties unless:
     a) clients consent after full disclosure; or
     b) REALTORS® are required by court order; or
     c) it is the intention of a client to commit a crime and the information is necessary to prevent the crime; or
     d) it is necessary to defend a REALTOR® or the REALTOR®'S employees or associates against an accusation of wrongful conduct.

  Information concerning latent material defects is not considered confidential information under this Code of Ethics. *(Adopted 1/93, Amended 1/01)*

- **Standard of Practice 1-10**

  REALTORS® shall, consistent with the terms and conditions of their real estate licensure and their property management agreement, competently manage the property of clients with due regard for the rights, safety and health of tenants and others lawfully on the premises. *(Adopted 1/95, Amended 1/00)*

- **Standard of Practice 1-11**

  REALTORS® who are employed to maintain or manage a client's property shall exercise due diligence and make reasonable efforts to protect it against reasonably foreseeable contingencies and losses. *(Adopted 1/95)*

- **Standard of Practice 1-12**

  When entering into listing contracts, REALTORS® must advise sellers/landlords of:

1) the REALTOR®'S company policies regarding cooperation and the amount(s) of any compensation that will be offered to subagents, buyer/tenant agents, and/or brokers acting in legally recognized non-agency capacities;
2) the fact that buyer/tenant agents or brokers, even if compensated by listing brokers, or by sellers/landlords may represent the interests of buyers/tenants; and
3) any potential for listing brokers to act as disclosed dual agents, e.g., buyer/tenant agents. *(Adopted 1/93, Renumbered 1/98, Amended 1/03)*

- **Standard of Practice 1-13**

  When entering into buyer/tenant agreements, REALTORS® must advise potential clients of:
  1) the REALTOR®'S company policies regarding cooperation;
  2) the amount of compensation to be paid by the client;
  3) the potential for additional or offsetting compensation from other brokers, from the seller or landlord, or from other parties;
  4) any potential for the buyer/tenant representative to act as a disclosed dual agent, e.g., listing broker, subagent, landlord's agent, etc.; and
  5) the possibility that sellers or sellers' representatives may not treat the existence, terms, or conditions of offers as confidential unless confidentiality is required by law, regulation, or by any confidentiality agreement between the parties. *(Adopted 1/93, Renumbered 1/98, Amended 1/06)*

- **Standard of Practice 1-14**

  Fees for preparing appraisals or other valuations shall not be contingent upon the amount of the appraisal or valuation. *(Adopted 1/02)*

- **Standard of Practice 1-15**

  REALTORS®, in response to inquiries from buyers or cooperating brokers shall, with the sellers' approval, disclose the existence of offers on the property. Where disclosure is authorized, REALTORS® shall also disclose, if asked, whether offers were obtained by the listing licensee, another licensee in the listing firm, or by a cooperating broker. *(Adopted 1/03, Amended 1/09)*

- **Standard of Practice 1-16**

  REALTORS® shall not access or use, or permit or enable others to access or use, listed or managed property on terms or conditions other than those authorized by the owner or seller. *(Adopted 1/12)*

## Article 2

REALTORS® shall avoid exaggeration, misrepresentation, or concealment of pertinent facts relating to the property or the transaction. REALTORS® shall not, however, be obligated to discover latent defects in the property, to advise on matters outside the scope of their real estate license, or to disclose facts which are confidential under the scope of agency or non-agency relationships as defined by state law. *(Amended 1/00)*

- **Standard of Practice 2-1**

  REALTORS® shall only be obligated to discover and disclose adverse factors reasonably apparent to someone with expertise in those areas required by their real estate licensing authority. Article 2 does not impose upon the REALTOR® the obligation of expertise in other professional or technical disciplines. *(Amended 1/96)*

- **Standard of Practice 2-2**

  *(Renumbered as Standard of Practice 1-12 1/98)*

- **Standard of Practice 2-3**

  *(Renumbered as Standard of Practice 1-13 1/98)*

- **Standard of Practice 2-4**

  REALTORS® shall not be parties to the naming of a false consideration in any document, unless it be the naming of an obviously nominal consideration.

- **Standard of Practice 2-5**

  Factors defined as "non-material" by law or regulation or which are expressly referenced in law or regulation as not being subject to disclosure are considered not "pertinent" for purposes of Article 2. *(Adopted 1/93)*

## Article 3

REALTORS® shall cooperate with other brokers except when cooperation is not in the client's best interest. The obligation to cooperate does not include the obligation to share commissions, fees, or to otherwise compensate another broker. *(Amended 1/95)*

- **Standard of Practice 3-1**

  REALTORS®, acting as exclusive agents or brokers of sellers/ landlords, establish the terms and conditions of offers to cooperate. Unless expressly indicated in offers to cooperate, cooperating brokers may not assume that the offer of cooperation includes an offer of compensation. Terms of compensation, if any, shall be ascertained by cooperating brokers before beginning efforts to accept the offer of cooperation. *(Amended 1/99)*

- **Standard of Practice 3-2**

  Any change in compensation offered for cooperative services must be communicated to the other REALTOR® prior to the time that REALTOR® submits an offer to purchase/lease the property. After a REALTOR® has submitted an offer to purchase or lease property, the listing broker may not attempt to unilaterally modify the offered compensation with respect to that cooperative transaction. *(Amended 1/14)*

- **Standard of Practice 3-3**

  Standard of Practice 3-2 does not preclude the listing broker and cooperating broker from entering into an agreement to change cooperative compensation. *(Adopted 1/94)*

- **Standard of Practice 3-4**

  REALTORS®, acting as listing brokers, have an affirmative obligation to disclose the existence of dual or variable rate commission arrangements (i.e., listings where one amount of commission is payable if the listing broker's firm is the procuring cause of sale/lease and a different amount of commission is payable if the sale/lease results through the efforts of the seller/landlord or a cooperating broker). The listing broker shall, as soon as practical, disclose the existence of such arrangements to potential cooperating brokers and shall, in response to inquiries from cooperating brokers, disclose the differential that would result in a cooperative transaction or in a sale/lease that results through the efforts of the seller/landlord. If the cooperating broker is a buyer/tenant representative, the buyer/tenant representative must disclose such information to their client before the client makes an offer to purchase or lease. *(Amended 1/02)*

- **Standard of Practice 3-5**

  It is the obligation of subagents to promptly disclose all pertinent facts to the principal's agent prior to as well as after a purchase or lease agreement is executed. *(Amended 1/93)*

- **Standard of Practice 3-6**

  REALTORS® shall disclose the existence of accepted offers, including offers with unresolved contingencies, to any broker seeking cooperation. *(Adopted 5/86, Amended 1/04)*

- **Standard of Practice 3-7**

  When seeking information from another REALTOR® concerning property under a management or listing agreement, REALTORS® shall disclose their REALTOR® status and whether their interest is personal or on behalf of a client and, if on behalf of a client, their relationship with the client. *(Amended 1/11)*

- **Standard of Practice 3-8**

  REALTORS® shall not misrepresent the availability of access to show or inspect a listed property. *(Amended 11/87)*

- **Standard of Practice 3-9**

  REALTORS® shall not provide access to listed property on terms other than those established by the owner or the listing broker. *(Adopted 1/10)*

- **Standard of Practice 3-10**

  The duty to cooperate established in Article 3 relates to the obligation to share information on listed property, and to make property available to other brokers for showing to prospective purchasers/tenants when it is in the best interests of sellers/landlords. *(Adopted 1/11)*

## Article 4

REALTORS® shall not acquire an interest in or buy or present offers from themselves, any member of their immediate families, their firms or any member thereof, or any entities in which they have any ownership interest, any real property without making their true position known to the owner or the owner's agent or broker. In selling property they own, or in which they have any interest, REALTORS® shall reveal their ownership or interest in writing to the purchaser or the purchaser's representative. *(Amended 1/00)*

- **Standard of Practice 4-1**

  For the protection of all parties, the disclosures required by Article 4 shall be in writing and provided by REALTORS® prior to the signing of any contract. *(Adopted 2/86)*

## Article 5

REALTORS® shall not undertake to provide professional services concerning a property or its value where they have a present or contemplated interest unless such interest is specifically disclosed to all affected parties.

## Article 6

REALTORS® shall not accept any commission, rebate, or profit on expenditures made for their client, without the client's knowledge and consent.

When recommending real estate products or services (e.g., homeowner's insurance, warranty programs, mortgage financing, title insurance, etc.), REALTORS® shall disclose to the client or customer to whom the recommendation is made any financial benefits or fees, other than real estate referral fees, the REALTOR® or REALTOR®'s firm may receive as a direct result of such recommendation. *(Amended 1/99)*

- **Standard of Practice 6-1**

  REALTORS® shall not recommend or suggest to a client or a customer the use of services of another organization or business entity in which they have a direct interest without disclosing such interest at the time of the recommendation or suggestion. *(Amended 5/88)*

## Article 7

In a transaction, REALTORS® shall not accept compensation from more than one party, even if permitted by law, without disclosure to all parties and the informed consent of the REALTOR®'s client or clients. *(Amended 1/93)*

## Article 8

REALTORS® shall keep in a special account in an appropriate financial institution, separated from their own funds, monies coming into their possession in trust for other persons, such as escrows, trust funds, clients' monies, and other like items.

## Article 9

REALTORS®, for the protection of all parties, shall assure whenever possible that all agreements related to real estate transactions including, but not

limited to, listing and representation agreements, purchase contracts, and leases are in writing in clear and understandable language expressing the specific terms, conditions, obligations and commitments of the parties. A copy of each agreement shall be furnished to each party to such agreements upon their signing or initialing. *(Amended 1/04)*

- **Standard of Practice 9-1**

  For the protection of all parties, REALTORS® shall use reasonable care to ensure that documents pertaining to the purchase, sale, or lease of real estate are kept current through the use of written extensions or amendments. *(Amended 1/93)*

- **Standard of Practice 9-2**

  When assisting or enabling a client or customer in establishing a contractual relationship (e.g., listing and representation agreements, purchase agreements, leases, etc.) electronically, REALTORS® shall make reasonable efforts to explain the nature and disclose the specific terms of the contractual relationship being established prior to it being agreed to by a contracting party. *(Adopted 1/07)*

## Duties to the Public

## Article 10

REALTORS® shall not deny equal professional services to any person for reasons of race, color, religion, sex, handicap, familial status, national origin, sexual orientation, or gender identity. REALTORS® shall not be parties to any plan or agreement to discriminate against a person or persons on the basis of race, color, religion, sex, handicap, familial status, national origin, sexual orientation, or gender identity. *(Amended 1/14)*

REALTORS®, in their real estate employment practices, shall not discriminate against any person or persons on the basis of race, color, religion, sex, handicap, familial status, national origin, sexual orientation, or gender identity. *(Amended 1/14)*

- **Standard of Practice 10-1**

  When involved in the sale or lease of a residence, REALTORS® shall not volunteer information regarding the racial, religious or ethnic composition of any neighborhood nor shall they engage in any activity which may result in panic selling, however, REALTORS® may provide other demographic information. *(Adopted 1/94, Amended 1/06)*

- **Standard of Practice 10-2**

  When not involved in the sale or lease of a residence, REALTORS® may provide demographic information related to a property, transaction or professional assignment to a party if such demographic information is (a) deemed by the REALTOR® to be needed to assist with or complete, in a manner consistent with Article 10, a real estate transaction or professional assignment and (b) is obtained or derived from a recognized, reliable, independent, and impartial source. The source of such information and any additions, deletions, modifications, interpretations, or other changes shall be disclosed in reasonable detail. *(Adopted 1/05, Renumbered 1/06)*

- **Standard of Practice 10-3**

  REALTORS® shall not print, display or circulate any statement or advertisement with respect to selling or renting of a property that indicates any preference, limitations or discrimination based on race, color, religion, sex, handicap, familial status, national origin, sexual orientation, or gender identity. *(Adopted 1/94, Renumbered 1/05 and 1/06, Amended 1/14)*

- **Standard of Practice 10-4**

  As used in Article 10 "real estate employment practices" relates to employees and independent contractors providing real estate-related services and the administrative and clerical staff directly supporting those individuals. *(Adopted 1/00, Renumbered 1/05 and 1/06)*

## Article 11

The services which REALTORS® provide to their clients and customers shall conform to the standards of practice and competence which are reasonably expected in the specific real estate disciplines in which they engage; specifically, residential real estate brokerage, real property management, commercial and industrial real estate brokerage, land brokerage, real estate appraisal, real estate counseling, real estate syndication, real estate auction, and international real estate.

REALTORS® shall not undertake to provide specialized professional services concerning a type of property or service that is outside their field of competence unless they engage the assistance of one who is competent on such types of property or service, or unless the facts are fully disclosed to the client. Any persons engaged to provide such assistance shall be so identified to the client and their contribution to the assignment should be set forth. *(Amended 1/10)*

- **Standard of Practice 11-1**

  When REALTORS® prepare opinions of real property value or price they must:
  1) be knowledgeable about the type of property being valued,
  2) have access to the information and resources necessary to formulate an accurate opinion, and
  3) be familiar with the area where the subject property is located

  unless lack of any of these is disclosed to the party requesting the opinion in advance.

  When an opinion of value or price is prepared other than in pursuit of a listing or to assist a potential purchaser in formulating a purchase offer, the opinion shall include the following unless the party requesting the opinion requires a specific type of report or different data set:
  1) identification of the subject property
  2) date prepared
  3) defined value or price
  4) limiting conditions, including statements of purpose(s) and intended user(s)
  5) any present or contemplated interest, including the possibility of representing the seller/landlord or buyers/tenants
  6) basis for the opinion, including applicable market data
  7) if the opinion is not an appraisal, a statement to that effect
  8) disclosure of whether and when a physical inspection of the property's exterior was conducted
  9) disclosure of whether and when a physical inspection of the property's interior was conducted
  10) disclosure of whether the REALTOR® has any conflicts of interest *(Amended 1/14)*

- **Standard of Practice 11-2**

  The obligations of the Code of Ethics in respect of real estate disciplines other than appraisal shall be interpreted and applied in accordance with the standards of competence and practice which clients and the public reasonably require to protect their rights and interests considering the complexity of the transaction, the availability of expert assistance, and, where the REALTOR® is an agent or subagent, the obligations of a fiduciary. *(Adopted 1/95)*

- **Standard of Practice 11-3**

  When REALTORS® provide consultive services to clients which involve advice or counsel for a fee (not a commission), such advice shall be rendered in an objective manner and the fee shall not be contingent on the substance of the advice or counsel given. If brokerage or transaction services are to be provided in addition to consultive services, a separate compensation may be paid with prior agreement between the client and REALTOR®. *(Adopted 1/96)*

- **Standard of Practice 11-4**
  The competency required by Article 11 relates to services contracted for between REALTORS® and their clients or customers; the duties expressly imposed by the Code of Ethics; and the duties imposed by law or regulation. *(Adopted 1/02)*

# Article 12

REALTORS® shall be honest and truthful in their real estate communications and shall present a true picture in their advertising, marketing, and other representations. REALTORS® shall ensure that their status as real estate professionals is readily apparent in their advertising, marketing, and other representations, and that the recipients of all real estate communications are, or have been, notified that those communications are from a real estate professional. *(Amended 1/08)*

- **Standard of Practice 12-1**
  REALTORS® may use the term "free" and similar terms in their advertising and in other representations provided that all terms governing availability of the offered product or service are clearly disclosed at the same time. *(Amended 1/97)*

- **Standard of Practice 12-2**
  REALTORS® may represent their services as "free" or without cost even if they expect to receive compensation from a source other than their client provided that the potential for the REALTOR® to obtain a benefit from a third party is clearly disclosed at the same time. *(Amended 1/97)*

- **Standard of Practice 12-3**
  The offering of premiums, prizes, merchandise discounts or other inducements to list, sell, purchase, or lease is not, in itself, unethical even if receipt of the benefit is contingent on listing, selling, purchasing, or leasing through the REALTOR® making the offer. However, REALTORS® must exercise care and candor in any such advertising or other public or private representations so that any party interested in receiving or otherwise benefiting from the REALTOR®'S offer will have clear, thorough, advance understanding of all the terms and conditions of the offer. The offering of any inducements to do business is subject to the limitations and restrictions of state law and the ethical obligations established by any applicable Standard of Practice. *(Amended 1/95)*

- **Standard of Practice 12-4**
  REALTORS® shall not offer for sale/lease or advertise property without authority. When acting as listing brokers or as subagents, REALTORS® shall not quote a price different from that agreed upon with the seller/landlord. *(Amended 1/93)*

- **Standard of Practice 12-5**
  REALTORS® shall not advertise nor permit any person employed by or affiliated with them to advertise real estate services or listed property in any medium (e.g., electronically, print, radio, television, etc.) without disclosing the name of that REALTOR®'s firm in a reasonable and readily apparent manner either in the advertisement or in electronic advertising via a link to a display with all required disclosures. *(Adopted 11/86, Amended 1/16)*

- **Standard of Practice 12-6**
  REALTORS®, when advertising unlisted real property for sale/lease in which they have an ownership interest, shall disclose their status as both owners/landlords and as REALTORS® or real estate licensees. *(Amended 1/93)*

- **Standard of Practice 12-7**
  Only REALTORS® who participated in the transaction as the listing broker or cooperating broker (selling broker) may claim to have "sold" the property. Prior to closing, a cooperating broker may post a "sold" sign only with the consent of the listing broker. *(Amended 1/96)*

- **Standard of Practice 12-8**
  The obligation to present a true picture in representations to the public includes information presented, provided, or displayed on REALTORS®' websites. REALTORS® shall use reasonable efforts to ensure that information on their websites is current. When it becomes apparent that information on a REALTOR®'s website is no longer current or accurate, REALTORS® shall promptly take corrective action. *(Adopted 1/07)*

- **Standard of Practice 12-9**
  REALTOR® firm websites shall disclose the firm's name and state(s) of licensure in a reasonable and readily apparent manner.

  Websites of REALTORS® and non-member licensees affiliated with a REALTOR® firm shall disclose the firm's name and that REALTOR®'s or non-member licensee's state(s) of licensure in a reasonable and readily apparent manner. *(Adopted 1/07)*

- **Standard of Practice 12-10**
  REALTORS®' obligation to present a true picture in their advertising and representations to the public includes Internet content, images, and the URLs and domain names they use, and prohibits REALTORS® from:
  1) engaging in deceptive or unauthorized framing of real estate brokerage websites;
  2) manipulating (e.g., presenting content developed by others) listing and other content in any way that produces a deceptive or misleading result;
  3) deceptively using metatags, keywords or other devices/methods to direct, drive, or divert Internet traffic; or
  4) presenting content developed by others without either attribution or without permission; or
  5) otherwise misleading consumers, including use of misleading images. *(Adopted 1/07, Amended 1/18)*

- **Standard of Practice 12-11**
  REALTORS® intending to share or sell consumer information gathered via the Internet shall disclose that possibility in a reasonable and readily apparent manner. *(Adopted 1/07)*

- **Standard of Practice 12-12**
  REALTORS® shall not:
  1) use URLs or domain names that present less than a true picture, or
  2) register URLs or domain names which, if used, would present less than a true picture. *(Adopted 1/08)*

- **Standard of Practice 12-13**
  The obligation to present a true picture in advertising, marketing, and representations allows REALTORS® to use and display only professional designations, certifications, and other credentials to which they are legitimately entitled. *(Adopted 1/08)*

# Article 13

REALTORS® shall not engage in activities that constitute the unauthorized practice of law and shall recommend that legal counsel be obtained when the interest of any party to the transaction requires it.

# Article 14

If charged with unethical practice or asked to present evidence or to cooperate in any other way, in any professional standards proceeding or investigation, REALTORS® shall place all pertinent facts before the proper tribunals of the Member Board or affiliated institute, society, or council in which membership is held and shall take no action to disrupt or obstruct such processes. *(Amended 1/99)*

- **Standard of Practice 14-1**
  REALTORS® shall not be subject to disciplinary proceedings in more than one Board of REALTORS® or affiliated institute, society,

or council in which they hold membership with respect to alleged violations of the Code of Ethics relating to the same transaction or event. *(Amended 1/95)*

- **Standard of Practice 14-2**

  REALTORS® shall not make any unauthorized disclosure or dissemination of the allegations, findings, or decision developed in connection with an ethics hearing or appeal or in connection with an arbitration hearing or procedural review. *(Amended 1/92)*

- **Standard of Practice 14-3**

  REALTORS® shall not obstruct the Board's investigative or professional standards proceedings by instituting or threatening to institute actions for libel, slander, or defamation against any party to a professional standards proceeding or their witnesses based on the filing of an arbitration request, an ethics complaint, or testimony given before any tribunal. *(Adopted 11/87, Amended 1/99)*

- **Standard of Practice 14-4**

  REALTORS® shall not intentionally impede the Board's investigative or disciplinary proceedings by filing multiple ethics complaints based on the same event or transaction. *(Adopted 11/88)*

## Duties to REALTORS®

## Article 15

REALTORS® shall not knowingly or recklessly make false or misleading statements about other real estate professionals, their businesses, or their business practices. *(Amended 1/12)*

- **Standard of Practice 15-1**

  REALTORS® shall not knowingly or recklessly file false or unfounded ethics complaints. *(Adopted 1/00)*

- **Standard of Practice 15-2**

  The obligation to refrain from making false or misleading statements about other real estate professionals, their businesses, and their business practices includes the duty to not knowingly or recklessly publish, repeat, retransmit, or republish false or misleading statements made by others. This duty applies whether false or misleading statements are repeated in person, in writing, by technological means (e.g., the Internet), or by any other means. *(Adopted 1/07, Amended 1/12)*

- **Standard of Practice 15-3**

  The obligation to refrain from making false or misleading statements about other real estate professionals, their businesses, and their business practices includes the duty to publish a clarification about or to remove statements made by others on electronic media the REALTOR® controls once the REALTOR® knows the statement is false or misleading. *(Adopted 1/10, Amended 1/12)*

## Article 16

REALTORS® shall not engage in any practice or take any action inconsistent with exclusive representation or exclusive brokerage relationship agreements that other REALTORS® have with clients. *(Amended 1/04)*

- **Standard of Practice 16-1**

  Article 16 is not intended to prohibit aggressive or innovative business practices which are otherwise ethical and does not prohibit disagreements with other REALTORS® involving commission, fees, compensation or other forms of payment or expenses. *(Adopted 1/93, Amended 1/95)*

- **Standard of Practice 16-2**

  Article 16 does not preclude REALTORS® from making general announcements to prospects describing their services and the terms of their availability even though some recipients may have entered into agency agreements or other exclusive relationships with another REALTOR®. A general telephone canvass, general mailing or distribution addressed to all prospects in a given geographical area or in a given profession, business, club, or organization, or other classification or group is deemed "general" for purposes of this standard. *(Amended 1/04)*

  Article 16 is intended to recognize as unethical two basic types of solicitations:

  First, telephone or personal solicitations of property owners who have been identified by a real estate sign, multiple listing compilation, or other information service as having exclusively listed their property with another REALTOR® and

  Second, mail or other forms of written solicitations of prospects whose properties are exclusively listed with another REALTOR® when such solicitations are not part of a general mailing but are directed specifically to property owners identified through compilations of current listings, "for sale" or "for rent" signs, or other sources of information required by Article 3 and Multiple Listing Service rules to be made available to other REALTORS® under offers of subagency or cooperation. *(Amended 1/04)*

- **Standard of Practice 16-3**

  Article 16 does not preclude REALTORS® from contacting the client of another broker for the purpose of offering to provide, or entering into a contract to provide, a different type of real estate service unrelated to the type of service currently being provided (e.g., property management as opposed to brokerage) or from offering the same type of service for property not subject to other brokers' exclusive agreements. However, information received through a Multiple Listing Service or any other offer of cooperation may not be used to target clients of other REALTORS® to whom such offers to provide services may be made. *(Amended 1/04)*

- **Standard of Practice 16-4**

  REALTORS® shall not solicit a listing which is currently listed exclusively with another broker. However, if the listing broker, when asked by the REALTOR®, refuses to disclose the expiration date and nature of such listing, i.e., an exclusive right to sell, an exclusive agency, open listing, or other form of contractual agreement between the listing broker and the client, the REALTOR® may contact the owner to secure such information and may discuss the terms upon which the REALTOR® might take a future listing or, alternatively, may take a listing to become effective upon expiration of any existing exclusive listing. *(Amended 1/94)*

- **Standard of Practice 16-5**

  REALTORS® shall not solicit buyer/tenant agreements from buyers/ tenants who are subject to exclusive buyer/tenant agreements. However, if asked by a REALTOR®, the broker refuses to disclose the expiration date of the exclusive buyer/tenant agreement, the REALTOR® may contact the buyer/tenant to secure such information and may discuss the terms upon which the REALTOR® might enter into a future buyer/tenant agreement or, alternatively, may enter into a buyer/tenant agreement to become effective upon the expiration of any existing exclusive buyer/tenant agreement. *(Adopted 1/94, Amended 1/98)*

- **Standard of Practice 16-6**

  When REALTORS® are contacted by the client of another REALTOR® regarding the creation of an exclusive relationship to provide the same type of service, and REALTORS® have not directly or indirectly initiated such discussions, they may discuss the terms upon which they might enter into a future agreement

or, alternatively, may enter into an agreement which becomes effective upon expiration of any existing exclusive agreement. *(Amended 1/98)*

- **Standard of Practice 16-7**

  The fact that a prospect has retained a REALTOR® as an exclusive representative or exclusive broker in one or more past transactions does not preclude other REALTORS® from seeking such prospect's future business. *(Amended 1/04)*

- **Standard of Practice 16-8**

  The fact that an exclusive agreement has been entered into with a REALTOR® shall not preclude or inhibit any other REALTOR® from entering into a similar agreement after the expiration of the prior agreement. *(Amended 1/98)*

- **Standard of Practice 16-9**

  REALTORS®, prior to entering into a representation agreement, have an affirmative obligation to make reasonable efforts to determine whether the prospect is subject to a current, valid exclusive agreement to provide the same type of real estate service. *(Amended 1/04)*

- **Standard of Practice 16-10**

  REALTORS®, acting as buyer or tenant representatives or brokers, shall disclose that relationship to the seller/landlord's representative or broker at first contact and shall provide written confirmation of that disclosure to the seller/landlord's representative or broker not later than execution of a purchase agreement or lease. *(Amended 1/04)*

- **Standard of Practice 16-11**

  On unlisted property, REALTORS® acting as buyer/tenant representatives or brokers shall disclose that relationship to the seller/landlord at first contact for that buyer/tenant and shall provide written confirmation of such disclosure to the seller/landlord not later than execution of any purchase or lease agreement. *(Amended 1/04)*

  REALTORS® shall make any request for anticipated compensation from the seller/landlord at first contact. *(Amended 1/98)*

- **Standard of Practice 16-12**

  REALTORS®, acting as representatives or brokers of sellers/landlords or as subagents of listing brokers, shall disclose that relationship to buyers/tenants as soon as practicable and shall provide written confirmation of such disclosure to buyers/tenants not later than execution of any purchase or lease agreement. *(Amended 1/04)*

- **Standard of Practice 16-13**

  All dealings concerning property exclusively listed, or with buyer/tenants who are subject to an exclusive agreement shall be carried on with the client's representative or broker, and not with the client, except with the consent of the client's representative or broker or except where such dealings are initiated by the client.

  Before providing substantive services (such as writing a purchase offer or presenting a CMA) to prospects, REALTORS® shall ask prospects whether they are a party to any exclusive representation agreement. REALTORS® shall not knowingly provide substantive services concerning a prospective transaction to prospects who are parties to exclusive representation agreements, except with the consent of the prospects' exclusive representatives or at the direction of prospects. *(Adopted 1/93, Amended 1/04)*

- **Standard of Practice 16-14**

  REALTORS® are free to enter into contractual relationships or to negotiate with sellers/landlords, buyers/tenants or others who are not subject to an exclusive agreement but shall not knowingly obligate them to pay more than one commission except with their informed consent. *(Amended 1/98)*

- **Standard of Practice 16-15**

  In cooperative transactions REALTORS® shall compensate cooperating REALTORS® (principal brokers) and shall not compensate nor offer to compensate, directly or indirectly, any of the sales licensees employed by or affiliated with other REALTORS® without the prior express knowledge and consent of the cooperating broker.

- **Standard of Practice 16-16**

  REALTORS®, acting as subagents or buyer/tenant representatives or brokers, shall not use the terms of an offer to purchase/lease to attempt to modify the listing broker's offer of compensation to subagents or buyer/tenant representatives or brokers nor make the submission of an executed offer to purchase/lease contingent on the listing broker's agreement to modify the offer of compensation. *(Amended 1/04)*

- **Standard of Practice 16-17**

  REALTORS®, acting as subagents or as buyer/tenant representatives or brokers, shall not attempt to extend a listing broker's offer of cooperation and/or compensation to other brokers without the consent of the listing broker. *(Amended 1/04)*

- **Standard of Practice 16-18**

  REALTORS® shall not use information obtained from listing brokers through offers to cooperate made through multiple listing services or through other offers of cooperation to refer listing brokers' clients to other brokers or to create buyer/tenant relationships with listing brokers' clients, unless such use is authorized by listing brokers. *(Amended 1/02)*

- **Standard of Practice 16-19**

  Signs giving notice of property for sale, rent, lease, or exchange shall not be placed on property without consent of the seller/landlord. *(Amended 1/93)*

- **Standard of Practice 16-20**

  REALTORS®, prior to or after their relationship with their current firm is terminated, shall not induce clients of their current firm to cancel exclusive contractual agreements between the client and that firm. This does not preclude REALTORS® (principals) from establishing agreements with their associated licensees governing assignability of exclusive agreements. *(Adopted 1/98, Amended 1/10)*

## Article 17

In the event of contractual disputes or specific non-contractual disputes as defined in Standard of Practice 17-4 between REALTORS® (principals) associated with different firms, arising out of their relationship as REALTORS®, the REALTORS® shall mediate the dispute if the Board requires its members to mediate. If the dispute is not resolved through mediation, or if mediation is not required, REALTORS® shall submit the dispute to arbitration in accordance with the policies of the Board rather than litigate the matter.

In the event clients of REALTORS® wish to mediate or arbitrate contractual disputes arising out of real estate transactions, REALTORS® shall mediate or arbitrate those disputes in accordance with the policies of the Board, provided the clients agree to be bound by any resulting agreement or award.

The obligation to participate in mediation and arbitration contemplated by this Article includes the obligation of REALTORS® (principals) to cause their firms to mediate and arbitrate and be bound by any resulting agreement or award. *(Amended 1/12)*

- **Standard of Practice 17-1**

  The filing of litigation and refusal to withdraw from it by REALTORS® in an arbitrable matter constitutes a refusal to arbitrate. *(Adopted 2/86)*

- **Standard of Practice 17-2**

  Article 17 does not require REALTORS® to mediate in those circumstances when all parties to the dispute advise the Board in writing that they choose not to mediate through the Board's facilities. The fact that all parties decline to participate in mediation does not relieve REALTORS® of the duty to arbitrate.

  Article 17 does not require REALTORS® to arbitrate in those circumstances when all parties to the dispute advise the Board in writing that they choose not to arbitrate before the Board. *(Amended 1/12)*

- **Standard of Practice 17-3**

  REALTORS®, when acting solely as principals in a real estate transaction, are not obligated to arbitrate disputes with other REALTORS® absent a specific written agreement to the contrary. *(Adopted 1/96)*

- **Standard of Practice 17-4**

  Specific non-contractual disputes that are subject to arbitration pursuant to Article 17 are:

  1) Where a listing broker has compensated a cooperating broker and another cooperating broker subsequently claims to be the procuring cause of the sale or lease. In such cases the complainant may name the first cooperating broker as respondent and arbitration may proceed without the listing broker being named as a respondent. When arbitration occurs between two (or more) cooperating brokers and where the listing broker is not a party, the amount in dispute and the amount of any potential resulting award is limited to the amount paid to the respondent by the listing broker and any amount credited or paid to a party to the transaction at the direction of the respondent. Alternatively, if the complaint is brought against the listing broker, the listing broker may name the first cooperating broker as a third-party respondent. In either instance the decision of the hearing panel as to procuring cause shall be conclusive with respect to all current or subsequent claims of the parties for compensation arising out of the underlying cooperative transaction. *(Adopted 1/97, Amended 1/07)*

  2) Where a buyer or tenant representative is compensated by the seller or landlord, and not by the listing broker, and the listing broker, as a result, reduces the commission owed by the seller or landlord and, subsequent to such actions, another cooperating broker claims to be the procuring cause of sale or lease. In such cases the complainant may name the first cooperating broker as respondent and arbitration may proceed without the listing broker being named as a respondent. When arbitration occurs between two (or more) cooperating brokers and where the listing broker is not a party, the amount in dispute and the amount of any potential resulting award is limited to the amount paid to the respondent by the seller or landlord and any amount credited or paid to a party to the transaction at the direction of the respondent. Alternatively, if the complaint is brought against the listing broker, the listing broker may name the first cooperating broker as a third-party respondent. In either instance the decision of the hearing panel as to procuring cause shall be conclusive with respect to all current or subsequent claims of the parties for compensation arising out of the underlying cooperative transaction. *(Adopted 1/97, Amended 1/07)*

  3) Where a buyer or tenant representative is compensated by the buyer or tenant and, as a result, the listing broker reduces the commission owed by the seller or landlord and, subsequent to such actions, another cooperating broker claims to be the procuring cause of sale or

lease. In such cases the complainant may name the first cooperating broker as respondent and arbitration may proceed without the listing broker being named as a respondent. Alternatively, if the complaint is brought against the listing broker, the listing broker may name the first cooperating broker as a third-party respondent. In either instance the decision of the hearing panel shall be conclusive with respect to all current or subsequent claims of the parties for compensation arising out of the underlying cooperative transaction. *(Adopted 1/97)*

  4) Where two or more listing brokers claim entitlement to compensation pursuant to open listings with a seller or landlord who agrees to participate in arbitration (or who requests arbitration) and who agrees to be bound by the decision. In cases where one of the listing brokers has been compensated by the seller or landlord, the other listing broker, as complainant, may name the first listing broker as respondent and arbitration may proceed between the brokers. *(Adopted 1/97)*

  5) Where a buyer or tenant representative is compensated by the seller or landlord, and not by the listing broker, and the listing broker, as a result, reduces the commission owed by the seller or landlord and, subsequent to such actions, claims to be the procuring cause of sale or lease. In such cases arbitration shall be between the listing broker and the buyer or tenant representative and the amount in dispute is limited to the amount of the reduction of commission to which the listing broker agreed. *(Adopted 1/05)*

- **Standard of Practice 17-5**

  The obligation to arbitrate established in Article 17 includes disputes between REALTORS® (principals) in different states in instances where, absent an established inter-association arbitration agreement, the REALTOR® (principal) requesting arbitration agrees to submit to the jurisdiction of, travel to, participate in, and be bound by any resulting award rendered in arbitration conducted by the respondent(s) REALTOR®'S association, in instances where the respondent(s) REALTOR®'S association determines that an arbitrable issue exists. *(Adopted 1/07)*

## Explanatory Notes

The reader should be aware of the following policies which have been approved by the Board of Directors of the National Association:

In filing a charge of an alleged violation of the Code of Ethics by a REALTOR®, the charge must read as an alleged violation of one or more Articles of the Code. Standards of Practice may be cited in support of the charge.

The Standards of Practice serve to clarify the ethical obligations imposed by the various Articles and supplement, and do not substitute for, the Case Interpretations in *Interpretations of the Code of Ethics.*

Modifications to existing Standards of Practice and additional new Standards of Practice are approved from time to time. Readers are cautioned to ensure that the most recent publications are utilized.

© 2019 NATIONAL ASSOCIATION OF REALTORS®

166-288-19 (01/19 VG)

*430 North Michigan Avenue • Chicago, IL 60611-4087*
*800.874.6500 • www.nar.realtor*



# EXHIBIT C

Case: 1:19-cv-01610 Document #: 114-1 Filed: 08/09/19 Page 194 of 324 PageID #:1284

# Interpretations of the
# Code of Ethics

31st Edition



# Table of Contents —
# *Interpretations of the Code of Ethics*

**Preface** ....................................................... 1

**Article 1**
Protect and Promote Your Client's
Interests, But be Honest with All Parties.................... 2

**Article 2**
Avoid Exaggeration, Misrepresentation, and
Concealment of Pertinent Facts. Do Not
Reveal Facts that are Confidential Under
the Scope of Your Agency Relationship .................. 22

**Article 3**
Cooperate with Other Real Estate
Professionals to Advance Client's
Best Interests ........................................... 34

**Article 4**
When Buying or Selling, Make
Your Position in the Transaction or
Interest Known .......................................... 42

**Article 5**
Disclose Present or Contemplated
Interest in Any Property to All Parties ..................... 45

**Article 6**
Avoid Side Deals without Client's
Informed Consent ...................................... 46

**Article 7**
Accept Compensation from Only One
Party, Except with Full Disclosure and
Informed Consent ...................................... 50

**Article 8**
Keep the Funds of Clients and Customers
in Escrow ............................................... 51

**Article 9**
Assure, Whenever Possible, that
Transactional Details are in Writing ........................ 52

**Article 10**
Provide Equal Service to All Clients
and Customers ......................................... 53

**Article 11**
Be Knowledgeable and Competent in the
Fields of Practice in Which You Ordinarily
Engage. Obtain Assistance or Disclose Lack
of Experience if Necessary ...................... 57

**Article 12**
Present a True Picture in Your Advertising
and Other Public Representations............................ 61

**Article 13**
Do Not Engage in the Unauthorized
Practice of Law ......................................... 76

**Article 14**
Be a Willing Participant in Code
Enforcement Procedures ........................... 78

**Article 15**
Ensure that Your Comments about
Other Real Estate Professionals
are Truthful, and Not Misleading.............................. 80

**Article 16**
Respect the Exclusive Representation
or Exclusive Brokerage Relationship
Agreements that Other REALTORS® have
with their Clients........................................ 81

**Article 17**
Arbitrate and Mediate Contractual and Specific
Non-Contractual Disputes with
Other REALTORS® and with Your Clients ................... 95

**NOTE:** All new and amended Case Interpretations become effective upon approval by the National Association's Professional Standards Committee and publication on www.nar.realtor.

# Preface to the Thirty First Edition of
# *Interpretations of the Code of Ethics*

The Code of Ethics of the NATIONAL ASSOCIATION OF REALTORS® establishes a public and professional consensus against which the practice and conduct of REALTORS® and REALTOR-ASSOCIATE®s may be judged. Where the word REALTORS® is used in this Code and Preamble, it shall be deemed to include REALTOR-ASSOCIATE®s. In joining an Association of REALTORS®, REALTORS® signify their intention to abide by the Code and thereby enhance the public and professional image of themselves and all other REALTORS®. Adherence to the Code is the first great bond between REALTORS® throughout the country.

*Interpretations of the Code of Ethics* has been developed by the Professional Standards Committee of the NATIONAL ASSOCIATION OF REALTORS® to help REALTORS® understand the ethical obligations created by the Code of Ethics, and as a reference work for Grievance Committees, ethics and arbitration Hearing Panels, and Boards of Directors.

Professional Standards Policy Statement 57, *Code of Ethics and Arbitration Manual,* provides as follows:

### 57. Case Interpretations are Official Policy

*The Case Interpretation of the Code of Ethics approved by the National Association's Professional Standards Committee and published in Interpretation of the Code of Ethics illustrate and explain the principles articulated in the Articles and Standards of Practice. While a REALTOR® cannot be found in violation of a Standards of Practice or a Case Interpretation, both are official statements of National Association policy and are not merely advisory. Both can be cited by complainants in support of alleged violations of Articles and by hearing panels in support of decisions that an Article(s) has been violated.* (Adopted 11/10)

*Interpretations of the Code of Ethics* presents specific situations involving charges of alleged unethical conduct by REALTORS® which are reviewed by a peer panel of Association Members and in which decisions as to ethical conduct are reached. Each case provides the Hearing Panel's decision based on the facts and the rationale for the decision, but does not specify a specific sanction or discipline to be imposed. There are two reasons for this. First, any sanction imposed must always fit the offense and must involve every consideration of justice, equity, and propriety. Second, a Hearing Panel may base its recommendation for discipline on a Member's past record of ethics violations.

For this reason, the *Code of Ethics and Arbitration Manual* establishes that a Member Association may utilize a wide range of sanctions for ethics violations.

While Associations of REALTORS® have wide latitude in the sanctions which may be imposed for violations of the Code of Ethics, they must always act responsibly in the application of these sanctions, attempting to make the punishment commensurate with the offense. The mildest forms of sanction, a Letter of Warning or a Letter of Reprimand, would generally be the appropriate sanction for first offenses, except in cases involving gross or willful misconduct. Where ignorance of the Code of Ethics is involved, the Board may find that requiring the Member to attend a course or seminar reviewing the Code of Ethics and its interpretations to be the most appropriate sanction.

*Interpretations of the Code of Ethics* is formatted to provide the reader with information on each Article of the Code of Ethics and its interpretations in sequence. *Interpretations of the Code of Ethics* contains citations to Case Interpretations which were deleted, amended, or adopted as a result of the work of the Professional Standards Committee, providing a complete historical record for the reader. All new and amended Case Interpretations become effective upon approval by the National Association's Professional Standards Committee and publication on www.nar.realtor. *(Revised 5/17)*

# CASE INTERPRETATIONS RELATED TO ARTICLE 1:

## Case #1-1: Fidelity to Client (Originally Case #7-1. Revised May, 1988. Transferred to Article 1 November, 1994.)

Client A complained to a Board of REALTORS® that two of its members, REALTORS® B and his sales associate, REALTOR-ASSOCIATE® C, had failed to represent the client's interests faithfully by proposing to various prospective buyers that a price less than the listed price of a house be offered. His complaint specified that REALTOR® B, in consultation with him, had agreed that $137,900 would be a fair price for the house, and it had been listed at that figure. The complaint also named three different prospective buyers who had told Client A that while looking at the property, REALTOR-ASSOCIATE® C, representing REALTOR® B, when asked the price had said, "It's listed at $137,900, but I'm pretty sure that an offer of $130,000 will be accepted."

REALTOR® B and REALTOR-ASSOCIATE® C were notified of the complaint and requested to be present at a hearing on the matter scheduled before a Hearing Panel of the Board's Professional Standards Committee.

During the hearing, REALTOR® B confirmed that he had agreed with Client A that $137,900 was a fair price for the house, and that it was listed at that figure. He added that he had asked for a 90 day listing contract as some time might be required in securing the full market value. Client A had agreed to do this but had indicated that he was interested in selling within a month even if it meant making some concession on the price. The discussion concluded with an agreement on listing at $137,900 and with REALTOR® B agreeing to make every effort to get that price for Client A.

REALTOR-ASSOCIATE® C said in the hearing that REALTOR® B had repeated these comments of Client A and he, REALTOR-ASSOCIATE® C, had interpreted them as meaning that an early offer of about 10 percent less than the listed price would be acceptable to the seller, Client A. Questioning by the Hearing Panel established that neither REALTOR® B nor REALTOR-ASSOCIATE® C had been authorized to quote a price other than $137,900.

It was the Hearing Panel's conclusion that REALTOR® B was not in violation of Article 1 since he had no reason to know of REALTOR-ASSOCIATE® C's actions. The panel did find REALTOR-ASSOCIATE® C in violation of Article 1 for divulging his knowledge that the client was desirous of a rapid sale even if it meant accepting less than the asking price. The panel noted that such a disclosure was not in the client's best interest and should never be made without the client's knowledge and consent.

## Case #1-2: Honest Treatment of All Parties
(Originally Case #7-2. Revised May, 1988. Transferred to Article 1 November, 1994. Cross-reference Case #2-18.)

As the exclusive agent of Client A, REALTOR® B offered Client A's house for sale, advertising it as being located near a bus stop. Prospect C, who explained that his daily schedule made it necessary for him to have a house near the bus stop, was shown Client A's property, liked it, and made a deposit. Two days later, REALTOR® B read a notice that the bus line running near Client A's house was being discontinued. He informed Prospect C of this, and Prospect C responded that he was no longer interested in Client A's house since the availability of bus transportation was essential to him. REALTOR® B informed Client A and recommended that Prospect C's deposit be returned.

Client A reluctantly complied with REALTOR® B's recommendation, but then complained to the Board of REALTORS® that REALTOR® B had not faithfully protected and promoted his interests; that after Prospect C had expressed his willingness to buy, REALTOR® B should not have made a disclosure that killed the sale since the point actually was not of major importance. The new bus route, he showed, would put a stop within six blocks of the property.

In a hearing before a Hearing Panel of the Board's Professional Standards Committee, REALTOR® B explained that in advertising Client A's property, the fact that a bus stop was less than a block from the property had been prominently featured. He also made the point that Prospect C, in consulting with him, had emphasized that Prospect C's physical disability necessitated a home near a bus stop. Thus, in his judgment, the change in bus routing materially changed the characteristics of the property in the eyes of the prospective buyer, and he felt under his obligation to give honest treatment to all parties in the transaction, that he should inform Prospect C, and that in so doing he was not violating his obligation to his client.

The Hearing Panel concluded that REALTOR® B had not violated Article 1, but had acted properly under both the spirit and the letter of the Code of Ethics. The panel noted that the decision to refund Prospect C's deposit was made by the seller, Client A, even though the listing broker, REALTOR® B, had suggested that it was only fair due to the change in circumstances.

### Case #1-3: Net Listing (Originally Case #7-3. Revised May, 1988. Transferred to Article 1 November, 1994.)

Client A called REALTOR® B to list a small commercial property, explaining that he wanted to net at least $170,000 from its sale. He inquired about the brokerage commission and other selling costs. REALTOR® B's response was: "You have indicated that $170,000 net to you from the sale will be satisfactory. Suppose we just leave it at that and take all of the selling costs from the proceeds of the sale above $170,000." Client A agreed.

The property was sold to Buyer C for $220,000. After settlement, in which it was apparent that $50,000 would go to REALTOR® B as commission, Client A and Buyer C both complained to the Board of REALTORS® about REALTOR® B's conduct in the matter, and a hearing was scheduled before the Board's Professional Standards Committee.

REALTOR® B's defense was that he had performed the service that Client A engaged him for precisely in conformance with their agreement. Buyer C had considered the property a good buy at $220,000 and was happy with the transaction until he learned the amount of the commission.

The Hearing Panel found REALTOR® B in violation of Article 1 of the Code. The panel concluded that REALTOR® B had departed completely from his obligation to render a professional service in fidelity to his client's interest; that he had, in fact, been a speculator in his client's property; and that he had not dealt honestly with either party to the transaction.

### Case #1-4: Fidelity to Client (Originally Case #7-5. Revised May, 1988. Transferred to Article 1 November, 1994. Cross-reference Case #4-5.)

Client A contacted REALTOR® B to list a vacant lot. Client A said he had heard that similar lots in the vicinity had sold for about $50,000 and thought he should be able to get a similar price. REALTOR® B stressed some minor disadvantages in location and grade of the lot, and said that the market for vacant lots was sluggish. He suggested listing at a price of $32,500 and the client agreed.

In two weeks, REALTOR® B came to Client A with an offer at the listed price of $32,500. The client raised some questions about it, pointing out that the offer had come in just two weeks after the property had been placed on the market which could be an indication that the lot was worth closer to $50,000 than $32,500. REALTOR® B strongly urged him to accept the offer, stating that because of the sluggish market, another offer might not develop for months and that the offer in hand simply vindicated REALTOR® B's own judgment as to pricing the lot. Client A finally agreed and the sale was made to Buyer C.

Two months later, Client A discovered the lot was no longer owned by Buyer C, but had been purchased by Buyer D at $55,000. He investigated and found that Buyer C was a brother-in-law of REALTOR® B, and that Buyer C had acted on behalf of REALTOR® B in buying the property for $32,500.

Client A outlined the facts in a complaint to the Board of REALTORS®, charging REALTOR® B with collusion in betrayal of a client's confidence and interests, and with failing to disclose that he was buying the property on his own behalf.

At a hearing before a panel of the Board's Professional Standards Committee, REALTOR® B's defense was that in his observation of real estate transactions there can be two legitimate prices of property — the price that a seller is willing to take in order to liquidate his investment, and the price that a buyer is willing to pay to acquire a property in which he is particularly interested. His position was that he saw no harm in bringing about a transaction to his own advantage in which the seller received a price that he was willing to take and the buyer paid a price that he was willing to pay.

The Hearing Panel concluded that REALTOR® B had deceitfully used the guise of rendering professional service to a client in acting as a speculator; that he had been unfaithful to the most basic principles of agency and allegiance to his client's interest; and that he had violated Articles 1 and 4 of the Code of Ethics.

## Case #1-5: Promotion of Client's Interests

(Originally Case #7-6. Revised May, 1988. Transferred to Article 1 November, 1994.)

Client A gave an exclusive listing on a house to REALTOR® B, stating that he thought $132,500 would be a fair price for the property. REALTOR® B agreed and the house was listed at that price in a 90-day listing contract. REALTOR® B advertised the house without response, showing it to a few prospective buyers who lost interest when they learned the price. In a sales meeting in his office, REALTOR® B discussed the property, advised his associates that it appeared to be overpriced, and that advertising and showing of the property had proved to be a waste of time and money.

After six weeks had gone by without a word from REALTOR® B, Client A called REALTOR® B's office without identifying himself, described the property, and asked if the firm was still offering it for sale. The response he received from one of REALTOR® B's nonmember associates was: "We still have the house listed, but there is little interest in it because, in our opinion, it is overpriced and not as attractive a value as other property we can show you."

Client A wrote to the Board of REALTOR® complaining of REALTOR® B's action, charging failure to promote and protect the client's interest by REALTOR® B's failure to advise the client of his judgment that the price agreed upon in the listing contract was excessive, and by REALTOR® B's failure to actively seek a buyer.

In a hearing on the complaint before a Hearing Panel of the Board's Professional Standards Committee, REALTOR® B's response was that Client A had emphatically insisted that he wanted $132,500 for the property; that by advertising and showing the property he had made a diligent effort to attract a buyer at that price; that in receiving almost no response to this effort he was obliged to conclude that the house would not sell at the listed price; that in view of the client's attitude at the time of listing, he felt it would be useless to attempt to get Client A's agreement to lower the listed price; and that he had instructed his staff not to actively market the property at that price.

The Hearing Panel concluded that REALTOR® B was in violation of Article 1; that he had been unfaithful in his obligations in not advising his client of his conclusion that the property was overpriced, based on the response to his initial sales efforts; and in withholding his best efforts to bring about a sale of the property in the interests of his client.

## Case #1-6: Fidelity to Client's Interests

(Originally Case #7-7. Reaffirmed May, 1988. Transferred to Article 1 November, 1994. Revised November, 2001.)

REALTOR® A managed an apartment building owned by Client B. In his capacity as property manager, REALTOR® A received a written offer to purchase the building from Buyer C. REALTOR® A responded that the building was not for sale. A few days later Buyer C met Client B and told him that he thought he had made an attractive offer through his agent, and indicated that he would be interested in knowing what price would interest Client B. Client B answered that he had received no offer through REALTOR® A and asked for the details.

Client B then filed a complaint against REALTOR® A with the local Board of REALTOR® charging failure to represent and promote his interests. His complaint specified that while REALTOR® A had been engaged as a property manager, he had at no time told him not to submit any offers to buy, and that in the absence of any discussion whatever on this point, he felt that REALTOR® A should have recognized a professional obligation to acquaint him with Buyer C's offer which, he stated in the complaint, was definitely attractive to him.

REALTOR® A was notified of the complaint and directed to appear before a panel of the Board's Professional Standards Committee. In his defense, REALTOR® A stated that his only relationship with Client B was a property manager under the terms of a management contract; that he had not been engaged as a broker; that at no time had the client ever indicated an interest in selling the building; that in advising Buyer C that the property was not on the market, he felt that he was protecting his client against an attempt to take his time in discussing a transaction which he felt sure would not interest him.

It was the conclusion of the Hearing Panel that REALTOR® A was in violation of Article 1; that in the absence of any instructions not to submit offers, he should have recognized that fidelity to his client's interest, as required under Article 1 of the Code of Ethics, obligated him to acquaint his client with a definite offer to buy the property; and that any real estate investor would obviously wish to know of such an offer.

## Case #1-7: Obligation to Protect Client's Interests
(Originally Case #7-8. Reaffirmed May, 1988. Transferred to Article 1 November, 1994. Revised November, 2001.)

Client A, an army officer, was transferred to a new duty station and listed his home for sale with REALTOR® B as the exclusive agent. He moved to his new station with the understanding that REALTOR® B, as the listing broker, would obtain a buyer as soon as possible. After six weeks, during which no word had come from REALTOR® B, the client made a weekend visit back to his former community to inspect his property. He learned that REALTOR® B had advertised the house: "Vacant — Owner transferred," and found an "open" sign on the house but no representative present. Upon inquiry, Client A found that REALTOR® B never had a representative at the property but continually kept an "open" sign in the yard. Client A discovered that the key was kept in a combination lockbox, and when REALTOR® B received calls from potential purchasers about the property, he simply gave callers the address, advised that the key was in the lockbox, gave them the combination, and told them to look through the house by themselves and to call him back if they needed other information or wanted to make an offer.

Client A filed a complaint with the Board of REALTORS® detailing these facts, and charging REALTOR® B with failure to protect and promote a client's interests by leaving Client A's property open to vandalism, and by not making appropriate efforts to obtain a buyer.

REALTOR® B's defense during the hearing was that his advertising of the property was evidence of his effort to sell it. He stated, without being specific, that leaving keys to vacant listed property in lockboxes and advising callers to inspect property on their own was a "common local practice."

The Hearing Panel concluded that REALTOR® B was in violation of Article 1 of the Code of Ethics because he had failed to act in a professional manner consistent with his obligations to protect and promote the interests of his client.

## Case #1-8: Knowledge of Essential Facts
(Originally Case #7-10. Reaffirmed May, 1988. Transferred to Article 1 November, 1994.)

Client A listed a small house with REALTOR® B who obtained an offer to buy it and a deposit in the form of a check for $2,000. Client A agreed to accept the offer, then heard nothing from REALTOR® B, the listing broker, for three weeks. At that time REALTOR® B called him to say that the sale had fallen through and that the buyer's check had been returned by the bank marked "Not Sufficient Funds."

Client A complained to the local Board of REALTORS® against REALTOR® B charging him with dilatory and unprofessional conduct and apparent unfamiliarity with essential facts under laws governing procedures in real estate transactions.

At the hearing, it was established that two days after making the offer the buyer had refused to sign escrow instructions, and that REALTOR® B had not deposited the buyer's check until ten days after receiving it.

REALTOR® B's defense was that since the return of the check he had received numerous promises from the buyer that it would be made good, and that the buyer's reason for refusing to sign escrow instructions was to give the buyer's attorney time to read them. Questioning during the hearing established that the check had not been made good, the escrow instructions had not been signed, and that the delay had caused great inconvenience and possible loss to Client A.

The Hearing Panel concluded that REALTOR® B should have deposited the check immediately, in which event it would either have been accepted, or its NSF status could have been known and reported to the client at once; that REALTOR® B should have advised his client immediately of the buyer's refusal to sign escrow instructions; that in this negligence REALTOR® B reflected a lack of adequate knowledge of essential facts under laws governing real estate transactions, and was in violation of Article 1 of the Code of Ethics, having failed to protect the client's interests.

## Case #1-9: Exclusive Listing During Term of Open Listing  (Originally Case #7-11. Revised May, 1988. Transferred to Article 1 November, 1994. Revised November, 2001.)

During a Board of REALTORS® luncheon, REALTOR® A described to those at the table an old house in a commercial area which was open listed with him and invited the others to cooperate with him in selling the property. REALTORS® X and Y said they also had the property open listed but had found very little interest in it. REALTOR® B made no comment, but feeling he could find a buyer for it, went to the owner and discussed the advantages of an exclusive listing. The owner was persuaded and signed an exclusive listing agreement with REALTOR® B, telling him at the time that he had listed the property on an "open" basis for 30 more days with REALTORS® A, X, and Y. REALTOR® B's comment was, "Just don't renew those open listings when they expire."

A few days later, REALTOR® A brought the owner a signed offer to purchase the property at the asking price. The owner told REALTOR® A that he now had the property exclusively listed with REALTOR® B, and asked him to submit the offer through REALTOR® B. Before REALTOR® A could contact REALTOR® B, REALTOR® B had taken another offer to purchase the property at the asking price to the owner. Confronted with two identical offers, the owner found both REALTOR® A and REALTOR® B expected full commissions for performance under their respective existing listing agreements. The owner filed an ethics complaint with the Board of REALTORS® alleging violations of Article 1 of the Code of Ethics because of the difficult position he had been placed in by REALTOR® A and REALTOR® B. The owner alleged neither of them had warned him that he might be liable for payment of more than one commission.

A hearing before a panel of the Board's Professional Standards Committee established the facts to be as outlined above. In reviewing the actions of REALTOR® A, the Hearing Panel found that he was not at fault; that he had performed as requested under his listing agreement. On the other hand, it was the conclusion of the Hearing Panel that REALTOR® B had violated Article 1 by failing to advise the owner of his potential commission obligation to the other listing brokers when the client told him other listing agreements were in force.

The Hearing Panel pointed out that because of REALTOR® B's omission his client, through no fault of his own, may have incurred legal liability to pay two commissions; that REALTOR® B should have advised the owner of his potential liability for multiple commissions; and that by not doing so REALTOR® B had failed to protect his client's interests as required by Article 1.

## Case #1-10: Obligations Under Exclusive Listing  (Originally Case #7-12. Reaffirmed May, 1988. Transferred to Article 1 November, 1994. Revised November, 2001.)

At the time Client A signed an exclusive listing agreement with REALTOR® B, they discussed market conditions and prevailing prices, and agreed on listing at $156,900. After six weeks with no apparent interest in the house, Client A called REALTOR® B to learn why his property was receiving scant attention from prospective buyers. REALTOR® B said, "It's not hard to diagnose the trouble. Your property is overpriced. That was clear to me by the time we had it listed for ten days. In this market, it would take a really interested buyer to go as high as $149,000 for it. That's why it hasn't been possible for us to push it." "When you reached that conclusion, why didn't you tell me?" asked Client A. "Because," said REALTOR® B, "it wouldn't have done any good. I know from experience that sellers can't be convinced that they are overpricing their property until they get tired of waiting for an offer that will never come. Now that the market has taught you something that you would not take as advice, let's reduce the price to $148,900 and push it."

Client A complained about REALTOR® B to the Board of REALTORS®, detailing these circumstances, strongly insisting that REALTOR® B had fully agreed with him on the price at which the property was originally listed.

Client A reiterated this point strongly at the hearing of his complaint which was held before a Hearing Panel of the Board's Professional Standards Committee. REALTOR® B did not contest this, taking the position that at the time of the listing it was his judgment that a price of $156,900 was fair and obtainable in the market. He stated that a strong immediate sales effort had convinced him that the listed price was excessive, and he defended his action of reducing his sales effort as he had done in his discussion with the client. He said that many years of experience as a broker had convinced him that once a seller decides on a definite price for his property, no argument or analysis will shake his insistence on getting that price; that only inaction in the market is convincing to the sellers.

The Hearing Panel concluded that REALTOR® B's conduct had violated Article 1 of the Code of Ethics, which requires REALTORS® to protect and promote their clients' interests. The panel also found that since REALTOR® B honestly felt the original listing price of $156,900 was the fair market value at the time he listed it, REALTOR® B had not violated the Code of Ethics by suggesting that the price be lowered. However, since REALTOR® B later concluded the property was overpriced, he should have immediately notified Client A of his conclusion and not waited for Client A to call him six weeks later.

### Case #1-11: Responsibilities of Cooperating Broker (Originally Case #7-13. Revised May, 1988. Transferred to Article 1 November, 1994. Cross-reference Case #16-4. Deleted November, 2001.)

### Case #1-12: Presentation of Subsequent Offers After an Offer to Purchase Had Been Accepted by the Seller (Adopted November, 1987 as Case #7-16. Transferred to Article 1 November, 1994.)

REALTOR® A, the listing broker, presented an offer to purchase to his client, Seller X, which was $20,000 less than the property's listed price. The property had been on the market for several months and had not generated much interest. In his presentation, REALTOR® A told Seller X that, in his opinion, the offer was a good one and Seller X should consider accepting it. "With interest rates on their way up again," said REALTOR® A, "properties are just not moving the way they did six months ago." Seller X decided to accept the offer and the transaction closed. Several months after the sale, Seller X filed a complaint against REALTOR® A alleging a violation of Article 1, as interpreted by Standard of Practice 1-7. It had come to Seller X's attention that a second offer had been made on the property after Seller X had accepted the first offer but prior to closing. This second offer, alleged Seller X, had not been submitted to him by REALTOR® A and was for $2,500 more than the first offer. Seller X's complaint stated that by not presenting the second offer to him, REALTOR® A had not acted in his (the seller's) best interest, as required by Article 1.

At the hearing, REALTOR® A produced a copy of the listing contract, which contained a provision reading: "Seller agrees that Broker's responsibility to present offers to purchase to Seller for his consideration terminates with Seller's acceptance of an offer." REALTOR® A told the Hearing Panel that he had explained this provision to Seller X at the listing presentation and that Seller X had agreed to it, as indicated by Seller X's signature on the listing contract.

Seller X admitted that he had understood and agreed to the provision at the time he listed the property, but he felt that REALTOR® A should have advised him of the second, higher offer nonetheless.

The Hearing Panel found REALTOR® A not in violation of Article 1. In their decision, the panel noted that REALTOR® A had explained the contract provision relieving him of the obligation to submit subsequent offers to Seller X; that Seller X had agreed to the provision and had signed the listing contract; and that, while it was unfortunate that Seller X had received less than full price for the property, REALTOR® A had fulfilled his obligations under the listing contract once the first offer to purchase had been accepted by Seller X.

### Case #1-13: Obligation to Present Subsequent Offers After an Offer to Purchase Has Been Accepted by the Seller (Adopted November, 1987 as Case #7-17. Transferred to Article 1 November, 1994.)

REALTOR® A had a 90-day exclusive listing on Seller X's property. Seller X instructed REALTOR® A to list the property at $150,000 based upon the sales price of a neighbor's house, which had sold a month earlier.

REALTOR® A aggressively marketed the property, filing the listing with the Board's MLS, running a series of advertisements in the local newspaper, holding several "Open Houses," and distributing flyers on the property at local supermarkets. REALTOR® A, whose listing contract was nearing expiration, held another "Open House" on the property, which resulted in an offer to purchase from Buyer Y at $15,000 less than the listed price. REALTOR® A, convinced that this was the best offer Seller X was likely to obtain, persuaded Seller X to accept the offer. Seller X expressed dissatisfaction with REALTOR® A's failure to obtain a full price offer, but signed the purchase agreement nonetheless.

The next day, REALTOR® B, a cooperating broker, delivered to REALTOR® A a full price offer on Seller X's property from Buyer Z. Buyer Z had attended an earlier "Open House" and was very enthusiastic about the home's location, stating that it would be perfect for his mother.

REALTOR® A advised REALTOR® B and Buyer Z that an offer had already been accepted by Seller X and that he, REALTOR® A, would not present Buyer Z's offer. REALTOR® B and Buyer Z then promptly filed a complaint with the Board charging REALTOR® A with a violation of Article 1, as interpreted by Standard of Practice 1-7.

At the hearing, REALTOR® A stated that he felt he was under no obligation to present Buyer Z's offer, since the listing agreement did not specifically provide that subsequent offers would be presented to the seller. Further, REALTOR® A felt that such a practice could only lead to controversy between buyers and sellers, as well as result in breached contracts. "Why get everyone in an uproar," said REALTOR® A, "by presenting offers after one has been accepted? And what would I do if Seller X wanted to back out of the first purchase contract and accept Buyer Z's offer?"

The Hearing Panel found REALTOR® A in violation of Article 1. In their "Findings of Fact and Conclusions," the Hearing Panel cited REALTOR® A's lack of understanding of the requirements of Article 1, as interpreted by Standard of Practice 1-7. The panel noted that state law did not prohibit the presentation of offers after an offer had been accepted by the seller; that the fact that the listing contract was silent on whether subsequent offers would be presented did not relieve REALTOR® A from the obligation to present such offers; that as the agent of the seller, REALTOR® A must always act in the seller's best interest and advise the seller of all offers submitted; and that should the seller wish to consider accepting a subsequent offer, REALTOR® A must advise the seller to seek the advice of legal counsel.

## Case #1-14: Conditioning Submission of Purchase Offer on Execution of a Prelisting Agreement (Adopted May, 1988 as Case #7-18. Transferred to Article 1 November, 1994. Revised November, 2001.)

Owner A listed his home with REALTOR® B on an exclusive listing which was disseminated through the Multiple Listing Service.

Mr. C, a recent transferee to the city, was represented by REALTOR® D, who showed Mr. and Mrs. C a number of properties. Of the properties they had seen, Mr. and Mrs. C decided that Owner A's home was the only one that suited their needs. They told REALTOR® D they were prepared to make a full price offer to maximize their chances of purchasing the home.

REALTOR® D agreed to write the offer, but first produced a prelisting agreement which, if signed, would obligate Mr. and Mrs. C to give REALTOR® D or his assigns the exclusive right to sell the property for 90 days should they ever decide to list the property for sale.

Mr. and Mrs. C objected to committing to a future listing, but REALTOR® D insisted he would not prepare or submit their offer to REALTOR® B and Owner A unless the C's signed the prelisting agreement. Mr. and Mrs. C left without making an offer or signing the prelisting agreement. The next morning they called REALTOR® D stating that if the property was still available they would enter into the prelisting agreement since they still wanted to purchase the house. The prelisting agreement and the purchase offer were signed, their offer was accepted by Owner A, and the sale subsequently closed. After the closing, Mr. and Mrs. C filed an ethics complaint with the local Board of REALTORS®, alleging a violation of Article 1 on the part of REALTOR® D.

At the hearing, REALTOR® D defended his actions arguing that his conduct in no way had injured the buyers or sellers. He noted that Owner A's home had sold at the full price, and Mr. and Mrs. C purchased the home they wanted at a price they were willing to pay. In addition, REALTOR® D was prepared to put forth his best efforts to sell Mr. and Mrs. C's home if they ever decided to sell.

After hearing the evidence and testimony, the Hearing Panel concluded that REALTOR® D had violated Article 1. By entering into a principal/client relationship, REALTOR® D was obligated to protect and promote his clients' interests. The Hearing Panel concluded that by conditioning submission of his clients' offer on their signing a prelisting agreement, REALTOR® D had placed his financial gain ahead of his clients' interests, which is prohibited under Article 1.

## Case #1-15: Obligation to Advise Client on Market Value (Originally Case #2-1. Revised and transferred to Article 7 as Case #7-19 May, 1988. Transferred to Article 1 November, 1994.)

Client A went from his hotel to REALTOR® B's office and advised that he formerly lived in the community, and had kept his home as an income property after he moved away. The house had been vacant for several months and he had decided to sell it. He asked if REALTOR® B could drive him to look at it. As they inspected it, Client A stated that he would be happy to get $80,000 for it. REALTOR® B listed it at that price and after a few days it was sold to Buyer C.

Six months later, Client A was in town again. Hoping to recover a box of old photographs he had left in the attic, he called on Buyer C, whom he had met at settlement. When he arrived he found that Buyer D then lived in the house. He expressed some surprise that Buyer C had sold it so soon, and learned that Buyer D paid $140,000 for it. Astonished, Client A then made some inquiries as to market values and learned that he had grossly under priced his house when listing it with REALTOR® B. He went to the Board of REALTORS® office and filed a complaint against REALTOR® B charging him with unethical conduct in not having advised him as to the property's fair market value.

At the hearing, REALTOR® B's defense was that he had not been asked to put a price on the house, but had accepted agency on the basis of a price set by the client; that the client had stated he "would be happy" to get $80,000 for it; that he was glad to get a listing that would move quickly in the market; that he had done nothing unethical since he had not bought it himself; and that while he had honestly pointed out to the buyer that the house was a bargain, he had made no effort to induce relatives or business associates to buy it.

On questioning, he conceded that after looking at the house with Client A, he realized the property was being listed at about half its fair market value, but insisted that was his client's business; that different owners have different reasons for selling and pricing their property, but acknowledged that Client A had not indicated that he needed a quick sale or that he would make any price concession.

The Hearing Panel pointed out that brokers have no hesitation in advising clients that properties are overpriced when this is the case, and they are obligated to be equally candid in providing their best judgment to clients when properties being offered for sale are obviously underpriced.

The panel concluded that in view of the wide discrepancy between the owner's asking price and the property's market value, which REALTOR® B conceded was apparent to him, it was REALTOR® B's obligation as an agent to advise his client that the house was worth considerably more, especially since it was apparent that Client A had been away from the community for years and was out of touch with local values. The Hearing Panel found REALTOR® B in violation of Article 1.

## Case #1-16: Obligation to Advise Client of Market Value  (Originally Case #2-2. Revised and transferred to Article 7 as Case #7-20 May, 1988. Transferred to Article 1 November, 1994.)

REALTOR® A listed Client B's house at $136,000. The house was sold to Buyer C, who met Client B at a cocktail party a month later and told him that he had just been offered $148,000 for the house but declined the offer feeling that if he decided to sell, he could do considerably better.

On the basis of this information, Client B charged REALTOR® A with unethical conduct in not having advised him as to fair market value and pointing out that the offering price was considerably below market value. The Board's Grievance Committee referred the complaint to the Professional Standards Committee for hearing.

The Hearing Panel reviewed the facts. At the time the listing contract was signed, REALTOR® A advised his client that he had not recently been active in the part of the city where the house was located and that before fixing the price definitely it might be well to have an appraisal made, but the client declined saying that he felt $136,000 was a fair price.

REALTOR® A's defense was that he had indicated the desirability of an appraisal to determine a fair asking price; that he had indicated he was not active in the neighborhood where the home was located; and that while he had a feeling that the client might be placing a low price on his property, he felt his professional obligation to the client was discharged when he suggested having an appraisal made.

It was the finding of the Hearing Panel that REALTOR® A's defense was valid and that he was not in violation of Article 1.

## Case #1-17: Listing Property at Excessive Price  (Originally Case #2-3. Revised and transferred to Article 7 as Case #7-21 May, 1988. Transferred to Article 1 November, 1994.)

Mr. A was about to retire and move to a warmer climate, and had discussed the sale of his house with a number of brokers. He dropped in on REALTOR® B to discuss the matter and said that various brokers had told him he should expect to sell the property at from $150,000 to $158,000. "Oh, that sounds low to me," said REALTOR® B, "property moves well in that neighborhood and I recall that your house is in good shape and well landscaped. Give us an exclusive on it at $168,000 and we'll make a strong effort to get you what your property is really worth." REALTOR® B got the listing.

He advertised the property, held it open on weekends, had many inquiries about it, and showed numerous prospective buyers through it for a few weeks, but received no offers. When activity slowed, and the client became concerned, REALTOR® B was reassuring. "We'll just keep plugging till the right buyer comes along," he said. When the 90-day exclusive expired, REALTOR®

B asked for a renewal. He told the client that new houses coming on the market were adversely affecting the market on resales of existing houses, and recommended lowering the price to $158,900. Client A ruefully agreed, but the lowered price did not materially increase buyer interest in the property. As the term of the 90-day extension of the listing neared, REALTOR® B brought Client A an offer of $150,000 and strongly recommended that it be accepted. But the client objected. "You told me it was worth about $168,000 and sooner or later the right buyer would pay that price. Meanwhile similar houses in the neighborhood have been selling within 30 to 60 days at around $156,000."

"I know," REALTOR® B said, "but six months ago we had a stronger market and were at the most favorable time of the year and $168,000 was not an out-of-line price at that time. But now we're in the slow time of the year and the market is off. All things considered, I think the $150,000 offer in hand is a good one. I doubt that a better one will come along."

Client A accepted the offer and complained against REALTOR® B to the local Board of REALTORS®, charging REALTOR® B with misinforming him as to fair market value apparently as a means of obtaining the listing of his property.

At the hearing, the facts as set out above were not disputed. Questioning developed the additional fact that at the time of the original listing REALTOR® B had not gone through the house to make a systematic appraisal of opinion of value, and that his recommended offering price was not based on a systematic review of sales in the neighborhood. Members of the Hearing Panel pointed out that the neighborhood in question was a development of houses, basically the same in size and quality, that had been put on the market about 10 years earlier at prices varying from $145,000 to $150,000; that good location and land development practices had maintained a good market for resales, but there was no indication that any property in the immediate neighborhood had been resold for as high as $160,000. When told that circumstances tended to bear out the complainant's charge that REALTOR® B's recommended price was a stratagem to obtain the listing, REALTOR® B's defense was that he felt he had a right to take an optimistic view of the market.

It was concluded that REALTOR® B was in violation of Article 1 of the Code of Ethics.

## Case #1-18: REALTOR® Not Responsible for Legal Advice
(Originally Case #2-4. Revised and transferred to Article 7 as Case #7-22 May, 1988. Transferred to Article 1 November, 1994.)

Client A listed a commercial property with REALTOR® B who sold it. Following the sale, Client A learned that his total tax position would have been more favorable if he had disposed of the property in a trade. He complained to the Board of REALTORS® against REALTOR® B stating that in connection with his listing of the property he had discussed his total tax position with REALTOR® B, and that REALTOR® B, in spite of his obligation under Article 1 of the Code of Ethics to "be informed regarding laws" had failed to advise him that a trade would be more to his advantage than a sale.

At the hearing, REALTOR® B defended his actions by stating that it was true that Client A had briefly outlined his total tax situation at the time he listed the property for sale. REALTOR® B advised that he had told Client A that sale of the listed property might result in unfavorable tax consequences and suggested that Client A consult an attorney. The client had not taken this advice.

After several weeks of advertising and showing the property, in the absence of a change of instructions from the client, the property was sold in accordance with the terms of the listing contract.

The Hearing Panel concluded that advising the client to consult an attorney had demonstrated REALTOR® B's attempt to protect the best interest of his client; that in giving this advice REALTOR® B had fully discharged his obligation under Article 1; that a REALTOR® is not responsible for rendering legal advice beyond the advice that legal advice be sought when the client's interest requires it; and that REALTOR® B was not in violation of Article 1.

## Case #1-19: Knowledge of Proposed Legislation
(Originally Case #2-5. Revised and transferred to Article 7 as Case #7-23 May, 1988. Transferred to Article 1 November, 1994.)

REALTOR® A received a letter from the ABC College in another city stating that one of its old graduates in REALTOR® A's city had willed a vacant property in that community to the college. The letter explained that the college had no use for the property, and wanted REALTOR® A to sell it at its fair market value. The proceeds would go to the endowment fund of the college. REALTOR® A suggested a price for the property, an exclusive listing contract was executed, and in less than a month the lot was sold and settlement made with the college. Two weeks later, a trustee of the college, who handled its investments, filed a complaint against REALTOR® A charging negligence in knowledge of proposed local legislation which had resulted in sale of the property at approximately one-eighth of its fair market value. The Grievance Committee referred it for hearing before a panel of the Professional Standards Committee.

The Professional Standards Committee scheduled a hearing and notified Realtor A and the college trustee to be present. The hearing developed these facts:

(1) The client's property was in an area which had been approved for rezoning from residential to commercial use in a general revision of the local zoning map and ordinance that was in preparation. (2) Although specific sections of the revisions, including the section involving the lot in question, had been tentatively approved, final approval had not been given to the complete revision at the time of the sale, but this action had been taken a few days following the sale. For several months prior to the sale there had been a public notice of the proposal to rezone affixed to a sign near one corner of the property. (3) In his one inspection of the property, REALTOR® A had not noticed the sign. (4) Other sales in the rezoned area substantiated the client's belief that the shift to commercial zoning supported a value at approximately eight times the price received for the lot.

REALTOR® A's defense was that the ordinance putting the rezoning into effect had not been enacted at the date of his sale of the client's property, and that he had no knowledge at the time of the rezoning proposal.

The Hearing Panel's conclusion was that REALTOR® A had violated Article 1 and was definitely deficient in his professional obligations in this instance; that before suggesting a price to his client he should have checked the property carefully enough to have seen the notice concerning a proposal for rezoning; and that as a REALTOR® active in the area he should have been aware of the extensive changes that were being proposed in his city's zoning ordinance. Such knowledge was within his obligation under Article 1 to protect the best interests of his client.

## Case #1-20: REALTORS® Buying and Selling to One Another are Still Considered REALTORS®

(Originally Case #7-24. Revised May, 1988. Transferred to Article 1 November, 1994. Cross-reference Case #2-13.)

REALTOR® A owned a home which he listed through his own brokerage firm. The property listing was filed with the Multiple Listing Service of the Board. REALTOR® B called REALTOR® A and told him of his interest in purchasing the home for himself. REALTOR® A suggested a meeting to discuss the matter. The two agreed upon terms and conditions and the property was sold by REALTOR® A to REALTOR® B.

A few months later, during hard rains, leakage of the roof occurred with resultant water damage to the interior ceilings and side walls. REALTOR® B had a roofing contractor inspect the roof. The roofing contractor advised REALTOR® B that the roof was defective and advised that only a new roof would prevent future water damage.

REALTOR® B then contacted REALTOR® A and requested that he pay for the new roof. REALTOR® A refused, stating that REALTOR® B had had a full opportunity to look at it and inspect it. REALTOR® B had then charged REALTOR® A with violation of Articles 1 and 2 of the Code of Ethics by not having disclosed that the roof had defects known to REALTOR® A prior to the time the purchase agreement was executed.

At the subsequent hearing, REALTOR® B outlined his complaint and told the Hearing Panel that at no time during the inspection of the property, or during the negotiations which followed, did REALTOR® A disclose any defect in the roof. REALTOR® B acknowledged that he had walked around the property and had looked at the roof. He had commented to REALTOR® A that the roof looked reasonably good, and REALTOR® A had made no comment. The roofing contractor REALTOR® B had employed after the leak occurred told him that there was a basic defect in the way the shingles were laid in the cap of the roof and in the manner in which the metal flashing on the roof had been installed. It was the roofing contractor's opinion that the home's former occupant could not have been unaware of the defective roof or the leakage that would occur during hard rains.

REALTOR® A told the panel that he was participating only to prove that he was not subject to the Code of Ethics while acting as a principal as compared with his acts as an agent on behalf of others. He pointed out that he owned the property and was a principal, and that REALTOR® B had purchased the property for himself as a principal. The panel concluded that the facts showed clearly that REALTOR® A, the seller, did have knowledge that the roof was defective, and had not disclosed it to REALTOR® B, the buyer. Even though a REALTOR® is the owner of a property, when he undertakes to sell that property he accepts the same obligation to properly represent its condition to members of the public, including REALTOR® who are purchasers in their own name, as he would have if he were acting as the agent of a seller.

The panel concluded that REALTOR® A was in violation of Articles 1 and 2 of the Code.

## Case #1-21: REALTOR®'s Purchase of Property Listed with the Firm (Adopted May, 1989 as Case #7-25. Transferred to Article 1 November, 1994. Revised November, 2001.)

Mr. and Mrs. A visited REALTOR® B's office and explained they had owned a four-bedroom ranch house nearby for thirty years but since their children were grown and Mr. A was retiring, they wanted to sell their home and tour the country in their motor home.

REALTOR® B and Mr. and Mrs. A entered into an exclusive listing agreement. REALTOR® B conducted an open house, advertised in the local paper, and took other steps to actively promote the sale.

Four weeks after the property went on the market, REALTOR® B received a call from REALTOR® Z, a broker affiliated with the same firm who worked out of the firm's principal office downtown. REALTOR® Z explained that she had seen information regarding Mr. and Mrs. A's home in the MLS and was interested in the property as an investment. She indicated she was sending an offer to purchase to REALTOR® B through the firm's inter-office mail.

When REALTOR® B met with Mr. and Mrs. A to present REALTOR® Z's offer, he carefully explained and presented a written disclosure that REALTOR® Z was a member of the same firm although he was not personally acquainted with her. Mr. and Mrs. A, being satisfied with the terms and conditions of the purchase offer, signed it and several weeks later the sale closed and a commission was paid to REALTOR® B.

Several weeks later, REALTOR® B received a letter from Attorney T, representing Mr. and Mrs. A. Attorney T's letter indicated that since a member of REALTOR® B's firm had purchased the property, in Attorney T's opinion, REALTOR® B was not entitled to a commission. The letter went on to demand that REALTOR® B refund the commission that had been paid by Mr. and Mrs. A.

REALTOR® B politely, but firmly, refused to refund the commission.

Mr. and Mrs. A filed a complaint with the Board of REALTORS® alleging that REALTOR® B's refusal to refund the commission constituted a violation of Article 1 of the Code of Ethics.

REALTOR® B, in his response, agreed with the facts as stated in Mr. and Mrs. A's complaint but indicated that he had faithfully represented the best interests of Mr. and Mrs. A and had no obligation to refund the commission.

The Grievance Committee concluded that the matter should be referred to a Hearing Panel of the Board's Professional Standards Committee.

At the hearing, Mr. and Mrs. A repeated the facts as set forth in their written complaint and, in response to REALTOR® B's cross-examination, acknowledged that REALTOR® Z had not influenced their decision to list the property with REALTOR® B or their decision as to the asking price. They also agreed that REALTOR® B had carefully disclosed that REALTOR® Z was a member of the same firm; and that REALTOR® B had represented their best interests throughout the transaction. Their only disagreement with REALTOR® B, they stated, was that since their home had been purchased by a member of REALTOR® B's firm, they should not have been obligated to pay a commission and REALTOR® B's refusal to refund the commission violated Article 1.

The Hearing Panel concluded that REALTOR® B had promoted Mr. and Mrs. A's interests; and had carefully disclosed that REALTOR® Z was a member of the same firm; and that REALTOR® B's refusal to refund commission did not constitute a violation of Article 1.

## Case #1-22: REALTOR®'s Offer to Buy Property He has Listed  (Adopted May, 1989 as Case #7-26. Transferred to Article 1 November, 1994. Revised November, 2001.)

Doctor A, a surgeon in a major city, inherited a summer house and several wooded acres on the shores of a lake over a thousand miles from Doctor A's home. Being an extremely busy individual, Doctor A paid little attention to his inheritance for almost two years. Then, planning a vacation trip, Doctor A and his wife decided to visit their property since it was located in a part of the country that they had never seen. Doctor A and his wife spent a week in the house during which they concluded that it was too far from their home town to use on any regular basis. Consequently, Doctor A decided to sell the property and made an appointment with REALTOR® B whose office was located in a town nearby.

Doctor A explained that he had inherited the summer house two years earlier and wanted to sell it since it was impractical to keep for his personal use. Doctor A mentioned that he had no idea what the property was worth since it had not previously changed hands in forty years and that he was not familiar with local property values.

REALTOR® B explained that sales of vacation homes had been slow for a number of months and recommended a listing price of $75,000. When Doctor A commented that the price seemed low given that the house was located on a lake and included several wooded acres, REALTOR® B responded by asking Doctor A what he thought the property was worth. Doctor A repeated that he really had no idea what it was worth since he was completely unfamiliar with the area and concluded that he would have to rely on REALTOR® B's judgment. Doctor A and REALTOR® B executed an exclusive listing on the property and two days later Doctor A and his wife returned home.

Three weeks later, Doctor A received a letter from REALTOR® B to which was attached a purchase contract for $75,000 less the amount of the listing commission signed by REALTOR® B as the purchaser. REALTOR® B's letter indicated his belief that Doctor A should not expect any other offers on the property due to the slow market and that REALTOR® B's "full price" offer was made to "take the property off Doctor A's hands."

Doctor A immediately called REALTOR® B and advised him that while he might agree to sell the vacation house to REALTOR® B, he would not do so until he could have the property appraised by an independent appraiser. Under no circumstances, continued Doctor A, would he recognize REALTOR® B as his agent and pay a commission if REALTOR® B purchased the property.

REALTOR® B responded that there was no reason to obtain an independent appraisal since Doctor A had little choice in the matter. In REALTOR® B's opinion Doctor A could either sell the property to REALTOR® B for $75,000 less the amount of the commission or, should Doctor A refuse REALTOR® B's offer, REALTOR® B would be entitled to a commission pursuant to the listing agreement.

Believing that he had no choice, Doctor A signed the purchase agreement and returned it to REALTOR® B. Shortly thereafter, the transaction closed.

Several weeks later, reading a local news article, Doctor A learned that Boards of REALTORS® had Professional Standards Committees that considered charges of unethical conduct by REALTORS® and REALTOR-ASSOCIATES®. He wrote a detailed letter to REALTOR® B's Board spelling out all of the details of the sale of his summer house. In his letter, Doctor A indicated that he had no problem with REALTOR® B offering to purchase the property but rather his unhappiness resulted from REALTOR® B's insistence on being compensated as Doctor A's agent even though he had become a principal in the transaction. Doctor A quoted Article 1 questioning how REALTOR® B's duty to promote Doctor A's interests could have been served when REALTOR® B had taken an essentially adversarial role in the transaction. Finally, Doctor A commented, REALTOR® B's "take it or leave it" attitude had certainly seemed less than honest.

The Board's Professional Standards Administrator referred Doctor A's letter to the Grievance Committee which concluded that a hearing should be held. At the hearing before a panel of the Board's Professional Standards Committee, both Doctor A and REALTOR® B told their sides of the story. After all of the evidence and testimony was heard, the Hearing Panel went into executive session and concluded that while the Code of Ethics did not prohibit REALTOR® B's offering to purchase property listed by him, REALTOR® B had stepped out of his role as agent and had become a principal in the transaction. Article 1 of the Code of Ethics requires the REALTOR® to "protect and promote the interests of the client." Once REALTOR® B expressed his interest in purchasing the property, he could no longer act as Doctor A's agent except with Doctor A's knowledgeable consent. This consent had not been granted by Doctor A. Further, REALTOR® B's advice that Doctor A had no choice but to view REALTOR® B as his agent and to compensate him accordingly had been incorrect and had been a decisive factor in Doctor A's decision to sell to REALTOR® B. The Hearing Panel also found that REALTOR® B had significantly influenced Doctor A's decision as to the listing price, perhaps with knowledge that he (REALTOR® B) would like to purchase the property for himself. Consequently, the Hearing Panel found REALTOR® B in violation of Article 1.

## Case #1-23: Claims of Guaranteed Savings

(Adopted November, 1993 as Case #7-27. Revised April, 1994. Transferred to Article 1 November, 1994.)

In response to REALTOR® A's advertisement, "Guaranteed Savings! Don't purchase without representation," Mr. and Mrs. B signed an exclusive buyer representation contract with REALTOR® A. After viewing several homes accompanied by REALTOR® A, Mr. and Mrs. B decided to make an offer on 1234 Hickory. The seller did not accept the offer. The listing broker explained to REALTOR® A that the sellers were well-situated, spent much of their time at their vacation home, and had determined not to accept anything other than the listed price. REALTOR® A, in turn, explained that to Mr. and Mrs. B. In response to their questions, he indicated that there appeared to be little point in making anything other than a full price offer but that he would be happy to continue to show them other properties. Mr. and Mrs. B responded that they were not interested in other properties and had decided to make a full price offer on the Hickory Street residence. They did and their offer was accepted.

Following closing, and after discussing their transaction with friends, they wrote a letter to the Board of REALTORS® indicating that while they were pleased with the service provided by REALTOR® A, they thought that his claim of "guaranteed savings" was an exaggeration. After obtaining and reviewing a copy of the Code of Ethics, they filed a formal complaint alleging that Article 1, as interpreted by Standard of Practice 1-4, had been violated.

At the hearing, REALTOR® A defended his advertisement on the basis that as a buyer's agent he was able to aggressively negotiate purchase agreements on behalf of his clients whereas the listing broker or subagents, with their loyalty to the seller, could not. He also indicated that, in many instances, his buyer clients paid less, often substantially less, than buyers dealing through listing brokers, subagents, or even through other buyer agents. However, in response to questioning by Mr. B's attorney, REALTOR® A acknowledged that, while savings were not uncommon, they were not ensured in every instance, particularly in cases where the seller was determined to receive full price. "But I offered to show them other properties and, if we looked long enough, I am sure I could have found them a bargain," offered REALTOR® A in his defense.

The Hearing Panel disagreed with REALTOR® A's reasoning, concluding that while savings might be possible, REALTOR® A had been unable to demonstrate them in every instance and that this guarantee of savings was misleading. Consequently, his advertisement was in violation of Article 1.

## Case #1-24: Advantage Gained Through Deception of Client

(Originally Case #4-3. Revised and transferred to Article 6 as Case #6-5 May, 1988. Revised November, 1993. Transferred to Article 1 November, 1994. Revised November, 1997.)

Client X listed his unique parcel of land on a lake exclusively with REALTOR® A, who worked diligently for months to sell Client X's property. Finally, REALTOR® A came up with the idea of selling the property to the county for a park, and made arrangements for its presentation at a special meeting.

Client X went before the County Commissioners with his attorney. REALTOR® A, the listing broker, was in the audience. REALTOR® A commented about the property and told the County Commissioners that if the County purchased the property he, REALTOR® A, would receive a real estate commission. The County Commissioners agreed to take the matter under advisement.

REALTOR® B, a member of the County Commission, approached Client X and suggested that if the property were listed with REALTOR® B exclusively, and REALTOR® B then cooperated with REALTOR® A so that the real estate commission would be split between them, the County would probably purchase the property from Client X. Otherwise, REALTOR® B indicated, the County would not purchase it. Unknown to Client X, the County Commissioners had already voted to buy the land. Worried that he might not sell the land, Client X immediately signed a second written exclusive listing with REALTOR® B. Thereafter, a sales contract was executed which provided that the real estate commission was to be divided equally between REALTOR® A and REALTOR® B. Unknown to REALTOR® B, Client X had told REALTOR® A the entire story about REALTOR® B's approach to and conversation with Client X.

REALTOR® A filed a complaint against REALTOR® B alleging violations of Article 1 and Article 16. The Grievance Committee found enough evidence of REALTOR® B's alleged violations of the Code to warrant a hearing before a Hearing Panel of the Board's Professional Standards Committee.

At the hearing, REALTOR® B defended himself, indicating that he had been instrumental in influencing the County Commission to vote to buy Client X's land, and had voted for it himself. Accordingly, REALTOR® B felt it was appropriate for him to receive a commission.

It was the Hearing Panel's conclusion that REALTOR® B had used his official position as County Commissioner to deceive Client X with respect to the prospects of the County purchasing his property, and had coerced Client X into executing an exclusive listing while the property was already listed exclusively with REALTOR® A. The Hearing Panel found REALTOR® B in violation of Article 1 for having advised Client X dishonestly and Article 16 for having acted inconsistently with the exclusive relationship that existed between Client X and REALTOR® A.

## Case #1-25: Disclosure of Latent Defects
(Adopted November, 2000.)

REALTOR® A had listed Seller S's vintage home. Buyer B made a purchase offer that was contingent on a home inspection. The home inspection disclosed that the gas furnace was in need of replacement because unacceptable levels of carbon monoxide were being emitted.

Based on the home inspector's report, Buyer B chose not to proceed with the purchase.

REALTOR® A told Seller S that the condition of the furnace and the risk that it posed to the home's inhabitants would need to be disclosed to other potential purchasers. Seller S disagreed and instructed REALTOR® A not to say anything about the furnace to other potential purchasers. REALTOR® A replied that was an instruction he could not follow so REALTOR® A and Seller S terminated the listing agreement.

Three months later, REALTOR® A noticed that Seller S's home was back on the market, this time listed with REALTOR® Z. His curiosity piqued, REALTOR® A phoned REALTOR® Z and asked whether there was a new furnace in the home. "Why no," said REALTOR® Z. "Why do you ask?" REALTOR® A told REALTOR® Z about the home inspector's earlier findings and suggested that REALTOR® Z check with the seller to see if repairs had been made.

When REALTOR® Z raised the question with Seller S, Seller S was irate. "That's none of his business," said Seller S who became even angrier when REALTOR® Z advised him that potential purchasers would have to be told about the condition of the furnace since it posed a serious potential health risk.

Seller S filed an ethics complaint against REALTOR® A alleging that the physical condition of his property was confidential; that REALTOR® A had an ongoing duty to respect confidential information gained in the course of their relationship; and that REALTOR® A had breached Seller S's confidence by sharing information about the furnace with REALTOR® Z.

The Hearing Panel disagreed with Seller S's contentions. It noted that while REALTORS® do, in fact, have an obligation to preserve confidential information gained in the course of any relationship with the client, Standard of Practice 1-9 specifically provides that latent material defects are not considered "confidential information" under the Code of Ethics. Consequently, REALTOR® A's disclosure did not violate Article 1 of the Code of Ethics.

## Case #1-26: Subordination of Client's Interests to REALTOR®'s Personal Gain (Adopted May, 2001.)

REALTOR® B was a sales associate with XYZ, REALTORS®. To promote XYZ's in-house listings, the firm's principals offered $1,000 bonuses to the company's sales associates at time of closing on each of XYZ's listings they sold.

Dr. Z, a recent transferee to the town, entered into a buyer representation agreement with XYZ through REALTOR® B.

Dr. Z explained he had specific needs, foremost of which was any home he purchased be convenient for and readily accessible by Dr. Z's spouse who was physically challenged. "Part of my wife's physical conditioning program is swimming," said Dr. Z, "so in addition to everything else, I am looking for a home with a pool or room to build a pool."

REALTOR® B knew there were a number of homes for sale meeting most of Dr. Z's general specifications, several of which were listed with XYZ.

Over the next few days, REALTOR® B showed Dr. Z several properties in the Blackacre subdivision, all of which were listed with XYZ, including one with an outdoor swimming pool. Not included among the properties shown to Dr. Z were several similar properties in Blackacre listed with other firms, including one with an indoor pool.

After considering the properties shown to him by REALTOR® B, Dr. Z made an offer on the home with the outdoor pool. His offer was accepted and the transaction closed shortly thereafter.

Several months later, REALTOR® B received notice of an ethics complaint filed against him by Dr. Z. Dr. Z had learned about the home with the indoor pool from a colleague at the hospital who lived on the same block. The complaint alleged that REALTOR® B had put his interests, and those of his firm, ahead of Dr. Z's by promoting XYZ's listings exclusively and by not telling Dr. Z about a similarly-priced property with an indoor pool, which suited his family's needs better than the property he had purchased. The complaint went on to indicate that REALTOR® B had received a bonus for selling one of XYZ's listings and that Dr. Z suspected that REALTOR® B's failure to tell him about the home with the indoor pool was motivated by the opportunity to receive a bonus.

At the hearing, REALTOR® B defended his actions stating that properties rarely meet all of potential purchasers desires; that he had made Dr. Z aware of several properties that met most of his requirements, including one with an outdoor pool; and that Dr. Z must have been satisfied with REALTOR® B's service since he had purchased a home.

Upon questioning by Dr. Z's attorney, REALTOR® B acknowledged that he knew about but had not shown the house with the indoor pool to Dr. Z. He conceded that a pool that could be used year round was better suited to the family's needs than one that could be used only four months each year. He also admitted his failure

to tell Dr. Z about the house with the indoor pool had at least in part been motivated by the bonus offered by his firm. "But," he argued, "aside from the indoor pool, that house was no different than the one Dr. Z bought."

The Hearing Panel concluded that REALTOR® B had been fully aware that one of Dr. Z's prime concerns was his wife's ongoing physical conditioning needs and REALTOR® B's decision to show Dr. Z only properties listed with XYZ and to not tell him about the home with the indoor pool had been motivated by the possibility of earning an in-house bonus. The Hearing Panel determined that REALTOR® B had placed his interests ahead of those of his client and had violated Article 1.

## Case #1-27: Appraisal Fee as Percentage of Valuation (Originally Case #11-7. Revised November, 2001. Transferred to Article 1 November, 2001.)

REALTOR® A was approached by Client B who engaged him to make an appraisal of an apartment building located in a proposed public redevelopment area. Client B explained that he had recently inherited the property and recognized that it was in a neglected condition. Client B also explained that he wanted the appraisal performed in order to have a definite idea of the property's value before discussing its possible sale with negotiators for the redevelopment project. REALTOR® A and Client B entered into a contractual relationship whereby REALTOR® A promised to perform the appraisal of Client B's property. Client B, at REALTOR® A's suggestion, agreed to compensate REALTOR® A for his appraisal services based on a percentage of the amount of the appraised value to be determined.

Several months later, Client B complained to the Board of REALTORS® against REALTOR® A, specifying that he had been overcharged for the appraisal. Client B explained that the appraisal fee he had agreed upon with REALTOR® A was based on a percentage of the valuation shown in the appraisal report. Client B's letter to the Board stated that his attempt to negotiate with the redevelopment agency on the basis of REALTOR® A's appraisal had broken down and that the redevelopment agency had gone into court, under eminent domain proceedings, and that the award made by the court was approximately one-fourth of the amount of REALTOR® A's appraisal. Client B contended that by making his valuation so unrealistically high, REALTOR® A had grossly overcharged him. He added that the experience had been embarrassing to him, since in his attempts to negotiate with the redevelopment agency it had not been his intention to seek an unreasonably high price. By relying on REALTOR® A's appraisal, he had been placed in a position of seeming to have sought an excessive price for his apartment building. Client B said that it was his opinion that REALTOR® A had overvalued the property to obtain a higher fee.

Client B's complaint was considered by the Board's Grievance Committee which, upon review, referred it to the Board's Professional Standards Administrator to be scheduled for a hearing before a Hearing Panel of the Board's Professional Standards Committee. The appropriate notices were sent out and a hearing was scheduled.

At the hearing, REALTOR® A defended his actions stating that he was unaware of any prohibition in the Code of Ethics prohibiting a REALTOR® from charging a percentage of the valuation of a property as an appraisal fee. REALTOR® A stated that the client had freely agreed to the arrangement; that he felt that his appraisal was a fair one; and that he was not shaken in this view by the award made by the court since he felt that the court's award was unreasonably low.

After considering all of the evidence submitted by both parties, the Hearing Panel did not accept REALTOR® A's argument that he was unaware of the Code's prohibition of charging an appraisal

fee contingent upon the value as determined by the appraisal. The panel concluded that REALTOR® A, by basing his fee on the amount of valuation, had violated Article 1 of the Code of Ethics as interpreted by Standard of Practice 1-14.

## Case #1-28: Disclosure of Existence of Offers to Prospective Purchasers (Adopted November, 2002.)

Seller S listed her home for sale with REALTOR® B. The property was priced reasonably and REALTOR® B was confident it would sell quickly. The listing agreement included the seller's authorization for publication in the MLS and authority to disclose the existence of offers to prospective purchasers.

Within days, REALTOR® B had shown the property to several prospective purchasers and one of them, Buyer Z, wrote a purchase offer at close to the asking price.

REALTOR® B called Seller S to make an appointment to present the offer. After hanging up with Seller S, REALTOR® B received another call, this time from REALTOR® A. REALTOR® A explained that he represented a buyer who was interested in making an offer on Seller S's property. REALTOR® A explained that while his buyer-client was quite interested in the property, price was also a concern. He asked REALTOR® B if there were other offers on the property, indicating that his buyer-client would likely make a higher offer if there were competing offers on the table. REALTOR® B responded telling REALTOR® A, "That's confidential information. Please tell your client to make his best offer."

Taken aback by REALTOR® B's comments, REALTOR® A shared them with his buyer-client, who chose not to make an offer and instead pursued other properties.

Buyer Z's offer was accepted by Seller S later that evening and, sometime later, the transaction closed.

Several months afterward, Seller S and REALTOR® A met at a social event. REALTOR® A related his conversation with REALTOR® B. Seller S asked REALTOR® A if he thought that REALTOR® A's buyer-client would have made an offer on Seller S's home absent REALTOR® B's refusal to disclose whether there were other offers pending. REALTOR® A responded that it was impossible to tell for certain, but his buyer-client had certainly not been favorably impressed by REALTOR® B's response to a seemingly routine question.

Seller S subsequently filed an ethics complaint against REALTOR® B alleging violation of Article 1 as interpreted by Standard of Practice 1-15. He noted that he had clearly authorized REALTOR® B to disclose to buyers and cooperating brokers the existence of pending offers and that REALTOR® B's arbitrary refusal to share information he was authorized to share could have been the reason, or part of the reason, why REALTOR® A's client had chosen not to make an offer on Seller S's home.

REALTOR® B defended his actions indicating that while he agreed that he had an obligation to promote Seller S's interests, his obligation to REALTOR® A and to REALTOR® A's buyer-client was simply to be honest. He had not, in any fashion, misrepresented the availability of Seller S's property. Rather, he had simply told REALTOR® A to encourage his client to make his best offer. "I'm

not required to turn every sale into an auction, am I?" he asked rhetorically. "I feel that I treated all parties honestly and fairly," he concluded.

The Hearing Panel did not agree with REALTOR® B's reasoning, indicating that he had violated Article 1 as interpreted by Standard of Practice 1-15. They noted that Standard of Practice 1-15 requires REALTORS®, if they have the seller's approval, to divulge the existence of offers to purchase on listed property in response to inquiries from either potential buyers or from cooperating brokers. REALTOR® B had not met that obligation and, consequently, the Hearing Panel concluded that REALTOR® B had violated Article 1.

## Case #1-29: Multiple Offers to be Presented Objectively (Adopted November, 2002.)

REALTOR® A listed Seller S's house. He filed the listing with the MLS and conducted advertising intended to interest prospective purchasers. Seller S's house was priced reasonably and attracted the attention of several potential purchasers.

Buyer B learned about Seller S's property from REALTOR® A's website, called REALTOR® A for information, and was shown the property by REALTOR® A several times.

Buyer X, looking for property in the area, engaged the services of REALTOR® R as a buyer representative. Seller S's property was one of several REALTOR® R introduced to Buyer X.

After the third showing, Buyer B was ready to make an offer and requested REALTOR® A's assistance in writing a purchase offer. REALTOR® A helped Buyer B prepare an offer and then called Seller S to make an appointment to present the offer that evening.

Later that same afternoon, REALTOR® R called REALTOR® A and told him that he was bringing a purchase offer to REALTOR® A's office for REALTOR® A to present to Seller S. REALTOR® A responded that he would present Buyer X's offer that evening.

That evening, REALTOR® A presented both offers to Seller S for his consideration. Seller S noted that both offers were for the full price and there seemed to be little difference between them. REALTOR® A responded, "I'm not telling you what to do, but you might consider that I have carefully pre-qualified Buyer B. There's no question but that she'll get the mortgage she'll need to buy your house. Frankly, I don't know what, if anything, REALTOR® R has done to pre-qualify his client. I hope he'll be able to get a mortgage, but you never can tell." REALTOR® A added, "Things can get complicated when a buyer representative gets involved. They make all sorts of demands for their clients and closings can be delayed. You don't want that, do you? Things are almost always simpler when I sell my own listings," he concluded.

Seller S, agreeing with REALTOR® A's reasoning, accepted Buyer B's offer and the transaction closed shortly thereafter.

Upset that his purchase offer hadn't been accepted, Buyer X called Seller S directly and asked, "Just to satisfy my curiosity, why didn't you accept my full price offer to buy your house?" Seller S explained that he had accepted another full price offer, had been concerned about Buyer X being able to obtain the necessary financing, and had been concerned about delays in closing if a buyer representative were involved in the transaction.

Buyer X shared Seller S's comments with REALTOR® R the next day. REALTOR® R, in turn, filed an ethics complaint alleging that REALTOR® A's comments had intentionally cast Buyer X's offer in an unflattering light, that his comments about buyer representatives hindering the closing process had been inaccurate and unfounded, and that REALTOR® A's presentation of the offer

had been subjective and biased and in violation of Article 1 as interpreted by Standard of Practice 1-6.

At the hearing, REALTOR® A tried to justify his comments, noting that although he had no personal knowledge of Buyer X's financial wherewithal and while he hadn't had a bad experience dealing with represented buyers, it was conceivable that an overzealous buyer representative could raise obstacles that might delay a closing. In response to REALTOR® R's questions, REALTOR® A acknowledged that his comments to Seller S about Buyer X's ability to obtain financing and the delays that might ensue if a buyer representative were involved were essentially speculation and not based on fact.

The Hearing Panel concluded that REALTOR® A's comments and overall presentation had not been objective as required by Standard of Practice 1-6 and found REALTOR® A in violation of Article 1.

## Case #1-30: Multiple Offers Where Listing Broker Agrees to Reduce Listing Broker's Commission (Adopted November, 2002.)

REALTOR® A listed Seller S's house. He filed the listing with the MLS and conducted advertising intended to interest prospective purchasers. Seller S's house was priced reasonably and attracted the attention of several potential purchasers.

Buyer B learned about Seller S's property from REALTOR® A's website, called REALTOR® A for information, and was shown the property by REALTOR® A several times.

Buyer X, looking for property in the area, engaged the services of REALTOR® R as a buyer representative. Seller S's property was one of several REALTOR® R introduced to Buyer X.

After the third showing, Buyer B was ready to make an offer and requested REALTOR® A's assistance in writing a purchase offer. REALTOR® A helped Buyer B prepare an offer and then called Seller S to make an appointment to present the offer that evening.

Later that same afternoon, REALTOR® R called REALTOR® A and told him that he was bringing a purchase offer to REALTOR® A's office for REALTOR® A to present to Seller S. REALTOR® A responded that he would present Buyer X's offer that evening.

That evening, REALTOR® A presented both offers to Seller S for his consideration. Seller S noted that both offers were for the full price and there seemed to be little difference between them. REALTOR® A responded, "They're both good offers and they'll both net you the same amount." Seller S asked about the feasibility of countering one or both of the offers. REALTOR® A agreed that was a possibility, but noted that countering a full price offer could result in the buyer walking away from the table. Besides, he reminded Seller S, production of a full price offer triggered REALTOR® A's entitlement to a commission under the terms of their listing agreement. Seller S acknowledged that obligation but expressed regret that, faced with two full price offers, there was no way to increase the proceeds he would realize from the sale of his property. "I'll tell you what," said Seller S, "if you'll reduce your commission, I'll accept the offer you procured. While you'll get a little less than we'd agreed in the listing contract, you'll still have more than if you had to pay the other buyer's broker."

Seeing the logic of Seller S's proposal, and realizing that he and the seller were free to renegotiate the terms of their agreement, REALTOR® A agreed to reduce his commission by one percent. Seller S, in turn, accepted Buyer B's offer and the transaction closed shortly thereafter.

Upset that his purchase offer hadn't been accepted, Buyer X called Seller S directly and asked, "Just to satisfy my curiosity, why didn't you accept my full price offer to buy your house?" Seller S explained that he had accepted a full price offer produced by REALTOR® A because of REALTOR® A's willingness to reduce his commission by one percent.

Buyer X shared Seller S's comments with REALTOR® R the next day. REALTOR® R, in turn, filed an ethics complaint alleging that REALTOR® A's commission reduction had induced Seller S to accept the offer REALTOR® A had produced, that REALTOR® A's commission reduction made his presentation of the competing offer less than objective and violated Article 1, as interpreted by Standard of Practice 1-6, and that REALTOR® A's failure to inform him of the change in his (REALTOR® A's) commission arrangement violated Article 3, as interpreted by Standard of Practice 3-4.

At the hearing, REALTOR® A defended his actions stating that he had said nothing inaccurate, untruthful, or misleading about either of the offers and that he understood that his fiduciary duties were owed to his client, Seller S, and that he and Seller S were free to renegotiate the terms of their listing agreement at any time. REALTOR® A acknowledged that by reducing his commission with respect to an offer he produced, he might arguably have created a dual or variable rate commission arrangement of the type addressed in Standard of Practice 3-4. He pointed out that if that commission arrangement had been a term of their agreement when the listing agreement was entered into, or at some point other than Seller S's deciding which offer he would accept, then he would have taken appropriate steps to disclose the existence of the modified arrangement. He noted that Standard of Practice 3-4 requires disclosure of variable rate commission arrangements "as soon as practical" and stated that he saw nothing in the Standard that required him and his client to call "time-out" while the existence of their renegotiated agreement was disclosed to other brokers whose buyers had offers on the table—or to all other participants in the MLS. He acknowledged that if the accepted offer had subsequently fallen through and Seller S's property had gone back on the market with a variable rate commission arrangement in effect (where one hadn't existed before), then the existence of the variable rate commission arrangement would have had to have been disclosed. But, he concluded, the accepted offer hadn't fallen through so disclosure was not feasible or required under the circumstances.

The Hearing Panel agreed with REALTOR® A's reasoning and concluded that he had not violated either Article 1 or Article 3.

## Case #1-31: Protecting Client's Interest in Auction Advertised as "Absolute" (Adopted May, 2005. Cross-referenced with Case #12-18.)

Seller T, a widowed elementary school teacher in the Midwest inherited a choice parcel of waterfront property on one of the Hawaiian islands from a distant relative. Having limited financial resources, and her children's' college educations to pay for, she concluded that she would likely never have the means to build on or otherwise enjoy the property. Consequently, she decided to sell it and use the proceeds to pay tuition and fund her retirement.

Seller T corresponded via the Internet with several real estate brokers, including REALTOR® Q whose website prominently featured his real estate auction services. An exchange of email followed. REALTOR® Q proposed an absolute auction as the best way of attracting qualified buyers and ensuring the highest possible price for Seller T. Seller T found the concept had certain appeal but she also had reservations. "How do I know the property will sell for a good price?" she e-mailed REALTOR® Q. REALTOR® Q responded "You have a choice piece of beachfront. They aren't making any more of that, you know. It will easily bring at least a million five hundred thousand dollars." Seller T acquiesced and REALTOR® Q sent her the necessary contracts which Seller T executed and returned.

Several days prior to the scheduled auction, Seller T decided to take her children to Hawaii on vacation. The trip would also afford her the chance to view the auction and see, firsthand, her future financial security being realized.

On the morning of the auction only a handful of people were present. Seller T chatted with them and, in casual conversation, learned that the only two potential bidders felt the property would likely sell for far less than the $1,500,000 REALTOR® Q had assured her it would bring. One potential buyer disclosed he planned to bid no more than $250,000. The other buyer wouldn't disclose an exact limit but said he was expecting a "fire sale."

Seller T panicked. She rushed to REALTOR® Q seeking reassurance that her property would sell for $1,500,000. REALTOR® Q responded, "This is an auction. The high bidder gets the property." Faced with this dire prospect, Seller T insisted that the auction be cancelled. REALTOR® Q reluctantly agreed and advised the sparse audience that the seller had cancelled the auction.

Within days, two ethics complaints were filed against REALTOR® Q. Seller T's complaint alleged that REALTOR® Q had misled her by repeatedly assuring her—essentially guaranteeing her—that her property would sell for at least $1,500,000. By convincing her she would realize that price—and by not clearly explaining that if the auction had proceeded the high bidder—at whatever price—would take the property, Seller T claimed her interests had not been adequately protected, and she had been lied to. This, Seller T concluded, violated Article 1.

The second complaint, from Buyer B, related to REALTOR® Q's pre-auction advertising. REALTOR® Q's ad specifically stated "Absolute Auction on July 1." Nowhere in the ad did it mention that the auction could be cancelled or the property sold beforehand. "I came to bid at an auction," wrote Buyer B, "and there was no auction nor any mention that it could be cancelled." This advertising, Buyer B's complaint concluded, violated Article 12's "true picture" requirement.

Both complaints were forwarded by the Grievance Committee for hearing. At the hearing, REALTOR® Q defended his actions by noting that comparable sales supported his conclusion that Seller T's property was worth $1,500,000. "That price was reasonable and realistic when we entered the auction contract, and it's still reasonable today. I never used the word 'guarantee;' rather I told her the chances of getting a bid of $1,500,000 or more were very good." "But everyone knows," he added, "that anything can happen at an auction." If Seller T was concerned about realizing a minimum net return from the sale, she could have asked that a reserve price be established.

Turning to Buyer B's claim of deceptive advertising, REALTOR® Q argued that his ad had been clear and accurate. There was, he stated, an auction scheduled for July 1 and it was intended to be an absolute auction. "The fact that it was advertised as 'absolute' doesn't mean the property can't be sold beforehand—or that the seller can choose not to sell and cancel the auction. Ads can't discuss every possibility. It might have rained that day. Should my ad have cautioned bidders to bring umbrellas?" he asked rhetorically.

The Hearing Panel concluded that while REALTOR® Q had not expressly guaranteed Seller T her property would sell for $1,500,000, his statements had led her to that conclusion and after realizing Seller T was under that impression, REALTOR® Q had done nothing to disabuse her of that misperception. Moreover, REALTOR® Q had taken no steps to explain the auction process to Seller T, including making her aware that at an absolute auction the high bidder—regardless of the bid— would take the property. REALTOR® Q's actions and statements had clearly not protected his client's interests and, in the opinion of the Hearing Panel, violated Article 1.

Turning to the ad, the Hearing Panel agreed with REALTOR® Q's position. There had been an absolute auction scheduled—as REALTOR® Q had advertised—and there was no question but that REALTOR® Q had no choice but to cancel the auction when he had been instructed to do so by his client. Consequently, the panel concluded REALTOR® Q had not violated Article 12.

# CASE INTERPRETATIONS RELATED TO ARTICLE 2

## Case #2-1: Disclosure of Pertinent Facts (Revised Case #9-4 May, 1988. Transferred to Article 2 November, 1994.)

REALTOR® A, acting as a management agent, offered a vacant house for rent to a prospective tenant, stating to the prospect that the house was in good condition. Shortly after the tenant entered into a lease and moved into the house, he filed a complaint against REALTOR® A with his Board of REALTORS®, charging misrepresentation, since a clogged sewer line and a defective heater had been discovered, contrary to REALTOR® A's statement that the house was in good condition.

At the hearing, it was established that REALTOR® A had stated that the house was in good condition; that the tenant had reported the clogged sewer line and defective heater to REALTOR® A on the day after he moved into the house; that REALTOR® A responded immediately by engaging a plumber and a repairman for the heater; that REALTOR® A had no prior knowledge of these defects; that he had acted promptly and responsibly to correct the defects, and that he had made an honest and sincere effort to render satisfactory service. It was the Hearing Panel's decision that REALTOR® A was, therefore, not in violation of Article 2.

## Case #2-2: Responsibility for Sales Associate's Error (Revised Case #9-5 May, 1988. Transferred to Article 2 November, 1994.)

REALTOR® A, a REALTOR® principal, was asked to list a neglected house that obviously needed a wide range of repairs. He strongly advised the owner that it would be to his advantage to put the house in good repair before offering it for sale, but the owner wanted it sold at once on an "as is" basis. REALTOR® A wrote a novel advertisement offering a "clunker" in poor condition as a challenge to an ambitious do-it-yourself hobbyist.

A few days later, Sales Associate B, who was not a Board member, from REALTOR® A's office showed the house to a retired couple who liked the location and general features, and who had been attracted by the ad because the husband was looking forward to applying his "fix-up" hobby to improving a home. The sale was made. Shortly thereafter, REALTOR® A was charged by the buyer with having misrepresented the condition of the property.

REALTOR® A accompanied Sales Associate B to the hearing, armed with a copy of his candid advertisement. The hearing established that the buyer fully understood that the house was represented to be generally in poor condition, but that while inspecting the house with a view to needed repairs, Sales Associate B had commented that since the house was of concrete block and stucco construction, there would be no termite worries since termites could not enter that type of construction. Sales Associate B confirmed this and his belief that the statement was correct. However, after the sale was made, the buyer ripped out a sill to replace it and found it swarming with termites, with termite damage to floors in evidence. Further questioning established that there had been no evidence of termite infestation prior to the sale, and that the Sales Associate had volunteered an assurance that he thought was well grounded.

REALTOR® A, prior to the conclusion of the hearing, offered to pay the cost of exterminating the building and the cost of lumber to repair termite damage in view of Sales Associate B's failure to recommend a termite inspection, which was the usual and customary practice in this area. The complainant stated that this would satisfy him completely. It was the Hearing Panel's view that while REALTOR® A's actions were commendable, and would be taken into account by the Hearing Panel, REALTOR® A was still responsible for the errors and misstatements of the sales associates affiliated with him. The Hearing Panel concluded that REALTOR® A was in violation of Article 2.

## Case #2-3: Obligation to Disclose Defects

(Revised Case #9-9 May, 1988. Transferred to Article 2 November, 1994.)

Seller A came to REALTOR® B's office explaining that his company was transferring him to another city and he wished to sell his home. In executing the listing contract, Seller A specified that the house had hardwood floors throughout and that the selling price would include the shutters and draperies that had been custom made for the house. Seller A said that he would like to continue to occupy the house for 90 days while his wife looked for another home at his new location, and agreed that REALTOR® B could show the house during this time without making a special appointment for each visit. Accordingly, REALTOR® B advertised the house, showed it to a number of prospective buyers, and obtained a purchase contract from Buyer C. Settlement was completed and at the expiration of the 90-day period from the date of listing, Seller A moved out and Buyer C moved in.

On the day that Buyer C moved in, seeing the house for the first time in its unfurnished condition, he quickly observed that hardwood flooring existed only on the outer rim of the floor in each room that had been visible beyond the edges of rugs when he inspected the house, and that the areas that had been previously covered by rugs in each room were of subflooring material. He complained that REALTOR® B, the listing broker, had misrepresented the house in his advertisements and in the description included in his listing form which had specified "hardwood floors throughout." Buyer C complained to REALTOR® B, who immediately contacted Seller A. REALTOR® B pointed out that the house had been fully furnished when it was listed and Seller A had said that the house had hardwood floors throughout. Seller A acknowledged that he had so described the floors, but said the error was inadvertent since he had lived in the house for ten years since it had been custom built for him. He explained that in discussing the plans and specifications with the contractor who had built the house, the contractor had pointed out various methods of reducing construction costs, including limiting the use of hardwood flooring to the outer rim of each room's floor. Since Seller A had planned to use rugs in each room, he had agreed, and after ten years of living in the house with the subflooring covered by rugs, he had "simply forgotten about it."

REALTOR® B explained, however, that Seller A's description, which he had accepted, had resulted in misrepresentation to the buyer. "But it's a small point," said Seller A. "He'll probably use rugs too, so it really doesn't make any difference." After further pressure from REALTOR® B for some kind of adjustment for Buyer C, Seller A concluded, "It was an honest mistake. It's not important. I'm not going to do anything about it. If Buyer C thinks this is a serious matter, let him sue me."

REALTOR® B explained Seller A's attitude to Buyer C, saying that he regretted it very much, but under the circumstances could do nothing more about it. It was at this point that Buyer C filed a complaint with REALTOR® B's Board.

At the hearing before a Hearing Panel of the Professional Standards Committee of REALTOR® B's Board, during which all of these facts were brought out, the panel found that REALTOR® B had acted in good faith in accepting Seller A's description of the property. While Article 2 prohibits concealment of pertinent facts, exaggeration, and misrepresentation, REALTOR® B had faithfully represented to Buyer C information given to him by Seller A. There were no obvious reasons to suspect that hardwood floors were not present throughout as Seller A had advised. REALTOR® B was found not in violation of Article 2.

## Case #2-4: Obligation to Ascertain Pertinent Facts (Revised Case #9-10 May, 1988. Transferred to Article 2 November, 1994.)

Shortly after REALTOR® A, the listing broker, closed the sale of a home to Buyer B, a complaint was received by the Board charging REALTOR® A with an alleged violation of Article 2 in that he had failed to disclose a substantial fact concerning the property. The charge indicated that the house was not connected to the city sanitary sewage system, but rather had a septic tank.

In a statement to the Board's Grievance Committee, Buyer B stated that the subject was not discussed during his various conversations with REALTOR® A about the house. However, he pointed out that his own independent inquiries had revealed that the street on which the house was located was "sewered" and he naturally assumed the house was connected. He had since determined that every other house on the street for several blocks in both directions was connected. He stated that REALTOR® A, in not having disclosed this exceptional situation, had failed to disclose a pertinent fact.

REALTOR® A's defense in a hearing before a Hearing Panel of the Professional Standards Committee was:

(1) that he did not know this particular house was not connected with the sewer;

(2) that in advertising the house, he had not represented it as being connected;

(3) that at no time, as Buyer B conceded, had he orally stated that the house was connected;

(4) that it was common knowledge that most, if not all, of the houses in the area were connected to the sewer; and

(5) that the seller, in response to REALTOR® A's questions at the time the listing was entered into, had stated that the house was connected to the sewer.

The panel determined that the absence of a sewer connection in an area where other houses were connected was a substantial and pertinent fact in the transaction; but that the fact that the house was not connected to the sewer was not possible to determine in the course of a visual inspection and, further, that REALTOR® A had made appropriate inquiries of the seller and was entitled to rely on the representations of the seller The panel concluded that REALTOR® A was not in violation of Article 2.

## Case #2-5: Ascertainment and Disclosure of Pertinent Facts (Revised Case #9-11 May, 1988. Transferred to Article 2 November, 1994.)

Mrs. A, a retired college professor, came to the office of REALTOR® B, a cooperating broker, in search of a large house in which she could occupy a small apartment, using the remainder of the building to operate a residential club for graduate students. What she had in mind was a deluxe "rooming house" in which the tenants would have use of a parlor, dining room, kitchen, and laundry. She felt confident, from previous experience in the community, that she could obtain from 10 to 16 "roomers", and indicated that she would be guided in her charges to the tenants by the amount of mortgage payments she would have to make.

Most of the large houses on the market were inadequate. Finally, REALTOR® B located a massive old mansion listed with REALTOR® C that appealed to Buyer A. After repeated visits to the house and after discussing financing with a local lending institution, Buyer A said she was interested in the house if it could accommodate as many as 11 tenants. REALTOR® B accompanied her for another inspection to check on this point.

By planning double occupancy of the large bedrooms she found she could accommodate eight roomers. In addition, there were three small rooms upstairs that had been used for storage which REALTOR® B suggested might make acceptable single rooms. Buyer A agreed, and the sale was made.

Two months later, the buyer filed a complaint with the local Board, charging REALTOR® B with failing to disclose pertinent facts. The complaint alleged that REALTOR® B knew the buyer was taking on a substantial obligation with the expectation of housing 11 persons in the structure; that REALTOR® B had suggested that three rooms might make acceptable single rooms; and that she had been subsequently advised by the building department that these rooms could not be used as dwelling rooms since the windows were too small to meet code requirements. She had been advised that it would cost $1,480 to replace the windows. She charged REALTOR® B with negligence in not advising her of this deficiency. After reviewing the complaint, the Grievance Committee referred it for hearing before a Hearing Panel of the Professional Standards Committee.

At the hearing, REALTOR® B acknowledged the facts set out in Buyer A's complaint, but advised that the complaint did not state all of the relevant facts. With respect to the house in question, as with many other houses shown to Buyer A, he had made a special check at city hall as to zoning regulations to be sure that the kind of occupancy intended by the buyer would be lawful; that the buyer's specifications were unusual and that in attempting to meet them, he had devoted an unusual amount of time and effort to help her realize her objective; and that he had acted in good faith and had not deliberately failed to disclose any pertinent fact but had, in fact, urged the buyer to consult with an engineer and to check with the zoning authorities prior to making an offer to ensure that the property could be utilized as a residential club.

The Hearing Panel found that REALTOR® B had satisfied his duty to the buyer by recommending that the advice of experts be sought out and considered by the buyer prior to making an offer to purchase.

REALTOR® B was found not in violation of Article 2.

## Case #2-6: Misrepresentation (Reaffirmed Case #9-12 May, 1988. Transferred to Article 2 November, 1994.)

REALTOR® A, a cooperating broker, had shown four houses to Buyer B, and Buyer B's wife had asked to see one of them a second time. There was a third inspection, and a fourth. They seemed at the point of decision but said they would like to "sleep on it." When there was no word the next day, REALTOR® A called. Buyer B said he was a bit hesitant on the price; that some transfers of executives in his company had been rumored; that this could affect him within the year; that he hesitated to buy at a price that might mean taking a loss if he should be transferred within a year.

REALTOR® A tried to reassure the prospect by telephone. Then he dictated a letter stating that the house was an exceptional bargain at the asking price and "our office guarantees to get your money out of it for you any time in the next year if you should need to sell." Buyer B came in and signed the contract.

Six months later, Buyer B came to REALTOR® A as a seller. He was being transferred. He would need to get his equity out of the house to be able to afford a purchase in the new community. REALTOR® A listed the house at the price Buyer B had paid for it. After a month there had been no offers. Buyer B reminded REALTOR® A of his written assurance that his office had guaranteed he would get his money out of the house within the year.

REALTOR® A explained that the market had become much less active and that Buyer B might have to reduce his price by $10,000 to $15,000 to attract a buyer. Whereupon, Buyer B filed a complaint with the Board of REALTORS® charging REALTOR® A with misrepresentation, exaggeration, and failure to make good a commitment. After examination of the complaint, the Grievance Committee referred it to the Professional Standards Committee for a hearing.

In response to questioning by the Hearing Panel, REALTOR® A admitted that he had written the letter to Buyer B in good faith and, at the time the letter was written, he had been certain that his office could obtain a price for the property that would ensure Buyer B was "getting his money out of the house." However, REALTOR® A explained that although he had held such an opinion in good faith, the market had softened and now the circumstances were different. The Hearing Panel reminded REALTOR® A that the pertinent fact being considered was not his opinion at the time of the previous sale as compared to his opinion now, but rather his written "guarantee" to Buyer B and his current failure to make good his written commitment. It was the conclusion of the Hearing Panel that REALTOR® A had engaged in misrepresentation and was in violation of Article 2.

## Case #2-7: Obligation to Determine Pertinent Facts  (Revised Case #9-13 May, 1988. Transferred to Article 2 November, 1994.)

REALTOR® A, a home builder, showed one of his newly constructed houses to Buyer B. In discussion, the buyer observed that some kind of construction was beginning nearby. He asked REALTOR® A what it was. "I really don't know," said REALTOR® A, "but I believe it's the attractive new shopping center that has been planned for this area." Following the purchase, Buyer B learned that the new construction was to be a bottling plant and that the adjacent area was zoned industrial.

Charging that the proximity of the bottling plant would have caused him to reject purchase of the home, Buyer B filed a complaint with the Board of REALTORS® charging REALTOR® A with unethical conduct for failing to disclose a pertinent fact. The Grievance Committee referred the complaint for a hearing before a Hearing Panel of the Professional Standards Committee.

During the hearing, REALTOR® A's defense was that he had given an honest answer to Buyer B's question. At the time he had no positive knowledge about the new construction. He knew that other developers were planning an extensive shopping center in the general area, and had simply ventured a guess. He pointed out, as indicated in Buyer B's testimony, that he had prefaced his response by saying he didn't know the answer to this question.

The Hearing Panel concluded that Buyer B's question had related to a pertinent fact; that REALTOR® A's competence required that REALTOR® A know the answer or, if he didn't know the answer, he should not have ventured a guess, but should have made a commitment to get the answer. The Hearing Panel also noted that although REALTOR® A had prefaced his response with "I don't know," he had nonetheless proceeded to respond and Buyer B was justified in relying on his response. REALTOR® A was found to have violated Article 2.

## Case #2-8: Misrepresentation  (Reaffirmed Case #9-14 May, 1988. Transferred to Article 2 November, 1994.)

REALTOR® A listed a motel for sale and prepared a sales prospectus setting out figures reporting the operating experience of the owner in the preceding year. The prospectus contained small type at the bottom of the page stating that the facts contained therein, while not guaranteed as to accuracy, were "accurate to the best of our knowledge and belief," and carried the name of REALTOR® A as the broker.

Buyer B received the prospectus, inspected the property, discussed the operating figures in the prospectus and other features with REALTOR® A, and signed a contract.

Six months after taking possession, Buyer B ran across some old records that showed discrepancies when compared with the figures in REALTOR® A's prospectus. Buyer B had not had as profitable an operating experience as had been indicated for the previous owner in the prospectus, and the difference could be substantially accounted for by these figures. He filed a charge of misrepresentation against REALTOR® A with REALTOR® A's Board.

At the hearing, REALTOR® A took responsibility for the prospectus, acknowledging that he had worked with the former owner in its preparation. The former owner had built the motel and operated it for five years. REALTOR® A explained that he had advised him that $10,000 in annual advertising expenses during these years could reasonably be considered promotional expenses in establishing the business, and need not be shown as annually recurring items. Maid service, he also advised, need not be an expense item for a subsequent owner if the owner and his family did the work themselves. REALTOR® A cited his disclaimer of a guarantee of accuracy. Buyer B testified that he had found maid service a necessity to maintain the motel, and it was apparent that the advertising was essential to successful operation. He protested that the margin of net income alleged in the prospectus could not be attained as he had been led to believe by REALTOR® A.

The Hearing Panel concluded that REALTOR® A had engaged in misrepresentation in omitting from the prospectus information which he reasonably should have known to be relevant and significant and that the disclaimer did not, in any respect, avoid his obligation of full disclosure.

REALTOR® A was found in violation of Article 2.

## Case #2-9: Realtor®'s Responsibility for Realtor-Associate®'s Statement (Reaffirmed Case #9-15 May, 1988. Transferred to Article 2 November, 1994.)

Realtor-Associate® D, associated with the firm of Realtor® A, obtained an offer to buy a property at less than the listed price. The offer was rejected. The property had been exclusively listed by Realtor® B and had been published through the Multiple Listing Service of the local Board of Realtors®. The owner received no further offers and at the expiration of the exclusive listing with Realtor® B, he approached Realtor® C and exclusively listed the property with him.

About this time, Realtor-Associate® D terminated his association with Realtor® A and became affiliated with Realtor® C's organization.

The prospect who had made the unsuccessful offer on the property continued to seek the assistance of Realtor-Associate® D and made another offer on the property, this time at the full listed price. Realtor-Associate® D and Realtor® C, the listing broker, submitted this offer to the owner, and it was accepted.

A few months following the sale, the purchaser complained to the Board of Realtors® that Realtor-Associate® D had made a statement that "a visible gas pipeline easement extended to the property but did not go onto any part of the property." The complainant presented evidence that the easement, in fact, crossed the property, and the complainant charged Realtor® C and Realtor-Associate® D with misrepresentation.

The complaint was reviewed by the Grievance Committee and then referred to the Board's Professional Standards Committee which promptly scheduled a hearing and asked Realtor® C and Realtor-Associate® D to be present to answer charges of unethical conduct in violation of Article 2 of the Code of Ethics.

At the hearing, Realtor-Associate® D confirmed that he had made the statement attributed to him; that he thought it was correct because the information had been given to him by a neighboring property owner. Questioning revealed that Realtor-Associate® D had made no effort to verify the information from authoritative sources. Realtor® C protested he knew nothing about the matter; that he had not been present when Realtor-Associate® D made the statement; that he was not responsible for the oral statements made by a Realtor-Associate®; and that Realtor-Associate® D's first contact with the buyer had occurred while Realtor-Associate® D was associated with Realtor® A.

It was concluded by the Hearing Panel that Realtor® C and Realtor-Associate® D were in violation of Article 2 of the Code of Ethics in a way that materially imposed upon the buyer, who actually received measurably less in his package of ownership rights when he purchased the property than he was led to believe he was buying. Since it had been demonstrated that Realtor-Associate® D made the statement containing misinformation on a pertinent fact while he was affiliated with Realtor® C, and in view of the fact that Realtor® C was the exclusive agent of the seller at the time, Realtor® C was held to be responsible.

He was advised that a Realtor® is definitely responsible for pertinent statements of his salespersons in real estate transactions.

Realtor® C and Realtor-Associate® D were found in violation of Article 2.

## Case #2-10: Use of State Revenue Stamps to Mislead (Reaffirmed Case #9-16 May, 1988. Transferred to Article 2 November, 1994. Revised November, 2001.)

REALTOR® A, the listing broker, had shown a house to Buyer B on several occasions. It was an old house in a desirable location in which Buyer B had become interested for extensive modernization. It was listed at $140,000. Buyer B had offered $125,000, but the owner had held firm to his asking price. While negotiations were at this point, REALTOR® A received a call from the owner saying that because of a sudden death in the family a number of family plans were being rapidly changed, and if a signed offer was presented within 24 hours, the price of $125,000 would be accepted. REALTOR® A called on Buyer B, obtained a written offer, and closed the transaction.

Buyer B then continued his discussion with REALTOR® A concerning financing for the modernization of the house that he contemplated. In this connection, REALTOR® A advised him that state revenue stamps in the amount of $5.00 per thousand of the price paid for the house would have to be affixed to the deed when it was filed, and suggested that Buyer B spend an extra $75 for stamps to give the appearance of a $140,000 purchase price for the house. This, he pointed out, would be to his advantage in obtaining a liberal mortgage, should it be checked by the financing institution when Buyer B applied for a mortgage loan to finance his modernization program.

An official of a local mortgage company learned from Buyer B of this advice given by REALTOR® A, and made a formal complaint to the Board of REALTORS® that REALTOR® A had violated Article 2 of the Code by making this suggestion. He pointed out that mortgage finance institutions in the locality generally regarded the state revenue stamps as an indication of selling price.

At the hearing, REALTOR® A's defense was that he had not been a party to the naming of any false consideration in a document; that the deed in this case stated that the consideration was "ten dollars and other consideration" — a nominal consideration expressly permitted by the Code of Ethics; that the state revenue stamps are not required as a means of indicating prices paid for property, but as a means of deriving state revenue; that while a buyer may not lawfully place less in such revenue stamps on a deed than $5.00 per thousand in price paid, there was nothing illegal or unethical in placing a greater amount in stamps on the deed than the minimum required.

It was the finding of the Hearing Panel that the circumstances under which REALTOR® A gave his advice to Buyer B respecting state revenue stamps made his action tantamount to urging a false consideration of a document, since it obviously showed intent to mislead and deceive a financing institution which, in keeping with general practice, might check the deed and the stamps affixed to it as a factor in appraising the property for mortgage loan purposes. The panel's decision pointed out that Buyer B's comments had shown he so interpreted the intent of REALTOR® A's advice. It stated

that while use of an excessive amount of state revenue stamps is, in itself, not necessarily unethical, the circumstances and intent can make such action unethical.

REALTOR® A was found in violation of Article 2 of the Code of Ethics.

## Case #2-11: False Consideration in a Deed

(Revised Case #9-17 May, 1988. Transferred to Article 2 November, 1994. Revised May, 2017.)

Commissioner B, a member of a state conservation commission, filed a complaint with an association of REALTORS® charging that REALTOR® A had been a party to the naming of a false consideration in a deed.

In his response, REALTOR® A denied the charge and protested that all of his actions had been clearly necessary in his client's interest and justifiable in view of the unusual circumstances.

At the hearing, Commissioner B, the complainant, produced a copy of a deed to 300 acres of undeveloped land with the consideration stated to be $10,000 an acre; an affidavit from Seller C, who had deeded the land to the XYZ Development Company, affirming that the price actually paid for the land by the company was $6,000 an acre; and a letter from the president of the XYZ Development Company stating that the deed was prepared in consultation with, and upon advice of, REALTOR® A, upon whom the company depended in its land acquisition and home selling activities.

REALTOR® A explained that he had assisted XYZ Development Company over a period of several years in working out a long-range building program, and that in keeping with this plan the company would need 300 acres of undeveloped land in that area before the end of the year. At the time he began negotiations, a news story emanating from the state conservation commission announced that it would acquire extensive tracts of undeveloped land. The story had indicated that this acquisition would take place in five counties, including the county where the property under discussion was located. The story had also indicated that the commission would be limited in its acquisitions to land that would be purchased for not more than $8,000 an acre.

REALTOR® A had advised his clients that suitable land for their proposed development could probably be purchased for $5,000 an acre. He recommended, however, that he be authorized to offer $6,000 per acre. This authority was given and REALTOR® A negotiated purchase from Seller C of the 300 acre tract on behalf of the Development Company for $6,000 an acre.

REALTOR® A expressed concern that the state conservation commission might undertake to acquire the property from the company, since the price at which it was bought was below the commission per acre limit. An officer suggested asking Seller C to deed the property for "ONE DOLLAR AND OTHER CONSIDERATIONS" and then placing revenue stamps indicative of a $10,000 per acre price on the deed.

REALTOR® A pointed out that it was unlikely that a $10,000 per acre value could be supported by revenue stamps alone. He suggested that Seller C be asked to agree to a deed that would state the consideration to have been at a rate of $10,000 per acre.

Commissioner B testified that he had reviewed recorded deeds in recent sales, had visited the property in question, and had called on the sellers because of the high price at which it apparently had been sold. He had commented on the very favorable price to Seller C, who had inadvertently let it slip that the price shown on the deed was not the price paid. He later confirmed this in an affidavit that was presented at the hearing. The Hearing Panel found REALTOR® A in violation of Article 2 of the Code of Ethics by becoming a party to the naming of a false consideration.

## Case #2-12: Implied Membership in Institute, Society, or Council of National Association

(Revised Case #9-19 May, 1988. Transferred to Article 2 November, 1994. Deleted November, 2001.)

## Case #2-13: REALTOR® Buying and Selling to One Another are Still Considered REALTORS® (Revised Case #9-23 May, 1988. Transferred to Article 2 November, 1994. Cross-reference Case #1-20. Revised May, 2017.)

REALTOR® A owned a home which he listed through his own brokerage firm. The property listing was filed with the MLS of the Association. REALTOR® B called REALTOR® A and told him of his interest in purchasing the home for himself. REALTOR® A suggested a meeting to discuss the matter. The two agreed upon terms and conditions and the property was sold by REALTOR® A to REALTOR® B.

A few months later during hard rains, leakage of the roof occurred with resultant water damage to the interior ceilings and side walls. REALTOR® B had a roofing contractor inspect the roof. The roofing contractor advised REALTOR® B that the roof was defective and advised that only a new roof would prevent future water damage.

REALTOR® B then contacted REALTOR® A and requested that he pay for the new roof. REALTOR® A refused, stating that REALTOR® B had a full opportunity to look at it and inspect it. REALTOR® B then charged REALTOR® A with violation of Articles 1 and 2 of the Code of Ethics by not having disclosed that the roof had defects known to REALTOR® A prior to the time the purchase agreement was executed.

At the subsequent hearing, REALTOR® B outlined his complaint and told the Hearing Panel that at no time during the inspection of the property, or during the negotiations which followed, did REALTOR® A disclose any defect in the roof. REALTOR® B acknowledged that he had walked around the property and had looked at the roof. He had commented to REALTOR® A that the roof looked reasonably good, and REALTOR® A had made no comment. The roofing contractor, REALTOR® B had employed after the leak occurred, told him that there was a basic defect in the way the shingles were laid in the cap of the roof and in the manner in which the metal flashing on the roof had been installed. It was the roofing contractor's opinion that the home's former occupant could not have been unaware of the defective roof or the leakage that would occur during hard rains.

REALTOR® A told the panel that he was participating only to prove that he was not subject to the Code of Ethics while acting as a principal as compared with his acts as an agent on behalf of others. He pointed out that he owned the property and was a principal, and that REALTOR® B had purchased the property for himself as a principal. The panel concluded that the facts showed clearly that REALTOR® A, the seller, did have knowledge that the roof was defective, and had not disclosed it to REALTOR® B, the buyer. Even though a REALTOR® is the owner of a property, when he undertakes to sell that property he accepts the same obligation to properly represent its condition to members of the public, including REALTORS® who are purchasers in their own name, as he would have if he were acting as the agent of a seller.

The panel concluded that REALTOR® A was in violation of Articles 1 and 2 of the Code.

## Case #2-14: Time at Which Modification to Cooperative Compensation is Communicated is a Determining Factor (Revised Case #9-26 May, 1988. Transferred to Article 2 November, 1994. Cross-reference Case #3-7. Revised May, 2017.)

REALTOR® A listed Seller X's home and entered the listing into the MLS. The relevant MLS data field indicated the compensation REALTOR® A was offering to the other Participants if they were successful in finding a buyer for Seller X's home.

During the next few weeks, REALTOR® A authorized several Participants of the MLS, including REALTOR® C, to show Seller X's home to potential buyers. Although several showings were made, no offers to purchase were forthcoming. REALTOR® A and Seller X, in discussing possible means of making the property more salable, agreed to reduce the listed price. REALTOR® A also agreed to lower his commission. REALTOR® A changed his compensation offer in the field in the MLS and then called the MLS Participants who had shown Seller X's property to advise them that he was modifying his offer of compensation to cooperating brokers. Upon receiving the call, REALTOR® C responded that he was working with Prospect Z who appeared to be very interested in purchasing the property and who would probably make an offer to purchase in the next day or two. REALTOR® C indicated that he would expect to receive the compensation that had been published originally in the MLS and not the reduced amount now being offered to him, since he had already shown the property to Prospect Z and expected an offer to purchase would be made shortly. REALTOR® A responded that since Prospect Z had not signed an offer to purchase and no offer had been submitted the modified offer of compensation would be applicable.

The following day, REALTOR® C wrote an offer to purchase for Prospect Z. The offer was submitted to the Seller by REALTOR® A and was accepted. At the closing, commissions were dispersed reflecting the modified offer communicated to REALTOR® C by phone. REALTOR® C refused to accept the check indicating that he felt REALTOR® A's actions were in violation of the Code of Ethics. REALTOR® C filed a complaint with the Association's Grievance Committee alleging violation of Articles 2 and 3 on the part of REALTOR® A citing Standard of Practice 3-2 in support of the charge.

During the hearing, REALTOR® C stated that REALTOR® A's modification of the compensation constituted a misrepresentation through concealment of pertinent facts since he had not provided REALTOR® C with specific written notification of the modification prior to the time REALTOR® C began his efforts to interest the purchaser in the listed property. REALTOR® A defended his actions by indicating that timely notice of the modification of compensation offered had been provided to REALTOR® C by telephone prior to REALTOR® C submitting a signed offer to purchase. REALTOR® A also indicated that his modified offer of compensation had been noticed to all Participants, including REALTOR® C, through the MLS in accordance with Standard of Practice 3-2 prior to the time that REALTOR® C had submitted the signed offer to purchase. REALTOR® A also commented that

had REALTOR® C submitted the signed offer to purchase prior to REALTOR® A communicating the modified offer, then REALTOR® A would have willingly paid the amount originally offered.

Based on the evidence presented to it, the Hearing Panel concluded that REALTOR® A had acted in accordance with the obligation expressed in Standard of Practice 3-2 based on changing the offer of cooperative compensation in the MLS alone, even without the courtesy phone calls, and there had been no concealment of a pertinent fact relating to the transaction, and consequently was not in violation of Articles 2 or 3.

## Case #2-15: Refusal to Divulge Source of Fraudulent Information

(Originally Case #3-1. Revised and transferred to Article 9 as Case #9-27 May, 1988. Transferred to Article 2 November, 1994. Revised May, 2017.)

An official of the Federal Housing Administration (FHA) called on REALTOR® A to enlist his cooperation in solving a problem. As the official explained, FHA had reason to believe that there had been a number of "dual contract" transactions in the area involving FHA mortgage insurance. In a typical instance, a prospective buyer was induced by a broker to sign an offer to purchase a house at a figure several tens of thousands of dollars higher than the listed price of the house, so that the signed offer might be used as an evidence of value in obtaining a mortgage loan higher than would be available if the true selling price of the property was stated in the offer. In this procedure, the broker, after having thus fraudulently arranged for a mortgage loan, executed another contract, stating the true price offered, for presentation to the seller of the property.

The FHA official further explained that such conduct involved misrepresentation and law violations, and distorted FHA's market data. FHA lacked documentation, but believed that this type of procedure had been used by some brokers, builders, and to some extent had been condoned by persons approving mortgage loan applications.

He asked for REALTOR® A's assistance in documenting specific instances. REALTOR® A replied that persons in the real estate business had "common knowledge" that such practices were in use; that through business activities he knew of specific persons who had practiced it and had in his files legal evidence of fraudulent offers that were used to obtain mortgage loans in two instances. However, he took the position that much as he deplored such unethical conduct, he had no inclination to play the role of informer and did not believe he should be asked to. He refused to divulge information that he acknowledged he had in his possession.

It came to the attention of the Grievance Committee of REALTOR® A's Association that he had refused to cooperate with the FHA in bringing instances of alleged fraud and unethical conduct to light. The function of the Grievance Committee includes review of undocumented or hearsay reports of unethical conduct, and if definite evidence were found, making the evidence the subject of a complaint before the Association's Professional Standards Committee.

Fulfilling its duty, the Grievance Committee called in REALTOR® A and requested that he divulge the information in his possession to the Committee. REALTOR® A refused, and upon his refusal and statement of his position, the Grievance Committee referred the matter to the Professional Standards Committee of the Association for hearing charging REALTOR® A with having violated Article 2.

After hearing REALTOR® A restate his position, the Hearing Panel pointed out that Article 2 obligates a REALTOR® to "avoid misrepresentation or concealment of pertinent facts relating to a property or a transaction;" that his reluctance to avoid the role of informer was understandable, but that he could have discharged his obligation by divulging the factual information in his possession to the Association's Grievance Committee.

Because REALTOR® A had refused and continued in his refusal to divulge information to the Grievance Committee, a Hearing Panel of the Professional Standards Committee found him in violation of Article 2.

## Case #2-16: Falsification of Credit Information (Adopted as Case #9-29 May, 1988. Transferred to Article 2 November, 1994. Revised May, 2017.)

REALTOR® A, a property manager had an agreement to manage Owner O's 24 unit apartment building. During the course of their negotiations, Owner O had repeatedly emphasized that Realtor A was expected to use great care in screening the financial backgrounds of potential tenants.

Several months later, REALTOR® A received an application for a lease from prospective Tenant T. Following his usual procedure, REALTOR® A obtained a credit report that indicated that Tenant T had a generally satisfactory credit history but included several derogatory marks indicating that Tenant T was months in arrears on various store credit accounts. REALTOR® A, anxious to rent the vacant apartment but recognizing that his management agreement with Owner O precluded rentals to individuals with questionable credit histories, edited his saved copy of the credit report to remove references to the past due accounts. Tenant T made a security deposit equal to one month's rent, signed a one year lease, and moved into the apartment.

Early the following month, REALTOR® A noted that Tenant T had not mailed his rent check. A call to Tenant T's apartment revealed that his phone had been disconnected. REALTOR® A drove to the property, rang Tenant T's bell and, getting no response, let himself into Tenant T's apartment with a master key. It became quickly apparent that extensive damage had been done to the apartment since Tenant T had taken possession. Additional phone calls made it clear that Tenant T had moved out of state leaving no forwarding address and that Tenant T's security deposit would only cover a small part of the damage. Owner O, realizing that he would have to pay for most of the repairs, instructed his attorney to try to locate Tenant T. The attorney, in turn, asked REALTOR® A to provide all materials concerning Tenant T. REALTOR® A instructed his office manager to deliver the file on Tenant T to the attorney's office.

The attorney, in reviewing the documents, noted that the credit report appeared to have been edited. After running Tenant T's credit again online, it became clear that the report in REALTOR® A's file had been altered. The attorney shared this information with his client, Owner O, who filed a complaint against REALTOR® A alleging that Article 2 had been violated.

At the hearing, REALTOR® A admitted that he had altered the credit report but defended his action on the basis that Tenant T's credit history had been generally satisfactory except for the delinquent store credit accounts. Further, REALTOR® A indicated that in his opinion Owner O's insistence that any potential tenant have an unblemished credit history was unwarranted, made REALTOR® A's role in identifying potential tenants needlessly difficult, and could ultimately result in a large number of vacancies, a result not in Owner O's best interest.

The Hearing Panel concluded that REALTOR® A's defense was unfounded and that in altering the credit report he had knowingly misrepresented a pertinent fact in an attempt to circumvent specific instructions from his principal. REALTOR® A was found to have violated Article 2.

## Case #2-17: Obligations of REALTORS® in Referral
(Adopted as Case #9-30 May, 1988. Transferred to Article 2 November, 1994. Deleted November, 2001.)

## Case #2-18: Honest Treatment of All Parties
(Revised Case #9-31 May, 1988. Transferred to Article 2 November, 1994. Cross-reference Case #1-2. Revised May, 2017.)

As the exclusive agent of Client A, REALTOR® B offered Client A's house for sale, advertising it as being located near a bus stop. Prospect C, who explained that his daily schedule made it necessary for him to have a house near the bus stop, was shown Client A's property, liked it, and made an offer. Two days later REALTOR® B read a notice that the bus line running near Client A's house was being discontinued. He informed Prospect C of this and Prospect C responded that he was no longer interested in Client C's house since the availability of bus transportation was essential to him. REALTOR® B informed Client A and recommended that Prospect C's earnest money deposit be returned.

Client A reluctantly complied with REALTOR® B's recommendation, but then complained to the Association of REALTORS® that REALTOR® B had not faithfully protected and promoted his interests; that after Prospect C had expressed his willingness to buy, REALTOR® B should not have made a disclosure that killed the sale since the point actually was not of major importance. The new bus route, he showed, would put a stop within six blocks of the property.

In a hearing before a Hearing Panel of the Association's Professional Standards Committee, REALTOR® B explained that in advertising Client A's property, the fact that a bus stop was less than a block from the property had been prominently featured. He also made the point that Prospect C, in consulting with him, had emphasized that Prospect C's physical disability necessitated a home near a bus stop. Thus, in his judgment the change in bus routing materially changed the characteristics of the property in the eyes of the prospective buyer, and he felt under his obligation to give honest treatment to all parties in the transaction, that he should inform Prospect C, and that in so doing he was not violating his obligation to his client.

The Hearing Panel concluded that REALTOR® B had not violated Article 1, but had acted properly under both the spirit and the letter of the Code of Ethics. The panel noted that the decision to refund Prospect C's earnest money deposit was made by the seller, Client A, even though the listing broker, REALTOR® B, had suggested that it was only fair due to the change in circumstances.

## Case #2-19: Deceptive Information in MLS Database
(Adopted May, 2004. Revised May, 2017.)

REALTOR® R searched the MLS database of current listings on behalf of his client, Dr. Z, who had recently completed his residency and was returning home to take a position on the staff of the community hospital. REALTOR® R's search returned several listings that satisfied Dr. Z's requirements, including a two-story residence listed with REALTOR® B that showed, in the "Remarks" section, "Pay your mortgage with rent from the apartment upstairs."

REALTOR® R sent the listings he'd identified in an an e-mail to Dr. Z. A day later, REALTOR® R received a call from Dr. Z who told him there was something about REALTOR® B's listing that struck him as odd. "That house is in the neighborhood I grew up in," said Dr. Z, "I also remember our neighbors having a problem with the Building Department when they added a kitchen on the second floor so their grandmother could have her own apartment."

REALTOR® R assured Dr. Z that he would make the necessary inquiries and get back to him promptly. His call to the Building Department confirmed Dr. Z's suspicion that the home was zoned single family.

Feeling embarrassed and misled by REALTOR® B's apparent misrepresentation, REALTOR® R filed a complaint with the local association of REALTORS® alleging misrepresentation on the part of REALTOR® B for publishing inaccurate information in the MLS.

At the hearing convened to consider REALTOR® R's complaint, REALTOR® B acknowledged the seller had told him that the conversion had been made to code but without the necessary permits, and the apartment had never been rented. "I assumed the new owners could get a variance from the Building Department," he said.

The Hearing Panel did not agree with REALTOR® B's defense or rationale and concluded that showing a single family home as having income-producing potential from an upstairs apartment which had never been rented was a misrepresentation that violated Article 2.

# CASE INTERPRETATIONS RELATED TO ARTICLE 3:

## Case #3-1: Rules of MLS May Not Circumvent Code (Revised Case #22-1 May, 1988. Transferred to Article 3 November, 1994. Revised May, 2017.)

REALTOR® A complained to his Association of REALTORS® that procedures in the Association's Multiple Listing Service permitted REALTORS® participating in the Service to evade their obligations under Article 3 of the Code of Ethics. His specific complaint was that, as exclusive agent of Client B, he had filed the client's property in the Multiple Listing Service. Other REALTORS® participating in the Multiple Listing Service had contacted Client B directly to make appointments to show the property and to transmit offers to purchase it, without his, REALTOR® A's, knowledge or consent. When he objected to this conduct, the officers of the Multiple Listing Service had cited the MLS rule that held that placing property in the Service had the effect of listing the property with the MLS, and authorized the MLS to refer it to other Participants as subagents, who were then free to transmit offers directly to the client. REALTOR® A's complaint emphasized that his objection was primarily to the rule of the Multiple Listing Service.

The complaint was referred to the Directors of the Association of REALTORS® which asked the Chairperson of the Association's Multiple Listing Committee to attend a special Directors' meeting on the subject. At the meeting, it was pointed out that the contested rule of the Multiple Listing Service had cited the MLS rule to the Board of Directors for approval, was in conflict with Article 3 of the Code of Ethics, and with the nature and purpose of the MLS itself, since the MLS did not provide brokerage services and could not function as an agent of sellers. The Multiple Listing Service was directed to rescind all procedural rules that permitted the Service or any of its Participants to intrude upon the agency status of any REALTOR® holding an exclusive listing.

## Case #3-2: Assumed Consent for Direct Contact (Reaffirmed Case #22-2 May, 1988. Transferred to Article 3 November, 1994. Transferred to Article 16 as Case #16-18, November, 2001.)

## Case #3-3: Arbitrary Refusal to Cooperate (Revised Case #22-3 May, 1988. Transferred to Article 3 November, 1994. Deleted November, 2001.)

## Case #3-4: Cooperation Not Mandatory (Reaffirmed Case #22-4 May, 1988. Transferred to Article 3 November, 1994. Revised May, 2017.)

Client A called on REALTOR® B to list a small commercial property. In stipulating the price at which he wished to list the property, Client A explained that he was aware that it was a relatively low price, but he wanted a quick sale and, he added, a higher price could benefit very little at that time because of certain tax considerations. He told REALTOR® B that a number of prospective buyers had spoken to him about the property within the past year. He gave their names to REALTOR® B and said he felt sure that among them there would be a ready buyer at the price. He told REALTOR® B that he wanted the property submitted to them first.

The next day, REALTOR® C, who had unsuccessfully solicited the listing and learned that the property was listed exclusively with REALTOR® B, called REALTOR® B to ask that he be accepted as a cooperating broker. REALTOR® B told REALTOR® C that because of unusual circumstances the best service to his client did not require cooperation; that a prospective buyer was at that time seriously considering the property; and that under the circumstances he preferred not to invite cooperation.

REALTOR® C complained to the Association of REALTORS® charging REALTOR® B with a violation of Article 3 by refusing to cooperate. Pursuant to the complaint a hearing was scheduled before a Hearing Panel of the Association's Professional Standards Committee.

During the hearing, REALTOR® B outlined fully the circumstances under which the property had been listed by him, and maintained that the interest of Client A would not be advanced by acceptance of cooperation by REALTOR® C.

The panel concluded that REALTOR® B's reasons for not accepting cooperation in this instance were valid and that his action did not constitute a violation of Article 3.

## Case #3-5: Refusal to Extend Cooperation in Sale of New Homes (Reaffirmed Case #22-5 May, 1988. Transferred to Article 3 November, 1994. Revised November, 2001. Revised May, 2017.)

REALTOR® A, who operated a brokerage business in many areas of the city, was also a home builder. For the homes he built, he maintained a separate sales force and consistently refused to permit other REALTORS® to show his new homes.

This practice came to the attention of an officer of the Association of REALTORS® who made a complaint which was referred to the Professional Standards Committee by the Grievance Committee.

At the hearing, the Hearing Panel asked REALTOR® A to answer charges that his policy violated Article 3 of the Code of Ethics.

REALTOR® A's defense was that Article 3 requires REALTORS® to cooperate with other brokers "except when cooperation is not in the client's best interest." He contended that in selling his own new homes there was no client; that he was not acting in the capacity of a broker, but as owner-seller; and that, under the circumstances, Article 3 did not apply to his marketing the houses he built.

The Hearing Panel concluded REALTOR® A's defense was valid; that he was a principal; that Article 3 permitted him, as the builder-owner, to decide what marketing procedure would be in his best interest; and that although other REALTORS® might disagree with his decision, he was not in violation of Article 3.

## Case #3-6: Arbitrary Refusal to Extend Cooperation (Reaffirmed Case #22-6 May, 1988. Transferred to Article 3 November, 1994. Deleted November, 2001.)

## Case #3-7: Time at Which Modification to Offer of Compensation is Communicated is a Determining Factor
(Revised Case #22-7 May, 1988. Transferred to Article 3 November, 1994. Cross-reference Case #2-14. Revised November, 2001. Revised May, 2017.)

REALTOR® A listed Seller X's home and entered the listing into the MLS. The relevant MLS data field indicated the compensation REALTOR® A was offering to the other Participants if they were successful in finding a buyer for Seller X's home.

During the next few weeks, REALTOR® A authorized several Participants of the MLS, including REALTOR® C, to show Seller X's home to potential buyers. Although several showings were made, no offers to purchase were forthcoming. REALTOR® A and Seller X, in discussing possible means of making the property more salable, agreed to reduce the listed price. REALTOR® A also agreed to lower his commission. REALTOR® A changed his compensation offer in the field in the MLS and then called the MLS Participants who had shown Seller X's property to advise them that he was modifying his offer of compensation to cooperating brokers. Upon receiving the call, REALTOR® C responded that he was working with Prospect Z who appeared to be very interested in purchasing the property and who would probably make an offer to purchase in the next day or two. REALTOR® C indicated that he would expect to receive the compensation that had been published originally in the MLS and not the reduced amount now being offered to him, since he had already shown the property to Prospect Z and expected an offer to purchase would be made shortly. REALTOR® A responded that since Prospect Z had not signed an offer to purchase and no offer had been submitted the modified offer of compensation would be applicable.

The following day, REALTOR® C wrote an offer to purchase for Prospect Z. The offer was submitted to the Seller by REALTOR® A and was accepted. At the closing, REALTOR® A gave REALTOR® C a check for services in an amount reflecting the modified offer communicated to REALTOR® C by phone. REALTOR® C refused to accept the check indicating that he felt REALTOR® A's actions were in violation of the Code of Ethics. REALTOR® C filed a complaint with the Association's Grievance Committee alleging violation of Articles 2 and 3 on the part of REALTOR® A citing Standard of Practice 3-2 in support of the charge.

During the hearing, REALTOR® C stated that REALTOR® A's modification of the compensation constituted a misrepresentation through concealment of pertinent facts since he had not provided REALTOR® C with specific written notification of the modification prior to the time REALTOR® C began his efforts to interest the purchaser in the listed property. REALTOR® A defended his actions by indicating that timely notice of the modification of compensation offered had been provided to REALTOR® C by telephone prior to REALTOR® C submitting a signed offer to purchase. REALTOR® A also indicated that his modified offer of compensation had been bulletined to all Participants, including REALTOR® C, through the MLS in accordance with Standard of Practice 3-2 prior to the time that REALTOR® C had submitted the signed offer to purchase. REALTOR® A also commented that had REALTOR® C submitted the signed offer to purchase prior to REALTOR® A communicating the modified offer, then REALTOR® A would have willingly paid the amount originally offered.

Based on the evidence presented to it, the Hearing Panel concluded that REALTOR® A had acted in accordance with the obligation expressed in Standard of Practice 3-2 based on changing the offer of cooperative compensation in the MLS alone, even without the courtesy phone calls, and consequently was not in violation of Articles 2 or 3.

## Case #3-8: REALTOR®'s Obligation to Disclose Dual Commission Arrangements (Deleted Case #9-25 May, 1988. Revised and reinstated November, 1988 and subsequently revised May, 1989. Reaffirmed April, 1991. Transferred to Article 3 November, 1994. Revised November, 2001. Revised May, 2017.)

REALTORS® A and B were members of the same Association and Participants in the MLS. REALTOR® A, cooperating with REALTOR® B on REALTOR® B's listing, submitted an offer to purchase signed by buyers offering the listed price, and a check for earnest money. The only contingency was a financing contingency, and REALTOR® A shared with REALTOR® B the buyers' loan prequalification letter. The following day, REALTOR® B emailed the offer back to REALTOR® A with "REJECTED" written on it and initialed by the seller, and explained that the seller had accepted another offer secured by one of REALTOR® B's sales associates. REALTOR® A inquired about the seller's reason for rejecting the full price offer with only a mortgage contingency, and what had caused the seller to accept the other offer. REALTOR® B responded that he did not know, but with equal offers, he supposed the seller would favor the offer secured by the listing broker.

Later, REALTOR® A saw the seller at a dinner party. The seller thanked him for his efforts in connection with the recent sale of the seller's home. The seller hoped REALTOR® A understood there was nothing personal in his decision, adding that the money he saved through his "special agreement" with REALTOR® B had been the deciding factor. When REALTOR® A asked about the "special agreement," the seller explained he had signed a listing agreement for the sale of his property which authorized the submission of the listing to the Multiple Listing Service and specified a certain amount of compensation. However, the seller stated that he had also signed an addendum to the listing agreement specifying that if REALTOR® B sold the listing through his own office, a percentage of the agreed compensation would be discounted to the seller's credit, resulting in a lower commission payable by the seller.

REALTOR® A filed a complaint with the Association of REALTORS® against REALTOR® B, alleging a violation of Article 3. After its review of the complaint, the Grievance Committee requested that an ethics hearing be arranged.

REALTOR® A, in restating his complaint to the Hearing Panel, said that REALTOR® B's failure to disclose the actual terms and conditions of the compensation offered through the MLS resulted in concealment and misrepresentation of pertinent facts to REALTOR® A and to the prospective buyers served by REALTOR® A who had, in good faith, offered to purchase the property at the listed price with only a mortgage contingency. REALTOR® A told the Hearing Panel that if he had known the facts which were not disclosed by REALTOR® B, he could have fully and accurately informed the buyers who could have taken those facts into consideration when making their offer. As it was, said REALTOR® A, the buyers acting in good faith were deceived by facts unknown to them because they were unknown to REALTOR® A. Further, REALTOR® A said that REALTOR® B's failure to fully disclose the true terms and conditions relating to compensation made it impossible

to have a responsible relationship with REALTOR® B and make proper value judgments as to accepting the offer of compensation.

REALTOR® B stated that it was his business what he charged and the Association or MLS could not regulate his charges for his services. If he wished to establish a dual commission charge by agreement with his client, that was his right, and there was no need or right of the Association or MLS to interfere.

The Hearing Panel agreed that it was REALTOR® B's right to establish his fees and charges as he saw fit, and that the Association or MLS could not and would not interfere. However, the Hearing Panel noted that his complete freedom to establish charges for his services did not relieve him of his obligation to fully disclose the real terms and conditions of the compensation offered to the other Participants of the Multiple Listing Service, and did not justify his failure to disclose the dual commission arrangement. In the case of a dual commission arrangement, the listing broker must disclose not only the existence of the "special arrangement" but also must disclose, in response to an inquiry from a potential cooperating broker, the differential that would result in the total commission in a cooperative transaction. The Hearing Panel concluded that by submitting a listing to the MLS indicating that he was offering a certain amount of compensation to cooperating brokers while other relevant terms and conditions were not disclosed to the other MLS Participants, he had concealed and misrepresented real facts and was in violation of Article 3 of the Code of Ethics.

## Case #3-9: REALTOR®'s Obligation to Disclose True Nature of Listing Agreement (Adopted as Case #9-32 April, 1992. Transferred to Article 3 November, 1994. Revised May, 2017.)

REALTOR® A listed the home of Seller X and entered it in the MLS as an exclusive right to sell listing. REALTOR® A did not disclose that there was a variable rate commission arrangement on this listing, even though the listing contract provided that, should the seller be the procuring cause of sale, the listing broker would receive a commission of $1,000, an amount intended to compensate REALTOR® A for his photography and marketing costs.

REALTOR® B, a cooperating broker, showed the property several times. Eventually, REALTOR® B submitted a signed purchase agreement to REALTOR® A. REALTOR® A returned the purchase agreement the next day, informing REALTOR® B that the seller had rejected the offer. Several weeks later, REALTOR® B learned that the property had been sold, and that the buyer was Seller X's nephew.

Several months later, REALTOR® B met Seller X at a fund-raising event. Seller X thanked her for her efforts, and told her that, under "normal circumstances," he might have seriously considered the offer she had produced. When asked why the circumstances surrounding this transaction were "unusual," Seller X responded telling her of his agreement "with REALTOR® A to pay a $1,000.00 commission if Seller X found the buyer. And when my nephew decided to buy the house, I jumped at the chance to save some money."

When REALTOR® B learned of this arrangement, she filed a complaint with the Association of REALTORS® alleging that REALTOR® A had violated Article 3 of the Code of Ethics. The Professional Standards Administrator of the Association referred the complaint to the Grievance Committee, and, after its review, the Grievance Committee referred the complaint for hearing.

At the hearing, REALTOR® B, in stating her complaint to the Hearing Panel, said that REALTOR® A's failure to disclose the actual terms and conditions of his listing with Seller X was a misrepresentation. She explained that, had she been aware of this arrangement, she might have decided not to accept REALTOR® A's offer of cooperation, since it might put potential purchasers she would produce in a possibly unfair position.

REALTOR® A, speaking in his own defense, stated no commission differential would have resulted if the buyer had been procured by either the listing broker or a cooperating broker so whatever other arrangements he had with Seller X were personal and, as listing broker, it was his right to establish the terms and conditions of his relationship with his client.

After careful deliberation, the Hearing Panel concluded that while it was REALTOR® A's right to establish the terms and conditions of the listing contract, the existence of his "special" arrangement with Seller X should have been disclosed as a dual or variable rate commission, since without knowledge of it, cooperating brokers would be unable to make knowledgeable decisions regarding acceptance of the listing broker's offer to cooperate.

The Hearing Panel concluded that REALTOR® A had in fact concealed and misrepresented the real facts of the transaction and was in violation of Article 3 of the Code of Ethics as interpreted by Standard of Practice 3-4.

## Case #3-10: Disclose Accepted Offers with Unresolved Contingencies (Adopted May, 2004. Revised May, 2017.)

REALTOR® A listed Seller S's house and entered the listing in the MLS. Within a matter of days, REALTOR® X procured a full price offer from Buyer B. The offer specified that Buyer B's offer was contingent on the sale of Buyer B's current home. Seller S, anxious to sell, accepted Buyer B's offer but instructed REALTOR® A to continue marketing the property in hope that an offer that was not contingent on the sale of an existing home would be made.

A week later, REALTOR® Q, another cooperating broker working with an out-of-state transferee on a company-paid visit, contacted REALTOR® A to arrange a showing of Seller S's house for Buyer T. REALTOR® A contacted Seller S to advise him of the showing and then called REALTOR® Q to confirm that he and Buyer T could visit the property that evening. REALTOR® A said nothing about the previously-accepted purchase offer.

REALTOR® Q showed the property to Buyer T that evening and Buyer T signed a purchase offer for the full listed price. REALTOR® Q sent the purchase offer to REALTOR® A.

REALTOR® A informed Seller S about this second offer. At Seller S's instruction, Buyer B was informed of the second offer, and Buyer B waived the contingency in his purchase offer. REALTOR® A then informed REALTOR® Q that Seller S and Buyer B intended to close on their contract and the property was not available for purchase by Buyer T.

REALTOR® Q, believing that REALTOR® A's failure to disclose the existence of the accepted offer between Seller S and Buyer B at the time REALTOR® Q contacted REALTOR® A was in violation of Article 3 of the Code of Ethics, as interpreted by Standard of Practice 3-6, filed an ethics complaint with the association of REALTORS®.

At the hearing called to consider the complaint, REALTOR® A defended his actions noting that while Buyer B's offer had been accepted by Seller S, it had been contingent on the sale of Buyer B's current home. It was possible that Buyer B, if faced with a second offer, could have elected to withdraw from the contract. REALTOR® A argued that continuing to market the property and not making other brokers aware that the property was under contract promoted his client's best interests by continuing to attract potential buyers.

The Hearing Panel disagreed with REALTOR® A's justification, pointing to the specific wording of Standard of Practice 3-6 which requires disclosure of accepted offers, including those with unresolved contingencies. REALTOR® A was found in violation of Article 3.

## Case #3-11: Confidentiality of Cooperating REALTOR®'s Participation
(Revised Case #21-5 May, 1988. Transferred to Article 16 November, 1994. Revised and transferred to Article 3 November, 2018.)

When Client A listed his home for sale with REALTOR® B, he explained that he wanted the sale handled without advertising and without attracting any more attention than was absolutely necessary. He said he understood that he would have to have some contacts with prospective buyers and possibly with other REALTORS®, but that he did not want the property filed with the MLS, advertised, or in any way publicly announced as being on the market. He asked REALTOR® B to impress the same restrictions on any other REALTORS® who might become involved in the transaction.

REALTOR® B, having reason to think that REALTOR® C was in touch with prospective buyers to whom the property would appeal, approached REALTOR® C to invite his cooperation, and explained fully the Client's instructions. REALTOR® B required REALTOR® C to sign a confidentiality agreement that specified the terms and conditions of REALTOR® B's offer to cooperate. REALTOR® B discussed the matter with no other REALTOR® and refrained from any kind of advertising of the property. But a few days later, REALTOR® B learned that REALTOR® D was discussing the property with prospective buyers, knew that REALTOR® C was working on it, knew the price at which the property had been listed, and other details about it. Questioning revealed that REALTOR® C had told REALTOR® D that he was working on the sale of the property.

On the basis of the information from REALTOR® D, REALTOR® B charged REALTOR® C with unethical conduct in a complaint to the Association of REALTORS®, specifying that REALTOR® C's breach of the terms of his confidentiality agreement with REALTOR® B violated Article 3.

The complaint was referred to the Association's Professional Standards Committee, a hearing was scheduled, and REALTOR® C was directed to answer the charge of unethical conduct in violation of Article 3.

At the hearing, REALTOR® B detailed the instructions of the client and the fact that REALTOR® C was required to sign a confidentiality agreement as a condition of REALTOR® B inviting his cooperation. REALTOR® D told the Hearing Panel that REALTOR® C had discussed the listing with him. REALTOR® C defended himself against the charge of violating Article 3 by saying that while he had discussed the matter briefly with REALTOR® D, he had not violated the terms of his confidentiality agreement so egregiously as to warrant finding him in violation of the Code.

At the conclusion of the hearing, the panel held that REALTOR® B's complaint was valid; that Standard of Practice 3-1 allowed REALTORS®, acting as exclusive agents or brokers of sellers/landlords, to establish the terms and conditions of offers to cooperate. The panel noted that the terms of the confidentiality agreement between REALTOR® B and REALTOR® C were clear, and that REALTOR® C's discussion of the matter with REALTOR®

D violated the terms of the agreement and REALTOR® B's offer to cooperate. The panel therefore found REALTOR® C in violation of Article 3.

## Case #3-12: Confidentiality of Cooperating Realtor®'s Participation (Adopted November, 2018.)

When Client A listed his home for sale with Realtor® B, he explained that he wanted the sale handled without advertising and without attracting any more attention than was absolutely necessary. He said he understood that he would have to have some contacts with prospective buyers and possibly with other Realtors®, but that he did not want the property filed with the MLS, advertised, or in any way publicly announced as being on the market. He asked Realtor® B to impress the same restrictions on any other Realtors® who might become involved in the transaction.

Realtor® B, having reason to think that Realtor® C was in touch with prospective buyers to whom the property would appeal, approached Realtor® C to invite his cooperation, and explained fully the client's instructions. Realtor® B discussed the matter with no other Realtor® and refrained from any kind of advertising of the property. But a few days later, Realtor® B learned that Realtor® D was discussing the property with prospective buyers, knew that Realtor® C was working on it, knew the price at which the property had been listed, and other details about it.

On the basis of this information, Realtor® B charged Realtor® C with unethical conduct in a complaint to the Association of Realtors®, alleging Realtor® C had violated Article 3 by breaching the terms of the conditions of Realtor® B's offer to cooperate.

The complaint was referred to the Association's Professional Standards Committee, a hearing was scheduled, and Realtor® C was directed to answer the charge of unethical conduct in violation of Article 3.

At the hearing, Realtor® B detailed the instructions of the client as a condition of Realtor® B inviting his cooperation. Realtor® C defended himself against the charge of violating Article 3 by saying that he had not discussed the property directly with Realtor® D; and that his clients and Realtor® D's clients were close friends. Realtor® C's clients testified that they didn't know the seller was so secretive about the property, so didn't see the harm in mentioning it to Realtor® D's clients as they knew the home would be a perfect fit for them. Further testimony from Realtor® D confirmed that he had learned about the property from his clients, and not from Realtor® C directly.

At the conclusion of the hearing, the panel agreed with Realtor® B that Standard of Practice 3-1 allowed Realtors®, acting as exclusive agents or brokers of sellers/landlords, to establish the terms and conditions of offers to cooperate. The panel also noted that Realtor® C had not violated the terms and conditions of Realtor® B's offer to cooperate; rather, it was his clients, who were not subject to confidentiality as a condition of the offer to cooperate, that had spoken to Realtor® D's clients about the home. The panel, therefore, did not find Realtor® C in violation of Article 3.

*Interpretations of the Code of Ethics*

# CASE INTERPRETATIONS RELATED TO ARTICLE 4:

## Case #4-1: Disclosure when Buying on Own Account (Reaffirmed Case #13-1 May, 1988. Transferred to Article 4 November, 1994. Revised May, 2017.)

Client A consulted REALTOR® B about the value of a lot zoned for commercial use, saying that he would soon be leaving town and would probably want to sell it. REALTOR® B suggested an independent appraisal, which was arranged, and which resulted in a valuation of $390,000. The property was listed with REALTOR® B at that price. Shortly thereafter, REALTOR® B received an offer of $366,000 which he submitted to Client A, who rejected it. After the passage of four months, during which no further offers were received, Client A asked REALTOR® B if he would be willing to buy the lot himself. REALTOR® B on his own behalf, made an offer of $354,000, which the client accepted. Months later Client A, on a return visit to the city, discovered that REALTOR® B had sold the lot for $375,000 only three weeks after he had purchased it for $354,000.

Client A complained to the Association of REALTOR®s charging that REALTOR® B had taken advantage of him; that he had sought REALTOR® B's professional guidance and had depended on it; that he could not understand REALTOR® B's inability to obtain an offer of more than $366,000 during a period of four months, in view of his obvious ability to obtain one at $375,000 only three weeks after he became the owner of the lot; that possibly REALTOR® B had the $375,000 offer at the time he bought the lot himself at $354,000.

At the hearing, REALTOR® B introduced several e-mails from prospects that had been written while the property was listed with him, all expressing the opinion that the lot was overpriced. The buyer who purchased the lot for $375,000 appeared at the hearing as a witness and affirmed that he never met REALTOR® B or discussed the lot with him prior to the date of REALTOR® B's purchase of the lot from Client A. Questioning by members of the Hearing Panel established that REALTOR® B had made it clear that his offer of $354,000 in response to his client's proposal, was entirely on his own account.

The panel concluded that since REALTOR® B's own purchase was clearly understood by the client to be a purchase on his own account, and since the client's suspicions of duplicity were proven to be unfounded, REALTOR® B had not violated Article 4 of the Code of Ethics.

## Case #4-2: Indirect Interest in Buyer (Reaffirmed Case #13-3 May, 1988. Transferred to Article 4 November, 1994. Revised May, 2017.)

REALTOR® A had taken two offers to buy a commercial property listed with him to the owner, Client B. Both offers had been considerably below the listed price, and on REALTOR® A's advice, Client B had rejected both. REALTOR® C submitted a contract to REALTOR® A from a prospective buyer, a bank, offering more than the previous proposals, but still 10 percent less than the listed price. REALTOR® A took the offer to Client B and again advised him not to accept an offer at less than the full listed price. Again, the client acted on REALTOR® A's advice. The bank revised its offer, proposing to pay the listed price. This offer was accepted by Client B, the owner.

About a month after the closing, the Association of REALTORS® received a complaint from a director of the bank that had purchased Client B's property, charging REALTOR® A and REALTOR® C with unethical conduct and duplicity which had resulted in the bank's paying an excessive price for the property. The complaint stated that REALTOR® C was a stockholder in a corporation, one of whose officers was a director of the bank; that REALTOR® C, in a transaction that was handled through REALTOR® A, had evidently used his connection with the bank to induce the bank to buy at a price higher than the market; and that neither of the two REALTOR®s had disclosed to the other officers of the bank the connection that existed between them and one officer of the bank.

At the hearing, REALTOR® A defended his actions by stating that he knew nothing of any business relationship between REALTOR® C, the cooperating broker and the buyer; that he had acted wholly in accordance with the best interests of his client, the seller. REALTOR® C demonstrated that he had negotiated solely with the president of the bank; that the director of the bank who happened to be an officer of a corporation in which he, REALTOR® C, held stock was at no time contacted during the negotiations; that the matter had never been discussed with that individual.

It was the conclusion of the Hearing Panel that the indirect relationship between REALTOR® C and the buyer was not of a nature to require a formal disclosure; that REALTOR® C could not be held to be in violation of Article 4.

**Case #4-3: Disclosure of Family Interest** (Revised Case #13-4 May, 1988. Transferred to Article 4 November, 1994.)

REALTOR® A listed Client B's home and subsequently advised him to accept an offer from Buyer C at less than the listed price. Client B later filed a complaint against REALTOR® A with the Board stating that REALTOR® A had not disclosed that Buyer C was REALTOR® A's father-in-law; that REALTOR® A's strong urging had convinced Client B, the seller, to accept an offer below the listed price; and that REALTOR® A had acted more in the interests of the buyer than in the best interests of the seller.

At the hearing, REALTOR® A defended his actions stating that Article 4 of the Code requires disclosure when the purchaser is a member of the REALTOR®'s immediate family, and that his father-in-law was not a member of REALTOR® A's immediate family. REALTOR® A also demonstrated that he had presented two other offers to Client B, both lower than Buyer C's offer, and stated that, in his opinion, the price paid by Buyer C had been the fair market price.

REALTOR® A's defense was found by the Hearing Panel to be inadequate. The panel concluded that Article 4 forbids a REALTOR® to "acquire an interest in" property listed with him unless the interest is disclosed to the seller or the seller's agent; that the possibility, even remote, of REALTOR® A's acquiring an interest in the property from his father-in-law by inheritance gave the REALTOR® a potential interest in it; that REALTOR® A's conduct was clearly contrary to the intent of Article 4, since interest in property created through a family relationship can be closer and more tangible than through a corporate relationship which is cited in the Code as an interest requiring disclosure. REALTOR® A was found to have violated Article 4 for failing to disclose to Client B that the buyer was his father-in-law.

**Case #4-4: Responsibility for Subordinates** (Revised Case #13-6 May, 1988. Transferred to Article 4 November, 1994. Revised November, 2001 and November, 2017.)

REALTOR® B, a sales associate in REALTOR® A's office, exclusively listed a suburban house and subsequently convinced the seller to accept $60,000 less than the listed price. Several weeks after the transfer of title, the seller filed a written complaint with the Association, charging REALTOR® B with a violation of Article 4 in that REALTOR® B had sold the property to his mother without disclosing this relationship to his client, the seller, and that REALTOR® B got the price reduced for his mother's benefit.

The complaint was reviewed by the Grievance Committee which, with the complainant's concurrence, named REALTOR® A as an additional respondent.

At the hearing, REALTOR® B stated that he saw nothing wrong in selling the property to his mother and that the seller would have accepted the contract at the reduced price, even if the buyer had not been REALTOR® B's mother. REALTOR® A stated that REALTOR® B was an independent contractor licensed with him. REALTOR® A acknowledged that he was accountable under the Code for the actions of other REALTORS® and associated with him but shared with the panel information on his firm's orientation program. He noted that he required each licensee joining his firm to complete association-sponsored Code training. In addition, he required everyone in his firm to read *Professionalism in Real Estate Practice*, and produced a form signed by REALTOR® B stating that he had carefully read and understood his personal obligation under the Code of Ethics.

The panel found that REALTOR® B should have made his relationship to the buyer, his mother, unmistakably clear to the seller. He should have disclosed in writing that the buyer was his mother so there would have been no misunderstanding.

The Hearing Panel found REALTOR® B in violation of Article 4.

The Hearing Panel noted that REALTORS® are not presumed to be in violation of the Code of Ethics in cases where REALTORS® associated with them are found in violation. Rather, their culpability, if any, must be determined from the facts and circumstances of the case in question. It was the conclusion of the Hearing Panel that REALTOR® A had made reasonable efforts to ensure that REALTOR® B was familiar with the Code and its obligations, and that it would have been unreasonable to expect REALTOR® A to have known the purchaser was REALTOR® B's mother. Consequently, REALTOR® A was found not to have violated Article 4.

## Case #4-5: Fidelity to Client (Revised Case #13-7 May, 1988. Transferred to Article 4 November, 1994. Cross-reference Case #1-4. Revised May, 2017.)

Client A contacted REALTOR® B to list a vacant lot. Client A said he had heard that similar lots in the vicinity had sold for about $150,000 and thought he should be able to get a similar price. REALTOR® B stressed some minor disadvantages in location and grade of the lot, and said that the market for vacant lots was sluggish. He suggested listing at a price of $97,500 and the client agreed.

In two weeks, REALTOR® B came to Client A with an offer at the listed price of $97,500. The client raised some questions about it, pointing out that the offer had come in just two weeks after the property had been placed on the market which could be an indication that the lot was worth closer to $150,000 than $97,500. REALTOR® B strongly urged him to accept the offer, stating that because of the sluggish market, another offer might not develop for months and that the offer in hand simply vindicated REALTOR® B's own judgment as to pricing the lot. Client A finally agreed and the sale was made to Buyer C.

Two months later, Client A discovered the lot was no longer owned by Buyer C, but had been purchased by Buyer D at $165,000. He investigated and found that Buyer C was a brother-in-law of REALTOR® B, and that Buyer C had acted on behalf of REALTOR® B in buying the property for $97,500.

Client A outlined the facts in a complaint to the Association of REALTORS®, charging REALTOR® B with collusion in betrayal of a client's confidence and interests, and with failing to disclose that he was buying the property on his own behalf.

At a hearing before a panel of the Professional Standards Committee, REALTOR® B's defense was that in his observation of real estate transactions there can be two legitimate prices of property — the price that a seller is willing to take in order to liquidate his investment, and the price that a buyer is willing to pay to acquire a property in which he is particularly interested. His position was that he saw no harm in bringing about a transaction to his own advantage in which the seller received a price that he was willing to take and the buyer paid a price that he was willing to pay.

The Hearing Panel concluded that REALTOR® B had deceitfully used the guise of rendering professional service to a client in acting as a speculator; that he had been unfaithful to the most basic principles of agency and allegiance to his client's interest; and that he had violated Articles 1 and 4 of the Code of Ethics.

## Case 4-6: Disclosure of Secured Interest in Listed Property (Adopted May, 1999.)

Buyer X was interested in purchasing a home listed with REALTOR® B but lacked the down payment. REALTOR® B offered to lend Buyer X money for the down payment in return for Buyer X's promissory note secured by a mortgage on the property. The purchase transaction was subsequently completed, though REALTOR® B did not record the promissory note or the mortgage instrument.

Within months Buyer X returned to REALTOR® B to list the property because Buyer X was unexpectedly being transferred to another state. REALTOR® B listed the property, which was subsequently sold to Purchaser P. The title search conducted by Purchaser P's lender did not disclose the existence of the mortgage held by REALTOR® B since it had not been recorded, nor did REALTOR® B disclose the existence of the mortgage to Purchaser P. The proceeds of the sale enabled Buyer X to satisfy the first mortgage on the property, and he and REALTOR® B agreed that he would continue to repay REALTOR® B's loan.

Following the closing, REALTOR® B recorded both the promissory note and the mortgage instrument. When Purchaser P learned of this, he filed an ethics complaint alleging that REALTOR® B had violated Article 4 by selling property in which she had a secured interest without revealing that interest to the purchaser.

The Hearing Panel agreed with Purchaser P and concluded that REALTOR® B's interest in the property should have been disclosed to Purchaser P or Purchaser P's representative in writing.

# CASE INTERPRETATIONS RELATED TO ARTICLE 5:

## Case #5-1: Contemplated Interest in Property Appraised (Reaffirmed Case #12-2 May, 1988. Transferred to Article 5 November, 1994. Revised May, 2018)

Seller A and Buyer B were negotiating the sale of an apartment building, but couldn't agree on the price. Finally, they agreed that each would engage an appraiser and they would accept the average of the two appraisals as a fair price. Seller A hired REALTOR® C, a licensed appraiser, and Buyer B hired REALTOR® D. Both REALTORS® were informed of the agreement of the principals. The two appraisal reports were submitted. The principals averaged the two valuations and made the transaction at the price determined.

Six months later, it came to the attention of Seller A that REALTOR® C was managing the building that he had appraised. Upon making further inquiries he learned that REALTOR® C for several years had managed five other buildings owned by Buyer B, and that he had been Buyer B's property manager at the time he accepted the appraisal assignment from Seller A.

At this point Seller A engaged REALTOR® E to make an appraisal of the building he had sold to Buyer B. REALTOR® E's valuation was approximately 30% higher than that arrived at six months earlier by REALTOR® C.

These facts were set out in a complaint against REALTOR® C made by Seller A to the local Board of REALTORS®. The complaint charged that since REALTOR® C was an agent of Buyer B; since he managed all of Buyer B's properties; since he had become manager of the property he had appraised for Seller A in connection with a sale to Buyer B; and since he had not disclosed his relationship to Buyer B, he had acted unethically, and in the interest of his major client had placed an excessively low valuation on the property he had appraised for Seller A.

At the hearing, Seller A also brought in a witness who stated that he had heard Buyer B say that he had made a good buy in purchasing Seller A's building because Seller A's appraiser was his (Buyer B's) property manager.

Buyer B, appearing as a witness for REALTOR® C, disputed this and protested that he had paid a fair price. He substantiated REALTOR® C's statement that management of the building formerly owned by Seller A was never discussed between them until after it had been purchased by Buyer B.

It was concluded by the Hearing Panel that whether or not management of the building was discussed between Buyer B and REALTOR® C prior to its purchase by Buyer B, REALTOR® C had a logically contemplated interest in it as a property manager in view of the fact that he had served as property manager for all other properties owned by Buyer B. In view of this contemplated

interest, he was bound by the terms of Article 5 to disclose this interest to his appraisal client, Seller A. He had failed to do this, and so was found in violation of Article 5 of the Code of Ethics.

# CASE INTERPRETATIONS RELATED TO ARTICLE 6:

## Case #6-1: Profit on Supplies Used in Property Management (Reaffirmed Case #16-1 May, 1988. Transferred to Article 6 November, 1994. Revised May, 2017.)

REALTOR® A, a property manager, bought at wholesale prices, janitorial supplies used in cleaning and maintenance of an office building which he managed for his client, Owner B. In his statements to Owner B, he billed these supplies at retail prices.

REALTOR® A's practice came to the attention of Owner B who filed a complaint with the local Association of REALTORS®, charging REALTOR® A with unethical conduct in violation of Article 6 of the Code of Ethics.

In questioning during the hearing called by the Association's Professional Standards Committee, REALTOR® A's defense was that the prices at which he billed these supplies to his client were no higher than the prices which Owner B had been paying prior to putting the property under REALTOR® A's management. It was clearly established that no disclosure of this profit or supplies used in property management had been made, and also that in proposing the management contract, REALTOR® A had held out to Owner B the inducement of attainable economies in operation.

REALTOR® A was found by the Hearing Panel to be in violation of Article 6.

## Case #6-2: Manager's Use of Client's Property for Vending Machines (Reaffirmed Case #16-2 May, 1988. Transferred to Article 6 November, 1994. Revised May, 2017.)

REALTOR® A managed Client B's large apartment building, and made an arrangement under which vending machines were placed in the basement of the building.

Six months after the machines were installed, Client B noticed them and raised a question to the propriety of REALTOR® A's action in installing them, and deriving revenue from them, without Client B's knowledge and consent. REALTOR® A's response was that he had considered the machines a service to the tenants which in no way affected Client B's interests. He told Client B that he did derive a small amount of revenue from them, which had not been remitted to Client B because he felt that this revenue compensated him for his time and effort in arranging for installation of the machines and maintaining contact with the firm that operated them. He suggested that if Client B was unhappy he could seek a formal ruling by submitting the matter to the Professional Standards Committee of the Association of REALTORS®.

Accordingly, Client B did just that. At a hearing on the matter it was established that REALTOR® A had not consulted his client at the time he authorized installation of the machines; that revenue derived from operation of the machines had been retained by REALTOR® A; and that Client B had been furnished no information whatever in the matter until he observed the machines in his own periodic inspection of the building.

It was the conclusion of the Hearing Panel that, whether or not the presence of the machines was a service for the tenants, the giving of authority for their installation was in effect a rental of the space they occupied; and that, in the absence of any disclosure to the owner, REALTOR® A was in violation of Article 6 of the Code of Ethics.

## Case #6-3: Management Responsibility in Relation to Manager's Enterprises (Reaffirmed Case #16-3 May, 1988. Transferred to Article 6 November, 1994. Revised May, 2017.)

REALTOR® A managed a large apartment building for his client, Owner B. After the building had been under his management for two years, REALTOR® A acquired a vacant site adjacent to the building and developed it as an automobile parking lot with monthly rates set at $150. REALTOR® A advised Owner B of this action, feeling that it would be advantageous to the building, and Owner B indicated that he, too, felt this development was favorable to him.

Six months after opening his parking lot, REALTOR® A raised the monthly rate to $200. When this came to the attention of Owner B, he filed a complaint against REALTOR® A with the Association of REALTORS charging that the parking rate increase represented an unethical attempt on the part of REALTOR® A to profit by Owner B's investment in the apartment building; that REALTOR® A should have raised rents in the building but had instead substituted the rent increase with an increased rate in his parking lot.

A hearing was called on the complaint before the Association's Professional Standards Committee. At the hearing, REALTOR® A presented data tabulating monthly parking rates in the general area of his enterprise, which showed that $200 was the average prevailing rate for similar facilities in the area. He also presented information which showed that the rent charged in Owner B's building was relatively high in comparison with similar apartments in the area.

After careful review of this data, the Hearing Panel concluded that REALTOR® A's parking lot enterprise had involved no expenditure of Owner B's funds; that his action in establishing this business had met with Owner B's approval at the outset; that REALTOR® A's exhibits demonstrated that there was no merit to Owner B's contention that a justified rent increase had been shunted into an increase in parking rates; that Owner B's interests had in no sense been betrayed; that the proximity of the parking area continued to be an asset to Owner B's building; and that REALTOR® A was not in violation of Article 6.

## Case #6-4: Acceptance of Rebates from Contractors (Revised Case #16-4 May, 1988. Transferred to Article 6 November, 1994. Revised May, 2017.)

REALTOR® A, who managed a 30-year-old apartment building for Client B, proposed a complete modernization plan for the building, obtained Client B's approval, and carried out the work. Shortly after completion of the work, Client B filed a complaint with the Association of REALTORS® charging REALTOR® A with unethical conduct for receiving rebates or "kickbacks" from the contractors who did the work.

At the hearing, Client B presented written statements from the contractors to substantiate his charges.

REALTOR® A defended himself by stating that he had carried out all work involving the preparation of specifications, solicitation of bids, negotiations with the contractors, scheduling work, and supervising the improvement program; that he had presented all bids to the owner who had authorized acceptance of the most favorable bids; and that he and Client B had agreed on an appropriate fee for this service.

REALTOR® A also presented comparative data to show that Client B had received good value for his money.

After all of the contracts were signed and the work was under way, REALTOR® A found that his fee was inadequate for the time the work required; that he needed additional compensation but didn't want to add to his client's costs; and that when he explained his predicament to the contractors and asked for moderate rebates, they agreed.

Questioning by panel members revealed that the contractors felt that since they were being asked for rebates by the man who would supervise their work, they felt that they had no choice but to agree.

The Hearing Panel concluded that REALTOR® A was in violation of Article 6 of the Code of Ethics and that if he had miscalculated his fee with Client B, his only legitimate recourse would have been to renegotiate this fee with Client B.

Case: 1:19-cv-01610 Document #: 114-1 Filed: 08/09/19 Page 243 of 324 PageID #:1333

## Case #6-5: Advertising Real Estate-Related Products and Services (Adopted November, 2006. Revised November, 2017.)

REALTOR® X, a principal broker in the firm XY&Z, developed a robust, interactive website that he used both to publicize his firm and to serve the firm's clients and customers electronically. REALTOR® X maintained positive business relationships with providers of real estate-related products and services including financial institutions, title insurance companies, home inspectors, mortgage brokers, insurance agencies, appraisers, exterminators, decorators, landscapers, moving companies, and others. Given the volume of business REALTOR® X's firm handled, several of these companies purchased banner advertisements on the XY&Z website and some, including the Third National Bank, included links in their banner ads to their own websites.

Buyer B, who had earlier entered into an exclusive buyer representation agreement with XY&Z, received frequent e-mail reports from REALTOR® X about new properties coming onto the market. Hoping to purchase a home in the near future, he explored REALTOR® X's website to learn more about the home buying process and familiarize himself with the real estate-related products and services advertised there. Understanding that pre-qualifying for a mortgage would ensure he presented the strongest offer, Buyer B went to REALTOR® X's website and clicked on the Third National Bank's link. Once at the bank's website, he found a mortgage to his liking, completed the application process, and learned in a matter of days that he was qualified for a mortgage loan.

In the meantime, Buyer B's property search proved fruitful. REALTOR® X and Buyer B visited a new listing on Hickory Street several times. Buyer B decided it met his needs and made an offer which was accepted by the seller.

A few weeks after the closing, Buyer B hosted a housewarming attended by his friend D, a website designer who had, coincidentally, been instrumental in developing REALTOR® X's website. Buyer B told D how helpful the information from REALTOR® X's website had been. "You know, don't you, that each time a visitor to REALTOR® X's website clicks on some of those links, REALTOR® X is paid a fee?", asked D. "I didn't know that," said Buyer B, "I thought the links were to products and services REALTOR® X was recommending."

Buyer B filed an ethics complaint against REALTOR® X alleging a violation of Article 6 for having recommended real estate products and services without disclosing the financial benefit or fee that REALTOR® X would receive for making the recommendation. At the hearing, REALTOR® X defended himself and his website, indicating that the advertisements for real estate-related products and services on his website were simply that, advertisements, and not recommendations or endorsements. He acknowledged that he collected a fee each time a visitor to his website clicked on certain links, regardless of whether the visitor chose to do business with the "linked to" entity or not. "In some instances I do recommend products and services

to clients and to customers. In some instances I receive a financial benefit; in others I don't. But in any instance where I recommend a real estate-related product or service, I go out of my way to make it absolutely clear I am making a recommendation, and I spell out the basis for my recommendation. I also disclose, as required by the Code, the financial benefit or fee that I might receive. Those banner advertisements on my website are simply that, advertisements."

The hearing panel agreed with REALTOR® X's rationale, concluding that the mere presence of real estate-related advertisements on REALTOR® X's website did not constitute a "recommendation" or "endorsement" of those products or services, and that the "click through" fee that REALTOR® X earned when visitors to his website linked to certain advertisers' sites was not the type of financial benefit or fee that must be disclosed under Article 6.

### Case #6-6: Disclose Affiliated Business Relationships Prior to Recommending Real Estate-Related Products or Services (Adopted November, 2006. Revised November, 2017.)

REALTOR® Z, a broker and sole proprietor, had invested considerable resources into developing her website. Seeking to recoup some of her costs, she approached virtually every provider of real estate-related products and services in her area, including financial institutions, title insurance companies, home inspectors, mortgage brokers, insurance agencies, appraisers, exterminators, decorators, landscapers, furniture and appliance dealers, rug and carpet dealers, moving companies, and others about purchasing banner advertisement space on her website. As a condition of having a link to their own sites appear on her home page, REALTOR® Z required that a fee be paid to her each time a consumer "clicked through" from her site to an advertiser's.

Ads for providers of real estate-related products and services who agreed to REALTOR® Z's terms appeared on her home page under the heading "Preferred Providers." Immediately under that heading read: "These vendors provide quality goods and services. Please patronize them."

Buyer A frequented REALTOR® Z's website seeking information about available properties. Using that website, he became aware of a property on Elm Street that he made an offer on through REALTOR® Z, which was accepted by the seller. The sale closed shortly afterwards.

Buyer A was an avid remodeler and, using REALTOR® Z's website, linked to the Real Rug company website, among others. Interested by what he found there, he subsequently visited their showroom in person and purchased wall-to-wall carpeting and several expensive area rugs.

Given the size of Buyer A's order, one of the owners of Real Rug came to oversee the delivery and installation. In the course of conversation with Buyer A, he commented favorably on the amount of referral business received from REALTOR® Z's website. "And to think I only pay a small fee for each customer who's referred to me by REALTOR® Z," he added.

Buyer A was somewhat surprised that REALTOR® Z would receive money for referring clients and customers to providers of real estate-related products and services and contacted the local association of REALTORS®. The association provided him with a copy of the Code of Ethics. Reading it carefully, Buyer A concluded that REALTOR® Z's actions might have violated Article 6, and he filed an ethics complaint against REALTOR® Z.

At the hearing, REALTOR® Z defended herself and her website, stating that the advertisements for real estate-related products and services on her website were simply that, only advertisements and not recommendations or endorsements of the products and services found there. She acknowledged she collected a fee each time a visitor to her website clicked on the links found under "Preferred Providers" but claimed that simply referring to those advertisers as "preferred" did not constitute a recommendation or endorsement of the products and/or the services offered.

The hearing panel disagreed with REALTOR® Z's reasoning, pointing out that a reasonable consumer would certainly conclude that referring to a provider of real estate-related products or services as being "preferred" constituted a recommendation or endorsement. Further, since REALTOR® Z received a fee each time a consumer "clicked through" to one of REALTOR® Z's "Preferred Providers," REALTOR® Z received a referral fee, and disclosure of that fee was required under Article 6. REALTOR® Z was found in violation of Article 6.

# CASE INTERPRETATIONS
# RELATED TO ARTICLE 7:

### Case #7-1: Acceptance of Compensation from Buyer and Seller (Adopted as Case #8-3 May, 1988. Transferred to Article 7 November, 1994. Revised May, 2017.)

Buyer A engaged REALTOR® B to locate a small commercial property. Buyer A explained his exact specifications, indicating that he did not wish to compromise. They agreed that if REALTOR® B could locate such a property within Buyer A's price range, he—the buyer—would pay a finder's fee to REALTOR® B.

Two weeks later, REALTOR® B called Buyer A to advise that Seller C had just listed a property with him that met all of Buyer A's specifications except that the listed price was a bit higher than Buyer A wanted to pay. Buyer A inspected the property and liked it, but said he would adhere to his original price range. REALTOR® B called Buyer A three days later to say that Seller C had agreed to sell at Buyer A's price. The sale was made and REALTOR® B collected a commission from Seller C and a finder's fee from Buyer A which was not disclosed to Seller C, REALTOR® B's client.

Several weeks later, Seller C learned about the finder's fee that REALTOR® B had collected from Buyer A and filed a complaint with the Association of REALTORS® charging REALTOR® B with unprofessional conduct. The complaint specified that when REALTOR® B had presented Buyer A's offer at less than the listed price, he, the seller, was reluctant to accept it, but REALTOR® B had convinced him that the offer was a fair one and not likely to be improved upon in the current market; and that REALTOR® B had dwelt at length on certain disadvantageous features of the property in an attempt to promote acceptance of the offer. The complaint charged that REALTOR® B had actually been the agent of the buyer while holding himself out as the agent of the seller. Further, Seller C asserted that REALTOR® B had never mentioned that he was representing the buyer or intended to be compensated by the buyer.

At the hearing, REALTOR® B's defense was that he had served both buyer and seller faithfully; that he had not accepted Seller C's listing until after he had agreed to assist Buyer A in locating a property; and that in his judgment the listed price was excessive and the price actually paid was a fair price.

A Hearing Panel of the Association's Professional Standards Committee, which heard the complaint, concluded that REALTOR® B had acted in violation of Article 7 of the Code of Ethics. His efforts to represent the buyer and the seller at the same time, and the fact that he intended to be compensated by both parties, should have been fully disclosed to all parties in advance.

# CASE INTERPRETATIONS RELATED TO ARTICLE 8:

## Case #8-1: Failure to Put Deposit in Separate Account (Revised Case #18-1 May, 1988. Transferred to Article 8 November, 1994. Revised November, 2001. Revised May, 2017.)

REALTOR® A, a listing broker, obtained a signed offer to purchase, together with Buyer C's check for $10,000 as an earnest money deposit. Buyer C's offer was subject to the sale of his current residence. REALTOR® A presented the offer to Seller B who accepted it. REALTOR® A then inadvertently deposited the earnest money check in his personal checking account. Since Buyer C's offer was contingent on the sale of his current home, Seller B's house remained on the market. A week later, REALTOR® A received another offer to purchase Seller B's house from another broker and presented it to the seller as a back-up offer. Buyer C was informed about this new offer and reluctantly concluded that he would be unable to waive the sale contingency in order to proceed with the purchase of Seller B's house. He then asked REALTOR® A for his $10,000 check back. REALTOR® A explained that he had mistakenly deposited Buyer C's check in his personal bank account which had been attached since he received Buyer C's offer, and he was temporarily unable to refund the deposit to Buyer C.

Buyer C filed a complaint with the Association of REALTORS®, which was received by the Grievance Committee. The Grievance Committee concluded that the complaint warranted a hearing and referred it to the Professional Standards Committee. At hearing, REALTOR® A explained that his bank account had been unexpectedly attached following the loss of a civil suit which he was appealing; that his deposit of Buyer C's check in his personal account was a simple error; that he was arranging for the prompt release of his account; and that everything would be straightened out in three or four days, which should not be of great inconvenience to Buyer C.

It was the conclusion of the Hearing Panel that REALTOR® A was in violation of Article 8 of the Code of Ethics for having failed to put Buyer C's earnest money deposit in a special account separate from his personal funds.

## Case #8-2: Request for Investigation Filed by Association with the State Real Estate Commission (Originally Case #15-7. Revised and transferred to Article 18 as Case #18-4 May, 1988. Transferred to Article 8 November, 1994. Revised November, 2001 and May, 2017.)

REALTOR® A listed Client B's residential property and sold it to Buyer C, who made a substantial deposit subject only to Buyer C's obtaining a mortgage on terms and conditions not exceeding a specified rate of interest within 60 days.

REALTOR® A assisted Buyer C by recommending a lending institution, and after processing of his application for a mortgage, a written mortgage commitment was made by the lending institution which met the terms and conditions of the sales agreement. However, shortly after the mortgage commitment was received by Buyer C, REALTOR® A received a certified, return receipt requested letter from Buyer C, advising that Buyer C had changed his mind and would not go through with the sale. REALTOR® A discussed the matter by phone, but Buyer C said he would rather forfeit his deposit and definitely would not complete the sale, even at the risk of the seller suing for specific performance.

REALTOR® A then advised Client B of Buyer C's refusal to go through with the sale and Client B told REALTOR® A that he did not wish to sue Buyer C, but would just accept a portion of the forfeited deposit as specified in the listing agreement between Client B and REALTOR® A.

REALTOR® A then obtained a written release from the sale from Client B and Buyer C, and promised to send Client B a check for the portion of the forfeited deposit due to Client B as specified in the listing agreement. However, REALTOR® A failed to send Client B a check and Client B filed a complaint with the Professional Standards Administrator of the Association alleging a violation of Article 8 of the Code of Ethics.

At the hearing, Client B stated that he had no complaint about REALTOR® A's services to him except REALTOR® A's failure to provide Client B with the portion of the forfeited deposit due him, and that after several telephone calls and letters, REALTOR® A had told Client B that he would provide the forfeited monies due Client B "just as soon as he could." Client B said REALTOR® A told him he had some unexpected expenses and therefore Client B would have to wait until REALTOR® A obtained other funds which he expected to receive shortly.

REALTOR® A admitted the facts as related and further admitted that he had not placed the deposit received from Buyer C into an escrow account, but had placed it in his general funds. He said that unexpected expenditures had caused a deficit balance in these funds, and he would pay Client B as soon as he could.

The Hearing Panel concluded that REALTOR® A was in violation of Article 8 of the Code of Ethics and recommended that the decision, when final, be forwarded to the State Real Estate Commission as a possible violation of the public trust.

The Board of Directors affirmed the decision of the Hearing Panel; ordered implementation of the recommended sanction; and requested that the President forward, with advice of Board legal counsel, the final decision to the State Real Estate Commission as a possible violation of the public trust.

## CASE INTERPRETATIONS
## RELATED TO ARTICLE 9:

None currently existing.

# CASE INTERPRETATIONS RELATED TO ARTICLE 10:

## Case #10-1: Equal Professional Services by the REALTOR® (Reaffirmed May, 1988. Revised May, 2017.)

A minority couple called on REALTOR® A and expressed interest in purchasing a home in the $390,000 to $435,000 price range with at least three bedrooms, a large lot, and located in the Cedar Ridge area of town. Being familiar with Cedar Ridge through handling of numerous listings in that area, REALTOR® A explained that houses in Cedar Ridge generally sold in the price range from $540,000 to $660,000. The couple thereafter indicated that they would then like to see "what was available" within their budget. After further discussion with the couple concerning their financial circumstances and the maximum price range they could afford, REALTOR® A concluded that the couple could not afford more than $412,500 as an absolute maximum. The couple was then shown homes which met the criteria they had described to REALTOR® A. However, although REALTOR® A discussed with the couple the amenities and assets of each of the properties shown to them, they expressed no interest in any of the properties shown. A few days later, the minority couple filed charges with the Professional Standards Administrator of the Association, charging REALTOR® A with a violation of Article 10 of the Code Ethics, alleging that REALTOR® A had violated the Article by an alleged act of racial steering in his service to the minority couple.

The Professional Standards Administrator promptly referred the complaint to the Grievance Committee, which conducted a preliminary review and referred the complaint for a hearing. REALTOR® A was duly noticed and provided with an opportunity to make his response to the complaint.

At the hearing, the complainants elaborated upon their charge of the alleged racial steering by REALTOR® A, telling the Hearing Panel that they had specifically expressed an interest in purchasing a home in the Cedar Ridge area, but were not shown any homes in Cedar Ridge. REALTOR® A responded by producing e-mail records documenting the housing preference of the couple as they had described it to him, including price range and demonstrating that he had shown them a number of listings that met the requirements as expressed by them, although admittedly none of the properties shown were located in Cedar Ridge. However, REALTOR® A explained that he had advised the couple that there were no listings available in Cedar Ridge falling within their budget. Further, REALTOR® A produced listing and sales information concerning numerous homes in Cedar Ridge which confirmed an average sales price of $540,000 to $660,000. REALTOR® A told the Hearing Panel that he had, in fact, offered equal professional service to the minority couple by showing them properties which met the criteria they had presented to him. He pointed out to the Hearing Panel that the couple was charging him with "racial steering" which presumably they were relating to the denial of equal professional service. REALTOR® A stated, "If there were listings in Cedar Ridge in the $390,000 to $435,000 price range with at least three bedrooms and a large lot, and I had refused to show them such listings, then they might have a point in their charge.

But there are no such listings available now, nor have there been at any time since the original development of the Cedar Ridge area five years ago. I could not show them what did not and does not exist."

The Hearing Panel concluded that REALTOR® A had properly met his obligation to offer equal professional service and was not in violation of Article 10.

## Case #10-2: Denial of Equal Professional Service (Revised May, 1988. Revised November, 2001. Revised May, 2017.)

On a Saturday morning, REALTOR® B, a salesperson affiliated with REALTOR® A, answered an e-mail from Prospect C, a recent college graduate who was moving into the city to take his first teaching job at Northwest High School. Prospect C was married, had two young children, and was a veteran.

After working with Prospect C to determine his family could afford a three-bedroom home in the $240,000 range, REALTOR® B described available properties near Northwest High School and set up appointments to show houses to Prospect C. That afternoon, REALTOR® B showed Prospect C and his wife three houses in neighborhoods near the high school.

On Monday, at a faculty meeting, Prospect C met Prospect D, who was also moving into the city to take a teaching position at the same high school and who was also in the market for a home. Prospect D was married with two young children and was also a veteran.

Prospect C told Prospect D of REALTOR® B's knowledge of the market and VA financing and how helpful he had been. Prospect D called REALTOR® A's office that afternoon and asked for REALTOR® B.

REALTOR® B met Prospect D and determined Prospect D could also afford a home in the $240,000 range. Prospect D told REALTOR® B that he was also a new teacher at Northwest High School and had been referred by Prospect C. Prospect D was black.

REALTOR® B showed Prospect D houses in several neighborhoods undergoing racial transition but did not show Prospect D homes in neighborhoods near the high school.

Prospect D asked about houses closer to Northwest High School. REALTOR® B replied that he had no knowledge of any homes in that area for which Prospect D could qualify. The next day, Prospect D, while visiting Prospect C, related his problems in finding a home near the high school and learned that REALTOR® B had shown Prospect C several homes near the high school. Prospect D filed a complaint with the Association of REALTORS® claiming that REALTOR® B had discriminated against him and his family by not offering equal professional services.

The complaint was reviewed by the Grievance Committee. REALTOR® B was charged with an alleged violation of Article 10, and the complaint was referred to a Hearing Panel of the Association's Professional Standards Committee for hearing.

At the hearing, REALTOR® B admitted that he did not use the same efforts to show Prospect D properties in neighborhoods near the high school as he did with Prospect C because he felt Prospect D and his family would feel more comfortable living in a racially integrated neighborhood.

The Hearing Panel found REALTOR® B in violation of Article 10 of the Code of Ethics.

## Case #10-3: Equal Professional Services by the REALTOR® (Revised November, 2001. Revised May, 2017.)

REALTOR® A was contacted by Prospect C, a female head of household, concerning a home for sale which was advertised. When informed by REALTOR® A that the home in question had already been sold, Prospect C asked to be shown homes in the $240,000 to $270,000 price range with three bedrooms and located near schools and playgrounds. REALTOR® A proceeded to show Prospect C a number of homes which met her stated criteria for price range, size, and location, but Prospect C was interested in none of them.

Shortly thereafter, Prospect C filed a complaint with the Association of REALTORS® against REALTOR® A, complaining that he had violated Article 10 of the Code of Ethics by failing to offer equal professional service to her because she was a woman. Prospect C contended that she did not receive the same professional service from REALTOR® A that would have been afforded to a male head of household and home seeker with the same criteria for price range, size, and location.

At the hearing, Prospect C expressed her complaint and concluded by saying, "It was obvious to me that REALTOR® A discriminated against me because I am a woman. In my opinion, he showed little interest in helping me to find a home."

REALTOR® A responded that he was sorry that Prospect C had that opinion, but that certainly he held no such attitude as charged. REALTOR® A advised the Hearing Panel that he routinely utilized a contact report for each prospect which includes identification information on the clients, provides data on the price range, type of house and location preferred by the prospect, and records the homes shown to the prospect with information on the price, type, and location of each home shown. REALTOR® A presented several such reports from his files including the report pertaining to Prospect C. Prospect C's report showed that several homes shown to her met the data as supplied by her.

The Hearing Panel concluded that REALTOR® A's documented evidence did, in fact, establish a clear position in which equal professional service had been offered and that no violation of Article 10 had occurred.

### Case #10-4: Use of "Choose Your Neighbor" Marketing Letters (Adopted November, 1987. Revised November, 2013 and November, 2017.)

REALTOR® A listed a property in a new subdivision. At the instruction of his client, Seller X, REALTOR® A did not enter the listing in the MLS, did not place a "For Sale" sign on the property and did not advertise the property online. Seller X had told REALTOR® A that he wanted the sale handled quietly, with the new purchasers being people who would "fit into the neighborhood — people with the same socioeconomic background" as the other residents of the subdivision.

Based on his conversation with Seller X, REALTOR® A's only marketing effort was mailing a letter to the other residents of the subdivision, inviting them ". . . to play a part in the decision of who your next neighbor will be. If you know of someone who you would like to live in the neighborhood, please let them know of the availability of this home, or call me and I will be happy to contact them and arrange a private showing."

REALTOR® A's marketing strategy came to the attention of REALTOR® B, whose mother lived in the subdivision. REALTOR® B filed a complaint charging REALTOR® A with a violation of Article 10 of the Code of Ethics.

At the hearing, REALTOR® B told the Hearing Panel of receiving a copy of the marketing letter from his mother, who had recently moved to the subdivision. REALTOR® B advised the panel that he had checked the MLS for information on the property, had driven past the house to look for a "For Sale" sign and had searched online for any information on the property. Finding nothing, REALTOR® B concluded that REALTOR® A's marketing strategy was to limit access to the property to individuals preselected by the current residents. "In my mind," said REALTOR® B, "this could only mean one thing. REALTOR® A was deliberately discriminating against home buyers from other areas, or those with different backgrounds, who would never have the opportunity to learn about the house's availability. Obviously, REALTOR® A was directing all of his marketing energies into finding purchasers who would not disrupt the ethnic and economic character of the neighborhood."

REALTOR® A defended his actions by advising the panel that he was acting on Seller X's instructions. Seller X appeared as a witness for REALTOR® A and confirmed this fact, adding that he and the other residents of his block had an informal agreement that they would try to find "suitable" purchasers for their homes if they ever decided to sell. Seller X felt that by broadening the marketing campaign to include all residents of the subdivision he had increased the chances of finding such potential purchasers.

The Hearing Panel found REALTOR® A in violation of Article 10 of the Code of Ethics. In their decision, the panel advised REALTOR® A that no instruction from a client could absolve a REALTOR® from the obligation to market properties without regard to race, color, religion, sex, handicap, familial status, country of national origin, sexual orientation, or gender identity, as expressed in Article 10. There was no doubt, in the panel's opinion, that the exclusive use

of "Choose Your Neighbor" letters to market the property was designed to circumvent the requirements of Article 10.

## Case #10-5: Use of "Choose Your Neighbor" Form Letters as Part of a Marketing Campaign

(Adopted November, 1987. Revised November, 2013 and May, 2017.)

The ABC Association of REALTORS® received a complaint from a local fair housing group alleging that REALTOR® A was using discriminatory marketing techniques, in violation of Article 10 of the Code of Ethics, as the listing broker for a property in a new subdivision.

In support of their complaint, the fair housing group provided copies of "CHOOSE YOUR NEIGHBOR" form letters sent by REALTOR® A to current neighborhood residents. The letters announced that the property was on the market and invited neighborhood residents to contact REALTOR® A if they knew of anyone who they thought might be interested in purchasing the home.

At the hearing, REALTOR® A defended his use of "Choose Your Neighbor" form letters by demonstrating that they were just one element of his marketing campaign, and were not an attempt to restrict access to the property on the basis of race, color, religion, sex, handicap, familial status, country of national origin, sexual orientation, or gender identity, as prohibited by Article 10. REALTOR® A produced copies of banner advertisements run on several websites, "OPEN HOUSE" information provided on Realtor.com, and a copy of the property's MLS listing. REALTOR® A remarked, "In my experience, the current residents of a neighborhood often have friends or relatives who have said that they would love to live in the neighborhood. It just makes sense to me to include contacting these folks in any marketing campaign!"

The Hearing Panel found REALTOR® A not in violation of Article 10. In their "Findings of Fact and Conclusions," the panel noted that the use of "Choose Your Neighbor" letters is not a per se violation of Article 10, but cautioned that such letters could be used in a manner inconsistent with the intent of Article 10. If used in conjunction with other marketing techniques and not as a means of limiting or restricting access to property on the basis of race, color, sex, handicap, familial status, country of national origin, sexual orientation, or gender identity, "Choose Your Neighbor" letters were another method of announcing a property's availability and attracting potential purchasers.

# CASE INTERPRETATIONS RELATED TO ARTICLE 11:

## Case #11-1: Appraiser's Competence for Assignment (Revised May, 1988.)

REALTOR® A sold a light industrial property to Buyer B, a laundry operator. Several months later, Buyer B engaged REALTOR® A's services to appraise the property and to supply an appraisal report for use in possible merger with another laundry. REALTOR® A carried out this appraisal assignment and submitted his report. Buyer (now Client) B was dissatisfied with the report feeling that the valuation, in comparison with the market price that he had paid was excessively low. Client B then engaged an appraiser specializing in industrial property, and after receiving the second appraisal report, filed a complaint with the Board of REALTORS® charging REALTOR® A with incompetent and unprofessional service as an appraiser.

At the hearing, questioning established that REALTOR® A could cite no other industrial property appraisal he had made, and that his appraisal experience had been limited exclusively to residential property. The hearing also established that when the client proposed the appraisal, REALTOR® A had readily accepted the assignment and that he had at no time disclosed the extent and limitations of this appraisal experience with his client.

REALTOR® A was found by the Hearing Panel to be in violation of Article 11.

## Case #11-2: Obligation to Disclose Assistance in Appraisal (Revised November, 2001 and May, 2017.)

REALTOR® A completed an appraisal of a large house for Client B and submitted an appraisal report. In connection with a mortgage loan application, the appraisal report came to the attention of three other REALTORS®. One of them, REALTOR® C, filed a complaint with the local Association of REALTORS®, charging REALTOR® A with violation of Article 11 of the Code of Ethics. The complaint stated that REALTOR® A, while engaged in appraising Client B's property had called REALTOR® C and asked for information concerning residential property values in the area where Client B's property was located; that REALTOR® C had answered the questions; and that REALTOR® A's appraisal report had failed to acknowledge this assistance provided by REALTOR® C.

At the hearing, REALTOR® A protested that REALTOR® C was misreading Article 11, which is concerned entirely with conditions that must be met when a REALTOR® undertakes an appraisal that is outside the field of his experience. REALTOR® A established the fact that he had many years of successful experience as an appraiser of residential property in the area; that he specialized in that category of appraisal; that he had called a number of REALTORS® and officers of mortgage lending institutions to ask general questions about current residential values in the particular neighborhood in keeping with his usual practice; that he did not consider the courtesy of responding to general questions of this kind as constituting formal assistance in making an appraisal that is required to be identified under the terms of Article 11.

The Hearing Panel concluded that REALTOR® A's defense was valid, and that his action did not violate Article 11.

## Case #11-3: Identification of Contributor to Appraisal (Revised November, 2001 and May, 2017.)

REALTOR® A, who had made a number of residential and farm appraisals for Client B, a bank, was asked to appraise the real property of a corporation that operated two extensive industrial parks. REALTOR® A made his appraisal of open land belonging to the corporation for future development. With respect to specialized industrial structures included in the assignment, he engaged the XYZ firm of industrial engineers to make a study of obsolescence and of current reproduction costs leading to conclusions. The report on this study was incorporated into REALTOR A's appraisal report to Client B, without identifying the XYZ firm as a contributor to the report.

Sometime after the submission of the report, Engineer C, a member of the XYZ firm, was invited to speak on an appraisal panel arranged by the local Association of REALTORS®. During his talk he used as an illustration some of the industrial properties that had figured in REALTOR® A's appraisal report. Following the program, in informal conversation with Engineer C, REALTOR® B learned of REALTOR® A's action in incorporating the engineering firm's conclusions into his own appraisal without identification of the firm and its contributions to the assignment. REALTOR® B then filed a complaint against REALTOR® A alleging violation of Article 11 of the Code of Ethics. After examining the facts as set out above, the complaint was referred by the Grievance Committee for hearing before a panel of the Association's Professional Standards Committee.

At the hearing, REALTOR® A took the position that he had not violated Article 11 because the essence of the appraisal assignment had been to exercise his judgment as an appraiser, and that he had not engaged any other person to exercise judgment in connection with the assignment. He had simply employed the XYZ engineering firm, he said, to make certain conclusions as to the extent of obsolescence in properties and as to the current cost of reproducing them. Conceding that he had incorporated the XYZ firm's report into his own appraisal report, REALTOR® A contended that this material was only incidental, and that the essential appraisal function of arriving at a valuation was entirely his own work. He stated further that he had paid the XYZ firm for its services and felt that relieved him of any obligation to identify the firm in his appraisal report.

During the hearing it was established that REALTOR® A had no previous experience in appraisal of industrial property, and that he had not disclosed this to Client B at the time he accepted the assignment.

The Hearing Panel concluded that REALTOR® A's defense was insufficient; that the appraisal process includes the findings and calculations that support judgment; that the XYZ firm's conclusions had constituted a major element of the appraisal report; that under the requirements of Article 11, REALTOR® A should have identified the firm and its contribution.

REALTOR® A was found in violation of Article 11.

## Case #11-4: Disclosure of Limited Appraisal Experience (Reaffirmed May, 1988. Revised May, 2017.)

REALTOR® A was asked by Client B, an officer of a bank, to appraise an office building. In discussing the matter, REALTOR® A pointed out that while he was an experienced appraiser, he had never appraised an office building. Client B expressed his confidence in REALTOR® A, based on years of satisfactory service in appraising residential property, and said that notwithstanding REALTOR® A's lack of previous experience in appraising an office building, the bank wanted his judgment and asked him to accept the assignment to appraise the office building.

Accordingly, REALTOR® A undertook the assignment, and completed his appraisal report. The report later came to the attention of REALTOR® C, who complained to the Association of REALTORS® that REALTOR® A had violated Article 11 of the Code of Ethics by taking an appraisal assignment outside the field of his experience without obtaining the assistance of an authority on office buildings.

At the hearing, Client B appeared as a witness for REALTOR® A and stated that the assignment had been given to REALTOR® A after he had disclosed his lack of previous experience in appraising office buildings, and that the client was entirely satisfied by the manner in which REALTOR® A had completed his assignment.

The Hearing Panel concluded that Client B's statement completely exonerated REALTOR® A of any violation of Article 11, since it was clear that he had disclosed his lack of previous experience in appraising the type of property in question, and that he had been given the assignment after this disclosure was made to the client.

**Case #11-5: Appraiser's Competence to Assignment** (Revised November, 2001. Deleted November, 2017.)

**Case #11-6: Appraiser's Obligation to Consider All Factors of Value** (Revised November, 2001. Deleted November, 2017.)

## Case #11-7: Appraisal Fee as Percentage of Valuation (Transferred to Article 1 November, 2001.)

## Case #11-8: REALTOR®'s Obligation to Comply with USPAP (Adopted November, 1995. Deleted November, 2000.)

## Case #11-9: REALTOR®'s Obligation to Comply with USPAP (Adopted November, 1995. Deleted November, 2000.)

## Case #11-10: REALTOR®'s Obligation to Disclose Interest (Adopted May, 1997. Revised November, 2000 and May, 2017.)

Client A, an owner, needed to sell a property. She approached REALTOR® B to list the property. They agreed to the terms of the listing and the property was listed.

An offer was made and was accepted by Client A. After the prospective purchaser completed the loan application, REALTOR® B was contacted to appraise the property. When the lender was preparing the closing statement, the lender became aware that the listing broker was also the appraiser and filed a complaint with the Board of REALTORS® alleging that REALTOR® B had failed to disclose in the appraisal that he had an interest in the property, specifically seeing that the sale closed. The complaint was referred by the Grievance Committee for hearing before a panel of the Association's Professional Standards Committee.

At the hearing, REALTOR® B protested that the lender was misreading Article 11, as interpreted by Standard of Practice 11-1, claiming that "disclosure of whether the REALTOR® has any conflicts of interest" referred only to an ownership interest. REALTOR® B concluded that the listing commission had been earned when a ready, willing, and able purchaser contracted to purchase the property and that the appraisal process was separate and distinct from the brokerage process.

The Hearing Panel concluded that REALTOR® B's defense was specious and because he was the listing agent REALTOR® B was biased in favor of Client A since a successful transaction would benefit REALTOR® B in the form of a commission.

REALTOR® B was found in violation of Article 11.

## Case #11-11: REALTOR®'s Obligation to Disclose Present or Contemplated Interest (Adopted May, 1997. Revised November, 2000.)

Owner A was considering refinancing a property. Client B, a lender, ordered an appraisal from REALTOR® C. The appraisal report was completed and later Owner A decided to sell the property instead of refinancing it. Owner A contacted REALTOR® C who listed the property. An offer was made that was accepted by Owner A.

At the loan application, the prospective purchaser told the lender, Client B, that a recent appraisal on the property had been done for Client B. When the lender became aware that the listing broker was also the appraiser, the lender filed a complaint with the Association of REALTORS® alleging that REALTOR® C had not disclosed her "present or contemplated interest" in the property as required by Article 11, as interpreted by Standard of Practice 11-1. The complaint was referred by the Grievance Committee for hearing before a panel of the Association's Professional Standards Committee.

At the hearing, a written statement from Owner A containing all the facts above was entered into evidence. REALTOR® C stated that the appraisal had been completed in accordance with Standard of Practice 11-1 and it was only after Owner A decided to sell, rather than refinance, that there were any discussions about REALTOR® C representing the owner in the sale of the property.

REALTOR® C stated that the owner had been appreciative of the time that she had spent discussing the subject's neighborhood and existing market conditions, and that the owner had decided that he wanted someone really knowledgeable to represent him in the sale of his property.

Because REALTOR® C's disclosures regarding present and contemplated interests were true at the time they were made in connection with the appraisal, the Hearing Panel concluded that REALTOR® C was not in violation of Article 11.

# CASE INTERPRETATIONS RELATED TO ARTICLE 12:

### Case #12-1: Absence of Name on Sign (Reaffirmed Case #19-3 May, 1988. Transferred to Article 12 November, 1994. Revised November, 2001 and May, 2017.)

Prospect A observed a sign on a vacant lot reading: "For Sale — Call 330-5215." Thinking he would be dealing with a For Sale by Owner, he called the number on the sign. He was surprised that the lot was exclusively listed by REALTOR® A, and the telephone number on the sign was the home number of REALTOR® B in REALTOR® A's office.

Prospect A filed a complaint against REALTOR® A and REALTOR® B alleging a violation of Article 12 of the Code of Ethics.

At the hearing, REALTOR® A stated that he permitted REALTOR® B to put up the sign. REALTOR® B's defense was that the sign was not a "formal" advertisement, such as an online advertisement, business card, or billboard, to which he understood Article 12 to apply.

The Hearing Panel determined that the sign was an advertisement within the meaning of Article 12; that its use violated that Article of the Code; and that both REALTOR® A and REALTOR® B were in violation of Article 12.

## Case #12-2: Exaggeration in Advertising
(Reaffirmed Case #19-4 May, 1988. Transferred to Article 12 November, 1994. Revised November, 2001 and May, 2017.)

Prospect A noted REALTOR® B's advertisement on his website describing a home with five acres "about 20 miles from the city" giving directions to the "modern 3-bedroom home, well maintained, and set in a charmingly landscaped site."

After visiting the property, Prospect A filed a complaint with the Association of REALTORS® complaining of the gross exaggeration contained in the advertisement, which had induced him to waste time and money in inspecting the property. The property, he said, was actually 36 miles from the city limits. Its wood-lath support for plaster, which was visible in many large breaks in the walls, indicated it to be 80 years old or more. There was no evidence of painting in recent years. Several windows were broken, half of the back steps were missing. The house was located at the end of a crude dirt road in a small cleared area that had become densely overgrown in weeds — a picture of extreme neglect.

REALTOR® B was notified of the charge of misleading advertising, and a hearing was held. REALTOR® B criticized the complainant for bringing the matter to the Association, pointing out that Prospect A had failed to mention that the property was priced at only $90,000; that at such a price it was an exceptionally good buy to anyone looking for a small place with a few acres; that to get attention to such properties it was necessary to do a bit of "puffing" to attract attention in advertising; that as a matter of fact the general lines of the house were similar to many of modern design; that the house had been well enough maintained to be salvageable by anyone who would do a reasonable amount of work on it; and that, in his opinion, the site was truly "charming" in its rugged simplicity.

The Hearing Panel concluded that REALTOR® B had used gross exaggeration in his advertisement and was found in violation of Article 12 of the Code of Ethics.

## Case #12-3: Exaggeration in Advertising

(Reaffirmed Case #19-5 May, 1988. Transferred to Article 12 November, 1994. Revised April, 1998 and November, 2017.)

In his efforts to sell a furnished apartment building, REALTOR® A, the listing broker, used advertising describing the property, including such phrases as "modern updates . . . most units have new appliances . . . excellent earnings record." Buyer B saw the ad, called REALTOR® A, was shown three nicely appointed units on the property, signed an offer to buy, and wrote a check for a deposit. A few days later, he made a more careful inspection of the property and its earnings statements, and filed a complaint against REALTOR® A with the Association of REALTORS® charging misleading and exaggerated advertising.

The complaint was referred to the Grievance Committee which, after its review and evaluation, referred it to the Professional Standards Administrator directing that a hearing be scheduled before a Hearing Panel of the Professional Standards Committee.

At the hearing, Buyer B explained that he had been looking for just such an investment property in the general location, that the price appealed to him, and that he had only a very limited time available on the day he was shown the property. The three apartments which he was shown were in excellent condition, so he had thought it advisable to make an offer, feeling that he could place full reliance on REALTOR® A's representation of the property both in his oral statements and his advertising.

His second, and more thorough, inspection revealed that the three apartments shown to him were the only apartments in the building that were updated; the other nine were badly in need of renovation. Moreover, he said, the earnings record of the building, which by ordinary standards was satisfactory for the two years immediately preceding, had shown high vacancy and a loss in two of the ten years of the building's life, had shown a definitely low return in three years, and had never shown an earnings record that could be described as "excellent".

Responding to Buyer B's specifics, REALTOR® A pointed out that the complaint did not charge him with misrepresenting anything in his oral statements to Buyer B; that the complaint, therefore, was based solely on his advertisement which he felt did not depart from accepted standards in advertising. Since the building was about ten years old, he felt free to say that all of its units were "modern", and that when he stated "most units have new appliances," he based that, too, on the fact that the building was about ten years old. Finally, in his opinion, the earnings record of the building for its entire operating life, since it had shown a loss in only two of its ten years, could reasonably be described as "excellent".

Questioning of REALTOR® A revealed that the three apartments shown to Buyer B were, in fact, the only renovated units in the building, and that these three were the only apartments in which the original appliances had been replaced. REALTOR® A's comment on this was, "Naturally, in showing the building, I directed attention to the most attractive features. This is just ordinary competence in selling."

It was the conclusion of the Hearing Panel that REALTOR® A's advertising used exaggeration and had not presented a true picture in his representations to the buyer. REALTOR® A was found in violation of Article 12.

## Case #12-4: True Picture in Advertising

(Reaffirmed Case #19-6 May, 1988. Transferred to Article 12 November, 1994 and May, 2017.)

REALTOR® A was the exclusive marketing agent for a home building organization in Redtown, a suburban community within a metropolitan area that also contained the communities of Whitetown and Bluetown. As part of his sales effort, he posted the following on his blog:

Greenwood
In Redtown
STARTLING NEWS

On an identical house bought at "Greenwood" in Redtown, we have found that the difference in tax rates allows you to get $15,000 more house free than if you bought the same house in Whitetown or Bluetown. We have been doing some figuring, and here's what we came up with:

Plan A — built in Whitetown
Taxes approximately . . . $3,600

Plan B — built in Bluetown
Taxes approximately . . . $3,150

Plan C — built in Redtown
Taxes approximately . . . $1,950

This means that in Redtown your monthly payments for the same house would be approximately $137 less than in Whitetown, and $100 less than in Bluetown. Since principal and interest are the same, you get $15,000 or more house FREE when you buy in Greenwood.

REALTOR® B objected to the post and forwarded it with a complaint to the Professional Standards Administrator of his Association, charging that the blog post was misleading. A Hearing Panel of the Professional Standards Committee considered the matter in a hearing attended by REALTORS® A and B.

It was the panel's opinion that it is not unethical to point out the current tax differentials of various municipal jurisdictions, but that the final paragraph of the advertisement in question constituted an attempt to capitalize on a tax differential that is not predictable. To offer $15,000 or more house "free" based upon indefinite continuation of a current tax situation, which is not certain, is misleading. Therefore, the Hearing Panel concluded, the ad violated Article 12 of the Code of Ethics in that it did not present a true picture that could be assured by REALTOR® A.

## Case #12-5: True Picture in Use of "Sold" Sign

(Revised Case #19-7 May, 1988. Transferred to Article 12 November, 1994. Revised May, 2017.)

REALTOR® A, the listing broker, was charged by REALTOR® B with giving a false picture in his advertising by putting up a "sold" sign on property that had not been sold. REALTOR® A was notified of the complaint and of the date of a hearing on it scheduled before a Hearing Panel of his Association's Professional Standards Committee.

Undisputed testimony offered during the hearing revealed that REALTOR® A was an exclusive agent, offering Client C's home for sale. An offer to buy was obtained from Prospect D and a counter proposal by Client C was accepted. An earnest money deposit was made, and a date for settlement was agreed upon. At that point, REALTOR® A put up his "sold" sign. Several days later, Prospect D received an unexpected notice from his employer that he was to be transferred to another city. Prospect D immediately contacted REALTOR® A and Client C about his predicament. In an amicable discussion it was agreed that everyone had acted in good faith; that the property was readily marketable; that the earnest money deposit would be refunded; and that REALTOR® A would put the property on the market again. A week later, when REALTOR® B was showing a number of houses to a prospective buyer, they drove by Client C's property, and the prospect casually said that she didn't understand the "sold" sign, since she had been taken to see the house that morning by REALTOR® A.

REALTOR® B contended that a "sold" sign is a measure of a REALTOR®'s advertising, and that it cannot give a true picture if it is put up prior to the settlement and actual transfer of ownership.

The Hearing Panel's decision agreed with REALTOR® B's contention that the use of a "sold" sign constitutes advertising by a REALTOR® but did not agree that a "sold" sign could be put up only after the actual settlement and transfer of ownership. The decision indicated that after the client's acceptance of a bona fide offer, REALTOR® A could consider that he had brought about a sale and would not be in violation of the requirement to give a "true picture" by putting up a "sold" sign. However, once it was clear that the sale had fallen through, the "sold" sign should have been immediately removed since allowing the sign to remain in place no longer provided a "true picture."

REALTOR® A was found by the panel to have violated Article 12.

## Case #12-6: Misleading Advertising (Reaffirmed Case #19-8 May, 1988. Transferred to Article 12 November, 1994 and May, 2017.)

REALTOR® A's business included real estate brokerage, property management, and home building. In one of his advertisements of his home building activities, in which he identified himself as a REALTOR®, there was prominently featured the words, "Buy Direct and Save." REALTOR® B forwarded a link to the advertisement to the Association of REALTORS® as the basis of a complaint that REALTOR® A in his advertising was, through use of the quoted phrase, seeking to take unfair advantage of other REALTORS®.

At the hearing, it was brought out that REALTOR® A's properties had been listed with his real estate firm and entered into the MLS. He defended his advertising by asserting that it was reasonable for him to seek the sale of houses in his subdivision through his own brokerage office to the greatest extent possible. He was not able to show the Hearing Panel any instances of reduced prices on direct sales even though several such sales had occurred.

It was the conclusion of the panel that REALTOR® A had violated Article 12. The panel's decision indicated that just because he engaged in home building, he could not be exempted from the standards that apply to REALTORS® generally; and that the phrase "Buy Direct and Save" in his advertising was an attempt to convince prospective buyers that a lower price would be offered those purchasing direct rather than through cooperating brokers when, in fact, he had maintained the same prices and there was no saving by buying direct.

## Case #12-7: REALTOR® Advertising Free Market Analysis (Reaffirmed Case #19-9 May, 1988. Transferred to Article 12 November, 1994. Revised November, 2001 and May, 2017.)

REALTOR® A advertised on his website as follows: "Free Market Analysis With No Obligation."

A property owner complained about REALTOR® A's attempts to solicit the listing, and the complaint was referred for a hearing before a Hearing Panel of the Professional Standards Committee.

At the hearing the property owner testified he had called REALTOR® A to have him prepare a market analysis of his residential property, ". . . with no obligation. . ." as claimed in REALTOR® A's ads. However, the property owner said that when he and REALTOR® A spoke, he explained that he would be glad to provide the market analysis, but said, "I presume you understand that when we provide this service, we also expect that if you list your property, you will permit us to serve you." The property owner testified that REALTOR® A did not press the matter at the time and did provide a market analysis. The property owner told the panel that for the next three weeks REALTOR® A or one of his representatives called "practically every single day" soliciting the listing of his home. The property owner testified that on several occasions, someone from REALTOR® A's office reminded him that REALTOR® A had

provided a "valuable free service and we feel that you owe us the listing of the property."

REALTOR® A responded that he had provided the "free market analysis" as represented in his advertising, and had provided it ". . . with no obligation." He stated that he had neither asked for nor received a fee for the market analysis. He could not understand why he was required to appear before a Hearing Panel in connection with allegations of a violation of Article 12 of the Code of Ethics.

The Hearing Panel noted that offering premiums or prizes as inducements, or the advertising of anything described as "free" is not prohibited by the Code of Ethics.

While REALTOR® A was free to advertise "free market analysis with no obligation," such a representation was not a "true picture" if all of the terms governing availability are not clearly disclosed in the ad or representation. The Hearing Panel noted that the statement by REALTOR® A when he provided the "free market analysis" that it was "presumed" the property owner would list with REALTOR® A if the property was offered for sale, and the subsequent "reminders" by sales representatives of REALTOR® A about the "expectation" made the representation less than a "true picture." The panel concluded that REALTOR® A was in violation of Article 12.

### Case #12-8: REALTOR® to Disclose Status as Real Estate Broker or Salesperson Even When Advertising Property Owned by the REALTOR® (Revised Case #19-11 May, 1988. Transferred to Article 12 November, 1994. Revised May, 2017.)

REALTOR® A decided to sell a residential investment property he owned in the city. He did not list the property with his firm, but rather advertised it for sale under the heading "For Sale By Owner," giving only his name and home telephone number. Mr. X responded to the ad, purchased the property, and took occupancy.

Shortly after moving into the property, Mr. X filed a complaint with the Association, alleging that REALTOR® A had violated Article 12 of the Code of Ethics by not disclosing that he was a real estate broker in his advertising or in negotiations for the property.

The Grievance Committee determined that the matter should be heard and referred it to the Professional Standards Committee for hearing. After following the Association's prescribed professional standards procedures, including proper notice to parties, a Hearing Panel was convened to hear the matter.

Mr. X testified that he had purchased the property without knowledge that REALTOR® A was a real estate broker. If he had known this, said Mr. X, he might have decided not to purchase the property or might have decided to have an independent appraisal of the property made before agreeing to purchase. In any event, he said, REALTOR® A's special knowledge and expertise placed him at a disadvantage.

REALTOR® A testified that the obligations imposed by Article 12 relate only to listed properties, where the REALTOR® acts as agent for the seller. He told the panel that he believed he had complied with the "true picture" test of Article 12 by advertising the property as a "For Sale By Owner," because it had not been listed with his firm and there was no agency relationship to disclose.

"Besides," explained REALTOR® A, "there was no need to disclose my licensure status in the advertisement, because my name is well known in the community as a real estate broker."

The Hearing Panel disagreed with REALTOR® A's reasoning and indicated in its decision that Article 12 as interpreted by Standard of Practice 12-6, does establish a requirement to disclose both ownership interest and licensure status when the REALTOR® advertises his own unlisted property for sale. Merely indicating REALTOR® A's name in the advertisement and assuming that his prominence in the real estate business was well known was not enough. The panel concluded that REALTOR® A was obliged to disclose his licensure status in the advertisement, since this knowledge might well have affected Mr. X's negotiations on the property as well as his eventual decision to purchase.

REALTOR® A was found in violation of Article 12 of the Code of Ethics.

### Case #12-9: Unethical Advertising (Originally Case #9-2. Revised and transferred to Article 19 as Case #19-12 May, 1988. Transferred to Article 12 November, 1994. Revised May, 2017.)

REALTOR® A posted an ad on his website soliciting $15,000 investments in a "sure thing." The ad explained that he was seeking only ten investors at $15,000 each; that each investor would receive $18,000 for his investment in 30 days; or, if he chose to invest for a longer period, could receive $24,000 in 90 days. The ad stated that REALTOR® A personally guaranteed this investment experience to the first ten investors who responded to the ad.

A member of REALTOR® A's Association saw the ad and was concerned. He filed an ethics complaint, and in the subsequent hearing, REALTOR® A was asked to demonstrate that he had put liquid assets in escrow to back up his published guarantee. REALTOR® A was at first evasive, and then explained that there was no possibility of any one losing any money as a result of his ad because he had simply been using ingenuity to develop a list of prospects interested in small real estate investments.

REALTOR® A explained that he had told those who inquired that the opportunity was no longer available, but that he would take their names and addresses for future investment opportunities that might arise. He explained that in this case any guarantee he would make in a tangible transaction would, of course, be fully protected by liquid assets put in escrow.

The Hearing Panel concluded that REALTOR® A had not provided a "true picture" in his advertisement, and was in violation of Article 12.

## Case #12-10: REALTOR® Advertising Free Market Analysis

(Originally Case #9-21. Revised and transferred to Article 19 as Case #19-13 May, 1988. Transferred to Article 12 November, 1994. Revised November, 2001 and May, 2017.)

REALTOR® A advertised on his website as follows: "Free Market Analysis With No Obligation." REALTOR® B presented a written complaint to the Professional Standards Administrator of the Association filing a charge against REALTOR® A of an alleged violation of Article 12 of the Code of Ethics.

The matter was referred to the Grievance Committee which concluded the matter should be considered by a panel of the Professional Standards Committee. A hearing was convened with both REALTOR® A and REALTOR® B present.

REALTOR® A advised the Hearing Panel that he had placed the advertisement on his website and in good faith. He stated he felt his ad did present a "true picture," and was not unethical. When the panel asked if his offering of a "free market analysis" was contingent upon his obtaining a listing or commission, REALTOR® A answered in the negative. He pointed out that he charged no fee for the service and provided it as represented on his website.

In the absence of any evidence indicating that the advertising by REALTOR® A was misleading, the Hearing Panel concluded that such advertising by REALTOR® A is not prohibited by the Code of Ethics nor can such advertising be prohibited by an Association of REALTORS® unless it presents less than a "true picture." However, if a charge is filed against a REALTOR® alleging violation of Article 12 and there is a hearing before the Professional Standards Committee, determination may properly be made of the truth of any representations made.

The Hearing Panel concluded that REALTOR® A had demonstrated that his ads presented a "true picture" and that he was not in violation of Article 12.

## Case #12-11: Advertisements by Individuals Other Than the Listing Broker

(Adopted as Case #19-14 May, 1988. Transferred to Article 12 November, 1994. Revised November, 1995, November, 1996 and May, 2017.)

REALTOR® A purchased a banner ad on the website of his local newspaper. In the body of the ad were pictures of several homes and their addresses. At the top of the ad was the following: "We've sold these — we can sell yours, too."

The following week three complaints were received from other Association Members alleging that REALTOR® A's banner ad was in violation of Article 12. Each of the complaints noted that REALTOR® A had participated in the transaction as the successful cooperating broker who had located the eventual purchasers, but the complaints also claimed that REALTOR® A's claim to have "sold" these properties was false and misleading since none of the properties had been listed with him and, in one instance, the sale had yet to close.

Since all the complaints involved the same advertisement, they were consolidated to be heard at the same hearing before a Hearing Panel of the Professional Standards Committee.

At the hearing, REALTOR® A defended his actions on the basis that although the properties had been listed with other brokers, he had been the "selling" or "cooperating" broker and was entitled to advertise his role in the transactions.

The Hearing Panel agreed with REALTOR® A's reasoning in their decision, pointing out that Article 12 as interpreted by Standard of Practice 12-7, provides that cooperating brokers (selling brokers) may claim to have "sold" the property and that such claims may be made by either the listing broker or the cooperating broker or by both of them upon acceptance of a purchase offer by the seller. The panel also noted that REALTOR® A could have shown that he had "participated in" or had "cooperated in" these transactions and also met his ethical obligations.

The panel's decision also indicated that during the existence of any listing, the cooperating broker's rights to advertise and market flow from the listing broker. However, claims of this nature were not advertisements of the properties but rather were advertisements of the broker's services. The only limitation on the ability of a cooperating broker to claim or to represent that a property had been "sold" was that the listing broker's consent would be required before a "sold" sign could physically be placed on the seller's property prior to closing.

## Case #12-12: Advertising in the Guise of News (Adopted April, 1994. Revised November, 1995 and May, 2017.)

Shortly after e-mailing his "Homeowners Neighborhood Newsletter" to local residents, several complaints were filed against REALTOR® B claiming that he had engaged in deceptive advertising in violation of Article 12's "true picture" directive. These complaints were reviewed by the Grievance Committee which determined that a hearing should be held and that all of the related complaints would be consolidated in a single hearing. The appropriate notices were sent and the hearing was convened.

REALTOR® A, one of the complainants, introduced REALTOR® B's "Homeowners Neighborhood Newsletter" into evidence pointing out that REALTOR® B had prominently shown pictures of, and addresses for, ten homes in an exclusive area of town labeling each as "Recently Sold." REALTOR® A, the listing broker for several of these properties, stated that, in his opinion, the average reader would readily conclude that REALTOR® B, by advertising this way, was claiming to have listed and sold the properties and that his claims violated Article 12, as interpreted by Standard of Practice 12-7. In response, REALTOR® B indicated that Article 12 was limited in scope to ". . . advertising and representations to the public" and that his "Homeowners Neighborhood Newsletter" was not, in fact, advertising but rather a well-intentioned effort to make homeowners aware of current market values. "Sale prices in our county become a matter of public record once a deed of sale is recorded," REALTOR® B argued, "and anyone who wants to find out about recent sales can get that information from the recorder's office." "All I am doing," he continued, "is reporting news — and saving residents the time and effort of retrieving this information on their own. If someone appreciates my efforts and later buys or sells through me, so much the better, but that is not the reason for my newsletter."

After hearing from the complainants and the respondent, and after reviewing the content of the newsletter, the Hearing Panel concluded that it did, in fact, violate Article 12 since, while the information regarding the properties themselves was accurate, its cumulative effect was to convey the impression that REALTOR® B had listed and/or sold the properties when he had not. The fact that he had been the cooperating broker in one of the transactions did not give him the right to claim, directly or indirectly, that he had "sold" any of the other properties because in no instance had he been the listing broker. The Hearing Panel did not accept REALTOR® B's claim that his newsletter was exempt from scrutiny under Article 12 in that he was disseminating news and not engaging in advertising. They noted that the name, e-mail address, and phone number of REALTOR® B's firm appeared prominently in several places; that a considerable portion of the newsletter was devoted to services available from REALTOR® B's firm and the advantages of doing business with REALTOR® B; and concluded that while the newsletter might, in fact, include an element of "news" a primary purpose of it was to advertise REALTOR® B and his firm and, consequently, that it was subject to scrutiny under Article 12.

## Case #12-13: Advertising Including Information Based on Other Brokers' Transactions (Adopted November, 1994. Revised November, 1997 and May, 2017.)

Shortly after e-mailing his "Homeowners Neighborhood Newsletter" to local residents, a complaint was filed against REALTOR® B alleging he had engaged in deceptive advertising in violation of Article 12's "true picture" mandate. The complaint was reviewed by the Grievance Committee which determined that a hearing should be held. Appropriate notices were sent and a hearing was convened.

REALTOR® A, the complainant, provided panel members with copies of REALTOR® B's "Homeowners Neighborhood Newsletter" noting that REALTOR® B had compiled a list of 20 homes in an exclusive area of town, titling the list "Recently Sold." REALTOR® A, the listing broker for two of those properties, stated that he believed that readers could conclude that REALTOR® B, in advertising this way, had constructively claimed to have listed and sold all of the properties on the list and that such claims violated Article 12.

In his defense, REALTOR® B acknowledged that his "Homeowners Neighborhood Newsletter" was, in fact, primarily an advertising vehicle and that it did not have a regular publication schedule. While it included news and information, including tips on how to make residential property more readily saleable and information regarding products and services offered by REALTOR® B's firm, its primary purpose was to generate business for REALTOR® B's firm.

REALTOR® B defended inclusion of the "Recently Sold" list, pointing out that all of the properties on the list were the subject of recent sales transactions; that the period of time during which the transactions had closed was clearly stated; that the fact that the information was taken from local MLS sold data had been duly noted; that a footnote at the bottom of the e-mail clearly indicated that the properties on the list had been listed and sold by various Participants in the MLS; and that such use was consistent with the local MLS rules and regulations.

The Hearing Panel accepted REALTOR® B's defense, holding that reasonable readers would conclude that most newsletters were, in reality, promotional advertising pieces and, in any case, that REALTOR B's newsletter had included some items of "news". Moreover, they noted that if REALTOR® B had simply listed the 20 transactions, titling them as "recently sold" and had done nothing more, then a reasonable reader might have concluded that he was claiming to have listed and sold those properties. However, since REALTOR® B had included a footnote pointing out that the properties on the list had been listed and sold by various Participants in the MLS, the fact that REALTOR® B had not included the names of each listing broker could not be construed as REALTOR® B claiming to have been the listing broker in each instance or to have "sold" each of the properties.

## Case #12-14: Advertising Property as "Offered Exclusively" (Adopted November, 1995. Deleted November, 2017.)

## Case #12-15: Links to other Websites (Adopted April, 1998. Revised May, 2017.)

REALTOR® A, in building out her firm's Facebook page, decided to include a link to all the listings in her city on Realtor.com.

REALTOR® B, a competing broker in the same community, happened upon REALTOR® A's Facebook page, and discovered the link to Realtor.com which included REALTOR® B's listings.

REALTOR® B immediately filed an ethics complaint with the local Association of REALTORS® alleging that REALTOR® A had violated Article 12 of the Code of Ethics as interpreted by Standard of Practice 12-4. Following review by the Association's Grievance Committee, the complaint was scheduled for a hearing before a Hearing Panel of the Professional Standards Committee.

At the hearing, REALTOR® B argued that by providing a link to the listings on Realtor.com, REALTOR® A was advertising without authority all the listings in the local MLS on her firm's Facebook page.

REALTOR® A countered saying that links are merely a method of "pointing" or "referring" to another site; that the information had not been altered nor had any information been deleted; and that people who view links to websites understand that.

After hearing all relevant testimony, the Hearing Panel went into executive session and concluded that by linking to a website which contained other REALTORS®' listings, REALTOR® A had not engaged in unauthorized advertising and had not violated Article 12.

## Case #12-16, Copying and Publishing other Brokers' Listings (Adopted April, 1998. Revised May, 2017.)

In developing his website, REALTOR® A decided he would offer two pages of listings: his own and some featured listings of his competitors. Being careful not to pr esent a misleading picture in his advertising, he was very careful to list the company name and phone number of the listing company with each of his competitors' listings.

When REALTOR® B found one of her listings on REALTOR® A's website, she filed an ethics complaint with the local Association of REALTORS® complaining that REALTOR® A had "blatantly and without authorization of any kind whatsoever advertised my listing on his website and in so doing was clearly in violation of Article 12 of the Code of Ethics as interpreted by Standard of Practice 12-4."

At their next meeting, the Grievance Committee decided that the alleged conduct, if taken at face value, could possibly violate Article 12 and directed the Association's Professional Standards Administrator to schedule an ethics hearing before a Hearing Panel of the Association's Professional Standards Committee.

At the hearing, REALTOR® B produced a printed copy of her listing which was on REALTOR® A's website. She produced a copy of her listing agreement and a photograph of the property, which matched the information in the listing. She testified that she had never been contacted by REALTOR® A for permission to advertise her listing.

When REALTOR® A presented his case, he showed the hearing panel several examples of REALTORS® providing links to sites with ads for other REALTORS®' listings. He said he saw no fundamental difference between providing such links and actually advertising other listings on his website, especially when he was very careful to also give the listing company's name and phone number. He went on to argue that REALTOR® B's clients would be hard pressed to understand REALTOR® B's objection to giving their properties the additional exposure they received on REALTOR® A's website.

Upon the conclusion of all testimony and closing statements, the Hearing Panel met in executive session and decided that while providing a link to listings of other REALTORS® did not violate Article 12, by actually publishing REALTOR® B's listing on his website REALTOR® A was not linking, but instead was advertising (by copying, as opposed to simply providing a link) without authority. In their findings of fact, the Hearing Panel also noted that even if REALTOR® B's clients might not object to such advertising, the lack of objection could not be assumed and would not relieve REALTOR® A of the obligation to obtain REALTOR® B's specific authority and consent to advertise her listings.

The Hearing Panel found REALTOR® A in violation of Article 12 of the Code of Ethics.

## Case #12-17: Use of Deceptive Domain Name/URL (Adopted May, 2001. Revised May, 2017.)

REALTOR® X, a principal broker in the firm XYZ, was constantly looking for ways to promote his firm and drive additional traffic to his website.

REALTOR® X had registered, but not used, domain names that incorporated or played on the names of many of his competitors and their firms, including ABC, REALTORS®.

REALTOR® X and his information technology staff concluded that one way to drive traffic to the firm's website would be to take advantage of the search engines commonly used by potential buyers and sellers. When potential buyers or sellers searched on key words like "real estate" or "REALTORS®" or on similar words, lists of search hits would appear, and when consumers searched for ABC, REALTORS®, one of the domain names that might appear would be REALTOR® X's domain name, abcrealtors.com.

REALTOR® X decided to take advantage of the domain names that he had previously registered, and pointed several that used, in various ways, the names of his competitors, including "abcrealtors. com," to his site.

In a matter of days, REALTOR® X learned that he had been charged with a violation of Article 12 of the Code of Ethics by REALTOR® A, the owner of ABC, REALTORS®, alleging that his (REALTOR® X's) use of the domain name "abcrealtors.com" presented a false picture to potential buyers and sellers and others on the Internet.

At the hearing, REALTOR® X defended himself indicating that, in his opinion, use of a domain name was not advertising or a "representation" to the public but simply a convenient way for Internet users to find relevant websites. Moreover, "When consumers reach my home page, there is no question that it is my site since I clearly show XYZ's name and our status as REALTORS®," he continued.

The Hearing Panel disagreed with REALTOR® X's justification, indicating that while his use of a domain name that employed another firm's name might not be precluded by law or regulation, it did not comply with the Code's higher duty to present a "true picture."

REALTOR® X was found in violation of Article 12, presenting an untrue picture in his representation to the public.

## Case #12-18: Protecting Client's Interest in Auction Advertised as "Absolute" (Adopted May, 2005. Revised May, 2017. Cross-referenced with Case #1-31.)

Seller T, a widowed elementary school teacher in the Midwest inherited a choice parcel of waterfront property on one of the Hawaiian islands from a distant relative. Having limited financial resources, and her children's' college educations to pay for, she concluded that she would likely never have the means to build on or otherwise enjoy the property. Consequently, she decided to sell it and use the proceeds to pay tuition and fund her retirement.

Seller T corresponded via e-mail with several real estate brokers, including REALTOR® Q whose website prominently featured his real estate auction services. REALTOR® Q proposed an absolute auction as the best way of attracting qualified buyers and ensuring the highest possible price for Seller T. Seller T found the concept had certain appeal but she also had reservations. "How do I know the property will sell for a good price," she asked? REALTOR® Q responded, "You have a choice piece of beachfront. It will easily bring at least four million five hundred thousand dollars." Seller T acquiesced and REALTOR® Q sent her the necessary contracts which Seller T executed and returned.

Several days prior to the scheduled auction, Seller T decided to take her children to Hawaii on vacation. The trip would also afford her the chance to view the auction and see, firsthand, her future financial security being realized.

On the morning of the auction only a handful of people were present. Seller T chatted with them and, in casual conversation, learned that the only two potential bidders felt the property would likely sell for far less than the $4,500,000 REALTOR® Q had assured her it would bring. One potential buyer disclosed he planned to bid no more than $750,000. The other buyer wouldn't disclose an exact limit but said he was expecting a "fire sale."

Seller T panicked. She rushed to REALTOR® Q seeking reassurance that her property would sell for $4,500,000. REALTOR® Q responded, "This is an auction. The high bidder gets the property." Faced with this dire prospect, Seller T insisted that the auction be cancelled. REALTOR® Q reluctantly agreed and advised the sparse audience that the seller had cancelled the auction.

Within days, two ethics complaints were filed against REALTOR® Q. Seller T's complaint alleged that REALTOR® Q had misled her by repeatedly assuring her—essentially guaranteeing her—that her property would sell for at least $4,500,000. By convincing her she would realize that price—and by not clearly explaining that if the auction had proceeded the high bidder—at whatever price—would take the property, Seller T claimed her interests had not been adequately protected, and she had been lied to. This, Seller T concluded, violated Article 1.

The second complaint, from Buyer B, related to REALTOR® Q's pre-auction advertising. REALTOR® Q's ad specifically stated "Absolute Auction on July 1." Nowhere in the ad did it mention that the auction could be cancelled or the property sold beforehand. "I came to bid at an auction," wrote Buyer B, "and there was no auction nor any mention that it could be cancelled." This advertising, Buyer B's complaint concluded, violated Article 12's "true picture" requirement.

Both complaints were forwarded by the Grievance Committee for hearing. At the hearing, REALTOR® Q defended his actions by noting that comparable sales supported his conclusion that Seller T's property was worth $4,500,000. "That price was reasonable and realistic when we entered the auction contract, and it's still reasonable today. I never used the word 'guarantee'; rather I told her the chances of getting a bid of $4,500,000 or more were very good." "But everyone knows," he added, "that anything can happen at an auction." If Seller T was concerned about realizing a minimum net return from the sale, she could have asked that a reserve price be established.

Turning to Buyer B's claim of deceptive advertising, REALTOR® Q argued that his ad had been clear and accurate. There was, he stated, an auction scheduled for July 1 and it was intended to be an absolute auction. "The fact that it was advertised as 'absolute' doesn't mean the property can't be sold beforehand—or that the seller can choose not to sell and cancel the auction. Ads can't discuss every possibility."

The Hearing Panel concluded that while REALTOR® Q had not expressly guaranteed Seller T her property would sell for $4,500,000, his statements had led her to that conclusion and after realizing Seller T was under that impression, REALTOR® Q had done nothing to disabuse her of that misperception. Moreover, REALTOR® Q had taken no steps to explain the auction process to Seller T, including making her aware that at an absolute auction the high bidder—regardless of the bid—would take the property. REALTOR® Q's actions and statements had clearly not protected his client's interests and, in the opinion of the Hearing Panel, violated Article 1.

Turning to the ad, the Hearing Panel agreed with REALTOR® Q's position. There had been an absolute auction scheduled—as REALTOR® Q had advertised—and there was no question but that REALTOR® Q had no choice but to cancel the auction when he had been instructed to do so by his client. Consequently, the panel concluded REALTOR® Q had not violated Article 12.

## Case #12-19: Remove Information About Listings from Websites Once Authority to Advertise Ends (Adopted November, 2006. Revised May, 2017.)

REALTOR® A, a residential specialist in a major metropolitan area, spent several weeks each year in a cabin in the north woods he had inherited from a distant relative. Always on the lookout for investment opportunities, he paid careful attention to "for sale" signs, online ads, and local brokerage websites in the area.

Returning from the golf course one afternoon, REALTOR® A spotted a dilapidated "for sale" sign on an otherwise-attractive wooded lot. Getting out of his car, he was able to discern REALTOR® Z's name. Returning to his cabin, he looked online to locate REALTOR® Z and REALTOR® Z's company website. Visiting REALTOR® Z's website, he found detailed information about the lot he'd seen that afternoon.

He e-mailed REALTOR® Z and asked for information about the lot, including its dimensions and asking price. Several days later REALTOR® Z responded, advising simply, "That listing expired."

The following day REALTOR® A, hoping to learn whether the lot was still available, contacted REALTOR® X, another area real estate broker. "As it turns out, we have an exclusive listing on the property you're interested in," said REALTOR® X. In response to REALTOR® A's questions, REALTOR® X advised that he had had an exclusive listing on the property for almost six months. "That's funny," responded REALTOR® A, "REALTOR® Z has a 'for sale' sign on the property and information about it on her website. Looking at her website, I got the clear impression that she still had that property listed."

While the wooded lot proved to be out of REALTOR® A's price range, REALTOR® Z's "for sale" sign and website were still on his mind when he returned home. Ultimately, he contacted the local association of REALTORS® and filed an ethics complaint alleging that REALTOR® Z's "for sale" sign, coupled with her offering information on her website made it appear as if the wooded parcel was still listed with her firm, when that had not been the case for over six months. REALTOR® A noted that this conduct, in his opinion, violated Article 12 since REALTOR® Z was not presenting a "true picture" in her public representations and was, in fact, advertising without authority, a practice prohibited by Article 12, as interpreted by Standard of Practice 12-4.

At the hearing, REALTOR® Z claimed that failure to remove the "for sale" sign was simply an oversight, and if anyone was to blame, it was her personal assistant who was responsible for removing signs and lockboxes from expired and sold listings. Turning to the stale listing information on her website, REALTOR® Z acknowledged that information about her former listing had continued to appear for more than six months after the listing had expired. "REALTORS® have better things to do than constantly inspect their websites to make sure everything is absolutely, positively up-to-the-minute." "If we did that, none of us would have time to list or sell," she concluded.

The hearing panel disagreed with REALTOR® Z's reasoning. Information on REALTORS®' websites can be updated on a regular basis, and corrected if mistakes occur. The panel concluded that the continued presence of information about REALTOR® Z's former listing six months after expiration on her website, coupled with the continued presence of her "for sale" sign on the wooded lot, did not present the true picture required by Article 12, and was inconsistent with the obligation to have authority to advertise contemplated by Article 12 as interpreted by Standard of Practice 12-4. REALTOR® Z was found in violation of Article 12.

## Case #12-20: Misleading Use of "MLS" in URL

(Adopted November, 2007. Revised May 2008 and May, 2017.)

REALTOR® A, a residential broker in a major metropolitan city, spent several weeks each year in his cabin in the north woods where he planned to retire one day. Even while at home in the city, REALTOR® A stayed abreast of local news, events, and especially the local real estate market by subscribing to the online editions of the local newspaper. He also bookmarked a number of north woods brokers' websites to stay current with the market and to watch for potential investment opportunities.

One evening while on the Internet, he came across a site he was unfamiliar with—northwoodsandlakesmls.com. REALTOR® A was pleased to see the MLS serving the area where he vacationed for so many years had created a publicly-accessible website. Clicking on the link, he was surprised to find that the website he was connected with was not an MLS's website, but instead was REALTOR® Z's company website. Having had prior dealings with REALTOR® Z, A spent some time carefully scrutinizing the website. He noted, among other things, that the name of REALTOR® Z's firm did not include the letters MLS.

REALTOR® A sent an e-mail to the association's Professional Standards Administrator asking whether REALTOR® Z had been authorized by the association to use the URL northwoodsand-lakesmls.com and whether the association felt it presented a true picture as required by Article 12 of the Code of Ethics. The Professional Standards Administrator responded that their association did not assign, review, or approve URLs used by their members, but added that if REALTOR® A felt a possible violation of the Code of Ethics had occurred, the appropriate step was to file an ethics complaint. REALTOR® A did just that, alleging in his complaint that when he clicked on what appeared to be a real estate-related URL that included the letters "MLS" he expected to be connected with a website operated by a multiple listing service. He stated he felt that REALTOR® Z's URL was deceptive and did not meet Article 12's true picture test.

At the hearing, REALTOR® Z defended his URL on a number of grounds including the fact that he was a participant in good standing in the MLS and that he was authorized under the MLS's rules to display other participants' listings on his website. "If I used 'MLS' in the name of my firm, I could see how that might be perceived as something less than a true picture," he argued, "but by simply using MLS in my URL I am telling consumers that they can get MLS-provided information about properties in the north woods from me. What could be truer than that?"

The hearing panel disagreed with REALTOR® Z's reasoning. While REALTOR® Z's website included information about other participants' listings that the MLS had provided—and that REALTOR® Z was authorized to display—the fact remained that a real estate-related URL that includes the letters MLS will, in many cases, lead reasonable consumers to conclude that the website is an MLS's, and not a broker's website. That was the case with REALTOR® Z's URL and REALTOR® Z was found in violation of Article 12 as interpreted by Standard of Practice 12-10.

## Case #12-21: Registration of URL Similar to Name of Subsequently-Established Firm

(Adopted November, 2008. Revised May, 2017.)

REALTOR® Z was a partner in the XYZ residential real estate firm in the north woods. She was also a former advertising executive who was constantly looking at new and innovative ways to position and market the XYZ firm. While her partners had consistently resisted her suggestions to change the firm's name to better reflect the locale they served, REALTOR® Z had, with their concurrence, registered a number of domain names based on firm names she had to date been unable to convince her partners to adopt. She felt this was a wise strategy since it was only a matter of time until she would convince her partners that a name change was beneficial. Among the domain names registered were northwoodsrealestate.com, woodsandlakesrealty.com, and upnorthrealestate.com. None of those names were, to the best of REALTOR® Z's knowledge, similar to the names of other area real estate brokerage companies.

Approximately a year later Sales Associate B received his broker's license, left the XYZ firm, and opened his own brokerage firm which he named Up North Real Estate. When he attempted to register the domain name upnorthrealestate.com he learned it had already been registered by REALTOR® Z. Upset with this turn of events, he filed an ethics complaint with the local association of REALTORS® charging REALTOR® Z and her partners with having violated Article 12 of the Code of Ethics, as interpreted by Standard of Practice 12-12.

At the hearing, REALTOR® Z defended her actions in registering the domain name upnorthrealestate.com on the grounds she had been actively lobbying her partners to change the firm's name to Up North Real Estate; that she had no intention of using the domain name upnorthrealestate.com until the firm's name was changed and that at the time she had registered the domain name no other firm that she was aware of had a similar, let alone identical, name. Moreover, she argued, a domain name does not have to mirror a firm's name, it merely has to present a "true picture." "The XYZ firm has listed and sold residential property in the north woods for many years. 'Up north' is traditionally used by residents and visitors to refer to our area," she continued. "While I hoped to convince my partners to change the name of our firm to 'Up North Real Estate' at some point, if the XYZ firm had used the domain name—which we haven't—it still would have satisfied Article 12's true picture requirement since it refers to a particular geographic locale, not to a competing real estate company."

The hearing panel agreed with REALTOR® Z's reasoning, concluding that at the time REALTOR® Z registered the domain name upnorthrealestate.com, it was not similar to the name of any other area real estate company. The panel also noted that if it had been used, the domain name would have satisfied Article 12's true picture requirement since it would have simply suggested to consumers that it was a source of property information in that geographic area.

## Case #12-22: Registration of Domain Names Based on Competitors' Firms' Names (Adopted November, 2008.)

REALTOR® X was the principal broker of a small but growing real estate brokerage firm. REALTOR® X was constantly on the lookout for new and innovative ways to distinguish her firm from the competition and to increase its market share. Rather than simply relying on tried and true methods, REALTOR® X sought and often followed the advice of education, marketing and technology consultants.

Based on the advice of her technology expert, REALTOR® X created and registered domain names for her firm, for the licensees affiliated with her, and for herself. A somewhat more troubling recommendation was that she register domain names mirroring the names of the real estate brokerage firms in her area with the largest market shares. When she questioned the consultant, he responded, "There's no reason why not. Everyone does it. It's just competition — and aggressive marketing."

When REALTOR® A tried to register a domain name for his firm ABC REALTORS®, he learned that domain name had already been registered by REALTOR® X. Doing further research, he learned the names of several other large companies in the area had also been registered as domain names by REALTOR® X. REALTOR® A filed an ethics complaint with the local association of REALTORS® charging REALTOR® X with violating Article 12 of the Code of Ethics as interpreted by Standard of Practice 12-12.

At the hearing, REALTOR® X defended her actions noting that Article 12 requires REALTORS® to "present a true picture in their advertising, marketing, and other representations." She pointed out that she had never used the registered domain name mirroring the name of REALTOR® A's firm, or those based on the names of other local firms. Since she had not used the domain names, she couldn't see how she had violated Article 12.

The hearing panel did not agree with REALTOR® X's reasoning. The panel based its decision that REALTOR® X had violated Article 12 on the wording of Standard of Practice 12-12 which bars REALTORS® from registering URLs or domain names which, if used, would present less than a true picture. The panel also noted that the very act of registering a URL or domain name which, if used, would present an untrue picture is all that is required to violate Article 12, as interpreted by Standard of Practice 12-12.

## Case #12-23: Intentionally Misspelled Domain Names Based on Names of Competitors' Firms. (Adopted November, 2008. Revised May, 2017.)

REALTOR® V was the sole proprietor of a property management firm. REALTOR® V hoped to expand into residential brokerage and wanted to attract buyers and sellers to his website in order to enhance the growth of his firm's brokerage activity. REALTOR® V sought the advice of several website developers, each of whom had suggestions on how best to attract and hold visitors. One suggestion REALTOR® V found particularly interesting was to create domain names similar, but not identical, to the names of established brokerage firms in the area. REALTOR® V registered and began to use domain names that, while similar to the names of the five largest residential brokerage firms in the area, were each spelled slightly differently than those firms' actual names.

In short order, complaints were filed against REALTOR® V by REALTORS® from each of the five largest firms. The grievance committee concluded the complaints were related and consolidated them for consideration at one ethics hearing.

At the hearing, REALTOR® V acknowledged that Article 12 requires REALTORS® to be "honest and truthful in their real estate communications" and that REALTORS® must "present a true picture in their advertising, marketing, and other representations." "If I had used the actual names of any of these firms in my domain names, that would have been a misrepresentation," continued REALTOR® V, "but when I changed spellings, I constructively created meaningless domain names which aren't deceptive since they don't reflect the name of any actual real estate firm." The hearing panel did not agree with REALTOR® V's defense, finding that each of the "slightly misspelled" domain names were so similar to the names of REALTOR® V's competitors that reasonable consumers would readily conclude they would lead consumers to those firms' respective websites. As REALTOR® V's "misspelled" domain names would mislead reasonable consumers, REALTOR® V was found in violation of Article 12, as interpreted by Standard of Practice 12-12.

## Case #12-24: Registration of Domain Name Based on Sales Associate's Name When Sales Associate Subsequently Leaves the Firm

(Adopted November, 2008.)

REALTOR® P was the current broker-owner of the real estate brokerage firm founded by her grandmother. Always on the lookout for ways to attract top sales associates, REALTOR® P offered comprehensive training and benefits, including state of the art technology tools, individual websites, and personalized domain names for each sales associate.

Sales Associate Q had enjoyed a long and productive relationship with REALTOR® P's firm but, having gained considerable experience and a broad client base, decided the time had come to start his own firm. The parting was amicable except for one thing—Sales Associate Q's domain name which, under the terms of his independent contractor agreement, remained the property of the firm. Attempts to negotiate a release of the domain name proved unsuccessful and, with no alternative available, Sales Associate Q filed an ethics complaint against REALTOR® P, alleging violation of Article 12 as interpreted by Standard of Practice 12-12. Sales Associate Q's complaint noted that the domain name included Q's first and last names and that any future use by REALTOR® P, now that Q was no longer a member of her firm, would present something less than the true picture required by Article 12.

At the hearing, REALTOR® P defended refusal to release the domain name on the grounds that at the time she had registered it, Sales Associate Q had, in fact, been a member of her firm, and that use of the domain name by a member of her firm had presented a true picture. Circumstances change, she noted, adding that at the time she had registered the domain name on behalf of both her firm and Sales Associate Q, her actions had been consistent with Article 12 as interpreted by Standard of Practice 12-12. "The fact that Sales Associate Q decided to start his own firm shouldn't result in me being found in violation of the Code of Ethics," she concluded.

The hearing panel concluded that REALTOR® P was not in violation of Article 12 as interpreted by Standard of Practice 12-12 because her registration of a domain name that used Sales Associate Q's name; at the time of registration, use by REALTOR® P's firm satisfied Article 12's true picture requirement; and that REALTOR® P had ceased any use of the domain name at the time Sales Associate Q left the firm. The decision also noted that while the Code of Ethics did not require REALTOR® P to transfer the domain name to Sales Associate Q, domain name registrations must be renewed periodically and that a future renewal of the domain name by REALTOR® P would be a violation of Article 12 if that domain name does not reflect a "true picture" of REALTOR® P's business at the time of the renewal.

## Case #12-25: Advertising Role in Sales After Changing Firm Affiliation (Adopted May, 2009. Revised May, 2017.)

REALTOR® Q was a non-principal broker licensed with ABC REALTORS®. REALTOR® Q specialized in buyer representation. A prominent feature on her website carried the headline, "I sold these—and I can help you buy or sell, too!" Under the headline was a list of over a hundred street addresses of properties for which REALTOR® Q had found buyers.

For personal and professional reasons, REALTOR® Q chose to leave the ABC firm to affiliate with XYZ, REALTORS®. As she transitioned to her new firm, REALTOR® Q was careful to disclose the name of her new firm in a readily apparent manner on her website. Her website also continued to display the list of properties she had found buyers for during her time with the ABC firm.

REALTOR® Q's parting with ABC had been amicable, so she was surprised to receive a complaint brought by her former principal broker, REALTOR® C, alleging a violation of Article 12, as interpreted by Standard of Practice 12-7, based on her website's display of sales made while REALTOR® Q had been affiliated with ABC.

At the hearing, REALTOR® C, the complainant, noted that Standard of Practice 12-7 provides, in part, "Only REALTORS® who participated in the transaction as the listing broker or cooperating broker (selling broker) may claim to have 'sold' the property. "It was ABC, REALTORS®," REALTOR® C added, "that was the selling broker in these transactions, not our former sales associate REALTOR® Q. Her advertising our sales under the umbrella of her new firm, XYZ, REALTORS®, is confusing at best, and potentially misleading to consumers who may get the impression the XYZ firm was involved in these transactions when that's not the case."

REALTOR® Q defended herself and her website, arguing that the fact that she had found the buyers for each of the properties listed on her website was still true, and that the only thing that had changed was her firm affiliation. "If it was true when I was licensed with ABC, then it's still true even though I'm now licensed with XYZ," she reasoned.

The hearing panel agreed that REALTOR® Q had, in fact, sold the properties, albeit while licensed with ABC. Her website, however, suggested that the sales were made while REALTOR® Q was licensed with XYZ, which was not the case. Consequently, REALTOR® Q was found in violation of Article 12.

## Case #12-26:  Advertising Role in Sales After Changing Firm Affiliation (Adopted May, 2010)

REALTOR® P was a non-principal broker licensed with XYZ, REALTORS® whose forte was listing residential property.  Noted prominently on REALTOR® P's website was the banner: "Sold by REALTOR® P!"  Under that banner were addresses of nearly a hundred properties REALTOR® P had listed, and which had been sold either through REALTOR® P's efforts or through the efforts of cooperating brokers.

Seeking new opportunities, REALTOR® P ended his relationship with XYZ and affiliated with ABC, REALTORS®.  REALTOR® P promptly revised the information on his website to prominently display the name of his new firm in a readily apparent manner. He also continued to display the lengthy list of properties that he had listed, and which had sold, while REALTOR® P was affiliated with XYZ.

His departure from XYZ had been on good terms, so REALTOR® P was taken aback to receive a complaint brought by his former principal broker, REALTOR® D, alleging that REALTOR® P's website display of sold listings violated Article 12, as interpreted by Standard of Practice 12-7.

At the hearing, the complainant noted that Standard of Practice 12-7 provides, in relevant part, "Only REALTORS® who participated in the transaction as a listing broker or cooperating broker (selling broker) may claim to have 'sold' the property."  "It was XYZ, REALTORS®," REALTOR® D added, "that was the listing broker in these transactions, not our former sales associate, REALTOR® P.  His advertising of our listings and sales under the banner of his new firm ABC, REALTORS®, is unauthorized and misleading to consumers who will get the impression that ABC was involved in these transactions when that is simply not true."

REALTOR® P defended himself and his website pointing out that he had listed each of the properties displayed on his website, and the only thing that had changed was his firm affiliation.  He directed the hearing panel's attention to the disclaimer at the end of the list of properties that read, "Each of these properties was listed by REALTOR® P over the past seven years.  For much of that time, I was affiliated with another firm."

The hearing panel agreed with REALTOR® P's defense, noting that consumers would understand that some of the sales had occurred while REALTOR® P was affiliated with a different firm.  Consequently, REALTOR® P was found not in violation of Article 12.

# CASE INTERPRETATIONS RELATED TO ARTICLE 13:

## Case #13-1: Preparation of Instrument Unrelated to Real Estate Transaction (Reaffirmed Case #17-1 May, 1988. Transferred to Article 13 November, 1994. Revised November, 2001 and May, 2017.)

Client A dropped in to see his friend, REALTOR® B, who had recently provided professional services to Client A's company. Client A said the company was sending him on business to China; that the trip would involve a good deal of air travel in remote areas; and that he would like to leave a power of attorney with his wife while he was gone "just in case." He asked REALTOR® B if he would prepare a power of attorney for him and REALTOR® B said, "It's a simple document. I'll be glad to prepare one for you," and did.

This action came to the attention of the Grievance Committee of the Association of REALTORS®, which, after review, filed a complaint with the Association's Professional Standards Committee, charging REALTOR® B with a violation of Article 13 of the Code of Ethics.

REALTOR® B's defense was that he understood Client A's request to be essentially for a real estate service since from his general knowledge of Client A's personal affairs, he knew that Client A could have no reason for giving his wife a power of attorney except to put her in a position to act in real estate transactions. He contended that because his preparation of a legal document was directly related to real estate matters, he had rendered real estate, not legal, services to Client A.

It was the judgment of the Hearing Panel that REALTOR® B's defense was without merit; that by preparing the power of attorney, he had engaged in the practice of law in violation of Article 13 of the Code.

## Case #13-2: Use of Standard Purchase Contract Form (Reaffirmed Case #17-2 May, 1988. Transferred to Article 13 November, 1994. Revised May, 2017.)

REALTOR® A, as the exclusive agent of Seller B, sold a small commercial property to Buyer C, filling in the blanks in a standard purchase contract form. At the time REALTOR® A presented the contract for Buyer C's signature, he explained that the contract was prepared by attorneys and was commonly used in the area. He suggested that Buyer C have his attorney review it. Buyer C said he would read it over carefully, and if he had any questions he would consult an attorney about it. He subsequently signed the contract, saying it was clear and satisfactory to him.

At the closing, Buyer C professed to have been under some misunderstanding as to language in the contract regarding the date of possession of the property, and following the closing Seller B complained to the Association of REALTORS® that he had been greatly embarrassed by this circumstance at the closing and felt that REALTOR® A was at fault in preparing a contract without having an attorney participate in the drafting.

At the hearing, REALTOR® A reiterated the points that had been made in his written response to the complaint: that the contract he had used was the standard form, prepared by an attorney; that in keeping with Article 13 he had recommended that the buyer have the contract reviewed by his own attorney; and that no other parties present at the closing had found any lack of clarity in the clause in question.

The Hearing Panel concluded that REALTOR® A had acted in conformance with the Code; that he had not undertaken to practice law; and that he was not in violation of Article 13.

## Case #13-3: REALTOR®'s Obligation to Recommend Counsel When Needed (Reaffirmed Case #17-3 May, 1988. Transferred to Article 13 November, 1994. Revised May, 2017.)

REALTOR® A was the listing broker for 25 acres of land owned by Client B. Shortly after REALTOR® A's sign was placed upon the property, Customer C called REALTOR® A and expressed interest in purchasing the property. After inspecting the property, Customer C made a full price offer. Surprised, Client B prepared a counter-offer at a higher price. REALTOR® A realized that he might have a legal claim for commission from Client B, but not wishing to jeopardize their relationship, agreed that he would go back to Customer C and attempt to negotiate a higher price. Upon being informed of the property owner's change of mind and his requested higher price for the property, Customer C became upset and indicated his intent to consult his attorney to determine if he could force the seller to go through with the sales transaction at the price for which it had been originally offered. At this point REALTOR® A advised Customer C that, in his opinion, litigation would be lengthy and expensive and that in the final analysis the sale could not be enforced. On the basis of REALTOR® A's advice Customer C agreed to the higher price, and the transaction was consummated. Shortly after, Customer C complained to the Association of REALTORS® that REALTOR® A had provided bad advice to him. The Professional Standards Administrator referred the complaint to the Grievance Committee, which determined that a hearing should be held and referred the matter back to the Administrator to arrange such a hearing.

At the hearing, Customer C outlined his complaint to the Hearing Panel of the Professional Standards Committee. He indicated that he had intended to consult his attorney, however, because of the persuasive personality of REALTOR® A and REALTOR® A's assurance that legal action would be an exercise in futility, he had not done so.

REALTOR® A advised the panel that he had told Customer C that he could consult his attorney, but that, in his opinion, it would be a waste of time. He defended what he had told Customer C stating that it was only his opinion, not intended as a conclusive statement of law, and, in fact, was a correct statement under the law of the state. The panel concluded that REALTOR® A, in pointing out the fact that legal action was likely to be time consuming and expensive, was stating a practical circumstance which Customer C should consider and was proper. The panel further concluded that the expression of an opinion as to the probable outcome of the case was not an "unauthorized practice of law" within the meaning of Article 13.

However, the panel noted that a REALTOR® is obligated to "recommend that legal counsel be obtained when the interest of any party to the transaction requires it."

In this case, REALTOR® A was aware that the interest of Customer C required a legal opinion as to whether Customer C could compel Client B to convey title to the property and did not intend his personal opinion to represent a "statement of law" upon which Customer C could rely. Accordingly, REALTOR® A was obligated to affirmatively recommend that Customer C consult his attorney to definitively establish the legal rights in question.

Having failed to make such a recommendation, REALTOR® A was in violation of Article 13.

# CASE INTERPRETATIONS RELATED TO ARTICLE 14:

## Case #14-1: Establishing Procedure to be Followed in Handling Complaints (Revised Case #15-1 May, 1988. Transferred to Article 14 November, 1994. Revised November, 1996. Revised November, 2001. Deleted November, 2017.)

## Case #14-2: Refusal to Submit Pertinent Facts

(Revised Case #15-2 May, 1988. Transferred to Article 14 November, 1994. Revised May, 2018.)

REALTOR® A was charged with a violation of the Code of Ethics. At the hearing, the complainant formally presented the charge and a considerable body of evidence to support it. Members of the panel questioned REALTOR® A on specific points. To each question he responded that he was not guilty of the charge, but that specific answers to the questions put to him could conceivably do him an injustice, and that he felt that he should not be required to answer questions in a situation that was unfair to him.

Further attempts to question REALTOR® A met with similar responses. The Chairperson reminded REALTOR® A that he was not before a court of law but a Committee of the Board in which his membership was based wholly upon his willingness to abide by it rules, which did not provide for a "Fifth Amendment" refuge from proper questions by members of the Hearing Panel. The Chairperson specifically directed REALTOR® A to respond to the hearing panel's questions, and REALTOR® A refused.

The Chairperson of the Hearing Panel advised REALTOR® A that, in light of his refusal to answer questions directed to him, the complaint was being amended to include a charge of a violation of Article 14. The Chairperson asked REALTOR® A if he wished to proceed with the hearing, or if he preferred to have the hearing postponed to a later date to provide him with an opportunity to prepare a defense against the additional charge. The Chairperson also asked if REALTOR® A agreed to go forward with the existing Hearing Panel or if he would ask for a new Hearing Panel. REALTOR® A requested a continuance to prepare his defense against the amended complaint that now included an alleged violation of Article 14, and agreed to go forward with the current Hearing Panel. The hearing was adjourned to a date certain to enable REALTOR® A to prepare his defense to the additional charge. The Chairperson advised REALTOR® A that he was required to attend the new hearing date and respond to questions put to him by the Hearing Panel.

One day prior to the new hearing date, REALTOR® A called the association and advised that he would not be attending the hearing because he objected to the nature of the Hearing Panel's questions and the fact that he was required to respond. The following day, the Chairperson noted REALTOR® A's absence, and the complainant was permitted to present their case. The hearing concluded and the Hearing Panel entered executive session.

In executive session, the Hearing Panel discussed REALTOR® A's behavior with respect to the alleged violation of Article 14. The Panel members discussed that respondents in ethics cases are not required to attend hearings, defend themselves, and answer questions absent a specific and direct request to do so in order to remain compliant with Article 14. In this instance, however, REALTOR® A had received a specific and direct request from the Panel to attend the new hearing date and answer questions, and his failure to do so constituted a violation of Article 14.

## Case #14-3: Submission of Pertinent Facts

(Revised Case #15-3 May, 1988. Transferred to Article 14
November, 1994. Revised May, 2017.)

Buyer A filed a complaint against REALTOR® B, the listing broker,
involving a property purchased earlier by Buyer A.

REALTOR® B was notified of the complaint, directed to be present
at a hearing, and requested to present to a Hearing Panel of the
Association's Professional Standards Committee all pertinent facts
relating to the transaction. REALTOR® B's response was a statement
that he would refuse to submit any information in the matter to a
Hearing Panel and would not attend the scheduled hearing, on the
grounds that the complaint itself was not justified.

Explaining his position, REALTOR® B stated that his participation
in the transaction was exclusively as the agent of the seller; that
he had not been representing the buyer; and hence, could not
be subject to a complaint by the buyer for simply transmitting
information on behalf of the seller.

All of his statements concerning the property, REALTOR® B said,
were based on information supplied to him by his client, the seller.
Any error in this information, he contended, might well provide
the basis for a lawsuit between the buyer and seller. As the agent
of the seller, he felt that he was not answerable to the buyer for
having done no more than transmit information provided to him
by the seller.

REALTOR® B was advised by the Association that his reasoning
was incorrect; that he was obligated by Article 14 to submit
pertinent facts to a Hearing Panel of the Association's Professional
Standards Committee and to participate in the hearing. REALTOR®
B agreed to comply, and a hearing on the complaint was held.

## CASE INTERPRETATIONS RELATED TO ARTICLE 15:

### Case #15-1: Knowing or Reckless False Statements About Competitors (Adopted Case #23-1 November, 1992. Transferred to Article 15 November, 1994. Revised May, 2017.)

REALTOR® A operated a residential brokerage firm in a highly competitive market area. He frequently used information from the MLS as the basis for comparative ads and to keep close track of his listing and sales activity as well as his competition.

One day, while reviewing MLS data and comparing it to a competitor's ad, REALTOR® A noticed that REALTOR® Z had used a diagram to demonstrate his market share, contrasting it with those of several other firms. The ad showed that REALTOR® A had listed 10% of the properties in the MLS over the past three months.

REALTOR® A thought this was low. His analysis of MLS data showed his market share was 11%. REALTOR® A filed an ethics complaint against REALTOR® Z citing Article 15 of the Code of Ethics in that REALTOR® Z's "obviously understated market share claim" was a "misleading statement about other real estate professionals." REALTOR® A's complaint was considered by the Grievance Committee which determined that an ethics hearing should be held.

At the hearing, REALTOR® Z testified he had always been truthful in his advertising and that all claims were based in fact. He produced an affidavit from the MLS administrator which indicated that a programming error had resulted in miscalculations and, after careful recomputation, REALTOR® A's market share over the past three months had been 10.9%. The administrator's statement noted that this was the first time that information related to REALTOR® A's listings or sales had been misstated on the system. "I relied on information from the MLS. It's always been accurate and I had no reason to even suspect it was wrong last month," said REALTOR® Z in his defense.

The Hearing Panel agreed with REALTOR® Z's logic, noting that a REALTOR® should be able to rely on generally accurate information from reliable sources. They reasoned that if, on the other hand, the MLS had shown REALTOR® A having, for example, 1% of the market, then REALTOR® Z's reliance on the information would have been "reckless" because REALTOR® A had generally had a 10–15% market share and a reasonable conclusion would have been that the information from the MLS was seriously flawed.

The Hearing Panel concluded that REALTOR® Z's comparison with other real estate professionals, while slightly inaccurate, was based on usually accurate and reliable information and had been made in good faith and while technically "misleading," had not been "knowing" or "reckless". REALTOR® Z was found not to have violated Article 15.

### Case #15-2: Intentional Misrepresentation of a Competitor's Business Practices (Adopted Case #23-2 November, 1992. Transferred to Article 15 November, 1994. Revised November, 2001 and May, 2018.)

Following a round of golf early one morning, Homeowner A approached REALTOR® X. "We've outgrown our home and I want to list it with you," said Homeowner A. "I'm sorry," said REALTOR® X, "but I represent buyers exclusively." "Then how about REALTOR® Z?," asked Homeowner A, "I've heard good things about him." "I don't know if I would do that," said REALTOR® X, "while he does represent sellers, he doesn't cooperate with other brokers and, as a result, sellers don't get strong offers for their properties."

Later that day, Homeowner A repeated REALTOR® X's remarks to his wife who happened to be a close friend of REALTOR® Z's wife. Within hours, REALTOR® Z had been made aware of REALTOR® X's remarks to Homeowner A earlier in the day. REALTOR® Z filed a complaint against REALTOR® X charging him with making false and misleading statements. REALTOR® Z's complaint was considered by the Grievance Committee which determined that an ethics hearing should be held.

At the hearing REALTOR® Z stated, "I have no idea what REALTOR® X was thinking about when he made his comments to Homeowner A. I always cooperate with other REALTORS®." REALTOR® X replied, "That's not so. Last year you had a listing in the MLS and I spent months working with the buyers that submitted a purchase offer. You didn't pay me the offer of compensation, though; you paid another broker who stole my clients from me at the last minute, and all he did was submit the purchase offer."

REALTOR® Z countered REALTOR® X's statements, indicating he had made a blanket offer of compensation in the MLS, and that his refusal to pay REALTOR® X had nothing to do with him not cooperating with other brokers, but the fact that there was a procuring cause dispute at the end of the transaction. Upon questioning by panel members, REALTOR® X admitted he had no personal knowledge of any instance in which REALTOR® Z had refused to cooperate with any other broker, but assumed that his failure to pay the compensation REALTOR® X felt he had earned was likely how REALTOR® Z treated other brokers.

The Hearing Panel, in its deliberations, noted that cooperation and compensation are not synonymous. In fact, Standard of Practice 3-10 provided that the duty to cooperate established in Article 3 relates to the obligation to share information on listed property, and to make property available to other brokers for showing to prospective purchasers/tenants when it is in the best interests of sellers/landlords. In that respect, the Hearing Panel felt REALTOR® Z had, in fact, cooperated with REALTOR® X. However, to characterize REALTOR® Z's refusal to pay requested compensation because of a genuine commission dispute as a "refusal to cooperate", and to make the assumption and subsequent statement that REALTOR® Z "did not cooperate with other brokers", was false, misleading, and not based on factual information. Consequently, REALTOR® X was found in violation of Article 15.

# CASE INTERPRETATIONS
# RELATED TO ARTICLE 16:

### Case #16-1: Confidentiality of Cooperating REALTOR®'S Participation (Revised Case #21-5 May, 1988. Transferred to Article 16 November, 1994. Revised and transferred to Article 3 November, 2018.)

## Case #16-2: Respect for Agency (Revised Case #21-6 May, 1988. Transferred to Article 16 November, 1994. Revised May, 2017.)

Client A gave a 180-day exclusive right to sell listing of a commercial property to REALTOR® B, specifying that no "for sale" sign was to be placed on the property. REALTOR® B and his sales associates started an intensive sales effort which, after three months, had produced no offer to buy, but it had called attention to the fact that Client A's property was for sale. When REALTOR® C heard of it, he called on Client A, saying that he understood that his property was, or soon would be, for sale, and that if Client A would list the property with him exclusively he felt confident that he could provide prompt action. Client A said the property was exclusively listed with REALTOR® B under a contract that still had about 90 days to run.

"In that case," said REALTOR® C, "you are bound for the next 90 days to REALTOR® B. I have a really outstanding organization, constantly in touch with active buyers interested in this class of property. I am in a position to render you an exceptional service, and I will plan to call you again in 90 days or so."

The property remained unsold during the term of REALTOR® B's listing contract. REALTOR® C called again on Client A, and obtained his assurance that he would sign an exclusive listing of the property upon expiration of the listing contract.

When REALTOR® B called on Client A on the last day of the listing contract to seek its renewal, Client A told him of REALTOR® C's two visits. "I was impressed by REALTOR® C's assurance of superior service" Client A told REALTOR® B, "and in view of the fact that my listing with you produced no definite offer in the 180-day period, I have decided to give REALTOR® C a listing tomorrow."

REALTOR® B filed a complaint with the Grievance Committee of the Association, outlined the facts, and charged that REALTOR® C's conduct had been inconsistent with Article 16 of the Code of Ethics.

The Grievance Committee referred the matter to the Professional Standards Committee.

At the conclusion of the hearing, the panel found that REALTOR® C had violated Article 16 by failing to respect the exclusive agency of REALTOR® B. The panel's decision advised that REALTOR® C's original contact with Client A, made at a time when he had no knowledge of REALTOR® B's exclusive listing, was not in itself unethical, but that as soon as he learned of REALTOR® B's status as the client's exclusive agent, he should have taken an attitude of respect for the agency of another REALTOR®, and refrained from any effort to get the listing until after the expiration date of the original contract.

REALTOR® C's attitude of regarding the client's relationship with REALTOR® B as a kind of misfortune, of presenting his own service as superior to REALTOR® B's, and of suggesting to the client that, having a better capacity to serve him, he could wait until REALTOR®

B's listing had expired, was, the panel said, contrary to the respect for another REALTOR®'s exclusive agency required by Article 16.

The Hearing Panel's decision further advised REALTOR® C that he would have conducted himself in accord with Article 16 if, upon learning of REALTOR® B's status as exclusive agent, he had expressed his willingness to cooperate with REALTOR® B in the sale of Client A's property.

### Case #16-3: Mass Media Solicitation Not a Violation of the Code (Revised Case #21-8 May, 1988. Transferred to Article 16 November, 1994. Revised November 2017.)

REALTOR® A, a residential broker, worked in a market area that included an attractive suburb of a large city. At the time REALTOR® A launched a new advertising program, there were a number of houses for sale in the neighborhood listed exclusively with other REALTORS®, each having the respective listing broker's sign on its front lawn.

Working with his advertising agency, REALTOR® A developed a special e-mail solicitation describing the service of his offices. He employed a commercial e-mail distribution service to purchase the e-mails of every homeowner in REALTOR® A's market area.

The e-mail distribution service sent REALTOR® A's e-mail solicitation to all the homeowners in his market area, including houses that had other REALTORS®' signs in the front yard. Several of the REALTORS® whose clients received REALTOR® A's e-mails filed complaints with the Association against REALTOR® A. The Grievance Committee considered the complaints and referred them to the Professional Standards Administrator to schedule a hearing by a Hearing Panel of the Professional Standards Committee at which time all of the complaints would be considered. The complaints charged REALTOR® A with unethical conduct in failing to respect the exclusive agency of other REALTORS®.

At the hearing, REALTOR® A defended his action by saying that the distribution of his e-mail solicitation was widespread in nature; that it had been carried out by a commercial distribution service; and that it was of the same nature as television or social media advertising that might come to the attention of some clients having exclusive listing contracts with other REALTORS®.

The Hearing Panel's decision noted that REALTOR® A, in designing his advertising campaign, did not direct his e-mail to property owners whose identity had come to REALTOR® A's attention through information disclosed by other REALTORS® consistent with their ethical obligation to cooperate with other brokers under Article 3 of the Code of Ethics; e.g., through a "for sale" sign or through information disseminated through a Multiple Listing Service. Rather, REALTOR® A's advertising campaign was directed in an indiscriminate manner to all property owners in a given geographical area. Furthermore, the medium REALTOR® A chose for his advertising campaign was an e-mail, which property owners could read or delete as they saw fit. The panel determined that this form of communication does not harass a property owner, as would telephone calls or direct personal contacts. The Hearing Panel, therefore, held that REALTOR® A's advertising campaign did not violate Article 16 of the Code of Ethics.

### Case #16-4: Responsibilities of Cooperating Broker (Revised Case #21-10 May, 1988. Transferred to Article 16 November, 1994. Cross-reference Case #1-11. Deleted November, 2001.)

## Case #16-5: Solicitation of Expired Exclusive Listing

(Reaffirmed Case #21-11 May, 1988. Transferred to Article 16 November, 1994. Revised April, 1996 and May, 2017.)

A property was exclusively listed with REALTOR® A who advertised it widely and invited cooperation from other REALTORS®. The property was not sold during the term of REALTOR® A's listing, although both REALTOR® A and REALTOR® B, a buyer representative, had shown the property to prospects.

Sometime after the expiration of REALTOR® A's listing, the listing appeared on REALTOR® B's website. Shortly thereafter, the property was sold by REALTOR® B.

REALTOR® A confirmed that it was listed with REALTOR® B and then charged REALTOR® B in having failed to respect his exclusive representation status with the client by soliciting the listing. The Grievance Committee referred the complaint for hearing by a Hearing Panel of the Professional Standards Committee. Upon due notice to the parties, a hearing on the complaint was called with REALTORS® A and B present. REALTOR® A's specific charge was that REALTOR® B knew that the client had originally listed the property with him, REALTOR® A, because he had discussed the property with REALTOR® B during the term of the original listing contract; that during the term of REALTOR® A's listing, REALTOR® B had shown the property to the same individual who had now purchased the property through REALTOR® B; and that with this knowledge REALTOR® B's action in soliciting the listing, even after it had expired, was a violation of Article 16.

REALTOR® A told the Hearing Panel that when he had asked for an extension of the original exclusive listing, the client told him that because of a family problem he intended to take the property off the market for a few months, but would consider relisting at a later date.

REALTOR® B conceded that he had known of REALTOR® A's exclusive listing at the time the listing contract was current; that he had known the term of the listing contract and, hence, knew when it expired; and that he had shown the property to the individual who eventually purchased it. However, he explained, he had no continued contact with the prospect to whom he had originally shown the property. After the expiration date of REALTOR® A's listing, he was approached by the individual to whom he had originally shown the property and who was still actively interested in purchasing a home. In reviewing the purchaser's stated requirements and reviewing the market, the property in question seemed to correspond more closely than any other available properties. Knowing that the original listing with REALTOR® A had expired some time ago, REALTOR® B simply called the owner to ask if the property had been relisted with REALTOR® A. Upon learning that REALTOR® A's exclusive listing had not been extended, REALTOR® B told the owner of his prospective buyer, solicited the listing, and obtained it. REALTOR® B said he saw nothing unethical in having solicited the listing when it was no longer exclusively listed with another broker and felt that REALTOR® A was without grounds for complaint.

The panel concluded that it was not the intent of Article 16 to provide any extended or continuing claim to a client by a REALTOR® following the expiration of a listing agreement between the client and the REALTOR®. The panel concluded that REALTOR® A had not been successful in his efforts to sell the client's property and that neither the property owner nor other REALTORS® should be foreclosed from entering into a new listing agreement to sell the property.

The panel concluded that REALTOR® B was not in violation of Article 16 of the Code of Ethics.

## Case #16-6: Cooperating Broker's Compensation Specified on Deposit Receipt (Revised Case #21-12 May, 1988. Transferred to Article 16 November, 1994. Renumbered as Case #16-15 November, 2001.)

## Case #16-7: REALTOR®'s Refusal to Disclose Nature and Current Status of Listing to Another REALTOR® (Revised Case #21-13 May, 1988. Transferred to Article 16 November, 1994. Revised May, 2017.)

Client X listed his home with REALTOR® A under an exclusive right to sell listing agreement negotiated for a period of 90 days. During the first 75 days, REALTOR® A attempted various marketing strategies, but none were successful. Client X expressed disappointment and told REALTOR® A that he might seek another agency when the listing expired.

That same day, Client X expressed to a friend his dissatisfaction with REALTOR® A's lack of results, and mentioned that he might employ another agent. The friend, in turn, related this information to his friend, REALTOR® B, and suggested that REALTOR® B contact Client X. Aware that the property was currently listed with REALTOR® A, REALTOR® B called REALTOR® A, explained the information passed on to him, and inquired about the nature and current status of Client X's listing with REALTOR® A. Specifically, REALTOR® B asked REALTOR® A when the listing would expire and whether the listing was an "exclusive right to sell" or "open" listing. REALTOR® A responded that the listing was his and refused to discuss the matter further.

REALTOR® B then contacted Client X and explained that their mutual friend had informed him that Client X might be seeking another agent to sell his property. REALTOR® B told Client X that he did not wish to interfere in any way with Client X's present representation agreement with REALTOR® A, but that if Client X intended to seek another agent when his present listing agreement with REALTOR® A terminated, he would like to discuss the possibility of listing Client X's property. Client X invited REALTOR® B to his home that evening, and there they discussed the terms and conditions under which REALTOR® B would list the property upon termination of REALTOR® A's listing. REALTOR® B and Client X did not enter into any written agreement at that time. However, Client X requested REALTOR® B to meet with him the day following the expiration of REALTOR® A's listing, and Client X said that at that time he would execute a new listing agreement with REALTOR® B. The property did not sell before REALTOR® A's listing expired, and on the day following the expiration of REALTOR® A's listing, Client X listed the property with REALTOR® B. Upon learning of REALTOR® B's listing, REALTOR® A filed a complaint with the Association alleging that REALTOR® B violated Article 16 of the Code of Ethics.

At an ethics hearing duly noticed and convened after all due process procedures of the Association were followed, REALTOR® A presented his complaint that REALTOR® B had contacted REALTOR® A's client during the unexpired term of the client's

listing agreement with REALTOR® A and had, therefore, violated Article 16 of the Code of Ethics.

REALTOR® B defended his action by pointing out that when he was informed that Client X was seeking another broker, he sought to respect the agency of REALTOR® A by calling him to inquire about the type and expiration date of the listing. He said he told REALTOR® A he would respect REALTOR® A's agency agreement, but that he needed to know this information to determine when, and under what circumstances, Client X would be free to list the property with another broker. REALTOR® A refused to discuss the listing status, stating that "it was none of his business." REALTOR® B cited Standard of Practice 16-4 in defense of his direct contact with Client X.

The Hearing Panel concluded that REALTOR® B had adequately respected the agency of REALTOR® A as interpreted by Standard of Practice 16-4. The panel's decision indicated that a listing broker should recognize that his refusal to disclose the type and expiration date of a listing to an inquiring broker frees the inquiring broker to contact the seller directly. If the contact with the seller is made under the provisions of Standard of Practice 16-4, the REALTOR® is also able to discuss the terms of a future listing on the property or may enter into a listing to become effective upon the expiration of the current listing.

The panel found REALTOR® B not in violation of Article 16.

## Case #16-8: Unauthorized Use of Information Received from Listing Broker for the Purpose of Creating a Referral to a Third Broker or for Creating a Buyer Relationship (Reaffirmed Case #21-14 May, 1988. Transferred to Article 16 November, 1994. Revised May, 2017.)

REALTOR® A entered a listing with the Association MLS. In the "Remarks" portion of the listing, it was noted that the seller was moving out of state. Shortly thereafter, REALTOR® A received a call from REALTOR® B, requesting permission to show the property to a prospective purchaser. REALTOR® B's request was granted and the property was shown to the prospect. During the showing, REALTOR® B started a conversation with Seller X regarding his proposed move to another state. REALTOR® B told the seller that he was acquainted with a number of real estate brokers in the city to which Seller X was relocating and suggested that he be allowed to refer Seller X to one of these brokers. Seller X responded that REALTOR® A, the listing broker, had previously mentioned the possibility of a referral and that Seller X felt obligated to be referred by REALTOR® A, if by anyone.

Several days later, Seller X received a phone call from REALTOR® B who again asked permission to refer the seller to a broker in the city to which the seller was moving. The seller indicated that he was not interested in REALTOR® B's offer and that if he wished to be referred to another broker, he would do so through REALTOR® A. The seller then called REALTOR® A and asked if there was anything REALTOR® A could do to stop REALTOR® B from requesting that he be allowed to refer the seller to another broker. Upon learning of REALTOR® B's attempts to create a referral, REALTOR® A filed a complaint with the Grievance Committee of the Board alleging a violation of Article 16 of the Code of Ethics and cited Standard of Practice 16-18 in support of the allegations.

In accordance with the Association's established procedures, the Grievance Committee reviewed the complaint and referred it to a panel of the Professional Standards Committee for hearing. The appropriate notices were sent to all parties and a hearing was scheduled.

At the hearing, REALTOR® A produced a written statement from Seller X in support of his testimony and concluded that REALTOR® B had violated Article 16 of the Code of Ethics in attempting to use confidential information received through the Association's MLS to attempt to create a referral to a third broker.

REALTOR® B responded that he was attempting to promote the seller's best interest by referring the seller to a reputable broker whom he knew personally in the city to which the seller was going to relocate. REALTOR® B indicated that the seller had not accepted his offer of referral and, based on such refusal, REALTOR® B had not, in fact, made any referral and, therefore, had not acted in a manner inconsistent with his obligations as expressed in Standard of Practice 16-18.

After giving careful consideration to all the evidence, the Hearing Panel determined REALTOR® B to be in violation of Article 16 by his attempt to utilize confidential MLS information to create

a referral to a third broker, contrary to the intent of Standard of Practice 16-18, even though his effort to obtain the seller's permission to do so had been unsuccessful. The Hearing Panel also commented that MLS information is confidential and to be utilized only in connection with the REALTOR®'S role as cooperating broker. The panel further commented that information received from a listing broker through the MLS should not be used to create a referral to a third broker or to create a buyer relationship unless such use is authorized by the listing broker.

## Case #16-9: Mass Media Solicitation of Business Not a Violation of the Code (Reaffirmed Case #21-15 May, 1988. Transferred to Article 16 November, 1994. Revised May, 2018.)

REALTOR® A designed an advertising campaign to promote his new marketing program. Part of REALTOR® A's campaign included a number of advertisements in the local newspaper, and on mobile billboards that traveled around the city.

The message that appeared in REALTOR® A's advertisements and on his billboards was: "Attention: All homeowners whose properties are for sale. Do you want results? If so, contact REALTOR® A. He has a new marketing program that gets results."

In response to his advertisements, REALTOR® A received a number of calls from homeowners whose properties were currently listed with other REALTORS®. Several of the REALTORS® whose clients contacted REALTOR® A filed complaints with the Association, charging REALTOR® A with unethical conduct for failing to respect the exclusive agency of other REALTORS®. The Grievance Committee considered the complaints and referred them to the Professional Standards Administrator to schedule a hearing by a Hearing Panel of the Professional Standards Committee.

At the hearing held by the Professional Standards Committee to consider the complaints, REALTOR® A defended his advertising campaign by saying that the campaign was undertaken through the mass media; that it was not directed toward any particular owner; that it was not an attempt to induce property owners to breach existing listing agreements; and, therefore, was not the type of solicitation prohibited by Article 16 of the Code of Ethics.

The Hearing Panel concurred with REALTOR® A on the grounds that REALTOR® A's solicitation was made through the mass media, and was not specifically directed toward property owners whose identity had come to REALTOR® A's attention through information disclosed by other REALTORS® consistent with their ethical obligation to cooperate with other brokers under Article 3 of the Code of Ethics. The panel, therefore, held that REALTOR® A's advertising campaign did not violate Article 16 of the Code of Ethics.

### Case #16-10: Refusal to Disclose Nature and Expiration Date of Listing (Originally Case #9-20. Revised and transferred to Article 21 as Case #21-16 May, 1988. Transferred to Article 16 November, 1994. Revised May, 2018.)

REALTOR® A, on his way to his office, noticed the deteriorated condition of a "For Sale" sign posted on an unimproved site bearing the name of REALTOR® B. He remembered that REALTOR® B's "For Sale" sign had been on that site for a considerable period of time. REALTOR® A decided to call REALTOR® B to determine the status of the property. In response to several questions, one of which was, "Do you have an exclusive listing on that property?" REALTOR® B replied that he was not obligated to disclose the nature, status, or the type of listing. After considerable conversation, REALTOR® A stated his intention to contact the property owners for this information, citing Standard of Practice 16-4 as the basis for his action. REALTOR® B warned REALTOR® A not to contact his sellers and refused to discuss the matter further. A few days later, REALTOR® B had a telephone conversation with the property owners and learned of their decision to list their property with REALTOR® A when their current listing with REALTOR® B expired the following week. REALTOR® B filed a complaint against REALTOR® A with the Association, stating that REALTOR® A's actions in contacting his client had been inconsistent with REALTOR® B's exclusive agreement with the sellers.

The Grievance Committee reviewed the complaint and the response to the complaint filed by REALTOR® B. The case was referred to the Professional Standards Administrator to schedule a hearing by a Hearing Panel of the Association's Professional Standards Committee.

During the hearing, REALTOR® B repeated his complaint and his conversation with REALTOR® A. He also advised the Hearing Panel of his telephone conversation with the property owners and of their decision, as a result of REALTOR® A's direct contact, not to relist the property with him, REALTOR® B. "Not only did REALTOR® A fail to respect my exclusive agreement with the property owners by contacting them directly," said REALTOR® B, "but he violated Article 16 by taking the opportunity to relist the property away from me!"

REALTOR® A defended his actions by stating that he had requested information on the nature and status of the listing from REALTOR® B, as required by Article 16, and that REALTOR® B had refused to divulge the information; and that he had contacted the property owners only after this refusal, citing as his authority the principle established in Standard of Practice 16-4. "The sellers were happy to discuss listing their property with me, once I described the services my firm could offer," said REALTOR® A. "They said they hadn't had an interested customer since the first week of their listing with REALTOR® B."

After giving careful consideration to all of the evidence and testimony, the Hearing Panel concluded that REALTOR® A's actions had not been inconsistent with the exclusive agreement of REALTOR® B. The panel advised that REALTOR® B's refusal to disclose the nature and status of his listing had freed REALTOR® A to contact the property owners.

The Hearing Panel's decision noted that Article 16 requires a REALTOR® to respect the exclusive agency of another REALTOR®. But, in order to respect the listing broker's agency, the REALTOR® must be able to determine if an exclusive listing really exists. If the listing broker refuses to disclose the existence, type, and duration of his listing, Standard of Practice 16-4 recognizes the REALTOR®'s right to contact the seller directly to get that information. Once the REALTOR® secures information on the type and duration of the listing, Standard of Practice 16-4 also permits him to discuss the terms of a future listing or to enter into a listing that becomes effective upon the expiration of the current listing. The panel's decision also indicated that REALTOR® B could have barred REALTOR® A's contact with the sellers by simply providing him with information on the nature and status of the listing.

The panel found REALTOR® A not in violation of Article 16 of the Code of Ethics.

## Case #16-11: Buyer Agent's Demand that Listing Agent Reduce Commission (Adopted as Case #21-17 April, 1990. Transferred to Article 16 November, 1994. Renumbered as Case #16-16 November, 2001.)

## Case #16-12: Buyer Conditions Purchase Offer on Seller's Agreement to Pay Buyer Agent's Fee (Adopted as Case #21-18 April, 1990. Transferred to Article 16 November, 1994. Renumbered as Case #16-17 November, 2001.)

## Case #16-13: Dealings Initiated by Another Broker's Client (Adopted May, 1999.)

REALTOR® A, a residential broker, had recently listed a home. REALTOR® A's marketing campaign included open houses on several consecutive weekends.

One Sunday afternoon Buyer B came to the open house. REALTOR® A introduced herself to Buyer B and asked whether Buyer B was working with another broker. Buyer B responded that he was, in fact, exclusively represented but went on to add that he was quite familiar with the property as it had been previously owned by a close personal friend. REALTOR® A told Buyer B that she would be happy to show Buyer B through the home but reminded Buyer B that she represented the seller and not Buyer B.

After viewing the home, Buyer B indicated that he had pressing business travel plans, was seriously interested in the property, and requested REALTOR® A's assistance in preparing a purchase offer. REALTOR® A assisted Buyer B in filling out a standard form purchase contract and later that day presented the offer to the seller who accepted it.

REALTOR® A was subsequently charged with violating Article 16 for dealing and negotiating with a party who had an exclusive relationship with another REALTOR®.

At the hearing, REALTOR® A defended her actions noting that she had told Buyer B that she was the seller's exclusive agent and, as such, would not and could not represent Buyer B's interests. She pointed out that it was only after Buyer B had insisted on writing a purchase offer without the assistance of his exclusive representative that REALTOR® A had agreed to do so. She concluded her defense noting that Standard of Practice 16-13 authorizes dealings with the client of another broker in cases where those dealings are initiated by the client.

The Hearing Panel agreed with REALTOR® A that she was the seller's exclusive representative and had not represented the buyer and concluded that her conduct had not violated Article 16, as interpreted by Standard of Practice 16-13.

## Case #16-14: Dealings Initiated by Another Broker's Client (Adopted May, 1999.)

REALTOR® X, a residential broker, had recently listed a home. REALTOR® X's marketing campaign included open houses on several consecutive weekends.

One Sunday afternoon Buyer B came to the open house. REALTOR® X introduced herself to Buyer B and asked whether Buyer B was working with another broker. Buyer B responded that he was, in fact, exclusively represented but went on to add that he was quite familiar with the property as it had been previously owned by a close personal friend. REALTOR® X told Buyer B that she would be happy to show Buyer B through the home and answer any questions he might have, but added that she represented the seller and not Buyer B.

After viewing the home, Buyer B indicated that he was seriously interested in the property and intended to discuss a possible purchase offer with his buyer representative. REALTOR® X responded that there were several other buyers interested in the property and that it would likely sell quickly. "I can't tell you what to do, but if it were me, I would make an offer today," REALTOR® X told Buyer B, "You can go back and discuss this with your broker if you like or I can help you write a purchase contract. It's your choice." With REALTOR® X's words in mind, Buyer B decided to make an offer. REALTOR® X assisted Buyer B in filling out a standard form purchase contract which was accepted by the seller later that day.

REALTOR® X was subsequently charged with violating Article 16 for dealing and negotiating with a party who had an exclusive relationship with another REALTOR®.

At the hearing, REALTOR® X defended her actions noting that she had told Buyer B that she was the seller's exclusive agent and, as such, would not and could not represent Buyer B's interests. She pointed out that Buyer B had asked for her help in writing a purchase offer and had not sought the counsel and assistance of his exclusive representative. She concluded her defense noting that Standard of Practice 16-13 authorizes dealings with the client of another broker when those dealings are initiated by the client.

The Hearing Panel disagreed with REALTOR® X's reasoning. They concluded that REALTOR® X's inducement of Buyer B by emphasizing that the property might sell quickly (which might well have been true), coupled with her offer to prepare a purchase contract on Buyer B's behalf, constituted an initiation of dealings on the property by REALTOR® X, not by Buyer B. As a result, REALTOR® X was found in violation of Article 16.

### Case #16-15: Cooperating Broker's Compensation Specified on Deposit Receipt (Revised Case #21-12 May, 1988. Transferred to Article 16 November, 1994 as Case #16-6. Renumbered November, 2001. Revised November, 2018.)

REALTOR® A filed a written complaint against REALTOR® B, alleging violation of Article 16 of the Code of Ethics. It was referred to the Grievance Committee and after preliminary review, the Grievance Committee referred it to the Professional Standards Administrator with instructions to arrange a hearing before a Hearing Panel of the Professional Standards Committee. After following required procedures, including timely notices to all parties, a Hearing Panel was convened.

REALTOR® A stated to the Hearing Panel that he and REALTOR® B were both members of the Board MLS and that, as an MLS Participant, he was required to specify the amount of compensation he was offering on listings filed with the MLS. However, REALTOR® B had ignored this information as published by the MLS and had, on two separate occasions, brought REALTOR® A purchase agreements with copies of deposit receipts that provided for a different amount of cooperating broker compensation to be payable to REALTOR® B. In following this practice, REALTOR® B was, in effect, presenting a demand for a cooperating broker compensation greater than that which REALTOR® A, as the listing broker, had specified in the information filed with the Board's Multiple Listing Service.

REALTOR® A also complained that the language of the deposit receipt was so phrased as to make presentation of the offer conditioned upon REALTOR® A's agreement to pay a larger cooperating broker commission than he had offered through the MLS. REALTOR® A said this practice by REALTOR® B created a dilemma for him as the listing broker of either not submitting the offer to the client or, alternatively, paying an amount of cooperating broker compensation greater than he had offered through the MLS.

REALTOR® B responded that he had a right to negotiate with REALTOR® A as to the cooperating broker compensation he would receive for his work, and the amount he had put on the deposit receipt was the compensation for which he was willing to work. REALTOR® B said that REALTOR® A would have to make his own decision as to whether he would present the offer or not.

The Hearing Panel's decision noted that REALTOR® B was indeed entitled to negotiate with REALTOR® A concerning cooperating broker compensation but that such negotiation should be completed prior to the showing of the property by REALTOR® B. The decision indicated that REALTOR® B was entitled to show property listed by REALTOR® A on the terms offered by the listing broker in the MLS.

The panel's decision further advised that it was improper for REALTOR® B to insert the amount of cooperating broker compensation to be paid by the listing broker into the contract between the buyer and seller, as the brokers are not the parties to the buyer-seller contract. Compensation between the cooperating broker and the listing broker is properly a matter of contract between the listing and cooperating brokers; and that preconditioning an offer to purchase between the buyer and seller on the listing broker's acceptance of a cooperating broker commission greater than he had offered was inappropriate as a non-party to the buyer-seller contract.

REALTOR® B was found in violation of Article 16.

## Case #16-16: Buyer Agent's Demand that Listing Agent Reduce Commission (Adopted as Case #21-17 April, 1990. Transferred to Article 16 November, 1994 as Case #16-11. Renumbered November, 2001.)

REALTOR® B contacted REALTOR® A, the listing broker, and notified her that he was a buyer's agent and was interested in showing one of her listings to his client, a prospective purchaser. REALTOR® A made an appointment for REALTOR® B and his client to view the property. Shortly thereafter, REALTOR® A presented REALTOR® A with a signed offer to purchase from his client which was contingent on REALTOR® A's willingness to reduce her commission by the amount she had offered through the MLS to subagents and on the seller's willingness to compensate the buyer for the commission the buyer owed to REALTOR® B, his agent. REALTOR® A presented the offer to her client, the seller, explaining that she would not agree to reduce the previously agreed commission as specified in their listing contract.

REALTOR® A then filed a complaint with the local Board charging REALTOR® B with violating Article 16 as interpreted by Standard of Practice 16-16. In her complaint, REALTOR® A stated that REALTOR® B had interfered in her agency relationship with the seller by encouraging the buyer to condition acceptance of his offer on the renegotiation of REALTOR® A's commission arrangement with her client, the seller.

REALTOR® B defended his action arguing that REALTOR® A's refusal to reduce her commission by an amount equal to what she had offered other brokers for subagency services would have placed the seller in the position of having to pay an excessive amount of commission if he had accepted the offer agreeing to contribute to the buyer broker's compensation. In addition, REALTOR® B felt that it was his duty to his client to get the best price for the property by encouraging the buyer to reduce the costs of sale wherever practical. The Hearing Panel concluded that REALTOR® B's actions to encourage his buyer-client to pressure the seller to try to modify the listing agreement with REALTOR® A was an unwarranted interference in their contractual relationship.

The Hearing Panel noted that Article 16, as interpreted by Standard of Practice 16-16, required REALTOR® B to determine, prior to presenting an offer to REALTOR® A and her seller-client, whether REALTOR® A was willing to contribute to REALTOR® B's commission, either directly or by reducing the commission as agreed to in the listing contract and, if so, the terms and amount of such contributions. It was the decision of the Hearing Panel that REALTOR® B had violated Article 16.

## Case #16-17: Buyer Conditions Purchase Offer on Seller's Agreement to Pay Buyer Agent's Fee (Adopted as Case #21-18 April, 1990. Transferred to Article 16 November, 1994 as Case #16-12. Renumbered November, 2001.)

REALTOR® A filed a listed property with his local MLS offering to pay a fee for subagency services. REALTOR® B called REALTOR® A, identified himself as a buyer's agent, and asked if REALTOR® A would arrange a showing of the property to his client and himself. REALTOR® A agreed. The following day, REALTOR® B presented REALTOR® A with an offer to purchase that was contingent on the seller's agreement to pay REALTOR® B's commission. The seller accepted the offer and the sale closed shortly afterward.

REALTOR® A then filed a complaint against REALTOR® B citing Article 16 of the Code of Ethics as interpreted by Standard of Practice 16-16. He stated that REALTOR® B had interfered in REALTOR® A's relationship with his seller-client by attempting to negotiate a separate commission agreement with the seller. REALTOR® B responded that since the request that the seller pay his commission was made by REALTOR® B's client, the buyer, directly of the seller and not of the listing broker, no violation of the Code of Ethics had occurred.

In their decision, the Hearing Panel noted that if REALTOR® B, or if his client at REALTOR® B's urging, had demanded that a portion of REALTOR® A's commission be paid to REALTOR® B, there would have been a valid basis for REALTOR® A's position. Since the request for payment of REALTOR® B's fee was made directly to the seller, REALTOR® B was not in violation of Article 16.

## Case #16-18: Assumed Consent for Direct Contact (Reaffirmed Case #22-2 May, 1988. Transferred to Article 3 November, 1994. Transferred to Article 16 November, 2001.)

REALTOR® A, who held an exclusive listing of Client B's property, invited REALTOR® C to cooperate with him. When REALTOR® C, shortly thereafter, received an offer to purchase the property and took it to REALTOR® A, the latter took REALTOR® C with him to present the offer to Client B, and negotiations for the sale were started. The next day, REALTOR® C called on Client B alone, recommended that he accept the offer which was at less than the listed price, and Client B agreed. The contract was signed and the sale was made.

These facts were detailed in a complaint by REALTOR® A to the Board of REALTORS® charging REALTOR® C with unethical conduct in violation of Article 16, having made his second contact with the client without his, REALTOR® A's, consent.

At the subsequent hearing, REALTOR® C defended his actions on the basis that since he had been invited to cooperate with REALTOR® A, and particularly since REALTOR® A had invited him to be present when his offer was presented to the seller, REALTOR® C had assumed that he had REALTOR® A's consent for subsequent direct contacts with Client B. He stated further that he had a good reason for going alone because in his first visit to the client, REALTOR® A had undertaken to present his, REALTOR® C's, offer without fully understanding it and had made an inept presentation. Questioning by members of the Hearing Panel revealed that there had been some important considerations that REALTOR® A had not understood or explained to the client.

The conclusion of the panel was that the consent of the listing broker required by Article 16, as interpreted by Standard of Practice 16-13, cannot be assumed, but must be expressed; and that REALTOR® C had violated Article 16 by negotiating directly with REALTOR® A's client without REALTOR® A's consent.

## Case #16-19: Continued Contact With Potential Seller Who Enters Into an Exclusive Listing With Another REALTOR® (Adopted November, 2011)

After a decades-long career as a noted researcher and teacher, Professor Y decided to sell his home near the university campus in anticipation of his retirement to the northwoods. Having lived in the home for over thirty years and realizing that the proceeds from its sale would constitute a significant part of his retirement funds, Professor Y made appointments with several potential listing brokers, including REALTOR® P and REALTOR® Q. During each appointment, Professor Y asked extensive questions hoping to get a clear idea of his property's market value and each broker's proposed marketing strategies.

REALTOR® Q was familiar with Professor Y's home, having grown up on the same block and having gone to elementary and high school with Professor Y's children. Consequently, REALTOR® Q was not surprised when she received a call asking for a meeting to discuss a possible listing of Professor Y's home. The appointment had gone well and REALTOR® Q was confident she would get the listing. To her surprise, just three days later the property came onto the market listed with REALTOR® P. REALTOR® Q was taken aback and spent considerable time pondering what she had done or said – or failed to do or say – that had led Professor Y to choose to list with REALTOR® P. Several times she was tempted to call Professor Y and ask why she hadn't been chosen, but she never made that call.

Several weeks later Professor Y's son and daughter-in-law hosted a retirement party for Professor Y. Their friend REALTOR® Q was among the invited guests. At the party, Professor Y approached REALTOR® Q and, after exchanging pleasantries, commented, "You're probably wondering why I didn't list my home with you." "The thought crossed my mind," admitted REALTOR® Q, "but you made a good choice with REALTOR® P. I'm certain he'll do a fine job and get a fair price for you." Then, since Professor Y had raised the issue, REALTOR® Q asked, "Why didn't you give me the listing?" Professor Y explained that while he thought highly of REALTOR®® Q, he had been very impressed with REALTOR® P's marketing strategies, and his choice was a business decision and not one influenced by friendships. REALTOR® Q accepted Professor Y's explanation and their conversation turned to other topics. A month later, REALTOR® Q was surprised to receive notice from the local association of REALTORS® advising she had been named in an ethics complaint alleging that her conversation with Professor Y, after Professor Y had listed his home with REALTOR® P, had violated Article 16 of the Code of Ethics.

At the hearing, REALTOR® Q had acknowledged she had been surprised – and disappointed – when Professor Y listed his home with REALTOR® P instead of with her. She also acknowledged she discussed Professor Y's choice of listing broker with him at the party. In her defense, she called Professor Y as a witness. Professor Y testified that he had in fact told REALTOR® P, his listing broker, about his conversation with REALTOR® Q, adding that he had no idea that REALTOR® P would file an ethics complaint. He

also noted he – and not REALTOR® Q – had raised the subject of why he had chosen to list with REALTOR® P. "REALTOR® Q is a longtime friend of my family and I felt I owed her an explanation about why I listed with REALTOR® P instead of with her."

REALTOR® Q concluded her defense noting that while Standard of Practice 16-13 requires REALTORS® to conduct dealings related to exclusively listed property with the client's agent, there is an exception in cases where dealings are initiated by an exclusively-represented client. She pointed out that her conversation with Professor Y could fairly be characterized as a "dealing" related to Professor Y's exclusively listed home, and that her conversation with Professor Y, since it was initiated by Professor Y, did not violate Article 16 of the Code of Ethics.

The Hearing Panel concurred with REALTOR® Q's defense, and found no violation of Article 16.

### Case #16-20: Continued Contact With Potential Seller Who Enters Into an Exclusive Listing With Another REALTOR® (Adopted November, 2011)

At the conclusion of a detailed listing presentation, REALTOR® B asked the sellers whether they had any questions. "No," said Seller Z. "Your presentation was professional and complete and we very much appreciate your time. We have appointments with two other realty firms and after we talk to them we'll make our decision." REALTOR® B thanked the sellers and encouraged them to contact him with any questions they might have. "I really look forward to being your broker," he added.

Several days later, REALTOR® B noticed that Seller Z's property had come on the market, listed with REALTOR® A. REALTOR® B and REALTOR® A were friends, but were also quite competitive, both frequently pursuing the same potential seller-clients. "I wonder why Seller Z decided to list with REALTOR® A," mused REALTOR® B, "it won't matter if I just call and ask why they decided to list with my friend REALTOR® A instead of me." REALTOR® B called the sellers and left a message on their answering machine asking for a return call at their convenience.

That evening, Seller Z returned REALTOR® B's phone call. REALTOR® B started the conversation by thanking Seller Z and his wife for their time. "What I'd like to know is why you chose to give your listing to REALTOR® A instead of me?" he then asked. "Don't get me wrong, REALTOR® A is a good broker and will do a good job for you. I'm not suggesting you cancel your listing with REALTOR® A but if your listing expires and REALTOR® A hasn't sold it, I'd be pleased to talk to you about listing with me."

Seller Z did not follow up on REALTOR® B's offer and the following weekend at REALTOR® A's open house Seller Z and his wife recounted REALTOR® B's follow-up phone call. Over the next few days REALTOR® A debated filing an ethics complaint. He weighed his friendship with REALTOR® B against what he saw as his duty to bring potentially unethical conduct to the attention of the association of REALTORS®. Somewhat reluctantly, he filed an ethics complaint alleging a violation of Article 16, as interpreted by Standard of Practice 16-13.

At the hearing, REALTOR® A called Seller Z as a witness. Seller Z faithfully recounted the substance of REALTOR® B's conversation with Seller Z and his wife, commenting that while REALTOR® B had said he was only trying to understand why he hadn't been given the listing, it appeared to Seller Z that REALTOR® B wanted Seller Z to cancel his listing with REALTOR® A. Then REALTOR® B testified in his own defense. He acknowledged he had been aware that REALTOR® A had already exclusively listed the property when he contacted Seller Z and asked for a follow-up appointment. He defended his actions stating he was not trying to induce Seller Z to cancel the listing, he was simply trying to find out what he had said – or failed to say – that led Seller Z to list with REALTOR® A instead of with him, and wanted Seller Z and his wife to be fully aware of the services he would provide if their listing with REALTOR® A expired.

The Hearing Panel did not agree with REALTOR® B's defense, noting that REALTOR® B's curiosity or desire to enhance his listing presentation skills did not justify continued contact with a potential seller-client after that seller had entered into an exclusive representation agreement with another broker. REALTOR® B was found in violation of Article 16 as interpreted by Standard of Practice 16-13.

## Case #16-21: Continued Contact With Potential Seller Who Enters Into an Exclusive Listing With Another REALTOR® (Adopted November, 2011. Revised May 2017.)

REALTOR® P and Ms. Q had been members of the church choir for several years and had become social friends. One evening after choir practice Ms. Q mentioned that now that her children were grown and out of the family home, she and her husband were seriously considering downsizing. "I'm sure I can help you with that," said REALTOR® P, "I'm going away for the weekend but I'll get in touch with you early next week."

The following Monday evening REALTOR® P called Ms. Q. After exchanging pleasantries, REALTOR® P turned the conversation toward business. "I've identified some comparable sales to show you and I'd like to come over and visit with you and your husband to discuss listing your home," she said. After a lengthy pause, Ms. Q shared with REALTOR® P that her husband had been very anxious to get started and over the weekend they had visited several local real estate brokerages and had listed their home with REALTOR® B. "I hope you understand," said Ms. Q, "my husband was very impressed with REALTOR® B and his plans for selling our house." REALTOR® P responded positively telling Ms. Q, "I know REALTOR® B. He'll do a fine job for you. If there is ever anything I can do for you in the future, never hesitate to call me." On that note, REALTOR® P and Ms. Q ended their conversation.

The next afternoon REALTOR® B was at the Q's home placing his "For Sale" sign on their front lawn. Ms. Q invited REALTOR® B into the house for coffee. During their conversation, she mentioned her conversation the evening before with REALTOR® P, commenting, "I was so relieved that REALTOR® P wasn't upset that I didn't list with her. She was very gracious and even suggested that I should call her if she could be of assistance to us in the future." REALTOR® B said nothing about Ms. Q's remark, but after returning to his office filled out the paperwork necessary to file an ethics complaint against REALTOR® P, charging her with violating Article 16, as interpreted by Standard of Practice 16-13.

At the hearing convened to consider the complaint, REALTOR® B testified that REALTOR® P had directly contacted his exclusive client, Ms. Q, and after Ms. Q had shared with REALTOR® P the fact that the Q's home had been listed by REALTOR® B, had not immediately terminated their telephone conversation. "Even worse," said REALTOR® B, "REALTOR® P told Ms. Q that she should call her if there was ever anything she could do for her. REALTOR® P's offer to be of assistance 'at any time in the future' was simply a thinly-veiled attempt to convince the Q's to cancel their listing with me and to list with her.

REALTOR® P, testifying in her defense, noted that she did not know the Q's property had been listed by REALTOR® B when she called Ms. Q; that when Ms. Q informed her they had listed their property with REALTOR® B she had responded courteously, professionally, and positively, assuring Ms. Q that REALTOR® B would do a good job for the Qs; and that her offer was simply to be of assistance in future real estate transactions, possibly the purchase of a new

home or condominium. "Once I learned that REALTOR® B had listed the Q's property, I ended our telephone conversation as quickly and as politely as I could," concluded REALTOR® P, "I certainly was not trying to interfere in REALTOR® B's exclusive contract with the Qs."

After giving careful consideration to the testimony of both parties, the Hearing Panel concluded that REALTOR® P had not violated Article 16 as interpreted by Standard of Practice 16-13, and that her offer to be of assistance in the future was simply a polite way to end the conversation.

# CASE INTERPRETATIONS RELATED TO ARTICLE 17:

## Case #17-1: Obligation to Submit to Arbitration (Revised Case #14-2 May, 1988. Transferred to Article 17 November, 1994. Revised November, 1995. Revised November, 2001 and May, 2017.)

REALTOR® A and REALTOR® B had been engaged in a cooperative transaction that resulted in a dispute regarding entitlement to compensation. Rather than requesting arbitration before the Association of REALTORS®, REALTOR® A filed suit against REALTOR® B for payment of the compensation he felt REALTOR® B owed him. Upon receiving notification of the lawsuit, REALTOR® B filed a request for arbitration with the Association, which was reviewed by the Grievance Committee and found to be a mandatory arbitration situation. REALTOR® A was advised of the Grievance Committee's decision, but refused to withdraw the lawsuit. Thereupon, REALTOR® B filed a complaint with the Board charging a violation of Article 17 as supported by Standard of Practice 17-1.

REALTOR® A was directed to be present at a hearing on the complaint before the Board of Directors. Evidence that REALTOR® B had sought REALTOR®R A's agreement to submit the dispute to arbitration was presented at the hearing. REALTOR® A defended his action in filing the suit and refusing to submit to arbitration by asserting that under laws of the state, the Association of REALTORS® had no authority to bar his access to the courts or to require him to arbitrate his dispute with REALTOR® B.

The Board of Directors concluded that REALTOR® A was correct as to his legal right and as to the Association's lack of any right to prevent him from filing a suit. It was pointed out to REALTOR® A, however, that the Association of REALTORS® is a voluntary organization, whose members accept certain specified obligations with respect to their relations with other REALTORS®, and that if he wished to continue as a member of the Association, he would be obliged to adhere to the Association's requirements as to arbitration.

Because REALTOR® A would not withdraw the litigation, the Board of Directors concluded that REALTOR® A was in violation of Article 17 for refusing to arbitrate in a mandatory arbitration situation. However, it was noted that if REALTOR® A had filed litigation against REALTOR® B, and had REALTOR® B then requested arbitration with the Grievance Committee determining that an arbitrable issue of a mandatory nature existed, REALTOR® B might have successfully petitioned the court to remand the matter to the Association for arbitration, and there would have been no finding of a violation of Article 17 since the Association's arbitration process would have been ultimately complied with.

## Case #17-2: Dispute Between REALTORS® in Different Boards (Revised Case #14-6 May, 1988. Transferred to Article 17 November, 1994. Revised November, 1995.)

REALTOR® A cooperated in the sale of a commercial property with REALTOR® B, the listing broker. REALTOR® A is a member of the XYZ Board of REALTORS®, and his office is located in the XYZ Board. Both the property and REALTOR® B's office are located within the jurisdiction of the ABC Board of REALTORS® where REALTOR® B is a member. A dispute arose between REALTORS® A and B over the division of the commission.

REALTOR® A filed a request for arbitration with the Professional Standards Committee of his Board. The President of the Board, when advised of the contractual dispute, subsequent to the Grievance Committee finding the matter arbitrable and of a mandatory nature, notified the President of REALTOR® B's Board and requested interboard arbitration in accordance with Article 17 of the Code of Ethics. The arbitration request was brought before the Grievance Committee of REALTOR® B's Board which also determined that the dispute was arbitrable and of a mandatory nature.

One week before being notified of his Grievance Committee's decision, REALTOR® B filed suit against REALTOR® A. The Board of Directors of the ABC Board notified REALTOR® B to appear and answer to a charge of violation of Article 17 when REALTOR® B did not withdraw the suit subsequent to being informed that both Grievance Committees had found the issue arbitrable and mandatory.

REALTOR® B described his contractual dispute to the Directors and stated that he knew REALTOR® A had requested arbitration because he had received a copy of the request. REALTOR® B maintained that he had filed suit because REALTOR® A was in another Board's jurisdiction and he did not think anything would come of the request since he, REALTOR® B, was not a member of the XYZ Board.

REALTOR® B was advised that since both Grievance Committees had determined the matter was arbitrable and mandatory that interboard arbitration was being scheduled to hear the dispute. The Board of Directors concluded that his action in filing suit was not in itself in violation of Article 17 but advised REALTOR® B that if he failed to withdraw from the suit and participate in the interboard arbitration, he could be found in violation of Article 17.

## Case #17-3: Dispute Between REALTORS® of Different Boards (Reaffirmed Case #14-7 May, 1988. Transferred to Article 17 November, 1994.)

REALTOR® A, the listing broker and a member of the X Board of REALTORS®, and REALTOR® B, the cooperating broker and a member of the Y Board of REALTORS®, disagreed as to whether REALTOR® B should participate in a commission on a sale. The property was located within the jurisdiction of REALTOR® A's Board, and REALTOR® A proposed that the dispute be submitted for arbitration within his Board, the X Board of REALTORS®. REALTOR® B agreed, and appeared before an arbitration panel of the Professional Standards Committee of the X Board of REALTORS® to present evidence in support of his view that he was entitled to participate in the commission. The arbitration panel of the X Board of REALTORS® found in favor of REALTOR® A.

REALTOR® B then requested his Board, the Y Board of REALTORS®, to contact the X Board of REALTORS® for the purpose of arranging interboard arbitration as provided for in Article 17 of the Code of Ethics. The Y Board of REALTORS® refused, pointing out that REALTOR® B had voluntarily accepted the proposal to have the matter arbitrated by the X Board of REALTORS®; that he had agreed to be bound by the Hearing Panel's decision; had participated in the arbitration proceeding; and having done so, he was not, following an adverse decision, entitled to initiate another arbitration hearing.

## Case #17-4: Dispute Involving REALTOR® Holding Membership in Two Boards (Revised Case #14-8 May, 1988. Revised and transferred to Article 17 November, 1994.)

REALTORS® A and B, disputants in an arbitrable issue, both belonged to the X Board of REALTORS®, a large Board in the central city of a metropolitan area. REALTOR® B also maintained a branch office in a nearby suburb and was also a member of the Board having jurisdiction in that area, the Y Board of REALTORS®.

REALTOR® A filed a written request with the X Board of REALTORS® for arbitration. REALTOR® B was notified and advised of the date of the hearing.

REALTOR® B replied that because he considered himself primarily a member of the Y Board of REALTORS®, he would proceed through the Y Board of REALTORS® and would request interboard arbitration as provided for in Article 17 of the Code of Ethics.

Upon consideration by the Board of Directors of the X Board of REALTORS®, the request for interboard arbitration was refused. Regardless of which of the two Boards REALTOR® B considered to be his primary Board, he was a member of the X Board. Since both parties to the dispute were members of the X Board, there was no need for interboard arbitration and the matter was arbitrated by the X Board.

## Case #17-5: Time of Dispute a Determining Factor as to Arbitration (Revised Case #14-10 May, 1988. Transferred to Article 17 November, 1994.)

REALTOR® A belonged to an All-REALTOR® Board (one in which all nonprincipal brokers and salespersons as well as principals are eligible for REALTOR® membership). Salesperson B had been a REALTOR® for a number of years and had been associated as an independent contractor with REALTOR® A during that time. Salesman B showed a property to Prospect C, who subsequently purchased the property through Salesman D, who also was affiliated with REALTOR® A. Salesman D was also a REALTOR® Member of the Board.

There was considerable dispute over the facts of the situation, but REALTOR® A finally paid the sales commission to Salesman D but admitted that the written office policies did not precisely cover the circumstances. Salesman B demanded a share of the commission and, upon REALTOR® A's refusal to pay it to him, transferred his license to REALTOR® E's firm.

REALTOR® E and Salesman B joined in a request for arbitration of the dispute with REALTOR® A stating that Article 17 required the arbitration of disputes between REALTORS® associated with different firms.

REALTOR® A refused to arbitrate on the basis that the dispute had arisen while he and Salesman B were associated with the same firm and that it was an internal matter which he was not required to arbitrate.

The matter was referred to the Board of Directors, consistent with the Board's Code of Ethics and Arbitration Manual. After a hearing, the Board of Directors ruled that the deciding factor was the relationship between the REALTORS® at the time the dispute arose rather than at the time the demand for arbitration was made. Therefore, REALTOR® A was not required to arbitrate the matter and was not in violation of Article 17.

## Case #17-6: Request for Arbitration Expenses (Reaffirmed Case #14-11 May, 1988. Transferred to Article 17 November, 1994.)

REALTOR® A, the listing broker, and REALTOR® B, a cooperating broker, engaged in a heated dispute as to which REALTOR® was the procuring cause of a sale and, therefore, entitled to the commission. Finding that they could not resolve the matter themselves, they agreed to arbitrate in accordance with Article 17 of the Code of Ethics.

REALTOR® A initiated the request for arbitration with a letter to the Board; the letter was received and reviewed by the Grievance Committee which agreed that it was an arbitrable matter. The case was sent on to the Professional Standards Committee for a hearing.

The President of the Board, consistent with the Board's Code of Ethics and Arbitration Manual, appointed a five-member Hearing Panel to hear the case. The proper forms agreeing to the arbitration were sent to both REALTORS®, each signed his agreement and returned it to the Professional Standards Administrator. Prior to the date set for the hearing, REALTOR® A learned that REALTOR® B had practiced law before he entered the real estate business. REALTOR® A then decided that he would be at a disadvantage in presenting his case to the Hearing Panel without an attorney due to the legal background of REALTOR® B. REALTOR® A sent in an amended arbitration request in which he asked that he be awarded the commission and attorney's fees and any other administrative expenses that he might incur in the presentation of his case before the Hearing Panel. The Chairperson accepted the amended complaint as part of the case and mailed REALTOR® B a copy.

The case was set and a hearing was held at which REALTOR® A appeared with his attorney and a court reporter. REALTOR® B acted as his own attorney. The Hearing Panel had the Board's attorney and a Professional Standards Administrator with a tape recorder present. After giving both parties the opportunity to present their case, the Hearing Panel adjourned the hearing and went into executive session to reach a decision.

It was the opinion of the Hearing Panel that the arbitration process is provided to all REALTORS® and REALTOR-ASSOCIATE®S by the Board to avoid any unnecessary expenses. The hiring of an attorney was REALTOR® A's own decision, not required by Article 17 of the Code of Ethics, the Hearing Panel, the Code of Ethics and Arbitration Manual, or the Board of REALTORS®. The Hearing Panel decided the commission dispute based strictly on the merits of the case presented. The Hearing Panel disallowed the request by REALTOR® A that he be awarded attorney's fees or other administrative expenses.

## Case #17-7: REALTOR® Not Precluded from Filing Complaint with State Real Estate Regulatory Agency (Revised Case #14-12 May, 1988. Transferred to Article 17 November, 1994. Revised May, 2002.)

REALTOR® A, a cooperating broker, filed a request for arbitration with REALTOR® B, the listing broker, in a dispute concerning entitlement to cooperative compensation in a real estate transaction. The complaint was referred to the Grievance Committee which concluded that a properly arbitrable matter existed and referred it to an arbitration hearing panel.

Shortly afterward REALTOR® B was notified that he was under investigation by the State Real Estate Commission for an alleged violation of the real estate regulations, based on a complaint filed by REALTOR® A.

REALTOR® B immediately filed an ethics complaint alleging violation of Article 17 by REALTOR® A for filing the complaint against REALTOR® B with the Commission. The complaint was referred to the Grievance Committee which concluded that since the ethics complaint and the arbitration request, while arising out of the same transaction, were clearly distinguishable the arbitration hearing should proceed as scheduled; and the ethics complaint should be dismissed, noting that while Article 17 requires REALTORS® to arbitrate contractual and specified non-contractual disputes, alleged violations of the Code and violations of law or regulations do not fall within its scope.

## Case #17-8: Attempted Use of Corporate Veil to Avoid Obligation to Arbitrate (Revised Case #14-14 April, 1992. Transferred to Article 17 November, 1994. Revised November, 1995. Revised November, 2001.)

REALTORS® A and B, principals in different firms, were both members of the same Board. A disagreement arose between them concerning entitlement to a commission in a real estate transaction. After initial efforts to resolve the dispute proved fruitless, REALTOR® A filed a request for arbitration with the Board which was reviewed by the Grievance Committee which concluded that an arbitrable issue existed. Instead of agreeing to arbitration through the Board, REALTOR® B filed a lawsuit against REALTOR® A. Receiving notice of the suit, REALTOR® A filed a charge with the Board alleging REALTOR® B had violated Article 17 of the Code of Ethics.

REALTOR® B, in his presentation to the Board of Directors indicated that, in his opinion, he was not subject to any ethics charge, since it was his corporation, and not REALTOR® B individually, that had filed suit against the corporation of REALTOR® A, not against REALTOR® A himself.

REALTOR® A told the Board of Directors that immediately upon occurrence of the dispute, he had suggested to REALTOR® B that the matter be arbitrated by the Board, and REALTOR® B said he would think about it. REALTOR® A then proceeded to file his request for arbitration with the Board. However, REALTOR® B did not respond to the arbitration notice and, shortly thereafter, REALTOR® A received notice of the suit filed by REALTOR® B's corporation against the corporation of REALTOR® A. He said he then called REALTOR® B and again discussed the obligation of Article 17 with him. However, REALTOR® B advised him that his corporation was not subject to the requirements of the Code and stated his intent to pursue the litigation.

REALTOR® B acknowledged that the facts as related by REALTOR® A were correct and that his corporation had filed suit upon the advice of the corporation's legal counsel. REALTOR® B said that membership in a Board of REALTORS® is individual and that personal responsibility disappears when a matter of corporate business is involved. He pointed out that he was not the only principal or officer in his corporation and that the decision to file litigation was not made by him alone, but by all of the corporate officers.

The Board of Directors, in reaching its decision, did not agree with REALTOR® B's position. The Directors' noted that the membership requirement in a Board of REALTORS® has, as its purpose, the assurance of commitment by the principals in the firm to the Code of Ethics. This commitment addresses the conduct and activities of all persons affiliated with the REALTOR®'s firm whether a sole proprietorship, partnership, or corporation. Moreover, the Directors pointed out that Article 17 obligates REALTORS® to ". . . cause their firms to arbitrate and be bound by an award."

REALTOR® B was advised to withdraw the litigation and submit to arbitration by a date certain or his membership in the Board would be terminated. REALTOR® B accepted the decision, withdrew the suit against REALTOR® A, and submitted to arbitration.

## Case #17-9: REALTOR® Not to be Denied Arbitration (Adopted Case #14-15 May, 1988. Transferred to Article 17 November, 1994. Deleted November, 2001.)

## Case #17-10: Board's Use of State Association Arbitration Panel (Adopted Case #14-16 May, 1988. Transferred to Article 17 November, 1994.)

A dispute arose between REALTOR® A and REALTOR® B, two of the 15 members of the X Board of REALTORS®. Both members requested that the matter be arbitrated by the Board's Professional Standards Committee. The Grievance Committee concluded that an arbitrable matter existed but expressed reservations about the Board's ability to provide an objective and impartial hearing since most of the other Board Members were either employed by or affiliated with REALTOR® A or REALTOR® B, or were frequently involved in transactions with them.

At a specially called meeting of the Board of Directors, it was determined that the Board was incapable of providing an impartial panel for an arbitration hearing. The Board President was authorized to refer the request to the State Association for a hearing by a Hearing Panel of the State Association's Professional Standards Committee.

Pursuant to the Board's request, a Hearing Panel was convened by the State Association which rendered an award on behalf of REALTOR® A. REALTOR® B refused to abide by the decision on the grounds that the dispute had not been heard by a panel of his Board as required by Article 17.

Both the State Association and the local Board advised REALTOR® A to seek judicial enforcement of the award in a court of competent jurisdiction noting that REALTOR® B had participated in the arbitration; that the State Association is also charged with the responsibility for enforcing the Code of Ethics; that the Board was within its rights in referring the matter to the State Association, due to its inability to provide an impartial panel; and that representatives of the State Association and local Board would be available to appear in support of the request for judicial enforcement.

## Case #17-11: Appeal of Grievance Committee Decision (Adopted Case #14-17 May, 1988. Transferred to Article 17 November, 1994.)

REALTORS® A and B were partners in a building company. They both held membership in the XYZ Board of REALTORS® and were Participants in the Board's Multiple Listing Service. After many successful years, they decided to terminate their partnership with REALTOR® A continuing the building business and REALTOR® B forming a new residential brokerage company. As part of their termination agreement, REALTOR® B agreed not to build new homes in the XYZ Board's jurisdiction for a period of twelve months.

Six months later, REALTOR® A filed a written request for arbitration with the Professional Standards Administrator of the XYZ Board of REALTORS®. In his request, REALTOR® A outlined the terms of their partnership termination agreement pointing out that REALTOR® B had continued to build new homes in violation of their agreement. REALTOR® A demanded that the Board take action to enforce the agreement and compel REALTOR® B to refrain from any further construction.

The Professional Standards Administrator forwarded the arbitration request to the Grievance Committee for review. After review, the Grievance Committee found the matter not properly arbitrable.

REALTOR® A was upset with the Grievance Committee's decision and appealed to the Board of Directors. The Board of Directors noted that Article 17 of the Code of Ethics requires arbitration of disputes " . . . between REALTORS® associated with different firms arising out of their relationship as REALTORS®."

If REALTOR® A were requesting arbitration of a dispute arising out of a real estate transaction (such as a dispute concerning entitlement to commissions or subagency compensation), this would be a properly arbitrable matter. However, the Directors noted that the dispute in question related to the provisions of a partnership termination agreement which the Board had no authority to enforce. The Directors advised that while the Board's arbitration facilities were available to settle disputes between members, buyers, and sellers related to real estate transactions, the Board's authority did not extend to ordering performance of contracts since this was properly the privilege of the courts.

## Case 17-12: Arbitration when a REALTOR® acts Exclusively as a Principal in a Transaction

(Adopted November, 1995. Revised May, 2017.)

REALTOR® A, a residential specialist in a major metropolitan area, inherited a cabin in the North woods from a distant relative. After spending a week of vacation there with her family, REALTOR® A decided that the fact that the cabin was over five hundred miles from her home made it likely that her use of the cabin would be infrequent, at best. Consequently, she decided to list and sell the cabin. REALTOR® A described her situation to REALTOR® B, who claimed to be experienced in the sale of vacation properties in the area and who told REALTOR® A that a quick sale should be "no problem." Based of the REALTOR® B's assurances, REALTOR® A signed a listing agreement with REALTOR® B.

REALTOR® B showed the property several times over the following months but to no avail. REALTORS® A and B spoke by long distance several times and ultimately concluded that a significant reduction in the listed price was called for.

A month later, REALTOR® B called REALTOR® A and advised that she had received an offer but disclosed that the offer was from REALTOR® B's daughter and son-in-law. REALTOR® A thanked REALTOR® B for disclosing her relationship to the purchasers but went on to indicate that, as she felt that REALTOR® B had been overly optimistic in recommending an asking price in the first place, and that even after a significant price reduction the only offer produced by REALTOR® B had been from a member of her family, and that it was an "in-house" sale, REALTOR® A thought it was only fair that REALTOR® B would reduce her commission. REALTOR® B disagreed and sent the purchase offer to REALTOR® A. REALTOR® A accepted the offer but at the closing, which was handled in escrow, REALTOR® B was surprised to learn that REALTOR® A had instructed the closing officer to disburse to REALTOR® B only half of the commission called for in the listing contract. REALTOR® B filed an interboard arbitration request against REALTOR® A claiming the balance of her commission. REALTOR® A refused to arbitrate on the grounds that she had been the seller in the transaction and had not acted within the scope of her real estate license and that there had been no "relationship as REALTORS®" between her and REALTOR® B as referenced in Article 17 of the Code of Ethics. REALTOR® A's refusal to arbitrate was referred to the Board of Directors of REALTOR® A's primary Association and, in response to questions put to her, she repeated her claim that she had acted exclusively as a principal in the transaction and not as a real estate professional. The Directors concurred with her reasoning noting that the operant words in Article 17 refer to contractual disputes between REALTORS® in different firms "arising out of their relationship as REALTORS®." They noted that if it had been the desire of REALTOR® A and B to bind themselves to resolve any contractual dispute that might arise out of their principal/agent relationship, that could have been accomplished through insertion of an appropriate arbitration clause in the listing agreement. Absent that, there was no obligation for REALTOR® A to arbitrate with REALTOR® B.

## Case 17-13: Arbitration Involving a REALTOR® Selling her Own Property (Adopted November, 1995. Revised May, 2017.)

REALTOR® B was a real estate broker and property manager who, in addition to managing property for others, frequently bought and sold income property for her own account. Needing capital for another project, REALTOR® B decided to sell a three-flat building in which she had a strong equity position and which she thought would move quickly, given the current market conditions. To maximize market exposure, she listed the property with her firm and entered the listing into the MLS. She put a sign in front of the property indicating that it was for sale "by owner." Her ads in the local newspapers indicated that the seller was a "broker-owner."

REALTOR® A, who lived near the building, saw the "for sale" sign and called REALTOR® B. Introducing himself as a broker and as a REALTOR®, REALTOR® A asked what the asking price was and whether REALTOR® B was interested in listing her property. REALTOR® B did not indicate that she had listed her own property nor did she disclose that she was a broker or a REALTOR®. She did indicate that she would pay a commission to REALTOR® A if he procured a purchaser for the property but added that she preferred not to enter into an exclusive relationship with any broker and didn't want to put anything into writing.

REALTOR® A thought the property might interest Dr. X, REALTOR® A's chiropractor, and contacted him. Dr. X was in fact interested and, after several visits to the property, made an offer to purchase which was subsequently accepted by REALTOR® B.

At the closing, REALTOR® A learned several things, among them, that REALTOR® B, the seller, was also a REALTOR® and, more importantly, that REALTOR® B had instructed that only half of the previously agreed on commission was to be disbursed to REALTOR® A. When REALTOR® A protested the shortfall, REALTOR® B responded that her property was highly desirable, had "practically sold itself," and, in any event, REALTOR® A had expended minimal efforts in bringing about the quick sale. REALTOR® A disagreed with REALTOR® B's reasoning and, after appeals to REALTOR® B's sense of fairness went unheeded, filed an arbitration request with the Association of REALTORS®. Faced with the request to arbitrate, REALTOR® B declined, referring to Article 17 of the Code of Ethics and noting that it relates to disputes between REALTORS® "...arising out of their relationship as REALTORS® ..." whereas she had been the seller.

REALTOR® B's refusal to arbitrate was referred to the Board of Directors for their consideration. REALTOR® B repeated her defense that, as the seller, she was not obligated to arbitrate a dispute with another REALTOR® who had been acting within the scope of his broker's license absent a specific arbitration agreement. REALTOR® B pointed out that the agreement between them was oral and, in response to REALTOR® B's question, REALTOR® A admitted that the question of arbitration had never even been discussed. REALTOR® A noted the property had appeared in the MLS, and REALTOR® B responded that inclusion of information in the MLS had been

a "technicality" and that she had "listed with herself" merely to comply with MLS rules and that she had considered herself the seller, first and foremost. The Directors agreed with REALTOR® B that she obviously had been a principal in the sale of her own property but went on to conclude that by listing the property, albeit with herself, she no longer was exclusively a principal in the transaction but had also acted within the scope of her broker's license. As such, she had become embroiled in a contractual dispute with another REALTOR® "...arising out of their relationship as REALTORS®..." and had become obligated to arbitrate.



©2019 NATIONAL ASSOCIATION OF REALTORS®
All Rights Reserved.

(01/19)

430 North Michigan Avenue • Chicago, IL 60611-4087
800.874.6500 • www.NAR.realtor



# EXHIBIT D



### UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 05 C 5140 |
| v. | ) | |
| | ) | Judge Kennelly |
| NATIONAL ASSOCIATION OF | ) | |
| REALTORS® | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

*MK 11-16-08*

## [AMENDED PROPOSED] FINAL JUDGMENT

WHEREAS, Plaintiff, the United States of America, filed its Amended Complaint on

October 4, 2005, alleging that Defendant National Association of Realtors® ("NAR") adopted

policies that restrain competition from innovative real estate brokers in violation of Section 1 of

the Sherman Act, 15 U.S.C. § 1, and Plaintiff and Defendant, by their respective attorneys, have

consented to the entry of this Final Judgment without trial or adjudication of any issue of fact,

and without this Final Judgment constituting any evidence against, or any admission by, any

party regarding any issue of fact or law;

WHEREAS, Defendant has not admitted and does not admit either the allegations set

forth in the Amended Complaint or any liability or wrongdoing;

WHEREAS, the United States does not allege that Defendant's Internet Data Exchange

(IDX) Policy in its current form violates the antitrust laws; and

WHEREAS, the United States requires Defendant to agree to certain procedures and

prohibitions for the purpose of preventing the loss of competition alleged in the Complaint;

NOW THEREFORE, before any testimony is taken, without trial or adjudication of any issue of fact, and upon consent of the parties, it is ORDERED, ADJUDGED AND DECREED:

## I. JURISDICTION

This Court has jurisdiction over the Parties and subject matter of this action. The Complaint states a claim upon which relief may be granted against Defendant under Section 1 of the Sherman Act, as amended (15 U.S.C. § 1).

## II. DEFINITIONS

As used in this Final Judgment:

A.      "Broker" means a Person licensed by a state to provide services to a buyer or seller in connection with a real estate transaction. The term includes any Person who possesses a Broker's license and any agent or sales associate who is affiliated with such a Broker.

B.      "Covered Entity" means each Member Board that, at any time prior to the expiration of this Final Judgment, operates a multiple listing service and each multiple listing service that, at any time prior to the expiration of this Final Judgment, is exclusively owned by one or more Member Boards or is otherwise obligated to comply with NAR mandatory multiple listing service policies.

C.      "Customer" means a seller client of a Broker or a Person who has expressed to a Broker an interest in purchasing residential real property and who has described the type, features, or location of the property in which he or she has an interest, entitling the Broker to Provide the Customer multiple listing service ("MLS") listing information by any method (*e.g.*, by hand, mail, facsimile, electronic mail, or display on a VOW).

2

D.     "Final Judgment" includes the Modified VOW Policy attached as Exhibit A and the definition of MLS Participant and accompanying Note attached as Exhibit B.

E.     "ILD Policy" means the "ILD (Internet Listing Display) Policy" that NAR adopted on or about August 31, 2005, and any amendments thereto.

F.     "Including" means including, but not limited to.

G.     "Listing Information" means all records of residential properties (and any information relating to those properties) stored or maintained by a multiple listing service.

H.     "Member Board" means any state or local Board of Realtors® or Association of Realtors®, including any city, county, inter-county, or inter-state Board or Association, and any multiple listing service owned by, or affiliated with, any such Board of Realtors® or Association of Realtors®.

I.     "Modified VOW Policy" means the policy attached to this Final Judgment as Exhibit A.

J.     "NAR" means the National Association of Realtors®, its predecessors, successors, divisions, subsidiaries, affiliates, partnerships, and joint ventures and all directors, officers, employees, agents, and representatives of the foregoing. The terms "subsidiary," "affiliate," and "joint venture" refer to any Person in which there is or has been partial (twenty percent or more) or total ownership or control between NAR and any other Person.

K.     "Person" means any natural person, corporation, company, partnership, joint venture, firm, association, proprietorship, agency, board, authority, commission, office, or other business or legal entity, whether private or governmental.

L.     "Provide" means to deliver, display, disseminate, convey, or reproduce.

3

M.    "Rule" means any rule, model rule, ethical rule, bylaw, policy, standard, or guideline and any interpretation of any Rule issued or approved by NAR, whether or not the final implementation date of any such Rule has passed.

N.    "VOW" or "virtual office website" means a website, or feature of a website, operated by a Broker or for a Broker by another Person through which the Broker is capable of providing real estate brokerage services to consumers with whom the Broker has first established a Broker-consumer relationship (as defined by state law) where the consumer has the opportunity to search MLS data, subject to the Broker's oversight, supervision, and accountability.

O.    "VOW Policy" means the "Policy governing use of MLS data in connection with Internet brokerage services offered by MLS Participants ('Virtual Office Websites')," adopted by NAR on or about May 17, 2003, and any amendments thereto.

P.    The terms "and" and "or" have both conjunctive and disjunctive meanings.

### III.  APPLICABILITY

This Final Judgment applies to NAR and all other Persons in active concert or participation with NAR who have received actual notice of this Final Judgment.  A Member Board shall not be deemed to be in active concert with NAR solely as a consequence of the Member Board's receipt of actual notice of this Final Judgment and its affiliation with or membership in NAR and its involvement in regular activities associated with its affiliation with or membership in NAR (*e.g.*, coverage under a NAR insurance policy, attendance at NAR meetings or conventions, or review of Member Board policies by NAR).

4

## IV. **PROHIBITED CONDUCT**

Subject to the provisions of Sections V and VI of this Final Judgment, the Modified
VOW Policy (Exhibit A), and the definition of MLS Participant and accompanying Note
(Exhibit B), NAR shall not adopt, maintain, or enforce any Rule, or enter into or enforce any
agreement or practice, that directly or indirectly

A.    prohibits a Broker from using a VOW or prohibits, restricts, or impedes a Broker
who uses a VOW from providing to Customers on its VOW all of the Listing Information that a
Broker is permitted to Provide to Customers by hand, mail, facsimile, electronic mail, or any
other methods of delivery;

B.    unreasonably disadvantages or unreasonably discriminates against a Broker in the
use of a VOW to Provide to Customers all of the Listing Information that a Broker is permitted
to Provide to Customers by hand, mail, facsimile, electronic mail, or any other methods of
delivery;

C.    prohibits, restricts, or impedes the referral of Customers whose identities are
obtained from a VOW by a Broker who uses a VOW to any other Person, or establishes the price
of any such referral;

D.    imposes fees or costs upon any Broker who operates a VOW or upon any Person
who operates a VOW for any Broker that exceed the reasonably estimated actual costs incurred
by a Member Board in providing Listing Information to the Broker or Person operating the
VOW or in performing any other activities relating to the VOW, or discriminates in such VOW-
related fees or costs between those imposed upon a Broker who operates a VOW and those
imposed upon a Person who operates a VOW for a Broker, unless the MLS incurs greater costs

5

in providing a service to a Person who operates a VOW for a Broker than it incurs in providing

the same service to the Broker; or

    E.      is inconsistent with the Modified VOW Policy.

## V. REQUIRED CONDUCT

    A.      Within five business days after entry of this Final Judgment, NAR shall repeal the

ILD Policy and direct each Member Board that adopted Rules implementing the ILD Policy to

repeal such Rules at the next meeting of the Member Board's decisionmaking body that occurs

more than ten days after receipt of the directive, but no later than ninety days after entry of this

Final Judgment.

    B.      Within five business days after entry of this Final Judgment, NAR shall direct

Member Boards that adopted Rules implementing the VOW Policy to repeal such Rules at the

next meeting of the Member Board's decisionmaking body that occurs more than ten days after

receipt of the directive, but no later than ninety days after entry of this Final Judgment.

    C.      Within five business days after entry of this Final Judgment, NAR shall adopt the

Modified VOW Policy.  NAR shall not change the Modified VOW Policy without either

obtaining advance written approval by the United States Department of Justice, Antitrust

Division ("DOJ") or an order of the Court pursuant to Section VIII of this Final Judgment

authorizing the proposed modification.

    D.      Within five business days after entry of this Final Judgment, NAR shall direct

each Covered Entity to adopt the Modified VOW Policy within ninety days after entry of this

Final Judgment, and to thereafter maintain, act consistently with, and enforce Rules

implementing the Modified VOW Policy.  NAR shall simultaneously direct Covered Entities,

6

beginning upon receipt of the directive, not to adopt, maintain, or enforce any Rule or practice
that NAR would be prohibited from adopting, maintaining, or enforcing pursuant to Section IV
of this Final Judgment (including Rules or practices that unreasonably discriminate against
Brokers in their operation of VOWs).

E.      If NAR determines that a Covered Entity has not timely adopted or maintained,
acted consistently with, or enforced Rules implementing the Modified VOW Policy, it shall,
within thirty days of such determination, direct in writing that the Covered Entity do so. NAR
shall deny coverage under any NAR insurance policy (or cause coverage to be denied) to any
Covered Entity for as long as that Covered Entity refuses to adopt, maintain, act consistently
with, and enforce rules implementing the Modified VOW Policy. NAR shall also notify the DOJ
of the identity of that Covered Entity and the Modified VOW Policy provisions it refused to
adopt, maintain, act consistently with, or enforce. For purposes of this provision, a failure of a
Covered Entity to adopt, maintain, act consistently with, or enforce Rules implementing the
Modified VOW Policy within ninety days of a written directive to that Covered Entity from
NAR shall constitute a refusal by the Covered Entity to do so.

F.      If NAR determines that a Member Board has adopted, maintained, or enforced
any Rule or practice that NAR would be prohibited from adopting, maintaining, or enforcing
pursuant to Section IV of this Final Judgment (including Rules or practices that unreasonably
discriminate against Brokers in their operation of VOWs), it shall, within thirty days of such
determination, direct in writing that the Member Board rescind and cease to enforce that Rule or
practice. NAR shall deny coverage under any NAR insurance policy (or cause coverage to be
denied) to any Member Board for as long as that Member Board refuses to rescind and cease to

7

enforce that Rule or practice. NAR shall also notify the DOJ of the identity of that Member

Board and the Rule or practice it refused to rescind and cease to enforce. For purposes of this

provision, a Member Board's failure to rescind and cease to enforce the Rule or practice within

ninety days of a written directive from NAR shall constitute a refusal by the Member board to do

so.

G.    Within thirty days of entry of this Final Judgment, NAR shall designate an

Antitrust Compliance Officer with responsibility for educating Member Boards about the

antitrust laws and for achieving full compliance with this Final Judgment. The Antitrust

Compliance Officer shall be responsible for the following:

(1)    supervising NAR's review of Rules of NAR's Member Boards for compliance with this Final Judgment and the Modified VOW Policy;

(2)    maintaining copies of any communications with any Person containing allegations of any Member Board's (i) noncompliance with any provision of the Modified VOW Policy or with this Final Judgment or (ii) failure to enforce any Rules implementing the Modified VOW Policy;

(3)    reporting to the United States 180 days after entry of this Final Judgment and again on the first anniversary of the entry of this Final Judgment, the identity of each Covered Entity that has not adopted Rules implementing the Modified VOW Policy;

(4)    ensuring that each of NAR's Member Boards that owns or operates a multiple listing service are provided briefing materials, within ninety days of the entry of this Final Judgment, on the meaning and requirements of the Modified VOW Policy and this Final Judgment; and

(5)    holding an annual program for NAR Member Boards and their counsel that includes a discussion of the antitrust laws (as applied to such Member Boards) and this Final Judgment.

H.    NAR shall maintain and shall furnish to the DOJ on a quarterly basis (beginning

ninety days after entry of this Final Judgment) copies of any communications with any Person

8

containing allegations of any Member's Board's (1) noncompliance with any provision of the Modified VOW Policy or with this Final Judgment or (2) failure to enforce any Rules implementing the Modified VOW Policy.

 I. Within five business days after entry of this Final Judgment, NAR shall provide, in a prominent size and location on its website (www.realtor.org) a hyperlink to a webpage on which NAR has published copies of

   (1) this Final Judgment;

   (2) a notification that Member Boards must repeal any Rules implementing the ILD and VOW Policies (in accordance with Sections V.A and V.B of this Final Judgment); and

   (3) a copy of the Modified VOW Policy.

NAR shall also publish each of the three above items in the first issue of Realtor® Magazine scheduled for publication after the date of entry of this Final Judgment.

## VI. **PERMITTED CONDUCT**

 A. Subject to Section IX of this Final Judgment, nothing in this Final Judgment shall prohibit NAR from adopting and maintaining the definition of MLS Participant and the accompanying Note, together attached as Exhibit B. However, NAR shall direct each Member Board not to suspend or expel any Broker from multiple listing service membership or participation for reasons of the Broker's then-failure to qualify for membership or participation under the definition of MLS Participant and the accompanying Note, together attached as Exhibit B, until May 27, 2009.

 B. Notwithstanding any of the above provisions, and subject to Section IX of this Final Judgment, nothing in this Final Judgment shall prohibit NAR from adopting, maintaining,

9

or enforcing Rules that are generally applicable on their face and that do not, in their application, unreasonably restrict any method of delivery of Listing Information to Customers.

## VII. **COMPLIANCE INSPECTION**

A.     For the purposes of determining or securing compliance with this Final Judgment, or of determining whether this Final Judgment should be modified or vacated, and subject to any legally recognized privilege, from time to time authorized representatives of the DOJ, including consultants and other Persons retained by the United States, shall, upon written request of an authorized representative of the Assistant Attorney General in charge of the Antitrust Division, and on reasonable notice to NAR, be permitted:

(1)     access during NAR's office hours to inspect and copy, or at the option of the United States, to require NAR to provide hard copy or electronic copies of, all books, ledgers, accounts, records, data, and documents in the possession, custody, or control of NAR, relating to any matters contained in this Final Judgment; and

(2)     to interview, either informally or on the record, NAR's officers, employees, or agents, who may have their individual counsel and counsel for NAR present, regarding such matters. The interviews shall be subject to the reasonable convenience of the interviewee and without restraint or interference by NAR. NAR may, however, prevent the interviewee from divulging matters protected by the attorney-client privilege, work product doctrine, or other applicable privilege.

B.     Upon the written request of an authorized representative of the Assistant Attorney General in charge of the Antitrust Division, NAR shall submit written reports or response to written interrogatories, under oath if requested, relating to its compliance with any of the matters contained in this Final Judgment as may be requested.

C.     No information or documents obtained by the means provided in this section shall be divulged by the United States to any Person other than an authorized representative of the

10

executive branch of the United States, except in the course of legal proceedings to which the United States is a party (including grand jury proceedings), or for the purpose of securing compliance with this Final Judgment, or as otherwise required by law.

D.    If at the time information or documents are furnished by NAR to the United States, NAR marks as confidential any pertinent page of such material on the grounds that such page contains information as to which a claim of protection may be asserted under Rule 26(c)(1)(G) of the Federal Rules of Civil Procedure, then the United States shall give NAR ten calendar days notice prior to divulging such material in any legal proceeding (other than a grand jury proceeding).

## VIII. RETENTION OF JURISDICTION

This Court retains jurisdiction to enable any party to this Final Judgment to apply to this Court at any time for further orders and directions as may be necessary or appropriate to carry out or construe this Final Judgment, to modify any of its provisions, to enforce compliance, and to punish violations of its provisions.

## IX. NO LIMITATION ON GOVERNMENT RIGHTS

Nothing in this Final Judgment shall limit the right of the United States to investigate and bring actions to prevent or restrain violations of the antitrust laws concerning any Rule or practice adopted or enforced by NAR or any of its Member Boards.

## X. EXPIRATION OF FINAL JUDGMENT

This Final Judgment shall expire ten years from the date of its entry.

## XI. PUBLIC INTEREST DETERMINATION

Entry of this Final Judgment is in the public interest. The parties have complied with the requirements of the Antitrust Procedures and Penalties Act, 15 U.S.C. § 16, including making copies available to the public of this Final Judgment, the Competitive Impact Statement, and any comments thereon and the United States's responses to comments. Based upon the record before the Court, which includes the Competitive Impact Statement and any comments and response to comments filed with the Court, entry of this Final Judgment is in the public interest.

Dated:  11-18-08

> Court approval subject to procedures
> of Antitrust Procedures and Penalties
> Act, 15 U.S.C. § 16
>
>
> Matthew F. Kennelly
> United States District Judge

12

# EXHIBIT A

**Policy governing use of MLS data in connection with
Internet brokerage services offered by MLS Participants
("Virtual Office Websites")**

## I. Definitions and Scope of Policy.

1. For purposes of this Policy, the term Virtual Office Website ("VOW") refers to a
Participant's Internet website, or a feature of a Participant's Internet website, through which the
Participant is capable of providing real estate brokerage services to consumers with whom the
Participant has first established a broker-consumer relationship (as defined by state law) where
the consumer has the opportunity to search MLS data, subject to the Participant's oversight,
supervision, and accountability.

a. A Participant may designate an Affiliated VOW Partner ("AVP") to operate a VOW on behalf
of the Participant, subject to the Participant's supervision and accountability and the terms of this
Policy.

b. A non-principal broker or sales licensee, affiliated with a Participant, may, with the
Participant's consent, operate a VOW or have a VOW operated on its behalf by an AVP. Such a
VOW is subject to the Participant's supervision and accountability and the terms of this Policy.

c. Each use of the term "Participant" in this Policy shall also include a Participant's
non-principal brokers and sales licensees (with the exception of references in this section to the
"Participant's consent" and the "Participant's supervision and accountability," and in section
III.10.a, below, to the "Participant acknowledges"). Each reference to "VOW" or "VOWs"
herein refers to all VOWs, whether operated by a Participant, by a non-principal broker or sales
licensee, or by an AVP.

2. The right to display listings in response to consumer searches is limited to display of MLS
data supplied by the MLS(s) in which the Participant has participatory rights. This does not
preclude a firm with offices participating in different MLSs from operating a master website
with links to such offices' VOWs.

3. Participants' Internet websites, including those operated for Participants by AVPs, may also
provide other features, information, or services in addition to VOWs (including the Internet Data
Exchange ("IDX") function).

4. The display of listing information on a VOW does not require separate permission from the
Participant whose listings will be available on the VOW.

5. Except as permitted in Sections III and IV, MLSs may not adopt rules or regulations that
conflict with this Policy or that otherwise restrict the operation of VOWs by Participants.

## II. Policies Applicable to Participants' VOWs.

1. A Participant may provide brokerage services via a VOW that include making MLS active listing data available, but only to consumers with whom the Participant has first established a lawful consumer-broker relationship, including completion of all actions required by state law in connection with providing real estate brokerage services to clients and customers (hereinafter "Registrants"). Such actions shall include, but are not limited to, satisfying all applicable agency, non-agency, and other disclosure obligations, and execution of any required agreement(s).

2. A Participant's VOW must obtain the identity of each Registrant and obtain each Registrant's agreement to Terms of Use of the VOW, as follows:

a. A Registrant must provide his or her name and a valid email address. The Participant must send an email to the address provided by the Registrant confirming that the Registrant has agreed to the Terms of Use (described in subsection c below). The Registrant may be permitted to access the VOW only after the Participant has verified that the email address provided is valid and that Registrant received the Terms of Use confirmation.

b. The Registrant must supply a user name and a password, the combination of which must be different from those of all other Registrants on the VOW, before being permitted to search and retrieve information from the MLS database via the VOW. The user name and password may be established by the Registrant or may be supplied by the Participant, at the option of the Participant. An email address may be associated with only one user name and password. The Registrant's password and access must expire on a date certain but may be renewed. The Participant must at all times maintain a record of the name and email address supplied by the Registrant, and the username and current password of each Registrant. Such records must be kept for not less than 180 days after the expiration of the validity of the Registrant's password. If the MLS has reason to believe that a Participant's VOW has caused or permitted a breach in the security of the data or a violation of MLS rules related to use by one or more Registrants, the Participant shall, upon request, provide to the MLS a copy of the record of the name, email address, user name, current password, and audit trail, if required, of any Registrant identified by the MLS to be suspected of involvement in the violation.

c. The Registrant must be required affirmatively to express agreement to a "Terms of Use" provision that requires the Registrant to open and review an agreement that provides at least the following:

    i.    That the Registrant acknowledges entering into a lawful consumer-broker relationship with the Participant;

    ii.    That all data obtained from the VOW is intended only for the Registrant's personal, non-commercial use;

    iii.      That the Registrant has a bona fide interest in the purchase, sale, or lease of real estate of the type being offered through the VOW;

    iv.      That the Registrant will not copy, redistribute, or retransmit any of the data or information provided, except in connection with the Registrant's consideration of the purchase or sale of an individual property;

    v.      That the Registrant acknowledges the MLS's ownership of, and the validity of the MLS's copyright in, the MLS database.

After the Registrant has opened for viewing the Terms of Use agreement, a "mouse click" is sufficient to acknowledge agreement to those terms. The Terms of Use Agreement may not impose a financial obligation on the Registrant or create any representation agreement between the Registrant and the Participant.

The Terms of Use agreement shall also expressly authorize the MLS, and other MLS Participants or their duly authorized representatives, to access the VOW for the purposes of verifying compliance with MLS rules and monitoring display of Participants' listings by the VOW.

d. An agreement entered into at any time between the Participant and Registrant imposing a financial obligation on the Registrant or creating representation of the Registrant by the Participant must be established separately from the Terms of Use, must be prominently labeled as such, and may not be accepted solely by mouse click.

3. A Participant's VOW must prominently display an e-mail address, telephone number, or specific identification of another mode of communication (e.g., live chat) by which a consumer can contact the Participant to ask questions, or get more information, about properties displayed on the VOW. The Participant, or a non-principal broker or sales licensee licensed with the Participant, must be willing and able to respond knowledgeably to inquiries from Registrants about properties within the market area served by that Participant and displayed on the VOW.

4. A Participant's VOW must protect the MLS data from misappropriation by employing reasonable efforts to monitor for and prevent "scraping" or other unauthorized accessing, reproduction, or use of the MLS database.

5. A Participant's VOW must comply with the following additional requirements:

a. No VOW shall display the listing or property address of any seller who has affirmatively directed its listing broker to withhold its listing or property address from display on the Internet. The listing broker or agent shall communicate to the MLS that a seller has elected not to permit display of the listing or property address on the Internet. Notwithstanding the foregoing, a Participant who operates a VOW may provide to consumers via other delivery

3

mechanisms, such as email, fax, or otherwise, the listing or property address of a seller who has determined not to have the listing or address for its property displayed on the Internet.

b. A Participant who lists a property for a seller who has elected not to have the property listing or the property address displayed on the Internet shall cause the seller to execute a document that conforms to the form attached to this Policy as Appendix A. The Participant shall retain such forms for at least one year from the date they are signed.

c. With respect to any VOW that

(i) allows third-parties to write comments or reviews about particular listings or displays a hyperlink to such comments or reviews in immediate conjunction with particular listings, or
(ii) displays an automated estimate of the market value of the listing (or hyperlink to such estimate) in immediate conjunction with the listing,

the VOW shall disable or discontinue either or both of those features as to the seller's listing at the request of the seller. The listing broker or agent shall communicate to the MLS that the seller has elected to have one or both of these features disabled or discontinued on all Participants' websites. Except for the foregoing and subject to subparagraph (d), a Participant's VOW may communicate the Participant's professional judgment concerning any listing. Nothing shall prevent a VOW from notifying its customers that a particular feature has been disabled "at the request of the seller."

d. A VOW shall maintain a means (e.g., e-mail address, telephone number) to receive comments about the accuracy of any data or information that is added by or on behalf of the VOW operator beyond that supplied by the MLS and that relates to a specific property displayed on the VOW. The VOW operator shall correct or remove any false data or information relating to a specific property upon receipt of a communication from the listing broker or listing agent for that property explaining why the data or information is false. However, the VOW operator shall not be obligated to remove or correct any data or information that simply reflects good faith opinion, advice, or professional judgment.

e. Each VOW shall refresh MLS data available on the VOW not less frequently than every 3 days.

f. Except as provided elsewhere in this Policy or in MLS rules and regulations, no portion of the MLS database may be distributed, provided, or made accessible to any person or entity.

g. Every VOW must display a privacy Policy that informs Registrants of the ways in which information obtained from them will be used.

4

h. A VOW may exclude listings from display based only on objective criteria, including, but not limited to, factors such as geography, list price, type of property, cooperative compensation offered by listing broker, or whether the listing broker is a Realtor®.

6. A Participant who intends to operate a VOW must notify the MLS of its intention to establish a VOW and must make the VOW readily accessible to the MLS and to all MLS Participants for purposes of verifying compliance with this Policy and any other applicable MLS rules or policies.

7. A Participant may operate more than one VOW itself or through an AVP. A Participant who operates a VOW itself shall not be precluded from also operating VOWs in conjunction with AVPs.

### III. Policies Applicable to Multiple Listing Services.

1. A Multiple Listing Service shall permit MLS Participants to operate VOWs, or to have VOWs operated for them by AVPs, subject to the requirements of state law and this Policy.

2. An MLS shall, if requested by a Participant, provide basic "downloading" of all MLS non-confidential listing data, including without limitation address fields, listings types, photographs, and links to virtual tours. Confidential data includes only that which Participants are prohibited from providing to customers orally and by all other delivery mechanisms. They include fields containing the information described in paragraph IV(1) of this Policy, provided that sold data (i.e., listing information relating to properties that have sold) shall be deemed confidential and withheld from a download only if the actual sales prices of completed transactions are not accessible from public records. For purposes of this Policy, "downloading" means electronic transmission of data from MLS servers to a Participant's or AVP's server on a persistent basis. An MLS may also offer a transient download. In such case, it shall also, if requested, provide a persistent download, provided that it may impose on users of such download the approximate additional costs incurred by it to do so.

3. This Policy does not require an MLS to establish publicly accessible sites displaying Participants' listings.

4. If an MLS provides a VOW-specific feed, that feed must include all of the non-confidential data included in the feed described in paragraph 2 above except for listings or property addresses of sellers who have elected not to have their listings or addresses displayed on the Internet.

5. An MLS may pass on to those Participants who will download listing information the reasonably estimated costs incurred by the MLS in adding or enhancing its "downloading" capacity to enable such Participants to operate VOWs.

6. An MLS may require that Participants (1) utilize appropriate security protection, such as firewalls, as long as such requirement does not impose security obligations greater than those

5

employed concurrently by the MLS, and/or (2) maintain an audit trail of Registrants' activity on the VOW and make that information available to the MLS if the MLS has reason to believe that any VOW has caused or permitted a breach in the security of the data or a violation of applicable MLS rules.

7.  An MLS may not prohibit or regulate display of advertising or the identification of entities on VOWs ("branding" or "co-branding"), except to prohibit deceptive or misleading advertising or co-branding.  For purposes of this provision, co-branding will be presumed not to be deceptive or misleading if the Participant's logo and contact information (or that of at least one Participant, in the case of a VOW established and operated by or for more than one Participant) is displayed in immediate conjunction with that of every other party, and the logo and contact information of all Participants displayed on the VOW is as large as the logo of the AVP and larger than that of any third party.

8.  Except as provided in this Policy, an MLS may not prohibit Participants from enhancing their VOWs by providing information obtained from sources other than the MLS, additional technological services (such as mapping functionality), or information derived from non-confidential MLS data (such as an estimated monthly payment derived from the listed price), or regulate the use or display of such information or technological services on any VOW.

9.  Except as provided in generally applicable rules or policies (such as the Realtor® Code of Ethics), an MLS may not restrict the format of data display on a VOW or regulate the appearance of VOWs.

10.  Subject to the provisions below, an MLS shall make MLS listing data available to an AVP for the exclusive purpose of operating a VOW on behalf of a Participant.  An MLS shall make MLS listing data available to an AVP under the same terms and conditions as those applicable to Participants.  No AVP has independent participation rights in the MLS by virtue of its right to receive data on behalf of a Participant, or the right to use MLS data except in connection with operation of a VOW for a Participant.  AVP access to MLS data is derivative of the rights of the Participant on whose behalf the AVP is downloading data.

   a.  A Participant, non-principal broker or sales licensee, or AVP may establish the AVP's right to receive and use MLS data by providing to the MLS a writing in which the Participant acknowledges its or its non-principal broker's or sales licensee's selection of the AVP to operate a VOW on its behalf.

   b.  An MLS may not charge an AVP, or a Participant on whose behalf an AVP operates a VOW, more than a Participant that chooses to operate a VOW itself (including any fees or costs associated with a license to receive MLS data, as described in (g), below), except to the extent that the MLS incurs greater costs in providing listing data to the AVP than the MLS incurs in providing listing data to a Participant.

6

c. An MLS may not place data security requirements or restrictions on use of MLS listing data by an AVP that are not also imposed on Participants.

d. An MLS must permit an AVP to download listing information in the same manner (e.g., via a RETS feed or via an FTP download), at the same times and with the same frequency that the MLS permits Participants to download listing information.

e. An MLS may not refuse to deal directly with an AVP in order to resolve technical problems with the data feed. However, the MLS may require that the Participant on whose behalf the AVP is operating the VOW participate in such communications if the MLS reasonably believes that the involvement of the Participant would be helpful in order to resolve the problem.

f. An MLS may not condition an AVP's access to a data feed on the financial terms on which the AVP provides the site for the Participant.

g. An MLS may require Participants and AVPs to execute license or similar agreements sufficient to ensure that Participants and AVPs understand and agree that data provided by the MLS may be used only to establish and operate a VOW on behalf of the Participant and not for any other purpose.

h. An MLS may not (i) prohibit an AVP from operating VOWs on behalf of more than one Participant, and several Participants may designate an AVP to operate a single VOW for them collectively, (ii) limit the number of entities that Participants may designate as AVPs for purposes of operating VOWs, or (iii) prohibit Participants from designating particular entities as AVPs except that, if an AVP's access has been suspended or terminated by an MLS, that MLS may prevent an entity from being designated an AVP by another Participant during the period of the AVP's suspension or termination.

i. Except as stated below, an MLS may not suspend or terminate an AVP's access to data (a) for reasons other than those that would allow an MLS to suspend or terminate a Participant's access to data, or (b) without giving the AVP and the associated Participant(s) prior notice and the process set forth in the applicable provisions of the MLS rules for suspension or termination of a Participant's access. Notwithstanding the foregoing, an MLS may immediately terminate an AVP's access to data (a) if the AVP is no longer designated to provide VOW services to any Participant, (b) if the Participant for whom the AVP operates a VOW ceases to maintain its status with the MLS, (c) if the AVP has downloaded data in a manner not authorized for Participants and that hinders the ability of Participants to download data, or (d) if the associated Participant or AVP has failed to make required payments to the MLS in accordance with the MLS's generally applicable payment policies and practices.

11. An MLS may not prohibit, restrict, or impede a Participant from referring Registrants to any person or from obtaining a fee for such referral.

7

## IV. Requirements That MLSs May Impose on the Operation of VOWs and Participants.

1. An MLS may impose any, all, or none of the following requirements on VOWs but may impose them only to the extent that equivalent requirements are imposed on Participants' use of MLS listing data in providing brokerage services via all other delivery mechanisms:

a. A Participant's VOW may not make available for search by or display to Registrants the following data intended exclusively for other MLS Participants and their affiliated licensees:

i. Expired, withdrawn, or pending listings.

ii. Sold data unless the actual sales price of completed transactions is accessible from public records.

iii. The compensation offered to other MLS Participants.

iv. The type of listing agreement, i.e., exclusive right to sell or exclusive agency.

v. The seller(s) and occupant(s) name(s), phone number(s) and email address(es), where available.

vi. Instructions or remarks intended for cooperating brokers only, such as those regarding showing or security of the listed property.

b. The content of MLS data that is displayed on a VOW may not be changed from the content as it is provided in the MLS. MLS data may be augmented with additional data or information not otherwise prohibited from display as long as the source of such other data or information is clearly identified. This requirement does not restrict the format of MLS data display on VOWs or display of fewer than all of the listings or fewer authorized data fields.

c. There shall be a notice on all MLS data displayed indicating that the data is deemed reliable but is not guaranteed accurate by the MLS. A Participant's VOW may also include other appropriate disclaimers necessary to protect the Participant and/or the MLS from liability.

d. Any listing displayed on a VOW shall identify the name of the listing firm in a readily visible color, and reasonably prominent location, and in typeface not smaller than the median typeface used in the display of listing data.

e. The number of current or, if permitted, sold listings that Registrants may view, retrieve, or download on or from a VOW in response to an inquiry may be limited to a

8

reasonable number. Such number shall be determined by the MLS, but in no event may the limit be fewer than 100 listings or 5% of the listings in the MLS, whichever is less.

f. Any listing displayed on a VOW shall identify the name of the listing agent.

2. An MLS may also impose the following other requirements on the operation of VOWs:

a. Participants displaying other brokers' listings obtained from other sources, e.g., other MLSs, non-participating brokers, etc. shall display the source from which each such listing was obtained.

b. A maximum period, no shorter than 90 days and determined by the MLS, during which Registrants' passwords are valid, after which such passwords must be changed or reconfirmed.

3. An MLS may not prohibit Participants from downloading and displaying or framing listings obtained from other sources, e.g., other MLSs or from brokers not participating in that MLS, etc., but may require either that (i) such information be searched separately from listings obtained from other sources, including other MLSs, or (ii) if such other sources are searched in conjunction with searches of the listings available on the VOW, require that any display of listings from other sources identify such other source.

EFFECTIVE DATE:

MLSs have until not later than [90 DAYS AFTER ENTRY OF THE FINAL JUDGMENT] to adopt rules implementing the foregoing policies and to comply with the provisions of section III above, and (2) Participants shall have until not later than 180 days following adoption and implementation of rules by an MLS in which they participate to cause their VOW to comply with such rules.

See Appendix A for Seller Opt-Out Form

9

**Appendix A**
**Seller Opt-Out Form**

1.[Check one]

a. [Check here]  I have advised my broker or sales agent that I do not want the listed property to be displayed on the Internet;  or

b. [Check here]   I have advised my broker or sales agent that I do not want the address of the listed property to be displayed on the Internet.

2.  I understand and acknowledge that, if I have selected option a, consumers who conduct searches for listings on the Internet will not see information about the listed property in response to their search.

_____
initials of seller

# EXHIBIT B

(Statement of MLS Policy)
**Statement 7.9 . . . Definition of MLS "Participant"**

The term "Participant" in a Board Multiple Listing Service is defined, as follows:

"Where the term REALTOR® is used in this explanation of policy in connection with the word 'Member' or the word 'Participant', it shall be construed to mean the REALTOR® principal or principals, of this or any other Board, or a firm comprised of REALTOR® principals participating in a Multiple Listing Service owned and operated by the Board. Participatory rights shall be held by an individual principal broker unless determined by the Board or MLS to be held by a firm. It shall not be construed to include individuals other than a principal or principals who are REALTOR® Members of this or any other Board, or who are legally entitled to participate without Board membership. However, under no circumstances is any individual or firm, regardless of membership status, entitled to MLS 'Membership' or 'Participation' unless they hold a current, valid real estate broker's license and ~~are capable of offering and accepting~~ offer or accept cooperation and compensation to and from other Participants or are licensed or certified by an appropriate state regulatory agency to engage in the appraisal of real property. Use of information developed by or published by a Board Multiple Listing Service is strictly limited to the activities authorized under a Participant's licensure(s) or certification and unauthorized uses are prohibited. Further, none of the foregoing is intended to convey 'Participation' or 'Membership' or any right of access to information developed by or published by a Board Multiple Listing Service where access to such information is prohibited by law. Additionally, the foregoing does not prohibit Board Multiple Listing Services, at their discretion, from categorizing non-principal brokers, sales licensees, licensed and certified appraisers and others affiliated with the MLS 'Members' or 'Participants' as 'users' or 'subscribers' and, holding such individuals personally subject to the rules and regulations and any other governing provisions of the MLS and to discipline for violations thereof. MLSs may, as a matter of local determination, limit participatory rights to individual principal brokers, or to their firms, and to licensed or certified appraisers, who maintain an office or Internet presence from which they are available to represent  real estate  sellers, buyers, lessors or lessees or from which they provide appraisal services. (Amended 5/02)

Where the terms 'subscriber' or 'user' are used in connection with a Multiple Listing Service owned or operated by a Board of REALTORS®, they refer to non-principal brokers, sales licensees, and licensed and certified real estate appraisers affiliated with an MLS Participant and may, as a matter of local option, also include a Participant's affiliated unlicensed administrative and clerical staff, personal assistants, and individuals seeking licensure or certification as real estate appraisers provided that any such individual is under the direct supervision of an MLS Participant or the Participant's licensed designee. If such access is available to unlicensed or uncertified individuals, their access is subject to the rules and regulations, the payment of applicable fees and charges (if any), and the limitations and restrictions of state law. None of the foregoing shall diminish the Participant's ultimate responsibility for ensuring compliance with the rules and regulations of the MLS by all individuals affiliated with the Participant. (Adopted 4/92)

Under the 'Board of Choice' policy, MLS participatory rights shall be available to any REALTOR® (principal) or any firm comprised of REALTORS® (principals) irrespective of where they hold primary membership subject only to their agreement to abide by any MLS rules or regulations; agreement to arbitrate disputes with other Participants; and payment of any MLS dues, fees, and charges." Participatory rights granted under Board of Choice do not confer voting privileges or eligibility for office as an MLS committee member, officer, or director, except as granted at the discretion of the local Board and/or MLS. (Amended 5/97)

The universal access to services component of Board of Choice is to be interpreted as requiring that MLS Participatory rights be available to REALTOR® principals, or to firms comprised of REALTOR® principals, irrespective of where primary or secondary membership is held. This does not preclude an MLS from assessing REALTORS® not holding primary or secondary membership locally fees, dues, or charges that exceed those of, alternatively, that are less than those charged Participants holding such memberships locally or additional fees to offset actual expenses incurred in providing MLS services such as courier charges, long distance phone charges, etc., or for charging any Participant specific fees for optional additional services. (Amended 11/96)

None of the foregoing shall be construed as requiring a Board to grant MLS participatory rights, under Board of Choice, where such rights have been previously terminated by action of that Board's Board of Directors." (Adopted 11/95)

(Model MLS rules)
**Section 3—Participation:** Any REALTOR® of this or any other Board who is a principal, partner, corporate officer, or branch office manager acting on behalf of a principal, without further qualification, except as otherwise stipulated in these bylaws, shall be eligible to participate in Multiple Listing upon agreeing in writing to conform to the rules and regulations thereof and to pay the costs incidental thereto.* However, under no circumstances is any individual or firm, regardless of membership status, entitled to Multiple Listing Service "membership" or "participation" unless they hold a current, valid real estate broker's license and ~~are capable of offering and accepting~~ offer or accept compensation to and from other Participants or are licensed or certified by an appropriate state regulatory agency to engage in the appraisal of real property.** Use of information developed by or published by a Board Multiple Listing Service is strictly limited to the activities authorized under a Participant's licensure(s) or certification and unauthorized uses are prohibited. Further, none of the foregoing is intended to convey "participation" or "membership" or any right of access

to information developed by or published by a Board Multiple Listing Service where access to such information is prohibited by law. (Amended 11/96)

Note: Mere possession of a broker's license is not sufficient to qualify for MLS participation. Rather, the requirement that an individual or firm 'offers or accepts cooperation and compensation' means that the Participant actively endeavors during the operation of its real estate business to list real property of the type listed on the MLS and/or to accept offers of cooperation and compensation made by listing brokers or agents in the MLS. "Actively" means on a continual and on-going basis during the operation of the Participant's real estate business. The "actively," requirement is not intended to preclude MLS participation by a Participant or potential Participant that operates a real estate business on a part time, seasonal, or similarly time-limited basis or that has its business interrupted by periods of relative inactivity occasioned by market conditions. Similarly, the requirement is not intended to deny MLS participation to a Participant or potential Participant who has not achieved a minimum number of transactions despite good faith efforts. Nor is it intended to permit an MLS to deny participation based on the level of service provided by the Participant or potential Participant as long as the level of service satisfies state law.

The key is that the Participant or potential Participant actively endeavors to make or accept offers of cooperation and compensation with respect to properties of the type that are listed on the MLS in which participation is sought. This requirement does not permit an MLS to deny participation to a Participant or potential Participant that operates a Virtual Office Website ("VOW") (including a VOW that the Participant uses to refer customers to other Participants) if the Participant or potential Participant actively endeavors to make or accept offers of cooperation and compensation. An MLS may evaluate whether a Participant or potential Participant "actively endeavors during the operation of its real estate business" to "offer or accept cooperation and compensation" only if the MLS has a reasonable basis to believe that the Participant or potential Participant is in fact not doing so.

The membership requirement shall be applied on a nondiscriminatory manner to all Participants and potential Participants.