**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| CHRISTOPHER MOEHRL, MICHAEL COLE, STEVE DARNELL, VALERIE NAGER, JACK RAMEY, DANIEL UMPA, AND JANE RUH, on behalf of themselves and all others similarly situated, | ) ) ) ) ) ) | |
| | ) | Case No.: 1:19-cv-01610 |
| Plaintiffs, | ) ) | |
| | ) | Judge Andrea R. Wood |
| v. | ) ) | |
| THE NATIONAL ASSOCIATION OF REALTORS, REALOGY HOLDINGS CORP., HOMESERVICES OF AMERICA, INC., HSF AFFILIATES, LLC, BHH AFFILIATES, LLC, THE LONG & FOSTER COMPANIES, INC., RE/MAX LLC, AND KELLER WILLIAMS REALTY, INC., | ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

**PLAINTIFFS' MEMORANDUM IN OPPOSITION
TO DEFENDANTS' MOTIONS TO DISMISS**

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................. 1

STATEMENT OF FACTS ............................................................................................... 3

THE MOTION TO DISMISS STANDARDS ................................................................ 12

ARGUMENT ................................................................................................................... 13

I.    The Challenged Restraints Are Anticompetitive and Unlawful. ....................... 13

   A.    The Sherman Act prohibits agreements that unreasonably restrain trade ............. 13

   B.    The challenged conduct unreasonably restraints trade. ........................................ 14

      1.    The co-conspirators have market power. ................................................... 15

      2.    The challenged restraints are anticompetitive ........................................... 17

      3.    Defendants' anticompetitive restraints have injured plaintiffs and
            the class. ..................................................................................................... 29

      4.    Even if procompetitive benefits could be considered at the pleading
            stage, the challenged restraints have none. ............................................... 33

II.   NAR and the Corporate Defendants Agreed to the Challenged Restraints. ...................... 36

   A.    An association's rules are an agreement among its members for antitrust
         purposes. ................................................................................................................ 37

   B.    The Corporate Defendants participated in an agreement by imposing NAR
         and MLS rules on their subsidiaries and affiliates. .............................................. 39

   C.    The Corporate Defendants' role in driving NAR policy and implementing
         NAR rules through MLSs and Realtor associations plausibly shows
         their participation in an agreement. ...................................................................... 42

   D.    The CAC pleads an agreement—not merely parallel conduct ............................... 44

   E.    The CAC adequately pleads each Corporate Defendant's participation in an
         agreement. .............................................................................................................. 47

CONCLUSION ................................................................................................................ 53

**Page(s)**

**C**ASES

*In re Aftermarket Filters Antitrust Litig.*,
    No. 08-cv-4883, 2009 WL 3754041 (N.D. Ill. Nov. 5, 2009) ..........................................12, 22

*Alarm Detection Sys., Inc. v. Vill. of Schaumburg*,
    930 F.3d 812 (7th Cir. 2019) ......................................................................................42

*Am. Soc'y of Mech. Eng'rs, Inc. v. Hydrolevel Corp.*,
    456 U.S. 556 (1982).....................................................................................................41

*American Needle, Inc. v. NFL*,
    560 U.S. 183 (2010).....................................................................................................45

*Anderson v. Shipowners Ass'n of Pac. Coast*,
    272 U.S. 359 (1926).....................................................................................................39

*Ariz. v. Maricopa Cty. Med. Soc'y*,
    457 U.S. 332 (1982)..................................................................................14, 18, 29, 37

*Associated Press v. United States*,
    326 U.S. 1 (1945)..................................................................................................36, 39

*BCB Anesthesia Care, Ltd. v. Passavant Mem'l Area Hosp. Ass'n*,
    36 F.3d 664 (7th Cir. 1994) ........................................................................................32

*Bear v. Cty. of Jackson*,
    No. 5:14-CV-5059-KES, 2015 WL 1969760 (D.S.D. May 1, 2015) .....................................20

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)............................................................................................2, 12, 36

*Beltz Travel Serv., Inc. v. Int'l Air Transp. Ass'n*,
    620 F.2d 1360 (7th Cir. 1980) ...............................................................................41, 47

*Blue Shield of Va. v. McCready*,
    457 U.S. 465 (1982).....................................................................................................31

*In re Brand Name Prescription Drugs Antitrust Litig.*,
    No. 94-cv-897, 1994 WL 240537 (N.D. Ill. May 24, 1994)..............................................13

*In re Broiler Chicken Antitrust Litig.*,
    290 F. Supp. 3d 772 (N.D. Ill. 2017) ...............................................................12, 44, 47, 49

*In re Broiler Chicken Antirust Litig.*,
   2019 WL 1003111 (N.D. Ill. Feb. 28, 2019) ........................................................44

*Brown v. Visa U.S.A., Inc.*,
   674 F. Supp. 249 (N.D. Ill. 1987) ........................................................................32

*Car Carriers, Inc. v. Ford Motor Co.*,
   745 F.2d 1101 (7th Cir. 1984) .............................................................................32

*Catalano, Inc. v. Target Sales, Inc.*,
   446 U.S. 643, 647-48 (1980) ...................................................................15, 19, 28

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.*,
   370 U.S. 690 (1962) .............................................................................................22

*Cook Inc. v. Boston Sci. Corp.*,
   No. 01-cv-9479, 2002 WL 335314 (N.D. Ill. Feb. 28, 2002) ..............................14

*Cortelco Sys. of P.R. Inc. v. Phoneworks, Inc.*,
   No. 09-1371CCC, 2009 WL 4046794 (D. P.R. Nov. 20, 2009) ...........................32

*In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*,
   No. 9 CR 3690, 2013 WL 212908 (N.D. Ill. Jan. 18, 2013) ................................29

*In re Dealer Mgmt. Sys. Antitrust Litig.*,
   362 F. Supp. 3d 510 (N.D. Ill. 2019) ...................................................................13

*In re Dealer Mgmt. Sys. Antitrust Litig.*,
   No. 18-cv-864, 2018 WL 6629250 (N.D. Ill. Oct. 22, 2018) ..............................40

*Denny's Marina, Inc. v. Renfro Prods., Inc.*,
   8 F.3d 1217 (7th Cir. 1993) ...........................................................................13, 14

*Dickson v. Microsoft Corp.*,
   309 F.3d 193 (4th Cir. 2002) ...............................................................................44

*In re Elevator Antitrust Litig.*,
   502 F.3d 47 (2d Cir. 2007) ...................................................................................49

*Esmark, Inc. v. NLRB*,
   887 F.2d 739 (7th Cir. 1989) .....................................................................48, 52, 53

*FTC v. Ind. Fed'n of Dentists*,
   476 U.S. 447 (1986) .........................................................................14, 17, 29, 37

*Gelboim v. Bank of Am. Corp.*,
   823 F.3d 759 (2d Cir. 2016) .................................................................................32

iii

*General Leaseways, Inc. v. National Truck Leasing Ass'n*,
  744 F.2d 588, 590 (7th Cir. 1984) .................................................................. 48

*Goldfarb v. Va. State Bar*,
  421 U.S. 773 (1975) ...................................................................................... 37

*Graphic Prod. Distribs., Inc. v. ITEK Corp.*,
  717 F.2d 1560 (11th Cir. 1983) ..................................................................... 35

*Greater Rockford Energy & Tech. Corp. v. Shell Oil Co.*,
  998 F.2d 391 (7th Cir. 1993) ......................................................................... 32

*Hannah's Boutique, Inc. v. Surdey*,
  No. 13-cv-2564, 2013 WL 4553313 (N.D. Ill. Aug. 28, 2013) ...................... 12

*Hanover Shoe, Inc. v. United Shoe Mach. Corp.*,
  392 U.S. 481 (1968) ...................................................................................... 33

*In re High Fructose Corn Syrup Antitrust Litig.*,
  295 F.3d 651 (7th Cir. 2002) ......................................................................... 32

*Howard Hess Dental Labs., Inc. v. Dentsply Int'l, Inc.*,
  602 F.3d 237 (3d Cir. 2010) .......................................................................... 42

*In re Indus. Diamonds Antitrust Litig.*,
  167 F.R.D. 374 (S.D.N.Y. 1996) ................................................................... 33

*Insulate SB, Inc. v. Advanced Finishing Sys., Inc.*,
  797 F.3d 538 (8th Cir. 2015) ......................................................................... 49

*Intellectual Ventures I LLC v. Cap. One Fin. Corp.*,
  No. 14-111, 2016 WL 160263 (D. Md. Jan. 14, 2016) .................................. 40

*Kendall v. Visa U.S.A., Inc.*,
  518 F.3d 1042 (9th Cir. 2008) ....................................................................... 39

*In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*,
  383 F. Supp. 3d 187 (S.D.N.Y. 2019) ...................................................... 44, 45

*Kleen Prods. LLC v. Int'l Paper*,
  276 F. Supp. 3d 811 ....................................................................................... 39

*Kochert v. Greater Lafayette Health Servs., Inc.*,
  463 F.3d 710 (7th Cir. 2006) ......................................................................... 32

*Lifewatch Servs. Inc. v. Highmark Inc.*,
  902 F.3d 323 (3d Cir. 2018) ..................................................................... 43, 45

*In re Managed Care Litig.*,
298 F. Supp. 2d 1259 (S.D. Fla. 2003) .................................................47, 48, 51, 53

*Marin Cty. Bd. of Realtors, Inc. v. Palsson*,
549 P.2d 833 (Cal. 1976) ..............................................................................7, 22

*Marrese v. Am. Acad. of Orthopedic Surgeons*,
No. 80-cv-1405, 1991 WL 5827 (N.D. Ill. Jan. 15, 1991), *aff'd*, 977 F.2d 585
(7th Cir. 1992)..............................................................................................39

*MCM Partners, Inc. v. Andrews-Bartlett & Assocs., Inc.*,
62 F.3d 967 (7th Cir. 1995) .....................................................................39, 43, 50

*McWane, Inc. v. FTC*,
783 F.3d 814 (11th Cir. 2015) .......................................................................25

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
465 U.S. 752 (1984)........................................................................................46

*Murphy v. Alpha Realty*,
No. 76-cv-2446, 1978 WL 1451 (N.D. Ill. 1978) ....................................................34

*N. Jackson Pharmacy, Inc. v. Caremark RX Inc.*,
No. 04-cv-5674, 2004 WL 2491630 (N.D. Ill. Nov. 3, 2004) .................................12

*Nat'l Soc. of Prof. Eng'rs v. United States*,
435 U.S. 679 (1978).........................................................14, 15, 19, 20, 37, 41

*NCAA v. Bd. of Regents of Univ. of Okla.*,
468 U.S. 85 (1984).......................................................................16, 37, 39, 41, 46

*Nobody in Particular Presents, Inc. v. Clear Channel Commc'ns, Inc.*,
311 F. Supp. 2d 1048 (D. Colo. 2004)...........................................40, 48, 50, 51, 53

*O'Neill v. Coca-Cola Co.*,
669 F. Supp. 217 (N.D. Ill. 1987) ....................................................................32

*O'Riordan v. Long Island Bd. of Realtors*,
707 F. Supp. 111 (E.D.N.Y. 1988) ..................................................................34

*Ohio v. Am. Express Co.*,
138 S. Ct. 2274 (2018)....................................................................................31

*Paramount Famous Lasky Corp. v. United States*,
282 U.S. 30 (1930)....................................................................................27, 28

*Penne v. Greater Minneapolis Area Bd. of Realtors*,
604 F.2d 1143, 1145 (8th Cir. 1979) ................................................................21

v

*Pirard v. Bank of Am.*,
    No. 12-cv-2901, 2013 WL 1154294 (N.D. Ill. Mar. 19, 2013) ..............................................31

*In re Plasma-Derivative Protein Therapies Antitrust Litig. ("Blood Plasma")*,
    764 F. Supp. 2d 991 (N.D. Ill. 2011) .....................................................................................12

*Ploss v. Kraft Foods Grp., Inc.*,
    197 F. Supp. 3d 1037 (N.D. Ill. 2016) ...................................................................................17

*Reading Int'l, Inc. v. Oaktree Capital Mgmt. LLC*,
    317 F. Supp. 2d 301 (S.D.N.Y. 2003)....................................................................................13

*Realcomp II, Ltd. v. FTC*,
    635 F.3d 815 (6th Cir. 2011) ...................................................................16, 20, 21, 29, 38

*Reifert v. S. Cent. Wis. MLS Corp.*,
    450 F.3d 312 (7th Cir. 2006) ..........................................................................................16, 34

*Robertson v. Sea Pines Real Estate Cos.*,
    679 F.3d 278 (4th Cir. 2012) ..........................................................................................38, 45

*Rocha v. FedEx Corp.*,
    15 F. Supp. 3d 796 (N.D. Ill. 2014) ...............................................................................31, 42

*Shuffle Tech. Int'l, Inc. v. Sci. Games Corp.*,
    No. 15-cv-3702, 2015 WL 5934834 (N.D. Ill. Oct. 12, 2015) .............................................32

*Silha v. ACT, Inc.*,
    807 F.3d 169 (7th Cir. 2015) .................................................................................................32

*Silver v. N.Y. Stock Exch.*,
    373 U.S. 341 (1963) ...............................................................................................................39

*Standard Iron Works v. ArcelorMittal*,
    639 F. Supp. 2d 877 (N.D. Ill. 2009) ....................................................................................47

*Supermarket of Homes v. San Fernando Valley Bd. of Realtors*,
    No. 80-cv-1888, 1983 WL 2199 (C.D. Cal. Sept. 1, 1983) ..................................................34

*Tamayo v. Blagojevich*,
    526 F.3d 1074 (7th Cir. 2008) ...............................................................................................12

*In re Text Messaging Antitrust Litig.*,
    630 F.3d 622 (7th Cir. 2010) .................................................................................................36

*Thompson v. Metro. Multi-List, Inc.*,
    934 F.2d 1566 (11th Cir. 1991) .............................................................................................16

*Toys "R" Us, Inc. v. FTC*,
    221 F.3d 928 (7th Cir. 2000) ...................................................14, 16

*United States v. Apple, Inc.*,
    791 F.3d 290 (2d Cir. 2015)...............................................................14

*United States v. Apple Inc.*,
    952 F. Supp. 2d 638 (S.D.N.Y. 2013)...............................................46

*United States v. Brighton Bldg. & Maint. Co.*,
    598 F.2d 1101 (7th Cir. 1979) ..........................................................46

*United States v. Gasoline Retailers Ass'n*,
    285 F.2d 688 (7th Cir. 1961) .......................................................15, 20

*United States v. Hilton Hotels Corp.*,
    467 F.2d 1000 (9th Cir. 1972) .....................................................41, 46

*United States v. Masonite Corp.*,
    316 U.S. 265 (1942)...........................................................................36

*United States v. NAR*,
    No. 05-cv-5140, 2006 WL 3434263 (N.D. Ill. Nov. 27, 2006) ...............17, 21, 28, 31, 38, 43

*United States v. Nat'l Ass'n of Real Estate Bds*. (*"NAREB"*),
    339 U.S. 485 (1950)...........................................................................37

*United States v. Paramount Pictures, Inc.*,
    334 U.S. 131 (1948)......................................................................39, 44

*United States v. Realty Multi-List, Inc.*,
    629 F.2d 1351 (5th Cir. 1980) .................................................16, 22, 36

*United States v. Socony-Vacuum Oil Co.*,
    310 U.S. 150 (1940)................................................................14, 15, 32

*United States v. Topco Assocs.*,
    405 U.S. 596 (1972)...........................................................................37

*United States v. U.S. Gypsum Co.*,
    438 U.S. 422 (1978)......................................................................19, 46

*In re Urethane Antitrust Litig.*,
    237 F.R.D. 440 (D. Kan. 2006).........................................................27

*Venture Res. Grp., Inc. v. Greater N.J. Reg'l MLS, Inc.*,
    No. 95-cv-0401, 1995 WL 866841 (D.N.J. Aug. 24, 1995) ...............34

*Wilk v. AMA,*
   895 F.2d 352 (7th Cir. 1990) ........................................................................16, 18, 39

**OTHER AUTHORITIES**

Philip E. Areeda & Herbert Hovenkamp, Antitrust Law (3d & 4th eds.)...............................18, 19

Fed. R. Civ. P. 12(b)(6)...........................................................................................12, 28, 29, 34

## INTRODUCTION

This suit challenges, under federal antitrust law, rules adopted by the National Association of Realtors ("NAR") that restrain price competition among real estate brokers—as well as the Corporate Defendants' essential role in agreeing to, facilitating, and enforcing those rules. Because the restraints Defendants impose are plainly anticompetitive and unlawful, denying their motions presents no difficult task.

