UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

---

CHRISTOPHER MOEHRL, MICHAEL COLE, STEVE DARNELL, VALERIE NAGER, JACK RAMEY, SAWBILL STRATEGIC, INC., DANIEL UMPA, and JANE RUE, on behalf of themselves and all others similarly situated,

    Plaintiffs,

v.

THE NATIONAL ASSOCIATION OF REALTORS, REALOGY HOLDINGS CORP., HOMESERVICES OF AMERICA, INC., BHH AFFILIATES, LLC, HSF AFFILIATES, LLC, THE LONG & FOSTER COMPANIES, INC., RE/MAX, LLC, and KELLER WILLIAMS REALTY, INC.,

    Defendants.

Civil Action No. 1:19-cv-01610
Judge Andrea R. Wood
Magistrate Judge M. David Weisman

## STATEMENT OF INTEREST ON BEHALF OF
## THE UNITED STATES OF AMERICA

MAKAN DELRAHIM
*Assistant Attorney General*

MICHAEL F. MURRAY
*Deputy Assistant Attorney General*

ANDREW J. ROBINSON
*Counsel to the Assistant Attorney General*

STEVEN J. MINTZ
*Attorney*

U.S. Department of Justice
Antitrust Division
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530-0001
Phone: (202) 353-0256
Fax: (202) 514-0536
Email: Steven.Mintz@usdoj.gov


JOHN R. LAUSCH, JR.
*United States Attorney*

THOMAS P. WALSH
*Assistant U.S. Attorney*

219 South Dearborn Street
Chicago, Illinois 60604
Phone: (312) 353-5312
thomas.walsh2@usdoj.gov

## INTEREST OF THE UNITED STATES

The United States respectfully submits this statement pursuant to 28 U.S.C. § 517, which permits the Attorney General to direct any officer of the Department of Justice to attend to the interests of the United States in any case pending in a federal court. The United States is principally responsible for enforcing the federal antitrust laws, *United States v. Borden Co.*, 347 U.S. 514, 518 (1954); *see* 15 U.S.C. §§ 4, 25, and has a strong interest in their correct application. We submit this statement to correct the inaccurate portrayal, by defendant The National Association of Realtors ("NAR"), of a 2008 consent decree between the United States and NAR.[1]

## BACKGROUND

1. During the early 2000s, the United States investigated and resolved an antitrust case involving NAR rules that allegedly thwarted the utility and growth of Internet websites operated by real estate brokers. *United States v. NAR* Amended Complaint ¶¶ 1-4 (copy attached). The United States sought to protect entry, innovation, and competition by ensuring that multiple listing services ("MLS") would treat brokers who provide real estate brokerage services to sellers or buyers of residential real property through websites in the same way that they treat brokers who provide real estate brokerage services to sellers or buyers of residential real property through traditional "brick-and-mortar" business models. *Id.* ¶ 8.

---

[1] The United States takes no position, at this stage of the proceeding, on any other issue in the case.

Specifically, in 2003 NAR adopted a policy relating to "virtual office websites" ("VOW"s) that allowed brokers to opt out of having their listings displayed on the VOW sites of competing brokers and prohibited VOWs from engaging in certain conduct. The United States investigated that VOW policy and sued NAR in 2005. The United States and NAR settled the case and agreed to the 2008 consent decree. The decree prohibited NAR from adopting or enforcing any rule or practice that prohibited a broker from using a VOW or from impeding a broker's ability to operate a VOW. Doc. #67-1 (Johnson Decl. Ex. D) at 5-6. The decree required NAR to replace its VOW policy with a Modified VOW Policy approved by the government, and to take other antitrust compliance actions. *Id*. at 6-9.

