UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CHRISTOPHER MOEHRL, MICHAEL COHL, STEVE DARNELL, VALERIE NAGER, JACK RAMEY, SAWBILL STRATEGIC, INC., DANIEL UMPA and JANE RUH, on behalf of themselves and all others similarly situated, | ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| | ) ) ) | Case No: 1:19-cv-01610 and Case No: 1:19-cv-2544 |
| v. | ) ) | Judge Andrea Wood Magistrate Judge M. David Weisman |
| THE NATIONAL ASSOCIATION OF REALTORS, REALOGY HOLDINGS CORP., HOMESERVICES OF AMERICA, RE/MAX HOLDINGS, INC. and KELLER WILLIAMS REALTY, INC. | ) ) ) ) ) | |
| Defendants. | ) ) ) | |

**REPLY BRIEF IN SUPPORT OF THE MOTION OF THE
NATIONAL ASSOCIATION OF REALTORS® TO DISMISS
THE CONSOLIDATED AMENDED COMPLAINT**

INTRODUCTION AND SUMMARY OF ARGUMENT ............................................................ 1

ARGUMENT ............................................................................................................................... 5

I.     Plaintiffs' Conclusory Allegations That Section 2-G-1 Injures Competition Are Inadequate To State An Antitrust Claim............................................................ 5

     A.    Plaintiffs Cannot Avoid Dismissal Merely By Repeating Their Unsupported Economic Theories............................................................. 6

     B.    Plaintiffs' "Factual" Allegations Are Insufficient. ................................... 8

          1.    Plaintiffs Have Failed To Support Their Claim That Section 2-G-1 Restrains Competition Over Commissions. ........................ 8

          2.    Plaintiffs Have Failed To Allege Facts To Support Their Claim That Section 2-G-1 Causes "Steering."............................. 9

          3.    Plaintiffs Have Failed To Allege Facts To Support Their Claim That NAR Rules Prevent Brokers From Negotiating Commissions........................................................................... 10

          4.    Plaintiffs Have Failed To Allege Facts To Show That Section 2-G-1 Inflates Commissions. .......................................... 11

     C.    Courts Have Considered, And Rejected, Plaintiffs' Argument That A Requirement To Offer A Commission In An MLS Listing Is Anticompetitive........................................................................................ 12

II.    Plaintiffs' Conclusory Allegations That They Have Been Injured By Section 2-G-1 Are Insufficient To Support Their Antitrust Claims. ................... 17

CONCLUSION........................................................................................................................ 18

# TABLE OF AUTHORITIES

**Cases**

*Adams v. City of Indianapolis*,
    742 F.3d 720 (7th Cir. 2014) ................................................... 15

*BCB Anesthesia Care Ltd. v. Passavant Memorial Area Hospital Assn.*,
    36 F.3d 664 (7th Cir. 1994) ..................................................... 4

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007) ........................................................ 1, 4, 11

*Car Carriers, Inc. v. Ford Motor Co.*,
    745 F.2d 1101 (7th Cir. 1984) ............................................ 2, 4, 5, 8, 18

*DSM Desotech, Inc. v. 3D Systems Corp.*,
    2012 WL 5463803, (N.D. Ill. Nov. 7, 2012) ................................... 6

*Greater Rockford Energy & Tech. Corp. v. Shell Oil Co.*,
    998 F.2d 391 (7th Cir. 1993) ..................................................... 2

*McReynolds v. Merrill Lynch & Co.*,
    694 F.3d 873 (7th Cir. 2012) ..................................................... 6

*Murphy v. Alpha Realty*,
    Case No. 76 C 2446, 1978 WL 1451 (N.D. Ill. Dec. 7, 1978) ................. 13, 14

*O'Riordan v. Long Island Board of Realtors*,
    707 F. Supp. 111 (E.D.N.Y. 1988) ............................................. 15

*Reifert v. South Cent. Wisconsin MLS Corp*,
    450 F.3d 312 (7th Cir. 2006) ................................................... 15

*Silha v. ACT, Inc.*,
    807 F.3d 169 (7th Cir. 2015) ..................................................... 2

*Sitzer v. NAR*,
    Case No. 4:19-cv-00332-SRB (W.D. Mo. 2019) ................................. 4

*Supermarket of Homes v. San Fernando Valley Bd. of Realtors*,
    1983 WL 2199 (C.D. Cal. 1983), *aff'd*, 786 F.2d 1400 (9th Cir. 1986)....... 12, 13, 14

*United States v. Reality Multi-List, Inc.*,
    629 F.2d 1351 (5th Cir. 1980) ................................................. 14

*Varela v. Gonzales*,
    773 F.3d 704 (5th Cir. 2014) ..................................................... 6

**<u>Rules</u>**

Rule 12(b)(6)...................................................................................................................... 1

## INTRODUCTION AND SUMMARY OF ARGUMENT

Although plaintiffs try hard to obscure this fact, their claims against NAR are based on an NAR rule that, by its indisputable terms, could not adversely affect competition. Section 2-G-1 of the NAR MLS Handbook requires only that a broker who lists a property on an MLS must offer cooperation and compensation to any other MLS participant who finds a buyer for the listed property. That is all it does. Period!

