# ATTACHMENT A

## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
## WESTERN DIVISION

| | | |
|---|---|---|
| JOSHUA SITZER AND AMY WINGER,<br>SCOTT AND RHONDA BURNETT,<br>and RYAN HENDRICKSON,<br>on behalf of themselves and all others<br>similarly situated, | )<br>)<br>)<br>)<br>) | |
| | ) | Case No. 4:19-cv-00332-SRB |
| Plaintiffs, | )<br>) | |
| v. | )<br>) | |
| THE NATIONAL ASSOCIATION OF<br>REALTORS, REALOGY HOLDINGS CORP.,<br>HOMESERVICES OF AMERICA, INC., BHH<br>AFFILIATES, LLC, HSF AFFILIATES, LLC,<br>RE/MAX LLC, and KELLER WILLIAMS<br>REALTY, INC. | )<br>)<br>)<br>)<br>)<br>)<br>) | |
| Defendants. | )<br>) | |

## ORDER

Before the Court is a Motion of the National Association of Realtors ("NAR") to Dismiss

the Association for Lack of Personal Jurisdiction and to Dismiss the Complaint for Failure to

State a Cause of Action (Doc. #76) and Corporate Defendants' Motion to Dismiss (Doc. #78).

For the following reasons, NAR's motion is DENIED and Corporate Defendants' motion is

DENIED.

## I. LEGAL STANDARD

### A. Personal Jurisdiction

When a defendant seeks dismissal for lack of personal jurisdiction under Rule 12(b)(2),

"the plaintiff bears the burden to show that jurisdiction exists." *Fastpath, Inc. v. Arbela Techs.*

*Corp.*, 760 F.3d 816, 820 (8th Cir. 2014) (citing *K–V Pharm. Co. v. J. Uriach & CIA, S.A.*, 648

F.3d at 591–92 (8th Cir. 2011)). The plaintiff's prima facie showing of personal jurisdiction

1

"must be tested, not by the pleadings alone, but by the affidavits and exhibits presented with the motions and in opposition thereto." *Dever v. Hentzen Coatings, Inc.*, 380 F.3d 1070, 1072–73 (8th Cir. 2004) (internal quotation marks omitted) (quoting *Block Indus. v. DHJ Indus., Inc.*, 495 F.2d 256, 259 (8th Cir. 1974)).

Plaintiffs filed suit in federal court under Section 1 of the Sherman Act, 15 U.S.C. § 1. The Sherman Act permits nationwide service of process for corporate defendants. *See* 15 U.S.C. § 12. "When a federal court is attempting to exercise personal jurisdiction over a defendant in a suit based upon a federal statute providing for nationwide service of process, the relevant inquiry is whether the defendant has had minimum contacts with the United States." *Aviva Life & Annuity Co. v. Davis*, 20 F. Supp. 3d 694, 703 (S.D. Iowa 2014); *In re Fed. Fountain, Inc.*, 165 F.3d 600, 601 (8th Cir. 1999) (en banc).

### B. Failure to Dismiss a Claim

Pursuant to Federal Rule of Civil Procedure 12(b)(6), a claim may be dismissed for "failure to state a claim upon which relief can be granted." "To survive a motion to dismiss [for failure to state a claim], a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)) (internal citations omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ash v. Anderson Merchs., LLC*, 799 F.3d 957, 960 (8th Cir. 2015) (quoting *Iqbal*, 556 U.S. at 678) (internal quotations omitted).

The Court must consider all facts alleged in the complaint as true when considering a motion to dismiss. *See Data Mfg., Inc. v. United Parcel Service, Inc.*, 557 F.3d 849, 851 (8th

2

Cir. 2009) (noting "[t]he factual allegations of a complaint are assumed true and construed in favor of the plaintiff, even if it strikes a savvy judge that actual proof of those facts is improbable"). However, allegations that are "legal conclusions or [a] formulaic recitation of the elements of a cause of action . . . may properly be set aside." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009) (quoting *Iqbal*, 556 U.S. at 677) (internal citations omitted). Ultimately, dismissal under Rule 12(b)(6) should be granted "only in the unusual case in which a plaintiff includes allegations that show, on the face of the complaint, that there is some insuperable bar to relief." *Strand v. Diversified Collection Serv., Inc.*, 380 F.3d 316, 317 (8th Cir. 2004) (internal quotations and citations omitted); *see also Double D Spotting Serv., Inc. v. Supervalu, Inc.*, 136 F.3d 554, 560 (8th Cir. 1998) ("We note that courts are hesitant to dismiss antitrust actions before the parties have had an opportunity for discovery, because proof of illegal conduct lies largely in the hands of the alleged antitrust conspirators.").

## II. BACKGROUND

A vast majority of residential real estate sales and purchases in the United States occur on a Multiple Listing Service ("MLS") marketplace.[1] An MLS is a database of properties listed for sale within a defined geographic region accessible to real estate brokers, their realtors, and agents. In a standard real estate transaction, the home seller retains a seller-broker and a home buyer separately retains a buyer-broker. Both brokers utilize a regional MLS listing to sell or locate a given property for their client. Generally, real estate brokers receive compensation in the form of a commission calculated as a percentage of a home's sale price. A seller-broker's compensation is set forth in a listing agreement, a contract between the home seller and broker

---

[1] Plaintiffs' first-amended class-action complaint ("FAC") alleges the following facts, which the Courts accepts as true for purposes of Defendants' motion to dismiss and views in a light most favorable to Plaintiff. *See Data Mfg., Inc.*, 557 F.3d at 851.

3

containing the terms of the listing. A home buyer enters a similar contract with a buyer-broker, which typically states the buyer-broker's compensation will be paid out of the seller-broker's total commission—a commission paid by the home seller once the property is sold.

Plaintiffs Joshua Sitzer and Amy Winger, Scott and Rhonda Burnett, and Ryan Hendrickson ("Plaintiffs") filed their FAC on June 21, 2019. (Doc. #38). Plaintiffs are home sellers who listed their homes on one of four MLS marketplaces: Kansas City MLS ("Heartland MLS"), St. Louis MLS ("MARIS MLS"), Springfield, Missouri MLS ("Southern Missouri Regional MLS"), and Columbia, Missouri MLS ("CBOR MLS") (collectively, "Subject MLS"). The Subject MLS are governed by local realtor associations that are members of NAR and must adhere to NAR rules and policies. Defendant NAR is a trade association for the real-estate industry that promulgates professional standards and policies its members and affiliates must abide by, including specific guidelines for listing properties on MLS marketplaces. Corporate Defendants are national real estate broker franchisors who each operate brokerage subsidiaries, franchisees, and/or affiliates within the geographic regions covered by the Subject MLS: Realogy Holdings Corp.; Homeservices of America, Inc.; BHH Affiliates, LLC; HSF Affiliates, LLC; RE/MAX, LLC; and Keller Williams Realty, Inc. (collectively, "Corporate Defendants").

Plaintiffs allege Defendants adopted and imposed anticompetitive restraints that inflated residential real estate commissions throughout Missouri, focusing primarily on Section 2-G-1 of NAR's MLS Listing Handbook—what Plaintiffs refer to as the "Adversary Commission Rule." Plaintiffs allege "[t]he cornerstone of Defendants' conspiracy is NAR's adoption and implementation of a rule that requires all seller's brokers to make blanket, unilateral and effectively non-negotiable offer [sic] of buyer broker compensation ("the Adversary Commission Rule") when listing a property on a [MLS]." (Doc. #38, p. 3). Plaintiff's FAC includes three

4

counts against Defendants: (1) Count I: Violation of Section 1 of the Sherman Act, 15 U.S.C. §
1; (2) Count II: Violation of the Missouri Merchandising Practices Act, Mo. Rev. Stat. § 407.010
*et seq.*; and (3) Count III: Violation of the Missouri Antitrust Law, Mo. Rev. Stat. § 416.031.
NAR asks the Court to dismiss it from the action for lack of personal jurisdiction under Rule
12(b)(2) or, alternatively, to dismiss Plaintiffs' FAC under Rule 12(b)(6) for failure to state a
claim. Corporate Defendants seek dismissal of Plaintiffs' FAC only pursuant to Rule 12(b)(6).

## III. DISCUSSION

### A. Lack of Personal Jurisdiction

Only NAR argues dismissal is appropriate under Rule 12(b)(2) for lack of personal
jurisdiction. In an Order previously denying NAR's Motion to Transfer (Doc. #82), this Court
found personal jurisdiction existed under Section 12 of the Clayton Act. The result here is the
same. For the reasons discussed in this Court's prior Order, the Court may properly exercise
personal jurisdiction over NAR and its motion to dismiss due to lack of personal jurisdiction is
accordingly denied.

### B. Count I: Violation of Section 1 of the Sherman Act

Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust
or otherwise, or conspiracy, in restraint of trade or commerce." 15 U.S.C. § 1. To establish a
claim under Section 1 of the Sherman Act, a plaintiff must plead evidentiary facts which, if true,
will prove: (1) there was a contract, combination, or conspiracy; (2) the agreement unreasonably
restrained trade under either a *per se* rule of illegality or a rule-of-reason analysis; and (3) the
restraint affected interstate commerce.[2] *See HM Compounding Servs., Inc. v. Express Scripts,*

---

[2] No party disputes whether the alleged anticompetitive conspiracy in this case substantially affects interstate
commerce. NAR's nationwide presence and influence, Corporate Defendants' multistate operational and business
structures, and the subject matter of the alleged conspiracy all sufficiently implicate interstate commerce. *See
Diversified Brokerage Servs., Inc. v. Greater Des Moines Bd. of Realtors*, 521 F.2d 1343, 1345 (8th Cir. 1975) (citing

5

*Inc.*, No. 4:14-CV-1858-JAR, 2015 WL 4162762, at *3 (E.D. Mo. July 9, 2015) (citations

omitted).  A plaintiff must additionally "demonstrate that he has suffered an 'antitrust injury' as a

result of the alleged conduct of the defendants."  *Insulate SB, Inc. v. Advanced Finishing Sys.,*

*Inc.*, 797 F.3d 538, 542 (8th Cir. 2015) (quoting *In re Canadian Import Antitrust Litig.*, 470 F.3d

785, 791 (8th Cir. 2006)).

