**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| CHRISTOPHER MOEHRL, et al., | ) | |
| on behalf of themselves and all others | ) | |
| similarly situated, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | No. 19-cv-01610 |
| v. | ) | |
| | ) | Judge Andrea R. Wood |
| THE NATIONAL ASSOCIATION OF | ) | |
| REALTORS, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiffs are seven individuals who sold their homes on a local database of properties for sale known as a Multiple Listing Service ("MLS"). As a condition of listing their home on an MLS, each Plaintiff had to include in their listing a single, set offer of compensation to any broker who found a buyer for their home. Plaintiffs then paid that offer amount in connection with the sale of their home. According to Plaintiffs, the requirement that a home seller make a set commission offer to the successful buyer-broker for their property to be listed on an MLS is anticompetitive and caused them to pay artificially inflated, supracompetitive commission rates. For that reason, they have brought the present antitrust action alleging that Defendant National Association of Realtors ("NAR"), along with Defendants Realogy Holdings Corp., HomeServices of America, Inc., HSF Affiliates, LLC, Long & Foster Companies, Inc., BHH Affiliates, LLC, RE/MAX LLC, and Keller Williams Realty, Inc. (collectively, "Corporate Defendants"), engaged in a conspiracy in restraint of trade in violation of § 1 of the Sherman Act, 15 U.S.C. § 1. Now, the NAR and the Corporate Defendants each bring motions to dismiss. (Dkt. Nos. 113, 115.) For the reasons that follow, the Court denies both motions.

# BACKGROUND

For the purposes of the motions to dismiss, the Court accepts all well-pleaded facts in the Consolidated Amended Class Action Complaint ("CAC") as true and views the facts in the light most favorable to Plaintiffs as the non-moving parties. *Killingsworth v. HSBC Bank Nev., N.A.*, 507 F.3d 614, 618 (7th Cir. 2007).

Defendant NAR is a 1.2 million member trade association that advocates for the interests of real estate brokers. (CAC ¶ 32, Dkt. No. 84.) In addition, NAR also oversees 54 state and territorial realtor associations and over 1,200 local realtor associations, each of which are NAR members. (*Id.* ¶¶ 32, 50.) Those local realtor associations own and operate in their markets a centralized database of properties listed for sale in the region known as an MLS. (*Id.* ¶¶ 2, 50, 98.) Listing a property for sale on an MLS is essential to market that property effectively to prospective buyers. (*Id.* ¶ 2.)

The NAR Board of Directors and the Multiple Listing Issues and Policies Committee (which reports to the NAR Board of Directors) issues the policies governing MLSs that are set forth annually in the Handbook on Multiple Listing Policies ("Handbook"). (*Id.* ¶ 57.) Those policies are then enforced by the local realtor associations that own the MLSs, which the NAR requires to agree to adhere to and enforce the Handbook as well as the NAR's Code of Ethics. (*Id.* ¶¶ 58–59, 94, 97.) And given the commercial necessity of having access to an MLS, real estate brokers and individual realtors[1] must comply with the Handbook's provisions and all other NAR rules. (*Id.* ¶¶ 95–98.)

---

[1] Under the state laws governing the real estate market, there are two types of licensees: the real estate broker (*i.e.*, the brokerage firm) and the individual real estate agent (also referred to as a realtor). (CAC ¶ 41.) Real estate brokers license individual realtors and are legally responsible for their activities. (*Id.*) Moreover, all brokerage contracts with sellers and buyers are with the real estate broker rather than the individual realtor and all payments to the realtor pass through the broker. (*Id.* ¶ 42.) Typically, both

As relevant here, Section 2-G-1 of the Handbook requires any broker listing a property for sale on an MLS to make a blanket unilateral offer of compensation to any broker who finds a buyer for the home. (*Id.* ¶¶ 3, 51, 60; *see also* The NAR's Br. in Supp. of Mot. to Dismiss the CAC at 6–7, Dkt. No. 114.)[2] That offer must be expressed either as a percentage of the gross selling price or as a definite dollar amount. (CAC ¶ 60.) Section 2-G-1 further prohibits "general invitations by listing brokers to other participants to discuss terms and conditions of possible cooperative relationships." (*Id.*) As a result of Section 2-G-1, a homebuyer does not have to pay any compensation to his broker. (*Id.* ¶ 47.) Indeed, the NAR's Code of Ethics permits and encourages buyer-brokers to tell clients that their services are free. (*Id.* ¶¶ 47, 79.) Buyer-brokers instead receive their commission out of the total commission paid by the seller. (*Id.*) Specifically, in the listing agreement, the seller will set the total commission to be paid to the seller-broker with the expectation that a portion of the commission will be paid to the buyer-broker. (*Id.* ¶ 48.)

Section 2-G-1 works as follows. When a property is listed on an MLS, the listing will contain a set offer of compensation that the buyer-broker will receive if a buyer represented by that broker purchases the home. (*Id.* ¶ 51.) For example, if a homeowner agrees to pay 6% in total commissions to the seller-broker, the seller-broker will then list the property on an MLS with a promise of a 3% commission to buyer-brokers. (*Id.* ¶ 52.) Then, if the property is sold for $500,000, the seller pays the seller-broker the 6% commission, or $30,000. (*Id.*) The seller-broker then pays 3% of the sale price, or $15,000, to the buyer-broker and retains the other $15,000 as their own commission. (*Id.*)

---

brokers and realtors "occupy dual roles" in that "they operate as seller-brokers for some home sales and buyer-brokers for other home sales." (CAC ¶ 45.)

[2] The CAC does not identify the challenged policy by its placement in the Handbook and only refers to it as the "Buyer-Broker Commission Rule." Rather, it was the NAR that first refers to the policy as Section 2-G-1 in its brief in support of the motion to dismiss. (The NAR's Br. in Supp. of Mot. to Dismiss the CAC at 1.) The Court will use Section 2-G-1 to refer to that specific Handbook provision.

