1

1

                    UNITED STATES DISTRICT COURT
2                   NORTHERN DISTRICT OF ILLINOIS
                          EASTERN DIVISION
3
CHRISTOPHER MOEHRL, MICHAEL COLE,      )
4  STEVE DARNELL, VALERIE NAGER,        )
JACK RAMEY, DANIEL UMPA, and           )
5  JANE RUH, on behalf of themselves    )
and all others similarly situated,     )
6                                       )
                Plaintiffs,             )
7                                       )
             vs.                        )  No. 1:19-cv-01610
8                                       )
THE NATIONAL ASSOCIATION OF            )
9  REALTORS, REALOGY HOLDINGS CORP.,    )  Chicago, Illinois
HOMESERVICES OF AMERICA, INC.,         )
10 BHH AFFILIATES, LLC,                 )  November 2, 2020
HSF AFFILIATES, LLC, THE LONG AND      )
11 FOSTER COMPANIES, INC.,              )
RE/MAX LLC, and KELLER WILLIAMS        )  1:34 p.m.
12 REALTY, INC.,                        )
                                        )
13              Defendants.             )

14

        TRANSCRIPT OF PROCEEDINGS - TELEPHONIC STATUS HEARING
15
             BEFORE THE HONORABLE ANDREA R. WOOD
16

17 APPEARANCES:

18 For the Plaintiffs:    COHEN MILSTEIN SELLERS & TOLL, PLLC
                          BY:  MR. ROBERT ABRAHAM BRAUN and
19                        MR. KIT A. PIERSON
                          (Appeared telephonically)
20                        1100 New York Avenue, Suite 500
                          Washington, DC 20002
21                        (504) 258-9894
                          rbraun@cohenmilstein.com
22                        kpierson@cohenmilstein.com

23

24

25

```
 1   APPEARANCES:   (Continued)

 2   For the Plaintiffs:      SUSMAN GODFREY, LLP
                              BY:  MR. MARC M. SELTZER
 3                            (Appeared telephonically)
                              1900 Avenue of the Stars, Suite 1400
 4                            Los Angeles, California 90067
                              (310) 789-3100
 5                            mseltzer@susmangodfrey.com

 6                            SUSMAN & GODFREY LLP
                              BY:  MS. BEATRICE FRANKLIN
 7                            (Appeared telephonically)
                              1301 Avenue of the Americas, 32nd Floor
 8                            New York, New York 10019
                              (212) 336-8330
 9                            bfranklin@susmangodfrey.com

10                            HAGENS BERMAN SOBOL SHAPIRO, LLP
                              BY:  MR. RIO SHAYE PIERCE
11                            (Appeared telephonically)
                              715 Hearst Avenue, Suite 202
12                            Berkeley, California 94710
                              (510) 725-3000
13                            riop@hbsslaw.com

14   For the Defendant
     National Association
15   of Realtors:             SCHIFF HARDIN, LLP
                              BY:   MR. JACK R. BIERIG
16                            (Appeared telephonically)
                              233 South Wacker Drive, Suite 7100
17                            Chicago, Illinois 60602
                              (312) 258-5500
18                            jbierig@schiffhardin.com

19   For the Defendant
     Realogy Holdings
20   Corp.:                   MORGAN LEWIS & BOCKIUS LLP
                              BY:  MR. KENNETH M. KLIEBARD
21                            (Appeared telephonically)
                              77 West Wacker Drive
22                            Chicago, Illinois 60601
                              (312) 324-1000
23                            kenneth.kliebard@morganlewis.com
                                      -and-
24

25
```

3

```
 1    APPEARANCES:   (Continued)
                              MORGAN LEWIS & BOCKIUS LLP
 2                            BY:  MS. STACEY ANNE MAHONEY
                              (Appeared telephonically)
 3                            101 Park Avenue
                              New York, New York 10178
 4                            (212) 309-6000
                              stacey.mahoney@morganlewis.com
 5
      For the Defendant
 6    HomeServices of
      America; BHH Affiliates,
 7    LLC; HSF Affiliates,
      LLC; The Long and Foster
 8    Companies, Inc.:
                              MacGILL PC
 9                            BY:  MR. ROBERT DEAN MacGILL
                              (Appeared telephonically)
10                            55 Monument Circle, Suite 1200C
                              Indianapolis, Indiana 46204
11                            (317) 721-1253
                              robert.macgill@macgilllaw.com
12
                                    -and-
13
                              FOLEY & LARDNER, LLP
14                            BY:  MR. JAY N. VARON and
                              MS. JENNIFER M. KEAS
15                            (Appeared telephonically)
                              3000 K Street NW
16                            Washington, DC 20007
                              (202) 672-5380
17                            jvaron@foley.com
                              jkeas@foley.com
18
      For the Defendant
19    Re/Max Holdings:        JONES DAY
                              BY:  MS. PAULA W. RENDER and
20                            MR. JEREMY JOHN GRAY
                              (Appeared telephonically)
21                            77 West Wacker Drive
                              Chicago, Illinois 60601
22                            (312) 782-3939
                              prender@jonesday.com
23                            jjgray@jonesday.com

24

25
```

4

```
 1   APPEARANCES:   (Continued)
     For the Defendant
 2   Keller Williams
     Realty, Inc.:           HOLLAND & KNIGHT, LLP
 3                           BY:  MR. TIMOTHY RAY,
                             MS. ANNA PENDLETON HAYES,
 4                           MR. DAVID C. KULLY
                             (Appeared telephonically)
 5                           150 North Riverside Plaza, Suite 2700
                             Chicago, Illinois 60606
 6                           (312) 928-6042
                             timothy.ray@hklaw.com
 7                           anna.hayes@hklaw.com
                             david.kully@hklaw.com
 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22
     Court Reporter:         Brenda S. Tannehill, CSR, RPR, CRR
23                           Official Court Reporter
                             219 South Dearborn Street, Suite 1928
24                           Chicago, Illinois 60604
                             (312) 554-8931
25                           brenda_tannehill@ilnd.uscourts.gov
```

1    (Proceedings heard in open court:)

2         THE COURT:  Good morning.  This is Judge Wood.

3    Hopefully, everybody's able to hear me okay.  I should say,

4    "Good afternoon," I guess.  It's 1:30.

5         We'll get started.  I'm going to ask my courtroom

6    deputy to call the case for the record, and then we will go

7    around and see who all we have on the line.

8         David.

9         THE CLERK:  19 C 1610, Moehrl, et al. versus the

10   National Association of Realtors, et al. for status.

11        THE COURT:  Okay.  Who do we have representing the

12   plaintiffs?

13        MS. FRANKLIN:  Good morning, your Honor.  This is

14   Beatrice Franklin from Susman Godfrey on behalf of the

15   plaintiffs.

16        MR. BRAUN:  Your Honor, you've also got Robert Braun

17   form Cohen Milstein representing the plaintiffs.

18        MR. PIERSON:  This is Kit Pierson from Cohen Milstein

19   for the plaintiffs.

20        MR. SELTZER:  Good afternoon, your Honor.

21   Marc Seltzer for the plaintiffs.

22        MR. PIERCE:  Rio Pierce from Hagens Berman for the

23   plaintiffs.

24        THE COURT:  Okay.  Do we have any other plaintiffs'

25   counsel who need to make an appearance this afternoon?

1          I'm not hearing from anybody so let's turn to the

2  defendants.  National Association of Realtors, who do we have

3  on the line?

4          MR. BIERIG:  Good afternoon, your Honor.  Jack Bierig

5  for the National Association of Realtors with the firm of

6  Schiff Hardin.

7          THE COURT:  And do you have any cocounsel on the line

8  with you, Mr. Bierig?

