IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CHRISTOPHER MOEHRL, MICHAEL COLE, STEVE DARNELL, VALERIE NAGER, JACK RAMEY, DANIEL UMPA, and JANE RUH, on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> THE NATIONAL ASSOCIATION OF REALTORS, REALOGY HOLDINGS CORP., HOMESERVICES OF AMERICA, INC., BHH AFFILIATES, LLC, HSF AFFILIATES, LLC, THE LONG & FOSTER COMPANIES, INC., RE/MAX LLC, and KELLER WILLIAMS REALTY, INC., <br><br> Defendants. | Case No: 1:19-cv-01610 <br><br> Judge Andrea Wood |

**JOINT STATUS REPORT**

Pursuant to the Court's Orders (ECF Nos. 192, 196), Plaintiffs, Christopher Moehrl, Michael Cole, Steve Darnell, Valerie Nager, Jack Ramey, Daniel Umpa, and Jane Ruh, on behalf of themselves and all others similarly situated ("Plaintiffs"), and Defendants, The National Associate of Realtors®, Realogy Holdings Corp., HomeServices of America, Inc., BHH Affiliates, LLC, The Long & Foster Companies, Inc., RE/MAX LLC, and Keller Williams Realty, Inc. ("Defendants"), (collectively, the "Parties"), respectfully submit this Joint Status Report setting forth the current status of discovery, as well as disputes and other issues the Parties wish to raise at the next status conference on January 19, 2021.

**I.      SEARCH TERMS, CUSTODIANS, AND TECHNOLOGY ASSISTED REVIEW ("TAR") PROTOCOL**

The Parties have reached agreement on search terms. Additionally, Plaintiffs and the HomeServices Defendants have agreed to use TAR, and expect to finalize shortly a proposed protocol that they will submit for the Court's approval.

Plaintiffs and NAR, RE/MAX, HomeServices, and Keller Williams have reached agreement on custodians.[1] Plaintiffs and Realogy have agreed on many custodians but have reached an impasse on one proposed custodian addressed below.[2] The respective positions of Plaintiffs and Realogy are set forth below.

In addition, on December 4, 2020, Plaintiffs made a proposal to designate as custodians a small sample of real estate agents that worked at Realogy's corporate subsidiaries. Plaintiffs and Realogy have diligently met and conferred several times regarding this proposal. Realogy also continues to investigate available ESI in response to Plaintiffs' proposal. The Parties are not yet at an impasse on this issue, and think that it is reasonably likely that they will reach compromise. Therefore, the Parties do not think that this issue is ripe for the Court's decision. The Parties anticipate that they will be prepared to inform the Court at the January 19th status hearing whether they have reached compromise or are at an impasse on this issue.

### **Plaintiffs' Position Regarding Anthony Hull**

Plaintiffs propose that Anthony Hull, a former Realogy CFO, be designated as a custodian. Mr. Hull served as CFO of Realogy from 2006 to 2018. Throughout his tenure at Realogy, Mr. Hull repeatedly offered public statements on real estate commissions during investor earnings calls, frequently providing extensive comments on issues at the center of this litigation.

For example, Plaintiffs have specifically alleged that the inflated nature of the buyer broker commission rate is reflected in the fact that the real estate broker commission rate has remained fixed despite steadily increasing home prices. *See, e.g.*, Dkt. 84, ¶¶ 12-13, 126-127. Indeed, the Court specifically relied on these allegations in its order denying the motion to dismiss, stating that "further demonstrating the anticompetitive effect of the Buyer-Broker Commission Rules is the stability of commission rates over the years." *See* Dkt. 184 at 18. On a February 24, 2015 earnings call, Mr. Hull opined in detail on that very topic, stating that the average broker commission rate was expected to remain remarkably steady, despite increasing home prices: "And really what you're going to see -- if you see ABCR [Average Broker Commission] movement, it's mostly going to be due to what's happening with price. ABCR has been amazingly steady over the last three years, despite very robust average sales price increases. So we really benefit from that. And if it moves in the future, it will move a basis point here or there, and it will move mostly by what's happening with average sales price. So, we feel pretty confident that that's not going to be a big variable in the future."[3]

---

[1] Plaintiffs have reserved all rights to seek additional custodians and search terms if appropriate, including based on new information that comes to light or should Plaintiffs learn that Defendants failed to disclose relevant custodians and search terms during the Parties' negotiations. Defendants reserve all rights to contest any such request for additional search terms and custodians.

[2] Plaintiffs take the position that they may seek additional custodians for certain Defendants depending on the resolution of disputes (described below) concerning the scope of franchisee and subsidiary discovery, including the HomeServices Defendants' motion to strike.

[3] See Q4 2014 Realogy Holdings Corp Earnings Call, February 24, 2015 (available at https://ir.realogy.com/static-files/f03cdb63-3438-4791-91b0-52a2dbccd9d9).

