1      UNITED STATES DISTRICT COURT
       NORTHERN DISTRICT OF ILLINOIS
2           EASTERN DIVISION

3  CHRISTOPHER MOEHRL, MICHAEL COLE,     )
   STEVE DARNELL, VALERIE NAGER,         )
4  JACK RAMEY, DANIEL UMPA, and          )
   JANE RUH, on behalf of themselves     )
5  and all others similarly situated,    )
                                         )
6           Plaintiffs,                  )
                                         )
7           vs.                          ) No. 1:19-cv-01610
                                         )
8  THE NATIONAL ASSOCIATION OF           )
   REALTORS, REALOGY HOLDINGS CORP.,     ) Chicago, Illinois
9  HOMESERVICES OF AMERICA, INC.,        )
   BHH AFFILIATES, LLC,                  ) February 24, 2021
10 HSF AFFILIATES, LLC, THE LONG AND     )
   FOSTER COMPANIES, INC.,               )
11 RE/MAX LLC, and KELLER WILLIAMS       ) 11:18 a.m.
   REALTY, INC.,                         )
12                                       )
            Defendants.                  )
13

14      TRANSCRIPT OF PROCEEDINGS - MOTION HEARING
                VIA VIDEOCONFERENCE
15
         BEFORE THE HONORABLE ANDREA R. WOOD
16

17 APPEARANCES:

18 For the Plaintiffs:   COHEN MILSTEIN SELLERS & TOLL, PLLC
                         BY:  MR. ROBERT ABRAHAM BRAUN and
19                       MR. KIT A. PIERSON
                         (Appeared via videoconference)
20                       1100 New York Avenue, Suite 500
                         Washington, DC 20002
21                       (504) 258-9894
                         rbraun@cohenmilstein.com
22                       kpierson@cohenmilstein.com

23

24

25

```
 1   APPEARANCES:   (Continued)

 2   For the Plaintiffs:     SUSMAN & GODFREY LLP
                             BY:  MS. BEATRICE FRANKLIN
 3                           (Appeared via videoconference)
                             1301 Avenue of the Americas, 32nd Floor
 4                           New York, New York 10019
                             (212) 336-8330
 5                           bfranklin@susmangodfrey.com

 6                           HAGENS BERMAN SOBOL SHAPIRO, LLP
                             BY:  MR. RIO SHAYE PIERCE
 7                           (Appeared via videoconference)
                             715 Hearst Avenue, Suite 202
 8                           Berkeley, California 94710
                             (510) 725-3000
 9                           riop@hbsslaw.com

10   For the Defendant
     National Association
11   of Realtors:            SCHIFF HARDIN, LLP
                             BY:  MR. JACK R. BIERIG
12                           (Appeared via videoconference)
                             233 South Wacker Drive, Suite 7100
13                           Chicago, Illinois 60602
                             (312) 258-5500
14                           jbierig@schiffhardin.com

15   For the Defendant
     Realogy Holdings
16   Corp.:                  MORGAN LEWIS & BOCKIUS LLP
                             BY:  MR. KENNETH M. KLIEBARD
17                           (Appeared via videoconference)
                             77 West Wacker Drive
18                           Chicago, Illinois 60601
                             (312) 324-1000
19                           kenneth.kliebard@morganlewis.com
                                      -and-
20

21

22

23

24

25
```

```
 1   APPEARANCES:   (Continued)

 2                             MORGAN LEWIS & BOCKIUS LLP
                              BY:  MS. STACEY ANNE MAHONEY
 3                            (Appeared via videoconference)
                              101 Park Avenue
 4                            New York, New York 10178
                              (212) 309-6000
 5                            stacey.mahoney@morganlewis.com

 6   For the Defendant
     HomeServices of
 7   America; BHH Affiliates,
     LLC; HSF Affiliates,
 8   LLC; The Long and Foster
     Companies, Inc.:         MacGILL PC
 9                            BY:  MR. ROBERT DEAN MacGILL and
                              MR. MATTHEW T. CIULLA
10                            (Appeared via videoconference)
                              55 Monument Circle, Suite 1200C
11                            Indianapolis, Indiana 46204
                              (317) 721-1253
12                            robert.macgill@macgilllaw.com

13                                  -and-

14                            FOLEY & LARDNER, LLP
                              BY:  MR. JAY N. VARON and
15                            MS. JENNIFER M. KEAS
                              (Appeared via videoconference)
16                            3000 K Street NW
                              Washington, DC 20007
17                            (202) 672-5380
                              jvaron@foley.com
18                            jkeas@foley.com

19   For the Defendant
     Re/Max Holdings:         JONES DAY
20                            BY:  MR. JEFFREY A. LEVEE
                              (Appeared via videoconference)
21                            555 South Flower Street Suite 5000
                              Los Angeles, California 90071
22                            (213) 489-3939
                              jlevee.com

23

24

25
```

4

```
1    APPEARANCES:   (Continued)

2    For the Defendant
     Keller Williams
3    Realty, Inc.:              HOLLAND & KNIGHT, LLP
                                BY:  MR. TIMOTHY RAY,
4                               MS. ANNA PENDLETON HAYES,
                                MR. DAVID C. KULLY
5                               (Appeared via videoconference)
                                150 North Riverside Plaza, Suite 2700
6                               Chicago, Illinois 60606
                                (312) 928-6042
7                               timothy.ray@hklaw.com
                                anna.hayes@hklaw.com
8                               david.kully@hklaw.com

9

10

11

12

13

14

15

16

17

18

19

20

21

22   Court Reporter:            Brenda S. Tannehill, CSR, RPR, CRR
                                Official Court Reporter
23                              219 South Dearborn Street, Suite 1928
                                Chicago, Illinois 60604
24                              (312) 554-8931

25                              brenda_tannehill@ilnd.uscourts.gov
```

1      (Proceedings heard in open court:)

2         THE COURT:  Okay.  It seems as if we're all ready.  I

3 think I'm the last one to join, so I think we're ready to get

4 started.  I'm going to ask my courtroom deputy to call the

5 case, and then we'll go around and get appearances from

6 everyone on the line starting with the plaintiffs when we do

7 that.

8         David.

9         THE CLERK:  19 C 1610, Moehrl versus the National

10 Association of Realtors for motion and status hearing.

11         MR. AIKEN:  Thank you.  This is Alexander Aiken from

12 Sussman Godfrey on behalf of the plaintiffs.

13         THE COURT:  Do we have other counsel for plaintiffs

14 on our video call?

15         MR. BRAUN:  Yes, Your Honor.  Although Alex is going

16 to be taking the lead for us on the franchisee discovery

17 issue, you've got Robert Braun from Cohen Milstein also for

18 the plaintiff.

19         MR. PIERCE:  This is Rio Pierce from Hagens Berman

20 also for the plaintiffs.

21         THE COURT:  Thank you, Mr. Pierce.

22         Anyone else?

23         As no one is jumping in, let's move to defense

24 counsel and start with, let's say, counsel for the National

25 Association of Realtors.

1          MR. BIERIG:  Good morning, your Honor.  Jack Bierig

2   of Schiff Hardin for the National Association of Realtors.

3          THE COURT:  Okay.  And for Realogy Holdings Corp?

4          MR. KLIEBARD:  Good morning, your Honor.

5   Ken Kliebard and also Stacey Anne Mahoney from Morgan Lewis on

6   behalf of Realogy.

7          THE COURT:  HomeServices of America?

8          MR. VARON:  Good morning, your Honor.  Jay Varon from

9   Foley & Lardner for HomeServices of America as well as for BHH

10  Affiliates, HSF and Long and Foster.

11         I'm not sure if there are other counsel on the line

12  for HomeServices.

13         MR. MACGILL:  Good afternoon, Your Honor.

14  Rob MacGill also for the same HomeServices defendants.

15         MS. KEAS:  Jennifer Keas of Foley & Lardner also for

16  the HomeServices defendants.

17         THE COURT:  Okay.  What about the Re/Max defendants?

18         MR. LEVEE:  Good morning, your Honor.  Jeff LeVee of

19  Jones Day for defendant Re/Max, LLC which we refer to in the

20  papers as RM, LLC.

21         THE COURT:  Okay.  Is there a Re/Max Holdings Company

22  that's also in the case?

23         MR. LEVEE:  There is a Re/Max Holdings Company, but

24  the franchisor is Re/Max, LLC.

25         THE COURT:  Okay.  And then who have I left out, if

1    anyone?  Is there another defendant group that we need

2    appearances from?

3          MR. RAY:  Good morning, Your Honor.  This is

4    Timothy Ray on behalf of Keller Williams Realty, Inc. with the

5    law firm of Holland & Knight.  And I'll let my colleagues

6    speak for themselves.

7          THE COURT:  Who else do we have?

8          MR. KULLY:  David Kully from Holland & Knight for

9    Keller Williams as well, Your Honor.

10         MS. HAYES:  And Anna Hayes of Holland & Knight as

11   well.

12         Thank you.

13         THE COURT:  Any other defendant groups that I have

14   missed?

15         Okay.  It seems that we may actually have all of our

16   appearances taken care of.

17         I take it there are no interested third parties who

18   are represented by counsel for the hearing who feel it would

19   be appropriate to make an appearance?

20         I'm not hearing from anybody.  I wasn't aware of

21   anybody who requested to appear, but sometimes for discovery

22   disputes where there's an issue of who controls what other

23   entities and documents, you end up seeing counsel from all of

24   the allegedly-controlled parties that come.  That does not

25   seem to be the case here.

1          So what I'd like to do today is I just want to get a

2   quick status on pending matters other than the motion for a

3   protective order to make sure I understand your case status,

4   and then we'll spend the bulk of time today discussing the

5   motion for a protective order.

6          I will say I thought the parties' briefs were pretty

7   comprehensive.  So while I appreciate the parties' desire to

8   make presentations and the Power Points that you've put

9   together, I'm hoping to move through them pretty quickly.

10          You should assume I've read your briefs.  Again, I

11   think they were pretty well done and have most of the

12   information that I will need to rule, but if there are things

13   you want to highlight and if I have questions as we go

14   through, we'll deal with that today.

