IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CHRISTOPHER MOEHRL, MICHAEL COLE, STEVE DARNELL, JACK RAMEY, DANIEL UMPA, AND JANE RUH, on behalf of themselves and all others similarly situated,<br><br>   Plaintiffs,<br><br> v.<br><br>THE NATIONAL ASSOCIATION OF REALTORS, REALOGY HOLDINGS CORP., HOMESERVICES OF AMERICA, INC., HSF AFFILIATES, LLC, BHH AFFILIATES, LLC, THE LONG & FOSTER COMPANIES, INC., RE/MAX LLC, AND KELLER WILLIAMS REALTY, INC.,<br><br>   Defendants. | Case No.: 1:19-cv-01610<br><br>Judge Andrea R. Wood |

**REPLY MEMORANDUM IN SUPPORT OF PLAINTIFFS'
MOTION TO COMPEL TARGETED DISCOVERY FROM
<u>DEFENDANT NATIONAL ASSOCIATION OF REALTORS</u>**

i

In apparent response to Plaintiffs' lawsuit, NAR recently adopted several new rules designed to prohibit filtering of MLS listings by commission amount, permit increased disclosure to consumers of blanket commission offers, and prohibit buyers from falsely claiming that their services are free (which NAR previously expressly permitted)—while also repealing or amending several rules addressed in Plaintiffs' complaint.[1] NAR has categorically refused to produce discovery regarding these obviously relevant rule changes.

Yet news reports covering some of the NAR MLS committee's deliberations over these changes provide staggering evidence of the anticompetitive intent and effect of NAR's prior rules, including those expressly permitting Realtors to filter listings by commission and requiring them to refrain from disclosing the universe of offered commissions to buyers:

- One NAR committee member stated that **the new rules "could pose a problem" because buyer's agents might respond by saying "will you give me a rebate?"**;

- The same NAR committee member expressed concern that **the new rules might cause buyers to be "involved in negotiating the buyer's agent commission . . . that's the road that we're potentially headed down"**;

- Another NAR committee member admitted: **"We're placing ourselves in a situation where the consumer will feel empowered"**;

- General counsel to a NAR MLS said: **"To the gentleman who talked about potential rebates and maybe driving those elements, you're absolutely right."**[2]

The other categories of documents that Plaintiffs seek—(i) certain NAR meeting minutes and reports and (ii) documents related to Realtor.com and Upsteam—are also highly likely to yield

---

[1] To Plaintiffs' knowledge, NAR has not eliminated the "Buyer Broker Commission Rule," which requires listing brokers to make blanket offers of compensation to cooperating brokers. *See* NAR, Handbook on Multiple Listing Policy 37 (2021 ed.), https://cdn.nar.realtor/sites/default/files/documents/2021_NAR_HMLP_210112.pdf.

[2] Exhibit A, Andrea V. Brambila, NAR Buyer Broker Commission Policy Moves Ahead After Close Vote, Inman (Nov. 15, 2021), https://www.inman.com/2021/11/15/nar-buyer-broker-commission-policy-moves-ahead-after-close-vote/.

1

relevant evidence. Although NAR has refused to produce a complete set of these documents, among the handful of documents incidentally included in NAR's existing productions are several bombshells. For instance, the draft minutes from a NAR Strategic Thinking Advisory Committee include the following revelations (which NAR deleted from the final version of the minutes):

- A NAR consultant admitting that █████████████████████████████████████████████████████████████████████████████████████████

- A NAR committee member admitting that ███████████████████████████████████████

- The following were among the issues causing the NAR committee the ████████████████████████████████████████████████████████████████████████████████[3]

And, in another joint message from NAR's former CEO and President, NAR represented that the third-party company operating Realtor.com made ████████████████████████████ ████████████████████████████████[4] Although NAR has refused to timely produce the documents reflecting these ████████████ further discovery is likely to show that—far from acting as a neutral arbiter of ethical rules—NAR's core mission has been, and continues to be, to keep Realtors' commissions high and protect its members from competition.

