**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| CHRISTOPHER MOEHRL, MICHAEL COLE, STEVE DARNELL, JACK RAMEY, DANIEL UMPA, and JANE RUH, on behalf of themselves and all others similarly situated, | Case No.: 1:19-cv-01610 |
| Plaintiffs, | Judge Andrea R. Wood |
| v. | |
| THE NATIONAL ASSOCIATION OF REALTORS, REALOGY HOLDINGS CORP., HOMESERVICES OF AMERICA, INC., BHH AFFILIATES, LLC, HSF AFFILIATES, LLC, THE LONG & FOSTER COMPANIES, INC., RE/MAX LLC, and KELLER WILLIAMS REALTY, INC., | |
| Defendants. | |

**CORRECTED MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS COUNSEL**

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................. 1

II.   STATEMENT OF FACTS ................................................................................. 5

      A.   The Residential Real Estate Industry .................................................... 5

      B.   Defendants .............................................................................................. 6

      C.   Defendants' Anticompetitive Agreement. ............................................. 8

      D.   The Challenged Restraints .................................................................... 15

      E.   The Challenged Restraints Further a Long Line of Anticompetitive
           Conduct ................................................................................................ 17

      F.   The Challenged Restraints are Anticompetitive and Harmed the Class ... 19

      G.   Plaintiffs .............................................................................................. 19

III.  CLASS DEFINITIONS .................................................................................. 20

IV.   CLASS CERTIFICATION STANDARDS ..................................................... 20

V.    ARGUMENT .................................................................................................. 21

      A.   Plaintiffs Satisfy the Prerequisites of Rule 23(a) ............................... 21

           1.   The Proposed Classes are sufficiently numerous. ..................... 21

           2.   Common questions of fact and law exist. .................................. 22

           3.   Plaintiffs' claims are typical of class members' claims. ........... 23

           4.   Plaintiffs and counsel are adequate representatives ................. 23

      B.   Plaintiffs Satisfy the Requirements for a Damages Class under Rule
           23(b)(3). ............................................................................................... 24

           1.   Common questions predominate over any individual issues .... 24

                a.   Common issues regarding Defendants' conspiracy
                     predominate. ................................................................... 25

                b.   Common issues regarding an unreasonable restraint
                     predominate. ................................................................... 27

                c.   Common issues regarding antitrust impact predominate ... 37

d.   Common issues regarding damages predominate. ...................... 41

2.   A class action is superior to other methods of adjudication. ................... 42

3.   The Damages Class is ascertainable through objective criteria .............. 42

C.   Plaintiffs Satisfy the Requirements for an Injunctive Relief class under Rule 23(b)(2). ................................................................................. 43

D.   Class Counsel are Adequate under Rule 23(g). .................................................. 45

VI.   CONCLUSION ........................................................................................................ 45

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Agnew v. NCAA,*
683 F.3d 328 (7th Cir. 2012) .......................................................................................... 30

*Anderson v. Cornejo,*
199 F.R.D. 228 (N.D. Ill. 2000) ...................................................................................... 44

*Ariz. v. Maricopa Cnty. Med. Soc'y,*
457 U.S. 332 (1982) ..................................................................................................26, 28

*Associated Press v. United States,*
326 U.S. 1 (1945) ............................................................................................................ 26

*Beaton v. SpeedyPC Software,*
907 F.3d 1018 (7th Cir. 2018) ........................................................................................ 22

*Catalano, Inc. v. Target Sales, Inc.,*
446 U.S. 643 (1980) ........................................................................................................ 27

*Chicago Tchrs. Union, Loc. No. 1 v. Bd. of Educ. of Chi.,*
797 F.3d 426 (7th Cir. 2015) .....................................................................................21, 44

*Comcast Corp. v. Behrend,*
569 U.S. 27 (2013) .......................................................................................................... 41

*Copeland v. Wabash County, Indiana,*
2021 WL 4622155 (N.D. Ind. Oct. 7, 2021) .................................................................. 44

*Cordes & Co. Fin. Servs. v. A. G. Edwards & Sons, Inc.,*
502 F.3d 91 (2d Cir. 2007) .......................................................................................29, 39

*Esmark, Inc. v. NLRB,*
887 F.2d 739 (7th Cir. 1989) .......................................................................................... 26

*FTC v. Ind. Fed'n of Dentists,*
476 U.S. 447 (1986) ........................................................................................................ 26

*Goldfarb v. Va. State Bar,*
421 U.S. 773 (1975) ........................................................................................................ 26

*Gomez v. St. Vincent Health, Inc.,*
649 F.3d 583 (7th Cir. 2011) .......................................................................................... 23

*Hill v. Art Rice Realty Co.*,
66 F.R.D. 449 (N.D. Ala. 1974), *aff'd* 511 F.2d 1400 (5th Cir. 1975)................................ 18

*Holmes v. Godinez*,
311 F.R.D. 177 (N.D. Ill. 2015)................................................................................. 44

*Honorable v. Easy Life Real Est. Sys., Inc.*,
182 F.R.D. 553 (N.D. Ill. 1998)................................................................................. 44

*Howard v. Cook Cty. Sheriff's Off.*,
989 F.3d 587 (7th Cir. 2021)..............................................................................20, 21

*Hyland v. Homeservices of Am., Inc.*,
2008 WL 4858202 (W.D. Ky. Nov. 7, 2008)..................................................22, 23, 25, 42

*In re Allstate Corp. Sec. Litig.*,
966 F.3d 595 (7th Cir. 2020)..................................................................................... 25

*In re Currency Conversion Fee Antitrust Litig.*,
264 F.R.D. 100 (S.D.N.Y. 2010)................................................................................ 42

*In re Dealer Mgmt. Sys. Antitrust Litig.*,
2018 WL 6629250 (N.D. Ill. Oct. 22, 2018)................................................................. 26

*In re Linerboard Antitrust Litig.*,
305 F.3d 145 (3d Cir. 2002)...................................................................................... 38

*In re Microcrystalline Cellulose Antitrust Litig.*,
218 F.R.D. 79 (E.D. Pa. 2003).................................................................................... 29

*In re Online DVD Rental Antitrust Litig.*,
2010 WL 5396064 (N.D. Cal. Dec. 23, 2010)................................................................ 39

*In re Opana ER Antitrust Litig.*,
2021 WL 3627733 (N.D. Ill. June 4, 2021)................................................................... 22

*In re Playmobil Antitrust Litig.*,
35 F. Supp. 2d 231 (E.D.N.Y. 1998)............................................................................ 29

*In re Ranbaxy Generic Drug Application Antitrust Litig.*,
338 F.R.D. 294 (D. Mass. 2021)................................................................................. 38

*In re Steel Antitrust Litig.*,
2015 WL 5304629 (N.D. Ill. Sept. 9, 2015).........................................................23, 24, 25

*In re Sulfuric Acid Antitrust Litig.*,
2007 WL 898600 (N.D. Ill. Mar. 21, 2007).....................................................21, 22, 25, 26

*Johnson v. Diakon Logistics*,
   2020 WL 405636 (N.D. Ill. Jan. 23, 2020).........................................................42

*Kleen Prod. LLC v. Int'l Paper Co.*,
   831 F.3d 919 (7th Cir. 2016)..............................................24, 37, 38, 41

*Kohen v. Pac. Inv. Mgmt. Co. LLC*,
   571 F.3d 672 (7th Cir. 2009).............................................................40

*Laumann v. National Hockey League*,
   105 F. Supp. 3d 384 (S.D.N.Y. 2015).................................................43

*Ledford v. City of Highland Park*,
   2000 WL 1053967 (N.D. Ill. July 31, 2000)........................................44

*Lemon v. Int'l Union of Operating Engineers, Loc. No. 139, AFL-CIO*,
   216 F.3d 577 (7th Cir. 2000).............................................................21

*Loomis v. Exelon Corp.*,
   2007 WL 2060799 (N.D. Ill. June 26, 2007).......................................44

*McKerall v. Hunteville Real Estate Bd.*,
   1976-1 Trade Cases 60,709 (CCH), 1976 WL 1207 (N.D. Ala. 1976)............18

*Merenda v. VHS of Michigan, Inc.*,
   296 F.R.D. 528 (E.D. Mich. 2013).....................................................38

*Messner v. Northshore Univ. HealthSystem*,
   669 F.3d 802 (7th Cir. 2012)............................................24, 37, 40, 41

*Moehrl v. Nat'l Ass'n of Realtors*,
   2020 WL 5260511 (N.D. Ill. May 30, 2020)..................................24, 45

*Moehrl v. Nat'l Ass'n of Realtors*,
   492 F. Supp. 3d 768 (N.D. Ill. 2020)...........................25, 26, 27, 30

*Mullins v. Direct Digit., LLC*,
   795 F.3d 654 (7th Cir. 2015).............................................................43

*Murdock v. Walker*,
   2011 WL 13257344 (N.D. Ill. June 7, 2011)........................................44

*Nat'l Soc'y of Prof'l Eng'rs v. United States*,
   435 U.S. 679 (1978)......................................................26, 28, 29

*NCAA v. Bd. of Regents of Univ. of Okla.*,
   468 U.S. 85 (1984)............................................................................26

*Nitsch v. Dreamworks Animation SKG Inc.*,
  315 F.R.D. 270 (N.D. Cal. 2016)..................................................................23, 42

*Orr v. Shicker*,
  953 F.3d 490 (7th Cir. 2020)..........................................................................20, 21

*Pella Corp. v. Saltzman*,
  606 F.3d 391 (7th Cir. 2010)............................................................................. 40

*Ploss v. Kraft Foods Grp., Inc.*,
  431 F. Supp. 3d 1003 (N.D. Ill. 2020)........................................................23, 42

*Realcomp II, Ltd. v. FTC*,
  635 F.3d 815 (6th Cir. 2011)............................................................................. 26

*Reed v. Advoc. Health Care*,
  268 F.R.D. 573 (N.D. Ill. 2009)........................................................................ 29

*Rosario v. Livaditis*,
  963 F.2d 1013 (7th Cir. 1992)........................................................................... 23

*Smith v. City of Chicago*,
  2021 WL 3883116 (N.D. Ill. Aug. 31, 2021).................................................. 44

*State Oil Co. v. Khan*,
  522 U.S. 3 (1997).............................................................................................. 27

*Suchanek v. Sturm Foods, Inc.*,
  764 F.3d 750 (7th Cir. 2014)............................................................................. 22

*Tawfilis v. Allergan, Inc.*,
  2017 WL 3084275 (C.D. Cal. June 26, 2017)................................................. 22

*Tinsley v. Snyder*,
  922 F.3d 957 (9th Cir. 2019).........................................................................43, 44

*United States v. Brighton Bldg. & Maintenance Co.*,
  598 F.2d 1101 (7th Cir. 1979)........................................................................... 27

*United States v. Gasoline Retailers Ass'n*,
  285 F.2d 688 (7th Cir. 1961)..........................................................................27, 29

*United States v. Nat'l Ass'n of Real Estate Boards*,
  339 U.S. 485 (1950)........................................................................................... 18

*United States v. Socony-Vacuum Oil Co.*,
  310 U.S. 150 (1940)........................................................................................... 28

*United States v. U.S. Gypsum Co.*,
   438 U.S. 422 (1978)......................................................................... 29

*Walsh v. Kelley*,
   2021 WL 4459531 (N.D. Ill. Sept. 29, 2021)............................................21, 45

*Wilk v. AMA*,
   895 F.2d 352 (7th Cir. 1990)............................................................ 28

**Statutes**

Sherman Act § 1.................................................................................25, 26, 27, 29

**Rules**

Fed. R. Civ. P. 23.....................................................................................*passim*

**Treatises**

7AA Charles Alan Wright et al., Federal Practice & Procedure § 1781 (3d ed. 2021)............... 42

# I.  INTRODUCTION

> *"No trade association that I know of has engaged itself in the protection of its members as we have." – Dale Stinton, former CEO of the National Association of Realtors.* [1]

Plaintiffs challenge a longstanding conspiracy in the U.S. residential real estate industry carried out by the National Association of Realtors ("NAR") and the industry's largest firms. Plaintiffs specifically challenge NAR rules (a) requiring home sellers to make blanket unilateral offers of compensation to real estate brokers representing (and owing fiduciary duties to) buyers, (b) restraining negotiations of those offers, and (c) incentivizing and facilitating steering by brokers towards high commission listings and away from discounted listings. Defendants' anticompetitive actions have had the purpose and effect of causing home sellers across the 20 Covered Multiple Listing Services ("MLSs") [2] to pay supracompetitive commissions and impeding the entry and expansion of firms that would challenge the cartel's uniformly high prices.

Plaintiffs now seek to certify two classes: a damages class under Rule 23(b)(3) and an injunctive relief class under Rule 23(b)(2). The Court should grant Plaintiffs' motion and appoint Cohen Milstein Sellers & Toll PLLC, Hagens Berman Sobol Shapiro LLP, and Susman Godfrey LLP as Co-Lead Class Counsel.

