IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CHRISTOPHER MOEHRL, MICHAEL COLE, STEVE DARNELL, JACK RAMEY, DANIEL UMPA, AND JANE RUH, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>THE NATIONAL ASSOCIATION OF REALTORS, REALOGY HOLDINGS CORP., HOMESERVICES OF AMERICA, INC., HSF AFFILIATES, LLC, BHH AFFILIATES, LLC, THE LONG & FOSTER COMPANIES, INC., RE/MAX LLC, AND KELLER WILLIAMS REALTY, INC.,<br><br>Defendants. | Case No.: 1:19-cv-01610<br><br>Judge Andrea R. Wood |

## DECLARATION OF JACK RYAN

I, Jack Ryan, declare as follows:

1. I am the Chief Executive Officer of REX – Real Estate Exchange, Inc. ("REX"). I have personal knowledge of the matters set forth within.

2. I have been the CEO of REX since 2015, when I co-founded the company with REX's Chief Operating Officer, Lynley Sides. After receiving an MBA from Harvard Business School and a J.D. with Honors from Harvard Law School, I went to work at a refugee camp, Casa Juan San Diego. After Casa Juan San Diego, I went to Goldman Sachs, where I became a general partner. I left Goldman Sachs as a general partner to teach high school on the South Side of

Chicago. My wife Amanda and I have committed our stock in REX to Blaze Kids Academy, a boarding school, which Amanda and I founded, for children who have lost their parents. The goal of the boarding school is to provide a caring and safe environment with the best homes, educational classrooms, and athletic facilities to kids who need a break.

3. I had the original idea that gave birth to REX after a home purchase that I made some years ago. When I bought the home, the seller's agent was on vacation. Because the seller's agent was unavailable, I worked directly with the seller and agreed to all the transaction terms without the services of a real estate agent. Yet, when the seller's agent returned from vacation, having done no work to broker the transaction, he happily pocketed a 3% commission.

4. My experience in dramatically reducing the costs of trading other asset classes at Goldman Sachs taught me that we could do the same in the residential real estate industry. I also saw that when the costs of trading shares went from $.12 to $.01, the number of shares traded increased manyfold. I knew the same would happen with residential real estate and would provide a number of social benefits, including that people would find it easier to relocate through lowered real estate commissions in order to take advantage of job and educational opportunities. Because housing, education, and employment opportunities are so fundamental to success, I believe an efficient, cost-effective real estate market is essential to reducing the wealth gap in America.

5. In creating REX, we committed to benefitting Americans by changing the old model. Over the last seven years as REX's CEO, I have been immersed in understanding how residential real estate services are provided to consumers. I have learned how real estate brokers and agents who are members of the National Association of Realtors (NAR) and local multiple listing services (MLSs) traditionally cooperate in, and are compensated when, transacting homes.

6. As an investor in several technology start-ups and through research specific to REX's founding, I learned how data and internet accessibility have combined to create efficiencies for many different types of consumer transactions, especially in transactions traditionally involving one or more intermediaries. More direct consumer access to products and services has driven down transaction costs in a number of areas, including stock trades, taxi dispatching, and travel service purchases, among others.

7. REX was built to bring the same types of efficiencies to residential real estate services. REX uses data modeling and machine learning to match sellers and buyers of homes as accurately and speedily as possible. REX's approach reduces costs for all involved. REX is able to service both the buyer and seller sides of a residential real estate transaction with a total fee as low as 2% (paid by the seller), instead of the average 5-6% agents charge under the traditional NAR and MLS model. Our goal is to reduce the fees further as we improve our technology.

8. This technology drives the savings that REX delivers to its customers by replacing work that real estate agents used to do in the pre-internet era. It also drives customer satisfaction because REX's licensed, salaried agents are equipped with the latest machine-learning technology and data-modeling to most effectively serve the customer. REX's consumer satisfaction scores are much higher than industry participants.

9. Like other companies offering direct consumer access products and services, REX is able to deliver a convenient, economical, and full-service model because REX uses open internet channels to market REX-listed homes directly to buyers.

