IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

Moehrl et al. v. NAR et. al

)
)
)
)
)
)
)
)
)
)
)
)

Case No. 1:19-cv-01610

**Expert Class Certification Report of**

**Professor Einer Elhauge**

February 23, 2022

[Corrected March 8, 2022]

**HIGHLY CONFIDENTIAL:  SUBJECT TO PROTECTIVE ORDER**

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

# Contents

ASSIGNMENT ..................................................................................5

EXECUTIVE SUMMARY .....................................................................6

QUALIFICATIONS .............................................................................9

I. RESIDENTIAL REAL ESTATE INDUSTRY BACKGROUND......................10

*A. NAR, MLSs, and the Sources of Challenged Restraints* ...........12

*B. History of Anticompetitive Conduct: From Subagency to the Buyer Broker Commission Rule* ..................................................................24

*C. Relevant Terminology* ...........................................................28

II. MARKET DEFINITION ..................................................................30

*A. Market Definition Methodology* ............................................31

*B. The Relevant Product Market Is MLS Broker Services* ..............35

*1. The Conclusion that the Relevant Product Market Is MLS Broker Services Is Consistent with the Conclusions of the DOJ and FTC* ...............................36

*2. Non-MLS Brokers Cannot Prevent a Hypothetical Monopolist in MLS Broker Services from Raising Total Commissions 5% or More Above Competitive Levels* ...............................................................38

*3. FSBO Transactions and Sales to Home Buying Companies Cannot Prevent a Hypothetical Monopolist in MLS Broker Services from Raising Total Commissions 5% Above Competitive Levels* .....................................47

*4. Product Market Definition Confirmed by Evidence that MLS Brokers Were Actually Able to Raise Prices More Than 5% Above Competitive Levels*.......52

*5. The Relevant Product Market Includes MLS Brokerage Services to both Sellers and Buyers*..............................................................55

*C. The 20 Covered MLS Regions Are Relevant Geographic Markets*..............57

*1. MLS Regional Markets for MLS Broker Services Are Consistent with the Relevant Geographic Markets Defined by the DOJ and FTC* .........................57

*2. Regional Markets for the 20 MLSs At Issue in this Case Are Confirmed by Other Evidence*...................................................................59

*3. Broadening or Narrowing the Geographic Markets Would Not Alter the Assessment of Anticompetitive Effects* ............................................79

III. THE ALLEGED CONSPIRATORS HAVE A HIGH MARKET SHARE AND SIGNIFICANT MARKET POWER IN ALL RELEVANT MARKETS ............................80

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

*A.* **High Market Shares and Significant Barriers to Rival Entry or Expansion** ................................................................................................**82**

*B.* **Direct Evidence of Power Over Price** .............................................**88**

*C.* **Direct Evidence of Power to Exclude** ..............................................**90**

**IV. THE ECONOMIC CONSTRAINTS AND INCENTIVES CREATED BY THE CHALLENGED RESTRAINTS** ................................................................................**92**

*A.* **The Buyer Broker Commission Rule and Other NAR Rules Constrain Negotiation of Buyer-Broker and Total Commission Rates While Incentivizing and Facilitating Steering** ........................................................**92**

*B.* **NAR Code of Ethics Rules Encouraging Buyer-Broker Services to be Represented as "Free" Incentivized Overuse of Buyer-Brokers** ...................**103**

*C.* **NAR Rules Allowing MLS Buyer-Brokers to View, and Filter Listings by, the Amount of the Blanket Offer, While Restraining Buyers' Ability to Become Aware of The Blanket Offer** ................................................**107**

*D.* **The Collective Restraints Imposed by NAR Rules** ....................**115**

*E.* **The DOJ's Proposed 2020 Settlement, 2021 Withdrawal, and Subsequent 2022 Changes to NAR Rules** ...............................................**116**

**V. ANTICOMPETITIVE EFFECTS OF THE CHALLENGED RESTRAINTS** ..................**121**

*A.* **The Challenged Restraints Maintained and Extended an Anticompetitive Equilibrium Whereby Sellers Made Blanket Offers to Pay Buyer-Broker Commissions** ....................................................................**121**

*B.* **The Anticompetitive Equilibrium Maintained and Extended by the Challenged Restraints Maintained Supracompetitive Buyer-Broker Commissions by Incentivizing Steering** ............................................**130**

*1. The Theory of Steering Incentives* .............................................130

*2. Evidence of the Existence and Impact of The Threat of Steering from Academic Literature and Government Agencies* .............................133

*3. How the Challenged Restraints Created and Facilitated Steering Incentives* ....................................................................................135

*4. Evidence of Steering Incentives in this Case* ..............................137

*C.* **The Anticompetitive Equilibrium Led to the Prevalence of Listing Agreements Which Do Not Provide for Reducing a Seller's Total Commission if a Lower Buyer-Broker Commission is Actually Paid** ...............................**143**

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

*D.* *The Anticompetitive Equilibrium Maintained and Extended by the Challenged Restraints Increased the Usage of Buyer-Brokers and the Commissions Paid to Them* ..................................................................................*149*

*E.* *The Challenged Restraints Impeded Discount Brokers and Other Actual and Potential Entrants from Disrupting the Anticompetitive Equilibrium*....*154*

*F.* *The Rise in Commissions Despite Declining Value and Costs Confirms that the Challenged Restraints Have Elevated Buyer-Broker Commissions Above the Competitive Level*....................................................................*156*

*G.* *Commission Rates in the 20 Covered MLSs Are Much Higher Than in Competitive Benchmark Nations, Confirming that the Challenged Restraints Have Elevated Buyer-Broker Commissions Above Their But-for Levels* ......*164*

*H.* *NAR's 2022 Rule Changes Will Not Eliminate the Anticompetitive Effects of the Challenged Restraints*................................................................*168*

**VI. THE CHALLENGED RESTRAINTS HAVE IMPACTED AND WILL IMPACT ALL OR NEARLY ALL CLASS MEMBERS** ................................................................*170*

**VII. THE ABSENCE OF PROCOMPETITIVE EFFECTS**................................................*174*

**APPENDIX A: DATA SOURCES AND PROCESSING**................................................*179*

*A.* *MLS Data* ............................................................................................*179*

*B.* *Defendants' Data* ................................................................................*181*

*C.* *Validation of Buyer-Broker Compensation Offers* ................................*181*

*D.* *Exclusions* ..........................................................................................*183*

*E.* *Net Price Transactions*........................................................................*184*

**APPENDIX B: RELEVANT FEATURES OF THE 20 COVERED MLSs AND CORPORATE DEFENDANTS**............................................................................................*185*

*A.* *Summary of the Prevalence of Relevant MLS Features*..........................*185*

*1. NAR Affiliation of the 20 Covered MLSs* ....................................185

*2. Non-Realtor Participation and Related Rules* ............................185

*3. Non-Mandatory NAR Rules* ......................................................186

*B.* *The 20 Covered MLSs*..........................................................................*190*

*1. Austin/Central Texas Realty Information Service ("ACTRIS MLS")* .......190

*2. ARMLS* ..................................................................................192

*3. Bright MLS*..............................................................................194

*4. Canopy MLS*............................................................................196

3

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

*5. Multiple Listing Service of the Columbus Board of REALTORS®, Inc. ("Columbus MLS")* ..................................................................................198

*6. Florida Gulf Coast MLS* ......................................................................199

*7. Greater Las Vegas Association of REALTORS® MLS ("GLVAR MLS")* .201

*8. Houston Association of REALTORS® MLS ("HAR MLS")* ....................203

*9. Metro MLS* .........................................................................................205

*10. MIAMI MLS* ....................................................................................207

*11. MLS Now* ..........................................................................................209

*12. NorthstarMLS* ..................................................................................212

*13. NTREIS MLS* ....................................................................................214

*14. Pikes Peak Multiple Listing Service ("PPMLS")* ...............................216

*15. Realcomp II* .....................................................................................217

*16. REColorado MLS* .............................................................................220

*17. San Antonio Board of REALTORS, Inc. MLS ("SABOR MLS")* ............221

*18. Stellar MLS* ......................................................................................223

*19. Triangle MLS* ...................................................................................226

*20. Wasatch Front Regional Multiple Listing Service, Inc.* .......................227

**C. Relevant Policies of the Corporate Defendants**.......................................**229**

**APPENDIX C: MLSS NOT EXCLUSIVELY OWNED OR OPERATED BY NAR MEMBER ASSOCIATIONS** .....................................................................**231**

**A. Overview of the Features Relevant to My Analysis**..............................**231**

**B. MLSs Not Exclusively Owned by Realtor Associations** ...........................**233**

**EXHIBIT A**.................................................................................................**251**

**EXHIBIT B**.................................................................................................**264**

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**ASSIGNMENT**

1.      Plaintiff counsel have asked me to perform an economic analysis of the evidence in this case to answer the following questions about the challenged conduct:

A. Can common economic evidence establish the existence of the relevant antitrust markets?

B. Can common economic evidence establish market power in any relevant markets?

C. Can common economic evidence establish whether the challenged conduct reduced competition and thereby caused the class to pay supracompetitive commissions?

D. Can common economic evidence establish whether the challenged conduct has any procompetitive benefits, and whether any such benefits outweigh any reduction in competition?

I understand that two classes are defined in this case, as follows:

**Damages Class**: Home sellers who paid a commission between March 6, 2015, and December 31, 2020, to a brokerage affiliated with a Corporate Defendant in connection with the sale of residential real estate listed on a Covered MLS and in a covered jurisdiction(s).[1] Excluded from the class are (i) sales of residential real estate for a price below $56,500, (ii) sales of residential real estate at auction, and (iii) employees, officers, and directors of defendants, the presiding Judge in

---

[1] A "Covered MLS" includes any MLSs that were NAR-affiliated and whose listings were maintained as of June 30, 2021 by the Covered MLS. The Covered MLSs and jurisdictions are: Bright MLS (Jurisdiction: Delaware, Maryland, District of Columbia, New Jersey, Pennsylvania, Virginia, West Virginia); Carolina/Canopy MLS (North Carolina, South Carolina); Triangle MLS (North Carolina); Stellar MLS (Florida); Miami MLS (Florida); Florida Gulf Coast (Florida); Metro MLS (Wisconsin); Yes MLS/MLS Now (Ohio, West Virginia); Columbus Realtors MLS (Ohio); Northstar MLS (Minnesota, Wisconsin); Wasatch Front/Utah Real Estate (Utah); REcolorado/Metrolist (Colorado); Pikes Peak MLS (Colorado); GLVAR MLS (Nevada); SABOR (Texas); ACTRIS/ABOR (Texas); HAR MLS (Texas); NTREIS (Texas); ARMLS (Arizona); and Realcomp II (Michigan). For purposes of the injunctive relief class, "Covered MLS" includes any successor of a Covered MLS.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

this case, and the Judge's staff.

**Injunctive Relief Class**: Current and future owners of residential real estate in the covered jurisdictions who are presently listing or will in the future list their home for sale on a Covered MLS. Excluded from the class are (i) sales of residential real estate for a price below $56,500, (ii) sales of residential real estate at auction, and (iii) employees, officers, and directors of defendants, the presiding Judge in this case, and the Judge's staff.[2]

## EXECUTIVE SUMMARY

2.      In Part I, I explain that two central features of the residential real estate industry in the U.S. are, and have been, the National Association of Realtors ("NAR") and a number of Multiple Listing Services ("MLSs").  The former is the largest trade association in the U.S., and through its member associations exclusively owns or operates the vast majority of the latter, which are databases of properties listed for sale in particular geographic regions.  Many NAR rules (including those challenged in this case) have been mandatorily imposed by NAR on NAR MLSs, including the 20 Covered MLSs in this case, while others have been voluntarily adopted by those 20 Covered MLSs, in either case making them binding on all brokers in those 20 Covered MLSs.  Other challenged NAR restraints have been mandatorily imposed (via its Code of Ethics) on all NAR Realtors in the Covered MLSs (nine of which do not admit brokers who are not NAR Realtors) or voluntarily adopted (in MLS Standards of Conduct) by those Covered MLSs that admit brokers who are not NAR Realtors, in either case making those additional NAR restraints binding on all brokers in those 20 Covered MLSs.  The history of NAR's restraints, including its current buyer-broker compensation rule and its predecessor rule for seller-broker subagents, are important to understanding the context for the restraints challenged in the present case.

3.      In Part II, I use the hypothetical monopolist test, the standard approach to market definition used by antitrust economists, to analyze the product and geographic markets relevant to the challenged restraints, in case it is ultimately determined that this is necessary.  I conclude that the relevant product market in this case is MLS broker services, which is consistent with the conclusions that the DOJ and FTC have reached about this same market.  As part of this analysis, I find that

---

[2] *See* Plaintiffs' Class Certification Brief.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

sales by non-MLS brokers, FSBO sales, and sales to home buying companies cannot prevent a hypothetical monopolist in MLS broker services from raising total commissions 5% or more above the competitive level. This product market definition is confirmed by evidence that MLS brokers were actually able to raise prices more than 5% above competitive levels. I further conclude that the best way to analyze the competitive effects of the challenged NAR rules is to examine a combined market for brokerage services to both sellers and buyers, both because MLS brokerage services are reasonably interchangeable with each other and because they are both subject to the same NAR Restraints.

4. I also conclude in Part II that the 20 Covered MLS regions are relevant geographic markets, which is consistent with the conclusions the DOJ and FTC have reached. This is confirmed by data indicating little overlap in sold listings between those geographic markets and with other data showing that sellers and buyers could not constrain a 5% increase in the price of MLS broker services in one MLS area by switching to utilizing MLS broker services in another MLS area. Moreover, I find that broadening or narrowing this defined geographic market would not alter the assessment of anticompetitive effects because the NAR restraints would apply both to any broadened or narrowed geographic markets.

5. In Part III, I find that the alleged conspirators have significant market power in all relevant markets. This conclusion is supported by the fact that the alleged conspirators have high market shares—100% in correctly defined markets, and 72-91% even in various incorrectly over-broadened markets—in relevant markets that exhibit significant barriers to rival entry and expansion. It is further confirmed by direct evidence that MLS brokers governed by the challenged restraints exercised both a market power over price and a market power to exclude rivals from these relevant markets.

6. In Part IV, I analyze the constraints and incentives created by the restraints challenged in this case. I find that the Buyer Broker Commission Rule and other NAR rules not only required sellers to make blanket offers of fixed compensation to buyer-brokers, but also constrained negotiation of buyer-broker and total commissions while incentivizing and facilitating steering. I also find that NAR Code of Ethics rules encouraged buyer-broker services to be represented as "free" in a way that incentivized overuse of buyer-brokers and helped maintain an anticompetitive equilibrium in which sellers made blanket offers to pay buyer-broker commissions and the threat of steering incentivized sellers to offer high buyer-broker commissions. I further find that NAR rules enabled MLS buyer-brokers to view, and filter listings by, the amount of the unilateral blanket commission offer, while

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

also restraining buyers' ability to become aware of the blanket offer, which both reinforced the other NAR rules constraining and disincentivizing negotiation of buyer-broker and total seller commissions, while also increasing steering incentives. Collectively these rules required that in all 20 Covered MLSs, home sellers had to make blanket unilateral offers of fixed compensation to all MLS buyer-brokers, while constraining the economic incentive and ability of buyers, sellers, or their brokers to negotiate buyer-broker commissions below this blanket offer, and limiting the knowledge buyers needed to try to negotiate lower commissions while typically making that blanket offer viewable and filterable by buyer-brokers. I also analyze the DOJ's proposed 2020 settlement with NAR, the 2021 withdrawal of that settlement, and subsequent 2022 changes to NAR rules.

7.     In Part V, I discuss the anticompetitive effects of the challenged restraints. These include that the challenged restraints maintained and extended an anticompetitive equilibrium in which: (1) sellers made blanket offers to pay buyer-broker commissions; (2) buyer-brokers were incentivized to steer buyers away from properties offering lower buyer-broker commissions, which maintained buyer-broker commissions at a supracompetitive level; (3) the great majority of listing agreements did not provide that the seller would pay a lower total commission if a lower-than-offered (or no) buyer-broker commission was actually paid; and (4) buyer-broker incentives to compete for buyer clients through lower commission rates were limited. As a result, discount brokers and other actual and potential entrants were impeded from disrupting the anticompetitive equilibrium, commission rates have risen despite technological changes that should have lowered those rates, and commission rates in the 20 Covered MLSs are much higher than in the competitive benchmark nations identified by Prof. Economides. Finally, I analyze NAR's 2022 rule changes and find that they will not eliminate the future anticompetitive effects of the challenged restraints.

8.     In Part VI, I explain that my analysis indicates that all or nearly all class members paid supracompetitive commissions as a result of the challenged conduct, meaning that all or nearly all class members were impacted by it. This is confirmed by Professor Economides' analysis of the competitive benchmarks of Australia, the Netherlands, and the U.K. Without the challenged restraints, all or nearly all class members would have paid commissions that reflected lower or no buyer-broker commission and the same or lower commission to seller-brokers. All or nearly all class members thus suffered injury as a result of the anticompetitive effect of the challenged restraints.

9.     In Part VII, I analyze whether the challenged restraints had any

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

procompetitive efficiencies and whether such efficiencies could have offset the anticompetitive harm those restraints caused. I have found no evidence that the challenged restraints produced any plausible procompetitive efficiency, much less that the benefits of any such efficiency could have possibly offset the anticompetitive harm from the challenged restraints. I also assess three procompetitive efficiencies which Defendants might advance. These include that the challenged restraints: (1) are necessary to achieve the informational benefits provided by MLSs, (2) promoted seller properties or rewarded buyer-broker efforts to find the best house for their buyers, or (3) have benefited buyers and sellers by allowing buyers to finance their buyer-broker costs. I conclude that any such efficiency claims would be deeply flawed and could not possibly offset the anticompetitive harm resulting from the challenged restraints.

10.     Discovery in this case is ongoing, and I reserve the right to update my opinions based on new evidence.

## QUALIFICATIONS

11.     I am the Petrie Professor of Law at Harvard University, where I teach and write about the economic analysis of antitrust law, health policy, and various other subjects. I am the author of various books, including *U.S. Antitrust Law & Economics*; co-author of *Global Antitrust Law & Economics*, *Global Competition Law & Economics*, and *Areeda, Elhauge & Hovenkamp, Vol X, Antitrust Law*; and editor of *The Research Handbook on the Economics of Antitrust Law* and *The Fragmentation of U.S. Health Care*. I am also the author of numerous articles on various topics involving the economic analysis of antitrust and other legal issues, including articles on monopolization and exclusionary agreements. My CV (attached as Exhibit A) lists all my publications, including all those in the past ten years. Exhibit B to this report describes my compensation and the cases in which I have testified as an expert in a trial or deposition in the past four years. I am being compensated at a rate of $1300 per hour for my work on this case, and my consulting firm, Legal Economics LLC, is being compensated $245-695 per hour for the work of my staff on this report. None of my compensation in this case is contingent upon the outcome of the case or any aspect of the case.

12.     I am also President of Legal Economics, LLC, which provides expert witnesses and support work on legal cases. I have testified as an expert witness on antitrust economics in dozens of federal cases. I have been qualified as an expert in antitrust economics by all twenty-one court opinions to rule on that question, and my economic and econometric methodologies have been repeatedly sustained and

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

found reliable. I have also served as an expert witness on antitrust economics before Congress, arbitration panels, and competition agencies in the US, EC, Korea, and Brazil. My testimony as an economics expert has spanned a wide range of topics, including reverse-payment settlements, other horizontal agreements, vertical agreements, mergers, monopolization and exclusionary conduct, price discrimination, health economics, patent economics, and contract economics. My clients have included leading corporations, law firms, and the United States government. I have been named one of the world's leading competition economists in the *International Who's Who of Competition Lawyers and Economists*.

13. I am a Member of Advisory Boards for the Journal of Competition Law & Economics, the Social Sciences Research Network on Antitrust Law & Policy, and the Social Sciences Research Network on Telecommunications & Regulated Industries. I have taken courses in economics, statistics, antitrust, and economic analysis of law, and I regularly read and use economic literature on antitrust economics, including books on industrial organization. I also regularly attend workshops on those and other topics regarding the economic analysis of law. I routinely use and teach economic analysis in my classes, including those that I regularly offer on antitrust law and economics.

## I. RESIDENTIAL REAL ESTATE INDUSTRY BACKGROUND

14. In this section, I discuss relevant background information about the United States ("U.S.") real estate industry generally and the Parties to this litigation specifically. While usage of the terms may vary, there are "two principal categories of real estate brokerage professionals," namely "agents" and "brokers," and agents generally work directly with consumers and brokers have the further ability to manage their own brokerages and hire and supervise agents.[3] Moreover, "States

---

[3] *See* "Competition in the Real Estate Brokerage Industry," "A Report by the Federal Trade Commission and the U.S. Department of Justice," April 2007, *available at*: https://www.justice.gov/atr/public/reports/223094.pdf (hereinafter cited as "2007 FTC-DOJ Real Estate Brokerage Industry Report") at pp. 4-5 ("Although the terms may vary by state, there are two principal categories of real estate brokerage professionals: 'agents' and 'brokers.' Generally speaking, agents work directly with consumers and brokers supervise agents. Typically, agents solicit listings, work with homeowners to sell their homes, and show buyers homes that are likely to match their preferences. Instead of working with customers directly, brokers often provide agents with branding, advertising, and other services that help the agents complete transactions. In terms of branding, the broker may invest in and create a brand or affiliate with a national or regional

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

require real estate brokers and agents to be licensed."[4] Typically, all payments are made to these licensed brokerage firms before any compensation can be passed through to individual agents.[5] The vast majority of buyers and sellers use a real estate broker when buying or selling a home, with approximately 89-90% of sellers

---

franchisor that provides a brand with certain reputational value and an advertising campaign. As for services, brokers may provide agents with computers, website hosting, office space, training, and marketing."). *See also* Zillow, "Real Estate Agent vs. Broker: What's the Difference?", *available at*: https://www.zillow.com/agent-resources/blog/real-estate-broker-vs-agent/; Redfin, "What is the Difference Between a Real Estate Agent, Broker, and Realtor®?", *available at*: https://www.redfin.com/guides/real-estate-agent-vs-broker.

[4] 2007 FTC-DOJ Real Estate Brokerage Industry Report at p 5. *See also* Zillow, "Real Estate Agent vs. Broker: What's the Difference?", *available at*: https://www.zillow.com/agent-resources/blog/real-estate-broker-vs-agent/; Redfin, "What is the Difference Between a Real Estate Agent, Broker, and Realtor®?", *available at*: https://www.redfin.com/guides/real-estate-agent-vs-broker.

[5] As explained in greater detail below in Parts I.A. and IV.A, for NAR MLSs, this is built into the NAR "Buyer Broker Commission Rule," which requires that "In filing property with the multiple listing service, participants make blanket unilateral offers of compensation to the other MLS participants and shall therefore specify on each listing filed with the service the compensation being offered by the listing broker to the other MLS participants." *See* National Association of Realtors, 2021 Handbook on Multiple Listing Policy 2021, *available at*: https://cdn.nar.realtor/sites/default/files/documents/2021_NAR_HMLP_210112.pdf (hereinafter cited as "2021 NAR Handbook") at p. 37 ("Section 1 Information Specifying the Compensation on Each Listing Filed with a Multiple Listing Service of an Association of Realtors® (Policy Statement 7.23)").

Within the context of the Buyer Broker Commission Rule, an "MLS participant" must be a licensed broker. *See id*. at pp. 3-4 ("Section 2 Definition of MLS Participant (Policy Statement 7.9)" stating that "Where the term Realtor® is used in this explanation of policy in connection with the word member or the word participant, it shall be construed to mean the Realtor® principal or principals, of this or any other association, or a firm comprised of Realtor® principals participating in a multiple listing service owned and operated by the board. Participatory rights shall be held by an individual principal broker unless determined by the association or MLS to be held by a firm. […] However, under no circumstances is any individual or firm, regardless of membership status, entitled to MLS membership or participation unless they hold a current, valid real estate broker's license and offer or accept cooperation and compensation to and from other participants or are licensed or certified by an appropriate state regulatory agency to engage in the appraisal of real property. […] (Amended 11/08).").

Further, the NAR Code of Ethics requires compensating the "principal brokers" in "cooperative transactions." *See* 2021 NAR Code of Ethics, available at: https://cdn.nar.realtor/sites/default/files/documents/2021-02-09-CEAM-PDF.pdf, Standard of Practice 16-15 ("Standard of Practice 16-15" stating that "In cooperative transactions REALTORS® shall compensate cooperating REALTORS® (principal brokers) and shall not compensate nor offer to compensate, directly or indirectly, any of the sales licensees employed by or affiliated with other REALTORS® without the prior express knowledge and consent of the cooperating broker.").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

engaging a real estate broker to assist with selling their home and approximately 87-88% of buyers engaging a real estate broker to assist with buying their home.[6] Throughout this Report, references to "brokers," "seller-brokers," and "buyer-brokers" includes agents acting on behalf of such brokers.

### A. NAR, MLSs, and the Sources of Challenged Restraints

15.     The National Association of Realtors ("NAR") was founded in 1908, and its founding "objective was 'to unite the real estate men of America for the purpose of effectively exerting a combined influence upon matters affecting real estate interests.'"[7]  NAR is now the largest trade association in the U.S., with 1.5 million members.[8]  NAR creates policies governing local Multiple Listing Services ("MLSs") through its Handbook on Multiple Listing Policies ("NAR Handbook").[9] NAR also establishes a Code of Ethics and specifically defines a "REALTOR®" to be a NAR member who "subscribes to its strict Code of Ethics."[10]  Throughout this

---

[6] "Highlights from 2021 Profile of Home Buyers and Sellers", National Association of REALTORS® (hereinafter, "2021 NAR Profile Highlights"), *available at*: https://cdn.nar.realtor/sites/default/files/documents/2021-highlights-from-the-profile-of-home-buyers-and-sellers-11-11-2021.pdf at pp. 8-9 ("Eighty-seven percent of buyers recently purchased their home through a real estate agent or broker" and "Ninety percent of home sellers worked with a real estate agent to sell their home"); "2020 Profile of Home Buyers and Sellers," National Association of REALTORS®, (hereinafter, "2020 NAR Profile"), *available at*: https://www.gaar.com/images/uploads/2020_NAR_Consumer_Profile.pdf at pp. 7-8 ("Eighty-eight percent of buyers recently purchased their home through a real estate agent or broker"; "Eighty-nine percent of home sellers worked with a real estate agent to sell their home.").

[7] https://www.nar.realtor/about-nar/history.

[8] *See* About NAR, *available at*: https://www.nar.realtor/about-nar ("America's largest trade association, representing 1.5 million members, including NAR's institutes, societies, and councils, involved in all aspects of the residential and commercial real estate industries."); https://www.nar.realtor/about-nar/history ("The Association became the largest trade association in the United States in the early 1970s, with over 400,000 members in 1975. Today, the National Association of REALTORS® has over 1.5 million members, 54 state associations (including Guam, Puerto Rico, and the Virgin Islands) and more than 1,130 local associations.").

[9] *See* 2021 NAR Handbook at p. iii (under "Preface," stating that "The *Handbook* includes model enabling provisions for insertion in association bylaws authorizing establishment of a multiple listing service and bylaws and rules and regulations for MLSs which will permit optimum service and efficiency.").

[10]     *See*     https://www.nar.realtor/membership-marks-manual/definition-of-realtor, "Definition of a REALTOR®" (stating that "REALTOR® is a federally registered collective membership mark which identifies a real estate professional who is member of the NATIONAL ASSOCIATION OF REALTORS® and subscribes to its strict Code of Ethics."). *See also* "2021

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Report, when I refer to a "Realtor" or "Realtors," it is in this sense of a NAR member who is subject to the NAR Code of Ethics.

16.     MLSs are databases of properties listed for sale in particular geographic regions.[11]  They are typically owned and/or operated by local realtor associations.  If an MLS is exclusively owned or operated by one or more NAR member associations, I will call it a "NAR MLS" because such MLSs have obligations to adopt certain NAR rules, as detailed below.  All 20 Covered MLSs in this case are NAR MLSs within this definition.[12]  It should be borne in mind that MLSs that do not meet the definition of a NAR MLS are nonetheless often controlled or partly owned by NAR member associations or Realtors and often expressly adopt NAR rules as well.[13]

17.     The NAR Handbook classifies rules and other provisions applicable to MLSs into four categories, "Mandatory," "Recommended," "Optional," and "Informational," and states, "Association and association-owned MLSs must conform their governing documents to the mandatory MLS policies established by the National Association's Board of Directors to ensure continued status as member boards and to ensure coverage under the master professional liability insurance program."[14]  I understand that the 20 MLSs at issue in this case are such "association and association-owned MLSs."[15]  Beginning in 2021, such NAR "MLSs [did] not need to submit their governing documents for review" any longer, but instead "need to certify that MLS' rules and regulations and bylaws contain all of the mandatory

---

Constitution and Bylaws of the NATIONAL ASSOCIATION OF REALTORS®," *available at*: https://cdn.nar.realtor/sites/default/files/documents/2021-Constitution-and-Bylaws-FINAL.pdf at p. 21 (Article I of the Bylaws, entitled "Membership").

[11] *See* https://www.nar.realtor/mls-online-listings ("The multiple listing service, or MLS, is a facility that allows real estate professionals to learn about and share local property listings in support of the interests of clients and customers. […] There are hundreds of MLSs across the country, which use a common set of rules to enable a smooth exchange of information in their local communities.").

[12] *See* Appendix B: Relevant Features of the 20 Covered MLSs and Corporate Defendants (Section A.1).

[13] *See* Appendix C: MLSs Not Exclusively Owned or Operated by NAR Member Associations.

[14] *See* 2021 NAR Handbook at p. iii & 2; *see also id.* at p. 2 (stating that when a NAR Handbook Rule is marked mandatory, "Adoption is necessary to ensure compliance with mandatory policies established by the [NAR] Board of Directors and coverage under the National Association's master professional liability insurance policy.").

[15] *See* Appendix B: Relevant Features of the 20 Covered MLSs and Corporate Defendants (Section A.1).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

provisions established by NAR."[16]

18.     Accordingly, NAR MLSs have to adopt mandatory NAR rules, such as the "Buyer Broker Commission Rule" being challenged in this case, which requires listing brokers to publish a blanket unilateral offer of compensation to buyer-brokers.[17]  To enforce such mandatory rules, MLSs can (and do) monitor listings for compliance with their rules and flag violators for removal or potential fines.[18]  MLSs also can (and do) often implement such mandatory rules by using their control over the interface of the listing submission, such as by designing their systems in a way that prevents brokers from entering listings without including the required blanket unilateral offer.[19]  The imposition of mandatory rules like the Buyer Broker

---

[16] *See* https://www.nar.realtor/about-nar/policies/mls-governing-documents-certification-process-information-and-resources.  The "FAQs" on this same page explain, in response to the question, "Do all MLSs need to certify their governing documents?" that "MLSs owned and/or operated by a local association of REALTORS® must certify their governing documents comply with NAR policy.  Regional MLSs are asked to certify their MLSs governing documents on behalf of the associations that are shareholders of their organization." *Id*.

[17] *See infra* Part IV.A.  Throughout this Report, I regularly use the term "Buyer Broker Commission Rule" to refer to Policy Statement 7.23 in the NAR Handbook.  *See* 2021 NAR Handbook, pp. 37-39 ("Section 1 Information Specifying the Compensation on Each Listing Filed with a Multiple Listing Service of an Association of Realtors® (Policy Statement 7.23)").  This Section is followed by a symbol indicating that it is "Mandatory." *See id*. at p. 2 of the pdf ("The compliance classification category of each item is denoted by the following symbol" and showing such symbols for "Mandatory," "Recommended," "Optional," and "Information" rules).

[18] *See, e.g.*, CANOPY_00032131 (



); MLSNow_002745 (2019 Yes-MLS email) at -47 (

).

[19] *See, e.g.*, STELLAR_0295183 (

) at -86 (

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Commission Rule on NAR MLSs thus makes it necessary for any broker to abide by such rules in order to utilize such MLSs.

19.     Further, broker access to any NAR MLS is conditioned on the broker complying with all applicable rules that that MLS adopted from the NAR Handbook (whether mandatory or not), and brokers who fail to comply can be fined or even lose access to the MLS.[20]  I understand that some jurisdictions may require, by law, that non-Realtors be allowed to list on a NAR MLS (Florida, Georgia, Alabama, California),[21] and NAR MLSs can voluntarily choose to allow non-Realtors to access the MLS.[22]  Of the 20 MLSs at issue in this case, 11 provide for non-Realtor MLS

---

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

); MLSNow_003322 (August 2017 email chain) at -23 (████████████████

██████████████████████████████████████████████████████████ ).

[20] *See* 2021 NAR Handbook at pp. 36-37 (providing enforcement guidelines that recommend that (1) rule violations "relating to listing information provided by a participant or subscriber" be disciplined by fines up to $2000; (2) rule violations "relating to IDX and VOW displays" be disciplined by fines up to $10,000 and suspension from MLS or from the MLS' lockbox key access for up to 3 months; and (3) rule violations "relating to cooperation with a fellow participant or subscriber, and mandatory submission of listings to the service" be disciplined by fines up to $15,000, suspension from MLS for up to 6 months, and termination from MLS or from use of the MLS' lockbox key access for 1 to 3 years.)

[21] *See* 2021 NAR Handbook at p. 11 ("Section 3 MLS Indoctrination Requirements Relating to Individuals Entitled to Participation without Association Membership (Policy Statement 7.38)" stating that "In processing the application of an individual entitled by law to MLS participation without Realtor® membership, the listing information and services shall be promptly provided upon completion of the following […]").  This Section is followed by a symbol indicating it is "Mandatory."  *See id.*

My understanding is that the jurisdictions where this is required by law are those states in the 11th Circuit (Florida, Georgia, and Alabama), as well as California, as a result of decisions in the following cases: Thompson v. Metropolitan Multi-List, Inc., 934 F.2d 1566 (11th Cir. 1991); Marin County Board of Realtors v. Palsson, 549 P. 2d 833 (Cal. 1976); Glendale Bd. of Realtors v. Hounsell, 139 Cal. Rptr. 830 (Cal. Ct. App. 1977).

[22] *See* 2021 NAR Handbook at p. 13 ("Section 10 Nonmember Broker/Appraiser Access (Policy Statement 7.55)" stating that "MLSs may, as a matter of local discretion, make limited participation in MLS available to all brokers (principals) and firms comprised of brokers (principals) and to licensed or certified real estate appraisers (principals) and firms comprised of licensed or certified real estate appraisers. Limitations on participatory rights, if any, shall be determined locally.").  This Section is followed by a symbol indicating it is "Optional."  *See id.*

*See also id.* at p. 10 ("Section 1 Procedures to Be Followed by an Association of Realtors® Upon Demand for Access to the Association's Multiple Listing Service without Association

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

access.[23]  However, non-Realtor MLS brokers are subject to the same MLS rules that the NAR MLS adopted for other brokers (including, necessarily, the NAR "Mandatory" rules, as well as any other model rules in the NAR Handbook which the MLS adopts), and NAR imposes mandatory rules providing that its MLS must require non-Realtor MLS brokers to agree to comply with the MLS's rules and regulations and complete any course of instruction about what those rules and regulations are.[24]

20.     Realtors in all MLSs (whether or not they are NAR MLSs) also have to comply with NAR's Code of Ethics.  The NAR Handbook provides that "Adherence to the Code of Ethics of the National Association of Realtors® shall be a privilege and obligation of Realtors® and Realtor-Associate®s."[25]  Realtors who fail to comply with NAR's Code of Ethics risk losing the ability to call themselves Realtors, because NAR defines a "REALTOR®" to be a NAR member who

---

Membership (Policy Statement 7.25)" stating that "In states other than California, Georgia, Alabama, and Florida, whenever an association is confronted with a request or demand by an individual for access to the association's multiple listing service without membership in the association, member associations are advised that the association should immediately advise both the state association and the Member Policy Department of the National Association, and the recommended procedures will be provided to the member association with any other pertinent information or assistance."). This Section is followed by a symbol indicating it is "Mandatory." *See id*.

[23] *See* Appendix B: Relevant Features of the 20 Covered MLSs and Corporate Defendants (Section A.2).

[24] *See* 2021 NAR Handbook at p. 51 ("A. Model Association Bylaw Provisions Authorizing MLS as a Committee of an All-Realtor® Association) at pp. 52-54, 55-56, 96-97 (imposing a mandatory rule on NAR MLSs that if they admit non-Realtor members, they must require evidence that any non-Realtor applicant "agrees to complete a course of instruction (if any) covering the MLS rules and regulations […] and shall agree that if elected as a participant, he will abide by such rules and regulations ... *(Amended 11/08)*"); *id*. p. 99 ("E. Model Bylaws for a Multiple Listing Service Separately Incorporated but Wholly-owned by an Association of Realtors®") at pp. 100-102 (imposing a mandatory rule on NAR MLSs that if they admit non-Realtor members, "The nonmember principal of any firm, partnership, corporation, or the branch office manager designated by said firm, partnership, or corporation as the participant . . . shall accept all obligations to the service for the participant's firm, partnership, or corporation, and for compliance with the bylaws and rules and regulations of the service by all persons affiliated with the participant who utilize the service. (Amended 11/08)"); *id,* p.11 (imposing a mandatory rule on NAR MLSs that applications by non-Realtor brokers for MLS participation are subject to "MLS Indoctrination Requirements" that require the applicant to complete "any required MLS orientation on MLS bylaws, MLS rules and regulations, other MLS related policies or procedures").

[25] 2021 NAR Handbook at p. 31.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

"subscribes to its strict Code of Ethics,"[26] and stresses in its Constitution and Bylaws that the trademark REALTORS® can be used only to the extent licensed by the NAR and that it licenses NAR MLSs to do so only to the extent that brokers are willing to abide by the Code of Ethics.[27] Further, NAR's Code of Ethics and Arbitration Manual provides that Realtor members who violate the Code of Ethics can be punished by fines up to $15,000 or by suspension or termination of the Realtor membership that allows them to hold themselves out as Realtors.[28]

21. All NAR local Realtor associations are also required to adopt the NAR Code of Ethics. NAR's Constitution and Bylaws expressly state that "Each Member Board shall adopt the Code of Ethics of the National Association as a part of its governing regulations for violation of which disciplinary action may be taken."[29] NAR's Constitution and Bylaws further provide, "Any Member Board which shall neglect or refuse to maintain and enforce the Code of Ethics with respect to the business activities of its members may, after due notice and opportunity for hearing, be expelled by the Board of Directors from membership in the National Association."[30] The meaning of the Code of Ethics provisions is explained by NAR's Standards of Practice and Case Interpretations.[31] Violations of the Code of

---

[26] *See* https://www.nar.realtor/membership-marks-manual/definition-of-realtor, "Definition of a REALTOR®," (stating that "REALTOR® is a federally registered collective membership mark which identifies a real estate professional who is member of the NATIONAL ASSOCIATION OF REALTORS® and subscribes to its strict Code of Ethics."); 2021 NAR Constitution and Bylaws, at Title Page ("REALTOR® is a registered collective membership mark which identifies real estate professionals who are members of the NATIONAL ASSOCIATION OF REALTORS® and subscribe to its strict Code of Ethics.").

[27] *See* 2021 NAR Constitution and Bylaws, at pp. 24-25, 28.

[28] 2021 NAR Code of Ethics and Arbitration Manual at pp. 2-3.

[29] *See* "2021 Constitution and Bylaws of the NATIONAL ASSOCIATION OF REALTORS®", Article IV, Code of Ethics, Section 1, at p.23 (hereinafter cited as "2021 NAR Constitution and Bylaws"), *available at*: https://cdn.nar.realtor/sites/default/files/documents/2021-Constitution-and-Bylaws-FINAL.pdf.

[30] *Id.* Section 2. *See also* Milligan Dep. at 44:15-25 (███████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ███████████████).

[31] *See* 2021 NAR Code of Ethics and Arbitration Manual at p. 27, *available at*: https://cdn.nar.realtor/sites/default/files/documents/2021-02-09-CEAM-PDF.pdf ("57. Case Interpretations are official Policy" stating that "The Case Interpretations of the Code of Ethics approved by the National Association's Professional Standards Committee and published in Interpretations of the Code of Ethics illustrate and explain the principles articulated in the Articles

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Ethics can be punished by fines, suspension or termination of Realtor membership, or the suspension or termination of MLS access.[32]

22.     NAR's Code of Ethics thus binds all Realtor members of an MLS.  For those MLSs that have non-Realtor members, the NAR Handbook also includes a set of "Standards of Conduct for MLS Participants" that mirror some of the provisions reflected in NAR's Code of Ethics and Standards of Practice, and the Handbook indicates an MLS should adopt these MLS Standards of Conduct only if the MLS has non-Realtor members.[33]  The NAR Handbook makes it optional for MLSs to adopt these MLS Standards of Conduct but provides that, if adopted, they cannot be modified.[34]  Thus, while Realtor members are always bound by the Code of Ethics, non-Realtor members are typically not, but are bound by the MLS Standards of Conduct that the MLS has adopted.[35]  However, at least one MLS does make the NAR Code of Ethics applicable to both Realtors and non-Realtors.

23.     To analyze the NAR restraints that are being challenged in this case, it

---

and Standards of Practice. While a Realtor® cannot be found in violation of a Standard of Practice or a Case Interpretation, both are official statements of National Association policy and are not merely advisory. Both can be cited by complainants in support of alleged violations of Articles and by hearing panels in support of decisions that an Article(s) has been violated. (Adopted 11/10)").

[32] 2021 NAR Code of Ethics and Arbitration Manual at pp. 2-3 (stating that "a wide range of sanctions are available to vindicate violations of the Code" including:

"(d) Appropriate and reasonable fine not to exceed $15,000 *(Amended 5/13)*";

"(e) Membership of individual suspended for a stated period not less than thirty (30) days nor more than one (1) year  […] *(Amended 11/13)*";

"(f) Expulsion of individual from membership with no reinstatement privilege for a specified period of one (1) to three (3) years [...] *(Amended 4/96)*").

"(g) Suspension or termination of MLS rights and privileges may also be utilized. Suspension of MLS services may be no less than thirty (30) days nor more than one (1) year; termination of MLS services shall be for a stated period of one (1) to three (3) years; *(Amended 5/02)*").

[33] 2021 NAR Handbook at p. 79-83 & n.*.

[34] 2021 NAR Handbook at p. 79-83 & n.*.

[35] *See* GLVAR_0129013 (2016) ("███████████████████████████████████████████████████████████████████████████████████████████); *see also* NARSITZER0000501489.  At least one MLS does make the NAR Code of Ethics applicable to both Realtors and non-Realtors.  *See* GSMLS Rules and Regulations, Section 2.2 (Feb. 26, 2022), https://forms.gsmls.com/RulesRegs.pdf?v=28674794945 ("Applicants for participation, as Participants or Subscribers from non-REALTOR offices and non-REALTOR Subscribers from REALTOR offices, shall be bound by all Rules and Regulations applicable to participation by REALTORS and expressly agree: To be bound by the Code of Ethics of NAR and NJAR. …").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

does not matter whether the NAR Code of Ethics applies to non-Realtor members. Of the 20 MLSs at issue in this case, nine do not even allow non-Realtor participation,[36] and thus all their MLS brokers are bound by the Code of Ethics. For the other eleven MLSs at issue that do admit some non-Realtors, all of the challenged restraints that were imposed by the NAR Code of Ethics were duplicated either in mandatory NAR Handbook rules applicable to all MLS members or in optional MLS Standard of Conduct rules specifically applicable to non-Realtors that were adopted by all eleven of these MLSs.[37] Non-Realtor MLS participants in the 20 MLSs at issue are thus subject to all the challenged restraints in this case, regardless of the applicability of the NAR Code of Ethics.

24.     Moreover, even if the inapplicability of the Code of Ethics to non-Realtor MLS participants in some Covered MLSs meant that they were not subject to every single one of the challenged restraints, it would not alter my analysis for several reasons. First, those non-Realtor MLS participants would still be subject to all the other restraints, including the core Handbook rules, which would still have the anticompetitive effects discussed in Parts IV and V, and they would thus still be subject to the conspiracy. Second, there is evidence suggesting that non-Realtor participation in those eleven MLSs is minimal, possibly only 0.4-2.0%.[38] Third, the

---

[36] *See* Appendix B: Relevant Features of the 20 Covered MLSs and Corporate Defendants (Section A.2).

[37] *See infra* Part IV; Appendix B (Section A.3). The only technical exception is that the Code of Ethics provisions that encouraged brokers to represent buyer-broker services as free do not have an explicit duplicative provision, but whether or not those provisions are binding on non-Realtors, they had an informational effect on the market and also encouraged non-Realtors to make the same representation. *See infra* Part IV.B..

[38]



HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

NAR Code of Ethics would still apply to all *class* transactions, because the class is limited to Corporate Defendant-associated transactions and the Corporate Defendants all required their brokers/agents to join NAR and follow its Code of Ethics.[39]  Fourth, even if one of the many challenged NAR restraints did not apply to all MLS participants at some particular MLS, the impact of that would be taken into account by my analysis because my analysis shows a separate impact on prices for each Covered MLS and thus already takes into account any variation in the set of restraints imposed at any such MLSs.[40]

25.    The evidence indicates that only about 3% of U.S. MLSs are not NAR MLSs.[41]  Of these MLSs, many are partly owned or operated by local Realtor associations or are owned by Realtor-aligned brokerages and did adopt at least some of the challenged restraints at issue in this case, including the Buyer Broker Commission Rule.[42]  Most of these MLSs do not overlap geographically with the coverage area of the 20 MLSs at issue in this case, and most have either adopted the Buyer Broker Commission Rule and/or are very small.[43]  Further, as already noted



[39] *See* Appendix B (Section C).

[40] *See infra* Section II.B.4, II.C.2, V.G.

[41] *See* ███████████████████████████████████████ *See also* Appendix C: MLSs Not Exclusively Owned or Operated by NAR Member Associations.

[42] *See* Appendix C. *See also* the discussion of the Buyer Broker Commission Rule in Parts I.B and IV.A below.

[43] *See* Appendix C.  Of the 20 Covered MLSs at issue in this case, 14 are not in the same state as one of the 22 identified MLSs that are not exclusively owned or operated by NAR member associations.  *See id.* (only exceptions among the 20 Covered MLSs are Bright MLS, Carolina/Canopy MLS, Yes MLS/MLS Now, Realcomp II, GLVAR, and ARMLS).  Only three of the covered MLSs have overlapping coverage areas with any of the 22 identified MLSs that are

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

previously, even in non-NAR MLSs, Realtors are—by definition—required to comply with NAR's Code of Ethics.

26.     According to NAR, approximately 89-91% of real estate transactions are facilitated through MLSs, making access to MLSs of vital importance for brokers to succeed.[44]  These MLS listings serve as the main source of information about homes available for sale.[45]  Thus, because NAR MLSs must require brokers who access MLSs to comply with mandatory Handbook Rules and with any adopted optional Handbook Rules, and to also comply with either the NAR Code of Ethics or adopted MLS Standards of Conduct, broker compliance with the challenged NAR restraints is vital for brokers to succeed in any NAR MLSs, including the 20 at issue in this case.  In addition to the public-facing information contained in MLS listings and disclosed on such portal websites, during the Damages Class Period certain information in MLS listings was viewable only by real estate brokers, including in most MLSs, the compensation offered to cooperating buyer-brokers.[46]

27.     The standard practice in the U.S. has been for the seller and seller-broker to agree to a commission that is calculated as a percentage of the home's sale price in a listing agreement.[47]  Listing brokers are required to disclose to sellers the

---

not exclusively owned or operated by NAR member associations.  *See id*. (only exceptions among the 20 Covered MLSs are Bright MLS, Realcomp II, and GLVAR).  Two of these three have minimal overlap (Bright MLS and GLVAR).  *See id*.

Of the three identified MLSs not exclusively owned or operated by NAR member associations that have overlapping coverage areas with any of the 20 Covered MLSs, two have adopted the Buyer Broker Commission Rule (Garden State MLS and MiRealSource) and it is unclear whether the other (Mesquite Multiple Listing Service) has done so.  *See id*.  This latter MLS is not reflected in the top 200 MLSs by number of Participants and serves the Mesquite, NV area, a city with a current population below 25,000.  *See id*.

[44] 2021 NAR Profile Highlights at p. 9 ("Eighty-nine percent of sellers listed their homes on the Multiple Listing Service (MLS), which is the number one source for sellers to list their home."); 2020 NAR Profile at p. 8 ("Ninety-one percent of sellers listed their homes on the Multiple Listing Service (MLS)").

[45] *See* Complaint, U.S. v. National Association of Realtors, Nov. 19, 2020, *available at*: https://www.justice.gov/atr/case-document/file/1338661/download at paragraph 10 ("In each area an MLS serves, the MLS will include or "list" the vast majority of homes that are for sale through a residential real estate broker in that area. In most areas, the local MLS provides the most up-to-date, accurate, and comprehensive compilation of the area's home listings.").

[46] *See infra* Part IV.C.

[47] *See*, *e.g.*, RMLLC-WDMO-00330452 at -55 (RE/MAX "Exclusive Right to Sell Brokerage Agreement") (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮)

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

amount of this commission that will be used as a cooperation payment to the buyer's broker in the event of a completed sale.[48] These disclosures are often, but not always, reflected in the terms of listing agreements between sellers and seller-brokers.[49] The commission being offered by sellers and seller-brokers to cooperating buyer-brokers is disseminated via MLS listings to participating brokers and agents on the MLS.[50]



); ARMLS_0046939 at -41 

).

[48] *See* 2021 NAR Code of Ethics, Standard of Practice 1-12 ("When entering into listing contracts, REALTORS® must advise sellers/landlords of: 1) the REALTOR®'s company policies regarding cooperation and the amount(s) of any compensation that will be offered to subagents, buyer/tenant agents, and/or brokers acting in legally recognized non-agency capacities […]"). *See also* NARSITZER0000749480 (

).

[49] *See, e.g.*, RMLLC-WDMO-00330452 (RE/MAX "Exclusive Right to Sell Brokerage Agreement") at -55 (

). *See also* Niersbach Dep. at 182:17-183:1 (

).

[50] See the discussion of the Buyer Broker Commission Rule below in Par IV.A. *See also* Mark S. Nadel, "A Critical Assessment of the Traditional Residential Real Estate Broker Commission Rate Structure (Abridged)" 5 Cornell Real Estate Review 26 (2007), *available at*: https://ecommons.cornell.edu/bitstream/handle/1813/70619/2007_26_47_Nadel.pdf at 27 ("Yet the listing broker usually retains only half of that fee (three percent) for providing those services

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Until a (now-withdrawn) recent settlement with the DOJ, and consequent changes to the 2022 NAR Handbook and 2022 NAR Code of Ethics, buyer-brokers were explicitly permitted by the NAR Code of Ethics to represent to their clients that their services were "free" because of this arrangement.[51]

28.      But rather than render buyer-broker services "free", the anticompetitive equilibrium in which sellers pay buyer-broker commissions serves to inflate the price of those services through at least two mechanisms, as discussed in Parts IV and V.  First, because sellers and seller-brokers, rather than buyers, pay the buyer-brokers, buyers have a significantly reduced incentive to negotiate the commission amount paid to their brokers.  This disincentive has been reinforced by challenged NAR rules that have constrained and disincentivized such negotiations, that prevented disclosure of buyer-broker commission offers to buyers, and that represented to buyers that they get buyer-broker services for free.  Second, because buyer-brokers have incentives to steer buyers towards homes with higher commissions, this current practice incentivizes each seller to offer a supra-competitive buyer-broker commission in order to entice buyer-brokers to steer buyers towards that seller's property and to avoid having buyers steered toward other

---

and generally offers the other three percent to the broker of the agent who finds a buyer."); Redfin, https://www.redfin.com/guides/how-much-is-real-estate-agent-commission-buyer-seller  ("Who pays the commission? […] If you're selling a home, you usually pay commission to both your listing agent and the buyer's agent when your home sale closes.").
    Buyers sometimes enter into written agreements with their buyer-brokers, some of which may provide for the buyer-broker to be paid a minimum commission by the buyer in the event the seller does not pay the buyer-broker's commission.  *See, e.g.,* BHHACN-ILe-0044604 (█████████████████████████████████████████████████████████████████████████████████████████████████████████████); BHHACN-ILe-0027848 (███████████████████████████████████████████████████████████████████████); BHHPenFed-ILe-0001301 at -02 (Berkshire Hathaway HomeServices "Exclusive Right to Represent Buyer Agreement" dated July 10, 2020) ██████████████████████████████████████████████████████████████).  However, it is not clear how frequent such contracts are. Moreover, even for those buyers who had such contracts, all or the lion's share of the minimum commission owed to their buyer-brokers would still be covered by the seller-broker's cooperation payments to buyer-brokers, given the high levels of such cooperation payments in the Covered MLSs.  *See infra* Section II.B.4, II.C.2, V.G.  Thus, the incentive effects created by the challenged restraints would continue to apply.  *See infra* Parts IV-V.
    [51] *See infra* Parts IV.C, IV.E, V.H.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

sellers who offer a higher buyer-broker commission. If buyers paid their own brokers, buyer-brokers would instead compete for buyers by offering lower commissions that would apply to any home that buyer-broker showed to a buyer and thus would not give buyer-brokers any incentives to steer buyers to or away from any particular sellers.

### B. History of Anticompetitive Conduct: From Subagency to the Buyer Broker Commission Rule

29.     The current anticompetitive equilibrium results from, and is reinforced by, the NAR Buyer Broker Commission Rule being challenged in this case, the first version of which became effective in 1993.[52] Subsequent modifications of the Buyer Broker Commission Rule were reflected in the 1997 and the 2006 NAR Handbooks.[53] The current version of this Rule requires a seller-broker when listing a home on an MLS to make a blanket unilateral offer of fixed compensation to other MLS agents working with a buyer (whether they are acting as buyer-brokers or as subagents to the seller-broker) and limits the ability of buyers or their agents to negotiate below any blanket offer.[54]

30.     Prior to the adoption of this rule, real estate agents working with buyers almost always acted as subagents of the listing broker and were paid by the seller

---

[52] *See* NARSITZER0000019614 (1993 NAR "Handbook on Multiple Listing Policy") at -43-44 ("Section 7.23 Information Specifying the Compensation on Each Listing Filed with a Multiple Listing Service of a Board of REALTORS®" stating that "In filing a property with the Multiple Listing Service of a Board of REALTORS® the Participant makes a blanket unilateral offer of cooperation to the other MLS Participants, and shall therefore specify on each listing filed with the Service the compensation being offered by the listing broker to the other MLS Participants. […] (Revised 4/92)").

[53] *See* NARSITZER0000020078 (1997 NAR "Handbook on Multiple Listing Policy") at -109 ("Section 7.23" stating that "In filing a property with the Multiple Listing Service of a Board of REALTORS®, the Participant makes a blanket unilateral offer of compensation to the other MLS Participants and shall therefore specify on each listing filed with the Service the compensation being offered by the listing broker to the other MLS Participants. […] *(Revised 11/96)*"); NARSITZER0000020945 (2006 NAR "Handbook on Multiple Listing Policy") at -80 ("Section 1 Information Specifying the Compensation on Each Listing Filed with a Multiple Listing Service of an Association of REALTORS®" stating that "In filing property with the multiple listing service, participants make blanket unilateral offers of compensation to the other MLS participants and shall therefore specify on each listing filed with the service the compensation being offered by the listing broker to the other MLS participants. […] *(Revised 11/04)*").

[54] *See infra* Part IV.A.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

and seller-broker as the seller's subagent.[55]  This prior practice of seller subagency reflected an earlier NAR rule that required seller-brokers to "make[] a blanket unilateral offer of subagency to the other MLS Participants, and shall therefore specify on each listing filed with the Service the subagency compensation being offered by the listing broker to the MLS Participants."[56]  Under the subagency system, "all agents, even those working with buyers (as subagents), would be fiduciaries of sellers."[57]  The prior rule also provided that an "agent representing potential purchasers cannot assume that the offer of subagency compensation also applies to buyer agents"[58] and "did not permit home buyers to have a fiduciary relationship with an agent [acting as a subagent]."[59]  The practice of subagency was

---

[55] ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

[56] *See* NARSITZER0000019457 (1980 NAR "Handbook on Multiple Listing Policy," "As revised through November, 1988") at -69 ("Section 7.23 Information Specifying the Compensation on Each Listing Filed with a Multiple Listing Service of a Board of REALTORS®" stating that "In filing a property with the Multiple Listing Service of a Board of REALTORS®, the Participant makes a blanket unilateral offer of subagency to the other MLS Participants, and shall therefore specify on each listing filed with the Service the subagency compensation being offered by the listing broker to the other MLS Participants.  […] An agent representing potential purchasers cannot assume that the offer of subagency compensation also applies to buyer agents.").

[57] "The Agency Mess" by Stephen Brobeck, Consumer Federation of America, Jan. 14, 2019, *available at*: https://consumerfed.org/wp-content/uploads/2019/01/the-agency-mess-home-buyer-and-seller-confusion-report.pdf at p. 4 ("In the 1970s, NAR's chief legal counsel proposed and successfully persuaded NAR members to adopt a solution in which all agents, even those working with buyers (as subagents), would be fiduciaries of sellers. While subagency had been widely practiced for many decades before this time, now the NAR formally and explicitly adopted it as the basis for all relationships between its members and its customers.").

[58] *See* NARSITZER0000019457 (1980 NAR "Handbook on Multiple Listing Policy," "As revised through November, 1988") at -69 ("Section 7.23" stating that "An agent representing potential purchasers cannot assume that the offer of subagency compensation also applies to buyer agents.").

[59] "The Agency Mess" by Stephen Brobeck, Consumer Federation of America, Jan. 14, 2019, *available at*: https://consumerfed.org/wp-content/uploads/2019/01/the-agency-mess-home-buyer-and-seller-confusion-report.pdf at p. 4 ("However, [subagency] did not permit home buyers to have a fiduciary relationship with an agent. A new group of agents ('exclusive buyer brokers') did emerge that worked exclusively with buyers as their fiduciary agents. Yet, partly because of discrimination by other agents, they had difficulty surviving, and only a handful still practice today." (endnotes omitted)).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

formalized by NAR in the 1970s, but had been widely practiced for decades prior.[60]

31.    The practice of subagency encountered challenges when "[i]n the 1980s, courts began finding that brokers could inadvertently create agency relationships with buyers simply by advising them during negotiations, or providing other services that might lead buyers to believe they were being represented."[61] These findings potentially exposed brokers to legal liability for claims relating to "undisclosed dual agency," to "vicarious liability" for subagents, and to "professional negligence claims" by buyers.[62]    Moreover, "opposition to the subagency system was mounted through litigation, criticism by the Federal Trade Commission, consumer group opposition, and press exposure", and "[b]y the mid-1990s, the NAR abandoned its strong defense of this system."[63]

32.    The Buyer Broker Commission Rule maintained the general arrangement under which sellers generally paid fees to real estate agents working with buyers, but it eliminated mandatory subagency.  The Buyer Broker Commission Rule did so by replacing language requiring "offers of subagency" with "offers of cooperation" and eliminated the final sentence of the rule in order to make such mandatory offers applicable to buyer-brokers as well.[64]    A subsequent revision of

---

[60] "The Agency Mess" by Stephen Brobeck, Consumer Federation of America, Jan. 14, 2019, *available at*: https://consumerfed.org/wp-content/uploads/2019/01/the-agency-mess-home-buyer-and-seller-confusion-report.pdf at p. 4 ("In the 1970s, NAR's chief legal counsel proposed and successfully persuaded NAR members to adopt a solution in which all agents, even those working with buyers (as subagents), would be fiduciaries of sellers. While subagency had been widely practiced for many decades before this time, now the NAR formally and explicitly adopted it as the basis for all relationships between its members and its customers.").

[61] "From subagency to non-agency: a history" by Matt Carter, Feb. 17, 2012, https://www.inman.com/2012/02/17/from-subagency-non-agency-a-history/.

[62] "From subagency to non-agency: a history" by Matt Carter, Feb. 17, 2012, https://www.inman.com/2012/02/17/from-subagency-non-agency-a-history/ ("If brokers or their agents owed buyers fiduciary duties, that meant brokers were liable to claims of undisclosed dual agency. Sellers might have "vicarious liability" for the actions of subagents working on their behalf. Buyers could file professional negligence claims.").

[63] "The Agency Mess" by Stephen Brobeck, Consumer Federation of America, Jan. 14, 2019, *available at*: https://consumerfed.org/wp-content/uploads/2019/01/the-agency-mess-home-buyer-and-seller-confusion-report.pdf at p. 4 ("More effective opposition to the subagency system was mounted through litigation, criticism by the Federal Trade Commission, consumer group opposition, and press exposure. By the mid-1990s, the NAR abandoned its strong defense of this system and worked with local industry groups to find alternatives.").

[64] *Compare* NARSITZER0000019614 (1993 NAR "Handbook on Multiple Listing Policy") at -43-44 ("Section 7.23" stating that "In filing a property with the Multiple Listing

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

the rule, reflected in the 1997 NAR Handbook, modified "offers of cooperation" to "offers of compensation."[65]  The current rule has since 2004 required seller brokers to "make blanket unilateral offers of compensation to the other MLS participants and shall therefore specify on each listing filed with the service the compensation being offered by the listing broker to the other MLS participants."[66]  While the 1992 announcement of the end of mandatory subagency noted that ███████████ ███████████████████████████████████,"[67] after the introduction of the Buyer Broker Commission Rule, agents working with buyers increasingly served as buyer-brokers rather than

---

Service of a Board of REALTORS® the Participant makes a blanket unilateral offer of cooperation to the other MLS Participants, and shall therefore specify on each listing filed with the Service the compensation being offered by the listing broker to the other MLS Participants.  This is necessary because the cooperating Participant has a right to know what his compensation shall be prior to commencing his endeavor to sell. (Revised 4/92)" [asterisk note omitted]) *with* NARSITZER0000019714 (1992 NAR "Handbook on Multiple Listing Policy) at -43-44 ("Section 7.23" stating that "In filing a property with the Multiple Listing Service of a Board of REALTORS®, the Participant makes a blanket unilateral offer of subagency to the other MLS Participants, and shall therefore specify on each listing filed with the Service the subagency compensation being offered by the listing broker to the other MLS Participants.  This is necessary because the subagent has a right to know what his compensation shall be prior to commencing his endeavor to sell.  An agent representing potential purchasers cannot assume that the offer of subagency compensation also applies to buyer agents." [asterisk note omitted]).

[65] *Compare* NARSITZER0000020078 (1997 NAR "Handbook on Multiple Listing Policy") at -109 ("Section 7.23" stating that "In filing a property with the Multiple Listing Service of a Board of REALTORS®, the Participant makes a blanket unilateral offer of compensation to the other MLS Participants and shall therefore specify on each listing filed with the Service the compensation being offered by the listing broker to the other MLS Participants. […] *(Revised 11/96)*") *with* NARSITZER0000020199 (1996 NAR "Handbook on Multiple Listing Policy") at -230 ("Section 7.23" stating that "In filing a property with the Multiple Listing Service of a Board of Realtors the Participant makes a blanket unilateral offer of cooperation to the other MLS participants, and shall therefore specify on each listing filed with the Service the compensation being offered by the listing broker to the other MLS Participants. […] (Revised 4/92)").

[66] *See* 2021 NAR Handbook at p. 37 ("Section 1 Information Specifying the Compensation on Each Listing Filed with a Multiple Listing Service of an Association of Realtors® (Policy Statement 7.23)" stating that "In filing property with the multiple listing service, participants make blanket unilateral offers of compensation to the other MLS participants and shall therefore specify on each listing filed with the service the compensation being offered by the listing broker to the other MLS participants. […] *(Revised 11/04)*").

[67] ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

as seller subagents, to the point subagency has virtually disappeared.[68]

33.     The Buyer Broker Commission Rule thus maintained and extended the incentives for steering and the disincentives for buyers to attempt to negotiate broker commissions that went with the prior arrangement under which sellers paid agent and subagent commissions. Indeed, a 1983 FTC Staff Report suggests that this prior system incentivized steering in much the same way as under the Buyer Broker Commission Rule:

> Brokers' short-run profit maximizing interest relates to the amount of the split they will obtain if they are the procuring cause in the sale of the particular house. For example, a "discount" broker who charges 4 percent and splits 50/50 with the cooperating broker is, in effect, offering the cooperating broker 2 percent if he or she procures the buyer. A "traditional" broker who charges 6 percent and splits 50/50 is, in effect, offering the cooperating broker 3 percent of the transaction if he or she procures the buyer. From the cooperating broker's point of view, the traditional broker in this example is paying him or her 50 percent more than the discount broker. In many cases the differential is even greater. […] Brokers appear to steer buyers toward the house listed by the traditional, full-commission broker.[69]

### C. Relevant Terminology

34.     Throughout this Report, except when describing the distinction between true buyer-brokers and subagents, I use the term "buyer-broker" generically to refer to all cooperating brokers working with buyers, regardless of their agency

---

[68]

[69] NARSITZER0000165422 at p. 39 ("The Residential Real Estate Brokerage Industry," Federal Trade Commission Staff Reports, Los Angeles Regional Office Staff Report: Volumes I and II and The Butters Report, December 1983 (footnote omitted)).

relationship.  My use of the term "buyer-broker" thus includes cooperating brokers acting as buyer-brokers, transaction brokers, and subagents.  During the last decade subagency has been practically nonexistent.[70]  Transaction brokers (also called facilitators) are relatively rare nationally.[71]  In most states, transaction brokers are not permitted by law, and in many other states where transaction brokers are permitted, they are not the default arrangement.[72]  However, transaction brokers are prevalent in Florida, where by statute the default arrangement with consumers is the transaction brokerage.[73]  I understand that, in contrast to single agents representing a buyer or a seller, transaction brokers have no duty of loyalty or obedience to consumers, and only limited duties of disclosure and confidentiality.[74]  Despite the differences in the potential for legal liability and services provided by transaction brokers and buyer-brokers, they receive identical offers of cooperative compensation for nearly all MLS listings.[75]  Indeed, in the three Florida MLSs at issue in this case, offered commissions to transaction brokers were equal to or greater than the commissions offered to buyer-brokers 99.67% of the time for FGCMLS, 98.78% of the time for MiamiMLS, and 99.66% of the time for Stellar from March 6, 2015 to

[70] *See supra* Section I.B.

[71] ████████████████████████████████████████████████████

[72] *See* "Does Transaction Brokerage in Florida Serve the Interest of Home Buyers and Sellers?"  Stephen Brobeck, Consumer Federation of America, Jan. 2022, *available at*: https://consumerfed.org/wp-content/uploads/2022/02/Real-Estate-Transaction-Brokerage-Report-1-31-22-1.pdf at p. 2 (edited version of Report identifying 17 states in which transaction brokers are permitted and observing that "[i]n almost all of these states, transaction brokerage is not the dominant form of service relationship between real estate agent and consumer.").

[73] *See* Fla. Stat. § 475.278(1)(b), *available at*: https://m.flsenate.gov/Statutes/475.278 ("It shall be presumed that all licensees are operating as transaction brokers unless a single agent or no brokerage relationship is established, in writing, with a customer.").

[74] *Compare* Fla. Stat. § 475.278(2) *with* Fla. Stat. § 475.278(3), *available at*: https://m.flsenate.gov/Statutes/475.278.

[75] *See* Stephen Brobeck, Consumer Federation of America, "Does Transaction Brokerage in Florida Serve the Interest of Home Buyers and Sellers?" at pp.7-8 (finding in analysis of 2,000 MLS listings in Florida that buyer brokers and transaction brokers received identical offers of cooperative compensation in 1,976 out of 2,000 closed transactions (98.8%), with buyer-brokers receiving higher compensation offers than transaction brokers in 12 instances (0.6%) and in 6 instances (0.3%) compensation was only offered for buyer-brokers but not for transaction brokers).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

December 31, 2020.[76]

35.    Also, throughout this Report, I often refer to sellers offering and paying buyer-broker commissions, even though the seller-broker actually makes the offer or payment to the buyer-broker, because sellers authorize and fund the commissions that seller-brokers offer to buyer-brokers, and thus sellers' economic incentives (such as their incentives to avoid having buyers steered to other properties) affect how those offered commissions are set under NAR's restraints. Under NAR's Code of Ethics, listing brokers make offers of cooperative compensation to buyer-brokers in their capacity as agents of their seller principals.[77] Listing brokers must follow sellers' lawful instructions regarding the amount of commission to be offered to buyer-brokers.[78] Further, listing brokers must disclose to sellers any cooperating payment being offered to buyer-brokers and often include that information in the listing agreements between sellers and seller-brokers.[79]

36.    The evidence and analysis above are all common to the class and would be the same even if every class member brought a separate antitrust suit.

## II. MARKET DEFINITION

37.    I understand that the Plaintiffs allege that the conduct challenged in this case is per se illegal and that per se claims do not require defining a relevant market or establishing market power. I nonetheless address market definition and market

---

[76] *See* "REA108 Transaction Broker Commission v1.xlsx".

[77] *See* Niersbach Dep. 178:12-16 ( ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ). *See also* 2021 NAR Code of Ethics, Standard of Practice 3-1 ("REALTORS®, acting as exclusive agents or brokers of sellers/landlords, establish the terms and conditions of offers to cooperate. […]").

[78] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[79] *See supra* Part I.A.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

power not only because they may be relevant to Plaintiffs' alternative claims under the rule of reason, but also because they provide a basis for inferring both the existence and classwide nature of anticompetitive effects.

38.     Based on the methodology, evidence, and analysis below, I conclude that the relevant product market in this case is the MLS brokerage services market. I also conclude that the relevant geographic markets in this case are the territories covered by each of the 20 MLSs at issue in this case.

39.     The methodology, evidence, and analysis used below to define the relevant product and geographic markets are all common to the class and would be the same even if every class member brought a separate antitrust suit. The same conclusion about product market definition also applies equally to all class members. Likewise, my conclusions about how to correctly define the various geographic markets do not vary by class member, even though different class members are in different markets. There were at least 25,000 class transactions in each of the 20 Covered MLSs during the class period, so the issue of the proper definition of the relevant product and geographic markets would require enormous duplication of effort without class certification.[80]

## A. Market Definition Methodology

40.     The appropriate approach to market definition should be shaped by the relevant economic question being asked.[81]  Here, the relevant question being asked is whether the MLS brokers governed by challenged NAR restraints in the Covered MLSs had sufficient collective market power that those restraints would likely impose meaningful restraints on market competition and lead to supra-competitive commission rates. One way to answer that question is to infer it (as I do below in Part III.A) from the market share governed by the restraints in relevant antitrust markets. This method requires defining those markets, as I do here in Part II. But other methods do not require defining the markets. One other method would be to directly prove market power by showing that MLS brokers governed by challenged NAR restraints in the Covered MLSs had the power to raise prices, as I do below in Part III.B. Yet another method would be to simply prove anticompetitive effects

---

[80] *See* "REA106 Class Transactions per MLS.xlsx".

[81] *See* 2B PHILLIP E. AREEDA, HERBERT HOVENKAMP & JOHN L. SOLOW, ANTITRUST LAW 135 (3d ed. 2007) at 232 ("Finding the relevant market and its structure is typically not a goal in itself but a mechanism for considering the plausibility of antitrust claims that the defendants' business conduct will create, enlarge, or prolong market power.").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

directly (thus obviating the need to either define markets or establish market power), as I do below in Part V.G using direct evidence that commission rates in the Covered MLS were *in fact* elevated above competitive levels.

41.    The standard approach to market definition used by antitrust economists is outlined in the Department of Justice's Horizontal Merger Guidelines, based on performing the hypothetical monopolist test.[82]    The Hypothetical Monopolist Test asks whether a hypothetical 100% monopolist in a posited market would likely find it profit maximizing to charge prices that were at least 5% higher than the prices that would prevail if the market were competitive.[83]  If a hypothetical monopolist would, then the test is passed, meaning that the posited market is sufficiently broad (i.e., includes a sufficient number of substitutes) to be useful in economic analysis.  If the test is failed, that tells the economist that the posited market is too narrow (i.e., includes an insufficient number of substitutes) to be useful in economic analysis.  The posited market should then be expanded to include the next closest substitute, and then the hypothetical monopolist test should be repeated to see whether the slightly broader market is sufficiently broad.

42.    Markets defined using the hypothetical monopolist test usually "exclude some substitutes to which some customers might turn" in response to a price increase for the products in the relevant market.[84]  Economists generally define markets narrowly to focus only on close substitutes because "defining a market broadly to include relatively distant product or geographic substitutes can lead to

---

[82] The DOJ/FTC Horizontal Merger guidelines describe this methodology, among other commonly used market definition methodologies in economic analysis of antitrust issues. Although the government enforcement agencies most often apply this methodology to merger analysis, it is also applicable to exclusionary conduct cases. See DOJ/FTC Horizontal Merger Guidelines n.5 (2010) (noting that market definition is similar for non-merger conduct, such as monopolization, except that one cannot assume that the prices that exist in the market are at competitive levels because the alleged anticompetitive conduct may have in fact already elevated them above competitive levels).

[83] *See* DOJ/FTC Horizontal Merger Guidelines §4 (2010) (describing the hypothetical monopolist test).

[84] DOJ/FTC Horizontal Merger Guidelines §4 (2010) ("Market shares of different products in narrowly defined markets are more likely to capture the relative competitive significance of these products, and often more accurately reflect competition between close substitutes.  As a result, properly defined antitrust markets often exclude some substitutes to which some customers might turn in the face of the price increase even if such substitutes provide alternatives for those customers."); *id*. §4.1.1 ("Groups of products may satisfy the hypothetical monopolist test without including the full range of substitutes from which customers choose.").

32

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

misleading market shares" that overstate the importance of distant substitutes.[85] Thus, under this test, the mere fact that some customers substitute between Products A and B does not necessarily mean that Products A and B are in the same market. Indeed, "The hypothetical monopolist test may identify a group of products as a relevant market even if customers would substitute significantly to products outside that group."[86]

43.      Rather, to defeat a posited market definition, the percentage of customers who would switch to other products in response to a price increase of 5% or more must be sufficiently high that that price increase would not be profitable. For example, suppose a hypothetical monopolist in a posited market with a competitive price of $100, cost of $95/unit, and sales of 1000 units would lose 40% of customers to other markets if it raised prices by 5%. That price increase would still be profitable because profits with the price increase = ($105-$95)(.6)(1000) = $6,000, whereas profits at the competitive price were ($100-$95)(1000) = $5,000. Thus, it would be a relevant market even though a substantial percentage (40%) of customers would switch in response to a 5% price increase because that percentage is not sufficiently high to deter the price increase from occurring.

44.      The "relevant markets need not have precise metes and bounds."[87] As the official commentary to the Merger Guidelines explains, "Even when no readily apparent gap exists in the chain of substitutes, drawing a market boundary within the chain may be entirely appropriate when a hypothetical monopolist over just a segment of the chain of substitutes would raise prices significantly."[88] For example, in geographic markets, it is often the case that buyers close to the border between different geographic markets are more able to switch to the neighboring market than other buyers. This fact would not mean that a separate market should be defined for the border area, nor that the neighboring market should be included in the relevant

---

[85] DOJ/FTC Horizontal Merger Guidelines §4 (2010) ("Defining a market broadly to include relatively distant product or geographic substitutes can lead to misleading market shares. This is because the competitive significance of distant substitutes is unlikely to be commensurate with their shares in a broad market. Although excluding more distant substitutes from the market inevitably understates their competitive significance to some degree, doing so often provides a more accurate indicator of the competitive effects of the merger than would the alternative of including them and overstating their competitive significance").

[86] DOJ/FTC Horizontal Merger Guidelines §4.1.1 (2010); American Bar Association, MARKET DEFINITION IN ANTITRUST: THEORY AND CASE STUDIES, I.B.2.b.(1). (2012) ("The hypothetical monopolist test may be satisfied by a group of products even though it does not include the full range of substitutes available to buyers.").

[87] DOJ/FTC Horizontal Merger Guidelines §4 (2010).

[88] DOJ/FTC, Commentary on the Horizontal Merger Guidelines 15 (2006).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

geographic market, because the hypothetical monopolist test is based on the marketwide substitution rate in response to a price increase, not on the border substitution rate. Marketwide substitution is the proper focus because that is what bears on the ability of firms in the posited market to raise prices.

45.     To illustrate, suppose that the Chicago metropolitan area were posited to be the right market for assessing whether a Chicago grocery store monopolist has market power. Suppose that the evidence indicates that if the monopolist in that area raised grocery store prices by 5%, it would lose only 4% of buyers across that geographic market, which would make that price increase profitable and thus mean the market definition satisfies the hypothetical monopolist test. Suppose further that this 4% consists of half the buyers who live close to the border of that metropolitan area, who would respond by deciding to buy in the next metropolitan area, so that a price increase limited to that border area would not be profitable. The proper economic method would still conclude that the Chicago metropolitan area is a correct market definition because it indicates that a monopolist in that market would find it profitable to significantly raise prices to consumers across that market, even if it would lose a lot of border sales, so that impairing competition in that market matters. The fact that 50% of buyers near the border would switch to buying elsewhere would not justify defining them as a separate market because their existence does not suffice to constrain the monopolist from raising prices to supracompetitive levels. Nor are buyers at the border free from being harmed by such market power because half of them would pay the supracompetitive price and the other half would be forced to purchase in an area different than they would have preferred.

46.     Finally, the Guidelines recognize that even if the rate of substitution at *current* prices is high enough to make price increases unprofitable, that does not justify broadening the market definition if firms in the market are already exercising market power because those firms will have already raised prices above competitive levels.[89] "The problem is that current prices may already be at monopoly levels, which are where the monopolist maximizes profits and thus by definition mean a monopolist could not profitably raise prices any further.... [A] monopolist would predictably keep increasing prices until its prices did create significant substitution to other products... What we really want to know is what buyer substitution rates would be if prices were elevated from competitive levels, which will differ from current levels if monopoly power actually exists."[90] Thus, "the existence of

[89] DOJ/FTC Horizontal Merger Guidelines §4.1.2 & n.5.
[90] EINER ELHAUGE, U.S. ANTITRUST LAW & ECONOMICS 236-237 (3d ed. 2018).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

significant substitution in the event of *further* price increases or even at the *current* price does not tell us whether the defendant *already* exercises significant market power."[91]  Indeed, it is regarded as a well-known economic error to broaden the market definition based on evidence of high substitution rates at current prices when those current prices have already been anticompetitively inflated.[92]

### B. The Relevant Product Market Is MLS Broker Services

47.    In this case, the plaintiff's posited product market constitutes the "services provided to homebuyers and sellers by residential real estate brokers with MLS access."[93]  For brevity, I will call this the market for MLS broker services.  The Hypothetical Monopolist test thus asks whether an absolute 100% monopolist in MLS broker services could profitably charge a price at least 5% higher than the price that would prevail if there were instead unrestrained competition for MLS broker services.  To be clear, this is 5 percent, not 5 percentage points, which is important to note when the price is itself usually expressed as a percentage commission.  For example, a 5 percent increase on a 5 percent commission would be an increase from 5 percent to 5.25 percent (i.e., 5 percent * 1.05), and not an increase from 5 percent to 10 percent.

48.    In Section 1 below, I demonstrate that a product market for MLS broker services is consistent with relevant markets defined by the DOJ and FTC.  In Sections 2-3, I examine whether the nearest substitutes for MLS broker services (non-MLS brokers, FSBO sales, and homebuying companies) could constrain a hypothetical monopolist in MLS broker services from raising prices more than 5% above the competitive level, and I conclude that they could not.  In Section 4, I confirm this conclusion by examining evidence that MLS brokers have in fact raised total commission rates by more than 5% above the competitive level.  Finally, in section 5, I show that the relevant market is not narrower than MLS broker services.  While defendants might dispute some or all of the evidence described in these sections on the merits, all of the evidence is classwide, and any analysis of it and its implications are common to the class, as is any conclusion about what the correct

---

[91] AREEDA & KAPLOW, ANTITRUST ANALYSIS ¶ 342(c) (4th ed. 1998) (emphasis in original), cited in Eastman Kodak Co. v. Image Technical Servs., Inc., 504 U.S. 451, 471 (1992).

[92] *See* George W. Stocking & Willard F. Mueller, *The Cellophane Case and New Competition*, 45 AMERICAN ECONOMIC REVIEW 29 (1955); Luke M. Froeb & Gregory J. Werden, *The Reverse Cellophane Fallacy in Market Delineation*, 7 REVIEW OF INDUSTRIAL ORGANIZATION 241 (1992).

[93] Consolidated Complaint ¶ 133.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

product market definition is.

### 1. The Conclusion that the Relevant Product Market Is MLS Broker Services Is Consistent with the Conclusions of the DOJ and FTC

49.     The conclusion that the product market is no broader than the market for MLS broker services is consistent with the product market definitions posited by both the DOJ and the FTC in various enforcement actions. The FTC has defined the relevant product market to be "the provision of residential real estate brokerage services to sellers and buyers of real property" in numerous complaints.[94] Similarly, the DOJ in 2020 concluded in a competitive impact statement that "NAR's member brokers and agents compete with one another in local listing broker and buyer service markets to provide real estate brokerage services to home sellers and home buyers," and that "The NAR rules, policies, and practices challenged in this action have anticompetitive effects in the relevant market for local listing broker and buyer

---

[94] *See*, *e.g.*, Complaint, In the Matter of Northern New England Real Estate Network, Inc., Docket No. C-4175, Before Federal Trade Commission, Nov. 22, 2006, ¶ 18, *available at*: https://www.ftc.gov/sites/default/files/documents/cases/2006/12/0510065complaint061128.pdf ("The provision of residential real estate brokerage services to sellers and buyers of real property in the State of New Hampshire and/or the NNEREN Multiple Listing Service Area is a relevant service market."); Complaint, In the Matter of Monmouth County Association of Realtors, Docket No. C-4176, Before Federal Trade Commission, Nov. 22, 2006, ¶ 18, *available at*: https://www.ftc.gov/sites/default/files/documents/cases/2006/12/0510217complaint061128.pdf ("The provision of residential real estate brokerage services to sellers and buyers of real property in Monmouth County and Ocean County, New Jersey and/or the MOMLS Service Area is a relevant service market"); Complaint, In the Matter of Williamsburg Area Association of Realtors, Inc., Docket No. C-4177, Before Federal Trade Commission, Nov. 22, 2006, ¶ 17, *available at*: https://www.ftc.gov/sites/default/files/documents/cases/2006/12/0610268complaint061128.pdf ("The provision of residential real estate brokerage services to sellers and buyers of real property in the Williamsburg Area is a relevant product market."); Complaint, In the Matter of Realtors Association of Northeast Wisconsin, Inc., Docket No. C-4178, Before Federal Trade Commission, Nov. 22, 2006, ¶ 17, *available at*: https://www.ftc.gov/sites/default/files/documents/cases/2006/12/0610267complaint061130.pdf (" The provision of residential real estate brokerage services to sellers and buyers of real property in the Northeast Wisconsin Area is a relevant product market."); Complaint, In the Matter of Information and Real Estate Services, LLC, Docket No. C-4179, Before Federal Trade Commission, Nov. 22, 2006, ¶ 17, available at: https://www.ftc.gov/sites/default/files/documents/cases/2006/12/0610087complaint061201.pdf ("The provision of residential real estate brokerage services to sellers and buyers of real property in the Northern Colorado and/or the IRES Service Area is a relevant product market.").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

broker services."[95]

50.     Because the DOJ and FTC's product market definitions included all residential real estate broker services, they were not technically limited to MLS broker services.  However, the DOJ also concluded in 2020 that: "The membership of an MLS is generally comprised of nearly all residential real estate brokers and their affiliated agents in an MLS's service area."[96]  The DOJ further concluded that:

> […] By virtue of nearly industry-wide participation and control over important data, brokers offering MLSs possess and exercise market power in the markets for the provision of real estate brokerage services to home buyers and sellers in local markets throughout the country.[97]

Likewise, the DOJ concluded in 2008 that: "An MLS is thus a market-wide joint venture of competitors that possesses substantial market power: to compete successfully, a broker must be a member […]"[98]  These DOJ conclusions necessarily mean not only that a hypothetical monopolist over MLS broker services would have the market power to raise prices significantly over competitive price levels, but also that such a power has actually been exercised by MLS brokers.  Those conclusions justify defining MLS broker services as a relevant market under the hypothetical monopolist test detailed in the DOJ's own guidelines.[99]  I likewise find in the next section that non-MLS brokers cannot constrain a hypothetical monopolist in MLS broker services from raising total commissions 5% or more above the competitive level.

---

[95] Competitive Impact Statement, U.S. v. National Association of Realtors, Dec. 10, 2020, at pp. 4, 10, *available at*:  https://www.justice.gov/atr/case-document/file/1344346/download. The associated DOJ Complaint states the same market definition.  Complaint, U.S. v. National Association of Realtors, Nov. 19, 2020, at paragraph 8 *available at*: https://www.justice.gov/atr/case-document/file/1338661/download.

[96] *See* Competitive Impact Statement, U.S. v. National Association of Realtors, Dec. 10, 2020, at p.4, *available at*:  https://www.justice.gov/atr/case-document/file/1344346/download. *See also* Complaint, U.S. v. National Association of Realtors, Nov. 19, 2020, at paragraph 9 (same), *available at*: https://www.justice.gov/atr/case-document/file/1338661/download.

[97] Competitive Impact Statement, U.S. v. National Association of Realtors, Dec. 10, 2020, at p.4, *available at*:  https://www.justice.gov/atr/case-document/file/1344346/download. *See also* Complaint, U.S. v. National Association of Realtors, Nov. 19, 2020, at paragraph 10 (same), *available at*: https://www.justice.gov/atr/case-document/file/1338661/download.

[98] *See* Competitive Impact Statement, U.S. v. National Association of Realtors, Jun. 12, 2008, at p.10, *available at*: https://www.justice.gov/atr/cases/f234000/234013.htm.

[99] *See supra* Part II.A.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

*2. Non-MLS Brokers Cannot Prevent a Hypothetical Monopolist in MLS Broker Services from Raising Total Commissions 5% or More Above Competitive Levels*

51.     The nearest substitute for MLS broker services would be turning to a non-MLS broker.  But the evidence indicates that 89-90% of sellers use a broker and 89-91% of sellers list their homes on an MLS[100] (which requires using an MLS broker), so at most only a tiny percentage of sellers turned to a non-MLS broker.  As already noted above, the DOJ in 2020 similarly concluded that "The membership of an MLS is generally comprised of nearly all residential real estate brokers and their affiliated agents in an MLS's service area."[101]  The fact that sellers who use brokers hardly ever use non-MLS brokers indicates that sellers do not find them to be reasonable substitutes.

52.     Qualitative evidence likewise indicates that non-MLS brokers are not reasonable substitutes for MLS brokers.  As the DOJ concluded in 2008:

> Brokers regard participation in their local MLS to be critical to their ability to compete with other brokers for home sellers and buyers. By participating in the MLS, brokers can promise their seller clients that the information about the seller's property can be immediately made available to virtually all other brokers in the area. Brokers who work with buyers can likewise promise their buyer customers access to the widest possible array of properties listed for sale through brokers. An MLS is thus a market-wide joint venture of competitors that possesses substantial market power: to compete successfully, a broker must be a member; and to be a member, a broker must adhere to any restrictions that the MLS imposes.[102]

53.     Accordingly, both quantitative and qualitative evidence indicates that non-MLS brokers are not a reasonable substitute for MLS brokers and thus cannot

---

[100] 2021 NAR Profile Highlights at p. 9 ("Ninety percent of home sellers worked with a real estate agent to sell their home" and "Eighty-nine percent of sellers listed their homes on the Multiple Listing Service (MLS), which is the number one source for sellers to list their home."); 2020 NAR Profile at p. 8 ("Eighty-nine percent of home sellers worked with a real estate agent to sell their home." and "Ninety-one percent of sellers listed their homes on the Multiple Listing Service (MLS)").

[101] *See* Competitive Impact Statement, U.S. v. National Association of Realtors, Dec. 10, 2020, at p.4, *available at*: https://www.justice.gov/atr/case-document/file/1344346/download. *See also* Complaint, U.S. v. National Association of Realtors, Nov. 19, 2020, at paragraph 9 (same), *available at*: https://www.justice.gov/atr/case-document/file/1338661/download.

[102] *See* Competitive Impact Statement, U.S. v. National Association of Realtors, Jun. 12, 2008, at p.10, *available at*: https://www.justice.gov/atr/cases/f234000/234013.htm.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

constrain a price increase in MLS broker services above the competitive level. This conclusion is not surprising. Given that the MLS lists 89-91% of all homes being sold,[103] the bulk of buyers and their buyer-brokers have incentives to focus their home searches on MLS listings because that is where the lion's share of listings are. Sellers in turn will want to list on an MLS because it is where the bulk of potential buyers are focusing their searches.

54. Moreover, the effects of the challenged restraints themselves prevent non-MLS brokers from constraining such a price increase in MLS broker service. As described in Parts IV-V below, the challenged restraints maintained and extended an anticompetitive equilibrium in which sellers were required to offer a fixed payment for buyer-broker commissions in their listings and were incentivized to set those offered buyer-broker commissions high because buyer-brokers had incentives to steer buyers toward sellers offering higher buyer-broker commissions. Given this anticompetitive equilibrium, 87-88% of buyers utilize a buyer-broker.[104] Thus, for non-MLS seller-brokers to effectively compete for sales to buyers represented by buyer-brokers, they would need to offer buyer-broker commissions that are similar to those offered by MLS brokers. This significantly limits the ability of non-MLS brokers to constrain any increase in the total commission paid by sellers to MLS brokers, because non-MLS brokers could effectively engage in price competition only on the portion of the total commission allocated to seller-brokers.[105] But it is the portion of the total commission earmarked for buyer-brokers on which the challenged restraints, the steering incentives they created, and resultant anticompetitive equilibrium has had the largest anticompetitive impact. Indeed, as explained in Part V, but for the challenged restraints, sellers would not make blanket offers to pay the buyer-broker portion of the commission and the great majority of

---

[103] 2021 NAR Profile Highlights at p. 9 ("Eighty-nine percent of sellers listed their homes on the Multiple Listing Service (MLS), which is the number one source for sellers to list their home."); 2020 NAR Profile at p. 8 ("Ninety-one percent of sellers listed their homes on the Multiple Listing Service (MLS)").

[104] 2021 NAR Profile Highlights at p. 7 ("Eighty-seven percent of buyers recently purchased their home through a real estate agent or broker"); 2020 NAR Profile at p. 7 ("Eighty-eight percent of buyers recently purchased their home through a real estate agent or broker"). *See also infra* Part V (explaining why the restraints induce buyers to utilize a buyer-broker when they otherwise would not).

[105] As explained in Parts V-VI, the challenged restraints, the steering incentives they created, and the resultant anticompetitive equilibrium have also reduced the extent of price competition on the portion of total commissions allocated to seller-brokers. This conclusion is confirmed by the fact that, as discussed in Part V.G, Prof. Economides has found that seller-broker commissions in the U.S. are higher than in other countries that he identifies as competitive but-for benchmarks.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

buyers would entirely forgo use of buyer-brokers, as they commonly do in the benchmark countries identified by Prof. Economides.[106]

55.     The above conclusions are confirmed by evidence that non-MLS brokers could not evade these competitive obstacles by listing homes on websites like Zillow that aggregated real estate listings.[107]  Non-MLS brokers could not even get their listings on the second-most visited residential listing site, Realtor.com,[108] because "For listings to be displayed on Realtor.com®, the listings must be entered into an MLS and marked to display on the internet."[109]  Nor could a non-MLS broker effectively attract potential buyers by listing on aggregator websites that failed to obtain access to MLS listings, because those websites would be missing 89-91% of offered homes and thus be less attractive to buyers and thus less attractive for sellers.[110]  Other aggregation websites could gain access to MLS listings only if they either entered into syndication agreements with MLSs and MLS brokers or became MLS brokers themselves, and each of those options imposed its own restraints on competition, as detailed below.

---

[106] *See* Economides Report at Section V.C (finding that buyer brokers were used in 5% or less of transactions in Australia and the United Kingdom, and used in 20% of transactions on average between 2016 and 2020 in the Netherlands).

[107] *See* Declaration of Jack Ryan (CEO of REX), March 9, 2021, in Rex v. Zillow, (hereinafter cited as "Jack Ryan Declaration") at paragraph 18 ("Zillow.com and Truilia.com, both now owned by Zillow, are two internet sites that grew into the [sic] two of the most visited aggregator sites for residential home listings on the internet (the first and fourth, respectively). Real estate aggregator sites generally gather all home listings available to them so that consumers can search for and view all available homes that meet the criteria defined by the consumer's search parameters in one click.").

[108] Jack Ryan Declaration at paragraph 20 ("Many other sites, particularly Realtor.com, which is the second most visited residential home listing sites […]").

[109] *See* https://support.realtor.com/s/article/does-realtor-com-display-for-sale-by-owner-listings ("For listings to be displayed on Realtor.com®, the listings must be entered into an MLS and marked to display on the internet.  All listings displayed on Realtor.com® come from REALTOR® Brokers and REALTOR® owned and operated MLSs, where the real estate licensee has established an agency relationship through an exclusive right-to-sell or exclusive agency listing agreement.").

[110] 2021 NAR Profile Highlights at p. 9 ("Eighty-nine percent of sellers listed their homes on the Multiple Listing Service (MLS), which is the number one source for sellers to list their home."); 2020 NAR Profile at p. 8 ("Ninety-one percent of sellers listed their homes on the Multiple Listing Service (MLS)").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

56.     Zillow (by far the most visited aggregation website)[111] at first tried the strategy of entering into syndication agreements, which "required it to negotiate agreements and manage relationships with approximately 585 local MLSs and thousands of brokers."[112]  Zillow obtained access to MLS listings in this way for some time before 2019.[113]  In 2019, Zillow decided to shift to the second strategy of becoming an MLS broker itself in order to get access to MLS listing data through IDX Feeds,[114] and in January 2021 Zillow shifted to actually getting listing data through IDX Feeds.[115]

57.     This shift from syndication agreements to becoming an MLS broker was motivated, in part, by Zillow's desire to "ensure access to better-quality, reliable data," as Zillow had "determined that there were persistent issues with syndication

---

[111] *See* Declaration of W. Robert Majure, March 9, 2021, in Rex v. Zillow, attaching March 9, 2021 Expert Report, Exhibit 1 (showing "Monthly Visits to Zillow and Top Real Estate Websites" for January 2021, with Zillow at 277.5 million, Realtor at 156.2 million, Redfin at 80.9 million, Trulia at 61.7 million, Homes at 8.3 million, and ReMax at 6.6 million).

[112] Declaration of Errol Samuelson, April 30, 2021, in Rex v. Zillow, (hereinafter cited as "Errol Samuelson Declaration") at paragraph 43 ("It was also logistically very challenging for Zillow to both close this gap in listings coverage, and maintain comprehensive listings, as doing so required it to negotiate agreements and manage relationships with approximately 585 local MLSs and thousands of brokers.").

[113] *See* Errol Samuelson Declaration at paragraphs 30-31 ("Ever since I joined Zillow—and perhaps even before that—Zillow has considered different ways to both simplify how it obtains that data and improve the coverage and quality of the data it provides to consumers. […] Zillow determined in 2019 it was time to take those plans off the bookshelf, and Project Bookshelf was born.  Project Bookshelf involved the strategic shift by Zillow from receiving its listings via thousands of syndication feeds to obtaining more reliable, comprehensive, and higher-quality IDX Feeds directly from each local MLS in the country."); *id*. at paragraph 3 ("Before joining Zillow Group in 2014, I held various leadership roles […]"); *id*. at paragraph 32 ("Most recently, until it switched to IDX Feeds, Zillow obtained its property listings by entering into so-called 'syndication agreements' with hundreds of MLSs, and thousands of individual participant brokers and franchise brands.")

[114] *See* Errol Samuelson Declaration at paragraph 53 ("[…] by early 2019 Zillow made the decision to switch the way it obtained property listings from syndication and broker agreement feeds to IDX Feeds. […] Second, Zillow had to become a licensed brokerage and hire and/or license designated brokers in all 50 states, plus Washington D.C. (as well as certain Canadian provinces), who then applied for membership with hundreds of local MLSs, and subsequently request access to IDX Feeds from those MLSs. Third, Zillow then had to adhere to various rules and policies enacted by the local MLSs regarding the display of IDX data by virtue of the agreements that were executed between Zillow's brokers and the MLSs.").

[115] *See* Errol Samuelson Declaration at paragraph 68 ("On September 23, 2020 we made a public announcement that we would be making the switch to IDX Feeds in January 2021").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

feeds that it was unable to overcome."[116] These included "limitations to the coverage it was able to reach via its syndication agreements."[117] The MLS listings to which Zillow gained access under its syndication agreements were also incomplete because such "listings might exclude some key information (or fields)" and "A number of brokers and MLSs also placed restrictions on the number or quality of listing photos they would share with Zillow, and when and how those photos could be used."[118] In addition, "certain MLSs and brokers imposed restrictions on how often Zillow would obtain updated listings information," including "one of the largest franchisors [Zillow] had contracted with" which "would often have delays of 20-24 hours in updating their feed with listings data for all of their franchisees."[119] The IDX Feeds, in contrast, allow "Zillow to obtain updates every 5 minutes."[120] Moreover, Zillow was "at constant risk of losing a critical input for its users with little notice," because "The syndication agreements and brokerage listing agreements typically provided the MLSs and brokers with the ready ability to terminate the agreements (and the delivery of their listing feeds) at any time without cause and with very limited notice," and there were instances in which MLSs threatened to (or actually did) "withdraw their listings from Zillow, causing Zillow to 'go dark' in that area for a

---

[116] *See* Errol Samuelson Declaration at paragraph 53 (heading prior to paragraph 53, "Overview of Zillow's Shift to IDX Agreements to Ensure Access to Better-Quality, Reliable Data") *and* at paragraph 39 ("Despite the significant efforts to draft and negotiate syndication agreements, over the years, Zillow determined that there were persistent issues with syndication feeds that it was unable to overcome.").

[117] *See* Errol Samuelson Declaration at paragraph 39 ("These included limitations to the coverage it was able to reach via its syndication agreements (meaning certain homes would not appear on our platforms, leaving consumers unaware of some homes that may be available for sale in their market).").

[118] *See* Errol Samuelson Declaration at paragraph 44 ("[…] listings might exclude some key information (or fields) within the listing itself, for example, lot size or open house information.") *and* at paragraph 45 ("A number of brokers and MLSs also placed restrictions on the number or quality of listing photos they would share with Zillow, and when and how those photos could be used.").

[119] *See* Errol Samuelson Declaration at paragraph 47 ("[…] certain MLSs and brokers imposed restrictions on how often Zillow would obtain updated listings information. Instead of allowing Zillow to obtain updates every 5 minutes, as is the case with the IDX Feeds, under some of Zillow's agreements it was only able to obtain listings with significant latency. As just one example, one of the largest franchisors we had contracted with (an organization with 100,000 agents in the U.S.) would often have delays of 20-24 hours in updating their feed with listings data for all of their franchisees.").

[120] *See* Errol Samuelson Declaration at paragraph 47 ("Instead of allowing Zillow to obtain updates every 5 minutes, as is the case with the IDX Feeds […]").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

period of time."[121]  These competitive disadvantages, which ultimately informed Zillow's decision to gain access to MLS listing information through IDX Feeds by becoming an MLS broker itself, would have also been competitive disadvantages for any non-MLS broker that attempted to use Zillow instead of an MLS.

58.    Moreover, syndication agreements under which aggregation websites like Zillow gained access to MLS listings often required aggregators to agree to non-compete conditions.  NAR provided the framework for such non-competes on its website under the topic of "Syndication," providing a "detailed checklist of issues for MLSs and brokers to consider when evaluating an agreement to directly license listing data to a third party."[122]  This checklist included, in relevant part:

***Non-Compete***
1. Portal must agree they will not compete with the brokerage firms or MLSs by either becoming a licensed brokerage firm or by providing offers of cooperation and compensation.
2. Portal may not use the data in a manner that is similar to a Multiple Listing Service business.
3. Non-compete must prevail during the agreement and for a certain number of years after the agreement.[123]

Pursuant to this framework, Zillow in fact entered into non-competes that prevented it from posting listings that offered cooperation or compensation to buyers.[124]  Other

---

[121] *See* Errol Samuelson Declaration at paragraph 49 ("The syndication agreements and brokerage listing agreements typically provided the MLSs and brokers with the ready ability to terminate the agreements (and the delivery of their listing feeds) at any time without cause and with very limited notice. That was a significant vulnerability for Zillow, as it was at constant risk of losing a critical input for its users with little notice. And this wasn't just a theoretical concern. There were instances in which certain MLSs actually withdrew, or threatened to withdraw, their listings from Zillow, causing Zillow to 'go dark' in that area for a period of time.").

[122] *See* https://www.nar.realtor/syndication/critical-components-of-a-contract-licensing-agreement-with-portals ("Syndication," "Critical Components of a Contract Licensing Agreement with Portals").

[123] *See* "Critical Components of a Contract Licensing Agreement with Portals," dated March 5, 2015, available at: https://cdn.nar.realtor/sites/default/files/documents/Components-of-a-Contract-Lic.pdf at p. 4 of .pdf (in the "Checklist of Critical Components for MLSs and Brokerage Firms to Consider in Contracts with Consumer Facing Portals.").

[124] *See, e.g.,* FWEBER-ILe-0008124 (████████████████████████████████████████████████) at -25 (██████████████████████████████████████████████████████████████████████████████████████████████████████████████████)

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

websites did so as well, including Apartments.com, Homes.com, PingZing, Pre Open House, Render Estate, and Showingly, LLC.[125]

59.     Even if an aggregation website were able to gain access to MLS listings via a syndication agreement that did not itself impose those anticompetitive restraints, the aggregation website would not be as attractive a place to list a home as an MLS would be.  The reason is that the syndication agreements meant that being listed on an MLS would easily permit a broker to make a home available not only on MLS but on all the aggregation websites that included MLS listings.  In contrast, putting a non-MLS listing on an aggregation website would make it available only on that aggregation website and not on an MLS or any other aggregation website.  This meant that non-MLS brokers listing properties on any aggregation website that had access to MLS listings would not get the same breadth of coverage as an MLS broker would get by simply listing properties on an MLS.  This again meant that non-MLS brokers were not a reasonable substitute.

60.     To the extent that aggregation websites instead gained access to MLS listings by becoming brokers themselves, then the aggregation websites would themselves be subject to all the NAR rules in the NAR MLSs, with all the same anticompetitive effects.  Importantly for market definition, the NAR rules they would be bound by would include rules requiring that the websites *not* post information about the offered buyer-broker commissions in a way that would be

---

).

[125] *See, e.g.,* ██████████████████████

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

accessible by buyers.[126] Without that information, buyer-brokers would have little incentive to use such websites when searching for properties, so that the lion's share of buyers who are represented by buyer-brokers would have their searches instead focused on MLSs, which would give sellers strong incentives to list on an MLS rather than on these websites.

61. Indeed, whether it was because of the anticompetitive restraints imposed by the NAR rules on these websites when they acted as MLS brokers, or via the syndication agreements when they did not, or for some other reason, the market reality was that, during the class damages period, leading real estate website aggregators like Zillow, Realtor.com, and Trulia did not list the offered buyer-broker commission on the NAR MLS listings they posted.[127] Without that information, buyer-brokers would have strong incentives to turn to MLSs rather than to those websites for housing searches, and thus the bulk of buyers (who were represented by buyer-brokers) would have their housing searches focused on MLS searches, which in turn would mean that sellers would have strong incentives to list on MLS. Given that market reality, non-MLS brokers could not offer a reasonable substitute by listing on such websites.

62. Further, in most of the MLSs relevant in this case,[128] the MLSs had adopted a non-mandatory NAR rule that required "[l]istings obtained through IDX feeds" to segregate MLS and non-MLS listings.[129] Indeed, when Zillow began to

---

[126] *See infra* Part IV.

[127] *See* Housing Wire (February 8, 2021), https://www.housingwire.com/articles/redfins-listings-to-disclose-agent-commissions/ ("Zillow, and other websites like Trulia and Realtor.com, have not started posting buyer's fees.").

[128] *See* Appendix B: Relevant Features of the 20 Covered MLSs and Corporate Defendants (Section A.3) (13 of the 20 MLSs at issue adopted policies expressly prohibiting comingling of MLS and non-MLS listings obtained through IDX feeds).

[129] *See* 2021 NAR Handbook, pp. 24-28 ("Section 1 Internet Data Exchange (IDX) Policy (Policy Statement 7.58)") at pp. 27-28 (under "Additional Local Issues/Options," paragraph 5 stating that "MLSs cannot prohibit participants from downloading and displaying or framing other brokers' listings obtained from other sources, e.g., other MLSs, non-participating brokers, etc., but can, as a matter of local option, require that listings obtained through IDX feeds from Realtor® Association MLSs be searched separately from listings obtained from other sources. *(Amended 11/14)*"); *id.* at p. 86 (Section 18.3.11, "Listings obtained through IDX feeds from Realtor® Association MLSs where the MLS participant holds participatory rights must be displayed separately from listings obtained from other sources. Listings obtained from other sources (e.g., from other MLSs, from non-participating brokers, etc.) must display the source from which each such listing was obtained. *(Amended 05/17)*" (footnote omitted)). Section 18.3.11 is followed by a symbol indicating it is "Optional." *See id.* at p. 86.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

gain access to MLS listings through becoming an MLS broker, Zillow changed its interface on a nationwide basis so that its non-MLS listings appeared on a different tab from the MLS listings.[130]  As a result, the initial set of search results would just show MLS listings, relegating non-MLS brokers that listed on Zillow to another tab where they would not appear alongside the MLS listings that would dominate buyer attention, so that listing on Zillow could not overcome the relevant competitive obstacles.[131]  This was another market factor that prevented non-MLS brokers from offering a reasonable substitute for MLS brokers.

63.     In short, for all the above reasons, non-MLS brokers could not act as a significant constraint on the total commission paid for MLS broker services in the actual world.  They thus could not prevent a hypothetical monopolist in MLS broker services from profitably raising total commissions 5% above the competitive level.

---

[130] Errol Samuelson Declaration at paragraph 62 ("In connection with its decision to switch to IDX Feeds, Zillow had to implement various changes to the display of property listings on its websites to abide by the IDX rules enacted individually by each of the local MLSs. These include, for example […] (vi) the separate display of listings from MLS sources and other sources, including For-Sale-By-Owner (FSBO), auctions, and non-MLS brokers."); *id*. at paragraph 66 ("We found that roughly two-thirds of the MLSs we have agreements with have adopted a no-comingling rule. Given this, Zillow had to make a design decision about how it would comply with that rule, taking into account a number of factors, including timeline to project launch, engineering cost, and consumer experience. Although approximately a third of MLSs did not prohibit comingling of listings, we determined it would be a poor consumer experience to change the display of search results by geography.").

[131] Visiting Zillow.com, searching for "Baltimore, MD" and clicking "For sale" in the dialog box asking "What type of listings would you like to see?" leads to search results showing "1,297 Agent listings" and "83 Other listings."  The "Agent Listings" tab is highlighted and is the initial list of results.  Clicking the "Other listings" tab will then show those results, but will not continue to show the "Agent listings" at the same time.  Search conducted 2/2/2022.

*See also* https://zillow.zendesk.com/hc/en-us/articles/360056662414-New-Search-Toggle#:~:text=%E2%80%9CAgent%20Listings%E2%80%9D%20are%20homes%20listed,estate%20agents%20on%20the%20MLS.&text=%E2%80%9COther%20Listings%E2%80%9D%20are%20homes%20for,by%20agents%20on%20the%20MLS ("What's the difference between 'Agent Listings' and 'Other Listings'?  'Agent Listings' are homes listed by real estate agents on the MLS. 'Agent Listings' do not include homes for sale by owner, non-MLS auctions or foreclosures.  'Other Listings' are homes for sale by owner, non-MLS auctions, foreclosures and other properties. 'Other Listings' do not include homes listed by agents on the MLS.").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

*3. FSBO Transactions and Sales to Home Buying Companies Cannot Prevent a Hypothetical Monopolist in MLS Broker Services from Raising Total Commissions 5% Above Competitive Levels*

64.     The next closest substitute would be doing without broker services by selling in a for-sale-by-owner ("FSBO") transaction or through a home buying company, neither of which would be able to list on an MLS without an MLS broker. However, during the relevant class period from March 6, 2015 on,[132] the FSBO and home buying companies' share of home sales was (depending on the year) only 7-8% and 0-2%, respectively, and in combination only 8-10%.[133]  The fact that only 8-10% of sellers are willing to turn to these alternatives, despite the anticompetitive restraints on MLS listings that inflate the commissions paid by sellers and require them to cover buyer broker commissions, indicates that sellers must not regard these alternatives as reasonably interchangeable with MLS broker services.  This is not surprising given that the MLS lists 89-91% of all homes being sold.[134]  Buyers, and particularly their buyer-brokers,[135] are likely to focus their home searches on MLS listings, and sellers are likely to want a broker who can list on the service that has access to the bulk of potential buyers.  Indeed, one academic study has concluded that the data suggests that broker-marketed and FSBO properties are in separate markets, given the limited ability of FSBO properties to constrain the prices of broker-marketed properties.[136]  Another academic study concludes that one reason

---

[132] Consolidated Complaint ¶ 142.

[133] 2021 NAR Profile Highlights at p. 9 ("less than one percent sold via iBuyer"); 2020 NAR Profile at p. 120 ("Exhibit 6-31: Method Used To Sell Home, 2001-2020," showing that from 2001 through 2020, the percentage of homes "Sold to home buying company" was 1% in all but two years: an "*" in 2017 and 2% in 2019).  This same "Exhibit 6-31" has a color coding labeled "Sold it through an iBuyer program—N/A."  *Id.*  No such coloration is visible on the chart, suggesting that such sales were trivial.  *See id.*

[134] 2021 NAR Profile Highlights at p. 9 ("Eighty-nine percent of sellers listed their homes on the Multiple Listing Service (MLS), which is the number one source for sellers to list their home."); 2020 NAR Profile at p. 8 ("Ninety-one percent of sellers listed their homes on the Multiple Listing Service (MLS)").

[135] *See* "Anticompetition in Buying and Selling Homes."  Alford, Roger P. and Benjamin H. Harris.  *Regulation* 44 (2021): 28.  *Available at*: https://www.cato.org/sites/cato.org/files/2021-06/regulation-v44n2-2.pdf ("Despite technological advances that would theoretically promote a higher share of FSBO sales and empirical evidence showing that using a realtor does not raise the selling price, the FSBO strategy has yet to gain traction and is employed by only about one in 10 sellers. Here, steering is likely to blame: FSBO sellers who are not on the MLS are easily avoided by realtors who use the MLS as their sole source of available homes […]").

[136] *See* "Can Real Estate Brokers Affect Home Prices Under Extreme Market Conditions?" Stelk, Steven, and Leonard V. Zumpano.  *International Real Estate Review* 20.1 (2017): 51-73 at

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

FSBO properties imposed only a limited constraint on the demand for brokers was that 40% of FSBO sales were never placed on the open market, but instead were transactions between closely related parties, such as friends and relatives.[137]

65.    Moreover, like non-MLS brokers, FSBO sellers face the same problem that the challenged restraints have maintained and extended an anticompetitive equilibrium in which sellers make blanket unilateral offers to pay buyer-broker commissions, which incentivizes buyer-brokers to steer buyers to sellers who pay higher buyer-broker commissions.[138]   Given this anticompetitive equilibrium, a FSBO seller who does not offer a similarly high buyer-broker commission cannot compete effectively for the 87-88% of buyers that are represented by buyer-brokers.[139]  This effect likely explains why 57% of FSBO sales involve sellers and buyers who know one another.[140]  And as noted above, it is the buyer-broker portion of the total commission on which the challenged restraints and the resulting steering incentives and anticompetitive equilibrium have the largest anticompetitive impact.[141]  Thus, FSBO transactions do not act as a significant constraint on the total

---

p. 68. *Available at*:  https://www.um.edu.mo/fba/irer/papers/current/vol20n1_pdf/03.pdf  ([…] broker-marketed properties still commanded a price premium over FSBO properties. This suggests two separate real estate markets in 2006 and 2009: One for broker-marketed properties and one for FSBO properties. Competitive pressure from FSBO homes was not enough to keep home sellers from passing along broker commission costs to buyers in the form of higher prices.").

[137] *See* "Entry and inefficiency in the real estate brokerage industry: empirical evidence and policy implications."  Han, Lu, and Seung-Hyun Hong.  Working Paper, Univ. Toronto/Rotman School of Management, June 2008.  *Available at*: http://citeseerx.ist.psu.edu/viewdoc/download?doi=10.1.1.627.6757&rep=rep1&type=pdf  at p. 19, fn. 18 ("In addition, two out of five of these FSBO transactions are between closely related parties, such as friends and relatives. That is, 40% of FSBOs are not placed on the open market and therefor are less likely to have direct effect on demand for real estate brokerage service.").

[138] *See supra* Part II.B.2.

[139] 2021 NAR Profile Highlights at p. 8 ("Eighty-seven percent of buyers recently purchased their home through a real estate agent or broker"); 2020 NAR Profile at pp. 7-8 ("Eighty-eight percent of buyers recently purchased their home through a real estate agent or broker"; "Eighty-nine percent of home sellers worked with a real estate agent to sell their home.").

[140] 2021 NAR Profile Highlights at p. 9 ("The majority of FSBO sellers, 57 percent, knew the buyer of the home."); 2020 NAR Profile at p. 8 ("FSBO homes sold more quickly on the market than agent-assisted homes. Seventy-seven percent of FSBO homes sold in less than two weeks— often because homes were sold to someone the seller knows.").  This number is higher than the 40% figure mentioned in the preceding paragraph, because the figure there was limited FSBO sales between closely related parties of properties that were never placed on the open market, whereas the figure here reflects sales between any parties who know each other (however closely) and is not limited to properties that were never put on the open market.

[141] *See supra* Part II.B.2.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

commission paid for MLS broker services in the actual world, and thus they do not prevent a hypothetical monopolist in MLS broker services from profitably raising total commissions 5% above the competitive level.

66.    Moreover, FSBO sellers have two options for marketing their properties.  They can try to market their properties themselves, which is unlikely to reach many buyers.  Or they can list on websites that aggregate real estate listings, such as Zillow.  But the latter option is likely to be ineffective for all the same reasons described above for non-MLS brokers who might try to do the same.[142]  Namely, those websites either (a) do not take FSBO listings; (b) lack the MLS listings that constitute the lion's share of properties for sale, and thus will be less attractive to prospective buyers; (c) have MLS listings, but are subject to syndication agreements that make the websites less effective and bar offering the compensation to the buyer-brokers who represent the vast bulk of buyers and thus have incentives to search elsewhere for their clients; or (d) are MLS brokers, and thus under NAR MLS rules they could not publicly post listings that offer compensation to buyer-brokers (because they would violate the rule on such offers being disclosed to buyers), and they segregate listings so that the initial search results just show MLS listings, relegating non-MLS listings such as FSBO listings to another tab.[143]

67.    There is also evidence that sellers cannot evade these competitive obstacles by selling to home buying companies.  To begin with, home buying companies (e.g., "iBuyers") have not been successful in gaining significant market share.  Despite dedicating significant resources to an attempt to become a home buying company, Zillow recently abandoned its large bet on buying homes outside of MLSs after it lost a lot of money attempting to do so.[144]  "Zillow Offers lost more than $420 million in the [third quarter of 2021], roughly the same amount that the company had earned in total during the prior 12 months."[145]  Zillow is currently "sitting on thousands of houses worth less than what the company paid for them," and Zillow CEO Richard Barton acknowledged that "the algorithm [used] to buy and sell houses had not produced predictable profits," but instead "made the

---

[142] *See supra* Part II.B.2.

[143] *Id.*

[144] *See* https://www.zillow.com/offers/?t=zo-sell-with-subnav (stating that "Zillow Offers is winding down, which means we are not making any new offers on homes. We're focused on helping existing customers and selling our remaining inventory.").

[145] *See* "Zillow, facing big losses, quits flipping houses and will lay off a quarter of its staff," by Stephen Gandel, The New York Times, Nov. 2, 2021, *available at*: https://www.nytimes.com/2021/11/02/business/zillow-q3-earnings-home-flipping-ibuying.html.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

company's overall bottom line unpredictable."[146]  Other iBuyers, like Opendoor and Offerpad, have gained a small market share, but have not made any profits yet.[147]

68.     More important, although home buying companies purchase properties outside of MLSs, they typically resell them via MLSs, thus making them governed by NAR rules in the relevant MLS markets and subject to standard buyer-broker commissions.[148]  Such firms thus do not offer an effective way of circumventing NAR's restraints on MLS sales and their anticompetitive effect on commissions; to the extent such firms succeed, they do so only because they resell through NAR's MLS system, which requires them to comply with their rules and pay those supracompetitive commissions on resale.

69.     Consistent with the above analysis, the evidence indicates that the

[146] *See id.*

[147] Opendoor reported revenue of $2.3 billion in the third quarter of 2021, up 91% from the previous quarter, but posted a loss of $56.8 million.  *See* "Opendoor Announces Third Quarter 2021 Financial Results," Opendoor Press Release, Nov. 10, 2021, *available at*: https://investor.opendoor.com/news-releases/news-release-details/opendoor-announces-third-quarter-2021-financial-results.

Offerpad reported revenue of $540.3 million in the same quarter, up 190% from the third quarter in 2020, but posted a loss of $15.3 million.  *See* "Offerpad Announces Third-Quarter Record Revenue and Gross Profit; Company Raises Full-Year 2021 Outlook," Offerpad News Release, Nov. 10, 2021, *available at*: https://investor.offerpad.com/news-releases/news-details/2021/Offerpad-Announces-Third-Quarter-Record-Revenue-and-Gross-Profit-Company-Raises-Full-Year-2021-Outlook/.

[148] *See, e.g.*, "How real estate agents are working with iBuyers," by Joe Gomez, Jul. 12, 2019, *available at*: https://www.opendoor.com/w/blog/how-real-estate-agents-work-with-ibuyers ("For represented buyers who choose to purchase an Opendoor listed home, Opendoor's MLS listings include co-broke commissions."); Agent FAQ, Zillow Offers, *available at*: https://www.zillow.com/z/offers/agent-faq/ ("What will happen with homes Zillow owns?" "We will continue to work through selling our inventory, meaning Zillow-owned homes will still be offered for sale to buyers of all types. Buyers' agents will be paid a commission published in the MLS for all Zillow-owned homes listed on the open market." [emphasis omitted]).

*See also*  RMLLC-WDMO-00178711 (█████████████████████████████████████████████████████████████████████████████████████████████████ ") *and* at -40 (███████████████████████████████████████████████████████████████████████████████████████"); RMLLC-WDMO-00439432 (May 9, 2018 PiperJaffray Industry Note) at -35 ("██████████████████████████████████████████████████████████████████████████████████████.").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

percentage of transactions which are FSBO or to home buying companies has actually declined over time. FSBO transactions were 13-14% of home sales from 2001-05, but have steadily contracted to the 7-8% that they have had during the class period from 2015-2020.[149] Home buying companies have also been unable to expand their share of home sales: they had 1% of home sales in each year from 2001-2014 and from 2015-2020 they likewise averaged 1%, accounting for 1% in each year with the exception of one year when they were 0% (2017) and another year when they were 2% (2019).[150] In combination, the share of home sales that were either FSBO or to home buying companies went from 14-15% in 2001-05 to 8-10% from 2015-2020.[151] This is illustrated in **Figure 1** below.

**Figure 1: FSBO and Homebuyer Share, 2001-2020[152]**



---

[149] 2020 Profile of Home Buyers and Sellers," National Association of REALTORS®, p. 120, https://www.gaar.com/images/uploads/2020_NAR_Consumer_Profile.pdf.

[150] *Id.*

[151] *Id.*

[152] "Market Definition Chart - From 2020 NAR Profile.xlsx". This was produced from the data in "Exhibit 6-31: Method Used to Sell Home, 2001-2020" in the 2020 NAR Profile. See 2020 NAR Profile at p. 120.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

70.     Further, this downward trend in FSBO and home buying company transactions occurred despite the fact that, as explained in Section II.B4 below, prices for MLS broker services were above the competitive level during that time period.  The fact that the share of such non-MLS transactions declined despite supracompetitive prices for MLS broker services indicates that the non-MLS options were so comparatively undesirable that, instead of switching to them (as one would expect if they were reasonable substitutes for the price-elevated MLS broker services), sellers have increasingly shifted away from non-MLS options.  Thus, such non-MLS transactions could not have constrained MLS broker service prices enough to have prevented a hypothetical monopolist in MLS broker services from profitably raising prices by 5% above the competitive level.

*4. Product Market Definition Confirmed by Evidence that MLS Brokers Were Actually Able to Raise Prices More Than 5% Above Competitive Levels*

71.     The conclusion that MLS broker services is a relevant product market is confirmed by evidence that no potential substitute has in fact prevented MLS brokers from raising prices by at least 5% above competitive levels.  Two sources of data support this conclusion.

72.     First, the data indicates that MLS broker commissions in the U.S are more than 5% higher than comparable broker commissions in otherwise comparable international markets that are more competitive.  In his report, Professor Economides found that the average buyer broker commission is 1.925% in Australia (including goods and services tax ["GST"] of 10%), 1.13% in the Netherlands (including a value added tax ["VAT"] of 21%), and 1.59% in the U.K. (including VAT of 20%).[153]  The median buyer-broker commission in each of the 20 Covered MLSs in this case was far more than 5% higher than any of these competitive benchmarks, as **Table 1** summarizes.  This data provides direct proof that the alleged substitutes have not constrained MLS brokers from raising prices by at least 5% over competitive levels, thus confirming that MLS brokerage services are a relevant product market.

---

[153] *See* Economides Report at Section V.C (Table 6), and at Section V.B.2 (Table 4).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

| Table 1. Buyer-Broker Rate in each Covered U.S. MLS Is More Than 5% Higher than in Competitive Benchmarks in Other Nations[154] | | | | |
|---|---|---|---|---|
| MLS | MLS Median Buyer-Broker Rate | % increase over Australia Rate | % increase over Dutch Rate | % increase over UK Rate |
| Arizona Regional | 3.00 | 56% | 165% | 89% |
| Austin Bd. of Realtors | 3.00 | 56% | 165% | 89% |
| Bright (mid-Atlantic) | 2.50 | 30% | 121% | 57% |
| Canopy (Carolinas) | 3.00 | 56% | 165% | 89% |
| Columbus Realtors (Ohio) | 3.00 | 56% | 165% | 89% |
| Florida Gulf Coast | 3.00 | 56% | 165% | 89% |
| Greater Las Vegas | 3.00 | 56% | 165% | 89% |
| Houston Ass'n of Realtors | 3.00 | 56% | 165% | 89% |
| Metro (Wisconsin) | 2.40 | 25% | 112% | 51% |
| Miami | 3.00 | 56% | 165% | 89% |
| North Texas RE Info Serv. | 3.00 | 56% | 165% | 89% |
| Northstar (Minn & W. Wis.) | 2.70 | 40% | 139% | 70% |
| Pikes Peak (Colorado) | 3.00 | 56% | 165% | 89% |
| REColorado | 2.80 | 45% | 148% | 76% |
| Realcomp II (Michigan) | 3.00 | 56% | 165% | 89% |
| San Antonio Bd. Of Realtors | 3.00 | 56% | 165% | 89% |
| Stellar (was My Florida Regional) | 2.93 | 52% | 160% | 84% |
| Triangle (North Carolina) | 2.40 | 25% | 112% | 51% |
| Utah Real Estate | 3.00 | 56% | 165% | 89% |
| Yes_Now (Ohio & WVA) | 2.83 | 47% | 151% | 78% |

---

[154] *See* "REA113 Median Commissions by MLS v Comp Benchmarks v4.xlsx."

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

73.     Second, data in this case shows that the inflation-adjusted buyer-broker commission paid to MLS brokers has increased 32% in the seven years from 2013 to 2020 in the 20 Covered MLSs.  In 2013, the average buyer-broker commission was $7,323 (measured in 2020 dollars because of the inflation adjustment), whereas in 2020 the average buyer-broker commission was $9,676.  Figure 2 illustrates the results.  This real increase in MLS broker compensation has occurred despite the fact that, as shown below, technological advancements have decreased the value of broker services while creating the opportunity for significant reductions in home transaction costs.[155]  In a competitive market, one would expect prices to decline when changes in technology reduce product value and incremental costs, which is what we have seen in other markets where agents have been affected by similar technological changes, such as travel agents and stock brokers.[156]  Thus, even if commissions had been competitively priced in 2013 (contrary to the evidence[157]), this real increase in commission prices by more than 5%, despite a decrease in product value and incremental costs, suffices to demonstrate that the alleged substitutes have not constrained MLS brokers in the 20 Covered MLSs from profitably charging at least 5% more than competitive levels for MLS broker services.  This again confirms that MLS brokerage services are a relevant product market.

---

[155] *See infra* Section V.F.
[156] *See infra* Section V.F.
[157] *See supra* Part 1.B *and infra* Part V.A.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**Figure 2: Growth in Inflation-Adjusted Commission Amount Over Time in the 20 Covered MLSs[158]**



*5. The Relevant Product Market Includes MLS Brokerage Services to both Sellers and Buyers*

74.    The above establishes that the relevant product market is no broader than MLS brokerage services. The evidence also indicates that the relevant market is not narrower, because MLS brokerage services are reasonably interchangeable with each other. In particular, the evidence indicates that the provision of MLS brokerage services to sellers is not separate from the provision of MLS brokerage services to buyers. Licensed brokers can provide services to either sellers or buyers, so the set of brokers to whom sellers and buyers can turn is the same. Moreover, only a small minority of brokers represent only sellers or only buyers, with the vast bulk representing both. In 2011, "Only 10 percent of Realtors identified themselves as working exclusively with buyers, while 7 percent said they enter into agency

---

[158] *See* "REA75 Commission Amount over Time v2.xlsx."

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

relationships only with sellers."[159]  In 2020, a NAR study likewise found that 10% of residential Realtors represented only buyers, while 6% represented only sellers.[160] This data thus indicates that throughout the class period, only one sixth of MLS brokers represented only buyers or only sellers, with the vast bulk representing both. This means not only that MLS brokers could switch readily between representing buyers and sellers, but that the vast majority already do so.  Moreover, this is data for individual Realtors, so it is even more likely that a brokerage firm with multiple Realtors could work with both sellers and buyers.

75.     Moreover, "[t]he hypothetical monopolist test ensures that markets are not defined too narrowly, but it does not lead to a single relevant market."[161]  Instead, antitrust analysis can use "any relevant market satisfying the test, guided by the overarching principle that the "the purpose of defining the market and measuring market shares is to illuminate the evaluation of competitive effects."[162]  Accordingly, "There is no single, inherently correct, market definition; it all depends on the anticompetitive effects theory that the market definition is trying to illuminate."[163] In this case, the evidence detailed below in Part III that shows that NAR MLS brokers have monopoly shares and market power across the MLS brokerage services offered to both sellers and buyers also shows that NAR MLS brokers have monopoly shares and market power in selling their services to sellers and buyers separately as well.  Further, the issue at hand is whether the challenged NAR rules have anticompetitive effects, and those rules not only restrain both seller-brokers and buyer-brokers, but also necessarily link any potentially separate markets for MLS broker services provided to sellers and buyers by requiring sellers who list on NAR MLS through a seller-broker to make blanket offers to pay for buyer-broker services as well and by limiting the ability of either seller-brokers or buyer-brokers to negotiate changes from that blanket offer.[164]  Thus, even if markets for MLS broker services to sellers and buyers might become separate if the NAR rules did not exist, the challenged NAR rules restrain both and have so far prevented them from becoming separate markets.  It thus makes sense to analyze the combined market for brokerage services to both sellers and buyers in order to evaluate the competitive effects of the challenged NAR rules.

---

[159] Matt Carter, "Dual Agency and 'double-dipping' still risky business", November 1, 2011, available at: https://www.inman.com/2011/11/01/dual-agency-and-double-dipping-still-risky-business/.

[160] *See* Kentwood-ILe-0034795 at - 817 (2020 NAR "Member Profile").

[161] DOJ/FTC Horizontal Merger Guidelines §4.1.1 (2010).

[162] DOJ/FTC Horizontal Merger Guidelines §4.1.1 (2010).

[163] EINER ELHAUGE, U.S. ANTITRUST LAW & ECONOMICS 255 (3d ed. 2018).

[164] *See infra* Part IV.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

### C. The 20 Covered MLS Regions Are Relevant Geographic Markets

76.     In this case, the plaintiffs' alleged geographic markets are "the geographic areas in which the twenty Covered MLSs operate."[165]   In Section 1 below, I demonstrate that defining local MLS areas as the relevant geographic markets for MLS broker services is consistent with the conclusions of the DOJ and FTC.  In Section 2, I show that other evidence confirms those local MLS geographic markets.  In Section 3, I show that more narrow or broader geographic market definitions would not alter the assessment of anticompetitive effects, and thus should be rejected.[166]

### 1. MLS Regional Markets for MLS Broker Services Are Consistent with the Relevant Geographic Markets Defined by the DOJ and FTC

77.     The FTC and DOJ have repeatedly reached the same conclusion regarding the relevant geographic markets as those alleged in this case, defining residential real estate brokerage service markets within the U.S. based on the geographic area covered by each MLS.  In 2020, the DOJ's Competitive Impact Statement from its case against NAR concluded that:

> The geographic coverage of the MLS serving an area normally establishes the geographic market in which competition among brokers occurs, although meaningful competition among brokers may also occur in smaller areas, like a particular area of a city, in which case that smaller area may also be a relevant geographic market.[167]

This is consistent with the DOJ's 2005 Amended Complaint against NAR, which similarly explained that:

> The real estate brokerage business is local in nature.  Most sellers prefer to work with a broker who is familiar with local market conditions and who maintains an office or affiliated sales associates within a reasonable distance of the seller's property.  Likewise, most buyers

---

[165] Consolidated Complaint ¶134.

[166] *See supra* Section II.B.5 (showing that the relevant market is the market relevant for assessing anticompetitive effects).

[167] *See* Competitive Impact Statement, U.S. v. National Association of Realtors at p.4 (Dec. 10, 2020), *available at*:  https://www.justice.gov/atr/case-document/file/1344346/download.  *See also* Complaint, U.S. v. National Association of Realtors at paragraph 9 (Nov. 19, 2020), *available at*: https://www.justice.gov/atr/case-document/file/1338661/download (same).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

seek to purchase property in a particular city, community, or neighborhood, and typically prefer to work with a broker who has knowledge of the area in which they have an interest. The geographic coverage of the MLS serving each town, city, or metropolitan area normally establishes the outermost boundaries of each relevant geographic market, although meaningful competition among brokers may occur in narrower local areas.[168]

Likewise, the DOJ concluded in 2008 that: "the relevant geographic markets in which brokers compete are local and normally no larger than the service area of the MLS or MLSs in which they participate."[169]

78. The FTC has similarly indicated in its enforcement actions that the relevant geographic market is no larger than the area serviced by an MLS.[170] Moreover, the 2007 FTC-DOJ Real Estate Brokerage Industry Report similarly concluded that:

Competition among brokers is primarily local because real estate is fixed in a geographic location, and buyers and sellers often want some in-person interaction with a broker who has experience and expertise

---

[168] *See* Amended Complaint, U.S. v. National Association of Realtors at paragraph 17 (Oct. 4, 2005), *available at*: https://www.justice.gov/atr/cases/f211700/211751.htm. The DOJ's logic was the same in its 2020 complaint against NAR. *See* Complaint, U.S. v. National Association of Realtors at paragraph 8 (Nov. 19, 2020), *available at*: https://www.justice.gov/atr/case-document/file/1338661/download ("The real estate brokerage business by its nature tends to be local. Most buyers and sellers prefer to work with a broker who is familiar with local market conditions. As a result, NAR's member brokers and agents compete with one another in local listing broker and buyer broker service markets to provide real estate brokerage services to home sellers and home buyers.").

[169] Competitive Impact Statement, U.S. v. National Association of Realtors at p. 9, fn. 7 (Jun. 12, 2008), *available at*: https://www.justice.gov/atr/cases/f234000/234013.htm.

[170] *See*, *e.g.*, Complaint, In the Matter of Williamsburg Area Association of Realtors, Inc., Docket No. C-4177, Before Federal Trade Commission, Nov. 22, 2006, ¶¶ 6, 17 *available at*: https://www.ftc.gov/sites/default/files/documents/cases/2006/12/0610268complaint061128.pdf (market limited to Williamsburg Area, which is the region that the WMLS services); Complaint, In the Matter of Realtors Association of Northeast Wisconsin, Inc., Docket No. C-4178, Before Federal Trade Commission, Nov. 22, 2006, ¶¶ 6, 17 *available at*: https://www.ftc.gov/sites/default/files/documents/cases/2006/12/0610267complaint061130.pdf (market limited to Northeast Wisconsin Area, which is the region that the RANW MLS services); Complaint, In the Matter of Information and Real Estate Services, LLC, Docket No. C-4179, Before Federal Trade Commission, Nov. 22, 2006, ¶¶ 6, 17 *available at*: https://www.ftc.gov/sites/default/files/documents/cases/2006/12/0610087complaint061201.pdf (market limited to "Northern Colorado and/or the IRES Service Area", with the service area defined as "the territory within Northern Colorado").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

relevant to that particular location. For example, a broker in Alexandria, Virginia, competes with other brokers able to meet the needs of consumers who are buying and selling homes in the area; this is likely to include other brokerage firms located in and around Alexandria, but not those located in California.[171]

The same report relates that "research supported by NAR states that 'the U.S. real estate industry is a collection of many local real estate markets.'"[172] Moreover, at least one court has sustained an FTC finding that the relevant geographic market for real estate brokerage services was the local area in which an MLS operated.[173] These sources generally indicate that the broadest plausible definition of the relevant geographic market is coextensive with the geographic boundaries of the MLSs, but that narrower markets may also be relevant. This would necessarily indicate that the relevant geographic markets are no broader than the geographical scope of the 20 MLSs at issue. I show in section 3 that the theoretical possibility of smaller geographic submarkets is not relevant to assessing anticompetitive effects in this case, which means that smaller geographic submarkets would not be relevant markets in this case.

## 2. Regional Markets for the 20 MLSs At Issue in this Case Are Confirmed by Other Evidence

79.    To assess whether the 20 local MLSs at issue in this case are relevant geographic markets, the Hypothetical Monopolist test asks whether an absolute monopolist over all MLS broker services in each of those 20 MLS geographic areas could profitably charge a price at least 5% higher than the price that would prevail if there were instead unrestrained competition between MLS broker services in that market. As discussed above in Section II.A, for such a price increase to be profitable,

---

[171] *See* 2007 FTC-DOJ Real Estate Brokerage Industry Report at pp. 30-31.

[172] *See* 2007 FTC-DOJ Real Estate Brokerage Industry Report at p. 31 (citing "Steve Sawyer, Local Real Estate Market Competition: Evidence and Insight From an Analysis of 12 Local Markets 3 (2005)").

[173] Realcomp II, Ltd. v. F.T.C., 635 F.3d 815, 828-29 (6th Cir. 2011) ("Because of the local nature of real-estate markets, the ALJ found that counties in southeastern Michigan define the geographic scope of competition for real-estate-brokerage services. . . . Adopting these findings, the Commission agreed that "Realcomp possessed substantial market power in two relevant markets in Southeastern Michigan: the market for residential real estate brokerage services and the market for multiple listing services, which is a vital input into the brokerage services market." . . . . Given the extensive and undisputed market analysis undertaken by the ALJ and adopted by the Commission, substantial evidence supports the Commission's findings that Realcomp possessed substantial market power.").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

it does not have to be the case that there is little substitution to brokers in other geographic areas. It simply has to be the case that the substitution rate in response to a price increase is not so high that the price increase will be unprofitable. Nor does it have to be the case that there are no border areas where the substitution rate is relatively high. Instead, whether a relevant market can be defined turns on whether the substitution rate across the entire geographic area would be so high that a price increase imposed on that area would be unprofitable. In a properly defined geographic market, one will often observe higher substitution rates in border areas than non-border areas within that geographic market.

80. NAR and the MLSs themselves define MLSs in regional/local terms. NAR's rules require that each MLS have a geographically defined "service area," within which all listings by participating brokers are required to be submitted to the MLS.[174] Consistent with NAR's rule, each of the MLSs at issue in the case has adopted a geographically defined service area that is regional or local in scope, as is detailed for several of the MLSs in the analysis below. These service areas are typically defined in terms of particular counties or, alternatively, the geographic footprint of the Realtors association(s) that own or operate the MLS. Some MLSs permit (but do not require) listings located outside of the service area, and some limit such non-mandatory listings to those located in the same state(s) as the MLSs' service area.[175]

81. Several factors indicate that sellers and buyers could not defeat a 5% increase in MLS broker prices in one MLS area by switching to MLS brokers in other MLS areas. To begin with, the location of seller homes is obviously fixed, and seller-brokers overwhelmingly list homes located in an MLS's area with that MLS. To be sure, sellers or their brokers do sometimes also list a home located in one MLS area on other MLSs as well, but it is rare. This conclusion is confirmed by examining the data available in this case, which includes MLS data for all the 20 MLS markets alleged in this case. This data shows that the percentage of homes that were listed in only one Covered MLS is 99.85% from March 6, 2015, through December 31, 2020.[176] Similarly, the percentage of actual closed sales of properties that were listed

---

[174] *See* NAR Model MLS Rules, Section 1.12 ("Only listings of the designated types of property located within the service area of the MLS are required to be submitted to the service. Listings of property located outside the MLS's service area will (or will not) be accepted if submitted voluntarily by a participant, but cannot be required by the service. (Amended 11/17)").

[175] *See* Appendix B: Relevant Features of the 20 Covered MLSs and Corporate Defendants (Section B.1-20).

[176] *See* "REA100 Listings in Multiple MLSs v5.xlsx" at Tab "Listed".

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

on only one Covered MLS was 99.83% during that same time period.[177]

82. Further, this data indicate that in any given zip code, almost all sales are of properties listed on the same local MLS. To determine this, I went through each zip code that is included in the produced MLS data, and I determined the percentage of closed sales in that zip code that were listed on each of the 20 Covered MLSs from March 6, 2015, through December 31, 2020. I found that in 78.7% of zip codes, 100% of all closed sales were listed in the same MLS, which means that in the vast bulk of zip codes, the data contains literally zero property sales that were listed on an MLS other than the home MLS.[178] Further, in 92.4% of zip codes, 95% or more of sales were of properties listed on the same MLS.[179] In 93.7% of zip codes, 90% or more of sales were of properties listed on the same MLS from March 6, 2015 through December 31, 2020.[180] And in 95.8% of zip codes, there was no significant overlap in MLSs (where significant overlap is defined as a zip code where at least two MLSs each had over a 20% share of sold listings).[181]

83. This data thus indicates that in each zip code, the vast bulk of sales were of properties listed through the local MLS. To be sure, because the produced data was limited to the 20 Covered MLSs, this analysis could not account for sales of properties that might have been listed on MLSs that did not produce data. However, as shown below, the results are similar for Covered MLSs that do abut other Covered MLSs for which data was produced, so one would expect similar results if data for those other MLSs could be obtained.

84. Moreover, there are two senses in which this data overstates the extent to which sellers with properties located within one MLS's service area might substitute to MLSs in other regions. First, MLSs generally define their service areas by counties, and many zip codes cross multiple counties, especially in rural areas. Thus, to some extent, the existence of sales through multiple MLSs in one zip code may simply reflect the fact that some sellers in that zip code are located within a county that is within one MLS's service area, whereas other sellers in that same zip code are located in another county that is within another MLS's service area. To the extent that is the case, sales of properties within a zip code may be through multiple MLSs even if all those sales were made through the home MLS in whose service

---

[177] "REA100 Listings in Multiple MLSs v5.xlsx" at Tab "Closed".
[178] "REA111 Shares of Sales Multiple MLSs v2.xlsx" at Tab "Pct of Zip Codes."
[179] *Id.*
[180] *Id.*
[181] *Id.*

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

area the properties were located.

85.    Second, in part because the zip codes with a higher percentage of sales through multiple MLSs are more likely to be rural, they also on average have lower total property sales per zip code than zip codes with lower percentages of split MLS sales, so that MLS substitution within zip codes with higher levels of MLS splits would produce less of an effect on the marketwide substitution rate across the MLS service area and thus be less likely to constrain a price increase across that MLS service area.  To assess this effect, I calculated the percentage of actual property sales that went through zip codes with various levels of MLS splits.  I found that for each type of zip code with low levels of MLS splits, the percentage of property sales through such zip codes was larger than the percentage of zip codes at that split level. The results are reported in **Table 2**.

| Table 2.  Low MLS Split Zip Codes' Percentage of Zip Codes & Sold Listings for All 20 MLSs at Issue Combined[182] | | |
|---|---|---|
| **Type of Split Zip Code** | **% of Zip Codes** | **% of Sold Listings** |
| ≥ 95% sales thru 1 MLS | 92.4% | 97.4% |
| ≥ 90% sales thru 1 MLS | 93.7% | 97.9% |
| No Significant Overlap (2 MLSs do not each have ≥ 20%) | 95.8% | 99.6% |

86.    As the preceding table indicates, almost all sales were in zip codes for which the MLS for that area had the vast majority of sold listings and for which there was no significant overlap between rival MLSs.  This indicates that a hypothetical monopolist in each MLS area would be able to impose a profitable price increase of at least 5%.

87.    I also analyzed the data MLS by MLS for each of the 20 MLS areas at issue in this case.  **Table 3** reports the share of sold listings at each MLS in zip codes with various low levels of MLS splits.

---

[182] *Id.*

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

| MLS | ≥ 95% one MLS | ≥ 90% one MLS | Not ≥ 20% for 2 MLSs |
|---|---|---|---|
| **Table 3. Share of Sold Listings at Each MLS in Zip Codes with Low MLS Splits[183]** | | | |
| Arizona Regional | 100.0% | 100.0% | 100.0% |
| Austin Bd. of Realtors | 91.3% | 94.4% | 99.4% |
| Bright (mid-Atlantic) | 100.0% | 100.0% | 100.0% |
| Canopy (Carolinas) | 99.9% | 99.9% | 99.9% |
| Columbus Realtors (Ohio) | 96.7% | 97.6% | 99.1% |
| Florida Gulf Coast | 94.9% | 96.4% | 99.2% |
| Greater Las Vegas | 99.9% | 99.9% | 99.9% |
| Houston Ass'n of Realtors | 98.8% | 99.3% | 99.7% |
| Metro (Wisconsin) | 99.0% | 99.2% | 99.4% |
| Miami | 99.3% | 99.5% | 99.8% |
| North Texas RE Info Serv. | 99.4% | 99.7% | 99.9% |
| Northstar (Minn & W. Wis.) | 99.3% | 99.7% | 99.8% |
| Pikes Peak (Colorado) | 1.8% | 8.9% | 86.3% |
| REColorado | 94.3% | 95.7% | 98.6% |
| Realcomp II (Michigan) | 100.0% | 100.0% | 100.0% |
| San Antonio Bd. Of Realtors | 88.4% | 90.2% | 99.5% |
| Stellar (was My Florida Regional) | 98.7% | 99.5% | 99.7% |
| Triangle (North Carolina) | 99.7% | 99.8% | 99.9% |
| Utah Real Estate | 99.8% | 99.9% | 100.0% |
| Yes_Now (Ohio & WVA) | 97.7% | 98.1% | 99.4% |

88.     This data indicates that, for almost every MLS, a very high percentage of MLS sales was through zip codes that had low levels of split MLS sales. The main possible exception is the Pikes Peak MLS, which has a low percentage of sales in zip codes in which it has more than 90-95% of sold listings. But even Pikes Peak MLS has a very large percentage of its sales (86.3%) that are in zip codes without significant MLS overlap (i.e., in zip codes in which it and a rival MLS both had more than 20% of sold listings). Such percentages can be more than enough to sustain a market definition. Suppose a hypothetical monopolist had the average profit margin for real estate agents and brokers, which is 14.8%.[184] Suppose further we conservatively assume that if that hypothetical monopolist raised prices by 5% in the

---

[183] *Id.* at Tab "Original MLS Zip Codes".
[184] *See* Jim Woodruff, *What Is a Reasonable Profit Margin?*, CHRON (updated Feb. 4, 2019), *available at* https://smallbusiness.chron.com/reasonable-profit-margin-17989.html.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Pikes Peak MLS area, it would lose every single listing in the zip codes with significant overlap. Under that conservative assumption, if a hypothetical monopolist that began with a price P and quantity Q raised prices by 5% it would lose 13.7% of sales Q, which given the profit margin would be profitable if $(1.05 - .852)(P)(.863)(Q)$ were greater than $(.148)(P)(Q)$, which boils down to $.17 > .148$, which is true and thus means it would find such a price increase profitable. And this analysis conservatively abstracts from the reality that the alleged anticompetitive conduct has already inflated prices and profit margins to supracompetitive levels.[185]

89.     Second, as noted above, MLS overlap within zip codes can overstate substitution because zip codes cross the county lines that usually define MLS service areas. This appears to be a particular problem for the Pikes Peak MLS, which defines its service area as the El Paso and Teller Counties in Colorado.[186] But it can also affect other MLSs that define their service areas by county, such as the Austin Board of Realtors.[187] To test this proposition, I ran another version of my analysis to determine the share of sales at counties (rather than zip codes) with various low levels of split MLS sales. The results are reported in **Table 4**.

---

[185] *See supra* at Section II.A (discussing this issue).

[186] *See* Pikes Peak Realtor Service Corp., Rules and Regulations, Mar. 20, 2019, PPRSC0051127 (████████████████████████████████████████████████████████████████████████████████████████████████)

[187] *See* ACTRIS Rules and Regulations (April 2020), ABOR0034929 at 6, 9 ("█████████████████████████████████████████████████████████████████████████████████████████████████████)

64

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

| Table 4. Share of Sold Listings at Each MLS Thru Counties with Low MLS Splits[188] | | | |
|---|---|---|---|
| MLS | ≥ 95% one MLS | ≥ 90% one MLS | Not ≥ 20% for 2 MLSs |
| Arizona Regional | 100.0% | 100.0% | 100.0% |
| Austin Bd. of Realtors | 94.7% | 97.1% | 99.5% |
| Bright (mid-Atlantic) | 100.0% | 100.0% | 100.0% |
| Canopy (Carolinas) | 99.8% | 99.9% | 100.0% |
| Columbus Realtors (Ohio) | 96.1% | 96.2% | 98.2% |
| Florida Gulf Coast | 95.4% | 97.1% | 100.0% |
| Greater Las Vegas | 99.9% | 99.9% | 100.0% |
| Houston Ass'n of Realtors | 98.7% | 99.3% | 99.7% |
| Metro (Wisconsin) | 99.0% | 99.2% | 99.3% |
| Miami | 99.4% | 99.5% | 99.6% |
| North Texas RE Info Serv. | 99.5% | 99.6% | 99.9% |
| Northstar (Minn & W. Wis.) | 99.1% | 99.7% | 99.8% |
| Pikes Peak (Colorado) | 2.2% | 2.7% | 97.3% |
| REColorado | 94.4% | 95.8% | 99.7% |
| Realcomp II (Michigan) | 100.0% | 100.0% | 100.0% |
| San Antonio Bd. Of Realtors | 88.9% | 89.5% | 99.6% |
| Stellar (was My Florida Regional) | 99.5% | 99.8% | 99.9% |
| Triangle (North Carolina) | 99.3% | 99.8% | 99.9% |
| Utah Real Estate | 99.7% | 100.0% | 100.0% |
| Yes_Now (Ohio & WVA) | 97.4% | 98.1% | 98.3% |

90.     This data indicates that, for each MLS, the percentage of MLS sales through counties with low levels of MLS splits was relatively high. In particular, for each MLS, the percentage of sold listings in zip codes without significant MLS overlap (i.e., in which there are not at least two MLSs with 20% of sold listings) is extremely high (≥ 97.3%) in each MLS area. The impact of changing to a county measure is particularly significant for the Pikes Peak MLS, for which the percentage of sold listings in subareas without significant MLS overlap increased from 86.3% (under a zip code measure) to 97.3% (using a county measure). For the Austin Board of Realtors, changing to a county measure only slightly increased its percentage of sold listings in subareas without significant MLS overlap from 99.4% to 99.5%, but had the slightly less modest impact of changing its percentage of sold listings in

---

[188] "REA111 Shares of Sales Multiple MLSs v2.xlsx" at Tab "Original MLS Counties".

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

subareas with more than 95% of sales through its MLS from 91.3% to 94.7%, and changing its percentage of sold listings in subareas with more than 90% of sales through its MLS from 94.4% to 97.1%. For all other MLS areas, the change from the zip code to county measure did not significantly alter these percentages. This data again supports a conclusion that MLS brokers from other MLSs were unlikely to be a reasonable substitute that could constrain supracompetitive prices from any given MLS.

91.    To gain further insight, I mapped the extent to which zip codes met certain thresholds for low splits for each of the 20 MLSs at issue in this case. The results conformed to the normal pattern of data for relevant geographic markets in that they indicated that for the bulk of the geographic markets, a very high percentage (>90%) of sold listings were by suppliers within those markets, with the subareas with lower percentages of sold listings by suppliers within those markets generally being limited to border areas between the geographic markets.[189] In interpreting these maps, one must keep in mind that they visually overstate the split sold listings across MLSs within MLS areas in at least two ways: (1) the zip codes with higher MLS splits tend to be more rural and thus visually larger in relation to population and property sales than other zip codes; and (2) zip codes may well cross the county lines that define each MLS's service area, so that splits within zip codes may not indicate splits within MLS areas at all.

92.    Starting in the West, the MLSs for Greater Las Vegas, Utah Real Estate, and Arizona Regional seem to clearly be separate markets. For each of them, **Figure 3** shows that sales of properties listed in that MLS exceeded 90% in virtually all the zip codes in which that MLS has sold listings, as the next map illustrates. **Figure 3** thus confirms that each of these MLSs has been a separate relevant geographic market. The data above also shows that each of these MLSs had an extremely high percentage of sales (99.7-100%) in the zip codes or counties with low MLS splits, which likewise indicates separate relevant geographic markets.

---

[189] *See supra* Part II.A (noting that general pattern for geographic markets).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**Figure 3: MLSs for Greater Las Vegas, Utah Real Estate, and Arizona Regional[190]**



---

[190] "REA102 Maps Multiple MLSs (zip codes).xlsx".

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

93.     In the mid-Atlantic states, **Figure 4** illustrates the results.  For the Bright MLS, it shows that sales of properties listed at the Bright MLS exceeded 90% in virtually all the zip codes in which Bright had sold listings.  **Figure 4** thus clearly confirms that the Bright MLS has also been a separate geographic market.  Further, the data above also shows that the Bright MLS had 100% of sold listings in zip codes or counties with low MLS splits, which strongly indicates separate geographic markets.

94.     For the Canopy and Triangle MLSs that abut each other in the Carolinas, **Figure 4** indicates that sold listings by one MLS exceeded 90% in almost all the zip codes in which the MLSs had sold listings, with some lower percentages in limited border areas between the two MLSs.  **Figure 4** thus also indicates that the Canopy and Triangle MLSs have been separate geographic markets.  The data above about the extremely high percentage of sold listings (99.3-100%) that each of these MLSs had in zip codes or counties with low MLS splits likewise indicates separate markets.  Defining separate markets is also consistent with the fact that there has been no overlap in the counties that the two MLSs define as their areas of coverage.[191]  However, to be conservative I will also show below that the results would not differ if those markets were combined into one geographic market.

---

[191] Canopy defines its service area as certain counties in North Carolina (Alexander, Anson, Buncombe. Burke. Cabarrus, Caldwell, Catawba. Cleveland, Gaston. Haywood. Henderson. Iredell. Lincoln, Madison, McDowell, Mecklenburg. Montgomery. Polk, Rowan, Rutherford, Stanly, Transylvania, Union) and certain counties in South Carolina (York, Chester, Lancaster). *See* https://carolinamls.happyfox.com/kb/article/66-canopy-mls-service-area/.  Triangle defines its service area as the following counties in North Carolina: Wake, Durham, Orange, Alamance, Caswell, Chatham, Franklin, Granville, Halifax, Harnett, Johnston, Lee, Nash, Person, Vance, and Warren.  *See* Triangle MLS Rules & Regulations, Revised September 2020, TRIANGLE_00001576 at p. 7 ("■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■.");  https://www.trianglemls.com/servicearea.

68

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**Figure 4: Bright, Canopy, Columbus Realtors, Triangle, and Yes_Now MLSs[192]**



95.     Likewise, for the Columbus Realtors and Yes/Now MLSs that abut each other in Ohio, **Figure 4** indicates that sold listings by one MLS exceeded 90% in almost all the zip codes in which those MLSs had sold listings, with some lower percentages in limited border areas between the two MLSs.  **Figure 4** thus also indicates that the Columbus Realtors and Yes/Now MLSs have been separate geographic markets.  The data above about the high percentage of sold listings (96.1-99.4%) that each of these MLSs had in zip codes or counties with low MLS splits likewise indicates separate markets.  Defining separate markets is also consistent with the fact that there has been no overlap in the counties that the two MLSs define as their areas of coverage.[193]  However, to be conservative I will also show below

---

[192] "REA102 Maps Multiple MLSs (zip codes).xlsx".

[193] Columbus Realtors defines its service area as certain counties in Ohio: Fayette, Franklin, Madison, Morrow, Pickaway, Union, Licking, and Delaware. See

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

that the results would not differ if those markets were combined into one geographic market.

96. In the Midwest states, **Figure 5** illustrates the results. For each of the Metro, Northstar, and Realcomp II MLSs, **Figure 5** indicates that sold listings by one MLS exceeded 90% in almost all the zip codes in which they had sold listings, with some lower percentages in limited border areas between the MLSs where they abut. **Figure 5** thus also indicates that these three MLS areas have been separate geographic markets. The data above about the high percentage of sold listings (99.0-100%) that each of these MLSs had in zip codes or counties with low MLS splits likewise indicates separate markets. Defining separate markets is also consistent with the fact that there is hardly any overlap in the counties that the two MLSs define as their areas of coverage, other than the fact that Northstar includes Buffalo county in Wisconsin, which Metro says is a secondary county for them, and Northstar includes all of Minnesota, even though Metro says that secondary counties for them include two counties in Minnesota: Winona and Houston.[194] However, to be conservative I will also show below that the results would not differ if the Northstar-Metro MLS markets for Minnesota-Wisconsin were combined into one geographic

---

ttps://www.columbusrealtors.com/clientuploads/Forms_Directory/BYLAWS-June2021.pdf (June 2021) (Article 3, Section 1: "The territorial jurisdiction of the Association as a member of the National Association of REALTORS® is Fayette, Franklin, Madison, Morrow, Pickaway and Union counties of Ohio. (amended September 2016"); Multiple Listing Service of the Columbus Association of Realtors (Sept. 2020), Columbus_Realtors000137 at p.4 (amended February 2018) (███████████████████████.

[194] Northstar defines its service area as ███████████████████████████████████████ ████████████████████████████." *See* Regional Multiple Listing Service of Minnesota (Northstar) Rules and Regulations, Section 1.2, NORTHSTAR_00000854; Metro defines its service to include following counties in Wisconsin: Dodge (Primary), Jefferson (Primary), Kenosha (Primary), LaCrosse (Primary), Manitowoc (Primary), Marinette (Primary), Milwaukee (Primary), Ozaukee (Primary), Racine (Primary), Sheboygan (Primary), Walworth (Primary), Washington (Primary), Waukesha (Primary), Buffalo (Secondary), Tremealeau (Secondary), Jackson (Secondary), Monroe (Secondary), Vernon (Secondary), Crawford (Secondary), Rock (Secondary), Fond du Lac (Secondary), Calumet (Secondary); as well as the following counties in Minnesota: Winona (Secondary) and Houston (Secondary). *See* https://metromls.com/wp-content/uploads/2020/11/AdvancedManual-052418.pdf; https://metromls.com/wp-content/uploads/2021/08/Metro-MLS-Coverage-Map.pdf. Realcomp II defining its service area as "the State of Michigan". *See* Realcomp II Ltd. Rules and Regulations at p.6, *available at:* https://realcomp.moveinmichigan.com/Portals/0/Support/RulesRegulations.pdf.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

market.[195]

## Figure 5: Metro, Northstar, and Realcomp II MLSs[196]



97.      **Figure 6** illustrates the results for Florida.  For each of the Florida Gulf Coast, Miami, and Stellar MLSs, **Figure 6** indicates that sold listings by one MLS exceeded 90% in almost all the zip codes in which they had sold listings, with some lower percentages in limited border areas between the MLSs where they abut. **Figure 6** thus also indicates that these three MLS areas have been separate geographic markets.  The data above about the high percentage of sold listings (94.9-100%) that each of these MLSs had in zip codes or counties with low MLS splits likewise indicates separate markets.  However, to be conservative I will also show below that the results would not differ if the three Florida MLSs were combined into one geographic market.

---

[195] I do not analyze how the results would be different if Realcomp II were not deemed a separate market because it not only has no overlap in service area with the other Covered MLSs, but also has 100% of its sales through zip codes or counties with low MLS splits.

[196] "REA102 Maps Multiple MLSs (zip codes).xlsx".

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**Figure 6: Florida Gulf Coast, Miami, and Stellar MLSs[197]**



98.    **Figure 7** illustrates the results in Texas. For each of the Austin Bd. of Realtors, Houston Ass'n of Realtors, North Texas RE Info Serv., and San Antonio Bd. of Realtors MLSs, **Figure 7** indicates that sold listings by one MLS exceeded 90% in almost all the zip codes in which they had sold listings, with some lower percentages in limited border areas between the MLSs where they abut. **Figure 7** thus also indicates that these three MLS areas have been separate geographic markets. The data above about the high percentage of sold listings (88.4-99.9%) that each of these MLSs had in zip codes or counties with low MLS splits likewise indicates separate markets. However, to be conservative I will also show below that the results would not differ if the four Texas MLSs were combined into one

---

[197] "REA102 Maps Multiple MLSs (zip codes).xlsx".

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

geographic market.

**Figure 7: Austin Bd. Of Realtors, Houston Ass'n of Realtors, North Texas RE Info Serv., and San Antonio Bd. Of Realtors MLSs[198]**



99.     **Figure 8** illustrates the results in Colorado.  **Figure 8** indicates that each of the two MLSs in Colorado (Pikes Peak and REColorado) had a core area of zip codes in which their sold listings exceeded 90%, with lower percentages in border areas between the MLSs.  **Figure 8** thus tends to indicate that the two MLS areas are separate geographic markets.  The data above also shows that REColorado had a high percentage of sales (94.3-99.7%) in zip codes or counties with low MLS splits, which indicates that the REColorado MLS is likely a separate geographic market from Pikes Peak.  The evidence is less strong that the Pikes Peak MLS is a separate geographic market from REColorado.[199]  However, as noted above, the Pikes Peak

---

[198] "REA102 Maps Multiple MLSs (zip codes).xlsx".

[199] *See generally* EINER ELHAUGE, U.S. ANTITRUST LAW & ECONOMICS 255 (3d ed. 2018) (noting that "the proper market definition may not run equally in both directions if either the substitution rates or baseline profit margins differ. For example, suppose a monopolist in A would profitably raise prices by 6% given substitution to B, but a monopolist in B could profitably raise prices by only 4% given substitution to A. Then in assessing conduct in A, the proper market

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

MLS is likely a separate geographic market because even if one uses zip codes, the percentage of its sold listings (86.3%) in zip codes without significant overlaps would not constrain a hypothetical monopolist from raising prices by 5% even if doing so would lose all sale in zip codes with significant overlap. Further, if one uses counties, the percentage of its sold listings (97.3%) in counties without significant overlaps would be even higher, and thus certainly would not constrain a hypothetical monopolist from raising prices by 5% even if doing so would lose all sales in counties with significant overlap. However, to be conservative I will also show below that the results would not differ if the two Colorado MLSs were combined into one geographic market.

**Figure 8: PikesPeak and REColorado MLSs[200]**



100. Accordingly, the data detailed above indicates that if brokers in an MLS area raised the dollar amount of their commissions by 5% over competitive rates, the percentage of sellers located in that area who would switch to selling via listings at another MLS would be too small to constrain such a price increase. This is also

definition is A, but in assessing conduct in B, the proper market definition is A-B combined. Again, the reason is that the focus is functional, on the degree of actual power to raise prices that might be created by anticompetitive conduct or mergers.")

[200] "REA102 Maps Multiple MLSs (zip codes).xlsx".

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

consistent with economic incentives, because if a seller's home is located in one MLS area, the seller would want their home listed in an MLS that also lists the bulk of other homes in that same MLS area, as this is where buyers and their brokers will find it useful to look for home searches in a given geographic location. Because sellers are the ones paying the inflated commissions under current NAR rules, it is their inability to switch to other areas that determines whether that area is a relevant geographic market. Moreover, while buyers might in theory be able to switch to making purchases in another MLS area, they had little incentive to do so because, under the rules that operated during the class period, buyers did not directly pay for any of the inflated buyer-broker commissions, those commissions could not be disclosed to buyers, and buyers were told that buyer-broker services were free.[201] Further, even if buyers did pay and were aware of those inflated buyer-broker commissions, their choice of housing locations would likely be determined by factors more important to them than a 5% increase in the dollar amount of broker services.

101. The conclusion that each of the 20 Covered MLSs is a separate geographic market is also consistent with the federal government's definition of Metropolitan Statistical Areas (MSAs). The federal government defines MSAs as areas that are linked by social and economic integration and a willingness to commute within that area.[202] Buyers are likely to focus their searches on homes in the MSA in which their job, school, and/or family is located because homes in that MSA are most likely to be a commutable distance away. Although MLSs sometimes encompass multiple MSAs, almost all of the MSAs in the Covered MLSs are only located in one of the 20 MLSs at issue in this case.[203] Thus, each buyer willing to buy a home in a particular MSA can only turn to the MLS that lists properties for that MSA, which will overwhelmingly be the MLS in which that MSA is located. Likewise, sellers who are trying to sell homes located in any given MSA will want

---

[201] *See infra* at Parts IV-V.

[202] *See* United States Census Bureau, Geographic Areas Reference Manual Chapter 13, "Metropolitan Areas", pp. 13-1, *available at*: https://www.census.gov/programs-surveys/geography/guidance/geographic-areas-reference-manual.html ("The general concept of a metropolitan area (MA) is that of a core area containing a large population nucleus, together with adjacent communities that have a high degree of economic and social integration with that core. […] Included among MAs are metropolitan statistical areas (MSAs), consolidated metropolitan statistical areas (CMSAs), and primary metropolitan statistical areas (PMSAs)."); *id*. at 13-6 ("Additional outlying counties are included in the MSA if they meet specified requirements of commuting to the central counties as well as other requirements of metropolitan character.").

[203] *See* "REA82 MLS vs MSA.xlsx" (out of the 79 MSAs, the only two exceptions being the La Crosse, WI-MN and San Antonio, TX MSAs).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

to be listed in the MLS that encompasses that MSA because that MLS will have the house listings that are most attractive to those sellers' set of potential buyers.

102. Finally, even if sellers or buyers could turn to MLS broker services provided outside the geographic area of an MLS, such MLS broker services would not offer a competitive alternative because they would nearly always be subject to most or all of the challenged restraints that apply to the 20 MLSs at issue in this case. As noted above, 97% of MLSs are wholly owned or operated by NAR Realtor associations and thus subject to the same mandatory NAR rules.[204] Many of the remaining 3% of MLSs are controlled or partly owned by NAR Realtor associations or are owned by Realtor-aligned brokerages and did adopt at least some of the challenged restraints at issue in this case, including the Buyer Broker Commission Rule.[205] Moreover, many of the remaining 3% of MLSs either made the NAR Code of Ethics applicable to non-Realtors,[206] required all their MLS brokers to be Realtors,[207] or had high numbers of brokers who were Realtors,[208] which would make the Code of Ethics applicable since it applies to Realtors regardless of their MLS.[209] Few of these MLSs overlapped geographically with the coverage area of the 20 MLSs at issue in this case, and most have either adopted the Buyer Broker Commission Rule and/or are very small.[210] MLS broker services in other areas thus could not provide a competitive alternative that would constrain the anticompetitive

---

[204] *See supra* Section I.A.

[205] *See supra* Section I.A.

[206] *See* GSMLS Rules and Regulations, Section 2.2 (Feb. 26, 2022), https://forms.gsmls.com/RulesRegs.pdf?v=28674794945.

[207] For instance, although they are not exclusively owned by Realtor associations, at least MRED, MiRealSource, SMART MLS, WNYREIS, UNYREIS, and CNYIS required NAR membership as a condition for participating in the MLS. *See* MRED Rules and Regulations, Section 1(a), https://www.mredllc.com/comms/resources/MREDRulesAndRegulations.pdf; MiRealSource Rules & Regulations, July 23, 2013, Art. I, Sec. 1; MiRealSource Broker Application, https://mirealsourceinc.app.box.com/s/ubmxscz952rdibzjxi4ldi47kad64lrx; SmartMLS Rules and Regulations, Section 2.1, https://smartmls.com/wp-content/uploads/2022/01/SmartMLS-Rules-and-Regulations-Master-Copy-Jan-20-2022.pdf; WNYREIS Rules and Regulations at p.1, https://www.bnar.org/downloads/mlscurrentrules.pdf; UNYREIS Rules and Regulations at p. 1, https://www.grar.org/wp-content/uploads/2017/05/2021-03-29-Alliance-MLS-Rules-for-UNYREIS.pdf; CNYIS Rules and Regulations at p. 1, https://www.cnyrealtor.com/clientuploads/Webpage%20Files/MLSResources/alliance_(CNYIS)_mls_rules_4.21.21_approved.pdf .

[208] *See* RMLLC-WDMO-01306855 (2020 T360 MLS Report) and NARSITZER0000097821 (NAR MLS/association spreadsheet).

[209] *See supra* Section I.A.

[210] *See supra* Section I.A.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

effects of those rules. Nor are MLS broker services from other areas likely to be as effective since the providers will typically lack the local knowledge, experience, and in-person availability that sellers and buyers value.[211]

103. Accordingly, the above evidence indicates that a hypothetical monopolist over MLS broker services in each MLS area could raise prices by at least 5% over competitive levels without being constrained by substitution to MLS brokers in other areas, thus making each of those areas a relevant geographic market. This conclusion is confirmed by data directly showing that MLS brokers in each of those areas have actually been able to raise prices by far more than 5% above competitive levels, as discussed in Section II.B.4. **Table 5**, with results reproduced from that section, again details the results. This provides direct proof that the horizontal monopolist test is met for each of the covered MLS areas, and thus supports treating each as a relevant geographic market.

---

[211] *See* 2007 FTC-DOJ Real Estate Brokerage Industry Report at p. 30 ("Competition among brokers is primarily local because real estate is fixed in a geographic location, and buyers and sellers often want some in-person interaction with a broker who has experience and expertise relevant to that particular location.").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

| Table 5. Buyer-Broker Rate in each Covered U.S. MLS Is More Than 5% Higher Than in Competitive Benchmarks in Other Nations[212] | | | | |
|---|---|---|---|---|
| MLS | MLS Median Buyer-Broker Rate | % increase over Australia Rate | % increase over Dutch Rate | % increase over UK Rate |
| Arizona Regional | 3.00 | 56% | 165% | 89% |
| Austin Bd. of Realtors | 3.00 | 56% | 165% | 89% |
| Bright (mid-Atlantic) | 2.50 | 30% | 121% | 57% |
| Canopy (Carolinas) | 3.00 | 56% | 165% | 89% |
| Columbus Realtors (Ohio) | 3.00 | 56% | 165% | 89% |
| Florida Gulf Coast | 3.00 | 56% | 165% | 89% |
| Greater Las Vegas | 3.00 | 56% | 165% | 89% |
| Houston Ass'n of Realtors | 3.00 | 56% | 165% | 89% |
| Metro (Wisconsin) | 2.40 | 25% | 112% | 51% |
| Miami | 3.00 | 56% | 165% | 89% |
| North Texas RE Info Serv. | 3.00 | 56% | 165% | 89% |
| Northstar (Minn & W. Wis.) | 2.70 | 40% | 139% | 70% |
| Pikes Peak (Colorado) | 3.00 | 56% | 165% | 89% |
| REColorado | 2.80 | 45% | 148% | 76% |
| Realcomp II (Michigan) | 3.00 | 56% | 165% | 89% |
| San Antonio Bd. Of Realtors | 3.00 | 56% | 165% | 89% |
| Stellar (was My Florida Regional) | 2.93 | 52% | 160% | 84% |
| Triangle (North Carolina) | 2.40 | 25% | 112% | 51% |
| Utah Real Estate | 3.00 | 56% | 165% | 89% |
| Yes_Now (Ohio & WVA) | 2.83 | 47% | 151% | 78% |

[212] *See* "REA113 Median Commissions by MLS v Comp Benchmarks v4.xlsx."

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

### *3. Broadening or Narrowing the Geographic Markets Would Not Alter the Assessment of Anticompetitive Effects*

104.    As noted above in Section III.B.5, "the purpose of defining the market and measuring market shares is to illuminate the evaluation of competitive effects."[213]  Accordingly, narrower or broader definitions of the relevant geographic market should be rejected if they would not alter the assessment of anticompetitive effects in this case.[214]  In this case, neither narrower nor broader definitions of the geographic market would alter the assessment of anticompetitive effects.

105.    As noted above, the DOJ and FTC have concluded that, although the geographic markets are no broader than the MLS areas at issue in this case, relevant markets could be narrower in some cases.[215]  In this case, however, narrower geographic markets would not be relevant because this case concerns restraints imposed by NAR rules and ethical codes that, if proven to apply to any MLS at issue in this case, clearly apply to subareas within that MLS area.

106.    As the above discussion also indicated, although the available evidence does indicate that the relevant geographic markets are no broader than the MLS areas at issue in this case, one could conservatively combine some of those MLS areas into larger geographic markets.  However, that also would not change the assessment of anticompetitive effects.  To begin with, it is clear that the relevant geographic markets could be no broader than the posited combined markets because in each of those posited combined markets the percentage of sold listings in zip codes with low MLS splits would literally be 100%, as the following table summarizes.

---

[213] DOJ/FTC Horizontal Merger Guidelines §4.1.1 (2010).
[214] *See supra* Part II.B.5.
[215] *See supra* Part II.C.1.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

| Table 6. Share of Sold Listings in the Combined Markets Thru Zip Codes with Low MLS Splits[216] | | | |
|---|---|---|---|
| **Combined MLS Market** | ≥ 95% one MLS | ≥ 90% one MLS | Not ≥ 20% for 2 MLSs |
| Carolinas (Canopy & Triangle) | 100.0% | 100.0% | 100.0% |
| Colorado (Pikes Peak & REColorado) | 100.0% | 100.0% | 100.0% |
| Florida (Florida Gulf Coast, Miami, Stellar) | 100.0% | 100.0% | 100.0% |
| Minnesota-Wisconsin (Northstar & Metro) | 100.0% | 100.0% | 100.0% |
| Ohio-WVA (Columbus Realtors & Yes Now) | 100.0% | 100.0% | 100.0% |
| Texas (Austin Bd. of Realtors, Houston Ass'n of Realtors, North Texas RE Info Serv., & San Antonio Bd. Of Realtors) | 100.0% | 100.0% | 100.0% |

107. Further, defining the relevant geographic markets to include these combinations of local MLS areas would not alter the assessment of anticompetitive effects because the NAR rules apply equally to each of the 20 MLSs at issue, and thus apply equally to any combination of those MLSs.

## III. THE ALLEGED CONSPIRATORS HAVE A HIGH MARKET SHARE AND SIGNIFICANT MARKET POWER IN ALL RELEVANT MARKETS

108. The alleged conspirators in this case include NAR, the local Realtor associations that run the 20 local NAR MLSs at issue, and all brokers governed by the NAR restraints that are challenged in this case.[217] The evidence indicates that all brokers who provided MLS broker services in the 20 Covered MLSs in this case were subject to challenged NAR restraints, as described in greater detail in Parts I and IV.[218] Thus, the alleged conspiracy of NAR-governed MLS brokers includes all MLS brokers that list on the 20 MLSs at issue in this case.

109. I conclude that such NAR-governed MLS brokers have collective market power in each relevant geographic market in this case. Market power can be

---

[216] "REA111 Shares of Sales Multiple MLSs v2.xlsx" at Tab "Combined MLS Zip Codes."
[217] Consolidated Complaint ¶ 32, 37-39.
[218] *See also* Appendix B: Relevant Features of the 20 Covered MLSs and Corporate Defendants (Section A.3).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

established using any one of the three alternative methods discussed in the following three sections—high market shares and significant barriers to rival entry or expansion, direct proof of power over price, and direct proof of power to exclude—and all three of those methods point to market power in this case, as I show below. As I also show below, these conclusions would remain the same even if one (incorrectly) broadened the product market definition to include methods of sale other than MLS brokering or (incorrectly) broadened the geographic market to include the entire nation.

110. My conclusion that NAR-governed MLS brokers have collective market power in each of the 20 MLSs at issue in this case is consistent with the conclusions of the DOJ. In 2020 the DOJ concluded: "By virtue of nearly industry-wide participation and control over important data, brokers offering MLSs possess and exercise **market power** in the markets for the provision of real estate brokerage services to home buyers and sellers in local markets throughout the country."[219] Likewise, the DOJ concluded in 2008 that: "An MLS is thus a market-wide joint venture of competitors that possesses **substantial market power**: to compete successfully, a broker must be a member […]"[220] These statements thus indicate that throughout the class period, NAR-governed brokers in the Covered MLSs had collective market power.

111. The methodology, evidence, and analysis used in my analysis of market power is common to the class and would be the same even if every class member brought a separate antitrust suit. Likewise, the conclusions as to whether NAR-governed MLS brokers have market power in each relevant market do not vary by class member. There were at least 25,000 class transactions in each relevant MLS market during the class period,[221] so the issue of whether NAR-governed MLS brokers have market power in any particular relevant MLS market would require enormous duplication of effort without class certification.

---

[219] Competitive Impact Statement, U.S. v. National Association of Realtors, Dec. 10, 2020, at p.4 (emphasis added), *available at*: https://www.justice.gov/atr/case-document/file/1344346/download. *See also* Complaint, U.S. v. National Association of Realtors, Nov. 19, 2020, at paragraph 10 (same), *available at*: https://www.justice.gov/atr/case-document/file/1338661/download.

[220] *See* Competitive Impact Statement, U.S. v. National Association of Realtors, Jun. 12, 2008, at p.10 (emphasis added), *available at*: https://www.justice.gov/atr/cases/f234000/234013.htm.

[221] *See* "REA106 Class Transactions per MLS.xlsx".

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

### A. High Market Shares and Significant Barriers to Rival Entry or Expansion

112.  Market power can be inferred from evidence of high market shares coupled with significant barriers to rival entry or rival expansion.  As shown below, NAR-governed brokers literally had a 100% market share in the relevant local markets for MLS brokerage services, and the barriers to rival entry were effectively infinite because one could not become an MLS broker in the relevant markets without being subject to NAR restraints and thus becoming part of the conspiracy. Further, even if one incorrectly broadened the product market to include all methods of home sales, NAR-governed brokers would still have a market share of 89-91% in local markets with significant barriers to rival expansion.  If one instead incorrectly broadened the geographic markets to include the entire nation, NAR-governed brokers would conservatively still have at least an 82% share of such a national market for MLS brokerage services.  And if one incorrectly broadened both the product market to include all methods of home sales and the geographic markets to include the nation, NAR-governed brokers would conservatively still have at least a 73-75% share of such a national market for all methods of home sales.  Coupled with the significant barriers to rival entry or expansion, all these market shares are high enough to infer not only market power, but monopoly power, even in such (incorrectly) broadened markets.  While defendants might dispute some of the following evidence or analysis on the merits, the evidence I use below is all classwide, as are the methods used to determine whether this evidence establishes market power and the conclusions I reach on that topic.

### 1. High Market Shares

As shown in Part II, the relevant product market is MLS brokerage services, and the relevant geographic markets are each of the 20 covered MLS areas.  In assessing whether the parties governed by the challenged restraints had market power in the relevant markets, the relevant measure of market share is thus the share of MLS brokered sales that are through MLS brokers governed by challenged NAR rules in each of the covered MLS areas.  In those 20 geographic markets, all MLS brokers are governed by challenged NAR restraints,[222] so the relevant market share is 100% in each geographic market.

113.  Even if one (incorrectly) broadened the product market to include any method of selling a home (without incorrectly broadening the geographic market

---

[222] *See supra* Parts I, *infra* Part IV *and* Appendix B: Relevant Features of the 20 Covered MLSs and Corporate Defendants (Section A.3).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

definitions), the relevant market share would remain high because NAR's own statistics indicate that MLS brokers account for 89-91% of all property sales.[223] Thus, even in such an incorrectly broadened product market for all methods of selling a home, NAR's own statistics indicate that MLS brokers governed by the challenged NAR restraints would have roughly a 89-91% market share in the relevant geographic markets.

114.   Likewise, if one instead (incorrectly) broadened the geographic market to include the entire U.S. (without incorrectly broadening the product market definition), the relevant market share would remain high.  In the nation, 97% of MLSs are exclusively owned or operated by NAR Realtor associations and thus clearly governed by NAR rules.[224]  Many of the remaining 3% of MLSs are controlled or partly owned by NAR Realtor associations or are owned by Realtor-aligned brokerages and did adopt at least some of the challenged restraints at issue in this case, including the Buyer Broker Commission Rule.[225]  Moreover, many of the remaining 3% of MLSs either made the NAR Code of Ethics applicable to non-Realtors, required all their MLS brokers to be Realtors, or had high numbers of brokers who were Realtors, which would make the Code of Ethics applicable since it applies to Realtors regardless of their MLS.[226]  Even if, to be extremely conservative, we ignored the fact that brokers at these 3% of MLSs were often governed by the same restraints as are being challenged here, only approximately 18% of MLS brokers in the nation are members of those MLSs.[227]  Thus, even on this extremely conservative assumption, the MLS brokers governed by the challenged NAR restraints would still have at least an 82% share of any claimed national market for MLS brokers.

115.   Finally, even if one incorrectly broadened both the product market (to include any method of selling a home) and the geographic market (to include the entire nation), the relevant market share would remain high.  Even with the highly conservative estimate that NAR-governed brokers provide at least 82% of all MLS brokerage services, discounting that figure to reflect the fact that MLS brokers

---

[223] 2021 NAR Profile Highlights at p. 9 ("Eighty-nine percent of sellers listed their homes on the Multiple Listing Service (MLS), which is the number one source for sellers to list their home."); 2020 NAR Profile at p. 8 ("Ninety-one percent of sellers listed their homes on the Multiple Listing Service (MLS)").

[224] *See supra* Part I.A *and* Appendix C: MLSs Not Exclusively Owned or Operated by NAR Member Associations.

[225] *See supra* Section I.A.

[226] *See supra* Section II.C.2.

[227] *See infra* Appendix C.

account for 89-91% of property sales would result in a conservative estimate that the relevant market share would be at least 73-75%, even in such an (incorrectly) broadened national market for all methods of selling homes.

### 2. Significant Barriers to Rival Entry or Expansion

116. The barriers to rival entry or expansion are clearly significant. Although individual brokers can become MLS brokers through a straightforward application, doing so in the 20 Covered MLSs would subject them to challenged NAR restraints and thus require them to participate in the challenged conspiracy. Accordingly, the ability of individual brokers to become MLS brokers cannot constrain the collective market power of the MLS brokers that are governed by NAR restraints in the 20 relevant geographic markets. In effect, the barriers to rival entry into the MLS broker services market within the relevant geographic markets are infinite, because one cannot become an MLS broker in the 20 Covered MLSs without being governed by the challenged NAR restraints.[228]

117. Even if one (incorrectly) broadened the product market definition to include means of selling a home other than utilizing MLS broker services, the barriers to rival expansion for those other methods are clearly significant. All the obstacles to competing with MLS brokers that I detailed above in Sections II.B.2-3 would continue to apply, only now (given the broadened product market definition), those obstacles would constitute powerful barriers to expansion for those other methods within that broadened market.

118. Further, because MLSs are the incumbent transaction platform, network effects make it extremely hard for any of these other methods to expand by using alternative listing services, such as online aggregators such as Zillow, given that sellers and buyers will both have strong preferences for using a platform that already has the vast majority of the attention of all potential participants on the other side of the transaction. Any seller, buyer, non-MLS broker, or buying company that contemplates switching to a listing service that lacks access to MLS listings thus knows doing so would lose access to the vast majority of buyers and sellers with which they might want to transact. Once an equilibrium is reached where the bulk of sellers and buyers use a transaction platform for which network effects are strong,

---

[228] *See supra* Part I, *infra* Part IV and Appendix B (Section A.3).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

it is very difficult to change that equilibrium because no rival transaction platform can offer the same network benefits.[229]

119.    Indeed, MLSs' syndication agreements and data feeds with a variety of alternative listing services (online aggregators such as Zillow) utilize these network effects and the possibility of multi-homing to create an additional impediment to rivals. MLSs do this by providing an automatic means to multi-home listings in a way that rival services simply cannot, because the MLSs will not reciprocate by syndicating listings *from* Zillow. Thus, a broker can either list a property on the MLS and have that listing easily syndicated to a large number of aggregator

---

[229] *See*, *e.g.*, Gregory J. Werden, *Network Effects and Conditions Of Entry: Lessons From The Microsoft Case*, 69 Antitrust L. J. 87, 90-92 (2001) ("When two networks compete head-to-head, the larger one offers consumers a cost or quality advantage (other things being equal), which, by the nature of network effects, attracts additional consumers to it. This feedback mechanism tends to cause the larger network to grow further, while the smaller network shrinks. When this feedback mechanism is sufficiently powerful relative to other economic forces at work, markets experience 'tipping,' i.e., when one network is sufficiently larger than rival networks, the rivals tend to shrink and perhaps disappear…. With strong network effects, a product or technology standard can lose out to an objectively inferior alternative with a network size advantage…. A potential entrant into a market with network effects necessarily faces a disadvantage as compared with the incumbent. Without some offsetting advantage, the potential entrant has no prospect of success, and the stronger the network effects, the greater the potential entrant's off- setting advantage must be."); David S. Evans & Richard Schmalensee, *The Antitrust Analysis of Multi-Sided Platform Businesses*, in 1 THE OXFORD HANDBOOK OF INTERNATIONAL ANTITRUST ECONOMICS 404, 421 (Roger D. Blair & D. Daniel Sokol eds., 2015) ("the existence of indirect network effects can also limit supply-side substitutability and increase entry barriers for multisided platforms. Successful incumbent firms have, by definition, obtained a critical mass of users on their several sides and benefit from the positive feedback effects between these customer groups. Entrants have to obtain critical mass as well, and that often takes time. Moreover, in a mature market the entrant has the challenge of persuading users who may benefit from these positive feedback effects to switch to a platform that has a smaller and therefore possibly less valuable group of customers on the other side.").

*See also* Lipczynski et al., INDUSTRIAL ORGANIZATION COMPETITION, STRATEGY AND POLICY (5th ed. 2017) ("The outcome of a battle between technologies aiming to establish supremacy as the industry standard may have far-reaching consequences for the survival and profitability of the competing suppliers. Often the coexistence of competing technologies is unstable. Small or early advantages gained in a standards battle may have decisive and far-reaching consequences, if one technology surpasses a tipping point beyond which all users would switch to the victor, through a bandwagon effect. History matters, and the preferences of early adopters may have considerable influence in shaping product characteristics. Technically superior or cheaper products that arrive on the market later might be unable to dislodge an inferior product that arrived earlier, because users of the latter are already benefiting from a network effect that they are unwilling to forgo by switching.").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

websites, or a broker can take the non-MLS route and list on an alternative listing service that does not, and manually list the property on various aggregator websites (while still not being listed on an MLS). Clearly, the non-MLS route provides far more limited potential availability of that listing for viewing by interested buyers. Thus, even if a broker in a relevant geographic market were interested in using an alternative listing service, it would have little reason to refrain from instead listing on an MLS to get broader exposure on both the MLS and the various alternative listing sites to which the MLSs syndicate listings. But listing on the MLS would mean the broker was providing MLS broker services on a NAR MLS in the 20 relevant MLS markets, thus simply adding to the market share of those providing NAR-governed MLS broker services.

120. The existence of significant barriers to rival expansion within an (incorrectly) broadened market for all methods of selling homes is confirmed by the fact that rival methods of selling a home (that is, methods other than using an MLS broker) have in fact not been able to expand. The three rival methods are selling using a non-MLS broker, sellers selling their homes themselves, or selling to a home buying company. As shown below, each of those rival methods has been unable to expand its market share. This provides strong confirmatory evidence of significant barriers to expansion, especially given that they have been unable to expand despite the fact that MLS broker commissions have been elevated to supracompetitive levels by the challenged restraints.[230] Indeed, such evidence directly confirms that the barriers to rival entry and expansion are sufficiently high to permit firms in the market to earn returns above the competitive level.[231]

121. ***a. The Inability of Non-MLS Brokers to Gain a Significant Share of Home Sales.*** Although individuals can become brokers without joining an MLS, such non-MLS brokers have not been able to gain any significant share of home sales. NAR itself reports that approximately 89-90% of sellers use a broker and approximately 89-91% of sellers listed on an MLS, which means that at most only a

---

[230] *See supra* Sections II.B.4.

[231] *See* AREEDA & HOVENKAMP, ANTITRUST LAW ¶ 420 (4th and 5th Editions 2015-2021) ("For antitrust purposes, a barrier to entry is best defined as any factor that permits firms already in the market to earn returns above the competitive level while deterring outsiders from entering.")

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

tiny percentage of sellers turned to a non-MLS broker.[232]  The DOJ in 2020 likewise concluded that "nearly all" residential real estate brokers are MLS brokers.[233]

122.  ***b. The Inability of Home Buying Companies to Gain a Significant Share of Home Sales.***     Home buying companies have also faced strong barriers to entry and expansion.  As noted above in Section II.B.3, Zillow recently abandoned its large bet on buying homes outside of MLSs after it lost a lot of money attempting to do so.  Other iBuyers like Opendoor and Offerpad have not made any profits yet and have been able to obtain only a small market share, thus likewise indicating an inability to significantly expand.  NAR's own statistics confirm more generally that home buying companies have been unable to expand their share of home sales.  NAR's analysis finds that home buying companies have been stuck at a 1% share of home sales for every year from 2001-2020, with the exception of one year when their share was 0% (2017) and another year when their share was 2% (2019).[234]  Two decades of being unable to expand beyond an initial share of 1% indicates powerful obstacles to expansion.

123.  Moreover, although these firms buy homes outside of MLSs, they then typically resell them via MLSs.[235]  Thus, even if such firms could enter and expand, their entry and expansion would avoid neither NAR's restraints nor the supracompetitive commissions that those restraints maintain.  Such entry and expansion thus could not provide a relevant constraint on the collective market power than NAR exercises through those restraints.

124.  ***c. The Inability of FSBO Sales to Expand Their Share of Home Sales.*** For-Sale-By-Owner (FSBO) sales have also proven to be unable to expand their share of home sales.  To the contrary, as discussed in Section II.B.3, and shown in Figure 9 below, in combination, the share of home sales that were FSBO has actually

---

[232] 2021 NAR Profile Highlights at p. 9 ("Ninety percent of home sellers worked with a real estate agent to sell their home" and "Eighty-nine percent of sellers listed their homes on the Multiple Listing Service (MLS), which is the number one source for sellers to list their home."); 2020 NAR Profile at p. 8 ("Eighty-nine percent of home sellers worked with a real estate agent to sell their home." and "Ninety-one percent of sellers listed their homes on the Multiple Listing Service (MLS)").

[233] *See* Competitive Impact Statement, U.S. v. National Association of Realtors, Dec. 10, 2020, at p.4, *available at*:   https://www.justice.gov/atr/case-document/file/1344346/download. *See also* Complaint, U.S. v. National Association of Realtors, Nov. 19, 2020, at paragraph 9 (same), *available at*: https://www.justice.gov/atr/case-document/file/1338661/download.

[234] 2020 Profile of Home Buyers and Sellers," National Association of REALTORS®, p. 120, https://www.gaar.com/images/uploads/2020_NAR_Consumer_Profile.pdf.

[235] *See supra* Section II.B.3.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

declined significantly, from shares of 13-14% during 2001-05 to shares of 7-8% in 2015-2020. The fact that FSBO sales not only failed to expand, but actually significantly declined, during a period in which MLS broker were elevated above the competitive level, provides powerful evidence that significant barriers to expansion exist.

**Figure 9: FSBO and Homebuyer Share, 2001-2020**[236]



### B. Direct Evidence of Power Over Price

125.   Market power can also be inferred from direct evidence that the relevant actors have the power to charge supracompetitive prices. As noted above in Section II.B.4 and II.C2, the evidence shows that NAR-governed MLS brokers have been able to raise prices by far more than 5% above competitive levels in each of the 20

---

[236] "Market Definition Chart - From 2020 NAR Profile.xlsx". This was produced from the data in "Exhibit 6-31: Method Used To Sell Home, 2001-2020" in the 2020 NAR Profile. *See* 2020 NAR Profile at p. 120.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Covered MLSs.  Table 7 below again reproduces those results.  This data provides direct proof that NAR-governed MLS brokers in each of these areas were able to exercise a collective market power to increase prices far above competitive levels.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

| Table 7. Buyer-Broker Rate in each Covered U.S. MLS Is More Than 5% Higher than in Competitive Benchmarks in Other Nations[237] | | | | |
| --- | --- | --- | --- | --- |
| **MLS** | **MLS Median Buyer-Broker Rate** | **% increase over Australia Rate** | **% increase over Dutch Rate** | **% increase over UK Rate** |
| Arizona Regional | 3.00 | 56% | 165% | 89% |
| Austin Bd. of Realtors | 3.00 | 56% | 165% | 89% |
| Bright (mid-Atlantic) | 2.50 | 30% | 121% | 57% |
| Canopy (Carolinas) | 3.00 | 56% | 165% | 89% |
| Columbus Realtors (Ohio) | 3.00 | 56% | 165% | 89% |
| Florida Gulf Coast | 3.00 | 56% | 165% | 89% |
| Greater Las Vegas | 3.00 | 56% | 165% | 89% |
| Houston Ass'n of Realtors | 3.00 | 56% | 165% | 89% |
| Metro (Wisconsin) | 2.40 | 25% | 112% | 51% |
| Miami | 3.00 | 56% | 165% | 89% |
| North Texas RE Info Serv. | 3.00 | 56% | 165% | 89% |
| Northstar (Minn & W. Wis.) | 2.70 | 40% | 139% | 70% |
| Pikes Peak (Colorado) | 3.00 | 56% | 165% | 89% |
| REColorado | 2.80 | 45% | 148% | 76% |
| Realcomp II (Michigan) | 3.00 | 56% | 165% | 89% |
| San Antonio Bd. Of Realtors | 3.00 | 56% | 165% | 89% |
| Stellar (was My Florida Regional) | 2.93 | 52% | 160% | 84% |
| Triangle (North Carolina) | 2.40 | 25% | 112% | 51% |
| Utah Real Estate | 3.00 | 56% | 165% | 89% |
| Yes_Now (Ohio & WVA) | 2.83 | 47% | 151% | 78% |

## *C. Direct Evidence of Power to Exclude*

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

126.   Market power can also be inferred from direct evidence that the relevant actors have the power to exclude rivals.  In this case, several pieces of evidence indicate that NAR-governed MLS brokers have collectively exercised a power to exclude rivals.  While defendants might dispute this evidence on the merits, it involves classwide evidence and analysis, and any resolution of it would be common to the class.

127.   First, there is evidence that NAR-governed MLS brokers have exercised their power to exclude by giving MLS access to websites like Zillow only if they either (a) agreed to conditions that prevented or hampered their ability to compete with MLS broker services or (b) became MLS brokers governed by NAR rules.[238]  Either of those options excluded independent competition.  A significant power to exclude is evidenced by the fact that NAR-governed MLS brokers' market power over MLS listings was sufficient to make a large company like Zillow at first agree to be excluded from independent competition with MLS brokers and then eventually give up trying to compete with MLS brokers but instead become an MLS broker itself to avoid exclusionary conditions.

128.   Second, there is evidence that NAR MLSs have used their power over MLS listings (a) to get Zillow to exclude non-MLS listings from its initial search results and (b) to get websites like Zillow and Trulia to exclude listings that made public offers of buyer-broker commissions that might compete with MLS listings that made nonpublic offers of buyer-broker commissions.[239]  Both indicate a power to exclude rival forms of competition.

129.   Third, there is evidence that the NAR MLSs have exercised a power to exclude REX, a discount broker that until recently marketed its listings outside of any MLS, by using a combination of market power over MLS broker services and an ability to incentivize buyer-brokers to steer buyers away from REX's non-MLS listings.[240]

---

[237] *See* "REA113 Median Commissions by MLS v Comp Benchmarks v4.xlsx."
[238] *See supra* Part II.B.2.
[239] *See supra* Part II.B.2.
[240] *See infra* Part V.B.4.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

## IV. The Economic Constraints and Incentives Created by the Challenged Restraints

130.   In this Part, I analyze the economic constraints and incentives created by the NAR restraints that are challenged in this case.   My analysis of those economic constraints and incentives may well be disputed on the merits, but as the following analysis clearly shows, they would remain issues resolvable on a classwide basis using classwide evidence, and neither the resolution nor that evidence would differ for different members of the class.

### A. The Buyer Broker Commission Rule and Other NAR Rules Constrain Negotiation of Buyer-Broker and Total Commission Rates While Incentivizing and Facilitating Steering

131.   As explained above in Part I.B, the Buyer Broker Commission Rule maintained and extended the economic incentives for steering and the disincentives for buyers to attempt to negotiate broker commissions that went with the prior arrangement under which sellers paid agent and subagent commissions.[241]   Together with additional NAR rules, the Buyer-Broker Commission Rule continues to provide economic constraints on the negotiation of buyer-broker and total commission rates, while both incentivizing and facilitating steering.   This has maintained and extended an anticompetitive equilibrium, described in greater detail below in Part V.A, in which sellers make blanket offers to pay commissions to buyer-brokers.

132. The NAR Handbook includes the mandatory Buyer Broker Commission Rule as Policy Statement 7.23, which requires listing brokers to publish a blanket unilateral offer of compensation to other MLS brokers working with buyers:

---

[241] The rule was adopted to extend the prior rule, which had similar terms regarding commissions paid to seller-broker subagents, to buyer-brokers, so on its face it applies not only to buyer-brokers but also to seller-broker subagents and transaction brokers working with buyers. *See supra* Part I.B.  While this was relevant to the transition period, after the new rule was adopted, agents working with buyers increasingly served as buyer-brokers rather than seller-broker subagents, so that now virtually all brokers working with buyers are buyer-brokers or, occasionally, transaction brokers.  *See supra* Parts I.B-C.  I thus refer to the rule as the "Buyer Broker Commission Rule," even though technically it also applies to the rare seller-broker subagents who might work with buyers, as well as to transaction brokers.  *See supra* Part I.C. Likewise, throughout this Report, unless otherwise specified, references to "buyer-brokers" include seller-broker subagents, transactions brokers, and cooperating brokers who are working with a buyer.  *See id.*

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

> In filing property with the multiple listing service, participants make blanket unilateral offers of compensation to the other MLS participants and shall therefore specify on each listing filed with the service the compensation being offered by the listing broker to the other MLS participants. This is necessary because cooperating participants have the right to know what their compensation will be prior to commencing their efforts to sell.[] *(Revised 11/04)*[242]

A "participant," as used in this context, must have a "current, valid real estate broker's license" and typically "[p]articipatory rights shall be held by an individual principal broker unless determined by the association or MLS to be held by a firm."[243]

133. The Buyer Broker Commission Rule also (a) requires that the mandatory blanket unilateral offer of commission to buyer-brokers must be made as a ***fixed*** percentage or dollar amount, and (b) prohibits "general invitations by listing brokers to other participants to discuss terms and conditions of possible cooperative relationships."[244] NAR has narrowly interpreted the requirement to offer only a

---

[242] 2021 NAR Handbook, pp. 37-39 (under "Part Two: Policies," "G. Commission/Cooperative Compensation Offers," "Section 1 Information Specifying the Compensation on Each Listing Filed with a Multiple Listing Service of an Association of Realtors® (Policy Statement 7.23)" (footnote omitted)). This Section is followed by a symbol indicating that it is "Mandatory." *See id. See also id.* at p. 2 of pdf ("The compliance classification category of each item is denoted by the following symbol" and showing symbols for "Mandatory," "Recommended, "Optional," and "Informational.").

[243] 2021 NAR Handbook, p. 3 ("Section 2 Definition of MLS Participant (Policy Statement 7.9)" stating that "Where the term Realtor® is used in this explanation of policy in connection with the word member or the word participant, it shall be construed to mean the Realtor® principal or principals, of this or any other association, or a firm comprised of Realtor® principals participating in a multiple listing service owned and operated by the board. Participatory rights shall be held by an individual principal broker unless determined by the association or MLS to be held by a firm. It shall not be construed to include individuals other than a principal or principals who are Realtor® members of this or any other association, or who are legally entitled to participate without association membership. However, under no circumstances is any individual or firm, regardless of membership status, entitled to MLS membership or participation unless they hold a current, valid real estate broker's license and offer or accept cooperation and compensation to and from other participants or are licensed or certified by an appropriate state regulatory agency to engage in the appraisal of real property. […] *(Amended 11/08)*").

[244] 2021 NAR Handbook, p. 37-39 (the Buyer Broker Commission Rule) at p. 38 ("Multiple listing services shall not publish listings that do not include an offer of compensation expressed as a percentage of the gross selling price or as a definite dollar amount, nor shall they include general invitations by listing brokers to other participants to discuss terms and conditions of possible cooperative relationships. *(Amended 11/96)*").

93

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

fixed percentage or dollar amount in a way that precludes any conditions, even ones that are fairly cut and dry.



247

134. The Buyer Broker Commission Rule requires that seller-brokers "specify on each listing filed with the service the compensation being offered" as "blanket unilateral offers of compensation to other MLS participants," and explains that "[t]his is necessary because cooperating participants have the right to know what their compensation will be prior to commencing their efforts to sell."[248] This goal indicates that such compensation cannot be unilaterally modified after buyer-brokers begin such "efforts to sell." Consistent with that goal, the Buyer Broker Commission Rule also explicitly constrains efforts by seller-brokers to negotiate a change in the commissions offered to buyer-brokers from the time an offer to buy a property is made, stating, in relevant part, that:

> This shall not preclude the listing broker from offering any MLS participant compensation other than the compensation indicated on his listings as published by the MLS, **provided the listing broker informs the other broker in writing in advance of their submitting an offer to Purchase** […] [emphasis added][249]

Note 1 to Policy Statement 7.23 (the Buyer Broker Commission Rule) similarly explains, in relevant part, that:

> The essential and appropriate requirement by a multiple listing service is that the information to be published shall clearly inform the participants as to the compensation they will receive in cooperative transactions unless advised otherwise by the listing broker in writing in



245

246

.

247

[248] 2021 NAR Handbook, p. 37-39 (the Buyer Broker Commission Rule) at p. 37.
[249] 2021 NAR Handbook, pp. 37-39 (the Buyer Broker Commission Rule) at p. 38 (this paragraph was "*(Amended 05/10)*".)

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

advance of their submitting an offer to purchase. *(Amended 5/10)*[250]
Thus, by its terms, the Buyer Broker Commission Rule restrains the ability of seller-brokers to negotiate a change in the commission offered to buyer-brokers from the time an offer is made.

135.    In short, the mandatory Buyer Broker Commission Rule requires that listing brokers publish fixed unilateral (i.e., non-negotiated) blanket offers of compensation to buyer-brokers, and prohibits general invitations to negotiate that compensation or the use of conditions that might alter that compensation based on buyer-broker effort level, with the explicit goal of assuring that buyer-brokers know the fixed commission they will get prior to making any effort to help the seller-brokers sell their properties to the buyer-brokers' clients.    The Buyer Broker Commission Rule further explicitly prohibits a seller-broker from later offering an individual broker compensation that differs from the blanket offer published in the MLS, unless three conditions are met: (1) that individual offer is communicated to the buyer broker in "writing"; (2) it is made "in advance of their submitting an offer to purchase"; and (3) it is "expressed as either a percentage of the gross sales price or as a flat dollar amount."[251]    These three conditions impose significant economic constraints on the ability of brokers to tailor their commission offers to individual brokers.  First, NAR prohibits brokers from using MLS fields to vary commissions to individual brokers, meaning that attempts to vary the blanket commission offer requires incurring the burdensome costs of separate writings.[252]    Second, the requirement that the writing modifying the commission offered to a particular broker must be made prior to when a buyer's offer is submitted makes such modifications economically impractical.    Because homes may be shown to many potential purchasers, seller-brokers may not be able to identify that a given buyer-broker will be submitting an offer of purchase, or the economic need to vary a commission offer to such a broker, until after the offer to purchase is submitted.    And, at that point, under NAR's rules it is too late to vary a commission offer.[253]

136.    The Buyer Broker Commission Rule's economic constraints on seller-

---

[250] 2021 NAR Handbook, pp. 37-39 (the Buyer Broker Commission Rule) at p. 38 (Note 1).

[251] *See* 2021 NAR Handbook, p. 38 (Policy Statement 7.23).

[252] *See, e.g.,* NARSITZER0000356812 ( ▮▮▮▮▮▮▮▮▮▮▮▮ ).

[253] *Id.* (after being informed of NAR's policy, broker questioning "how we can properly give notice in writing in advance of a written offer, of a change in commission offering to an agent who's never shown the property & whom we don't know exists").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

broker efforts to change the buyer-broker commission offered from the time an offer is made is replicated in NAR Code of Ethics Standard of Practice 3-2, which states that:

> Any change in compensation offered for cooperative services must be communicated to the other REALTOR® prior to the time that REALTOR® submits an offer to purchase/lease the property. After a REALTOR® has submitted an offer to purchase or lease property, the listing broker may not attempt to unilaterally modify the offered compensation with respect to that cooperative transaction. *(Amended 1/14)*.[254]

The practical significance of this Standard of Practice in the 20 MLSs at issue is primarily that it underscores the constraints on negotiation included within the Buyer Broker Commission Rule; otherwise, its replication in the NAR Code of Ethics simply allows an alternative route by which those who attempt to violate the rule could suffer economic penalties that would disincentivize such violations.[255] Its inclusion in the NAR Code of Ethics also means that even in any non-NAR MLSs that have not adopted rules substantially the same as the Buyer Broker Commission Rule, Realtor seller-brokers will have similar economic constraints on negotiating the offered buyer-broker commission from the time a buyer has made an offer as they would when listing on an MLS in which the Buyer Broker Commission Rule

---

[254] 2021 NAR Code of Ethics, Standard of Practice 3-2, *available at*: https://cdn.nar.realtor/sites/default/files/documents/2021-02-09-COE-PDF.pdf ("Amended 1/14").

[255] ████████████████████████████████████████████

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

applied.[256]

137. Additional NAR rules likewise impose economic constraints on the ability of buyer-brokers to negotiate the buyer-broker commission rate. For example, NAR Code of Ethics Standard of Practice 16-16 constrains efforts by Realtor buyer-brokers to even attempt to negotiate a change in their commission when making an offer to buy a property, stating:

> REALTORS®, acting as subagents or buyer/tenant representatives or brokers, shall not use the terms of an offer to purchase/lease to attempt to modify the listing broker's offer of compensation to subagents or buyer/tenant representatives or brokers nor make the submission of an executed offer to purchase/lease contingent on the listing broker's agreement to modify the offer of compensation. (Amended 1/04).[257]

In both language and effect, Standard of Practice 16-16 applies to Realtor buyer-brokers' attempts to decrease commissions from the blanket offer of compensation, not just to buyer-broker attempts to increase compensation.[258]

138. There is a nearly identical provision in Standard 16.18 of the Standards of Conduct for MLS Participants that applies to non-Realtors,[259] which states:

> MLS participants, acting as subagents or buyer/tenant representatives or brokers, shall not use the terms of an offer to purchase/lease to attempt to modify the listing broker's offer of compensation to subagents or buyer/tenant representatives or brokers, or make the

---

[256] *See supra* Part I.A (showing that the NAR Code of Ethics binds Realtors even in non-NAR MLSs).

[257] 2021 NAR Code of Ethics, Standard of Practice 16-16 ("REALTORS®, acting as subagents or buyer/tenant representatives or brokers, shall not use the terms of an offer to purchase/lease to attempt to modify the listing broker's offer of compensation […]").

[258] *See* Niersbach (NAR) Dep. at 177:13-178:7 (███████████████████████████████████████████████████████████████████████████████████████).

[259] *See* 2021 NAR Handbook, pp. 59-93 ("C. Model Rules and Regulations for an MLS Operated as a Committee of an Association of Realtors®") at pp. 79-82 ("Standards of Conduct for MLS Participants," with an asterisk footnote indicating "Only adopt the standards of conduct if the association's MLS is open to nonmember participants (otherwise qualified individuals who do not hold Realtor® membership anywhere). Any of the standards of conduct, if adopted, may not be modified."); *id*. pp. 107-141 ("F. Model Rules and Regulations for an MLS Separately Incorporated but Wholly-owned by an Association of Realtors®") at 127-130 (Standards of Conduct for MLS Participants).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

submission of an executed offer to purchase/lease contingent on the listing broker's agreement to modify the offer of compensation. *(Amended 1/04)*[260]

139.   As discussed above, the NAR Code of Ethics applies to all Realtors and must be adopted by all local Realtor associations, whereas the MLS Standards of Conduct apply to non-Realtors when MLSs adopt them.[261]   For the nine Covered MLSs that do not admit non-Realtors,[262] NAR Code of Ethics Standard of Practice 16-16 necessarily constrains negotiations by all MLS brokers that use their MLSs. Further, all of the eleven Covered MLS that admit some non-Realtors have adopted MLS Standard of Conduct 16.18,[263] and thus for them all MLS brokers using their MLSs are also governed by the same substantive economic constraint, either under the Code of Ethics Standard of Practice 16-16 (if they are Realtors) or under the MLS Standard of Conduct 16.18 (if they are non-Realtors).   Accordingly, the same substantive economic constraint on buyer-broker efforts to negotiate their commissions from the blanket offers applies to all MLS brokers at all 20 of the Covered MLSs.

140.   In preventing all buyer-brokers in the Covered MLSs from using "the terms of an offer to purchase/lease to attempt to modify the listing broker's offer of compensation" to buyer-brokers, these NAR rules constrain the most economically significant means by which a buyer might attempt to negotiate a lower buyer-broker commission.   Negotiating a lower buyer-broker commission would be most economically significant if it could be coupled with a property offer because then a lower buyer-broker commission would make the rest of the buyer's offer for the property more attractive to the seller if either: (a) the listing agreement makes the commission paid by the seller lower if the buyer-broker commission funded out of that commission is lower; or (b) the seller can use that offer to negotiate a change to that listing agreement that lowers the total commission paid to the seller-broker in

---

[260] 2021 NAR Handbook, pp. 59-93 ("C. Model Rules and Regulations for an MLS Operated as a Committee of an Association of Realtors®") at p. 81 (Standard 16.18, followed by a symbol indicating that it is "Optional"); *id*. pp. 107-141 ("F. Model Rules and Regulations for an MLS Separately Incorporated but Wholly-owned by an Association of Realtors®") at p. 129 (Standard 16.18, followed by a symbol indicating that it is "Optional.").

[261] *See supra* Part I.A.

[262] *See* Appendix B: Relevant Features of the 20 Covered MLSs and Corporate Defendants (Section A.2).

[263] *See* Appendix B (Section A.2).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

order to reflect the reduced buyer-broker commission.[264]  Restraining buyer-brokers from offering lower commissions as part of a purchase offer thus restrains such efforts when they are most likely to economically benefit buyers by providing sellers with lower commissions (or an opportunity to negotiate for them) in a way that would make the rest of the buyer's offer more attractive to the seller.

141.  Several NAR Case Interpretations of its Code of Ethics further underscore the NAR economic constraints on negotiations from the mandatory blanket commission offer to buyer-brokers.[265]  One NAR Case Interpretation indicates that any such negotiation efforts by buyer-brokers should occur not only before an offer occurs, but even before any *showing* occurs.  NAR Case Interpretation #16-15 (dating back to at least May of 1988) states in relevant part that:

> The Hearing Panel's decision noted that REALTOR® B was indeed entitled to negotiate with REALTOR® A concerning cooperating broker compensation, but that such negotiation should be completed *prior to the showing* of the property by REALTOR® B.  The decision indicated that REALTOR® B was entitled to show property listed by

---

[264] As explained in Part V.C and later in this section, in the vast majority of situations the listing agreement between a seller and seller-broker does not provide for a reduced total commission to be paid by the seller if a lower-than-offered buyer-broker commission is actually paid.  Thus, the vast majority of sellers would also need to negotiate a corresponding change in their total commission with the listing broker in order to benefit from a lower buyer-broker commission.  For the few listing agreements that might reduce the total commission paid by the seller if the buyer-broker commission is lower, this rule likewise restrains efforts by a buyer to negotiate a lower buyer-broker commission in order to make a more attractive offer to sellers in a way that does not require any further negotiation with the seller-broker.

[265] NAR's Case Interpretations are "specific and factual situations involving charges of alleged unethical conduct by Realtors®," and are "intended to be used much like decisions in judicial proceedings."  2021 NAR Code of Ethics and Arbitration Manual at p. 2 ("The numbered Case Interpretations are of particular significance. These cases are intended to be used much like decisions in judicial proceedings. That is, they are specific and factual situations involving charges of alleged unethical conduct by Realtors® and/or Realtor-Associates®s and provide insight into the proper form of complaint, the procedures of a Board of Realtors® in processing the complaint to ensure due process, and the rationale of the peer judgment rendered in each case.").  *See also* 2021 NAR Code of Ethics, Explanatory Notes ("In filing a charge of an alleged violation of the Code of Ethics by a REALTOR®, the charge must read as an alleged violation of one or more Articles of the Code. Standards of Practice may be cited in support of the charge. The Standards of Practice serve to clarify the ethical obligations imposed by the various Articles and supplement, and do not substitute for, the Case Interpretations in Interpretations of the Code of Ethics.").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

REALTOR® A on the terms offered by the listing broker in the MLS.[266] This interpretation is consistent with the fact that the Buyer-Broker rule indicates that it is designed to assure that buyer-brokers "know what their compensation will be *prior to commencing their efforts to sell*."[267] Restraining efforts to negotiate the buyer-broker commission unless prior to showing the property greatly reduces the economic incentive to negotiate lower commissions to buyer-brokers, as doing so would require sellers, buyers, and their brokers to engage in time-consuming negotiations at a point in time when it is not yet known how serious the potential buyer's interest in the property is and whether they will even be making an offer. Moreover, it would be very difficult to reach economic agreement on a reduced commission for the buyer-broker outside the context of an offer for the property, which is unlikely to be formulated before the buyer sees the home.

142. Another NAR Case Interpretation, #3-7 (dating back to at least May of 1988), indicates that although seller-brokers can unilaterally modify a blanket offer of compensation before an offer to buy the property is made, with only limited exceptions (discussed above), they can do so only by changing the blanket offer in the MLS listing to all buyer-brokers.[268] This limitation on modifying the blanket offer for a particular buyer creates a further economic constraint on individuated negotiation. It also creates economic disincentives against making any modifications that lower the buyer-broker commission, as it would make that the lower offer apply not only to specific buyer-brokers to whom the seller or seller-

---

[266] *See* "Interpretations of the Code of Ethics of the National Association of Realtors®," 34th Edition, at p. 92, *available at*: https://cdn.nar.realtor/sites/default/files/documents/COE-2022-Case-Interpretations-2021-12-16.pdf (Case #16-15) (emphasis added).

[267] NAR Handbook includes Policy Statement 7.23 (emphasis added).

[268] *See* "Interpretations of the Code of Ethics of the National Association of Realtors®," 34th Edition, *available at*: https://cdn.nar.realtor/sites/default/files/documents/COE-2022-Case-Interpretations-2021-12-16.pdf at p. 36 ("[…] Realtor® A and Seller X, in discussing possible means of making the property more salable, agreed to reduce the listed price. Realtor® A also agreed to lower his commission. Realtor® A changed his compensation offer in the field in the MLS and then called the MLS Participants who had shown Seller X's property to advise them that he was modifying his offer of compensation to cooperating brokers. […] Realtor® C indicated that he would expect to receive the compensation that had been published originally in the MLS and not the reduced amount now being offered to him, since he had already shown the property to Prospect Z and expected an offer to purchase would be made shortly. Realtor® A responded that since Prospect Z had not signed an offer to purchase and no offer had been submitted the modified offer of compensation would be applicable. […] Based on the evidence presented to it, the Hearing Panel concluded that Realtor® A had acted in accordance with the obligation expressed in Standard of Practice 3-2 based on changing the offer of cooperative compensation in the MLS alone, even without the courtesy phone calls, and consequently was not in violation of Articles 2 or 3.").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

broker might offer it, but to all buyer-brokers, which would increase the incentives of other buyer-brokers to steer other buyers away from the seller's property.

143.   As explained in Part V.C, the vast majority of listing agreements do not provide for a reduction in the total commission paid by sellers in instances where the buyer-broker commission paid is less than the offer provided for in the listing agreement.  Thus, for the vast majority of sellers, the only way they could derive economic benefit from negotiating a lower buyer-broker commission would be to also renegotiate their listing agreement to include a correspondingly reduced total commission.  Economic constraints on negotiating the buyer-broker commission thus disincentivize a corresponding negotiation of a lower total seller commission.  Accordingly, while the NAR rules and interpretations discussed above are ostensibly about negotiating the offered compensation to buyer-brokers, they also disincentivize negotiations of the total commission paid by the seller.

144.   This economic constraint on any negotiation of the total commission paid by the seller is further reinforced by another NAR Case Interpretation.  NAR Case Interpretation #16-16 (adopted in April of 1990) states in relevant part that:

> The Hearing Panel concluded that Realtor® B's actions to encourage his buyer-client to pressure the seller to try to modify the listing agreement with Realtor® A was an unwarranted interference in their contractual relationship.
>
> The Hearing Panel noted that Article 16, as interpreted by Standard of Practice 16-16, required Realtor® B to determine, prior to presenting an offer to Realtor® A and her seller-client, whether Realtor® A was willing to contribute to Realtor® B's commission, either directly or by reducing the commission as agreed to in the listing contract and, if so, the terms and amount of such contributions.[269]

This NAR interpretation indicates that, even before making a property purchase offer, a buyer-broker cannot involve the seller in any effort to negotiate the total commission paid by the seller, because the interpretation condemns doing so as an "unwarranted interference" with the contractual relationship between the seller and seller-broker.  As the language in a form listing agreement put it, ███████

███████████████████████████████████████

_____

[269] *See* "Interpretations of the Code of Ethics of the National Association of Realtors®," 34th Edition, *available at*: https://cdn.nar.realtor/sites/default/files/documents/COE-2022-Case-Interpretations-2021-12-16.pdf at p. 93 ("Case #16-16: Buyer Agent's Demand that Listing Agent Reduce Commission (Adopted as Case #21-17 April, 1990. Transferred to Article 16 November, 1994 as Case #16-11. Renumbered November, 2001.)").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

███████████████████████████"[270]  Instead, the buyer-broker can only ask the seller-broker whether the latter would be willing to reduce the seller-broker's commission or contribute to the buyer-broker commission.  Because the seller has far more incentive to want to negotiate a lower total commission than a seller-broker does, and because without a reduction in the total commission a reduction in the buyer-broker commission only benefits the seller-broker and not the seller in the vast majority of instances, this rule further disincentivizes any effort to negotiate the buyer-broker's portion of that total commission.

145.  To be sure, a recent NAR Case Interpretation, #3-13, "Adopted November, 2019" (after the beginning of this litigation), indicates that a seller-broker can ask the buyer-broker whether the latter would be willing to accept a lower buyer-broker commission than was in the blanket offer made in the MLS listing, but the Case Interpretation also underscores that if the buyer-broker declines, the seller-broker must pay the buyer-broker commission indicated in the blanket offer.  The Case Interpretation #3-13 states:

> At the hearing on the matter, Realtor® C argued that by asking her to accept 0.5% less in cooperative compensation after the offer was submitted, Realtor® A was unilaterally modifying the compensation with regard to that transaction. The Hearing Panel disagreed and found no violation of Article 3, noting that Standard of Practice 3-3 specifically authorizes listing and cooperating brokers to enter into an agreement to change the compensation for a transaction at any time, and that the Code of Ethics would never interfere with the negotiation of commissions between listing and cooperating brokers. The Panel also noted that Realtor® C could have said no to the reduced commission, and in that instance Realtor® A would have been obligated to pay the commission stated in the MLS.[271]

In short, under this NAR interpretation of its rules, the seller-broker cannot engage in normal economic negotiation by insisting on a requested term (here a lower buyer-

---

[270]  *See*  BHHACN-ILe-0003680  at  -81  ████████

[271]  *See* "Interpretations of the Code of Ethics of the National Association of Realtors®," 34th Edition, *available at*: https://cdn.nar.realtor/sites/default/files/documents/COE-2022-Case-Interpretations-2021-12-16.pdf at p. 93 ("Case #3-13: Timing of Commission Negotiations (Adopted November, 2019)").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

broker commission) as part of the give-and-take in negotiation over the property sale; instead, the seller-broker can only ask the buyer-broker if the latter would voluntarily accept a lower commission. Since buyer-brokers can get the full commission by simply saying no, they have strong incentives to do just that. This economic constraint greatly undermines the bargaining power of the seller or seller-broker to negotiate a lower buyer-broker commission.

146. These Case Interpretations reflect NAR's official policy as to the proper constraints on negotiations between seller-brokers and buyer-brokers, which indicates its policy would be similar when implementing other rules that use comparable or identical language but are not part of the NAR Code of Ethics. Indeed, to the extent that different sources of similar or identical rules apply to non-Realtor MLS brokers, NAR and its MLSs have strong economic incentives to implement those rules in a way that applies the same standards to all, in order to minimize disputes and avoid disadvantaging Realtors relative to non-Realtors. Moreover, all of the substantive rules that impose economic constraints on negotiating buyer-broker and total commissions (described in this Part IV.A) would apply to all MLS brokers, regardless of whether the particular rule they were subject to was interpreted in line with a particular Case Interpretation, so the practical significance of any possible difference in between-similar-rule interpretation would be small, as negotiations would still be economically constrained in every potential or actual transaction on the 20 MLSs at issue during the class period. Moreover, even if the parallel standards applicable to non-Realtors were interpreted somewhat differently, nine of the 20 Covered MLSs do not have any non-Realtor brokers, and the percentage of non-Realtor brokers at the other eleven Covered MLSs is extremely small.[272]

## B. NAR Code of Ethics Rules Encouraging Buyer-Broker Services to be Represented as "Free" Incentivized Overuse of Buyer-Brokers

147. Other NAR Code of Ethics rules have long incentivized overuse of buyer-broker services by encouraging buyer-brokers to represent that their services are "free."[273] While specifically directed to Realtor brokers who are subject to the

---

[272] *See supra* Part I.A.

[273] *See* 2019 NAR Code of Ethics, *available at*: https://cdn.nar.realtor/sites/default/files/documents/COE2019.pdf, Standard of Practice 12-1 ("Realtors® may use the term 'free' and similar terms in their advertising and in other representations provided that all terms governing availability of the offered product or service are

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Code of Ethics, encouraging brokers subject to those rules to represent their services as "free" encourages all those offering buyer-broker services as brokers to do the same, not just Realtors or MLS brokers. This is because encouraging brokers who are subject to the NAR Code of Ethics provisions to represent their services as free means that anyone they compete with for clients will need to make similar representations, or else be placed at the massive competitive disadvantage of competing against something which is "free." Thus, in any relevant market in which NAR's Code of Ethics rules apply to a substantial number of those offering MLS broker services (which not only will be true for all 20 NAR MLSs in this case, but also will likely to be true for every single MLS in the U.S. given NAR's large membership),[274] they will encourage the same representations regarding all buyer-broker services, and thus will have the same effects as described below throughout the relevant market.

148. While basic economic principles lead to the conclusion that buyer belief that a product's price is lower than its true price will typically lead to excessive demand for that product,[275] recent research has suggested that characterizing a product as "free" has on outsized influence on economic demand.[276] The power of

---

clearly disclosed at the same time. *(Amended 1/97)*") *and* 12-2 ("Realtors® may represent their services as 'free' or without cost even if they expect to receive compensation from a source other than their client provided that the potential for the Realtor® to obtain a benefit from a third party is clearly disclosed at the same time. *(Amended 1/97)*"); 1997 NAR Code of Ethics, *available at*: https://cdn.nar.realtor/sites/default/files/documents/COE1997.pdf, Standard of Practice 12-1 (same) *and* 12-2 (same).

[274] *See* About NAR, *available at*: https://www.nar.realtor/about-nar ("America's largest trade association, representing 1.5 million members, including NAR's institutes, societies, and councils, involved in all aspects of the residential and commercial real estate industries."); https://www.nar.realtor/about-nar/history ("The Association became the largest trade association in the United States in the early 1970s, with over 400,000 members in 1975. Today, the National Association of REALTORS® has over 1.5 million members, 54 state associations (including Guam, Puerto Rico, and the Virgin Islands) and more than 1,130 local associations.")

[275] For example, if a consumer values a product at $10, their reservation price (the most they would be willing to pay for that product) would also be $10, at which point they would be indifferent between buying and not buying the product. If the product's actual price were $12, but this same consumer was convinced that they were actually only paying $8 for it, then the consumer would want to purchase the product even though its actual cost was higher than their maximum valuation of the product.

[276] *See* Daniel L. Rubinfeld & Michal Gal, *The Hidden Costs of Free Goods: Implications for Antitrust Enforcement*, 80 ANTITRUST L.J. 521, 528 (2016). ("The zero price point has become more and more ubiquitous for another reason. Suppliers of the free good may be taking into account an important effect newly acknowledged by behavioral economics. While the allure of

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

this characterization to affect demand is demonstrated in the following, from an explanation of "Why It's a Smart Move to Use a Real Estate Agent":



.[277]

That this incentive had an effect is confirmed by Prof. Economides' analysis of competitive benchmark countries such as Australia, the Netherlands, and the United Kingdom, which found that buyer utilization of buyer-broker services was far less common in those benchmark countries than in the 20 MLS markets at issue in this case.[278] Incentivizing overuse of buyer-brokers maintains, or even increases, defendant market power. As I explained above in Sections II.B.2-3, the closest potential substitutes for MLS broker services include non-MLS broker services and FSBO transactions, but the pervasiveness of the use of buyer-broker services combined with the anticompetitive equilibrium in which sellers pay buyer-broker commissions helps reduce the ability of these potential substitutes to provide any economic constraint on the ability of MLS brokers to raise prices above the competitive level.

149. Moreover, because incentivizing overuse of buyer-brokers means that

---

free is intuitive, recent studies have shown that a free good can have a much stronger lure than its actual value. Zero often serves as a focal point, signaling to consumers that the product or service has a substantially higher benefit than if the same product or service was made available at a very low but positive price. This effect has been found to be so important that it is often called the 'zero price effect' or the 'free effect.' Several major studies have confirmed the existence of such an effect." (footnote omitted)).

[277] RMLLC-NDIL-01376527 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ .

[278] *See* Economides Report Section V.C (finding that buyer brokers were used in 5% or less of transactions in Australia and the United Kingdom, and used in 20% of transactions on average between 2016 and 2020 in the Netherlands). *Compare to* National Association of REALTORS® Research Group, "Real Estate in a Digital Age: 2019 Report" at p. 2 ("In 2018, buyers worked with an agent 87 percent of the time to find their home . . . .").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

almost all buyers use buyer-brokers, it increases the importance of the steering incentives of those buyer-brokers, and thus increases the incentives of seller to offer high buyer-broker commissions. In addition, these NAR rules encouraging buyer-brokers to call their services "free" reinforce the other rules (discussed in the preceding Section) that create economic constraints and disincentives against negotiating buyer-broker and total commission rates, by suggesting to buyers that there is nothing to negotiate over, as their buyer-broker's services are provided for "free." This reinforcing effect further helps maintain the anticompetitive equilibrium and supracompetitive commissions.

150. The NAR rules encouraging buyer-brokers to claim that their services were free included, from 1997 through 2019, NAR Code of Ethics Standard of Practice 12-1, which stated that "REALTORS® may use the term 'free' and similar terms in their advertising and in other representations provided that all terms governing availability of the offered product or service are clearly disclosed at the same time,"[279] and Standard of Practice 12-2, which stated that "REALTORS® may represent their services as 'free' or without cost even if they expect to receive compensation from a source other than their client provided that the potential for the REALTOR® to obtain a benefit from a third party is clearly disclosed at the same time."[280] Although these rules provided that Realtor buyer-brokers who advertise their services as free to buyers should disclose that the buyer-brokers expect some benefit from a third party, they did not require disclosing the amount of that compensation or how it varies across the listings that the buyer-broker might discuss with or provide (or not provide) to the buyer.

151. Effective January 1, 2020, after the filing of this lawsuit, the NAR Code of Ethics Standard of Practice 12-1 was amended while 12-2 was deleted.[281] The new Standard of Practice 12-1 provided that:

> Unless they are receiving no compensation from any source for their time and services, Realtors® may use the term "free" and similar terms in their advertising and in other representations only if they clearly and conspicuously disclose:
> 1) by whom they are being, or expect to be, paid;

---

[279] *See* 2019 NAR Code of Ethics, Standard of Practice 12-1 *and* 12-2; 1997 NAR Code of Ethics, Standard of Practice 12-1 *and* 12-2.

[280] *See* 2019 NAR Code of Ethics, Standard of Practice 12-1 *and* 12-2; 1997 NAR Code of Ethics, Standard of Practice 12-1 *and* 12-2.

[281] *See* 2020 NAR Code of Ethics, *available at*: https://cdn.nar.realtor/sites/default/files/documents/COE2020.pdf, Standard of Practice 12-1 (quoted in main text) *and* 12-2 ("*(Deleted 1/20)*").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

2) the amount of the payment or anticipated payment;

3) any conditions associated with the payment, offered product or service, and;

4) any other terms relating to their compensation. *(Amended 1/20)*.[282]

While this amended Standard of Practice required more specific disclosures than the prior rules did, it did not change that buyer-broker services could be represented as being "free," and would not necessarily lead buyers to become aware prior to closing of the amount of compensation being offered to their buyer-broker for each listed property. This latter point is the case because, first, these disclosures were only required when representing services as free, and second, the most likely time at which such representations would be made is when a buyer initially retains a buyer-broker. Nothing in this revised version of the rule appeared to require continuing disclosure by a buyer-broker of all offers of compensation, so long as they were not continually representing their services as free at the same time as they provided a buyer with listings or showed a property.[283] This rule change thus did little to reduce incentives to overuse buyer-brokers. Under the revised rule, buyers would still usually lack the knowledge needed to incentivize efforts to negotiate buyer-broker commissions below the seller's blanket offers, as the rule would continue to suggest that there was nothing to negotiate over, as their buyer-broker services are provided for "free."

### *C. NAR Rules Allowing MLS Buyer-Brokers to View, and Filter Listings by, the Amount of the Blanket Offer, While Restraining Buyers' Ability to Become Aware of The Blanket Offer*

152. Until recently, still other NAR rules reinforced the above-described rules that constrained and disincentivized the negotiation of buyer-broker and total seller commissions, while also increasing steering incentives. They did so by making the amount of the blanket offers on the MLS listing viewable and filterable by MLS buyer-brokers, but not by buyers. This effect was reinforced by other NAR rules that prevented disclosure to buyers of the commissions that sellers were offering to their buyer-brokers.

153. Several NAR rules operated together to make the amount of blanket offers on an MLS listing viewable and filterable by MLS buyer-brokers. First, as noted in Section IV.A above, the Buyer Broker Commission Rule itself provides that

---

[282] 2020 NAR Code of Ethics, Standard of Practice 12-1.
[283] *See* 2020 NAR Code of Ethics, Standard of Practice 12-1.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

listing brokers must make a unilateral fixed blanket offer of compensation as part of their listing, and that an MLS cannot publish a listing unless this is done. An essential aspect of the Rule is thus making these blanket offers viewable by MLS buyer-brokers. Other rules provided for MLSs to offer means by which MLS buyer-brokers can filter listings according to the blanket offer. NAR Policy Statement 7.58, for instance, required that: "Participants may select the IDX listings they choose to display based only on objective criteria including, but not limited to, factors such as […] cooperative compensation offered by listing brokers."[284] Model MLS Rule Section 18.2.4, another mandatory NAR rule, includes nearly identical language.[285] Model MLS Rule Section 19.12, another mandatory NAR rule, similarly provides that: "A participant's VOW [Virtual Office Website] may exclude listings from display based only on objective criteria, including, but not limited to, factors such as

---

[284] 2021 NAR Handbook, pp. 24-28 ("Section 1 Internet Data Exchange (IDX) Policy (Policy Statement 7.58)") at p. 25 (paragraph 4 under "Policies Applicable to Participants' IDX Websites and Displays" stating that "Participants may select the IDX listings they choose to display based only on objective criteria including, but not limited to, factors such as […] cooperative compensation offered by listing brokers […] *(Amended 05/12)*"). This Section is followed by a symbol indicating that it is "Mandatory." *See id*. at p. 28.

[285] 2021 NAR Handbook pp. 59-93 ("C. Model Rules and Regulations for an MLS Operated as a Committee of an Association of Realtors®" in "Part Three: Model Governance Provisions") at p. 84 (Section 18.2.4, stating that "Participants may select the listings they choose to display through IDX based only on objective criteria including, but not limited to, factors such as […] cooperative compensation offered by listing brokers […]" and that it was "*(Amended 5/17)*"). This Section is followed by a symbol indicating that it is "Mandatory." *See id*.

*See also id*., pp. 107-141 ("F. Model Rules and Regulations for an MLS Separately Incorporated but Wholly-owned by an Association of Realtors®" in "Part Three: Model Governance Provisions") at p. 132 ("Section 18.2.4" with the same restriction); NARSITZER0000022465 (2014 NAR Handbook) at -553 *and* at -597 (same).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

[…] cooperative compensation offered by listing broker."[286]  In this manner, MLS brokers were able to not only view the amount of the blanket offer made in the listing, but could actually filter the listings they provided to buyers according to the amount of that offer.[287]  This ability created strong economic incentives for buyer-brokers to steer buyers to sellers who offered the highest commission to buyer-brokers.

154.    This stands in stark contrast to the information MLSs prohibited being provided to buyers about the blanket offers.  As the DOJ concluded in 2020, "NAR's Commission-Concealment Rules recommend that MLSs prohibit disclosing to prospective buyers the total commissions offered to buyer brokers.  All or nearly all of NAR-affiliated MLSs have adopted a prohibition on disclosing commissions offered to buyer brokers."[288]  This effect was accomplished through the combination of a number of rules in the NAR Handbook.

155.    NAR's Model MLS Rule Section 19.15 stated that: "A participant's

---

[286] 2021 NAR Handbook pp. 59-93 ("C. Model Rules and Regulations for an MLS Operated as a Committee of an Association of Realtors®" in "Part Three: Model Governance Provisions") at p. 91 (Section 19.12).  This Section is followed by a symbol indicating that it is "Mandatory."  *See id*.

    *See also id*., pp. 107-141 ("F. Model Rules and Regulations for an MLS Separately Incorporated but Wholly-owned by an Association of Realtors®" in "Part Three: Model Governance Provisions") at p. 139 (same);

[287] It is important to note that the possibility of a listing being filtered out as a consequence of offering too low of a blanket offer has an impact on behavior regardless of whether such filtering regularly occurs.  Such filtering is simply a form of steering and, as explained in Part V.B.1, the ability and incentive to steer impacts behavior and commission rates even if the steering does not ultimately occur.  Indeed, as I demonstrate below in Part V.B.4.ii, MLS data shows that the ability and incentive to steer has resulted in buyer broker rates clustering in each of the 20 Covered MLSs.  Given that the ability and incentive to steer resulted in the substantial clustering of buyer-broker commission rates, it would not be surprising if many buyer-brokers did not always utilize the filtering feature.  If they were already aware that most or all properties which could be returned by a particular MLS search would offer the same percentage commission as a blanket offer, then there would be little need to utilize such a filter.

[288] Competitive Impact Statement, U.S. v. National Association of Realtors, Dec. 10, 2020, at pp. 6, *available at*:  https://www.justice.gov/atr/case-document/file/1344346/download.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

VOW [Virtual Office Website] may not make available for search by or display to Registrants any of the following information," including "the compensation offered to other MLS participants."[289] "Registrants" are "clients and customers" receiving "real estate brokerage services,"[290] in other words, potential buyers and sellers. Further, this NAR Rule is immediately preceded by a "Note" to Section 19.14 stating that:

> Adoption of Sections 19.15 through 19.19 is at the discretion of the MLS. However, if any of the following sections are adopted, an equivalent requirement must be imposed on participants' use of MLS listing information in providing brokerage service through all other delivery mechanisms.[291]

156. Relatedly, MLS Policy Statement 7.91 ("Virtual Office Websites (VOW) Policy") provides, in relevant part, that:

> An MLS may impose any, all, or none of the following requirements on VOWs, but may impose them only to the extent that equivalent requirements are imposed on participants' use of MLS listing data in providing brokerage services via all other delivery mechanisms.
> a. A participant's VOW may not make available for search by or display to Registrants the following data, intended exclusively for other MLS participants and their affiliated licensees:

---

[289] 2021 NAR Handbook, pp. 59-93 ("C. Model Rules and Regulations for an MLS Operated as a Committee of an Association of Realtors®" in "Part Three: Model Governance Provisions") at p. 91 (Section 19.15). This Section is followed by a symbol indicating that it is "Optional."

*See also id*., pp. 107-141 ("F. Model Rules and Regulations for an MLS Separately Incorporated but Wholly-owned by an Association of Realtors®" in "Part Three: Model Governance Provisions") at pp. 139-140 (same); NARSITZER0000022465 (2014 NAR Handbook) at -560 ("Section 19.15" with the same restriction) *and* at -604 (same).

[290] 2021 NAR Handbook, pp. 43-50 ("Virtual Office Websites (VOW) Policy (Policy Statement 7.91)" at p. 44 ("A participant may provide brokerage services via a VOW that include making MLS active listing data available, but only to consumers with whom the participant has first established a lawful consumer-broker relationship, including completion of all actions required by state law in connection with providing real estate brokerage services to clients and customers (hereinafter 'Registrants').").

[291] 2021 NAR Handbook pp. 59-93 ("C. Model Rules and Regulations for an MLS Operated as a Committee of an Association of Realtors®" in "Part Three: Model Governance Provisions") at p. 91 (Section 19.14, "Note"). The Section 19.14 preceding the "Note" is followed by a symbol indicating that it is "Mandatory." *See id*.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

[…] iii. the compensation offered to other MLS participants […][292]
Per this rule, an MLS that restricted VOWs in this manner had to restrict "all other delivery mechanisms" in the same way. As a result, where a NAR MLS adopted NAR's recommended rule prohibiting the disclosure of commissions through VOWs, all MLS brokers were also prohibited from disclosing commissions to customers through any delivery mechanism, even "orally."[293]

157. Also, MLS Policy Statement 7.58 ("Internet Data Exchange (IDX) Policy"), which NAR recommended that MLSs adopt "to conform to National Association policy," provided that:

MLSs may: […] 2. prohibit display of confidential information fields intended for cooperating brokers rather than consumers including compensation offered to other MLS participants, showing instructions,

---

[292] 2021 NAR Handbook pp. 43-50 ("Virtual Office Websites (VOW) Policy (Policy Statement 7.91)") at p. 49 ("IV. Requirements that MLSs May Impose on the Operation of VOWs and Participants").
Section IV.1.a.vi. adds "instructions or remarks intended for cooperating brokers only, such as those regarding showing or security of the listed property." *See id*.

[293] 2021 NAR Handbook pp. 43-50 ("Virtual Office Websites (VOW) Policy (Policy Statement 7.91)") at p. 47 ("III. Policies Applicable to Multiple Listing Services" with paragraph 2 providing in relevant part that "Confidential data includes only that which participants are prohibited from providing to customers *orally and by all other delivery mechanisms*. They include fields containing the information described in Section IV.1. of this policy […]") (emphasis added).

111

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

property security information, etc.[294]

In addition, Model MLS Rule Section 18.3.1 provided:

Listings displayed pursuant to IDX shall contain only those fields of data designated by the MLS. Display of all other fields (as determined by the MLS) is prohibited. Confidential fields intended only for other MLS participants and users (e.g., cooperative compensation offers, showing instructions, property security information, etc.) may not be displayed. *(Amended 05/12)*[295]

158. Of the 20 Covered MLSs, 15 adopted a rule which prevented disclosure of commission offers through VOW listings.[296] Per MLS Policy Statement 7.91, described above, MLS brokers in these 15 MLSs were thus prohibited from disclosing commission offers to customers through any other delivery mechanism, including orally.[297] For the other 5 MLSs, I can find no affirmative indication that the MLSs allowed the disclosure of commission offers through VOWs or other mechanisms.[298] 18 of the 20 Covered MLSs adopted a rule which prevented

---

[294] 2021 NAR Handbook, pp. 24-28 ("Section 1 Internet Data Exchange (IDX) Policy (Policy Statement 7.58)") at p. 27 (under the heading "Policies Applicable to Multiple Listing Services," stating "The following guidelines are recommended but not required to conform to National Association policy. MLSs may: […] prohibit display of confidential information fields intended for cooperating brokers rather than consumers including compensation offered to other MLS participants […]").

[295] 2021 NAR Handbook, pp. 59-93 ("C. Model Rules and Regulations for an MLS Operated as a Committee of an Association of Realtors®" in "Part Three: Model Governance Provisions") at p. 85 (Section 18.3.1). This Section is followed by a symbol indicating that it is "Optional."

*See also id.*, pp. 107-141 ("F. Model Rules and Regulations for an MLS Separately Incorporated but Wholly-owned by an Association of Realtors®" in "Part Three: Model Governance Provisions") at p. 133 (same).

[296] *See* Appendix B: Relevant Features of the 20 Covered MLSs and Corporate Defendants (Section A.3 and B-1-20). The exceptions were Bright MLS, Canopy MLS, Metro MLS, MLS NOW, and Triangle MLS. *Id.* at Section B.1-20.

[297] *See* 2021 NAR Handbook pp. 43-50 ("Virtual Office Websites (VOW) Policy (Policy Statement 7.91)"); Gansho Dep. at 119:17-120:10; *id.* at 123:12-124:4; *id.* at 126:16-127:8.

[298] *See* Appendix B (B.1-20).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

disclosure of commission offers through IDX feeds.[299]  For the two exceptions, MLS Now and Realcomp II, I can find no affirmative indication that they allowed disclosure of commission offers through IDXs or other mechanisms.[300]  In fact, despite the lack of a clear rule preventing disclosure of commission offers on IDX feeds, MLS Now and Realcomp II's non-disclosure can be confirmed by accessing MLS Now and Realcomp II listings on the RE/MAX website, which displays offered commissions for listings from MLSs which allow commission offers to be disclosed through IDX feeds while not showing them for MLSs which do not.[301]  Neither MLS Now nor Realcomp II's listings display offered commissions.[302]  Thus, all 20 Covered MLSs prevented disclosure of commission offers through at least VOW or IDX feeds, without affirmative indications that they allowed disclosure of commission offers through either mechanism.[303]  This indicates that all 20 Covered MLSs did not disclose offered commissions through VOWs or IDX feeds, and were thus subject to NAR's non-mandatory non-disclosure rules.[304]

159.  This demonstrates that, together, these non-disclosure provisions provided a framework within which all 20 Covered MLSs could and did prevent buyers from seeing the blanket offers made to buyer-brokers.[305]  Moreover, mandatory Model MLS Rule Section 10, "Confidentiality of MLS Information," places further limits on the ability of buyers to get this information:

> Any information provided by the multiple listing service to the participants shall be considered official information of the service. Such information shall be considered confidential and exclusively for the use of participants and real estate licensees affiliated with such participants and those participants who are licensed or certified by an appropriate state regulatory agency to engage in the appraisal of real property and licensed or certified appraisers affiliated with such participants. *(Amended 4/92)*[306]

---

[299] *See* Appendix B (B.1-20).

[300] *See* Appendix B (B.11).

[301] *See* Inman, RE/MAX starts displaying buyers' agent commission on listings (Feb. 8, 2021), available at https://www.inman.com/2021/01/29/re-max-starts-displaying-buyers-agent-commission-on-listings/.

[302] *See* Appendix B (B.11, 15).

[303] *See* Appendix B (A.3, B.1-11).

[304] *See id*.

[305] *See* Appendix B (Section A.3).

[306] 2021 NAR Handbook pp. 59-93 ("C. Model Rules and Regulations for an MLS Operated as a Committee of an Association of Realtors®" in "Part Three: Model Governance Provisions") at p. 74 ("Section 10 Confidentiality of MLS Information").  This Section is followed by a symbol indicating that it is "Mandatory."  *See id*.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

This end was further supported by mandatory NAR MLS Policy Statement 7.3, which discusses the possible provision of statistical and other informational reports to Realtors who do not participate in the MLS or to government agencies, and notes that "It is strongly recommended that any irrelevant information such as […] the sales commission or the compensation offered or paid to cooperating brokers be deleted."[307] These restrictions could prevent buyers from becoming even *generally aware* of the buyer-broker commissions offered on an MLS. Because these rules were mandatory on NAR MLSs, they necessarily applied in all the 20 MLSs that are relevant in this case.

160. The effectiveness of these NAR rules constraining the disclosure to buyers of the commissions that sellers were offering to their buyer-brokers was further supported by agreements MLSs reached with aggregator websites like Zillow as a condition of their accessing MLS listing data. Those agreements generally provided MLS listing data to websites only on the condition that the websites either: (a) agreed to non-compete conditions that precluded those websites from making MLS offers of cooperation payments to buyer-brokers public to buyers; or (b) agreed to become MLS brokers themselves, thus subjecting them to all the above constraints on disclosing to buyers the cooperation-payments being offered to buyer-brokers.[308]

161. In combination, the NAR rules discussed above meant that buyers would usually lack the knowledge needed to motivate them to even try to negotiate a buyer-broker commission below the seller's blanket offer. After all, these rules would lead buyers to mistakenly believe that buyer-broker services were free and would prevent disclosure to buyers of how much sellers were offering to pay their buyer-brokers either generally or for the specific homes in which they might be interested. As discussed further in below in Part V.B, these additional NAR rules also impeded the ability of buyers to see if they were being steered by their buyer-broker towards properties on which sellers offered higher buyer-broker commissions.

---

[307] 2021 NAR Handbook, p. 23 (Part 2-D, "Statistical Reports," "Section 1 Statistical Reports (Policy Statement 7.3)" stating that "It is strongly recommended that any irrelevant information such as the names of current or former owners, or information concerning the sales commission or the compensation offered or paid to cooperating brokers be deleted. *(Revised 11/04).*" This Section is followed by a symbol indicating that it is "Mandatory." *See id*.

[308] *See supra* Section II.B.2-3.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

### D. The Collective Restraints Imposed by NAR Rules

162.   Collectively the rules discussed in Parts IV.A-C:

1. Required in all 20 Covered MLSs that home sellers make a "blanket" offer of compensation to all MLS buyer-brokers that had to be a fixed percentage or dollar amount and could not include general invitations to negotiate those offers or the use of conditions that might alter that compensation based on buyer-broker effort level, with the explicit goal of assuring that buyer-brokers know the fixed commission they will get prior to making any effort to help the seller-brokers sell their properties to the buyer-brokers' clients.

2. Constrained the economic incentive and ability of buyers, sellers, or their brokers to negotiate buyer-broker commissions below the blanket offer published on the MLS.

3. Limited the knowledge needed for buyers to try to negotiate lower commissions by (a) encouraging buyer-brokers to represent that their services were free to buyers and (b) preventing the disclosure to buyers of the compensation that sellers were offering to their buyer-brokers, while making that offered compensation viewable and filterable by buyer-brokers.

163.   As explained in Part V.B below, the combined effect of these rules incentivized steering because they: (a) caused the vast majority of buyers to be represented by a broker; (b) made sure that buyer-broker commission offers were set by sellers and seller-brokers, who had incentives to set them at levels that would discourage buyer-brokers from steering buyers away from their listings; (c) allowed MLS brokers and their agents to sort or exclude properties according to the amount of compensation offered to buyer-brokers; (d) made such offers viewable only by MLS brokers and agents and not by buyers; and (e) made sure that these offers of compensation were based solely on whether the sale was completed, rather than based on any effort the buyer-brokers exerted.

164.   NAR's challenged restraints applied to all MLS brokers in all of the 20 MLSs at issue in this case and whose transactions were included in the class definition.  Thus, a proper understanding of the economic constraints and incentives created by these restraints are equally applicable to all class members, and the evidence and analysis on which they rely are all common to the class.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

### E.  The DOJ's Proposed 2020 Settlement, 2021 Withdrawal, and Subsequent 2022 Changes to NAR Rules

165.  On November 19, 2020, the DOJ filed a Complaint against NAR[309] as well as a proposed Final Judgment that would have settled the case.[310]  Section IV of the proposed Final Judgment addressed "Prohibited Conduct," and provided in relevant part that:

> NAR and its Member Boards must not adopt, maintain, or enforce any Rule, or enter into or enforce any Agreement or practice, that directly or indirectly:
> 1. prohibits, discourages, or recommends against an MLS or MLS Participant publishing or displaying to consumers any MLS database field specifying the compensation offered to other MLS Participants;
> 2. permits or requires MLS Participants, including buyer Brokers, to represent or suggest that their services are free or available to a Client at no cost to the Client;
> 3. permits or enables MLS Participants to filter, suppress, hide, or not display or distribute MLS listings based on the level of compensation offered to the buyer Broker or the name of the brokerage or agent […][311]

In short, had the Proposed Judgment been entered, its provisions would have negated the NAR rules (discussed above in Sections IV.B and IV.C) that encouraged buyer-brokers to represent their services as free to buyers, allowed MLS participants to filter listings based on the amount of the blanket offer, and prohibited disclosure of the blanket offer to buyers in listings.  The associated Competitive Impact Statement explained that "the United States filed a Stipulation and Order and proposed Final Judgment, which are designed to remedy the anticompetitive effects alleged in the Complaint" and thus indicate that the DOJ concluded that the restraints discussed above in Sections IV.B and IV.C were anticompetitive.[312]

---

[309] Complaint, U.S. v. National Association of Realtors, Nov. 19, 2020, *available at*: https://www.justice.gov/atr/case-document/file/1338661/download.

[310] [Proposed] Final Judgment, U.S. v. National Association of Realtors, Nov. 19, 2020, *available at*: https://www.justice.gov/atr/case-document/file/1338671/download.

[311] [Proposed] Final Judgment, U.S. v. National Association of Realtors, Nov. 19, 2020 at p. 4.  Part IV. lists one other form of "Prohibited Conduct," namely that which "4. prohibits, discourages, or recommends against the eligibility of any licensed real estate agent or agent of a Broker, from accessing, with seller approval, the lockboxes of those properties listed on an MLS." *See id*.

[312] Competitive Impact Statement, U.S. v. National Association of Realtors, Dec. 10, 2020, *available at*: https://www.justice.gov/atr/case-document/file/1344346/download.  *See also* [Proposed] Final Judgment, U.S. v. National Association of Realtors, Nov. 19, 2020 at 1 (stating

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

166.    The DOJ subsequently withdrew the proposed Final Judgment on July 1, 2021[313] and voluntarily dismissed the case.[314]   The withdrawal of the proposed Final Judgment does not indicate any change in the DOJ's conclusion that the restraints it would have prohibited were anticompetitive, but instead indicates that the DOJ withdrew it in order to preserve the DOJ's ability to "investigate and challenge *additional* potential antitrust violations committed by Defendant [NAR]."[315]   The combination of the proposed Final Judgment and its withdrawal thus indicates that the DOJ concluded that the restraints discussed above in Sections IV.B and IV.C were anticompetitive and that other NAR restraints (as to which DOJ has preserved its ability to investigate and challenge) might be anticompetitive as well.  The former conclusion thus confirms the conclusions of this report.  The latter conclusion is consistent with my conclusions above in Section IV.A that additional anticompetitive restraints were imposed by the Buyer Broker Commission Rule and the other NAR rules that imposed economic constraints on the ability and incentives of sellers, buyers, and brokers to negotiate the amount of the buyer-broker commission.

167.    Effective in 2022, NAR changed several rules in line with what would have been required by the proposed Final Judgment with the DOJ.  These changes include: (1) prohibiting buyer-brokers from representing that their services are free unless they actually receive no compensation from any source for those services; (2) prohibiting MLSs from providing participants with the ability to filter listings according to the amount of the blanket offer; and (3) requiring MLSs to include the amount of the blanket offer on their websites, in data feeds, and that they "must permit" such information to be shared.[316]   The changes are all mandatory rules that

---

that its provisions had "the purpose of remedying the anticompetitive effects alleged in the Complaint").

[313] *See* Notice of Withdrawal of Consent to Entry of Proposed Final Judgment, July 1, 2021, in U.S. v. National Association of Realtors, *available at*: https://www.justice.gov/atr/case-document/file/1409106/download ("Plaintiff United States of America, by and through its attorneys of record, hereby withdraws its consent to entry of the proposed Final Judgment in the above-captioned matter.").

[314] *See* Notice of Voluntary Dismissal, U.S. v. National Association of Realtors, July 1, 2021, *available at*: https://www.justice.gov/atr/case-document/file/1409111/download ("The United States accordingly notices voluntary dismissal of this action, without prejudice.").

[315] *See* Notice of Withdrawal of Consent to Entry of Proposed Final Judgment, July 1, 2021, in U.S. v. National Association of Realtors at 1-2 (emphasis added).

[316] *See* "Summary of 2022 MLS Changes," https://www.nar.realtor/about-nar/policies/summary-of-2022-mls-changes; 2022 NAR Handbook, *available at*:

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

are stated to be effective as of January 1, 2022[317] and required to be adopted by MLSs by March 1, 2022.[318]  While my understanding is that the current class period for damages purposes runs through December 31, 2020, for completeness, and because Plaintiffs have also proposed an injunctive relief class, I discuss each of these changes in turn.

168.  First, the 2022 NAR Code of Ethics and 2022 NAR Handbook now prohibit buyer-brokers from representing that their services are free unless they actually receive no compensation from any source for those services.  NAR Code of Ethics Standard of Practice 12-1 now provides that "REALTORS® must not represent that their brokerage services to a client or customer are free or available at no cost to their clients, unless the REALTOR® will receive no financial compensation from any source for those services."[319]  Likewise, the NAR Handbook now has a mandatory new Section 4.5 added to the Model MLS Rules, and a mandatory new MLS Policy Statement 8.4, which require that "MLS participants and subscribers must not represent that their brokerage services to a client or customer are free or available at no cost to their clients, unless the participant or subscriber will receive no financial compensation from any source for those services."[320]  This goes beyond the initial 2020 amendments to the NAR Code of

---

https://cdn.nar.realtor/sites/default/files/documents/2022%20MLS%20Handbook%20final%2012.28.21%20pdf.pdf;  2022  NAR  Code  of  Ethics,  *available  at*: https://cdn.nar.realtor/sites/default/files/documents/2022-COE-Standards-of-Practice-2021-12-15.pdf.

[317]  *See* "Summary of 2022 MLS Changes," https://www.nar.realtor/about-nar/policies/summary-of-2022-mls-changes ("All changes become effective January 1, 2022, unless indicated otherwise."); 2022 NAR Code of Ethics ("Effective January 1, 2022").  The changes in the 2022 NAR Handbook generally reflect that they were "Amended 11/21." *See, e.g.*, 2022 NAR Handbook at p. 69 ("Section 4.5 Services Advertised as 'Free'" reflecting that it was "*(Amended 11/21)*").

[318]  *See* "Summary of 2022 MLS Changes," https://www.nar.realtor/about-nar/policies/summary-of-2022-mls-changes (asterisk indicating that for rules marked with an "M" symbol to denote that their "compliance classification category" is "Mandatory," that "Adoption is necessary to ensure compliance with mandatory policies and ensure coverage under the NAR's insurance policy for associations and MLSs. Local adoption is required by March 1, 2022.").

[319] 2022 NAR Code of Ethics, Standard of Practice 12-1 ("(Amended 1/22)").

[320]  *See* "Summary of 2022 MLS Changes," https://www.nar.realtor/about-nar/policies/summary-of-2022-mls-changes ("(New) Section 4.5, Services Advertised as 'Free'" and "(New) MLS Policy Statement 8.4, Services Advertised as 'Free'").  Both the Section and the Policy Statement are followed by a symbol indicating that they are "Mandatory." *See id*.  *See also* 2022 NAR Handbook at p. 69 ("Section 4.5 Services Advertised as 'Free'" which was "*(Amended 11/21)*") *and* at p. 30 ("Section 6 Services Advertised as 'Free'").  The "Table of Contents for

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Ethics, which allowed buyer-brokers to represent their services as free as long they disclosed how they expected to be paid.[321]

169.    Second, the 2022 NAR Handbook now prohibits MLSs from providing participants with the ability to filter listings according to the amount of the blanket offer.  A mandatory new MLS Policy Statement 8.5 requires that "MLS participants and subscribers must not, and MLSs must not enable the ability to, filter out or restrict MLS listings that are searchable by and displayed to consumers based on the level of compensation offered to the cooperating broker or the name of a brokerage or agent."[322]   Accordingly, the ability to select or exclude listings based on the "cooperative compensation offered by listing broker,"[323] discussed above in Part IV.C, has been removed from a number of rules, including Sections 18.2.4 and 19.12 of the Model MLS Rules and MLS Policy Statements 7.58 and 7.91.[324]

170.    Third, the 2022 NAR Handbook now has a mandatory rule that requires MLSs to include the amount of the blanket offer on their "consumer-facing website(s)," in data feeds, and that they "must permit" such information to be shared.  New MLS Policy Statement 8.8 requires that:

> MLSs must include the listing broker's offer of compensation for each active listing displayed on its consumer-facing website(s) and in MLS data feeds provided to participants and subscribers and must permit MLS participants or subscribers to share such information though IDX and VOW displays or through any other form or format provided to clients and consumers. The information about the offer of compensation must be accompanied by a disclaimer stating that the

---

Chronological Listing of Multiple Listing Policy Statements" lists "Statement 8.4 Services Advertised as 'free'" at p. 30, but p. 30 itself does not identify Section 6 as being Policy Statement 8.4.  *See id*. at pp. xi-xiv (Table of Contents) *and* at p. 30 (Section 6).

[321] *See supra* Section IV.B.

[322] *See* "Summary of 2022 MLS Changes," https://www.nar.realtor/about-nar/policies/summary-of-2022-mls-changes ("(New) MLS Policy Statement 8.5, Non-filtering of Listings").  This Policy Statement is followed by a symbol indicating that it is "Mandatory."  *See id*. *See also* 2022 NAR Handbook at p. 22 ("Section 21 Non-filtering of Listings (Policy Statement 8.5)" which was "*(Adopted 11/21)*").

[323] *See*, *e.g.*, 2021 NAR Handbook at p. 84 (Section 18.2.4); p. 91 (Section 19.12).

[324] *See* "Summary of 2022 MLS Changes," https://www.nar.realtor/about-nar/policies/summary-of-2022-mls-changes.

*See also* 2022 NAR Handbook, pp. 24-28 ("Section 1 Internet Data Exchange (IDX) Policy (Policy Statement 7.58)") at pp. 25-26 ("*(Amended 11/21)*"); *id*. pp. 45-52 ("Virtual Office Websites (VOW) Policy (Policy Statement 7.91)") at p. 48 ("*(Amended 11/21)*"); *id*. at p. 87 (Section 18.2.4 "*(Amended 11/21)*"); *id*. at p. 94 (Section 19.12 "*(Amended 11/21)*").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

offer is made only to participants of the MLS where the listing is filed.[325]

Similarly, MLS Policy Statement 7.58 now states that "MLSs must designate compensation fields as non-confidential and make them available for display via participants' and subscribers' IDX and VOW displays."[326] Rules which encouraged MLSs not to make this information available, such as Section 18.3.1 of the Model MLS Rules and Policy Statements 7.3 and 7.91, have correspondingly been amended.[327]

171.   These changes in NAR and NAR MLS rules that became effective in 2022 obviously could not alter the constraining economic effects of the preceding rules before MLSs adopted these changes.  Nor will the 2022 changes, once adopted by NAR MLSs, eliminate all of the challenged economic constraints from that point onwards.  In particular, the simple disclosure of the amount of the blanket offer to buyers does little to mitigate the anticompetitive effects of the remaining challenged restraints, in particular the Buyer Broker Commission Rule and the restraints on negotiating a change from that blanket offer.  The 2022 changes will alter some rules that reinforced those still-continuing restraints, but those still-continuing NAR restraints are likely to continue to induce an anticompetitive equilibrium in which sellers are required to make blanket unilateral offers to pay buyer-broker commissions, buyer-brokers are used more often than buyers would otherwise want, steering incentives are created and reinforced, and commission rates are inflated.  If, at some point, the 2022 NAR rule changes do change the anticompetitive equilibrium in a way that causes sellers to pay more competitive commission rates,

---

[325] *See* "Summary of 2022 MLS Changes," https://www.nar.realtor/about-nar/policies/summary-of-2022-mls-changes ("(New) MLS Policy Statement 8.8, Display of Listing Broker's Offer of Compensation").  This Policy Statement is followed by a symbol indicating that it is "Mandatory." *See id*. *See also* 2022 NAR Handbook, pp. 39-41 (Part 2-G, "Commission/Cooperative Compensation Offers") at p. 41 ("Section 3 Display of the Listing Broker's Offer of Compensation (Policy Statement 8.8)" which was "*(Amended 11/21)*").

[326] *See* "Summary of 2022 MLS Changes," https://www.nar.realtor/about-nar/policies/summary-of-2022-mls-changes (under "Policies Applicable to Multiple Listing Services").  *See also* 2022 NAR Handbook, pp. 24-28 ("Section 1 Internet Data Exchange (IDX) Policy (Policy Statement 7.58)") at p. 27 ("*(Amended 11/21)*").  This Policy Statement is followed by a symbol indicating that it is "Mandatory." *See id*. at 28.

[327] *See* "Summary of 2022 MLS Changes," https://www.nar.realtor/about-nar/policies/summary-of-2022-mls-changes.  *See also* 2022 NAR Handbook, at pp. 23-24 ("Section 1 Statistical Reports (Policy Statement 7.3)" with recommendation removed, "*(Amended 11/21)*"); pp. 45-52 ("Virtual Office Websites (VOW) Policy (Policy Statement 7.91)") at p. 51 (Part IV.1.a.iii has been removed); at p. 88 (Section 18.3.1 with example removed, "*(Amended 11/21)*").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

that would (if necessary) be examinable on a classwide basis and not require individual inquiry into the particular circumstances of any individual class member, given that the 2022 rule changes apply throughout all the relevant MLS markets.

## V. ANTICOMPETITIVE EFFECTS OF THE CHALLENGED RESTRAINTS

172. In this Part, I discuss the anticompetitive effects of the challenged restraints. These include that the challenged restraints maintained and extended an anticompetitive equilibrium in which: (A) sellers made blanket offers to pay buyer-broker commissions; (B) buyer-brokers were incentivized to steer buyers away from properties offering lower buyer-broker commissions, which maintained buyer-broker commissions at a supracompetitive level; (C) the great majority of listing agreements did not provide that the seller will pay a lower total commission if a lower-than-offered (or no) buyer-broker commission was actually paid; and (D) buyer-broker incentives to compete for buyer clients through lower commission rates were limited. As a result: (E) discount brokers and other actual and potential entrants were impeded from disrupting the anticompetitive equilibrium; (F) commission rates have been remarkably stable over time despite massive technological change; and (G) commission rates in the 20 MLSs at issue are much higher than in the competitive benchmark nations identified by Prof. Economides. Finally, I show: (H) NAR's 2022 rule changes will not eliminate the anticompetitive effects of the challenged restraints.

173. The methodology, evidence, and analysis used below to analyze, and thereby demonstrate, anticompetitive effects are all common to the class and would be the same even if every class member brought a separate antitrust suit. Likewise, the conclusions about the existence of those anticompetitive effects do not vary by class member.

### A. The Challenged Restraints Maintained and Extended an Anticompetitive Equilibrium Whereby Sellers Made Blanket Offers to Pay Buyer-Broker Commissions

174. As explained above, the challenged NAR rules not only required sellers (through their brokers) to make unilateral blanket offers of fixed compensation to brokers providing MLS broker services to buyers, but also imposed economic constraints on both the ability and knowledge needed to negotiate commissions below those blanket offers. These challenged NAR rules were restraints on free

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

market competition that maintained and extended an anticompetitive equilibrium whereby the seller had to pay for buyer-broker services and the buyer had little practical and effective way of negotiating the buyer-broker's fees and little incentive to do so. The challenged NAR rules also prevented buyers from even being aware of the benefit of reducing the buyer-broker commission. This anticompetitive equilibrium, and the supracompetitive commissions that sellers paid as a result, were not inevitable, but rather a consequence of the challenged NAR rules.

175. In residential real estate markets found otherwise comparable by Prof. Economides—those in Australia, the Netherlands, and the United Kingdom ("U.K.")—where aggregation websites on which buyers search for properties do not have similar rules to those challenged in this case, the use of buyer-brokers is rare, and, if they are used, the buyer negotiates the price and typically pays them.[328] This results in significantly lower total commissions paid by home sellers because they do not have to pay buyer-broker commissions.[329]

176. Absent the challenged NAR MLS rules that required a different structure, it is my opinion that the situation in Australia, the Netherlands, and the U.K. would have been the competitive equilibrium that economics would predict in the U.S., given that it would encourage buyers to use precisely the services they actually value and to negotiate the best price they can for the services. NAR MLS rules instead required sellers to offer fixed buyer-broker commissions on a blanket basis and restrained meaningful negotiation of them, which changed the incentives of buyers in the U.S. Whereas in a free market, buyer-brokers would be paid according to the value they provided to buyers, with buyers being freely able to negotiate those fees, with NAR's restraints, U.S. sellers have had to compete for buyer-brokers by offering them supracompetitive commissions to avoid creating incentives for buyer-brokers to steer buyers towards other properties offering higher commissions to buyer-brokers.

177. For much of the 20th Century, NAR's Code of Ethics had required its members to adhere to commission schedules set by local Realtor boards.[330] Price

---

[328] *See* Economides Report at Section III.C. and Section IV.A.

[329] *See infra* Section V.G.

[330] *See* 1913 Code of Ethics, p. 3 (Article 10 required that "[a]n agent should always exact the regular real estate commission of the Association of which he is a member […]"); 1915 Code of Ethics, p. 4 (Article 10 provided: "Maintaining Rates: Brokers owe it to themselves and the general public to maintain the rates of commissions and charges of the Board." [emphasis omitted]); 1924 Code of Ethics, p. 4 (Part I, Article 9 provided: "The schedules of fees established

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

advertising was originally prohibited as well.[331] Consistent with these requirements, NAR's local member boards routinely set the commissions that member Realtors were required to charge,[332] and commission schedules were regularly published by NAR in its official publications.[333] Despite lawsuits by the Department of Justice and others asserting that NAR and its member boards were engaged in illegal price-fixing,[334] NAR's member boards also continued to publish commission schedules through at least the early 1970s.[335] Following a wave of lawsuits and consent decrees

---

by the various real estate boards are believed to represent fair compensation for services rendered in their communities and should be observed by every Realtor"); 1952 Code of Ethics (Part I, Article 9 provided: "The Realtor should charge for his services only such fees as are fair and reasonable, and in accordance with local practice in similar transactions.").

[331] *See* William D. North, *Antitrust and Real Estate* (1982) ("Between 1936 and 1950 adherence to a schedule of fees was mandated by the National Association's Code of Ethics. The Code was changed to require the fee to be reasonable, fair and in accordance with local practice during the period 1951 through 1961, and was entirely abandoned as an ethical precept thereafter. Likewise, price advertising was deemed unprofessional and therefore unethical under Article 3 of the National Association's Code of Ethics until 1972 when that ethical precept was likewise abandoned.").

[332] *See* William D. North, *Antitrust and Real Estate* (1982) ("Board and MLS rules and regulations constitute agreement of the type from which a price-fixing conspiracy can be inferred. Prior to the National Association's Fourteen-Point Multiple Listing Policy, many real estate boards and multiple listing services had a rule under which the split of commission in a cooperative transaction was established by the multiple listing service. Likewise, some multiple listing services had rules granting preferential or exclusive treatment to listings bearing a particular commission rate. For example, the MAP Multiple Listing Service, until challenged by the Illinois Attorney General, would accept only listings taken at a six percent rate.").

[333] *See* NARSITZER0000165423 at p. 227 ( ).

[334] *See, e.g.*, United States v. National Association of Real Estate Boards, 339 U.S. 485 (1950).

[335]

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

in the 1960s and 1970s,[336] NAR prohibited commission fee schedules for the first time in 1971.[337]

178. NAR subsequently adopted a rule requiring that listing brokers make blanket unilateral offers of "subagent compensation" to subagents working with buyers, but did not provide for blanket offers to buyer-brokers in MLS listings, with the rule stating:

> In filing a property with the Multiple Listing Service of a Board of REALTORS®, the Participant makes a blanket unilateral offer of subagency to the other MLS Participants, and shall therefore specify on each listing filed with the Service the subagency compensation being offered by the listing broker to the other MLS Participants. This is necessary because the subagent has a right to know what his compensation shall be prior to commencing his endeavor to sell.[338]

179. Indeed, at that time, NAR *defined* an MLS as "

---

William D. North, *Antitrust and Real Estate* (1982) ("While mandatory schedules were abandoned after the decision in United States v. National Association of Real Estate Boards, recommended commission schedules were widely used until they were prohibited by the NAR's Fourteen-Point Multiple Listing Policy in 1971.").

[336] *See, e.g.*, McKerall v. Hunteville Real Estate Bd., 1976-1 Trade Cases f 60,709 (CCH) (N.D. Ala. 1976); Hill v. Art Rice Realty Co., 66 F.R.D. 449 (N.D. Ala. 1974), aff'd 511 F.2d 1400 (5th Cir. 1975); United States v. Real Estate Bd. of Rochester, N.Y., 1974-2 Trade Cases 7 75,355 (CCH) (W.D. N.Y. 1974); United States v. Real Estate Bd. of Metropolitan St. Louis., 1973-2 Trade Cases f 74,744 (CCH) (E.D. Mo. 1973); United States v. Multiple Listing Service, Realtors of Portland, 1973-1 Trade Cases 7 74,515 (CCH) (D. Ore. 1973); United States v. Greater Pittsburgh Bd. of Realtors, 1973-1 Trade Cases 1 74,454 (CCH) (W.D. Pa. 1973); United States v. Los Angeles Realty Bd., 1973-1 Trade Cases f 74,366 (CCH) (C.D. Cal. 1973); United States v. Memphis Bd. of Realtors, 1972 Trade Cases 7 74,056 (CCH) (W.D. Tenn. 1972); United States v. Cleveland Real Estate Bd., 1972 Trade Cases f 74,020 (CCH) (N.D. Ohio 1972); United States v. Atlanta Real Estate Bd., 1972 Trade Cases f 73,787 (CCH) (N.D. Ga. 1972); People of the State of Ill., ex rel. Scott v. Baird & Warner, Inc., 1977-1 Trade Cases (CCH) f 61,398 (Ill. Cir. Ct. 1977); United States v. Prince George's County Bd. of Realtors, Inc., [1971] Trade Cases 73,393 (D.Md. entered Dec. 28, 1980).

[337] *See* NARSITZER0000019277 (1972 National Association of Real Estate Boards Handbook on Multiple Listing Policy) at -86-87.

[338] *See* NARSITZER0000019457 (1980 NAR "Handbook on Multiple Listing Policy," "As revised through November, 1988") at -69 ("Section 7.23 Information Specifying the Compensation on Each Listing Filed with a Multiple Listing Service of a Board of REALTORS®" [footnote omitted]).

*See also supra* Part I.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

████████████████████████████████████████████████████████████ ."[339] Before the Buyer Broker Commission Rule became effective in 1993, this mandatory blanket offer of "subagent" compensation did not apply to buyer-brokers because subagents (though working with buyers) were understood to be fiduciaries of the sellers, and home buyers could not have a fiduciary relationship with a subagent.[340] Accordingly, the NAR rule that was effective before 1993 explicitly stated: "An agent representing potential purchasers [as opposed to subagents owing duties to the seller] cannot assume that the offer of subagency compensation also applies to buyer agents."[341] As a result, during this period, buyers usually worked with real estate agents that were deemed subagents of the seller's broker.[342] On those rare occasions where genuine buyer-brokers were utilized at all for transactions, they were not generally compensated through blanket offers of compensation, and their commissions were negotiated and often paid by the buyer (rather than the seller).[343]

180. Similarly, NAR's 1992 Report of the Presidential Advisory Group on Agency explained that ██████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████ ."[344] Thus, at the time, there was substantial uncertainty ██████████████████████████████████████ ████████████████████████████████████████████████████ [345] Indeed, a 1986 NAR report concluded that under the system then in place, ██████████████████ ████████████████████

---

[339] *See* NARSITZER0000005797 ████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ .

[340] *See supra* Part I.

[341] *See* NARSITZER0000019457 (1980 NAR "Handbook on Multiple Listing Policy," "As revised through November, 1988") at -69 ("Section 7.23 Information Specifying the Compensation on Each Listing Filed with a Multiple Listing Service of a Board of REALTORS®" stating that "[…] An agent representing potential purchasers cannot assume that the offer of subagency compensation also applies to buyer agents. […]").

[342] *See supra* Part I.

[343] Millett Dep. at 93:5-12 ██████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████

[344] *See* NARSITZER0000005797 at 808 [emphasis added].

[345] *See* NARSITZER0000005797 at 804.

125

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████ [46]

As a result, before the adoption of the Buyer Broker Commission Rule in 1992, even if a seller or seller-broker wanted to make a unilateral blanket offer of compensation to buyer brokers, there was no mechanism available within the MLS framework to do so, and no guarantee that any such offer to subagents would ultimately be paid to buyer-brokers in the rare instances where they were utilized, rather than being negotiated lower (if paid at all) after an offer on the home was made.[347]

181.    In the 1980s and early 1990s, NAR's rules requiring mandatory offers of subagency were subject to criticism by the FTC, lawmakers, consumers, and others.[348]  NAR created an "Agency Task Force" to ██████████████
███████████████████████████████████████████
███████████████████████████████████████████
████████████████████████████ [349]    In 1991, NAR formed a Presidential Advisory Group on Agency, which published a report the following year.[350]  The 1992 Report concluded that ███████████████████████████████
██████████

---

[346] NARSITZER0000005875 (May 1, 1986 "Agency Task Force," "Final Report") at -923-924.



[349] NARSITZER0000005875 (1986 NAR Agency Task Force Report) at -77.
[350] *See* NARSITZER0000005797 (March 1992 "Report of the Presidential Advisory Group on Agency") at -799.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY



182. ████ ████ ████ ████████ ████████ ████ ████ ██████████ The prior status quo that listing brokers were required to make blanket unilateral offers of subagency (and compensation) to agents working with buyers was changed when NAR adopted the current version of the Buyer Broker Commission Rule. This new rule extended blanket offers of compensation to include buyer-brokers.[354] Although the language of the new rule continued to permit blanket offers of compensation to subagents as an option, in practice, subagency quickly disappeared.[355]

183. In the absence of this rule, the anticompetitive equilibrium in which sellers make unilateral blanket offers of compensation to buyer-brokers would never have arisen. Indeed, in 1993, NAR's own retired Executive Vice President and General Counsel William D. North warned NAR's "Presidential Advisory Group on the Facilitator Concept" against addressing widespread "undisclosed dual agency" by replacing mandatory subagency with the "true 'adversarial relationship'" of



[354] *See supra* Parts I.B & IV.A.
[355] *See supra* Part I.B.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

separate representation for sellers and buyers.[356]  Among the issues he noted was that it would "make it highly improper and probably a conflict of interest for the listing broker to pay the buyer's broker's compensation."[357]  Given these conflicts of interest, and the lack of a mechanism to make such binding offers in the MLS framework, such blanket offers of compensation to buyer-brokers would not have become prevalent absent the challenged rules and thus the current anticompetitive equilibrium would not have come into existence.

184.  The current anticompetitive equilibrium in which listing brokers make blanket unilateral commission offers to buyer-brokers is not a necessary result of providing the aggregation benefits that are provided by MLSs.  As discussed above, a purpose of the Buyer Broker Commission Rule was to address the perceived "issue" that buyer-brokers would not necessarily receive compensation from sellers under NAR's mandatory subagency system.



---

[356]  *See* William D. North, *Agency, Facilitation, and the Realtor* (1993) (NARSITZER0000165547) at pp. 5-6.

[357]  *See* William D. North, *Agency, Facilitation, and the Realtor* (1993) (NARSITZER0000165547) at p. 6.  Mr. North also expressed █████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████

[358] █████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████

[359] █████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY



185.   All of the above analysis in this section is common to the class, is based on restraints and evidence that are common to the class, and reaches conclusions that are common to the class.



[360] NARSITZER0000367709 (May 31, 2018 email chain between Rodney Gansho and Kevin Milligan).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

### B. The Anticompetitive Equilibrium Maintained and Extended by the Challenged Restraints Maintained Supracompetitive Buyer-Broker Commissions by Incentivizing Steering

186. Buyer-broker commissions levels were anticompetitively elevated because of the steering incentives created by NAR rules that (a) required seller-brokers to make unilateral blanket offers of compensation to buyer-brokers, (b) constrained negotiations of those offers of compensation, (c) enabled buyer-brokers to filter properties by the buyer-broker commission offered, and (d) denied buyers information on the commissions being offered to their buyer-brokers.[361] Under such rules, sellers have incentives to offer the "standard" supracompetitive commission to buyer-brokers to prevent buyers from being steered away from their properties to competing properties that offer higher commissions. In this Section, I first explain the general economic theory regarding steering incentives and their potential to cause harm. I then discuss some of the evidence regarding steering incentives that has been described in the academic literature and analyzed by government agencies. I next explain how the NAR Rules create strong steering incentives. Finally, I describe evidence specific to this case demonstrating that steering incentives impacted market outcomes during the class period.

187. All of the following analysis in this section is common to the class, is based on rules and evidence that are common to the class, and reaches conclusions that are common to the class. Because the anticompetitive impact of steering incentives created by the challenged restraints is that they inflate the marketwide commissions paid by all sellers, assessing that impact is common to the class and would be the same even if every class member brought a separate antitrust suit. The analysis requires no individualized inquiry into whether a given seller was in fact steered against or was even aware of the possibility of steering, as the harm to each class member flows from the higher commissions they paid, rather than from being steered against. Indeed, the more that the restraints created steering incentives that anticompetitively elevated all offered buyer-broker commissions to similarly high levels, the more they resulted in a similarity in those commission levels that would reduce the amount of actual steering that occurred.

### 1. The Theory of Steering Incentives

188. The basic economic premise about steering is simple: buyer-brokers,

---

[361] *See supra* Part IV.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

like people generally, respond to incentives. As explained in Part IV, the challenged restraints required seller-brokers to make unilateral blanket offers of fixed compensation to buyer-brokers, restrained negotiations from those fixed offers, provided buyer-brokers with information to filter listings by the size of the offered buyer-broker commission, and denied information to buyers about those offered buyer-broker commissions. These restraints created strong incentives to steer because they meant that the commissions offered to buyer-brokers were not the result of negotiation with buyers, or of negotiations between buyers and sellers as part of a property's sale. They were instead set in pre-showing listings by sellers and seller-brokers who had incentives to offer high commissions to buyer-brokers to avoid having buyers steered away from their properties. The restraints incentivized steering further by providing buyer-brokers with information that maximized their steering incentives, while denying buyers the information needed to police against being steered. As real estate economists Barwick and Wong put it: "All else being equal, buyers' agents have an incentive to prioritize properties that offer high commissions and steer buyers away from low-commission listings. As a result, listings that offer low commissions would suffer from poor sales performances."[362]

189. While the explanation for steering is straightforward, there are a number of nuances relevant to understanding its impact in the MLS broker market. In particular:

- The *incentive* to steer alone impacts behavior, even absent actual steering in any particular instance. Indeed, if steering incentives are generally effective at inducing sellers to agree to offer high commissions to buyer-brokers to avoid being steered against, then there may be little or no steering in practice because there would be few differences in commission that could incentivize a buyer-broker to steer a client away from (or towards) a given property.[363]

- Steering incentives need not be absolute to impact behavior and cause harm. Sellers need not believe that absolutely no buyer-brokers would show a buyer that seller's home if the buyer-broker commission were, say, 2.9% rather than 3.0% in order for steering incentives to have an impact. Any reduction in buyer interest in a seller's property due to steering—whether some potential

---

[362] Barwick, Panel Jia and Maisy Wong, "Competition in the Real Estate Brokerage Industry: A Critical Review," Economic Studies at Brookings, December 2019, p. 11, *available at*: https://www.brookings.edu/wpcontent/uploads/2019/12/ES-12.12.19-Barwick-Wong.pdf.

[363] Buyer-brokers could, in theory, steer their clients towards or away from a property for any number of reasons. But it is the incentive to steer as a result of sellers paying buyer-broker commissions that is relevant here.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

buyers are steered away from the home entirely or whether steering causes some potential buyers to place a lower value on the home—will lower the expected value of selling that home, and hence increase the seller's willingness to pay buyer-brokers not to steer buyers away from their property.

- Sellers are impacted by steering incentives whether they are aware of them or not. Seller-brokers, who are paid only when the home sells and normally are paid more when the home sells for more, are aware of steering incentives and, because their own financial interests are at stake, are incentivized to encourage sellers to offer a standard, high commission to buyer-brokers, to maximize the chance of a quick sale at a high price. Moreover, seller-brokers have incentives to inform sellers of steering incentives in order to justify a high total commission in their listing agreement, which is confirmed by the fact that defendant brokerage scripts instruct brokers and agents to explain steering incentives in order to counter objections to those commission rates.[364] In any event, even if some particular sellers (or even their brokers) were unaware of steering incentives, they will still be impacted by the fact that steering incentives are pervasive and anticompetitively elevate the commissions that sellers pay in the brokerage market and create incentives to steer buyers away from sellers and seller-brokers who offer a lower commission to buyer-brokers.[365]

- For these reasons, as I demonstrate in Section V.B.4.ii, buyer-broker commissions cluster around particular commission percentages in each of the 20 Covered MLSs.

190. The steering incentives created by the challenged restraints harm both sellers and buyers.[366] Steering incentives harm sellers by forcing them to pay (through seller-brokers) buyer-broker commissions and to pay supracompetitive commissions to buyer-brokers in order to avoid having buyers steered towards other properties. Those supracompetitive commissions also harm buyers because the increased cost of a home transaction may dissuade them from buying a home or offering enough to win a bid. Steering incentives also mean that buyers get worse, rather than better, service from their buyer-brokers. When the commission rates offered by sellers and seller-brokers do differ from the "standard" commission rate,

---

[364] *See infra* Section V.B.4.i.

[365] *See infra* Sections V.B.2-4 (collecting evidence on the pervasive nature of steering incentives and that steering actually occurs when different properties offer different commissions to buyer-brokers).

[366] As explained in Parts I.B & V.A, this anticompetitive equilibrium was itself maintained and extended by the Buyer Broker Commission rule and other challenged rules.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

steering incentives harm buyers by preventing them from seeing properties they would want to buy or by distorting the advice they receive from their broker. Moreover, under the strong steering incentives created by the challenged restraints, the commissions paid to buyer-brokers are set in a blanket way that does not vary with their effort, experience, or quality, which thus systematically reduces the quality of services that buyer-brokers provide to buyers, and does so even when their commissions are set in a uniformly high fashion that does not result in actual steering.

### 2. Evidence of the Existence and Impact of The Threat of Steering from Academic Literature and Government Agencies

191. The FTC and DOJ have similarly raised economic concerns about steering incentives in the US real estate industry. A 2007 joint FTC/DOJ report explained that:

> [C]onsumers may be unaware of the possibility that their brokers may have conflicting interests that lead them not to provide the consumer with the best possible advice. […] [B]rokers have certain incentives to "steer" consumers toward those homes that offer the highest cooperating broker commission payment and away from homes listed by brokers known to charge home sellers discounted commission rates. In this manner, brokers can take advantage of their superior knowledge of market conditions by steering clients away from home listings that otherwise match the criteria identified by the consumers, but provide lower financial gains for the broker than other homes.[367]

---

[367] *See* 2007 FTC-DOJ Real Estate Brokerage Industry Report at p. 27. In its 1983 Report, the FTC likewise found strong incentives to steer, as well as widespread evidence that actual steering existed, under NAR's mandatory subagency system. *See* NARSITZER0000165422 at pp. 75-76 ("Alternative brokers indicate they experience a consistent pattern of traditional brokers steering away from the alternative listings. Of MLS alternative brokers answering Survey Question V.7., 59 percent claimed to have experienced frequent refusals by other brokers to show their homes during their first year of operations. Fully 90 percent reported that they had experienced at least occasional refusals during their first year. Even after several years in operation, 50 percent of the alternative firms said that they continued to experience frequent refusals."); *id*. at pp. 40-41 ("The structure of the MLS, the form of compensation of cooperating brokers and the natural tendency to steer, therefore make the system self-policing and self-stabilizing. Each member, in pursuing his or her own individual interests, also pursues any group interest in stabilizing and maintaining the commission rate. The pervasiveness of the cooperative MLS coupled to the individual incentives of the brokers appear to be key to understanding the pricing peculiarities of

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

192. The DOJ has also reached conclusions about the anticompetitive steering incentives created by NAR's rules that parallel conclusions in this report. In its Competitive Impact Statement regarding its proposed 2020 settlement with NAR, the DOJ concluded:

> Because of the Commission-Concealment Rules, buyer brokers may steer potential home buyers away from properties with low commission offers by filtering out, failing to show, or denigrating homes listed for sale that offer lower commissions than other properties in the area. When potential home buyers can't see commission offers, they can't detect or resist this type of steering. […] Fear of having potential home buyers steered away from a property is a strong deterrent to sellers who would otherwise offer lower buyer broker commissions, which further contributes to higher prices for buyer broker services." […] NAR's Commission-Filter Rules and Practices, which have been widely adopted by NAR-affiliated MLSs, are anticompetitive because they facilitate steering by helping buyer brokers conceal from potential home buyers any property listings offering lower buyer broker commissions.[368]

In this analysis, the DOJ confirms the conclusions of this report that (1) steering incentives are worsened by NAR rules that allow buyer-brokers to filter listings by buyer-broker commission and that deny information about buyer-broker commissions to buyers and (2) the steering incentives created by NAR rules anticompetitively elevate the commissions paid by sellers.

193. The academic literature provides empirical poof that regulators are correct in their concerns that steering incentives alter market outcomes. Real estate economists Barwick, Pathak, and Wong, conducted a study in 2017 of eastern Massachusetts MLS data, finding that properties with lower offered commission rates to buyer-brokers are less likely to sell and take longer to sell when they do.[369] This study thus confirms that steering in fact occurs and results from the steering incentives created by the commissions offered by sellers and seller-brokers to buyer-

---

the present system."). As explained in this Section, the incentive to steer continued to exist even after NAR replaced mandatory offers of subagency with its rule requiring mandatory offers of compensation to buyer-brokers.

[368] *See* Competitive Impact Statement, U.S. v. National Association of Realtors, Dec. 10, 2020, *available at*: https://www.justice.gov/atr/case-document/file/1344346/download at pp. 7, 9.

[369] *See* Barwick, Panle Jia, Parag A. Pathak, and Maisy Wong, "Conflicts of Interest and Steering in Residential Brokerage," *American Economic Journal: Applied Economics,* 2017, Vol. 9, No. 3, p. 191.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

brokers.

### 3. How the Challenged Restraints Created and Facilitated Steering Incentives

194. The challenged rules created and facilitated steering incentives. The Buyer Broker Commission Rule created steering incentives by requiring seller-brokers to make unconditioned "blanket unilateral offers of compensation to the other MLS participants" as part of a listing on the MLS, which inherently induces steering.[370] This restraint meant that the commissions paid to buyer-brokers were not set by buyers or during property negotiations, but in pre-showing listings by sellers and seller-brokers who have incentives to set them to induce steering toward their properties and avoid buyers being steered away from their properties. Further, because the rule prevented these "blanket unilateral offers of compensation" from being conditioned on the effort of buyer-brokers, it maximized steering incentives because it meant buyer-brokers would typically be paid based on whether their buyer bought property with a favorable offered commission, and not on their effort in showing or assessing the property. The effectiveness of these steering incentives was maintained by NAR rules, described above in Part IV.A, which together effectively require that any negotiations over the amount of the blanket offer be made prior to even showing the property.

195. These steering incentivizes were exacerbated and facilitated by other NAR rules. For example, NAR rules enabled MLS participants to view and sort listings by the amount of the blanket offer, thus enabling buyer-brokers to utilize this filtering mechanism to exclude properties with insufficiently high commissions from the properties that they send or recommend to their client.[371] Even for those buyers who independently find a listing using an online aggregator like Zillow, buyer-brokers can utilize more subtle ways of steering the client away from that listing, for example by discouraging the buyer from seeing the listing or by counseling the buyer against making an offer. Steering incentives were further increased by other NAR rules that made the blanket offers of compensation viewable only by other MLS participants and that prevented the disclosure of information about buyer-broker commissions to potential buyers.[372] Such rules made it more difficult for buyers to determine whether the agent working with them might be steering them towards

---

[370] *See supra* Part IV.A; 2021 NAR Handbook, pp. 37-39 (the Buyer Broker Commission Rule).

[371] *See supra* Part IV.C.

[372] *Id.*

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

properties with higher commission rates. Together, the NAR rules both made it easier for agents working with buyers to steer buyers and made it more difficult for buyers to detect that steering, thus both exacerbating and facilitating steering incentives.

196. Moreover, even though steering incentives create a conflict of interest between buyers and buyer-brokers, neither the NAR Handbook nor its Code of Ethics has a rule prohibiting, discouraging, or even referencing steering.[373] On the contrary, steering is supported by the language of the Buyer Broker Commission Rule itself, which states that blanket offers are "necessary because cooperating participants [i.e., buyer-brokers] have the right to know what their compensation will be prior to commencing their efforts to sell."[374] Such certainty on buyer-broker

---

[373] Utilizing the "Find" function to search for "steer" within the pdf versions of the 2021 NAR Handbook and 2021 NAR Code of Ethics produces no matches within either document.



[374] *See supra* Part IV.A; 2021 NAR Handbook at pp. 37-39.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

commissions could be provided only if NAR rules restrained meaningful negotiated discounts from the blanket offers, thus creating an incentive for sellers to set those blanket offers high to steer buyers to their homes. Further, providing such advance certainty on the buyer-broker commission applicable to a particular home before buyer-brokers began their efforts could have value only if knowing the commission in advance would alter the effort, if any, the buyer-brokers would spend on investigating, recommending, or showing that particular home, which is precisely what steering is.

197. The above NAR rules not only created and facilitated steering incentives within MLS listings, but also created anticompetitive incentives to steer to MLS listings and away from off-MLS listings, because the rules meant that MLS listings would include unilateral blanket offers of high fixed commissions to buyer-brokers that were hidden from buyers. In a but-for world without the challenged restraints, there would be no unilateral blanket offers of compensation to buyer-brokers and thus buyer-brokers would have no incentive to steer in this way.

### 4. Evidence of Steering Incentives in this Case

198. The fact that steering incentives affect market outcomes is confirmed not only by the above-described economic theory, academic empirical literature, and agency conclusions, but also by evidence in this case. In this Section, I discuss: (1) evidence demonstrating that defendant brokerages recognized and made use of steering incentives in their interactions with clients; (2) empirical evidence in this case demonstrating that the steering incentives have led commissions to cluster around standard local broker commission rates, so that each seller can avoid being disadvantaged by steering; and (3) record evidence of instances in which defendant broker clients were actually steered.

199. Before discussing this evidence, it is important to reiterate a point made above in Section V.B.1: what anticompetitively elevates commissions are steering incentives, not whether steering in fact occurs in any particular instance. The restraints created steering incentives that elevated the commissions paid by sellers through their listing brokers to buyer-brokers, regardless of whether any particular

137

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

seller's property was actually steered against by any given buyer-broker, and regardless of whether that particular seller even knew that steering was possible. Indeed, if steering incentives successfully induced all sellers and listing brokers to offer high commissions to buyer-brokers, it would result in little or no difference in the buyer-broker commissions offered by different sellers and their brokers and thus in little or no actual steering.

i. Defendants Recognized and Utilized Steering Incentives

200. The steering incentives created by the fact that the seller and seller-broker were setting the commission offered to buyer-brokers were acknowledged by and explicitly incorporated into the defendant brokers' business scripts for responding to sellers who sought to pay a lower total commission. For example, a Realogy script █████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████[375] ReMax had a similar suggested response to seller objections to high commissions:

███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████[376]

Likewise, a Keller Williams script suggests that agents say, ███████████████████████████████████████████████████████████████████████████████████████[377] These scripts not only acknowledged that steering incentives exist, but also argued that steering incentives were a reason to elevate both the commission offered to buyer-brokers and the total commission paid by the seller. And NAR's own draft white paper acknowledged that ██████████████████████████████████

---

[375] Realogy-Sitzer-00285583 ███████████████████████████████████ .

[376] RMLLC-WDMO-00334084 ████████████████████████████ at -85.

[377] RMLLC-WDMO-00124600 ██████████████████████
██████████████████████████████████████████████████ .

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

██████████████████████████████████████████████████
██████████████████████████████████████████████████
████████████████████████████████████ [378]
████████████████████████████

ii. <u>MLS Data Shows that Steering Incentives Resulted in Substantial Clustering of Buyer-Broker Commission Rates</u>

201.    Because the challenged rules create steering incentives across all listings, economics would predict those incentives to lead broker commission rates to cluster around a standard commission in each market, to reduce the risk that buyers might be steered to other properties.  This economic prediction is confirmed by the data for each of the 20 Covered MLSs each of which were affected by the challenged rules.  Table 8 below shows that commission rates are clustered within each of the 20 Covered MLSs during the class damages period of March 6, 2015 to December 31, 2020.

---

[378] *See* NARSITZER0000638727 ██████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
████████████████████████████

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

| Table 8.  Buyer-Broker Rates Were Clustered in each Covered U.S. MLS[379] | | | | |
|---|---|---|---|---|
| | **Frequency of** | | | |
| **MLS** | **Most Common Rate** | **2d Most Common Rate** | **3rd Most Common Rate** | **3 Most Common Rates** |
| Arizona Regional | 93.5% | 2.5% | 1.4% | 97.5% |
| Austin Bd. of Realtors | 76.4% | 18.0% | 1.6% | 96.0% |
| Bright (mid-Atlantic) | 50.3% | 41.7% | 2.0% | 94.1% |
| Canopy (Carolinas) | 83.7% | 12.7% | 1.1% | 97.5% |
| Columbus Realtors (Ohio) | 93.1% | 3.1% | 0.9% | 97.1% |
| Florida Gulf Coast | 78.8% | 16.5% | 1.2% | 96.5% |
| Greater Las Vegas | 59.4% | 33.8% | 2.0% | 95.3% |
| Houston Ass'n of Realtors | 94.7% | 2.9% | 1.1% | 98.7% |
| Metro (Wisconsin) | 83.2% | 5.9% | 3.3% | 92.4% |
| Miami | 73.1% | 20.0% | 3.1% | 96.1% |
| North Texas RE Info Serv. | 92.3% | 4.4% | 1.2% | 97.9% |
| Northstar (Minn & W. Wis.) | 65.4% | 10.6% | 9.2% | 85.2% |
| Pikes Peak (Colorado) | 86.4% | 4.0% | 3.9% | 94.3% |
| REColorado | 74.2% | 16.0% | 7.1% | 97.3% |
| Realcomp II (Michigan) | 87.0% | 5.5% | 1.6% | 94.1% |
| San Antonio Bd. Of Realtors | 93.6% | 2.4% | 1.1% | 97.0% |
| Stellar (was My Florida Regional) | 47.2% | 19.6% | 8.1% | 75.0% |
| Triangle (North Carolina) | 51.6% | 27.9% | 17.7% | 97.2% |
| Utah Real Estate | 78.4% | 16.0% | 2.3% | 96.6% |
| Yes_Now (Ohio & WVA) | 39.3% | 16.4% | 7.9% | 63.7% |

---

[379] *See* "REA114 Commission Clustering by MLS v4".  This data covers closed transactions during the class damages period of March 6, 2015 to December 31, 2020.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

### iii. Record Evidence Shows Buyer-Brokers Actually Steering Their Clients

202. The discount broker REX, which generally marketed listings outside of any MLS until recently, has reported that buyer-brokers have extensively steered their clients away from its listings because REX did not make blanket unilateral offers to pay buyer-broker commissions.[380] I understand from a sworn declaration that REX has submitted in this case that during a period of time in which REX had just over 5,000 listings, REX was able to identify more than 600 recorded phone calls reflecting evidence that, once the buyer-broker caller learned that REX's policy was not to make a blanket offer of compensation, that buyer-broker indicated they would steer their buyer clients away from a REX property.[381] REX was further able to identify more than 100 additional recorded calls from the same period in which a buyer-broker abruptly hung up after learning that REX does not make blanket offers of compensation.[382]

203. I understand that the recordings identified by REX as examples of steering have been produced in this litigation and that several reflect evidence of steering by individuals who identify themselves as brokers and agents who are affiliated with the defendants in this case or their franchisees.[383] In several of the recordings that REX produced, the callers indicate that they would not show any property that offered less than a 2.5% buyer-broker commission, including because there are other properties they could show at "full commission."[384] In addition, several of the callers indicate that their entire brokerage prohibits showing properties that offer less than a certain buyer-broker commission.[385]

204. REX's analysis likely undercounts the extent of steering. First, REX's

---

Commission rates are considered clustered on a common rate when they are within 0.05% of that rate.

[380] *See* Declaration of Will Fried.

[381] *See id*. at ¶8 ("My analysis identified evidence of steering by buyer's agents in 602 calls during the periods between January 1, 2019 and January 26, 2020 and between April 14, 2020 and July 17, 2021. Another 108 calls during this period reflected abrupt hang-ups by a buyer's agent after learning that REX listings don't offer a preset buy-side commission. By point of comparison, REX had 5,198 listings that were active at some point during the period of the steering analysis.").

[382] *Id*.

[383] *See* REX000497 (███████████████████████████████); REX000955 (caller identifies himself as agent with REMAX); REX000975 ███████ ████████████████ ); REX000960 (████████████████████████ ████████ ); REX000263 (████████████████████████ .

[384] REX000971; REX000949.

[385] REX000975; REX000960; REX000971; REX000949.

141

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

analysis relied on buyer-brokers affirmatively indicating, on a recorded call, that they intended to steer their clients. But buyer-brokers who intended to steer their clients away from a property may not always admit to doing so, especially when told that their telephone call was being recorded. Second, REX explains that its analysis could not identify buyer-brokers who engaged in steering but never called REX because they were already aware of REX's business model. Third, REX's analysis also could not identify instances of steering by buyer-brokers who showed REX's properties, but due to the absence of a blanket commission offer at the prevailing rate, used pretextual justifications to convince their clients not to make an offer on the home.[386]

205.    Trelora, a discount broker that generally submits listings on the MLS, has also described extensive steering and other retaliation towards its agents and listings. Its former CEO Joshua Hunt made the following comments at a 2018 FTC-DOJ workshop on real estate brokerage competition:

> So when I started the company, we did a flat fee on the front side, and we began to take the buyer agent commission fully when we would represent buyers. And after about three months of doing that, I realized it was very hypocritical to say that it was worth a flat fee on the sell side, but not the buy side. And through the myth of "the buyer agent's free because the seller pays me," we shifted and pivoted to a $2,500 flat fee on the buy side as well.
>
> What we've done that has caused us as a company a lot of frustration and anguish is we offer— we allow our sellers to offer a flat fee to a buyer's agent with any other brokerage. So any of these gentlemen, if they were in our market bringing buyer agents in and representing, they would only receive a $2,500 commission as it's offered in the MLS.
>
> We've had bricks thrown through car windows. We've had our cars egged. We've had hate mail sent to our sellers. And so the anti-competitive nature we've dealt with is—I've got here a list of over 719 brokerages in Denver alone that have flat out said, we will not show TRELORA listings. We tell every seller, 40% of agents will go out of their way, above and beyond, and push hard not to show or sell your home if you don't offer a 2.8% to 3% commission.
>
> And to the pocket listing conversation that took place in the last group, there's only one reason an agent pockets a listing and that's because they want both commissions. And so until we make commissions transparent to consumers and/or stop sellers and their agents offering

---

[386] *See* Declaration of Will Fried at ¶¶9-10.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

commissions to buyers, the competitiveness of this around commissions is going to continue.[387]

206. In 2014, the real estate industry publication Inman produced a special report called "Why the real estate industry does not compete on commission rates."[388] The report stated that when "[a]sked to put their finger on the biggest obstacle to competing for listings by offering a reduced commission to sellers, many cited hostility within the industry," and noted the following among the exemplar responses: "agents won't show homes for less than 2.5 percent. This is the least amount I will discount to (5 percent total)," "Lack of cooperation from other brokers," and "Other agents getting angry."[389] Half of the survey respondents indicated that they strongly or somewhat agreed with the statement "some brokers do not compete for listings by offering commission discounts because […] They fear retaliation by cooperating brokers (refusal to show house to buyers)."[390]

### C. The Anticompetitive Equilibrium Led to the Prevalence of Listing Agreements Which Do Not Provide for Reducing a Seller's Total Commission if a Lower Buyer-Broker Commission is Actually Paid

207. These challenged restraints, and the steering incentives they created, further maintained and extended an anticompetitive market equilibrium in which listing agreements typically provide that the seller shall pay a certain commission to listing brokers in the event of sale and authorize listing brokers to offer to pay a buyer-broker commission out of the commission they receive from the seller,[391] but

---

[387] *See* What's New in Residential Real Estate Brokerage Competition – An FTC-DOJ Workshop (June 5, 2018), Panel on Developments in Real Estate Fee and Service Models, transcript *available at*: https://www.ftc.gov/system/files/documents/public_events/1361534/ftc-doj_residential_re_brokerage_competition_workshop_transcript_segment_2.pdf.

[388] *See* KWRI_00725808 ("Inman Select Special Report", "Why the real estate industry does not compete on commission rates" summarizing the results of a survey of 725 real estate brokers and agents).

[389] KWRI_00725808 at -18-19.

[390] KWRI_00725808 at -29.

[391] As explained above in Part I.A, the NAR Code of Ethics requires seller-brokers to inform sellers of the amount of compensation to be offered to buyer-brokers when entering into a listing agreement. *See* Part I.A, *supra*. As explained in Part I.C, my understanding is that under the NAR Code of Ethics seller-brokers make offers of compensation in their capacity as agents of the seller. *See* Part I.C, *supra*. In addition, my understanding is that seller-brokers must also follow a seller's lawful instructions regarding the amount of such compensation to be offered. *See id*.

143

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

allow the listing broker to retain the full commission amount even if no (or a reduced) buyer-broker commission is actually paid.[392]  Under this typical arrangement, if a listing agreement states that the seller will pay the seller-broker 6% of the home sales price, and that the seller-broker will offer to pay a buyer-broker 3%, the seller-broker can retain any part of the offered buyer-broker commission that is not paid to a buyer-broker.[393]  Accordingly, in the current equilibrium created

---

[392] *See*, *e.g.*,  "The Pros and Cons of Buying a Home Without an Agent" by Ilyce Glink and Samuel Tamkin, Washington Post, Oct. 12, 2020, *available at*: https://www.washingtonpost.com/business/2020/10/12/pros-cons-buying-home-without-an-agent/ ("Sellers who have listed their homes generally pay between 4 percent and 6 percent of the sales prices as a commission to the listing agent. The listing agent, in turn, typically pays the buyer's broker around half of the total commission. No buyers [sic] agent means the listing agent doesn't have anyone to share in the commission. So, unagented buyers unwittingly allow the listing agent to pocket the entire commission."); "Why you Need A Real Estate Agent to Buy a Home" by Dan Bergman, Redfin Blog, Feb. 12, 2015, *available at*: https://www.redfin.com/blog/why-you-need-a-real-estate-agent-to-buy-a-home/ ("It's tempting to think that if you don't use a buyer's agent, their part of the commission can go in your pocket, but this is generally not the case. The commission rate is agreed upon via a contract before the listing even goes on the market. If you choose not to have legal representation from a buyer's agent, the entire commission is then paid to the listing agent. The listing agent would have to agree to modify their contract to cut you in on part of their compensation, and this is unlikely.").

*See also* Amended Complaint, United States v. National Association of REALTORS®, Oct. 4, 2005, *available at*: https://www.justice.gov/atr/cases/f211700/211751.htm at paragraph 19 ("In a typical transaction, the seller agrees to pay a commission to the broker who has contracted with the seller to market the home (the 'listing broker').  If the listing broker finds the buyer, the listing broker keeps the full commission.  Frequently, however, a second broker (the 'cooperating broker') finds the buyer, and the two brokers share the commission."); *infra* Section V.C (noting that data indicated that at most 10.8% of listing agreements provided for a reduced total commission if the property was sold "by the listing broker without assistance" rather than "through the efforts of a cooperating broker").

[393] ████████████████████████████████████████

---

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

by the challenged restraints, even if a buyer went without a buyer-broker or the parties were somehow able to overcome the rules' restraints on negotiating a reduced buyer-broker commission, the economic benefit would typically simply go to the seller-broker and would not result in any reduced commission to the seller, unless the listing agreement between the seller and seller-broker was itself renegotiated.[394]

208.    The potential exception to this current typical practice, "Dual or Variable Rate Commission Arrangements," provides for different total commissions to be paid by the seller depending upon certain circumstances.  NAR defines dual or variable rate commission agreements as those that provide that the total commission paid by the seller could vary (1) depending on whether or not a property is sold "by the listing broker without assistance" or instead "through the efforts of a cooperating broker," or (2) depending on whether a property is sold "with or without the assistance of a cooperating broker" or instead "through the efforts of a seller[]".[395]  However, although such contracts would lower the total commission paid by the seller if the property is sold without the efforts of a cooperating buyer-broker, they would not lower it simply because a lower commission to a cooperating buyer-broker was negotiated with a buyer.  Nor do variable rate agreements change sellers' incentive to offer a "standard" buyer-broker commission to avoid buyer-brokers steering buyers away from that seller's listing.  Thus, such listing agreement terms would still provide sellers with little incentive to negotiate a lower buyer-broker commission, if such negotiation were even possible.  As a result, it is not surprising that the available data indicates that only 10.8% of listing agreements for closed transactions listed on the 20 MLSs at issue in this case during the class period

[394] But for the challenged restraints, in a competitive equilibrium in which blanket offers were rare or non-existent, buyers negotiated their own buyer-broker commissions, and sellers no longer expected the listing broker to "share" their commission with the buyer-broker, listing agreements would rarely, if ever, have any provision about the seller or seller-broker covering any buyer-broker commissions and thus no provision about the seller-broker retaining that commission if a sale were made without a buyer-broker.

[395] 2021 NAR Handbook at pp. 69-70 ("Section 5.3 Dual or Variable Rate Commission Arrangements" defines "a dual or variable rate commission arrangement" as "one in which the seller/landlord agrees to pay a specified commission if the property is sold/leased by the listing broker without assistance and a different commission if the sale/lease results through the efforts of a cooperating broker; or one in which the seller/landlord agrees to pay a specified commission if the property is sold/leased by the listing broker either with or without the assistance of a cooperating broker and a different commission if the sale/lease results through the efforts of a seller/landlord…").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

provided for dual or variable rate commissions, meaning that over 89% did not.[396] Moreover, the available data reflects that only 1.6% of closed transactions during the class period both offered a dual or variable rate commission and resulted in a sale in which there was no separate broker on the buyer side (either because there was no buyer-broker or because the same broker represented the seller and buyer).[397]

209.    NAR also imposes a mandatory rule on NAR-affiliated MLSs requiring that the existence of a dual or variable rate commission "shall be disclosed by the listing broker."[398]  A MetroMLS document answers "Why is disclosure necessary?" by stating that:

> Disclosure of a Variable Rate Commission is required as a means to inform the agent working with that buyer, as well as the buyer, that if an offer is drafted on behalf of that buyer, and they are in competition with an offer drafted by the listing office, their offer may be at a disadvantage based upon the difference in the commission rate.[399]

Such disclosure necessarily informs the buyer-broker, just based upon the MLS listing information, that the difference in commission rate may leave their buyer's offer at a disadvantage versus another buyer.  If the offer of the buyer they represent may be thus disadvantaged, this necessarily incentivizes the buyer-broker to steer their client away from such properties in the first place, as this suggests the buyer will be less likely to make a successful offer for them.  Thus, just as the challenged restraints disincentivize sellers from negotiating lower buyer-broker commissions due to the threat of buyers being steered away from their property, they also disincentivize sellers from seeking dual or variable rate commission structures which can lower sellers' total commission paid if no buyer-broker were to be utilized.  This provides an additional explanation for why only 10.8% of closed transactions listed on the 20 MLSs at issue in this case during the class period provided for dual or variable rate commissions, and why it resulted in a commission savings from the absence of a separate buyer-broker in only 1.6% of closed transactions.[400]

---

[396] "REA115 Dual Variable Rate Analysis.xlsx".

[397] "REA115 Dual Variable Rate Analysis.xlsx."

[398] *See* 2021 NAR Handbook at pp. 69-70 ("Section 5.3 . . .  The existence of a dual or variable rate commission arrangement … shall be disclosed by the listing broker by a key, code, or symbol as required by the MLS.").  This Section is followed by a symbol indicating that it is "Mandatory." *See id.*

[399] MetroMLS, "Variable Rate Commission," *available at*: https://metromls.com/wp-content/uploads/2020/11/Toolkit_-Understanding-Variable-Rate-Commission.pdf (in the situation relating to "1. The Agent Responsible for Procurement of the Buyer" explaining "Why is disclosure necessary?").

[400] "REA115 Dual Variable Rate Analysis.xlsx."

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

210. The ubiquity of agreements allowing a seller-broker to retain the full commission amount even if no (or a reduced) buyer-broker commission is actually paid is unsurprising given the challenged restraints and the steering incentives and anticompetitive equilibrium that they maintained and extended.[401] Given these realities in the actual world, seller-brokers have little incentive to compete by offering agreements in which the total commission paid by the seller reflects any reduction in the buyer-broker commission below the amount provided for in the listing agreement, and sellers have little incentive to expend the effort to seek seller-brokers offering such agreements, or to negotiate for them, because such a provision would rarely matter. As explained in Part IV, the challenged restraints required blanket commission offers to buyer-brokers and constrained the ability for sellers or buyers to benefit by negotiating a lower buyer-broker commission. Indeed, as explained further in Section V.B, the steering incentives that were maintained by the challenged restraints incentivized sellers to agree to offer high fixed buyer-broker commissions in order to minimize the risk that they would be steered against. Given these realities, and the fact that 87-88% of U.S. homebuyers utilize a buyer-broker,[402] offering, seeking, or negotiating a listing agreement in which the total commission paid by the seller would be reduced to the extent that the buyer-broker commission actually paid was reduced below the required blanket offer would likely be wasted effort. Moreover, as explained in Section V.B.4.i, defendants even produced scripts for their agents in which steering incentives were used to counter seller attempts to negotiate for lower commissions through offering lower buyer-broker commissions. Offering such a provision would directly counter that messaging.

211. The result of these restraints is that sellers overwhelmingly agreed to listing agreements that meant sellers not only paid a total commission that covered any buyer-broker commissions, but also did not make the amount of that total commission turn on the amount of commission actually paid to the buyer-broker. Given those typical listing agreement terms, even in the rare case in which brokers or parties might overcome the NAR rule restraints on negotiating a lower buyer-broker commission, or in which a buyer simply did not utilize a buyer-broker, doing so could rarely lower the commission paid by the seller and thus would give the seller no incentive to agree to a lower home sale price that could benefit the buyer who either went without a buyer-broker or negotiated a lower commission for them.

---

[401] *See* Parts IV.A-D and V.A, *supra*, and Part V.D, *infra*.

[402] 2021 NAR Profile Highlights at p. 7 ("Eighty-seven percent of buyers recently purchased their home through a real estate agent or broker"); 2020 NAR Profile at p. 7 ("Eighty-eight percent of buyers recently purchased their home through a real estate agent or broker").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

For example, under an agreement that allows a seller-broker to retain the full commission amount even if no (or a reduced) buyer-broker commission is actually paid, if the seller agreed to pay the seller-broker a 6% commission, with a 3% commission offered to the buyer-broker, then even if a buyer negotiated to lower the buyer-broker commission from 3% to 2%, the seller-broker would simply keep 4% instead of 3% and the seller would still pay a 6% commission, thus creating no incentive to lower the home sales price. This effect further undermines any residual incentive a buyer might have to negotiate a lower buyer-broker commission, or to do without a buyer-broker entirely, even if there were a rare buyer who could otherwise overcome the NAR rules' restraints on such negotiations.

212. If, as is expected in the but-for world, sellers would rarely pay buyer-broker commissions and buyers would rarely retain buyer-brokers, then the typical commissions that sellers agreed to pay their seller-brokers would be lower and entirely for the seller-broker. Listing agreements would then no longer typically assume that sellers would cover buyer-broker commissions and hence there would be no buyer-broker commission for the seller-broker to keep in the event that no buyer-broker were used or a reduced buyer-broker commission were negotiated. In this way, the costs of buyer-brokers would not need to be borne to sell properties.

213. All of the above analysis in this section is common to the class, is based on rules and evidence that are common to the class, and reaches conclusions that are common to the class. This is the case even though a minority of class members may have had listing agreements that allowed for a lower commission for sales without buyer-brokers or for lower buyer-broker commissions. The reason is that for the great majority of these sellers, the buyer retained a separate broker and thus the variable rate commission did not kick in. Even for the small percentage of class transactions for which a variable rate commission did apply, they would still be harmed if the restraints anticompetitively elevated marketwide commission rates. The restraints did so, in part by creating an anticompetitive equilibrium in which more than 89% of listing agreements provided for the same commission even when no buyer-broker was used or the buyer-broker accepted a lower commission, which reduced incentives for buyers to forgo using buyer-brokers or for buyers or sellers to negotiate lower buyer-broker commissions.

148

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

### D.    The Anticompetitive Equilibrium Maintained and Extended by the Challenged Restraints Increased the Usage of Buyer-Brokers and the Commissions Paid to Them

214.    If buyers negotiated their own buyer-broker commissions, economics would predict that buyer-broker commissions would drop.  The NAR restraints requiring seller-brokers to make blanket fixed offers to pay for buyer-broker commissions externalizes the cost of buyer-broker services onto the seller and thus reduces the incentive of buyers to either forego or limit their use of buyer-broker services or to negotiate for a lower price for them.  The NAR restraints thus divorce the economic incentive from the individual making the competitive choice, which creates a market failure similar to that which occurs in healthcare with a third-party payor, in which the patient chooses the provider, but the insurer usually pays most of the cost.  Under the current NAR restraints, buyer-brokers do not compete for the business of buyers and do not get paid according to the value they provide to the buyer, and buyers lack the ability to negotiate that fee as a condition of retention. Instead, the current NAR restraints require sellers to make blanket offers of fixed commissions to buyer-brokers, which incentivizes sellers to offer supracompetitive commissions to buyer-brokers to make sure that they do not have incentives to steer buyers towards other sellers' properties.  In short, the NAR restraints create an anticompetitive market equilibrium in which buyer-brokers are not paid for the value that they provide to buyers, but rather are paid for the steering influence they can exercise for sellers, which results in supracompetitive commissions.

215.    Without the challenged restraints, those buyers who chose to use buyer-brokers would have incentives to try to negotiate to have their buyer-brokers take a lower commission because the buyer would be paying the commission either directly or through the home purchase financing.[403]  With the challenged NAR rules, this did not occur because those rules both restrained the ability and knowledge needed for such negotiations and greatly reduced incentives to engage in such negotiations. First, the challenged NAR rules led to a market equilibrium in which, as explained in Section V.C, the vast majority of listing agreements allowed the seller-broker to keep the whole commission even if no (or a reduced) buyer-broker commission was

---

[403] In the but-for world, the rare buyer who utilizes a buyer-broker might negotiate with the seller for a closing credit equal to some or all of their buyer-broker fee in exchange for paying a higher price for the home, in order to finance the fee.  In such situations, the buyer would still have an incentive to negotiate for a lower buyer-broker commission (or to forgo a buyer-broker entirely) because they would be better off if they needed to finance a smaller fee in this manner.  This is in contrast to the actual world in which the challenged restraints apply, where a buyer would rarely benefit from forgoing a buyer-broker or negotiating a lower buyer-broker commission.

149

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

actually paid, in which case any discount in buyer-broker commissions that a buyer might negotiate would simply redound to the benefit of the seller-broker. Without any resulting reduction in the commission paid by the seller, negotiating a lower buyer-broker price could not affect the home sales price and thus could not benefit the buyer either. Second, the NAR rules discussed above in Part IV restrained and disincentivized negotiation of both the buyer-broker commission and the total commission. For sellers with typical listing agreements that did not provide for a reduced total commission in line with any reduction in the buyer-broker commission actually paid, the only way to benefit from a reduced buyer-broker commission would be to renegotiate the total commission in their listing agreement. By restraining both the negotiation of the buyer-broker commission and any linking of buyer-broker commission to total seller commission in any negotiations, the NAR rules restrained and disincentivized the realization of this possibility. Third, NAR rules encouraged buyer-brokers to represent buyer-broker services as free to the buyer and restrained the disclosure to buyers of the blanket seller offers to pay buyer-brokers.[404] These rules made it less likely that buyers would even realize that they might have anything to gain by trying to negotiate the commissions offered to buyer-brokers.

216. These rules also created strong incentives to steer. The rules not only created a market equilibrium in which buyer-brokers were paid by sellers with incentives to set commissions to encourage buyer-brokers to steer buyers to their properties or prevent them from steering buyers to other properties. They also restrained negotiation of those buyer-broker commissions and provided buyer-brokers with comparative commission information to maximize their steering incentives.[405] At the same time, these rules denied buyers access to information—the amount of buyer-broker commission offered by sellers—that might have allowed buyers to detect (and potentially avoid) at least some forms of steering.[406] This, combined with the just-noted lack of incentive to negotiate buyer-broker commission rates and the restraints and deterrence against doing so, bolstered the maintenance and clustering of buyer-broker commissions around "standard" supracompetitive rates.[407]

217. Because in the current anticompetitive equilibrium the buyer-broker commission is set by the seller and seller-broker, the buyer-broker's client—the

---

[404] *See supra* at Sections IV.B-C.
[405] *See supra* Sections IV.A-B.
[406] *See supra* Sections IV.C.
[407] *See supra* Section V.B.4.ii.

150

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

buyer—has no influence over the setting of that price. In addition, because sellers pay the buyer-broker commission, buyer-brokers are limited in their ability to compete for clients based on lowering the price of their services. Instead, buyer-brokers are limited to forms of non-price competition, largely by engaging in socially inefficient levels of non-price marketing (such as paying for billboard advertisements).[408] In contrast, if the buyers paid the buyer-broker commission, buyer-brokers would have an incentive to compete for clients by offering lower buyer-broker commissions.

218. The best opportunity to induce price competition among buyer-brokers is in the selection and retention process by the buyer, when buyer-brokers are competing to be retained by the buyer. If the buyer were paying the commission or could readily internalize benefits from negotiating it lower, the buyer would have an incentive to make buyer-brokers compete on price to be retained. That incentive is severely restricted when restraints require seller-brokers to all make unilateral offers to pay buyer-brokers a blanket commission that comes out of the seller-brokers' commission and that maximizes buyer-broker incentives to steer buyers to sellers offering buyer-brokers the highest commissions, require that those offers not be disclosed to buyers, encourage buyer-brokers to advertise their services as "free" to the buyer, and restrain any efforts to negotiate lower buyer-broker commissions from the blanket offers.

---

[408] *See* Gregory S. Vistnes, "Competitive Distortions that Increase Real Estate Commissions" (Sep. 2021), at p. 9 ("[…] Instead of competition driving down commissions (thus reducing the attractiveness of entry by new agents), the increased number of agents has led to an inefficient market outcome in which agents engage in non-price competition (e.g., marketing) in an effort to attract clients (either a buyer or seller), but the number of closings/agent is quite low."); *id*. at p. 10 ("*An inability to compete on 'price' results in excessive non-price competition*. Absent the ability to compete for Buyers by offering a lower price, [buy-side agent]s engage in non-price competition as a means of attracting Buyers such as free calendars; free refrigerator magnets; postcards advertising local listings; and flyers in mailboxes and front doors. These forms of non-price competition are not only costly to agents, but typically of limited value to consumers." [footnote omitted]).

*See also* 2007 FTC-DOJ Real Estate Brokerage Industry Report at pp. 45-46 ("But with more and more agents competing to close transactions, the average number of transactions per agent will decline. Further, if commission rates are relatively inflexible, such that agents do not seek to attract customers by offering lower rates, agents will compete along other dimensions to gain clients. For instance, agents may expend resources 'prospecting' for listings by, for example, door-to-door canvassing, mailings, providing potential clients with free pumpkins at Halloween, and calling on FSBO sellers. Marketing is often beneficial to consumers and competition, and some consumers may benefit from the enhanced service competition in this market. But when competition occurs primarily along such dimensions, brokers may expend more resources providing additional services than the value of those services to consumers." [footnotes omitted]).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

219.   Absent these restraints on free market competition, many buyers would forgo using a buyer-broker entirely, limit the amount of buyer-broker services they sought, or would retain a different broker offering better terms, and the credible threat of doing so would reduce the commission rates demanded by buyer-brokers for those buyers who still chose to retain one.  Buyers cannot circumvent the anticompetitive equilibrium by choosing not to hire a buyer-broker in the actual world for two reasons.  First, as I explained above in Section V.C, given the anticompetitive equilibrium created by the challenged restraints, the vast majority of listing agreements allow for the seller-broker to keep the whole commission even if no (or a reduced) buyer-broker commission is actually paid, so even if the buyer does not hire a buyer-broker, the seller will almost always still have to pay the listing agent the exact same commission.  Thus, there are generally no savings to the seller that could lead the seller to prefer an offer from a buyer without a buyer-broker to an otherwise identical offer from a buyer with a buyer-broker.  Second, even if more listing agreements provided that the seller would pay a lower commission if no (or a reduced) commission were paid to the buyer-broker, that would not create much of an incentive to forego retaining a broker because buyer-brokers are normally retained near the outset of the home search process, when buyers usually do not know which homes they are likely to make an offer on and, regardless, will almost certainly not know whether any particular seller's listing agreement provides for a reduction in the seller's total commission in line with any reduction in the actual buyer-broker commission paid.  Moreover, as explained in Sections IV.B-C, the challenged restraints  denied buyers information about the compensation that sellers were offering to buyer-brokers and allowed buyer-brokers to advertise their services as "free," both of which would enhance this effect by making it more difficult for the buyer to know how much their forgoing a buyer-broker could reduce the seller's commission cost, if it could do so at all.

220.   Defendants may argue that discount buyer-brokers could disturb this equilibrium by offering buyers "rebates" of the buyer-broker commission, which in theory could allow buyers to internalize some of the cost of the buyer-broker commission.  However, in practice this is not feasible and would not prevent anticompetitive effects even if it were.  As explained in Part IV.B, the challenged rules permitted buyer-brokers to represent that their services are free, and buyers might be suspicious of offers to provide them with rebates for something which is

represented to be "free."[409]  Moreover, as explained in Part IV.C, the challenged restraints also prohibited buyer-brokers from disclosing the blanket offers by seller-brokers to pay their fees.  These rules effectively prevented buyer-brokers succeeding with a strategy of offering buyers rebates of the commissions they received from sellers, because those buyer-brokers (a) could not tell buyers the blanket offers from which they would be getting a rebate and (b) would be competing with other buyer-brokers who would be telling buyers their services were free, in a market in which the restraints meant that market participants would rarely observe any buyers benefiting from being able to negotiate lower commissions.  Moreover, even if such buyer-broker rebates to buyers were effective, they would not eliminate the anticompetitive effects.  Such buyer-broker rebates would not alter the fact that the NAR restraints mean buyers lack the incentives to do without the services of buyer-brokers altogether, as the great majority of buyers do in the competitive benchmark nations that lack similar restraints.[410]  Thus, even with buyer-broker rebates, the restraints would still result in the wasteful hiring of buyer-brokers, or the wasteful over-hiring of buyer-brokers for more services than a buyer actually finds valuable, that would not occur in a free market.  Further, the fact that the restraints eliminate buyer incentives to do without buyer-brokers makes it unlikely they can credibly threaten to do so, which will tend to increase any negotiated net buyer-broker commission.  Finally, buyer-broker rebates cannot solve the steering problem discussed above because, even with rebates, buyer-brokers would have incentives to steer buyers to the seller properties that paid the highest buyer-broker commissions.[411]  That steering problem alone would maintain supracompetitive buyer-broker commissions.

221.   All of the above analysis in this section is common to the class, is based on rules and evidence that are common to the class, and reaches conclusions that are common to the class.

---

[409] *See* Gregory S. Vistnes, "Competitive Distortions that Increase Real Estate Commissions" (Sep. 2021), at p. 21 ("Buyers' surprising indifference to rebates appears to stem from Buyer confusion about how the real estate market operates. In particular, most Buyers believe that their BSA's services are 'free' to the Buyer, and the concept of the BSA then offering to pay them money is both confusing and perhaps a suspicious (or even illegal) type of kickback. […]").

[410] *See infra* Section V.G.

[411] *See supra* Section V.B.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

### E. The Challenged Restraints Impeded Discount Brokers and Other Actual and Potential Entrants from Disrupting the Anticompetitive Equilibrium

222. The challenged restraints have also maintained the anticompetitive equilibrium by preventing actual and potential market entrants from disrupting that equilibrium by offering discounted commissions or by choosing not to make blanket offers to pay buyer-broker commissions at all. As noted above, NAR MLS rules restrained competitive entry into markets within the U.S. by both REX and Trelora, discount brokers that have offered commissions lower than incumbent MLS brokers.[412] REX charged lower seller commissions by not making blanket offers of buyer-broker commissions, while Trelora offered a low flat seller commission along with a buyer-broker commission that was below the prevailing rate.[413] But despite offering prices that should have been more attractive to sellers, the NAR restraints prevented these entrants from successfully competing, which helped enable Defendants and their affiliated brokers to maintain supracompetitive commission rates. This denied lower commissions to potential consumers of the entrants' services, as well as consumers of the Defendants' brokerage services.

223. The experience of another discount broker, Redfin, similarly demonstrates how the challenged restraints prevented discount brokers from disrupting the anticompetitive equilibrium. For example, in 2005 Redfin tried to launch a service which provided technological tools to empower home buyers to put in an offer on a home listing without using a buyer-broker, including for homes listed on an MLS.[414] However, Redfin's first attempt to implement this service failed, and Redfin CEO Glenn Kelman concluded that Redfin's initial strategy did not work because, "the listing agent controls the rules" regarding buyer-broker compensation, which "allows listing agents to set the price for buyers agents and prevents real price competition among agents."[415] In other words, under the anticompetitive equilibrium created by the challenged restraints, the vast majority of listing agreements provide for seller-brokers to keep the full amount of the total commission in the listing agreement, regardless of if a smaller (or no) buyer-broker

---

[412] *See supra* V.B.4.iii.

[413] *See id.*

[414] *See* August 29, 2021 interview with Glenn Kelman on the Investor's Podcast, *available at*: https://open.spotify.com/episode/0wssOPJRRSiV7L42za9L3W?si=T1WYMiGBQISc3q5CgYg B5w&context=spotify%3Ashow%3A0umSLpOkCt5LszdtrQn9Uc&nd=1 ("The original premise was that we could let people make offers on home through a website, but we weren't the listing agent […] The reason this became a second act was that we had to get listing share first.").

[415] *Id.*

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

commission were actually paid.[416]  As explained above in Section V.C, this would make sellers indifferent to an identical offer from a buyer with no buyer-broker and a buyer-broker who would be paid the full offered commission, because any foregone buyer-broker commission would accrue to the listing broker rather than to the seller.  As a result, Kelman realized that to have a chance of succeeding, Redfin first had to obtain its own large set of listings that would allow both buyers and sellers to internalize some of the savings that result from a buyer making an offer directly without the use of a buyer-broker.[417]

224.    After it had obtained a larger number of its own listings, in 2019 Redfin reintroduced its online home purchase offer service, "Redfin Direct."  Under that program, buyers can make offers without an agent using Redfin's online tool, and Redfin markets the tool to buyers by explaining that their offer will be more attractive since Redfin will only charge the seller a 1% fee as opposed to the more usual 2.5% or 3%.[418]  However, unlike Redfin's first attempt to create this tool, such offers can only be made on other Redfin listings.  Kelman himself admits that, because the new Redfin Direct strategy can only succeed to the extent that Redfin obtains a large share of listings, it will take a "very long time" for Redfin Direct to "influence financials."[419]  In addition, after news of Redfin's new program became public in May of 2019, Defendant RE/MAX announced it was pulling out of a referral partnership with Redfin, stating that "Given Redfin's recent announcement regarding a program that would encourage buyers not to use agents on listings where the seller is represented by Redfin, we cannot continue with an official, corporate-

---

[416] *See supra* Section V.C.

[417] *See* August 29, 2021 interview with Glenn Kelman on the Investor's Podcast, *available at*: https://open.spotify.com/episode/0wssOPJRRSiV7L42za9L3W?si=T1WYMiGBQISc3q5CgYg B5w&context=spotify%3Ashow%3A0umSLpOkCt5LszdtrQn9Uc&nd=1  ("The reason this became a second act was that we had to get listing share first.").

[418] *See* https://www.geekwire.com/2019/redfin-looks-disrupt-real-estate-new-program-letting-homebuyers-make-direct-offers-online-without-agent/  ("Redfin quietly launched a new feature that lets homebuyers without an agent make offers on homes directly through its website, bringing back an initiative the company first tried more than a decade ago. […] Instead of paying a commission to the buying agent, often around 2 to 2.5 percent of the purchase price, the seller pays an additional 1 percent fee to Redfin on a Redfin Direct sale.").

[419] *See* August 29, 2021 interview with Glenn Kelman on the Investor's Podcast, *available at*: https://open.spotify.com/episode/0wssOPJRRSiV7L42za9L3W?si=T1WYMiGBQISc3q5CgYg B5w&context=spotify%3Ashow%3A0umSLpOkCt5LszdtrQn9Uc&nd=1. ("Redfin Direct is a long-term initiative. It is going to be such a slog […] It is not affecting our financials much now… Redfin Direct is going to take a long time.").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

level relationship at this time."[420]  Redfin relies heavily on such referrals in certain new markets where it has not yet built its operations to scale.[421]  RE/MAX's stated concern was that Redfin Direct could "undermine the standing of North American buyers' agents[.]"[422]

225.  The Redfin experience confirms that the anticompetitive equilibrium created by the challenged restraints has stymied efforts to discount buyer-broker services.  To effectively evade these restraints a discounter would need to create a rival set of listings, which (if even possible in the face of the network effects favoring an incumbent MLS) would take a very long time before it could amass enough listings to provide a significant competitive constraint.

### F. The Rise in Commissions Despite Declining Value and Costs Confirms that the Challenged Restraints Have Elevated Buyer-Broker Commissions Above the Competitive Level

226.  In a competitive market, economics predicts that the price of a service should be related to the costs of providing that service as well as to the value of that service to its consumers.  Moreover, economics would predict that if technological advances allow for cutting costs in the face of a decline in the value of that service to consumers, it would lead to the displacement of high-cost providers by more efficient, low-cost innovators.  In this market, that has not happened because of NAR's anticompetitive restraints.  Instead, buyer-broker commissions have risen sharply, even though the value and cost of providing buyer-broker services have fallen, and low-cost innovators have faltered because of those anticompetitive

---

[420]    https://www.bizjournals.com/boston/news/2019/05/31/new-redfin-platform-draws-criticism-from-buyer-s.html ("After news of the program became public in May, RE/MAX announced it was pulling out of a U.S. and Canadian referral partnership with Redfin because the franchisor objected so strongly to the program encouraging buyers to forgo a buyer's agent. In a statement, RE/MAX said, 'Given Redfin's recent announcement regarding a program that would encourage buyers not to use agents on listings where the seller is represented by Redfin, we cannot continue with an official, corporate-level relationship at this time.'").

[421] Redfin 2020 10-K ("We refer customers to third-party partner agents when we do not have a lead agent available due to high demand or geographic limitations. Our dependence on partner agents can be particularly heavy in certain new markets as we build our operations to scale in those markets.").

[422]    https://www.thetruthaboutmortgage.com/redfin-direct-buy-a-redfin-listed-home-without-a-real-estate-agent/ ("RE/MAX's beef was that Redfin Direct could 'undermine the standing of North American buyers' agents,' in which Redfin said that it 'understands this concern.'").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

restraints.

227.    As noted above, inflation-adjusted buyer-broker commissions have increased 32% from 2013 to 2020 in the 20 Covered MLSs.[423]  The chart below again illustrates the results.  At the same time, technological change and the growth of internet aggregators, such as Zillow, has decreased the value of the services provided by buyer-brokers to buyers, while creating opportunities for substantial cost savings in the provision of broker services.  Economics would predict that the declining value of these services combined with such technological advances would lead to competitive cost-cutting and the displacement of high-cost providers, which would then lead the dollar amount of buyer-broker commissions to decrease. Instead, commissions have increased far faster than inflation.  As Ryan Gorman, current CEO of Coldwell Banker and CEO of the company-owned brokerage side of Realogy, wrote: ███████████████████████████████████ ███████████████████████████████████████████████ ████████████████████████ [24]

**Figure 10: Growth in Inflation-Adjusted Commission Amount Over Time in the 20 Covered MLSs[425]**

---

[423] *See supra* Section II.B.4.
[424] Realogy-Sitzer-01029752 ███████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ ████.
[425] *See* "REA75 Commission Amount over Time v2.xlsx."

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY



228. The value of buyer-brokers has declined because technology and the growth of aggregator websites has expanded home buyers' participation in the home search process, and consequently decreased the importance of the buyer-broker's role. As early as 2001, NAR recognized that "████████████████████ ██████████████████████████████████████████████████ ████████████████████████████████████████."[426] More recently, technological innovations have massively shifted consumer behaviors in relation to residential real estate transactions. Most notably, aggregator websites (such as Zillow) allow buyers to research, view, and compare homes from their phone, tablet, or computer without needing to contact anyone or leave their home. NAR's own analysis found that the share of buyers who used the Internet as part of their home search process increased from 92% in 2013 to 97% in 2020.[427] Indeed, by 2020, "For 43 percent of recent buyers, the first step that they took in the home buying process was to look online at properties for sale," while only "18 percent of buyers

---

[426] NARSITZER0000774432 ("*Strategic Analysis*," "Economic Research" dated Jan. 25, 2001, for the NAR "Leadership Team/ Strategic Thinkers Group Meeting" Feb. 7-8, 2001) at -33.
[427] 2020 NAR Profile at p. 64, Exhibit 3-11.

158

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

first contacted a real estate agent."[428]  Repeat buyers were even more likely to first look online at properties, with that being the first step for 48% of them.[429] Accordingly, the evidence indicates that buyer-brokers are providing less help on the process of searching for homes to look at.  The same 2020 NAR study found that buyers viewed most of the homes they looked at "only online".[430]  Accordingly, buyer-brokers are also providing less help in showing homes.  In effect, buyers increasingly perform for themselves many functions that buyer-brokers once performed, in large part because technology has revolutionized the industry and dramatically reduced search costs.  This both decreases the value of buyer-broker services and decreases the costs of providing them, since buyers are using technology and websites to themselves perform many of the services that buyer-brokers used to provide.

229.    Unsurprisingly, NAR (and industry research it commissioned), as well as the economic literature, anticipated that technology would greatly reduce the value and costs of broker services. ████████████████████████ ████████████████████████████████████████ ████████████████████████[431]  A 1999 academic paper likewise projected that technological change would "reduce the prevailing, comparatively high, transaction costs associated with the sale/purchase of all types of real estate."[432]  In 2001, NAR had recognized that ███████████

---

[428] 2020 NAR Profile at pp. 7, 58 & Exhibit 3-1.
[429] 2020 NAR Profile at p. 58 & Exhibit 3-1.
[430] 2020 NAR Profile at pp. 56, 62 & Exhibit 3-7 ("Buyers commonly looked at a median of nine homes before finding a home to purchase, five of which they viewed only online.").
[431]



[432] *See* Baen, John S., and Randall S. Guttery, "The Coming Downsizing of Real Estate: Implications of Technology," *Journal of Real Estate Portfolio Management*, Vol. 1, No. 1, 1997,

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████[433] By 2011, former NAR Chief Economist John Tuccillo concluded:

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████████[434]

████████████████████

230.    These conclusions reflect a basic economic logic: if technological advances provide an opportunity to reduce the costs of a service while simultaneously reducing the value of that service to consumers, competition should lead low-cost innovators to displace high-cost legacy providers who fail to adapt. ████████████████████████████████████████ ████████████████  That this has not occurred is the result of the challenged restraints described above in Part IV, which have extended and maintained an anticompetitive equilibrium which has allowed high-cost providers to maintain their market position (and supracompetitive prices) in the face of actual and potential competition from low-cost innovators.  This is confirmed by the evidence described above in Part V.E of low-cost innovators like REX, Redfin, and Trelora all faltering in the face of the challenged restraints.

231.    Instead, as noted above, NAR's inflation-adjusted buyer-broker commissions have risen sharply by 32% in just seven years from 2013-2020, even though they began from an already anticompetitive baseline in 2013.[435]  This contrasts with the more typical, and more competitive, impact of the technological

---

at p. 1 ("The current rapid growth of both consumer and reed estate service provider business computing, coupled with the growing availability of market information databases for real estate participants, are revolutionizing the real estate industry. The real estate property and mortgage markets, together with all supporting professions and service providers, are experiencing a paradigm shift that will have major implications in levels of employment and compensation. This will reduce prevailing, comparatively high, transaction costs associated with the sale/purchase of all types of real estate.").

[433] *See* NARSITZER0000774432 ████████████████████
████████████████████████████████████████████████
████████████████████████████████████████.

[434] *See* NARSITZER0000735684 at pp. 1, 7 (emphasis omitted).

[435] *See supra* Sections I.B & V.A.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

revolution on fees that can be seen in the trends in other commission-based industries that were not subject to the sort of anticompetitive restraints that are being challenged in this case. An analyst report circulated within RE/MAX asked:



[436] The analyst report noted ███

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████ [437]

232. The air travel agent industry provides a good example of how technology would normally drive down commissions absent anticompetitive conduct. Indeed, a 2011 report by the CREA Futures Project noted ████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████ [438] Prior to the Internet revolution, roughly 8 out of 10 airline tickets were sold through a travel agent, and those agents were paid 10% commissions by the airlines, and almost never charged fees to purchasers.[439] As technology advanced, airlines reduced or

---

[436] RMLLC-WDMO-00767036 ████████████████████████████

████████████.

[437] *See* RMLLC-WDMO-00767036 at -38 ████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████.

[438] *See* NARSITZER0000735684 ████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████.

[439] Peltz, James, "Delta to Be First Airline to Cap Agent Commissions: Travel: Carrier Will Pay a Maximum of $50 on Domestic Tickets. Agencies Say Move Hits Them Hard." *Los Angeles Times,* February 10, 1995, *available at*: https://www.latimes.com/archives/la-xpm-1995-02-10-fi-30298-story html; "Upheaval in Travel Distribution: Impact on Consumers and Travel Agents,"

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

eliminated the commissions paid to travel agents, with most consumers booking directly through the internet, and the minority who still sought a higher level of service eventually choosing to pay dramatically reduced commissions to travel agents directly as airlines stopped paying commissions.

233.  Similarly, technology dramatically reduced commissions in the stock brokerage industry.  When online trading first emerged as an option, commissions for online trades were "$40 or so a trade", a bargain compared to traditional commissions, which could be $200 per trade.[440]  Since the advent of online trading, the combination of technological and competitive pressure on commissions has been relentless, ultimately resulting in 2019 in most major brokers offering $0 online trading commissions.[441]  This demonstrates how decreasing costs as a result of technology would normally reduce costs to consumers absent anticompetitive restraints.

234.  The final economic factor that could cause a change in commission rates is the supply of real estate agents.  In theory, a shortage of agents could result in increasing commissions.  Indeed, in 2001, NAR predicted that ██████████ ████████████████████████████████████████████████████[442] However, the number of brokers has *increased* rather than decreased, both in absolute terms and in relation to the U.S. population and home sales, which one

---

Report to Congress and the President by the National Commission to Ensure Consumer Information and Choice in the Airline Industry, November 13, 2002, Chapter 2 – The Travel Agency System Today, *available at*: https://govinfo.library.unt.edu/ncecic/report.asp.

[440] Beilfuss, Losa, and Alexander Osipovich, "The Race to Zero Commissions," *The Wall Street Journal,* October 5, 2019, *available at*: https://www.wsj.com/articles/the-race-to-zero-commissions-11570267802.

[441] *Id.*  Stock brokers instead make money by charging for ancillary services such as collecting interest on margin loans and cash sitting in customers' accounts, as well as receiving "payment for order flow" in exchange for routing trades to specific market makers.  *See* "U.S. online brokers still profiting from 'dumb money,'" Reuters, Oct. 8, 2019, *available at*: https://www.reuters.com/article/us-usa-brokers-fees/u-s-online-brokers-still-profiting-from-dumb-money-idUSKBN1WN1UD ("brokers have other ways of profiting from retail trading, including interest earned on customer cash balances and margin lending.  There is also payment for order flow, in which wholesale market makers, like Citadel Securities or Virtu Financial pay for the first crack at executing a stock order […]").

[442] *See* NARSITZER0000774432 █████████████████████████ ████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████.

162

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

would expect to put downward pressure on commissions in a competitive market.[443] Instead, given the anticompetitive effects of the challenged restraints, this increase in the number of brokers indicates that supracompetitive commissions have attracted new real estate agents, but that the challenged restraints and the anticompetitive equilibrium they have maintained and extended has led to intensified, inefficient non-price competition among these agents, rather than direct price competition that would benefit consumers through lower prices.[444]  Indeed, John Tucillo, the former Chief Economist of NAR, wrote, ███████████████████████████████████ ███████████████████████████████████████████████████████████ █████████[445]  His conclusion indicates that not only have supracompetitive commissions inefficiently attracted more people to become real estate agents than would have occurred but-for the challenged restraints, but that doing so has generally

---

[443] From 1993 to 2020, NAR reported an approximately 100% increase in membership. *See* NAR, Historic Report, *available at*: https://www.nar.realtor/membership/historic-report (membership of 1,458,661 in 2020 and 729,266 in 1993).  Over this same time period, the U.S. population grew by approximately 26.8%.  *See* FRED Economic Data, Population, Total for United States, *available at*: https://fred.stlouisfed.org/series/POPTOTUSA647NWDB (population of 329,484,123 in 2020 and 259,919,000 in 1993).  The number of home transactions increased by approximately 46.7%.  *See* FRED Economic Data, New One Family Houses Sold: United States, *available at*: https://fred.stlouisfed.org/series/HSN1FA (new home sales of 822 thousand units in 2020 and 666 thousand units in 1993); U.S. Department of Housing and Urban Development's Office of Policy Development and Research, U.S. Housing Market Conditions 4th Quarter, 2012, Historical Data Exhibit 7, *available at*: https://www.huduser.gov/portal/periodicals/ushmc/winter12/index.html (existing home sales of 3.739 million in 1993); NAR, December 2020 Existing Home Sales Annual Pace Rises to 6.76 Million, *available at*: https://www.nar.realtor/blogs/economists-outlook/december-2020-existing-home-sales-annual-pace-rises-to-6-76-million (existing home sales of 5.64 million in 2020).  The NAR membership increase has thus greatly outpaced the growth in both the size of the U.S. population and in the number of annual home transactions over the same period.

[444] *See* 2007 FTC-DOJ Real Estate Brokerage Industry Report at pp. 46-47 ("According to Hsieh, real estate agents may be competing intensely but do so primarily by expending resources to gain listings rather than competing by lowering their commission fees, a phenomenon Hsieh calls the 'tragedy of the commission.'  The 'tragedy' of relatively inflexible commission rates, according to Hsieh, is not just that consumers receive more services and fewer commission fee reductions than many consumers might prefer, but that the agents themselves are no better off. Because the ratio of agents to buyers and sellers has increased, agents have to work harder to find clients and consequently spend less time actually closing transactions. In this manner, a larger number of agents dissipates the increased profit opportunities by incurring additional expenses to close transactions. Further, this theory suggests that because agents compete profits away by incurring additional expenses to provide these services, rather than lowering their commission rates, they operate at inefficiently high cost levels." (footnotes omitted)).

[445] *See* NARSITZER0000735684 ███████████████████ ████████████████████████████████████████████.

163

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

lowered the quality of such agents because each agent handles fewer home transactions annually and thus takes longer to acquire (or fails to maintain) relevant experience and expertise.[446]

### G. Commission Rates in the 20 Covered MLSs Are Much Higher Than in Competitive Benchmark Nations, Confirming that the Challenged Restraints Have Elevated Buyer-Broker Commissions Above Their But-for Levels

235. The fact that the challenged restraints elevated buyer-broker commissions above their but-for levels is also confirmed by an examination of international benchmarks that have not experienced the challenged anticompetitive restraints and do not suffer from the resulting anticompetitive equilibrium in which sellers and their brokers make unilateral fixed blanket offers of buyer-broker commissions. In these international benchmarks, the use of buyer-brokers is rare, and buyer-broker commission rates are lower.

236. A report commissioned by NAR itself, called the "Definitive Analysis of Negative Game Changers Emerging in Real Estate" ("D.A.N.G.E.R.") report, selected six international comparators (Australia, the U.K., Belgium, Netherlands, Singapore, and Germany) for what could happen in the US if there was a "gradual downward slide [in commission rates] or a realignment of fees as charged in other countries in the world."[447] I understand that Professor Economides has conducted a

---

[446] *See* Gregory S. Vistnes, "Competitive Distortions that Increase Real Estate Commissions" (Sep. 2021), at p. 9 ("[…] Instead of competition driving down commissions (thus reducing the attractiveness of entry by new agents), the increased number of agents has led to an inefficient market outcome in which agents engage in non-price competition (e.g., marketing) in an effort to attract clients (either a buyer or seller), but the number of closings/agent is quite low."); 2007 FTC-DOJ Real Estate Brokerage Industry Report at p. 46 ("Because the ratio of agents to buyers and sellers has increased, agents have to work harder to find clients and consequently spend less time actually closing transactions." [footnote omitted]).

[447] *See* NARSITZER0000315626 (2015 "D.A.N.G.E.R. Report," "definitive analysis of negative game changers emerging in real estate" which was "researched and authored by Swanepoel T3 Group" and "commissioned by National Association of REALTORS®") at p. 23 (slide titled "Commissions Spiral Downward," noting "The continued rise in home prices has facilitated the elevation of real estate earnings based on commissions. Those earnings have not gone unnoticed by consumers, who are responding by placing increased pressure on real estate agents to reduce their commission rates. As a result, many fear a gradual downward slide or a realignment of fees as charged in other countries in the world." and reporting "real estate brokerage fees" for the U.K., Singapore, Netherland, Australia, Belgium, and Germany).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

thorough review of potential international benchmark countries based on a number of relevant criteria including per capita GDP, corruption indices, and population. ████████████████████████████████████████████████████ ████████████████████████████████████[448] I further understand that the set of countries he considered included five out of six of those evaluated by the NAR as comparators in its D.A.N.G.E.R. report.[449] Of the countries considered by either Professor Economides or the NAR D.A.N.G.E.R. report, I understand that Professor Economides finds that the three most appropriate comparison countries (considering both relevant criteria and the existence of confounding factors such as conduct similar to the NAR rules challenged in this case) are Australia, the U.K., and the Netherlands.[450]

237. Consistent with the economic predictions above, in competitive benchmark countries, the use of buyer-brokers is rare—20% in the Netherlands, less than 5% in Australia and the U.K.[451] This contrasts with the fact that 87-88% of U.S. homebuyers utilize a buyer-broker.[452] This data confirms the conclusion above that without the challenged restraints, buyers would be much less likely to use buyer-brokers. Accordingly, without those challenged restraints, sellers and seller-brokers would usually not have to incur the costs of paying for buyer-brokers out of the total commission paid by the seller, and thus the total commission paid by sellers would decline.

238. Also consistent with the economic predictions above, when buyer-brokers are used in the three nations that Professor Economides identifies as competitive benchmarks, the commission rates are lower than they are in the United States. In his report, Professor Economides found that the average buyer broker

---

[448] *See* ████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████

[449] *See* Economides Report at Section III.A.

[450] *See* Economides Report at Sections III.B-C.

[451] *See* Economides Report at Section IV.A.

[452] 2021 NAR Profile Highlights at p. 7 ("Eighty-seven percent of buyers recently purchased their home through a real estate agent or broker"); 2020 NAR Profile at p. 7 ("Eighty-eight percent of buyers recently purchased their home through a real estate agent or broker").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

commission is 1.925% in Australia (including goods and services tax ["GST"] of 10%), 1.13% in the Netherlands (including a value added tax ["VAT"] of 21%), and 1.59% in the U.K. (including VAT of 20%).[453] The median buyer-broker commission in each of the 20 Covered MLSs in this case was far higher than any of these competitive benchmarks, as Table 9 summarizes.

---

[453] *See* Economides Report at Section V.C (Table 6), and at Section V.B.2 (Table 4).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

| Table 9.  Buyer-Broker Rate in each Covered U.S. MLS Is More Than 5% Higher than in Competitive Benchmarks in Other Nations[454] | | | | |
|---|---|---|---|---|
| **MLS** | **MLS Median Buyer-Broker Rate** | **% increase over Australia Rate** | **% increase over Dutch Rate** | **% increase over UK Rate** |
| Arizona Regional | 3.00 | 56% | 165% | 89% |
| Austin Bd. of Realtors | 3.00 | 56% | 165% | 89% |
| Bright (mid-Atlantic) | 2.50 | 30% | 121% | 57% |
| Canopy (Carolinas) | 3.00 | 56% | 165% | 89% |
| Columbus Realtors (Ohio) | 3.00 | 56% | 165% | 89% |
| Florida Gulf Coast | 3.00 | 56% | 165% | 89% |
| Greater Las Vegas | 3.00 | 56% | 165% | 89% |
| Houston Ass'n of Realtors | 3.00 | 56% | 165% | 89% |
| Metro (Wisconsin) | 2.40 | 25% | 112% | 51% |
| Miami | 3.00 | 56% | 165% | 89% |
| North Texas RE Info Serv. | 3.00 | 56% | 165% | 89% |
| Northstar (Minn & W. Wis.) | 2.70 | 40% | 139% | 70% |
| Pikes Peak (Colorado) | 3.00 | 56% | 165% | 89% |
| REColorado | 2.80 | 45% | 148% | 76% |
| Realcomp II (Michigan) | 3.00 | 56% | 165% | 89% |
| San Antonio Bd. Of Realtors | 3.00 | 56% | 165% | 89% |
| Stellar (was My Florida Regional) | 2.93 | 52% | 160% | 84% |
| Triangle (North Carolina) | 2.40 | 25% | 112% | 51% |
| Utah Real Estate | 3.00 | 56% | 165% | 89% |
| Yes_Now (Ohio & WVA) | 2.83 | 47% | 151% | 78% |

[454] *See* "REA113 Median Commissions by MLS v Comp Benchmarks v4.xlsx."

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

239. Finally, seller commissions are at least no higher in these countries than in the 20 MLSs at issue, indicating that the infrequency of buyers employing agents has not increased the costs of selling agents. Professor Economides examines NAR documents, posted realtor prices, and survey evidence, and finds that the average seller commission rate in the three comparison countries is around 2.19% in Australia (typically between 1.5% and 3%), around 1.3% in the Netherlands (typically 1% to 2%), and around 1.42% in the U.K (typically 1% to 2%).[455] In comparison, Professor Economides analyzes the commission data produced by the defendants, and finds an average seller commission rate for defendant brokers in the U.S. of 2.70%.[456]

## H. NAR's 2022 Rule Changes Will Not Eliminate the Anticompetitive Effects of the Challenged Restraints

240. As discussed above in Part IV.E, NAR has approved changes to some of the rules that are included among the restraints at issue in this case that become effective in 2022. These changes include: (1) prohibiting buyer-brokers from representing that their services are "free" unless they actually receive no compensation from any source for those services; (2) prohibiting MLSs from providing participants with the ability to filter listings according to the amount of the blanket offer and prohibiting MLS members from engaging in filtering; and (3) requiring MLSs to include the amount of the blanket offer of compensation on their websites and in data feeds and to permit such information to be shared.[457]

241. These rule changes became effective on January 1, 2022 and MLSs have until March 1, 2022 to adopt them, so they could not have had any restraining effect before that time.[458] As of the date of this report, March 1, 2022 is still in the future, so I obviously cannot yet have data on the actual effect that lessening these particular restraints might have. However, my economic analysis would predict that these changes would not eliminate anticompetitive effects from the challenged NAR restraints because these are all changes to rules that exacerbated (rather than created) the steering incentives created by the other challenged NAR rules and that have little connection to all the other anticompetitive effects created by other challenged NAR

---

[455] *See* Economides Report at Section III.D.
[456] *See* Economides Report at Section III.D.
[457] *See supra* Section IV.E.
[458] *See supra* Section IV.E.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

rules.[459]

242.   To be sure, these changes should somewhat lessen steering incentives by preventing buyer-brokers from filtering listings according to the amount of the blanket offer and by making it more likely that buyers will be able to detect such steering.  However, the steering incentives created by other challenged restraints will still exist because buyer-brokers will still be able to see which sellers are offering the highest commissions (even though they will not have the ease of filtering them automatically) and buyers will usually be unable to detect when they have been steered (even though the rule changes make such detection somewhat easier). Moreover, as discussed above, even when buyers do find homes for sale that offer lower buyer-broker commissions, buyer-brokers have many other ways of steering buyers, including failing to recommend certain listings that meet buyer search criteria, denigrating listings with low commission offers, or simply refusing to show certain listings at all.[460]  The economic relevance of the prior rules that NAR has now changed was mainly that it made it particularly obvious that the rules were advancing the collective incentive of NAR members to exacerbate steering in order to inflate commissions, not that those prior rules were necessary to advance that collective incentive.  Even with these changes, NAR's other restraints will still mean that buyer-brokers will be paid based on blanket offers of fixed compensation from sellers and that negotiation of that offered compensation will be constrained, which will create powerful steering incentives.[461]

243.  Nor will the rule changes meaningfully reduce any of the other anticompetitive effects of the challenged restraints that require that buyer-brokers be paid based on blanket offers of fixed compensation from sellers from which negotiation is constrained.  Those restraints will still induce an anticompetitive equilibrium in which (a) seller commissions will usually not be lowered even if no buyer broker is used,[462] (b) buyer-broker usage and commission rates will be higher than they would be without the restraints,[463] and (c) discount brokers and other entrants will be restrained.[464]  Even with these rule changes, the other NAR restraints will still mean that buyers will have little incentive to shop around for lower cost buyer-brokers or to forgo using a buyer-broker entirely (because they will not internalize the cost or savings themselves), and buyer-brokers will have no incentive

---

[459] *See supra* Part IV; Sections V.A-E.
[460] *See supra* Section V.B.
[461] *See supra* Section V.B.
[462] *See supra* Section V.C.
[463] *See supra* Section V.D.
[464] *See supra* Section V.E.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

to compete on commission levels because the client retaining them (the buyer) still will not be the same as the party paying them (the seller).

## VI. The Challenged Restraints Have Impacted and Will Impact All or Nearly All Class Members

244. Leaving aside certain limited exclusions, the Damages Class consists of all home sellers who paid a commission between March 6, 2015, and December 31, 2020, to a brokerage affiliated with a Corporate Defendant in one of the Covered MLSs.[465] The Injunctive Relief Class consists of all current and future sellers who are now or will list their home for sale in a Covered MLS.[466] My opinion is that all or nearly all class members in the Damages Class suffered an anticompetitive overcharge due to the challenged NAR restraints. My opinion is further that all or nearly all class members in the Injunctive Relief Class will suffer an anticompetitive overcharge from the challenged NAR restraints unless they are enjoined.

245. For the Damages Class, all class members necessarily offered payment of a buyer-broker commission under the buyer-broker compensation rule.[467] Likewise, for the Injunctive Relief Class, all class members would necessarily have to offer payment of a buyer-broker commission under the buyer-broker compensation rule if it is not enjoined. My analysis shows that, in the current anticompetitive equilibrium created by the challenged restraints, sellers in no more than 1.7% of Damages Class transactions were able to avoid paying for some or all of this buyer-broker commission with a dual or variable rate listing agreement in cases in which there was no separate broker on the buyer side.[468] Additionally, because dual or variable rate provisions do not necessarily reduce the total commission by the entire amount of the offered buyer broker commissions on occasions when they apply at all (i.e., a 6% commission with a 3% offered commission to buyer-brokers may only be reduced to 5% total if there is no separate buyer-broker), this 1.7% estimate is conservative and likely overstates the percentage of transactions in which sellers did not pay for some of the buyer-broker commission. But we can conservatively conclude from this data that more than 98.2% of sellers had to pay buyer-broker commissions under the current NAR restraints and would likely have to continue to do so if those restraints are not

---

[465] *See supra* Part I.
[466] *Id.*
[467] *See supra* Section IV.A.
[468] *See* "REA115 Dual Variable Rate Analysis.xlsx" and *supra* Section V.C.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

enjoined.

246. My analysis also indicates that, in a but-for world without the challenged NAR restraints, sellers either would not have paid buyer-broker commissions or would have paid a much lower commission to buyer brokers. The lion's share of sellers would have paid zero buyer-broker commissions, because in the but-for world buyers would usually have done without buyer-brokers, sellers would usually not have offered to pay buyer-broker commissions for the buyers who did use them, and even when they did, listing agreements would not usually have required sellers to pay buyer-broker commissions even if there were no separate buyer-broker.[469] Further, in the but-for world, even sellers who would have chosen to pay for the buyer-broker commissions would have paid a greatly reduced amount, both because buyer-broker commissions would have been lower with increased competition and reduced steering incentives, and because sellers would have borne buyer-broker commissions only to the extent that some buyers both chose to engage a buyer-broker and were able to get the seller to bear some of the buyer-broker commission cost as part of negotiations over the net home sale price.[470] Both those changes would have lowered the total broker commission paid by sellers. The same holds for a future world without the challenged restraints.

247. Accordingly, for the Damages Class, more than 98.2% of sellers who paid buyer-broker commissions in the actual world would have paid no buyer-broker commission or a lower buyer-broker commission in the but-for world. Thus, more than 98.2% of sellers in the Damages Class were injured from the inflated buyer-broker commissions, standing alone. Likewise, this supports the conclusion that, for the Injunctive Relief Class, more than 98.3% of sellers will pay buyer-broker commissions if the current NAR restraints continue but would pay no buyer-broker commission or a lower buyer-broker commission if those restraints were enjoined.[471] Accordingly, more than 98.3% of sellers in the Injunctive Relief class would benefit from an injunction against the challenged restraints due to lower buyer-broker commissions, standing alone.

248. Further, my analysis indicates that seller-brokers would have also received lower commissions in the but-for world without the challenged restraints, both because there would have been fewer contracts that paid them the buyer-broker commission even if there were no buyer-broker and because increased competition

---

[469] *See supra* Part V.
[470] *See supra* Part V.
[471] *See supra* Section V.C.

171

would have also lowered the seller-broker portion of the total commission.[472] Likewise, seller-brokers would for similar reasons receive lower commissions in the future if the challenged restraints were enjoined. These effects would further increase the extent to which class members in the Damages Class were injured by the challenged restraints, and the extent to which class members in the Injunctive Relief Class would be injured if the challenged restraints are not enjoined. I thus conclude that all or nearly all Damages Class members paid supracompetitive commissions as a result of the challenged restraints, and that all or nearly all Injunctive Relief Class members would pay supracompetitive commissions if those restraints are not enjoined.

249. My analysis is confirmed by Professor Economides' analysis. He shows that in the competitive benchmarks of Australia, the Netherlands, and the U.K., homebuyers rarely use buyer-brokers (only 20% do so in the Netherlands, and less than 5% do so in Australia and the U.K.), whereas 87-88% of U.S. homebuyers utilize a buyer-broker.[473] He further shows that when buyers in those competitive benchmarks do use buyer-brokers, those buyer-brokers are paid by buyers,[474] and they receive much lower commissions than they receive in the 20 Covered U.S. MLSs.[475] Finally, he shows that commissions received by seller-brokers are at least no higher in the competitive benchmarks (and on average lower) than the seller commissions charged by defendant brokers in the United States.[476] The competitive benchmarks studied by Professor Economides thus confirm that all or nearly all U.S. sellers would have paid a lower commission without the challenged restraints.

250. As I explained in Part IV, the challenged restraints required listing brokers to make blanket offers of fixed compensation to buyer-brokers in their listings and restrained any negotiation of those offers. As explained in Parts IV and V, these restraints thus created and facilitated steering incentives (which were further exacerbated by other NAR rules) and maintained and extended an anticompetitive equilibrium in which sellers made and continue to make unilateral offers to pay buyer-broker commissions, buyers were incentivized to use buyer-brokers even when they would not otherwise have done so, and listing agreements generally

---

[472] *See supra* Part V.

[473] *See* Economides Report at Section IV.A; 2021 NAR Profile Highlights at p. 7 ("Eighty-seven percent of buyers recently purchased their home through a real estate agent or broker"); 2020 NAR Profile at p. 7 ("Eighty-eight percent of buyers recently purchased their home through a real estate agent or broker").

[474] *See* Economides Report at Section III.C.

[475] *See supra* Sections II.B.4, II.C.2, V.G.

[476] *See supra* Sections V.G.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

allowed for the seller-broker to keep the whole commission even if no (or a reduced) buyer-broker commission is actually paid. Absent such restraints, there would be no justification for charging sellers a total fixed commission that incorporated an expected payment to a buyer-broker and that would not be reduced even if there were no buyer-broker. As a result, competition between seller-brokers in the but-for world would have reduced the total commission charged by seller-brokers, and eliminated agreements which charge a total commission based on providing an offer of compensation to buyer-brokers, while making that total commission independent of the buyer-broker commission (if any) actually paid. Furthermore, the portion of the total seller commission not earmarked for the buyer-broker would not have been larger in the but-for world. This is because, as discussed in Part V, the challenged restraints also impeded price competition between seller-brokers. Thus, in the but-for world, there would have been greater price competition between seller-brokers, leading to seller-broker commissions equal to or below the net commission that seller-brokers were willing to accept in the actual world.

251. Defendants may argue that in a but-for world in which few buyers utilize buyer-brokers, seller-brokers would have to do more work and would thus demand more compensation as a result. But the premise that seller-brokers would have to do more work without buyer-brokers is dubious. If buyer-brokers provide any value to their buyer-broker clients in the actual world, it would include for instance noting flaws in a property and alerting the buyer, so that the broker can either negotiate accordingly or find a property without those issues. Dealing with an aggressive negotiator who notes flaws in a property would not make the seller-broker's job easier. Nor is there much basis for the conclusion that sellers would demand more compensation without buyer-brokers. As noted above in Parts I & V, standard practice in the U.S. is for the seller and seller-broker to agree to a commission calculated as a percentage of the home's sale price in a listing agreement. Then, as per the Buyer Broker Commission Rule, seller-brokers listing on the 20 MLSs at issue provide blanket, unilateral offers of compensation to buyer-brokers, without regard for the ability, amount of effort exerted, or even the tasks performed by the buyer-brokers this offer is made to.[477] There is thus no basis for the claim that seller-brokers would increase their commission to reflect any supposed additional work they would have to undertake without buyer-broker assistance, as in the actual world they do not generally vary their net commission based on the amount of work performed by buyer-brokers. Consistent with my analysis, Professor Economides shows that, without similar anticompetitive restraints, sellers in other nations not only do not pay buyer-broker commissions

---

[477] *See supra* Section IV.A.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

(which are also themselves lower), but also pay lower seller-broker commissions.[478]

252. In short, without the challenged restraints, all or nearly all class members would have paid commissions that reflected lower or no buyer-broker commissions and the same or lower commissions to seller-brokers. Thus, all class members suffered injury as a result of the anticompetitive effect of the challenged restraints.

## VII. THE ABSENCE OF PROCOMPETITIVE EFFECTS

253. I have found no evidence that the challenged restraints produced any plausible procompetitive efficiency, much less that the benefits of any such efficiency could have possibly offset the anticompetitive harm from the challenged restraints.[479] Nor were the challenged restraints necessary to achieve, or justified by, the benefits of having an MLS. Here, I address three potential claims of procompetitive efficiencies Defendants might advance: (1) that the challenged restraints are necessary for the informational benefits provided by MLSs; (2) that the challenged restraints promoted seller properties or rewarded buyer-broker efforts to find the best house for their buyers; or (3) that the challenged restraints have benefited buyers and sellers by allowing buyers to finance their buyer-broker costs. If Defendants or their Experts ultimately advance other claimed procompetitive efficiencies, I will assess such claims. Even if my conclusions on these potential efficiency claims were disputed, and even if other claimed procompetitive efficiencies were advanced, the analysis of any purported procompetitive effects, and the determination of whether their benefits offset the anticompetitive effects of the challenged restraints, would be common to all class members.

254. First, the informational benefits provided by MLSs do not justify the anticompetitive effects of the challenged restraints, because those restraints were not needed to achieve those informational benefits. Kevin Milligan, VP at NAR

---

[478] *See supra* Sections V.G.
[479] When Kevin Milligan, VP at NAR,

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY



[81]    Indeed, aggregator websites like Zillow provide information that many buyers now rely upon to identify homes of interest in a convenient format. Further, international benchmarks demonstrate that it is simply not necessary to have the challenged restraints in order for an effective informational clearinghouse to function. Indeed, NAR itself has surveyed global real estate practices and found that countries without MLSs subject to the challenged restraints, including Australia and the U.K., nevertheless have "main property portals for consumer property searches."[482]

255.    Second, the challenged restraints have not efficiently promoted seller

---

[480] *See* NARSITZER0000367709

[481] *See supra* V.A & V.F; NARMOEHRL0000000001 at -98

[482] https://www.nar.realtor/global/real-estate-practices-around-the-world.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

properties or rewarded buyer-broker efforts to find the best house for their buyers. To the extent that, as a result of the challenged restraints, sellers offered "standard" supracompetitive buyer-broker commissions, this did not help promote any individual property. It instead just reflected the results of a collective action problem, in which all sellers had to offer supracompetitive buyer-broker commissions to avoid having buyers steered away from their properties.[483] To the extent that, with the challenged restraints, some sellers offered higher buyer-broker commissions than others, that could have resulted in buyers being steered by their brokers to properties for which higher buyer-broker commissions were offered.[484] This is not a procompetitive effect, but rather an anticompetitive effect, because it means that instead of being directed to the properties that are the best fit for their needs, buyers were directed to the properties that offered the highest fees to their brokers.

256. Indeed, far from facilitating home sales, the supracompetitive broker commissions paid by sellers discouraged home sales because they constituted an additional tax on such sales. The supracompetitive broker commission, like any tax, thus increased the transaction costs involved in selling a home and thereby reduced such transactions below their but-for levels. This general reduction in home sales transactions harms current and potential homeowners by making it more likely that they will remain in a living situation which does not match their current preferences (home size, amenities, location, climate, etc.), reducing total consumer welfare versus what it would be but-for the conduct.

257. Third, the fact that the challenged restraints resulted in sellers paying buyer-broker commissions has not helped buyers finance their properties. On the contrary, as demonstrated in Part V, the challenged restraints elevated the total price of MLS broker services above the but-for level throughout the relevant markets by making buyers more likely to engage buyer-brokers and increasing the commissions that sellers paid to both seller-brokers and buyer-brokers. The challenged restraints have thus made it harder for buyers to finance property purchases by raising the total price of a residential property transaction. Even for the rare buyer who would want to use buyer-brokers in the but-for world and who would benefit from having sellers cover the buyer broker fees, sellers could cover buyer-broker costs as a closing cost in exchange for a higher home price that the buyer could finance. Indeed, disruptive entrant REX utilizes this exact model by offering no buyer-broker commission in its listings, but, when asked to do so by the buyer, adjusting the closing price of the

---

[483] *See supra* Section V.B.
[484] *See supra* Section V.B.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

house to incorporate the commission negotiated between the buyer and their buyer-broker.[485] This alternative would still be preferable to sellers versus the actual world situation in which they must pay the entirety of the anticompetitively elevated buyer-broker commission. Likewise, in such rare cases, mortgage providers would rationally be more willing to finance the lower amount of total commission in the but-for world than the higher amount of total commission paid in the actual world, especially because their goal is to make sure that the potential resale value of each property (net of any costs) exceeds the outstanding loan balance by a sufficient margin of safety, and a lower amount of commission paid than in the actual world would increase the potential resale value as a percentage of the gross offer amount.

---

[485] *See* Jack Ryan Declaration, Rex v. Zillow, at paragraph 9 ("Another important difference in REX when compared to the MLS model, is that sellers listing with REX do not make what is for all practical purposes a non-negotiable offer of compensation to any buyer's agent that ultimately participates in the closing of the transaction. Instead, REX believes that buyers and their agents should determine, by negotiation if necessary, what fee a buyer's agent deserves and should receive, just how this works in other professions like legal and banking. This also eliminates an apparent conflict of interest when agents are incentivized to sell a home to their clients that makes them the most money, rather than what's best for the client. REX will assist in facilitating the payment of a buyer commission by requesting that buyer agents disclose their fee and that it be negotiated, adjusting the closing price of the house if requested. In my experience, this often results in a buyer's agent commission well below 3%.").

177

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.  Executed on February 23, 2022 (with corrections as of March 8, 2022), at Newton, Massachusetts.


_____

Einer Elhauge

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

### Appendix A: Data Sources and Processing

#### A. MLS Data

258.  The MLS listings data cover the time period starting from January 1, 2013. The latest closing dates differ by MLS and are summarized in Table 1 below.

| Table 1.  MLS Listings Data[486] | | | | |
|---|---|---|---|---|
| **MLS** | **Earliest Closing Date** | **Latest Closing Date** | **Total Observations** | **Class Transactions** |
| Arizona Regional | 1/5/2013 | 12/28/2021 | 1,050,009 | 127,861 |
| Austin Bd. of Realtors | 1/1/2013 | 5/14/2021 | 385,303 | 62,643 |
| Bright (mid-Atlantic) | 1/2/2013 | 12/31/2021 | 3,102,771 | 920,980 |
| Canopy (Carolinas) | 1/2/2013 | 11/1/2021 | 667,540 | 112,008 |
| Columbus Realtors (Ohio) | 1/3/2013 | 5/11/2021 | 320,744 | 85,812 |
| Florida Gulf Coast | 1/8/2013 | 8/31/2021 | 198,409 | 25,233 |
| Greater Las Vegas | 1/7/2013 | 9/29/2021 | 354,662 | 57,086 |
| Houston Ass'n of Realtors | 1/3/2013 | 6/25/2021 | 1,129,193 | 215,214 |
| Metro (Wisconsin) | 1/18/2013 | 12/31/2021 | 276,876 | 48,594 |
| Miami | 1/2/2013 | 12/31/2021 | 720,797 | 61,608 |
| North Texas RE Info Serv. | 1/1/2013 | 12/1/2021 | 1,148,144 | 298,080 |
| Northstar (Minn & W. Wis.) | 1/1/2013 | 7/27/2021 | 1,047,500 | 303,848 |

---

[486] "REA116 MLS Data Statistics.xlsx".

179

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

| | | | | |
|---|---|---|---|---|
| Pikes Peak (Colorado) | 1/1/2013 | 12/31/2020 | 165,840 | 42,488 |
| REColorado | 1/1/2013 | 12/1/2021 | 746,164 | 170,343 |
| Realcomp II (Michigan) | 1/1/2013 | 10/23/2021 | 2,207,779 | 243,193 |
| San Antonio Bd. Of Realtors | 1/7/2013 | 5/1/2021 | 344,750 | 76,868 |
| Stellar (formerly My Florida Regional) | 1/1/2013 | 5/21/2021 | 1,385,062 | 333,618 |
| Triangle (North Carolina) | 1/1/2013 | 12/31/2021 | 403,787 | 77,357 |
| Utah Real Estate | 1/4/2013 | 12/31/2021 | 547,679 | 90,579 |
| Yes_Now (Ohio & WVA) | 1/18/2013 | 12/16/2021 | 645,257 | 110,422 |

259. My staff created a consolidated MLS dataset that includes the following fields: listing price, listing date, selling price, closing date, off market date, address, street number, postal code, buyer-broker commission rate, year built, listing office name, number of bathrooms and bedrooms, square feet, lot size, agent and office identifiers, transaction broker and sub agent commission rates. The consolidated MLS dataset also contains fields indicating whether a listing is a new construction, condo, single family residence, subject to short sales, auction, foreclosure, variable rate, whether both buyer and seller are represented by the same broker, and whether there is no buyer broker information.

260. Listings with missing MLS numbers and incorrect five-digit postal codes were dropped. Listing with closing dates before January 1, 2013 and after December 31, 2021 were also deleted. Duplicate listings were removed within each MLS if they had the same address, selling price, closing date, listing date, the number of bedrooms and bathrooms, square feet and MLS number. Across all MLSs duplicate listings were removed if they had the same street number, postal code, selling price, closing date, listing date and the number of bedrooms and bathrooms.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

The listing from the MLS with the lowest buyer's broker commission rate was retained unless it was zero.

261.  If the buyer broker commission rate was not available in the data as a percentage, my staff converted the commission amount into the rate by dividing it by the selling price.  For some listings, the commission amount had to be calculated by using a formula in the commission description.

### B. Defendants' Data

262.  The defendants' data cover the time period from January 1, 2013 to December 31, 2020 with the exception of the Keller Williams data that end on September 30, 2020.

263.  My staff created a consolidated defendants' dataset that includes the following fields: street number, selling price, closing date, postal code, buyer's broker commission rate, seller's broker commission rate, defendant's side (buyer, seller or both) and MLS number (if it is available). The observations by defendant are summarized in Table 2 below.

| Table 2. MLS Listings Data[487] | | | |
|---|---|---|---|
| **Defendant** | **Earliest Closing Date** | **Latest Closing Date** | **Total Observations** |
| HomeServices | 1/1/2013 | 12/31/2020 | 951,446 |
| Keller Williams | 1/1/2013 | 9/30/2020 | 6,808,967 |
| ReMax | 1/1/2013 | 12/31/2020 | 2,865,101 |
| Realogy | 1/1/2013 | 12/31/2020 | 2,881,361 |

### C. Validation of Buyer-Broker Compensation Offers

264.  The MLS data that I use to identify class transactions includes offers of buyer broker compensation, but no information on actual payments of buyer broker compensation. In order to verify that the MLS data is a close reflection of actual payments, I asked my staff to compare, where possible, the defendants' data on

---

[487] "REA117 Defendants Data Statistics.xlsx".

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

buyer broker commissions to the MLS data on buyer broker commission offers.

265.  My staff matched MLS data with the defendants' data in two steps. First, listings were matched by MLS number and postal codes. Matched listings must also have the closing dates within 30 days and the selling prices within $1000 in the two datasets. Second, listings were matched by street number, postal code, selling price and closing date. The second step was necessary because many listings in the defendants' data do not have MLS numbers.

266.  In order to determine whether buyer brokers were typically paid the same amount as the blanket offer published in the MLS, my staff examined the buyer broker commission data in the transaction data produced by the defendants. Because both datasets may have data entry errors, the data were first limited to transactions where both the MLS and the defendants' data have a non-missing, non-negative value for the buyer broker commission. Also, since the buyer broker commission offered is supposed to be positive per NAR rules, the data were limited to transactions where the MLS data has a positive value for the buyer broker commission offered. The data were also limited to MLS and defendants' data where the buyer broker commission values are less than 10, because values above 10 are likely to be data entry errors.

267.  My staff then constructed a variable equal to the difference between the MLS offered commission value and the defendants' buyer broker commission value. The focus is on listings where a defendant broker was the buyer broker but not the seller broker, in order to avoid any issues that might arise from a defendant's internal allocation or recording of revenues between two brokers or agents. Table 3 summarizes the findings:



[488] "REA118 Validation.xlsx".

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY



268. ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ I conclude that these transaction data closely track the offer data.

269. ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ██████████████████████████████████ I conclude that these transaction data closely track the offer data.

270. ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ██████████████████████████████████ I conclude that these transaction data closely track the offer data. If anything, using the MLS data here may be slightly conservative.

271. ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ████████ I conclude that there are serious flaws in the ReMax data and that it should not be relied upon for these validation purposes.

### D. Exclusions

272. Per the class definition, unless otherwise noted in a particular analysis, I excluded residential real estate that sold for a price below $56,500, and residential real estate sold at auction. Listings covering sales of vacant land, farms,

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

commercial/industrial properties were likewise excluded, as were listings of rental and leased properties.

273.   Although I did not have information sufficient to exclude them from the data, if and when possible I will also exclude employees, officers, and directors of defendants, the presiding Judge in this case, and the Judge's staff.

274.   Listings with incomplete five-digit postal codes were omitted.

### E. Net Price Transactions

275.   Utah Real Estate, REColorado, Pikes Peak MLS and Stellar MLS indicated that their commission payments can be based on the net price rather than the gross price. Utah Real Estate is the only MLS with a significant share of listings—49.9%[489]—having net price commissions. My staff compared the offered commission payment in the Utah Real Estate data to the actual commission payment in the Keller Williams data and found that they were identical for more than 61%[490] of transactions reflected as "net price" transactions. For those transactions in which there was a difference in the dollar value of commissions, the difference in adjusted commission rate based on gross sale price was less than 0.1 80% of the time and less than 0.2 85%[491] of the time. Thus, given the small scale of the issue and the data limitations I do not make an adjustment for net prices at this time.

---

[489] *See* REA88 Net Price in the Merged Data v2.xlsx.
[490] *See* REA88 Net Price in the Merged Data v2.xlsx.
[491] *See* REA88 Net Price in the Merged Data v2.xlsx.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

## Appendix B: Relevant Features of the 20 Covered MLSs and Corporate Defendants

276. In this Appendix B, I discuss features of the 20 Covered MLSs in this case which are relevant to my analysis. These features include: (a) general information about the MLS, including its ownership and operation; (b) whether non-Realtor participation is permitted, and if so, whether certain related rules apply to non-Realtors; (c) whether the MLS has adopted certain non-mandatory NAR rules relevant to my economic analysis of the Challenged Rules in this case; and (d) the geographic area which the MLS considers to be its "service area" or to similarly express where it primarily operates. After discussing the 20 Covered MLSs, I also briefly describe relevant policies of the Corporate Defendants related to the NAR Code of Ethics.

### A. Summary of the Prevalence of Relevant MLS Features

#### 1. NAR Affiliation of the 20 Covered MLSs

277. For each of the 20 Covered MLSs, I determine whether the MLS is NAR-affiliated, which, per my understanding, can take two forms: (1) the MLS can be a separately incorporated entity owned by one or more associations of Realtors, or (2) the MLS can be operated as a committee of an association of Realtors (though not separately incorporated).

278. All 20 of the Covered MLS are affiliated with NAR (i.e., are owned and/or operated by local Realtor associations) and are therefore obligated to implement and enforce the mandatory policies and rules reflected in NAR's Handbook on Multiple Listing Policy. Miami MLS and SABOR MLS are each operated as a committee of a board of Realtors. Each of the remaining 18 Covered MLSs are separately incorporated entities owned by one or more associations of Realtors.

#### 2. Non-Realtor Participation and Related Rules

279. I understand that some MLSs are required, by law, to permit non-Realtor participation,[492] while others choose to do so under an optional NAR rule

---

[492] *See* Thompson v. Metropolitan Multi-List, Inc., 934 F.2d 1566 (11th Cir. 1991); Marin County Board of Realtors v. Palsson, 549 P. 2d 833 (Cal. 1976), Glendale Bd. of Realtors v. Hounsell, 139 Cal. Rptr. 830 (Cal. Ct. App. 1977) (collectively requiring MLSs located in Florida, Georgia, Alabama, and California to permit non-Realtor membership).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

allowing for such participation.[493]   For those Covered MLSs which allow non-Realtor participation, there are two follow-up issues relevant to my analysis: (1) were non-Realtor MLS participants subject to the same MLS rules and regulations as Realtor participants, and (2) did the MLS adopt Standard of Conduct for MLS Participants 16.18 (which prohibits buyer-brokers from attempting to modify the listing broker's offer of compensation through an offer or contingent offer) from the optional NAR rules,[494] or a functionally equivalent standard apply to any non-Realtors?[495]

280.   Nine of the 20 Covered MLS generally limit participation to Realtors (i.e., NAR members), while the remaining 11 Covered MLSs permit non-Realtors to participate.  The same MLS rules apply to both Realtor and non-Realtor members of NAR-affiliated MLSs, including each of the Covered MLSs.  All 11 of the Covered NAR MLSs that permit non-Realtors to participate have also adopted MLS Standard of Conduct 16.18 (or a functionally equivalent standard).

### 3. Non-Mandatory NAR Rules

281.   There are several recommended or optional NAR rules which, while non-mandatory, facilitate the implementation and effects of other Challenged Rules, or are otherwise relevant to my economic analysis in this case.  I thus determine whether each of these non-mandatory NAR rules was applicable to the 20 Covered

---

[493] NAR 2022 MLS Handbook at p. 13 (Policy Statement 7.55) ("MLSs may, as a matter of local discretion, make limited participation in MLS available to all brokers (principals) and firms comprised of brokers (principals) and to licensed or certified real estate appraisers (principals) and firms comprised of licensed or certified real estate appraisers. Limitations on participatory rights, if any, shall be determined locally. (Amended 11/04)"); *see also id.* at pp. 54, 58 ("Optional Provision for Establishing Nonmember Participatory Rights (Open MLS)").

[494] 2021 NAR Handbook, pp. 59-93 ("C. Model Rules and Regulations for an MLS Operated as a Committee of an Association of Realtors®") at p. 81 (Standard 16.18, followed by a symbol indicating that it is "Optional," stating that "MLS participants, acting as subagents or buyer/tenant representatives or brokers, shall not use the terms of an offer to purchase/lease to attempt to modify the listing broker's offer of compensation to subagents or buyer/tenant representatives or brokers, or make the submission of an executed offer to purchase/lease contingent on the listing broker's agreement to modify the offer of compensation."); *id.* at pp. 107-141 ("F. Model Rules and Regulations for an MLS Separately Incorporated but Wholly-owned by an Association of Realtors®") at p. 129 (same).

[495] This issue is primarily relevant to non-Realtor MLS participants because Realtors are independently constrained in the same way by NAR Code of Ethics Standard of Practice 16-16. *See supra* Section IV.A.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

MLSs during the class period. These include (i) Non-Disclosure rules, (ii) No-Comingling rules, and (iii) Administrative Sanctions.

i. Non-Disclosure Rules

282. As I note above in Section I.A, MLS listings serve as the main source of information about homes available for sale. Online websites that allow for search and display of real estate listings often receive listing data from MLSs through Internet Data Exchange ("IDX") feeds:

> An IDX feed is a data connection that transfers listings data between a real estate agent's website and a Multiple Listing Service (MLS) and updates those listings as properties come on or off the market. Anytime you search for properties online, you are using a website feature built with an IDX feed. Think about a brokerage website. As soon as you land on the home page, you see a search bar. And if you enter a search term, you see all the listings matching that term. The IDX feed is the data link that allows the brokerage to display these listings and keep them up-to-date in an ever-changing market.[496]

A NAR Realtor's own website for providing brokerage services and allowing consumers to search MLS data is also known as a Virtual Office Website ("VOW").[497] There are several non-mandatory rules that MLSs can adopt to prevent the buyer-broker commission from being disclosed to buyers in MLS listings that are displayed on VOWs and/or otherwise transmitted through IDX feeds.

283. With respect to VOWs, MLS Policy Statement 7.91 ("Virtual Office Websites (VOW) Policy") provides, in relevant part, that "A participant's VOW may not make available for search by or display to Registrants the following data, intended exclusively for other MLS participants and their affiliated licensees: […] iii. the compensation offered to other MLS participants […]."[498] This policy could

---

[496] REALTYNA, "What is an IDX feed? An Explainer for New Agents", *available at* https://realtyna.com/blog/what-idx-feed-explainer-new-agents/.

[497] NAR, "Virtual Office Websites", *available at* https://www.nar.realtor/handbook-on-multiple-listing-policy/virtual-office-websites-policy-governing-use-of-mls-data-in-connection-with-internet-brokerage.

[498] 2021 NAR Handbook pp. 43-50 ("Virtual Office Websites (VOW) Policy (Policy Statement 7.91)") at p. 49 ("IV. Requirements that MLSs May Impose on the Operation of VOWs and Participants," stating that "An MLS may impose any, all, or none of the following requirements on VOWs, but may impose them only to the extent that equivalent requirements are imposed on participants' use of MLS listing data in providing brokerage services via all other

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

be implemented by NAR's Model MLS Rule Section 19.15 (or something similar), which states: "A participant's VOW may not make available for search by or display to Registrants any of the following information," including "the compensation offered to other MLS participants."[499]  Within this Appendix, I will subsequently refer to these types of rules (specifically as applied to disclosing the buyer-broker commission) as a "VOW Non-Disclosure Rule."

284.   With respect to IDX feeds, MLS Policy Statement 7.58 ("Internet Data Exchange (IDX) Policy") recommends that MLSs "prohibit display of confidential information fields intended for cooperating brokers rather than consumers including compensation offered to other MLS participants."[500]   This policy could be implemented by Model MLS Rule Section 18.3.1 (or something similar), which provides that "[l]istings displayed pursuant to IDX shall contain only those fields of data designated by the MLS. Display of all other fields (as determined by the MLS) is prohibited.  Confidential fields intended only for other MLS participants and users (e.g., cooperative compensation offers […]) may not be displayed."[501]   Within this

---

delivery mechanisms. A participant's VOW may not make available for search by or display to Registrants the following data, intended exclusively for other MLS participants and their affiliated licensees: […] iii. the compensation offered to other MLS participants […] vi. instructions or remarks intended for cooperating brokers only, such as those regarding showing or security of the listed property […]").

[499] 2021 NAR Handbook, pp. 59-93 ("C. Model Rules and Regulations for an MLS Operated as a Committee of an Association of Realtors®" in "Part Three: Model Governance Provisions") at p. 91 (Section 19.15).  This Section is followed by a symbol indicating that it is "Optional."

*See also id*., pp. 107-141 ("F. Model Rules and Regulations for an MLS Separately Incorporated but Wholly-owned by an Association of Realtors®" in "Part Three: Model Governance Provisions") at pp. 139-140 (same); NARSITZER0000022465 (2014 NAR Handbook) at -560 ("Section 19.15" with the same restriction) *and* at -604 (same).

[500] 2021 NAR Handbook, pp. 24-28 ("Section 1 Internet Data Exchange (IDX) Policy (Policy Statement 7.58)") at p. 27 (under the heading "Policies Applicable to Multiple Listing Services," stating "The following guidelines are recommended but not required to conform to National Association policy. MLSs may: […] prohibit display of confidential information fields intended for cooperating brokers rather than consumers including compensation offered to other MLS participants […]").

[501] 2021 NAR Handbook pp. 59-93 ("C. Model Rules and Regulations for an MLS Operated as a Committee of an Association of Realtors®" in "Part Three: Model Governance Provisions") at p. 85 (Section 18.3.1, providing that "Listings displayed pursuant to IDX shall contain only those fields of data designated by the MLS. Display of all other fields (as determined by the MLS) is prohibited. Confidential fields intended only for other MLS participants and users (e.g., cooperative compensation offers, showing instructions, property security information, etc.)

188

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Appendix, I will subsequently refer to these types of rules (specifically as applied to disclosing the buyer-broker commission) as an "IDX Non-Disclosure Rule."

285. All 20 of the Covered MLSs had an IDX Non-Disclosure Rule, either through an explicit rule or effectively from not including buyer-broker compensation in their feeds. 15 of the Covered MLSs explicitly adopted a VOW Non-Disclosure Rule. The other 5 Covered MLSs do not have clear evidence on whether a VOW Non-Disclosure Rule was adopted, but as I explain above in Part IV.C, the implementation of a VOW, IDX, or other non-disclosure rule in the absence of affirmative evidence of disclosure through these means indicates that an MLS did not provide for disclosure of commission offers through these mechanisms.

286. As I explained in Part V.H above, NAR has changed its policies as of 2022 to require MLSs to implement, by March 1, 2022, rules requiring MLSs to include the amount of the blanket offer of compensation on their websites and in data feeds and to permit such information to be shared. The above VOW and IDX Non-Disclosure Rules therefore will become inapplicable as Covered MLSs respond to this NAR policy change, but I also explain in Part V.H above that such changes will not eliminate the anticompetitive effects from the challenged NAR restraints.

ii. No-Comingling Rules

287. Model MLS Rule 18.3.11 provides that "Listings obtained through IDX feeds from Realtor® Association MLSs where the MLS participant holds participatory rights must be displayed separately from listings obtained from other sources."[502] Within this Appendix, I will subsequently refer to this rule as the "Model MLS Rule 18.3.11 on No-Comingling." Thirteen of the Covered MLSs adopted express policies prohibiting the comingling of MLS and non-MLS listings.

---

may not be displayed. *(Amended 05/12)*"); *id.* at pp. 107-141 ("F. Model Rules and Regulations for an MLS Separately Incorporated but Wholly-owned by an Association of Realtors®" in "Part Three: Model Governance Provisions") at p. 133 (same)

[502] 2021 NAR Handbook pp. 59-93 ("C. Model Rules and Regulations for an MLS Operated as a Committee of an Association of Realtors®" in "Part Three: Model Governance Provisions") at p. 86 (Section 18.3.11, providing that "Listings obtained through IDX feeds from Realtor® Association MLSs where the MLS participant holds participatory rights must be displayed separately from listings obtained from other sources. Listings obtained from other sources (e.g., from other MLSs, from non-participating brokers, etc.) must display the source from which each such listing was obtained. *(Amended 05/17)*" [asterisk footnote omitted]); *id.* at pp. 107-141 ("F. Model Rules and Regulations for an MLS Separately Incorporated but Wholly-owned by an Association of Realtors®" in "Part Three: Model Governance Provisions") at pp. 134 (same).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

### iii. Administrative Sanctions

288. An MLS can adopt "Administrative Sanctions" similar to those outlined on pp. 36-37 of the 2021 NAR Handbook including, in particular, the possibility of fines, suspension or termination from the MLS.[503]   Within this Appendix, I will subsequently refer to these as "Administrative Sanctions."  All of the Covered MLSs have adopted rules providing for sanctions and discipline, including fines and suspension of MLS access, for members who violate the MLS rules.

## B. The 20 Covered MLSs

### 1. Austin/Central Texas Realty Information Service ("ACTRIS MLS")

### i. General MLS Information, Including NAR Affiliation

289. ACTRIS MLS was NAR-affiliated.  It was a separately incorporated entity owned or operated by one or more associations of Realtors.[504]

### ii. Non-Realtor Participation and Related Rules

290. ACTRIS MLS did not allow non-Realtor participation.[505]

291. Because ACTRIS MLS did not allow for non-Realtor participation, the follow-up issues are not applicable.

---

[503] 2021 NAR Handbook at pp. 36-37 ("Administrative Sanctions").

[504] ███████████████████████████████████████████████

[505] ABOR0034793 at 4800-4801 ("'Participant' means a licensed real estate broker . . . who is a member of the a member [sic] of the National Association of REALTORS®, . . . who has applied for designated REALTOR® status . . . . Subscriber must be a member of the National Association of REALTORS® . . . .") ("Only (i) Participants, Subscribers, Appraisers and Authorized Assistants who are engaged actively in the real estate profession, . . . and who maintain or are associated with an established real estate office located in the State of Texas and (ii) other persons identified as members of other REALTOR® Boards are eligible to use the MLS.").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

iii. Adoption of Non-Mandatory NAR Rules

292. ACTRIS MLS adopted an IDX Non-Disclosure Rule.[506] It also adopted a VOW Non-Disclosure Rule.[507] It also adopted Model MLS Rule 18.3.11 on No-Comingling.[508] Finally, ACTRIS MLS adopted "Administrative Sanctions" including the possibility of fines and MLS suspension or termination.[509]

iv. MLS Service Area

293. The ACTRIS MLS service area includes Central Texas, which incorporates the following counties: Bastrop, Bell, Blanco, Burnet, Caldwell, Comal, Fayette, Gillespie, Gonzales, Guadalupe, Hays, Lampasas, Lee, Llano, Milam, San Saba, Travis, and Williamson.[510]



[509] ABOR0034793 at 4829 ("By becoming and remaining a Participant or Subscriber, each Participant and Subscriber agrees to be subject to these Rules and the MLS Terms and Conditions of Use. ACTRIS may, through the administrative and hearing procedures established in this Article X, impose discipline for violations of the Rules and the MLS Terms and Conditions of Use. Discipline that may be imposed may only consist of one or more of the following: . . . reasonable fine not to exceed $15,000; probation for a stated period of time . . . ; suspension of MLS rights, privileges, and services . . . ; termination of MLS rights, privileges, and services . . . .").

[510] ABOR0034929 at 4937 ("Subject to compliance with the other terms hereof, ACTRIS will accept property listings for properties that are of a Designated Property Type and that (i) are located within Central Texas or (ii) are located outside of Central Texas and that are submitted voluntarily by a Participant."); ABOR0034929 at 4934 ("'Central Texas' shall mean Bastrop, Bell, Blanco, Burnet, Caldwell, Comal, Fayette, Gillespie, Gonzales, Guadalupe, Hays, Lampasas, Lee, Llano, Milam, San Saba, Travis and Williamson counties in the State of Texas.").

191

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

## 2. *ARMLS*

### i. General MLS Information, Including NAR Affiliation

294. ARMLS was NAR-affiliated. It was a separately incorporated entity owned by one or more associations of Realtors.[511]

### ii. Non-Realtor Participation and Related Rules

295. ARMLS did allow non-Realtor participation.[512]

296. Because ARMLS allowed non-Realtor participation, there are two follow-on issues relevant to my analysis. Non-Realtor MLS participants were subject to the same MLS rules and regulations as Realtor MLS participants.[513] ARMLS adopted Standard of Conduct for MLS Participants 16.18 (or an equivalent) from the NAR rules.[514]

### iii. Adoption of Non-Mandatory NAR Rules

---

[511] ARMLS_0007085 at 7086 ("Except as otherwise set forth in this Agreement, only REALTOR® Associations . . . shall be entitled to own any of the Founder Stock or Class A Stock."); ARMLS, *Who is ARMLS?*, armls.com/who-are-armls-subscribers-2 (last visited Feb. 16, 2022) ("ARMLS is owned by five local associations: WeServ, PAR, SAAR and SEAZ.").

[512]

[513]

[514]

192

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

297.   ARMLS adopted an IDX Non-Disclosure Rule.[515]  It also adopted a VOW Non-Disclosure Rule.[516]  It also adopted the co-mingling language in Model MLS Rule 18.2.10, but not the language reflected in Model MLS Rule 18.3.11 on No-Comingling.[517]  Finally, ARMLS adopted "Administrative Sanctions" including the possibility of fines and MLS suspension or termination.[518]

iv. <u>MLS Service Area</u>

298.   The ARMLS service area includes the following counties of Arizona: Santa Cruz, Cochise (small, southern portion carved out), Pinal (with some carveouts in the north and south parts of the county), and Maricopa.[519]

---

[515]

[516] ARMLS_0054736 at 4746 (Section 19.15).

[517]

[518]

[519] ARMLS_0007614 at 7620 ("The ARMLS service area shall, at a minimum, include the combined jurisdiction of all Associations. The service area may encompass natural market areas outside the jurisdiction of the Associations as may be defined by the BOD."); ARMLS, *Who is ARMLS?*, armls.com/who-are-armls-subscribers-2 (last visited Feb. 16, 2022) ("ARMLS is owned by five local associations: WeServ, PAR, SAAR and SEAZ."); Arizona Realtors®, *Multiple Listing Service (MLS) Map* (2021), https://www.aaronline.com/wp-content/uploads/2021/07/22/regional-mls-640x832.png; *see also* https://geology.com/county-map/arizona.shtml.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

### *3. Bright MLS*

i. General MLS Information, Including NAR Affiliation

299. Bright MLS was NAR-affiliated. It was a separately incorporated entity owned by one or more associations of Realtors.[520]

ii. Non-Realtor Participation and Related Rules

300. Bright MLS did allow non-Realtor participation.[521]

301. Because Bright MLS allowed non-Realtor participation, there are two follow-on issues relevant to my analysis. Non-Realtor MLS participants were subject to the same MLS rules and regulations as Realtor MLS participants.[522] Bright MLS adopted Standard of Conduct for MLS Participants 16.18 (or an equivalent) from the NAR rules.[523]

iii. Adoption of Non-Mandatory NAR Rules

---

[520] BRIGHT0000018 at 0024 ("Prior to each annual meeting of the Stockholders convened in accordance with Section 2.2. of these Bylaws, the Executive Committee shall take up the issue of whether and to which other REALTOR® association the Corporation may offer to sell shares of the stock of the Corporation, and the Executive Committee shall cause the Board to vote on its determination."); Lorraine Mirabella, *MRIS and other real estate listings merge into Bright MLS*, The Baltimore Sun (Jan. 12, 2017, 12:23 PM), https://www.baltimoresun.com/business/real-estate/bs-bz-bright-mls-created-20170112-story.html; Bright MLS, *Story of Us*, https://www.brightmls.com/about-bright/story-of-us (last visited Feb. 16, 2022).

[521] BRIGHT0000391 at 0398 ("A REALTOR® or non-REALTOR® who is a principal, partner, corporate officer or branch office manager acting on behalf of a principal, shall be eligible to participate in the services provided by the Bright MLS upon agreeing in writing to conform to the Bylaws and Rules and Regulations thereof and pay the costs incidental thereto.").

[522] BRIGHT0000391 at 0398 ("A REALTOR® or non-REALTOR® who is a principal, partner, corporate officer or branch office manager acting on behalf of a principal, shall be eligible to participate in the services provided by the Bright MLS upon agreeing in writing to conform to the Bylaws and Rules and Regulations thereof and pay the costs incidental thereto.").

[523] BRIGHT0000391 at 0418 ("*Subscribers*, acting as subagents, buyer/tenant representatives or brokers, shall not use the terms of an *offer* to purchase/lease to attempt to modify the listing *Participant's* offer of compensation to subagents, buyer/tenant representatives or brokers, nor make the submission of an executed *offer* to purchase/lease contingent on the listing *Participant's* agreement to modify the offer of compensation.").

194

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

302. Bright MLS adopted an IDX Non-Disclosure Rule.[524] It is unclear whether it adopted a separate VOW Non-Disclosure Rule.[525] It also adopted Model MLS Rule 18.3.11 on No-Comingling.[526] Finally, Bright MLS adopted "Administrative Sanctions" including the possibility of fines and MLS suspension or termination.[527]

iv. MLS Service Area

303. The Bright MLS service area includes: all the counties in Delaware; all the counties in Maryland; all the counties in the District of Columbia; the Burlington, Camden, Cumberland, Gloucester, Hunterdon, Mercer, Ocean, Salem, and Somerset counties in New Jersey; the Adams, Berks, Bucks, Chester, Cumberland, Dauphin, Delaware, Franklin, Fulton, Lancaster, Lebanon, Montgomery, Perry, Philadelphia, Schuykill, and York counties in Pennsylvania; the Alexandria City, Arlington, Caroline, Clarke Culpepper, Fairfax, Fairfax City, Falls Church City, Fauquier, Frederick, Fredericksburg City, King George, Loudon, Madison, Manassas City, Manassas Park City, Orange, Page, Prince William, Rappahannock, Spotsylvania, Shenandoah, Stafford, Warren, and Winchester City counties in Virginia; the

---

[524] BRIGHT0000311 at 0342 ("Confidential fields intended only for other MLS *Participants* and *Subscribers* (e.g., cooperative compensation offers, showing instructions, property security information, etc.) may not be displayed on *IDX* sites."); *see also* BRIGHT0001813 (reflecting that commission field is not included in IDX).

[525] Bright MLS's rules provide that "Except as provided in these Rules, the National Association of REALTORS® VOW Policy, or any other applicable MLS rules or policies, no Participant shall distribute, provide, or make accessible any portion of the MLS Listing Information to any person or entity." BRIGHT0000311 at 0348. This leaves ambiguous whether the NAR's optional prohibition on disclosing buyer-broker compensation through VOWs is incorporated by reference.

[526] BRIGHT0000311 at 0344 ("*IDX Participants and Subscribers* are not permitted to display or frame non-MLS listed properties (*Non-MLS Listings*) on any page or window of their web site that displays the *listings* of other *Participants* obtained from Bright MLS's *IDX Database*. Such *Non-MLS Listings* may be displayed on a separate page or window of the *IDX Participant's* web site.").

[527] BRIGHT0000391 at 0412-0413 ("By becoming and remaining a Subscriber in Bright MLS, each Subscriber agrees to be subject to the Rules and Regulations and any other Bright MLS governance provision. Bright MLS may, through administrative and hearing procedures established in these rules, impose discipline for violations of the rules and other Bright MLS governance provisions. Discipline that may be imposed may only consist of one or more of the following: . . . appropriate, reasonable fine not to exceed $15,000[;] . . . suspension of MLS rights, privileges, and services[;] . . . termination of MLS rights, privileges, and services . . . .").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Berkeley, Grant, Hampshire, Hardy, Jefferson, Mineral, Morgan, and Pendleton counties of West Virginia.[528]

### 4. Canopy MLS

i. General MLS Information, Including NAR Affiliation

304.  Canopy MLS was NAR-affiliated.  It was a separately incorporated entity owned by one or more associations of Realtors.[529]

ii. Non-Realtor Participation and Related Rules

305.  Canopy MLS did not allow non-Realtor participation.[530]

306.   Because Canopy MLS did not allow for non-Realtor participation, the follow-up issues are not applicable.

iii. Adoption of Non-Mandatory NAR Rules

307.  Canopy MLS adopted an IDX Non-Disclosure Rule.[531]  It is unclear whether it adopted a separate VOW Non-Disclosure Rule.[532]  Canopy also adopted

---

[528] BRIGHT0000351 at 0355-0356; Bright MLS, *Rules and Regulations*, 8 (2021), https://assets.ctfassets.net/1g8q1frp41ix/1OIRpXI3g8HEnBD7FIdLzk/da3b53e30f48eb9462e23 28899a2378d/Bright_MLS_Rules_-_Rev_04.08.21.pdf.

[529] CANOPY_00000627 at 0627 ("a wholly owned subsidiary corporation of the Charlotte Regional REALTOR® Association, Inc.").

[530] CANOPY_00000639 at 0639-0640 ("Any REALTOR® of this or any other association of REALTORS® who is a principal, partner, limited liability company member or manager, corporate officer, or branch office manager, or trustee of a real estate brokerage firm acting on behalf of a principal; or any non-Realtor® director of a government agency who holds an active North or South Carolina real estate broker's license or who is licensed and certified by an appropriate state regulatory agency in North Carolina or South Carolina to engage in the appraisal of real property. . . . Subscribers (or users) of CarolinaMLS include non-principal brokers, sales associates, licensed and certified appraisers andappraiser [sic] trainees affiliated with a Member Participant . . . .").

[531] CANOPY_00002780 at 2826 ("Display of confidential fields intended only for other Member Participants (e.g., cooperative compensation offers, showing instructions, property security information, etc.) is prohibited."); *see also* CANOPY_00020191 (reflecting absence of compensation field from IDX field list).

[532] Canopy MLS's rules provide that "Except as provided in these rules, the NATIONAL ASSOCIATION OF REALTORS® VOW Policy, or any other applicable MLS rules or policies,

196

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Model MLS Rule 18.3.11 on No-Comingling.[533]  Finally, Canopy MLS adopted "Administrative Sanctions" including the possibility of fines and MLS suspension or termination.[534]

### iv. MLS Service Area

308.  The Canopy MLS service area includes the following counties: the Alexander, Anson, Buncombe, Burke, Cabarrus, Caldwell, Catawba, Cleveland, Gaston, Haywood, Henderson, Iredell, Lincoln, Madison, McDowell, Mecklenburg, Montgomery, Polk, Rowan, Rutherford, Stanly, Transylvania, and Union counties in North Carolina; and the York, Chester, and Lancaster counties in South Carolina.[535]

---

no Participant shall distribute, provide, or make accessible any portion of the MLS Listing Information to any person or entity." CANOPY_00002780 at 2821.  This leaves ambiguous whether the NAR's optional prohibition on disclosing buyer-broker compensation through VOWs is incorporated by reference.

[533] CANOPY_00002780 at 2828 ("Listings obtained through IDX feeds from Realtor® Association MLSs where the Member Participant holds participatory rights must be displayed separately from listings obtained from other sources. Listings obtained from other sources (e.g., from non-MLS sources, from non-participating brokers, etc.) must display the source from which each such listing was obtained.").

[534] CANOPY_00002780 at 2805-2806 ("The MLS may, through the administrative and hearing procedures established in these rules, impose discipline for violations of the rules and other MLS governance provisions. Discipline that may be imposed may only consist of one or more the following: . . . Appropriate, reasonable fines not to exceed $15,000[;] . . . Suspension of MLS rights, privileges and services[;] . . . Termination of MLS rights, privileges and services . . . .").

[535] Canopy MLS, *Canopy MLS Service Area*, (July 26, 2021), https://carolinamls.happyfox.com/kb/article/66-canopy-mls-service-area/ ("Canopy MLS currently serves 13 Realtor® associations and 26 NC and SC counties: 1. Canopy Realtor® Association (Mecklenburg, Iredell, Alexander, Haywood) 2. Union County Association of Realtors® (Union, Anson) 3. Gaston Association of Realtors® (Gaston) 4. Central Carolina Association of Realtors® (Cabarrus, Montgomery, Stanly) 5. Lincoln County Board of Realtors® (Lincoln) 6. Hendersonville Board of Realtors® (Henderson, Polk) 7. Land of the Sky Association of Realtors® (Buncombe, Madison, Transylvania) 8. Burke County Board of Realtors® (Burke) 9. Cleveland County Association of Realtors® (Cleveland) 10. McDowell Board of Realtors® (McDowell) 11. Salisbury/Rowan Association of Realtors® (Rowan) 12. Catawba Valley Association of Realtors® (Catawba, Caldwell) 13. Piedmont Regional Association of Realtors® ( York, Lancaster, Chester) 14. Rutherford County."); Canopy MLS, *North and South Carolina multiple listing services*, https://cf3.carolinamls.com/map/map.cfm (last visited Feb. 17, 2022).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

*5. Multiple Listing Service of the Columbus Board of REALTORS®, Inc.*
*("Columbus MLS")*

i. General MLS Information, Including NAR Affiliation

309. Columbus MLS was NAR-affiliated.  It was a separately incorporated entity owned by one or more associations of Realtors.[536]

ii. Non-Realtor Participation and Related Rules

310. Columbus MLS did not allow non-Realtor participation.[537]

311. Because Columbus MLS did not allow for non-Realtor participation, the follow-up issues are not applicable.

iii. Adoption of Non-Mandatory NAR Rules

312. Columbus MLS adopted an IDX Non-Disclosure Rule.[538]  It also adopted a VOW Non-Disclosure Rule.[539]  It also adopted Model MLS Rule 18.3.11



[536] ███████████████████████████████████

[537] ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ *see also* https://www.columbusrealtors.com/clientuploads/Membership/MLSPartApp14_interactive.pdf ("MLS PARTICIPATION APPLICATION" limited to Realtors and corporate affiliates of realtors).

[538] ████████████████████████████████████████████████████████████████████████████████████████

[539] ████████████████████████████████████████

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

on No-Comingling.[540]  Finally, Columbus MLS adopted "Administrative Sanctions" including the possibility of fines and MLS suspension or termination.[541]

iv.  <u>MLS Service Area</u>

313.   The Columbus MLS service area is defined as the following counties in Ohio: Fayette, Franklin, Madison, Morrow, Pickaway, Union, Licking, and Delaware.[542]

## 6. Florida Gulf Coast MLS

i.  <u>General MLS Information, Including NAR Affiliation</u>

314.   Florida Gulf Coast MLS was NAR-affiliated.  It was a separately incorporated entity owned by one or more associations of Realtors.[543]



199

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

## ii. Non-Realtor Participation and Related Rules

315.   Florida Gulf Coast MLS did allow non-Realtor participation.[544]

316.   Because Florida Gulf Coast MLS allowed non-Realtor participation, there are two follow-on issues relevant to my analysis.   Non-Realtor MLS participants were subject to the same MLS rules and regulations as Realtor MLS participants.[545]   Florida Gulf Coast adopted Standard of Conduct for MLS Participants 16.18 (or an equivalent) from the NAR rules.[546]

## iii. Adoption of Non-Mandatory NAR Rules

317.   Florida Gulf Coast MLS adopted an IDX Non-Disclosure Rule.[547]   It also adopted a VOW Non-Disclosure Rule.[548]   It also adopted Model MLS Rule 18.3.11 on No-Comingling.[549]   Finally, Florida Gulf Coast MLS adopted

---

[544] NARSITZER0000109738 at p. 4 ("A nonmember applicant for MLS participation who is a principal, partner, corporate officer, or branch office manager acting on behalf of a principal, shall supply evidence satisfactory to the Membership Committee . . . .").

[545] NARSITZER0000109738 at p. 4 ("A nonmember applicant for MLS participation . . . shall agree that if elected as Participant, he will abide by such rules and regulations and pay the MLS fees and dues . . . .").

[546] NARSITZER0000109738 at p. 23 ("MLS Participants acting as subagents or buyer/tenant representative or brokers, shall not use the terms of an offer to purchase/lease to attempt to modify the listing broker's offer of compensation to subagents or buyer tenant representatives or brokers nor make the submission of an executed offer to purchase/lease contingent on the listing broker's agreement to modify the offer of compensation.").

[547] NARSITZER0000109738 at p. 28 ("Listings displayed pursuant to IDX shall contain only those fields of data designated by the MLS. Display of all other fields (as determined by the MLS) is prohibited. Confidential fields intended only for other MLS participants and users (e.g., cooperative compensation offers, showing instructions, property security information, etc.) may not be displayed.").

[548] NARSITZER0000109738 at p. 33 ("A participant's VOW may not make available for search by or display to Registrants any of the following information: . . . the compensation offered to other MLS participants . . . .").

[549] NARSITZER0000109738 at p. 29 ("Listings obtained through IDX feeds from REALTOR® Association MLSs where the MLS Participant holds participatory rights much be displayed separately from listings obtained from other sources. Listings obtained from other sources (e.g., from other MLSs, from non-participating brokers, etc.) must display the source from which each such listing was obtained.").

200

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

"Administrative Sanctions" including the possibility of fines and MLS suspension or termination.[550]

iv. MLS Service Area

318.   The Florida Gulf Coast MLS service area is the territorial jurisdiction of Royal Palm Cost Realtor Association (Hendry and Lee counties, and the island of Boca Grande, excluding those portions of Lee County allocated to Bonita Springs Estero association; to Sanibel-Captiva Board (beginning at 42 Causeway and ending at Redfish Pass, nothing off the Island of Sanibel/Captiva).[551]

### 7. Greater Las Vegas Association of REALTORS® MLS ("GLVAR MLS")

i. General MLS Information, Including NAR Affiliation

319.   GLVAR MLS was NAR-affiliated.  It was a separately incorporated entity owned by one or more associations of Realtors.[552]

ii. Non-Realtor Participation and Related Rules

---

[550] NARSITZER0000109738 at pp. 16-17 ("By becoming and remaining part a participant or subscriber in this MLS, each participant and subscriber agrees to be subject to the rules and regulations and any other MLS governance provision. The MLS may, through the administrative and hearing procedures established in these rules, impose discipline for violations of the rules and other MLS governance provisions. Discipline that may be imposed may only consist of one or more the following: . . . appropriate, reasonable fine not to exceed $15,000[;] . . . probation for a stated period of time[;] . . . suspension of MLS rights, privileges, and services[;] . . . termination or MLS rights, privileges, and services with no right to reapply for a specified period . . . .").

[551] Royal Palm Coast REALTOR® Association, Inc., *BYLAWS Royal Palm Coast REALTOR® Association, Inc.*, 2 (2021), https://swflrealtors.com/media/attachments/2021/02/26/2021-royal-palm-coast-realtor-association-bylaws.pdf; Florida Gulf Coast MLS, *Florida Gulf Coast Multiple Listing Service, Inc. Rules and Regulations*, 9 (2021), https://swflrealtors.com/media/attachments/2021/02/26/2021-fgc-mls-rules-and-regulations.pdf ("Only listings of the designated types of property located within the Service area of the Board of REALTORS® are required to be submitted to the Service.").

[552]

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

320.   GLVAR MLS did allow non-Realtor participation.[553]

321.   Because GLVAR MLS allowed non-Realtor participation, there are two follow-on issues relevant to my analysis.  Non-Realtor MLS participants were subject to the same MLS rules and regulations as Realtor MLS participants.[554] GLVAR adopted Standard of Conduct for MLS Participants 16.18 (or an equivalent) from the NAR rules.[555]

### iii.  Adoption of Non-Mandatory NAR Rules

322.   GLVAR effectively had an IDX Non-Disclosure Rule because cooperative compensation was not in its list of the "only data that may be displayed" in IDX listings.[556]  GLVAR adopted a VOW Non-Disclosure Rule.[557]  It also adopted the co-mingling language in Model MLS Rule 18.2.10, but not the language reflected in Model MLS Rule 18.3.11 on No-Comingling.[558]  Finally, GLVAR MLS



HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

adopted "Administrative Sanctions" including the possibility of fines and MLS suspension or termination.[559]

iv. <u>MLS Service Area</u>

323.   The GLVAR MLS service areas is defined as the State of Nevada, but it primarily operates in the Nevada counties of Clarke, Nye, Lincoln, and White Pine.[560]

*8. Houston Association of REALTORS® MLS ("HAR MLS")*

i. <u>General MLS Information, Including NAR Affiliation</u>

324.   HAR MLS was NAR-affiliated.  It was a separately incorporated entity owned by one or more associations of Realtors.[561]

ii. <u>Non-Realtor Participation and Related Rules</u>

325.   HAR MLS did allow non-Realtor participation.[562]

---

[559]

[560] Las Vegas REALTORS® MLS, Multiple Listing Service Rules and Regulations, 15 (2020), https://members.lasvegasrealtor.com/mls/pdf/MLS-Rules-And-Regulations.pdf ("The service area of the Multiple Listing Service is the state of Nevada."); Greater Las Vegas REALTORS®, Las Vegas REALTORS® May 2020 Statistics, 1 (2020), https://members.lasvegasrealtor.com/statistics/pdf/2020-05-GLVAR-Housing-Stats(00fmih8emoE).pdf ("The territorial jurisdiction of the GLVAR as a member of the National Association of REALTORS® includes Clark, Nye, Lincoln and White Pine Counties, Nevada, and such other areas as from time to time may be allocated to the GLVAR by the Board of Directors of the National Association of REALTORS®.").

[561] HAR000032 at 0035 ("Houston Association of REALTORS®, Inc. ("HAR") is the sole shareholder of the Corporation.").

[562] HAR000032 at 0045 ("Participation in the MLS is also available to nonmember principals who meet the qualifications established in these Bylaws and MLS Rules and Regulations.").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

326. Because HAR MLS allowed non-Realtor participation, there are two follow-on issues relevant to my analysis. Non-Realtor MLS participants were subject to the same MLS rules and regulations as Realtor MLS participants.[563] HAR MLS adopted Standard of Conduct for MLS Participants 16.18 (or an equivalent) from the NAR rules.[564]

### iii. Adoption of Non-Mandatory NAR Rules

327. HAR MLS adopted an IDX Non-Disclosure Rule.[565] It also adopted a VOW Non-Disclosure Rule.[566] It also adopted the co-mingling language in Model MLS Rule 18.2.10, but not the language reflected in Model MLS Rule 18.3.11 on

---

[563] HAR000032 at 0045 ("Participation in the MLS is also available to nonmember principals who meet the qualifications established in these Bylaws and MLS Rules and Regulations. . . . The nonmember principal of any firm, partnership, corporation, or the branch office manager designated by said firm, partnership, or corporation as the "Participant" (sometimes referred to as Non-Member Participant) shall have only those rights, benefits, and privileges as specified by the MLS, and shall accept all obligations to the MLS for the Participant's firm, partnership, or corporation, and for compliance with these Bylaws and Rules and Regulations of the MLS by all persons affiliated with the Participant who utilize the MLS.").

[564] HAR000071 at 0103 ("MLS Participants, acting as subagents or buyer/tenant representatives or brokers, shall not use the terms of an offer to purchase/lease to attempt to modify the listing broker's offer of compensation to subagents or buyer/tenant representatives or brokers, or make submission of an executed offer to purchase/lease contingent on the listing broker's agreement to modify the offer of compensation.").

[565] HAR000071 at 0108 ("Confidential fields intended only for other MLS participants and users (e.g., cooperative compensation offers, showing instructions, property security information, pager number, night number, appointment number, agent remarks, list date, expiration date, bonuses, variable dual rate, interest rate, tax exemptions, etc.) may not be displayed on IDX sites.").

[566] HAR000071 at 0115 ("A Participant's VOW may not make available for search by, or display to, Registrants any of the following information… The compensation offered to other MLS Participants…").

204

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

No-Comingling.[567] Finally, HAR MLS adopted "Administrative Sanctions" including the possibility of fines and MLS suspension or termination.[568]

iv. MLS Service Area

328. The HAR MLS Service Area includes the following counties in Texas: Harris, Waller, Montgomery, Liberty, Chambers, Galveston, Brazoria, Fort Bend.[569]

## 9. Metro MLS

i. General MLS Information, Including NAR Affiliation

329. Metro MLS was NAR-affiliated. It was a separately incorporated entity owned by one or more associations of Realtors.[570]

---

[567] HAR000071 at 0107-0108 ("An MLS Participant (or where permitted locally, an MLS Subscriber) may co-mingle the listings of other brokers received in an IDX feed with listings available from other MLS IDX feeds, provided all such displays are consistent with the MLS Rules, and the MLS Participant (or MLS Subscriber) holds participatory rights in those MLSs. As used in this policy, "co-mingling" means that consumers are able to execute a single property search of multiple IDX data feeds resulting in the display of IDX information from each of the MLSs on a single search results page; and that Participants may display listings from each IDX feed on a single webpage or display.").

[568] HAR000071 at 0091 ("Participants (including licensed appraisers) and Subscribers (including affiliated appraisers) of the MLS are subject to the MLS Rules and may be disciplined for violation thereof as provided in this Section 7, Section 9 and in the attached Schedule of Fees and Charges. Failure of any Subscriber to abide by the MLS Rules and/or pay any charge imposed for violation hereof can subject the Participant to discipline and cause the Participant to ultimately be responsible for all charges assessed against its Subscribers or anyone affiliated with Participant. Discipline that may be imposed may only consist of one or more of the following: . . . appropriate, reasonable fine not to exceed $15,000[;] . . . suspension of MLS rights, privileges and services[;] . . . termination of MLS rights, privileges, and services . . . .").

[569] HAR_0037205 at 7205 ("Only properties located within Harris and contiguous counties (Waller, Montgomery, Liberty, Chambers, Galveston, Brazoria, Fort Bend) are required to be entered into HAR's MLS and only MLS listed properties carry a guaranteed offer of compensation."); Houston Realtors Information Service, Inc., *Bylaws of the Houston Realtors Information Service, Inc. (The "Corporation" or "HRIS")*, 15 (2018), https://content.harstatic.com/pdf/HRIS/03-16-2018/hris_bylaws.pdf ('The Jurisdiction of the MLS shall be Harris County, Texas and the seven (7) contiguous counties thereto.").

[570] Metro MLS, *Metro MLS Orientation*, (2020), https://metromls.com/wp-content/uploads/2020/11/Metro-MLS-Orientation-Guide.pdf

("Multiple Listing Service, Inc." is a "partnership of area REALTOR® Associations serving over 9,000 REALTORS® in Southeast Wisconsin and the Greater La Crosse and Marinette County area").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

ii. Non-Realtor Participation and Related Rules

330. Metro MLS did not allow non-Realtor participation.[571]

331. Because Metro MLS did not allow for non-Realtor participation, the follow-up issues are not applicable.

iii. Adoption of Non-Mandatory NAR Rules

332. Metro MLS adopted an IDX Non-Disclosure Rule.[572] It is unclear whether it also adopted a separate VOW Non-Disclosure Rule.[573] Metro MLS also adopted Model MLS Rule 18.3.11 on No-Comingling.[574] Finally, Metro MLS

---

[571] METROMLS 000031 at 0032 ("Participation in the Corporation's multiple listing service (the 'Service') is available to the firm, partnership or corporation of any REALTOR Principal of any Board of REALTORS without further qualification except (i) payment of required dues and fees as stipulated and changed from time to time by the Board of Directors and (ii) agreement to abide by these By-Laws and the Rules and Regulations of the Corporation as modified from time to time. The REALTOR Principal of any firm, partnership or corporation designated by said firm, partnership or corporation shall be termed the 'Participant', shall have all rights, benefits and privileges of the Service and shall accept all obligations to the Corporation for the Participant's firm, partnership or corporation and for compliance with the Bylaws and Rules and Regulations of the Corporation by all persons affiliated with the Participant who utilizes the Service.").

[572] Metro MLS, *Metro MLS Rules*, 30 (2020), https://metromls.com/wp-content/uploads/2020/12/Rules-2020-approved-12-17-2020.pdf ("Except for the listings of the Participant, all listings displayed pursuant to IDX shall contain only those fields of data designated by the MLS and as defined in the IDX Dataset Definition. Display of all other fields (as determined by the MLS) is prohibited. Confidential fields intended only for other MLS Participants and users (e.g. cooperative compensation offers, showing instructions, property security information, etc.) may not be displayed on IDX sites.").

[573] Metro MLS's rules provide that "Except as provided in these Rules, the NATIONAL ASSOCIATION OF REALTORS® VOW Policy, or any other applicable MLS Rules or policies, no Participant shall distribute, provide, or make accessible any portion of the MLS Listing Information to any person or entity." Metro MLS, *Metro MLS Rules*, 27 (2020), https://metromls.com/wp-content/uploads/2020/12/Rules-2020-approved-12-17-2020.pdf. This leaves ambiguous whether the NAR's optional prohibition on disclosing buyer-broker compensation through VOWs is incorporated by reference.

[574] Metro MLS, *Metro MLS Rules*, 31 (2020), https://metromls.com/wp-content/uploads/2020/12/Rules-2020-approved-12-17-2020.pdf ("Listings obtained through IDX feeds from REALTOR® Association MLSs where the MLS Participant holds participatory rights must be displayed separately from listings obtained from other sources. Listings obtained from

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

adopted "Administrative Sanctions" including the possibility of fines and MLS suspension or termination.[575]

iv. MLS Service Area

333. The Metro MLS service area includes the following counties: the Dodge (primary), Jefferson (primary), Kenosha (primary), LaCrosse (primary); Manitowoc (primary); Marinette (primary); Milwaukee (primary); Ozaukee (primary), Racine (primary), Sheboygan (primary), Walworth (primary), Washington (primary), Waukesha (primary), Buffalo (secondary), Tremealeau (secondary), Jackson (secondary), Monroe (secondary), Vernon (secondary), Crawford (secondary), Rock (secondary), Fond du Lac (secondary), and Calumet (secondary) counties in Wisconsin; and the Winona (secondary), and Houston (secondary) counties in Minnesota.[576]

## 10. MIAMI MLS

i. General MLS Information, Including NAR Affiliation

334. MIAMI MLS was NAR-affiliated. It was operated as a committee of an association of Realtors (but is not separately incorporated).[577]

ii. Non-Realtor Participation and Related Rules

---

other sources (e.g., from other MLSs, from non- participating brokers, etc.) must display the source from which each such listing was obtained.").

[575] METROMLS001436 at 1588 ("By becoming and remaining a Participant or Subscriber in this MLS, each Participant and Subscriber agrees to be subject to the Rules and Regulations and any other MLS governance provision. The MLS may, through the administrative and hearing procedures established in these rules, impose discipline for violation of the rules and other MLS governance provisions. Discipline that may be imposed may only consist of one or more of the following: . . . appropriate, reasonable fine not to exceed $15,00[;] . . . probation for a stated period of time[;] . . . suspension of MLS rights, privileges, and services[;] . . . termination of MLS rights, privileges, and services . . . .").

[576] https://metromls.com/wp-content/uploads/2021/08/Metro-MLS-Coverage-Map.pdf; *see also* Multiple Listing Service, Inc., *Advanced FlexMLS: Your MLS system*, 2 (2018), https://metromls.com/wp-content/uploads/2020/11/AdvancedManual-052418.pdf.

[577] MIAMI00001108 at p. 1 ("The MLS shall be operated by the Residential Board of Governors of the MIAMI Association of REALTORS® and the Broward Council Board of Governors . . . .").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

335.   MIAMI MLS did allow non-Realtor participation.[578]

336.   Because MIAMI MLS allowed non-Realtor participation, there are two follow-on issues relevant to my analysis.   Non-Realtor MLS participants were subject to the same MLS rules and regulations as Realtor MLS participants.[579] MIAMI MLS adopted Standard of Conduct for MLS Participants 16.18 (or an equivalent) from the NAR rules.[580]

### iii.  Adoption of Non-Mandatory NAR Rules

337.   MIAMI MLS adopted an IDX Non-Disclosure Rule.[581]  It also adopted a VOW Non-Disclosure Rule.[582]  It also adopted Model MLS Rule 18.3.11 on No-

---

[578] MIAMI00001108 at p. 3 ("A nonmember applicant from MLS participation who is a principal, partner, corporate officer, or branch office manager acting on behalf of a principal, shall supply evidence satisfactory to the membership committee . . . .").

[579] MIAMI00001108 at p. 3 ("A nonmember applicant from MLS participation who is a principal, partner, corporate officer, or branch office manager acting on behalf of a principal, shall supply evidence satisfactory to the membership committee . . . ; and shall agree that if elected as a participant, he/she will abide by such rules and regulations and pay the MLS fees and dues . . . .").

[580] MIAMI00001108 at p. 26 ("MLS Participants, acting as non-agency or buyer/tenant representatives or brokers, shall not use the term of an offer to purchase/lease to attempt to modify the listing broker's offer of compensation to non-agents or buyer/tenant representatives or brokers, or make the submission of an executed offer to purchase/lease contingent on the listing broker's agreement to modify the offer of compensation.").

[581] MIAMI00001108 at p. 30 ("Listings displayed pursuant to IDX shall contain only those fields of data designated by the MLS. Display of all other fields (as determined by the MLS) is prohibited.  Confidential fields intended only for other MLS participants and users (e.g., cooperative compensation offers, showing instructions, property security information, etc.) may not be displayed.").

[582] MIAMI00001108 at p. 34 ("A participant's VOW may exclude listings from display based only on objective criteria, including, but not limited to, factors such as geography, list price, type of property, cooperative compensation offered b listing broker, and whether the listing broker is a REALTOR®. . . . A participant's VOW may not make available for search by or display to Registrants any of the following information[:] . . . the compensation offered to other MLS participants . . . .").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Comingling.[583]   Finally, MIAMI MLS adopted "Administrative Sanctions" including the possibility of fines and MLS suspension or termination.[584]

iv. MLS Service Area

338.   The MIAMI MLS service area includes the Florida counties: Miami-Date, Broward, Palm Beach, and Martin.[585]

*11. MLS Now*

i. General MLS Information, Including NAR Affiliation

339.   MLS Now was NAR-affiliated.  It was a separately incorporated entity owned by one or more associations of Realtors.[586]

ii. Non-Realtor Participation and Related Rules

340.   MLS Now did allow non-Realtor participation.[587]

---

[583] MIAMI00001108 at p. 30 ("Listings obtained through IDX must be displayed separately from listings obtained from other sources, including information provided by other MLSs. Listings obtained from other sources (e.g., from other MLSs, from non-participating brokers, etc.) must display the source from which each such listing was obtained.").

[584] MIAMI00001108 at pp. 20-21 ("By becoming and remaining a participant or subscriber in this MLS, each participant and subscriber agrees to be subject to the rules and regulations and other MLS governance provisions. The MLS may, through established administrative procedures and through the findings of the MLS Hearing Panel established in these rules, impose discipline for violations of the rules and other MLS governance provisions. Discipline that may be imposed must consist of one or more of the following: . . . appropriate, reasonable fine not to exceed $15,000[;] . . . probation for a stated period of time[;] . . . suspension of MLS rights, privileges, and services[;] . . . termination of MLS rights, privileges, and services . . . .").

[585] Miami Association of Realtors®, Inc., *Policies and Procedures – Rules and Regulations*, 9 (2021), https://www.miamirealtors.com/wp-content/uploads/bsk-pdf-manager/2020/04/mls-rules-and-regulations.pdf ("Geographic Market Area. All of MIAMI-Dade, Broward, Palm Beach and Martin Counties." (emphasis omitted)).

[586] 

[587] 

209

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

341. Because MLS Now allowed non-Realtor participation, there are two follow-on issues relevant to my analysis. Non-Realtor MLS participants were subject to the same MLS rules and regulations as Realtor MLS participants.[588] MLS Now adopted Standard of Conduct for MLS Participants 16.18 (or an equivalent) from the NAR rules.[589]

### iii. Adoption of Non-Mandatory NAR Rules

342. Although MLS Now's rules do not explicitly state whether buyer-broker commissions may be included in IDX feeds,[590] in practice such commissions appear to have been excluded, which can be established as follows: the brokerage website RE/MAX displays the amount of compensation being offered to buyer's agents *if* an MLS listing allows it.[591] One can corroborate that RE/MAX makes this display by checking a few exemplar listings: multiple listings for Boston from MLS PIN seem to show the "Buyer Agency Compensation".[592] However, a listing on RE/MAX from MLS Now does not yet seem to similarly display a "Buyer Agency Compensation" (I have not yet come across an example where it is displayed for



[591] Inman, RE/MAX starts displaying buyers' agent commission on listings (Feb. 8, 2021), *available at* https://www.inman.com/2021/01/29/re-max-starts-displaying-buyers-agent-commission-on-listings/.
[592] Several MLS PIN listings that appeared on Remax after searching for Boston listings all showed a "Buyer Agency Compensation". *See* https://www.remax.com/homes-for-sale/ma/boston/city/2507000; https://www.remax.com/ma/boston/home-details/29-peter-parley-rd-3-3-boston-ma-02130/8023864701231291392/M00000306/72943831; https://www.remax.com/ma/boston/home-details/55-phillips-st-2-2-boston-ma-02114/11945996795647420766/M00000306/72945239; https://www.remax.com/ma/boston/home-details/18-brenton-st-boston-ma-02121/3718863209110388455/M00000306/72944978.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

MLS Now listings).[593]   Thus, MLS Now appears to have effectively had an IDX Non-Disclosure Rule.

343.   It is unclear whether MLS Now adopted a separate VOW Non-Disclosure Rule.[594]  MLS Now did adopt the co-mingling language in Model MLS Rule 18.2.10, but not the language reflected in Model MLS Rule 18.3.11 on No-Comingling.[595]  Finally, MLS Now adopted "Administrative Sanctions" including the possibility of fines and MLS suspension or termination.[596]

---

[593]        https://www.remax.com/homes-for-sale/oh/ashtabula-county/county/39007; https://www.remax.com/homes-for-sale/wv/jackson-county/county/54035; https://www.remax.com/wv/ravenswood/home-details/1211-woodcrest-dr-ravenswood-wv-26164/10685198742682474426/M00000830/4347581; https://www.remax.com/wv/ravenswood/home-details/347-utah-rd-ravenswood-wv-26164/9280156605427751819/M00000830/4349636; https://www.remax.com/wv/ravenswood/home-details/406-harpold-ave-ravenswood-wv-26164/6534858764713431999/M00000830/4350567; https://www.remax.com/oh/conneaut/home-details/1114-lake-rd-conneaut-oh-44030/12556745754426024847/M00000830/4350460; https://www.remax.com/oh/jefferson/home-details/1-hickory-ct-jefferson-oh-44047/2255022334845639544/M00000830/4350660;        https://www.remax.com/oh/roaming-shores/home-details/1752-morning-star-dr-roaming-shores-oh-44084/7935684587117385479/M00000830/4350978.

[594]

[595]

[596]

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

iv. MLS Service Area

344. The MLS Now service area includes the following counties: the Ashtabula, Belmont, Carroll, Columbiana, Coshocton, Cuyahoga, Geauga, Guernsey, Harrison, Holmes, Jefferson, Lake, Lorain, Mahoning, Medina, Monroe, Morgan, Muskingum, Noble, Perry, Portage, Stark, Summit, Trumbull, Tuscarawas, Washington, and Wayne counties in Ohio; and the Jackson, Pleasants, Ritchie, Wirt, and Wood counties in West Virginia.[597]

*12. NorthstarMLS*

i. General MLS Information, Including NAR Affiliation

345. NorthstarMLS was NAR-affiliated. It was a separately incorporated entity owned by one or more associations of Realtors.[598]

ii. Non-Realtor Participation and Related Rules

346. NorthstarMLS did not allow non-Realtor participation.[599]

347. Because NorthstarMLS did not allow for non-Realtor participation, the follow-up issues are not applicable.

iii. Adoption of Non-Mandatory NAR Rules

---

[597] MLS Now, *MLS Now Territory Chart – 32 Counties*, (2021), https://www.mlsnow.com/pdf/counties.pdf.

[598] ███████████████████████████████████████████

[599] NORTHSTAR_00000775 at 0777 ("Any REALTOR®, who is a principal, partner, corporate officer or trustee, of a real-estate brokerage firm, who holds a current, valid Minnesota or Wisconsin real estate broker's license and who offers or accepts compensation to and from other Participants or holds a valid Minnesota or Wisconsin appraiser's license shall be eligible to participate in the Service. . . . Participatory rights in the Service shall also be available to any REALTOR® [principal] or any firm comprised of REALTORS® [principals] irrespective of where they hold primary membership subject only to their agreement to abide by these MLS Rules and Regulations; agreement to arbitrate disputes with other Participants; and payment of any MLS dues, fees, and charges.").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

348. NorthstarMLS generally prohibited disclosure of a listing broker's offer of compensation unless specifically asked by a consumer,[600] which would have applied to VOW and IDX disclosures. NorthstarMLS also adopted a specific VOW Non-Disclosure Rule.[601] It also adopted Model MLS Rule 18.3.11 on No-Comingling.[602] Finally, NorthstarMLS adopted "Administrative Sanctions" including the possibility of fines and MLS suspension or termination.[603]

iv. MLS Service Area

349. The NorthstarMLS service area is defined as Minnesota and the following counties in Wisconsin: Buffalo, Pepin, Pierce, Polk, and St. Croix.[604]

---

[600] NORTHSTAR_00000801 at 810 ("A Participant or Subscriber shall not disclose a listing broker's offer of compensation except that a Participant or Subscriber may disclose the listing broker's offer of compensation on a given listing in response to a request by a consumer. A Participant or Subscriber may disclose the listing broker's offer of compensation on a given listing in the absence of a consumer request if such disclosure is required by a contractual agreement, applicable law or the REALTORS® Code of Ethics. (Amended March 2009.)").

[601] NORTHSTAR_00000801 at 0822 ("A participant's VOW may not make available for search by or display to Registrants any of the following information… Instructions or remarks intended for cooperating brokers only…").

[602] NORTHSTAR_00000801 at 0818 ("No portion of the Broker Reciprocity Database shall be co-mingled with any non-MLS listings on the BRS's Internet web site. An MLS Participant (or where permitted locally, an MLS Subscriber) may co-mingle the listings of other brokers received in the BR feed with listings available from other MLS IDX feeds, provided all such displays are consistent with the BR rules, and the MLS Participant (or MLS Subscriber) holds participatory rights in those MLSs. As used in this policy, "co-mingling" means that consumers are able to execute a single property search of multiple IDX data feeds resulting in the display of IDX information from each of the MLSs on a single search results page; and that Participants may display listings from each IDX feed on a single webpage or display.").

[603] NORTHSTAR_00000775 at 0785 ("By becoming and remaining a participant or subscriber in this MLS, each participant and subscriber agrees to be subject to the rules and regulations and any other MLS governance provision. The MLS may, through the administrative and hearing procedures established in these rules, impose discipline for violations of the rules and other MLS governance provisions. Discipline that may be imposed may only consist of one or more of the following: . . . Appropriate, reasonable fine not to exceed $5,000[;] . . . Suspension of MLS rights, privileges and services[;] . . . Termination of MLS rights, privileges and services . . . .").

[604] NORTHSTAR_00000854 at 0856 ("'Service Area' shall mean the state of Minnesota and the following counties in Wisconsin: Buffalo, Pepin, Pierce, Polk, and St. Croix.").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

*13. NTREIS MLS*

i. General MLS Information, Including NAR Affiliation

350.  NTREIS MLS was NAR-affiliated.  It was a separately incorporated entity owned by one or more associations of Realtors.[605]

ii. Non-Realtor Participation and Related Rules

351.  NTREIS MLS did allow non-Realtor participation.[606]

352.  Because NTREIS MLS allowed non-Realtor participation, there are two follow-on issues relevant to my analysis.  Non-Realtor MLS participants were subject to the same MLS rules and regulations as Realtor MLS participants.[607]  NTREIS MLS adopted Standard of Conduct for MLS Participants 16.18 (or an equivalent) from the NAR rules.[608]

iii. Adoption of Non-Mandatory NAR Rules

---

[605] NTREIS 00003331 at 3331 ("all the shares of stock of which are owned and held by boards/associations of REALTORS® chartered by and in good standing with the National Association of REALTORS®").

[606] NTREIS 00003679 at 3683 ("Any nonmember broker who desires to participate in the MLS shall (i) submit a written application on the Nonmember Broker Application form provided by the  MLS provider accompanied by the application fee currently in effect, (ii) sign the required Agreement of Participant, (iii) comply with the requirement to affirmatively disclaim in all of his or her advertisements which refer to participation in the  MLS that he or she is not a member of a local Association of REALTORS®, and (iv) comply with the prescribed orientation requirements as the applicant's MLS Provider may require. . . . Nonmember participation in the MLS is authorized at the discretion of each MLS Provider.  Nonmember brokers participating in the MLS must agree to comply with these Rules and the policies of NTREIS.").

[607] NTREIS 00003679 at 3683 ("Nonmember brokers participating in the MLS must agree to comply with these Rules and the policies of NTREIS.").

[608] NTREIS 00003679 at 3717 ("Participants, acting as subagents or buyer/tenant representatives or brokers, shall not use the terms of an offer to purchase/lease to attempt to modify the Listing Participant's offer of compensation to subagents or buyer/tenant representatives or brokers or make the submission of an executed offer to purchase/lease contingent on the Listing Participant's agreement to modify the offer of compensation.").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

353. NTREIS MLS adopted an IDX Non-Disclosure Rule.[609] It also adopted a VOW Non-Disclosure Rule.[610] It also adopted the co-mingling language in Model MLS Rule 18.2.10, but not the language reflected in Model MLS Rule 18.3.11 on No-Comingling.[611] Finally, NTREIS MLS adopted "Administrative Sanctions" including the possibility of fines and MLS suspension or termination.[612]

iv. MLS Service Area

354. The NTREIS primary service area is Collin County, Cooke County, Dallas County, Delta County, Ellis County, Fannin County, Grayson County, Henderson County, Hill County, Hood County, Hopkins County, Hunt County, Johnson County, Kaufman County, Montague County, Navarro County, Parker County, Rains County, Rockwall County, Somervell County, Tarrant County, Van Zandt County, Wise County, and Wood County,[613] but the MLS also operates in certain other nearby Texas counties, including Anderson County, Bosque County, Brown County, Callahan County, Clay County, Coleman County, Comanche County, Eastland County, Erath County, Franklin County, Freestone County, Hamilton County, Harrison County, Jack County, Lamar County, Limestone

---

[609] NTREIS 00021615 at 1631 ("Participants and Subscribers may not publish or display to customers or clients the compensation offered to Other Participants."); *see also* NTREIS00030818 & NTREIS00030821 (reflecting the absence of a compensation field from the IDX feed).

[610] NTREIS 00021615 at 1647-1648 ("A Participant's VOW may not make available for search by, or display to, Registrants any of the following information: . . . The compensation offered to other MLS Participants.").

[611] NTREIS 00021615 at 1642 ("An MLS participant (or where permitted locally, an MLS subscriber) may comingle the listings of other brokers received in an IDX feed with listings available from other MLS IDX feeds, provided all such displays are consistent with the IDX rules, and the MLS participant (or MLS subscriber) holds participatory rights in those MLSs. As used in this policy, "co-mingling" means that consumers are able to execute a single property search of multiple IDX data feeds resulting in the display of IDX information from each of the MLSs on a single search results page; and that participants may display listings from each IDX feed on a single webpage or display.").

[612] NTREIS 00003679 at 3698 ("Each Participant shall be responsible for any actions in violation of the Rules committed by any Subscriber or other person under the supervision of such Participant. A Participant shall be subject to disciplinary sanctions for the actions of any such Subscriber or other person who violates the Rules, in the same manner as if the actions of such Participant violated the Rules. Discipline that may be imposed may only consist of one or more of the following: . . . "Appropriate, reasonable fine not to exceed $15,000[;] . . . Suspension of MLS rights, privileges, and services[;] . . . Termination of MLS rights, privileges, and services . . . .").

[613] NTREIS00030824 at 0824; NTREIS 00021488 at 1488.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

County, Nolan County, Palo Pinto County, Shackelford County, Smith County, Stephens County, Stonewall County, Taylor County, Upshur County, and Young County.[614]  In early 2021, the following parishes from Louisiana were integrated into NTREIS: Caddo, Bossier, Webster, Claiborne, Red River, Bienville, and DeSoto.[615]

*14. Pikes Peak Multiple Listing Service ("PPMLS")*

i. Generale MLS Information, Including NAR Affiliation

355.   PPMLS was NAR-affiliated.  It was a separately incorporated entity owned by one or more associations of Realtors.[616]

ii. Non-Realtor Participation and Related Rules

356.   PPMLS did not allow non-Realtor participation.[617]

357.   Because PPMLS did not allow for non-Realtor participation, the follow-up issues are not applicable.

iii. Adoption of Non-Mandatory NAR Rules

---

[614] NTREIS, *Local Market Update*, 1 (2022), https://ntreis.net/download/ntreis-statistics-local-market-update-2022-janurary/?wpdmdl=9049.

[615] NARSITZER0000163808 at 3833.

[616] ████████████████████████████████████████

[617] ████████████████████████████████████████

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

358.   PPMLS adopted an IDX Non-Disclosure Rule.[618]  It also adopted a VOW Non-Disclosure Rule.[619]  It also adopted Model MLS Rule 18.3.11 on No-Comingling.[620]  Finally, PPMLS adopted "Administrative Sanctions" including the possibility of fines and MLS suspension or termination.[621]

iv. <u>MLS Service Area</u>

359.   The PPMLS service area includes the El Paso and Teller counties in Colorado.[622]

## 15. Realcomp II

i. <u>General MLS Information, Including NAR Affiliation</u>



HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

360.    Realcomp II was NAR-affiliated.  It was a separately incorporated entity owned by one or more associations of Realtors.[623]

## ii. Non-Realtor Participation and Related Rules

361.    Realcomp II did not allow non-Realtor participation.[624]

362.    Because Realcomp II did not allow for non-Realtor participation, the follow-up issues are not applicable.

## iii. Adoption of Non-Mandatory NAR Rules

363.    Realcomp II adopted a VOW Non-Disclosure Rule.[625] Although its rules do not explicitly state whether buyer-broker commissions may be included in IDX feeds, in practice such commissions appear to have been excluded, which can be established as follows: I explained above (in the MLS Now discussion) that the brokerage website RE/MAX displays the amount of compensation being offered to buyer's agents *if* an MLS listing allows it.  However, multiple listings on RE/MAX from Realcomp II do not seem to display a "Buyer Agency Compensation" (I have

---

[623] NARSITZER0000145558 at p. 26 ("The Board of REALTORS® shall maintain for the use of its members a Multiple Listing Service, known as Realcomp II LTD., a lawful corporation in the State of Michigan, of which the Dearborn Area Board of REALTORS® shall be a shareholder.").

[624]


[625] NARSITZER0000143488 at p. 35 ("A participant's VOW may not make available for search by or display to Registrants any of the following information: . . . the compensation offered to other MLS participants . . . .").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

not yet come across an example where it is displayed).[626]  Thus, Realcomp II appears to have effectively had an IDX Non-Disclosure Rule.

364.  Realcomp II also adopted Model MLS Rule 18.3.11 on No-Comingling.[627]  Finally, Realcomp II adopted "Administrative Sanctions" including the possibility of fines and MLS suspension or termination.[628]

iv. <u>MLS Service Area</u>

365.  The Realcomp II service area is defined as the State of Michigan, but primarily operates in the following Michigan counties: Huron, Tuscola, Sanilac, Lapeer, St. Clair, Livingston, Oakland, Macomb, and Wayne.[629]

---

[626]       https://www.remax.com/homes-for-sale/mi/huron-county/county/26063; https://www.remax.com/mi/millington/home-details/2556-swaffer-rd-millington-mi-48746/5289630405705460574/M00000316/2220011636; https://www.remax.com/mi/millington/home-details/4689-north-st-millington-mi-48746/20960703116404561/M00000316/2220011395; https://www.remax.com/mi/vassar/home-details/5645-s-vassar-rd-vassar-mi-48768/11370899889349699319/M00000316/2220011869; https://www.remax.com/mi/harbor-beach/home-details/1584-s-lakeshore-rd-harbor-beach-mi-48441/7639727173894521073/M00000316/2220003196; https://www.remax.com/mi/kinde/home-details/529-odell-st-kinde-mi-48445/12507225515097522535/M00000316/2220008503; https://www.remax.com/mi/pigeon/home-details/118-ruppert-st-pigeon-mi-48755/16566752781052403459/M00000316/2220008725.

[627] NARSITZER0000143488 at p. 29 ("Listings obtained through IDX feeds from Realtor® Association MLSs where the MLS Participant holds participatory rights must be displayed separately from listings obtained from other sources. Listings obtained from other sources (e.g., from other MLSs, from non-participating brokers, etc.) must display the source from which each such listing was obtained.").

[628] NARSITZER0000143488 at p. 13 ("By becoming and remaining a participant or subscriber in this MLS, each participant and subscriber agrees to be subject to the rules and regulations and any other MLS governance provision. The MLS may, through the administrative and hearing procedures established in these rules, impose discipline for violations of the rules and other MLS governance provisions. Discipline that may be imposed may only consist of one or more of the following: . . . appropriate, reasonable fine not to exceed $15,000[;] . . . suspension of MLS rights, privileges, and services[;] . . . termination of MLS rights, privileges, and services . . . .").

[629] ████████████████████████████████ ████ ███ ████ ████████ Realcomp II, *Data Sharing Screenshot*, https://realcomp.moveinmichigan.com/portals/0/Images/Data_Sharing_Screenshot.png.

219

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

### *16. REColorado MLS*

i. General MLS Information, Including NAR Affiliation

366. REColorado MLS was NAR-affiliated. It was a separately incorporated entity owned by one or more associations of Realtors.[630]

ii. Non-Realtor Participation and Related Rules

367. REColorado MLS did allow non-Realtor participation.[631]

368. Because REColorado MLS allowed non-Realtor participation, there are two follow-on issues relevant to my analysis. Non-Realtor MLS participants were subject to the same MLS rules and regulations as Realtor MLS participants.[632] REColorado MLS adopted Standard of Conduct for MLS Participants 16.18 (or an equivalent) from the NAR rules.[633]

iii. Adoption of Non-Mandatory NAR Rules

---

[630] REC-0000001 at 0053 ("Shareholders: Denver Metro Associations of REALTORS®: Aurora Association of REALTORS®, Douglas/Elbert REALTOR® Association, and South Metro Denver REALTOR® Association.").

[631] REC-0000001 at 0005 ("Any REALTOR® or non-Subscriber applicant who is a principal, partner, corporate officer, or branch office manager acting on behalf of a principal, without further qualification, except as otherwise stipulated in these rules, shall be eligible to participate in Multiple Listing upon agreeing in writing to conform to the rules and regulations thereof and to pay the costs of incidental thereto. . . . Similarly, the definition of Participant applies to a principal, partner, corporate office, or branch office manager acting on behalf of a principal regardless of the Realtor® status.").

[632] REC-0000001 at 0005 ("Any REALTOR® or non-Subscriber applicant who is a principal, partner, corporate officer, or branch office manager acting on behalf of a principal, without further qualification, except as otherwise stipulated in these rules, shall be eligible to participate in Multiple Listing upon agreeing in writing to conform to the rules and regulations thereof and to pay the costs of incidental thereto.").

[633] REC-0000001 at 0045 ("Participants acting as buyer/tenant representatives or brokers must not use the terms of an offer to purchase/lease to attempt to modify the listing broker's offer of compensation to buyer/tenant representatives or brokers or make the submission of an executed offer to purchase/lease contingent on the listing broker's agreement to modify the offer of compensation.").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

369.    REColorado MLS adopted an IDX Non-Disclosure Rule.[634]  It also adopted a VOW Non-Disclosure Rule.[635] It also adopted Model MLS Rule 18.3.11 on No-Comingling.[636]   Finally, REColorado MLS adopted "Administrative Sanctions" including the possibility of fines and MLS suspension or termination.[637]

iv. MLS Service Area

370.    The ReColorado service area is defined in terms of territorial jurisdiction of metro Denver area Associations of REALTORS®, South Metro Association of Realtors®, Aurora Association of Realtors®, Mountain Metro Association of Realtors®, the Realtors® of Central Colorado and Steamboat Springs Board of Realtors®.[638]

### 17. San Antonio Board of REALTORS, Inc. MLS ("SABOR MLS")

i. General MLS Information, Including NAR Affiliation

371.    SABOR MLS was NAR-affiliated.  It was operated as a committee of an association of Realtors (but it not separately incorporated).[639]

---

[634] REC-0000001 at 0034 ("IDX listings displayed may not contain any additional fields that are not designated as required, recommended or optional in the Content License Agreement. Confidential fields and information (e.g., Broker remarks, listing and expiration dates, co-op compensation, showing instructions, property security information, etc.) may not be displayed.").

[635] REC-0000001 at 0041 ("A Participant's VOW may not make available for search by, or display to, Registrants any of the following information… The compensation offered to other MLS Participants….").

[636] REC-0000001 at 0034-0035 ("Listings obtained through IDX feeds from Realtor Association MLSs where the MLS Participant holds participatory rights must be displayed separately from listings obtained from other sources. Listings obtained from other sources (e.g. from other MLSs, from non-participating brokers, etc.) must display the source from which each such listing was obtained.").

[637] REC-0000001 at 0020-0021 ("The Compliance Department and the MLS Rules & Regulations Committee may, through administrative authority granted by the REcolorado Board of Directors, impose discipline for violation of the rules and other MLS governance provision. Discipline that may be imposed may consist of one or more of the following: . . . Appropriate, reasonable sanction(s) not to exceed $15,000[;] . . . Probation for a stated period[;] . . . Suspension and/or termination of MLS rights, privileges and services . . . .").

[638] REC-0000001 at 0010.

[639] SABOR0000963 at 0963 ("The MLS System is operated under the supervision of the MLS Committee in accordance with the Bylaws of the SAN ANTONIO BOARD OF REALTORS®, Inc. Article XVIII-Multiple Listing.").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

ii. <u>Non-Realtor Participation and Related Rules</u>

372.    SABOR MLS did allow non-Realtor participation.[640]

373.    Because SABOR MLS allowed non-Realtor participation, there are two follow-on issues relevant to my analysis.  Non-Realtor MLS participants were subject to the same MLS rules and regulations as Realtor MLS participants.[641] SABOR MLS adopted Standard of Conduct for MLS Participants 16.18 (or an equivalent) from the NAR rules.[642]

iii. <u>Adoption of Non-Mandatory NAR Rules</u>

374.    SABOR MLS adopted an IDX Non-Disclosure Rule.[643]  It also adopted a VOW Non-Disclosure Rule.[644]  It also adopted Model MLS Rule 18.3.11 on No-

---

[640] SABOR0000494 at 0494 ("Any REALTOR® member of this or any other Board or any nonmember broker who is a principal, partner, or corporate officer, or branch manager acting on behalf of the principal, without further qualification, except as otherwise stipulated in these bylaws, shall be eligible to participate in Multiple Listing upon agreeing in writing to conform to the Rules and Regulations thereof and to pay the costs incidental thereto.").

[641] SABOR0000494 at 0494 ("Any REALTOR® member of this or any other Board . . . shall be eligible to participate in Multiple Listing upon agreeing in writing to conform to the Rules and Regulations thereof and to pay the costs incidental thereto.").

[642] SABOR0000494 at 0509 ("MLS Participants, acting as subagents or buyer/tenant representatives or brokers, shall not use the terms of an offer to purchase/lease to attempt to modify the listing broker's offer of compensation to subagents or buyer/tenant representatives or brokers, or make the submission of an executed offer to purchase/lease contingent on the listing broker's agreement to modify the offer of compensation.").

[643] SABOR0000963 at 0989 ("Listings displayed pursuant to IDX shall contain only those fields of data designated by the MLS. Display of all other fields (as determined by the MLS) is prohibited. Confidential fields intended only for other MLS Participants and users (e.g. cooperative compensation offers, showing instructions, property security information, etc.) may not be displayed.").

[644] SABOR0000963 at 0994 ("A Participant's VOW may not make available for search by, or display to, Registrants any of the following information… The compensation offered to other MLS Participants…").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Comingling.[645]    Finally, SABOR MLS adopted "Administrative Sanctions" including the possibility of fines and MLS suspension or termination.[646]

iv. MLS Service Area

375.   The SABOR MLS service area includes the following counties in Texas: Bexar, Kendall, Frio, Medina, Karnes, Wilson, La Salle, McMullen, Atascosa, and Uvalde.[647]

## 18. Stellar MLS

i. General MLS Information, Including NAR Affiliation

376.   Stellar MLS was NAR-affiliated.  It was a separately incorporated entity owned by one or more associations of Realtors.[648]

---

[645] SABOR0000963 at 0990 ("Listings obtained through IDX feeds from REALTOR® Association MLSs where the MLS Participant holds participatory rights must be displayed separately from listings obtained from other sources, Listings obtained from other sources (e.g. from other MLS's from non-participating brokers, etc.) must display the source from which each such listing was obtained.").

[646] SABOR0000494 at 0502 ("By becoming and remaining a participant or subscriber in this MLS, each participant and subscriber agrees to be subject to the rules and regulations and any other MLS governance provision. The MLS may, through the administrative and hearing procedures established in these rules, impose discipline for violations of the rules and other MLS governance provisions. Discipline that may be imposed may only consist of one or more of the following: . . . appropriate, reasonable fine not to exceed $15,000[;] . . . Probation for a state period of time[;] . . . Suspension of MLS rights, privileges, and services[;] . . . Termination of MLS rights, privileges, and services . . . .").

[647] SABOR, *About Us*, https://realestate.sabor.com/pages/about-us (last visited Feb. 17, 2022) (ABOR's jurisdiction covers Bexar, Kendall, Frio, Medina, Karnes, Wilson, La Salle, Uvalde, McMullen, and Atascosa counties."); SABOR, MLS Rules and Regulation, 4 (2021), https://member.sabor.com/wp-content/uploads/2021/02/SABOR-MLS-Rules-and-Regulations-Clean-Copy-20210124.pdf (reflecting "9 county region" prior to addition of Uvalde county); Mitchell Parton, *Why and how San Antonio Board of Realtors is merging with Uvalde Board of Realtors*, San Antonio Business Journal (Nov. 27, 2020, 9:11 am), https://www.bizjournals.com/sanantonio/news/2020/11/27/why-sabor-is-merging-with-uvalde-board-of-realtors.html.

[648] STELLAR_0070018 at 0022 ("The name of this organization shall be the My Florida Regional Multiple Listing Service Inc. (MFRMLS). All the shares of stock are solely and wholly-owned by the Bartow Board of REALTORS®, East Polk County Association of REALTORS®, Englewood Area Board of REALTORS®, Greater Tampa Association of REALTORS®, Lakeland Association of REALTORS®, Orlando Regional REALTOR® Association, Osceola

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

### ii. Non-Realtor Participation and Related Rules

377.    Stellar MLS did allow non-Realtor participation.[649]

378.    Because Stellar MLS allowed non-Realtor participation, there are two follow-on issues relevant to my analysis. Non-Realtor MLS participants were subject to the same MLS rules and regulations as Realtor MLS participants.[650] Stellar MLS adopted Standard of Conduct for MLS Participants 16.18 (or an equivalent) from the NAR rules.[651]

### iii. Adoption of Non-Mandatory NAR Rules

379.    Stellar MLS adopted an IDX Non-Disclosure Rule.[652] It also adopted a VOW Non-Disclosure Rule.[653] It also adopted the co-mingling language in Model

---

County Association of REALTORS®, Pinellas REALTOR® Organization, Punta Gorda-Port Charlotte-Northport Association of REALTORS®, REALTORS® Association of Lake and Sumter Counties, REALTORS® Association of Sarasota and Manatee County, Venice Area Board of REALTORS®, West Pasco Board of REALTORS® and West Volusia Association of REALTORS®.").

[649] STELLAR_0070018 at 0023 ("A non-member applicant for participation who is a principal, partner, corporate officer or branch office manager acting on behalf of a principal, shall supply evidence satisfactory to MFRMLS . . . [and] agrees . . . to abide by the Rules and Regulations and pay the fees and dues . . . .").

[650] STELLAR_0070018 at 0023 ("A non-member applicant for participation who is a principal, partner, corporate officer or branch office manager acting on behalf of a principal, . . . agrees . . . to abide by the Rules and Regulations and pay the fees and dues . . . .").

[651] STELLAR_0070018 at 0047 ("MLS participants, acting as subagents or buyer/tenant representatives or brokers, shall not use the terms of an offer to purchase/lease to attempt to modify the listing broker's offer of compensation to subagents or buyer/tenant representatives or brokers, or make the submission of an executed offer to purchase/lease contingent on the listing broker's agreement to modify the offer of compensation.").

[652] STELLAR_0070018 at 0049 ("Listings displayed pursuant to IDX shall contain only those fields of data designated by the MLS. Display of all other fields (as determined by the MLS) is prohibited. Confidential files intended only for other MLS participants and subscribers (e.g., cooperative compensation offers, showing instructions, property security information, etc.) may not be displayed.").

[653] STELLAR_0070018 at 0054 ("A Participant's VOW may exclude listings from display based only on objective criteria, including, but not limited to, factors such as geography, list price, type of property, cooperative compensation offered by listing broker, and whether the listing broker is a REALTOR®. . . . A Participant's VOW may not make available for search by or display to registrants any of the following information: . . . compensation offered to other MLS

224

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

MLS Rule 18.2.10, but not the language reflected in Model MLS Rule 18.3.11 on No-Comingling.[654]    Finally, StellarMLS adopted "Administrative Sanctions" including the possibility of fines and MLS suspension or termination.[655]

## iv. MLS Service Area

380.    The Stellar MLS service area is the territorial jurisdiction of Bartow Area Board of Realtors, East Polk County Association of REALTORS®, Englewood Area Board of REALTORS®, REALTORS® Association of Lake and Sumter Counties, Greater Tampa Association of REALTORS®, Lakeland Association of REALTORS®, Orlando Regional REALTOR® Association, Osceola County Association of REALTORS®, Pinellas REALTOR® Organization, Punta Gorda-Port Charlotte-Northport Association of REALTORS®, REALTORS® Association of Sarasota and Manatee County, Venice Area Board of REALTORS®, West Pasco Board of REALTORS®, West Volusia Association of REALTORS®, and Ocala Marion County Association of Realtors.[656]

---

Participants."); *see also* STELLAR_0313799 at 803 (reflecting that compensation fields were restricted to broker office and MLS staff).

[654] STELLAR_0070018 at 0051 ("An MLS Participant (or where permitted locally, an MLS Subscriber) may co-mingle the listings of other brokers received in an IDX feed with listings available from other MLS IDX feeds, provided all such displays are consistent with the IDX rules, and the MLS Participant (or MLS Subscriber) holds participatory rights in those MLSs. As used in this policy, "co-mingling" means that consumers are able to execute a single property search of multiple IDX data feeds resulting in the display of IDX information from each of the MLSs on a single search results page; and that Participants may display listings from each IDX feed on a single webpage or display. When MFRMLS Participant listings are co-mingled with listings from other MLSs, an identifier provided by MFRMLS must be included on each listing that originated from the MFRMLS IDX feed.").

[655] STELLAR_0070018 at 0040-0041 ("By becoming and remaining a participant or subscriber in this MLS, each participant and subscriber agrees to be subject to the rules and regulations and any other MLS governance provision. The MLS may, through the administrative and hearing procedures established in these rules, impose discipline for violations of the rules and other MLS governance provisions. Discipline that may be imposed may only consist of one or more of the following: . . . Appropriate, reasonable fine not to exceed $15,000[;] . . . Suspension of MLS rights, privileges, and services[;] . . . Termination of MLS rights, privileges, and services . . . .").

[656]    Stellar    MLS,    *Shareholder    and    Customer    Organizations*, https://www.stellarmls.com/about/shareholders (last visited Feb. 18, 2022); STELLAR_0000277 at 0280 ("The following counties are our current service area, including our newest shareholder. Alachua, Charlotte, DeSoto, Hernando, Highlands, Hillsborough, Lake, Lee, Manatee, Marion, Martin, Okeechobee, Orange, Osceola, Palm Beach, Pasco, Pinellas, Polk, Sarasota, Seminole,

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

## 19. Triangle MLS

### i. General MLS Information, Including NAR Affiliation

381.   Triangle MLS was NAR-affiliated.  It was a separately incorporated entity owned by one or more associations of Realtors.[657]

### ii. Non-Realtor Participation and Related Rules

382.   Triangle MLS did not allow non-Realtor participation.[658]

383.   Because Triangle MLS did not allow for non-Realtor participation, the follow-up issues are not applicable.

### iii. Adoption of Non-Mandatory NAR Rules

384.   It is unclear whether Triangle adopted separate a VOW Non-Disclosure Rule,[659] but Triangle effectively had an IDX Non-Disclosure Rule because its IDX Policy stated that "prohibited fields are all those fields not included in the IDX data feed"[660] and Triangle MLS did not have cooperative commissions in its IDX field

---

Sumter, Volusia."); STELLAR_0085895 at 5922 ("has as its service area those areas in which the members of the shareholders of STELLAR (the 'Member Associations') (and certain other Boards/Associations of REALTORS® whose members may from time participate in Service by agreement between such Boards/Associations of REALTORS® may from time to time participate in the Service) acquire and service listings ").

[657] TRIANGLE_00001420 at 1420 ("The name of this organization shall be the Triangle MLS, Inc. hereinafter "Service", all the shares of the stock of which are solely and wholly-owned by the Raleigh Regional Association of REALTORS®.").

[658] TRIANGLE_00004877 at 4877 ("Any REALTOR® of this or any other Board who is a principal partner, corporate officer, or branch office manager acting on behalf of a principal, without further qualification, except as otherwise stipulated in these bylaws, shall be eligible to participate in Multiple Listing . . . .").

[659] Triangle's rules provide that "Except as provided in these rules, the NATIONAL ASSOCIATION OF REALTORS® VOW Policy, or any other applicable MLS rules or policies, no Participant shall distribute, provide, or make accessible any portion of the MLS Listing Information to any person or entity." TRIANGLE_00000882 at 0913.  This leaves ambiguous whether the NAR's optional prohibition on disclosing buyer-broker compensation through VOWs is incorporated by reference.

[660]   Triangle    MLS,    "Internet    Data    Exchange",   *available    at* https://www.trianglemls.com/clientuploads/TMLS/RulesReg/IDX_Revised_August_2018.pdf.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

list.[661] It also adopted Model MLS Rule 18.3.11 on No-Comingling.[662] Finally, Triangle MLS adopted "Administrative Sanctions" including the possibility of fines and MLS suspension.[663]

## iv. MLS Service Area

385. The Triangle MLS service area includes the following counties of North Carolina: Wake, Durham, Orange, Alamance, Caswell, Chatham, Franklin, Granville, Halifax, Harnett, Johnston, Lee, Nash, Person, Vance, and Warren.[664]

### 20. Wasatch Front Regional Multiple Listing Service, Inc.

## i. General MLS Information, Including NAR Affiliation

386. Wasatch Front Regional MLS was NAR-affiliated. It was a separately incorporated entity owned by one or more associations of Realtors.[665]

---

[661] https://www.trianglemls.com/clientuploads/TMLS/Idx_fields.pdf (IDX Field list does not include cooperative compensation).

[662] TRIANGLE_00000882 at 0907-8 ("Listings obtained through IDX feeds from REALTOR® Association MLSs where the MLS Participant holds participatory rights must be displayed separately from listing obtained from other sources.").

[663] TRIANGLE_00006135 at 6154-6155 ("By becoming and remaining a participant in the MLS, each participant agrees to be subject to the rules and regulations and any other MLS governance provision. Each participant is subject to these rules with regard to licensees affiliated with the participant who are subject to fee waiver under Section 6.2. The MLS may, through the administrative and hearing procedures established in these rules, impose discipline for violations of the rules and other MLS governance provisions. . . . (b) for failure to comply with any other rule, the provisions or Section 9 and 9.1 shall apply. (c) Any infractions regarding the Triangle MLS rules and regulations are subject to the fines listed in the compliance fee schedule in Appendix A. . . . Section 9.1 Sanctions for Violation of Rules: . . . If a violation is determined to have occurred, a sanctions may be imposed including a fine, a suspension, or both.").

[664] TRIANGLE_00001576 at 1586 ("All listings of the designated types of property located within the Triangle Counties Service Area (Wake, Durham, Orange, Alamance, Caswell, Chatham, Franklin, Granville, Halifax, Harnett, Johnston, Lee, Nash, Person, Vance, and Warren) are required to be entered in the System. Listings of property located outside the Triangle Counties Service Area will be accepted if submitted voluntarily by a Participant, but are not required by the Service to be entered."); Triangle MLS, *MLS Service Area*, https://www.trianglemls.com/servicearea (last visited Feb. 17, 2022) ("Triangle MLS covers the following 16 counties of North Carolina, Alamance, Caswell, Chatham, Franklin, Granville, Halifax, Harnett, Johnston, Lee, Nash, Person, Vance, Warren, Wake, Durham, and Orange.").

[665] URE001474 at 1480 (chart depicting the ownership equity of the Wasatch Front Regional MLS as of May 1, 2021 (Northern Wasatch Association of REALTORS – 33.33%; Salt Lake Board of REALTORS – 33.34%; Utah Central Association of REALTORS – 33.33%)).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

ii. Non-Realtor Participation and Related Rules

387. Wasatch Front Regional MLS did not allow non-Realtor participation.[666]

388. Because Wasatch Front Regional MLS did not allow for non-Realtor participation, the follow-up issues are not applicable.

iii. Adoption of Non-Mandatory NAR Rules

389. Wasatch Front Regional MLS adopted an IDX Non-Disclosure Rule.[667] It also adopted a VOW Non-Disclosure Rule.[668] It also adopted Model MLS Rule 18.3.11 on No-Comingling.[669] Finally, Wasatch Front Regional MLS adopted "Administrative Sanctions" including the possibility of fines and MLS suspension or termination.[670]

iv. MLS Service Area

---

[666] URE000001 at 0010 ("'Broker Participant' is a Broker who meets all of the following requirements: . . . The individual is a REALTOR® in good standing . . . ." (emphasis omitted)).

[667] URE000001 at -157 ("IDX Listings shall contain only those fields of data designated by URE. Display of all other fields, as determined by URE, is prohibited. Confidential fields intended only for other Broker Participants (e.g., cooperative compensation offers, showing instructions, property security information, etc.) may not be Displayed.").

[668] URE000001 at -165 (A Broker Participant's VOW shall not make available for search and shall not display to Registrants any of the following information: a. Listings in the Expired, Canceled, or Withdrawn statuses… Compensation offered to Cooperating Brokers…").

[669] URE000001 at -912 ("Listings obtained through IDX must be displayed separately from Listings obtained from other sources, including information provided by other MLSs. Listings obtained from other sources (e.g., from other MLSs, from non-Subscriber brokers, etc.) must display the source from which each such Listing was obtained.").

[670] URE000001 at -52 ("URE may immediately terminate any Participant or Subscirber without notice, upon the occurrence of any of the following events: … Failure to comply with the Rules and or association Rules."); URE000001 at -31 ("By becoming and remaining a Participant or Subscriber, each Participant and Subscriber agrees to be subject to the Rules and any other URE governance provision. The MLS may, through the administrative and hearing procedures established in these Rules and the URE Fine Policy, impose fines and/or discipline for violations of the Rules and other MLS governance provisions.").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

390. The Wasatch Front Regional MLS service area is defined as Utah, Idaho, Wyoming, Colorado, Arizona, Nevada, but primarily operates in Utah and Southeastern Idaho.[671]

### C. Relevant Policies of the Corporate Defendants



391. RE/MAX requires its franchisee brokers to ██████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████[672] RE/MAX also requires its franchisee brokers to ████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████[73]

392. Keller Williams requires that agents ████████████████ ████████████████████████[674] Keller Williams witnesses have been unable to identify any instances where an exemption has been granted.[675] Keller Williams also ████ ████████████████████████████████████████████████████[676]

393. Realogy requires its ████████████████████████ ████████████████████.[677] Realogy brands also require that ████ ████████████████████[678]

---

[671] URE000001 at -134.

[672] RMLLC-WDMO-00000001 at -29; *see also* Contos Dep. at 38:8–40:7.

[673] RMLLC-WDMO-00000001 at -59–61; *see also* Contos Dep. at 45:15–25.

[674] KWRI_00466314 at -69; King Dep., at 53:13–54:3, 55:12–58:10, 64:13–67:18; Keller Dep. 1 at 23:8–16.

[675] *See* Keller Dep. 2 at 38:12–39:8; King Dep. at 58:18–59:13.

[676] KWRI_00466314 at -71; *see also id.* at -425 (addendum to include code); King Dep. at 59:17–64:2, 67:23–70:6.

[677] *See, e.g.*, Realogy-Sitzer-00476543 at -57 (Better Homes and Gardens); Realogy-Sitzer-00004348 at -69 (Century 21); Realogy-Moehrl-01088601 at -14 (Coldwell Banker); Realogy-Sitzer-00002132 at -51–52 (Sotheby's International); Realogy-Sitzer-00000648 at -769 (ERA Franchise Systems); Realogy-Sitzer-00389727 at -839 (Corcoran).

[678] *See, e.g.*, Realogy-Sitzer-00476338 at -40 (Coldwell Banker); Realogy-Sitzer-00639382 at -94 (Century 21); Realogy-Sitzer-00848523 at -26 (Sotheby's International).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

394. HomeServices brokerages require ███████████████████ █████████████████████████████████████████[679] HomeServices similarly requires its franchisee-owned brokerages ████████ ██████ █████████████████████████████████ ████████████[680]

---

[679] *See, e.g.*, HSOA-MOe-0000026374 at -85 (████████████████████████ ███████); Ebby-MO-0000424 at -25 (███████████████████████ ███████); Edina-ILe-0003012 at -17 (██████████████████████ ████████████████████████████████████████████████); Blefari Dep. 2 at 57:21–25, 76:1–6.

[680] HSOA-MOe-0000336393 at -401 (Berkshire Hathaway HomeServices); RLRE-MO-0001256 at -64 (Real Living); Blefari Dep. 2 at 57:21–25, 69:22–70:20, 71:17–72:6.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

## Appendix C: MLSs Not Exclusively Owned or Operated by NAR Member Associations

### A. Overview of the Features Relevant to My Analysis

395.    As part of my market power analysis, I investigated whether it would be feasible for an MLS broker to avoid the challenged restraints (including, in particular, NAR's rules mandating blanket offers of compensation) by participating in an MLS that does not impose those rules. As discussed in my report,[681] because all NAR-affiliated MLSs are required to adopt NAR's mandatory MLS rules and all Realtors are subject to NAR's Code of Ethics, it is not possible for MLS brokers to avoid the challenged restraints by switching from a NAR-affiliated MLS to another NAR-affiliated MLS. As a result, in order to determine whether MLS brokers could avoid NAR's rules by switching MLSs, I conducted an analysis of MLSs that are not exclusively owned by NAR associations and are thus not obligated to adopt NAR's mandatory MLS rules.

396.    The initial step in my analysis was to identify those MLSs that are not exclusively owned or operated by NAR associations. The number of MLSs in the United States has fallen over time, with industry estimates ranging from around 850-███ in the 2014-2015 timeframe[682] to around ███-597 in the 2019-2020 timeframe.[683]    According to NAR and other industry sources, around 97% of all MLSs nationwide are owned or operated by NAR associations, which means that only 3% are not.[684] This would suggest around 17-18 MLSs that are not exclusively

---

[681] *See supra* Part I.A.

[682] *See* NARSITZER0000267556 (████████████████████████████████████████████████); NARSITZER0000267557 (████████████████████████); https://www.inman.com/2015/05/16/nar-may-require-mlss-to-allow-non-mls-property-data-on-broker-listing-pages/ ("All Realtor-affiliated MLSs (which include the vast majority of the nation's 850 or so MLSs) must comply with NAR's MLS rules.").

[683] *See* T3 Sixty, LLC, *Real Estate Almanac* 126 (2020), RMLLC-NDIL-01415597 at 5718 ████████████████████████); Real Estate Standards Organization, *What is an MLS and How Many MLSs Are There? (Multiple Listing Services)*, https://www.reso.org/blog/mls-faq/ (last visited Feb. 22, 2022) ("As of 2020, there are 597 MLSs in the United States."); RealtyNA, *List of MLS in the U.S.*, https://realtyna.com/blog/list-mls-us/ ("comprehensive list of MLS in the U.S." that lists 569 MLSs, having been "Updated 10/26/2020").

[684] T3 Sixty, LLC, *Real Estate Almanac* 126 (2020), RMLLC-NDIL-01415597 at 5718 (████████████████████████████████████████████████)

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

owned or operated by Realtor associations as of 2020. Starting from the industry sources I have just cited, I worked to identify those MLSs not exclusively owned or operated by NAR associations.[685] As a result of this investigation, I identified 22 MLSs that are not exclusively owned or operated by one or more Realtor associations,[686] which comports with the industry estimate that suggested the number was around 3% of all MLSs. I hereinafter refer to these 22 MLSs collectively as "Non-NAR-Exclusive MLS(s)." These MLSs collectively account for approximately 18% of all MLS subscribers nationwide as of the end of 2019.[687]

397. For the second step of my analysis, I researched the location and service area for each of the 22 Non-NAR-Exclusive MLSs. I found that, of the 20 Covered MLSs, 17 had service areas that did not overlap with any Non-NAR-Exclusive MLS,[688] and 14 were not even located in the same state as any Non-NAR-Exclusive MLS.[689] For two of the three Covered MLSs where there was at least some overlap with MLSs not exclusively owned by one or more Realtor associations, the extent of that overlap was minimal.

398. Finally, I investigated whether these Non-NAR-Exclusive MLSs impose comparable restraints to those challenged in the litigation. I found that it was common among these MLSs to adopt restraints that were identical or similar to



[685] The steps I took in this process involved removing entities with "REALTORS" in the name, removing entities that NAR's MLS Directory (NARSITZER0000267557) identified as REALTOR owned or affiliated, removing the Covered MLSs in this case, and positively identifying those of the remaining entities that appear not to have exclusive NAR affiliation.

[686] Additional sources supporting these 22 findings are cited throughout this Appendix.

[687]



[688] The only exceptions were Bright MLS, Realcomp II, and GLVAR MLS.

[689] The only exceptions were Bright MLS, Carolina/Canopy MLS, MLS Now (a.k.a. Yes MLS), Realcomp II, GLVAR MLS, and ARMLS.

232

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

those imposed by NAR. A possible reason for this is that while MLSs that are not exclusively owned by Realtor associations are sometimes labelled "independent MLSs," many had features suggesting that they were in fact not fully independent from NAR. These features include: (i) partial MLS ownership by Realtor associations; (ii) MLS rules restricting ownership to brokers that are NAR members (i.e., Realtors); (iii) MLS rules limiting membership to NAR members (i.e., Realtors); (iv) MLS executive participation on NAR's MLS rulemaking bodies; and/or (v) MLS rules expressly adopting or incorporating NAR's Code of Ethics, NAR's MLS Handbook, and other NAR policies.

### B. MLSs Not Exclusively Owned by Realtor Associations

#### 1. First Multiple Listing Service ("FMLS")

399. FMLS is located in Georgia. It is broker owned.[690] It has a coverage area limited to certain counties in Georgia.[691] FMLS's coverage area does not overlap with the coverage area of any of the Covered MLSs. I have not located a copy of FMLS's rules and regulations.

#### 2. Midwest Real Estate Data ("MRED")

---

[690] COVE Governance Survey 2015, URE012251 at 2254 ("FMLS has 26 of 1,787 broker owners, and potential stockholders are approved by the board. They do not require the shares to be forfeited when a broker is no longer active; eight of the 26 are no longer active brokers.").

[691] FMLS, *About FMLS*, https://firstmls.com/about/ (last visited Feb. 22, 2022) (reflecting "compulsory listing areas" consisting of the following Georgia counties: Chattooga, Floyd, Polk, Haralson, Paulding, Bartow, Gordon, Douglas, South Fulton, Cobb, Cherokee, Pickens, North Fulton, Dekalb, Gwinnett, Forsyth, Dawson, Lumpkin, Hall, Jackson, Barrow, Walton, Newton, and Rockdale).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

400.    MRED is located in Illinois.  It is partly owned by Realtor associations and partly owned by brokerages.[692]  MRED limits its membership to Realtors.[693]  It has a coverage area limited to certain counties in Illinois.[694]  MRED's coverage area does not overlap with the coverage area of any of the Covered MLSs.  MRED has also adopted rules mandating blanket unilateral offers of compensation.[695]    Until

---

[692] *See* MRED, *Brokerages*, https://ww2.mredllc.com/associations-brokerages/brokerages/ (last visited Feb. 22, 2022) ("While most MLSs around the country are solely owned by REALTOR® Associations, MRED is proud to be brokerage-owned and controlled. Associations do still hold an important ownership aspect . . . .").  COVE Governance Survey 2015, URE012251 at 2254 ("MRED, in the Chicago area, has both broker and association shareholders. MRED was formed in 2008 from a broker owned organization and an association owned organization. There are 73 of 6,000 brokers who are owners.").

[693] MRED, *Rules and Regulations: Midwest Real Estate Data*, § 1(a) (Revised Jan. 19, 2022), http://www.mredllc.com/comms/resources/MREDRulesAndRegulations.pdf (hereinafter "MRED 2022 Rules") ("Any REALTOR® member of an Association /Board that Midwest Real Estate Data LLC provides services to, who is a principal, partner, corporate officer or branch office manager acting on behalf of a principal, without further qualification, except as otherwise stipulated in these Rules & Regulations, shall be eligible to participate in the Service upon agreeing in writing to comply with these Rules and Regulations and MRED's Subscriber Agreement.").

[694] MRED, *Who We Are*, https://ww2.mredllc.com/about/who-we-are/ (last visited Feb. 22, 2022) (reflecting a coverage area exclusively within Illinois consisting of counties within the jurisdictions of the following Realtor associations: Central Illinois Board of REALTORS®; Champaign County Association of REALTORS®; Chicago Association of REALTORS®; REALTOR® Association of the Fox Valley; Greater Gateway Association of REALTORS®; Heartland REALTOR® Organization; HomeTown Association of REALTORS®; Illini Valley Association of REALTORS®; Kankakee-Iroquois-Ford Association of REALTORS®; Mainstreet Organization of REALTORS®; Mid-Illinois REALTORS® Association; Northern Illinois Commercial Association of REALTORS®; North Shore-Barrington Association of REALTORS®; Oak Park Area Association of REALTORS®; Rockford Area REALTORS®; and Three Rivers Association of REALTORS®); *see also* MRED 2022 Rules, *supra* note 686, § 1.14 ("Only listings of the designated types of property located within the combined territorial jurisdiction of the Associations/Board that Midwest Real Estate Data provides services to are required to be placed into the Service. Listings of property located outside those locations will be accepted if placed voluntarily by a Participant but is not required by the Service.").

[695] MRED 2022 Rules, *supra* note 686, § 1.11, ("All listings submitted to the Service must contain either a specific dollar amount or percentage in the applicable field(s). Any listing that shows "0" or less in the Cooperative Compensation field will be removed from the system to a "hold" status and that an automatic fine will be issued to the Listing Broker, and that fine will be a cumulative fine. The listing will be returned to the active database, once the Service receives a percentage or dollar amount in writing, to add to the (CC) field (see Section 9.6)."); *id.* § 1(b) ("Net listings are not accepted because (1) they are considered unethical, and (2) by nature they do not permit cooperation and compensation on a blanket unilateral basis.").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

recently, MRED adopted commission display and filtering rules for IDXs and VOWs that were substantially identical to those adopted in NAR's MLS rules.[696]

### 3. MLS Property Information Network ("MLS PIN")

401. MLS PIN is located in Massachusetts. It is broker owned, with ownership limited to brokers that are Realtors.[697] It has a coverage area limited to certain New England states.[698] MLS PIN's coverage area does not overlap with the coverage area of any of the Covered MLSs. MLS PIN has also adopted rules mandating blanket unilateral offers of compensation.[699] Until recently, buyer agent

---

[696] *See* MRED, *Rules and Regulations: Midwest Real Estate Data* (May 30, 2018), § 37.15, NARSITZER0000353083 ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████.

[697] COVE Governance Survey 2015, URE012251 at 2254 ("In MLS PIN, buying in is optional and 281 of 6,840 brokers have done so. MLS PIN has a buy-in and buy-out agreement. On leaving the MLS, their share is bought back by MLS PIN for the current price."); MLS PIN, *Become a Stockholder*, https://www.mlspin.com/about/become-a-stockholder (last visited Feb. 22, 2022) (reflecting that ownership is limited to Realtors because "[s]tock is available for purchase by the Owner/REALTOR® Participant of MLS PIN only").

[698] MLS PIN, *MLS PIN Rules and Regulations*, 29 (Amended Aug. 4, 2021), https://www.mlspin.com/content/uploads/2020/03/RULES-AND-REGS-Thru-8-4-21-FORMATTED-USE-THIS-Doc4.65-CLEAN.pdf ("Subscription States – Means the states of Connecticut, Maine, Massachusetts, New Hampshire, New York, Rhode Island and Vermont." (emphasis omitted)).

[699] *Id.* § 5.0 ("In Filing a Listing with the Service, a Participant is deemed to be making blanket unilateral offers of compensation to the other Participants in the Service. The Participant therefore shall specify on each Listing Filed with the Service the compensation being offered to the other Participants, as a Cooperating Broker has the right to know, prior to initiating any sales effort, what its compensation might be for that effort. The Listing Broker has the right to determine the amount of compensation to be offered to a Cooperating Broker.").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

compensation was not included among MLS PIN's "Acceptable Data Fields for Public Access Websites."[700]

### 4. Northwest MLS ("NWMLS")

402.   NWMLS is located in Washington State.  It is broker owned.[701]  It has a coverage area limited to certain counties in Washington State and one county in Oregon.[702]  NWMLS's coverage area does not overlap with the coverage area of any of the Covered MLSs.  Until October 2019, NWMLS had adopted rules mandating blanket unilateral offers of compensation and precluding the display of offered commissions.[703]

### 5. Garden State MLS ("GSMLS")

---

[700] MLS PIN, *MLS PIN Rules and Regulations*, 39-42 (Amended through Sept. 16, 2020) (commission and compensation fields not reflected among "Acceptable Data Fields for Public Access Websites").

[701] COVE Governance Survey 2015, URE012251 at 2254 ("In NWMLS each designated broker pays a capital contribution upon joining the MLS and there is no provision for a buy out when leaving.").

[702] NWMLS, *About Us*, https://www.nwmls.com/About-Us/page/Who-We-Are (last visited Feb. 22, 2022) (reflecting a service area comprised of the following counties: Adams County; Asotin County; Benton County; Chelan County; Clark County; Clallam County, Columbia County; Cowlitz County; Douglas County; Ferry County; Franklin County; Grant County; Grays Harbor County; Island County; Jefferson County; King County; Kitsap County; Kittitas County; Klickitat County; Lewis County; Lincoln County; Mason County; Okanogan County; Pacific County; Pierce County; San Juan County; Skagit County; Skamania County; Snohomish County; Spokane County; Stevens County; Thurston County; Wahkiakum County; Walla Walla County; Whatcom County; Whitman County; Yakima County; and Umatilla County (Oregon)).

[703] NARSITZER0000556617, App. 3

; NWMLS Rules and Regulations 101(a)(ii) (May 2019), NARSITZER0000740737 at p. 19

.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

403.   GSMLS is located in New Jersey.  It is broker owned.[704]  GSMLS permits both Realtors and non-Realtors to join but requires non-Realtor members to agree to abide by NAR's Code of Ethics.[705]  It has a coverage area limited to certain counties in northern New Jersey.[706]  GSMLS's coverage area includes 3 of the 86 counties and local jurisdictions in Bright MLS.[707]  GSMLS's coverage area does not overlap with the coverage area of any other Covered MLS. GSMLS has adopted rules mandating blanket unilateral offers of compensation.[708]

### 6. Metrolist MLS

404.   Metrolist is located in California.  It is part Realtor association owned and part broker owned.[709]  It has a coverage area limited to certain counties in

---

[704] FR-ILe-0039654 at -707 (████████████████████████████████████████).

[705] GSMLS, *Rules and Regulations of NEWMLS, L.L.C. d/b/a Garden State Multiple Listing Service, L.L.C.*, § 2.2 (Revised Feb. 16, 2022), https://forms.gsmls.com/RulesRegs.pdf?v=28674794945 ("Applicants for participation, as Participants or Subscribers from non-REALTOR offices and non-REALTOR Subscribers from REALTOR offices, shall be bound by all Rules and Regulations applicable to participation by REALTORS and expressly agree: To be bound by the Code of Ethics of NAR and NJAR.").

[706] GSMLS, *Property Search*, https://www2.gsmls.com/publicsite/getcountysearch.do?method=getcountysearch&bundle=publicsite.English (last visited Feb. 22, 2022) (reflecting a service area consisting of the following counties in New Jersey: Sussex, Passaic, Bergen, Hudson, Essex, Morris, Warren, Union, Hunterdon, Somerset, Middlesex).

[707] *See supra* Appendix B (Section B.3).

[708] GSMLS, *Rules and Regulations*, *supra* note 698, § 6.1 ("In filing a property with the Service, the Participant of the Service is making a blanket unilateral offer of cooperation to the other Service Participants and Subscribers, and shall therefore specify on each listing filed with the Service the compensation being offered by the listing broker to the other Service Participants and Subscribers. Specifying the compensation for each listing is necessary because the cooperating broker has the right to know what his/her compensation shall be prior to his/her endeavor to sell. The listing broker retains the right to determine the amount of compensation offered to subagents, buyer agents and transaction brokers, which may be the same or different. The Service will not accept listings which offer cooperation without compensation. The Service will not accept listings with offers of cooperation that do not include an offer of compensation expressed as a percentage of the gross selling price or as a definite dollar amount nor shall they include general invitations by listing brokers to other Participants to discuss terms and conditions of possible cooperative relationships.").

[709] Metrolist, *About*, https://prospector.metrolist.net/ (last visited Feb. 22, 2022) ("MetroList was founded in 1985 by three Association of REALTORS(AOR), Sacramento, Placer County and El Dorado. As the success of MetroList grew, Lodi AOR, Stockton AOR, Yolo County AOR, Central Valley AOR, Amador County AOR, Nevada County AOR, Sutter-Yuba AOR and the Brokers in Western Merced County joined to provide a seamless real estate information

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

California.[710] Metrolist's coverage area does not overlap with the coverage area of any Covered MLS. Metrolist adopted rules mandating blanket unilateral offers of compensation.[711] Metrolist further restricted the display and publication of cooperative commissions through electronic and other means,[712] and adopted a rule comparable to NAR Standard of Practice 16-16.[713]

### 7. Real Estate Information Network ("REIN")

405. REIN is located in Virginia. It is broker owned.[714] It has a coverage area limited to certain parts of North Carolina and Virginia.[715] REIN's coverage area does not overlap with the coverage area of any Covered MLS. REIN adopted

---

network. Today, MetroList serves thirteen Northern California counties and is 50% owned by the California Real Estate Brokers, Inc., and 50% owned by local Associations of REALTORS.").

[710] Metrolist Services, Inc., *MLS Rules*, § 7.8 (Effective Jan. 1, 2018), https://www.sacrealtor.org/documents/members/mls/MLS_Rules_1-1-18.pdf ("Service Area. The MLS shall serve the counties of Sacramento, San Joaquin, Stanislaus, Yolo, El Dorado and Placer except for the Lake Tahoe Basin, the eastern portion of Merced County, and others as approved by the MetroList Board of Directors from time-to-time." (emphasis omitted)).

[711] *Id.* § 7.13 ("In filing a property with the MLS, the Broker Participant makes a blanket unilateral contractual offer of compensation to the other MLS Broker Participants for their services in selling the property.").

[712] *Id.* § 7.13(c) ("Broker Participants and R.E. Subscribers shall not reproduce confidential information fields, as determined by the MLS in the MLS's sole discretion, such as that information intended for cooperating brokers rather than consumers."); *id.* § 12.14.2 ("The listing broker and agent shall not include the following information in Property Description, Directions, Attached Documents, or other areas not intended for such information, and other Participants and Subscribers shall not reproduce the following information unless prior written consent is obtained from the listing broker/agent: . . . compensation or bonuses offered to cooperating brokers").

[713] *Id.* § 9.5 ("The cooperating broker shall not use the terms of an offer to purchase to attempt to modify the listing broker's offer of compensation nor make the submission of an executed offer to purchase contingent on the listing broker's agreement to modify the offer of compensation.").

[714] REIN, *About,* https://www.reinmls.com/about (last visited Feb. 22, 2022) ("REIN is owned by broker-stockholder members and serves broker member firms and their real estate agents, as well as appraiser members and affiliate businesses. Our members include more than 670 broker firms, which represent more than 800 offices and 10,000 real estate professionals.").

[715] REIN Rules and Regulations (Apr. 27, 2018), LF-ILe-0214135 at 4139 ("REIN Primary Service Area: Includes Norfolk, Portsmouth, Chesapeake, Virginia Beach, Suffolk, Isle of Wight, Smithfield, Franklin, Hampton, Newport News, York County, and Poquoson. In addition to the Primary Service Area, the Extended Service Area are Emporia, James City, Greensville, Matthews, Gloucester, Middlesex, Williamsburg, and any other areas of Virginia, areas of North Carolina, and other out-of-state areas as approved by the Board of Directors." (emphasis omitted)).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

rules mandating blanket unilateral offers of compensation.[716] REIN also adopted rules making commission fields confidential and generally prohibiting their disclosure to customers and clients.[717]

### 8. *West Penn Multi-List ("WPML")*

406. WPML is located in Pennsylvania. It has a coverage area limited to certain counties in Pennsylvania.[718] WPML's coverage area does not overlap with the coverage area of any Covered MLS. WPML adopted rules mandating blanket offers of compensation.[719] WPML also adopted rules prohibiting the disclosure of commission fields through IDXs.[720]

### 9. *MiRealSource*

---

[716] REIN Rules and Regulations (Apr. 27, 2018), LF-ILe-0214135 at 4150 (███████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████).

[717] REIN Rules and Regulations (Apr. 27, 2018), LF-ILe-0214135 at 4152-53 (████ ███████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████ ████████████████████).

[718] West Penn Multi-List, Inc., *Rules and Regulations*, 2 (Effective Aug. 16, 2021), https://www.westpennmls.com/wp-content/uploads/RR-Cover-Page-TOC-7-1-2020.pdf ("The term 'COVERAGE AREA' shall mean the Counties of Allegheny, Armstrong, Beaver, Butler, Washington, Westmoreland, Clarion, Crawford, Fayette, Greene, Indiana, Lawrence, Mercer, Somerset, Venango, Erie, and any other area designated from time to time by the Board of Directors as a coverage area." (emphasis omitted)).

[719] *Id.* at 46 (stating that "buyer agency compensation" is a "required field[] and MUST be completed").

[720] *Id.* at 61 ("The following listing information WILL NOT be permitted to appear on any IDX listing: . . . BAC [i.e. Buyer Agent Commissions]").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

407.   MiRealSource is located in Michigan.  It is Realtor broker owned.[721] MiRealSource limits its membership to Realtors.[722]   It has a service area in Southeastern Michigan.[723]   MiRealSource's coverage area overlaps with the coverage area of Realcomp II.  MiRealSource's coverage area does not overlap with the coverage area of any other Covered MLS.  MiRealSource adopted rules mandating blanket unilateral offers of compensation.[724]  It also prohibited the display of cooperative compensation fields on its IDX.[725]

### 10. SmartMLS

---

[721] MiRealSource Rules & Regulations, July 23, 2013, Art. I, Sec. 1 ("An individual Broker-Owner … who is a who is a "REALTOR®", i.e. a member in good standing of the National Association of Realtors ('NAR') and the Michigan Association of Realtors ('MAR'), and who accepts and/or offers compensation to and from other members, pays the required fees, and agrees to abide by the Bylaws, Rules and Regulations, Principles of Professional Conduct, and all policies of MiRealSource may become a Shareholder…"); *see also* MiRealSource, *Application for Shareholder Paperwork Required*,  1 (Revised Jan. 19, 2019), https://mirealsourceinc.app.box.com/s/ubmxscz952rdibzjxi4ldi47kad64lrx (***REQUIRED*** Letter of Good Standing for Shareholder and all Licensees under such Shareholder from Local Association of Realtor® . . . .").

[722] MiRealSource Rules & Regulations, July 23, 2013, Art. I, Sec. 1 ("An individual Broker-Owner … who is a who is a "REALTOR®", i.e. a member in good standing of the National Association of Realtors ('NAR') and the Michigan Association of Realtors ('MAR'), and who accepts and/or offers compensation to and from other members, pays the required fees, and agrees to abide by the Bylaws, Rules and Regulations, Principles of Professional Conduct, and all policies of MiRealSource may become a Shareholder…"); *see also* MiRealSource Broker Application, https://mirealsourceinc.app.box.com/s/ubmxscz952rdibzjxi4ldi47kad64lrx   (***REQUIRED*** Letter of Good Standing for Shareholder and all Licensees under such Shareholder from Local Association of Realtor").

[723]    MiRealSource, *About MiRealSource*, https://www.mirealsource.com/page.cfm?pageid=106 (last visited Feb. 22, 2022) ("MiRealSource allows agents to quickly and accurately search properties in Southeast Michigan . . . .").

[724] MiRealSource Rules & Regulations, July 23, 2013, Art. V, Sec. 1.7 ("In filing a property with MiRealSource the Shareholder is making blanket unilateral offer of cooperation and compensation to the other MiRealSource participants, and shall therefore specify on each listing filed with MiRealSource, the compensation being offered to the other MiRealSource Shareholder. Specifying the compensation on each listing is necessary because the cooperating broker has the right to know what his compensation shall be prior to his endeavor to sell."); *see also* MiRealSource, National Coverage for Successful Data Sharing with GLR, (Oct. 29, 2015), https://www.mirealsource.com/blog/National-Coverage-for-Successful-Data-Sharing-with-GLR (participation in GLR "includes an agreement for cooperation and compensation" (emphasis omitted)).

[725] MiRealSource Broker Data Sharing (IDX) Consultant Licensing Agreement, Realogy-Moehrl-01126733 at 6748 (███████████████████████████████████████████████ ███████████████████████████████████████████████████ █████████████████████████████).

240

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

408.    SmartMLS is located in Connecticut.  It is partly Realtor association owned and partly Realtor broker owned.[726]  SmartMLS limits participation to Realtors.[727]  SmartMLS's coverage area is the state of Connecticut.[728]  Its coverage area does not overlap with the coverage area of any Covered MLS.  SmartMLS expressly models its MLS policies after those adopted by NAR.[729]  SmartMLS has adopted rules mandating blanket unilateral offers of compensation.[730]  SmartMLS also excludes cooperative compensation fields from its IDX and VOW data feeds.[731]

*11. Bay Area Real Estate Information Service ("BAREIS")*

409.    BAREIS MLS is located in California.  It is partly Realtor association owned and partly broker owned.[732]  BAREIS's service area includes certain Bay

---

[726] Smart MLS, Inc., *Certificate of Merger of Connecticut Multiple Listing Service, Incorporated and Greater Fairfield County CMLS, Inc. Into Smart MLS, Inc.* (Certificate of Merger) (Mar. 13, 2017).

[727] SmartMLS, *SmartMLS Rules and Regulations*, at 4, https://smartmls.com/wp-content/uploads/2022/01/SmartMLS-Rules-and-Regulations-Master-Copy-Jan-20-2022.pdf ("Participation in the Service is available to any REALTOR® principal who is an active member of the Connecticut Association of REALTORS® or any other Association of REALTORS® without further qualification except payment of required dues and fees and agreement to abide by these By-laws and these Rules and Regulations of the Service").

[728] SmartMLS, *SmartMLS Rules and Regulations*, at 11, https://smartmls.com/wp-content/uploads/2022/01/SmartMLS-Rules-and-Regulations-Master-Copy-Jan-20-2022.pdf ("Only Listings of the designated types of property located within the state of Connecticut set forth in Section 4.1 above are required to be submitted to the service.").

[729] *Id.* at 3 ("As determined by the Board of Directors, the Corporation shall seek to model its governing documents, rules, regulations, and policies, practices, and procedures to the Constitution, Bylaws, Rules, Regulations, and Policies of the NATIONAL ASSOCIATION OF REALTORS®."); *see also* ██████████████████████████████████ ██ ██ ██ ███ ██ ███ █ ██ ███ █ ██ ███ ██ ███ ██ ██ ████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████.

[730] SmartMLS, *SmartMLS Rules and Regulations*, *supra* note 721, at 29 ("In filing a property with the Service, the Participant is making blanket unilateral offers of compensation to the other Participants, and shall therefore specify on each Listing Filed with the Service, the compensation being offered to the other Participants.").

[731] https://smartmls.com/wp-content/uploads/2021/01/RETS-IDX-IDX-AO10518-9.xlsx; https://smartmls.com/wp-content/uploads/2021/01/RETS-VOW.xlsx.

[732] BAREIS MLS, *Amended and Restated Bylaws of Bay Area Real Estate Information Services*, Inc., 3-5 (Amended Apr. 16, 2010), https://bareis.com/root-documents/forms/forms-

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Area counties from California.[733]  Its coverage area does not overlap with the coverage area of any Covered MLS.  BAREIS adopted rules requiring that any offers of compensation be "blanket, unconditional, [and] unilateral."[734]

### 12. Hudson County MLS/Realty MLS ("RMLS")

410.   RMLS is located in New Jersey.  It is broker owned.[735]  It has a service area in portions of Hudson County, New Jersey.[736]  RMLS's coverage area does not overlap with the coverage area of any Covered MLS.  RMLS adopted rules mandating blanket unilateral offers of compensation.[737]  RMLS further adopted rules prohibiting the display of commission information, while also expressly permitting the filtering of listings by offered commissions.[738]

### 13. Brooklyn MLS

---

1/rules-forms/619-bareis-bylaws/file.html (reflecting that owners include brokers and "the Marin Association of REALTORS®, the North Bay Association of REALTORS®, the Northern Solano Association of REALTORS®, and the Solano Association of REALTORS®").

[733] BAREIS MLS, *MLS Rules*, 54 (Revised Mar. 1, 2022), https://bareis.com/root-documents/forms/forms-1/rules-forms/2383-bareis-current-regulations-redline-03-1-22/file.html ("'Primary Service Area' refers to the following counties: Marin, Mendocino, Napa, Solano and Sonoma. BAREIS accepts listings from all counties in the State of California.").

[734] *Id.* at 24 (reflecting that until March 1, 2022, BAREIS's rules provided that "[b]y submitting a listing the MLS Database, the Listing Broker is making a blanket, unconditional, unilateral contractual offer of compensation, if any, to the other Participants and, through the Participants, other Members, for their service in selling the property").

[735] *See generally* By-Laws of the Realty Multiple Listing System, Inc., LF-ILe-0154288.

[736] *See* Rules and Regulations of the Hudson County Multiple Listing Service, LF-ILe-0153408 at 3408 (███████████████████████████████████████████████████████████████).

[737] *See* Rules and Regulations of the Hudson County Multiple Listing Service, LF-ILe-0153408 at 3416 (████████████████████████████████████████████████████████████████████████████████████████████████████████████████████).

[738] *See* Rules and Regulations of the Hudson County Multiple Listing Service, LF-ILe-0153408 at 3426 (█████████████████████████████████████████████████████████████████████████████████████); LF-ILe-0153408 at 3427 (████████████████████████████████████████████████████████████████████████████████████████████████████████████████████).

242

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

411.   Brooklyn MLS is located in New York.  It is broker owned,[739] and shares its CEO with the Brooklyn Board of Realtors.[740]  It appears to serve the Brooklyn, New York area.[741]  Brooklyn MLS's coverage area does not overlap with the coverage area of any Covered MLS.

### 14. Western New York REIS (WNYREIS)

412.   WNYREIS is located in New York State.  It is Realtor broker owned, and managed by a local Realtor association.[742]  WNYREIS limits its membership to Realtors.[743]  Its coverage area is the Buffalo, New York area.[744]  WNYREIS's coverage area does not overlap with the coverage area of any Covered MLS. WNYREIS appears to have adopted NAR's MLS rules largely in their entirety,

---

[739] NARSITZER0000094974 at 4979 (██████████████████████████████████████████████████████████████████████████████████████████████████████████).

[740] *Id.*; *see also* Rich Schulhoff, *My New York Story*, New York Lifestyle Magazine (Mar. 2020), https://newyorklifestylesmagazine.com/articles/2020/03/78.html ("For the past 15 years, I've been the CEO of the Brooklyn MLS (Multiple Listing Service) and Brooklyn Board of Realtors.").

[741] NARSITZER0000094974 at 4979 (██████████████████████████████████████████████████████████████████████████████████████████).

[742] Buffalo Niagara Association of REALTORS®, *MLS/WNYREIS Benefits & Services*, https://www.bnar.org/services/mls-wnyreis/index.html (last visited Feb. 22, 2022) ("Who owns the MLS? The MLS in the Buffalo Niagara Area is owned by the companies participating in the MLS. The day to day functions are managed by the staff of the Buffalo Niagara Association of REALTORS, under the direction of the WNYREIS Board of Managers.").

[743] Buffalo Niagara Association of REALTORS®, *Rules and Regulations – adopted by Western New York Real Estate Information Service LLC* at p.1, (Mar. 1, 2022), https://www.bnar.org/downloads/mlscurrentrules.pdf ("All Shareholders, Members/Participants & Subscribers shall adhere to the Code of Ethics of the National Association of REALTORS®."); *id*. at p. 20 ("Participation in IDX is available to all MLS participants who are REALTORS® who are engaged in real estate brokerage and who consent to display of their listings by other participants.   (Amended   11/09)");   https://www.bnar.org/services/membership-member-benefits/index.html (reflecting that all of the MLS participation options require Realtor membership).

[744] NY State Alliance of MLS's, *Portal Login*, https://iam.mynysmls.com/idp/login (last visited Feb. 22, 2022) (reflecting coverage of MLSs participating in NY State Alliance of MLSs).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

including NAR rules mandating blanket unilateral offers of compensation.[745] It also included rules prohibiting the disclosure of cooperative commissions.[746] WNYREIS requires that all of its members adhere to NAR's Code of Ethics.[747]

### 15. Upstate New York REIS ("UNYREIS")

413. UNYREIS is located in New York State. It is Realtor broker owned, and partly managed by a local Realtor association.[748] UNYREIS limits its membership to Realtors.[749] Its service area is the Rochester and Finger Lakes region

---

[745] *See generally* Buffalo Niagara Association of REALTORS®, *Rules and Regulations – adopted by Western New York Real Estate Information Service LLC*, (Mar. 1, 2022), https://www.bnar.org/downloads/mlscurrentrules.pdf (reflecting when a rule is deemed "mandatory" by NAR); *see also id.* at 11 ("In filing a property with the multiple listing service, the participant of the service is making blanket unilateral offers of compensation to the other MLS participants, and shall therefore specify on each listing filed with the service, the compensation being offered to the other MLS participants.").

[746] *Id.* at 20 ("Listings displayed pursuant to IDX shall contain only those fields of data designated by the MLS. Display of all other fields (as determined by the MLS) is prohibited. Confidential fields intended only for other MLS Participants and users (e.g., cooperative compensation offers, showing instructions, property security information, etc.) may not be displayed on IDX sites. (See IDX Field List.) (Amended 5/12); *see also* https://www.cnyrealtor.com/clientuploads/Webpage%20Files/MLSResources/NYSAMLS_Broker-Vendor_Resource_Guide_IDX_Field_List_2020_Final.pdf ("Fields That May Not Be Used on IDX Websites/Displays (sec. 18.3.1) □ Compensation fields (Broker's Agent, Buyer's Agent, Sub-Agent)").

[747] Buffalo Niagara Association of REALTORS®, *Rules and Regulations – adopted by Western New York Real Estate Information Service LLC* at p.1, (Mar. 1, 2022), https://www.bnar.org/downloads/mlscurrentrules.pdf ("All Shareholders, Members/Participants & Subscribers shall adhere to the Code of Ethics of the National Association of REALTORS®.").

[748] Greater Rochester Association of REALTORS®, *About UNYREIS*, https://www.grar.org/unyreis/ (last visited Feb. 22, 2022) ("UNYREIS serves the Rochester and Finger Lakes region. Whether it is Matrix, Realist, HomeSteadNet.com, Homesnap, ShowingTime, Instanet Forms, or one of many other tools, UNYREIS is probably behind it. UNYREIS is owned and managed by the local brokers with the goal of providing members with the best tools in the industry. The staff of the Greater Rochester Association of REALTORS® provides personal service and support of all of these systems.").

[749] Greater Rochester Association of REALTORS®, *New York State Alliance of Multiple Listing Service's (NYSAMLSs) Multiple Listing Rules and Regulations – adopted by UNYREIS*, at p.1 (Mar. 2021) ("All Shareholders, Members/Participants & Subscribers shall adhere to the Code of Ethics of the National Association of REALTORS®."); *id*. at p. 19 ("Participation in IDX is available to all MLS participants who are REALTORS® who are engaged in real estate brokerage and who consent to display of their listings by other participants. (Amended 11/09)").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

of New York.[750] UNYREIS's coverage area does not overlap with the coverage area of any Covered MLS. UNYREIS appears to have adopted NAR's MLS rules largely in their entirety, including NAR rules mandating blanket unilateral offers of compensation.[751] It also included rules prohibiting the disclosure of cooperative commissions.[752] UNYREIS requires that all of its members adhere to NAR's Code of Ethics.[753]

### 16. Central New York Information Service ("CNYIS")

414. CNYIS is located in New York State. It is Realtor broker owned and managed by a local Realtor association.[754] CNYIS limits its membership to

---

[750] Greater Rochester Association of REALTORS®, *About UNYREIS*, https://www.grar.org/unyreis/ (last visited Feb. 22, 2022) ("UNYREIS serves the Rochester and Finger Lakes region.").

[751] *See generally* Greater Rochester Association of REALTORS®, *New York State Alliance of Multiple Listing Service's (NYSAMLSs) Multiple Listing Rules and Regulations – adopted by UNYREIS*, (Mar. 2021), https://www.grar.org/wp-content/uploads/2017/05/2021-03-29-Alliance-MLS-Rules-for-UNYREIS.pdf (reflecting when a rule is deemed "mandatory" by NAR); *see also id.* at 11 ("In filing a property with the multiple listing service, the participant of the service is making blanket unilateral offers of compensation to the other MLS participants, and shall therefore specify on each listing filed with the service, the compensation being offered to the other MLS participants.").

[752] *Id.* at 20 ("Listings displayed pursuant to IDX shall contain only those fields of data designated by the MLS. Display of all other fields (as determined by the MLS) is prohibited. Confidential fields intended only for other MLS Participants and users (e.g., cooperative compensation offers, showing instructions, property security information, etc.) may not be displayed on IDX sites. (See IDX Field List.) (Amended 5/12); *see also* https://www.cnyrealtor.com/clientuploads/Webpage%20Files/MLSResources/NYSAMLS_Broker-Vendor_Resource_Guide_IDX_Field_List_2020_Final.pdf (sec. 18.3.1) ☐ Compensation fields (Broker's Agent, Buyer's Agent, Sub-Agent)").

[753] *See id.* at 1 ("All Shareholders, Members/Participants & Subscribers shall adhere to the Code of Ethics of the National Association of REALTORS®.").

[754] NY State Alliance of MLS's, *Portal Login*, https://iam.mynysmls.com/idp/login (reflecting coverage of MLSs participating in NY State Alliance of MLSs).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Realtors.[755]   Its service area is the greater Rochester region of New York.[756] CNYIS's coverage area does not overlap with the coverage area of any Covered MLS.  CNYIS appears to have adopted NAR's MLS rules largely in their entirety, including NAR rules mandating blanket unilateral offers of compensation.[757]  It also included rules prohibiting the disclosure of cooperative commissions.[758]  CNYIS requires that all of its members adhere to NAR's Code of Ethics.[759]

### 17. Willamette Valley MLS ("WVMLS")

---

[755] *See* cnyREALTOR.com, *New York State Alliance of Multiple Listing Service's (NYSAMLSs) Multiple Listing Rules and Regulations – adopted by CNYIS Inc.* at p.1, (Approved Apr.                    21,                    2021) https://www.cnyrealtor.com/clientuploads/Webpage%20Files/MLSResources/alliance_(CNYIS)_mls_rules_4.21.21_approved.pdf ("All Shareholders, Members/Participants & Subscribers shall adhere to the Code of Ethics of the National Association of REALTORS®."); id. at p. 19 ("Participation in IDX is available to all MLS participants who are REALTORS® who are engaged in real estate brokerage and who consent to display of their listings by other participants. (Amended 11/09)").

[756] *Id.*

[757] *See generally* cnyREALTOR.com, *New York State Alliance of Multiple Listing Service's (NYSAMLSs) Multiple Listing Rules and Regulations – adopted by CNYIS Inc.*, (Approved                    Apr.                    21,                    2021) https://www.cnyrealtor.com/clientuploads/Webpage%20Files/MLSResources/alliance_(CNYIS)_mls_rules_4.21.21_approved.pdf (reflecting when a rule is deemed "mandatory" by NAR); *see also id.* at 11 ("In filing a property with the multiple listing service, the participant of the service is making blanket unilateral offers of compensation to the other MLS participants, and shall therefore specify on each listing filed with the service, the compensation being offered to the other MLS participants.").

[758] Id. at 20 ("Listings displayed pursuant to IDX shall contain only those fields of data designated by the MLS. Display of all other fields (as determined by the MLS) is prohibited. Confidential fields intended only for other MLS Participants and users (e.g., cooperative compensation offers, showing instructions, property security information, etc.) may not be displayed on IDX sites. (See IDX Field List.) (Amended 5/12); see also https://www.cnyrealtor.com/clientuploads/Webpage%20Files/MLSResources/NYSAMLS_Broker-Vendor_Resource_Guide_IDX_Field_List_2020_Final.pdf ("Fields That May Not Be Used on IDX Websites/Displays (sec. 18.3.1)  Compensation fields (Broker's Agent, Buyer's Agent, Sub-Agent)").

[759] *Id.* at 1 ("All Shareholders, Members/Participants & Subscribers shall adhere to the Code of Ethics of the National Association of REALTORS®.").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

415. WVMLS is located in Oregon. It is broker owned.[760] It has a service area in portions of Oregon.[761] WVMLS's coverage area does not overlap with the coverage area of any Covered MLS. WVMLS adopted rules mandating blanket unilateral offers of compensation.[762] WVMLS also prohibited the display of buyer-broker commission fields.[763] It has also adopted the substance of NAR Standard of Practice 16-16.[764]

### 18. Consolidated MLS (Columbia MLS) ("CMLS")

416. CMLS is located in South Carolina. It is broker owned.[765] It has a service area in certain counties in South Carolina.[766] CMLS's coverage area does

---

[760] WVMLS, *Member Login*, https://www.wvmls.com/member-login (last visited Feb. 22, 2022) ("WVMLS is your Local, Cooperative, Member Owned, Independent MLS that has been serving Oregon since 1949.").

[761] WVMLS, *Salem/Keizer Area Boundaries Map - WVMLS Area Boundaries*, https://members.wvmls.com/forms/area.pdf (reflecting that WVMLS services Linn, Benton, Marion, and Polk counties in Oregon).

[762] WVMLS, *Willamette Valley Multiple Listing Service Rules*, 6, https://members.wvmls.com/forms/bylaws.pdf ("By submitting a listing to WVMLS, the Listing Broker Member is making blanket unilateral offers of cooperation and compensation to the other Members; the Listing Broker Member must therefore specify, on each listing filed with WVMLS, the compensation offered to other Members for their services in the sale of the listing.").

[763] *Id*. at 10 ("Members shall refrain from all reproduction and display to non-Members of any of the following fields by any means: PRE-Active listings (any data), Expiration date, Private Remarks, Selling Office Commission, Showing Instructions, Owner/Occupant phone numbers, Lockbox info. (Amended 8/1/17)").

[764] *Id*. at 14-15 ("No modification of compensation in purchase agreement. Members, acting as subagents or buyer representatives, shall not use the terms of an offer to purchase to attempt to modify the listing Member's offer of compensation to cooperating brokers; nor shall they make the submission of an executed offer to purchase contingent on the listing Member's agreement to modify the offer of compensation.").

[765] CMLS, https://columbiamls.com/ (last visited Feb. 22, 2022) ("We are a member owned organization that has been facilitating the listing and sale of real estate in the Midlands area of South Carolina for over 35 years.").

[766] Consolidated Multiple Listing Service Rules and Regulations (Revised April 2010), NARSITZER0000765553 at p. 15 (█████████████████████████████ █████████████████████████████████████████████ █████████████████); https://cf3.carolinamls.com/map/map.cfm (reflecting CMLS service area).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

not overlap with the coverage area of any Covered MLS.  CMLS adopted rules mandating blanket offers of compensation.[767]

### 19. Alaska Multiple Listing Service ("Alaska MLS")

417.   Alaska MLS is located in Alaska.  It is broker owned.[768]  I was able to locate only limited information about Alaska MLS, but it appears to serve the state of Alaska.

### 20. MLS of Hilton Head Island ("HHIMLS")

418.   HHIMLS is located in South Carolina.  It is broker owned.[769]  It has a service area in certain counties in South Carolina.[770]  HHIMLS's coverage area does not overlap with the coverage area of any Covered MLS.  Although I was not able

---

[767] CMLS Bylaws, NARSITZER0000765553 at 11 (████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████ ).

[768] CMLS legal seminar Interactive agenda, program, and outline (2014), URE014768 at 4784 (reflecting 17 broker-owned/hybrid MLSs, including Alaska MLS).

[769] HHIMLS, *Multiple Listing Service Hilton Head Island Bylaws* at 8, (Amended Jan. 1, 2018),   https://www.hiltonheadmls.com/AccountData/151347516/By-Laws2.22.18.pdf   ("Only Full Members shall be entitled to voting rights in HHIMLS after the REB or appraisal firm has submitted a complete membership application, paid all required fees, and executed a Full Member Agreement.").

[770] HHIMLS, *Associate Member/NLSA Application & Change Order Form*, (2018) https://www.hiltonheadmls.com/AccountData/151347516/JoinNow-AssociateApplication Fillable.pdf ("HHIMLS collects . . . information about real properties in the counties of Beaufort, Jasper, Allendale, Bamberg, Barnwell, Colleton, Hampton and Orangeburg in the State of South Carolina . . . ."); Jamie Wilburn, *Multiple Listing Service of Hilton Head Island Improves Technology to Make Hone Buying Easier and Quicker*, Cision PRWeb (Feb. 13, 2017), https://www.prweb.com/releases/2017/02/prweb14061153.htm ("Multiple Listing Service of Hilton Head Island (HHIMLS) is a premier multiple listing service in South Carolina, established in 1976. It is the listing platform facilitating more than $3 billion in annual real estate transactions. Headquartered on Hilton Head Island, it serves all of South Carolina including the counties of Allendale, Bamberg, Barnwell, Beaufort, Colleton, Hampton, Jasper, and Orangeburg.").

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

to locate HHIMLS's rules, its bylaws reflect that it likely adopted rules mandating blanket offers of compensation.[771]

### 21. Mid-Hudson MLS ("MHMLS")

419.   MHMLS is located in New York State.  It is broker owned.[772]  It operates primarily in Dutchess County, New York.[773]  MHMLS's coverage area does not overlap with the coverage area of any Covered MLS.  MHMLS has adopted rules mandating offers of compensation.[774]

### 22. Mesquite Multiple Listing Service ("MMLS")

420.   MMLS is located in Nevada.  There is very limited public information available about MMLS.  It is not reflected among the top 200 MLSs, which means that it has at most several hundred subscribers.  MMLS's website appears not to have been updated recently, but it states that its members are required to follow "NAR's Cod [sic] of Ethics."[775]  MMLS states that it operates in the Greater Mesquite Nevada area.[776]  Mesquite, Nevada has a population of around 20,000 people.[777]  The Mesquite area comprises a very small portion of the service area covered by GLVAR

---

[771] HHIMLS, *Multiple Listing Service Hilton Head Island Bylaws*, 1 (Amended Jan. 1, 2018), https://www.hiltonheadmls.com/AccountData/151347516/By-Laws2.22.18.pdf ("establish a mechanism for real estate brokerages to share listings of real property for sale, rent, lease, etc. by establishing a means by which blanket unilateral offers of subagency to other real estate brokerages may be made").

[772]  CMLS legal seminar Interactive agenda, program, and outline (2014), URE014768 at 4784 (reflecting 17 broker-owned/hybrid MLSs, including MHMLS).

[773] MHMLS, *Mid-Hudson Multiple Listing Service Rule and Regulations*, 6 (Effective July 2015), http://www.mydreamhouse.com/MHMLS_Rules15_07.pdf ("All such listings of properties within Dutchess County must be so submitted to MHMLS for dissemination.").

[774] *Id.* at 7 ("Every Listing Contract filed with MHMLS, shall include the percentage rate of commission or dollar amount of same the Seller has agreed to pay in connection with the sale of the property.").

[775] Mesquite Real Estate Association, http://www.mreaonline.com/ (last visited Feb. 22, 2022) ("Copyright © 2013 Mesquite Real Estate Association"); *see also* Mesquite Real Estate Association, *MLS Participation Agreement*, http://www.mreaonline.com/my_files/applications/MLS%20PARTICIPATION%20AGREEMENT_ADMINISTRATIVE%20USER.pdf ("The User further agrees to be bound by the NAR Code of Ethics as established.").

[776] Mesquite Real Estate Association, http://www.mreaonline.com/ ("The mission of the MREA is to operate a multiple listing service for the Greater Mesquite Nevada area . . . .").

[777]                             Data                       Commons,                  *Mesquite*, https://datacommons.org/place/geoId/3246000?utm_medium=explore&mprop=count&popt=Person&hl=en (last visited Feb. 22, 2022).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

MLS. MMLS's coverage area does not overlap with the coverage area of any other Covered MLS.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

# EXHIBIT A

**Einer Richard Elhauge**
**Harvard Law School**
**1575 Massachusetts Ave.**
**Cambridge, Ma 02138**

**Tel: (617) 496-0860**                               **Hauser Hall 502**
**Fax: (617) 496-0861**                   **elhauge@law.harvard.edu**

## EMPLOYMENT

**Petrie Professor of Law, Harvard University**

Subjects: Antitrust, Contracts, Health Law Policy, Statutory Interpretation.

Founding Director, Petrie-Flom Center for Health Law Policy, Biotechnology and Bioethics.

Member, ABA Antitrust Section Transition Task Force 2012.

Chair, Obama Campaign's Antitrust Advisory Committee

Co-Chair, Obama Campaign's Blogs and Op-eds Committee

Member, Obama Campaign's Health Policy Advisory Committees.

Member, Editorial Board for Competition Policy International

Member, Advisory Board for the Journal of Competition Law & Economics.

Member, Advisory Board for the Social Sciences Research Network on Antitrust Law & Policy.

Member, Advisory Board for the Social Sciences Research Network on Telecommunications & Regulated Industries.

FTC Special Employee on Antitrust Issues.

Recipient, 2010 Jerry S. Cohen Memorial Fund Writing Award, for "Tying, Bundled Discounts, and the Death of the Single Monopoly Profit Theory"

Recipient, Best Academic Anticompetitive Practice Article - 2015 Antitrust Writing Awards, for "Robust Exclusion and Market Division Through Loyalty Discounts"

Recipient, 2016, Award for being one of the top 10 corporate and securities articles of the year,

251

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

for "Horizontal Shareholding"

Recipient, 2017 Jerry S. Cohen Memorial Fund Writing Award, for "Horizontal Shareholding"

Recipient, 2017, Society of Investment Law Prize for best investment law scholarship, for "Horizontal Shareholding"

## Books

ELHAUGE, U.S. ANTITRUST LAW & ECONOMICS (3d ed. 2018) (Foundation Press: 2d ed. 2011; 1st ed. 2008).

ELHAUGE & GERADIN, GLOBAL ANTITRUST LAW & ECONOMICS (3d ed. 2018) (Foundation Press: 2d ed. 2011; 1st ed. 2007)

ELHAUGE, ED., RESEARCH HANDBOOK ON THE ECONOMICS OF ANTITRUST LAW (Edward Elgar Publishing Ltd. 2013).

ELHAUGE, OBAMACARE ON TRIAL (2012), available at www.amazon.com

ELHAUGE & GERADIN, GLOBAL COMPETITION LAW & ECONOMICS (2D ED. HART PUBLISHING 2011; 1ST ED. 2007).

ELHAUGE, ED., THE FRAGMENTATION OF U.S. HEALTH CARE: CAUSES AND SOLUTIONS (Oxford University Press 2010).

ELHAUGE, STATUTORY DEFAULT RULES (Harvard University Press 2008).

AREEDA, ELHAUGE & HOVENKAMP, VOL X, ANTITRUST LAW (Little, Brown 1996).

## Academic Articles

Elhauge, *The Causal Mechanisms of Horizontal Shareholding*, 82 OHIO STATE L.J. 1 (2021)

Elhauge, *How Horizontal Shareholding Harms Our Economy—And Why Antitrust Law Can Fix It,* 10 HARVARD BUSINESS LAW REVIEW 207 (2020)

Brito, Elhauge, Ribeiro, and Vasconcelos, *Modeling Horizontal Shareholding With Ownership Dispersion* (Nov. 2018), http://ssrn.com/abstract=3264113

252

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Elhauge, *New Evidence, Proofs, and Legal Theories on Horizontal Shareholding* (Jan. 11, 2018), https://ssrn.com/abstract=3096812

Elhauge, *The Growing Problem of Horizontal Shareholding,* 3 ANTITRUST CHRONICLE 1 (June 2017)

Elhauge & Nalebuff, *The Welfare Effects of Metering Ties,* 33 JOURNAL OF LAW, ECONOMICS & ORGANIZATION 68 (2017)

Elhauge, *Contrived Threats v. Uncontrived Warnings: A General Solution to the Puzzles of Contractual Duress, Unconstitutional Conditions, and Blackmail,* 83 U. CHICAGO LAW REVIEW 503 (2016)

Elhauge, *Horizontal Shareholding*, 129 HARVARD LAW REVIEW 1267 (2016) (Awarded the Jerry S. Cohen Memorial Fund Writing Award for Best Antitrust Article, the Society of Investment Law Prize for best investment law scholarship, and an Award for being one of top ten corporate and securities articles of the year)

Elhauge*, Rehabilitating Jefferson Parish: Why Ties Without a Substantial Foreclosure Share Should Not Be Per Se Legal*, 80 ANTITRUST LAW JOURNAL 463 (2016)

McGuire, Drake, Elhauge, Hartman & Starr, *Resolving Reverse-Payment Settlements With The Smoking Gun Of Stock Price Movements*, 101 IOWA L. REV. 1581 (2016)

Elhauge & Wickelgren, *Robust Exclusion and Market Division Through Loyalty Discounts,* 43 INTERNATIONAL JOURNAL OF INDUSTRIAL ORGANIZATION 111 (2015) (Awarded Best Academic Anticompetitive Practice Article - 2015 Antitrust Writing Awards)

Elhauge*, How* Italian Colors *Guts Private Antitrust Enforcement by Replacing It With Ineffective Forms Of Arbitration,* 38 FORDHAM INT'L LAW JOURNAL 771 (2015)

Elhauge, *Obamacare and the Theory of the Firm,* in THE FUTURE OF HEALTH CARE REFORM (Malani and Schill, eds., U. Chicago Press 2015)

Elhauge, *Treating RAND Commitments Neutrally,* 11 JOURNAL OF COMPETITION LAW & ECONOMICS 1 (2015)

253

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Elhauge, *I'm Not Quite Dead Yet—And Other Health Care Observations*, 49 TULSA L. REV. 607 (2014).

Elhauge, *Introduction and Overview to Current Issues in Antitrust Economics*, in Research Handbook on the Economics of Antitrust Law (Edward Elgar Publishing Ltd. 2013).

Elhauge & Krueger, *Solving the Patent Settlement Puzzle*, 91 TEXAS LAW REVIEW 283 (2012)

Elhauge, *The Irrelevance of the Broccoli Argument Against the Insurance Mandate,* NEW ENGLAND JOURNAL OF MEDICINE (Dec 21, 2011)

Elhauge, *Why the Google Books Settlement Is Procompetitive*, 2(1) JOURNAL OF LEGAL ANALYSIS 1 (2010).

Elhauge, *The Failed Resurrection of the Single Monopoly Profit Theory*, 6(1) COMPETITION POLICY INTERNATIONAL 155 (Spring 2010).

Elhauge, *Why We Should Care about Health Care Fragmentation and How to Fix It,* in THE FRAGMENTATION OF U.S. HEALTH CARE: CAUSES AND SOLUTIONS 1 (Oxford University Press 2010).

Elhauge, *Tying, Bundled Discounts, and the Death of the Single Monopoly Profit Theory*, 123 HARVARD LAW REVIEW 397 (2009). (Awarded 2010 Jerry S. Cohen Memorial Fund Writing Award for Best Antitrust Article).

Elhauge, *Framing the Antitrust Issues in the Google Books Settlement*, GLOBAL COMPETITION POL'Y, (October 2009 Release 2).

Elhauge, *How Loyalty Discounts Can Perversely Discourage Discounting*, 5 JOURNAL OF COMPETITION LAW & ECONOMICS 189 (2009)

Elhauge, *Disgorgement as an Antitrust Remedy*, 76 ANTITRUST LAW JOURNAL 79 (2009).

Elhauge, *Do Patent Holdup and Royalty Stacking Lead to Systematically Excessive Royalties?,* 4 JOURNAL OF COMPETITION LAW & ECONOMICS 535 (2008)

Elhauge, *How Should Competition Law Be Taught?*, 4(1) COMPETITION POLICY INTERNATIONAL 267 (Spring 2008)

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Elhauge, *Harvard, Not Chicago: Which Antitrust School Drives Recent Supreme Court Decisions?*, 3(2) COMPETITION POLICY INTERNATIONAL 59 (Autumn 2007)

Elhauge, *Can Health Law Become a Coherent Field of Law?*, 41 WAKE FOREST L. REV. 365 (2006).

Elhauge, *Sacrificing Corporate Profits in the Public Interest,* 80 N.Y.U. LAW REVIEW 733 (2005)

Elhauge, *Corporate Manager's Operational Discretion to Sacrifice Corporate Profits in the Public Interest*, in ENVIRONMENTAL PROTECTION AND THE SOCIAL RESPONSIBILITY OF FIRMS 13-76 (Bruce Hay, Robert Stavins, & Richard Vietor eds., 2005)

Elhauge, *Defining Better Monopolization Standards*, 56 STANFORD LAW REVIEW 253 (2003)

Elhauge, *Why Above-Cost Price Cuts to Drive out Entrants Do Not Signal Predation or Even Market Power – and the Implications for Defining Costs,* 112 YALE LAW JOURNAL 681 (2003)

Elhauge, *Preference-Estimating Statutory Default Rules*, 102 COLUMBIA LAW REVIEW 2027 (2002)

Elhauge, *Preference-Eliciting Statutory Default Rules*, 102 COLUMBIA LAW REVIEW 2162 (2002)

Elhauge, *The Lessons of Florida 2000*, 110 POLICY REVIEW 15 (Dec 2001 -Jan 2002).

Elhauge, *What Term Limits Do That Ordinary Voting Cannot*, CATO POLICY ANALYSIS, No. 328 (Dec. 16, 1998).

Elhauge, *Are Term Limits Undemocratic?*, 64 U. CHIC. L. REV. 83 (1997).

Elhauge, Lott & Manning, *How Term Limits Enhance the Expression Of Democratic Preferences*, 5 SUPREME COURT ECON. REV. 59 (1997)

Elhauge, *The Limited Regulatory Potential of Medical Technology Assessment*, 82 VA. L. REV. 1525 (1996).

Elhauge, *Allocating Health Care Morally*, 82 CALIF. L. REV. 1449 (1994)

Elhauge, *Toward a European Sale of Control Doctrine*, 41 AM. J. COMP. LAW 627 (1993)

255

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Bundy & Elhauge, *Knowledge About Legal Sanctions*, 92 MICH. L. REV. 261 (1993)

Elhauge, *The Triggering Function of Sale of Control Doctrine*, 59 U. CHIC. L. REV. 1465 (1992)

Elhauge, *Making Sense of Antitrust Petitioning Immunity*, 80 CALIF. L. REV. 1177 (1992)

Bundy & Elhauge, *Do Lawyers Improve the Adversary System? A General Theory of Litigation Advice and Its Regulation*, 79 CALIF. L. REV. 313 (1991)

Elhauge, *Does Interest Group Theory Justify More Intrusive Judicial Review?*, 101 YALE L.J. 31 (1991)

Elhauge, *The Scope of Antitrust Process*, 104 HARV. L. REV. 667 (1991)


Media Publications

"Donald Trump: The Protector," The Atlantic (March 2, 2016)

"Ted Cruz Is Not Eligible to Run for President," Salon (Jan. 20, 2016)

"The Best Way to Reform Health Care—and Cut the Deficit," The Daily Beast (January 6, 2013)

"Roberts' Real Long Game?," The Atlantic (July 20, 2012)

"The Fatal Flaw In John Roberts' Analysis Of The Commerce Clause," The New Republic (July 1, 2012)

"The Killer Precedent For Today's Decision," The New Republic (June 28, 2012)

"Even The Most Conservative Supreme Court Justices Have Already Declared Mandates Constitutional," The New Republic (June 21, 2012) (with Emily Bass)

"What a Nobel Prize-Winning Economist Can Teach Us About Obamacare," The Atlantic (May 23, 2012) (with Kevin Caves)

"A Further Response to Critics on the Founding Fathers and Insurance Mandates", The New Republic (April 21, 2012)

"A Response to Critics on the Founding Fathers and Insurance Mandates", The New Republic (April 19, 2012)

"It's Not About Broccoli!: The False Case Against Health Care," The Atlantic (April 16, 2012)

256

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

"If Health Insurance Mandates Are Unconstitutional, Why Did the Founding Fathers Back Them?"
    The New Republic (April 13, 2012)

"Commentary: The Roberts-Kagan Compromise on Obamacare?:, The National Law Journal
    (March 28, 2012)

"Don't Blame Verrilli for Supreme Court Health-Care Stumble," The Daily Beast (March 28, 2012)

"Economists Argue Over the Cost of Caring for the Uninsured," The Daily Beast (March 26, 2012)

"The Broccoli Test," New York Times (Nov. 16, 2011)

"Coverage vs Coercion," The Huffington Post (March 3, 2008)

"Rewire This Circuit," The Wall Street Journal, A26 (Sept. 17, 2003)

"Soft on Microsoft," The Weekly Standard (March 25, 2002)

"Despite What the Critics Say, it Wasn't a Bag Job," Boston Globe (March 3, 2002)

"Florida 2000: Bush Wins Again!," Weekly Standard (November 26, 2001 )

"State Made The Right Call On Microsoft," The Hartford Courant (Nov. 9, 2001)

"States Should Seek More From Microsoft," San Francisco Chronicle (Nov. 6, 2001)

"A Smart Move on Microsoft," Boston Globe (Sept. 11, 2001)

"Competition Wins in Court," New York Times, (June 30, 2001)

"Bush v. Florida," New York Times, A31 (Nov. 20, 2000)

"Florida's Vote Wasn't 'Irregular,'" Wall Street Journal (Nov. 13, 2000)

"The New 'New Property'," San Francisco Chronicle (Nov. 6, 2000)

"The Real Problem with Independent Counsels," The Washington Times, A19 (Jun 30, 1999)

"Foul Smoke," The Washington Post, A15 (August 4, 1998)

"The Court Failed My Test," The Washington Times, A-19 (July 10, 1998)

"Microsoft Gets an Undeserved Break," The New York Times,A21 (June 29, 1998)

"Medi-Choice," The New Republic, 24 (November 13,1995)

"Term Limits: Voters Aren't Schizophrenic," Wall Street Journal, A-16 (March 14, 1995)

257

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

<u>Harvard Committees</u>

Chair, Harvard Law School Lateral Appointments Committee (1998-99), Member (2003-05, 2011-2014).

Member, Harvard Law School Entry Level Appointments Committee (2009-2011).

Member, Harvard University Standing Committee on the Degree of Doctor of Philosophy in Health Policy (1996-99, 2006-07).

Member, Harvard University Internal Advisory Board for the Interfaculty Initiative in Health Policy (1996-99).

Member, Harvard Law School Lecturers and Visitors Committee (1996-98).

**Past Academic Positions**

| | |
|---|---|
| 1988-95 | Professor of Law, Boalt Hall, University of California at Berkeley |
| 1995 | Visiting Professor of Law, Univ. of Chicago Law School |
| 1994 | Visiting Professor of Law, Harvard Law School |
| 1993 | Visiting Olin Faculty Fellow, Yale Law School |
| 1991-92 | Visiting Scholar in Europe at the Karolinska Institute, the Centre for Health Economics, the Rockefeller Foundation Study Center, Cambridge University, the European University Institute and the University of Florence |

**Clerkships**

| | |
|---|---|
| 1987-88 | Clerk for Justice William J. Brennan, Jr., United States Supreme Court |
| 1986-87 | Clerk for Judge William A. Norris, U.S. Court of Appeals for the Ninth Circuit |
| 1986 | Clerk for U.S. Solicitor General's Office, Washington, D.C. |

**Bar Admissions**: Massachusetts (2000); Pennsylvania (1986); United States Courts of Appeals

258

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

for the Fourth (1997), Sixth (2008), and Ninth Circuits (1987); Supreme Court of the United States (1997).

## ECONOMICS EXPERT WORK

President, Legal Economics LLC, 2007 to present.

Senior Expert at Criterion Economics LLC, 2004-2007

Recipient in 2016 and 2020 of AAI award for Outstanding Antitrust Litigation Achievement in Economics.

Named One of World's Leading Competition Economists in the *International Who's Who of Competition Lawyers and Economists*.

Testifying Expert in *In re Broiler Chicken Antitrust Litigation*, a case alleging that producers of broiler chickens engaged in conspiracies to share information, restrict output, and manipulate or fix prices.

Testifying Expert in *Cameron v. Apple,* a class action by app developers alleging that Apple has anticompetitively excluded competition for app distribution.

Testifying Expert in *In Re Novartis And Par Antitrust Litigation,* a case alleging an reverse payment patent settlement delayed generic competition with the branded pharmaceutical Exforge.

Testifying Expert in *In Re EpiPen Marketing Sales Practices and Antitrust Litigation*, a case alleging anticompetitive reverse payments and foreclosing agreements.

Testifying Expert in *Roxul USA, Inc. v. Armstrong World Industries, Inc.*, a case alleging exclusive dealing agreements in the market for suspended acoustical ceiling tiles.

Testifying Expert in *Sitts v. Dairy Farmers of America, Inc.,* a case alleging a conspiracy to suppress raw milk prices.

Testifying Expert in *In Re Qualcomm Antitrust Litigation*, a case alleging tying and exclusive dealing involving modem chipsets and cellular standard essential patents.

259

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Testifying Expert in *In Re Niaspan Antitrust Litigation*, a case alleging a reverse payment patent settlement.

Testifying Expert in *In Re Lamictal Direct Purchaser Antitrust Litigation*, a case alleging a reverse payment patent settlement.

Testifying Expert in *In re Namenda Antitrust Litigation*, a case alleging a reverse payment patent settlement and product hop.

Testifying Expert in *In re Lidoderm Antitrust Litigation*, a case alleging a reverse payment patent settlement.

Testifying Expert in *Valassis Communications v. News Corp,* a case alleging anticompetitive bundling and other exclusionary conduct.

Testifying Expert in *GN Netcom v. Plantronics,* a case alleging exclusive dealing in the distribution of contact center and office headsets.

Testifying Expert in *Louisiana Wholesale Drug v. Unimed Pharmaceuticals (Androgel case),* a case alleging a reverse payment patent settlement.

Testifying Expert in *Garber v. Office of the Commissioner of Baseball,* a case alleging horizontal territorial restraints on broadcasting baseball games.

Testifying Expert in *Suture Express v. Cardinal Health*, a case alleging tying and bundled loyalty contracts in medical distribution.

Testifying Expert in *Savant v. Crestron*, a case alleging exclusive dealing in the high-end home control system market

Testifying Expert in *Castro et. al. vs Sanofi Pasteur*, a case alleging anticompetitive bundled loyalty contracts in the vaccines industry.

Testifying Expert in *In re Mushroom Direct Purchaser Antitrust Litigation*, a case alleging price-fixing in the fresh mushroom market.

Testifying Expert in *It's My Party, Inc. v. Live Nation, Inc.*, a case alleging anticompetitive conduct in markets for promotion and amphitheaters.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Testifying Expert in *Retractable Technologies v. Becton Dickinson*, a case alleging exclusionary contracts in syringe and IV catheter markets.

Testifying Expert in *Caldon v. Westinghouse Electric*, a case alleging attempted monopolization.

Testifying Expert in *King Drug v. Cephalon*, a case alleging that a reverse payment settlement of a patent dispute delayed entry and restrained competition in a pharmaceutical market.

Testifying Expert for the United States in *United States v. Wyeth*, a case involving claims of bundled sales and bundled discounts in a pharmaceutical market, which resulted in a $784 million settlement for the United States.

Testifying Expert in *BAE Holdings AH v. ArmorWorks Enterprises*, a case alleging price discrimination by a ceramic tile manufacturer resulting in harm to downstream competition.

Testifying Expert in *In re Marsh & Mclennan Companies, Inc. Securities Litigation*, a case alleging securities violations from failure to disclose bid steering.

Testifying Expert in *Tessera Technologies v. Hynix Semiconductor*, a case alleging conspiracy to exclude outside technologies from semiconductor markets.

Testifying Expert in *American Steel Erectors v. Local Union No. 7*, a case alleging boycott claims related to steel erection and labor markets.

Testifying Expert in *BP America v. Repsol*, an arbitration.

. Testifying Expert in *Food Lion v. Dean Foods Company*, a class action alleging conspiracies to restrict and foreclose competition in milk markets.

Testifying Expert in *Eisai Inc. v. Sanofi-Aventis U.S. LLC*, a case by a rival alleging foreclosure in anticoagulant pharmaceutical markets.

Testifying Expert in *Daniels v. Tyco*, a case by a rival alleging foreclosure from sharps containers and GPO markets.

Testifying Expert in *Natchitoches Parish Hospital v. Tyco*, a class action concerning medical sharps containers and GPO markets.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Testifying Expert in *Amgen v. F. Hoffman La Roche*, concerning erythropoietin-simulating agents (ESAs) and white blood cell simulators (WBCs) pharmaceutical markets.

Testifying Expert in *White v. NCAA*, concerning markets for athletic and educational services.

Testifying Expert in *Applied Medical Resources v. Ethicon, Inc,* concerning sutures, trocars, and GPO markets.

Testifying Expert in *Masimo Corp. v. Tyco Health Care Group*, concerning oximetry products and GPO markets.

Testifying Expert in *Rochester Medical v. Bard*, concerning catheter and GPO markets.

Testifying Expert in *Retractable Technologies, Inc. v. Becton Dickinson*, concerning syringes and GPO markets.

Testifying Expert in *Spartanburg v. Hill-Rom*, a class action concerning hospital beds and GPO markets.

Testifying Expert in *Mountain Area Realty v. Wintergreen Partners,* concerning conduct in the real estate brokerage services market.

Testifying Expert in *Louisiana Municipal Police Employees' Retirement System v. Crawford,* concerning merger in the pharmacy benefit manager market.

Testifying Expert in *Capital Credit Alliance v. National Automated Clearing House Association,* concerning electronic checks market.

Testifying Expert for Intel before EC and Korean antitrust authorities on microprocessor markets.

Testifying Expert for AmBev before the EC and Brazilian antitrust authorities on beer market.

Testifying Expert for 1-800-Contacts before the FTC on OSI-CooperVision merger and agreements restraining distribution by nonprescribing retailers.

Testifying Expert in *In Re Cardizem CD Antitrust Litigation*, concerning patents and pharmaceuticals.

Testifying Expert regarding the *B.F. Goodrich-Coltec* Merger, concerning the aerospace industry.

Testifying Expert regarding the *Alcoa-Reynolds* Merger, concerning the aluminum industry

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Expert Consultant to National Cable Television Association on Internet Access Bills before Congress and Interactive Television Inquiry before FCC.

Expert for Royal Caribbean for proposed mergers of Princess with Royal Caribbean and Carnival, concerning the cruise industry.

Expert for the Medical Device Manufacturers Association, producing Report to U.S. Senate and Statement to FTC/DOJ regarding exclusionary agreements between medical device suppliers and Group Purchasing Organizations and their hospitals.

## EDUCATION

**Harvard Law School**                J.D., June 1986

*Awards*

Fay Diploma -- for graduating first in class

Sears Prize -- Second Year -- to top two students in class

Sears Prize -- First Year -- to top two students in class

*Activities*

Harvard Law Review, Articles Office Co-Chair

Class Marshal

Author: *Modes of Analysis: The Theories and Justifications of Privileged Communications*, 98 HARV. L. REV. 1471-1500 (1985).

**Harvard College**                B.A., June 1982

Graduated in three years, majoring in Biochemical Sciences.  GPA 3.9

## PERSONAL

Born of Argentinian immigrants in New York City.  First language was Spanish.  Live with wife and 3 children in Newton, Massachusetts.

263

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

## EXHIBIT B

## STATEMENT OF PUBLICATIONS, PRIOR TRIAL AND DEPOSITION EXPERT TESTIMONY, AND COMPENSATION

### I. Publications

My publications from the last 10 years are listed on my CV, which is attached as Exhibit A.

### II. Trial and Deposition Expert Testimony

Within the past four years, I have provided deposition testimony as an expert in *In re Lamictal Direct Purchaser Antitrust Litigation* on June 7, 2018; *In Re Qualcomm Antitrust Litigation* on August 1, 2018 and December 19, 2018; *Sitts v. Dairy Farmers of America, Inc.* on November 6, 2018; *Roxul USA, Inc. v. Armstrong World Industries, Inc.* on January 14, 2019; *In re Niaspan Antitrust Litigation* on January 31, 2019; *In Re EpiPen (Epinephrine Injection, USP) Marketing Sales Practices and Antitrust Litigation* on February 6, 2019 and December 15, 2019; in *Cameron v. Apple* on July 30, 2021; *In Re Novartis and Par Antitrust Litigation* on December 20. 2021; and *In Re Broiler Chicken Antitrust Litigation* on February 15, 2022.

Within the past four years, I have also testified as an expert at a Daubert Hearing in *Roxul USA, Inc. v. Armstrong World Industries, Inc.* on March 5, 2019, and at a class certification hearing in *In Re EpiPen (Epinephrine Injection, USP) Marketing Sales Practices and Antitrust Litigation* on June 11, 2019.

### III. Compensation

I am being compensated at a rate of $1300 per hour for my work on this case, and my consulting firm, Legal Economics LLC, is being compensated $245-695 per hour for the work of my staff on this report.