While Defendants claim their anticompetitive scheme is simply "the free market at work,"[1] the reality is the opposite. Defendants do not dispute that access to a multiple listing service ("MLS") is usually essential to selling a home. Yet, to gain MLS access, the challenged restraints:

- *Require* that every home seller offer payment to *the buyer's* broker, even though the buyer-broker is retained by and owes "fiduciary obligation[s]" to *the buyer*. *See* Jt. Mem. 19 (acknowledging that buyer-brokers owe fiduciary duty to home-buyer client).

- *Require* that the seller's offer be a "blanket offer"—i.e., the same payment must be offered to *every* buyer-broker on the MLS, regardless of their experience level or the services they are providing to the buyer;

- *Require* that the blanket offer be *published* on the MLS either as a specified dollar amount or specified commission amount—requirements that facilitate the ability of buyer-brokers to compare the compensation *they* are being offered and steer home-buyers to sellers offering buyer-brokers the largest payment;

- *Require* that information about this universe of offers be published to every buyer-broker and *prohibit* it from being disclosed to home-buyers; and

- *Strictly limit* the timing and effectiveness of any efforts by buyers, sellers, or their agents to negotiate buyer-broker commissions below the blanket amount offered on the MLS.

These restraints collectively distort the operation of the real estate services market.

---

[1] Br. in Support of the Mot. of the Nat'l Assoc. of Realtors® to Dismiss the Cons. Am. Compl. for Failure to State a Cause of Action ("Jt. Mem.") at 2 (ECF No. 114). All Defendants have joined NAR's memorandum. *See* Mem. of Law in Support of the Corporate Defs.' Mot. to Dismiss the Cons. Am. Class Action Compl. ("Corp. Defs.' Mem.") at 2 (ECF No. 116).

Defendants' mandatory imposition of this pricing system has had severe anticompetitive consequences, costing home sellers *billions* of dollars annually and impeding lower-cost competition. The system's effects on broker compensation are clear: commissions in the United States have been sustained at an elevated level impervious to changing market conditions and costs; actual charges imposed on sellers and buyers have nearly *doubled*; charges are far higher than those in other developed countries; and economists have concluded that commissions in the United States should be around *half* of what they are.

These supracompetitive charges have been maintained, and even increased, without regard to the value of the property sold, the services provided, the broker's experience, or cost reductions resulting from the Internet and other technological improvements—market changes that have caused dramatic price declines in other information-based markets, but have had virtually no impact on Defendants' pricing system. Defendants' mandatory rules and their effects do not reflect "standard market forces."

NAR and the Corporate Defendants are liable for perpetuating this anticompetitive system. It has long been established that rules adopted by associations, that restrict the actions of members, constitute agreements under Sherman Act Section 1. This is *not* a case like *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), where the Supreme Court considered whether the plaintiffs plausibly alleged a secret agreement. Here, the challenged agreement was made and lives in the open. Although the Corporate Defendants now try to distance themselves from their actions, their crucial role is clear from the Consolidated Amended Class Action Complaint ("CAC"). In the words of Defendant HomeServices:

> As an industry leader, we have a responsibility to *actively participate in shaping our industry* and its current and future business model. The HomeServices executive leadership and CEOs of our operating companies drive these important

discussions as *leaders within the National Association of Realtors . . . and at the regional and local levels of the MLS organizations*."

*Id.* ¶ 105 (emphasis added). Consistent with this, all of the Corporate Defendants—the nation's largest real estate conglomerates—have agreed to further the agreement, including by *requiring* their franchisees and brokerage operations to join and participate as a condition for obtaining the benefits of the Corporate Defendants' real estate brands, resources, and support. By playing a critical role in the agreement's success, the Corporate Defendants have reaped rich financial rewards, including billions of dollars in supracompetitive commissions and reduced competition.

The challenged conduct, which is now also being investigated by the Department of Justice ("DOJ"), is but the latest chapter in a long history of anticompetitive conduct in the real estate industry. *See id.* ¶ 56 n.18 (describing the "long history of anticompetitive actions" by NAR, local Realtor boards, and MLSs "designed to maintain broker commissions and impede entry by lower-cost alternatives" and describing NAR internal documents their goal "to keep competition out and fees high"). Because their comprehensive system of anticompetitive restraints is the antithesis of "the free market at work," Defendants' motions should be denied.

## STATEMENT OF FACTS

**The Residential Real Estate Industry.** The basic characteristics of the residential real estate industry are described in the CAC. CAC ¶¶ 41-52. The vast majority of residential homes in the United States are bought and sold through brokerages and their individual agents. Typically, a seller will retain a seller-broker, and the buyer will separately work with a buyer-broker.

The industry is dominated by the Corporate Defendants (and their families of real estate brokerages), as well as by the industry's powerful trade association, Defendant NAR. These entities and their co-conspirators collectively possess market power in local markets for real estate brokerage services through their control of the local MLSs. *Id.* ¶¶ 135-38. MLSs, which are

databases of properties listed for sale in a local area, are the marketplaces on which the vast majority of homes in the United States are sold. *Id.* ¶¶ 50, 133-38. All MLSs at issue in this case are controlled by local NAR associations. *Id.* ¶¶ 2, 50.[2] Access to the MLS is predicated on a broker agreeing to follow the rules in NAR's Handbook on Multiple Listing Policy. *Id.* ¶¶ 3, 58-60. Each of the Corporate Defendants requires that real estate agents working for its franchisees and other brokerages join the MLS and participate in this agreement. *Id.* ¶¶ 6, 103 116-20.

**The Anticompetitive Conduct.** The costs imposed by brokers on sellers are determined as follows. The seller-broker's compensation is specified in a contract ("listing agreement") with the home-seller. This agreement provides that the seller-broker has the exclusive right to market the seller's home. It also specifies the total commission (i.e., percentage of the sale price) that the seller will pay the seller-broker and includes a charge that the seller must offer the *buyer-broker.* In other words, buyer-brokers—who assist their clients in negotiating *against* the seller and, as Defendants acknowledge, owe fiduciary obligations *to the buyer*—receive their compensation from the commission charged to the home-seller. *Id.* ¶¶ 4, 48, 58-61. NAR's Code of Ethics further encourages buyer-brokers to tell their clients that their services are free. *Id.* ¶¶ 4, 79. Even when a buyer chooses not to use a broker, the seller will still have to pay the *same* total commission, including the charge that was ear-marked for a buyer-broker. *Id.* ¶ 86.

To access the MLSs on which nearly all homes are sold, sellers have little choice but to accede to NAR- and MLS-imposed requirements that restrict their freedom to choose the manner in which they compensate brokers. Defendants' anticompetitive restraints operate as follows:

---

[2] Defendants baselessly assert that Plaintiffs' "factual allegations implicate only 6" of the MLSs at issue. Jt. Mem. 4. In fact, Plaintiffs allege that the restraints challenged in the CAC have been implemented by *all* of the Covered MLSs. CAC ¶¶ 37–39, 50, 97-98, 109-15.

1.     The Buyer Broker Commission Rule ("BBCR") **requires** "the seller to make an offer of payment to compensate the buyer-broker even though the buyer-broker is working on behalf of the buyer, not the seller." *Id.* ¶ 4; *see also id.* ¶ 61 (Wall Street Journal article explaining that "[h]omeowners are required to hire a buying agent if they employ a selling agent through a multiple listing service . . . though they offer almost no useful services.").

2.     The Rule "requires that this be a **blanket** offer—i.e., the exact same compensation must be simultaneously offered to every buyer-broker without regard to their experience, the services they are providing to the buyer, or the financial arrangement they have made with the buyer." *Id.* ¶ 4 (emphasis added); *see also id.* ¶ 63.

3.     Because this blanket offer **must** be made to every buyer-broker using the MLS and can be compared by the buyer-broker with the blanket offers every other seller is required to post, the Rule "*encourages and facilitates anti-competitive 'steering'* by buyer-brokers"—i.e., showing buyer-brokers properties offering the highest buyer-broker compensation, or avoiding (or discouraging) homes offering lower payments to buyer-brokers. *Id.* ¶¶ 4, 64, 67-68, 73-74, 78. The prevalence of such steering has been "widely reported in government reports, economic research and the trade press and is well understood by NAR, the Corporate Defendants, and their co-conspirators." *Id.* ¶ 64; *see also id.* ¶ 67 & n.26 (citing quantitative analysis finding steering). Indeed, according to Keller Williams University course materials, offering less than 3% in buyer-broker commissions on an MLS "will reduce the number of willing and qualified buyers that will see your home." *Id.* ¶ 64. Defendants and their brokers and franchisees have even used software allowing them to *exclude* properties offering lower buyer-broker commissions from the MLS information forwarded to their buyer clients. *Id.* ¶ 70.

4.      The Rule facilitates supracompetitive pricing by **requiring** that "the offer of compensation be expressed as a percentage of the gross selling price of the home or a definite dollar amount" and **prohibiting** "general invitations by listing [i.e., seller] brokers to other participants to discuss terms and conditions of possible cooperative relationships." *Id.* ¶ 4; *see also id.* ¶ 73. By requiring every seller to make blanket offers that are readily comparable by all buyer-brokers, the BBCR creates "*tremendous pressure on sellers to offer a high commission that has long been maintained in this industry* so that buyer-brokers will not 'steer' buyers to properties offering higher buyer-broker commissions." *Id.* ¶ 4.[3] As one commentator explained: "Essentially, the MLS listing acts *as a tool which competing brokers can use to help enforce a near-uniform commission rate and drive out discounters.*"[4]

5.      The anticompetitive effects are magnified by a Gordian knot of NAR rules **strictly limiting** the ability of buyers, sellers, and their agents to negotiate lower buyer-broker commissions than those offered on the MLS. *Id.* ¶¶ 4, 82-91. These include, but are not limited to, NAR rules and interpretations: **requiring** that Realtors complete any negotiation over commissions prior to a property even being shown to a potential buyer, *id.* ¶ 89 (Case Interpretation #16-15); **prohibiting** Realtors from conditioning an offer to purchase a home on a seller-broker's agreement to lower buyer-broker compensation *or* even from encouraging a buyer-client to do so on its own, *id.* ¶¶ 88, 91 (Standard of Practice 16-16); and **prohibiting** seller-brokers from even

---

[3] *See also id.* ¶ 65 (listing standard 3% offers to buyer-brokers "on real estate firm and multiple listing service databases . . . act[] as a powerful force to discourage lower splits of 2% or even 1% because listing brokers, and their sellers, fear that properties carrying these lower splits will not be shown. . . . This informal discrimination against price competitors is *the most important factor that allows dominant brokers to maintain high and uniform prices.*" (emphasis added)).

[4] *Id.* ¶ 68 & n.28; *id.* ¶ 73 n.32 (economist explaining that "sellers that are attempting to coordinate their pricing behavior at above-competitive levels will usually favor simple pricing schedules over more complex ones, even if this simplicity means that quality differences go unrewarded").

"attempt[ing]" to unilaterally reduce buyer-broker commissions once a purchase offer has been submitted, *id.* ¶ 90 (Standard of Practice 3-2). Buyers and sellers are also strictly limited in their ability to negotiate with one another or with buyer-brokers to reduce commissions because broker compensation is specified in a listing agreement that cannot be modified without permission of the seller-broker (who is, in turn, limited by the aforementioned NAR rules in reducing commissions). *Id.* ¶¶ 46, 86. In light of these restraints, "downward negotiation of the buyer-broker commission is extremely limited" both in theory and in practice. *Id.* ¶ 92.

6.     These anticompetitive effects are exacerbated by rules **prohibiting** the full universe of offers to buyer-brokers from being disclosed to sellers and buyers. Because "MLSs utilize hidden fields that only *realtors* (i.e., brokers) subscribed to the MLS can see," sellers and buyers are "unlikely to know whether the buyer-broker is engaged in steering to higher commission properties." *Id.* ¶¶ 4, 78.[5] NAR further obfuscates pricing through its ethical rule permitting buyer-brokers to represent to buyers that their services are 'free' to the buyer—effectively communicating that buyers "have no reason to seek a reduction in the buyer-broker commission." *Id.* ¶¶ 4, 75, 87.

Defendants' motions either concede the existence of these restraints or fail to mention them at all, offering instead justifications at odds with market realities. *See* Jt. Mem. 2, 7 (admitting that seller-broker is required to "make a blanket, unilateral offer" of payment to buyer-broker); *id.* at 2 (misrepresenting NAR rules as "permit[ing]" an offer to be famed "either as a percentage of the sales price or as a specific amount," when, in fact, its rules *require* it).

---

[5] Buyers may be told the commission offered by their seller to the buyer-broker, but they are prohibited from learning the comparative terms offered on the MLS by other sellers, including the terms offered on homes they are not shown. *See id.* ¶ 115 (Greater Las Vegas Realtors Association "has also required that brokers conceal 'detail sheets' containing information about commissions from buyers").

**Defendants' Adoption and Enforcement of the Anticompetitive Agreement.** Each Defendant has played a central role in implementing and enforcing these restraints. The challenged restraints are written into Defendant NAR's Handbook on Multiple Listing Policy and ethics rules, and are incorporated into the Covered MLSs' policies. *Id.* ¶¶ 94-101. In setting forth those terms, "NAR has successfully invited the Defendants and other coconspirators to participate in the following agreement, combination and conspiracy: They can participate in the MLS, and gain the benefits provided by NAR and the MLS, but only if they agree to adhere to and enforce the anticompetitive restraints set forth in the Handbook on Multiple Listing Policy." *Id.* ¶ 58.

Each of the Corporate Defendants has *required* its brokerage operations and franchisees to "participate in, implement and/or facilitate the conspiracy by imposing NAR's rules, including the Buyer Broker Commission Rule, on its franchisees, affiliates, and realtors." *Id.* ¶¶ 6, 116. The Corporate Defendants require these entities and their agents to join NAR, comply with NAR's Code of Ethics, and join the MLSs at issue and thereby comply with the MLS requirements. *Id.* ¶¶ 6, 109, 116-20. Joining the MLS and agreeing to these restraints is "a condition of doing business with the Corporate Defendants" and securing "the benefits of the Corporate Defendants' brands, infrastructure, and other resources to support their brokerage operations." *Id.* ¶ 116.

Consistent with HomeServices' claim that its "executive leadership and CEOs of our operating companies" drive the discussion "as leaders" within NAR and "local levels of the MLS organizations," the Corporate Defendants and their real estate brokerage operations and franchisees have held key roles on NAR's Board of Directors,[6] dominate the leadership team "that

---

[6] *See, e.g.*, *id.* ¶ 104 ("both Ronald J. Peltier, the Executive Chairman of Home Services of America and Nancy Nagy, CEO of Berkshire Hathaway HomeServices KoenigRubloff Realty Group, currently serve as directors of NAR," and NAR's President is John Smaby, who works for Edina Realty, a HomeServices of America Company).

manage[s] NAR's day-to-day operations," and are members of the NAR Multiple Listing Issues and Policies Committee. *Id.* ¶¶ 104-06. Each year, these policy-making bodies review the NAR's Handbook on Multiple Listing Policy and other rules and, while modifying *other* requirements they no longer wish to impose, reimpose the challenged restraints. *Id.* ¶¶ 57, 107.