2. Plaintiffs' Consolidated Amended Class Action Complaint ("CAC") (Doc. #84) alleges that defendants NAR and certain national real estate broker franchisors have conspired to require home sellers to (1) pay the brokers representing the buyers of their homes, and (2) pay brokers' commissions that are "inflated" by comparison to allegedly comparable markets in other countries. CAC ¶ 1. Specifically, plaintiffs allege that "NAR and its co-conspirators require *every* seller's broker … when listing a property on a Multiple Listing Service, to make a '*blanket unilateral offer[] of compensation*' to any broker who may find a buyer for the home. This requirement, and related terms implementing the requirement … is hereafter referred to as the Buyer Broker Commission Rule[.]" CAC ¶¶ 3,60 (emphases in original). They further allege that other NAR rules, "Case Interpretations," and "hidden fields" in MLSs exacerbate the anticompetitive effects

and prevent buyers from reducing their buyer broker's commission. *Id*. ¶¶ 4, 90 (quoting NAR Standard of Practice 3-2), 75-78 (describing "hidden fields" and "one-way information exchange" that "prevents price competition that benefits consumers while allowing brokers to put upward pressure on pricing and to punish brokers who deviate downwards"), 79 (quoting NAR's Code of Ethics Standard Practice 12-2), 88 (quoting NAR Standard of Practice 16-16), 89 (quoting NAR Case Interpretation #16-15). The NAR ethics rules and case interpretations, according to plaintiffs, "foreclose[] virtually all negotiation over the buyer-broker commission." *Id*. ¶ 89. This conduct allegedly violates (among other things) Section 1 of the Sherman Act, 15 U.S.C. § 1.[2]

       3. NAR and the corporate defendants have moved to dismiss the CAC on several grounds. NAR's brief in support of its Motion to Dismiss (Doc. #114) refers twice to the 2008 consent decree. First, NAR asserts that the "MLS system" and "the rules upon which it has been based, have repeatedly been upheld by the courts. … It was explicitly permitted by the Department of Justice in a consent decree that expressly authorizes NAR to limit membership in an MLS to persons who make offers of cooperation and compensation to other members of the MLS—a decree that

---

[2] Plaintiffs also allege that the United States has opened an antitrust investigation of practices in the market for residential real estate brokerage services. CAC ¶¶ 1, 72. Although the United States generally does not comment on the existence or non-existence of pending investigations, it acknowledges that a Civil Investigative Demand relating to an investigation of residential real estate brokerage was published in a trade publication. The focus and scope of that investigation, however, have not been publicly disclosed.

and prevent buyers from reducing their buyer broker's commission. *Id*. ¶¶ 4, 90 (quoting NAR Standard of Practice 3-2), 75-78 (describing "hidden fields" and "one-way information exchange" that "prevents price competition that benefits consumers while allowing brokers to put upward pressure on pricing and to punish brokers who deviate downwards"), 79 (quoting NAR's Code of Ethics Standard Practice 12-2), 88 (quoting NAR Standard of Practice 16-16), 89 (quoting NAR Case Interpretation #16-15). The NAR ethics rules and case interpretations, according to plaintiffs, "foreclose[] virtually all negotiation over the buyer-broker commission." *Id*. ¶ 89. This conduct allegedly violates (among other things) Section 1 of the Sherman Act, 15 U.S.C. § 1.[2]

       3. NAR and the corporate defendants have moved to dismiss the CAC on several grounds. NAR's brief in support of its Motion to Dismiss (Doc. #114) refers twice to the 2008 consent decree. First, NAR asserts that the "MLS system" and "the rules upon which it has been based, have repeatedly been upheld by the courts. … It was explicitly permitted by the Department of Justice in a consent decree that expressly authorizes NAR to limit membership in an MLS to persons who make offers of cooperation and compensation to other members of the MLS—a decree that

---

[2] Plaintiffs also allege that the United States has opened an antitrust investigation of practices in the market for residential real estate brokerage services. CAC ¶¶ 1, 72. Although the United States generally does not comment on the existence or non-existence of pending investigations, it acknowledges that a Civil Investigative Demand relating to an investigation of residential real estate brokerage was published in a trade publication. The focus and scope of that investigation, however, have not been publicly disclosed.

was approved by Judge Kennelly of this Court." Doc. #114 at 1-2 (case citations omitted). Second, NAR asserts in a separate paragraph that

> Other attacks on the rules governing MLSs have been rejected because courts have recognized the efficiency and consumer benefits provided by MLSs. … The Department of Justice, similarly, entered into a consent decree, approved by a Court in this District, expressly permitting NAR to maintain a rule that provides that MLS membership may be made contingent on a broker's agreement to "actively endeavor" to "make or accept offers of cooperation and compensation" through the MLS. Plaintiffs have totally ignored the long antitrust scrutiny of MLSs and the repeated judicial conclusion that MLSs and the rules that govern them are procompetitive.