- Section 2-G-1 does *not* fix commission levels. The listing broker may offer any amount of compensation to buyers brokers – even a nominal amount;

- Section 2-G-1 does *not* address, let alone dictate, the amount of commission that home sellers may, or should, offer to their listing brokers. That amount is set in negotiations between the seller and prospective listing brokers;

- Section 2-G-1 does *not* address, let alone dictate, whether buyers brokers are paid directly by their clients, or by the listing broker's offer to share cooperative compensation. Buyers brokers are free to negotiate with buyers over the amount of commission, if any, that they will seek from the buyer; and

- Section 2-G-1 does *not* prohibit brokers from negotiating over the commission amount that is offered in the listing, and neither does any other NAR rule or case interpretation.

Yet plaintiffs argue that, despite 2-G-1's limited scope, it somehow "cost[s] home sellers billions of dollars annually and imped[es] lower-cost competition." (Pl. Opp. at 2.) Significantly, that argument is not supported by a single specific *factual* allegation in the Consolidated Amended Complaint ("CAC"). Rule 12(b)(6), however, requires specific factual allegations that "must be enough to raise a right to relief above the speculative level" – not conclusory allegations, speculation, or opinions of third parties. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Given the indisputable language of the challenged Rule, the CAC cannot survive NAR's motion to dismiss because that Complaint does not allege specific facts that, if proven, would support the conclusion that Section 2-G-1 somehow has anticompetitive effects completely at odds with its language – or that it was the direct cause of injury to plaintiffs in this case.

Unable to make specific factual allegations that would defeat a motion to dismiss, plaintiffs rely on the claim that "testimony and analysis from economists, industry experts and many other sources" can somehow substitute for such facts. (Pl. Opp. at 20). But they do not cite a single case to support the notion that antitrust plaintiffs can avoid their obligation to plead specific facts through the tactic of selectively quoting newspaper editorials and commentators at industry panels. And no such case exists. The law is clear: Plaintiffs are required to plead specific facts to support their claims (a) that defendants have violated the antitrust laws and (b) that they were directly injured by virtue of the alleged violation. *See Silha v. ACT, Inc.*, 807 F.3d 169, 174-75 (7th Cir. 2015); *Greater Rockford Energy & Tech. Corp. v. Shell Oil Co.*, 998 F.2d 391, 401 (7th Cir. 1993) They have not done, and cannot do, so. Moreover, "it is axiomatic that [a] complaint may not be amended by the briefs in opposition to a motion to dismiss." *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1107 (7th Cir. 1984).

Plaintiffs also attempt to hide the inadequacy of their factual allegations by focusing on irrelevant details of those allegations. In its opening brief, NAR showed that Section 2-G-1 does not, and indeed could not, have any effect on commission levels because it allows commission offers to be made in any amount. (NAR Br. at 7-9.) Plaintiffs respond by noting that Section 2-G-1 requires ***blanket*** offers. (Pl. Opp. at 1-2, 5, 18.) But they do not allege any facts to counter the point that these blanket offers can be a nominal amount. Nor does the CAC allege any facts to support plaintiffs' conclusory claim that Section 2-G-1's requirement that offers be made on a blanket basis is actually responsible for inflating commissions.

Similarly, plaintiffs seek to characterize as sinister the fact that Section 2-G-1 permits cooperative commission offers to be made either as a fixed amount or as a percentage of the purchase price. (*Id.* at 18-19.) But they make no allegations that, if proven, would show that either

type of pricing offer is anticompetitive, let alone how else one would set a price. All that they do is advance their own conclusion, devoid of any factual foundation.

NAR's opening brief also showed that the NAR rules cited in the CAC do not, in fact, prohibit negotiations between brokers over commissions. (NAR Br. at 9-11.) Plaintiffs respond by continuing to insist that NAR rules prevent brokers from negotiating commission amounts. (Pl. Opp. at 6.) However, even a cursory review of the relevant NAR rules demonstrates that all that those rules prohibit buyers brokers from doing is the wholly self-interested practice of "mak[ing] the submission of an executed offer to purchase contingent" on the listing broker increasing the compensation offered to the buyer's broker. (NAR Br. at 6-8.) In every other way, the relevant rules permit negotiation of commissions. And plaintiffs make no effort to explain how they, as a group of home-sellers, could possibly have been injured by that rule.

Plaintiffs also argue that Section 2-G-1 is responsible for commissions for real estate transactions allegedly not having fallen as much as they "should" have, and that commissions are supposedly higher in the U.S. than in other countries. (Pl. Opp. at 9-11.) But plaintiffs have not alleged that these other countries even have an MLS system similar to the American system, let alone how Section 2-G-1 – which does not even address commission amounts – could be responsible for these allegedly higher commission levels. Plaintiffs' factually unsupported speculation is not enough to withstand a motion to dismiss.

Plaintiffs' legal arguments are no more convincing than their inadequate factual allegations. Plaintiffs spend pages discussing cases that condemn price-fixing agreements among horizontal competitors, as if to suggest that this case involves such an agreement. (*Id.* at 13-15.) But the CAC alleges no facts to support such a theory. Indeed, plaintiffs do not even seem to really

be pursuing it.[1] There is, and can be, no allegation of price fixing based on a rule that does nothing more than require some offer of compensation.