### a.  Existence of a Conspiracy

To demonstrate concerted action among defendants to restrain trade, a plaintiff must

plead facts plausibly showing "the defendants shared a unity of purpose or a common design and

understanding, or a meeting of the minds."  *Insulate*, 797 F.3d at 543–44 (citations and internal

quotations omitted).  No formal or explicit agreement between the parties is required.  *Id*. at 544,

548 (quoting *United States v. Parke, Davis & Co.*, 362 U.S. 29, 44 (1960)) ("[P]laintiffs can

prove concerted action by showing a [defendant] took some action 'beyond mere announcement

of his policy and the simple refusal to deal [and] employ[ed] other means which effect adherence

to his' policies.").  Concerted or collaborative action may be demonstrated by showing two or

more parties "had a conscious commitment to a common scheme designed to achieve an

unlawful objective."  *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984) (internal

citations and quotations omitted).  "[T]he crucial question is whether the challenged

anticompetitive conduct stem[s] from independent decision or from an agreement, tacit or

express."  *Park Irmat Drug Corp. v. Express Scripts Holding Co.*, 911 F.3d 505, 516 (8th Cir.

2018) (quoting *Twombly*, 550 U.S. at 553) (internal quotation marks omitted).

---

*Burke v. Ford*, 389 U.S. 320, 321 (1967) ("For it is well established that an activity which does not itself occur in interstate commerce comes within the scope of the Sherman Act if it substantially affects interstate commerce."). Accordingly, the threshold question of whether the activities alleged here affect interstate commerce is considered undisputed for purposes of the motion to dismiss.

The parties dispute whether Plaintiffs' factual allegations plausibly demonstrate the existence of an agreement among and between Defendants. NAR primarily disputes Plaintiffs' anticompetitive characterization of Section 2-G-1 and its effects. Corporate Defendants contend Plaintiffs present no evidence showing the existence of an agreement between Defendants or any affirmative steps by Corporate Defendants and their associated brokers to adopt or implement Section 2-G-1. Corporate Defendants argue each Defendant's decision to join a Subject MLS and enforce its listing policies is an act of independent business judgment necessary for competitive success in regional real estate markets. Plaintiffs argue NAR imposes an anticompetitive trade restraint by mandating all Subject MLS participants comply with Section 2-G-1 and its related provisions. Plaintiffs allege NAR invites each Corporate Defendant to agree to, and participate in, this anticompetitive restraint by conditioning the benefits of participation in the MLS system on adherence to Section 2-G-1. Plaintiffs also allege each Corporate Defendant agrees to NAR's anticompetitive restraint by requiring its subsidiaries, franchisees, and associated brokerages (and those brokerages' affiliated agents) to join NAR member groups, participate in the MLS, and adhere to all NAR-imposed listing rules and policies, including Section 2-G-1. Additionally, Plaintiffs allege executives of each Corporate Defendant serve or served in management and/or leadership positions within NAR and the local realtor associations governing the Subject MLS, arguing that involvement shows Corporate Defendants' continued adoption, implementation, and agreement to enforce NAR's anticompetitive policies.

As for the conspiracy element of their Section 1 claim, the Court finds Plaintiffs satisfy the pleading requirements necessary to survive a motion to dismiss. Plaintiffs' assertion that NAR and Corporate Defendants agreed to carry out NAR's allegedly anticompetitive policies is

7

adequately supported by factual allegations regarding both the substance and nature of their purported agreement. Plaintiffs present facts showing the terms and effects of the alleged agreement and the methods allegedly used by NAR and Corporate Defendants to uphold and perpetuate it. In turn, Plaintiffs' allegations plausibly suggest the franchisees, subsidiaries, and agents of each Corporate Defendant knew of, complied with, participated in, and benefitted from Section 2-G-1 and its related provisions. *See, e.g.*, *Interstate Circuit, Inc. v. United States*, 306 U.S. 208, 227 (1939) ("Acceptance by competitors without previous agreement of an invitation to participate in a plan, the necessary consequence of which, if carried out, is restraint of interstate commerce, is sufficient to establish unlawful 'conspiracy' under the Sherman Anti-Trust Act."). Taken as true and in a light most favorable to them, Plaintiffs adequately allege facts placing the conduct of NAR and each Corporate Defendant "in a context that raises a suggestion of a preceding agreement" rather than "identical, independent action." *Twombly*, 550 U.S. at 557, 549; *see also Interstate Circuit*, 306 U.S. at 227; *Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 195, 199 (2010) ("Any joint venture involves multiple sources of economic power cooperating to produce a product. And for many such ventures, the participation of others is necessary. But that does not mean that necessity of cooperation transforms concerted action into independent action."). As to this element, that is sufficient to survive dismissal.

### b. Unreasonable Restraint of Trade

"Despite its broad language, Section 1 has long been interpreted to outlaw only those restraints that are 'unreasonable.'" *Craftsmen Limousine, Inc. v. Ford Motor Co. (Craftsmen I)*, 363 F.3d 761, 772 (8th Cir. 2004) (quoting *Arizona v. Maricopa Cnty. Med. Soc'y,* 457 U.S. 332, 343 (1982). An antitrust plaintiff must demonstrate the alleged conspiracy "unreasonably restrains trade in a relevant product or geographic market." *Minn. Ass'n of Nurse Anesthetists v.*

*Unity Hosp.*, 208 F.3d 655, 659 (8th Cir. 2000). Whether a trade restraint is unreasonable is evaluated under either the *per se* rule of illegality, the more common "rule of reason" analysis, or the "quick look" analysis.[3] *Id.*; *Craftsmen I*, 363 F.3d at 772. Under the rule-of-reason standard, relevant inquiry "is whether, on balance, the challenged agreement is one that 'merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition.'" *Rosebrough Monument Co. v. Mem'l Park Cemetery Ass'n*, 666 F.2d 1130, 1138 (8th Cir. 1981) (quoting *Cont'l T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 49 (1977)). The unreasonableness of a restraint on competition is a fact-intensive inquiry evaluated within the context of the relevant product and/or geographic market. *Rosebrough*, 666 F.2d at 1138; *Nat'l Soc'y of Prof'l Engineers v. United States*, 435 U.S. 679, 691 (1978).

### i. Relevant Product and Geographic Market

As a preliminary matter, Plaintiffs must properly define the relevant product or market where competition is suppressed by the allegedly anticompetitive restraint. *See Double D*, 136 F.3d at 558–560 ("the 'rule of reason' analysis involves an inquiry into the market structure and the defendant's market power in order to assess the actual effect of the restraint."). Given that a "proper market definition can be determined only after a factual inquiry into the commercial realities faced by consumers," dismissal at the motion to dismiss stage based on a plaintiff's market definition is disfavored. *Id.* at 560.

---

[3] Plaintiffs contend there are ample grounds to conclude Section 2-G-1 is *per se* illegal. Corporate Defendants contend Section 2-G-1 is not part of the small and shrinking group of "manifestly anticompetitive conduct" typically evaluated under a *per se* standard. (Doc. #118, p. 4 n.5). In considering a motion to dismiss, it is not necessary for this Court to determine whether the facts might ultimately support a finding of a *per se* violation, nor whether Section 2-G-1 warrants evaluation under a *per se* standard. That determination is best left to the merits stage of this proceeding. *See Craftsmen I*, 363 F.3d at 772 ("although a court's determination that the *per se* rule applies 'might involve many fact questions, the selection of a mode [of analysis] is entirely a question of law.") (citations omitted). For purposes of a motion to dismiss, evaluating whether Plaintiffs' factual allegations could plausibly satisfy a rule-of-reason standard is sufficient.

NAR does not dispute whether Plaintiff sufficiently defined the relevant market impacted by Section 2-G-1 and its attendant policies. Corporate Defendants contend Plaintiffs do not allege a legally cognizable relevant market and further argue Plaintiffs ignore the procompetitive effects of the MLS system. In their FAC, Plaintiffs describe the relevant product market as "the bundle of services provided to buyers and sellers by residential real estate brokers with access to the Subject MLSs." (Doc. #38, p. 38). Plaintiffs further define the relevant geographic market as the geographic areas in which the Subject MLS exclusively operate.

The Court finds Plaintiffs adequately define the relevant market impacted by Section 2-G-1. The FAC describes in detail residential real estate commission structures and how brokers in the industry utilize MLS marketplaces, including the Subject MLS, to sell and purchase homes. Plaintiffs also present factual allegations demonstrating the ubiquitous use of MLS services and the limited alternatives available to those who cannot utilize MLS listings. In sum, these allegations define a plausible, valid, and sufficiently-broad relevant market to which a rule-of-reason analysis can be applied. *See Double D*, 136 F.3d at 560; *Foam Supplies, Inc. v. Dow Chem. Co.*, No. 4:05-CV-1772-CDP, 2006 WL 2225392, at *4 (E.D. Mo. Aug. 2, 2006) (noting dismissal due to inadequate market definition appropriate when "it is clear that the alleged relevant market is too narrow, implausible, defined solely by franchise agreement, or simply not defined anywhere in the pleadings.").