Because Section 2-G-1 requires a blanket offer, home sellers must provide the listed offer of compensation without regard to the buyer-broker's experience or the value of services the buyer-broker provides to the buyer client. (*Id.* ¶ 63.) Consequently, there is substantial uniformity in the compensation paid to buyer-brokers. (*Id.*) Since Section 2-G-1 has been in effect, total commissions have remained stable at between 5.0% and 5.4% of the sale price, with between 2.5% and 3.0% of the sale price going to the buyer-brokers. (*Id.* ¶¶ 12, 65–66, 92, 125–26.) By contrast, in comparable international markets where buyer-brokers are paid directly by the home buyer, total commission rates are generally between 1% and 3% of the sale price, with buyer-brokers receiving less than half the commission rate received by buyer-brokers in the United States. (*Id.* ¶¶ 11, 125.)

According to Plaintiffs, Section 2-G-1 facilitates the stability of these allegedly supracompetitive commission rates by allowing buyer-brokers "to identify and compare the buyer-broker compensation offered by every seller in the MLS." (*Id.* ¶ 67.) In turn, that disincentivizes buyer-brokers from showing a home where the seller offers a buyer-broker commission substantially lower than the typical 2.5% to 3.0% rate. (*Id.* ¶ 68.) Similarly, Section 2-G-1 discourages sellers and seller-brokers from making buyer-broker commission offers significantly below the normal industry rate because doing so would significantly hinder their ability to sell the property. (*Id.* ¶¶ 65, 74.) Furthermore, some seller-brokers may face retaliation for attempting to offer discounted buyer-broker compensation. (*Id.* ¶ 68.)

In addition, Plaintiffs point to several other factors that work in conjunction with Section 2-G-1 to ensure the stability of commission rates. First, MLSs allow only brokers and realtors that subscribe to the MLS to see the buyer-broker commission offers. (*Id.* ¶ 75.) Thus, the actual sellers and buyers are unable to "view the universe of buyer-broker commission terms" or other

financial incentives offered to the buyer-broker. (*Id.* ¶¶ 75–76.) That impedes a buyer's ability to detect whether the buyer-broker is steering the buyer away from properties that offer insufficient buyer-broker commissions. (*Id.*) Moreover, at least some MLSs have software that allows buyer-brokers to filter listings based on the value of the offered buyer-broker commission and to send buyer clients electronic property listings that exclude properties where the offered commission falls below a certain rate. (*Id.* ¶¶ 70–71.)

Next, various NAR rules effectively limit both buyers' and sellers' abilities to negotiate lower commissions. As discussed above, the NAR's Code of Ethics contains a provision allowing buyer-brokers to inform their clients that their services are free. (*Id.* ¶¶ 79, 87.) At the same time, seller-brokers often inform sellers who seek to negotiate down the amount of buyer-broker commission offered on the MLS that reducing the commission could result in fewer potential buyers learning about or viewing the seller's property. (*Id.* ¶ 84.) And because the total commission is a term of the contract between the seller and seller-broker, the seller must pay the entire amount of commission set forth in that contract even if the buyer is able to negotiate down the buyer-broker commission. (*Id.* ¶ 86.) Put differently, any discount from the offered buyer-broker commission would not go back to the seller but would instead be retained by the seller-broker. (*Id.*)

Another NAR ethical rule forbids buyer-brokers from attempting to negotiate a buyer-broker commission offer through the submission of a purchase offer. (*Id.* ¶ 88.) Consequently, a buyer-broker violates the NAR's Code of Ethics where they present an offer to a seller that is contingent on the seller reducing the buyer-broker commission. (*Id.*) Moreover, the NAR has interpreted its ethical rules as requiring a buyer-broker that seeks to modify the offered buyer-broker commission to attempt to do so before the property is even shown to any potential buyers.

(*Id.* ¶ 89.) That requirement means that a buyer-broker must "unilaterally contact a selling-broker to request a reduction to the buyer-broker commission before a potential buyer has even seen, let alone expressed an interest in purchasing, the property." (*Id.*) At the same time, the NAR's Code of Ethics also prevents the seller-broker from attempting to modify the buyer-broker's compensation unilaterally after there has been an offer to purchase the property. (*Id.* ¶ 90.) Finally, the NAR has deemed it unethical for a buyer-broker to urge the buyer to negotiate directly with the seller to reduce commissions. (*Id.* ¶ 91.)

Plaintiffs have brought the present action on behalf of themselves and a class of similarly-situated individuals. They allege that, by adopting and enforcing Section 2-G-1 and other rules restraining the negotiation of buyer-broker commissions (collectively, "Buyer-Broker Commission Rules"), the NAR and the Corporate Defendants have engaged in a continuing contract, combination, or conspiracy to unreasonably restrain price competition among real estate brokers in violation of § 1 of the Sherman Act, 15 U.S.C. § 1. Each Plaintiff sold a home that was listed on an MLS and paid allegedly inflated commissions in connection with the sale of their home as a result of Defendants' allegedly anticompetitive restraints. (*Id.* ¶¶ 1, 156.) The proposed class would cover any home seller that paid a buyer-broker commission during the four-year period prior to the initiation of this action in connection with the sale of a residence listed on one of twenty MLSs covering various regions across the United States. (*Id.* ¶¶ 18, 142–43.)

## DISCUSSION

To survive a motion under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This pleading standard does not necessarily require a complaint to contain

detailed factual allegations. *Twombly*, 550 U.S. at 555. Rather, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Adams v. City of Indianapolis*, 742 F.3d 720, 728 (7th Cir. 2014) (quoting *Iqbal*, 556 U.S. at 678).