9          MR. BIERIG:  I don't believe so, Judge.

10         THE COURT:  Okay.  How about Realogy Holdings Corp?

11         MR. KLIEBARD:  Good afternoon, your Honor.  It's

12  Ken Kliebard of Morgan Lewis for Realogy Holdings Corporation.

13         MS. MAHONEY:  And Your Honor, you also have

14  Stacey Anne Mahoney from Morgan Lewis as well for Realogy.

15         Thank you.

16         THE COURT:  And for HomeServices of America, Inc.?

17         MR. VARON:  Good afternoon, your Honor.  It's

18  Jay Varon from Foley & Lardner.  And I think Rob MacGill from

19  MacGill PC is also on.  And my partner Jennifer Keas from

20  Foley is also on for all of the HomeServices defendants which

21  is HomeServices of America, HSF Affiliates, BHH Affiliates and

22  Long and Foster, the Long and Foster Companies, actually.

23         THE COURT:  Very good.  Thank you.

24         Do we have counsel for Re/Max?

25         MS. RENDER:  This is Paula Render for Re/Max, and my

1    partner Jeremy Gray is also on the line for Re/Max, and we're

2    from Jones Day.

3              THE COURT:  And what about Keller Williams?

4              MR. RAY:  Good afternoon, Your Honor.  This is

5    Timothy Ray.  We also have Dave Kully and Anna Hayes on the

6    line all from Holland & Knight.

7              THE COURT:  Okay.  Have I actually exhausted all of

8    the parties?  Are there any other counsel on the line who need

9    to make an appearance this afternoon?  I'm not hearing from

10   anybody so let's proceed.

11             So I have reviewed the parties' status report.  I

12   hope this isn't a harbinger of difficult times ahead in terms

13   of the parties' ability to agree on various issues.

14             We'll start with the things that the parties agreed

15   on out of the gate which is that the Rule 26(a) disclosures

16   and answers will be served on November 16th of 2020.

17             I take it the parties are still comfortable with that

18   date?

19             MS. FRANKLIN:  Yes, Your Honor.

20             THE COURT:  Not hearing any objection.  Okay.  Good,

21   good.

22             And in general, if I ask a question and I don't hear

23   anybody jump in to object, I'm going to assume that you're

24   comfortable with whatever the proposal is.

25             Given the number of people that we have on the line

1    and the many disputed areas in the parties' proposed schedule,

2    I think I'd like to ask a few pointed questions, and then I'll

3    probably mull over the answers a little bit and issue a

4    separate scheduling order after the hearing; but there are a

5    couple of things that I'd like to get a better idea of.

6         I think the first major area of dispute is, of

7    course, how long it's going to take to get all of the

8    documents, including the transaction data, produced here.

9         Let me ask this. So the defendants are proposing a

10   date of July 1st of next year, so that's about eight months,

11   to complete the production of just the transaction data. And

12   there's a reference in the status report to just the

13   difficulty of pulling this data because of the different

14   systems involved and the need to have somebody review it.

15        Is there somebody on the defense side -- perhaps

16   maybe this is a HomeServices issue given that I think that was

17   the defendant who expressed the most concern about the

18   plaintiffs' timeline for document production so perhaps I'll

19   start by seeing if someone from HomeServices can sort of

20   explain to me why it's going to take so long to pull together

21   the transactional data.

22        MR. VARON:  Yes, Your Honor.  This is Jay Varon from

23   Foley.  I'll try and address that.

24        Your Honor is right that there is a very

25   decentralized system.  There are four HomeServices defendants.

1    One of them is a brand new defendant, Long and Foster, which

2    is a large, mid-Atlantic, regional brokerage; and in general,

3    there are 12 HomeServices subsidiaries that potentially have

4    commission data that would be relevant to the 20 alleged MLS

5    markets at issue that cover 14 states and the District of

6    Columbia.

7            And each of these subsidiaries are decentralized.

8    They have typically different accounting systems, different

9    transaction management systems.  I think we said there are

10   maybe 13 enterprise resource performance systems and about 11

11   different transaction management systems; and they have

12   different types of software, different accounting systems,

13   different people operating them, sometimes third-party

14   vendors, sometimes in-house vendors.  There are different

15   points of contact.

16           And Your Honor may hear all that and go, "Well, you

17   know, why eight months?"  And I think the answer is that we

18   look to Sitzer for a parallel, and in Sitzer, we were dealing

19   with really just Missouri commission data, four small MLS

20   markets in Missouri, and our franchise companies, HSF and BHH,

21   were able to produce franchise data for Missouri that they

22   had.

23           There were two Missouri subs that were commonly

24   managed but had different systems, and the two franchisors

25   were able to produce franchise data.

1     It took six months to do all the things that we're

2  saying would be necessary here; and, of course, in this case,

3  we have 12 subsidiaries, and the franchisors have to get the

4  data for 14 states and the District of Columbia with the same

5  kind of problems.

6     So we didn't multiply it out proportionally, but we

7  do think that even though we may have learned some things from

8  the Sitzer experience that eight months as opposed to the six

9  that it took in Sitzer is really quite reasonable, and we

10  don't think we could do much better on the transactional data

11  and the commission side.

12     THE COURT:  Is all of that data maintained

13  electronically as far as you know?

14     MR. VARON:  A lot of it is maintained electronically

15  in different systems but in disparate systems in different

16  places.  And there may be some paper data that may or may not

17  be different, but we also, Your Honor, are dealing with legacy

18  systems.

19     You know, the plaintiffs, I think, want to go back to

20  at least 2015, if not before, and so some of the systems that

21  we have are old systems and even more difficult to penetrate.

22     THE COURT:  And so it's not possible to develop some

23  sort of an algorithm that would allow you to run a search that

24  would cover most or all of the systems?  And we're talking

25  about, I take it, your franchisees, not necessarily for other

1    defendants that may have their own issues?

2          MR. VARON:  Well, not exactly, Your Honor.  I'm glad

3    you asked.

4          To clarify, HomeServices has kind of two distribution

5    systems, if you will.  They have 12 wholly-owned subsidiaries

6    in this general market that is alleged in the case, and they

7    also have dozens, if not more, franchisees that are run

8    through a franchise network.

9          So in contrast to some of the other defendants, for

10   example, Re/Max and Keller Williams are mostly -- in fact, I

11   think they're exclusively just franchisees.  Realogy is more

12   similar to us, but we have these additional subs that are

13   independently-operated, decentralized systems so I don't think

14   that is possible.

15         THE COURT:  And in suggesting an additional month

16   until August 1st of 2021 for the complete production of

17   documents, I take it that defendants are planning on or would

18   be planning on searching for and producing other types of

19   documents and data at the same time that you are searching for

20   transactional data.  In other words, you're not planning on

21   starting that search on July 2nd.

22         MR. VARON:  No.  That's precisely right, Your Honor.

23   We would be doing the same thing.  And again, the issue is

24   that plaintiffs have sent all the corporate -- all the

25   defendants very comprehensive, we would say very broad

1  document requests seeking every piece of information you can

2  imagine about the real estate industry.  And, you know, they

3  define defendants as comprising every sub, every affiliate,

4  every parent company, every former director, officer, employee

5  and agent.

6        They have requests such as all documents and data

7  concerning actual, projected, estimated, planned conditions in

8  the markets for residential real estate in the US and

9  internationally including competition, market shares,

10 competitive positions, agent/broker commissions, residential

11 real estate costs, supply, demand, profits and other industry

12 statistics.  And that's just one document request.

13       And so we, of course, have produced a lot of this

14 information already for the HomeServices corporate defendants

15 that overlap between Sitzer and Moehrl, but if we have 12

16 subsidiaries, we don't think we should have to do that for 12

17 subsidiaries.  We think there should be a more limited

18 production that is required.  And, in fact, in Sitzer, we

19 agreed to begin producing a much more limited set of material

20 that basically consists of policies and procedures and

21 guidelines and training materials and company memos relating

22 to the challenged restraints and the setting and maintaining

23 and stabilizing of commission rates or market share, much

24 narrower than even that one document request.