Similarly, Plaintiffs have also specifically alleged that the anticompetitive effect of the challenged restraints is reflected in the imperviousness of buyer broker commissions to the increased usage of online services that diminish the actual role of buyer brokers. *See* Dkt. 84, ¶ 14. The Court specifically noted in its order that "the fact that a buyer-broker for a client that first found their home online is compensated the same for doing less work raises an additional antitrust concern." *See* Dkt. 184 at 18, n.8. Again, Mr. Hull offered his own public statements on this very topic on a August 3, 2017 earnings call, stating in response to a question on the effect of new competitors, like Redfin, on the broker commission rate that "we play in 99.5% of the market… the world we play in, the real world we play in is very stable and sustainable for the foreseeable future."[4]

Based on these repeated public statements alone, Plaintiffs anticipate that Anthony Hull is very likely to be one of the Realogy executives whom Plaintiffs will seek to depose in this matter. Obviously, an effective deposition of Mr. Hull depends on access to his custodian files. Mr. Hull's public statements also contradict Realogy's claim that the best custodial sources of relevant documents are the executives running the residential real estate sales business because it was Mr. Hull, not those executives, who repeatedly offered public comments on behalf of Realogy regarding key factual issues in this litigation.

Mr. Hull's position further supports Plaintiffs' contention that he should be designated as a custodian. Upon Mr. Hull's departure in 2018, Realogy specifically emphasized the important role that Mr. Hull had played for over a decade in Realogy's business operations, with Chief Executive Officer Ryan Schneider stating that Mr. Hull "led Realogy's successful 2012 IPO, and since then has guided Realogy as a public company. He has been a strategic and valued partner to our business leaders."[5] Indeed, each of the other corporate defendants has designated at least one individual as a custodian who served either as a chief financial officer or chief economist during the relevant period. Here, Mr. Hull had, by far, the longest tenure of any of the CFOs proposed as custodians by Plaintiffs.

It is well established that "ultimately, the party objecting to discovery bears the burden to show the requested discovery is improper." *Baxter Int'l, Inc. v. AXA Versicherung*, 320 F.R.D. 158, 161 (N.D. Ill. 2017). Realogy has only vaguely articulated the burden that it would face from adding this solitary custodian. In particular, Realogy has not provided search hit reports or any other form of documentation to support its claim that adding Mr. Hull would be unduly burdensome. Realogy also simply asserts that search terms are an initial culling tool that would not be able to serve as a proxy for relevancy or responsiveness. But Realogy has provided no explanation or documentation to support this position. For example, Realogy states that Mr. Hull helped oversee Cartus, a relocation business owned by Realogy. There is no reason to think that search strings could not be designed and applied to exclude documents focused only on the Cartus business. Indeed, Realogy has produced the custodial files of other Realogy executives, such as Mr. Schneider, who also oversaw the Cartus relocation business without apparent trouble.

---

[4] *See* Q2 2017 Realogy Holdings Corp Earnings Call, August 3, 2017 (available at https://ir.realogy.com/static-files/e96630c2-a72f-4ae7-be97-ca6a766b9d82).

[5] https://www.realogy.com/news/2018/11/02/realogy-cfo-anthony-e-hull-to-retire.

Thus, Plaintiffs' request to add Mr. Hull as a custodian is proportional, considering his repeated public statements on issues in the litigation, his status as a likely deponent, and his long-term senior role at the company. *See id.* at 166 (granting discovery request because the party resisting discovery "has not provided the necessary detail for the Court to assess whether it would suffer an undue burden because [the resisting party] has done nothing more than say it would have to review some indefinite number of documents and translate them. It has not provided the Court with estimates of, for example, how many documents it needs to review, how many people would need to be involved in the review process, how long it would take to review the documents, and how much money it would cost to complete the review").

**Realogy's Position Regarding Anthony Hull**

Plaintiffs and Realogy have had several meet-and-confers regarding the appropriate scope of custodians for this case. With regard to custodians, although the Plaintiffs and Realogy made substantial progress,[6] there remains a disagreement about a custodian requested by Plaintiffs, namely, Anthony Hull. As explained below, adding Mr. Hull as a custodian is unduly burdensome and not proportional to the needs of the case for two reasons: (1) Mr. Hull's documents will be largely duplicative of documents already produced to Plaintiffs from other more senior Realogy Holdings Corporation employees; and (2) a large portion of Mr. Hull's documents are not relevant to this litigation because Mr. Hull was a Realogy Holdings Corporation employee.

To be clear, not every witness with possible knowledge of the subject matter of the lawsuit becomes a document custodian. Instead, performing the requisite proportionality analysis as applied to potential custodians focuses on whether that particular custodian's documents are cumulative or duplicative of those that will be produced from other custodians, along with the associated burden and expense of adding custodians. *See, e.g.*, *Simon v. Nw. Univ.*, No. 1:15-CV-1433, 2017 WL 467677, at *2 (N.D. Ill. Feb. 3, 2017) ("Despite the strong public policy in favor of disclosure of relevant materials … a district court should impose limits if the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive.") (internal quotations and citations omitted); *see also Cty. of Cook v. Bank of Am. Corp.*, No. 14 C 2280, 2019 WL 5393997, at *3-5 (N.D. Ill. Oct. 22, 2019) (denying plaintiff's motion to compel additional custodians and upholding the magistrate judge's relevancy and proportionality analysis because, *inter alia,* plaintiff failed to explain why its proposed nine additional custodians would have different information than the current custodians who had similar roles).

Here, a review of Mr. Hull's role reveals Plaintiffs have not established that Mr. Hull would have different or additional information beyond the existing agreed-upon Realogy custodians, including, most particularly, Messrs. Smith and Schneider. Mr. Hull served as Realogy Holdings Corporation's Chief Financial Officer from 2006 until November 2018. In his role as CFO, Mr. Hull reported directly to Realogy Holdings Corporation's Chief Executive Officer at that time, Richard Smith. From November 2018 until March 2019, Mr. Hull served as the Senior Advisor to

---

[6] In addition to the 19 custodians from whom Plaintiffs have already received discovery through the agreed-upon sharing arrangement from the *Sitzer* case (explained in further detail in the text below), Realogy has agreed to add the following additional custodians: Bob Christian, Kate Koplinka-Conquest, Greg Macres, and Kate Rossi.