15          Please assume in your presentations; however, that

16   I've read the materials and I'm hoping, notwithstanding what I

17   understand to be the request for 25 to 30 minutes for the

18   defendants collectively, that we can keep it a little closer

19   to 20 minutes per side.

20          Before we do that, though, I'd like to make sure that

21   I have an overall case status here.  So I have a fully-briefed

22   motion to strike the class definition which is now ripe for my

23   ruling.

24          I have a motion for entry of TAR protocol.  I have

25   taken a look at it.  I am going to enter that order, so that

1   will be entered today.  Thank you.  I think that was

2   appropriate.  I didn't have any questions.

3           There is a motion for withdrawal of an attorney for

4   Re/Max.  I understand that just to be somebody who has left

5   Jones Day.  So that will be granted.

6           David, that's at Docket Number 207.

7           I think those are the motions that have been filed.

8   Then I understand that there might be a motion to reassign a

9   related case coming my way.  I'm not sure which side in the

10  litigation is going to be advocating for that, but if someone

11  wants to give me a preview of what the situation is, I'd

12  appreciate that.

13          Is that a plaintiffs' issue or a defendants' issue?

14          MR. LEVEE:  Your Honor, this is Jeff LeVee from

15  Jones Day.

16          I think it's probably a defendant issue, at least

17  initially.  There was a complaint filed in the Northern

18  District before Judge Pacold.  The case is captioned Leeder,

19  L-E-E-D-E-R, versus NAR.  The other corporate defendants are

20  also named.

21          This case, Your Honor, before you is a case involving

22  a putative class of sellers.  The Leeder case before

23  Judge Pacold is a putative class of buyers.  Otherwise, some

24  of the allegations and the issues are the same.  And so the

25  Leeder plaintiffs have told us that they intend to file a

1    notice of related case.  And when they filed their complaint,

2    they did check the box on the civil complaint form that

3    indicated that the case was related.

4         So we do not know when they intend to file that

5    motion, but they have told us that they would file it, and per

6    the local rules, it would be filed in your court.

7         THE COURT:  Yes.

8         And so would the defendants in this case be

9    supportive of reassignment, or would you oppose it?

10        And I appreciate you might have different views

11   depending on which defendant is answering, so I'll start with

12   Mr. LeVee since he was answering.

13        MR. LEVEE:  Yes.  Jeff LeVee again, Your Honor.

14        My understanding is that the defendants will be

15   supportive or at a minimum will not oppose the reassignment.

16        THE COURT:  Okay.  And then what's the plaintiffs'

17   view?

18        MR. BRAUN:  Your Honor, this is Robbie Braun from

19   Cohen Milstein for the plaintiffs.

20        We understand that under the local rules, the

21   preferred but not mandatory course of action with respect to

22   motions to relate is to file them after an answer or a motion

23   to dismiss has been filed.

24        We are in the process of reviewing the complaint and

25   considering our position, and I think unless a motion to

1    relate is filed very shortly, I think we would decide our

2    position after the motion to relate and the motions to dismiss

3    in the Leeder case are filed.

4         THE COURT:  I take it the plaintiffs' firms that are

5    involved in this case are not involved in the Leeder case.  Is

6    that correct?

7         MR. BRAUN:  That's accurate, Your Honor.

8         THE COURT:  With respect to the class definition, how

9    would things -- would you expect that -- if it were reassigned

10   here, would there be an effort to consolidate the cases?

11        I understand this is purely speculative at this

12   point, but just so that I have an idea of how things might

13   affect the course of this case, would you expect there to be

14   an effort to try to consolidate the cases, or would it be a

15   reassignment for coordination purposes?

16        MR. BRAUN:  Your Honor, if your question is directed

17   at the plaintiffs, again, we're continuing to evaluate the

18   Leeder plaintiffs' complaint and I think, again, would also

19   like an opportunity to review the defendants' motions to

20   dismiss before taking a position on consolidation.

21        THE COURT:  Fair enough.

22        So no position on whether the cases might be properly

23   consolidated into one class action with perhaps a couple of

24   different subclasses or something along those lines?

25        MR. BRAUN:  So again, I think we're -- I hate to be a

1    broken record.  We're continuing to consider our position.  I

2    don't think it's likely that the way that you framed the

3    consolidation is a position we would be able to -- is one that

4    would make sense.

5         I mean, I think the classes are separate from one

6    another.  They involve two different groups of individuals

7    potentially and transactions, and so I don't think it's likely

8    that there would be consolidation in the sense that they would

9    ultimately become the same case with two subclasses of a

10   larger class.

11        THE COURT:  Again, I'm not going to hold you to any

12   off-the-cuff assessments during this hearing.  I'm just trying

13   to get a sense of what the issues might be.

14        Do the defendants have any views on whether if the

15   other case were treated as related and reassigned it would

16   actually be appropriate to consider consolidating them into

17   one case as opposed to just having them in front of the same

18   judge for coordination reasons?

19        MR. KLIEBARD:  Your Honor, if I may, it's

20   Ken Kliebard for Realogy.

21        I was on the phone with Mr. Bierig when we spoke to

22   the plaintiffs' lawyers in the Leeder case and we asked them;

23   and they said at this point, they were just seeking to

24   reassign for coordination purposes and not consolidation, so I

25   don't think we have evaluated that yet on our side.

1          MR. BIERIG:  Your Honor, this is Jack Bierig for NAR.

2          Just as Mr. Braun said, I think we really need to see

3     what the motion looks like, and then we'll evaluate it.  And

4     then for NAR, we'll determine what our position is, as

5     plaintiffs will do, once we see their motion.

6          THE COURT:  Okay.  Anybody else want to weigh in?

7     Mr. LeVee, Mr. Ray?

8          MR. LEVEE:  Mr. Kliebard said exactly what I was

9     going to say.

10         MR. RAY:  I have nothing to add, Your Honor.

11         THE COURT:  I, too, will wait until any such motion

12     is filed and put a pin in that issue until the time comes.

13         In the parties' status report, you indicated that you

14     were continuing to meet and confer over additional discovery

15     issues.  Do you expect that some of those issues will ripen

16     into motion practice?

17         MR. LEVEE:  Eternally optimistic.  We hope not, but

18     we can't predict.

19         THE CLERK:  This is the courtroom deputy.

20         MR. AIKEN:  Your Honor, Alex Aiken for the

21     plaintiffs.

22         I would just say the same thing.  We don't have

23     anything at this time that we're envisioning raising outside

24     of the Valerie Nager issue that's separately mentioned in the

25     status report there.

1          THE COURT:  Yes.  Speaking of that, where does that

2  stand?  Are the parties working out an agreement as to whether

3  she will be voluntarily dismissed or if she will voluntarily

4  withdraw, or do you expect that this will be teed up in some

5  way for me to decide?

6          MR. AIKEN:  Your Honor, once again, Alex Aiken for

7  the plaintiffs.

8          As we point out in the status report, we had sought

9  consent from defendants to remove Ms. Nager from the case back

10  in November.  At least NAR has conditioned its consent to her

11  withdrawal on responding to discovery served, and it's our

12  position that that discovery is improper.

13          So it's our intention if there's no -- if NAR is not

14  willing to provide its consent that we will go ahead and move

15  for her to withdraw and move for a protective order on that

16  discovery.

17          So that's where it stands from plaintiffs'

18  perspective.

19          MR. BIERIG:  Your Honor, this is Jack Bierig for NAR.

20          We do not object to the dismissal of Ms. Nager

21  without prejudice as they sought, but we would like the Court

22  to condition that upon a small amount of discovery at a

23  deposition of Ms. Nager.

24          We would like permission to brief that issue.  We

25  don't want to take up the Court's time with that now.

1     Hopefully, we can resolve it, but if we can't, we'd like

2     permission to submit a short brief on that down the road.

3          THE COURT:  That's fine.  You can certainly file a

4     brief if you're not able to resolve it.

5          This strikes me as the type of issue that it might

6     make sense for the parties to try to file one consolidated

7     document that includes both of your respective positions.

8          You've obviously discussed it quite a bit, you've

9     considered, you know, sort of compromise positions that you

10    might be able to reach.

11         If you're not able to resolve it, you can certainly

12    file a motion and we can brief it in the traditional manner,

13    but I would, I guess, encourage you to consider whether you

14    might be able to put together one statement each side that

15    spends five pages explaining this is our position and why we

16    think it's right.  And that way, we can hopefully expedite

17    things as opposed to having briefing back and forth.

18         MR. BIERIG:  Again, Your Honor, Jack Bierig for NAR.

19         We'd be happy to do that.  I've been dealing with

20    Mr. Pierce on this, and after this call, I'll try to work with

21    Mr. Pierce on coming up with a joint presentation to the

22    Court.

23         MR. AIKEN:  And Your Honor, Alex Aiken for

24    plaintiffs.

25         I don't see an objection or anything to object to on

1      that unless Mr. Pierce for our side thinks differently.

2              MR. PIERCE:  Your Honor, this is Mr. Pierce.

3              I have no issue working with Mr. Bierig to present

4      this efficiently to the Court, so we will be happy to do that.

5      We appreciate the suggestion.

6              THE COURT:  Good.

7              THE COURT REPORTER:  Your Honor, excuse me.  I'm

8      getting interference from Caller Number 10.  If they can mute

9      themselves, that will help.

10         (A discussion was had off the record.)

11             THE COURT:  So that is a good transition into our

12     argument on the motion because I'd like to make sure we have

13     designated people who are going to take the lead, and then

14     everybody who's not going to be arguing can mute themselves to

15     avoid feedback.

16             So who's going to be taking the lead on the

17     plaintiffs' side?

18             MR. AIKEN:  Your Honor, Alex Aiken again.  I'll be

19     taking the lead for plaintiffs.

20             THE COURT:  Thank you, Mr. Aiken.

21             And on the defendants' side, I'm not opposed to a

22     representative from the different defendants arguing your

23     portion of it.  I think that's fine, but I'd like to know

24     who's going to be arguing and then an order in which we're

25     going to proceed.

1  So is there somebody who's going to kick things off

2  for the defendants?

3  MR. LEVEE: Yes, Your Honor. Jeff LeVee. I will

4  kick things off on behalf of RM, LLC. Following me will be

5  Mr. Varon on behalf of HomeServices; following will be

6  Mr. Kliebard on behalf of Realogy; and following -- I think

7  it's Tim, yes?