In response to Plaintiffs' request for this discovery, NAR makes a series of baseless and contradictory arguments designed to shield obviously relevant materials that NAR should already have produced. For instance, NAR argues that Plaintiffs should have moved to compel more than a year ago—even though many of the documents Plaintiffs seek *did not even exist at that time*. In

---

[3] Exhibit B, Stinton Dep., Ex. 34, at 1, 3-4.
[4] Exhibit C, Stinton Dep., Ex. 23, at 2.

almost the same breadth, however, NAR asserts that Plaintiffs should have waited *even longer* to file their motion. In addition, NAR invents out of whole cloth a purported "discovery cutoff" that:

- is not reflected in any court order (and is directly contrary to the fact discovery deadline reflected in the case schedule);
- as NAR concedes, is not reflected in any written document exchanged between Plaintiffs and NAR;
- as NAR concedes, was negotiated by the *Sitzer* Plaintiffs only;
- is directly contrary to written statements both by Plaintiffs here and the *Sitzer* Plaintiffs; and
- is inconsistent with the positions taken by the four other Defendants in this case.

In response, NAR points only to (i) a court order in another case; and (ii) a self-serving summary of internal call notes that have not been provided to Plaintiffs or the Court and, even in NAR's telling, appear to address the timing of NAR's initial custodial productions (not a discovery cutoff). These arguments and NAR's remaining, generic burden objections are insufficient bases to thwart discovery. Accordingly, Plaintiffs respectfully ask the Court to grant their Motion.

## I. NAR Should be Compelled to Produce Discovery on Its Newly Adopted Rules Addressing the Disclosure, Filtering, and Marketing of Cooperative Commissions

On November 15, 2021, NAR approved several changes to its MLS rules and Code of Ethics directly related to Plaintiffs' claims. These include: (i) adopting a new rule preventing MLS participants from filtering listings by offered commission, and repealing existing rules that explicitly permitted this practice; (ii) rules preventing MLS participants and Realtors from falsely advertising their services as "free," and repealing an existing rule that permitted this practice; (iii)

3

and a rule requiring MLSs to display on consumer-facing websites the buyer broker commission offered with a listing.[5]

NAR asserts that these new rules were not included in the definition of *one* of Plaintiffs' document requests or in the Amended Complaint, and, as result, that they are "not relevant to this case." NAR's Opp'n at 1 n.1, ECF No. 276. Contrary to NAR's claims, however, the operative complaint includes extensive allegations regarding the anticompetitive nature of commission filtering and consumer disclosure limitations, including citations to NAR's then-existing rules and practices. *See, e.g.*, Consol. Am. Compl. ("CAC") ¶ 75, ECF No. 84 ("The anticompetitive effects of the Buyer Broker Commission Rule are further magnified by the fact that neither the buyer nor the seller is even permitted to view the universe of buyer-broker commission terms").[6] The

---

[5] NAR Announces New Guidance that Reinforces Greater Transparency for Consumers, NAR (Nov. 15, 2021), https://www.nar.realtor/newsroom/nar-announces-new-guidance-that-reinforces-greater-transparency-for-consumers; *see also* MLS Technology and Emerging Issues Advisory Board, *List of Recommendations*, NAR (Sept. 9-10, 2021), https://cdn.nar.realtor/sites/default/files/documents/MLS-AB-List-of-Recommendations-Sept-21.pdf