First, Plaintiffs satisfy the requirements of Rule 23(a): numerosity, commonality, typicality, and adequacy of representation. The proposed classes consist of thousands if not millions of homeowners in 20 of the largest U.S. metropolitan areas. Plaintiffs allege that the requirement that a home seller make a blanket offer of compensation to buyer brokers to list a

---

[1] Aiken Decl. Ex. 1 (Stinton Dep. Ex. 129), at 2. All exhibits cited are attached to the accompanying Declaration of Alexander W. Aiken.

[2] Databases of properties listed for sale. *See* https://www.nar.realtor/mls-online-listings.

home on an MLS (along with other NAR rules) is anticompetitive and caused them to pay artificially inflated, supracompetitive buyer-broker commissions when they sold their homes. Plaintiffs' claims are typical of the classes' claims because they arise from the same events and are predicated on the same legal theories. Moreover, numerous questions are common to the classes, including whether Defendants conspired, the interpretation and effects of the challenged rules, and whether the conspiracy harmed competition. Finally, the class representatives and class counsel are more than adequate representatives of the classes. The class representatives have the same interests as the classes in establishing Defendants' liability, classwide damages, and enjoining Defendants' future unlawful conduct, and counsel have vigorously represented the interests of the putative classes and will continue to do so.

Second, Plaintiffs' damages class satisfies Rule 23(b)(3)'s predominance and superiority requirements. Whether Defendants conspired is a question common to the class and depends on common evidence concerning Defendants' actions. Whether Defendants' agreement is an unreasonable restraint of trade can likewise be adjudicated classwide. A long line of authority condemning horizontal agreements that tamper with price mechanics and result in supracompetitive prices shows that Defendants' agreement is *per se* unlawful—an issue that is common to the class. But even if Defendants' conduct is analyzed under the alternative Rule of Reason, common evidence demonstrates the Challenged Restraints are unlawful.

Prof. Einer Elhauge—the Petrie Professor of Law at Harvard University—opines that common evidence shows that the Challenged Restraints have maintained and extended an anticompetitive equilibrium and inflated commissions classwide in at least two ways:

1) The Challenged Restraints (which make offered commissions easily viewable by brokers and filterable) create strong incentives for sellers and their brokers to offer uniformly supracompetitive buyer-broker commissions to prevent buyer brokers from steering buyers away from their homes to listings offering higher commissions. Elhauge Decl., at § V.B.

2) Because buyer-broker commissions are set by the seller and seller broker, buyers have little incentive to either forgo or limit their use of buyer-broker services or to negotiate a lower price, and they have little influence over the setting of buyer-broker commissions. Buyer-brokers thus have limited incentive or ability to compete by lowering the price of their services, which fosters supracompetitive commissions. Elhauge Decl., at § V.D.

As shown by Prof. Elhauge, common evidence further reflects that Defendants' agreement has caused classwide overcharges: (a) buyer-broker commission rates in the U.S. are much higher than in comparable international markets; (b) have remained stable despite technology reducing the value of buyer brokers and their transaction costs all while housing prices have increased (meaning that commissions paid are much higher today); and (c) the challenged rules have impeded price discounters from entering and disrupting the anticompetitive equilibrium. Elhauge Decl., at §§ V.E, V.F, V.G. Common evidence from Defendants and third parties likewise demonstrates the anticompetitive effects of the challenged NAR rules. For example:

- Defendants are aware of and have even acknowledged that the challenged rules have incentivized and facilitated the market-wide threat of steering. *See infra*.

- The Corporate Defendants train their agents to use the threat of steering to push back against home sellers seeking to pay lower commissions. *See infra*.

- And Defendants have acknowledged that steering has prevented the development of competitive business models. *See infra*.

The question of antitrust impact is also susceptible to classwide proof and adjudication. Prof. Elhauge opines that the challenged rules maintained and extended an anticompetitive equilibrium which resulted in classwide commission overcharges in *each* of the Covered MLSs. All or nearly all class members were impacted because in the but-for world most buyers would have decided not to retain a broker (and thus neither sellers nor buyers would have paid that broker's commission) and any brokers that were retained by buyers would have received a reduced buyer-broker commission (by virtue of increased competition and reduced steering incentives).

*See* Elhauge Decl., at ¶¶ 244–48. Plaintiffs' second expert—Prof. Nicholas Economides, Professor of Economics at NYU's Stern School of Business—uses an international benchmark model that relies on common evidence concerning comparable international markets (Australia, the Netherlands, and the United Kingdom) and concludes that: (a) most transactions in the but-for world would not have involved buyer brokers; (b) for all or nearly all transactions, buyer broker commissions would have been either lower or zero (regardless of whether the buyer broker was paid by the buyer or seller); and (c) seller-broker commissions would remain the same or decrease. *See* Economides Decl., at § IV. By comparing buyer-broker commissions in class transactions to what buyer brokers would have been paid in a but-for world similar to the benchmark countries, Prof. Economides concludes that all or nearly all class members were impacted and paid supracompetitive commissions. *See* Economides Decl., at § IV.

Damages can similarly be calculated classwide. Using a common methodology, Prof. Economides determines that the mean of the buyer-broker commission rates paid in the benchmark countries is 1.55%. *See* Economides Decl., at ¶ 91. Based on the conservative assumption that all buyers would be among the *few* who would have retained brokers in the but-for world and all sellers would be among the *few* who would pay buyer-broker commissions, Prof. Economides calculates classwide damages by comparing the buyer-broker commissions paid in the actual world to the 1.55% benchmark rate. *See* Economides Decl., at ¶ 95.

Because each of the issues driving this litigation rises and falls on common evidence, common questions predominate over individualized issues. Further, a class action is superior to numerous individual suits. It would be more efficient to resolve the many common questions in a single adjudication, and many class members' claims will be small relative to the high costs of an antitrust action. The Court should certify the proposed damages class under Rule 23(b)(3).

Finally, Plaintiffs satisfy the requirements of Rule 23(b)(2). Plaintiffs seek to enjoin ongoing conduct that is generally applicable to the class: NAR rules applicable to all 20 Covered MLSs. Any injunction here would concern those generally-applicable rules. Accordingly, the Court should certify the proposed injunctive-relief class under Rule 23(b)(2).

## II. STATEMENT OF FACTS

### A. The Residential Real Estate Industry.

The vast majority of residential properties in the United States are bought and sold through real estate brokerages and their affiliated agents. *See, e.g.*, Ex. 6 (BHHUT-Ile-0000562), at 0626, 0679 (█████████████████████████████████████████████ ███); Ex. 7 (Blefari Dep. 2), at 23:16–:20, 25:18–:23; Ex. 8 (Contos Dep.), at 27:21–:25; Elhauge Decl., at ¶ 14. There are "two principal categories of real estate brokerage professionals": "agents" and "brokers." "[A]gents [generally] work directly with consumers and brokers supervise agents." Ex. 9 (2007 FTC Report), at 4–5.

MLSs are databases of properties listed for sale. *See* https://www.nar.realtor/mls-online-listings. The vast majority of homes in the United States are sold on local or regional MLSs, making access of vital importance for brokers to succeed. *See* Ex. 6 (BHHUT-Ile-0000562), at 0693 (████████████████████████); Ex. 9 (2007 FTC Report), at 12 ("[A]s a practical matter, any broker who wishes to compete effectively in a market must participate in the local MLS."); Ex. 10 (Keller Dep. 1), at 144:23–145:4 (███████████████████████████ █████████████████████); Elhauge Decl., at ¶ 26.

Listing brokers receive a commission from their seller clients that is typically calculated as a percentage of a home's sales price. *See* Ex. 7 (Blefari Dep. 2), at 23:21–24:1; Ex. 5 (Figgs Dep. 2), at 24:2–:13. As a result of Defendants' anticompetitive agreement, a portion of the total

commission that is paid to listing brokers must be earmarked to pay buyer brokers. *See* Elhauge Decl., § V.C; Ex. 7 (Blefari Dep. 2), at 27:17–28:1; Ex. 12 (Perriello Dep.), at 190:17–191:16; Ex. 11 (Strandmo Dep.), at 15:6–:13. In other words, buyer brokers—who owe fiduciary obligations to the buyer—are typically not paid by their clients; instead they are paid by the home sellers and listing brokers they are negotiating against. Until this year, NAR rules even permitted buyer brokers to tell clients their services were free (*see infra*), and they did. *See* Ex. 13 (KWRI_00331342), at 1349; Ex. 14 (KWRI_00329741); Ex. 15 (KWRI_00321029), at 1093; Ex. 16 (KWRI_00122324), at 2334.

### B. Defendants.

**NAR**. NAR is America's largest trade association with over 1.5 million members called "Realtors"—a term that is trademarked. https://www.nar.realtor/about-nar; Ex. 17 (Milligan Dep.), at 35:7–10. NAR has a "three-way" structure: it is comprised of the national association, as well as state and local associations of Realtors frequently known as "member boards." Ex. 17 (Milligan Dep.), at 32:25–33:19. Realtors cannot join NAR without joining a local member board, and Realtors cannot join a local member board without joining NAR. Ex. 17 (Milligan Dep.), at 35:19–36:2. NAR currently oversees 54 state and territorial Realtor associations and over 1,200 local Realtor associations. https://www.nar.realtor/about-nar.

**Corporate Defendants**. The Corporate Defendants are Defendants (1) Realogy Holdings Corporation; (2) HomeServices of America, Inc., BHH Affiliates, LLC, HSF Affiliates, LLC, and The Long & Foster Companies, Inc. (collectively, "HomeServices"); (3) RE/MAX LLC; and (4) Keller Williams Realty, Inc.

Realogy is the "world's largest franchisor of residential real estate brokerages" and "the leading U.S. residential real estate brokerage." Ex. 18 (Realogy 10-K), at 5. It owns, operates, and

franchises real estate brokerage firms under several brands, including Century 21, Coldwell Banker, Sotheby's International Realty, Corcoran, Better Homes and Garden Real Estate, and ERA Real Estate. *Id.* at 6; Ex. 19 (Gorman Dep.), at 11:12–12:18. "Substantially all of [Realogy's] real estate franchising revenues" are derived from royalties "based on a percentage of the franchisees' sales commissions," and marketing fees. *Id.* at 10. Similarly, Realogy's "company owned real estate brokerages business derives revenue primarily from gross commission income received as the broker at the closing of real estate transactions." *Id.* at 14. The "average broker commission rate" is thus a "key driver" of the company's revenue. *Id.* at 28.

The HomeServices Defendants consist of several related entities. *See* Docket No. 217-4 (describing structure). Defendant HomeServices of America "is the largest residential real estate brokerage firm in the United States" with "43,000 real estate agents in nearly 900 brokerage offices in 30 states and the District of Columbia." Ex. 20 (Berkshire Hathaway Inc. 10-K), at K-10. The HomeServices Defendants collectively own, operate, and franchise many real estate brokerage firms, including under the Berkshire Hathaway HomeServices ("BHHS"), Ebby Halliday, Edina Realty, and the Long & Foster brands. *See id.*; https://www.homeservices.com/brokerage. HomeServices of America's revenue from company-owned brokerages is "comprised almost entirely of commission revenue from real estate brokerage transactions." Ex. 21 (HSOA-MOe-0000138532), at 8532. It also receives royalties from its franchisees as a percentage of commissions earned, with an average royalty rate ███████ *Id.* at 8534.

Defendant RE/MAX, LLC franchises local RE/MAX brokers around the country. Ex. 22 (RE/MAX 10-K), at 4. RE/MAX currently has more than 8,600 franchised offices and 137,000 affiliated sales agents. *Id.* at 6. RE/MAX receives revenue from: (1) fixed monthly fees per agent or office; (2) annual dues from agents; (3) broker fees which are a "[p]ercentage fee paid by

RE/MAX franchisees on agent-generated transactions;" and (4) fees from the sale or renewal of franchises and other revenue. *Id.* at 16–17.

Defendant Keller Williams is the "world's largest real estate technology franchise by agent count and the U.S. leader in units and sales volume." Ex. 23 (KW Press Release), at 1. ████ ████████████████████████████████████████████████████████████████ Ex. 24 (King Dep.), at 12:1–13:14. █████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████████ █████████████████████ *Id.* at 36:1–39:23, 42:3–51:2. ██████████████████████ ██████████████████████████████████ Ex. 25 (Talbot Dep.), at 197:19–198:2; Ex. 24 (King Dep.), at 30:10–32:25.

## C. Defendants' Anticompetitive Agreement.

NAR issues rules governing MLSs in its Handbook on Multiple Listing Policies ("NAR MLS Rules"). *See* Ex. 26 (2021 NAR MLS Rules), at p. iii. All but around 3% of MLSs are owned or operated solely by local Realtor associations. Ex. 27 (RMLLC-NDIL-01415597), at 5718. NAR-affiliated MLSs are required to follow NAR's mandatory rules to (1) receive professional liability insurance and (2) continue as NAR member boards. Ex. 26 (2021 NAR MLS Rules), at p. iii. All MLSs at issue in this action are controlled by local Realtor associations and must follow mandatory NAR rules. Elhauge Decl., at ¶ 108.