10. REX's model would not have been possible before the internet became widely adopted.

11. Additionally, REX's licensed agents are salaried. They are incentivized and trained to put customers first rather than to just close transactions. REX's licensed agents serve sellers and buyers from listing to close, and they share the information our customers need via an easy-to-use internet-accessible dashboard, in-person visits, telephone calls, or whatever other method the client prefers.

12. Another important difference between REX and the traditional model is that when REX was founded, sellers listing with REX did not make a "blanket unilateral offer of compensation" to all buyer brokers. It is my understanding that this blanket unilateral offer is a pre-requisite for listing a home for sale on NAR MLSs.

13. Instead, REX believes that buyers and their brokers should determine, by negotiation if necessary, what fee buyer's brokers deserve and should receive, in the same way fees are set in other professions like law and banking. Doing so eliminates a conflict of interest that arises under NAR's rule requiring blanket offers of cooperative compensation, which incentivizes buyer's agents to sell the home to their clients that makes the agent the most money in commission, rather than based on which home is best for the client.

14. As a result, REX typically requests that buyer's agents disclose and negotiate their fee directly with their buyer clients. If asked, REX will then adjust the closing price of the house to incorporate the fees the buyer and their agent agree upon. This facilitates buyers' ability to finance any broker fee they have agreed to pay through a home mortgage. In REX's experience, this often results in a buyer's broker commission well below 3%. In adjusting the home closing price to incorporate the fees the buyer and their agent agree upon, REX has not encountered any issues during the appraisal or financing process.

15. REX maintains data concerning the amount of commissions clients pay to REX as well as any commissions paid to a counterparty's agent (assuming they are represented by an agent). Total commissions paid on REX-facilitated home sales averaged 3.3% of a home's selling price, and I expect this percentage to fall over time, as mentioned above. Further, REX calculated savings based on total commissions actually paid on REX transactions versus what they would have been if a 5.5% commission had been paid. According to this calculation, REX saved consumers $28.7 million in real estate brokerage commissions in over just five years of operations.

16. REX makes up a small share of the overall market for residential brokerage services, but grew steadily in its early years. REX's success was in spite of (and was limited by) the anticompetitive rules adopted by NAR and its members. Before September 2021, REX was not a member of any MLS and typically did not make unilateral offers of compensation to buyer's brokers. As a result, agents who would receive negotiated commissions if their clients purchased a REX-listed home would often steer their clients away from homes listed by REX.

17. Traditional brokerages know that steering is a problem in the industry, but instead of taking steps to reduce it, they lean into it for greater profits, at the expense of their clients. These brokerages train their agents to use the existence of steering to guide sellers away from offering more competitive commissions in their listings and listing agents are trained to tell sellers that if they don't offer the standard (2.5-3%) commission in their listing, buyer's agents won't show the seller's home. This training is further reinforced by third-party trainers and at trade shows, where "top agents" teach other real estate agents how best to convince sellers to keep commissions high. Because incumbent brokerages represent both buyers and sellers, when their agents turn around and act as buyer's agents, they then reap the benefit of the elevated commissions they helped put in place.

18. This steering is pervasive. I understand based on an analysis conducted by REX data scientist Will Fried that, since January 2019, REX has recorded over 600 calls across multiple major markets reflecting steering. The buyer's agents on these calls indicate that they would not show clients REX-listed homes after finding out that REX-listed homes do not offer pre-determined commissions. The agents are often open about their reasoning. For example, in one call, when a buyer's agent was told that REX does not require sellers "to pay any type of buyer agent commission or fee," the buyer's agent responded, "okay, then I won't be showing [the home]."[1] In another call, the buyer's agent let the REX agent know that "I don't show a property unless I have an agreement of a commission paid in the beginning."[2] And in yet another call, the buyer's agent told the REX agent that because of REX's efforts to make the market more equitable and efficient, REX was "getting a bad name."[3]

19. These recordings also indicate that steering is not just a problem limited to the several hundred bad agents that REX recorded. Rather, some buyer's agents have told REX that their entire brokerages have policies preventing any agents from showing homes without a blanket commission offer (some have further indicated that their brokerages require that this blanket commission be above a certain level). As one buyer's agent with RE/MAX put it, "we're not allowed to show any properties before we have a commission agreement."[4] A similar position was expressed by a Keller Williams agent in a completely different market: "I have strict guidelines I have to adhere to with my broker. So until I know the compensation, I can't show the property."[5]

---

[1] 2019 Las Vegas Call 4.
[2] 2020-21 Chicago Steering Call #6.
[3] 2020 Brokerage Call 1.
[4] 2020 Brokerage Call 15.
[5] 2020 Brokerage Call 9.