**The Impact of the Challenged Restraints.** The pricing system imposed through Defendants' anticompetitive agreement has had numerous adverse effects on the market for real estate services, including: (i) stabilizing commissions at a supracompetitive level; (ii) significantly increasing the actual broker costs imposed; (iii) and impeding lower-cost competition. *Id.* ¶¶ 122-32. These impacts resulting from Defendants' conduct are extensively supported in the CAC, including through citations to empirical and other economic studies of the real estate industry, real estate industry experts, Defendants' own documents, commentary by other industry participants, analysis by leading journalists, and other sources, including the following:

1.      Evidence of the uniformity of commission rates over time and across transactions, including the U.S. Government Accountability Office's conclusions in a report on price competition in the residential real estate market, which observed that "commission rates have remained relatively uniform—regardless of market conditions, home prices, or the efforts required to sell a home." *Id.* ¶ 126. Other sources show that the average commission was at "virtually the same level in 2017, as it was at the time of the GAO's analysis," and that, "over the past two decades the average total commission on an annual basis has always been maintained between 5.02 percent and 5.4 percent." *Id.* ¶ 126; *see also id.* (Defendant Keller Williams reported in 2016 that its average buyer-broker commission of 2.71% has remained virtually unchanged since 2002).

2.      Evidence of the unexplained rising cost of commissions, including from Cornell University economist Dr. Panle Barwick, who observed that, because a commission is based on a

percentage of a home's sale price, and housing prices have increased faster than inflation, "if you look at the commission the consumers are paying today relative to 20 years ago, they're nearly paying twice as much." *Id.* ¶ 127.

3. Sources showing that the stabilization of commissions is inconsistent with "standard market dynamics," Jt. Mem. 14, including a published industry analysis finding: "[o]ne would have expected that an information and communication-based industry like real estate brokerage, would enjoy tremendous cost efficiencies from the development of the Internet, Databases, and other communication technologies. Yet it appears that traditional brokers generally have not passed on their cost savings to consumers in the form of lower fees." CAC ¶ 129.

4. The obvious "disconnect between buyer-broker costs and commissions" caused by Defendants' imposed restraints, including that (i) "Buyer-broker costs are similar regardless of the price of the home, yet buyer-brokers are paid, for example, four times more when their client buys a million-dollar home rather than a $250,000 home" and (ii) "[C]ommissions imposed on home sellers are 'unrelated to either the quantity or quality of the service rendered.'" *Id.* ¶ 15.

5. The fact that, "[i]n more competitive foreign markets, homebuyers pay their brokers if they choose to use one, and they pay less than half the rate paid to buyer-brokers in the United States," *id.* ¶ 11, including an empirical international study of real estate markets by economists Natalya Delcoure and Norm Miller, which concluded that "based on global data, the [total] US residential brokerage fees should run closer to 3.0%," *id.* ¶ 125.

6. Economic and other evidence that the challenged conduct has significantly impeded competition by facilitating steering away from seller-brokers that publish a "blanket offer" lower than the prevailing high commission rate, including:

- Statements from a broker to the DOJ and FTC that "40% of agents will go out of their way, above and beyond, . . . not to show or sell your home if you don't offer a 2.8% or 3%

commission,'" and that when it tried to offer a lower commission on the MLS, its agents "had bricks thrown through car windows. We've had our cars egged. We've had hate mail sent to our sellers,'" *id.* ¶ 68;

- An empirical study finding evidence of steering away from those listings offering even slightly below-average commissions, *id.* ¶ 67 n.26; and

- Defendants' own admissions that the industry has succeeded in driving lower-priced competitors from the market, including Defendant Keller Williams' CEO's cheerful report that "[l]imited service, discount broker, market share in the United States, is at an all-time low," and efforts to gain business by offering discounted commissions have become "irrelevant," *id.* ¶ 69; *see also id.* ¶ 68.

7. The pricing effects of Defendants' restraints in transactions involving buyers representing themselves or retaining discount brokers: because a seller-broker is required to make a "blanket offer" to all buyer-brokers regardless of services provided, seller-brokers can keep the total commission (and impose this charge on the seller) even if a buyer is prepared to offer a lower buyer-broker commission or to forgo hiring a broker altogether. *Id.* ¶¶ 86, 89.

The cumulative adverse impact on consumers of Defendants' anticompetitive practices is enormous. As the Consumer Federation of America has explained, "[i]f sellers and buyers each separately negotiated compensation with their brokers, uniform 5-6% commissions would quickly disappear." *Id.* ¶ 130. Economists Chang-Tai Hsieh and Enrico Moretti have suggested that "more than half of current commissions might be eliminated by competition." *Id.* ¶ 132. Similarly, economists Delcoure and Miller "found that U.S. broker fees should equal something closer to three percent." *Id.* Nationally, estimates of the amount of "annual broker fees consumers might save if there was effective price competition suggest as much as $30 billion or more annually." *Id.*

All of the named Plaintiffs and class members were harmed by Defendants' agreement: each sold a home on an MLS that implemented the challenged restraints, and in a marketplace otherwise subject to Defendants' anticompetitive conduct and the resulting supracompetitive pricing. *Id.* ¶¶ 23-31, 122-32.

## THE MOTION TO DISMISS STANDARDS

The legal standards governing Rule 12(b)(6) motions are well established. A complaint need only include enough facts to give a defendant fair notice and state a plausible claim. *Tamayo v. Blagojevich*, 526 F.3d 1074, 1084 (7th Cir. 2008). To be plausible, the complaint is not required to meet a probability requirement, and courts do not weigh alternative explanations for the challenged conduct provided by a defendant. *Twombly*, 550 U.S. at 556. Instead, the complaint must simply raise the possibility of relief above the "speculative level." *Id.* at 555. In other words, the plaintiffs must "nudge[] their claims across the line from conceivable to plausible." *Id.* at 570. Additionally, all "well-pled facts of the complaint must be taken as true." *In re Plasma-Derivative Protein Therapies Antitrust Litig. ("Blood Plasma")*, 764 F. Supp. 2d 991, 999 (N.D. Ill. 2011). Courts "construe the complaint in the light most favorable to the plaintiff" and draw "all possible inferences" in favor of the plaintiff. *Tamayo*, 526 F.3d at 1081.

The Supreme Court and lower courts have made clear that the *Twombly* decision does "not establish a heightened pleading requirement for antitrust cases." *Blood Plasma*, 764 F. Supp. 2d at 999 (citing *Twombly*, 550 U.S. at 569 n.14). "Congress drafted the antitrust laws with the express purpose of encouraging private enforcement," and, "[i]f private plaintiffs, who do not have access to inside information, are to pursue violations of the law, the pleading standard must take into account the fact that a complaint will ordinarily be limited to allegations pieced together from publicly available data." *Id.* at 1002 n.10. Accordingly, numerous decisions in the Seventh Circuit and this District have applied these standards and denied motions to dismiss antitrust claims.[7] The

---

[7] *See, e.g.*, *In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772, 778 (N.D. Ill. 2017); *Hannah's Boutique, Inc. v. Surdey,* No. 13-cv-2564, 2013 WL 4553313 (N.D. Ill. Aug. 28, 2013); *Blood Plasma*, 764 F. Supp. 2d 991; *In re Aftermarket Filters Antitrust Litig.*, No. 08-cv-4883, 2009 WL 3754041 (N.D. Ill. Nov. 5, 2009); *N. Jackson Pharmacy, Inc. v. Caremark RX Inc.*, No. 04-cv-5674, 2004 WL

same result is appropriate here, where the CAC easily satisfies the requirements for stating a claim under Section 1 of the Sherman Act.

## ARGUMENT

### I. The Challenged Restraints Are Anticompetitive and Unlawful.

#### A. The Sherman Act prohibits agreements that unreasonably restrain trade.

Under Section 1 of the Sherman Act, "[e]very contract, combination . . . or conspiracy, in restraint of trade" is illegal. 15 U.S.C. § 1. To state a Section 1 claim, the plaintiff must allege facts plausibly suggesting: "a contract, combination, or conspiracy"; "a resultant unreasonable restraint of trade in [a] relevant market"; and "an accompanying injury." *Denny's Marina, Inc. v. Renfro Prods., Inc.*, 8 F.3d 1217, 1220 (7th Cir. 1993).

Courts use one of three approaches to determine whether challenged conduct is unlawful: per se, quick look, or rule of reason. *Id.* at 1220 & n.6. Where, as here, it is evident that disputed factual issues defeat a motion to dismiss even assuming the rule of reason is applied, the court need not decide which approach governs. *See, e.g.*, *Reading Int'l, Inc. v. Oaktree Capital Mgmt. LLC*, 317 F. Supp. 2d 301, 319 (S.D.N.Y. 2003) ("It is not necessary to resolve whether or not the facts might ultimately support a conclusion of a *per se* violation, because it is clear that the facts alleged could support finding a violation under the rule of reason.").

Under the rule of reason, to defeat a motion to dismiss, a plaintiff need only plausibly allege that (a) the defendants have market power and (b) the challenged restraints are anticompetitive. *See In re Dealer Mgmt. Sys. Antitrust Litig.*, 362 F. Supp. 3d 510, 538-39 (N.D. Ill. 2019) ("[W]hether challenged conduct has a procompetitive effect on balance so as to survive scrutiny

---

2491630 (N.D. Ill. Nov. 3, 2004); *In re Brand Name Prescription Drugs Antitrust Litig.*, No. 94-cv-897, 1994 WL 240537 (N.D. Ill. May 24, 1994) (all denying motions to dismiss Sherman Act claims).

under a rule-of-reason analysis is a factual issue for trial"). Because the rule of reason analysis entails a "complex inquiry into the surrounding circumstances," case law overwhelmingly establishes that factual issues of the kind asserted by Defendants—such as the presence of and weight accorded to procompetitive justifications, as well as whether such justification are narrowly tailored—cannot properly be resolved at the pleading stage. *Cook Inc. v. Boston Sci. Corp.*, No. 01-cv-9479, 2002 WL 335314, at *4 (N.D. Ill. Feb. 28, 2002).

### B.     The challenged conduct unreasonably restraints trade.

"Price is the 'central nervous system of the economy,' and an agreement that 'interfere[s] with the setting of price by free market forces'" is unlawful. *Nat'l Soc. of Prof. Eng'rs v. United States*, 435 U.S. 679, 692 (1978) (first quoting *United States v. Socony-Vacuum Oil Co*., 310 U.S. 150, 224 (1940)). "The Sherman Act reflects a legislative judgment that ultimately competition will produce not only lower prices, but also better goods and services." *Id.* at 695. The Supreme Court has repeatedly struck down restraints that "limit consumer choice by impeding the ordinary give and take of the market place." *FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 459 (1986).

These concerns are at the forefront where, as here, horizontal competitors engage in conduct that tampers with price mechanics with the effect of elevating or stabilizing prices.[8] In *National Society of Professional Engineers*, the Supreme Court had little difficulty striking down

---

[8] *See, e.g.*, *Ariz. v. Maricopa Cty. Med. Soc'y*, 457 U.S. 332, 346 (1982) (ruling that "[a]ny combination which tampers with price structures is engaged in an unlawful activity"); *Socony-Vacuum*, 310 U.S. at 223-24 (1940) (holding that buying program implemented by competitors violated Sherman Act where it contributed to "the rise and stability" of spot market pricing and was "a force which distorts" market prices and "prevents the determination of those prices by free competition alone"); *United States v. Apple, Inc.*, 791 F.3d 290, 329 (2d Cir. 2015) (any combination "which tampers with price structures" and "interfere[s] with the free play of market forces" violates the Sherman Act); *Toys "R" Us, Inc. v. FTC*, 221 F.3d 928, 937 (7th Cir. 2000) (explaining that "[t]aking steps to prevent a price collapse through coordination of action among competitors" violates the Sherman Act); *Denny's Marina*, 8 F.3d at 1221-22 (concerted action to protect competitors "from price competition by discounters" and "to suppress price-cutting" violated Sherman Act "notwithstanding the apparent lack of an explicit agreement to set prices").

a professional association's canon of ethics prohibiting open competitive bidding prior to the initial selection of an engineer—even though customers retained the ability to negotiate with individual engineers and, that failing, select a different engineer. 435 U.S. 679 (1978). The Supreme Court upheld the lower court's finding that this restraint was "on its face a tampering with the price structure of engineering fees in violation of § 1 of the Sherman Act," because it "'impedes the ordinary give and take of the marketplace.'" *Id.* at 686, 692.

And in *Catalano, Inc. v. Target Sales, Inc.*, the Supreme Court held *per se* unlawful "a horizontal agreement among competitors to use a specific method of quoting prices"—there, an agreement not to allow customers to make purchases on credit. 446 U.S. 643, 647-48 (1980). Even though that agreement did not specify prices or eliminate other price competition or negotiations, the Court found that it nevertheless entailed "an obvious risk of anticompetitive impact with no apparent potentially redeeming value." *Id.* at 645, 649.

That an agreement among competitors does not expressly specify a price is immaterial where its effect is to elevate or stabilize prices or exclude or impede lower-cost competitors. *See, e.g.*, *Socony-Vacuum*, 310 U.S. at 219, 222 (buying arrangement that "at least contributed to the price rise and the stability of the spot markets" violated the Sherman Act even though "the prices paid by the combination were not fixed in the sense that they were uniform and inflexible"); *United States v. Gasoline Retailers Ass'n*, 285 F.2d 688, 691 (7th Cir. 1961) (agreement to limit competition was per se illegal even though it was not "direct price fixing" but was "aimed rather at affecting the market price").

### 1. The co-conspirators have market power.

That Plaintiffs plausibly plead Defendants have "the ability to raise prices above the competitive level by restricting output"—i.e., market power—is undisputed.[9] *Wilk v. AMA*, 895 F.2d 352, 359 (7th Cir. 1990). Market power can be demonstrated either by analysis of a relevant market or direct evidence of anticompetitive effects. *Toys "R" Us*, 221 F.3d at 937. Numerous courts, including the Seventh Circuit, have recognized that MLSs have market power.[10]

The same is true here. Nearly all homes are bought and sold through a broker. CAC ¶ 43. And the Corporate Defendants, through their co-conspirator franchisees and other conspiring brokers in the Covered MLSs, collectively provide the majority of the residential real estate broker services in these areas. *Id.* ¶ 135. Moreover, brokers are required by formal NAR and MLS rules, the Corporate Defendants' requirements, and commercial necessity to list all of the homes they sell on an MLS. *Id.* ¶ 2. Every Covered MLS is owned and operated by one or more local NAR associations, which are required to implement the mandatory provisions in NAR's Handbook. *Id.* ¶¶ 50, 95. NAR's 1.2 million members are likewise required to follow NAR's ethical rules. *Id.* ¶ 32. Finally, due to substantial barriers to market entry, including network effects, there are no effective competitors to the NAR-run MLSs. *Id.* ¶¶ 137-38. In sum, because buyers and sellers have no reasonable alternative to MLS-listed homes, Defendants have the power to raise commissions above competitive levels.

---

[9] To the extent this Court ultimately determines that the challenged conduct constitutes a naked restraint on price or output, proof of market power is not required. *NCAA v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 110 (1984).