Doc. #114 at 21-22 (case citations omitted).

## ARGUMENT

NAR inaccurately portrays the 2008 consent decree. The consent decree resolved the United States' antitrust claims against NAR for its exclusionary policies targeting brokers using innovative platforms. In that case the United States did not examine the rest of NAR's policies, including those at issue here, and therefore those policies simply were not subjected to antitrust scrutiny. Importantly, those other policies were in no sense analyzed and found consistent with antitrust laws.

NAR attempts to give the decree much broader significance, but it does so through an imprecise reading of the decree. NAR's first reference to the decree, by using the ambiguous noun "It," suggests that the United States affirmatively approved an entire "MLS system" and all of its related rules. NAR's second reference sandwiches its reference to the consent decree between two sentences asserting that *court decisions* have found MLSs to be procompetitive. Then, by

4

using the word "similarly," NAR gives the impression that the *United States* determined that a NAR rule concerning MLS membership was procompetitive, or even that the specific rules challenged by the plaintiffs here are procompetitive. Those impressions are incorrect.

The United States' 2005 lawsuit and resulting 2008 consent decree (*see* Doc. #67-1, Johnson Decl. Ex. D), which expired in November 2018, had nothing to do with the specific NAR rules and "Case Interpretations" challenged by the plaintiffs here. Rather, they focused narrowly on NAR rules that allegedly thwarted the effectiveness, during the early 2000s, of Internet websites operated by real estate brokers. *United States v. NAR* Amended Complaint ¶¶ 1-4. Indeed, the United States' Amended Complaint (amended to account for NAR's modification to its VOW policy) states that the purpose of the action was to "enjoin the defendant—a national association of real estate brokers—from maintaining or enforcing policies that restrain competition from brokers who use the Internet to more efficiently and cost effectively serve home sellers and buyers, and from adopting other related anticompetitive rules." *Id.* ¶ 1. Every paragraph setting forth the "Nature of the Offense" focuses on NAR's initial and modified VOW policies. *Id.* ¶¶ 30-43. The specific "Violation Alleged" is that "NAR's adoption of the above-referenced provisions in its Initial VOW policy and its Modified VOW Policy, or equivalent provisions, constitutes a contract, combination, or conspiracy by and between NAR and its members which unreasonably restrains competition in brokerage service

markets throughout the United States in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1." *Id*. ¶ 44.

The United States did not affirmatively find any NAR rule or policy to be "procompetitive" in the 2008 consent decree. Nor does the prior consent decree in any way "authorize" the system that plaintiffs' CAC challenges. The consent decree does not mention the NAR Standards of Practice 3-2, 12-2, or 16-16, NAR Case Interpretation #16-15, or the "hidden fields" in MLSs, which are the other NAR provisions and practices challenged by the plaintiffs.[3]

NAR's claim to the contrary relies on a section of the decree titled "Permitted Conduct." Doc. #67-1 (Johnson Decl. Ex. D) at 9. That section identified NAR conduct that was not at issue in the case and which the consent decree was not intended to affect. That the consent decree identified certain conduct as not affected by its prohibitions does not mean that the conduct is permitted if it can be

---

[3] Even an article by NAR's own Declarant, Katie Johnson, confirms that the consent decree focused on NAR's rules governing VOWs, not the rules challenged in this case. *See* Katie Johnson, "Breaking Down the 2008 DOJ-NAR Settlement Agreement," REALTOR Magazine (Feb. 14, 2018) (copy attached). The article explains that the scope of the decree "is narrowly focused on a broker's operation of a virtual office website and the use of MLS listing data on such a site[.]" *Id*. at 1. The article asserts that the "crux" of the consent decree is the prohibition on "all REALTOR associations and association-owned MLSs from impeding a broker's ability to operate a VOW." *Id*. at 3. "Every other provision prohibiting or requiring certain conduct of NAR is geared toward achieving this objective that we refer to as 'the parity rule.' That is, MLSs must treat brokers providing real estate services via websites the same way they treat brokers providing real estate services via bricks-and-mortar businesses." *Id*. The article does not mention the specific section of the NAR Handbook challenged by the plaintiffs, or anything in NAR's Code of Ethics or Case Interpretations, as having been at issue in the consent decree in any way.