Plaintiffs also claim that Section 2-G-1 and the handful of NAR ethical rules that they challenge are "facially anticompetitive" (*id.* at 17), but they barely address the numerous cases cited in NAR's opening brief which held that MLSs are procompetitive precisely ***because*** they do what plaintiffs now complain they do, *i.e.*, provide transparency and efficiency to the market. (NAR Br. at 4.) The CAC contains no alleged facts that would support a different result here.

Numerous courts, including the Supreme Court and the Seventh Circuit, have held that courts should be vigilant in not exposing antitrust defendants to the enormous expenses of an antitrust case on the basis of complaints lacking in specific factual allegations that, if proven, would demonstrate a violation of the antitrust laws. *See, e.g.*, *Twombly*, 550 U.S. at 558-59 ("[I]t is one thing to be cautious before dismissing an antitrust complaint in advance of discovery, but quite another to forget that proceeding to antitrust discovery can be expensive." (internal citations omitted)); *Car Carriers*, 745 F.2d at 1106-1107; *see also BCB Anesthesia Care Ltd. v. Passavant Memorial Area Hospital Assn.*, 36 F.3d 664, 669 (7th Cir. 1994). Yet that is precisely what plaintiffs are asking the Court to order. This Court should not permit that result – particularly where, as here, the MLS system that is being attacked has been repeatedly found to promote efficiency and transparency – and thus to be lawful.[2]

---

[1] Plaintiffs argue at one point that this case involves horizontal competitors engaging in "conduct that tampers with price mechanics," *id.* at 14, but they cite no place in the CAC where they allege facts to back up that kind of claim, and presumably are simply referring only to their insufficient allegations about Section 2-G-1.

[2] Judge Stephen Bough, in the Western District of Missouri, recently denied defendants' motion to dismiss a similar case. *See* ECF No. 131 in *Sitzer v. NAR*, Case No. 4:19-cv-00332-SRB (W.D. Mo. 2019) (decision attached as Attachment A). NAR respectfully submits that that court erred in finding the conclusory allegations in that complaint sufficient to survive a motion to dismiss.

**ARGUMENT**

**I.** **Plaintiffs' Conclusory Allegations That Section 2-G-1 Injures Competition Are Inadequate To State An Antitrust Claim.**

Plaintiffs' claims against NAR depend entirely on the notion that Section 2-G-1 of the NAR MLS Handbook somehow (1) requires home sellers to pay for buyers broker services, (2) fixes the price that home sellers pay for those services at a supracompetitive level, and (3) prohibits home-buyers from paying for the services of their brokers directly. (*See* Pl. Opp. at 5-7, 9-11.) But as NAR showed in its opening brief, Section 2-G-1 does none of these things. Section 2-G-1 says nothing about (1) who must or should pay for buyers brokers services; (2) the broker services for which home sellers must or should pay; or (3) how much compensation a listing broker must or should offer to buyers brokers. All that Section 2-G-1 says is that the listing broker must offer some amount of compensation to buyer brokers. (*See* NAR Br. at 6-8, 10-14.) Plaintiffs have alleged no facts to support their implausible and speculative claim that this very limited Rule is somehow responsible for creating the market structure that they claim is anticompetitive.

Plaintiffs offer three principal responses. They spend pages simply repeating their economic theory that Section 2-G-1 is anticompetitive, but they fail to cite any ***factual*** allegations in the CAC that supports that theory. (*See* Pl. Opp. at 17-22.) They purport to respond to NAR's showing that the CAC's factual allegations are insufficient simply by repeating those allegations, without even attempting to address their factual inadequacy. (*Id.* at 22-32.) Finally, they assert that the case law does not support NAR's position that the required offering of cooperation and compensation is not anticompetitive. (*Id.* at 32-36.) None of these responses is convincing.

---

In any event, in the Seventh Circuit, more is required to survive a motion to dismiss than the conclusory allegations of the CAC in this case. *See*, *e.g*., *Car Carriers*, 745 F.2d at 1106-1107.

## A. Plaintiffs Cannot Avoid Dismissal Merely By Repeating Their Unsupported Economic Theories.

Plaintiffs begin their argument with the assertion that Section 2-G-1 is "facially anticompetitive," and then spend several pages detailing the manner in which that Section supposedly hinders competition. (Pl. Opp. at 17-22.) But as NAR showed in its opening brief, the CAC does not contain any factual allegations to support these assertions. (NAR Br. at 13-16.) Rather, the CAC offers conclusory allegations, without any specific facts, that are insufficient to survive a motion to dismiss.[3] Rather than offering an effective response, plaintiffs do their best to ignore the point.

For example, plaintiffs assert that Section 2-G-1 requires that home sellers pay for the services of buyers brokers, thereby "impos[ing] an expense on every seller." (Pl. Opp. at 18.) This argument ignores NAR's showing in its opening brief that Section 2-G-1 does not require that offers be made at any particular amount, and allows *de minimis* offers. (*See* NAR Br. at 6-14.) This means that a home seller can, if the seller wishes, avoid this "expense" simply by insisting that the listing broker offer cooperative compensation of a nominal amount. Plaintiffs have alleged