### ii. Detrimental Effects on Competition

Having adequately defined the relevant market, the rule of reason requires Plaintiffs to allege facts plausibly showing the alleged anticompetitive conduct has a detrimental effect on competition within the relevant market or "the potential for genuine adverse effects on competition." *Flegel v. Christian Hosp., Ne.-Nw.*, 4 F.3d 682, 688 (8th Cir. 1993); *Craftsmen*

Case 4:19-cv-00332-SRB   Document 131   Filed 10/16/19   Page 10 of 19

*Limousine, Inc. v. Ford Motor Co. (Craftsmen II)*, 491 F.3d 380, 388 (8th Cir. 2007). While recognizing the parties have not yet had the benefit of discovery, Plaintiffs must still present a plausible factual basis for the alleged anticompetitive effects. *See Double D*, 136 F.3d at 560.

Defendants argue Plaintiffs mischaracterize Section 2-G-1, its attendant policies, and their purported anticompetitive effects. Relying on the plain language of the rule itself, NAR argues Section 2-G-1 only mandates listing brokers make some offer of compensation and that no minimum commission rate or amount is required. Defendants also contend the allegations and economic rationale cited by Plaintiffs illustrate the procompetitive nature of the MLS system, not an unreasonable restraint on trade. Plaintiffs allege Section 2-G-1 mandates seller brokers make "blanket, unilateral and effectively non-negotiable" offers of compensation to buyer brokers whenever they list a home on an MLS owned by a local NAR association. (Doc. #38, p. 19). Plaintiffs argue this blanket-offer of compensation, when implemented in concert with other mandatory commission rules and provisions, limits the ability of buyer-brokers to negotiate commission reductions. As a result, Plaintiffs allege Section 2-G-1 and its related rules—and NAR and Corporate Defendants' enforcement of them—force home sellers to pay inflated sales commissions and buyer-broker commission rates, force home sellers to pay elevated buyer-broker commissions to ensure their homes are competitively marketed,[4] and limits competition among buyer-brokers by severely limiting their ability to negotiate for lower commission rates.

---

[4] Relevant to this alleged effect is the practice of steering. As alleged by Plaintiffs, buyer-brokers can use their access to MLS information (unavailable to potential homebuyers) to view details about the offered levels of buyer-broker compensation and dissuade clients from viewing or purchasing homes with lower buyer-broker commission offers, thus "steering" them to properties with higher-paying commissions. (Doc. #38, p. 8; Doc. #88, p. 25). Plaintiffs allege the documented practice of steering causes home sellers to pay elevated commission rates, and thus elevated buyer-broker commissions, to avoid or dissuade buyer-brokers from engaging in steering.

11

At this stage of the proceeding, the Court's job is not to balance the anticompetitive effects of Section 2-G-1 against the procompetitive justifications advanced by Defendants. Instead, the Court must evaluate whether Plaintiffs' FAC presents facts which, when viewed in a light most favorable to Plaintiffs, show the challenged conduct plausibly exerts an unreasonable restraint on trade. *See Ash*, 799 F.3d at 960. The Court finds Plaintiffs have satisfied that requirement. Given the sheer market power possessed by the Subject MLS and few available listing alternatives, combined with the fact that each MLS participant must adhere to NAR listing rules or face professional sanctions and/or repercussions, Plaintiffs demonstrate the significant influence exerted by Defendants and their listing policies in the Subject MLS. Viewed in a light most favorable to Plaintiffs, allegations that Section 2-G-1 requires seller-brokers to present blanket commission offers to buyer-brokers could plausibly create a skewed compensation structure within the residential real estate market, leading to inflated commissions that would otherwise be lower under competitive market conditions. According to Plaintiffs, Section 2-G-1 and other identified NAR provisions cooperatively limit negotiation, which could plausibly maintain elevated commission rates and deter price-cutting. Plaintiffs also describe buyer-brokers' unique access to MLS listings, the historical practice of steering, and plausibly suggest Section 2-G-1 creates or exacerbates upward pressure on commission rates. The fact-intensive arguments raised by Defendants do not operate as a bar to relief and are appropriate for resolution at a later stage of the proceeding. *See Strand*, 380 F.3d at 317. As to this element, Plaintiffs present enough factual allegations to survive dismissal.

### c. Antitrust Injury

To recover damages, "a private plaintiff must demonstrate that he has suffered an 'antitrust injury' as a result of the alleged conduct of the defendants, and that he has standing to

pursue a claim under the federal antitrust laws." *Insulate*, 797 F.3d at 542 (quoting *In re Canadian Import Antitrust Litig.*, 470 F.3d at 791). Standing to sue under the Sherman Act "requires an evaluation of the plaintiff's harm, the alleged wrongdoing by the defendant, and the relationship between them." *Gen. Indus. Corp. v. Hartz Mountain Corp.*, 810 F.2d 795, 809 (8th Cir. 1987) ("[M]ere causal connection between an antitrust violation and harm to a plaintiff cannot be the basis for antitrust compensation unless the injury is directly related to the harm the antitrust laws were designed to protect.").

NAR argues Plaintiffs do not allege the challenged NAR rules are the cause of their claimed injury and contend Plaintiffs cannot show they suffered a legally-cognizable injury under antitrust law. NAR also notes Plaintiffs omit allegations of any failed attempts by a Plaintiff to negotiate a lower commission with their respective brokers as a result of Section 2-G-1. Plaintiffs argue all that is required of them to survive dismissal is to allege that Section 2-G-1 was "either a material cause, a substantial factor, or a proximate cause of Plaintiffs' injuries." (Doc. #88, pp. 32–33).

The Court finds Plaintiffs allege a legally-cognizable injury under the Sherman Act. Plaintiffs claim Defendants' anticompetitive agreement forced them to pay higher total sales commissions when they sold their homes and forced them to pay elevated buyer-broker commissions to induce buyer-brokers to show their homes to prospective buyers. Paying a higher price as a result of the alleged trade restraint is certainly the type of injury "antitrust laws were intended to prevent." *See Se. Mo. Hosp. v. C.R. Bard, Inc.*, 642 F.3d 608, 624–25 (8th Cir. 2011) (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)). Plaintiffs also present facts sufficiently linking their alleged injury to NAR's adoption and implementation of Section 2-G-1, its related rules and provisions, and Corporate Defendants'

13

adherence to and enforcement of them. While Plaintiffs will have to account for the various economic and market factors that may have caused or contributed to their alleged injuries, Plaintiffs do not have to do so to survive a motion to dismiss. Instead, Plaintiffs must present enough factual allegations to plausibly show Defendants' alleged anticompetitive actions are a "material cause" of their alleged injuries. *See Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1060 (8th Cir. 2000) (quoting *Nat'l Ass'n of Rev. Appraisers & Mortgage Underwriters, Inc. v. Appraisal Found.*, 64 F.3d 1130, 1135 (8th Cir. 1995)). They have done so.

In sum, Plaintiffs satisfy their burden under Rule 12(b)(6) for each element of their federal antitrust claim under Section 1 of the Sherman Act. NAR and Corporate Defendants' motions to dismiss Count I for failure to state a claim are accordingly denied.

### C. Count II: Violation of the Missouri Merchandising Practices Act

The MMPA prohibits the "act, use or employment by any person of any deception" or "unfair practice . . . in connection with the sale or advertisement of any merchandise in trade or commerce." Mo. Rev. Stat. § 407.020.1. To successfully present a claim under the MMPA, Plaintiffs must allege they: "(1) purchased merchandise from the defendant (2) for personal, family, or household purposes and (3) suffered an ascertainable loss of money or property (4) as a result of defendant's use of one of the methods, acts, or practices declared unlawful by the Act." *Kelly v. Cape Cod Potato Chip Co*., 81 F. Supp. 3d 754, 757 (W.D. Mo. 2015) (citing Mo. Rev. Stat. § 407.025.1). MMPA broadly defines the term "merchandise" to include services. *See* Mo. Rev. Stat. § 407.020.4; *Pointer v. Edward L. Kuhs Co.*, 678 S.W.2d 836, 841 (Mo. App. E.D. 1984) (holding real estate broker services fall within scope of the MMPA). Unlawful methods, acts, or practices under the MMPA are those which "include any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or

14

omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce." *Kelly*, 81 F. Supp. 3d at 757 (quoting Mo. Rev. Stat. § 407.020.1) (internal quotation marks omitted). Here, Defendants do not dispute the purchases alleged by Plaintiffs were for personal, family, or household purposes or whether the alleged anticompetitive conduct constitutes an "unlawful act" within the scope of MMPA.

### a. Use of Unfair Practices "In Connection With" Sale or Advertisement

The MMPA's requirement that the unfair or deceptive practice be done "in connection with the sale or advertisement of any merchandise" has been broadly construed. *See, e.g.*, *Conway v. CitiMortgage, Inc.*, 438 S.W.3d 410, 414–16 (Mo. banc 2014) ("Given the potentially broad scope of what is prohibited under the MMPA, it would seem incongruous to limit 'in connection with' to only apply to the original parties in a transaction."). Even persons who were not direct parties to the original sale transaction may still be implicated in an MMPA violation if their deceptive practice occurred "before, during or after a sale." *Id.* at 414 (quoting Mo. Rev. Stat. § 407.020.1). In *Conway*, the Missouri Supreme Court interpreted the phrase "in connection with" as meaning "to have a relationship," and held that to validly state a claim under the MMPA a plaintiff must allege a relationship between the losses suffered and the defendant's unlawful act. *Id.* ("Section 407.020.1 prohibits the use of the enumerated deceptive practices if there is a relationship between the sale of merchandise and the alleged unlawful action.). In light of this broad construction, the critical inquiry is whether a relationship plausibly exists between NAR's alleged anticompetitive practices and Plaintiffs' payment of inflated commission rates by purchasing real-estate brokerage services. *See, e.g.*, *Jackson v. Barton*, 548 S.W.3d 263, 270 (Mo. banc 2018); *Faltermeier v. FCA US LLC*, 899 F.3d 617, 622 (8th Cir. 2018).