Section 1 of the Sherman Act makes illegal "[e]very contract, combination . . . or conspiracy, in restraint of trade or commerce." 15 U.S.C. § 1. Because "restraint is the very essence of every contract[,] read literally, § 1 would outlaw the entire body of private contract law." *Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 687–88 (1978). That, of course, "is not what the statute means." *Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 189 (2010). Rather, "in view of the common law and the law in this country when the Sherman Act was passed, the phrase 'restraint of trade' is best read to mean undue restraint." *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2283 (2018) (internal quotation marks and alteration omitted). Thus, the Supreme Court has "understood § 1 to outlaw only ***unreasonable*** restraints." *Id.* (internal quotation marks omitted). Accordingly, to state a claim under § 1 of the Sherman Act, a plaintiff must allege: "(1) a contract, combination, or conspiracy; (2) a resultant unreasonable restraint of trade in a relevant market; and (3) an accompanying injury." *Agnew v. Nat'l Collegiate Athletic Ass'n*, 683 F.3d 328, 335 (7th Cir. 2012) (internal quotation marks omitted).

The NAR and the Corporate Defendants have filed separate motions to dismiss, although the Corporate Defendants have joined the NAR's motion to dismiss. In its motion to dismiss, the NAR argues that Plaintiffs fail to plead sufficient facts with respect to the latter two elements of a § 1 claim. Specifically, the NAR contends that Plaintiffs fail to allege sufficiently that the Buyer-Broker Commission Rules constitute an unreasonable restraint of trade. And even if Plaintiffs could plead an unreasonable restraint of trade, the NAR contends that the CAC should still be

dismissed because Plaintiffs fail to plead facts showing that the NAR's rules caused their claimed injury. While the NAR does not challenge Plaintiffs' allegations with respect to the existence of a contract, combination, or conspiracy, the Corporate Defendants argue in their motion to dismiss that they should be dismissed as defendant because Plaintiffs fail to plead sufficient facts regarding their involvement in the purported conspiracy.[3]

## I. Conspiracy

The CAC alleges that the NAR conspired with the Corporate Defendants, the twenty MLSs at issue in this lawsuit, each of the local realtor associations that own and operate those MLSs, and multiple franchisees and brokers of the Corporate Defendants[4] to agree to, comply with, and implement the anticompetitive Buyer-Broker Commission Rules. (CAC ¶¶ 37–40, 153.) As discussed above, the NAR does not contest that Plaintiffs have sufficiently pleaded the conspiracy element with respect to it. Thus, for present purposes, the Court accepts the existence of a conspiracy—at least among the NAR and the non-Defendant coconspirators. However, the Corporate Defendants contend that they must be dismissed from the action because Plaintiffs fail to allege sufficiently facts showing that they joined in the alleged conspiracy.

To plead the existence of an antitrust conspiracy, a plaintiff must allege facts showing that "the alleged conspirators 'had a conscious commitment to a common scheme designed to achieve an unlawful objective.'" *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 706 (7th Cir. 2011) (quoting *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984)). Put differently, "the circumstances of the case must reveal 'a unity of purpose or a common design

---

[3] For simplicity, the Court will use "conspiracy" to refer to the "contract, combination, or conspiracy" element.

[4] While the MLSs, local realtor associations, and the Corporate Defendants' franchisees and brokers are alleged coconspirators, they are not named as Defendants in this action.

and understanding, or a meeting of minds in an unlawful arrangement.'" *Id.* (quoting *Am. Tobacco Co. v. United States*, 328 U.S. 781, 810 (1946)). "While the complaint need not contain detailed 'defendant by defendant' allegations, it must allege that each individual defendant joined the conspiracy and played some role in it because, at the heart of an antitrust conspiracy is an agreement and a conscious decision to join it." *Standard Iron Works v. ArcelorMittal*, 639 F. Supp. 2d 877, 900 (N.D. Ill. 2009) (internal quotation marks omitted). However, § 1 does not reach independent action that happens to have an anticompetitive effect. *Twombly*, 550 U.S. at 553–54; *In re Plasma-Derivative Protein Therapies Antitrust Litig.*, 764 F. Supp. 2d 991, 997 (N.D. Ill. 2011). Factual allegations that are equally as consistent with a wide range of lawful, independent business conduct as they are with an anticompetitive agreement are insufficient. *See Twombly*, 550 U.S. at 553–57. An antitrust conspiracy may be pleaded with either direct evidence of an anticompetitive agreement or circumstantial evidence "from which the existence of such an agreement can be inferred." *In re Dealer Mgmt. Sys. Antitrust Litig. ("Dealer Mgmt. Sys. I")*, 313 F. Supp. 3d 931, 949 (N.D. Ill. 2018).

Here, Plaintiffs claim that the Corporate Defendants participated in the NAR's conspiracy by participating in, facilitating, and implementing the Buyer-Broker Commission Rules. Perhaps most importantly, Plaintiffs point to the allegation that each of the Corporate Defendants requires its franchisees, affiliates, and realtors to comply with the NAR's allegedly anticompetitive restraints to secure the benefits of their brands, infrastructure and resources. (*See* CAC ¶ 116.) They do this by requiring their franchisees and realtors to join the NAR and follow the NAR's Handbook and Code of Ethics, including the Buyer-Broker Commission Rules. (*Id.*) In addition, Plaintiffs allege that the Corporate Defendants require their franchisees and realtors join a local

realtor association and MLS, which themselves require compliance with the NAR's rules. (*Id.* ¶¶ 94, 99, 101, 116.)

Plaintiffs also highlight the Corporate Defendants' involvement in the governance of the NAR and the promulgation and enforcement of the Handbook and Code of Ethics. Specifically, representatives from each Corporate Defendant and its franchisees regularly attend the NAR's biannual meetings. (*Id.* ¶ 104.) Representatives from the Corporate Defendants or their franchisees have also served in leadership roles with the NAR. (*Id.*) Several have served on the NAR's Multiple Listing Issues and Policies Committee, which is responsible for reviewing and reissuing the Handbook. (*Id.* ¶ 106.) And multiple senior executives from the Corporate Defendants or their franchisees have served on the NAR's governing Board of Directors. (*Id.*) By serving on the Board of Directors, those representatives of the Corporate Defendants not only participate in granting final approval to the Handbook but also had ultimate authority in enforcing it. (*Id.* ¶¶ 107–08.) Moreover, representatives from the Corporate Defendants or their franchisees implement and enforce the NAR's rules through their involvement with the local realtor associations that own and operate the MLSs. (*Id.* ¶¶ 108–09.)