25       We don't know what the plaintiffs are going to

1    require of us in this broad a market.  And that's not true

2    just for HomeServices.  You'll note that the plaintiffs say

3    that, you know, they've begun to negotiate custodians, but

4    it's clear that there will be additional custodians for

5    Re/Max, Realogy and HomeServiess of America.

6         And we also don't know -- they say that -- you know,

7    I think they say on Page 6 the limited additional regional or

8    sub-specific discovery or subsidiary-specific discovery

9    doesn't warrant the time that defendants say, but we don't

10   know what that limited additional regional or

11   subsidiary-specific discovery would be.

12        If it's limited to what we're already doing in

13   Sitzer, well, then that's perfectly true, but we don't know

14   what plaintiffs consider limited, and we don't know what the

15   scope of that discovery will be.  And again, if it's going to

16   be as broad as the document requests, we're going to have

17   quite a job in front of us coupled with the commission data.

18        So we're trying to be reasonable, Your Honor.  And

19   I'm not saying we might not be able to do a drop sooner, but

20   only if we know what the requests are and what the demands

21   are.

22        And, you know, just to touch on one other thing as

23   long as I have the floor for a second and I'll give it up,

24   we've also asked for a more extended date to submit what the

25   plaintiffs have said are disputes that may have to go to the

1    Court if we can't agree on custodians on the franchisee

2    discovery and presumably on these document requests; and the

3    problem is that, again, in Sitzer, we went through these, we

4    negotiated the document requests at length.

5         It took over 30 days to do it.  Even when we reached

6    an agreement in principle about how we were going to do it, it

7    took another two weeks to memorialize it, and the plaintiffs

8    haven't said that they're going to live up to those particular

9    understandings that we reached.

10        And so what we want is enough time to actually meet

11   and confer and see what we can do as well as if we can't,

12   enough time to prepare an appropriate submission to the Court

13   so it can decide.  And right now, plaintiffs' 12/7 date is

14   five weeks away essentially.  We don't know exactly what they

15   want.

16        It took over 30 days easily to negotiate

17   HomeServices' custodians in Sitzer.  It took, as I just

18   mentioned, over 30 days to reach agreement on the scope of the

19   document requests that we'd be producing, and then we'd have

20   to go out and do all that.  So that's why we've asked for the

21   dates we have, Your Honor.

22            THE COURT:  I understand.

23            MR. VARON:  Sorry for speaking so long.

24            THE COURT:  With respect to the transaction data,

25   what sort of analysis or review do you need to conduct once

1  the information is gathered?

2  So there was some reference in the status report to

3  it's going to take all this time to gather the data and then

4  it's going to take all this additional time to kind of review

5  it and get it ready for production.

6  So what is it that needs to be done once the raw

7  information is gathered?  And is that something that's being

8  done in house at the law firms, or is that something that

9  you're having to hire outside vendors or even people with

10 particular expertise to do?

11 MR. VARON:  So we have an outside vendor, Your Honor,

12 that's going to retrieve the commission data for us and that

13 retrieved it in the Sitzer case.

14 And then again, you have to interview the people who

15 run the accounting systems and the management systems and who

16 have access to them whether they are vendors or in house or

17 third party.  You have to understand the differences in the

18 software.  And then I think the thing that the consultant

19 really does is processes the data once you can locate it and

20 get access to it, and they put it in a form that can be

21 produced.

22 So all of that occurs, and unfortunately, you know,

23 it doesn't occur in a uniform fashion.  They have to talk to

24 people at each of the different companies.

25 It's a little smoother -- candidly, Your Honor, it's

1    a little smoother from the franchisee side because the

2    franchisees are reporting information in a more uniform

3    manner.  So we can probably get the franchise information a

4    little quicker.

5         THE COURT:  Okay.  Let me hear from someone on behalf

6    of the plaintiffs' side -- I don't know which counsel is

7    prepared to take the lead -- if you'd like to respond to

8    anything that you just heard from Mr. Varon.

9         MS. FRANKLIN:  Good afternoon, your Honor.  This is

10   Beatrice Franklin on behalf of the plaintiffs.  I'll respond

11   to a couple of the points that Mr. Varon made.

12        First, as we note in our papers, it's really just the

13   HomeServices defendants that seem to have any specific

14   objections to the discovery deadlines we proposed for our data

15   production and document production.

16        You know, it is an unusual case in that we're not at

17   the stage where parties typically would be after a motion to

18   dismiss has been decided in a complex antitrust action because

19   of the Sitzer matter.

20        The custodian and search firm negotiations are either

21   done or very far along.  Our subpoenas have already been

22   served; we've begun negotiating them.  Over 700,000 documents

23   have already been produced.  And so plaintiffs' position is

24   that it's important to keep that overall context in mind when

25   looking at the discovery deadlines in particular and with the

1   overall case schedule.

2          And Keller Williams and NAR have represented to us

3   that their production is substantially complete; they don't

4   anticipate producing a significant amount of additional data

5   or documents beyond what's been produced in Sitzer.

6          Realogy and Re/Max, our understanding is that they

7   have some additional geographic-specific and role-specific

8   discovery that they will need to produce, but it's really just

9   HomeServices that is seeking these 10 months for discovery.

10  And, you know, we simply don't think that the entire case

11  schedule should be held up for nearly a year because of the

12  decentralization of HomeServices' subsidiaries and

13  franchisees.

14         In the first place, HomeServices is talking about 12

15  subsidiaries, it's talking about data collection from its

16  franchisees; but HomeServices hasn't even agreed to produce

17  that data to us necessarily.

18         HomeServices has reserved the right to maintain

19  objections to producing discovery based on all kinds of

20  reasons such as arbitration agreements, objection to scope or

21  accessibility to this data.

22         So it seems, I think, difficult to say that they need

23  10 months when we don't even know how much of that data

24  they're going to end up agreeing to produce.

25         As far as the HomeServices defendant's concern that

1    we can't set deadlines without knowing what kind of discovery

2    plaintiffs are seeking, in fact, plaintiffs are seeking the

3    discovery to which we're entitled under the federal rules.

4            Obviously, we understand that as in any case, there

5    will be negotiations about what discovery is proportional,

6    whether we're willing to make certain concessions in terms of

7    discovery that we're seeking, but it puts the cart before the

8    horse to say that plaintiffs need to have made all of their

9    requests and negotiate all of their requests and precisely

10   articulated the discovery that we're seeking before we can

11   even set a case schedule.  That's not what happens.

12           Parties set a case schedule, and then the discovery

13   negotiations take place according to that schedule.  And

14   that's really one of the lessons that we've learned from

15   Sitzer.

16           In the Sitzer matter, discovery negotiations in some

17   cases probably did take longer than they needed to because

18   there were no firm deadlines.  There was not a firm deadline

19   for document production or data production.

20           When deadlines were set by the Court in Sitzer or

21   deadlines to start document production, deadlines to submit

22   any custodian negotiations, that really speeded those

23   negotiations along, and it seemed like it helped parties come

24   to the table and helped the parties reach agreement more

25   quickly maybe than they otherwise would have.

1      So it's based on that understanding that plaintiffs

2   feel it's important to set these reasonable but prompt

3   deadlines in this case.

4      THE COURT:  So Ms. Franklin, there's lots of

5   discussion in the status report about data and document

6   production.  There's not much mention at all of witnesses that

7   may need to be deposed.

8      When are depositions of fact witnesses -- so putting

9   aside expert depositions for the moment, when are depositions

10  of any fact witnesses going to take place, and how has that

11  been accounted for in the plaintiffs' schedule?