Realogy Holdings Corporation's then-CEO, Ryan Schneider. Mr. Hull retired in March 2019. Because Mr. Hull reported directly to Mr. Smith and Mr. Schneider during the period relevant to this lawsuit, and Plaintiffs have already received all relevant documents from both Mr. Smith and Mr. Schneider, Mr. Hull's documents are unlikely to yield any additional relevant and responsive documents.

To be clear, pursuant to the procedures for discovery sharing between the *Sitzer* case and this one, Realogy has already produced 989,586 pages of documents (240,330 documents) to Plaintiffs. Relevant to this particular dispute, Realogy has already produced to Plaintiffs in this case all of the responsive and non-privileged documents that it produced in *Sitzer* for Messrs. Schneider and Smith, totaling 10,136 responsive, non-privileged documents (including families) (resulting from a review of more than 40,000 documents (not including families) that hit on search terms for these custodians). Plaintiffs have not articulated why, in the face of that production, Mr. Hull would be a non-duplicative source of any relevant and responsive documents so as to justify, as required under Federal Rule of Civil Procedure 26(b)(2)(C), the additional burden and expense to Realogy. If required to add Mr. Hull as a custodian, Realogy would likely have to review at least another 40,000 documents (not including families), which will be largely duplicative and non-responsive. For example, the two Earnings Call documents Plaintiffs cite as evidence that Mr. Hull is relevant were led by Mr. Smith. *See Kleen Prod. LLC v. Packaging Corp. of Am.*, No. 10 C 5711, 2012 WL 4498465, at *14 (N.D. Ill. Sept. 28, 2012), *objections overruled*, No. 10 C 5711, 2013 WL 120240 (N.D. Ill. Jan. 9, 2013) ("just because a proposed custodian exchanged a large number of emails with a current custodian does not mean that the proposed custodians will have a significant number of important, *non-cumulative* information.") (emphasis in original).

Additionally, because of Mr. Hull's role as a former Realogy Holdings Corporation employee, a large portion of his documents are not responsive in this litigation. That is because Realogy Holdings Corporation is a publicly traded holding company that operates multiple businesses. In addition to Realogy Holdings Corporation's real estate brokerage and franchise businesses, which are encompassed within the subject matter of this lawsuit, Realogy Holdings Corporation operates several businesses that have nothing to do with the subject matter of this litigation, including the Cartus relocation business, the Title and Investment Services business, the joint venture in the mortgage business, and the leads business. These non-responsive businesses are part of the responsibilities of the holding company personnel, including Mr. Hull, throughout the time when Mr. Hull was a Realogy Holdings Corporation employee. Indeed, Plaintiffs themselves establish the non-responsiveness of a significant amount of documents that will have been maintained by Mr. Hull, and thus would have to be reviewed if they hit on search terms (which resulted in approximately 30,000 documents that needed to be reviewed but were ultimately determined to be non-responsive in the cases of Messrs. Schneider and Smith) by acknowledging his role with regard to the 2012 IPO. Moreover, as described above, Realogy has already produced documents from the agreed-to custodians in the *Sitzer* litigation, which include several Realogy Holdings Corporation executives and C-Suite executives for the residential real estate company-owned brokerages and residential real estate franchise business. Given that Plaintiffs already have access to the best custodial sources of relevant and responsive documents – from the people actually responsible for running the relevant residential real estate sales business – there is no need for documents from an additional Realogy Holdings Corporation executive.

As such, to the degree that Mr. Hull has any relevant and responsive documents, they will be largely duplicative of those from Messrs. Smith and Schneider's documents. Furthermore, requiring a review of Mr. Hull's documents will also necessitate an unwarranted and unjustifiable review of a significant number of documents that will be non-responsive to this litigation.[7] Nor is it dispositive that Plaintiffs might depose Hull. That possibility cannot be the litmus test; otherwise a party could automatically and unilaterally justify identifying a "custodian" through a non-committal statement that the potential custodian might be deposed.

Not coincidentally, the *Sitzer* Plaintiffs also sought (unsuccessfully) to include Mr. Hull as a custodian, in addition to Ryan Schneider and Richard Smith. In receipt of virtually identical arguments to those from Realogy, the Court in *Sitzer* denied plaintiffs' request to include the production of Mr. Hull's documents. *Sitzer* Dkt. No. 255.

Accordingly, for these reasons, this Court should reject Plaintiffs' request to include Anthony Hull as a custodian, just as the Court did in *Sitzer*.

## II.   THE HOMESERVICES DEFENDANTS' MOTION TO STRIKE CERTAIN PLAINTIFFS' CLASS ALLEGATIONS

On January 12, 2021, Plaintiffs and the HomeServices Defendants will complete briefing on the HomeServices Defendants' motion to strike certain Plaintiffs' class allegations. The Parties have proposed that the Court hear argument on the motion at the January 19, 2021 status conference.