8  MR. RAY: That's correct.

9  MR. LEVEE: On behalf of Keller Williams.

10 THE COURT: Okay. Very good.

11 So it's a motion for a protective order, so the party

12 seeking the relief here -- the parties seeking relief are the

13 corporate defendants.

14 I think under the circumstances -- well, did the

15 parties have something in mind of terms of whether plaintiffs

16 or defendants should speak first?

17 MR. LEVEE: To my knowledge -- we did not discuss it,

18 Your Honor.

19 MR. BRAUN: That's correct, Your Honor.

20 THE COURT: Mr. Aiken, do you have a preference?

21 MR. AIKEN: I do not, Your Honor. I'm happy to lead

22 off or follow the defendants, whichever order Your Honor

23 prefers.

24 MR. LEVEE: It might make sense, Your Honor, subject

25 to what my co-counsel think, for the defendants to lead off so

1  that we can make sure that we get through our presentation,

2  make sure that the plaintiffs have an opportunity fully to

3  respond and for both sides to answer the Court's questions.

4          I know that Your Honor extended by a few minutes the

5  time you were willing to give us.  We do have four speakers.

6  So that we're not speaking like Fed Ex advertisements, we did

7  sequence ourselves, we coordinated our slides, and since we

8  filed the first brief, it might make sense for us to go first.

9          THE COURT:  That's fine.  Let's go in that order

10 since it's defendants' motion.  And so that's where we'll

11 begin.

12         And so we're using the WebEx technology.  I'm hoping

13 that you are familiar with how to share your screens.  And if

14 not, David can assist, but if you're ready to start and if you

15 want to pull up the Power Point presentation, that's fine.

16         MR. LEVEE:  Thank you.  Mr. Kully on behalf of

17 Keller Williams offered to share his screen.

18         If you can make that a little bit bigger, Dave, that

19 might help the Court, but I can see it fine.

20         THE COURT:  I can see it.

21         MR. LEVEE:  Okay.  There we go.

22         So as I mentioned, we have coordinated our

23 presentations.  We've coordinated it in a single Power Point.

24 I'm going to lead off.  I'm going to give Your Honor a brief

25 overview, I'm going to discuss the plaintiffs' cases, and then

1    I'll briefly address the RM, LLC franchise agreement, and then

2    my co-counsel will follow with theirs.

3         So plaintiffs are seeking to compel the corporate

4    defendants to produce certain documents from the files of the

5    franchisees.  These are documents that the defendants are not

6    specifically entitled to receive pursuant to their franchise

7    contracts.

8         The documents the plaintiffs have requested include

9    emails of the franchisees and relate to meetings that the

10   franchisees may have had regarding the so-called NAR handbook,

11   communications related to commissions, manuals that the

12   franchisees might have that set forth policies and relate to

13   commissions and the NAR rules and then membership of the

14   franchisees in trade associations.

15        As explained in the declarations that the Court

16   received from each of the defendants, defendants do not ever

17   request this sort of information from their franchisees and do

18   not ever receive this information from their franchisees.

19        An important point, even though we filed the motion

20   for protective order, is that the plaintiffs do not dispute

21   that they have the burden on this motion because they are the

22   party seeking the production of the documents.

23        As noted in defendants' brief, in the Seventh

24   Circuit, courts follow what is referred to as the legal rights

25   standard to determine whether a defendant has control of

1   documents for purposes of Rule 34.  And this standard is more

2   restrictive than the standard that is sometimes applied

3   outside of the Seventh Circuit where courts look, in addition,

4   at whether the defendant has the so-called practical ability

5   to obtain the documents.  That factor is not part of the test

6   in the Seventh Circuit.

7        Plaintiffs argue on Page 4 of their brief that the

8   control concept has been construed broadly, but they cite a

9   decision from the Southern District of New York which is not

10  itself controlling.

11       In fact, Mr. Kully, if we could turn to Slide 2, this

12  slide shows the cases on which plaintiffs rely.  Three of the

13  four -- three or four of these cases are outside of this

14  circuit.

15       The *Moretti* decision Your Honor must be familiar

16  with, having read the papers.  It's from the District of

17  Delaware.  It is the primary case on which plaintiffs rely.

18       I must say that the decision is neither controversial

19  nor relevant.  The plaintiff in *Moretti* booked a Hertz rental

20  car, and Hertz had signed a contract with its licensee in

21  Mexico, which is where the plaintiff was going to pick up the

22  car, that allowed Hertz to obtain, quote, "The licensee's

23  records ascertaining and verifying the number of vehicles

24  owned, leased, used or kept by the licensee and any other

25  information, any other information required by Hertz with

1  respect to the licensee's vehicle-renting business."

2  So there is no question Hertz had the legal right to

3  obtain the very documents that plaintiff sought in discovery

4  which were the documents as to who rented the cars, how much

5  insurance they purchased and what the conversion rate was.

6  Indeed, Hertz conceded to the Court that it had

7  already obtained these types of records in the past, and so it

8  was not surprising that the Court ordered Hertz to produce the

9  documents.

10  The next decision on this slide, *Coventry Capital*,

11  again, Southern District of New York, *Coventry* involved a

12  management agreement, and that agreement provided the

13  manager -- provided that the manager shall at all times give

14  promptly to the directors, people who had signed the contract,

15  quote, "all such information and explanations as the

16  defendants may require," all such information.

17  Two of the defendants in the case were the directors,

18  and so the directors clearly had control over the requested

19  information, and they were required to produce it.

20  The third case is *MSP Recovery*.  That's a case

21  actually decided by Magistrate Judge Jensen.  In that case,

22  the plaintiffs were pursuing antitrust claims on behalf of

23  other entities; and those entities had signed assignment

24  agreements with the plaintiffs that specifically provided the

25  plaintiffs with a right to obtain all such instruments and

1   documents and to take all such action to pursue the claims.

2   And some of the assignment agreements even transferred

3   ownership of the actual documents to the plaintiffs.  Not a

4   remarkable case; clearly a correct decision by Judge Jensen.

5        *Lofton vs. Verizon* is a decision from the Northern

6   District of California.  In that case, Verizon was asked to

7   produce documents in the possession of its third-party debt

8   collectors.

9        The contract between Verizon and the debt collectors

10  provided that Verizon shall have the right at all times to

11  examine and audit records specifically including, according to

12  the Court, the records sought by the plaintiffs.  And the

13  access to the records was identified as completely

14  unrestricted.

15       I'll mention also not on the slide, plaintiffs

16  reference in their slides the *Haskins* decision from the

17  District of New Jersey; but, again, in that case, like

18  *Moretti*, the title company's contract with its agent provided

19  access to all records, books, documents, correspondence and

20  material of any kind.  And that access was to be given upon

21  request.

22       So the plaintiffs' cases involve contracts that

23  contain sweeping language very different from that before the

24  Court today.

25       Let's go to the next slide.  I'm going to move

1    quickly to RM, LLC's franchise agreement.  This is Slide 3.

2            Thanks, Dave.

3            I'm showing you very quickly, Your Honor, the

4    declaration of Nick Bailey, and the only reason I'm doing it,

5    he's RM, LLC's chief customer officer, he's our declarant.

6    I'm showing you the first page simply as a reminder.

7            Plaintiffs do not attempt to controvert anything in

8    Mr. Bailey's declaration, so it's undisputed that Re/Max

9    franchisees are independently owned and operated; RM, LLC has

10   no authority to control the operations of its franchisees; and

11   RM, LLC does not provide email or information-storing systems

12   to its franchisees.

13           Now Slide 4.

14           The franchisee agreement that plaintiffs reference is

15   Exhibit A to Mr. Bailey's declaration, but what I'm showing to

16   Your Honor is Page 31 of the RM, LLC franchise agreement.

17   This page contains Section 10 of the agreement which is

18   entitled "Records and Reports."

19           Subparagraph A says, "The franchisee will maintain

20   records at its location."  Not controversial.

21           Subparagraph B says that RM, LLC can get certain

22   types of reports from its franchisees.

23           Now, I didn't blow up the rest of the slide because

24   the plaintiffs don't focus on this paragraph, but the reports

25   that the franchisor is entitled to get relate to the number of

1    sales associates, their commissions, financial statements and
2    other financial reports.

3          The plaintiffs don't refer to that paragraph because
4    they're not seeking those documents.  We've already agreed to
5    provide some of them, but the documents that are the subject
6    of this motion are not the documents that are referenced in
7    subparagraph B.

8          Finally, Slide 5, this is the next page of our
9    franchise agreement, Page 32.

10          Plaintiffs' argument with respect to RM, LLC boils
11   down to a single sentence in subparagraph C of Section 10
12   which is entitled "Other Information."

13          Now, this is still part of Section 10 from the
14   previous page, and it says, "No reports and records or other
15   information supplied by us shall be considered confidential.
16   We shall have the right to use information derived from that
17   supplied by you for our own business purposes, to disclose
18   such information as may be required by law and governmental
19   authority and to aggregate such information."

20          Here is the key sentence the plaintiffs quote.  I
21   highlighted it.  "You will provide us and/or cooperate with us
22   in collecting other information as we may reasonably request
23   including information for research and development of
24   services, products and programs, identification or demographic
25   information, industry reports in preparation of franchise

1    disclosure documents."  That's it.

2           The other information in this paragraph that RM, LLC

3    is entitled to request, specific types of information that

4    generally relates to what the franchisor may need or

5    disclosure documents and other information that's required by

6    law, as you know, franchise agreements are regulated under

7    federal law.

8           This paragraph is not an open invitation to request

9    documents of any kind.  It's not even close to the language in

10   *Moretti* and the other cases that I've cited to Your Honor that

11   basically permit access on demand to all information that the

12   franchisee has.

13          And with that, I will pass the baton to counsel for

14   HomeServices.  And I thank you.

15          MR. VARON:  Thank you, your Honor.

16          Jay Varon for the HomeServices defendants.

17          We have two main points to make this morning, and I

18   would just remind the Court that even though we're not showing

19   Ms. Warner's declaration, it also is uncontroverted and also

20   establishes the terms of the franchise relationship and the

21   independent ownership operation that exists.