[6] *See also, e.g.*, *id.* ¶ 76 ("Sellers and buyers (and the general public) are precluded from accessing the hidden fields and seeing the universe of buyer-broker commissions and other financial incentives being offered on the MLS. NAR's Handbook on Multiple Listing Policy states: 'Any information provided by the Multiple Listing Service to the Participants shall be considered official information of the service. Such information shall be considered confidential and exclusively for the use of Participants and real estate licensees affiliated with such Participants and those Participants who are licensed or certified by an appropriate state regulatory agency to engage in the appraisal of real property and licensed or certified appraisers affiliated with such Participants.'"); *id.* ¶ 77 ("NAR has also instituted a series of rules which ensure that commission offers and private remarks are not disclosed through data sharing agreements with third-party websites or other MLS syndication services."); *id.* ¶ 70 ("CoreLogic provides software and data services to most, if not all, of the Covered MLSs. Matrix allows brokers to provide tailored electronic listings to their buyer clients. Matrix automatically generates and regularly sends emails to buyer clients that describe properties for sale that match their search criteria. When brokers set up the Matrix program for their buyer clients, one of the fields in the software allows the brokers to filter listings according to the value of the buyer-broker commission being offered. In other words, brokers can program the software to only send property listings to buyers that promise buyer-broker commissions above a specified value."); *id.* ¶ 71 ("[U]nbeknownst to them, buyer

Complaint also expressly challenges NAR's then-rule permitting buyer brokers to represent that their services are free—quoting the specific language of that rule. *Id*. ¶ 75 ("NAR's Code of Ethics Standard 12-2 states that 'REALTORS may represent their services as 'free' or without cost if they expect to receive compensation from a source other than their client provided that the potential for the REALTOR to obtain a benefit from a third party is clearly disclosed at the same time.'").

Unsurprisingly, given the allegations in Plaintiffs' complaint, in its opinion denying Defendants' motions to dismiss, the Court directly addressed the relevance of: (i) filtering listing by the amount of cooperative commission offered; and (ii) buyer's limited visibility into such cooperative commissions. The Court explained that "[s]uch an arrangement could restrain trade because it 'substantially deprives the customer of the ability to utilize and compare prices in selecting' brokers." Mem. Op. & Order (Oct. 2, 2020) at 20, ECF No. 184 (quoting *Nat'l Soc'y of Prof'l Eng'rs*, 435 U.S. 679, 692-93 (1978)).[7] Likewise, the Court noted: "There is no real incentive for either the buyer or seller to negotiate the offered rate. That is because . . . the NAR Code of Ethics allows the buyer-broker to convey that their services are free." *Id*. at 21.

---

clients of those realtors often do not receive Matrix-generated emails that include properties offering a buyer-broker commission of less than 2.5 percent or higher, even if that property perfectly matches the buyers' search criteria."); *id*. ¶ 75 ("The MLSs utilize hidden fields that only realtors (i.e., brokers) subscribed to the MLS can see. Two of these hidden fields address compensation to buyer-brokers. The first field consists of the unilateral offer of buyer-broker commission that must be supplied as a condition of listing a home on the MLS. The second field is called 'private remarks,' and seller-brokers often include additional financial incentives for buyer-brokers in the 'private remarks' field.").

[7] *See also id*. ("Of course, . . . some MLSs allow the buyer-broker to filter listings based on the value of the buyer broker commission offer. . . . Nor would a prospective homebuyer necessarily be able to detect that their broker is screening out homes offering insufficient commissions because only brokers and realtors that subscribe to the MLS can view buyer-broker commission offers. That also means a home seller is unable to view the universe of buyer-broker commission offers before agreeing to a commission rate in the listing agreement, thereby putting the seller-broker in a substantial position of influence with respect to that decision.").

5

Following the denial of the Defendants' motion to dismiss, Plaintiffs served discovery requests on NAR expressly seeking documents relating to NAR's policies regarding commission filtering, consumer disclosure limitations, and marketing buyer brokers services as "free."[8] Following negotiations between the parties, NAR *agreed* to produce documents responsive to these requests.[9] Accordingly, in refusing to produce such discovery now, NAR seeks to go back on its prior commitments.