By joining a NAR-affiliated MLS, brokers agree to follow NAR's MLS Rules, which NAR-affiliated MLSs must adopt and enforce. Ex. 26 (2021 NAR MLS Rules), at p. iii; *see also* Ex. 28 (NARSITZER0000368655); Ex. 29 (Coile Dep. 2), at 34:19–35:2. Violations are punishable by fines or the suspension or termination of MLS access. Ex. 17 (Milligan Dep.), at 58:24–59:10; Ex. 29 (Coile Dep. 2), at 35:3–:7.

NAR also issues a Code of Ethics, which is binding on all Realtors and NAR member boards. *See* Ex. 30 (NAR Bylaws), art IV §§ 1, 2. NAR further publishes Standards of Practice and Case Interpretations, which are also binding on member boards and Realtors. Ex. 31 (2022 NAR Code of Ethics), at 2, 27. Violations are punishable, including by warnings, fines, membership suspension, and expulsion. *Id.* at 2–3.

Many NAR MLSs require NAR membership as condition for participation. Elhauge Decl., at ¶ 19. This necessarily subjects all MLS members both to NAR's Code of Ethics and mandatory MLS rules. For MLSs that permit non-Realtor members, NAR provides separate MLS Standards of Conduct to govern the few non-Realtor members. They duplicate certain of the requirements reflected in NAR's Code of Ethics challenged here. Elhauge Decl., at ¶ 23. All of the Covered MLSs either limit their membership to Realtors or have adopted NAR's MLS Standards of Conduct. Elhauge Decl., at ¶ 23.

The upshot, given the necessity of MLS access, is that brokers must comply with NAR's MLS Rules and NAR's Code of Ethics. NAR offers its co-conspirators the following agreement: they can participate in the MLS and gain the attendant benefits—supracompetitive pricing and protection from competition—as long as they adhere to and promote the anticompetitive restraints set forth in NAR's MLS Rules and NAR's Code of Ethics.

Each of the Corporate Defendants has accepted NAR's bargain. For one, the Corporate Defendants require that their company-owned brokerages, franchisees, and/or affiliated agents join Realtor associations, join local MLSs, and/or follow NAR's Code of Ethics. RE/MAX requires its franchisee brokers to ███████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████ Ex. 33 (RMLLC-WDMO-00000001), at 0029; *see also* Ex. 8 (Contos Dep.), at

38:9–40:7. RE/MAX also requires its franchisee brokers to ████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████ Ex. 33 (RMLLC-WDMO-00000001), at 0059–61;

*see also* Ex. 8 (Contos Dep.), at 45:15–:25.

Keller Williams requires that agents ████████████████████████████████████████

████████████████████████████████████████████████████████████ Ex. 34

(KWRI_00466314), at 6369; Ex. 24 (King Dep.), at 53:13–54:3, 55:12–58:10, 64:13–67:18; Ex.

10 (Keller Dep. 1), at 23:8–:16. Keller Williams witnesses have been unable ████████████

████████████████████████████████ *See* Ex. 35 (Keller Dep. 2), at 38:12–39:8; Ex. 24

(King Dep.), at 58:18–59:13. Keller Williams also ████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████ Ex. 34 (KWRI_00466314), at 6371; *see also id.* at 6425 (addendum to include code);

Ex. 24 (King Dep.), at 59:17–64:2, 67:23–70:6.

Realogy requires ████████████████████████████████████████████████████████

████████████████████ *See, e.g.*, Ex. 36 (Realogy-Sitzer-00476543), at 6557 (Better Homes and

Gardens); Ex. 37 (Realogy-Sitzer-00004348), at 4469 (Century 21); Ex. 38 (Realogy-Moehrl-

01088601), at 8614 (Coldwell Banker); Ex. 39 (Realogy-Sitzer-00002132), at 2252 (Sotheby's

International); Ex. 40 (Realogy-Sitzer-00000648), at 0769 (ERA Franchise Systems); Ex. 41

(Realogy-Sitzer-00389727), at 9839 (Corcoran). Realogy brands also require ████████████

████████████████████████ *See, e.g.*, Ex. 42 (Realogy-Sitzer-00476338), at 6340 (Coldwell

Banker); Ex. 43 (Realogy-Sitzer-00639382), at 9394 (Century 21); Ex. 44 (Realogy-Sitzer-

00848523), at 8526 (Sotheby's International).

HomeServices brokerages require ███████████████████████████
██████████████████████ *See, e.g.*, Ex. 45 (HSOA-MOe-0000026374), at 6385 (Long &
Foster: must join local association and MLS); Ex. 46 (Ebby-MO-0000424), at 0425 (Ebby
Halliday: expected to join NAR, local association, and MLS); Ex. 47 (Edina-ILe-0003012), at
3017 (████████████████████████████████████████████████████████████
███████████████████); Ex. 7 (Blefari Dep. 2), at 57:21–:25, 76:1–:6. HomeServices similarly
requires its franchisee-owned brokerages—Berkshire Hathaway HomeServices and Real Living
Real Estate—and their agents ███████████████████████ Ex. 48 (HSOA-MOe-
0000336393), at 6401 (Berkshire Hathaway HomeServices); Ex. 49 (RLRE-MO-0001256), at
1264 (Real Living); Ex. 7 (Blefari Dep. 2), at 57:21–:25, 69:22–70:20, 71:17–72:6.

The Corporate Defendants also participate in the conspiracy through their extensive
involvement in and influence over NAR and the real estate industry. Common evidence shows that
Defendants' executives, employees, and their affiliated agents occupy key positions on NAR
committees and advisory boards and NAR's Board of Directors, which is responsible for
approving NAR's MLS Rules and NAR's Code of Ethics[3]. *See, e.g.*, Ex. 50 (KWRI_00558434)
(KW agents involved in NAR and state and local Realtor associations); Ex. 51 (KWRI_00021306)
(RE/MAX, Berkshire Hathaway, Coldwell Banker, and Century 21 agents on NAR committees);
Ex. 52 (RMLLC-WDMO-00765043) (members of NAR's RES advisory group in 2013); Ex. 53
(NARSITZER0000051160) (list of NAR directors in various years with affiliations); Ex. 54
(KWRI_00581662) (list of 2018 NAR directors); Ex. 55 (Realogy-Moehrl-00963322) (same).

---

[3] Ex. 29 (Coile Dep. 2), at 44:16–45:20; Ex. 32 (Gansho Dep.), at 245:15–247:2 (explaining how MLS
Rules are passed); Ex. 17 (Milligan Dep.), at 59:19–60:19 (explaining how NAR rules are enacted).

For example, in 2013, there were approximately 

Ex. 53a (NARSITZER0000051160). In 2018 there were approximately

Ex. 55a (Realogy-Moehrl-00963322).

HomeServices touts itself "[a]s an industry leader" with a "responsibility to actively participate in shaping our industry and its current and future business model. The HomeServices executive leadership and CEOs of our operating companies drive these important discussions as leaders within the National Association of Realtors, The Realty Alliance, Leading RE and at the regional and local levels of the MLS organizations." https://www.homeservices.com/about-homeservices. HomeServices documents and testimony from HomeServices witnesses confirm that mission and the importance to HomeServices of participating in NAR and other industry groups                                *See, e.g.*, Ex. 11 (Strandmo Dep.), at 20:22–21:11, 38:7–41:8; Ex. 7 (Blefari Dep. 2), at 40:6–9, 41:2–5; Ex. 56 (Coile Dep. 1), at 41:5–42:7, 60:22–75:11; Ex. 57 (HSOA-MOe-0000003293), at 3293.

True to HomeServices's mission to shape the real estate industry:

- Jon Coile, Vice President of Industry Relations, is a member and 2021 chair of NAR's Multiple Listing Issues and Policies Committee, which is responsible for reviewing and reissuing NAR's MLS Rules, and a member and current chair of NAR's MLS Technology and Emerging Issues Advisory Board. Ex. 56 (Coile Dep. 1), at 12:4–:22; Ex. 29 (Coile Dep. 2), at 44:16–45:20.

- ██████████████████████████████████████████████ Ex. 58 (HSOA-MOe-0000017586), at 7586; *see also* Ex. 59 (Blefari Dep. 1), at 58:14–60:9; Ex. 56 (Coile Dep. 1), at 13:1–15:11. ███████████████████████████████████████ ████████████████████████████████ Ex. 60 (RMLLC-WDMO-00829346), at 9349; *see also* Ex. 56 (Coile Dep. 1), at 15:18–17:7.

- ██████████████████████████████████████████████ ███████████████████████████ Ex. 56 (Coile Dep. 1), at 82:21–96:13; Ex. 29 (Coile Dep. 2), at 131:8–132:16; *see also* Ex. 61 (HSOA-MOe-0000023269), at 3269; Ex. 62 (HSOA-MOe-0000451417), at 1417. ██████████████████████ Ex. 63 (HSOA-MOe-0000003496), at 3496. ████████████████████ ████████████████████████ Ex. 59 (Blefari Dep. 1), at 18:8–19:6.

- ██████████████████████████████████████████████ ███████████████████████████████████ Ex. 64 (FR-ILe-0034195), at 4195; Ex. 11 (Strandmo Dep.), at 51:2–53:17; Ex. 65 (Moline Dep. 2), at 17:4–20:16; Ex. 66 (HSOA-MOe-0000118276); Ex. 67 (HSOA-MOe-0000143866).

Keller Williams has likewise encouraged its members and associates to join and remain active in NAR. Ex. 10 (Keller Dep. 1), at 22:13–:17. Gary Keller, ████████████████████ ███████ Ex. 68 (KWRI_00305063), at 5063), in 2017 wrote to Keller Williams's leadership that Keller Williams ██████████████████ Ex. 69 (KWRI_00466700), at 6700. Accordingly, Keller Williams's Industry Relations Team in recent years ████████████████████████ ████. Ex. 70 (Kelm Dep.), at 20:15–21:14, 24:14–:25, 27:15–:19. They ████████████████████ ██████████████████████████████████████████████ ████████████████████████ Ex. 70 (Kelm Dep.), at 33:21–34:16, 45:1–:20, 47:20–

---

[4] NAR's Clear Cooperation Policy requires an MLS participant to list a property on an MLS within one business day of marketing the property to the public. *See* Ex. 26 (2021 NAR MLS Rules), at 33.

49:21; *see also* Ex. 71 (KWRI_00321496), at 1497 (█████████████████████████████ ████████████████████████████████████). The goal was ████████████████ ███████████████████████████████ (Ex. 71 (KWRI_00321496), at 1496), █████████ █████████████ (Ex. 72 (KWRI_00652524), at 2524). That ██████ grew, with Keller Williams seeing a ████████████████████████████████ Ex. 69 (KWRI_00466700), at 6701. ████████████████████ the number of Keller Williams agents on NAR's Board of Directors █████ ████████████ Ex. 70 (Kelm Dep.), at 51:23–52:19, 85:1–:14. ████████████████████████████████████████████████████████████████ Ex. 73 (KWRI_00019962), at 9962. ████████████████████████████████████████████ ████████████████████████████████ Ex. 70 (Kelm Dep.), at 52:15–55:22. ██████ ██████████████████████████████████ Ex. 74 (KWRI_00476614), at 6614.

Alexander Perriello, Realogy Franchise Group's former CEO, has remarked that it is ████████████████████████████████████████████ Ex. 75 (Realogy-Sitzer-00432063), at 2064. He has served on NAR's RES Advisory Board, Large Firm Advisory Council, President's Advisory Group on IDX Policy, Executive Committee, and chaired its Strategic Planning Committee. Ex. 12 (Perriello Dep.), at 54:21–74:14, 79:14–81:20, 277:7–:15; Ex. 76 (NARMOEHRL0000000395). Ryan Gorman, CEO of Coldwell Banker, serves on NAR's RES Advisory Group. Ex. 19 (Gorman Dep.), at 146:21–147:25. As does Sherry Chris, CEO of the Realogy Expansion Brands Portfolio. https://www.realogy.com/about/leadership-team/business-executives/sherry-chris/. Kenneth Fries (of a Realogy affiliate) served on NAR's Insurance Committee ████████████████████████████████████ Ex. 75 (Realogy-Sitzer-

---

[5] The Large 75 Firm Forum allows representatives from the top 75 real estate firms to come together and collaborate on issues affecting the real estate industry. Ex. 70 (Kelm Dep.), at 53:13–:23.

00432063). ██████████████████████████████████████ Ex.

77 (Millett Dep.), at 208:23–212:25, 220:18–232:8; Ex. 121 (Realogy-Moehrl-00364792).