20. This steering is also locked in by NAR's ethical rules, which until recently permitted buyer's agents to advertise their services as free to buyers, which in turn makes buyers indifferent to the amount of the buyer agent's commission. As these recordings show, because buyer's agents have already advertised their services as free, buyer's agents are often unwilling to ask their clients about being paid directly, even though that is the norm in most other service industries, and even if such an arrangement might save their client's money. As one buyer's agent put it: "How am I going to explain to my buyers, 'hey if you buy this you have to pay my commission too.'"[6] According to another agent: "It's an awkward conversation to have. . . . I'd rather just keep [the house] out of my showings."[7]

21. REX cannot avoid steering by simply co-listing with or joining the MLS.

22. Zillow.com and Trulia.com, both now owned by Zillow, are two internet sites that grew into the two of the most visited aggregator sites for residential home listings on the internet (the first and fourth, respectively). Real estate aggregator sites generally gather all home listings available to them so that consumers can search for and view all available homes that meet the criteria defined by the consumer's search parameters in one click. REX listings' inclusion on Zillow's sites has been critical to REX's ability to reach consumers directly.

23. In 2021, Zillow became a real estate broker and joined NAR, state and local associations of Realtors, and NAR MLSs. This required them to follow NAR's rules, including its MLSs rules. Many of those MLSs have adopted model NAR rules requiring that listings obtained from MLSs be segregated and displayed separately from listings obtained from other sources.

---

[6] 2019 NY-NJ Call 28.
[7] 2019 NY-NJ Call 57.

24. Now when a consumer searches for homes on Zillow.com and Trulia.com, rather than all listings meeting the search criteria being displayed, as had been the case since REX began operations, only NAR/MLS listings were returned. A consumer had to see a second tab, "Other listings," to the right of the tab, "Agent listings." REX's listings were contained under the "Other listings" tab.

25. I have reviewed internal reports of widespread REX seller-client concerns after Zillow implemented its changes. Some clients have had trouble finding their homes listed on Zillow since the change. Others have expressed concern that the placement of their homes under the "Other listings" tab will decrease the visibility of their homes. Some clients have personally reviewed and seen the activity measures that indicate decreased views on their homes. Other clients have requested that their homes now be co-listed with an MLS agent to increase the visibility of their homes. Still others have canceled their listings with REX.

26. Due to the impact of NAR's segregation rules on REX's business, beginning in September 2021, REX has been forced to join certain MLSs and to list properties on those MLSs. As a result, REX is now required under NAR's MLS rules to make blanket cooperative commission offers.

27. NAR's model rules requiring blanket offers of compensation and the segregation of MLS and non-MLS listing have compromised REX's direct-to-consumer business model. The barriers created by the NAR/MLS cartel, including its rule mandating blanket offers of cooperative compensation, have not only hurt REX. They are also likely to deter other potential innovators from entering the real estate brokerage industry and bringing lower prices and increased options to consumers. The existing system hurts competition, cements the NAR/MLS system's inflated rate structure, and limits the consumer benefits of innovative business models.

I declare under penalty of perjury that the foregoing is true and correct.

Signed the 21 day of February, 2022.

_____
Jack Ryan

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CHRISTOPHER MOEHRL, MICHAEL COLE, STEVE DARNELL, JACK RAMEY, DANIEL UMPA, AND JANE RUH, on behalf of themselves and all others similarly situated,<br><br>    Plaintiffs,<br><br>    v.<br><br>THE NATIONAL ASSOCIATION OF REALTORS, REALOGY HOLDINGS CORP., HOMESERVICES OF AMERICA, INC., HSF AFFILIATES, LLC, BHH AFFILIATES, LLC, THE LONG & FOSTER COMPANIES, INC., RE/MAX LLC, AND KELLER WILLIAMS REALTY, INC.,<br><br>    Defendants. | Case No.: 1:19-cv-01610<br><br>Judge Andrea R. Wood |

**DECLARATION OF WILL FRIED**

I, Will Fried, declare as follows:

1. I am a data scientist with REX – Real Estate Exchange, Inc. ("REX"). I have personal knowledge of the matters set forth within.