[10] *See, e.g.*, *Realcomp II, Ltd. v. FTC*, 635 F.3d 815, 829 (6th Cir. 2011); *see also, e.g.*, *Reifert v. S. Cent. Wis. MLS Corp.*, 450 F.3d 312, 317 (7th Cir. 2006) (holding that defendant MLS "possesses sufficient market power to restrain competition"); *Thompson v. Metro. Multi-List, Inc.*, 934 F.2d 1566, 1577 (11th Cir. 1991) (reversing summary judgment on market power because there was evidence that "[MLSs] are necessary, that there are few realistic substitutes, that there are entry barriers to the market, and that [the defendant MLS] may not have any competitors"); *United States v. Realty Multi-List, Inc.*, 629 F.2d 1351, 1374 (5th Cir. 1980) (holding that defendant MLS "has sufficient market power to warrant facial review of its membership rules").

The CAC also includes numerous allegations, supported by both economic analysis and industry experts, directly showing anticompetitive effects. Those allegations, discussed *infra* pp. 9-12, independently suffice to establish market power. *Ind. Fed'n of Dentists*, 476 U.S. at 460.

Nor do Defendants genuinely dispute Plaintiffs' pleaded market definition. *See* CAC ¶ 133 (relevant product market is "bundle of services provided to homebuyers and sellers by residential brokers with MLS access"); *id.* ¶ 134 (relevant geographic market is "no broader than the geographic areas in which the twenty Covered MLSs operate"). This definition is substantially identical to the one alleged by the DOJ and accepted by the court in *United States v. NAR*, No. 05-cv-5140, 2006 WL 3434263, at *1, 12 (N.D. Ill. Nov. 27, 2006). The Corporate Defendants concede that the relevant product market is the one Plaintiffs plead in the CAC, which includes residential real estate services provided to both buyers and sellers, Corp. Defs.' Mem. 22-23, yet purport to contest that definition on grounds they do not explain. *Cf. Ploss v. Kraft Foods Grp., Inc.*, 197 F. Supp. 3d 1037, 1070-71 (N.D. Ill. 2016) ("Courts should dismiss antitrust claims based on a market [definition] argument only when it is certain" that alleged market is improperly defined). Accordingly, Plaintiffs here have plausibly defined the relevant market.

## 2. The challenged restraints are anticompetitive.

The restraints challenged in this case are facially anticompetitive. Defendants mandate adherence to a pricing system that defies free market principles and has the purpose and effect of stabilizing commissions, dramatically increasing actual charges, and restraining low-cost competition.[11] The challenged restraints have the following anticompetitive characteristics.

---

[11] Defendants inaccurately accuse Plaintiffs of "complete mischaracterization" of the NAR restraints, "abandon[ing] their original, demonstrably false theory," and proceeding on a "new theory." Jt. Mem. 1, 6 & 9. There is no new theory. In their original motions, Defendants ignored the substance of Plaintiffs' allegations and quibbled over the tangential issue of whether commissions are *ever* negotiable.

First, the challenged restraints *require* every seller to make an offer to pay a buyer-broker commission in order even to list a residence on the MLS, even though the buyer-broker is working for and owes a fiduciary duty *to the buyer.* In doing so, Defendants both impose an expense on every seller, *cf. Wilk*, 895 F.2d at 360 ("[I]t is anticompetitive to impose higher costs on chiropractors by forcing them to pay for their own x-ray equipment rather than obtaining x-rays from hospital radiology departments or radiologists in private practice"), and "restrain their ability to sell in accordance with their own judgment," *Maricopa Cty. Med. Soc'y*, 457 U.S at 346.

Second, the restraints *require* that this be a "blanket offer"—i.e., the same financial payment is offered to every buyer-broker regardless of their experience or services. *See, e.g.*, *id.* at 348 (finding that Sherman Act was violated by "a price restraint that tends to provide the same economic rewards to all practitioners regardless of their skill, their experience, their training, or their willingness to employ innovative and difficult procedures in individual cases").

Third, they *require* that the financial offer either be for a fixed amount or a specified commission percentage and *prohibit* sellers from instead making "general invitations" to other participants to discuss terms and conditions of possible cooperative relationships. *See* Philip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 2021 (3d & 4th eds.) (explaining that "price-posting agreements make it easier for rivals to verify one another's prices," as do agreements standardizing pricing terms, because "[a]s long as 'price' operates along a single avenue—the basic price for the product itself—cartels and oligopolists may find it quite easy to observe and follow one another's prices").

---

Plaintiffs' CAC avoids this side-show, while re-alleging the same anti-competitive aspects of the Buyer Broker Commission Rule that has always been present in the complaints.

Fourth, the restraints at issue *require* that blanket offers (and readily comparable terms for buyer-broker payments) be published to every buyer-broker on the MLS. This requirement creates tremendous upward pressure on charges for buyer-broker commissions and facilitates steering buyers away from any seller that is unwilling to pay this buyer-broker expense. Through this publication requirement, "the MLS listing acts *as a tool which competing brokers can use to help enforce a near-uniform commission rate and drive out discounters.*" CAC ¶ 68. The Supreme Court has frequently recognized that agreements among competitors to "[e]xchange[] current price information . . . have the greatest potential for generating anticompetitive effects . . . ." *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 441 n.16 (1978).[12] Moreover, this case does not challenge a mere exchange of price information, but rather "an agreement among competitors limiting action with respect to the published prices." *Catalano*, 446 U.S. at 649-50.

Fifth, even though every broker is given full access to this information so they can compare the blanket offers, Defendants and their co-conspirators *prohibit* disclosing the full universe of buyer-broker offers to home-sellers and home-buyers. CAC ¶ 75–76, 78. Courts routinely forbid agreements among competitors to limit consumers' access to and ability to compare price information. *See, e.g.*, *Nat'l Soc'y of Prof'l Eng'rs*, 435 U.S. at 693 (professional association rule preventing consumers from comparing bids from multiple engineers was anticompetitive "on its

---

[12] Defendants' claim that the dissemination of pricing information is categorically "recognized as procompetitive, not anticompetitive" flies in the face of more than a century of antitrust law and economics. Jt. Mem. 15. *See, e.g.*, *Catalano*, 446 U.S. at 649-50 ("Nor can the informing function of the agreement, the increased price visibility, justify its restraint on the individual wholesaler's freedom to select his own prices and terms of sale"). While disseminating price information to *consumers* may sometimes be procompetitive, *agreements* among *competitors* to exchange pricing offers with one another— particularly when coupled with rules and practices that prevent consumers from viewing the full universe of offers— are "highly suspect." *See* Areeda & Hovenkamp, *supra*, ¶ 2024 ("[H]orizontal agreements to engage in [price] posting, or posting of a particular kind, are generally unnecessary to the proper functioning of the market, raise significant potential for facilitating collusion or oligopoly, and should be regarded as highly suspect.").

face"); *Gasoline Retailers Ass'n*, 285 F.2d at 691 (per se unlawful for gasoline retailers to agree not to advertise prices except by posting directly on the pump).

Sixth, Defendants and their co-conspirators *impose* myriad additional restraints that in concert limit the incentives and ability of home-sellers and -buyers, and their brokers, to negotiate brokerage commissions that are lower than the supracompetitive levels resulting from this conduct. CAC ¶¶ 88-91. For instance, NAR's Case Interpretation #16-15 requires that any negotiations between realtors concerning buyer-broker commissions must be "completed prior to the showing of the property"—before a potential buyer has seen, let alone expressed an interest in purchasing, the property. *Id.* ¶ 89. Agreements that restrain price competition by limiting the timing and effectiveness of negotiations from offered prices are anticompetitive and unlawful. *See, e.g.*, *Nat'l Soc'y of Prof'l Eng'rs*, 435 U.S. at 679.

The anticompetitive nature of these restraints is detailed in the CAC and supported by testimony and analysis from economists, industry experts, and many other sources—even though "plaintiffs are not required to make an evidentiary showing or produce expert testimony to survive a motion to dismiss." *Bear v. Cty. of Jackson*, No. 5:14-CV-5059-KES, 2015 WL 1969760, at *7 (D.S.D. May 1, 2015). These factual allegations are not only well supported, they must be accepted as true for purposes of Defendants' motions.

Moreover, courts have repeatedly condemned as anticompetitive rules adopted by NAR and MLSs—particularly those restricting competition over commissions. In *Realcomp II, Ltd.*, the Sixth Circuit denied a petition to review an FTC ruling that a local association's policies limiting the public distribution and display of limited-service brokers' property listings were anticompetitive. 635 F.3d at 819. The defendant association had adopted rules for its MLS that excluded listings by limited-service brokers, which typically offered lower commission rates, from

its default searches. *Id.* at 822. The Sixth Circuit found that these rules were anticompetitive because they: "created barriers to the dissemination of discount listings to public websites"; placed discount brokers at a competitive disadvantage; "limited access to internet marketing and imposed additional costs on the marketing of discount listings"; and were "likely to protect [the] full-service brokers from competitive pricing." *Id.* at 829-30.

NAR also lost a motion to dismiss in this District when the federal government challenged its policies on virtual office websites. *See NAR*, 2006 WL 3434263. Some brokers, taking advantage of the developments of the Internet, had established websites through which potential buyers could search MLS databases themselves. *Id.* at *2. The government alleged that, faced with this competitive challenge, NAR and several of the large brokerages worked together to craft policies for MLSs and local Realtor boards that prohibited brokers from conveying MLS listings to customers via the Internet without the permission of the listing broker. *Id.* at *4. The district court denied NAR's motion to dismiss because the government had sufficiently alleged that NAR's policies—which "were developed and utilized with anti-competitive animus"—"restrain[ed] competition from brokers who use the Internet to more efficiently and cost effectively serve home sellers and buyers." *Id.* at *12.

And in *Penne v. Greater Minneapolis Area Board of Realtors*, the Eighth Circuit reversed a summary judgment in favor of a defendant local Realtor board because the plaintiff had pointed to sufficient evidence showing that the board's commission rules were anticompetitive. 604 F.2d 1143, 1145 (8th Cir. 1979). The board included on its MLS listings information about the commission rates offered by the listing firm, thus permitting brokers to engage in "punitive" commission splits with discounters. *Id.* at 1147. Among other things, the court found the plaintiff raised a fact issue with respect to whether competitors were refusing to cooperate on listings where

the plaintiff's firm was offering a slightly lower commission: "[s]uch refusals to deal, if proven and proven to have been undertaken pursuant to a conspiracy to stifle [the plaintiff's] price competition, could well constitute violations of Section 1 of the Sherman Act." *Id.* at 1149.[13]

In response, Defendants do little more than assert specious factual claims that, at most, would raise factual disputes that cannot be resolved on a motion to dismiss.

**Defendants' Claim that They Do Not Dictate the Specific Amount Sellers Must Offer.**

Despite admitting that they *require* home-sellers to offer payment of a buyer-broker commission, Jt. Mem. 2, 7, Defendants assert that they do not dictate a specific amount, repeatedly claiming that the offer can be only "one cent," "a de minimis amount," or, in effect, "an offer of no compensation at all," *id.* at 7, 17. By looking at the offer requirement with blinders, Defendants contravene a basic principle of antitrust law and disregard this requirement's close interrelationship with other restraints and their combined effects. *See, e.g.*, *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962) (plaintiffs "should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each"); *In re Aftermarket Filters*, 2009 WL 3754041, at *3 ("defendants may not 'cherry pick' specific allegations in the complaint"). Sellers are not only required to offer payment of a buyer-broker commission, the offer must be (i) a blanket offer to all buyer-brokers, (ii) published to every buyer-broker on the MLS (but *not* their buyer clients), and (iii) stated in a

---

[13] MLS and local Realtor association rules that limit broker competition—thereby suppressing competition with respect to commission rates—have also been found potentially unlawful. *See, e.g.*, *Realty Multi-List*, 629 F.2d at 1371 ("A new entrant into the market might, for example, be more aggressive and willing to accept a lower commission rate. Exclusion of such a broker would tend to reduce the amount of price competition in the market."); *Marin Cty. Bd. of Realtors, Inc. v. Palsson*, 549 P.2d 833, 843 (Cal. 1976) (finding anticompetitive MLS membership restrictions that "limit entry into a competitive field by making it difficult for nonmembers to compete effectively with members. . . . This narrowing of [consumer] choice may have an effect on the commissions a consumer must pay for brokerage service").

form that allows every buyer-broker to make an instant comparison with the compensation to buyer-brokers offered by every other seller on the MLS.

Defendants offer no serious defense of their *requirement* that sellers make a "blanket offer" to every buyer-broker regardless of their experience or the services they are providing to a home buyer. Tellingly, in support of their assertion that it is "common" in our free-market economy to require "the same payment to all service providers regardless of their skill level," Jt. Mem. 11 n.7, Defendants are only able to point to Medicare—a market that is among the least "free" and, in which, the government dictates the fees paid to medical providers. Indeed, it would come as a surprise to a client in the legal profession if it were required to make a blanket offer to another party's counsel (and fiduciary), and the amount had to be *exactly the same* for a senior partner and an associate fresh from law school. Defendants' "blanket offer" requirement imposed on every home seller as a precondition to access to the MLS is the opposite of "standard market dynamics."

The blanket offer and related pricing requirements have predictable market effects: they create tremendous pressure on sellers to make blanket offers to buyer-brokers at or near 3% and, as Realtors are trained to warn sellers, any seller making a materially lower offer on the MLS will be subject to significant steering by buyer-brokers away from that property. It requires no great leap to imagine how many offers a seller would receive, under the current system, if her broker offered one cent to buyer-brokers. As the case law makes clear, concerted actions like these that tamper with free market pricing, and have the effect of stabilizing or elevating prices, are anticompetitive and unlawful regardless of whether the conspirators agree on or dictate a specific price. *See infra* pp. 14-16.

Even were Defendants correct that requiring every home-seller to make a blanket offer of payment to all buyer-brokers is "tantamount" to allowing "an offer of no compensation at all," Jt.

Mem. 7, then Defendants would have no reason to oppose this requirement's elimination. But, as Defendants well know, requiring blanket offers published to all buyer-brokers has enormous practical and anticompetitive consequences, including adverse impacts on both prices and low-cost competition.

**Defendants' Claim that Steering Involves "Standard Market Dynamics."** The CAC sets forth detailed facts explaining how Defendants' restraints facilitate steering and the significant anticompetitive results that follow.[14] In arguing that categorical imposition of such requirements on every home seller is a "way to incentivize" buyer-brokers "to show their clients the property in question," Jt. Mem. 14, Defendants ignore the other side of this coin. NAR's requirements also *disincentivize* showing any property offering a *lower* buyer-broker commission.

Defendants' admitted facilitation of steering is both unethical and anticompetitive. As Defendants concede, buyer-brokers owe a fiduciary duty to their home-buyer clients—a duty plainly breached if a buyer-broker declines to show a property meeting a home buyer's criteria simply because the buyer-broker believes the commission is too low. In offering supracompetitive commissions to buyer-brokers, home-sellers and -buyers obtain no additional services; rather, sellers effectively pay a bribe to an opposing party's fiduciary (the buyer-agent) in order to discourage it from violating its obligations to its client (the buyer). Moreover, Defendants do not dispute that they impose a regime in which information about these competing "buyer-broker" offers is published to every buyer-broker on the MLS, but disclosure of this universe of information to the client is *prohibited*.

---

[14] Defendants assert that the term "steering" is simply an "anticompetitive-sounding epithet" conjured up in the CAC. In fact, this term is widely used in economic literature describing anti-competitive conduct in the real estate industry, including government studies and the economic literature referenced in the CAC. *See, e.g.*, CAC ¶¶ 67 n.26, 68 n.28, 78 & n.33.