6

shown to violate the antitrust laws. For example, in *Penne v. Greater Minneapolis Area Bd. of Realtors*, 604 F.2d 1143, 1150 (8th Cir. 1979), the defendant realty board argued that its dissemination of commission rate information was permitted by an earlier settlement and injunction stating that "[n]othing in this injunction shall be deemed to prohibit" that conduct. The Court of Appeals rejected that argument, stating "[t]he short answer to this argument is that nothing in the Forbes injunction … can be construed to countenance the sort of dissemination of price information as is here involved if such dissemination is shown to have anticompetitive effects forbidden under the Sherman Act."[4] *Id*.

The language of the decree also makes clear that the United States did not affirmatively endorse any NAR rule or policy regarding "cooperation and compensation." The consent decree merely permitted NAR to limit MLS participation to active individuals or firms, by stating that it did not prohibit NAR from "adopting and maintaining the definition of MLS Participant and the accompanying Note, together attached as Exhibit B." Doc. #67-1 (Johnson Decl. Ex. D) at 9. The "definition of MLS Participant" and the Note in Exhibit B provide, in turn, that "[m]ere possession of a broker's license is not sufficient to qualify for MLS participation" and that "the requirement that an individual or firm 'offers or accepts

---

[4] Similarly, because 15 U.S.C. § 15(a) creates a private cause of action for violation of the antitrust laws, even if the allegedly anticompetitive conduct in this case was the same as in the 2008 consent decree (which it is not), the United States' settlement of its own claims before trial would not foreclose claims by private parties. *See also* 15 U.S.C. § 16(a) (consent decrees in government cases made before any testimony is taken are not prima facie evidence in private cases).

7

cooperation and compensation' means that the Participant actively endeavors during the operation of its real estate business to list real property of the type listed on the MLS and/or to accept offers of cooperation and compensation made by listing brokers or agents in the MLS." These definitional requirements recognized that the Final Judgment's prohibition of NAR's restrictions on VOWs did not override the way brokerage activity in general was conducted when the case settled.

Consistent with *Penne*, the 2008 consent decree contained an express reservation of the United States' rights in Section IX, "No Limitation on Government Rights." Doc. #67-1 (Johnson Decl. Ex. D) at 11. That section provides that "[n]othing in this Final Judgment shall limit the right of the United States to investigate and bring actions to prevent or restrain violations of the antitrust laws concerning any Rule or practice adopted or enforced by NAR or any of its Member Boards." The paragraph of the decree that NAR appears to rely on as "approving" an MLS system, *see id*. § VI(A) at 9, is expressly conditioned on this reservation of the United States' rights. This reservation therefore further undercuts any notion that the United States somehow granted immunity to an "MLS system" or all NAR rules relating to an MLS. This reservation also confirms that the United States did not permit NAR to use the consent decree to shield from investigation or challenge any conduct or rules shown to be anticompetitive.

## CONCLUSION

The United States did not, in the 2008 consent decree, approve any NAR rule or policy as procompetitive. The specific NAR rules challenged by the plaintiffs were neither scrutinized nor litigated in the United States' case.

Dated: October 7, 2019

Respectfully submitted.

/s/ Steven J. Mintz

MAKAN DELRAHIM
*Assistant Attorney General*

MICHAEL F. MURRAY
*Deputy Assistant Attorney General*

ANDREW J. ROBINSON
*Counsel to the Assistant Attorney General*

STEVEN J. MINTZ
*Attorney*

U.S. Department of Justice
Antitrust Division
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530-0001
Phone: (202) 353-0256
Fax: (202) 514-0536
Email: Steven.Mintz@usdoj.gov

JOHN R. LAUSCH, JR.
*United States Attorney*

THOMAS P. WALSH
*Assistant U.S. Attorney*
219 South Dearborn Street
Chicago, Illinois 60604
Phone: (312) 353-5312
thomas.walsh2@usdoj.gov

# CERTIFICATE OF SERVICE

I hereby certify that on October 7, 2019, I electronically filed the foregoing Statement of Interest on Behalf of the United States of America with the Clerk of Court using the CM/ECF system that will send notification of such filing to all counsel of record.

                                                  Respectfully submitted.

                                                  /s/ Steven J. Mintz

                                                  Attorney for the United States

.