---

[3] The CAC, and plaintiffs' opposition, are replete with references to opinions expressed by alleged industry experts, participants, or "commentators." (*See, e.g.*, Pl. Opp. at 5, citing CAC ¶ 61 (Wall Street Journal article), ¶ 64 (unidentified "government reports, economic research and trade press"), ¶ 67 (law review article), ¶ 68 ("commentator" at FTC/DOJ workshop), ¶ 73 (business school professor), ¶ 78 (law review articles).) But articles, comments, and opinions set forth conclusions; they do not state facts, and plaintiffs cannot rely on such conclusory allegations to support their claim. *See McReynolds v. Merrill Lynch & Co.*, 694 F.3d 873, 885 (7th Cir. 2012) (explaining that "allegations in the form of legal conclusions are insufficient to survive" a motion to dismiss); *see also Varela v. Gonzales*, 773 F.3d 704, 710 (5th Cir. 2014) (stating that opinions in an expert report attached to a complaint cannot be *considered* on a motion to dismiss because "opinions cannot substitute for facts"); *DSM Desotech, Inc. v. 3D Systems Corp.*, 2012 WL 5463803, *1 n.1 (N.D. Ill. Nov. 7, 2012) (noting, on summary judgment, that expert opinions are not facts).

no facts that support their assertion that Section 2-G-1 prevents home sellers from avoiding the payment of a material amount of cooperative compensation to buyers brokers if that is what they want to do.

Plaintiffs also assert that Section 2-G-1 is anticompetitive because it (1) requires blanket offers of cooperative compensation, and (2) requires those offers to be expressed either in absolute dollar terms or as a percentage of the home sale price. (Pl. Opp. at 4-6, 18-19.) But plaintiffs point to no *facts* alleged in the CAC to support their claim that either of these features of Section 2-G-1 does, or even could, cause the plaintiffs (or anyone else) to pay artificially inflated commissions to their listing broker. A cooperative commission offer of a nominal amount can be made on a blanket basis just as easily as it can be made on an individual basis. Plaintiffs have alleged no facts to show that requiring blanket offers somehow causes commission levels to be higher than permitting individual offers would – or that it would be more efficient to have listing brokers offer different commission amounts to different MLS participants.

Similarly, plaintiffs have alleged no facts demonstrating what is anticompetitive about offers of compensation being expressed in either absolute dollar or percentage terms. How else would a listing broker make an offer? This argument, like plaintiffs' other arguments, simply does not withstand any analysis.

Plaintiffs also argue that Section 2-G-1 is anticompetitive merely because it allows brokers to see the offers made by other brokers, thereby allowing them to "enforce a near-uniform commission rate and drive out discounters." (*Id.* at 19-20, 4-6.) But as NAR explained in its opening brief, plaintiffs have alleged no facts to support their assertion that Section 2-G-1 prevents discounting, and other NAR rules affirmatively forbid agreements among brokers regarding commission levels. (*See* NAR Br. at 11-12, 16-17.) Moreover, courts have repeatedly considered,

and rejected, plaintiffs' argument that the circulation of commission offers in an MLS is anticompetitive.  (*See* Section I.C, below.)

Finally, plaintiffs argue that NAR rules prohibit negotiation over commission rates, and that NAR rules in general should be regarded as presumptively anticompetitive.  (Pl. Opp. at 6-7, 20-22.)  But as NAR showed in its opening brief, the former argument is contrary to the language of NAR's rules, while the latter is contrary to several decades of law.[4]  (*See* NAR Br. at 18-20; Section II, below.)

**B.    Plaintiffs' "Factual" Allegations Are Insufficient.**

NAR's opening brief demonstrated that plaintiffs have failed to allege facts to support any of their theories regarding the allegedly anticompetitive effects of Section 2-G-1 and/or NAR's ethical rules.  (NAR Br. at 9-20.)  None of plaintiffs' responses is convincing.

**1.    Plaintiffs Have Failed To Support Their Claim That Section 2-G-1 Restrains Competition Over Commissions.**

NAR showed in its opening brief that, since Section 2-G-1 permits *de minimis* cooperative commission offers, plaintiffs must do more than simply cite the text of that rule to support their claim that it somehow causes commissions to be set at supracompetitive levels.  (NAR Br. at 10-14.)  In response, plaintiffs offer only argument.  They do not point to a single place in the CAC where they allege such facts.  (*See* Pl. Opp. at 22-24.)  As noted above, it is "axiomatic" that deficiencies in a complaint cannot be cured by statements in briefs.  *See Car Carriers*, 745 F.2d at 1107.  In any event, it is telling that plaintiffs end with the argument that, if Section 2-G-1 operates according to its plain terms, then NAR should "have no reason to oppose [its] elimination."  (Pl.

---

[4]   The cases that plaintiffs cite as examples of "anticompetitive" NAR rules all involved alleged restrictions on certain types of listings or brokerage models.  (Pl. Opp. at 20-22.)  Plaintiffs do not make any such allegations here.

Opp. at 24.)  The Court should not accept this kind of taunt in lieu of facts showing that Section 2-G-1 has the anticompetitive effect that plaintiffs ascribe to it.

### 2. Plaintiffs Have Failed To Allege Facts To Support Their Claim That Section 2-G-1 Causes "Steering."

NAR showed in its opening brief that what plaintiffs call "steering" is simply an epithet for what, *according to plaintiffs' own allegations*, is simply the market at work: *i.e.*, listing brokers offering sufficient cooperative compensation to incentivize buyers brokers to come forward with a buyer for the listed property.  (NAR Br. at 14-16.)  Plaintiffs respond by arguing that this amounts to an unethical "bribe" that listing brokers pay to buyers brokers, one that supposedly causes buyers brokers to forsake their fiduciary duty to their clients.  (Pl. Opp. at 24.)[5]  However, plaintiffs fail to acknowledge that the offer of compensation is intended to benefit the seller by encouraging other MLS participants to produce a buyer for the listed property.  Moreover, they fail to come to grips with the fact that a seller may, under NAR rules, instruct the listing broker to offer *de minimis* compensation to other MLS participants if that is how the seller wants to proceed.