15

NAR argues its connection to the sales of Plaintiffs' homes is too remote to implicate the MMPA, contending Plaintiffs do not—and cannot—allege they purchased any services directly from NAR. NAR argues it has no "direct connection" to the sale of Plaintiffs' homes. Absent allegations that it was directly involved in or induced the contracts between Plaintiffs and their brokers, NAR argues the MMPA claim against it should be dismissed. Plaintiffs argue NAR's requirement that local realtor associations governing the Subject MLS comply with Section 2-G-1 and other listing provisions plausibly shows NAR's "connection" with Plaintiffs' purchase of brokerage services that include buyer-broker compensation terms within their listing agreements.

Since Plaintiffs' purchase of real estate broker services underlies the basis of their MMPA claim against Defendants, at issue is whether NAR's alleged anticompetitive practices occurred "in connection with" the sale or advertisement of the residential real estate brokerage services purchased by Plaintiffs. At this early stage, the Court finds Plaintiffs provide sufficient factual allegations that plausibly show a relationship between NAR's alleged anticompetitive practices and Plaintiffs' purchase of real-estate brokerage services containing inflated commission structures. The FAC contains factual allegations regarding NAR's creation, adoption, and implementation of Section 2-G-1 and its complementary provisions, as well as NAR's requirement that any participant in its member-MLS listings (including the Subject MLS) adhere to those rules or face professional sanctions. Plaintiffs also present facts plausibly showing how Section 2-G-1 leads to inflated commission levels in seller-broker listing agreements. A direct contractual relationship between Plaintiffs and NAR is not necessary, nor is evidence showing NAR directly induced Plaintiffs into entering their brokerage contracts. It is enough that Plaintiffs can plausibly show a relationship between NAR's challenged policies and the higher commission prices paid pursuant to Plaintiffs' real-estate brokerage contracts, even if

16

NAR's unfair or deceptive practices occurred before those brokerage services were purchased. *See Conway*, 438 S.W.3d at 416 ("a plaintiff can maintain a suit under the MMPA against a party with a connection to the merchandise *before* a buyer enters the transaction.").  In light of precedent describing MMPA's language "regarding unlawful merchandising as unrestricted, all-encompassing and exceedingly broad" and a scope which covers "every practice imaginable and every unfairness to whatever degree," Plaintiffs have pled enough as to this element to survive dismissal.  *Perras v. H & R Block*, 789 F.3d 914, 917–18 (8th Cir. 2015) (internal quotation marks and citations omitted).

### b. Ascertainable Loss

"A plaintiff adequately pleads this element of an MMPA claim if he alleges an ascertainable loss under the benefit-of-the-bargain rule, which compares the actual value of the item to the value of the item if it had been as represented at the time of the transaction." *Murphy v. Stonewall Kitchen, LLC*, 503 S.W.3d 308, 313 (Mo. Ct. App. 2016).  The alleged loss should also be a result of the defendant's unlawful or deceptive practice.  *Id.*

Defendants argue Plaintiffs do not allege facts establishing an ascertainable loss under MMPA.  NAR presents two arguments as to why Plaintiffs fall short on showing they suffered an ascertainable loss: (1) failure to allege the services they bought were not as represented, and (2) failure to allege they bore the costs attributed to NAR's alleged unfair practices.  Corporate Defendants argue Plaintiffs failed to allege they were denied the benefit of their bargain under the listing agreements executed with real estate agents for the sale of their homes.[5]

---

[5] Corporate Defendants also argue they cannot be held liable for a violation of the MMPA based solely on the alleged antitrust violation because Plaintiffs fail to allege conduct violative of state or federal antitrust laws.  Given this Court's finding that Plaintiffs adequately plead factual allegations which plausibly suggest Corporate Defendants entered into an anticompetitive agreement, this argument need not be evaluated here.

Here, Plaintiffs allege they lost money because they paid artificially inflated commission rates upon the sale of their homes pursuant to their listing agreements. Plaintiffs specifically allege their commission rates would be lower in a competitive market but for the alleged anticompetitive restraints imposed by Defendants. This is an allegation which plausibly states an objectively ascertainable loss. Plaintiffs' allegations that they received the services they contracted for—a brokerage firm's assistance in selling their homes in exchange for a commission based on the percentage of the home's sale price—do not mean Plaintiffs fail to plead an ascertainable loss. Plaintiffs' alleged losses arise from their payment of artificially-inflated commissions pursuant to those listing agreements, agreements which did not represent to Plaintiffs the inflated commission values they were paying as a result of Defendants' allegedly anticompetitive activities. In sum, Plaintiffs' allegations adequately and plausibly attribute the inflated commissions they paid to Section 2-G-1 and its related provision and, thus, allege an ascertainable loss. Whether Plaintiffs actually incurred those losses or subsequently passed those losses on to buyers via increased sales prices is a question of fact to be resolved at a later stage of this case. *See, e.g.*, *Roberts v. BJC Health System*, 391 S.W.3d 433, 438–39 (Mo. banc 2013).

Accordingly, Plaintiffs present sufficient factual allegations to plausibly support their MMPA claims against Defendants. NAR and Corporate Defendants' motions to dismiss Count II for failure to state a claim are accordingly denied.

### D. Count III: Violation of the Missouri Antitrust Law

Under the Missouri Antitrust Law, "every contract, combination or conspiracy in restraint of trade or commerce in this state is unlawful." Mo. Rev. Stat. § 416.031.1. "Missouri antitrust statutes are construed 'in harmony with ruling judicial interpretations of comparable federal antitrust statutes.'" *Se. Missouri Hosp.*, 642 F.3d at 612 n. 3 (8th Cir. 2011) (quoting Mo. Rev.

Stat. § 416.141); *see, e.g.*, *Process Controls Int'l, Inc. v. Emerson Process Mgmt.*, 753 F. Supp. 2d 912, 920 (E.D. Mo. 2010) (applying federal antitrust law to Missouri antitrust claims).

Defendants argue Plaintiffs' Missouri Antitrust Law action should be dismissed for the same reasons as their federal antitrust claim. Plaintiffs contend they have presented enough factual allegations to survive a motion to dismiss. Based on this Court's earlier analysis regarding the sufficiency of Plaintiffs' allegations with respect to their federal antitrust claim under Section 1 of the Sherman Act, Plaintiffs' Count III may proceed against NAR and Corporate Defendants.

## IV. CONCLUSION

Accordingly, it is ORDERED that Defendant National Association of Realtor's Motion to Dismiss (Doc. #76) is denied. It is further ORDERED that Corporate Defendants' Motion to Dismiss (Doc. #78) is denied.

**IT IS SO ORDERED.**

/s/ Stephen R. Bough
STEPHEN R. BOUGH
UNITED STATES DISTRICT JUDGE

Dated: October 16, 2019

19

# ATTACHMENT B



|  |  |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| Plaintiff, ) | |
| ) | Civil Action No. 05 C 5140 |
| v. ) | |
| ) | Judge Kennelly |
| NATIONAL ASSOCIATION OF ) | |
| REALTORS® ) | |
| ) | |
| Defendant. ) | |

*MVL 11-18-08*

## [~~AMENDED PROPOSED~~] FINAL JUDGMENT

WHEREAS, Plaintiff, the United States of America, filed its Amended Complaint on

October 4, 2005, alleging that Defendant National Association of Realtors® ("NAR") adopted

policies that restrain competition from innovative real estate brokers in violation of Section 1 of

the Sherman Act, 15 U.S.C. § 1, and Plaintiff and Defendant, by their respective attorneys, have

consented to the entry of this Final Judgment without trial or adjudication of any issue of fact,

and without this Final Judgment constituting any evidence against, or any admission by, any

party regarding any issue of fact or law;

WHEREAS, Defendant has not admitted and does not admit either the allegations set

forth in the Amended Complaint or any liability or wrongdoing;

WHEREAS, the United States does not allege that Defendant's Internet Data Exchange

(IDX) Policy in its current form violates the antitrust laws; and

WHEREAS, the United States requires Defendant to agree to certain procedures and

prohibitions for the purpose of preventing the loss of competition alleged in the Complaint;

NOW THEREFORE, before any testimony is taken, without trial or adjudication of any issue of fact, and upon consent of the parties, it is ORDERED, ADJUDGED AND DECREED:

## I. JURISDICTION

This Court has jurisdiction over the Parties and subject matter of this action. The Complaint states a claim upon which relief may be granted against Defendant under Section 1 of the Sherman Act, as amended (15 U.S.C. § 1).

## II. DEFINITIONS

As used in this Final Judgment:

A.      "Broker" means a Person licensed by a state to provide services to a buyer or seller in connection with a real estate transaction. The term includes any Person who possesses a Broker's license and any agent or sales associate who is affiliated with such a Broker.

B.      "Covered Entity" means each Member Board that, at any time prior to the expiration of this Final Judgment, operates a multiple listing service and each multiple listing service that, at any time prior to the expiration of this Final Judgment, is exclusively owned by one or more Member Boards or is otherwise obligated to comply with NAR mandatory multiple listing service policies.

C.      "Customer" means a seller client of a Broker or a Person who has expressed to a Broker an interest in purchasing residential real property and who has described the type, features, or location of the property in which he or she has an interest, entitling the Broker to Provide the Customer multiple listing service ("MLS") listing information by any method (*e.g.*, by hand, mail, facsimile, electronic mail, or display on a VOW).

2

D.    "Final Judgment" includes the Modified VOW Policy attached as Exhibit A and the definition of MLS Participant and accompanying Note attached as Exhibit B.