Viewing all of the above factual allegations together, the Court concludes that Plaintiffs have sufficiently pleaded the Corporate Defendants' participation in the conspiracy. Plaintiffs do not merely allege parallel conduct. Unlike in *Twombly*, where the plaintiffs only set forth parallel business conduct bound together by a conclusory allegation of a secret agreement, *Twombly*, 550 U.S. at 557, the purported anticompetitive restraints here are a product of written rules issued by the NAR that each Corporate Defendant expressly imposes upon their franchisees and realtors. That suggests that each Corporate Defendant has reviewed, understood, and ultimately agreed to the NAR's rules, including the Buyer-Broker Commission Rules. *Cf. Robertson v. Sea Pines Real*

*Estate Cos.*, 679 F.3d 278, 289–90 (4th Cir. 2012) (explaining that MLS by-laws provide direct evidence of an anticompetitive agreement such that "the concerted conduct is both plainly documented and readily available so the plaintiffs can describe the factual content of the agreement without the benefit of extended discovery"). Thus, Plaintiffs' allegations provide the "setting suggesting the agreement necessary to make out a § 1 claim." *Twombly*, 550 U.S. at 557.

Moreover, Plaintiffs plead facts about the structure of the residential real estate industry and industry practices that bolster an inference of the Corporate Defendants' involvement in the alleged conspiracy. *See In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 627–28 (7th Cir. 2010) ("[A]n industry structure that facilitates collusion constitutes supporting evidence of collusion."). Here, the Corporate Defendants constitute the four largest real estate brokers in the United States. (CAC ¶ 1.) It is reasonable to infer from the fact that each Corporate Defendant requires its franchisees and realtors to join the NAR and local realtor associations that the Corporate Defendants supply those organizations the membership base that gives them the power to impose the NAR's rules upon the entire industry. *See Vogel v. Am. Soc'y of Appraisers*, 744 F.2d 598, 604 (7th Cir. 1984) (stating that a plaintiff could prove a trade association's market power by showing that the association's "members as a group have a substantial share of the market"); *United States v. Realty Multi-List, Inc.*, 629 F.2d 1351, 1374 (5th Cir. 1980) (finding an association to have market power where its members constituted a majority of active residential real estate brokers in the relevant area). In short, Plaintiffs' allegations plausibly demonstrate that each Corporate Defendant has participated in an agreement that centralizes control over how real estate brokers are compensated with the NAR. Thus, as pleaded, the Corporate Defendants' actions satisfy the conspiracy element because their actions "deprive[d] the marketplace of

independent centers of decisionmaking," at least with respect to buyer-broker commissions. *Am. Needle*, 560 U.S. at 195 (internal quotation marks and citation omitted).

The Corporate Defendants argue that Plaintiffs' allegations do nothing more than show that each Corporate Defendant was acting in its own rational business interest by requiring its franchisees and realtors to join the NAR, local realtor associations, and MLSs, and comply with those entities' rules. Given the commercial necessity of having access to the MLSs, the Corporate Defendants claim it is wholly rational and in each Corporate Defendant's individual interest to encourage its franchisees to take the necessary steps to access the MLSs. However, at the motion to dismiss stage it is not necessary for Plaintiffs' allegations to "exclude the possibility of independent conduct." *In re Dealer Mgmt. Sys. Antitrust Litig. ("Dealer Mgmt. Sys. II")*, 360 F. Supp. 3d 788, 797 (N.D. Ill. 2019) (internal quotation marks omitted). Rather, Plaintiffs need only to "allege a conspiracy which is plausible in light of competing explanations." *Plasma-Derivative*, 764 F. Supp. 2d at 1002.

All parties agree that access to an MLS is a commercial necessity for brokers and realtors. Of course, while an MLS "may create significant competitive advantages both for its members and for the general public, there exists the potential for significant competitive harms when the group, having assumed significant power in the market, also assumes the power to exclude other competitors from access to its pooled resources." *Realty Multi-List, Inc.*, 629 F.2d at 1370. As discussed above, Plaintiffs' allegations, show an interlinked market in which the NAR and local realtor associations' market power to run and regulate MLSs is dependent on the Corporate Defendants' support. Thus, the Corporate Defendants' conduct has empowered the MLSs such that access to MLSs is commercially necessary for real estate brokers. Without the Corporate Defendants' conscious assent to the system, MLSs would be unlikely to have the power to

exclude brokerages and realtors that did not abide by the NAR's Buyer-Broker Commission Rules.

Next, the Corporate Defendants contend that Plaintiffs fail to allege that any Corporate Defendant participated in the initial issuance of Section 2-G-1 in 1996. And the Corporate Defendants further reject as implausible any assertion that they joined the conspiracy at some later point by virtue of the fact that Section 2-G-1 has been retained in each annual reissue of the Handbook. However, it is unnecessary for Plaintiffs to prove "[p]articipation by each conspirator in every detail in the execution of the conspiracy . . . to establish liability, for each conspirator may be performing different tasks to bring about the desired result." *Beltz v. Travel Serv., Inc. v. Int'l Air Transp. Ass'n*, 620 F.2d 1360, 1367 (9th Cir. 1980). Furthermore, "acquiescence in an illegal scheme is as much a violation of the Sherman Act as the creation and promotion of one." *United States v. Paramount Pictures*, 334 U.S. 131, 161 (1948); *see also MCM Partners, Inc. v. Andrews-Bartlett & Assocs., Inc.*, 62 F.3d 967, 975 (7th Cir. 1995) ("So long as defendants knew that they were acquiescing in conduct that was in all likelihood unlawful, we have no difficulty concluding that they thereby joined a combination or conspiracy for which they can be held accountable under section 1."). Thus, the Court finds it is unnecessary for Plaintiffs to plead the Corporate Defendants' involvement in the initial issuance of Section 2-G-1. Instead, it is sufficient that Plaintiffs have shown that the Corporate Defendants played a role in the conspiracy by requiring their franchisees and realtors to join the NAR and abide by its rules.