12     MS. FRANKLIN:  Those would take place in the time

13  between the completion of document production and the filing

14  of our motion for class cert.

15     So if Your Honor looks at our proposal, we have the

16  deadline for data production is in late February, and

17  deadlines for document production is in early April.  Then our

18  opening class cert motions aren't due until mid November.

19  That gives about seven months for depositions to happen.

20     And really, the reason that we need that time, that

21  time between the data production deadline and the opening

22  class cert briefs, is because it's going to take a substantial

23  amount of time for our experts to clean up and work with that

24  data.

25     You know, we expect that there will be some work in

1    trying to figure out what data is missing, what data is

2    actually there, formatting the data and making it usable.  And

3    so we believe there's ample time to conduct depositions while

4    all of that data cleaning and data manipulation and document

5    work is going on in the background.

6              THE COURT:  In order to prepare your class

7    certification motion, are you going to have to depose somebody

8    from every single defendant, or is there testimony already out

9    there from the Sitzer case that might be helpful?

10             How are you approaching it?  Just because I can

11   imagine each subsidiary and potentially each franchisee being

12   sent a 30(b)(6) notice of some sort.  Is that what your

13   deposition discovery is going to look like?

14             MS. FRANKLIN:  I think it's a little early for

15   plaintiffs to have a set deposition plan in mind without

16   seeing all of the documents.

17             You know, certainly we would take some depositions

18   before class cert.  I think it's likely that we would maybe

19   take other depositions, other fact depositions, after class

20   cert briefing but before merits expert reports and dispositive

21   motion practice.

22             You know, again, I'm reluctant to bind us to any kind

23   of discovery deposition plan right now.  I would imagine that

24   we would be seeking deposition testimony probably from -- at

25   least in some capacity from each of the corporate defendants,

1    but I think it's hard to say in part because depositions have

2    not yet taken place in Sitzer to my knowledge, certainly none

3    that plaintiffs in Moehrl have participated in.

4         And defendants are welcome to correct me if any

5    depositions have been scheduled yet, but I don't believe they

6    have.

7         THE COURT:  And it's not lost on me that one of the

8    differences between the plaintiffs' proposed schedule and the

9    defendants' proposed schedule is that the plaintiffs have less

10   time, significantly less time, I would say, between the

11   completion of the document production and when class

12   certification motions need to be filed.

13        So under the plaintiffs' proposed schedule, there's

14   about seven months, and under the defendants' proposed

15   schedule, it's more like four and a half, I guess.  Or maybe

16   it's five, but, you know, at least about a month, month and a

17   half less time.

18        So is the plaintiffs' view that under the defense

19   schedule, this idea that you would have from August 1st to

20   January 15th, is that just not enough time?

21        MS. FRANKLIN:  Plaintiffs are concerned that that is

22   not enough time for our experts to do the work that they need

23   to do with the data and document production in preparation for

24   their expert reports and class cert briefing while at the same

25   time also doing any necessary depositions that would need to

1    happen.

2            In the first place, we think that the time that we've

3    given the defendants to make whatever supplemental productions

4    need to be made is more than enough, and we also think that

5    those two months difference between the end of document

6    discovery and the filing of the class cert motions, we think

7    those two months do matter, and it's important to plaintiffs

8    that we retain those in the schedule.

9            THE COURT:  I'm not going to ask for defendants' view

10   on that issue because I'm going to assume that the defendants'

11   position would be that you could just push back the dates for

12   the filing of class certification if they still need the time

13   that they need to produce the documents, and a way to solve

14   the problem of plaintiffs not having enough time before class

15   certification would be to push the other dates back.

16           Is that a fair assumption, Mr. Varon?

17           MR. VARON:  Yes, Your Honor, that's certainly one

18   way.

19           You know, I would just say that there's a dichotomy

20   in plaintiffs' position in that, you know, they talk about

21   we're not doing this on a clean slate, there's 700,000

22   documents already produced, but, you know, then other times,

23   it looks like we are on a clean slate.

24           And the point is that the discovery that plaintiffs

25   are describing as supplemental, we have no idea whether it's

1   supplemental.  I don't think it's supplemental.  I hope it is,

2   but -- and, you know, we may argue that it should be, but

3   without knowing, it's very difficult to do this.

4          And, you know, we're not saying that you can't set a

5   case management schedule without this.  We can pick briefing

6   dates right now for class certification, when it will begin;

7   but we don't necessarily have to have precise deadlines,

8   especially before we even know, as Ms. Franklin admits, too,

9   what the scope of the discovery will be, what we're going to

10  fight on, what we're not going to fight on, what we can agree

11  to.

12         We've asked for demands on custodians.  We got one

13  demand for seven custodians for Long and Foster which we think

14  is disproportionate; and we don't know and Realogy doesn't

15  know and Re/Max doesn't know what custodian requests may be

16  forthcoming.  It's described as limited, it's described as

17  supplemental, and it should be, but we don't have any

18  assurance that it will be.

19         THE COURT:  Okay.  With respect to the timing of sort

20  of fact and expert discovery relative to the class

21  certification decision, it wasn't clear to me whether the

22  parties believe that the class certification decision would

23  have a material impact on the scope of fact discovery and how

24  much time would be needed for it.

25         I think there was a suggestion that expert discovery

1    would be materially impacted, but it wasn't clear to me the

2    parties' positions on fact discovery.

3          So let me start with plaintiffs' counsel and ask is

4    there any reason why you need to have the class certification

5    decision before you get to the end of fact discovery?

6          MS. FRANKLIN:  Thank you, your Honor.  Again, this is

7    Beatrice Franklin on behalf of plaintiffs.

8          Neither party believes that class and merits

9    discovery should be or needs to be bifurcated in this case so,

10   you know, the vast majority of fact discovery we expect will

11   be completed by the time the class cert briefing happens.

12   That's not to say that all discovery will happen by then.

13         You know, I can imagine a world in which there will

14   be certain depositions that will be relevant to our merits

15   expert reports, you know, that might be relevant, for example,

16   to evidence of the conspiracy or something along those lines

17   that wouldn't necessarily be relevant to or wouldn't be

18   relevant to class cert briefing.  And so we might prioritize

19   leaving those depositions until after the class cert work has

20   been done.

21         I think that's why both parties have left a little

22   bit of time after class cert briefing to finish expert

23   discovery, but plaintiffs certainly would expect that the vast

24   majority of fact discovery will be completed by the time the

25   class cert briefing is done.

1      THE COURT:  And is it plaintiffs' view that if your

2  class certification motion fails and if there's no class

3  certified, would there be a need for expert discovery?

4      MS. FRANKLIN:  I think that that would -- yeah, I

5  think that it would be unlikely that if the class

6  certification motion fails that we would be proceeding with

7  expert discovery.

8      THE COURT:  And I appreciate that it may turn on the

9  reason that the class certification motion fails.

10      MS. FRANKLIN:  Yeah.

11      THE COURT:  Okay.  What about from the defense side?

12  I don't know who would be in the best position to take the

13  lead on this.  What's the relationship between the class

14  certification decision and the scope and timing of fact

15  discovery?

16      MS. RENDER:  Your Honor, I think I can respond to

17  that.  This is Paula Render, and I represent Re/Max, but I'm

18  speaking on behalf of the defendants today.

19      I think I agree with a lot of what -- I'm sorry.  I

20  don't remember Beatrice's last name, but I remember a lot of

21  what the plaintiffs' counsel just said to the Court.

22      We haven't bifurcated fact discovery between class

23  and merits, and so we will have done a lot of the fact

24  discovery for the merits phase by the time we get to class

25  certification.