## III.   FRANCHISEE DISCOVERY

Plaintiffs and Realogy Holdings Corp., HomeServices of America, Inc., BHH Affiliates, LLC, The Long & Foster Companies, Inc., RE/MAX LLC, and Keller Williams Realty, Inc. (the "Corporate Defendants") have reached an impasse on whether the Corporate Defendants have possession, custody, or control over certain documents associated with brokerages that operate pursuant to franchise agreements with the Corporate Defendants. The Parties are working on a proposed briefing schedule that will be submitted to the Court separately, but anticipate submitting briefing on this issue shortly and propose scheduling an oral argument on that issue in February.

## IV.   REMOTE DEPOSITION PROTOCOL

The Parties have jointly negotiated and in large part agreed to a protocol to govern the procedure for remote depositions, and have agreed that the protocol will be subject to periodic reassessment starting in April 2021 to take into account the evolving public health crisis and the emerging vaccination efforts as related to COVID-19.

The Parties, however, remain in dispute as to one discrete issue: whether the deposing party shall generally be required to provide in advance paper copies of exhibits to a witness to be used during a remote deposition. Plaintiffs' position, as discussed below, is that because exhibits will be displayed electronically during the deposition to the witness and all participants through an

---

[7] This is true, regardless of the use of search terms, which only serve as an initial culling tool that is not a proxy for relevance and responsiveness.

online exhibit sharing platform, advance printing and mailing of hard-copy exhibits is unnecessary and unduly burdensome on the deposing party. Defendants' position, as discussed below, is that hard-copy exhibits should be provided to the witness for review at the deposition, subject to appropriate safeguards to ensure the exhibits are not reviewed prior to actually being used and presented as exhibits at a deposition, and the ability of the Parties to supplement the hard-copy paper exhibits with electronic exhibits on limited bases. The Parties detail their positions below.

The Parties in *Moehrl* and *Sitzer* have conferred and reached agreement in principle on a protocol to govern remote depositions, with the exception of whether the deposing party should be required to mail physical copies of deposition exhibits to the deponent in advance of the deposition. The Parties' positions on this issue are reflected below.

### **Plaintiffs' Position**

Plaintiffs have worked hand-in-hand with Defendants to develop a draft protocol that spells out the procedures governing remote depositions conducted in this case and protects the interests of witnesses and parties. Plaintiffs and Defendants remain in dispute about one issue, however. Defendants have demanded that the deposing party be required to mail to the deponent physical copies of potential exhibits in advance of any remote deposition. For the reasons addressed below, Defendants' proposed procedure is wholly unnecessary, burdensome, and prejudicial to the deposing party—which, for the vast majority of depositions in this case, will be Plaintiffs.

*First*, modern exhibit-sharing platforms render physical exhibits outmoded and superfluous in a remote-deposition setting. *See, e.g.*, *Lopez v. CIT Bank, N.A.*, No. 15-cv-00759, 2015 WL 10374104, at *2 (N.D. Cal. Dec. 18, 2015) ("Modem videoconference software permits participants to quickly and conveniently share documents and images with each other."); *Joffe v. King & Spalding LLP*, No. 17-cv-03392, 2020 WL 4361754, at *2 (S.D.N.Y. July 9, 2020) (affording the deposing party the option to "introduce exhibits electronically during the deposition" *or* to "mail or deliver via courier physical copies of documents that may be used during the deposition"); *Hernandez v. Bobst Grp. N. Am., Inc.*, No. 1:19-cv-00882, 2020 WL 6063143, at *4 (E.D. Cal. Oct. 14, 2020) (reflecting an agreement not to disclose remote deposition exhibits in advance and to instead use "the available and prevalent technology of email and screenshare"). Indeed, for most document types, exhibit-sharing platforms are equally adept as hard-copy documents at publishing exhibits; and, in other instances (e.g., Excel documents, and PowerPoint presentations), have significant advantages.

This is borne out by the collective experience of multiple attorneys for Plaintiffs who have taken numerous remote depositions in other matters using modern exhibit-sharing platforms. In those depositions, the publication and use of exhibits has proceeded with few issues, including where physical exhibits were not mailed in advance to the deponent. For instance, the stipulated remote deposition protocol in the complex and discovery-intensive *Stock Lending* antitrust suit does not require the advance disclosure of exhibits through the mail or otherwise. *Ia. Pub. Employees' Ret. Sys. v. Bank of Am.*, No. 17-cv-6221 (S.D.N.Y.), Dkt. 302 (Appendix ("App.") A, Ex. 1). In that case, thousands of exhibits have been introduced without issue across more than one hundred depositions (most using the same exhibit-sharing platform Defendants have suggested the Parties use here). Nevertheless, claiming to have "canvassed dockets around the country," Defendants inaccurately represent that advance mailing of hard copy exhibits is "generally

accepted practice." To the contrary, numerous courts have endorsed the use of electronic-only exhibits, or have permitted the *deposing* party to choose whether to mail advance paper copies of potential exhibits.[8] As courts and parties have become more comfortable with remote depositions, reliance on outmoded paper exhibits has, if anything, become *less* common. Consistent with this, the model remote deposition stipulation endorsed by Judge Cave (S.D.N.Y.) permits the deposing party to choose whether to rely exclusively on electronic exhibits or paper exhibits (or both). App. A, Ex 7.