22          So the first point goes right to the language at

23   issue here, and it's on the next slide.  It's Section 9.09 of

24   BHH's standard franchise agreement.  There is an RLRE Real

25   Living one that's identical, so we're just going to focus on

1    BHH.

2           As with Re/Max and perhaps even a little stronger,

3    plaintiffs' whole argument here is basically in the blue

4    highlighted language fragments of one sentence of one

5    subsection, indeed, of one fragment of one sentence of the

6    entire franchise agreement; but doing that eliminates or does

7    not take account of the context in which this language

8    appears, the purpose of this language and, indeed, other

9    relevant language.

10          So if you start with me, Your Honor, just with the

11   very first sentence in this section that sets, I think, the

12   scope of what is occurring here, the franchisee is under an

13   obligation to keep and maintain during the term of the

14   agreement and for three years later full and complete records

15   of all revenues and expenditures referring to its business.

16          Then comes the second sentence at issue that we're

17   debating.  And I'll read the whole sentence because I think,

18   again, the context is important.

19          "The franchisee shall permit the franchisor to

20   examine books of account, bank statements, documents, records,

21   papers, federal, state and local taxes, tax returns relating

22   to the business."

23          Plaintiffs argue that the fact that documents and

24   papers have been added to this sentence gives the franchisor,

25   BHH, the right to go and get any document or paper or

1   information that the franchisee has.  And that's just simply

2   not the intent or not the way you would read this sentence.

3   It's not in keeping with the first sentence.

4         And if you look at the very next sentence, it

5   explains why the franchisor has the right to examine the books

6   and records.  It's so that the franchisee's records can be

7   examined to see whether the royalty payment is understated,

8   and if it is, to permit adjustment with a significant interest

9   penalty.  And that's pretty much it.

10        I submit to you that this is nothing like *Moretti*

11  which has the broad language of "inspection of the premises"

12  and "any other information required."  This just describes

13  records in slightly more detail than the first sentence or the

14  second sentence, and it's just not really realistic to open

15  this up to plaintiffs' interpretation.

16        The second point is related, Your Honor, because not

17  only is it not like *Moretti*, but it is just like the

18  *Papa John's* case which plaintiffs don't believe -- plaintiffs

19  seek to distinguish but improperly.

20        I think you'll see that the declaration that was used

21  in *Papa John's* and the underlying franchise agreement is just

22  like ours.

23        So if we go to the next slide quickly, Your Honor,

24  this is just a passage from *Papa John's* which says exactly

25  what we all know, that *Papa John's* agreement was focussed on

1    broad corporate financial and accounting documents and didn't

2    give the right for every other document in the universe.

3           Significantly, when the Court said this, they cited

4    Docket 154 at 6 which was the reply memo in the case.

5           So if we can see the next slide, on the left, you see

6    down at the bottom Docket 154 at 6.  That's the reply memo,

7    and it says that the plaintiffs' argument is basically taken

8    out of context, that there's a limited right to pursue

9    accounting documents.  And it cites Docket 145 at 2 which is

10   the affidavit that *Papa John's* put in to support its

11   statements.

12          The two paragraphs on the right are what *Papa John's*

13   is saying which is exactly what Ms. Warner said and exactly

14   what the other declarants for the other corporate defendants

15   say, that you can only get the accounting and financial

16   documents.  And Mr. Wadell cites the excerpts of the

17   *Papa John's* franchise agreement that he claims supports this

18   statement.

19          To go to the final slide, Paragraph 13, this is

20   Page 29 and 30 of the Papa John's agreement, the very pages

21   that Mr. Wardell cited in the prior section.  And you'll see

22   that the plaintiffs in *Papa John's* are making the precise

23   arguments that plaintiffs here are making.

24          Here are the sections that Mr. Wardell put in, and

25   you'll see the first one, "record keeping," says that you can

1  establish -- the franchisee should establish and maintain
2  record keeping, broadly speaking.
3      The second one is even more telling:  Periodic
4  reports.  You shall deliver to us, the first one, statements
5  about revenues and expenses for the restaurant; and then two,
6  such other records and reports as requested by us including,
7  but not limited to, bank statements, sales expense forms,
8  reports, current balance sheet.  Same kind of argument that
9  plaintiffs are making because it was not limited; anything
10 could be asked.
11     And the third one, "Examinations and Audits, The
12 franchisor shall have the right, upon reasonable notice, to
13 examine your books and records and to make photocopies
14 thereof."  "Books and records" undefined, presumably very
15 broadly construed by the plaintiffs in *Papa John's*.
16     And then the interesting part, Your Honor, is that
17 the sentence that follows this Examination and Audit section
18 is the exact kind of sentence that follows HomeServices'
19 inspection.  Right after it, it says, "If the examination
20 reveals underpayment of royalty funds, they'll be adjusted."
21     So our conclusion, Your Honor, is that the fragments
22 of the sentence have to be read in line with the language
23 that's used, the purpose of the statute and don't give --
24 HomeServices and similar language doesn't give the other
25 corporate defendants the right to compel any document they

1    want.

2            If Your Honor has questions, I'd be delighted to

3    answer, but otherwise, I know we're trying to get through

4    this.  I'll pass it on to Mr. Kliebard.

5            THE COURT:  Proceed.

6            MR. KLIEBARD:  Good morning, your Honor.

7            I apologize.  I made it through the first 42 minutes

8    without my dog coming in and snoring, so if you hear snoring

9    in the background, that's what it is.

10           If we can have the next slide, please, I just wanted

11   to point out quickly we did submit the declaration of

12   Susan Yannaccone.  She is the president and Chief Executive

13   Officer for Realogy Franchise Group.

14           And the important point which is in Paragraph 14, I

15   think, is that the purpose of these provisions in the

16   franchise agreement is to allow the franchisor to verify the

17   amounts that are owed to it under the franchise agreement.

18           We have a relationship with the franchisees where we

19   provide them with tools and brand information, and they pay

20   the license fees in exchange for that.  And we have the right

21   to go in and audit their books and records to make sure that

22   we are receiving the proper payments that are due to us.  And

23   so that's the purpose of these provisions.

24           In Paragraph 16 of Ms. Yannaccone's declaration which

25   I did not include in the slide, similarly as with

1   HomeServices, it does not provide the -- Realogy does not

2   provide the franchisees with computers, servers, cloud storage

3   and the like.

4          The main point I would like to make -- and if we

5   could have the next slide, please -- is, again, looking at the

6   provisions in context and recognizing that the purpose of the

7   provisions is to identify franchise fees due to Realogy, all

8   of the disputed provisions here fall under the heading "Record

9   Keeping and Audit."

10         Why is that important?  Well, it was very important

11  in the *Papa John's* case because the Court there noted that

12  *Papa John's* did have broad ability to obtain franchisees'

13  financial and accounting information but noted that that was

14  for purposes of fulfilling its audit rights under the

15  agreement.  And that point was critical in the *Moretti*

16  decision.

17         And the plaintiffs in their slide deck and in their

18  brief say that the *Moretti* franchise agreement is similar to

19  Realogy's and that of the other corporate defendants, and

20  that's really not true.

21         At Asterisk 3 of the Lexis decision, the Court

22  actually goes to great lengths to point out that even though

23  in that case, Hertz was arguing that its rights were limited

24  to essentially audit purposes.  The Court said, "However, as

25  plaintiff points out, the word 'audit' appears nowhere in

1  either of the license agreements."

2  It was on that basis that the *Moretti* court

3  distinguished *Papa John's.* And it also pointed out there was

4  much broader language in *Moretti* which, again, doesn't appear

5  in the Realogy franchise agreement, which there, it allowed

6  the franchisor, Hertz, to obtain any and all documents related

7  in any way to the licensee's business. Again, that's quite a

8  bit different from what we have here.

9  And again, one of the critical provisions, if we

10  could have the next slide, please, 13.2.1, which is one of the

11  provisions relied on by plaintiffs, again, it mentions audit.

12  It's to inspect, audit and check and make copies of the books

13  and records.

14  Again, this is so that Realogy could make sure that

15  it was receiving the fees that it was entitled to. This is

16  not anything close to the "any and all" language found in

17  *Moretti.*

18  How did plaintiffs respond to it, how do they respond

19  to the audit argument? They make the argument on Page 14 of

20  their brief that Realogy can't rely on the heading "Record

21  Keeping and Audit," and they say that, you know, headings

22  don't matter and the Court shouldn't pay attention to them.

23  I do want to point out plaintiffs' inconsistency

24  because on Page 13 of their brief, they make a big point in

25  arguing about Section 13.5, that it falls under a heading that

1    they think is relevant.

2           So to quote a little bit from Shakespeare, I think

3    plaintiffs were hoisted by their own petard on that issue, but

4    it also ignores that the language in 13.2.1 specifically

5    refers to audit rights, not the kind of catch-all in *Moretti*.

6           I did put a slide up on this, but plaintiffs also --

7    and I'll be brief, Your Honor -- they also rely on

8    Section 13.5 which they say is a catch-all provision.

9           I just want to note that the language that appears in

10   the Realogy agreement in Section 13.5 is, I think, almost

11   verbatim identical, except for three words, to the language

12   that Mr. LeVee discussed on behalf of Re/Max.  So I'm going to

13   incorporate his argument on that and not repeat it.

14          The one additional point I would make is that

15   Section 13.5 is part of this broader Section 13.0 under

16   "Record Keeping and Audit," and all the surrounding subparts,

17   13.3, 13.6 and 13.7, discuss audits.

18          So again, all these provisions -- I'll conclude with

19   this -- are part of the general audit and financial record

20   keeping requirements of the type found in *Papa John's* and

21   which the *Moretti* court were not found present in that case,

22   and so we urge the Court to grant the protective order.

23          THE COURT:  Thank you.  Mr. Ray, I think, is up next.

24          MR. RAY:  Thank you, Your Honor.

25          I would just ask -- I realize you've imposed

34

1    limitations on us, but we do have a number of items to get

2    through as it concerns Keller Williams, so I would just ask

3    for the Court's indulgence on that.