NAR further argues that some of the relevant documents will be privileged; that some of the relevant documents will be found among irrelevant documents; and that NAR will have to collect and review these documents to determine what should be produced and what withheld. This may be true, but it is true of all discovery and NAR does not explain why the costs would be uniquely burdensome here—or why they suffice to preclude discovery into such obviously relevant materials. *See, e.g.*, *Oxbow Carbon & Minerals LLC v. Union Pacific R.R. Co.*, 322 F.R.D. 1, 6-7 (D.D.C. 2017) (compelling additional, costly supplemental productions). Moreover, the

---

[8] Exhibit D, Pls.' First Set of Reqs. for Produc. of Docs. ("Pls.' First Set of RFPs") at 6 (seeking "documents and communications reflecting or relating to practices, policies, [and] procedures": "Enabling or permitting brokers to search for, filter, or exclude MLS listings based on the level or type of cooperative compensation offered by a listing broker;"); *id.* (seeking "documents and communications reflecting or relating to practices, policies, [and] procedures": "[p]rohibiting, restricting, or inhibiting display or publication to consumers (including potential sellers, buyers, clients, or customers) of compensation offered by listing brokers to cooperating brokers"); *id.* (seeking "documents and communications reflecting or relating to practices, policies, [and] procedures": "Permitting brokers to represent their services as free—either provided that the potential for the broker to obtain a benefit from a third party is clearly defined or otherwise").

[9] For instance, NAR agreed to the following search strings: (i) (show* or screen* or filter* or discrim* or hide* or hidden* or secret* or transparen* or shield* or withhold* or divulg* or reveal* or restric* or search* or publish* or disclos* or sort* or exclude* or segreg* or display*) w/25 (commission* or compensation*); and (ii) (Commission* or compensation*) w/5 (free or "without cost" or "no cost" or "no charge") OR ((service* or advertis*) w/5 (free or "without cost" or "no cost" or "No charge") w/7 (agent* broker* or realtor*)).

6

discovery related to this request would not be duplicative of previous NAR discovery efforts because these documents were only generated in the last two years, meaning documents would not need to be "re-collected" but would be collected for the first time.

Nor has the need for this additional discovery been precipitated by some delay or inaction by Plaintiffs. Plaintiffs timely filed their motion to compel one month after the new rules were proposed, and only after reaching out to NAR to discuss the voluntary production of related materials. Rather, this discovery has been made necessary by NAR's decision to alter the litigation landscape in the middle of depositions and while Plaintiffs are preparing for class certification. Indeed, NAR has refused to agree not to rely on these new rules or related documents in the litigation. And Plaintiffs have already been unable to use the requested documents in the depositions of high-ranking NAR executives.

Finally, despite NAR's protestations, Plaintiffs' discovery requests *are* targeted. Plaintiffs do not seek a categorical document refresh from all custodians regarding all document requests, and have in fact spent months reviewing NAR's previous productions to ensure that Plaintiffs' current requests are not duplicative. Rather, Plaintiffs only seek additional documents regarding rules that NAR concedes Plaintiffs could not have known about until two months ago. Plaintiffs are willing to work with NAR in good faith to identify the likely locations of relevant documents and, where appropriate, to craft search terms that are focused on such changes.

    **II.   NAR Should be Compelled to Produce Discovery on Realtor.com and Upstream.**

Documents related to Realtor.com and Upstream are relevant to Plaintiffs' claims because NAR supported both projects in an effort to avoid the disintermediation of real estate agents by internet platforms such as Zillow and Redfin. To that end, NAR's existing productions reveal that NAR pitched Realtor.com to its members as a ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

7

██████████████████████████ NAR does not seriously contest that these documents are relevant to Plaintiffs' claims.

NAR instead argues that Plaintiffs could have minimized the burden on NAR by including related search terms in earlier negotiations. But this ignores the fact that NAR agreed to perform go-get searches of central files, not just run search terms on custodial files. Despite knowing that documents pertaining to Realtors.com and Upstream were likely to be responsive to several of plaintiffs' document requests, including those pertaining to commissions levels, NAR *did not even collect* central file documents relating to these projects. Given the documents related to Realtor.com and Upstream that hit upon Plaintiffs' agreed search terms concerning "commissions" even without that collection, it is likely that had NAR collected the requested documents, they too would have included relevant and responsive documents.