RE/MAX has touted its agents ████████████████████████████████

████████████████████████████████████████ Ex. 122 (RMLLC-

WDMO-00174504), at 4507. ████████████████████████████

Ex. 8 (Contos Dep.), at 70:1–:14. ██████████████████████████

████████████████ Ex. 60 (RMLLC-WDMO-00829346), at 9359. ██████

██████████████████ *See* Ex. 116 (RMLLC-WDMO-00025435), at 4536.

RE/MAX also ████████████████████████████████████████

████████████████████ (Ex. 118 (RMLLC-WDMO-00025379), at

5379), ████████████████████████████████████████

██████████ *Id.*; Ex. 120 (RMLLC-WDMO-00032356), at 2356. When the policy came up

for a vote, RE/MAX █████████████████████████████████████

████████████ Ex. 117 (RMLLC-WDMO-00025384), at 5384.

### D. The Challenged Restraints.

The Challenged Restraints are rules in NAR's MLS Rules and NAR's Code of Ethics that

(a) require listing brokers to make blanket unilateral offers of compensation to buyer brokers, (b)

restrain negotiations concerning those offers, (c) deny buyers information on the commissions

being offered, and (d) allow buyer brokers to filter searches based on the commission offered.

**Blanket unilateral offer of compensation**. NAR's MLS Policy Statement 7.23 requires

listing brokers to "mak[e] blanket unilateral offers of compensation to . . . MLS participants"

working with buyers. Ex. 26 (2021 NAR MLS Rules), at 37–39. The offer (a) must be a fixed

percentage or dollar amount and (b) cannot be a "general invitation[]" to discuss and negotiate

terms. *Id.* at 38. Participants are not allowed to submit, and MLSs are not allowed to publish, listings that fail to include the blanket unilateral offer of compensation. *Id.* The Buyer-Broker Commission Rule thus requires a seller to make an offer of payment to compensate a buyer broker even though the buyer broker works for the buyer and is supposed to represent their interests, and requires the same blanket offer be made to every buyer broker regardless of experience and the services they are providing. Elhauge Decl., at ¶¶ 131–35, 190.

**Restraints on negotiation**. Intertwined with the Buyer-Broker Commission Rule are NAR rules that restrain negotiations. These include, but are not limited to:

- NAR Standard of Practice 16-16, which prohibits Realtors from even attempting to condition an offer to purchase a home on a seller-broker's agreement to lower buyer-broker compensation or even from encouraging a buyer-client to do so. Ex. 31 (2022 NAR Code of Ethics), Standard of Practice 16-16; Elhauge Decl., at ¶¶ 137, 144.

- NAR Standard of Practice 3-2, which requires that "[a]ny change in compensation offered . . . must be communicated" before a "Realtor® submits an offer to purchase/lease the property" and prohibits seller-brokers from "attempt[ing] to unilaterally modify the offered compensation" to the buyer broker once a purchase offer has been submitted. Ex. 31 (2022 NAR Code of Ethics), Standard of Practice 3-2; Elhauge Decl., at ¶ 136.

- NAR's Case Interpretation #16-15, which requires that Realtors complete any negotiation over "cooperating broker compensation . . . prior to the showing of the property" to a potential buyer. Ex. 115 (2022 NAR Case Interpretations), at 92; Elhauge Decl., at ¶ 141.

*See also* Elhauge Decl., at ¶¶ 136–146 (discussing in detail these and other related restraints).

**One-sided commission transparency**. Defendants' conspiracy was facilitated through additional NAR rules that (until pressure from DOJ led to rule changes this year) made offered commissions easily viewable and filterable by brokers while hiding them from consumers. The Buyer-Broker Commission Rule effectively requires that offered commissions be visible through the MLS to brokers. Ex. 26 (2021 NAR MLS Rules), at 37–39; Elhauge Decl., at ¶ 153. At the same time, Model MLS Rules Section 18.2.4 and Section 19.12—both mandatory NAR rules— permitted MLS participants to select the listings they display to consumers through IDX feeds or

on their Virtual Office Websites ("VOWs")[6] based on the "cooperative compensation offered by listing brokers." Ex. 26 (2021 NAR MLS Rules), at 84, 91; Elhauge Decl., at ¶ 153. Thus, NAR rules made offered commissions readily viewable and even filterable by brokers.

Other NAR rules, however, simultaneously restricted price transparency for consumers. First, NAR rules precluded consumers from seeing the universe of buyer-broker commissions offered on the MLS. NAR Model MLS Rule Section 18.3.1 and Model MLS Rule Section 19.15, for example, prohibited MLS brokers from displaying the blanket compensation offered through IDX feeds or on VOWs. Ex. 26 (2021 NAR MLS Rules), at 85, 91; Elhauge Decl., at ¶¶ 155–57. The 20 Covered MLSs implemented these rules by restricting the display of cooperative compensation to consumers. Elhauge Decl., at ¶¶ 158–59. Second, for two decades, NAR's Code of Ethics expressly permitted and encouraged buyer-brokers to represent that their services were "free." Ex. 119 (2019 NAR Code of Ethics), Standard of Practice 12-1 *and* 12-2; Ex. 124 (1997 NAR Code of Ethics), Standard of Practice 12-1 *and* 12-2; Elhauge Decl., at ¶¶ 147-151.

### E. The Challenged Restraints Further a Long Line of Anticompetitive Conduct.

Common evidence shows that the Challenged Restraints were not the natural consequence of the free market. They instead followed an extensive history of anticompetitive conduct by Defendant NAR and its members and were adopted for the purpose and effect of restraining competition and maintaining supracompetitive prices.

For much of the twentieth century, NAR's Code of Ethics required its members to adhere to fixed commission schedules, and local Realtor boards set the commissions that member Realtors were required to charge. *See, e.g.*, Ex. 123 (NARSITZER0000169886) (1946 commission

---

[6] IDX is a tool used by real estate professionals to add MLS listings to their websites. VOW's provide internet brokerage services.

schedule). NAR did not prohibit commission schedules until 1971 (Ex. 125 (NARSITZER0000019277), at 9286), following a host of antitrust challenges.[7] In the aftermath, NAR revised its MLS rules to impose a mandatory offer of subagency (including subagent compensation) on all MLSs and all participants. Ex. 78 (NARSITZER0000648123), at 8135, 8137. Brokers could not list a property without making a blanket offer of compensation to subagents. Ex. 77 (Millett Dep.), at 38:7–:10. And during that regime, most agents working with buyers were subagents (rather than buyer agents), with a duty to act in the best interests of the seller even though they were working with the buyer. Ex. 77 (Millett Dep.), at 38:21–40:6.

Lawsuits and criticism challenging the subagency system abounded (Ex. 77 (Millett Dep.), at 41:4–:12, 49:3–:6), leading NAR to abandon it. Due to uncertainty over whether, in the absence of rules mandating cooperative compensation, seller brokers would offer compensation to buyer brokers as they had previously to subagents,[8] NAR replaced the subagency system with the Buyer-Broker Commission Rule (which became effective in 1993). Ex. 79 (NARSITZER0000007802), at 7802. NAR did so despite reviewing an FTC Report documenting widespread steering of buyers to listings offering higher commissions and its own former general counsel's opinion that requiring sellers to make blanket offers of compensation to buyer brokers would create a "conflict of interest" for buyer brokers. Ex. 77 (Millett Dep.), at 41:15–43:2, 117:23–120:24 (FTC report); Ex. 80 (NARSITZER0000165422), at 74–76 (FTC report); Ex. 81 (NARSITZER0000165547), at 5–6 (GC opinion). In adopting the Buyer-Broker Rule, NAR did not ████████████████

████████████████████████████████████████████████████████████████

---

[7] *See, e.g.*, *United States v. Nat'l Ass'n of Real Estate Boards*, 339 U.S. 485 (1950); *McKerall v. Hunteville Real Estate Bd.*, 1976-1 Trade Cases 60,709 (CCH), 1976 WL 1207 (N.D. Ala. 1976); *Hill v. Art Rice Realty Co.*, 66 F.R.D. 449 (N.D. Ala. 1974), *aff'd* 511 F.2d 1400 (5th Cir. 1975).

[8] Ex. 82 (NARSITZER0000005797), at 5803–04; Ex. 77 (Millett Dep.), at 96:12–98:19.

Ex. 77 (Millett Dep.), at 107:6–108:1, 124:21–125:11.

### F. The Challenged Restraints are Anticompetitive and Harmed the Class.

The Challenged Restraints maintained and extended an anticompetitive market for real estate broker services. *See infra* Section V.B.1.b. The common methodology, evidence, and analysis of Plaintiffs' expert, Prof. Elhauge, and common evidence from Defendants and third parties show that the Challenged Restraints have inflated buyer-broker commissions classwide by (1) incentivizing and facilitating steering, and (2) limiting the ability and incentive for buyer brokers to compete by reducing commissions. Common evidence also demonstrates that the Challenged Restraints impeded discount brokers from disrupting the anticompetitive equilibrium.

Plaintiffs' second expert, Prof. Economides, establishes using a benchmark model that analyzes common evidence concerning international markets that all or nearly all class members were injured by Defendants' supracompetitive commissions. *See* Economides Decl., at § IV. He further quantifies the resulting harm to class members using a common damages methodology and calculates that total class damages are $13.7 billion. *See* Economides Decl., at § V. That common methodology can also be used to estimate the damages to each individual class member. *See* Economides Decl., at ¶ 97.

### G. Plaintiffs.

The proposed Class Representatives are Christopher Moehrl, Michael Cole, Steve Darnell, Jack Ramey, Daniel Umpa, and Jane Ruh. Each was harmed by Defendants' agreement: each sold a home on an MLS that implemented the challenged restraints, and each paid a buyer-broker commission inflated by Defendants' anticompetitive actions. Moehrl Decl., at ¶ 2; Darnell Decl., at ¶ 1; Cole Decl., at ¶¶ 2–3; Ruh Decl., at ¶ 2; Ramey Decl., at ¶ 2; Umpa Decl., at ¶ 2.

## III.    CLASS DEFINITIONS

Plaintiffs seek to certify the following two classes (the "Proposed Classes"):

- **Damages Class**: Home sellers who paid a commission between March 6, 2015, and December 31, 2020, to a brokerage affiliated with a Corporate Defendant in connection with the sale of residential real estate listed on a Covered MLS and in a covered jurisdiction.[9] Excluded from the class are (i) sales of residential real estate for a price below $56,500, (ii) sales of residential real estate at auction, and (iii) employees, officers, and directors of defendants, the presiding Judge in this case, and the Judge's staff.

- **Injunctive Relief Class**: Current and future owners of residential real estate in the covered jurisdictions who are presently listing or will in the future list their home for sale on a Covered MLS. Excluded from the class are (i) sales of residential real estate for a price below $56,500, (ii) sales of residential real estate at auction, and (iii) employees, officers, and directors of defendants, the presiding Judge in this case, and the Judge's staff.

## IV.    CLASS CERTIFICATION STANDARDS

A plaintiff seeking class certification must "satisfy all four requirements of Rule 23(a)— numerosity, commonality, typicality, and adequacy of representation—and any one of the general categories of Rule 23(b)." *Orr v. Shicker*, 953 F.3d 490, 497 (7th Cir. 2020). A class may be certified under Rule 23(b)(3) if a court "find[s] that common questions of law or fact 'predominate' over individual ones and that a class action is 'superior' to other methods of adjudicating the case." *Howard v. Cook Cty. Sheriff's Off.*, 989 F.3d 587, 597 (7th Cir. 2021). A class may be certified under Rule 23(b)(2) if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is

---

[9] A "Covered MLS" includes any MLSs that were NAR-affiliated and whose listings were maintained as of June 30, 2021 by the Covered MLS. The Covered MLSs and jurisdictions are: Bright MLS (Jurisdiction: Delaware, Maryland, District of Columbia, New Jersey, Pennsylvania, Virginia, West Virginia); Carolina/Canopy MLS (North Carolina, South Carolina); Triangle MLS (North Carolina); Stellar MLS (Florida); Miami MLS (Florida); Florida Gulf Coast (Florida); Metro MLS (Wisconsin); Yes MLS/MLS Now (Ohio, West Virginia); Columbus Realtors MLS (Ohio); Northstar MLS (Minnesota, Wisconsin); Wasatch Front/Utah Real Estate (Utah); REcolorado/Metrolist (Colorado); Pikes Peak MLS (Colorado); GLVAR MLS (Nevada); SABOR (Texas); ACTRIS/ABOR (Texas); HAR MLS (Texas); NTREIS (Texas); ARMLS (Arizona); and Realcomp II (Michigan). For purposes of the (b)(2) class, "Covered MLS" includes any successor of a Covered MLS.

appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2).