2. I have worked with REX since June 2019. I first joined REX as a data science Intern and was employed as a full-time Data Scientist between February 2021 and December 2021. Since that time, I have provided consulting services to REX. My responsibilities include building predictive models, corporate strategy analysis, and assisting general counsel. I earned my B.S. in

mechanical engineering from Harvard University in 2019 and earned an M.S. in Data Science from Harvard University in 2020, while I was working at REX.

3. One of the projects I worked on at REX was to identify instances in which buyer's agents "steer" their clients away from seeing or bidding on REX-listed properties.

4. I understand that NAR has adopted a rule, that it has imposed on a mandatory basis on all of its associated Multiple Listing Services ("MLSs"), requiring that listing brokers make a "blanket unilateral offer of compensation" to cooperating brokers. I further understand that the offer is a blanket offer because it normally applies to every buyer's broker, regardless of their experience or how much work they put into assisting the buyer with a home purchase.

5. During the period of time that I analyzed phone calls, unlike traditional listing brokers, REX did not typically list properties on the MLS and did not make a blanket unilateral offer of compensation. This is because REX believes fees for buyer's agents should be the result of negotiation between the buyer and their agent, just like in other professions such as law and banking. When such negotiations take place, this often results in a buyer's agent commission below the standard 2.5-3%.

6. NAR's rules requiring that each MLS listing reflect a "blanket unilateral offer of compensation" incentivize many buyer's agents to steer their clients away from REX-listed properties. If a buyer purchases a REX-listed property, then the buyer's agent will not only likely receive a lower commission, they also have to justify their commission to their client—something buyer's agents do not usually have to do under the standard MLS model.

7. I was able to identify a large number of instances of steering by analyzing recorded phone calls between buyer's agents and REX representatives tasked with scheduling showings for REX-listed homes. Unlike traditional discount brokerages which still participate in the traditional

MLS system, these calls are unique to REX because buyer's agents are often unfamiliar with our listing model and call to ask how commission splits work.

8. My analysis identified evidence of steering by buyer's agents in 602 calls during the periods between January 1, 2019 and January 26, 2020 and between April 14, 2020 and July 17, 2021. Another 108 calls during this period reflected abrupt hang-ups by a buyer's agent after learning that REX listings don't offer a preset buy-side commission. By point of comparison, REX had 5,198 listings that were active at some point during the period of the steering analysis.

9. The actual incidence of steering, however, is almost certainly higher than what I was able to identify through my analysis. Buyer's agents may not tell third parties after being informed that they are on a recorded line that they are steering their clients away from homes they would otherwise be interested in. Further, buyers may not know when or why they are not being shown a specific property.

10. In particular, there are at least three types of steering that my analysis would not be able to identify. First, my analysis cannot identify instances of steering by buyer's agents who were already aware of how REX's business model works and never called REX in the first place. Second, my analysis does not capture steering by buyer's agents who, after calling REX, chose not to show their clients REX properties based on the absence of an offered commission—but did not expressly admit to steering on a recorded phone line or hang up after learning of REX's commission policy. Third, my analysis could not identify steering by buyer's agents who steered their clients away from REX properties after showing those properties.

11. I describe below how I conducted my steering analysis.

12. Inbound calls from buyer's agents to REX representatives are automatically routed through the cloud communications platform Twilio. Twilio is a commonly used communications

platform which manages inbound calls to REX representatives. While the REX representative is on the line, Twilio automatically records each call as an audio file (both in MP3 and WAV format) and tracks other data associated with the call, such as the phone number and date.