Additionally, Defendants' improper factual contentions about the impact of the Internet on buyers and steering disregard market realities. Defendants provide no support for their claims that: information about buyer-broker commissions is ordinarily available over the Internet; consumers (who typically purchase homes infrequently) have an understanding of buyer-broker compensation or other market dynamics that would often make them aware they are being steered; or steering has materially declined. Defendants' effort to dispute the CAC's factual allegations is not appropriate at the pleading stage.

Similarly, Defendants' suggestion that because their actions have not eliminated *every* discounter means they have not impeded competition is contrary to well-established law. *Cf. McWane, Inc. v. FTC*, 783 F.3d 814 (11th Cir. 2015) (monopolist liable despite presence of weakened rival). It also ignores the CAC's allegations and Defendants' own statements about the irrelevance of discounters. *See, e.g.*, CAC ¶ 69 (statement by Defendant Keller William's CEO that market share of discount brokers is "at an all-time low" and they have become "irrelevant").

**Defendants' Claim that Commissions Are Negotiable.** Defendants' *factual* argument that, despite their restraints, commissions are partially negotiable misquotes the CAC and ignores its allegations. *See* Jt. Mem. 18 (misquoting the CAC's well-supported allegation that the conspiracy's restraints "impede effective negotiation," CAC ¶¶ 82-92, as "NAR Rules 'Effectively Prohibit'" negotiation).

Defendants have employed numerous methods that collectively impede effective negotiation over commission pricing. First, Defendants' seller-brokers are trained to warn sellers against negotiating down the amount of the buyer-broker commission. CAC ¶¶ 84-85. Second, Defendants' pricing regime authorizes seller-brokers to include the buyer-broker commission as part of the total commission charged to the seller. This allows seller-brokers to collect the full

commission even if *no* buyer-broker is used or if the buyer negotiates a lower buyer-broker commission—known in industry parlance as a "hogger fee." *Id.* ¶ 86. Third, because NAR permits buyer-brokers to represent that their services are "free," homebuyers "are effectively told they have no reason to seek a reduction in the buyer-broker commission." *Id.* ¶ 87. Fourth, NAR rules prohibit buyer-brokers from presenting an offer to a seller that *reduces* the offered buyer-broker commission. *Id.* ¶ 88.[15] Fifth, NAR has informed buyer-brokers that any negotiation of a lower buyer-broker commission must be completed "*prior to the showing of the property*"—in practice eliminating negotiation. *Id.* ¶ 89. Sixth, NAR rules prohibit seller-brokers from changing their offer of compensation to the buyer-broker after the latter has produced an offer from the buyer. *Id.* ¶¶ 4, 90. Seventh, NAR has stated that it is unethical for buyer-brokers to urge a home buyer to negotiate directly with the seller to reduce commissions. *Id.* ¶ 91.

Given this obstacle course, Defendants fail to explain how negotiations may materially reduce the anticompetitive impact of the challenged restraints. They argue that each restraint *individually* does not "prohibit home buyers and sellers from *attempting* to lower commission rates," Jt. Mem. 7 (emphasis added), and that *some* of their restraints prohibit only "unilateral" changes, *id.* 19-20. Defendants ignore the combined effect of their rules and practices in strictly limiting buyers' and sellers' ability to negotiate with one another or with brokers to reduce commissions, as well as brokers' incentives to agree to any reduction. *See supra* pp. 6-7, 20.[16]

---

[15] Defendants argue that this prevents brokers from holding an offer hostage by increasing the amount of the commission. They ignore the fact that this restraint is not so narrowly drawn and also prohibits any *reduction* in offered buyer-broker commission.

[16] Neither Defendants' improper reliance on a NAR Case Interpretation not referenced in the CAC, nor NAR's SOP 3-3 alters this analysis. Jt. Mem. 19. Because commissions are fixed in a listing agreement, even in the limited circumstances where NAR's rules permit downward negotiation of buyer-broker commissions, an agreement between (i) a buyer and seller or (ii) a buyer Realtor and seller Realtor to reduce buyer-broker compensation would fail to lower the total commission paid by the seller. It would simply permit the seller-broker to keep a "hogger fee."

Defendants also ignore the CAC's allegations underscoring the effectiveness of their limits on negotiation: "seller-brokers who initially list property with a buyer-broker commission at 2.5% or above almost always stay at a high commission rate." CAC ¶ 92. If anything, "if a seller-broker who initially offers a lower buyer-broker commission decides to change the amount, the change ordinarily involves imposition of an *increased* buyer-broker commission." *Id.* ¶ 92. Even if there are rare cases of negotiation from MLS-posed commissions, Defendants' restraints would still be anticompetitive because they elevate the baseline price. *See, e.g.*, *In re Urethane Antitrust Litig.*, 237 F.R.D. 440, 450-51 (D. Kan. 2006) ("conspiratorial behavior elevates list prices and list prices serve as a reference or benchmark for pricing or pricing negotiations"). "[T]o establish violation of the Sherman Anti-Trust Act, it is not necessary to show that the challenged arrangement suppresses *all* competition between the parties." *Paramount Famous Lasky Corp. v. United States*, 282 U.S. 30, 44 (1930) (emphasis added).

**Defendants' Claim that Buyers Are Free to Offer Additional Compensation.**
Defendants attack a strawman in asserting they do not prohibit buyers from paying their broker, a claim that is irrelevant because: (a) Defendants impose a pricing regime that forces every seller to make a blanket offer of buyer-broker compensation; (b) buyers have little reason to offer payment to buyer-brokers since they are told those services are "free" to buyers; (c) payments from buyers, who are not informed of commissions offered on the MLS, would not reduce buyer-brokers' incentives to steer buyers to listings offering higher commissions; and (d) any payment from buyers to buyer-brokers would only further increase already inflated commissions because Defendants' pricing regime permits seller-brokers to charge the seller for the entire commission specified in the listing agreement. That the challenged restraints preserve buyers' "option" to pay

buyer-brokers more on top of the supracompetitive commissions those brokers receive from sellers does not defeat Plaintiffs' claims.

**Defendants' Rebate Argument.** Citing a source external to the complaint, Defendants claim that buyer-broker rebates are available from some brokers in some states. Jt. Mem. 16. This factual argument is improper under Rule 12(b)(6). Defendants also make no showing that such rebates have competitive significance or that they reduce the "blanket offers" that sellers are required to offer every buyer-broker. Defendants' unsupported claim that rebates are "widespread" contradicts not only Plaintiffs' well-pleaded allegations (which must be credited), but also Defendants' own public statements that such competition is "irrelevant" and at "an all-time low." CAC ¶ 69. Even were some rebates off of MLS-posted commissions available, the challenged restraints would still be anticompetitive. *See Catalano*, 446 U.S. at 649 (restraint "extinguishing one form of [price] competition," but not others, was nevertheless per se illegal); *Paramount Famous Lasky Corp.*, 282 U.S. at 44.

**NAR's Consent Decree with the DOJ.** Defendants' reliance on a consent decree entered more than a decade ago, and now expired, to argue that the DOJ has blessed the challenged restraints is equally groundless. Jt. Mem. 1-2, 21. Consistent with NAR's long history of restraining competition, that decree was necessitated after the DOJ sued NAR in 2005 for adopting discriminatory rules to "restrain competition" arising from Internet-based brokers that wanted to permit customers to search MLS listings on the Internet through virtual office websites. *NAR*, 2006 WL 3434263. The fact that DOJ had to take action to forbid one set of illegal and anticompetitive NAR policies obviously does not immunize Defendants from Plaintiffs' challenge to a different set of illegal and anticompetitive policies. Indeed, based on publicly available information, the DOJ appears to be actively investigating the very restraints challenged here. CAC ¶ 72.

### 3.    Defendants' anticompetitive restraints have injured plaintiffs and the class.

Plaintiffs' demonstration of both "market power and [the] anticompetitive tendencies" of the challenged restraints supports "an inference of adverse effects," even absent allegations of actual anticompetitive effects. *Realcomp II, Ltd*., 635 F.3d at 827-28 & n.6 (citing authorities, including *Ind. Fed'n of Dentists*, 476 U.S. at 459-62). Plaintiffs, nevertheless, go beyond what is required under the rule of reason and Rule 12(b)(6) by pleading detailed allegations that plausibly show the actual anticompetitive effects of Defendants' restraints on the market.

First, commission rates have remained stable, and actual charges have almost doubled—with limited if any regard to market conditions. CAC ¶ 126. Such "[u]nusual and sustained pricing stability is not expected in a competitive market." *In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig*., No. 9 CR 3690, 2013 WL 212908, at *5 (N.D. Ill. Jan. 18, 2013). In fact, charges imposed on sellers and buyers have not declined (to the contrary, they have substantially increased) even though the Internet and other technologies have reduced costs. CAC ¶ 129; *see also id.* at ¶ 14. This is in stark contrast to "almost every other consumer industry—booksellers, retailers, home appliances, insurance, banking, stock brokers," where the "introduction of Internet and discount sellers has been a phenomenal financial benefit to customers," causing real prices in the airline industry, for example, to drop as much as "60% or more." *Id.* ¶ 14.

Second, due to the challenged restraints, broker charges are being set "without regard to either the quantity or quality of services rendered." CAC ¶ 128; *see also Maricopa Cty. Med. Soc'y*, 457 U.S. at 348 (finding that Sherman Act was violated by "a price restraint that tends to provide the same economic rewards to all practitioners regardless of their skill, their experience, their training, or their willingness to employ innovative and difficult procedures in individual cases"). Indeed, because the commission rate has been stabilized, the actual charges imposed on

sellers of higher-priced homes are many times higher, regardless of the cost or services involved. CAC ¶ 15.

Third, the real estate brokerage charges imposed on consumers in the United States are far higher than those typically imposed in developed countries. After comparing different markets, economists Delcoure and Miller concluded that, "based on global data, [total] US residential brokerage fees should run closer to 3.0%." CAC ¶ 125.[17]

Defendants do not dispute that both total and buyer-broker commissions have been stable for two decades, nor that actual charges imposed have almost doubled even accounting for inflation. They nevertheless posit that this is "the free market at work." Jt. Mem. 2. In doing so, Defendants ignore the CAC's extensive allegations explaining how the challenged restraints cause supracompetitive pricing. Defendants' sole alternative explanation—their assertion that it results simply from "standard market dynamics," rather than the pricing regime they have imposed—is contrary to the detailed factual allegations in the CAC, a substantial body of economics literature, the analysis of industry experts, and fundamental principles of economics.[18]

---

[17] Defendants' claim that a complaint cannot be based on "opinions" misses the mark. The cases Defendants' cite address the propriety of pleading *legal* conclusions—not the factual allegations Plaintiffs advance. Even so, the CAC generally describes both the underlying facts and the conclusions of economists and industry experts it cites. Moreover, Defendants themselves contend that any remaining facts on which these experts rely are incorporated by reference into the CAC.

[18] Defendants disregard all but one of the cited academic studies and industry analysis that not only explain the manner in which Defendants' conduct has significantly restrained competition, but also conclude that price competition would save consumers "as much as $30 billion or more annually" and that "more than half of current commissions might be eliminated by competition." CAC ¶ 132. The only study Defendants address is a published paper by Delcoure and Miller finding, based on a comparison of real estate commission pricing and models used in various countries, that residential brokerage fees in the United States are supracompetitive and should run closer to 3.0%—more than 40% below existing levels. Corp. Defs.' Mem., Ex. 2 at 1. Defendants misconstrue Delcoure and Miller's observation that U.S. real estate agents "do not earn excess profits" to mean that commission prices are not supracompetitive. Corp. Defs.' Mem. 23 & Ex. 2. But the authors reached the opposite conclusion: they found that supracompetitive U.S. commissions lead to an "excess supply" of U.S. agents, reducing agents' efficiency and driving down their individual profits. *Id.*, Ex. 2 at 20 n.18. This inefficiency is simply another competitive harm caused by Defendants' conduct.

Ignoring the nub of the CAC's allegations concerning the impact of Defendants' restraints on pricing, Defendants also claim Plaintiffs have not alleged injury to the market as a whole. Corp. Defs.' Mem. 22-24. In fact, the CAC alleges that: (i) the challenged conduct has inflated the "*total* commissions" paid by consumers of real estate brokerage services and harmed *both* buyers and sellers—not simply shifted costs from buyers to sellers, CAC ¶¶ 16, 122-32 (emphasis added); (ii) prevented quality-based competition, *id.* ¶¶ 63, 73 & n.32, 128; and (iii) impeded entry of lower-cost competition, *id.* ¶¶ 68-69. These are market harms recognized by the Supreme Court in *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2288 (2018) (granting summary judgment where plaintiff did *not* prove that price was "higher than the price one would expect to find in a competitive market") and alleged by the DOJ in its earlier complaint challenging NAR's actions to restrain competition by Internet competitors, *NAR*, 2006 WL 3434263, at *15 (alleging that NAR's actions "reduc[ed] competition among brokers based on price and quality, and raising barriers to entry").

Finally, Defendants' cursory argument that Plaintiffs have not plausibly alleged Article III or antitrust injury is contrary to established law. Jt. Mem. 24-25. Plaintiffs allege that Defendants' conspiracy has caused "total commissions in the areas in which the Covered MLSs operate (and elsewhere) to be inflated," Plaintiffs sold homes in the Covered MLSs, and "paid these inflated commissions during (and before) the last four years in connection with the sale of residential real estate." CAC ¶ 156. The Supreme Court has been unwavering in recognizing that "an increase in price resulting from dampening of competitive market forces is assuredly one type of injury for which" the antitrust laws offer redress. *Blue Shield of Va. v. McCready*, 457 U.S. 465, 482-83 (1982).[19] Defendants state that the challenged conduct must be a sufficiently direct cause of

_____

[19] In trying to defend the challenged restraints, Defendants cite various cases that do nothing to advance their position here. *See Rocha v. FedEx Corp.*, 15 F. Supp. 3d 796, 811 (N.D. Ill. 2014) (rejecting a *tying* claim where defendant lacked market power and did not force plaintiff to buy tied product); *Pirard v. Bank of Am.*, No. 12-cv-2901, 2013 WL 1154294, at *2 (N.D. Ill. Mar. 19, 2013) (after defaulting on a

Plaintiffs' injuries but do not point to any purported intervening causes. Moreover, it is legally sufficient if the challenged restraints "at least contributed to the price rise and the stability" of the market—"[t]hat other factors also may have contributed to that rise and stability of the markets is immaterial." *Socony-Vacuum*, 310 U.S. at 219.[20]

Defendants nevertheless assert that Plaintiffs have not sufficiently shown injury because, although Plaintiffs allege they paid supracompetitive commissions that they would not have paid absent the challenged restraints, Plaintiffs did not also plead that their brokers refused to negotiate. This argument ignores Plaintiffs' steering allegations, which demonstrate the futility of any reduction in buyer-broker commissions due to the challenged restraints. It is also contrary to precedent holding that allegations concerning "the influence that a conspiracy exerts on the starting point for prices" are sufficient to plead injury—even where a plaintiff "remain[] free to negotiate." *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 773, 776 (2d Cir. 2016); *see also In re High Fructose*

---

mortgage, plaintiff sued the lender on the basis of a "completely speculative and unsupported" Sherman Act claim); *BCB Anesthesia Care, Ltd. v. Passavant Mem'l Area Hosp. Ass'n*, 36 F.3d 664, 667 (7th Cir. 1994) (court considering staffing decision by a single hospital explained that "hundreds or thousands of pages" of caselaw "come to the same conclusion: the staffing decision at a single hospital" does not violate the Sherman Act); *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1110 (7th Cir. 1984) (party lacked standing where it was terminated because its prices were *too high*).