NAR also pointed out in its opening brief that plaintiffs' own allegations undermine their "steering" theory, since the CAC alleges that home buyers often select homes ***before*** they contact a broker – thereby making it impossible for their broker to "steer" them towards listings based on commission.  (NAR Br. at 15-16.)  Plaintiffs pretend that NAR is "disput[ing] the CAC's factual allegations" by making this point (Pl. Opp. at 25), but that is incorrect: NAR simply noted that plaintiffs ***admitted*** that steering cannot occur in the manner they allege.

---

[5]  Earlier in their brief, plaintiffs recite the CAC's allegations about "steering," (Pl. Opp. at 5), but those allegations are insufficient because they are conclusory and based only on the opinions of industry "commentators."  (*See* note 2, above.)

### 3. Plaintiffs Have Failed To Allege Facts To Support Their Claim That NAR Rules Prevent Brokers From Negotiating Commissions.

As NAR showed in its opening brief, plaintiffs' claim that NAR rules create a "Gordian knot" that "strictly limits"[6] the ability of home buyers to negotiate a lower buyers' commission than what is initially offered on the MLS is simply incorrect. (NAR Br. at 18-20.) Plaintiffs respond by citing to CAC paragraphs 82-92, but most of those paragraphs have nothing to do with NAR's rules or standards of practice as they relate to negotiations. (*See* Pl. Opp. at 25-27, citing CAC at ¶¶ 82-84, 86 (alleging price effects of Section 2-G-1); ¶ 85 (discussing alleged "script" from Keller-Williams University); ¶ 87 (alleging that NAR rules allow buyers brokers to describe their services as free);[7] ¶ 92 (conclusory recapitulation of plaintiffs' theory).)

The handful of CAC allegations that actually address NAR's rules on negotiation do not support plaintiffs' claims. Plaintiffs misinterpret NAR Case Interpretation 16-15, which states that brokers are "entitled to negotiate" commissions but may not do so by altering the terms of the *buyer's* purchase offer itself. (Pl. Opp. at 26, citing CAC ¶ 89.) Plaintiffs claim that this Interpretation requires that commission negotiations occur before the property is shown, but it does not.[8] And even if it did, plaintiffs plead no facts to support their claim that requiring pre-showing negotiations would "in practice eliminat[e] negotiation." (*Id.*) Similarly, plaintiffs continue to ignore the fact that NAR Case Interpretation 16-16 does not prohibit negotiations over

---

[6]  (Pl. Opp. at 6.)

[7]  Plaintiffs ignore the fact that the relevant rule requires brokers who claim that their services are free to disclose all material facts.

[8]  While Case Interpretation 16-15 says that commission negotiations "should" be completed prior to showing, the Hearing Panel's decision did not rely on the timing of the negotiations, but instead on the fact that the buyer's broker had used the purchase offer – a contract to which the brokers are not parties – as a tool for requesting a higher commission.

commissions; it merely prohibits buyers brokers from using **the submission of the buyer's purchase offer** to request such a change.  (*See* NAR Br. at 7-8, 19.)

Even more significantly – and fatal to all of plaintiffs' arguments on this point –  plaintiffs ignore the obvious fact that allowing buyers brokers to negotiate compensation amounts would not **decrease** commissions paid by home-sellers, since buyers brokers will inevitably seek higher commissions, not lower ones.  The CAC contains no facts to support plaintiffs' claim that home sellers are somehow injured by NAR rules that supposedly prevent buyers brokers from negotiating higher commissions for themselves.  Notably, plaintiffs offer nothing to support the conclusion that NAR rules prevent buyers brokers from seeking payment from their clients if the commission paid by the seller through the listing broker is thought to be inadequate.

### 4. Plaintiffs Have Failed To Allege Facts To Show That Section 2-G-1 Inflates Commissions.

Finally, NAR showed in its opening brief that plaintiffs have failed to allege facts connecting Section 2-G-1 to the assertion that brokerage commissions in the United States are supposedly higher than in other countries.  (NAR Br. at 22-23.)  Plaintiffs respond by largely ignoring the point, repeating their allegations that commissions are too high – without even addressing the point that nothing in the CAC supports their claim that Section 2-G-1 is responsible for the alleged commission levels.  (*See* Pl. Opp. at 29-31.)  But in order to state a claim against NAR over allegedly inflating commission levels, plaintiffs must do more than simply cite conclusory allegations that commission levels are inflated. Plaintiffs are required to allege facts showing that **NAR's rules have caused the inflation**.  Their failure to do so means that they have failed to satisfy *Twombly*'s requirement for factual allegations that are "enough to raise a right to relief above the speculative level."  550 U.S. at 555.