E.    "ILD Policy" means the "ILD (Internet Listing Display) Policy" that NAR adopted on or about August 31, 2005, and any amendments thereto.

F.    "Including" means including, but not limited to.

G.    "Listing Information" means all records of residential properties (and any information relating to those properties) stored or maintained by a multiple listing service.

H.    "Member Board" means any state or local Board of Realtors® or Association of Realtors®, including any city, county, inter-county, or inter-state Board or Association, and any multiple listing service owned by, or affiliated with, any such Board of Realtors® or Association of Realtors®.

I.    "Modified VOW Policy" means the policy attached to this Final Judgment as Exhibit A.

J.    "NAR" means the National Association of Realtors®, its predecessors, successors, divisions, subsidiaries, affiliates, partnerships, and joint ventures and all directors, officers, employees, agents, and representatives of the foregoing. The terms "subsidiary," "affiliate," and "joint venture" refer to any Person in which there is or has been partial (twenty percent or more) or total ownership or control between NAR and any other Person.

K.    "Person" means any natural person, corporation, company, partnership, joint venture, firm, association, proprietorship, agency, board, authority, commission, office, or other business or legal entity, whether private or governmental.

L.    "Provide" means to deliver, display, disseminate, convey, or reproduce.

3

M.      "Rule" means any rule, model rule, ethical rule, bylaw, policy, standard, or guideline and any interpretation of any Rule issued or approved by NAR, whether or not the final implementation date of any such Rule has passed.

N.      "VOW" or "virtual office website" means a website, or feature of a website, operated by a Broker or for a Broker by another Person through which the Broker is capable of providing real estate brokerage services to consumers with whom the Broker has first established a Broker-consumer relationship (as defined by state law) where the consumer has the opportunity to search MLS data, subject to the Broker's oversight, supervision, and accountability.

O.      "VOW Policy" means the "Policy governing use of MLS data in connection with Internet brokerage services offered by MLS Participants ('Virtual Office Websites')," adopted by NAR on or about May 17, 2003, and any amendments thereto.

P.      The terms "and" and "or" have both conjunctive and disjunctive meanings.

### III. APPLICABILITY

This Final Judgment applies to NAR and all other Persons in active concert or participation with NAR who have received actual notice of this Final Judgment. A Member Board shall not be deemed to be in active concert with NAR solely as a consequence of the Member Board's receipt of actual notice of this Final Judgment and its affiliation with or membership in NAR and its involvement in regular activities associated with its affiliation with or membership in NAR (*e.g.*, coverage under a NAR insurance policy, attendance at NAR meetings or conventions, or review of Member Board policies by NAR).

4

## IV. PROHIBITED CONDUCT

Subject to the provisions of Sections V and VI of this Final Judgment, the Modified

VOW Policy (Exhibit A), and the definition of MLS Participant and accompanying Note

(Exhibit B), NAR shall not adopt, maintain, or enforce any Rule, or enter into or enforce any

agreement or practice, that directly or indirectly

A.    prohibits a Broker from using a VOW or prohibits, restricts, or impedes a Broker

who uses a VOW from providing to Customers on its VOW all of the Listing Information that a

Broker is permitted to Provide to Customers by hand, mail, facsimile, electronic mail, or any

other methods of delivery;

B.    unreasonably disadvantages or unreasonably discriminates against a Broker in the

use of a VOW to Provide to Customers all of the Listing Information that a Broker is permitted

to Provide to Customers by hand, mail, facsimile, electronic mail, or any other methods of

delivery;

C.    prohibits, restricts, or impedes the referral of Customers whose identities are

obtained from a VOW by a Broker who uses a VOW to any other Person, or establishes the price

of any such referral;

D.    imposes fees or costs upon any Broker who operates a VOW or upon any Person

who operates a VOW for any Broker that exceed the reasonably estimated actual costs incurred

by a Member Board in providing Listing Information to the Broker or Person operating the

VOW or in performing any other activities relating to the VOW, or discriminates in such VOW-

related fees or costs between those imposed upon a Broker who operates a VOW and those

imposed upon a Person who operates a VOW for a Broker, unless the MLS incurs greater costs

5

in providing a service to a Person who operates a VOW for a Broker than it incurs in providing the same service to the Broker; or

E.     is inconsistent with the Modified VOW Policy.

## V. REQUIRED CONDUCT

A.     Within five business days after entry of this Final Judgment, NAR shall repeal the ILD Policy and direct each Member Board that adopted Rules implementing the ILD Policy to repeal such Rules at the next meeting of the Member Board's decisionmaking body that occurs more than ten days after receipt of the directive, but no later than ninety days after entry of this Final Judgment.

B.     Within five business days after entry of this Final Judgment, NAR shall direct Member Boards that adopted Rules implementing the VOW Policy to repeal such Rules at the next meeting of the Member Board's decisionmaking body that occurs more than ten days after receipt of the directive, but no later than ninety days after entry of this Final Judgment.

C.     Within five business days after entry of this Final Judgment, NAR shall adopt the Modified VOW Policy.  NAR shall not change the Modified VOW Policy without either obtaining advance written approval by the United States Department of Justice, Antitrust Division ("DOJ") or an order of the Court pursuant to Section VIII of this Final Judgment authorizing the proposed modification.

D.     Within five business days after entry of this Final Judgment, NAR shall direct each Covered Entity to adopt the Modified VOW Policy within ninety days after entry of this Final Judgment, and to thereafter maintain, act consistently with, and enforce Rules implementing the Modified VOW Policy.  NAR shall simultaneously direct Covered Entities,

6

beginning upon receipt of the directive, not to adopt, maintain, or enforce any Rule or practice

that NAR would be prohibited from adopting, maintaining, or enforcing pursuant to Section IV

of this Final Judgment (including Rules or practices that unreasonably discriminate against

Brokers in their operation of VOWs).

      E.     If NAR determines that a Covered Entity has not timely adopted or maintained,

acted consistently with, or enforced Rules implementing the Modified VOW Policy, it shall,

within thirty days of such determination, direct in writing that the Covered Entity do so. NAR

shall deny coverage under any NAR insurance policy (or cause coverage to be denied) to any

Covered Entity for as long as that Covered Entity refuses to adopt, maintain, act consistently

with, and enforce rules implementing the Modified VOW Policy. NAR shall also notify the DOJ

of the identity of that Covered Entity and the Modified VOW Policy provisions it refused to

adopt, maintain, act consistently with, or enforce. For purposes of this provision, a failure of a

Covered Entity to adopt, maintain, act consistently with, or enforce Rules implementing the

Modified VOW Policy within ninety days of a written directive to that Covered Entity from

NAR shall constitute a refusal by the Covered Entity to do so.

      F.     If NAR determines that a Member Board has adopted, maintained, or enforced

any Rule or practice that NAR would be prohibited from adopting, maintaining, or enforcing

pursuant to Section IV of this Final Judgment (including Rules or practices that unreasonably

discriminate against Brokers in their operation of VOWs), it shall, within thirty days of such

determination, direct in writing that the Member Board rescind and cease to enforce that Rule or

practice. NAR shall deny coverage under any NAR insurance policy (or cause coverage to be

denied) to any Member Board for as long as that Member Board refuses to rescind and cease to

7

enforce that Rule or practice. NAR shall also notify the DOJ of the identity of that Member

Board and the Rule or practice it refused to rescind and cease to enforce. For purposes of this

provision, a Member Board's failure to rescind and cease to enforce the Rule or practice within

ninety days of a written directive from NAR shall constitute a refusal by the Member board to do

so.

G.      Within thirty days of entry of this Final Judgment, NAR shall designate an

Antitrust Compliance Officer with responsibility for educating Member Boards about the

antitrust laws and for achieving full compliance with this Final Judgment. The Antitrust

Compliance Officer shall be responsible for the following:

>   (1)     supervising NAR's review of Rules of NAR's Member Boards for
>           compliance with this Final Judgment and the Modified VOW Policy;
>
>   (2)     maintaining copies of any communications with any Person containing
>           allegations of any Member Board's (i) noncompliance with any provision
>           of the Modified VOW Policy or with this Final Judgment or (ii) failure to
>           enforce any Rules implementing the Modified VOW Policy;
>
>   (3)     reporting to the United States 180 days after entry of this Final Judgment
>           and again on the first anniversary of the entry of this Final Judgment, the
>           identity of each Covered Entity that has not adopted Rules implementing
>           the Modified VOW Policy;
>
>   (4)     ensuring that each of NAR's Member Boards that owns or operates a
>           multiple listing service are provided briefing materials, within ninety days
>           of the entry of this Final Judgment, on the meaning and requirements of
>           the Modified VOW Policy and this Final Judgment; and
>
>   (5)     holding an annual program for NAR Member Boards and their counsel
>           that includes a discussion of the antitrust laws (as applied to such Member
>           Boards) and this Final Judgment.

H.      NAR shall maintain and shall furnish to the DOJ on a quarterly basis (beginning

ninety days after entry of this Final Judgment) copies of any communications with any Person

8

containing allegations of any Member's Board's (1) noncompliance with any provision of the

Modified VOW Policy or with this Final Judgment or (2) failure to enforce any Rules

implementing the Modified VOW Policy.

      I.     Within five business days after entry of this Final Judgment, NAR shall provide,

in a prominent size and location on its website (www.realtor.org) a hyperlink to a webpage on

which NAR has published copies of

      (1)    this Final Judgment;

      (2)    a notification that Member Boards must repeal any Rules implementing the ILD and VOW Policies (in accordance with Sections V.A and V.B of this Final Judgment); and

      (3)    a copy of the Modified VOW Policy.

NAR shall also publish each of the three above items in the first issue of Realtor® Magazine

scheduled for publication after the date of entry of this Final Judgment.