Yet the Corporate Defendants contend that it is implausible that they consciously committed to the NAR's scheme by passively standing by as the NAR annually reissued the Handbook for over twenty years without eliminating or modifying Section 2-G-1. The Court disagrees. Rather, Plaintiffs' allegations show that the Corporate Defendants and their

representatives were actively involved in the issuance and enforcement of the Handbook and the Code of Ethics. In response, the Corporate Defendants argue that many of the representatives identified in the CAC as leaders in the NAR or local realtor associations were associated with their franchisees. Thus, the Corporate Defendant franchisor cannot be held accountable for the acts of its franchisees, which are legally distinct entities. However, this does not necessarily insulate the Corporate Defendants from liability, as "courts have recognized antitrust vicarious liability claims between franchisors and franchisees under a theory of actual agency" as well as apparent agency. *Hyland v. Homeservices of Am., Inc.*, No. 3:05-cv-612-R, 2007 WL 1959158, at *8 (W.D. Ky. June 28, 2007); *see also Am. Soc'y of Mech. Eng'rs*, 456 U.S. 556, 570 (1982) ("We hold that the apparent authority theory is consistent with the congressional intent to encourage competition."). In the franchisor-franchisee context, "a franchisor can be held vicariously liable for the torts or other wrongdoing of a franchisee when the franchisor controls or has the right to control the specific policy or practice resulting in harm to the plaintiff." *Bartolotta v. Dunkin' Brands Grp., Inc.*, No. 16 CV 4137, 2016 WL 7104290, at *2 (N.D. Ill. Dec. 6, 2016). Here, Plaintiffs have sufficiently alleged that the Corporate Defendants have control over their franchisees and realtors insofar as the Corporate Defendants require them to join the NAR and local realtor associations, the entities responsible for implementing and enforcing the alleged anticompetitive restraints here. At this stage, Plaintiffs have pleaded a plausible corporate policy to survive dismissal.[5] *See In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772, 804 (N.D.

---

[5] At times, Plaintiffs' allegations group together Defendant HomeServices of America, Inc. with its subsidiaries Defendants BHH Affiliates, LLC, HSF Affiliates, LLC, and the Long & Foster Companies, Inc., and refer to them collectively as HomeServices. According to the Corporate Defendants, all four companies must be dismissed because Plaintiffs fail to make specific allegations as to each company's involvement in the alleged conspiracy. At this stage, however, the Court concludes that Plaintiffs have sufficiently pleaded that each entity has participated in the conspiracy by requiring its franchisees and realtors to comply with the NAR's rules. Further, the CAC contains specific allegations that

Ill. 2017) ("If private plaintiffs, who do not have access to inside information, are to pursue violations of the law, the pleading standard must take into account the fact that a complaint will ordinarily be limited to allegations pieced together from publicly available information.").

Moreover, the fact that, since its adoption in 1996, Section 2-G-1 has appeared in successive reissues of the Handbook without modification does not preclude the reasonable inference that the Corporate Defendants consciously committed to the NAR's pricing system. Regardless of whether the Corporate Defendants were in on the scheme when Section 2-G-1 was first included in the Handbook or joined it at a later time, it is implausible that the Corporate Defendants would be passive as to the issue of buyer-broker commissions. "Price is the central nervous system of the economy," *Nat'l Soc'y of Prof'l Eng'rs*, 435 U.S. at 692, and commissions are the primary way that brokers are compensated. Thus, it is entirely reasonable to infer that the Corporate Defendants are involved in the maintenance of the existing pricing system. That inference is bolstered by allegations in the CAC that the CEO of Corporate Defendant Keller Williams Realty, Inc. informed attendees at an industry event with its competitors that offering a lower buyer-broker commission rate than the industry average amounted to "giving away money" and that "limited service, discount broker, market share in the United States is at an all-time low." (CAC ¶ 66, 69.) Thus, the operation of the Buyer-Broker Commission Rule was clearly a topic of considerable interest at least to that Corporate Defendant and was an issue discussed among competitors.

In sum, Plaintiffs adequately allege that the Corporate Defendants' conduct deprived the real estate market of independent centers of decisionmaking by effectively concentrating power in the hands of the NAR to set the rules for buyer-broker commissions. Moreover, the Corporate

---

representatives from each company were involved in leadership roles with the NAR or local realtor associations. (CAC ¶¶ 104–05, 106, 108, 110, 113.)

Defendants played a key role in maintaining that system by requiring its franchisees and realtors to join the NAR and local realtor associations and abide by their rules. And representatives from the Corporate Defendants implemented and enforced those rules through their leadership roles with the NAR and local realtor associations Together, these allegations are sufficient to plead the Corporate Defendants' participation in an antitrust conspiracy.

## II. Unreasonable Restraint of Trade

To determine whether a restraint of trade is unreasonable, courts use one of three methods of analysis: *per se*, quick look, and the Rule of Reason. *Agnew*, 683 F.3d at 335. All three methods "are meant to answer the same question: 'whether or not the challenged restraint enhances competition.'" *Id.* (quoting *Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 780 (1999)). Plaintiffs assert in the CAC that the Defendants' conspiracy is a *per se* violation of § 1 (CAC ¶ 157)—that its nature and necessary effect is "so plainly anticompetitive that no elaborate study of the industry is needed to establish [its] illegality." *Nat'l Socy' of Prof'l Eng'rs*, 435 U.S. at 692. Nonetheless, in their motion to dismiss, Plaintiffs contend that the Court need not decide whether the *per se* rule applies at this stage. Instead, they employ the Rule of Reason analysis in arguing against dismissal.