1    I think it would make a lot of sense to evaluate at

2  the time that the class certification briefs are in what makes

3  sense at that point because I think the class certification --

4  obviously, if there's no class certification decision, then we

5  wouldn't need to do any further discovery, I wouldn't think;

6  but if we only have a couple of depositions left, it's

7  possible that the defendants would be willing to just go ahead

8  and do that to get it done while we wait for the class

9  certification decision.

10    On the other hand, if there's a ton of fact discovery

11  that seems that needs to be done, then we might be looking at,

12  well, what are the issues in the class certification brief,

13  what really makes sense here in terms of waiting for a

14  decision versus not waiting for a decision.

15    So I guess I would say that it would make more sense

16  to decide when fact discovery should close -- well, it would

17  make more sense to have a status conference after the class

18  certification briefs are in to see with the benefit of all the

19  work that the parties have done whether it makes sense to set

20  a June 24th, 2022, date for fact discovery closing as

21  plaintiff has suggested or whether it makes sense to do

22  something else.

23    THE COURT:  Okay.  Let me switch topics to a

24  different question I had and direct this towards the

25  plaintiffs' side.  And this has to do with plaintiffs'

1    proposal to brief -- to make expert disclosures on the merits

2    basically simultaneously with dispositive motions so that

3    there are merits expert reports which presumably are going to

4    be relied upon by the plaintiffs for their summary judgment;

5    or, I guess, depending on who moves first, if I adopt the

6    plaintiffs' position, the defendants would have to make their

7    expert disclosures at the same time as their dispositive

8    motions.

9            I have to say that sounds incredibly inefficient to

10   me; and one of the biggest problems I see with the plaintiffs'

11   proposal is that in order for any party to file a summary

12   judgment motion, they have to believe that the undisputed

13   facts warrant resolution in their favor of whatever the issue

14   is.

15           How can you know that a fact is undisputed if you're

16   going to be supporting it with expert testimony and you

17   believe that the other side is going to have a responsive

18   expert in some way?

19           It seems to me that you can't make a good faith

20   determination on liability issues that are going to be

21   supported by expert testimony until you've actually seen the

22   other side because frankly, if you're relying on expert

23   testimony, it's usually not all that hard to create a disputed

24   issue of fact.

25           So maybe somebody on the plaintiffs' side can explain

1   to me how that works, the proposal of having the expert

2   reports disclosed at the same time as the dispositive motions.

3          MS. FRANKLIN:  Your Honor, Beatrice Franklin again on

4   behalf of the plaintiffs.

5          So plaintiffs agree with Your Honor that the key

6   consideration is efficiency, and so for us, the most important

7   part of our proposal for merits expert reports and dispositive

8   motion briefing is that we set firm deadlines now.

9          We think that it absolutely does not make sense to

10  wait to have a status conference at the end of class cert

11  briefing as defendants have proposed just now or when there is

12  a class cert order and then setting deadlines at that point.

13         Because the defendants agree there's no bifurcation

14  of discovery here, discovery will be nearly completed by the

15  time class cert briefing is done.  It's much more efficient to

16  proceed directly to merits work at that point when memories

17  are fresh, when everyone is familiar with the evidence rather

18  than inject months or even longer of delay into the schedule

19  for an indeterminate period of time and allow all of that work

20  essentially to fall by the wayside.  That's really the

21  cornerstone of our merits proposal.

22         As for having a merits report and dispositive motions

23  submitted at the same time, we think that the parties are

24  going to be pretty familiar with the issues at that point.

25  There will have been -- you know, fact discovery will have

1    been fully completed, the parties will have completed class

2    cert briefing in this case, and then the parties will also

3    have the benefit of Sitzer.

4          The issues are identical there.  You know, if we're

5    not counsel in Sitzer, it's possible that different issues

6    will arise, there will be different arguments that are made;

7    but by the time the merits deadlines roll around, the parties

8    will know what each other's positions are, they will know what

9    the issues in the case are, they will know what our experts

10    are likely to say.

11          So we think that it actually is more efficient to

12    submit everything at the same time rather than add in an

13    additional few months of delay to do expert reports first and

14    then dispositive motion briefing second.

15          It also means that because the parties are responding

16    to both expert reports and dispositive motions at the same

17    time, the expert reports are going to be tailored to the

18    dispositive motion practice so we're not going to be shooting

19    in the dark to try and think of what the party -- essentially,

20    expert work isn't going to be completed before the parties

21    have a chance to see what the summary judgment arguments are.

22    There's going to be a bit more of a dialogue there so their

23    expert reports can end up being a little bit more responsive.

24          It's worth noting that the parties agree that that's

25    how we should structure class work, you know, when it comes to

1   class cert briefing, and we can do reports and dispositive

2   motions at the same time.

3        THE COURT:  But that's not comparable because summary

4   judgment is very specific in the fact that we're talking about

5   undisputed material facts.  Class certification actually gives

6   a burden, and I have to weigh evidence and make

7   determinations.

8        The key difference, as I see it, is I don't see how

9   you can decide that you have a good faith motion for summary

10  judgment based on undisputed facts when you haven't seen the

11  other side's response to your experts yet.

12       MS. FRANKLIN:  Again, Your Honor, I think that in

13  this case, we would be able to understand what facts are in

14  dispute and what facts aren't based on the way that discovery

15  has developed and the way that class cert briefing and expert

16  work has developed.

17       THE COURT:  If there's somebody on the defense side

18  that wants to respond on that point, I'll give you a chance;

19  and then I think I have just a couple of other questions.

20       MS. RENDER:  Thank you, your Honor.

21       This is Paula Render again representing Re/Max and

22  speaking for all defendants.

23       I think Your Honor identified exactly what the

24  problem is with this, and I guess I think that these things

25  are easier to think about with a concrete example than in the

1   abstract so I'd like to -- and this is just an example, you

2   know, but the definition of the relevant market in which the

3   case is going to be evaluated is often an issue that courts

4   resolve on summary judgment, and it could very well be an

5   issue that defendants would move for summary judgment on.

6        So we would typically already have the plaintiffs'

7   proposed definition of the relevant market from the

8   plaintiffs' experts' opinions, and we would then look at that

9   and say, "Well, do we agree that that's the relevant market,

10  or do we think that they've done this wrong."  And then and we

11  would file a motion for summary judgment with our opening

12  brief saying either that we agree with it, or let's assume we

13  don't, plaintiffs' definition is wrong, they cannot prove

14  their relevant market definition because of the following.

15       That would be an issue in our summary judgment brief,

16  but how would we do that with this procedure where we won't

17  even have seen the plaintiffs' experts' reports at that time?

18       We won't know what their proposed relevant market is

19  until they file their opposition brief.  So essentially, that

20  means we -- or maybe we just guess at it, we say, "Well, maybe

21  they're going to say it's this, but that's not right because,

22  they can't prove that because" and we make a few guesses.  I

23  mean, that's a ridiculous way to proceed through summary

24  judgment.

25       So for all the reasons you just said, we do need to

1  know, and there are many issues that will not be -- that will

2  not surface during class certification; they will not be the

3  subject of expert disclosures that will need to be -- have

4  expert support and then be briefed in summary judgment or

5  tried at a trial.  So we will not know what plaintiffs'

6  position is on many, many issues when we get to the end of

7  class certification.

8       And I'd like to say, you know, I've been litigating

9  for 25 years.  I do nothing but antitrust litigation.  I've

10  been in many class actions.  I have several partners who have

11  similar experience.  None of us has ever seen the expert

12  disclosures made along with the summary judgment motion

13  where -- (inaudible).

14       THE COURT REPORTER:  You're cutting out.  Judge, we

15  lost part of that.

16       THE COURT:  I'm sorry.  I think we may be losing you.

17  I think you came in and out, and I think our court reporter

18  may have lost track of what you were saying as well.  Maybe

19  you could back up a sentence or two.  Can you repeat what you

20  were saying?