Here, the Parties have discussed jointly using AgileLaw's exhibit-sharing platform (which Defendants proposed and endorsed). The AgileLaw platform allows deposing counsel to quickly export documents and, when introduced as exhibits, to instantly share them with the deponent and other participating counsel. Indeed, AgileLaw itself addresses the benefits of relying exclusively on its platform instead of mailing physical exhibits:

> Here is a short list: Save all your copy costs and shipping costs; search all your documents instantly; sync your view to the witness's view and sync the witness's view to yours – meaning you can literally "get on the same page" in no time; ensure everyone gets identical copies of all exhibits immediately after the deposition; easily conduct remote depositions without shipping all your exhibits ahead of time for the witness to prepare; add last minute documents with a simple upload – no more last-minute scrambles to make copies of a forgotten document; the list goes on…

https://www.agilelaw.com/#agilelaw-menu; *see also* https://www.agilelaw.com/wp-content/uploads/Nelson-Mullins-Case-Study1.pdf (describing how counsel at a large defense firm was able to use AgileLaw in a deposition with 237 exhibits comprising 50,265 printed pages). AgileLaw is available as both a browser-based platform and an application that can be loaded onto a tablet, including a loaner tablet sent to the witnesses for purposes of the deposition.

*Second*, Defendants' proposal creates unnecessary burdens on the deposing party—and even Defendants—with few countervailing benefits. It would require deposing counsel to identify, print, and mail to the deponent a complete set of physical exhibits several days prior to the deposition. Printing and mailing a full set of dozens, if not hundreds, of paper exhibits is costly, not to mention an environmental burden. It imposes an unrealistic requirement that deposing counsel fully prepare their deposition outlines and exhibits several days before a deposition. Even

---

[8] *See also, e.g.*, Stipulation Regarding Remote Deposition Protocol, ¶h(i), *DZ Reserve v. Facebook, Inc.*, No. 3:18-cv-04978 (N.D. Cal.), Dkt. 187 (App. A, Ex. 2) (default procedure is for parties to introduce exhibits exclusively through an exhibit sharing platform); Deposition Protocol at 41, Fifth Am. Case Management Order, *In re Flint Water Cases*, No. 5:16-cv-10444 (E.D. Mich.), Dkt. 1255 (App. A, Ex. 3) (permitting counsel to make exhibits available to deposition participants during each deposition); Order, *Doe I v. Exxon Mobil Corp.*, No. 1:01-cv-1357 (D.D.C.), Dkt. 750 (App. A, Ex. 4) (allowing questioning counsel to elect whether to rely exclusively on electronic or paper exhibits); Stipulation & Order Establishing Remote Deposition Protocol, *Martinelli v. Johnson & Johnson*, No. 2:15-cv-01733 (E.D. Cal.), Dkt. 244 (App. A., Ex. 5) (providing that, "[i]n lieu of hard-copy exhibits, the noticing party may use electronic exhibits"); Pretrial Order No. 35, *In re: 3M Combat Arms Earplug Prods. Liability Litig.*, No. 3:19-md-2885 (N.D. Fla.), Dkt. 1125 (App. A, Ex. 6) (permitting deposition counsel to provide the witness and counsel with exhibits either via physical or electronic means).

were the Parties permitted to identify and use a limited number of electronic-only "last minute" exhibits, Defendants' proposed mailing requirement is likely to lead to unnecessary disputes among the Parties over compliance with the spirit of that requirement. And Defendants' proposal creates a real risk that confidential material will be inadvertently disclosed. Under the terms of the protective order, Plaintiffs are allowed to present highly confidential materials produced by one defendant to a witness from another defendant in the course of a deposition. If deposing counsel is required to send not only the exhibits that are ultimately used, but any potential exhibits, counsel will likely send many highly confidential documents from one competitor Defendant to the offices of another. Even if the remote protocol includes provisions for destruction of the exhibits after the deposition, perfect compliance may be unattainable. The simplest course of action for effectuating each side's significant interest in the confidentiality of potential exhibits for remote depositions, and saving the cost and time burden of preparing and mailing hard-copy exhibits, would be to publish them electronically.

In response, Defendants make various pseudo-scientific arguments to justify the burdensome and unnecessary procedure they propose—relying, for instance, on a "meta-analysis on the effects of reading media" finding a trivial one-fifth standard deviation in reading comprehension between paper and electronic documents. But deponents here will not be using exhibits to study for their European History finals. In depositions, witnesses—who have been prepared for the deposition by counsel—are typically asked to identify a document and to testify regarding specific passages identified by deposing counsel. Defendants provide no explanation, using scientific literature or otherwise, as to why the remote exhibit sharing platform that Defendants themselves researched and selected is not up to these basic tasks. If anything, Defendants' proposed paper-*and*-electronic copy procedure imposes far greater hurdles to reading comprehension and efficient questioning than requiring all deposition participants to work off of the same electronic document. Indeed, deponents would be required to shift their attention, back-and-forth, across electronic and paper copies of the same exhibit. This is further reason to reject Defendants' proposal.

In addition, Defendants ignore the reality of how attorneys and business executives actually do their jobs in the 21st Century. Defendants bemoan the need for deponents to perform such tasks as "reading a document on a screen" and "scroll[ing] through multiple pages" to identify information like "dates" and "email recipients." Defendants' parade of horribles notwithstanding, these are common tasks that most professionals perform hundreds of times a day using computers and other electronic devices. They do not justify the added burden and expense of mailing potential exhibits in advance of a deposition. Even so, in the extremely rare instance that a technologically unsophisticated witness is truly unable to perform these basic actions using electronic exhibits, Plaintiffs are committed to working with the deponent and counsel to devise a reasonable workaround. Defendants further complain that, without advance paper copies of exhibits, deponents may have to "split[] their screen[s]" in half—with a document on one side and video on the other. But this is a non-issue. As most attorneys can attest based on their own daily work experience, even laptop screens are usually large enough to fit two windows; and many professionals regularly use or have ready access to large or multiple screens. Finally, as noted above, the AgileLaw application can be loaded onto a loaner tablet sent to any deponent who prefers an additional screen.