4           Plaintiffs' arguments against Keller Williams can be

5    placed into four buckets.  First, they allege that we have a

6    contractual right to obtain documents such as manuals,

7    policies, procedures and agent emails.

8           Second, Keller Williams has control over KW.com and,

9    by extension, independent agent emails.

10          Third, in Sitzer, we compromised with plaintiffs to

11   help them obtain information from independently-owned-and-

12   operated market centers.

13          And fourth, they categorize our burden argument as a

14   parade of horribles.

15          Slide 1, please.

16          Keller Williams does not have a legal right to obtain

17   the types of documents that plaintiffs seek.  Our market

18   center license agreement allows for us the ability to obtain

19   financial information that our market centers report; and that

20   was accurately described in our motion.

21          Next slide.

22          In support for their argument that we exercised

23   custody or control over our market centers, plaintiffs have

24   focussed on Section 10.01 in our market center license

25   agreement.

1      Section 10.01 is our accounting and records section.

2  This section is categorized from Categories A through G.

3  Plaintiffs have focussed on Sections D, E and F.

4      Next slide.

5      10.01(d), plaintiffs have latched onto this because

6  of the statement that says, "We operate as an open-book

7  organization."

8      Rather than taking a snippet and running with it, you

9  have to read the entire section, and in doing so, you quickly

10  see that it relates to financial reports or statements or

11  information derived therefrom.  Much of this information we've

12  already provided to plaintiffs' counsel.

13      Next slide.

14      Section 10.01 -- excuse me.  Next slide, please.

15      Slide E.  Thank you.

16      Section 10.01(e), plaintiffs focus on the one part of

17  this section which is to submit to company -- to submit to

18  company language.

19      All of this information that we require in Section E

20  involves our effort to understand from a financial standpoint

21  how our market centers are performing.  These are financial

22  reports that we have already shared with the plaintiffs.

23      Next slide, please.

24      "10.01(f), The company has the right to examine and

25  copy at company's expense the books, records and tax returns

1   of licensee," plaintiffs choose to focus on the very first

2   sentence in Section F, but they ignore the rest of the entire

3   section.  Section F does not end after the first sentence.

4   Under the rule of completeness, you have to review the entire

5   section.

6           In the very next sentence, we reference our right to

7   audit the books.

8           In the third sentence, we state:  "If an inspection

9   reveals that any payments have been understated in any report

10  to the company, then licensee shall immediately pay to company

11  the amount understated upon demand."

12          If you look at the fourth sentence, "If an inspection

13  discloses an understatement in any report of 2 percent or more

14  in any 12-month period, or if licensee's financial records

15  require a substantial restatement as determined in the sole

16  judgment of the company to be readily reviewed or audited,

17  licensee shall, in addition, reimburse the company."

18          Section 10.01(f) is about making sure that our market

19  centers are meeting their financial obligations to

20  Keller Williams, and in doing so, that we receive correct

21  financial information.

22          Now, you've already heard about *Moretti*, *Lofton* and

23  *Haskins*, and all I would say to the Court is that all of those

24  cases should be grouped accordingly.  As my colleagues have

25  previously stated, they're factually distinguishable.  The

1    contract language in those cases cannot be useful in your

2    analysis of viewing Keller Williams' contract because our

3    contract is very narrowly tailored.  It does not confer broad,

4    unfettered access to our market centers.

5           And it's interesting that in *Moretti* and *Lofton*, they

6    distinguish contracts limited to records and accounting, which

7    is exactly what we have here.

8           Next slide.  Next slide.

9           So what I'd like to do at this time, Your Honor, is

10   I'd like to address the agent emails that plaintiffs have made

11   a pretty big deal about.

12          We have a relationship with Google under which Google

13   provides G suite accounts including KW.com email accounts.

14          All we have done is set up KW.com email addresses for

15   agents of our independently-owned-and-operated market centers

16   who want to use them and don't know whether -- and we don't

17   know whether they do so or not.  Agents are not required to

18   use these accounts.  We don't operate email systems for our

19   market centers, we don't store any market center or agent

20   emails on our servers.

21          We provided you Mr. Gartner's unrefuted declaration

22   which is Docket Number 217-6 as an explanation for how our

23   emails work.

24          Now I'd like to address our participation in Sitzer.

25          In Sitzer, Your Honor, we compromised with plaintiffs

1    who, in that case, were willing to work with us to attempt to

2    help get them the information that they believed resided

3    within our market centers.

4         Plaintiffs attach Exhibit A to their response to our

5    motion for protective order which is correspondence dated

6    July 28, 2020, that we sent to plaintiffs' counsel sharing

7    what our market centers were kind enough to share with us.

8         It's important to note two things about their

9    reference to our participation in Sitzer.  First, this was

10   information that we voluntarily obtained from our market

11   centers.

12        We made no promises about what, if anything, we would

13   find.  We could not promise anything because we were not sure

14   they would cooperate.  Through compromise, we continued to

15   contest.  Even though we compromised, we continued to contest

16   any assertion that we exercised either custody or control over

17   any of our independent market centers.

18        THE COURT:  I'm sorry.  Mr. Ray, if I can just ask

19   you one question on that point.  Is it your position then that

20   the market centers could have said no and then you wouldn't

21   have been able to produce any of the things that you hoped

22   that you would be able to produce?

23        MR. RAY:  That's exactly right, Your Honor.

24        THE COURT:  And so you're saying that in that case,

25   that situation is different because the plaintiffs in Sitzer

1   were willing to work more towards a compromise, so you agreed

2   to seek voluntary production of things that you wouldn't

3   necessarily have the ability to demand?

4           MR. RAY:  That's exactly right.

5           THE COURT:  Continue.

6           MR. RAY:  And it's important to note that although we

7   were present at the hearing in Sitzer that Keller Williams was

8   not at issue concerning any of the franchisee dispute

9   discussion that went on because of our compromise.

10          I'd now like to focus the Court's attention to

11  plaintiffs' assertion about our burden argument.

12          Keller Williams is a company built by agents for

13  agents, and trust is fundamental to our business.  So when

14  Darryl King whose affidavit we provided states in Paragraph 2

15  of his declaration that it's important that we do not do

16  anything to alienate or undercut their trust, that's not a

17  parade of horribles.  That's an unrefuted, true statement, and

18  it goes directly to the heart of our business.

19          Your Honor, you don't need to issue an order that

20  will harm our business model as plaintiffs are asking you to

21  do for them to get what they need.

22          They devote one paragraph in their entire response to

23  our suggestion that they issue Rule 45 subpoenas.  They say

24  that it's less efficient.  Effectively, their response is that

25  it's inconvenient, and they'd rather not do it.

1    We'd ask that you require them to issue subpoenas to

2  get the information they need and, in the process, respect our

3  business model and corporate structure.

4    Judge, we'll require the Sitzer plaintiffs to issue

5  Rule 45 subpoenas, and we believe that would be the prudent

6  course of action in this case.

7    Thank you.

8    THE COURT:  One last question before I'm going to

9  give it to plaintiffs' counsel which is:  I don't recall, but

10 is there an actual specific concern that requiring the

11 production or requiring the corporate defendants to go and

12 demand the documents would actually harm relationships with

13 your respective franchisee requirements?

14   I'll have Mr. Ray answer that question since he was

15 the last one to speak, and then I will let everybody else have

16 15 seconds to say if it's different for your equivalent.

17   So if you went and you said, "Look, we're demanding

18 that you provide this full list of things," would it damage

19 your relationships with the market centers, would it make it

20 difficult for you to form those relationships in the future

21 and to enter into these agreements?

22   MR. RAY:  Your Honor, can I just clarify something?

23   We didn't demand -- let me just be clear.  We did not

24 demand that they produce information.  We simply went to them,

25 asking if they would compromise.

1          THE COURT:  I understand.

2          I'm saying, hypothetically, if you were to do that,

3    because one of the arguments that's often made when people

4    talk about having to go get discovery from third-party

5    business partners is that overstepping anything that we're

6    permitted to do might damage the relationship, at least with

7    respect to some of the items in Sitzer, you were able to get

8    the items voluntarily.  It doesn't seem like it damaged any

9    business relationships.

10         Are you taking the position that here, that is a

11   concern, that one of the reasons why this matters to your

12   client is that you're concerned about being able to maintain

13   and develop these business relationships that you rely upon?

14         MR. RAY:  If you're asking me that question,

15   Your Honor, then I would say --

16         THE COURT:  Yes, we'll start there.

17         MR. RAY:  I would say that the answer is yes, that we

18   do believe that it would be harmful for all of the reasons

19   that I just stated.

20         Our independent contractor agents are empowered to

21   run their business as they see fit.  If you talk about emails,

22   for instance, as they alleged with respect to us, we're not

23   even sure if they use the KW.com email address.

24         So they have a fair amount of autonomy to run their

25   businesses as they see fit.  And this would also be true at

1    the market center level.

2          So although we attempted to compromise because we

3    wanted to avoid bringing this issue before Judge Bough, it was

4    not without some significant costs.

5          What we're saying here is that we're simply asking

6    for the plaintiffs in this particular case to issue subpoenas.

7    It's more efficient, it's cleaner.  They can have direct

8    communications with the market centers, get the information

9    that they need rather than putting us in the middle between

10   them and the relationship that we have with our market

11   centers.

12         THE COURT:  Okay.  So I'll let Mr. Kliebard weigh in.

13         And just to try to be a little more clear as to how

14   I'm trying frame the question, I'm really trying to get at why

15   this really matters so much to your clients.

16         Is this the defendants are just trying to hold the

17   plaintiffs to the letter of the procedure, or is there a real

18   concern here that this is more than just principle and more

19   than just everybody should follow the rules the way the rules

20   are drafted, but there is a real legitimate concern that this

21   is going to damage our business model and we won't be able to

22   maintain the relationships the way we've set them up in our

23   agreements?

24         MR. RAY:  Can I just address that one point?  Because

25   that's a different question.

1          THE COURT:  Go ahead, Mr. Ray.

2          MR. RAY:  Your Honor, our success depends on real

3    estate agents choosing to affiliate with our franchisee market

4    centers.