Finally, NAR also argues that the requested discovery might burden NAR with having to defend additional depositions regarding those materials. But this burden is of NAR's own making. Plaintiffs requested these materials months ago—and NAR has generally refused to produce them. The Court should not reward NAR for its intransigence by allowing NAR to escape the consequences of that decision.

### III. NAR Should be Compelled to Produce Discovery on Relevant NAR Committees.

NAR commits for the first time in its opposition brief to producing non-privileged meeting minutes and reports from the Strategic Thinking Advisory Committee, the Large Firm Directors Forum, and the Real Estate Services Advisory Group and their predecessors, to the extent those documents exist in NAR's central files. NAR's Opp'n at 10, ECF No. 276. Plaintiffs note only that they have been requesting these easy-to-produce documents since September and that NAR has

neither produced these documents, nor committed to any date for producing them. Accordingly, Plaintiffs request that the Court set a deadline for the production of these documents.

## IV. Plaintiffs' Discovery Requests Are Timely

NAR repeatedly relies on the discovery cutoff date negotiated in *Sitzer* to argue that additional discovery in this case is prohibited. That reliance is misplaced. It is irrelevant whether Plaintiffs were aware of the discovery cutoff in *Sitzer*, because multiple written exchanges between the parties made clear that *Moehrl* Plaintiffs agreed *only* to certain common custodians and search terms. By comparison, when *Sitzer* Plaintiffs separately negotiated a cutoff date with Defendants— without the involvement of *Moehrl* Plaintiffs—*Sitzer* Plaintiffs made clear they were "obviously speaking for *Sitzer* Plaintiffs only." Exhibit E, April 2, 2020 10:37 A.M. E-Mail from Brandon Boulware, *Sitzer* Plaintiffs' counsel, to Jeremy J. Gray, RE/MAX's counsel, and Matt Dameron, Courtney Stout, and Jeremy Suhr, *Sitzer* Plaintiffs' counsel. Even NAR admits that only the *Sitzer* Plaintiffs negotiated the discovery cutoff and that *Moehrl* Plaintiffs never agreed in writing to the same. NAR's Opp'n at 12, ECF No. 276.

Notwithstanding, NAR asserts that during an April 2020 meet and confer "*Moehrl* plaintiffs stated they did not object to using the same cut-offs." *Id.* at 4.[10] But this assertion is unsupported, inconsistent with Plaintiffs' recollection of events, and otherwise contradicted by the written record. Plaintiffs acknowledge that in a meet and confer related to this motion, NAR informed Plaintiffs that it has notes from the April 2020 meet and confer suggesting Plaintiffs agreed to the *Sitzer* cutoff. However, NAR has refused to tell Plaintiffs specifically what those notes say, and even now NAR's brief leaves the exact details of those notes to the imagination.

---

[10] NAR repeatedly references a meet and confer that took place in April 2021. Plaintiffs are not aware of any meet and confer with NAR that occurred at that time.

9

Plaintiffs believe this is because those notes do not say Plaintiffs agreed to the *Sitzer* cutoff and are merely consistent with the fact that Plaintiffs agreed to a particular date for NAR's original document collections.

In fact, NAR is the *only* Defendant that appears to have understood the initial document collection date in *Sitzer* as a "discovery cutoff" foreclosing additional discovery in this case. Plaintiffs served additional requests for production on the Corporate Defendants, and *all* the Corporate Defendants have stated that they are willing to meet and confer regarding a "reasonable and proportional refresh . . . from a limited set of document custodians." *See, e.g.*, Exhibit F, Def. Keller Williams Realty, Inc.'s Resp. to Pls.' 2d Set of Reqs. for Prod. of Docs. to the Corp. Defs. at 8.[11]