A court may certify separate classes under Rule 23(b)(2) and Rule 23(b)(3). *See Chicago Tchrs. Union, Loc. No. 1 v. Bd. of Educ. of Chi.*, 797 F.3d 426, 445 (7th Cir. 2015) (holding that a class could be certified under "both Rule 23(b)(2) and Rule 23(b)(3)"); *Lemon v. Int'l Union of Operating Engineers, Loc. No. 139, AFL-CIO*, 216 F.3d 577, 581 (7th Cir. 2000) (holding that a "district court could certify a Rule 23(b)(2) class for the portion of the case addressing equitable relief and a Rule 23(b)(3) class for the portion of the case addressing damages"). In deciding certification, "a court's preview of the merits must remain tethered to its Rule 23 analysis. The merits themselves are not on the table at this early stage." *Howard*, 989 F.3d at 597.

## V.     ARGUMENT

### A.     Plaintiffs Satisfy the Prerequisites of Rule 23(a).

#### 1.     The Proposed Classes are sufficiently numerous.

A class must be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "To ascertain the size of the proposed class, the Court may 'rely on common sense assumptions or reasonable inferences' based on the record." *Walsh v. Kelley*, 2021 WL 4459531, at *2 (N.D. Ill. Sept. 29, 2021). "[A] forty-member class is often regarded as sufficient." *Orr*, 953 F.3d at 498. Plaintiffs here easily clear the numerosity bar. The Proposed Classes include home sellers in 20 MLSs covering major U.S. metropolitan areas. There are thousands if not millions of class members and many more than the forty-member floor numerous courts have found sufficient. *See In re Sulfuric Acid Antitrust Litig.*, 2007 WL 898600, at *2 (N.D. Ill. Mar. 21, 2007) ("[T]here is little doubt that the total number of sulfuric acid purchasers would number more than forty. Therefore numerosity is satisfied.").

## 2. Common questions of fact and law exist.

"To satisfy the commonality requirement found in Rule 23(a)(2), there needs to be one or more common questions of law or fact that are capable of classwide resolution and are central to the claims' validity." *Beaton v. SpeedyPC Software*, 907 F.3d 1018, 1026 (7th Cir. 2018). The commonality requirement is not an onerous one: "even a single common question will do." *Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 755 (7th Cir. 2014) (internal quotations omitted).

The Proposed Classes readily satisfy the commonality requirement. At least the following questions are common to the Classes, are central to the case, and are capable of classwide resolution: (1) whether Defendants conspired, (2) the interpretation and effects of the challenged rules, (3) whether the conspiracy harmed competition, and, to the extent that the Rule of Reason applies, (4) market definition and power, and (5) whether the competitive harm from the conspiracy substantially outweighs any competitive benefits. Such questions are sufficient to satisfy the commonality requirement. *See In re Sulfuric Acid Antitrust Litig.*, 2007 WL 898600, at *3–4 (concluding that similar questions satisfied the commonality requirement).

Indeed, courts routinely find that where, as here, an antitrust class action alleges a common conspiracy and the same conduct classwide, commonality is satisfied. *See, e.g.*, *In re Opana ER Antitrust Litig.*, 2021 WL 3627733, at *2 (N.D. Ill. June 4, 2021) (commonality satisfied: "there was only one antitrust conspiracy, and Defendants had the same conduct towards all parties"); *Tawfilis v. Allergan, Inc.*, 2017 WL 3084275, at *11 (C.D. Cal. June 26, 2017) ("[T]he very nature of a conspiracy antitrust action compels a finding that common questions of law and fact exist."). That includes an action alleging real-estate commissions were fixed. *See Hyland v. Homeservices of Am., Inc.*, 2008 WL 4858202, at *4 (W.D. Ky. Nov. 7, 2008).

### 3. Plaintiffs' claims are typical of class members' claims.

"A claim is typical" under Rule 23(a)(3) "if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members" and is "based on the same legal theory." *Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992). "In antitrust cases, typicality usually will be established by plaintiffs and all class members alleging the same antitrust violations by defendants." *Nitsch v. Dreamworks Animation SKG Inc.*, 315 F.R.D. 270, 274 (N.D. Cal. 2016). That is precisely the case here. Just like the other class members, the Class Representatives sold homes on Covered MLSs and paid commissions to buyers' brokers that were inflated due to Defendants' unlawful conspiracy. *See supra* Section II.G; Economides Decl., at ¶ 98, tbl. 9. The Class Representatives' claims are typical. *See Hyland*, 2008 WL 4858202, at *4 ("claims aris[ing] from an alleged conspiracy to fix real estate broker's commission rates" typical).

### 4. Plaintiffs and counsel are adequate representatives.

The fourth requirement of Rule 23(a)—adequacy—involves two inquiries: "(1) the adequacy of the named plaintiffs as representatives of the proposed class's myriad members, with their differing and separate interests, and (2) the adequacy of the proposed class counsel." *Gomez v. St. Vincent Health, Inc.*, 649 F.3d 583, 592 (7th Cir. 2011). "The burden is on the party opposing class certification to demonstrate that representation will be inadequate." *In re Steel Antitrust Litig.*, 2015 WL 5304629, at *4 (N.D. Ill. Sept. 9, 2015).

The Class Representatives are adequate. Their claims are predicated on the same facts and legal theories as the class, and they have the same interests in establishing Defendants' liability, classwide damages, and enjoining Defendants' future unlawful conduct. *See Ploss v. Kraft Foods Grp., Inc.*, 431 F. Supp. 3d 1003, 1011–12 (N.D. Ill. 2020) ("Plaintiffs are adequate class representatives [where] the claims of the named Plaintiffs are identical, both legally and factually,

to those of the proposed class members."); *In re Steel Antitrust Litig.*, 2015 WL 5304629, at *4 (adequacy satisfied where the Plaintiffs' and class members' interests were "aligned in establishing Defendants' liability under the antitrust laws and maximizing class-wide damages").[10]  Proposed co-lead class counsel are likewise adequate, as the Court already found when naming them interim co-lead counsel. *See Moehrl v. Nat'l Ass'n of Realtors*, 2020 WL 5260511 (N.D. Ill. May 30, 2020). Since then, the three firms have continued to vigorously prosecute this case, reviewing hundreds of thousands of documents, taking depositions, beating back Defendants' motions to dismiss, and retaining highly qualified experts. Each firm also has significant experience in large antitrust class actions, making them particularly well-suited to serve as class counsel. *See* Docket No. 50 (Motion for Appointment of Interim Co-Lead Class Counsel and supporting attachments).

**B.      Plaintiffs Satisfy the Requirements for a Damages Class under Rule 23(b)(3).**

The proposed Damages Class satisfies the predominance and superiority requirements of Rule 23(b)(3) and should be certified.

1.      <u>Common questions predominate over any individual issues.</u>

"Predominance is satisfied when common questions represent a significant aspect of a case and . . . can be resolved for all members of a class in a single adjudication." *Kleen Prod. LLC v. Int'l Paper Co.,* 831 F.3d 919, 925 (7th Cir. 2016). The predominance analysis "begins, of course, with the elements of the underlying cause of action." *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 815 (7th Cir. 2012) (quotation omitted). Here, Plaintiffs must prove: (1) a contract,

---

[10] The HomeServices Defendants in connection with their Motion to Strike Certain Class Allegations (Docket No. 205) asserted that Plaintiff Daniel Umpa cannot adequately represent the interests of unnamed class members that purportedly signed arbitration agreements with HomeServices-affiliated brokerages. *See* Docket No. 206, at 6–10. The Court denied that motion. Docket No. 256. To the extent Defendants re-raise these arguments, Plaintiffs disagree for at least the reasons previously articulated in response to the HomeServices Defendants' motion and hereby incorporate that briefing by reference. *See* Docket No. 208.

combination, or conspiracy; (2) a resultant unreasonable restraint of trade; and (3) an accompanying injury. *Moehrl v. Nat'l Ass'n of Realtors*, 492 F. Supp. 3d 768, 776–77 (N.D. Ill. 2020). A court "must walk a balance between *evaluating* evidence to determine whether a common question exists and predominates, *without weighing* that evidence to determine whether the plaintiff class will ultimately prevail on the merits." *In re Allstate Corp. Sec. Litig.*, 966 F.3d 595, 603 (7th Cir. 2020). "[T]he issue is not whether plaintiffs will be able to prove [the] elements on the merits, but only whether their proof will be common for all plaintiffs, win or lose." *Id.* at 604.

Each of the elements of Plaintiffs' Sherman Act § 1 claim rises and falls on common evidence, satisfying the predominance requirement. Indeed, while "the predominance requirement is stringent," it is "readily met in certain cases," including cases alleging violations of the antitrust laws (as here). *In re Allstate*, 966 F.3d at 603 (internal quotations omitted); *see also Hyland*, 2008 WL 4858202, at *5–8 (common questions predominated where plaintiffs alleged a conspiracy by real estate brokerages to maintain supracompetitive commissions).

> a.  *Common issues regarding Defendants' conspiracy predominate.*

The existence of an antitrust conspiracy is a quintessential common issue appropriate for classwide resolution because it focuses on the behavior of defendants. *See In re Steel Antitrust Litig.*, 2015 WL 5304629, at *6 (existence of a conspiracy "is a question appropriate for resolution on a class-wide basis"); *In re Sulfuric Acid Antitrust Litig.*, 2007 WL 898600, at *6 ("[T]he existence of a conspiracy is a common question that can be addressed at the class-wide level."). This case is no different. Whether Defendants conspired is a common question, and it cannot seriously be disputed that it can be resolved classwide using common evidence.

NAR issues the rules that are challenged in this action in its MLS Rules and Code of Ethics. *See supra* Section II.C. All local Realtor associations and NAR-affiliated MLSs (like the Covered

MLSs) adopt, follow, and enforce those rules, as NAR requires. *Id.* And to use one of the Covered MLSs, a broker must follow the rules in NAR's MLS Rules and its Code of Ethics or MLS Standards of Conduct. *Id.* Thus, NAR and its members, each local Realtor association and their members, and the Covered MLSs and their members agree to the challenged anticompetitive restraints. Elhauge Decl., at ¶ 19. This evidence is common to the class and demonstrates a conspiracy involving NAR: associational rules imposing "duties and restrictions on the conduct of [the members'] separate businesses" are direct evidence of an agreement subject to Section 1. *Associated Press v. United States*, 326 U.S. 1, 8 (1945); *see also Realcomp II, Ltd. v. FTC*, 635 F.3d 815, 824–25 (6th Cir. 2011) (a "website policy constitutes an agreement governing the Realcomp MLS among the Realcomp members").[11]

The Corporate Defendants, for their part, require that their company-owned brokerages, franchisees, or affiliated agents join Realtor associations, local MLSs, and/or follow NAR's Code of Ethics. *See supra* Section II.C. That is common evidence of their involvement in the conspiracy. *See Moehrl*, 492 F. Supp. 3d at 778 ("Perhaps most importantly, Plaintiffs point to the allegation that each of the Corporate Defendants . . . require their franchisees and realtors to join the NAR and follow the NAR's MLS Rules and Code of Ethics" and require "their franchisees and realtors join a local realtor association and MLS."); *see also Esmark, Inc. v. NLRB*, 887 F.2d 739, 756 (7th Cir. 1989) (a corporate parent may be "derivatively" liable for the conduct of its subsidiaries where "the parent interposed a guiding hand"); *In re Dealer Mgmt. Sys. Antitrust Litig.*, 2018 WL 6629250, at *7 (N.D. Ill. Oct. 22, 2018) (allegations "that a parent company has directed its

---

[11] *See also, e.g., FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 451 (1986) (dental association rule); *NCAA v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 99 (1984) (NCAA plan); *Ariz. v. Maricopa Cnty. Med. Soc'y*, 457 U.S. 332, 357 (1982) (medical society schedule); *Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 681 (1978) (engineering society ethical canon); *Goldfarb v. Va. State Bar*, 421 U.S. 773, 781–83 (1975) (bar associations' fee schedules).

subsidiary to engage in anticompetitive conduct and itself engages in anticompetitive conduct, . . . are sufficient to establish market participation by the parent company.").

Common evidence likewise shows the Corporate Defendants' intimate involvement in and influence over NAR and the real estate industry. *See supra* Section II.C. That is further evidence of the Corporate Defendants' participation in the conspiracy. *See Moehrl*, 492 F. Supp. 3d at 778 ("Plaintiffs also highlight the Corporate Defendants' involvement in the governance of the NAR and the promulgation and enforcement of the Handbook and Code of Ethics," including service on NAR's "Multiple Listing Issues and Policies Committee" and "Board of Directors.").

> b.    *Common issues regarding an unreasonable restraint predominate.*

The next element of a Section 1 claim is an unreasonable restraint of trade. Plaintiffs have pleaded a conspiracy under both the *per se* and Rule of Reason modes of analysis. *Moehrl*, 492 F. Supp. 3d at 782. While the Court need not decide which rule applies at this stage, the question of whether Defendants' conduct should be evaluated as *per se* unlawful or under the Rule of Reason is a legal question that is itself common to the Damages Class. And whether analyzed as a *per se* violation or under the Rule of Reason, common issues predominate.