13. I analyzed recorded calls to REX representatives during two periods—between (i) January 1, 2019 and January 26, 2020 and (ii) April 14, 2020 and July 17, 2021. Inbound calls received between January 27, 2020 and April 13, 2020 are not included in these recordings because REX did not record inbound phone calls during that period.

14. These recordings were made and kept in the regular course of REX's business. REX maintains these recordings so that it can monitor the effectiveness of its customer support and outreach services and improve its messaging to other real estate agents.

15. All inbound calls since January 1, 2019 have started with the following automated message: "Thank you for calling REX. This call may be recorded." From January 1, 2019 until August 10, 2020 (excluding the gap in recordings between January 27, 2020 and April 13, 2020), Twilio began recording all calls the moment the caller reached REX, including when this automated message was provided. As such, this automated message can be heard at the beginning of calls recording during that time. Since August 11, 2020, Twilio has recorded all calls starting with the moment a REX representative picks up the call. Accordingly, although this automated message was still provided to inbound callers, the message is not heard on recordings as of August 11, 2020.

16. REX obtained mp3 audio files and then processed those files using Amazon Transcribe, an automated transcription service provided by Amazon Web Services. This produced a searchable text file for each call.

17. I used natural language processing to identify which of these calls were likely placed by buyer's agents. I used an algorithm to identify calls which reflected lengthy discussions of broker compensation. I manually read through transcripts and listened to the voice recordings of these calls to determine whether each reflected evidence of steering.

18. For ease of review, I separated these calls into three groups. In the first, largest group of calls, buyer's agents called to ask REX representatives about commission splits, then told the REX representative that they would not be showing the REX-listed property to their client after learning that REX does not offer a pre-determined standard commission. For example, in one call a Keller Williams buyer's agent told a REX representative: "If you are not offering any buyer's commission then that's fine, I'm not going to show that [property], and you're probably going to run into the same issue with everybody here." The REX representative further clarified: "you're not going to show the property just because you don't have a specific, guaranteed commission?" The agent responded: "Absolutely. Correct."[1] Or as one RE/MAX agent put it: "I'm not going to show a listing where I'm not guaranteed a commission."[2]

19. The second group of calls is similar to the first, except after learning that REX does not offer a pre-determined standard commission, the buyer's agent indicated that it is their brokerage's commission policy, and not just their personal interest, which keeps them from showing the REX-listed property to their client. As one Berkshire Hathaway agent stated, "I don't think I'm going to be able to do the appointment because my brokerage has to have [a commission agreement] written beforehand, before I even show [the property]."[3] As another Keller Williams

---

[1] 2019 NY-NJ Call 1.
[2] 2020 NY-NJ Call 6.
[3] 2020 Brokerage Call 2.

agent put it, "If you offer me 2.5% I will basically . . . be willing to show your property and bring in clients. For $2000, I cannot do it. My company will not allow any discount below 2.5%."[4]

20. The third group also consists of calls from buyer's agents to REX representatives. For these calls, the agents ask how REX handles commission splits then end the calls without asking any other questions. Although they do not state explicitly that they will not show the REX-listed properties to their clients due to REX's commission policy, the abrupt nature of their hang-ups suggests that it is because of REX's approach to commission splits that they have ended the call without scheduling a showing.

21. Calls for these three groups were separated into recordings from 2019 through early 2020 and recordings from April 2020 through mid-July 2021. Calls for the first group were further separated according to their geographic market. For example, all calls regarding properties in Austin, Texas were grouped together.

22. The audio files have been renamed so that they are easier to identify as part of their year/geographic grouping and match with their corresponding transcript. The audio files are otherwise true, accurate, and unedited copies of call recordings. Similarly, I renamed the relevant transcripts and consolidated them into a single text file for ease of organization. The transcripts are otherwise true, accurate, and unedited copies of call transcripts produced by Amazon Transcribe. In any event, the transcript contents can be verified by listening to the corresponding audio files.

23. I provided these audio files and their transcripts to the Plaintiffs in this case through Microsoft OneDrive on August 9, 2021.

I declare under penalty of perjury that the foregoing is true and correct.

---

[4] 2020 Brokerage Call 5.

Signed the 15th day of February, 2022.

_____
Will Fried