[20] The cases cited in Defendants' memoranda are not *remotely* similar to the instant case, where the CAC includes detailed allegations as well as ample support from economic literature and industry experts. *See Silha v. ACT, Inc.*, 807 F.3d 169, 175 (7th Cir. 2015) (in a non-antitrust case, plaintiffs did not allege "they lost anything of value as a result of the alleged misconduct"); *Shuffle Tech. Int'l, Inc. v. Sci. Games Corp.*, No. 15-cv-3702, 2015 WL 5934834 (N.D. Ill. Oct. 12, 2015) (*denying* motion to dismiss where plaintiffs alleged they were injured by conduct that limited competition); *Cortelco Sys. of P.R. Inc. v. Phoneworks, Inc.*, No. 09-1371CCC, 2009 WL 4046794, at *3 (D. P.R. Nov. 20, 2009) (plaintiff made completely unsubstantiated claim of antitrust injury); *Kochert v. Greater Lafayette Health Servs., Inc.*, 463 F.3d 710, 718 (7th Cir. 2006) (*summary judgment* decision in which allegedly harmful behavior was "nonexistent" at time of alleged injury); *Greater Rockford Energy & Tech. Corp. v. Shell Oil Co.*, 998 F.2d 391, 401 (7th Cir. 1993) (*summary judgment* decision in which record established alternative explanations for injury alleged by plaintiffs); *Brown v. Visa U.S.A., Inc.*, 674 F. Supp. 249, 252 (N.D. Ill. 1987) (plaintiff only alleged hypotheticals about harms that could occur in future, but did "not allege that even one of these 'ifs' actually took place"); *O'Neill v. Coca-Cola Co.*, 669 F. Supp. 217, 223 (N.D. Ill. 1987) (plaintiff did not show that she had purchased "any of the products of either defendant in any of the areas" at issue).

*Corn Syrup Antitrust Litig.*, 295 F.3d 651, 656 (7th Cir. 2002) (calling argument "that many of the actual sales . . . were made at prices below the defendants' list prices" a "trap"); *In re Indus. Diamonds Antitrust Litig.*, 167 F.R.D. 374, 383 (S.D.N.Y. 1996) (as long as plaintiff proves concerted action resulted in inflated list prices, "a jury could reasonably conclude that each purchaser who negotiated an individual price suffered some injury").[21]

### 4.     Even if procompetitive benefits could be considered at the pleading stage, the challenged restraints have none.

It is premature at the pleading stage to weigh against a challenged restraint's competitive harms any benefits that it might have. *See supra* p. 14. Defendants nevertheless seek to improperly inject into the litigation several purported justifications for their anticompetitive conduct. But Defendants' fail to show there is *any* procompetitive justification for their restraints—let alone benefits that justify billions of dollars in overcharges.

Defendants attempt to justify their anticompetitive conduct by pointing to past cases in which MLSs were deemed to have *some* benefit. But Plaintiffs have not challenged MLSs themselves—only certain rules they have implemented. And Defendants ignore numerous decisions condemning anticompetitive conduct in the real estate industry, including involving MLS rules. *See supra* pp. 20-22 & n.13. Moreover, although the real estate industry previously justified imposing buyer-broker charges on sellers by arguing that these brokers were "sub-agents" owing fiduciary duties to the seller, that system "collapsed" decades ago after it was exposed that "brokers working with buyers were legally obligated to pass on information disadvantageous to

---

[21] Hornbook antitrust law precludes Defendants' cursory factual argument that supracompetitive commissions paid for by a seller might be passed on to by buyers in the sale price of the home. Jt. Mem. 3. *See Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481 (1968) (establishing that alleged pass-through of an overcharge is not a cognizable defense under the federal antitrust laws).

their clients to sellers." CAC ¶ 54.[22] With the demise of sub-agency, "[t]here is no longer any reason to permit listing brokers to set the default price that these competing buyers' brokers charge to serve their own customers." CAC ¶ 123. Under the current system, "none of the purposes of the MLS 'has anything to do with interbroker compensation. In fact, MLS's could continue providing every service of significance they provide without addressing compensation at all.'" *Id.* ¶ 123 & n.37.[23]

Defendants also list several cursory, illogical, and factually groundless justifications for the enormous overcharges imposed on home-sellers: (i) "Home sellers may negotiate with potential listing brokers" over the commissions the seller will pay; (ii) "Home buyers may negotiate with competing brokers about how much the buyer will pay the broker" if the listing broker's offer is inadequate; (iii) "The buyer's broker and the listing broker may agree to change cooperative compensation as offered on the MLS"; (iv) "The home seller and the home buyer may

---

[22] The *only* cases Defendants cite that have anything to do with commissions were decided 35 or more years ago and involved the *sub-agency* system. *See Supermarket of Homes v. San Fernando Valley Bd. of Realtors*, No. 80-cv-1888, 1983 WL 2199, at *2, 7 (C.D. Cal. Sept. 1, 1983) (offer to broker is made so that broker can decide whether "a subagency" relationship should be established); *Murphy v. Alpha Realty*, No. 76-cv-2446, 1978 WL 1451, at *4 (N.D. Ill. 1978) (defendants alleged that payment was justified because broker would work as a "subagent" for the listing broker). The sub-agency rationale in those older cases, if anything, dictates *the opposite result* here: as Defendants' acknowledge, buyer-brokers now owe a fiduciary duty *to the buyer*, Jt. Mem. 19, and yet the challenged restraints *require* sellers to make a blanket offer to pay this expense, *see* CAC ¶¶ 55-56. Defendants also fail to mention that the cases they cite in support of their claim that "[t]his system, and the rules upon which it has been based, have repeatedly been upheld by the courts," Jt. Mem. 1, 15, 21, are *summary judgment* cases decided after *completion of discovery.* Factual findings underpinning these decisions cannot be used against Plaintiffs here and certainly not to resolve a Rule 12(b)(6) motion.

[23] Defendants rely on several summary judgment decisions (and one case where the plaintiff sought a preliminary injunction) finding that, in general, there are benefits to an MLS, *O'Riordan v. Long Island Bd. of Realtors*, 707 F. Supp. 111, 115 (E.D.N.Y. 1988); *Venture Res. Grp., Inc. v. Greater N.J. Reg'l MLS, Inc.*, No. 95-cv-0401, 1995 WL 866841, at *3 (D.N.J. Aug. 24, 1995) (*inter alia* declining to decide whether MLS fee violated antitrust laws and justified injunction absent showing of irreparable injury), or rejecting challenges to specific rules unrelated to those at issue in this case, *Reifert*, 450 F.3d at 321 (granting summary judgment upholding rule preventing NAR members from interfering with exclusive agreements that agents reach with a client). As the CAC makes clear, however, the existence of an MLS does not in any way necessitate the anti-competitive restraints challenged here. *See* CAC ¶ 123 & n.37.

negotiate the purchase offer with full transparency" about commissions or conflicts with the broker; and (v) "When a seller elects to permit its broker to pay compensation to the buyer's broker, it frees up buyer cash . . . ." Jt. Mem. 20-21.

None provides any basis for dismissal. The first four "justifications" impermissibly contradict Plaintiffs' allegations that the challenged restraints hinder the timing and effectiveness of negotiations between buyers, sellers, and their agents to lower commissions. *See supra* pp. 6-7, 20. And, even were Defendants' entitled to ignore the CAC's well-pleaded allegations, and the language of their own rules, the presence of some negotiation from supracompetitive base prices cannot justify anticompetitive behavior. *Supra* pp. 27, 33. These justifications also suffer from a more fundamental infirmity: buyers would be able to negotiate buyer-broker commissions more effectively if the challenged restraints were eliminated. *See Graphic Prod. Distribs., Inc. v. ITEK Corp.*, 717 F.2d 1560, 1576 (11th Cir. 1983) ("merely offering a rationale for a . . . restraint will not suffice; the record must support a finding that the restraint in fact is necessary to enhance competition and does indeed have a pro-competitive effect").

The final asserted "justification" simply misstates the challenged restraints. Under Defendants' pricing regime, sellers do not "elect" to offer payment of buyer-broker charges—they are *required* to do so, *must* do so on a blanket basis, and *must* otherwise comply with each requirement in the challenged agreement. There is no rationale consistent with a "free market" for requiring sellers to pay these costs for another party's agent and fiduciary. If sellers were required to give their homes away—or sell them at half price—this would also "free up buyer cash," but that hardly provides a justification for such a requirement.

Even were there a legitimate rationale for Defendants' pricing regime, Defendants fail to show that the challenged restraints are "reasonably necessary to the accomplishment of . . .

legitimate goals and narrowly tailored to that end." *Realty Multi-List, Inc.*, 629 F.2d at 1385 (reversing a summary judgment upholding challenged restraints imposed by an MLS, including because the rules were "overly broad to accomplish any legitimate goals of the association"). Defendants do not even attempt to defend the sweep of their restraints. They simply wish the harms away, asserting that their rules give sellers "encourage[ment]," "permit" them to take action, or leave them the option to do nothing. Jt. Mem. 2. This is contradicted by the plain language of NAR's rules and their predictable market effects. If Defendants truly believed that nothing more than permission were necessary to achieve purported procompetitive benefits, then there would be no basis for the far more sweeping requirements they impose.

## II.    NAR and the Corporate Defendants Agreed to the Challenged Restraints.

The existence of Defendants' anticompetitive *agreement* cannot reasonably be disputed. In a typical antitrust case, the illicit agreement is concealed, and there is rarely a "smoking gun." *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 629 (7th Cir. 2010). Here, however, Defendants' agreement is out in the open: the challenged restraints are written into publicly accessible documents. *Cf. Twombly*, 550 U.S. at 556 (challenged restraint was a secret agreement alleged based only on the defendants' parallel conduct). For nearly a century, the Supreme Court has treated such associational rules imposing "duties and restrictions on the conduct of [t]he members' separate businesses" as direct evidence of an agreement subject to Section 1. *Associated Press v. United States*, 326 U.S. 1, 8 (1945).

Because Plaintiffs plausibly allege that: the Corporate Defendants directly participate in NAR; require their affiliates and agents to join NAR and the MLSs, and to comply with their rules; and otherwise accepted NAR's invitation to participate in that agreement, each is liable under the Sherman Act for the injuries caused by the challenged restraints. *See, e.g.*, *United States v.*

*Masonite Corp.*, 316 U.S. 265, 275 (1942) ("Acceptance by competitors, without previous agreement, of an invitation to participate in a plan, the necessary consequence of which, if carried out, is restraint of interstate commerce, is sufficient to establish an unlawful conspiracy under the Sherman Act." (citation omitted)).

### A. An association's rules are an agreement among its members for antitrust purposes.

The Supreme Court has repeatedly held association rules to constitute agreements among their members under Sherman Act Section 1.[24] For example, the Supreme Court found that, where "the policies of the NCAA with respect to television rights are ultimately controlled by the vote of member institutions," by participating in the association, the member institutions had created "an agreement among competitors." *NCAA*, 468 U.S. at 99. This was true even though the NCAA announced that it would sanction any member institution that did not abide by the plan. *Id.* at 94-95. And, in striking down an association's ethical rule limiting competitive bidding among members, the Supreme Court held in *National Society of Professional Engineers* that "[e]vidence of this agreement is found in [the challenged rule] of the Society's Code of Ethics." 435 U.S. at

---

[24] *See, e.g.*, *Ind. Fed'n of Dentists*, 476 U.S. at 451 (dental association rule forbidding members from submitting x-rays to insurers); *NCAA*, 468 U.S. at 99 (NCAA plan restricting members' licensing of television rights); *Maricopa Cnty. Med. Soc'y*, 457 U.S. at 357 (medical society's schedule of maximum prices); *Nat'l Soc'y of Prof'l Eng'rs*, 435 U.S. at 681 (engineering society's ethical canon barring competitive bidding); *Goldfarb v. Va. State Bar*, 421 U.S. 773, 781-83 (1975) (bar associations' fee schedules); *United States v. Topco Assocs.*, 405 U.S. 596, 602-03 (1972) (joint-venture bylaws setting exclusive territories for members); *United States v. Nat'l Ass'n of Real Estate Bds.* (*"NAREB"*), 339 U.S. 485, 488 (1950) (real-estate board's code of ethics requiring adherence to standard rates). In *NAREB*, although the Court affirmed the trial court's finding that there was insufficient evidence of NAREB's participation in the conspiracy, the trial court had made no particularized findings, NAREB's alleged participation was premised solely on its ambiguous statement that local associations' fee schedules "should be observed," and the Court was bound by a "clearly erroneous" standard of review. 339 U.S. at 494-95; *see also id.* at 495 ("It is not enough that we might give the facts another construction, resolve the ambiguities differently, and find a more sinister cast to actions which the District Court apparently deemed innocent."). The allegations and applicable legal standard are different here.

683.[25] In the case of such agreements, "*Twombly*'s requirements with respect to allegations of illegal parallel conduct" are "superfluous in light of the direct evidence in the by-laws of the agreement itself." *Robertson v. Sea Pines Real Estate Cos.*, 679 F.3d 278, 289-90 (4th Cir. 2012).

Of particular relevance here, courts have long treated rules imposed by NAR, its local boards, and its MLSs as agreements under the Sherman Act. In a prior case in this district, NAR even "concede[d], for present purposes at least, that the challenged [MLS] Policies and rules are the product of a combination among NAR's members." *NAR*, 2006 WL 3434263, at *13 (denying NAR's motion to dismiss an antitrust challenge to its policies concerning the use of MLS data in connection with Internet brokerage services—which was adopted by NAR's Board of Directors at the urging of Defendant RE/MAX and the corporate predecessor of Defendant Realogy); *see also*, *e.g.*, *Realcomp II, Ltd.*, 635 F.3d at 824-25 (holding that, because the defendant MLS was "owned by seven associations of competing real-estate brokers, is governed by members of those associations, and claims a membership of brokers competing in the market for real-estate-brokerage services" its anticompetitive "website policy constitutes an agreement governing the Realcomp MLS among the Realcomp members"); *Robertson*, 679 F.3d at 289 (holding that an MLS's bylaws constituted a "plausible claim of conspiracy between the MLS board members").

Defendants imply that, in order to join a Section 1 agreement, an association's member must actively support, rather than simply agree to follow, an association rule. *See* Corp. Defs.' Mem. 10–11. But that is not the law. The Supreme Court has repeatedly held that associations' members engage in concerted action when, as here, they "surrender[] [their] freedom of action" in

---

[25] The Corporate Defendants' assertion that trade association membership does not *necessarily* entail anticompetitive activity is beside the point. Corp. Defs.' Mem. 9. The CAC does not merely plead trade organization membership; it includes detailed allegations concerning the anticompetitive nature and effects of Defendants' agreed restraints. *See supra* pp. 3-7, 9-12.

some aspect of their separate businesses and "agree[] to abide by the will of the associations." *Anderson v. Shipowners Ass'n of Pac. Coast*, 272 U.S. 359, 364-65 (1926); *see also, e.g.*, *NCAA*, 468 U.S. at 99; *Silver v. N.Y. Stock Exch.*, 373 U.S. 341, 348 (1963); *Associated Press*, 326 U.S. at 19. In fact, an association member that agrees to conduct its business according to an association's rules participates in an agreement even if it opposes those rules, because "acquiescence in an illegal scheme is as much a violation of the Sherman Act as the creation and promotion of one." *United States v. Paramount Pictures, Inc.*, 334 U.S. 131, 161 (1948); *see MCM Partners, Inc. v. Andrews-Bartlett & Assocs., Inc.*, 62 F.3d 967, 973-74 (7th Cir. 1995).[26]

**B.    The Corporate Defendants participated in an agreement by imposing NAR and MLS rules on their subsidiaries and affiliates.**

Given the clarity of the Supreme Court's pronouncements, there should be little dispute that the challenged NAR rules, and their adoption by local associations and MLSs, are the product of an agreement among each association's members. The only question remaining is whether Plaintiffs plausibly plead the Corporate Defendants' participation in that agreement. The answer is yes: Plaintiffs allege that (i) certain Corporate Defendants *directly* participated in the agreement through their or their officers' NAR leadership and membership roles (e.g., Defendant HomeServices) and (ii) each is liable because it required its brokerage operations, franchisees, and

---

[26] The purportedly contrary cases Defendants rely on generally were not decided on a motion to dismiss and, in each, the plaintiffs had alleged a secret agreement—not a written association rule—yet provided no evidence of either the agreement itself, the defendants' participation in that agreement, or both. *See, e.g.*, *Wilk*, 895 F.2d at 374; *Marrese v. Am. Acad. of Orthopedic Surgeons*, No. 80-cv-1405, 1991 WL 5827, at *6 (N.D. Ill. Jan. 15, 1991), *aff'd*, 977 F.2d 585 (7th Cir. 1992); *Kleen Prods. LLC v. Int'l Paper*, 276 F. Supp. 3d 811, 834 (N.D. Ill. 2017, *aff'd sub nom. Kleen Prods. LLC v. Georgia-Pacific LLC*, 910 F.3d 927 (7th Cir. 2018). In *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042 (9th Cir. 2008), for instance, despite obtaining deposition discovery, the plaintiffs could not supply any facts to support their claim that the banks participated in the credit-card consortiums and agreed to adopt their fees. 518 F.3d at 1048. Here, by contrast, the CAC alleges an agreement that was overt (not secret, as in *Kendall*), and that each Corporate Defendant required the adoption of the agreed restraints. CAC ¶¶ 104-20.

agents to join NAR, local Realtors associations, and MLSs and to comply with their rules, including the challenged restraints.