**C.      Courts Have Considered, And Rejected, Plaintiffs' Argument That A Requirement To Offer A Commission In An MLS Listing Is Anticompetitive.**

Plaintiffs' legal theory is that there is something inherently anticompetitive about the NAR Rule that requires a listing broker to make an offer of cooperation and compensation to all other MLS participants who produce a buyer for the listed property. (Pl. Opp. at 13-22.) This theory holds that requiring a listing broker to offer cooperation and compensation in an MLS listing somehow **decreases** competition by **increasing** competition among listing brokers to make offers of compensation that will incentivize other MLS participants to bring forward potential buyers. As NAR noted in its opening brief, however, this theory is in total tension with several relevant prior decisions. (*See* NAR Br. at 21-22.)

Specifically, in *Supermarket of Homes v. San Fernando Valley Bd. of Realtors*, 1983 WL 2199 (C.D. Cal. 1983), *aff'd*, 786 F.2d 1400 (9th Cir. 1986), the Court rejected the argument that "the inclusion of commission rates in the individual MLS listings" converted the MLS into a "secret price list," and that "the circulation of such information among brokers helps to stabilize commission rates at artificially high levels." *Id.* at *4. First, the Court found that the plaintiff had failed to present any evidence that brokers were using the MLS to engage in price fixing. (*Id.* at *6).[9] It then rejected the plaintiff's argument that merely sharing cooperative compensation offers in the MLS violated the rule of reason:

> Absent an agreement to adhere to particular price schedules, the exchange of price information among competitors is not a *per se* violation of the antitrust laws, but should be judged under the rule of reason. . . . Applying the rule of reason, *a number of courts have considered the antitrust implications of the exchange of*

---

[9]  Plaintiffs here do not seem to be making the argument that brokers use the MLS to engage in overt price-fixing, and they certainly have pleaded no facts to support such a claim. Moreover, as noted in NAR's opening brief, NAR rules explicitly forbid agreements on commissions, including cooperative commission offers. (NAR Br. at 11-12.)

***commission rates among real estate brokers in an MLS, and have found the
practice to be lawful*. *The Court agrees with that conclusion.***

The procompetitive benefits of the information exchange conducted through the
MLS have been widely noted. The centralized dissemination of information
contributes to the efficiency of geographically fragmented markets for housing and
for brokerage services. The allegedly anticompetitive effects of the disclosure of
commission rates, on the other hand, are difficult to discern. Plaintiff's
characterization of the MLS as a 'secret price list' is simply inapposite. . . . ***As to
the continued disclosure by listing brokers of the commissions payable to
cooperating brokers, it has been rightfully observed that the listing and
cooperative brokers are not truly competitors with respect to this use of the
MLS*. . . .**

The Court therefore concludes that the circulation of commission rates in the MLS
does not violate the antitrust laws.

*Supermarket of Homes*, 1983 WL 2199 at *7 (emphasis added) (internal citations omitted). It

would be utterly inconsistent with this ruling to hold now, as plaintiffs propose, that the

requirement that a listing broker offer compensation to all other MLS participants violates the

antitrust laws.

Similarly, this Court concluded in *Murphy v. Alpha Realty*, Case No. 76 C 2446, 1978 WL

1451, at *4 (N.D. Ill. Dec. 7, 1978), that the "practice of exchanging information concerning

commission rates and the division of those commissions" in an MLS does not violate the Sherman

Act, because this type of transparency is procompetitive:

Defendants argue that just as the seller and listing broker are entitled to know the
rate of commission involved in order to decide if they will enter into an agency
relationship, potential cooperating brokers are similarly entitled to information
concerning the rate of commission the listing broker is to receive from the seller
and how that commission will be apportioned in order to decide whether a
subagency relationship should be established. This Court agrees.

*Id.* Again, plaintiffs' fundamental argument goes directly contrary to, and would undermine, this

judicial endorsement of the long-standing practice of cooperation and compensation that is the

basis of the MLS system.

Plaintiffs respond by claiming that *Supermarket of Homes* and *Murphy* were decided during the period in which listing brokers and buyers brokers were said to form sub-agency relationships during a home sale. (*See* Pl. Opp. at 34, n.22.) But this purported distinction is irrelevant. Both courts ruled as they did because they found – as a matter of law – that transparency about specific offers of compensation to the other brokers in an MLS is procompetitive. *Supermarket of Homes*, 1982 WL 2199, at *7 (noting the "procompetitive benefits of the information exchange conducted through the MLS"); *Murphy*, 1978 WL 1451 at *4 (agreeing that buyers brokers are "entitled to information concerning the rate of commission" before pursuing a transaction with the listing broker). Regardless of characterizations of fiduciary duty, the purpose of the offer of cooperation and compensation was, and is, to incentivize other MLS participants to produce a buyer for the listed property – for the benefit of the seller. Courts have repeatedly and rightfully held that the MLS system, of which Section 2-G-1 is a fundamental part, is procompetitive – and is very much in the best interests of sellers and buyers alike.

Moreover, as NAR noted in its opening brief – and plaintiffs do not even attempt to answer, *Supermarket of Homes* and *Murphy* are fully consistent with long-standing antitrust authority regarding the procompetitive nature of the MLS system. Thus, the Fifth Circuit described the "enormously procompetitive" benefits of an MLS as follows:

> By serving as a central processing and distributing point for listings of real estate, [an MLS] helps reduce information and communication barriers and ease the built-in geographical barrier confronting buyer and seller. Further, it aids the market in its function as price-setter for properties and financing. It aids the seller by allowing him to give an exclusive listing to a broker, and thus to choose the agent with whom he prefers to deal, while nevertheless enabling him to place his listing in the hands of all [the MLS's] members to attempt to procure a buyer. The buyer benefits by gaining access to a wider selection of properties in a shorter time period than would be the case if he engaged a lone broker.