## VI.  **PERMITTED CONDUCT**

      A.    Subject to Section IX of this Final Judgment, nothing in this Final Judgment shall

prohibit NAR from adopting and maintaining the definition of MLS Participant and the

accompanying Note, together attached as Exhibit B.  However, NAR shall direct each Member

Board not to suspend or expel any Broker from multiple listing service membership or

participation for reasons of the Broker's then-failure to qualify for membership or participation

under the definition of MLS Participant and the accompanying Note, together attached as Exhibit

B, until May 27, 2009.

      B.    Notwithstanding any of the above provisions, and subject to Section IX of this

Final Judgment, nothing in this Final Judgment shall prohibit NAR from adopting, maintaining,

or enforcing Rules that are generally applicable on their face and that do not, in their application, unreasonably restrict any method of delivery of Listing Information to Customers.

## VII. COMPLIANCE INSPECTION

A.    For the purposes of determining or securing compliance with this Final Judgment, or of determining whether this Final Judgment should be modified or vacated, and subject to any legally recognized privilege, from time to time authorized representatives of the DOJ, including consultants and other Persons retained by the United States, shall, upon written request of an authorized representative of the Assistant Attorney General in charge of the Antitrust Division, and on reasonable notice to NAR, be permitted:

(1)    access during NAR's office hours to inspect and copy, or at the option of the United States, to require NAR to provide hard copy or electronic copies of, all books, ledgers, accounts, records, data, and documents in the possession, custody, or control of NAR, relating to any matters contained in this Final Judgment; and

(2)    to interview, either informally or on the record, NAR's officers, employees, or agents, who may have their individual counsel and counsel for NAR present, regarding such matters. The interviews shall be subject to the reasonable convenience of the interviewee and without restraint or interference by NAR. NAR may, however, prevent the interviewee from divulging matters protected by the attorney-client privilege, work product doctrine, or other applicable privilege.

B.    Upon the written request of an authorized representative of the Assistant Attorney General in charge of the Antitrust Division, NAR shall submit written reports or response to written interrogatories, under oath if requested, relating to its compliance with any of the matters contained in this Final Judgment as may be requested.

C.    No information or documents obtained by the means provided in this section shall be divulged by the United States to any Person other than an authorized representative of the

executive branch of the United States, except in the course of legal proceedings to which the United States is a party (including grand jury proceedings), or for the purpose of securing compliance with this Final Judgment, or as otherwise required by law.

D.    If at the time information or documents are furnished by NAR to the United States, NAR marks as confidential any pertinent page of such material on the grounds that such page contains information as to which a claim of protection may be asserted under Rule 26(c)(1)(G) of the Federal Rules of Civil Procedure, then the United States shall give NAR ten calendar days notice prior to divulging such material in any legal proceeding (other than a grand jury proceeding).

## VIII.  RETENTION OF JURISDICTION

This Court retains jurisdiction to enable any party to this Final Judgment to apply to this Court at any time for further orders and directions as may be necessary or appropriate to carry out or construe this Final Judgment, to modify any of its provisions, to enforce compliance, and to punish violations of its provisions.

## IX.  NO LIMITATION ON GOVERNMENT RIGHTS

Nothing in this Final Judgment shall limit the right of the United States to investigate and bring actions to prevent or restrain violations of the antitrust laws concerning any Rule or practice adopted or enforced by NAR or any of its Member Boards.

## X.  EXPIRATION OF FINAL JUDGMENT

This Final Judgment shall expire ten years from the date of its entry.

11

## XI. PUBLIC INTEREST DETERMINATION

Entry of this Final Judgment is in the public interest. The parties have complied with the requirements of the Antitrust Procedures and Penalties Act, 15 U.S.C. § 16, including making copies available to the public of this Final Judgment, the Competitive Impact Statement, and any comments thereon and the United States's responses to comments. Based upon the record before the Court, which includes the Competitive Impact Statement and any comments and response to comments filed with the Court, entry of this Final Judgment is in the public interest.

Dated:  11-18-08

> Court approval subject to procedures
> of Antitrust Procedures and Penalties
> Act, 15 U.S.C. § 16
>
> _Matthew F. Kennelly_
> Matthew F. Kennelly
> United States District Judge

12

# EXHIBIT A

**Policy governing use of MLS data in connection with**
**Internet brokerage services offered by MLS Participants**
**("Virtual Office Websites")**

## I. Definitions and Scope of Policy.

1. For purposes of this Policy, the term Virtual Office Website ("VOW") refers to a Participant's Internet website, or a feature of a Participant's Internet website, through which the Participant is capable of providing real estate brokerage services to consumers with whom the Participant has first established a broker-consumer relationship (as defined by state law) where the consumer has the opportunity to search MLS data, subject to the Participant's oversight, supervision, and accountability.

a. A Participant may designate an Affiliated VOW Partner ("AVP") to operate a VOW on behalf of the Participant, subject to the Participant's supervision and accountability and the terms of this Policy.

b. A non-principal broker or sales licensee, affiliated with a Participant, may, with the Participant's consent, operate a VOW or have a VOW operated on its behalf by an AVP. Such a VOW is subject to the Participant's supervision and accountability and the terms of this Policy.

c. Each use of the term "Participant" in this Policy shall also include a Participant's non-principal brokers and sales licensees (with the exception of references in this section to the "Participant's consent" and the "Participant's supervision and accountability," and in section III.10.a, below, to the "Participant acknowledges"). Each reference to "VOW" or "VOWs" herein refers to all VOWs, whether operated by a Participant, by a non-principal broker or sales licensee, or by an AVP.

2. The right to display listings in response to consumer searches is limited to display of MLS data supplied by the MLS(s) in which the Participant has participatory rights. This does not preclude a firm with offices participating in different MLSs from operating a master website with links to such offices' VOWs.

3. Participants' Internet websites, including those operated for Participants by AVPs, may also provide other features, information, or services in addition to VOWs (including the Internet Data Exchange ("IDX") function).

4. The display of listing information on a VOW does not require separate permission from the Participant whose listings will be available on the VOW.

5. Except as permitted in Sections III and IV, MLSs may not adopt rules or regulations that conflict with this Policy or that otherwise restrict the operation of VOWs by Participants.

1

## II. Policies Applicable to Participants' VOWs.

1. A Participant may provide brokerage services via a VOW that include making MLS active listing data available, but only to consumers with whom the Participant has first established a lawful consumer-broker relationship, including completion of all actions required by state law in connection with providing real estate brokerage services to clients and customers (hereinafter "Registrants"). Such actions shall include, but are not limited to, satisfying all applicable agency, non-agency, and other disclosure obligations, and execution of any required agreement(s).

2. A Participant's VOW must obtain the identity of each Registrant and obtain each Registrant's agreement to Terms of Use of the VOW, as follows:

a. A Registrant must provide his or her name and a valid email address. The Participant must send an email to the address provided by the Registrant confirming that the Registrant has agreed to the Terms of Use (described in subsection c below). The Registrant may be permitted to access the VOW only after the Participant has verified that the email address provided is valid and that Registrant received the Terms of Use confirmation.

b. The Registrant must supply a user name and a password, the combination of which must be different from those of all other Registrants on the VOW, before being permitted to search and retrieve information from the MLS database via the VOW. The user name and password may be established by the Registrant or may be supplied by the Participant, at the option of the Participant. An email address may be associated with only one user name and password. The Registrant's password and access must expire on a date certain but may be renewed. The Participant must at all times maintain a record of the name and email address supplied by the Registrant, and the username and current password of each Registrant. Such records must be kept for not less than 180 days after the expiration of the validity of the Registrant's password. If the MLS has reason to believe that a Participant's VOW has caused or permitted a breach in the security of the data or a violation of MLS rules related to use by one or more Registrants, the Participant shall, upon request, provide to the MLS a copy of the record of the name, email address, user name, current password, and audit trail, if required, of any Registrant identified by the MLS to be suspected of involvement in the violation.

c. The Registrant must be required affirmatively to express agreement to a "Terms of Use" provision that requires the Registrant to open and review an agreement that provides at least the following:

    i.    That the Registrant acknowledges entering into a lawful consumer-broker relationship with the Participant;

    ii.    That all data obtained from the VOW is intended only for the Registrant's personal, non-commercial use;

iii.     That the Registrant has a bona fide interest in the purchase, sale, or lease of real estate of the type being offered through the VOW;

iv.     That the Registrant will not copy, redistribute, or retransmit any of the data or information provided, except in connection with the Registrant's consideration of the purchase or sale of an individual property;

v.      That the Registrant acknowledges the MLS's ownership of, and the validity of the MLS's copyright in, the MLS database.

After the Registrant has opened for viewing the Terms of Use agreement, a "mouse click" is sufficient to acknowledge agreement to those terms. The Terms of Use Agreement may not impose a financial obligation on the Registrant or create any representation agreement between the Registrant and the Participant.

The Terms of Use agreement shall also expressly authorize the MLS, and other MLS Participants or their duly authorized representatives, to access the VOW for the purposes of verifying compliance with MLS rules and monitoring display of Participants' listings by the VOW.

d.  An agreement entered into at any time between the Participant and Registrant imposing a financial obligation on the Registrant or creating representation of the Registrant by the Participant must be established separately from the Terms of Use, must be prominently labeled as such, and may not be accepted solely by mouse click.

3. A Participant's VOW must prominently display an e-mail address, telephone number, or specific identification of another mode of communication (e.g., live chat) by which a consumer can contact the Participant to ask questions, or get more information, about properties displayed on the VOW. The Participant, or a non-principal broker or sales licensee licensed with the Participant, must be willing and able to respond knowledgeably to inquiries from Registrants about properties within the market area served by that Participant and displayed on the VOW.