Under the Rule of Reason analysis, a "plaintiff carries the burden of showing that an agreement or contract has an anticompetitive effect on a given market within a given geographic area." *Agnew*, 683 F.3d at 335. The first step in the analysis is for the plaintiff to show that the defendants have market power in the relevant geographic market. *Agnew*, 683 F.3d at 335; *Slep-Tone Entm't Corp. v. Kalamata, Inc.*, 75 F. Supp. 3d 898, 907 (N.D. Ill. 2014). Here, Plaintiffs allege that the relevant geographic market is "the bundle of services provided to homebuyers and sellers by residential real estate brokers with MLS access" in the areas served by the twenty MLSs

at issue in this action. (CAC ¶¶ 133–34.) Defendants do not have a genuine dispute[6] with respect to Plaintiffs' definition of the relevant market. Nor do Defendants deny that they have market power—"that is, the ability to raise prices significantly without going out of business." *Agnew*, 683 F.3d at 335. Indeed, the Seventh Circuit and several other courts have recognized that MLSs have market power. *Reifert v. S. Cent. Wis. MLS Corp.*, 450 F.3d 312, 317 (7th Cir. 2006); *see also Realcomp II, LLC v. FTC*, 635 F.3d 815, 829 (6th Cir. 2011) (finding that substantial evidence supported Administrative Law Judge's finding that MLS possessed substantial market power); *Realty Multi-List*, 629 F.2d at 1374.

Nonetheless, Defendants contend that Plaintiffs fail to allege facts showing that the NAR's Buyer-Broker Commission Rules had an anticompetitive effect within the market. In undertaking this analysis, this Court focuses solely on whether Plaintiffs have met their burden of pleading anticompetitive effects. *See Havoco of Am., Ltd. v. Shell Oil Co.*, 626 F.2d 549, 556 (7th Cir. 1980). But to the extent Defendants contend that the Buyer-Broker Commission Rules have a procompetitive effect on balance, the Court will not consider such arguments at this stage.[7] *E.g.*,

---

[6] In their motion to dismiss, the Corporate Defendants make a brief, conclusory contention that Plaintiffs failed to define adequately a legally cognizable relevant market. Yet they do not elaborate on why Plaintiffs' definition of the relevant market is incorrect. Instead, they pivot to argue that Plaintiffs fail to allege a competitive harm to the market. That argument will be addressed below. But because the Corporate Defendants failed to develop adequately their objection to the definition of the relevant market, that argument is waived. *See United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir. 1991) ("We repeatedly have made clear that perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority are waived . . . ."). In any case, the Court finds no issue with Plaintiffs' definition of the market and other courts have approved similar definitions. *See Sitzer v. Nat'l Ass'n of Realtors*, 420 F. Supp. 3d 903, 914 (W.D. Mo. 2019); *United States v. Nat'l Ass'n of Realtors*, No.05 C 5140, 2006 WL 3434263, at *12 (N.D. Ill. Nov. 27, 2006).

[7] For this reason, the Court rejects the Corporate Defendants' argument in their motion to dismiss that Plaintiffs fail to allege anticompetitive effects in the relevant market. That argument is based on the Corporate Defendants' contention that Plaintiffs' allegations ignore the corresponding benefits to both home sellers and home buyers. For now, it is sufficient that Plaintiffs have pleaded that buyers are injured by the limitation of their ability to compete for the purchase of a home by negotiating a lower amount of the buyer-broker commission to be paid by the seller. (CAC ¶ 122.)

*Dealer Mgmt. Sys. II*, 360 F. Supp. 3d at 803 ("[W]hether challenged conduct has a procompetitive effect on balance so as to survive scrutiny under a rule-of-reason analysis presents a factual issue that cannot be resolved at this stage of the case.").

According to Plaintiffs, the Buyer-Broker Commission Rules cause an anticompetitive effect in the form of artificially inflated buyer-broker commissions. Specifically, they allege that while the Buyer-Broker Commission Rules have been in effect, total commissions for United States residential real estate sales have held steady between 5.0 and 5.4 percent with 2.5 to 3.0 commissions going to buyer-brokers. Those rates are sufficiently higher than in comparable international markets. In response, Defendants argue that Plaintiffs fail to plead sufficiently an anticompetitive effect by comparing the United States commission rates with international commission rates because Plaintiffs plead no facts regarding the real estate markets in the comparator countries. But Defendants demand more facts than necessary at this time, as the adequacy of the comparison is a fact-intensive issue not appropriate for resolution at this stage. *Cf. LaBella Winnetka, Inc. v. Village of Winnetka*, 628 F.3d 937, 942 (7th Cir. 2010) ("Whether a comparator is similarly situated is usually a question for the fact-finder.") At this stage, the comparison is sufficient to raise a reasonable inference that the Buyer-Broker Commission Rules have resulted in supracompetitive commission rates in the United States real estate market.

Further demonstrating the anticompetitive effect of the Buyer-Broker Commission Rules is the stability of commission rates over the years. Indeed, between 2000 and 2017, total commission rates remained in the 5.0 to 5.4 percent range. (CAC ¶¶ 12, 126.) That is so even as housing prices increased during that time (outpacing the rate of inflation), meaning that actual dollar commissions on home sales rose during that period. (*Id.* ¶¶ 13, 127.) Such "[u]nusual and sustained pricing stability is not expected in a competitive market." *In re Dairy Farmers of Am.,*

*Inc. Cheese Antitrust Litig.*, MDL No. 2031, 2013 WL 212908, at *5 (N.D. Ill. Jan. 18, 2013).

And, as at least some Defendants have explicitly recognized, brokers who try to gain business by

offering discounted commissions have become almost "irrelevant." (CAC ¶ 69.)

Yet Defendants claim that Plaintiffs fail to allege facts showing how the Buyer-Broker

Commission Rules cause inflated commission rates. As an initial matter, Defendants err by

addressing each rule separately. The Supreme Court has made clear that the "character and effect

of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only

by looking at it as a whole." *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699

(1962). Thus, while each NAR rule at issue here might survive antitrust scrutiny by itself, the

conspiracy can only be properly be understood by considering how Buyer-Broker Commission

Rules work together.