21       MS. RENDER:  Sure.  Absolutely, Your Honor.  And

22  thank you for letting me know.

23       I've never seen a case like this, a schedule like

24  this where the summary judgment motion briefs are filed

25  simultaneously with expert disclosures.  I've never seen that,

1    none of my colleagues have ever seen that, and all we do is

2    antitrust litigation.

3         We looked for cases in which courts applied that kind

4    of a schedule; we couldn't find any.  Plaintiffs haven't cited

5    any.  They have not cited any cases in which judges said,

6    "Yes, make your expert disclosures at the same time as your

7    summary judgment briefs."  And I think that's because it just

8    makes no sense.

9         It essentially renders the defendants' opening briefs

10   irrelevant and then only gives them the reply brief in which

11   to try and tackle all of the new expert disclosures that

12   they've never seen before, you know, in that short a period of

13   time and that generally fewer number of pages, and then the

14   plaintiff gets to come back.

15        And so it essentially robs the defendants of the

16   opportunity to make the full summary judgment motions that

17   they are entitled to make on the issues where the plaintiffs

18   are disclosing expert opinions for the first time.

19        So I think this procedure is never done.  We would be

20   going way out on a limb with a very novel kind of schedule for

21   which I haven't heard any real benefit other than, you know,

22   maybe it takes a month or two out of the schedule.

23        And, you know, we could take all of the procedure out

24   of it.  I mean, we have to do things; they take some time.  We

25   can't just short circuit things and take summary judgment away

1   from the defendants just because we'd like to take a month out

2   of the schedule.

3   THE COURT:  Okay.  With respect to the overall fact

4   discovery schedule, putting aside the intermediate dates for a

5   moment, the plaintiffs have proposed fact discovery to close

6   June 24th of 2022.

7   I guess all other things being equal, do the

8   defendants disagree that that's enough time for fact discovery

9   in general?  I mean, that's, you know, a good amount of time

10  from now, about a year and a half, I guess, from where we are

11  now, to complete fact discovery.

12  So putting aside for the moment how all the pieces

13  fit together in terms of whether class certification takes

14  place first or after, is a year and a half enough time to

15  complete fact discovery here?

16  MS. RENDER:  Your Honor, Paula Render.

17  I can only speak for my client on this point so you

18  may have to canvass the defendants on this point.

19  I think that we really ought to look at what fact

20  discovery is needed once a class certification decision has

21  been made because that class certification decision may very

22  well change the parties' views.

23  If the plaintiffs' class definition includes all

24  persons who have paid commissions in connection with

25  residential real estate, that would be buyers and sellers, but

1    perhaps buyers don't get included in the eventual class

2    decision.  That might change the discovery that people think

3    they need with respect to the rest of the case or perhaps

4    certain kinds of sellers but not others, certain kinds of

5    buyers, not others.

6         I mean, the class certification decision itself

7    really could affect what discovery people need.  Maybe they

8    think they need yet another deposition of this type of seller

9    or something.  So I would say that at least for my client, we

10   would stick with the proposal that was made in the defendants'

11   proposed schedule, and we would say that decision really

12   should be made after the class certification decision is made.

13        THE COURT:  Okay.  Any response to that from the

14   plaintiffs' side?

15        MS. FRANKLIN:  Yes, Your Honor.  Beatrice Franklin

16   again on behalf of the plaintiffs.

17        I think that it's possible, although plaintiffs

18   obviously think it's likely, that the class cert order could

19   narrow the scope of needed discovery; but it seems extremely

20   unlikely that the class cert order would expand the scope of

21   discovery beyond what plaintiffs believe proper discovery is

22   in this case already.

23        And again, because defendants haven't argued that we

24   should be bifurcating fact discovery based on merits and class

25   discovery, discovery is presumptively proceeding on the whole

1    scope of plaintiffs' case.  So there's simply -- there's no

2    reason to hold aside some portion of fact discovery with the

3    idea that the class cert order might end up limiting the scope

4    of the class.  That's not how -- it's certainly not how

5    plaintiffs' plans for discovery will proceed.  We're going to

6    take the discovery that we're entitled to take.

7            And so if the class cert order necessitates maybe one

8    or two additional depositions or something like that, we can

9    work that out when the time comes, but the fact is that the

10   scope of the case is defined, and discovery should proceed as

11   it has already in Sitzer.  And there's no reason that a year

12   and a half isn't enough time to get that discovery done.

13           THE COURT:  Okay.  So here are my thoughts, having

14   considered what the parties have put in writing and what

15   you've told me today.  One, I'm inclined to at least with

16   respect to some of the initial dates, with respect to the

17   dates for the parties to agree to the ESI terms, the custodian

18   and also to submit any disputes to the Court for resolution,

19   I'm going to be inclined to go with the January 8th date

20   proposed by the defendants in part because I think

21   December 7th is just going to come up awfully quickly from

22   where we are.  And based on what I've heard from the parties

23   and where you are in that process, it strikes me as perhaps

24   not realistic to think that you would be able to get to

25   whatever you're able to agree on and identify disputes that

1    need the Court's help by December 7th.

2            With respect to the other dates, I'm going to give

3    some thought to the specific dates and issue a scheduling

4    order separately.

5            In general, my thought is this.  One, I think that

6    the amount of time that's being provided to the plaintiffs

7    after the completion of the document production in order to

8    get to the filing of class certification and to get the class

9    expert reports prepared and ready to be filed at the same time

10   is perhaps a little unreasonable under the defendants'

11   schedule.  I think a little more time needs to be there.

12           So the question is do the defendants really need as

13   much time as they are proposing in order to get their document

14   production complete, you know, which from today is another

15   nine months from where we are, or does the schedule shift

16   otherwise.

17           I suspect that what will end up happening is a

18   schedule that has the filing of the class certification motion

19   and expert reports a little closer to the defendants' date but

20   allowing a slightly shorter period of time for the defendants

21   to complete their document production and a little bit more

22   time for the plaintiffs to get to prepare what they need to

23   prepare.  I haven't quite decided how I want to break that

24   down.  I'll give it some thought and issue a separate order.

25           I will let the parties know my inclination is going

1   to be to set a fact discovery deadline and to set it for,

2   I think, shortly after the briefing of class certification

3   would be complete.

4        I think the plaintiffs have a reasonable approach in

5   setting an actual fact discovery deadline. In their proposal,

6   it's about six weeks after the class certification and related

7   expert issues are fully briefed. I think that is a fairly

8   reasonable way to do it.

9        I also think that if there are issues that require

10   additional fact discovery after the class certification

11   decision is raised, if there really is something that has

12   changed about the scope of what's necessary, I would like to

13   think that the Court would be reasonable in allowing a limited

14   time for specific issues to be addressed that come out of the

15   class certification ruling.

16        So the parties should expect that there will be an

17   actual fact discovery deadline. It will be after briefing of

18   class certification, and it will be set.

19        With respect to expert reports, I again tend to agree

20   with the defendants' approach that I think you need to have

21   the expert reports on the merits before dispositive motions

22   are filed.

23        I don't see how you can file a proper dispositive

24   motion where you're relying on your own expert report and you

25   haven't seen the other side's, especially in a case such as

1  this where the parties are going to be relying, I think,

2  fairly heavily on expert testimony for issues related to

3  summary judgment.

4       It just strikes me as not the way summary judgment is

5  supposed to work.  I don't think it's the way that it should

6  work in a case such as this, meaning either an antitrust case

7  or a class action case, and certainly not a class action

8  antitrust case.  I think you're going to need to have that

9  expert discovery complete before dispositive motions.

10      I am concerned about stretching out the schedule

11 beyond what's absolutely necessary given the timing of the

12 case and the fact that this is certainly a case where there

13 could be a snowball effect in terms of dates getting pushed

14 further and further out.