9

In sum, Plaintiffs request that the Court reject Defendants' proposal that the deposing party (generally Plaintiffs) be required to mail potential exhibits in advance to each deponent.

**Defendants' Position**

The Parties and the Court have all been required to adapt to important and necessary COVID-19 safety precautions in light of the ongoing pandemic. Everyone has had to adjust to "the new normal" in many significant respects, and litigants are no exception. Although there is reason for optimism given the recent vaccination developments, it is clear that in order for the Parties to continue making meaningful progress with discovery, the procedure for depositions in this lawsuit should ensure the safety of all participants. The Parties agree on this. Therefore, Defendants proposed to Plaintiffs a protocol to govern the procedure for depositions to proceed via a remote platform where some or all of the Parties that participate are not in the same room – and the witness, counsel, and court reporter are visible through a remote videography-based deposition platform (*i.e.*, Zoom). The Defendants' proposed remote deposition protocol preserves the integrity of the depositions, allows the seamless participation in depositions by counsel, and replicates for the witness, as much as possible, the procedures and protections of an in-person deposition.

A key challenge presented by remote depositions is how to provide a witness with a meaningful ability to review and testify about deposition exhibits, some of which may be lengthy and some of which may be substantively related to one another. It is anticipated that, given the scope of document discovery that has already occurred in this case, with yet further party and third-party document productions forthcoming, many of the depositions in this case (including those taken of Defendants' and third parties' witnesses) will be document intensive. We know from the document productions completed to date that many of the documents produced are not simple one-page documents, but instead are multiple pages, and at times, are lengthy documents or long email threads. On top of that, particularly given that the discovery period includes documents dating many years for all Defendants and third parties, and back to 1996 for certain NAR documents, many of the documents that have been produced will not be of recent vintage that might otherwise be top-of-mind for the deponent. Thus, the challenge to the witnesses of reviewing and testifying to these exhibits is tangible in this high-stakes litigation, and enabling their ability to testify thoroughly and accurately should be paramount.

In light of the importance of exhibits to the depositions in this lawsuit, Defendants propose that all Parties be required to provide witnesses printed copies of the exhibits anticipated to be used during each deposition, just as it would be if these depositions were proceeding in non-pandemic times.[9] The paper copy exhibits could be delivered via overnight service for delivery the day before the deposition and appropriately sealed so that all Parties can confirm during the deposition that the documents had not been reviewed in advance. *See* Appendix B, Current Draft Remote Deposition Protocol, ¶ 41.[10] Defendants are not alone in their view of the appropriateness of this

---

[9] Addressing one of Plaintiffs' concerns, Defendants previously agreed that for lengthy spreadsheets, Defendants would be amenable to dispense with a paper copy requirement.

[10] The Parties agree on most aspects of the Current Draft Remote Deposition Protocol, with the exception of the paragraphs indicated in red and blue text in Appendix B. As concerns the current dispute, Plaintiffs are advocating for the paragraphs in red text (¶¶ 39, 40), while Defendants are advocating for the paragraph in blue text (¶ 41).

process. Defendants have canvassed dockets around the country to see how other courts have addressed this issue. As can be seen in the attached chart and appendix of deposition protocols, it is now a generally accepted practice for courts to enter orders that require the exchange of hard copy exhibits prior to a deposition. *See* Appendix C. In addition, Defendants' proposal is based on their own (and their colleagues') experiences with remote depositions in document-intensive depositions.

The reasons justifying this common practice are substantial: Witnesses will be sitting for their depositions remotely, "attending" the deposition via a computer screen. The witness may have more difficulty reading a document on a screen than he or she would if provided a paper copy—particularly if the witness has a small display or experiences challenges reading small, electronic text. Accordingly, review of exhibits provided only electronically will not result in an optimal record. This is not mere speculation. Multiple academic studies have confirmed what we all know from our own life experiences: readers "tend to absorb more when they're reading on paper than on screens, particularly when it comes to nonfiction material." Jill Barshay, "Evidence Increased for Reading on Paper Instead of Screens," *The Hechinger Report*, (Aug. 12, 2019), *available at* https://hechingerreport.org/evidence-increases-for-reading-on-paper-instead-of-screens/ (last visited Jan. 6, 2021); Pablo Delgado, *et al.*, "Don't throw away your printed books: A meta-analysis on the effects of reading media on reading comprehension," 25 Education Res. Rev. 23 (Nov. 2018) (discussing "evidence of a robust screen inferiority effect" on comprehension and noting experimental evidence that "those who read from computers showed screen inferiority: they had more pronounced overconfidence than paper learners and achieved lower test scores").

Putting aside the difficulty of reading documents on a computer screen, and the ability of witnesses to better absorb hard-copy documents, the deponent will be required to use the limited real estate on their computer's display to watch the counsel taking the deposition and monitor the colloquy, such as objections by defending counsel. Requiring the witness, at the same time, to use the computer's display (perhaps splitting the screen in half) to read and testify as to exhibits displayed on the screen is unfair to the witness and bears no resemblance to a normal, non-pandemic, deposition. In addition, a witness who is not technologically sophisticated may have trouble navigating an electronically displayed document and instead have "tunnel vision" as to the particular portion of a document highlighted by examining counsel on the screen—rather than reviewing the full and complete context of a document as a deponent would do in person.