5          We have over 160,000 independent contractor real

6    estate agents who are currently affiliated with

7    Keller Williams.

8          We are a franchise company.  This is our business

9    model.  And so when we tell you that it would be harmful to

10   our business as our affidavit -- as the declarations support,

11   it's true.  It's not something that we are exaggerating.

12         And so we've never been in the position where we've

13   had to provide information pursuant to a court order

14   concerning information like this at our market center level.

15         So that trust is something that we value, and that

16   trust is something that we work very hard to keep and sustain

17   with our agents.  So yes, it would be harmful, and we would

18   ask that, hopefully, we not be put in the situation to do so.

19         THE COURT:  Okay.  Mr. Kliebard.  I'm working

20   backwards.

21         MR. KLIEBARD:  Thanks, Your Honor.

22         To answer your question, yes, and for similar reasons

23   as Mr. Ray articulated, our success depends on good

24   relationships with our independent franchisees.  That's how

25   this business operates.

1       The other types of materials that the franchisees

2   provide to us routinely which we've produced in the case is

3   part of the standard operating procedures where they provide

4   information on transactions and revenue.

5       But the types of things that the plaintiffs are

6   asking for are much more intrusive; and for it to come from us

7   as the franchisor, it will be viewed negatively by the

8   franchisees that we are demanding or attempting to demand that

9   they produce this information to us.  And our only recourse

10  under the franchise agreements, if we meet with any

11  resistance, would be to terminate the franchisees which would

12  set a horrible precedent for us.

13      I realize that asking that the franchisees be

14  subpoenaed would still inject them into the litigation, but as

15  the Court is aware, third parties responding to subpoenas

16  generally are better positioned to assert objections as to

17  scope and burden than we would be as a party.  And so while

18  they would still be pulled into the litigation a bit, they

19  would have broader rights than if we were forced to try to

20  pull them into the litigation.

21      THE COURT:  Okay.  Thank you.

22      Mr. Varon, do you have anything to add?

23      Do we have him?

24      MR. LEVEE:  He might be on mute.

25      MR. VARON:  I'm sorry.  I was on mute.

1          We have the same position, but just to give you a

2     little bit of context, when we approached this in Sitzer which

3     is in the Eighth Circuit which has not only the legal

4     right-to-control standard but the practical ability to obtain

5     information, we were aware of the efforts that Keller Williams

6     was making to compromise; and we went to our franchise

7     management and basically said, "Do you want to try to work out

8     an arrangement like Keller Williams has."

9          And the answer was a resounding, "No, we don't want

10    to do that, we don't want to impose on our franchisees" for

11    all the reasons that they've said but one more.

12         The relationship with franchisors and franchisees is

13    fragile and competitive.  These franchisees will switch brands

14    for reasons that they didn't like the way they were treated or

15    for some positive aspect that somebody else is offering.

16         And it's not just the four companies around this

17    table who have real estate franchisees.  This is a broad and

18    competitive business.

19         And so yes, Your Honor, one is we really don't

20    believe that there is any legal right for us to obtain this

21    information; but two, to try to go to the franchisees and

22    assert that we need it is something that our management

23    believes affects the relationship in these matters.

24         THE COURT:  Thank you, Mr. Varon.

25         I'm going to give Mr. LeVee an opportunity to add

1   anything, truly something new, because I want to move on

2   before we get too late in the day.

3          MR. LEVEE:  Well, I do endorse what my co-defense

4   counsel have said.  I'll add only these are small neighborhood

5   businesses.  They do not have -- they're not legally

6   sophisticated.  This would be an enormous burden on them.

7          And there are, in fact, a multitude of competitors in

8   this space.  We are extremely concerned that going to them and

9   saying, "You have to start producing all sorts of information"

10  that's unrelated to their obligation to pay us where they

11  already do have to provide that information, we have great

12  concerns about the relationship with our franchisees under

13  that scenario.  And that's the reason that you received a long

14  saga today and our request that each of us speak separately.

15         Thank you.

16         THE COURT:  Thank you.

17         Now I'm going to turn things over to the plaintiffs'

18  side and Mr. Aiken and start my clock.

19         Mr. Aiken, you may begin as soon as you get your

20  presentation up and going.

21         MR. AIKEN:  Thank you, your Honor.  Give me one

22  moment just to start the share.

23         THE COURT:  While you're doing that, Mr. Aiken, I'm

24  going to preemptively ask a question which is:  I am

25  interested in the answer to the question of why it is such a

1   burden for you, if you think it is a burden, to just subpoena

2   these entities.  It seems like you're spending a lot of time

3   and money briefing and arguing the issue.  Why not just issue

4   the subpoenas and not have to go through, you know, this

5   process?

6           So if you want to start there before you head into

7   your presentation, I'd appreciate it.

8           MR. AIKEN:  Absolutely, Your Honor.

9           So on the subpoena point, the reason that plaintiffs

10   are proceeding via this route is if, as we contend and

11   believe, the corporate defendants have possession, custody or

12   control over the franchisee documents we're requesting, then

13   it's obviously much more efficient to issue requests and have

14   negotiations over those requests with four corporate defending

15   groups as opposed to literally dozens of franchisees across

16   the country.

17           So that's the efficiency point that plaintiffs

18   highlighted in their brief.  And it really flows from the fact

19   that these are agreements that are within the possession,

20   custody or control of the corporate defendants, and thus,

21   plaintiffs are entitled to proceed via Rule 34.  And doing

22   that is a more efficient means to do so than to go out and

23   subpoena dozens of different entities.

24           So I hope that answers your question, Your Honor.

25   I'm happy to address any follow-up on it.

1          THE COURT:  Yes, sure.

2          And would we be talking about dozens of subpoenas, or

3   would it even be into the hundreds?  How many different

4   entities?  I don't remember if that was in the papers.

5          MR. AIKEN:  It was.  So the discovery we've sought --

6          THE COURT:  It's right there.  Thank you.

7          MR. AIKEN:  So the discovery we've sought and

8   proposed to the corporate defendants is 10 franchisees per

9   group with one agent per franchisee.  So that's a total of 10

10  franchisees plus 10 agents per each defendant group.  So if we

11  were to issue subpoenas, it's going to be in the

12  dozens-of-subpoena range as opposed to, you know, hundreds of

13  subpoenas.

14         You know, if the Court thought this was too much or

15  too burdensome, we could probably live with less franchisees,

16  but it's certainly going to be the case that at the end of the

17  day, the plaintiffs here are going to be seeking discovery

18  from at least dozens of franchisees from the various corporate

19  defendants.

20         THE COURT:  Okay.  Go ahead.

21         MR. AIKEN:  So Your Honor, both sides agree that a

22  party has control for purposes of Rule 34 over any documents

23  it has a legal right to obtain and that a contractual right to

24  search documents is sufficient to establish control.

25         The question before the Court then is relatively

1    straightforward:  Do the corporate defendants have a

2    contractual right to the documents plaintiffs are requesting.

3    And as we highlight in our brief and discuss at length in our

4    brief, the answer is unequivocally yes.

5         The franchise agreements broadly provide the

6    corporate defendants the right to inspect and obtain their

7    franchisees' books, documents, information and/or records.

8         And before I get into and sort of parse the language

9    of that, I just want to respond to a few assertions from

10   defendants during their presentation and their arguments

11   today.

12        So the first point is all of the corporate defendants

13   try to take the very direct, very clear language in their

14   agreements and try to say, "Oh, that's not the purpose of it,

15   that's not the intent of it."  But that's not the relevant

16   question.

17        The question is what does the agreement say.  And as

18   we point out in our briefs, the agreements are very explicit

19   and very clearly allow the corporate defendants as franchisors

20   broad rights to obtain, among other things, books, documents

21   and records from their franchisees.

22        A sort of related point is the corporate defendants

23   often point to the headings in their various agreements and

24   point out the fact that these provisions fall under headings

25   that mention auditing or relate to auditing or whatnot, but

1   each of the corporate defendants' agreements themselves

2   actually state that the headings are for convenience only and

3   shall not be construed to limit the meaning or limit the

4   obligations of the parties to the agreements.

5          So reliance on the headings is, you know,

6   inappropriate under the plain language of the agreements

7   themselves.

8          And to respond to one comment that I think counsel

9   for Realogy made, plaintiffs in their brief don't actually

10  rely on the headings in making our argument.  We point out

11  what the names of those headings are for convenience, but our

12  argument is not that the corporate defendants have a right to

13  these agreements because of something that the headings say.

14  It's because the obligations and the rights in the agreements

15  clearly set out that the corporate defendants have a right to

16  the sorts of materials plaintiffs are requesting.

17         One other thing that the corporate defendants point

18  out is that they don't get these materials in the ordinary

19  course, these aren't the kind of things that are shared in the

20  ordinary course.  Again, that's not the legal standard, that's

21  not the question.

22         The question is whether they have a right to such

23  materials, and that requires looking at the language, not

24  necessarily what they're doing in the ordinary course,

25  although that would, of course, be indicative of what that

1    term means.

2          And then the final point is just a response to

3    Your Honor's final question to them about would this harm your

4    relationship.  And plaintiffs' point on that is simply that

5    it's hard to imagine serious harm or really any legitimate

6    harm coming from them exercising their contractual rights if

7    the Court agrees with plaintiffs that these contractual rights

8    allow the corporate defendants to obtain books, records,

9    information and the like.  If they have the right to those,

10   then under Rule 34, they should be made to produce those

11   documents.

12         So with that, I want to turn and talk about the

13   specific language of these agreements.

14         So starting in reverse order from the defendants and

15   talking first about Keller Williams, the two provisions

16   plaintiffs principally rely on are Sections 10.01(e) and (f)

17   in the Keller Williams agreement.

18         On 10.01(e), counsel for Keller Williams argued that

19   the purpose of this section is to obtain financial information

20   and to get financial information, but that's not what the

21   actual plain language of the agreement says.

22         There's nothing in there that says licensee shall

23   promptly submit to company financial information.  It says

24   that the licensee shall promptly submit to company other

25   forms, graphs, reports, records, information and data as

1    company may reasonably designate.

2          It's broad language.  It's not limited to financial

3    information, and it doesn't have any limitation in here saying

4    that Keller Williams can only obtain these materials in

5    connection with an audit.

6          Keller Williams is simply trying to imply language

7    into the agreements or imply a purpose that's not stated

8    there.