Alternatively, NAR argues that Plaintiffs' last opportunity to raise any issues regarding the scope of NAR's production was January 2021, the Court's deadline for initial motions regarding custodian and ESI disputes. This cannot be right. Defendants only completed their first round of productions a month earlier, and Plaintiffs could not possibly have reviewed those productions to determine their adequacy. NAR's understanding of the January 2021 deadline also makes little sense given that the Court left discovery open until September 2022. And even if January 2021 were the deadline for attempting to resolve some disputes, NAR's own cited case—which concerned a motion to compel filed 15 months after the *close* of fact discovery, *see CornerStone Staffing Sols., Inc. v. James*, No. 12-cv-01527, 2015 WL 13037133 (N.D. Cal. June 8, 2015)—

---

[11] Nobody else believes that the discovery cutoff forecloses additional discovery in even *Sitzer*. Correspondence between *Sitzer* Plaintiffs and Defendants also shows agreement on future document refreshes, with the option for *Sitzer* Plaintiffs to petition the court for additional refreshes as necessary. *See* Exhibit E, April 3, 2020 10:40 A.M. E-Mail from Brandon Boulware, Sitzer Plaintiffs' counsel, to Jeremy J. Gray, RE/MAX's counsel, and Matt Dameron, Courtney Stout, and Jeremy Suhr, Sitzer Plaintiffs' counsel.

states that "motion cut-off deadlines do not categorically preclude motions to enforce discovery orders that call for production after the deadlines." *CornerStone Staffing Sols., Inc. v. James,* No. 12-cv-01527, 2015 WL 13037132, at *1 (N.D. Cal. June 24, 2015). That is particularly true here where (a) unlike in *CornerStone*, fact discovery has not closed and Plaintiffs moved to compel with almost a year left to them; (b) Plaintiffs only moved to compel after reviewing NAR's previous productions and determining that the documents they sought were not included; and (c) certain critical documents were likely not generated until *after* the *Sitzer* cutoff and *after* discovery negotiations, and Plaintiffs had no reason to know about them until just recently.

## CONCLUSION

For the reasons stated above, Plaintiffs' Motion to Compel Targeted Discovery From Defendant NAR should be granted.

Dated: November 23, 2021          Respectfully submitted,

    /s/ Robert A. Braun
Kit A. Pierson
 kpierson@cohenmilstein.com
Daniel A. Small
 dsmall@cohenmilstein.com
Benjamin D. Brown
 bbrown@cohenmilstein.com
Robert A. Braun
 rbraun@cohenmilstein.com
Leonardo Chingcuanco
 lchingcuanco@cohenmilstein.com
COHEN MILSTEIN SELLERS & TOLL PLLC
1100 New York Ave. NW, Fifth Floor
Washington, DC 20005
Telephone: (202) 408-4600

Carol V. Gilden (Bar No. 6185530)
 cgilden@cohenmilstein.com
COHEN MILSTEIN SELLERS & TOLL PLLC
190 South LaSalle Street, Suite 1705
Chicago, IL 60603
Telephone: (312) 357-0370

Steve W. Berman (Bar No. 3126833)
 steve@hbsslaw.com
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292

Daniel Kurowski
 dank@hbsslaw.com
Jeannie Evans
 jeannie@hbsslaw.com
Whitney Siehl
 wsiehl@hbsslaw.com
HAGENS BERMAN SOBOL SHAPIRO LLP
455 North Cityfront Plaza Drive, Suite 2410
Chicago, IL 60611
Telephone: (708) 628-4949

Rio S. Pierce
 riop@hbsslaw.com
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000

Matthew R. Berry
 mberry@susmangodfrey.com
Alexander W. Aiken
 aaiken@susmangodfrey.com
SUSMAN GODFREY L.L.P
1201 Third Avenue, Suite 3800
Seattle, Washington 98101
Telephone: (206) 516-3880

Marc M. Seltzer
 mseltzer@susmangodfrey.com
Steven G. Sklaver
 ssklaver@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, California 90067
Telephone: (310) 789-3100

Beatrice C. Franklin
 bfranklin@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1301 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (212) 336-8330