> (1)    Common issues regarding the *per se* analysis predominate.

"Some types of restraints . . . have such predictable and pernicious anticompetitive effect, and such limited potential for procompetitive benefit, that they are deemed unlawful *per se*." *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997). Horizontal price fixing and bid rigging fall into this category. *See Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643, 647 (1980) (price fixing); *United States v. Brighton Bldg. & Maintenance Co.*, 598 F.2d 1101, 1106 (7th Cir. 1979) (bid rigging).

An agreement need not literally fix prices to be condemned as illegal horizontal price fixing. *See, e.g.*, *United States v. Gasoline Retailers Ass'n*, 285 F.2d 688, 691 (7th Cir. 1961)

(agreement was *per se* illegal even though it was not "direct price fixing" but was "aimed rather at affecting the market price"). "[A] combination formed for the purpose and with the effect of raising, depressing, fixing, pegging, or stabilizing the price of a commodity in interstate or foreign commerce" constitutes price fixing. *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 219, 222 (1940) (buying arrangement that "at least contributed to the price rise and the stability of the spot markets" *per se* unlawful even though "the prices paid by the combination were not fixed in the sense that they were uniform and inflexible"). The Supreme Court has thus had little difficulty concluding that agreements between horizontal competitors that "impede[] the ordinary give and take of the marketplace" with the effect of elevating or stabilizing prices (as here) are unlawful. *See Nat'l Soc'y of Prof'l Engineers v. United States*, 435 U.S. 679, 686, 692 (1978).

Defendants' anticompetitive agreement is *per se* unlawful. The Challenged Restraints ***require*** every home seller to offer to pay through their listing broker a buyer-broker commission simply to list a home on an MLS and thus "impose higher costs on [home sellers] by forcing them to pay" buyer brokers, *see Wilk v. AMA*, 895 F.2d 352, 360 (7th Cir. 1990), and "restrain their ability to sell in accordance with their own judgment," *Maricopa Cty. Med. Soc'y*, 457 U.S at 346. The Challenged Restraints also ***require*** that home sellers offer the same commission to every buyer broker without consideration of that broker's experience or the services being rendered, something courts have repeatedly condemned. *See, e.g.*, *Maricopa Cty. Med. Soc'y*, 457 U.S at 348 (condemning "price restraint that tends to provide the same economic rewards to all practitioners regardless of their skill, their experience, their training, or their willingness to employ innovative and difficult procedures in individual cases"). The Challenged Restraints further ***require*** that cooperative commissions be published and offered to every MLS participant. Agreements among competitors to "[e]xchange[] current price information . . . have the greatest potential for

generating anticompetitive effects . . . ." *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 441 n.16 (1978). Finally, until recently, Defendants and their co-conspirators ***prohibited*** disclosing to consumers the full universe of buyer-broker offers—another practice courts have repeatedly condemned. *See, e.g.*, *Nat'l Soc'y of Prof'l Eng'rs*, 435 U.S. at 693 (professional association rule preventing consumers from comparing bids from multiple engineers was anticompetitive "on its face"); *Gasoline Retailers Ass'n*, 285 F.2d at 691 (*per se* unlawful for gasoline retailers to agree not to advertise prices except by posting directly on the pump).

Whether Defendants' anticompetitive agreement is *per se* unlawful is a legal question that is common to all putative class members. *See, e.g.*, *In re Microcrystalline Cellulose Antitrust Litig.*, 218 F.R.D. 79, 86 (E.D. Pa. 2003) (whether agreement "constitutes a *per se* violation" is a question "that would be common to all putative class members."). And if Defendants' agreement is *per se* unlawful, establishing a *per se* violation necessarily depends on common evidence and analysis. *See, e.g.*, *Cordes & Co. Fin. Servs. v. A. G. Edwards & Sons, Inc.*, 502 F.3d 91, 104–05 (2d Cir. 2007) ("[Plaintiffs'] allegations of the existence of a price-fixing conspiracy are susceptible to common proof."); *Reed v. Advoc. Health Care*, 268 F.R.D. 573, 581 (N.D. Ill. 2009) ("Plaintiffs' allegations that defendants participated in a wage-fixing conspiracy, or, alternatively, a conspiracy to exchange information about wages, are clearly susceptible to common proof."); *In re Playmobil Antitrust Litig.*, 35 F. Supp. 2d 231, 240 (E.D.N.Y. 1998) ("It is well established that class actions are particularly appropriate for antitrust litigation concerning price-fixing schemes because price-fixing presumably subjects purchasers in the market to common harm.").

> (2)    Common issues regarding the Rule of Reason analysis predominate.

Even if Defendants' agreement is not a *per se* violation of § 1 of the Sherman Act, whether Defendants' agreement is an unreasonable restraint of trade under the Rule of Reason is a question

that is common to the class and susceptible to classwide proof and resolution. The Rule of Reason asks whether "an agreement or contract has an anticompetitive effect on a given market within a given geographic area." *Moehrl*, 492 F. Supp. 3d at 782 (quoting *Agnew v. NCAA*, 683 F.3d 328, 335 (7th Cir. 2012)). The "first step in the analysis is for the plaintiff to show that the defendants have market power in the relevant geographic market." *Id.* In the second step the plaintiff must prove that the agreement "had an anticompetitive effect within the market." *Id.*

*(a)      Common issues regarding market power predominate.*

Whether Defendants have market power is a common issue and Plaintiffs' expert, Prof. Elhauge, presents common evidence establishing that the conspirators, including Defendants, have market power in the relevant product and geographic markets.

Prof. Elhauge opines that the relevant product market in this case is no broader than the market for "services provided to homebuyers and sellers by residential real estate brokers with MLS access" and the "relevant geographic markets . . . are the territories covered by each MLS." *See* Elhauge Decl., at § II. Analyzing the relevant markets, Prof. Elhauge concludes that the alleged conspirators—NAR, the local Realtor associations that run the 20 covered MLSs, the Corporate Defendants, and all brokers governed by the NAR rules challenged in this case—have market power. He explains that (1) the coconspirators have a 100% market share because (a) all MLS brokers are governed by the challenged NAR rules and (b) barriers to entry and expansion are significant; (2) data common to the class shows that NAR-governed MLS brokers have been able to raise prices by far more than 5% above competitive levels; and (3) NAR-governed MLS brokers have exercised their power to exclude. *See* Elhauge Decl., at § III.

Prof. Elhauge's methodology, evidence, analysis, and conclusions are all common to the class and would be the same even if every class member brought a separate antitrust suit.

*See* Elhauge Decl., at ¶¶ 108–111. Common issues concerning market power predominate.

(b)     *Common issues regarding anticompetitive effects predominate.*

Whether the Challenged Restraints had anticompetitive effects in the relevant markets is an issue that is common to the class. And it is one that is susceptible to classwide proof and resolution.

**First**, Prof. Elhauge presents common evidence, theory, and analysis demonstrating that the Challenged Restraints inflated buyer-broker commissions and impeded discount brokers and others from disrupting the anticompetitive equilibrium. *See* Elhauge Decl., at § V. Prof. Elhauge opines that the Challenged Restraints inflated buyer-broker commissions by (1) incentivizing and facilitating steering and (2) eliminating the incentive for buyer brokers to compete by reducing commissions. *See* Elhauge Decl., at § V.B, V.D.

On the first point (steering), Professor Elhauge explains that the Challenged Restraints, which require blanket unilateral offers of compensation to buyer brokers (and which made offered commissions easily viewable and even filterable by brokers) create strong incentives to offer uniformly supracompetitive commissions to keep buyer brokers from steering buyers to other homes offering the standard commission. Elhauge Decl., at § V.B. This is true even if steering is rare. If sellers or seller brokers generally perceive steering as a potential threat, they have a strong incentive to offer the standard supracompetitive buyer-broker commissions. Elhauge Decl., at ¶ 189. And because inflated commissions marketwide are the primary anticompetitive effect of the Challenged Restraints, no individualized inquiry into whether a given seller was in fact steered against or was even aware of the possibility of steering is needed. The harm to each class member flows from the higher commissions they paid as a result of the threat of steering, rather than from being steered against. Elhauge Dec. at ¶ 199. Moreover, because of NAR rules limiting the

commission information available to consumers until recently, buyers had limited ability to detect when steering occurred. Elhauge Decl., at ¶ 195.

On the second point (price competition), Prof. Elhauge explains that in the current anticompetitive equilibrium buyer-broker commissions are set by the seller and seller broker. Buyers (buyer brokers' clients) thus have little incentive or ability to either forgo or limit their use of buyer-broker services or to negotiate a lower price for them, and they have little influence over the setting of buyer-broker commissions. Elhauge Decl., at ¶ 215. Buyer brokers, in turn, have limited incentive or ability to compete for clients by lowering the price of their services. Elhauge Decl., at ¶ 217. If buyers instead paid buyer-broker commissions, buyer brokers would have an incentive to compete by lowering their price. Elhauge Decl., at ¶ 217 .

The stability in commission rates offered by listing brokers over time (reflecting a rise in absolute commission levels)—evidence that is common to the class—confirms that the Challenged Restraints inflated buyer-broker commissions. *See* Elhauge Decl., at § V.F, V.G. In a competitive market, the price of a service should be related to the costs of providing that service as well as to the value of that service. *See* Elhauge Decl., at ¶ 226. In the U.S. real estate market, incremental costs for buyer brokers and the value they provide buyers has decreased (with technology), and yet buyer-broker commission percentages have stayed remarkably stable, even as housing prices have dramatically increased, meaning that the dollar amount of commissions have sharply increased. *See* Elhauge Decl., at § V.F; *see also* Ex. 8 (Contos Dep.), at 73:5–77:23 (CEO of RE/MAX ██████████████████████████████████████████████████). Lower buyer-broker commission rates and usage in comparable benchmark countries—evidence that is again common to the class—likewise confirm that the Challenged Restraints inflated buyer-broker commissions. *See* Elhauge Decl., at § V.G. Finally, common data from the 20 Covered

MLSs shows that offered buyer-broker commission rates cluster around a standard commission in each market. *See* Elhauge Decl., at ¶ 201, tbl. 8. This is precisely what economic theory predicts would happen to reduce the risk that buyers might be steered to other properties. *See* Elhauge Decl., at ¶ 201.

Prof. Elhauge also finds that the Challenged Restraints impeded discount brokers and other actual or potential entrants from disrupting the anticompetitive equilibrium. *See* Elhauge Decl., at § V.E. For example, NAR's MLS rules coupled with non-compete agreements with real estate aggregation websites (like Zillow) restrained competitive entry into markets within the U.S. by discount brokers that have either listed properties off the MLS without blanket offers of compensation (like REX) or have offered commissions lower than incumbent MLS brokers (like Trelora). *See* Elhauge Decl., at ¶ 222; Ryan Decl.; Fried Decl.

***Second***, common evidence from Defendants and third parties demonstrates the anticompetitive effects of the Challenged Restraints. Defendants, for example, are aware of and have even acknowledged that the Buyer-Broker Commission Rule has facilitated the market-wide threat of steering in the industry:

- Senior NAR officials, including its former CEO, were repeatedly made aware of the incentives for and practice of steering, but failed to take steps to punish or prevent it. *See* Ex. 32 (Gansho Dep.), at 189:3–223:7; Ex. 127 (NARSITZTER0000582458); Ex. 126 (KWRI_00725808), at 5818–19, 2829; Ex. 128 (NARSITZER0000109626), at 9; Ex. 129 (Gansho Dep. Ex. 15); Ex. 130 (NARSITZER0000561393); Ex. 131 (HAR_0025451). Instead, internal NAR documents acknowledge that as a natural consequence of NAR's rules, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *See* Ex. 2 (NARSITZER0000638727), at 8730.

- Alexander Perriello, a senior executive at Realogy, testified ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 12 (Perriello Dep.), at 195:15–197:5.

- A Realogy fact sheet acknowledges that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

████████████████████████████████████ Ex. 84 (Realogy-Sitzer-00640539).

- HomeServices CEO Gino Blefari has admitted ███████████████████████████
  ███████████████ Ex. 59 (Blefari Dep 1.), at 33:16–:22.

- Adam Contos, CEO of RE/MAX, ██████████████████████████████████████
  ██████████████████████████████████████ Ex. 85 (RMLLC-WDMO-
  00433205), at 3207. Ryan Gorman, CEO of Coldwell Banker, similarly
  ████████████████████████████████████████████████████████████████
  ███████████ Ex. 86 (Realogy–Sitzer-00364224), at 4224.

- And Gary Keller has ███████████████████████████████████████████
  ████████████████████████████████████████████████████████████████
  ████████████████████████████ Ex. 87 (KWRI_00595618), at 5618.