"[W]here a plaintiff alleges . . . that a parent company has directed its subsidiary to engage in anticompetitive conduct and itself engages in anticompetitive conduct, such allegations are sufficient to establish market participation by the parent company." *In re Dealer Mgmt. Sys. Antitrust Litig.*, No. 18-cv-864, 2018 WL 6629250, at *7 (N.D. Ill. Oct. 22, 2018); *see also Nobody in Particular Presents, Inc. v. Clear Channel Commc'ns, Inc.*, 311 F. Supp. 2d 1048, 1071 (D. Colo. 2004) (allegations that parent company "directs and controls the policies and behavior of its subsidiaries" raised fact question as to parent's antitrust liability); *Intellectual Ventures I LLC v. Cap. One Fin. Corp.*, No. 14-111, 2016 WL 160263, at *5 (D. Md. Jan. 14, 2016) (plaintiff adequately alleges participation where defendant "is a parent company, controlling or directing the anticompetitive conduct" of its affiliates).

Here, the Corporate Defendants concede that Plaintiffs plausibly allege that they "require[] the real estate brokerage companies that they respectively own and/or franchise to abide by NAR's rules and code of ethics . . . ." Corp. Defs.' Mem. 1. In addition, Plaintiffs allege that "[e]ach Corporate Defendant requires its franchisees, affiliates, and realtors to join NAR . . . , and join a local realtor association and/or MLS, which requires compliance with the Buyer Broker Commission Rule and the other anticompetitive NAR Standards of Practice." CAC ¶ 116. For each Corporate Defendant, the requirements that "realtors and franchisees . . . abide by NAR rules" is a "condition of doing business with the Corporate Defendants, and to secure the benefits of the Corporate Defendants' brands, infrastructure, and other resources that support their brokerage operations." *Id.*; *see also id.* ¶¶ 117-20. Because the Corporate Defendants "are the leading brokers in the United States, their participation in the conspiracy and implementation and enforcement of

its terms is essential to the success of the conspiracy." CAC ¶ 6; *see also NCAA*, 468 U.S. at 99 (NCAA's anticompetitive television-rights policy was carried out through the schools bound by the policy); *Nat'l Soc'y of Prof'l Eng'rs*, 435 U.S. at 683 (anticompetitive policy preventing fee negotiation was carried out by the engineers bound by the policy).[27]

The Corporate Defendants nevertheless assert that Plaintiffs' claims against them must be dismissed unless Plaintiffs can plausibly show that they all *directly* communicated to agree to the challenged restraints. Corp. Defs.' Mem. 6-7. This misstates the governing law. "Participation by each conspirator in every detail in the execution of the conspiracy is unnecessary to establish liability, for each conspirator may be performing different tasks to bring about the desired result." *Beltz Travel Serv., Inc. v. Int'l Air Transp. Ass'n*, 620 F.2d 1360, 1367 (7th Cir. 1980). Moreover, a corporation cannot evade liability under the Sherman Act merely by requiring another party, over whom it exercises control, to join and implement an anticompetitive agreement from which it reaps the benefits. *See, e.g.*, *United States v. Hilton Hotels Corp.*, 467 F.2d 1000, 1005 (9th Cir. 1972) (corporation was liable for agent's participation in conspiracy despite its antitrust compliance policy). Imposing liability on a person or corporation that requires others to engage in an anticompetitive conspiracy is essential for effective antitrust enforcement. *Cf. Am. Soc'y of Mech. Eng'rs, Inc. v. Hydrolevel Corp.*, 456 U.S. 556, 572 (1982) (if an entity is made "civilly liable for the antitrust violations of its agents acting with apparent authority, it is much more likely that similar antitrust violations will not occur in the future").

In contrast to the facts alleged here, in the decisions the Corporate Defendants rely on, the Plaintiffs had failed to plausibly allege *any* agreement—much less one that a parent corporation

---

[27] Based on material outside of the CAC, the Corporate Defendants make an improperly, partly factual claim that some of their agents are independent contractors, not employees. Corp. Defs.' Mem. 4 n.4. Regardless of their status, the Corporate Defendants do not dispute that their agents are required to follow the rules and policies imposed by the Corporate Defendants and their brokerages.

mandates its affiliates, franchises, and agents to join. *See Rocha*, 15 F. Supp. 3d at 809 (no plausible agreement because the plaintiffs had only identified officers and employees of a single firm—the rest of the alleged conspiracy was "an amorphous group of unnamed dominant contractors, and numerous other unspecified [parties]"); *Alarm Detection Sys., Inc. v. Vill. of Schaumburg*, 930 F.3d 812, 828 (7th Cir. 2019) (plaintiff "allege[d] no facts suggesting that an agreement—as opposed to an independent, legislative decision"—led the defendant village to pass the ordinance); *Howard Hess Dental Labs., Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237, 256 (3d Cir. 2010) (allegations insufficient to support an antitrust conspiracy claim because the plaintiffs had failed to allege either coordination among the several competitor labs or between each competitor lab and the central product manufacturer).

### C. The Corporate Defendants' role in driving NAR policy and implementing NAR rules through MLSs and Realtor associations plausibly shows their participation in an agreement.

The Corporate Defendants agreed to NAR's anticompetitive scheme not only by imposing the anticompetitive restraints on their brokerage operations and franchisees, but also in their roles adopting, enforcing, and ratifying associational rules within NAR, local Realtor boards, and MLSs. Representatives from each of the Corporate Defendants, their subsidiaries, or affiliates hold leadership positions in NAR—including on the committees responsible for developing NAR's rules—and vote to approve or reissue NAR rules like the BBCR. CAC ¶¶ 104-07. Defendant HomeServices, for instance, acknowledged that, "[a]s an industry leader, we have a responsibility to actively participate in shaping our industry and its current and future business model. *The HomeServices executive leadership and CEOs of our operating companies drive these important discussions as leaders within the National Association of Realtors . . . and at the regional and local levels of the MLS organizations*." CAC ¶ 105 (emphasis added).

Given the Corporate Defendants' dominance in the real estate industry, and their influence within NAR and its local associations, the challenged restraints persist at the Corporate Defendants' whim. Indeed, another judge in this District previously acknowledged the Corporate Defendants' role in driving a prior set of anticompetitive NAR rules. *See NAR*, 2006 WL 3434263, at *2-3 (it was "against th[e] backdrop" of complaints by Defendant RE/MAX and the predecessor of Defendant Realogy that NAR's policies concerning Internet brokerages were developed).

The Corporate Defendants argue (citing no caselaw) that this is not enough, because the CAC does not allege details with respect to individual brokers' actions on MLS and Realtor boards. *See* Corp. Defs.' Mem. 11. Plaintiffs allege, however, and the Corporate Defendants do not dispute, that individuals affiliated with the Corporate Defendants' brands participate on these boards, and these boards are directly responsible for implementing the challenged restraints. *See* CAC ¶¶ 108-20; *Lifewatch Servs. Inc. v. Highmark Inc.*, 902 F.3d 323, 334 (3d Cir. 2018) (finding it was evidence of agreement that unnamed representatives of the member plans participated in creating association's model policy). The Corporate Defendants also contend that Plaintiffs insufficiently plead an agreement because "[t]here is no suggestion in the Complaint that the Corporate Defendants ever communicated about NAR's rules or that they had any awareness whatsoever of each other's policies concerning their franchisees or affiliated brokers' or agents' participation in MLSs." Corp. Defs.' Mem. 6-7. This ignores the CAC's allegations concerning the Corporate Defendants' representatives' involvement in NAR and local Realtor boards, which necessarily include jointly discussing, approving, and reissuing NAR and MLS rules. CAC ¶¶ 104-20.

The Corporate Defendants are liable regardless whether they participated in the original adoption of the challenged restraints. "[A]cquiescence in an illegal scheme is as much a violation of the Sherman Act as the creation and promotion of one." *MCM Partners, Inc.*, 62 F.3d at 973-

74; *see also, e.g.*, *Dickson v. Microsoft Corp.*, 309 F.3d 193, 204-05 (4th Cir. 2002) ("The co-conspirators need not share the same motive or goal; it is sufficient to allege that the co-conspirators 'acquiesc[ed] in an illegal scheme.'" (quoting *Paramount Pictures, Inc.*, 334 U.S. at 161)). Moreover, Plaintiffs allege that "NAR approves and issues a new MLS Handbook each year" and, although it has "modified *other* MLS rules in connection with each reissuance (for example, in 2017 and 2018), the [NAR] Board has consistently and repeatedly reissued the Buyer Broker Commission Rule and anticompetitive restraints challenged herein." CAC ¶ 107.

### D. The CAC pleads an agreement—not merely parallel conduct.

Courts routinely reject motions to dismiss when it can plausibly be inferred that the defendants are conscious that their actions will further concerted action. *See, e.g.*, *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 383 F. Supp. 3d 187, 244-45 (S.D.N.Y. 2019) (allegations sufficient where the complaint alleged "an expansive system of exclusionary and noncompetition agreements is orchestrated by Keurig, and coffee and other beverage brands that enter into a license or manufacturing agreement with Keurig do so with the express knowledge of Keurig's anticompetitive agreements with other competitor roasters and brands"); *In re Broilers*, No. 16-cv-8637, 2019 WL 1003111, at *2 (N.D. Ill. Feb. 28, 2019) ("[T]aking the allegations that Agri Stats facilitated Defendants' conspiracy in the light most favorable to Plaintiffs, those allegations also plausibly support the claim that Agri Stats was a knowing co-conspirator. It is at least plausible (if not likely) that a person who facilitates a conspiracy knows about the conspiracy and engages in the facilitation knowing of its consequences.").

The CAC plausibly alleges that the Corporate Defendants consciously used their involvement with NAR and the MLSs to further the challenged restraints. First, the anticompetitive restraints, as reflected in NAR's Code of Ethics and Handbook on MLS Policy, are public

knowledge. CAC ¶¶ 57-60. Second, the CAC describes how the challenged restraints are disseminated throughout the Covered MLSs. *Id.* ¶¶ 94-101. As in *Keurig*, each Corporate Defendant knows, through its participation in the market, that the other Corporate Defendants are participants in the same scheme. Third, in agreeing and requiring others to agree to the challenged restraints, Defendants are aware that "[t]he entirely foreseeable result" of these restraints is that "'blanket' offers of compensation to buyer-brokers are overwhelmingly made at or near the high level that prevails in the industry." *Id.* ¶ 65; *see also id.* ¶ 81. And, Fourth, the CAC shows that the Corporate Defendants have adopted the buyer-broker commission rule *because of NAR*—not though independent decision-making. CAC ¶¶ 57-61, 94-97, 117-20; *see also Lifewatch Servs.*, 902 F.3d at 334 (plaintiff plausibly alleged an agreement, not just parallel conduct, because the complaint alleged that the insurance plans "agreed with each other and the Association that they would *substantially comply with* the model policy"). The Corporate Defendants point to no cases where a court found agreement lacking when a group of competitors all decided to abide by the same centralized set of rules or policies.

The Corporate Defendants assert that requiring their brokerages and franchisees to join NAR and MLSs "is consistent with independent and unilateral action," and therefore inconsistent with conspiracy. Corp. Defs.' Mem. 7-8, 11-12, 13-14. But with respect to overt agreements, like this one, "*Twombly*'s requirements with respect to allegations of illegal parallel conduct" are "superfluous in light of the direct evidence in the by-laws of the agreement itself." *Robertson*, 679 F.3d at 289-90. There is, thus, no need to infer an agreement from circumstantial evidence.

Nor need Plaintiffs allege that the Corporate Defendants had specific intent to violate antitrust law. The question whether an arrangement constitutes concerted action is "different from and antecedent to the question whether it unreasonably restrains trade." *American Needle, Inc. v.*

*NFL*, 560 U.S. 183, 186 (2010), and action may be concerted even if it is ultimately found to be procompetitive. A Section 1 plaintiff is never required to prove—let alone plead—that a defendant knew its conduct was illegal. "[A] civil violation can be established by proof of either an unlawful purpose or an anticompetitive effect." *U.S. Gypsum Co.*, 438 U.S. at 436 n.13; *see also Hilton Hotels*, 467 F.2d at 1005 ("Specific intent is not an element of any offense under [Section 1 of the Sherman] Act"); *United States v. Brighton Bldg. & Maint. Co.*, 598 F.2d 1101, 1105 (7th Cir. 1979) (intent instruction improper). Imputing an intent requirement would eviscerate Section 1 enforcement, particularly in rule of reason cases where an illegal restraint may nonetheless have procompetitive benefits, and a defendant may hold a genuine believe that its conduct is legal.

For these same reasons, the Corporate Defendants' contention that they have independent economic reasons to encourage their representatives to join NAR and participate in MLSs cannot absolve them from liability. *See NCAA*, 468 U.S. at 101 n.23 (observing that "good motives will not validate an otherwise anticompetitive practice"); *United States v. Apple Inc.*, 952 F. Supp. 2d 638, 698 (S.D.N.Y. 2013) ("It is not surprising that Apple chose to further its own independent economic interests. Such a motivation, however, does not insulate a defendant from liability for illegal conduct."), *aff'd*, 791 F.3d 290 (2d. Cir. 2015).[28] The handful of cases that the Corporate Defendants point to where courts found some competitive benefits from MLSs are irrelevant. Corp. Defs.' Mem. 12. The Corporate Defendants are liable for committing to Defendants'

---

[28] *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752 (1984), is not to the contrary. In addressing the degree of proof required to establish a Section 1 agreement based on circumstantial facts, the Court stated that the plaintiff must present evidence that the defendant had "a conscious commitment to a common scheme designed to achieve an unlawful objective." *Id.* at 764 (citation omitted). But the Court did not require that the "conscious commitment" include awareness of the scheme's unlawful nature. Here, the Corporate Defendants consciously committed themselves, their brokerage operations and franchisees, and their agents to an agreement to adopt and abide by association and MLS rules, including the challenged restraints.

anticompetitive scheme even if they had business reasons for abiding by and promoting NAR rules that are not challenged here. *See supra* pp. 33-36, 45-46.