*United States v. Reality Multi-List, Inc.*, 629 F.2d 1351, 1368 (5th Cir. 1980) (internal citations and quotation marks omitted). Other courts, including the Seventh Circuit, have similarly noted

that the MLS system is procompetitive precisely because it increases price transparency and lowers transaction costs – the very functions that plaintiffs now claim, inaccurately, are somehow anticompetitive. *See, e.g.*, *Reifert v. South Cent. Wisconsin MLS Corp*, 450 F.3d 312, 321 (7th Cir. 2006) (finding that Article 16 of the NAR Code of Ethics "aids competition and fulfills the purposes of the Sherman Act by providing a more transparent marketplace"); *O'Riordan v. Long Island Board of Realtors*, 707 F. Supp. 111, 115 (E.D.N.Y. 1988) (noting that MLSs are procompetitive because they function "like an exchange and provide[] wide dissemination of market information"). Section 2-G-1 is a fundamental feature of the MLS system that has long been found to be procompetitive.

Plaintiffs argue that these authorities should be ignored because they were decided on summary judgment or after trial. (*See, e.g.*, Pl. Opp. at 34, notes 24-25.) But that argument misses the import of these cases: These decisions establish, as a matter of law, that transparent offers of compensation to buyers brokers through an MLS are procompetitive, and may be considered on this motion for that explication of the substantive antitrust law surrounding MLSs. *See Adams v. City of Indianapolis*, 742 F.3d 720, 728 (7th Cir. 2014) (noting that "there's nothing wrong with relying on summary-judgment cases at the pleading stage to explain the substantive legal standards that apply to the case"). These decisions are flatly inconsistent with – and compel dismissal of – the antitrust theory advanced by plaintiffs in their complaint.

Finally, as NAR noted in its opening brief (at 1-2, 21-22), Section VI of its 2008 Consent Decree with the Department of Justice (copy attached as Attachment B) provided that "nothing in this Final Judgment shall prohibit NAR from adopting and maintaining the definition of MLS Participant and the accompanying Note, together attached as Exhibit B." (*See* Attachment B at 9.) The Exhibit B referenced in Section VI of the Consent Decree provides, *inter alia*, as follows:

However, under no circumstances is any individual or firm, regardless of membership status, entitled to MLS 'Membership' or 'Participation' unless they hold a current, valid real estate broker's license **and offer or accept cooperation and compensation to and from other Participants** . . . .

* * *

Note: Mere possession of a broker's license is not sufficient to qualify for MLS participation. Rather, the requirement than an individual or firm 'offers or accepts cooperation and compensation' means that the Participant actively endeavors during the operation of its real estate business to list real property of the type listed on the MLS and/or to accept offers of cooperation and compensation made by listing brokers or agents in the MLS.

> **The key is that the Participant or potential Participant actively endeavors to make or accept offers of cooperation and compensation with respect to properties of the type that are listed on the MLS in which participation is sought**.

(*See* Attachment B at 24-26 (emphasis added).) The 2008 Consent Decree thus explicitly permitted NAR to maintain MLS participation rules that include the requirement that brokers "actively endeavor[] to make or accept offers of cooperation and compensation" when listing properties on the MLS. This is the same requirement that plaintiffs now claim is "plainly anticompetitive." (*See* Pl. Opp. at 1.) And, contrary to plaintiffs' argument (*id.* at 28), the expiration of the Consent Decree in 2018 does not change the fact that the very conduct challenged here was explicitly permitted by that Decree.[10]

NAR recognizes that, in the Department of Justice's Statement of Interest in this case (ECF No. 135), DOJ stated that the 2005 investigation that led to the Consent Decree did not focus on Section 2-G-1 and that NAR has mischaracterized that Decree. To be clear, NAR never said, and never sought to imply, that that investigation and the complaint leading to the Consent Decree

---

[10] Judge Bough's decision in *Sitzer* did not address the cases cited above or the Consent Decree. NAR respectfully suggests that these authorities strongly support dismissal of the CAC.

focused on, or even addressed, Section 2-G-1.[11]  But NAR respectfully submits that the language of the Consent Decree speaks for itself.  It sets forth, as permitted conduct, NAR rules that limit MLS participation to brokers who engage in the very conduct that plaintiffs claim is unlawful: making or accepting offers of cooperation and compensation.  It would be most unfair if allegations of conduct that was explicitly permitted by a Consent Decree with the Department of Justice that was approved by Judge Kennelly were now held to state a cause of action and expose NAR to claims of enormous damages.  But even apart from the Consent Decree, the antitrust claims in the CAC should be dismissed for all of the reasons stated above.

## II.  Plaintiffs' Conclusory Allegations That They Have Been Injured By Section 2-G-1 Are Insufficient To Support Their Antitrust Claims.