4. A Participant's VOW must protect the MLS data from misappropriation by employing reasonable efforts to monitor for and prevent "scraping" or other unauthorized accessing, reproduction, or use of the MLS database.

5. A Participant's VOW must comply with the following additional requirements:

a. No VOW shall display the listing or property address of any seller who has affirmatively directed its listing broker to withhold its listing or property address from display on the Internet. The listing broker or agent shall communicate to the MLS that a seller has elected not to permit display of the listing or property address on the Internet. Notwithstanding the foregoing, a Participant who operates a VOW may provide to consumers via other delivery

3

mechanisms, such as email, fax, or otherwise, the listing or property address of a seller who has determined not to have the listing or address for its property displayed on the Internet.

b. A Participant who lists a property for a seller who has elected not to have the property listing or the property address displayed on the Internet shall cause the seller to execute a document that conforms to the form attached to this Policy as Appendix A. The Participant shall retain such forms for at least one year from the date they are signed.

c. With respect to any VOW that

    (i) allows third-parties to write comments or reviews about particular listings or displays a hyperlink to such comments or reviews in immediate conjunction with particular listings, or
    (ii) displays an automated estimate of the market value of the listing (or hyperlink to such estimate) in immediate conjunction with the listing,

the VOW shall disable or discontinue either or both of those features as to the seller's listing at the request of the seller. The listing broker or agent shall communicate to the MLS that the seller has elected to have one or both of these features disabled or discontinued on all Participants' websites. Except for the foregoing and subject to subparagraph (d), a Participant's VOW may communicate the Participant's professional judgment concerning any listing. Nothing shall prevent a VOW from notifying its customers that a particular feature has been disabled "at the request of the seller."

d. A VOW shall maintain a means (e.g., e-mail address, telephone number) to receive comments about the accuracy of any data or information that is added by or on behalf of the VOW operator beyond that supplied by the MLS and that relates to a specific property displayed on the VOW. The VOW operator shall correct or remove any false data or information relating to a specific property upon receipt of a communication from the listing broker or listing agent for that property explaining why the data or information is false. However, the VOW operator shall not be obligated to remove or correct any data or information that simply reflects good faith opinion, advice, or professional judgment.

e. Each VOW shall refresh MLS data available on the VOW not less frequently than every 3 days.

f. Except as provided elsewhere in this Policy or in MLS rules and regulations, no portion of the MLS database may be distributed, provided, or made accessible to any person or entity.

g. Every VOW must display a privacy Policy that informs Registrants of the ways in which information obtained from them will be used.

4

h. A VOW may exclude listings from display based only on objective criteria, including, but not limited to, factors such as geography, list price, type of property, cooperative compensation offered by listing broker, or whether the listing broker is a Realtor®.

6. A Participant who intends to operate a VOW must notify the MLS of its intention to establish a VOW and must make the VOW readily accessible to the MLS and to all MLS Participants for purposes of verifying compliance with this Policy and any other applicable MLS rules or policies.

7. A Participant may operate more than one VOW itself or through an AVP. A Participant who operates a VOW itself shall not be precluded from also operating VOWs in conjunction with AVPs.

### III. Policies Applicable to Multiple Listing Services.

1. A Multiple Listing Service shall permit MLS Participants to operate VOWs, or to have VOWs operated for them by AVPs, subject to the requirements of state law and this Policy.

2. An MLS shall, if requested by a Participant, provide basic "downloading" of all MLS non-confidential listing data, including without limitation address fields, listings types, photographs, and links to virtual tours. Confidential data includes only that which Participants are prohibited from providing to customers orally and by all other delivery mechanisms. They include fields containing the information described in paragraph IV(1) of this Policy, provided that sold data (i.e., listing information relating to properties that have sold) shall be deemed confidential and withheld from a download only if the actual sales prices of completed transactions are not accessible from public records. For purposes of this Policy, "downloading" means electronic transmission of data from MLS servers to a Participant's or AVP's server on a persistent basis. An MLS may also offer a transient download. In such case, it shall also, if requested, provide a persistent download, provided that it may impose on users of such download the approximate additional costs incurred by it to do so.

3. This Policy does not require an MLS to establish publicly accessible sites displaying Participants' listings.

4. If an MLS provides a VOW-specific feed, that feed must include all of the non-confidential data included in the feed described in paragraph 2 above except for listings or property addresses of sellers who have elected not to have their listings or addresses displayed on the Internet.

5. An MLS may pass on to those Participants who will download listing information the reasonably estimated costs incurred by the MLS in adding or enhancing its "downloading" capacity to enable such Participants to operate VOWs.

6. An MLS may require that Participants (1) utilize appropriate security protection, such as firewalls, as long as such requirement does not impose security obligations greater than those

employed concurrently by the MLS, and/or (2) maintain an audit trail of Registrants' activity on the VOW and make that information available to the MLS if the MLS has reason to believe that any VOW has caused or permitted a breach in the security of the data or a violation of applicable MLS rules.

7. An MLS may not prohibit or regulate display of advertising or the identification of entities on VOWs ("branding" or "co-branding"), except to prohibit deceptive or misleading advertising or co-branding. For purposes of this provision, co-branding will be presumed not to be deceptive or misleading if the Participant's logo and contact information (or that of at least one Participant, in the case of a VOW established and operated by or for more than one Participant) is displayed in immediate conjunction with that of every other party, and the logo and contact information of all Participants displayed on the VOW is as large as the logo of the AVP and larger than that of any third party.

8. Except as provided in this Policy, an MLS may not prohibit Participants from enhancing their VOWs by providing information obtained from sources other than the MLS, additional technological services (such as mapping functionality), or information derived from non-confidential MLS data (such as an estimated monthly payment derived from the listed price), or regulate the use or display of such information or technological services on any VOW.

9. Except as provided in generally applicable rules or policies (such as the Realtor® Code of Ethics), an MLS may not restrict the format of data display on a VOW or regulate the appearance of VOWs.

10. Subject to the provisions below, an MLS shall make MLS listing data available to an AVP for the exclusive purpose of operating a VOW on behalf of a Participant. An MLS shall make MLS listing data available to an AVP under the same terms and conditions as those applicable to Participants. No AVP has independent participation rights in the MLS by virtue of its right to receive data on behalf of a Participant, or the right to use MLS data except in connection with operation of a VOW for a Participant. AVP access to MLS data is derivative of the rights of the Participant on whose behalf the AVP is downloading data.

    a. A Participant, non-principal broker or sales licensee, or AVP may establish the AVP's right to receive and use MLS data by providing to the MLS a writing in which the Participant acknowledges its or its non-principal broker's or sales licensee's selection of the AVP to operate a VOW on its behalf.

    b. An MLS may not charge an AVP, or a Participant on whose behalf an AVP operates a VOW, more than a Participant that chooses to operate a VOW itself (including any fees or costs associated with a license to receive MLS data, as described in (g), below), except to the extent that the MLS incurs greater costs in providing listing data to the AVP than the MLS incurs in providing listing data to a Participant.

6

c. An MLS may not place data security requirements or restrictions on use of MLS listing data by an AVP that are not also imposed on Participants.

d. An MLS must permit an AVP to download listing information in the same manner (e.g., via a RETS feed or via an FTP download), at the same times and with the same frequency that the MLS permits Participants to download listing information.

e. An MLS may not refuse to deal directly with an AVP in order to resolve technical problems with the data feed. However, the MLS may require that the Participant on whose behalf the AVP is operating the VOW participate in such communications if the MLS reasonably believes that the involvement of the Participant would be helpful in order to resolve the problem.

f. An MLS may not condition an AVP's access to a data feed on the financial terms on which the AVP provides the site for the Participant.

g. An MLS may require Participants and AVPs to execute license or similar agreements sufficient to ensure that Participants and AVPs understand and agree that data provided by the MLS may be used only to establish and operate a VOW on behalf of the Participant and not for any other purpose.

h. An MLS may not (i) prohibit an AVP from operating VOWs on behalf of more than one Participant, and several Participants may designate an AVP to operate a single VOW for them collectively, (ii) limit the number of entities that Participants may designate as AVPs for purposes of operating VOWs, or (iii) prohibit Participants from designating particular entities as AVPs except that, if an AVP's access has been suspended or terminated by an MLS, that MLS may prevent an entity from being designated an AVP by another Participant during the period of the AVP's suspension or termination.

i. Except as stated below, an MLS may not suspend or terminate an AVP's access to data (a) for reasons other than those that would allow an MLS to suspend or terminate a Participant's access to data, or (b) without giving the AVP and the associated Participant(s) prior notice and the process set forth in the applicable provisions of the MLS rules for suspension or termination of a Participant's access. Notwithstanding the foregoing, an MLS may immediately terminate an AVP's access to data (a) if the AVP is no longer designated to provide VOW services to any Participant, (b) if the Participant for whom the AVP operates a VOW ceases to maintain its status with the MLS, (c) if the AVP has downloaded data in a manner not authorized for Participants and that hinders the ability of Participants to download data, or (d) if the associated Participant or AVP has failed to make required payments to the MLS in accordance with the MLS's generally applicable payment policies and practices.

11. An MLS may not prohibit, restrict, or impede a Participant from referring Registrants to any person or from obtaining a fee for such referral.