When viewing the Buyer-Broker Commission Rules as a whole, it is easy to understand

how they could plausibly result in inflated commission rates. First, under Section 2-G-1, the

seller-broker must list the property with a blanket offer of some compensation to the buyer-

broker. That requirement, by itself, raises antitrust concerns given that the offer is the same

regardless of the buyer-broker's experience or the value of services provided by the buyer-broker.

*See Arizona v. Maricopa Cty. Med. Soc'y*, 457 U.S. 332, 348 (1982) (finding, under the *per se*

analysis, that a price restraint violates the Sherman Act where it "tends to provide the same

economic rewards to all practitioners regardless of their skill, their experience, their training, or

their willingness to employ innovative and difficult procedures in individual cases"). Indeed,

Plaintiffs point to the fact that many prospective homebuyers use online websites like Zillow to

find homes. (*See* CAC ¶ 50.) But Zillow and other third-party websites' main source for listings is

the MLSs, and in exchange for the right to display the MLSs' listings, the websites have agreed

not to compete with the MLSs by becoming licensed brokerages or offering compensation or cooperation. (*Id.* ¶¶ 50, 139.) Consequently, prospective homebuyers who locate a prospective home online must still retain a buyer-broker. (*Id.* ¶ 14.) And if the homebuyer chooses to buy a home they found by themselves online, the buyer-broker is entitled to the same blanket buyer-broker commission offer as a buyer-broker who worked directly with the prospective homebuyer to initially locate the home. (*Id.*)[8]

Defendants contend that Section 2-G-1 requires a seller only to make some offer of compensation but does not compel a seller to offer a particular amount. Rather, the seller could offer as little as a penny. Of course, a buyer-broker can view every offer of compensation in the MLS and some MLSs allow the buyer-broker to filter listings based on the value of the buyer-broker commission offer. Common sense suggests that a buyer-broker is highly unlikely to show their client a home when the seller is offering a penny in commission. Nor would a prospective homebuyer necessarily be able to detect that their broker is screening out homes offering insufficient commissions because only brokers and realtors that subscribe to the MLS can view buyer-broker commission offers. That also means a home seller is unable to view the universe of buyer-broker commission offers before agreeing to a commission rate in the listing agreement, thereby putting the seller-broker in a substantial position of influence with respect to that decision.[9] Such an arrangement could restrain trade because it "substantially deprives the

---

[8] Defendants contend that these allegations fatally undermine Plaintiffs' claim that Section 2-G-1 enables buyer-brokers to steer homebuyers to listings based on commission levels. That is not so. Just because the risk of steering may be low for homebuyers who locate their home through an online website does not mean the risk is not present for those homebuyers who locate a home the traditional way—by retaining a buyer-broker who uses an MLS to find potential homes for the client. Moreover, as discussed above, the fact that a buyer-broker for a client that first found their home online is compensated the same for doing less work raises an additional antitrust concern.

[9] As an example of the seller-broker's influence, the CAC alleges that Keller Williams Realty, Inc. trains its seller-brokers to advise home sellers that the "standard real estate commission has stabilized over the

customer of the ability to utilize and compare prices in selecting" brokers. *Nat'l Soc'y of Prof'l Eng'rs*, 435 U.S. at 692–93. At the same time, MLS rules require that brokers subscribe to the MLS share price information. *See United States v. U.S. Gypsum Co.*, 438 U.S. 422, 441 n.16 (1978) ("Exchanges of current price information [among competitors], of course, have the greatest potential for generating anticompetitive effects and although not *per se* unlawful have consistently been held to violate the Sherman Act.").

Once a home seller has agreed to a commission rate, they are effectively locked in to paying that amount. There is no real incentive for either the buyer or seller to negotiate the offered rate. That is because the buyer is not required to pay any amount and the NAR Code of Ethics allows the buyer-broker to convey that their services are free. Conversely, the seller has contractually agreed to pay a total commission and even if the seller were able to negotiate down the buyer-broker's commission, the seller would not be entitled to the benefit as the seller-broker would be contractually entitled to retain any discount.

But even if the seller or buyer were inclined to negotiate the buyer-broker commission, the NAR rules make it a practical impossibility. According to the NAR's rules, the only time a buyer-broker can negotiate the listed commission amount is prior to showing the listed property to a potential buyer. It is difficult for a buyer-broker to gauge a client's interest in a property that the client has not even seen. Nor can the buyer-broker circumvent the rule by urging the buyer to negotiate with the seller directly. Conversely, once a seller-broker has received an offer on a property, they are prohibited from attempting to modify the buyer-broker commission unilaterally. Taken together, the NAR's rules allow for the hypothetical possibility of negotiation but it is difficult to imagine how such negotiation could occur. Indeed, seller-brokers who list a property

---

years, at right around 6 percent" and that "you're putting yourself at a disadvantage competitively when you reduce your commission." (CAC ¶ 66.)

with a buyer-broker commission offer of 2.5 percent or above almost never subsequently decrease the offer below that threshold. (*See* CAC ¶ 92.)

Accepted as true, Plaintiffs' allegations suggest a pricing system in which the seller is essentially locked into a buyer-broker commission rate upfront that neither the buyer nor the seller have the incentive or ability to negotiate. The Court thus concludes that Plaintiffs have sufficiently alleged "an agreement limiting consumer choice by impeding the 'ordinary give and take of the market place' [that] cannot be sustained under the Rule of Reason." *FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 459 (1986) (citation omitted) (quoting *Nat'l Soc'y of Prof'l Eng'rs*, 435 U.S. at 692). While Defendants argue that the Handbook actually prohibits local realtor associations and MLSs from requiring or encouraging substantial commission offers, such argument is unavailing in the face of Plaintiffs' allegations plausibly showing that Buyer-Broker Commission Rules have caused an artificial inflation of commission rate. *See United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 219–20 (1940) ("Proof that there was a conspiracy, that its purpose was to raise prices, and that it caused or contributed to a price rise is proof of the actual consummation or execution of a conspiracy under s 1 of the Sherman Act . . . .") *United States v. Gasoline Retailers Ass'n*, 285 F.2d 688, 691 (7th Cir. 1961) (stating that an agreement aimed "at affecting the market price" was a violation of the Sherman Act as much as a "direct price fixing" agreement).