15      So my inclination, I think, is going to be to set

16 some dates regarding expert discovery and perhaps even a date

17 for filing of dispositive motions that tries to take into

18 account a reasonable timeline for a ruling on the class

19 certification decision and takes into account the fact that

20 the parties may need to make a motion to adjust some things

21 based on the outcome of that ruling.

22      So I think that's generally going to be the approach

23 that I'm going to take.  I'll issue a scheduling order after

24 I've had a chance to pencil in the dates to see where I think

25 they properly fall.

1          In the short term, you should all be planning on

2     getting the 26(a) disclosures and answers due on November 16th

3     and working on working out those ESI search terms and

4     custodian issues so that those can be properly resolved or

5     teed up by January 8th.

6          My expectation is that things will be off and running

7     after the first of the year with producing a lot of

8     information at a pretty efficient pace.

9          We've only talked about the schedule itself.  The

10    parties didn't really identify any other issues that you

11    wanted to put on the agenda for today so let me first find out

12    if there's anything that's happened in the Sitzer case that I

13    should be aware of or that impacts any of these scheduling

14    considerations, and then I'll see if there are any other

15    issues that the parties generally want to touch on before I

16    set some next dates here.

17         So who is in the best position to tell me if there's

18    anything going on with the Sitzer case that I should be aware

19    of?

20         MS. RENDER:  Your Honor, this is Paula Render, and I

21    can offer that there have been no real developments in the

22    Sitzer case.  Discovery continues; our dates have stayed the

23    same; and we're just continuing to work through the schedule.

24         THE COURT:  Are there any issues that any of the

25    defense counsel wanted to address that we haven't touched on

1    today?

2          We'll start with Ms. Render since you are taking the

3    lead on a lot of the issues.

4          MS. RENDER:  Thank you, your Honor.

5          No, there is nothing that I -- nothing else that I

6    want to raise.

7          THE COURT:  Okay.  Mr. Varon, any other issues from

8    your clients?

9          MR. VARON:  I don't think so, Your Honor.  Thank you

10   very much.

11         THE COURT:  Okay.  Any of the other defense counsel

12   who haven't had a chance to weigh in today who would like to

13   put an issue on the table?

14         MR. KLIEBARD:  Just very briefly, Your Honor.  This

15   is Ken Kliebard for Realogy.

16         There is just one sort of note at the end of the

17   status report that we are working on a deposition protocol,

18   and the update on that is we hope to provide that to

19   plaintiffs this week.

20         As I'm sure you can imagine, it's quite complicated

21   just because all the depositions will likely be remote.  So we

22   are making progress on that and hope to have resolution on

23   that within the next week or so.

24         THE COURT:  Have the parties agreed on a platform?

25   In other words, are you planning to use Zoom or, you know,

1   Microsoft Teams?  What sort of platform do you all have access

2   to, and are you all comfortable with it?

3           MR. BRAUN:  Your Honor, this is Robbie Braun speaking

4   for the plaintiffs.

5           I don't believe that we have reached an agreement on

6   a platform yet, though I think the defendants did reach out to

7   us about starting discussions on potentially agreeing to one

8   platform that both sides would use for depositions.

9           MR. KLIEBARD:  Your Honor, again, this is

10  Ken Kliebard.

11         We have interviewed and received demonstrations from

12  a couple of vendors, and I think they tend to use a Zoom-based

13  platform.  It's not Zoom, it's powered by Zoom, whatever that

14  means, but it's a more secure enterprise-level platform.  And

15  so we'll share what we have with plaintiffs including our

16  recommendations on which services we thought did the best job

17  in terms of giving us a demonstration.

18         THE COURT:  And are you also discussing a protocol

19  for the use of documents during depositions and how that's

20  going to occur remotely?

21         MR. KLIEBARD:  Your Honor, again, it's Ken Kliebard.

22         That will be part of the protocol.  That's one of the

23  challenging issues, and the different vendors each have

24  different approaches on that so we've actually been trying to

25  get some hands-on experience to see which is least cumbersome

1   for remote depositions, and again, we'll be discussing that

2   with plaintiffs this week, we hope.

3   THE COURT:  Finally, what about the cost of utilizing

4   this vendor?  Have the parties reached an agreement on sharing

5   the cost, or is one side or the other going to bear the

6   expense either overall or for depositions that you notice or

7   of your clients?  How will that work?

8   MR. KLIEBARD:  Again, it's Ken Kliebard.

9   We haven't discussed that.  I think it will work

10  similar to a regular deposition so I think the party that

11  notices the deposition will have the initial burden of the

12  cost of the videographer, if you will, and the court reporter,

13  but we did receive pricing proposals which we've been actually

14  trying to negotiate down to save us and the plaintiffs money.

15  And we will share those pricing proposals with plaintiffs when

16  we have our discussion with them this week.

17  THE COURT:  Okay.  Good.  Well, I'm glad that you are

18  working on that and that you are not waiting until the eve of

19  when you're planning to start depositions to start looking for

20  a vendor.  I think that's a good approach, a necessary

21  approach, under the circumstances.

22  Okay.  Thank you.  Thank you for letting me know what

23  was going on with that.

24  Any other issues that any of the other defense

25  counsel would like to raise?

1          Not hearing anything, what about any other issues

2  from the plaintiffs' side?

3          MS. FRANKLIN:  Your Honor, this is Beatrice Franklin

4  for the plaintiffs.

5          I just wanted to flag one issue related to the

6  scheduling proposal that was in a footnote in the status

7  report that I just wanted to flag.

8          If Your Honor is thinking about dates for the

9  scheduling order, we do request that the Court make the

10  deadline for briefings and expert reports roughly even on each

11  side.  This was a bit of an issue with respect to the parties'

12  proposals for class cert briefing.

13          In our proposal, I think each side got basically two

14  months to submit responsive or rebuttal reports.  The

15  defendants wanted to have two and a half months for theirs and

16  then reduced our time to one and a half months.

17          We're fine giving the defendants two and a half

18  months, but we would just request that the Court give us at

19  least two months to respond or give even time with whatever

20  the Court ends up doing with the briefing schedule.

21          So that's the only other issue we would like to put

22  on the table.

23          THE COURT:  Okay.  Who on the defense side would like

24  to respond to that?  Was your original schedule unfair to

25  plaintiffs and not giving them equal time to respond?

1       MS. RENDER:  Your Honor, I don't think there was.

2       I guess I'm unfortunately having a little bit of

3   trouble following -- I see what we're saying.

4       The plaintiffs have seven months to prepare their

5   opening class certification motions.  Defendants then have six

6   weeks with two and a half months to prepare their response,

7   and then the plaintiffs have one and a half -- six weeks to do

8   their reply briefs, and I guess I don't see that as an unfair

9   amount of time.

10      I mean, the plaintiffs have a huge amount of time to

11  prepare their opening briefs, and we're not asking for that

12  much time, of course.  And so the reply briefs usually get a

13  shorter amount of time, but if Your Honor feels that it's more

14  fair to give them more time for their reply, I would just ask

15  for the same kinds of intervals to be applied to the summary

16  judgment motions as well if we're going to set dates certain

17  for the summary judgment motions.

18      MR. BRAUN:  Your Honor, this is Robbie Braun for the

19  plaintiff.  I just want to clarify one thing.

20      Our concern isn't about the time that we as attorneys

21  have for filing our reply.  Our concern is the time that our

22  experts have to receive and analyze and respond to the

23  defendants' expert reports.

24      So the defendants insisted when we were agreeing on

25  an expert protocol that they have up to, I think, five days to

1   even provide to our experts the backup data that their experts

2   are using.  So our experts effectively don't even have six

3   weeks; they'll have just a little bit over five weeks.