Further, with lengthy exhibits, the need to scroll through multiple pages to try to find the context, date of the document, recipients of the email or document, and the like, are tedious and unnecessary tasks – particularly given the simple alternative of providing the witness with a physical copy of the document. Commenters agree: "Providing physical copies to all individuals involved is the best option for exhibit sharing in a virtual deposition. Attorneys should distribute documents in advance, in sealed and labeled envelopes if practical, or in a binder. All recipients should be instructed not to open any envelopes, or the package containing the binder, until they are onscreen during the deposition."[11]

---

[11] Marjorie J. Peerce, *et al.*, *Virtual Depositions in the Time of the*

There is no strong argument against requiring hard-copy exhibits for the deponent. For starters, Plaintiffs' burden argument is weak. Plaintiffs grouse that they will have to work on their deposition outlines and identify exhibits a few days before the deposition, and not at the last minute as they apparently prefer. Yet, if these depositions were to take place in person, counsel would be required to identify and make copies of their exhibits before traveling to take the deposition. So, the burden argument rings hollow. To address Plaintiffs' articulated argument regarding the possible need to add exhibits after the paper copies were finalized and put into overnight delivery the day before, Defendants' proposed protocol contemplates that, if an examining party wishes to introduce an exhibit that was inadvertently not provided in advance, the attorney may do so. That can be accomplished, as an exception, through the remote platform deployed by the Parties' depositions vendor(s) (*e.g.*, on the witness's computer). Appendix B ¶ 41. There is no reason to assume, as Plaintiffs suggest, that this will spark deposition strife, unless the exception swallows the rule, and the Parties have no current basis to anticipate that kind of non-compliant conduct. Next, Plaintiffs' argument that requiring paper exhibits "creates a real risk that confidential material will be inadvertently disclosed" makes no sense. If Plaintiffs are concerned that paper exhibits that are not used during the deposition may nevertheless be disclosed to the Parties, this concern is already addressed in the protocol, which provides for placing individual exhibits in sealed envelopes and requires that unused exhibits be returned to examining counsel. Appendix B ¶¶ 41-42.

Furthermore, as articulated by Plaintiffs, the risk of inadvertent disclosure of highly confidential materials is equally present regardless of whether counsel share the documents electronically during the deposition, or in hard-copies unsealed upon introduction during the deposition itself. While mistakes could happen, there is no basis to assume mistakes are more likely to occur with paper versus on-screen exhibits. And of course, the Parties will work together in good faith to rectify any such mistakes. Additionally, any concern that the witness will prematurely examine the exhibits before the deposition commences is eliminated by the protocol's requirement that the sealed exhibits be opened on the record. Appendix B ¶ 41. Accordingly, the handful of concerns voiced by Plaintiffs are not at all compelling and are vastly outweighed by the prejudice to the witness if hard-copy exhibits are not required (other than under the circumstances of the limited, defined exceptions).

In sum, the fairest method for recording deposition testimony is to follow the tried and true procedure of using hard-copy deposition exhibits. Defendants' proposal reasonably accommodates the scant concerns raised by Plaintiffs while minimizing prejudice to the witness.

## V. PROPOSED DOJ/NAR CONSENT DECREE

On November 19, 2020, the Department of Justice and the National Association of Realtors® entered into a proposed consent decree ("Consent Decree"). [Proposed] Final Judgment,

---

*Coronavirus Pandemic*, Legal Intelligencer (April 14, 2020), https://www.ballardspahr.com/-/media/files/articles/the-legal-intelligencer---virtual-depositions---04-20.pdf?la=en&hash=061C9ADF892388BE89BAA5B5CAB7C1D3; *see also* Jamie Ballinger, *et al.*, *Navigating Remote Depositions: A Practitioner's* Guide (April 22, 2020), https://www.bakerdonelson.com/navigating-remote-depositions-a-practitioners-guide ("Keep in mind that it is usually easier for a witness to review a hard copy of exhibit and the court reporting agency can also simultaneously show the exhibit on the deposition platform."). *See also* Appendix B ¶ 41.

12

*United States v. NAR*, No. 1:20-cv-03356 (D.D.C. filed Nov. 19, 2020), ECF No. 2. The Consent Decree and related materials can be found at the following website: https://www.justice.gov/atr/case/us-v-national-association-realtors-0.

## VI. SITZER CASE DEVELOPMENTS

In *Sitzer*, party and third-party document discovery is ongoing. Defendants recently served deposition notices on the named *Sitzer* plaintiffs. The plaintiffs' motion for class certification is due on February 22, 2021.

## VII. REMAINING DISCOVERY ISSUES

Various Parties continue to confer on additional discovery issues, including the scope of certain document requests and transactional data productions. If, after conferring in good faith, the Parties are unable to resolve any outstanding discovery issues, they will raise them with the Court when they become ripe.