9          On 10.01(f), similarly, the provision there provides

10   broadly that Keller Williams shall have the right to examine,

11   among other things, its franchisees' books and records.

12   Again, nothing in there about those being financial books and

13   records or limiting that for purposes of auditing.

14         Keller Williams goes on to point out subsequent

15   language in this paragraph, so 10.01(f).

16         And I apologize that we don't have it on the slide,

17   but these were exchanged at roughly the same moment, so we

18   didn't have a chance to sort of respond to what the defendants

19   put forward, but it's important to note that the language they

20   point to after what we highlight here says, "Company shall

21   also have the right at any time to have an independent audit

22   made of the books of the licensee."

23         So this paragraph is speaking to multiple different

24   rights of Keller Williams as the franchisor.  It doesn't say,

25   for instance, Keller Williams shall have the right to obtain

1    these records solely for purposes of an audit or anything like

2    that.

3         And then before turning to the other corporate

4    defendants' language, on the Keller Williams email account

5    issue briefly, Your Honor, these KW.com email accounts are

6    ones that Keller contracts with Google to provide and, in

7    fact, provides them to its agents.

8         Counsel for Keller Williams noted that the Gartner

9    declaration is uncontroverted.  And that's true, Your Honor,

10   but that's because that declaration specifies that, in fact,

11   Keller can and has accessed the email accounts of the KW.com

12   email accounts of its agents to, for example, reset passwords

13   there.

14        This case is just like any other where an entity has

15   access and control over particular email accounts.  And just

16   as any other case, Keller Williams should be made to produce

17   responsive, relevant communications from these accounts based

18   on the agreed search terms and custodians.

19        Turning to HomeServices, the relevant provision at

20   issue the parties dispute here is 9.09(a) which is found in

21   the BHH agreement.  And Real Living has a similar provision at

22   9.10(a).

23        Again, similar to Keller Williams, HomeServices

24   argues that the purpose of this provision is to allow

25   inspection of these documents for auditing and like and this

1   is only related to financial and accounting information.  But

2   again, Your Honor, that's not what the plain language of the

3   agreement says, and it's the plain language that's relevant

4   and controls here.

5       The plain language says that franchisee shall permit

6   franchisor -- so here, HomeServices defendants -- to examine,

7   among other things, documents, records and papers relating to

8   the franchise business.

9       And there can be no real dispute that the documents

10  plaintiffs are seeking here, things like training materials,

11  policies, procedures, manuals are documents, records and/or

12  papers relating to the franchise business, namely the

13  provision of real estate services.

14      Counsel for HomeServices tried to point to the

15  language in sentences before and after, but those sentences

16  don't limit the meaning of the sentence we've highlighted

17  here.  For instance, the sentence right before what we've

18  highlighted requires the franchisee to maintain records for

19  36 months of all revenues and expenditures.  It specifically

20  limits the kind of records that the franchisee has to maintain

21  in the ordinary course, but then the very next sentence and

22  the one that plaintiffs here are pointing to goes beyond that

23  and requires the franchisee to allow for examination of a

24  number of materials beyond just documents related to things

25  like revenues and expenditures.

1    If the purpose of this sentence was simply to allow

2    franchisees to review the documents that are set out in the

3    first sentence, that's an easy thing to draft.  You just can

4    refer back to the first sentence.  But the second sentence

5    gets much broader on this point; and therefore, it's improper

6    for the HomeServices defendants to try to insert meaning into

7    the highlighted portions here that aren't actually there.

8    Turning next to Realogy, Your Honor, the relevant

9    provisions here are 13.2.1 and 13.5.  Turning first to 13.2.1,

10   the argument that Realogy makes is very similar to what

11   HomeServices and Keller Williams say which is, again, this

12   provision is only limited to auditing, it's only limited to

13   accounting and financial information.

14   Again, Your Honor, I'm sounding like a broken record

15   at this point, but that's not what the language says.  The

16   language allows the franchisor to, among other things, inspect

17   books, records and any correspondence and data relating to

18   your business, as in the franchise business, very similar to

19   the HomeServices defendants' language in their agreement and

20   clearly provides a right to the materials plaintiffs are

21   seeking for the same reason.

22   I'll also note that in their slides, Realogy

23   highlighted language in other sections such as 13.1 or 13.2.2,

24   but it's not the language in those separate sections that is

25   relevant and sets forth the meaning in this highlighted

1    Section 13.2.1.

2         It's the language in that section that the Court

3    needs to look to, and it sets out these broad rights of

4    inspection.  And even if it didn't, there is Section 13.5

5    which allows or requires franchisees to provide Realogy or

6    cooperate with Realogy in collecting other information as they

7    may reasonably request.  There's nothing there to suggest that

8    the materials plaintiffs are seeking here are not information

9    that Realogy could reasonably request.

10        Counsel for Re/Max made the point that there's this

11   "including" clause in this sentence that has some text after

12   it and says, you know, that sort of limits the types of

13   materials that Realogy or Re/Max can obtain.

14        Well, Your Honor, that's setting out examples of

15   purposes for which the franchisors can obtain those materials.

16   It doesn't limit the actual information that Realogy or Re/Max

17   could obtain from their franchisees.

18        And it's important to note those are only examples of

19   reasons why either Realogy or Re/Max could obtain such

20   materials.  That's why they use the term "including" in this

21   sentence.  And it's worth noting here that the Realogy

22   agreement itself, as we point out in plaintiffs' brief,

23   specifically defines "including" to mean including without

24   limitation.  So this "including" clause that they rely heavily

25   on is simply not limiting, Your Honor.

1      Turning finally to Re/Max, the relevant section here

2   is going to be 10(c).  It has, as I just noted, virtually

3   identical language to 13.5 from the Realogy agreement.  And so

4   for the same reasons, Your Honor, plaintiffs believe that this

5   provides sort of broad right to the sorts of materials that

6   plaintiffs have requested here.

7      Notably, Your Honor, the language in these agreements

8   is very similar to language in other agreements that courts

9   have found sufficient to establish control.  So plaintiffs

10  cite *Moretti* throughout their brief, and defendants spent a

11  lot of time on it in their presentation so I want to talk

12  about that for a second.

13      The first thing to note here is there were actually

14  two licensor-licensee agreements at issue in *Moretti*.  The

15  corporate defendants focussed exclusively on the Hertz

16  agreement, but there's also in the Point 3 here in our slide

17  this DTAG agreement that allowed for DTAG as the licensor to

18  inspect the books and records of its licensee which relate in

19  any way to the licensed business.

20      The court in *Moretti* found that language sufficient

21  to afford them a contractual right to obtain the documents at

22  issue there.  And that language is very similar to the

23  language highlighted on this slide from Keller Williams,

24  HomeServices, and Realogy providing them broad rights to

25  examine the books and records of their licensees.

1    Turning to that Hertz language, defendants focus

2 heavily on the fact that there's at the end of it here this

3 "any other information" clause.  That clause is actually

4 similar to other provisions I've talked about here today,

5 namely, the provisions in the Keller Williams, Realogy, and

6 Re/Max agreements that, unfortunately, aren't highlighted on

7 the slide but that provide those franchisors the broad right

8 to obtain other information, as in the language of Realogy or

9 Re/Max, they may reasonably request, or in the case of

10 Keller Williams, that it may reasonably designate.

11    So *Moretti* is, contrary to the corporate defendants'

12 contentions here today, directly on point in at least two

13 respects.

14    I'm getting a request to annotate from Mr. MacGill.

15 I want to go ahead and decline that.  Sorry.

16    To continue on, another case that plaintiffs discuss

17 is the *Coventry Capital* case, and there, the Court found that

18 one of the parties had a contractual right, and therefore,

19 control over documents based on contractual language allowing

20 it to obtain all such information as it may require.

21    This language is very similar to the language I was

22 just mentioning in the Keller Williams, Realogy, and Re/Max

23 agreements allowing them to obtain other information, as in

24 the case of Realogy and Re/Max, they may reasonably request,

25 or in the case of Keller Williams, that it may reasonably

1    designate.

2         So *Coventry Capital*, like *Moretti*, also very on point

3    and found language similar to that at issue here sufficient to

4    establish control under Rule 34.

5         Two other cases I will mention in passing,

6    Your Honor, without parsing are the *Lofton v. Verizon Wireless*

7    case and *Haskins v. First American Insurance*.  Both of those

8    cases, as briefed in plaintiffs' opposition, have similar

9    language to the language at issue here and are a further data

10   point indicative of the fact that the contractual rights here

11   afford the corporate defendants that broad right to obtain the

12   sorts of materials plaintiffs are requesting.

13        Defendants' principal case and the one they talked

14   about most about today is *Agne v. Papa John's*, and in

15   particular, they harped on the fact that *Agne v. Papa John's*,

16   the plaintiff there was making the same arguments plaintiff is

17   making here.

18        Notably, *Papa John's* is:  One, not controlling; and

19   two, it's not persuasive and it's simply untrue that the

20   plaintiff there was making the same arguments.

21        The plaintiff there made this control argument in

22   passing in its brief.  If you look at Docket 151 in the

23   *Papa John's* case at Pages 11 to 12, that has plaintiffs'

24   argument in support of control here.  It spans only three

25   sentences, cites zero case law or authority and is simply

1   conclusory.

2          Unsurprisingly then, the District Court gave short

3   shrift to that argument and found that the plaintiff hadn't

4   carried its burden to establish that the franchise agreements

5   at issue there established a right to the documents that

6   plaintiffs were requesting.

7          That's not the case here.  The plaintiffs here have

8   spent 20 pages of briefing and now extensive argument pointing

9   out how the language of these arguments allows or affords the

10  corporate defendants a contractual right to the types of

11  materials plaintiffs are requesting.

12         And moreover, I'd note that *Moretti*, as discussed,

13  dealt with very, very similar language, and that decision

14  involved extensive briefing from both parties, a lengthy

15  analysis from the Court.