Gary Keller, in fact, ████████████████████████████████████████████

████ —*i.e.*, the theory that buyer brokers may ██████████████████████████

████████████████████████████████████ *See* Ex. 3 (KWRI_00729056), at 9074; Ex. 4

(Figgs. Dep. 1), at 29:1–:8, 32:13–34:6. Keller Williams Senior Industry Analyst Michelle Figgs

has agreed that ██████████████████████████████████████████████████████████

█████ Ex. 5 (Figgs. Dep. 2), at 113:9–114:2.

The Corporate Defendants also specifically trained their agents to use the threat of steering

to push back against home sellers seeking to pay lower commissions:

- **Realogy:** ██████████████████████████████████████████████████
  ████████████████████████████████████████████████████ Ex. 88 (Realogy-Sitzer-
  00285583), at 5585; *see also* Ex. 89 (Realogy-Moehrl-01085959), at 5979.

- **RE/MAX:** ████████████████████████████████████████████████████
  ████████████████████████████████████████████████████████████████
  ████████████████████████████ Ex. 90 (RMLLC-WDMO-00334084), at 4085.

- **Keller Williams:** █████████████████████████████████████████████
  ████████████████████████████████████████████████████████████████

Ex. 91 (KWRI_00260201) at 0235; *see also* Ex. 92 (KWVick_0960), at 0970; Ex. 93 (KWRI_00500163), at 0174.

Brokers affiliated with the Corporate Defendants' brands have used the threat of steering to discourage commission discounting. A broker affiliated with BHHS Fox and Roach Realtors, for example, wrote sellers: █████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████████ Ex. 94 (HSOA-MOe-0000247857), at 7858. A Keller Williams agent similarly told sellers: ████████ ████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████ █████████████████████████████████████████ Ex. 95 (KWCharbel_0001207), at 1207. And an agent with a HomeServices brokerage told clients █████████████████████████████████ ████████████████████████████████████████████████████████████████████████████ ███████████ Ex. 96 (EWM-ILe-0019442), at 9442; *see also* Ex. 97 (EWM-ILe-0019453)████ ████████████████████████████████████████████████████████████████████████████

In addition, common evidence shows that Defendants use the price-sharing and steering facilitated by the Challenged Restraints to maintain commissions above competitive levels:

- Defendants' affiliated brokerages maintain policies that prohibit or strongly discourage agents from agreeing to commissions below 5 or 6%. *See, e.g.*, Ex. 98 (FR-ILe-0001593), at 1594 (█████████████); Ex. 99 (FWEBER-ILe-0023981), at 3981 (██████ ████████████████); Ex. 100 (Realogy-Moehrl-00995676), at 5700 (██████████████████); Ex. 101 (Realogy-Sitzer-00727026), at 7146–48 (████████ ██████████████████████); Ex. 102 (EWM-ILe-0029129), at 9129 (████████ ████████); Ex. 103 (KWRI_00466303), at 6304 ██████████████████ ███████████████████ Ex. 104 (HSOA-MOe-0000153723), at 3726 (██████████████████████████████); *see also* Ex. 105 (Moline Dep. 1), at 76:3–90:21.

- Defendants' brokerages also maintain policies about offering a particular commission split to cooperating brokers. *See, e.g.*, Ex. 98 (FR-ILe-0001593), at 1594 (███████████ █████████); Ex. 100 (Realogy-Moehrl-00995676), at 5700 (███████████████████); Ex.

106 (HSOA-MOe-0000432889), at 2894 (█████ ████ ████); Ex. 107 (KWAustinSW_00978), at 1005 (██████████████); Ex. 102 (EWM-ILe-0029129), at 9129 (████████████████); Ex. 108 (RMLLC-WDMO-00170144), at 0159 (██████████).

Common evidence also demonstrates that the widespread practice of steering has prevented the development of competitive business models. For example, Michelle Figgs, Senior Industry Analyst at Keller Williams, has written and testified that ████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████ *See* Ex. 109 (KWRI_00504920), at 4920; Ex. 5 (Figgs Dep. 2), at 172:18–174:4. ████████████████████████ ████████████████████████████████████████████████████████████ █████████████ *See* Ex. 109 (KWRI_00504920), at 4920; *see also* Ex. 5 (Figgs Dep. 2), at 176:25–177:25. Alexander Perriello, a senior Realogy executive, has written ██████████ ████████████████████████████████████████████████████████████ ████████████ Ex. 110 (Realogy-Moehrl-00508677). Realogy has posited that ██████ ████████████████████████████████████████████████████████████ ████████████ Ex. 111 (Realogy-Sitzer-00412531), at slide 1; *see also* Ex. 112 (Realogy-Moehrl-00537896), at slide 2. And a memorandum from a Keller Williams franchisee in Colorado notes that ██████████████████████████████████████████████████████████ █████████████████████████████ Ex. 113 (KWDTC_00005), at 0005.

The experience of REX likewise confirms that the threat of steering caused by Defendants' cartel has limited the ability of alternative business models to effectively compete and discipline prices. *See* Ryan Decl.; Fried Decl. REX has traditionally marketed properties through portals like Zillow, instead of through MLSs, and has not made blanket commission offers. Despite the small size of their business, REX has produced more than *600* audio recordings reflecting brokers from

around the country—including many affiliated with the Corporate Defendants—refusing to show REX properties due to the absence of offers of compensation and/or below-standard cooperative commissions. Ryan Decl. ¶¶ 17–20; Fried Decl. ¶¶ 7–22; Ex. 132 (recordings). In one example, a Keller Williams agent told a REX representative: "If you are not offering any buyer's commission then that's fine, I'm not going to show that [property], and you're probably going to run into the same issue with everybody here." *See* Fried Decl. ¶ 18. In another, a RE/MAX agent stated: "I'm not going to show a listing where I'm not guaranteed a commission." *See* Fried Decl. ¶ 18.

Prof. Elhauge's methodology, evidence, and analysis, as well as extensive evidence from Defendants and third parties concerning the anticompetitive effects of the Challenged Restraints, are common to the class and would be the same if every class member brought a separate antitrust suit. The common evidence on anticompetitive effects predominates.

c.    *Common issues regarding antitrust impact predominate.*

As to the third element, antitrust plaintiffs must establish that "the antitrust violation caused them some injury." *Messner*, 669 F.3d at 815. This element is referred to as antitrust impact or fact of damage. *Id.* at 816. Plaintiffs' current burden is "not to prove the element of antitrust impact, but only to demonstrate that" it "is capable of proof at trial through evidence that is common to the class rather than individual to its members." *Id.* at 818 (internal quotations omitted). The question "is whether the common evidence could show the fact of injury on a classwide basis." *Kleen*, 831 F.3d at 927.

The element of antitrust impact is readily susceptible to evidence that is common to the class here. As discussed, Prof. Elhauge opines and common evidence demonstrates that the Challenged Restraints maintained and extended an anticompetitive equilibrium which resulted in inflated commissions and overcharges in ***each*** of the 20 Covered MLSs. Prof. Elhauge thus opines

that all or nearly all class members were impacted by Defendants' anticompetitive conduct. *See* Elhauge Decl., at § VI. He explains that, in the but-for world:

- Most sellers would not pay buyer-broker commissions because buyers would usually forgo buyer brokers and, if they did not, sellers would usually not offer to pay or pay buyer-broker commissions.

- Sellers who chose to still pay buyer-broker commissions would pay a greatly reduced amount because buyer-broker commissions would be lower with increased competition and reduced steering incentives.

- Seller brokers would have also received a lower commission, both because there would be fewer contracts that paid them the buyer-broker commission even if there were no buyer broker and because increased competition would have lowered the seller-broker portion of the total commission.

Elhauge Decl., at ¶ 246.

Plaintiffs' expert, Prof. Nicholas Economides, also provides evidence of common impact. He uses a benchmark model that considers common evidence concerning international markets to ascertain what a world without the challenged restraints would look like and estimate the probability that each class transaction was harmed by Defendants' anticompetitive agreement. *See* Economides Decl., at § 4.C. Courts routinely hold that use of a benchmark (*i.e.*, a comparable market without the challenged restraints) necessarily entails common evidence, satisfying the predominance requirement. *See Kleen*, 831 F.3d at 929 (affirming finding of predominance where damages were calculated classwide using a benchmark analysis); *In re Linerboard Antitrust Litig.*, 305 F.3d 145, 153–55 (3d Cir. 2002) (affirming finding of predominance where the plaintiffs relied, in part, on a "benchmark or yardstick approach" to show antitrust impact classwide); *In re Ranbaxy Generic Drug Application Antitrust Litig.*, 338 F.R.D. 294, 305 (D. Mass. 2021) ("'yardstick' methodology" is a "widely accepted method[] of proving antitrust injury and damages on a classwide basis"); *Merenda v. VHS of Michigan, Inc.*, 296 F.R.D. 528, 542 (E.D. Mich. 2013) ("By its express design, [the] benchmark methodology purports to allow Plaintiffs to

establish through common evidence both the antitrust impact of Defendants' alleged conspiracy . . . and the losses suffered by each member of the proposed . . . class.").[12]

So too here. To identify comparable markets, Prof. Economides considered several criteria, including economic and institutional development, country size, and whether potentially comparable countries are free from conduct similar to that challenged here. *See* Economides Decl., at ¶¶ 22–45. Prof. Economides concludes that Australia, the Netherlands, and the United Kingdom are appropriate benchmarks. *See* Economides Decl., at ¶¶ 33–45. And reviewing evidence and data that is common to the class, Prof. Economides finds that in these countries: (a) buyer brokers are rare, (b) buyer brokers are typically paid by buyers, (c) buyer broker fees are lower than in the U.S., and (d) seller broker fees are typically the same or lower than in the U.S. *See* Economides Decl., at ¶¶ 33–45. Prof. Economides thus opines that in a world free of the Challenged Restraints: most transactions would not have involved buyer brokers; for all or nearly all transactions in which buyer brokers were involved, their commissions would be lower (regardless of whether they were paid by the buyer or seller); and seller-broker commissions would remain the same or decrease. *See* Economides Decl., at ¶¶ 56–79.

Prof. Economides then analyzes the probability that class members were harmed by Defendants' anticompetitive conduct using a methodology that is common across the class. Prof. Economides first estimates the probability that a given transaction harmed a seller class member. *See* Economides Decl., at ¶ 59–62. He does this by comparing buyer-broker commissions in the actual world to the distribution of commissions paid in the benchmark countries. For example, if

---

[12] *See also Cordes*, 502 F.3d at 107 ("If the plaintiffs' single formula can be employed to make a valid comparison between the but-for fee and the actual fee paid, then it seems to us that the injury-in-fact question is common to the class."); *In re Online DVD Rental Antitrust Litig.*, 2010 WL 5396064, at *9 (N.D. Cal. Dec. 23, 2010) (benchmark approach was "a feasible methodology to show" classwide impact).

a class transaction involved a 1.5% commission, Prof. Economides estimates that 98.7% of transactions in the benchmark countries involved a lower commission, and thus concludes that the transaction has a 98.7% chance of being impacted by the Challenged Restraints. Economides Decl., at ¶ 62. In this way, Prof. Economides can identify the probability of harm for each class member transaction. He first notes that 100% of transactions had at least an 80% chance of harm. *See* Economides Decl., at ¶ 63. Then, he estimates the total percentage of transactions that would have involved lower buyer-broker commission rates in the but-for world. *See* Economides Decl., at ¶¶ 64–65. Prof. Economides finally adjusts his model to account for the possibility that buyer brokers are used more frequently in tighter markets and in connection with more expensive homes, and concludes that the adjustments do not materially affect the results of the common impact analysis. *See* Economides Decl., at ¶¶ 66–74.

Prof. Economides's methodology, evidence, and analysis—all of which are common the class—demonstrate harm in the form of supracompetitive commissions for at least 99.4%-99.9% of class transactions, and show that 99.994%-100% of transactions had a greater than 50% likelihood of injury. *See* Economides Decl., at tbls. 1–3. "The ability to use such common evidence and common methodology to prove [Plaintiffs'] claims is sufficient to support a finding of predominance on the issue of antitrust impact for certification under Rule 23(b)(3)." *Messner*, 669 F.3d at 819. Further, the class does not "contain[] a great many persons who have suffered no injury at the hands of" Defendants and thus is not overbroad. *Kohen v. Pac. Inv. Mgmt. Co. LLC*, 571 F.3d 672, 678 (7th Cir. 2009) (rejecting an argument that a class definition was overbroad: "[a]though some of the class members probably were net gainers from the alleged manipulation, there is no reason at this stage to believe that many were"); *see also Pella Corp. v. Saltzman*, 606 F.3d 391, 394 (7th Cir. 2010) (affirming class certification despite possibility that class included

uninjured members). And to the extent the class includes some transactions where harm was unlikely, they can be identified and excluded. *See* Economides Decl., at ¶¶ 71, 92. Antitrust impact can thus be shown classwide.