Because the CAC alleges that each Corporate Defendant has knowingly acquiesced in the conspiracy by taking action to further the reach of the buyer-broker commission rule, Plaintiffs have pleaded a plausible conspiracy between NAR and the Corporate Defendants.

### E.  The CAC adequately pleads each Corporate Defendant's participation in an agreement.

"Participation by each conspirator in every detail in the execution of the conspiracy is unnecessary to establish liability, for each conspirator may be performing different tasks to bring about the desired result." *Beltz*, 620 F.2d at 1367. Thus, this Court has deemed allegations sufficient to establish individual defendants' liability when a complaint pleaded that each defendant took some action to restrain output, had executives who participated in association meetings, and all participated in the same information-sharing network, *see In re Broilers*, 290 F. Supp. 3d at 803-04, and when the complaint alleged the defendants' executives made public statements endorsing an anticompetitive industry practice, took action consistent with that practice, and attended trade association meetings where the practice was discussed, *see Standard Iron Works v. ArcelorMittal*, 639 F. Supp. 2d 877, 897-902 (N.D. Ill. 2009).

Where a complaint alleges that a parent company participated in a conspiracy itself or directed its subsidiaries or affiliates to participate, courts regularly decline to dismiss on the basis of allegedly insufficient assertions of parental corporate liability. "Direct liability is . . . imposed when the parent has forced the subsidiary to take the complained-of action in disregard of the subsidiary's distinct legal personality," particularly when "the parent corporations directly participated in formulating and implementing the [anticompetitive] schemes." *In re Managed Care Litig.*, 298 F. Supp. 2d 1259, 1309 (S.D. Fla. 2003) (quotation marks omitted). The Seventh Circuit

has observed that "a parent corporation may be held liable for the wrongdoing of a subsidiary where the parent directly participated in the subsidiary's unlawful actions." *Esmark, Inc. v. NLRB*, 887 F.2d 739, 756 (7th Cir. 1989). In such cases, "[t]he owner's liability [is] based on its control of its subsidiaries' actions from 'behind the scenes.'" *Id.* Thus, in *General Leaseways, Inc. v. National Truck Leasing Ass'n*, the court held that a trucking association's policies imposed through its franchise agreements with its members was a proper basis for antitrust liability. 744 F.2d 588, 590 (7th Cir. 1984). And in *Nobody in Particular*, the court found it highly relevant that the complaint alleged the defendant "directs and controls the policies and behavior of its subsidiaries" through setting "vision, strategy, and culture." 311 F. Supp. 2d at 1071.

The CAC sufficiently ties each Corporate Defendant to the conspiracy through its development of corporate policy, direction of subsidiaries' behavior, and executive participation in NAR and the MLSs. Notably, the Corporate Defendants do not dispute that the CAC identifies documents from each defendant imposing NAR and MLS membership, and thus the challenged restraints, on its affiliates and franchisees. These are documents and policies devised by the Corporate Defendants themselves.

The Corporate Defendants' arguments instead boil down to claims that Plaintiffs have not identified *enough* executives who participate in NAR, and that there are business reasons for encouraging NAR and MLS membership. But, as discussed above, the anticompetitive practice in question is allegiance to NAR's restraints specifically, and acquiescence in the anticompetitive scheme is enough to hold the Corporate Defendants liable. And to the extent that the Corporate Defendants contend Plaintiffs' allegations about corporate liability fall short, Plaintiffs have pleaded more than enough factual matter showing a plausible corporate policy on behalf of each Defendant to merit discovery. *See In re Managed Care*, 298 F. Supp. 2d at 1309 ("While the

question of proof is a matter for a different day, in alleging that the parent corporations directly participated in formulating and implementing the [anticompetitive] schemes, the Plaintiffs have met their burden at this stage of the proceedings."); *In re Broilers*, 290 F. Supp. 3d at 804 ("Allegations that each defendant participated in the parallel conduct, participated in the meetings that provided the opportunity to collude . . . are sufficient to allege participation in the agreement. . . . [Defendants' contrary arguments] should be tested by discovery."). Unlike the cases they cite, the CAC alleges facts tying each Corporate Defendant to the scheme. *Cf. Insulate SB, Inc. v. Advanced Finishing Sys., Inc.*, 797 F.3d 538, 546 (8th Cir. 2015) (complaint failed to allege conspiracy because it only contained "vague references to concerted action among 'key [d]istributors'"); *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) (complaint failed to allege conspiracy because it included a "list . . . in entirely general terms without any specification of any particular activities by any particular defendant").

**HomeServices.** Plaintiffs have alleged substantial facts showing that the HomeServices defendants have directly participated in formulating and implementing the buyer-broker commission rule. The CAC alleges that HomeServices of America, Inc., is a parent company of HSF Affiliates, LLC, and the Long & Foster Companies, Inc. BHH Affiliates, LLC is a subsidiary of HSF Affiliates, LLC. HSF and BHH operate franchise networks or otherwise offer brokerage services. The Executive Chairman of HomeServices of America serves on NAR's board of directors. CAC ¶ 104. NAR's President is an agent with a HomeServices of America brokerage. *Id.* Executives of several HomeServices brands are directors of NAR or serve on local MLSs: HomeServices KoenigRubloff Realty Group, HomeServices Alliance Real Estate, Berkshire Hathaway HomeServices, Long & Foster Real Estate, Inc. *Id.* ¶¶ 104, 106, 108. This is consistent with HomeServices' stated policy of encouraging its "executive leadership and CEOs of [its]

operating companies [to] drive . . . important discussions as leaders within the National Association of Realtors . . . and at the regional and local levels of the MLS organizations." *Id.* ¶ 105. Imposing a corporate policy of participation in NAR and the MLSs is clear evidence of an agreement to facilitate NAR's rules, including the anticompetitive buyer-broker commission rule. *See Nobody in Particular*, 311 F. Supp. 2d at 1071.

Further evidence of the HomeServices defendants' corporate policy of facilitating NAR's anticompetitive restraints is in their corporate franchise documents. The CAC cites Franchise Disclosure Documents—which set forth the conditions on which franchisees can take advantage of franchise benefits—for Real Living and Berkshire Hathaway HomeServices that require compliance with NAR's Code of Ethics and MLS membership. CAC ¶ 118. The CAC also cites manuals from Long & Foster and two regional Berkshire Hathaway HomeServices entities that demand compliance with NAR rules and/or membership in local Realtor associations and MLSs. *Id.* These allegations are more than enough to make it plausible that each HomeServices defendant has a corporate policy to facilitate and endorse NAR's anticompetitive practices.

HomeServices addresses neither the allegations about its policy of encouraging its executives to drive NAR leadership, nor the allegations about its corporate documents. Instead, HomeServices says that the CAC falls short because it does not allege HomeServices' involvement in the creation of the buyer-broker commission rule. Corp. Defs.' Mem. 21-22.[29] But facilitation of a conspiracy is enough to establish liability; every co-conspirator need not have dreamed up the scheme, or been present at its inception. *See, e.g.*, *MCM Partners, Inc.*, 62 F.3d at 973-74

---

[29] HomeServices asserts that Plaintiffs have engaged in impermissible group pleading by including all the HomeServices defendants together. To the contrary, Plaintiffs have made specific allegations about HomeServices of America, Long & Foster, and Berkshire Hathaway. CAC ¶¶ 102-15, 118. Moreover, Plaintiffs allege that parent HomeServices engaged in its own independent, anticompetitive conduct, making HomeServices liable for the participation of its subsidiaries.

("[A]cquiescence in an illegal scheme is as much a violation of the Sherman Act as the creation and promotion of one."). Additionally, Plaintiffs allege facts showing that directors—like HomeServices' executive chairman—are responsible for approving and reissuing the MLS Handbook and NAR rules each year, including the BBCR. CAC ¶¶ 57, 104-07.

**Keller Williams.** The CAC also pleads sufficient facts to show that Keller Williams has actively facilitated and endorsed NAR's anticompetitive practices. Keller Williams real estate agents serve on the NAR board of directors and NAR's Multiple Listing Issues and Policies Committee. *Id.* ¶¶ 104-05. They also participate in local real estate associations. *Id.* ¶¶ 108-12. The Keller Williams Policies and Guidelines Manual requires all associates to become members of their local Realtor association and MLS—which means that Keller Williams requires its associates to adhere to the challenged restraints. *Id.* ¶ 119. Franchise Disclosure Documents also show that participation in NAR and an MLS is a condition of doing business with the corporate brand. *Id.* This is more than enough to show that Keller Williams joined the conspiracy.

Keller Williams responds to this evidence of a central corporate policy promoting NAR and MLS participation by observing that there are economic justifications for encouraging Realtors to join Realtor organizations. Corp. Defs.' Mem. 16-17. This non sequitur does not address the fact that Keller Williams required its brokers to abide by NAR's restraints. And Keller Williams does not address the CAC's allegations about its Franchise Disclosure Documents, which illustrate a top-down corporate policy of supporting NAR and MLS rules. *See Nobody in Particular*, 311 F. Supp. 2d at 1071; *In re Managed Care Litig.*, 298 F. Supp. 2d at 1309.

**RE/MAX.** Plaintiffs' allegations show that RE/MAX too is an active participant in the conspiracy. NAR's immediate past president is the CEO of RE/MAX Boone Realty; executives from RE/MAX affiliates participate in NAR's multiple listing committee, and on the boards of

local Realtor organizations. CAC ¶¶ 104, 106, 108-15. RE/MAX requires its franchisees and their independent contractors to join a local Realtor association and MLS, and abide by NAR and MLS rules. *Id.* ¶ 120 (citing RE/MAX franchise agreement and independent contractor agreement).

RE/MAX ignores these allegations about its franchise and independent contractor agreements, which illustrate that RE/MAX itself has agreed to facilitate the buyer-broker commission rule by imposing the rule, through NAR and MLS membership, on its agents. *Cf.* Corp. Defs.' Mem. 17-19. RE/MAX argues only that the identified RE/MAX executives were not acting as agents of the corporate parent, and that the CAC does not allege RE/MAX discussed the buyer-broker commission rule specifically with any co-conspirator. But RE/MAX is not required to have discussed the buyer-broker rule with any co-conspirators; agreement to participate in the scheme knowing its purpose is sufficient. *See supra* pp. 40-41. Discovery will provide evidence on the extent to which the brand executives' NAR and MLS participation can be traced to central RE/MAX policies, and the CAC has already shown that it is more than plausible that these executives are acting at the direction of the corporate parent, especially where (as here) the corporate parent insisted on NAR participation and imposition of NAR rules. *See Esmark*, 887 F.2d at 756. Indeed, RE/MAX's imposition of NAR and MLS rules on franchisees and independent contractors is itself evidence of the conspiratorial agreement.

**Realogy.** Finally, the CAC illustrates that Realogy has not only agreed to, but facilitated and furthered the conspiracy. As with the other Corporate Defendants, affiliates of Realogy brands are active in NAR and local Realtor and MLS governance. CAC ¶¶ 106-15. The policies and procedures manuals for at least four different Realogy brands require real estate agents to obtain NAR and/or MLS membership. *Id.* ¶ 117. Franchise Disclosure Documents for at least three Realogy brands also incorporate NAR's rules. *Id.* And Realogy's SEC filings state that a

franchisee's failure to comply with the policies in the franchise agreements could result in a termination of the franchisee. *Id.* These allegations are sufficient because they show that Realogy has "direct[ed] and control[led] the policies and behavior of its subsidiaries," *Nobody in Particular*, 311 F. Supp. 2d at 1071, and has participated in formulating and implementing the anticompetitive scheme, *In re Managed Care Litig.*, 298 F. Supp. 2d at 1309.

Realogy argues that the CAC does not allege any actual anticompetitive conduct on its behalf. Corp. Defs.' Mem. 20. But Realogy's requirement that its affiliates adopt and enforce the challenged rule is precisely the anticompetitive conduct challenged here. The allegations in the CAC show that Realogy has a centralized corporate policy of endorsing NAR and the MLSs, and the rules that those entities impose.

*       *       *

The challenged restraints would not exist absent the energetic support of the Corporate Defendants—the nation's largest real estate conglomerates. Plaintiffs plead detailed allegations, including quoting the Corporate Defendants' own documents, showing that each Corporate Defendant requires its affiliates and franchisees to abide by the challenged restraints, and that each corporate family exerts considerable influence on the policies and rules of NAR, local Realtor associations, and MLSs. The CAC, thus, plausibly alleges each Corporate Defendant's liability for the conspiracy.

## CONCLUSION

For these reasons, Plaintiffs respectfully submit that NAR's and the Corporate Defendants' motions to dismiss the CAC should be denied in their entirety.

Dated: September 13, 2019                    Respectfully submitted,

/s/ Kit A. Pierson
Kit A. Pierson
  kpierson@cohenmilstein.com
Daniel A. Small
  dsmall@cohenmilstein.com
Benjamin D. Brown
  bbrown@cohenmilstein.com
Robert A. Braun
  rbraun@cohenmilstein.com
COHEN MILSTEIN SELLERS & TOLL PLLC
1100 New York Ave. NW, Fifth Floor
Washington, DC 20005
Telephone: (202) 408-4600

Carol V. Gilden (Bar No. 6185530)
  cgilden@cohenmilstein.com
COHEN MILSTEIN SELLERS & TOLL PLLC
190 South LaSalle Street, Suite 1705
Chicago, IL 60603
Telephone: (312) 357-0370

Steve W. Berman (Bar No. 3126833)
  steve@hbsslaw.com
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292

Daniel Kurowski
  dank@hbsslaw.com
Whitney Siehl
  wsiehl@hbsslaw.com
HAGENS BERMAN SOBOL SHAPIRO LLP
455 North Cityfront Plaza Drive, Suite 2410
Chicago, IL 60611
Telephone: (708) 628-4949

Jeff D. Friedman
 jefff@hbsslaw.com
Rio S. Pierce
 riop@hbsslaw.com
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000

Matthew R. Berry
 mberry@susmangodfrey.com
SUSMAN GODFREY LLP
1201 Third Avenue, Suite 3800
Seattle, Washington 98101
Telephone: (206) 516-3880

Marc M. Seltzer
 mseltzer@susmangodfrey.com
Steven G. Sklaver
 ssklaver@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, California 90067
Telephone: (310) 789-3100

Beatrice C. Franklin
 bfranklin@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1301 Avenue of the Americas
32nd Floor
New York, NY 10019
Telephone: (212) 336-8330

George Farah
 gfarah@hfajustice.com
HANDLEY FARAH & ANDERSON PLLC
81 Prospect Street
Brooklyn, NY 11201
Telephone: (212) 477-8090

William H. Anderson
 wanderson@hfajustice.com
HANDLEY FARAH & ANDERSON PLLC
4730 Table Mesa Drive, Suite G-200
Boulder, CO 80305
Telephone: (303) 800-9109

Benjamin David Elga
belga@justicecatalyst.org
Brian Shearer
brianshearer@justicecatalyst.org
JUSTICE CATALYST LAW
25 Broadway, Ninth Floor
New York, NY 10004
Telephone: (518) 732-6703

Monte Neil Stewart
monteneilstewart@gmail.com
Russell E. Marsh
rmarsh@wmllawlv.com
WRIGHT MARSH & LEVY
300 S. 4th Street, Suite 701
Las Vegas, NV 89101
Telephone: (702) 382-4004

Vildan A. Teske
teske@tkkrlaw.com
Marisa C. Katz
katz@tkkrlaw.com
TESKE KATZ KITZER & ROCHEL PLLP
222 South Ninth Street, Suite 4050
Minneapolis, MN 55402
Telephone: (612) 746-1558

## CERTIFICATE OF SERVICE

I hereby certify that on September 13, 2019, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notice to counsel for all parties that have appeared in this case.

/s/ Kit A. Pierson