Apart from the merits, the antitrust claims in the CAC should be dismissed on the additional ground that plaintiffs have failed to allege facts showing that the challenged Rule was the direct cause of their alleged injury.  As NAR noted in its opening brief (NAR Br. at 16-17), all of the plaintiffs have chosen to rely on the same boilerplate, conclusory allegation that, when they sold their homes, they "paid a substantial buyer-broker commission."  (CAC at ¶¶ 23-30.)  None of the plaintiffs has alleged that he or she even attempted to negotiate a lower commission to be paid to their listing broker, or a lower (or even *de minimis*) amount to be offered by the listing broker to

---

[11]  NAR's brief said the following about the Consent Decree: "[The NAR requirement that a listing broker must make an offer of cooperation and compensation to any buyers broker who produces a ready, willing and able purchaser] was explicitly permitted by the Department of Justice in a consent decree that expressly authorizes NAR to limit membership in an MLS to persons who make offers of cooperation and compensation to other members of the MLS – a decree that was approved by Judge Kennelly of this Court."  (NAR Br. at 1-2.)  The brief also said that "[t]he Department of Justice, similarly, entered into a consent decree, approved by a Court in this District, expressly permitting NAR to maintain a rule that provides that MLS membership may be made contingent on a broker's agreement to 'actively endeavor' to 'make or accept offers of cooperation and compensation' through the MLS."  (*Id*. at 21-22.)  As explained above, we respectfully submit that these statements are accurate.

the buyer's broker, let alone that their broker refused to do so because that broker believed that Section 2-G-1 precluded such negotiations. Nor has any plaintiff attempted to plead any other facts demonstrating that, but for the existence of Section 2-G-1, they would have paid a lower commission. This failure is fatal to their claims. (*See* NAR Br. at 24-25.)

Plaintiffs respond by claiming that they have adequately alleged a causal link between Section 2-G-1 and their own alleged injuries. (*See* Pl. Opp. at 29-33.) But the CAC paragraphs they cite do not do so. Instead, they contain only conclusory allegations that "sellers" paid "an inflated total commission." Plaintiffs, for example, point to CAC allegations which quote opinion pieces claiming that brokerage commissions are too high (CAC ¶¶ 14-15, 125, 128-29) or too uniform (*id.* ¶ 126). They also point to their boilerplate allegation that "[d]efendants' conspiracy has caused buyer-broker commissions and total commissions in the areas in which the Covered MLSs operate (and elsewhere) to be inflated." (*Id.* ¶ 156.) The CAC alleges no factual allegations that, if proven, would support those claims or tie the commissions paid by any individual plaintiff to any alleged wrongdoing. (*See* Sections I.A. and I.B. above.) This kind of boilerplate is insufficient to support the conclusion that any of the plaintiffs was injured by Section 2-G-1.

## CONCLUSION

The Seventh Circuit has warned that, given the massive costs of discovery in antitrust cases, such cases should be dismissed where they are based on "bare legal conclusion[s]" and nothing more than "the language of antitrust" – but do not allege specific facts that, if proven, would demonstrate an antitrust violation. *Car Carriers*, 745 F.2d at 1106. In these sorts of cases, as the Court of Appeals noted,

> the costs of modern federal antitrust litigation and the increasing caseload of the federal courts counsel against sending the parties into discovery when there is no reasonable likelihood that the plaintiffs can construct a claim from the events related in the complaint. A contrary view would be tantamount to providing antitrust litigation with an exemption from Rule 12(b)(6).

*Id.* at 1106-1107.  In light of the absence of any concrete factual allegations in the CAC that would make out an antitrust violation and in light of the massively burdensome discovery that will undoubtedly be inflicted on defendants if this case were permitted to go forward, this case is precisely the sort of litigation against which the Court of Appeals cautioned.

Specifically, the conduct challenged by the CAC is nothing more than a rule that a listing broker in an MLS must offer cooperation and compensation to other MLS participants as part of a long-accepted and judicially endorsed system for facilitating the sale of residential real property in an efficient and transparent manner.  That rule does not in any way dictate, or even influence, the commission that is negotiated between the seller and the listing broker.  It does not dictate, or even influence, the commission that the listing broker offers to other MLS participants for producing a buyer for the listed property – which can be a nominal amount.  It does not prevent the negotiation of the listed commission level by the buyer or the buyer's broker.  And it does not prevent buyers brokers from seeking commissions from their clients if they deem the commission offered by the listing broker to be inadequate.  Significantly, not a single concrete factual allegation in the CAC is to the contrary.  Absent non-conclusory, factual allegations that would, if proven, show that Section 2-G-1 has suppressed competition and has directly caused injury to these plaintiffs, the CAC should be dismissed with prejudice.

Dated:  October 18, 2019

Respectfully submitted,

*/s/Jack R. Bierig*
Jack R. Bierig
Robert J. Wierenga
Adam J. Diederich
Schiff Hardin LLP
233 South Wacker Drive, Suite 7100
Chicago, Illinois 60606
(312) 258-5500

jbierig@schiffhardin.com
rwierenga@schiffhardin.com
adiederich@schiffhardin.com

*Attorneys for Defendant*
*National Association of Realtors®*

**CERTIFICATE OF SERVICE**

The undersigned attorney hereby certifies that on October 18, 2019, the foregoing Reply Brief in Support of the Motion of the National Association of Realtors® to Dismiss Plaintiff's Complaint was electronically filed with the Clerk of the Court by utilizing the CM/ECF System, which will provide electronic notification to all counsel of record:

/s/ *Jack R. Bierig*
Jack R. Bierig