7

## IV. Requirements That MLSs May Impose on the Operation of VOWs and Participants.

1. An MLS may impose any, all, or none of the following requirements on VOWs but may impose them only to the extent that equivalent requirements are imposed on Participants' use of MLS listing data in providing brokerage services via all other delivery mechanisms:

    a. A Participant's VOW may not make available for search by or display to Registrants the following data intended exclusively for other MLS Participants and their affiliated licensees:

        i. Expired, withdrawn, or pending listings.

        ii. Sold data unless the actual sales price of completed transactions is accessible from public records.

        iii. The compensation offered to other MLS Participants.

        iv. The type of listing agreement, i.e., exclusive right to sell or exclusive agency.

        v. The seller(s) and occupant(s) name(s), phone number(s) and email address(es), where available.

        vi. Instructions or remarks intended for cooperating brokers only, such as those regarding showing or security of the listed property.

    b. The content of MLS data that is displayed on a VOW may not be changed from the content as it is provided in the MLS. MLS data may be augmented with additional data or information not otherwise prohibited from display as long as the source of such other data or information is clearly identified. This requirement does not restrict the format of MLS data display on VOWs or display of fewer than all of the listings or fewer authorized data fields.

    c. There shall be a notice on all MLS data displayed indicating that the data is deemed reliable but is not guaranteed accurate by the MLS. A Participant's VOW may also include other appropriate disclaimers necessary to protect the Participant and/or the MLS from liability.

    d. Any listing displayed on a VOW shall identify the name of the listing firm in a readily visible color, and reasonably prominent location, and in typeface not smaller than the median typeface used in the display of listing data.

    e. The number of current or, if permitted, sold listings that Registrants may view, retrieve, or download on or from a VOW in response to an inquiry may be limited to a

reasonable number. Such number shall be determined by the MLS, but in no event may the limit be fewer than 100 listings or 5% of the listings in the MLS, whichever is less.

f. Any listing displayed on a VOW shall identify the name of the listing agent.

2. An MLS may also impose the following other requirements on the operation of VOWs:

a. Participants displaying other brokers' listings obtained from other sources, e.g., other MLSs, non-participating brokers, etc. shall display the source from which each such listing was obtained.

b. A maximum period, no shorter than 90 days and determined by the MLS, during which Registrants' passwords are valid, after which such passwords must be changed or reconfirmed.

3. An MLS may not prohibit Participants from downloading and displaying or framing listings obtained from other sources, e.g., other MLSs or from brokers not participating in that MLS, etc., but may require either that (i) such information be searched separately from listings obtained from other sources, including other MLSs, or (ii) if such other sources are searched in conjunction with searches of the listings available on the VOW, require that any display of listings from other sources identify such other source.

EFFECTIVE DATE:

MLSs have until not later than [90 DAYS AFTER ENTRY OF THE FINAL JUDGMENT] to adopt rules implementing the foregoing policies and to comply with the provisions of section III above, and (2) Participants shall have until not later than 180 days following adoption and implementation of rules by an MLS in which they participate to cause their VOW to comply with such rules.

See Appendix A for Seller Opt-Out Form

**Appendix A**
**Seller Opt-Out Form**

1.[Check one]

    a. [Check here]  I have advised my broker or sales agent that I do not want the listed property to be displayed on the Internet;  or

    b. [Check here]   I have advised my broker or sales agent that I do not want the address of the listed property to be displayed on the Internet.

2.  I understand and acknowledge that, if I have selected option a, consumers who conduct searches for listings on the Internet will not see information about the listed property in response to their search.

—————————
initials of seller

10

# EXHIBIT B

(Statement of MLS Policy)
**Statement 7.9 . . . Definition of MLS "Participant"**

The term "Participant" in a Board Multiple Listing Service is defined, as follows:

"Where the term REALTOR® is used in this explanation of policy in connection with the word 'Member' or the word 'Participant', it shall be construed to mean the REALTOR® principal or principals, of this or any other Board, or a firm comprised of REALTOR® principals participating in a Multiple Listing Service owned and operated by the Board. Participatory rights shall be held by an individual principal broker unless determined by the Board or MLS to be held by a firm. It shall not be construed to include individuals other than a principal or principals who are REALTOR® Members of this or any other Board, or who are legally entitled to participate without Board membership. However, under no circumstances is any individual or firm, regardless of membership status, entitled to MLS 'Membership' or 'Participation' unless they hold a current, valid real estate broker's license and ~~are capable of offering and accepting~~ offer or accept cooperation and compensation to and from other Participants or are licensed or certified by an appropriate state regulatory agency to engage in the appraisal of real property. Use of information developed by or published by a Board Multiple Listing Service is strictly limited to the activities authorized under a Participant's licensure(s) or certification and unauthorized uses are prohibited. Further, none of the foregoing is intended to convey 'Participation' or 'Membership' or any right of access to information developed by or published by a Board Multiple Listing Service where access to such information is prohibited by law. Additionally, the foregoing does not prohibit Board Multiple Listing Services, at their discretion, from categorizing non-principal brokers, sales licensees, licensed and certified appraisers and others affiliated with the MLS 'Members' or 'Participants' as 'users' or 'subscribers' and, holding such individuals personally subject to the rules and regulations and any other governing provisions of the MLS and to discipline for violations thereof. MLSs may, as a matter of local determination, limit participatory rights to individual principal brokers, or to their firms, and to licensed or certified appraisers, who maintain an office or Internet presence from which they are available to represent   real  estate  sellers, buyers, lessors or lessees or from which they provide appraisal services. (Amended 5/02)

Where the terms 'subscriber' or 'user' are used in connection with a Multiple Listing Service owned or operated by a Board of REALTORS®, they refer to non-principal brokers, sales licensees, and licensed and certified real estate appraisers affiliated with an MLS Participant and may, as a matter of local option, also include a Participant's affiliated unlicensed administrative and clerical staff, personal assistants, and individuals seeking licensure or certification as real estate appraisers provided that any such individual is under the direct supervision of an MLS Participant or the Participant's licensed designee. If such access is available to unlicensed or uncertified individuals, their access is subject to the rules and regulations, the payment of applicable fees and charges (if any), and the limitations and restrictions of state law. None of the foregoing shall diminish the Participant's ultimate responsibility for ensuring compliance with the rules and regulations of the MLS by all individuals affiliated with the Participant. (Adopted 4/92)

Under the 'Board of Choice' policy, MLS participatory rights shall be available to any REALTOR® (principal) or any firm comprised of REALTORS® (principals) irrespective of where they hold primary membership subject only to their agreement to abide by any MLS rules or regulations; agreement to arbitrate disputes with other Participants; and payment of any MLS dues, fees, and charges." Participatory rights granted under Board of Choice do not confer voting privileges or eligibility for office as an MLS committee member, officer, or director, except as granted at the discretion of the local Board and/or MLS. (Amended 5/97)

The universal access to services component of Board of Choice is to be interpreted as requiring that MLS Participatory rights be available to REALTOR® principals, or to firms comprised of REALTOR® principals, irrespective of where primary or secondary membership is held. This does not preclude an MLS from assessing REALTORS® not holding primary or secondary membership locally fees, dues, or charges that exceed those or, alternatively, that are less than those charged Participants holding such memberships locally or additional fees to offset actual expenses incurred in providing MLS services such as courier charges, long distance phone charges, etc., or for charging any Participant specific fees for optional additional services. (Amended 11/96)

None of the foregoing shall be construed as requiring a Board to grant MLS participatory rights, under Board of Choice, where such rights have been previously terminated by action of that Board's Board of Directors." (Adopted 11/95)

(Model MLS rules)
**Section 3—Participation:** Any REALTOR® of this or any other Board who is a principal, partner, corporate officer, or branch office manager acting on behalf of a principal, without further qualification, except as otherwise stipulated in these bylaws, shall be eligible to participate in Multiple Listing upon agreeing in writing to conform to the rules and regulations thereof and to pay the costs incidental thereto.* However, under no circumstances is any individual or firm, regardless of membership status, entitled to Multiple Listing Service "membership" or "participation" unless they hold a current, valid real estate broker's license and ~~are capable of offering and accepting~~ offer or accept compensation to and from other Participants or are licensed or certified by an appropriate state regulatory agency to engage in the appraisal of real property.** Use of information developed by or published by a Board Multiple Listing Service is strictly limited to the activities authorized under a Participant's licensure(s) or certification and unauthorized uses are prohibited. Further, none of the foregoing is intended to convey "participation" or "membership" or any right of access

to information developed by or published by a Board Multiple Listing Service where access to such information is prohibited by law. (Amended 11/96)

Note:  Mere possession of a broker's license is not sufficient to qualify for MLS participation. Rather, the requirement that an individual or firm 'offers or accepts cooperation and compensation' means that the Participant actively endeavors during the operation of its real estate business to list real property of the type listed on the MLS and/or to accept offers of cooperation and compensation made by listing brokers or agents in the MLS. "Actively" means on a continual and on-going basis during the operation of the Participant's real estate business. The "actively" requirement is not intended to preclude MLS participation by a Participant or potential Participant that operates a real estate business on a part time, seasonal, or similarly time-limited basis or that has its business interrupted by periods of relative inactivity occasioned by market conditions. Similarly, the requirement is not intended to deny MLS participation to a Participant or potential Participant who has not achieved a minimum number of transactions despite good faith efforts. Nor is it intended to permit an MLS to deny participation based on the level of service provided by the Participant or potential Participant as long as the level of service satisfies state law.

The key is that the Participant or potential Participant actively endeavors to make or accept offers of cooperation and compensation with respect to properties of the type that are listed on the MLS in which participation is sought. This requirement does not permit an MLS to deny participation to a Participant or potential Participant that operates a Virtual Office Website ("VOW") (including a VOW that the Participant uses to refer customers to other Participants) if the Participant or potential Participant actively endeavors to make or accept offers of cooperation and compensation.  An MLS may evaluate whether a Participant or potential Participant "actively endeavors during the operation of its real estate business" to "offer or accept cooperation and compensation" only if the MLS has a reasonable basis to believe that the Participant or potential Participant is in fact not doing so.

The membership requirement shall be applied on a nondiscriminatory manner to all Participants and potential Participants.