Defendants also point to two decisions from courts upholding MLS rules requiring the disclosure of buyer-broker commission offers against antitrust challenges. Both of those cases, however, are inapposite as they were decided prior to the issuance of Section 2-G-1 and dealt with a system under which "***all*** brokers involved in residential home sales represented the seller either as the seller's broker or the 'sub-agent' of the seller's broker." (CAC ¶ 53); *see Supermarket of*

*Homes v. San Fernando Valley Bd. of Realtors*, No. CV 80-1888 Par, 1983 WL 2199 (C.D. Cal. Sept. 1, 1983); *Murphy v. Alpha Realty, Inc.*, No. 76 C 2446, 1978 WL 1451 (N.D. Ill. Dec. 7, 1978).

Defendants also contend that a consent decree approved by a court in this District in *United States v. National Association of Realtors*, No. 1:05-cv-05140 (N.D. Ill. Nov. 18, 2008), "expressly authorizes NAR to limit membership in an MLS to persons who make offers of cooperation and compensation to other members of the MLS." (The NAR's Br. in Supp. of Mot. to Dismiss the CAC at 1–2.). In response to this contention, the United States, a party to the consent decree, filed a statement of interest in this action contending that Defendants mischaracterize the consent decree. (Statement of Interest on Behalf of the United States, Dkt. No. 136-2.) Specifically, the United States claims that the consent decree only resolved its antitrust claims against the NAR "for its exclusionary policies targeting brokers using innovative platforms" but "did not examine the rest of NAR's policies, including those at issue" in this case. (*Id.* at 4.) While the consent decree does contain a section identifying certain conduct that the consent decree was not intended to affect, including limiting membership in an MLS to brokers that offer cooperation and compensation to other MLS members, the United States argues that section should not be read to authorize such conduct if it was found to run afoul of antitrust laws. (*Id.* at 4–6.) Indeed, that section is expressly conditioned on "the right of the United States to investigate or bring actions to prevent or restrain violations of the antitrust laws concerning any Rule or practice adopted or enforced by NAR or any of its Member Boards." (*Id.* at 8 (quoting Decl. of Katie Johnson in Supp. of the NAR's Mot. to Dismiss, Ex. D at 11, Dkt. No. 114-1).) The Court agrees with the United States that nothing in the consent decree can be read to immunize the practices challenged here from antitrust scrutiny.

In sum, Plaintiffs' allegations plausibly show that the Buyer-Broker Commission Rules prevent effective negotiation over commission rates and cause an artificial inflation of buyer-broker commission rates in the markets served by the MLSs identified in the CAC. Thus, Plaintiffs' allegations are sufficient to survive dismissal under the Rule of Reason analysis. This conclusion is in accord with that reached by a district court outside of this Circuit addressing essentially the same issues. *Sitzer v. Nat'l Ass'n of Realtors*, 420 F. Supp. 3d 903, 913–15 (W.D. Mo. 2019).

## III. Injury

Defendants also argue that the CAC should be dismissed because Plaintiffs fail to plead that the allegedly unlawful conduct was the cause of their injury. To establish an antitrust injury, a plaintiff must show that their "claimed injuries are of the type the antitrust laws were intended to prevent and reflect the anticompetitive effect of either the violation or of anticompetitive acts made possible by the violation." *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 481 (7th Cir. 2020). The court must first identify "the type of interests protected by the antitrust laws" and then "determine whether the violation was the cause-in-fact of the injury: that 'but for' the violation, the injury would not have occurred." *Greater Rockford Energy & Tech. Corp. v. Shell Oil Co.*, 998 F.2d 391, 395 (7th Cir. 1993).

The Court finds that Plaintiffs have sufficiently pleaded that they suffered an antitrust injury from Defendants' conspiracy. Each Plaintiff was a home seller required to pay a commission to the buyer-broker for the person who purchased their home. But-for Defendants' conspiracy, each Plaintiff would have paid "substantially lower commissions." (CAC ¶ 156.) Such an injury is assuredly of a type that the Sherman Act was designed to prevent. *See Blue Shield of Va. v. McCready*, 457 U.S. 465, 482–83 (1982) (stating that the Sherman Act offers

redress for "an increase in price resulting from a dampening of competitive market forces"). Nor is the alleged injury one particular to Plaintiffs but instead it would be felt by all home sellers who list their property on an MLS. *See Chi. Studio Rental, Inc. v. Ill. Dep't of Commerce*, 940 F.3d 971, 978 (7th Cir. 2019) ("Plaintiff must assert an injury not only to itself, but to the relevant market.") And, as discussed above, Plaintiffs' allegations demonstrate the ways that the Buyer-Broker Commission Rules artificially inflate buyer-broker commissions. Thus, they have alleged that Defendants' § 1 violation was the cause-in-fact of their injury.

Defendants make a perfunctory argument that Plaintiffs fail to plead that the Buyer-Broker Commission Rules caused their injury because Plaintiffs did not allege that they even attempted to negotiate a lower commission or that either the seller-broker or buyer-broker refused to engage in such negotiations. That argument ignores Plaintiffs' allegations that the Buyer-Broker Commission Rules preclude any opportunity for effective negotiation. And, in any case, even if Plaintiffs did successfully negotiate down the buyer-broker's commission, their allegations would tend to show that the seller-broker rather than Plaintiffs would likely obtain the benefit of the negotiation. Thus, the Court rejects Defendants' argument that Plaintiffs did not plead an antitrust injury.

## CONCLUSION

For the foregoing reasons, Defendants' motions to dismiss (Dkt. Nos. 113, 115) are denied.

ENTERED:

Dated:  October 2, 2020

_____
Andrea R. Wood
United States District Judge