4           And then once they get that data which is likely to

5   be fairly voluminous in this case, you know, they'll to go

6   back and try to understand what defendants' experts' analysis

7   of the transactional data and sophisticated regression models,

8   et cetera, are in this case, and then they'll have to respond

9   and rebut to any points that defendants' experts have made

10  based on those models.  And that takes time, and that's why

11  defendants have asked for two and a half months to effectively

12  conduct that analysis with respect to our experts.  And so our

13  experts have asked that they have at least two months to do

14  the same.

15          THE COURT:  I see.  Okay.

16          MS. RENDER:  Your Honor, I'll say this.

17          I certainly think the plaintiffs should have a fair

18  amount of time, and if they don't feel like the schedule

19  provides enough time, then, you know, I don't think defendants

20  have any objection to giving them some more time.

21          I will note for the record that we did not insist on

22  five days.  That was negotiated, and we don't really have the

23  power to force plaintiffs to agree to anything or to insist on

24  anything.  I'm just saying that to defend our honor, but in

25  terms of the amount of time they get, I certainly think they

1    should be provided a fair amount of time.

2         THE COURT:  Okay.  Duly noted.  I will take all of

3    that into account.

4         I think the goal should be for each side to have a

5    fair amount of time here.  I think each side is going to be

6    doing comparable work, at least your experts will be doing

7    comparable work.  The data may be coming from largely the

8    defense side, and so there's more production work on that

9    side; but in terms of the expert analysis, I think it's fair

10   to make sure that they have comparable amounts of time to do

11   the work that they need to do.

12        Okay.  I'm going to get the scheduling order entered

13   for the parties by tomorrow.  The answer is going to be filed,

14   the ESI.

15        I think what I would like to do is to set another

16   telephonic status hearing, and I think given where we are in

17   the year and where you're going to be in your process that I'm

18   going to set that hearing for mid January, and I'm going to

19   direct that the parties file a status report.

20        Let's file the status report by January 8th which is

21   going to give me a written update on where you are with

22   respect to discovery including your electronic discovery.

23        Since that's also going to be the date by which any

24   disputes regarding the ESI terms and custodians will need to

25   be identified for the Court, if you're going to need Court

1   intervention, the status report will give you an opportunity

2   to do that, to both confirm that you've completed that first

3   step in the discovery process and to identify at that point

4   what, if any, disputes you're aware of that are going to need

5   resolution and also whether there are any hiccups that have

6   come up in connection with your early discovery process that

7   might throw off the plans for the remainder of the schedule.

8           So let's go ahead and say that that status report

9   will be filed January 8th.  And then I'll set a telephonic

10  status hearing for mid January to address any issues that are

11  raised in that report.

12          David, can you give us a date and time?

13          THE CLERK:  We can do January 14th at 11:00.

14          MS. MAHONEY:  This is Stacey Mahoney on behalf of

15  Realogy.

16          With all due respect, I have a conflict with another

17  court at that time so I apologize.  If we could perhaps set a

18  different date for the status hearing, I'd be very

19  appreciative.

20          THE CLERK:  January 19 at 11:00.

21          THE COURT:  Does that work for Counsel?

22          MS. MAHONEY:  Yes, Your Honor, it does.

23          THE COURT:  January 19th which is a Tuesday.  I'm

24  guessing that that Monday is the long holiday weekend and the

25  19th is a Tuesday.  At 11:00 a.m.

1      I'll get your status report.  Obviously, if there are

2  issues that come up in the interim, you can either request an

3  earlier status date or file a motion to get something resolved

4  that needs to be resolved.  I look forward to getting the

5  answers.

6      Are the parties going to be putting together a

7  stipulation regarding the deposition protocol at some point,

8  and would you like to have that reflected on the docket?

9      It might be a good idea just in case there are

10  disputes to have something actually signed off on by the Court

11  and filed as a stipulated order in case you have any disputes

12  over how depositions proceed.

13      MR. KLIEBARD:  Your Honor, it's Ken Kliebard again.

14      I think that's a good plan.  Just to be clear, we

15  will provide the plaintiffs with a draft of the completed

16  stipulation, and for the reasons you stated, I do think it

17  would be helpful to have that order entered in the docket.

18      THE COURT:  Okay.  And so you can include in your

19  status report -- if you haven't by then submitted a

20  stipulation for a protocol on deposition discovery, you should

21  provide a status update on where you are in that negotiation.

22      I'm assuming that you're not going to be ready to

23  take depositions by January 8th so that should allow time for

24  you to kind of work out any remaining issues or disputes.

25      It is not usually my practice, by the way, to put

1    even tentative trial dates on my trial calendar so early in

2    the process or at least not as early as we are here because I

3    treat my trial dates as real, firm dates, and I like to be

4    realistic about the possibility that things will change,

5    especially when you're talking about litigation that's going

6    to go on for a couple of years before you get to that trial

7    date.

8           This, however, is a situation where I would expect

9    sort of pencilling in on calendars a trial date perhaps a

10    little sooner than I would normally in part because of the

11    number of attorneys who may need to be involved and to work

12    and to schedule and because of the fact that I would expect

13    witnesses to be coming from multiple places and the need to

14    plan ahead.

15           So once dates are set and a scheduling order and as

16    we get a little closer to actual dispositive motions down the

17    line, I will be approaching the parties about a realistic time

18    frame for trial probably sooner than I might otherwise.

19           You shouldn't expect to see a trial date in the

20    scheduling order that you're going to get this week, but just

21    to let you know that it is in the back of my mind and it will

22    be set in sufficient time for everybody to plan accordingly.

23           MR. BRAUN:  Thank you, your Honor.

24           This is Robbie Braun.

25           There was one final issue that we were hoping to

1 raise, and I think we can address it probably pretty quickly.

2   At the last hearing, Your Honor stated that you

3 didn't see any reason why discovery wouldn't go forward, and

4 since that hearing, plaintiffs have begun negotiating

5 Moehrl-specific discovery with several of the defendants.  We

6 just want to clarify those so there's no room for confusion or

7 doubt that the discovery stay has, in fact, been lifted.

8   THE COURT:  Yes, discovery should be proceeding so

9 you should be proceeding with discovery.  I don't know if you

10 need any more clarification than that.

11   And, you know, the dates that are going to be in the

12 scheduling order are deadlines by which things need to be

13 completed.  So at this point, particularly now that you've had

14 a very fulsome planning meeting on discovery and your initial

15 disclosures are forthcoming in two weeks, the parties should

16 move forward expeditiously with discovery.  You don't have to

17 wait until the latest date to do something in order to get it

18 complete.  So keep that in mind.

19   And I will be in the status reports that I asked the

20 parties to file asking for updates on what you've been able to

21 accomplish since the last status report.  So hopefully, you

22 will always have something to report in terms of progress.

23   MR. BRAUN:  Thank you, your Honor.

24   THE COURT:  Okay, Counsel.  Thank you for answering

25 my questions, and hopefully, you'll get off and moving.

1          Did somebody else have something to raise?

2          Okay.  Thank you, Counsel.  I think that's all for

3    today.

4          Have a good afternoon.  Court is adjourned.

5       (Proceedings adjourned at 2:48 p.m.)

1          C E R T I F I C A T E

2

3

4          I, Brenda S. Tannehill, certify that the foregoing is

5     a complete, true, and accurate transcript from the record of

6     proceedings on November 2, 2020, before the

7     HON. ANDREA R. WOOD in the above-entitled matter.

8

9

10    */s/Brenda S. Tannehill, CSR, RPR, CRR*          11/3/2020

11         Official Court Reporter                 Date
           United States District Court
12         Northern District of Illinois
           Eastern Division
13

14

15

16

17

18

19

20

21

22

23

24

25