Dated: January 8, 2021                  Respectfully submitted,

| *Co-Lead Counsel for Plaintiffs* | *Counsel for Homeservices of America, Inc., BHH Affiliates, LLC, HSF Affiliates, LLC, The Long & Foster Companies, Inc.* |
|---|---|
| /s/ Robert A. Braun | |
| Daniel A. Small | |
| dsmall@cohenmilstein.com | /s/ Robert D. Macgill |
| Kit A. Pierson | Robert D. Macgill |
| kpierson@cohenmilstein.com | robert.macgill@macgilllaw.com |
| Benjamin D. Brown | Matthew T. Ciulla |
| bbrown@cohenmilstein.com | matthew.ciulla@macgilllaw.com |
| Robert A. Braun | MACGILL PC |
| rbraun@cohenmilstein.com | 55 Monument Circle, Suite 1200C |
| COHEN MILSTEIN SELLERS & TOLL PLLC | Indianapolis, IN 46204 |
| 1100 New York Ave. NW, Fifth Floor | (317) 721-1253 |
| Washington, DC 20005 | |
| Telephone: (202) 408-4600 | Jay N. Varon |
| | jvaron@foley.com |
| | Jennifer M. Keas |
| Carol V. Gilden (Bar No. 6185530) | jkeas@foley.com |
| cgilden@cohenmilstein.com | FOLEY AND LARDNER LLP |
| COHEN MILSTEIN SELLERS & TOLL PLLC | 3000 K Street NW, Suite 600 |
| 190 South LaSalle Street, Suite 1705 | Washington, DC 20007 |
| Chicago, IL 60603 | (202) 672-5436 |
| Telephone: (312) 357-0370 | |

Marc M. Seltzer
 mseltzer@susmangodfrey.com
Steven G. Sklaver
 ssklaver@susmangodfrey.com
SUSMAN GODFREY LLP
1900 Avenue of the Stars, Suite 1400
Los Angeles, California 90067
Telephone: (310) 789-3100

Matthew R. Berry
 mberry@susmangodfrey.com
Alexander W. Aiken
 aaiken@susmangodfrey.com
SUSMAN GODFREY LLP
1201 Third Avenue, Suite 3800
Seattle, Washington 98101
Telephone: (206) 516-3880

Beatrice C. Franklin
 bfranklin@susmangodfrey.com
SUSMAN GODFREY LLP
1301 Avenue of the Americas
32nd Floor
New York, NY 10019
Telephone: (212) 336-8330

Steve W. Berman (Bar No. 3126833)
 steve@hbsslaw.com
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292

Daniel Kurowski
 dank@hbsslaw.com
Whitney Siehl
 wsiehl@hbsslaw.com
HAGENS BERMAN SOBOL SHAPIRO LLP
455 North Cityfront Plaza Drive, Suite 2410
Chicago, IL 60611
Telephone: (708) 628-4949

James D. Dasso
 jdasso@foley.com
Erik Kennelly
 ekennelly@foley.com
FOLEY & LARDNER LLP
321 N. Clark St., Suite 2800
Chicago, IL 60654
(312) 832-4588

*Counsel for Realogy Holdings Corp.*

*/s/ Kenneth M. Kliebard*
Kenneth Michael Kliebard
 kenneth.kliebard@morganlewis.com
Heather Nelson
 heather.nelson@morganlewis.com
MORGAN LEWIS & BOCKIUS LLP
77 West Wacker Drive, Suite 500
Chicago, IL 60601-5094
(312) 324-1000

Stacey Anne Mahoney, *pro hac vice*
 stacey.mahoney@morganlewis.com
MORGAN, LEWIS & BOCKIUS LLP
101 Park Avenue
New York, NY 10178
(212) 309-6000

William T. McEnroe
 william.mcenroe@morganlewis.com
MORGAN, LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, PA 19103
(215) 963-5000

Rio S. Pierce
 riop@hbsslaw.com
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000

*Counsel for Keller Williams Realty, Inc.*

*/s/ Timothy Ray*
Timothy Ray
 Timothy.Ray@hklaw.com
William F. Farley
  william.farley@hklaw.com
HOLLAND & KNIGHT LLP
150 N. Riverside Plaza, Suite 2700
Chicago, IL 60603
(312) 263-3600

David C. Kully
 david.kully@hklaw.com
Anna P. Hayes
 anna.hayes@hklaw.com
HOLLAND & KNIGHT LLP
800 17th Street NW, Suite 1100
Washington, DC 20530
(202) 469-5415

*Counsel for RE/MAX, LLC*

*/s/ Jeremy J. Gray*
Jeremy J. Gray
 jjgray@jonesday.com
Odeshoo Hasdoo
 ehasdoo@jonesday.com
Megan E. Ryan
 mryan@jonesday.com
JONES DAY
77 W Wacker, Suite 3500
Chicago, IL 60605
(312) 782-3939

Jeffrey A. LeVee
  jlevee@jonesday.com
 JONES DAY
 555 S. Flower Street, 50th Floor
 Los Angeles, CA 90071
(213) 243-2572

15

*Counsel for Defendant*
*National Association of Realtors®*

*/s/ Jack R. Bierig*
Jack R. Bierig
 jbierig@schiffhardin.com
Robert J. Wierenga
 rwierenga@schiffhardin.com
Adam J. Diederich
 adiederich@schiffhardin.com
SCHIFF HARDIN LLP
233 South Wacker Drive, Suite 7100
Chicago, IL 60606
312-258-5500 (Phone)
312-258-5600 (Fax)

Suzanne L. Wahl
  swahl@schiffhardin.com
SCHIFF HARDIN LLP
350 S. Main Street, Suite 210
Ann Arbor, MI 48104
(734) 222-1517