16         And to the extent there's any conflict between

17  *Papa John's* and *Moretti* insofar as they analyze very, very

18  similar contractual provisions and come out differently,

19  *Moretti* is the much more persuasive decision on this point,

20  Your Honor.

21         So I want to just briefly touch on a few of the

22  remaining arguments that corporate defendants raised in their

23  brief or also raised today.  One is that the corporate

24  defendants make the point that if they exercise their the

25  contractual right to obtain these documents from their

1   franchisees and their franchisees resisted, they have no

2   recourse.

3          As we point out in our brief, Your Honor, that's

4   speculative.  It's highly speculative that if the Court were

5   to order or find that the corporate defendants have a right to

6   these documents under their franchise agreements and then the

7   franchisors went out and asked franchisees for those documents

8   that those franchisees would turn around and refuse to

9   disclose them.

10         If that were the case, that is obviously something

11  that the parties and the Court could address if it were to

12  arise.  For instance, if a franchisor went out and received

13  documents and was able to get them from nine of ten

14  franchisees but there was one lone holdout, an easy fix and

15  solution is to just simply go to a different franchisee.

16         And then the final thing I'd note on this point,

17  Your Honor, is that defendants' contention is legally

18  irrelevant.

19         As *Coventry Capital* and similar cases hold, the

20  question is whether there's a contractual right to the

21  documents, not whether the third party that actually possesses

22  the documents or has access to or has them in its possession

23  would somehow block disclosure or refuse to turn them over.

24         Another point the corporate defendants make is that

25  they lack general control over their franchisees and don't

1   control their day-to-day business and don't control what they

2   do in the ordinary course.  Again, Your Honor, that's an

3   irrelevant question.  The question is simply whether they have

4   a contractual right to the documents; and here, they do.

5          For a related reason, the argument that they don't

6   have access to the documents, they don't have possession of

7   the documents, they don't have access to their franchisees'

8   systems is irrelevant.

9          Again, the argument plaintiffs are making and the

10  only question before the Court is whether there is a

11  contractual right to the documents.  And as explained in both

12  our briefing and here today, the one exception I would note is

13  that in the case of Keller Williams, it, in fact, has access

14  to the KW.com email accounts of agents affiliated with its

15  franchisees which is alone an independent reason to include

16  that it has possession, custody or control over those

17  communications.

18         The corporate defendants have suggested that the

19  Sitzer court and Judge Bough somehow came out in their favor

20  on this issue.  That's not what happened, Your Honor.

21         Judge Bough in Sitzer hasn't ruled one way or the

22  other whether the corporate defendants have control of

23  franchisee documents.  As alluded to, what happened there is

24  he ordered or required the plaintiffs to issue a certain

25  limited number of subpoenas and then see what they turn up and

1   come back to the Court.

2          Plaintiffs don't think that's a good solution here,

3   Your Honor, because there are many more MOSs spread out across

4   the country at issue here, so issuing a few subpoenas isn't

5   really going to give a true perspective of the types of

6   documents that are out there.  And so what's likely to happen

7   if Your Honor were to order that would be that those subpoenas

8   would be issued, and we're going to most likely be right back

9   here fighting over whether to allow for additional discovery

10  or not.

11         Plaintiffs think it's better to just have this issue

12  teed up now and decided so that the parties have clarity as to

13  whether plaintiffs have to proceed via Rule 45 subpoenas or

14  can use Rule 34 document requests.

15         We discussed subpoenas earlier, Your Honor, so I'll

16  go ahead and skip this slide.

17         And then the final point --

18         MR. BRAUN:  Alex, Alex, do you mind if I step in to

19  discuss the subpoenas?

20         THE COURT:  Very briefly, because I was going to

21  suggest that Mr. Aiken wrap it up.

22         MR. BRAUN:  Yep.  Understood.  I'll be very brief,

23  Your Honor.  I know we've been going for a while now.

24         So I just want to point out that it's an

25  understatement to say that subpoenaing the franchisees

1    directly would be a morass for the parties, the Court and,

2    frankly, courts around the country.

3              I mean, here's how that process would work out.  If

4    we have to serve subpoenas on dozens of franchisees and a

5    franchisee objects, we then have to negotiate the scope of any

6    production with dozens of different counsel, which could take

7    months.

8              Even more problematic, the default rule under the

9    Rules of Federal Procedure -- and it's a rule that I think

10   should be changed, but it's a rule that we all have to live

11   with -- is that we have to enforce the subpoenas in the

12   district where the franchisee is located, not in this court.

13             So we'd potentially have to file motions to compel in

14   a dozen or more different courts around the country.  And then

15   you have those courts that have no connection to or experience

16   with this case potentially making inconsistent rulings on key

17   discovery issues.

18             An alternative is we could ask each of those

19   courts -- an alternative under the federal rules that is

20   available to us is that we could ask each of those courts to

21   transfer the dispute here, but there's no guarantee that the

22   courts would agree to do so.

23             As I mentioned, the default rule is that the court

24   where the subpoenaed third party is located is the court that

25   would actually decide the scope of any production and any

1   motion to compel or for a protective order.

2        But let's assume a court is willing to entertain

3   transferring a dispute over those subpoenas to this court.  It

4   could take that court six months or a year, whenever the case

5   comes up on that court's six-month list, to actually decide

6   the dispute.

7        So we're potentially now talking about, even if we

8   were to issue subpoenas within the next month, not having

9   disputes -- even if we were to issue subpoenas this month,

10  even if we were within a month or two, you know, able to

11  narrow down the scope of any disputes over the subpoenas, and

12  even if those courts worked to transfer any dispute over the

13  subpoenas to this court, we're talking about potentially not

14  having discovery issues, disputes relating to these subpoenas,

15  resolved for a year, year and a half or more.

16       And this isn't an exaggeration, Your Honor.  I've

17  actually had to go through this process when many fewer third

18  parties were at issue.  And in that case, the Court ultimately

19  did decide to transfer the dispute, but it took many, many,

20  many months for the process to play out.

21       And so I just wanted to make sure that when we're

22  talking about the Rule 45 subpoena alternative, we're all on

23  the same page of what that actually means in the context of

24  this case.

25       THE COURT:  I understand your position.

1          Mr. Aiken, can you sort of bring us to a close?

2          MR. AIKEN:   I can, Your Honor.

3          And thanks for that, Robbie.

4          So one last point I wanted to briefly touch on is the

5     Keller Williams proportionality argument, Your Honor.

6          It's important to note here that Keller is the only

7     defendant who made this argument.   They're the only ones

8     asserting any harm, potential harm, to their business as a

9     reason that the Court should grant their motion for a

10    protective order.

11         It's important to note here that on this issue, as

12    opposed to the possession, custody or control issue,

13    Keller Williams, in fact, has the burden of proof, not

14    plaintiffs; and Keller hasn't carried it.   It hasn't come

15    forward with any concrete evidence that if it were to simply

16    follow its contractual rights and obtain the documents that

17    plaintiffs were requesting from its franchisees that that

18    would cause any franchisee to leave its network or individuals

19    to choose to go to a different franchisor over Keller Williams

20    or anything like that.

21         Moreover, Keller doesn't contest that the documents

22    plaintiffs here are seeking are highly relevant to our claims

23    and allegations in the case, nor does it contend that

24    obtaining those documents would be overly burdensome in terms

25    of the time, effort, and cost to get them from their

1   franchisees and then produce those on to plaintiffs.

2          And so, Your Honor, just to sum up and conclude,

3   because the provisions of the corporate defendants here in

4   their franchise agreements afford them the rights to obtain

5   from franchisees the documents plaintiffs are seeking, they

6   have control of them for purposes of Rule 34, and we would

7   respectfully ask that the Court deny the corporate defendants'

8   motion for a protective order.

9          Thank you.

10         THE COURT:  Okay.  Thank you.  I don't have any

11  further questions.

12         I'm going to take the motion under advisement as

13  fully briefed and argued, and we'll get to a ruling on it.

14         In keeping our case moving forward in the meantime,

15  the next date I'm going to set for the parties is a status

16  report date in 60 days.  So let's say April 26th since the

17  24th of April is on a weekend.  And I'd like the status report

18  to just let me know what additional progress has been made

19  with discovery.

20         If any of the motions that are fully briefed are

21  still pending, you can also put a little reminder in there

22  that they're still pending and ripe for ruling.

23         I'd also specifically like the parties to let me

24  know, if you haven't already, how you've resolved the issue of

25  Valerie Nager or Nager, whether I should be expecting a joint

1    submission in connection with a party's motion or whether

2    you've reached an agreement and resolved that matter on your

3    own.  So I just want to make sure that that's resolved.

4         And, of course, in the status report, indicate any

5    other issues that you would like to discuss at a status

6    hearing.

7         I'm going to hold off on setting a date for a

8    telephonic or video perhaps status hearing right now just

9    because my schedule in the April time frame is a bit in flux

10   over the next week or two while the court develops its plan

11   for resuming jury trials in the Northern District of Illinois.

12   And so since my schedule may be changing, I'm not going to set

13   another hearing date.  I'll have the status report date.

14        It may be that things are moving along swimmingly and

15   you don't need to actually speak to me in another 60 days and

16   we can just have another status report.  If not, then we'll

17   find a mutually-agreeable time in short order, but the status

18   report will be due April 26th.

19        Thank you all for your time today and for switching

20   platforms.  Hopefully, everybody found the WebEx platform to

21   be useful.  I think it worked pretty well, and it seemed as if

22   everybody was comfortable with it.  This is the platform that

23   the Northern District is moving to for its remote proceedings

24   or has moved to as of February.  So I think it went well.  If

25   you have any specific concerns or constructive criticism, you

1    can feel free to actually pass them along through my deputy

2    because we are trying to work out the bugs in our remote

3    proceedings.

4              Thank you.  Court's adjourned.

5         (Proceedings adjourned at 12:56 p.m.)

1                        C E R T I F I C A T E

2

3

4              I, Brenda S. Tannehill, certify that the foregoing is

5    a complete, true, and accurate transcript from the record of

6    proceedings on February 24, 2021, before the HONORABLE

7    ANDREA R. WOOD in the above-entitled matter.

8

9

10   */s/Brenda S. Tannehill, CSR, RPR, CRR*          2/26/2021

11        Official Court Reporter                      Date
          United States District Court
12        Northern District of Illinois
          Eastern Division
13

14

15

16

17

18

19

20

21

22

23

24

25