*d.      Common issues regarding damages predominate.*

"[I]t is well established that the presence of individualized questions regarding damages does not prevent certification under Rule 23(b)(3)." *Messner*, 669 F.3d at 815 (collecting cases). The Court must instead determine "if there is a classwide method for proving damages, and if not, whether individual damage determinations will overwhelm the common questions on liability and impact." *Kleen*, 831 F.3d at 929 (citing *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013)).

Damages here can be proven using a classwide methodology, as Prof. Economides demonstrates. *See* Economides Decl., at § V. Relying on common evidence and data, Prof. Economides determines that the mean of the buyer-broker commission rates paid in the benchmark countries is 1.55%. *See* Economides Decl., at ¶ 91. Prof. Economides subtracts the commissions that class members would have paid at that rate from the commissions paid in the actual world to determine the commission overcharge and damages. *See* Economides Decl., at ¶ 95. Class members that paid less than 1.55% as a buyer-broker commission, including all of those that Prof. Economides identified as less likely to be harmed, have zero damages and are not included in the classwide damages calculation. *See* Economides Decl., at ¶ 92. Total damages using Prof. Economides's methodology are $13.7 billion. *See* Economides Decl., at ¶ 96.

Prof. Economides's methodology, evidence, and analysis provide "a classwide method for proving damages." *Kleen*, 831 F.3d at 929. Further, the methodology is directly linked to Plaintiffs' theory of liability. *See Comcast Corp.*, 569 U.S. at 35. Prof. Elhauge opines that the Challenged Restraints led to supracompetitive buyer-broker commissions marketwide. And Prof. Economides

provides a common method for determining the class members that were likely harmed and the amount of the overcharge. Plaintiffs' ability to calculate damages classwide supports certification. *See Ploss*, 431 F. Supp. 3d at 1018 ("Ploss asserts only one theory of liability that cuts across the entire class, and it is the theory of liability on which Pirrong based the event studies. So proof of the damages caused by the scheme will either fail or succeed on a class-wide basis.").

### 2. A class action is superior to other methods of adjudication.

A class action here is superior to other methods of litigation. ***First***, "if common questions are found to predominate in an antitrust action," as here, "then courts generally have ruled that the superiority [requirement] is satisfied." 7AA Charles Alan Wright et al., Federal Practice & Procedure § 1781 (3d ed. 2021); *see also Johnson v. Diakon Logistics*, 2020 WL 405636, at *7 (N.D. Ill. Jan. 23, 2020). ***Second***, the size of potential individual claims compared to the costs of prosecuting an antitrust case weigh in favor of class treatment. *See In re Currency Conversion Fee Antitrust Litig.*, 264 F.R.D. 100, 117 (S.D.N.Y. 2010) ("A class action is the superior method of adjudicating these claims. Many of the class members' claims will be small relative to the high costs of maintaining an antitrust action."). ***Third***, "[i]f tried in individual actions, the same Defendants would be brought in to each suit to prove the nature and scope of the alleged conspiracy. This would be a waste of resources, as well as posing a risk of inconsistent verdicts on the issue." *Hyland*, 2008 WL 4858202, at *9. Given "[t]he nature of defendants' alleged overarching conspiracy and the desirability of concentrating the litigation in one proceeding . . . class treatment is superior to other methods of adjudication." *Nitsch*, 315 F.R.D. at 316.

### 3. The Damages Class is ascertainable through objective criteria.

Finally, the proposed Damages Class is ascertainable. "Rule 23 requires that a class be defined, and experience has led courts to require that classes be defined clearly and based on

objective criteria." *Mullins v. Direct Digit., LLC*, 795 F.3d 654, 659 (7th Cir. 2015) (rejecting a heightened ascertainability requirement). It is sufficient for Plaintiffs to "identif[y] a particular group of individuals . . . harmed in a particular way . . . during a specific period in particular areas." *Id*. at 660–61; *see also Laumann v. National Hockey League*, 105 F. Supp. 3d 384, 394 n.21 (S.D.N.Y. 2015). The Damages Class meets that standard. It is defined as home sellers (a group of individuals) who paid a commission (harmed in a particular way) between March 6, 2015, and December 31, 2020 (a specific period), to a brokerage affiliated with a Corporate Defendant in connection with the sale of residential real estate listed on a Covered MLS and located in listed jurisdictions (in particular areas). Moreover, though not required at this stage, members of the class can be identified, including using Corporate Defendants' own transaction records, as each of the Corporate Defendants maintains data on transactions completed by their affiliated agents.

* * *

Common questions and common evidence predominate over individualized issues, a class action is superior, and the Damages Class is ascertainable. The Court should certify it.

## C.     Plaintiffs Satisfy the Requirements for an Injunctive Relief class under Rule 23(b)(2).

The Injunctive Relief Class should also be certified. A class may be certified under Rule 23(b)(2) if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). Thus, certification is appropriate where plaintiffs challenge centralized rules that do not require individualized injunctive relief. *See B.K. by next friend Tinsley v. Snyder*, 922 F.3d 957, 971 (9th Cir. 2019).

Plaintiffs here challenge centralized rules of general applicability and much of the challenged conduct in this case is ongoing. While NAR recently changed its rules concerning when

a buyer broker can represent that their services are free and when buyer-broker commissions can be displayed to consumers, the Buyer-Broker Commission Rule and NAR's rules limiting the ability of buyers to negotiate commissions remain in place. NAR has not signaled any willingness to rescind these rules. Notably, NAR's failed settlement with DOJ, despite resulting in changes to certain rules, did not involve changes to the Buyer-Broker Commission Rule or NAR's rules limiting the ability of buyers to negotiate commissions. Elhauge Decl., at ¶ 165. And according to NAR's former CEO and its official responsible for overseeing MLS rulemaking, ██████

████████████████████████████████████████████████████████████████

██████. Ex. 114 (Stinton Dep.), at 268:20–269:3; Ex. 32 (Gansho Dep.), at 265:8–:19, 266:11–:25, 267:15–:24, 268:2–:9, 270:22–271:4; 280:11–:16. Courts in this Circuit have regularly certified (b)(2) classes that include people who would be harmed in the future based on ongoing unlawful conduct (as here).[13] And one court in this District has certified a (b)(2) class involving future home sales (as Plaintiffs seek here). *See Honorable v. Easy Life Real Est. Sys., Inc.*, 182 F.R.D. 553, 558 (N.D. Ill. 1998) (certifying a class of "all persons in the Austin neighborhood . . . who may in the future purchase homes from Easy Life and/or Ace").

Further, any injunction here would address NAR's rules and Defendants' generally-applicable conduct. The injunctive relief would thus be common to the class and not involve individualized relief. *See Chicago Tchrs. Union*, 797 F.3d at 442 (certification proper under Rule 23(b)(2) because plaintiffs sought "the same declaratory and injunctive relief for everyone"); *see also B.K.*, 922 F.3d at 971 (certification appropriate where plaintiffs sought a single injunction).

---

[13] *See, e.g.*, *Copeland v. Wabash County, Indiana*, 2021 WL 4622155, at *1 (N.D. Ind. Oct. 7, 2021); *Smith v. City of Chicago*, 2021 WL 3883116, at *10 (N.D. Ill. Aug. 31, 2021); *Holmes v. Godinez*, 311 F.R.D. 177, 216 (N.D. Ill. 2015); *Murdock v. Walker*, 2011 WL 13257344, at *2 (N.D. Ill. June 7, 2011); *Loomis v. Exelon Corp.*, 2007 WL 2060799, at *5 (N.D. Ill. June 26, 2007); *Ledford v. City of Highland Park*, 2000 WL 1053967, at *4 (N.D. Ill. July 31, 2000); *Anderson v. Cornejo*, 199 F.R.D. 228, 266 (N.D. Ill. 2000).

Finally, the proposed 23(b)(2) class is ascertainable. The Injunctive Relief Class seeks certification of a class of owners of residential real estate in specific geographic markets who are presently listing or will in the future list homes on the Covered MLSs and thus be subject to Defendants' anticompetitive conduct. Listing a home on a Covered MLS is "an objective criterion for determining who is a member of the class." *Walsh*, 2021 WL 4459531, at *6.

### D. Class Counsel are Adequate under Rule 23(g).

Cohen Milstein Sellers & Toll PLLC, Hagens Berman Sobol Shapiro LLP, and Susman Godfrey LLP should be appointed as Co-Lead Class Counsel. This Court has already appointed these firms as interim co-lead counsel applying "the same considerations" as Rule 23(g), explaining that "[a]ll three firms have extensive experience and success litigating complex class actions, including antitrust actions," "the firms have already devoted substantial time and effort cooperatively investigating" the case, and "each Plaintiff has agreed to the proposed leadership structure." *Moehrl*, 2020 WL 5260511, at *1–2. These conclusions remain true.

## VI. CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court: (1) grant Plaintiffs' motion for class certification of their antitrust claims; (2) certify the proposed Damages Class pursuant to Federal Rule of Civil Procedure 23(b)(3); (3) certify the proposed Injunctive Relief Class pursuant to Federal Rule of Civil Procedure 23(b)(2); (4) appoint Plaintiffs as Class Representatives for the Proposed Classes; and (5) appoint Cohen Milstein Sellers & Toll PLLC, Hagens Berman Sobol Shapiro LLP, and Susman Godfrey LLP as co-lead class counsel pursuant to Federal Rule of Civil Procedure 23(g).

DATED: March 8, 2022

Respectfully submitted,

By */s/ Marc M. Seltzer*

Marc M. Seltzer
Steven G. Sklaver
SUSMAN GODFREY LLP
1900 Avenue of the Stars, Suite 1400
Los Angeles, California 90067
Telephone: (310) 789-3100
mseltzer@susmangodfrey.com
ssklaver@susmangodfrey.com

Beatrice C. Franklin (*pro hac vice*)
bfranklin@susmangodfrey.com
SUSMAN GODFREY LLP
1301 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (212) 336-8330

Matthew R. Berry
Alexander W. Aiken
SUSMAN GODFREY LLP
1201 Third Avenue, Suite 3800
Seattle, Washington 98101
Telephone: (206) 516-3880
mberry@susmangodfrey.com
aaiken@susmangodfrey.com

Steve W. Berman (Bar No. 3126833)
Shelby R. Smith (*pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
steve@hbsslaw.com
shelby@hbsslaw.com

Rio S. Pierce (*pro hac vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
riop@hbsslaw.com

Daniel Kurowski (Bar No. 6286656)
Jeannie Evans (Bar No. 6296339)
Whitney K. Siehl (Bar No. 6313995)
HAGENS BERMAN SOBOL SHAPIRO LLP
455 North Cityfront Plaza Drive, Suite 2410
Chicago, IL 60611

Telephone: (708) 628-4949
dank@hbsslaw.com
jeannie@hbsslaw.com
wsiehl@hbsslaw.com

Carol V. Gilden (Bar No. 6185530)
COHEN MILSTEIN SELLERS & TOLL PLLC
190 South LaSalle Street, Suite 1705
Chicago, IL 60603
Telephone: (312) 357-0370
cgilden@cohenmilstein.com

Kit A. Pierson (*pro hac vice*)
Daniel A. Small (*pro hac vice*)
Benjamin D. Brown (*pro hac vice*)
Robert A. Braun (*pro hac vice*)
COHEN MILSTEIN SELLERS & TOLL PLLC
1100 New York Ave. NW, Fifth Floor
Washington, DC 20005
Telephone: (202) 408-4600
kpierson@cohenmilstein.com
dsmall@cohenmilstein.com
bbrown@cohenmilstein.com
rbraun@cohenmilstein.com

George Farah (*pro hac vice*)
Rebecca P. Chang (*pro hac vice*)
HANDLEY FARAH & ANDERSON PLLC
33 Irving Place
New York, NY 10003
Telephone: (212) 477-8090
gfarah@hfajustice.com
rchang@hfajustice.com

William H. Anderson (*pro hac vice*)
HANDLEY FARAH & ANDERSON PLLC
4730 Table Mesa Drive, Suite G-200
Boulder, CO 80305
Telephone: (303) 800-9109
wanderson@hfajustice.com

Benjamin David Elga
JUSTICE CATALYST LAW
123 William Street
16th Floor
New York, NY 10038
Telephone: (518) 732-6703
belga@justicecatalyst.org

Monte Neil Stewart
Russell E. Marsh
WRIGHT MARSH & LEVY
300 S. 4th Street, Suite 701

Las Vegas, NV 89101
Telephone: (702) 382-4004
monteneilstewart@gmail.com
rmarsh@wmllawlv.com

Vildan A. Teske
Marisa C. Katz
TESKE KATZ KITZER & ROCHEL PLLP
222 South Ninth Street, Suite 4050
Minneapolis, MN 55402
Telephone: (612) 746-1558
teske@tkkrlaw.com
katz@tkkrlaw.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

The undersigned attorney hereby certifies that on March 8, 2022, a true and correct copy of the foregoing was electronically filed by the Court's CM/ECF system, which caused notice to be sent to all counsel of record.

/s/ Marc M. Seltzer
Marc M. Seltzer