**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| CHRISTOPHER MOEHRL, MICHAEL COLE, STEVE DARNELL, JACK RAMEY, DANIEL UMPA, and JANE RUH, on behalf of themselves and all others similarly situated, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) ) | Case No: 1:19-cv-01610 |
| v. | ) ) ) ) | Judge Andrea Wood |
| THE NATIONAL ASSOCIATION OF REALTORS, REALOGY HOLDINGS CORP., HOMESERVICES OF AMERICA, INC., BHH AFFILIATES, LLC, HSF AFFILIATES, LLC, THE LONG & FOSTER COMPANIES, INC., RE/MAX LLC, and KELLER WILLIAMS REALTY, INC., | ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## JOINT STATUS REPORT

Pursuant to the Court's Order (ECF No. 310), Plaintiffs Christopher Moehrl, Michael Cole, Steve Darnell, Jack Ramey, Daniel Umpa, and Jane Ruh, on behalf of themselves and all others similarly situated ("Plaintiffs"), and Defendants The National Association of Realtors®, Realogy Holdings Corp. ("Realogy"), HomeServices of America, Inc., BHH Affiliates, LLC, HSF Affiliates, LLC, The Long & Foster Companies, Inc. (collectively, the "HomeServices Defendants" or "HSDs"), RE/MAX LLC ("RMLLC"), and Keller Williams Realty, Inc. ("Keller Williams") ("Defendants"), (collectively, the "Parties"), respectfully submit this Joint Status Report setting forth the current status of discovery.

## I. DISCOVERY UPDATE

Fact discovery is continuing to progress. Plaintiffs have now conducted twenty-seven depositions. The Defendants have deposed the named Plaintiffs and Plaintiffs' experts. The Parties have also served and responded to several sets of interrogatories and requests for production. And the Parties have served and received discovery from various third parties, including the covered MLSs. Plaintiffs await the production of certain additional documents that

some of the subpoenaed MLSs have not yet produced, despite agreeing to do so.  Plaintiffs expect that if they do not receive these documents shortly, they will seek the Court's assistance.

Plaintiffs and the Corporate Defendants have conferred over the last few months concerning a "refresh" of the Corporate Defendants' prior productions and supplemental discovery.  Two issues have arisen that require the Court's intervention.  Those disputes are discussed below.

Plaintiffs and NAR similarly continue to confer regarding certain discovery issues.  Although the Parties have made considerable progress on many of those issues, they have reached an impasse on two issues discussed below.  Additionally, NAR has indicated that it will complete the production of documents addressed in Plaintiffs' prior motion to compel by July 15, 2022.

The parties are also conferring regarding productions made by named Plaintiff Daniel Umpa.

## II.     INTERROGATORY RESPONSES AND DEPOSITION TRANSCRIPTS AND EXHIBITS FROM *BURNETT*

Plaintiffs' Second Set of Requests for Production of Documents to the Corporate Defendants sought, *inter alia*, the Corporate Defendants' interrogatory responses in the *Burnett* (formerly *Sitzer*) action and the deposition transcripts and exhibits of any Corporate Defendant witnesses deposed in that matter who were not cross noticed in this action.  On June 8, 2022 Plaintiffs informed the Corporate Defendants that they intended to ask for these materials from counsel to the *Burnett* plaintiffs in accordance with the protective ordered entered in the *Burnett* action.  On June 10, 2022, the Corporate Defendants responded to Plaintiffs with a counterproposal further detailed below.  The Parties' positions are below.

### Plaintiffs' Position

The Court should allow Plaintiffs to obtain the requested interrogatory responses and deposition transcripts/exhibits from the *Burnett* plaintiffs.  The *Burnett* Protective Order, which the Defendants here stipulated to, permits Plaintiffs to obtain the requested materials.  The transcripts and interrogatory responses are relevant discovery in this case and indeed admissible at trial.  And there is zero burden to the Corporate Defendants, since Plaintiffs can obtain these materials from the *Burnett* Plaintiffs.  At minimum, the Court should order Keller Williams to abide by its promise to provide deposition transcripts from the *Burnett* action "for depositions that Plaintiffs have not cross-noticed or in which Plaintiffs have not otherwise participated, to the extent not already produced by the [*Burnett*] Plaintiffs or another Defendant."  *See* Keller Williams Realty, Inc.'s Responses to Plaintiffs' Second Set of Requests for Production of Documents to the Corporate Defendants, at 15.

### A.     The *Burnett* Protective Order Permits Plaintiffs Access to the Requested Materials

The *Burnett* Protective Order allows the *Burnett* plaintiffs to share the requested interrogatory responses and deposition transcripts/exhibits with Plaintiffs here.  It provides that

any confidential material in that litigation can be provided "with the exception of materials pertaining only to Subject MLSs." *See Burnett v. NAR*, No. 19-cv-00332 (W.D. Mo.), ECF No. 92, at 10–11, 13 (September 12, 2019). Plaintiffs asked the Corporate Defendants whether they had any objection to Plaintiffs obtaining the requested materials from counsel in Missouri out of an abundance of caution. The Corporate Defendants responded that they did, but their objections (discussed below) have nothing to do with the only grounds available to them under the *Burnett* Protective Order. Defendants have not contended that every single interrogatory and deposition pertains only to the Subject MLSs, nor can they. Defendants have argued to this Court that the *Burnett* suit "alleges the same core, substantive allegations as in *Moehrl*" and that both "allege the same general anticompetitive conduct." Suggestions in Support of Corporate Defendants' Motion to Transfer, *Burnett v. NAR*, No. 19-cv-00332 (W.D. Mo.), ECF No. 62, at 5–7 (July 10, 2019). The *Burnett* plaintiffs thus have every right to share the requested materials with Plaintiffs and the Court should hold that Plaintiffs here may seek the requested materials from the *Burnett* plaintiffs. To the extent that the Corporate Defendants contend that a particular interrogatory or deposition "pertain[s] only to [the] Subject MLSs" in *Burnett*,[1] Plaintiffs are willing to meet and confer on the issue and raise any disputes with the Court, but the Corporate Defendants have categorically refused to allow Plaintiffs access to *any* interrogatory responses or deposition transcripts/exhibits from *Burnett* for witnesses who were not cross noticed in this action. Defendants have no basis to do so under the *Burnett* Protective Order.

The materials sought are plainly relevant. Again, Defendants have argued to this Court that the *Burnett* suit "alleges the same core, substantive allegations as in *Moehrl*"; that both "allege the same general anticompetitive conduct"; and that "[d]espite the complementary MLSs at issue in each complaint, the core allegations are the same, are not alleged to vary by geographic market, and discovery would necessarily overlap because each complaint focuses on Defendants' alleged conduct—i.e., Defendants' corporate policies and an alleged agreement between Corporate Defendants and NAR." Suggestions in Support of Corporate Defendants' Motion to Transfer, *Burnett v. NAR*, No. 19-cv-00332 (W.D. Mo.), ECF No. 62, at 5–7 (July 10, 2019). The requested interrogatories and exhibits/transcripts concern the "same general anticompetitive conduct" and "same core, substantive allegations" raised in each action and are thus relevant.

Indeed, the requested interrogatories would be admissible at trial here. *See, e.g.*, *Tao of Sys. Integration, Inc. v. Analytical Servs. & Materials, Inc.*, 330 F. Supp. 2d 668, 673 (E.D. Va. 2004) ("[A]n opposing party's answers to interrogatories are generally admissible as statements of a party opponent."); *Duff v. Lobdell–Emery Manufacturing Co.*, 926 F. Supp. 799, 803 (N.D. Ind. 1996) ("If a party relies upon an opposing party's answers to interrogatories, the answers are admissible as statements of a party opponent.").

The requested deposition transcripts are similarly admissible. *See Ikerd v. Lapworth*, 435 F.2d 197, 205–06 (7th Cir. 1970) (holding that depositions from prior action were admissible where counsel for the objecting party was "present at the taking of both of the depositions here in

---

[1] For example, the Corporate Defendants claim in their section that certain custodians and discovery materials are relevant to *Burnett* only. They have not, however, identified these materials. Instead, they've objected to Plaintiffs seeking any materials from the *Burnett* plaintiffs even if clearly relevant to both cases.

question and there is substantial identity of factual and legal issues involved"); *Howell v. Cruz*, No. 19-cv-00782, 2020 WL 6700178, at \*5 (E.D. Cal. Nov. 13, 2020) (deposition transcripts admissible where they involved one of the parties and covered the same general subject matter), *report and recommendation adopted*, No. 19-cv-00782, 2021 WL 24756 (E.D. Cal. Jan. 4, 2021); *Runge v. Stanley Fastening Sys., L.P.*, No. 4:09-cv-00130-TWP, 2011 WL 6755161, at \*3 (S.D. Ind. Dec. 23, 2011) ("[M]any cases have held that a deposition can be offered against one who was a party to the former suit even though the party now using the deposition was not." (cleaned up)).

The Corporate Defendants' contention that Plaintiffs should not be able to seek any discovery materials from the *Burnett* plaintiffs—and should have to funnel all requests through Defendants—flies in the face of the *Burnett* Protective Order. As does their contention that the *Burnett* Protective Order supports their position. The Order allows Plaintiffs here to seek, and the *Burnett* plaintiffs to provide, confidential discovery materials "***with the exception*** of materials pertaining only to Subject MLSs." *See Burnett v. NAR*, No. 19-cv-00332 (W.D. Mo.), ECF No. 92, at 10–11, 13 (September 12, 2019) (emphasis added). It does not provide that the *Burnett* plaintiffs cannot share any confidential discovery materials with Plaintiffs here and that those materials must be obtained from Defendants. The language of that order was carefully negotiated, and Defendants stipulated to it. They cannot now seek to unilaterally change it. And it is of course silent as to Plaintiffs' right to seek ***nonconfidential*** materials. In suggesting that Plaintiffs be barred from seeking any discovery materials from the *Burnett* plaintiffs, the Corporate Defendants seek to impose a bar that has zero basis in any order in this case or *Burnett*.

The protective order in this case likewise supports Plaintiffs, contrary to Defendants' assertions. It has provisions that mirror those of the *Burnett* Protective Order and allow Plaintiffs here to share confidential materials with the *Burnett* plaintiffs with the "exception of materials pertaining only to Covered MLSs." *See* Dkt. No. 125 at 10, 13. In agreeing to mirror provisions in both Protective Orders, Defendants were agreeing that Plaintiffs here and the *Burnett* plaintiffs can share discovery materials with the limited exception of materials that are (1) confidential and (2) relate only to the Covered MLSs of a particular case.

Defendants contend that their position is consistent with the Court's December 12, 2019 Order and the discussion at the status conference that same day. It's not. The Court there followed the plain language of the *Burnett* Protective Order and recognized that Plaintiffs were entitled to discovery materials from *Burnett* unless they concern only issues in the *Burnett* MLSs. *See* Dec. 12, 2019 Conf. Tr., at 29:22–:8 (reading the language of the *Burnett* Protective Order); *id.* at 29:9–:15 ("Follow the language in the protective order . . . . Deposition transcripts for witnesses who give testimony in the *[Burnett]* case who would properly be witnesses in this case need to be produced."); Dkt. No. 159 ("In addition, as agreed, Defendants shall provide Plaintiff with documents produced in the Missouri action and transcripts from the depositions in the Missouri action of any witness identified as a potential witness in this case."). The Court's ruling and the discussion at the status conference support Plaintiffs.

Defendants finally seek to impose, on a retroactive basis, a requirement that Plaintiffs "lose" depositions they are permitted under the deposition limits order for each *Burnett* transcript that Plaintiffs obtain through discovery and lose an interrogatory for each interrogatory they

4

receive. But these requirements do not appear anywhere in the agreed orders that govern the sharing of discovery between this case and *Burnett*, in the order governing deposition limits, or in any other order. It would be inappropriate and prejudicial to Plaintiffs to radically rewrite these orders so late in discovery, given that Plaintiffs relied on the knowledge that Plaintiffs would have access to the *Burnett* transcripts and discovery materials in determining our own deposition and discovery strategy—including with respect to depositions that have *already* taken place. Indeed, the Court recognized when partially lifting the stay Defendants sought that Plaintiffs would have access to "the prior sworn statements" of witnesses deposed in *Burnett* without **any** suggestion that access to such transcripts would reduce the number of depositions Plaintiffs would be entitled to. Dec. 12, 2019 Conf. Tr., at 29:13–:21.

Defendants' proposal is also inconsistent with how courts and parties regularly handle discovery in overlapping cases. Parties regularly produce discovery from other, related cases, and courts regularly order materials from related cases to be produced without any reduction in the number of depositions or interrogatories permitted. *See, e.g.*, *Guiden v. Leatt Corp.*, No. 5:10-cv-175, 2013 WL 12234612 (W.D. Ky. Apr. 30, 2013) (granting motion to compel deposition transcripts from prior actions over objection that the plaintiff "could take the deposition" of the same witnesses); *Graceway Pharms., LLC v. River's Edge Pharms., LLC*, No. 2:08-cv-00067, 2008 WL 4787517, at *2 (N.D. Ga. Oct. 27, 2008) (granting motion to compel production of depositions "given by Defendant's employees and representatives" in prior actions). Defendants do not cite a single case imposing a requirement like the one they advocate for.

Plaintiffs, in short, seek access to relevant, admissible materials they have a right to access. And there is zero burden being imposed on Defendants. On the contrary, to eliminate any burden Plaintiffs have indicated that they will shoulder the burden of obtaining the requested materials. The Court should allow Plaintiffs to obtain the requested interrogatory responses and deposition transcripts/exhibits.

### B. Keller Williams Committed to Producing Deposition Transcripts

At minimum, the Court should order Keller Williams to abide by its promise to provide deposition transcripts from the *Burnett* action "for depositions that Plaintiffs have not cross-noticed or in which Plaintiffs have not otherwise participated."

Plaintiffs' Request for Production No. 55 seeks, "from the [*Burnett*] action, . . . unredacted versions of all . . . transcripts of depositions taken and exhibits to such transcripts." In response to that request, Keller Williams committed to producing "transcripts of depositions and exhibits to such transcripts for depositions that Plaintiffs have not cross-noticed or in which Plaintiffs have not otherwise participated, to the extent not already produced by the [*Burnett*] Plaintiffs or another Defendant." *See* Keller Williams Realty, Inc.'s Responses to Plaintiffs' Second Set of Requests for Production of Documents to the Corporate Defendants, at 15.

Keller Williams cannot do an about-face now. It must abide by its promise. *See, e.g.*, *Attia v. Google LLC*, No. 17-cv-06037, 2018 WL 4202151, at *3 (N.D. Cal. Sept. 4, 2018) ("Mr. Attia has waived his objections to the specific documents Google seeks here by agreeing to produce all documents within the scope of Google's Request for Production No. 54."); *Commodores Entm't*

*Corp. v. McClary*, No. 6:14-cv-1335, 2015 WL 12843874, at *6 (M.D. Fla. Nov. 6, 2015) ("Plaintiff's request to compel Defendants to produce all documents they promised to produce in their original response to its First Request for Production is granted."); *Stewart-Jackson Pharmacal, Inc. v. River's Edge Pharm., LLC*, No. 1:10-cv-2037, 2011 WL 13273764, at *2 (N.D. Ga. May 4, 2011) ("The Court . . . orders Defendant to abide by its promise and produce any documents sought by RPD Nos. 2 and 4, or to state that it is not in possession, custody, or control of any responsive documents."); *Allen v. Greystar Mgmt. Servs., L.P.*, No. 09-CA-00122-XR, 2009 WL 10669156, at *4 (W.D. Tex. Aug. 27, 2009) ("Moreover, to the extent, plaintiff previously agreed to produce documents responsive to these requests, plaintiff has waived her objections.").

**Corporate Defendants' Position**

As an initial matter, the Corporate Defendants object to Plaintiffs seeking Defendants' materials from the *Burnett* plaintiffs. Any Defendants' materials that Plaintiffs seek to have produced in this case, should be sought from the Defendants themselves, and not from the *Burnett* plaintiffs.[2]

More importantly, in their June 10 response to Plaintiffs' request for production of Defendants' interrogatories, and deposition transcripts and exhibits from *Burnett*, the Corporate Defendants proposed: (1) to the extent relevant to the claims in *Moehrl*, including as defined by the alleged geographic scope in *Moehrl*, Defendants would produce their *Burnett* interrogatory responses in this case; and (2) to the extent the Corporate Defendant witnesses in *Burnett* are agreed-to custodians in *Moehrl* and/or are relevant to the claims in *Moehrl*, including as defined by the alleged geographic scope in *Moehrl*, Defendants would produce such *Burnett* deposition transcripts and exhibits in this case. The Corporate Defendants conditioned the production of those two categories of materials on the following: (a) to the extent the Corporate Defendants were to produce certain interrogatory responses from *Burnett* in this case, those interrogatories would count against the Plaintiffs' 25-interrogatory limit set by Federal Rule of Civil Procedure 33(a)(1) and the Court in this case;[3] and (b) to the extent the Corporate Defendants were to produce particular deposition transcripts (and their exhibits) from *Burnett* in this case, those depositions would count against the Plaintiffs' deposition limits set forth by this Court's September 22, 2021 order (Dkt. No. 269).

The Corporate Defendants' position regarding the production of *Burnett* deposition transcripts and exhibits in this case is consistent with the language in the respective Protective Orders. *See* Dkt. No. 125 at 10, 13 ("[A]ny confidential materials produced in this litigation, with the exception of materials pertaining only to Covered MLSs, may be provided to outside counsel in *Sitzer v. NAR* subject to the requirements of all Confidentiality Orders entered in that litigation."); *Burnett* Dkt. No. 92 at 10-11, 13 ("Any confidential materials produced in this

---

[2] *See, e.g.*, Dkt. No. 159 ("In addition, as agreed, *Defendants* shall provide Plaintiff with documents produced in the Missouri action and transcripts from the depositions in the Missouri action of any witness identified as a potential witness in this case.") (emphasis added).

[3] Fed. R. Civ. P. 33(a)(1) ("a party may serve on any other party no more than 25 written interrogatories, including all discrete subparts"); *see also* Dkt. No. 260 ("Plaintiffs may jointly serve 25 interrogatories per Defendant family").

litigation, with the exception of materials pertaining only to the Subject MLSs, may be provided to outside counsel in *Moehrl v. NAR* subject to the requirements of all Confidentiality Orders entered in that litigation."). It is also consistent with the Court's rulings during its December 12, 2019 status conference and the Court's December 12, 2019 Order addressing the appropriate relevance limitations on *Burnett* discovery materials to be produced in this case. *See* Dec. 12, 2019 Conf. Tr. 29:9-15 ("Follow the language in the protective order . . . . Deposition transcripts for witnesses who give testimony in the *[Burnett]* case who would properly be witnesses in this case need to be produced."); Dkt. No. 159 ("In addition, as agreed, Defendants shall provide Plaintiff with documents produced in the Missouri action and transcripts from the depositions in the Missouri action of any witness identified as a potential witness in this case.").

Because the geographic scope alleged in *Moehrl*[4] is different from the geographic scope alleged in *Burnett*,[5] certain custodians and discovery materials, including interrogatory answers and deposition transcripts, are relevant to *Burnett* only and certain custodians and discovery materials are relevant to *Moehrl* only. For example, as a result of Realogy's negotiations with the *Burnett* plaintiffs and the *Moehrl* Plaintiffs regarding relevant custodians, Realogy agreed to different sets of custodians for each of the two cases due, in part, to the varying geographic scopes in each matter.[6] Likewise, the varying geographic scope yielded certain differences in case custodians for the HSDs.[7]

To the extent that the Corporate Defendants were to produce to Plaintiffs a *Burnett* deposition transcript of any Corporate Defendant witness who was not cross noticed by the *Moehrl* Plaintiffs, such a deposition should count toward Plaintiffs' court-imposed deposition limits. As the Court will recall, as a result of contested motion practice, the Court limited Plaintiffs' depositions to ten per Defendant family. *See* Dkt. Nos. 260, 267, 269. Plaintiffs had notice of each and every deposition noticed in *Burnett*, and to the extent that Plaintiffs chose not to cross notice those depositions when they may have been able to do so, it is at best questionable that they should be rewarded for their failure to cooperate. But regardless, even if entitled to such depositions, they should not now be able to evade the Court-ordered deposition limitations while also reaping the substantive benefits of having those depositions produced in this case. The cases Plaintiffs cite to are also inapposite. *See Guiden*, 2013 WL 12234612; *Graceway Pharms., LLC*, 2008 WL 4787517. The plaintiffs in *Guiden* and *Graceway Pharms.* sought the production of

---

[4] *See* Dkt. No. 84, ¶ 18 (defining the "Covered MLSs").

[5] *See Burnett* Dkt. No. 759, ¶ 29 (defining the "Subject MLSs").

[6] Pursuant to the agreements reached during those negotiations, Realogy produced its documents in the *Moehrl* case with a *Moehrl* Bates stamp. As Plaintiffs know, Realogy has consistently objected to the use of Realogy discovery from the *Burnett* case that has not been independently produced in this case. in depositions or otherwise.

[7] To date, however, the *Burnett* plaintiffs have not opted to depose HSD custodians unique to that case. In contrast, several Realogy witnesses who are *Burnett*-only custodians were deposed in the *Burnett* case, and there is no reason why those irrelevant depositions should be produced in this case. Contrary to Plaintiffs' claims, Realogy does contend that certain depositions taken in *Burnett* pertain only to the Subject MLSs. Additionally, Defendants contend that many of the materials produced in *Burnett* (*e.g.*, commission levels for a Missouri MLS or a policy that a franchisee in Missouri may have adopted) have no relationship to the conduct or issues in *Moehrl*.

deposition transcripts from *prior* similar litigation where those plaintiffs did not have an opportunity to cross notice those depositions. *See Guiden*, 2013 WL 12234612, at *1; *Graceway Pharms., LLC*, 2008 WL 4787517, *1. Here, Plaintiffs were well aware of the court-imposed deposition limits and had the opportunity to cross notice the depositions of their agreed-to custodians, but chose not to do so. Allowing Plaintiffs to obtain and use these deposition transcripts while not counting toward the court-imposed deposition limit enables Plaintiffs to circumvent the Court's order. The Corporate Defendants have offered to produce the *Burnett* deposition transcripts of Corporate Defendant witnesses that are agreed-to custodians in *Moehrl* and/or are relevant to the claims alleged in *Moehrl* and interrogatory responses that satisfy the same criteria, including as the defined by the allegedly relevant geographic scope in this case, but any such produced depositions should count towards Plaintiffs' limitations on interrogatories and depositions.

Finally, contrary to Plaintiffs' assertion, Keller Williams is not seeking to back away from its statement in its RFP responses that it would provide deposition transcripts for witnesses deposed by the *Burnett* plaintiffs but not cross-noticed here. None of its witnesses testified only to matters concerning the geographic areas covered by the MLSs at issue in the *Burnett* case. Keller Williams seeks only to have those depositions count against the deposition limits set by the Court here.

## III.  SUBSTANTIAL COMPLETION DEADLINE FOR SUPPLEMENTAL PRODUCTIONS

Plaintiffs and the Corporate Defendants have conferred concerning a refresh of the Corporate Defendants' prior productions and supplemental discovery. The meet-and-confer process is on-going with Plaintiffs and each Corporate Defendant. Plaintiffs have requested that the Corporate Defendants substantially complete the production of responsive documents no later than August 1, 2022. The Corporate Defendants believe a set date is premature, but if a date must be set then it should be set at September 23, 2022. The Parties' positions are below.

### Plaintiffs' Position

Fact discovery closes in this case in less than four months—on October 6, 2022. To allow Plaintiffs time to review the Corporate Defendants' forthcoming documents, follow up on any issues, and use the documents in depositions, the Corporate Defendants need to substantially complete their production by August 1. If Defendants produce documents any later than that Plaintiffs will not be able to adequately take advantage of such discovery. Courts have not hesitated to order parties to substantially complete document productions by a date certain. *See, e.g.*, *Fleisher v. Phoenix Life Ins. Co.*, 1:11-cv-08405 (S.D.N.Y. Dec. 17, 2012), Dkt. 72; *Race Tires Am. v. Hoosier Racing Tire Corp.*, 2008 WL 2487835, at *2 (W.D. Pa. June 16, 2008). And the Court should do so here.

The Corporate Defendants have opposed Plaintiffs' proposed substantial completion deadline on the ground that negotiations with Plaintiffs concerning search terms and custodians are ongoing and discussion of a deadline is thus premature. Those discussions, however, should be close to resolution. As Defendants acknowledge, the parties have been meeting and conferring for months now. The open status of negotiations is a reason in favor of imposing a substantial

completion deadline, not putting one off.  Putting a deadline on the calendar incentivizes resolution of discussions and disincentivizes delay.  Plaintiffs are willing to continue to meet and confer about the parameters of the Corporate Defendants' production, but those discussions should occur with August 1, 2022, as the substantial completion deadline.

The Corporate Defendants have also stated that they will conduct a rolling production and offer a substantial completion deadline of September 23, 2022, but that does not address the timing issues presented by the impending fact discovery deadline.  If the Corporate Defendants do not intend to substantially complete the production of documents until September 23, 2022—a mere **two weeks** before the fact discovery deadline—Plaintiffs will be seriously prejudiced.  That is not enough time for Plaintiffs to ingest and upload the documents to their database, review them, and then be able to use them in depositions, much less calendar any depositions or seek further discovery based on what is learned.

It is thus imperative that the Court set a substantial completion deadline that provides Plaintiffs the time they need to review and use the Corporate Defendants' forthcoming documents. Plaintiffs request August 1.

### Corporate Defendants' Position

Plaintiffs' proposed deadline of August 1, 2022 for all Defendants to substantially complete all production of documents in response to supplemental discovery served by Plaintiffs is premature and unrealistic.  Defendants respectfully submit that the Parties should continue to meet and confer over the scope of supplemental discovery in an effort to reach a reasonable compromise, but if the Court is inclined to issue a firm date for the completion of document productions, Defendants request a deadline of September 23, 2022, which is still almost two full weeks before the fact discovery deadline of October 6.

Each Corporate Defendant has already produced several hundred thousand documents to Plaintiffs during discovery in response to Plaintiffs' Requests for Production of Documents. Plaintiffs served their second set of Requests for Production of Documents on October 13, 2021, and the Corporate Defendants served their responses and objections on November 12, 2021.  After almost four months, on March 10, 2022, Plaintiffs sent Defendants an email regarding Defendants' responses and objections.  About a month later, Plaintiffs sent each Corporate Defendants a proposed list of custodians and search terms.  Since Plaintiffs commenced the meet-and-confer process, each Corporate Defendant has been meeting individually with Plaintiffs to discuss discovery parameters.  Despite multiple meet-and-confer sessions, Plaintiffs did not raise the issue of a substantial completion deadline until just last week, on June 8, 2022.  Discussions that preceded that abrupt announcement concerning the parameters for each Defendant's refresh and supplemental discovery had been proceeding productively and remain ongoing.  These discussions have produced agreements with certain Defendants on custodians, time frames, and central files that will be the subject of this discovery.  But further negotiations remain, including for most Defendants with respect to the search terms to be applied.  The outcome of those discussions will have a material impact on the scope and timing of productions to come.

For some Corporate Defendants, negotiations over Plaintiffs' expansive search terms remain ongoing, with further discussions needed to reduce the scope of the review universe to one

that is more appropriate for a refresh review.[8]  In addition, some Defendants are waiting on responses from Plaintiffs regarding material issues, such as the basis for identifying the custodians that Plaintiffs have requested.  Even if the Parties reach an agreement that reduces the volume to a more manageable scope, the burden associated with the upcoming review, and the existing uncertainty as to that burden, makes an August 1 deadline unrealistic.  To give the Court an idea of how unrealistic an August 1 deadline is, for its initial review and productions, Defendants required approximately six months to substantially complete their document productions that involved, for some Defendants, a review of between 200,000 and 400,000 documents.  The Parties should continue to meet-and-confer in order to reach a reasonable compromise on the parameters for supplemental discovery.  Once those parameters are established, the Parties can agree to a reasonable substantial production deadline that accounts for the volume of discovery that each Corporate Defendant must process, review, and produce.

If the Court believes a substantial completion deadline is appropriate at this stage, the Corporate Defendants respectfully request a deadline of September 23, which will allow the parties to continue meeting and conferring in good faith regarding the refresh discovery parameters and is more likely to be an achievable deadline that will not require further judicial intervention.  An August 1 deadline – roughly six weeks from the date of the status conference – is unrealistic and unnecessary given that the conclusion of fact discovery is October 6 and the fact that the Parties require additional time to meaningfully engage in further meet and confers on refresh and supplemental discovery parameters, including search terms and custodians, in an effort to reach agreement on these parameters, and hopefully obviate further juridical intervention.

## IV.  WORK CALENDARS FOR NAR CUSTODIANS WHO MET WITH THE CORPORATE DEFENDANTS' EXECUTIVES

Plaintiffs seek the production of work calendars for those NAR custodians who have had meetings or phone calls with the Corporate Defendants' executives.  NAR objects.

### Plaintiffs' Position

Plaintiffs seek the production of work calendars for those NAR custodians who have had meetings or phone calls with the Corporate Defendants' executives.[9]

Under the Federal Rules of Civil Procedure, parties "may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs

---

[8] Realogy sent its search term counterproposals to Plaintiffs on May 24, 2022 but did not receive a response from Plaintiffs until this week, on June 14, 2022.  Realogy is now evaluating Plaintiffs' June 14 counterproposal, and anticipates that it will respond with an additional counterproposal that will necessitate further meet and confers.

[9] In inaccurately asserting that the parties "have not had time to meet and confer," NAR ignores the parties' multiple written and telephonic exchanges about these issues over several months.  Nor does NAR explain what further conferences will accomplish beyond delaying resolution of the parties' dispute, even as the discovery clock ticks down.  NAR's position makes clear that it opposes the discovery Plaintiffs seek, and so the parties are at an impasse.

of the case." Fed. R. Civ. P. 26(b)(1). A party objecting to discovery bears the burden of showing why discovery is improper. *Trading Techs. Int'l, Inc. v. eSpeed Inc.*, No. 04-cv-5312, 2005 WL 1300778, at *1 (N.D. Ill. Apr. 28, 2005). "A party claiming undue burden must do more than intone the phrase." *Jenkins v. White Castle Mgmt. Co.*, No. 12-cv-7273, 2014 WL 3809763, at *2 (N.D. Ill. Aug. 4, 2014). Undue burden must be shown by "a particular and specific demonstration of fact, as distinguished from stereotyped and conclusory statements." *Id*. (internal quotations omitted).

### A.   The Calendars of Senior NAR Officials Who Met with the Corporate Defendants' Executives Are Clearly Relevant

The requested calendars are clearly relevant. Plaintiffs have limited our request to calendars from NAR employees (i) who NAR has already agreed should serve as document custodians because they were likely to possess information relevant to the litigation *and* (ii) who NAR itself determines following a reasonable investigation met with the Corporate Defendants' executives.

Moreover, evidence of meetings between NAR's custodians—who include NAR's current and former CEOs and several current and former employees with responsibilities for setting NAR's ethics and MLS policies—goes to the heart of disputed issues in this litigation. This suit concerns an agreement between NAR and the Corporate Defendants to create, maintain, and enforce a tangle of rules limiting negotiation of commissions and generating immense incentivizes to set supracompetitive broker prices. Despite evidence of the Corporate Defendants' extensive involvement in and influence over NAR's policymaking and strategic direction, Defendants have made clear that they will seek to cast doubt on their connections to NAR as part of their litigation strategy. Accordingly, Plaintiffs' request for work calendars plainly relates to the conduct at issue in the litigation, and would provide evidence regarding the communications between NAR and the Corporate Defendants and the opportunities for competitors to conspire. Indeed, NAR produced a single month of its former CEO's calendar which was attached to an email, and even that reflected at least two planned meetings with Defendants' senior executives or their representatives, including one concerning a NAR-issued report that Plaintiffs have relied on in this litigation.

Producing calendars of key personnel is standard practice in antitrust suits—indeed, such productions are typically made without controversy. On those occasions when a dispute does arise, courts regularly order calendars to be produced in antitrust matters. *See, e.g.*, *In re Rail Freight Fuel Surcharge Antitrust Litig.*, No. 07-489, 2009 WL 10703132, at *3 (D.D.C. July 13, 2009) (requiring "defendants to produce the calendars and expense reports of any of their employees who have the authority to influence, recommend or adopt a fuel surcharge"); *In re Grand Jury Investigation*, 338 F. Supp. 1379, 1380 (W.D. Pa. 1972) (compelling the production of calendars).

### B.   NAR Should Produce Calendars on a "Go Get" Basis

NAR attempts to fault Plaintiffs for not limiting our request to calendars that reflect meetings that—on the face of the calendar itself—concern the challenged conduct or other issues that Defendants self-servingly deem relevant. But, given the nature of the information reflected in calendars, this is a practically impossible standard to meet. Calendar entries often reflect limited

information beyond the fact of a discussion between two individuals. Even in instances when additional notations are included, they are often vague and incomplete and use shorthand or abbreviations. As a result, the relevance of a particular calendar entry often requires context, such as other Defendants' documents and deposition testimony, that is not reflected in the calendar alone. For instance, additional research may be necessary to determine whether a calendar entry that says "Meet with Gary," reflects a meeting with Keller Williams CEO Gary Williams (or a different person named Gary) and whether such a meeting occurred just prior to a major vote on changes to NAR's MLS policies.

For these same reasons, it would be inappropriate to use search terms as a mechanism to cull calendars (or calendar entries). While search terms are a useful tool for searching certain types of documents, they are especially ill-suited to calendars. Hard copy calendars, which may include handwriting, are essentially impossible to search electronically because handwriting cannot be easily and accurately converted into computer-searchable text. Search terms are also unlikely to accurately identify even highly relevant calendar entries. For instance, searching a calendar using the term "blanket offers" would not pick up on an entry in the calendar of NAR's CEO reflecting that he "Met with Gary [Keller]," even if that meeting concerned NAR rules governing blanket offers of cooperative compensation.[10]

This is why in antitrust suits calendars are typically produced categorically on a "go get" basis. *See, e.g.*, *In re Generic Pharms. Pricing Antitrust Litig.*, No. 16-MD-2724, 2019 WL 8106511, at *2 (E.D. Pa. Oct. 24, 2019) (ordering that the production of certain documents "do[es] not require search terms" and that "[s]uch documents, which have previously been referred to as 'go get' documents . . . are not limited to: e.g. calendars . . . ."). Moreover, just as a relevant email is not broken up into separate pages, parties are typically required to produce relevant calendars in their entirety (rather than as separate entries). *See id.*; *cf. Goolsby v. Gentry*, No. 1:11-cv-01773, 2016 WL 159211, at *11 (E.D. Cal. Jan. 13, 2016) (hard-copy address book characterized as "one document"); *UIC Gov't Servs., LLC v. Fleitz*, No. 3:15-CV-00212, 2015 WL 12864202, at *2 (D. Alaska Nov. 9, 2015) (Outlook contact list considered single file); *Dobryndeva v. Sec'y of Health & Hum. Servs.*, No. 04-1593V, 2010 WL 2143481, at *10 (Fed. Cl. Mar. 12, 2010) (personal journal characterized as one document), *vacated and remanded on other grounds*, 94 Fed. Cl. 134 (2010).

NAR objects to the production of calendars on the ground that they may contain custodians' personal information. But Plaintiffs only seek NAR custodians' work calendars (not their personal calendars). And while work calendars may occasionally include non-work information, the parties' Agreed Confidentiality Order affords adequate protections for any sensitive information that may be included. The Confidentiality Order permits NAR to limit who may access any calendars that it produces by applying a confidentiality designation. It also allows

---

[10] This understates the problem with applying search terms to calendars. Many of the agreed search strings in this case use proximity limiters—e.g., "commission w/10 raise"—which are designed to search through lengthy texts. But, as an example, a search string with a 25-word proximity limited will *never* hit on a calendar entry that is fewer than 27 words, regardless of that entry's relevance.

redactions for highly sensitive personally identifiable information ("PII") or personally identifiable health information ("PIHI").[11]

### C. NAR Fails to Show that Requiring It to Produce a Handful of Calendars Would Be Unduly Burdensome

NAR also fails to demonstrate undue burden through "a particular and specific demonstration of fact, as distinguished from stereotyped and conclusory statements." *Jenkins*, 2014 WL 3809763, at *2. First, Plaintiffs are only seeking calendars from a limited number of document custodians who met directly with the Corporate Defendants' executives. Second, unlike most other types of documents, calendar entries are typically one line and do not require much time to review. Third, NAR has not explained why an extensive review is necessary at all given that Plaintiffs propose a full production of calendars with only privilege review (and, possibly, minimal redactions for PII or PIHI). This kind of review would not be burdensome.

Finally, any minimal burden on NAR of producing calendars is justified by their relevance and the significant size and importance of this litigation. *See* Fed. R. Civ. P. 26(b)(1) ("Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.")

### NAR's Position

NAR responded to plaintiffs regarding this issue on March 25. Between March 25 and June 13, NAR did not hear back from plaintiffs. Plaintiffs claim (at fn. 9) that there have been multiple discussions between the parties on this issue over the past few months. That is not correct. NAR is not aware of any communication from plaintiffs on this issue between March 25 and June 13. So the parties did not meet and confer during that nearly three month period.

NAR opposes the demand for calendars of every NAR custodian who had a meeting or phone call with an executive of any of the corporate defendants for a period of more than ten years. And contrary to plaintiffs' assertion, there are not a "handful" of custodians. Rather, there are 19 custodians. We respectfully submit that the burden of compliance with plaintiffs' demand as currently structured would vastly outweigh the relevance of all the calendars that plaintiffs seek. But, as explained below, NAR believes that further meet and confers could lead to a resolution of this issue without the need for judicial intervention.

---

[11] ECF No. 125 at 15 ("[A]ny producing party may in good faith redact information in Discoverable Information for purposes of protecting "personally identifiable information" ("PII") or "personally identifiable health information" (PIHI") to protect an individual's personal financial or personal health information. Examples of such PII or PIHI include, but are not limited to, Social Security numbers, bank account numbers, credit card numbers, and communications with or from a medical professional or an insurance provider discussing an individual's medical condition, symptoms, medications and/or treatment.)

At this point, plaintiffs' proposal is not even limited to calendars of custodians who spoke to executives of the corporate defendants about the NAR rules challenged in this litigation. Rather, plaintiffs are demanding the calendars of any of 19 separate NAR custodians who spoke with any executive of any corporate defendant on any subject at any time over a period of more than a decade -- regardless of the relevance of any conversation to the issues in this litigation and regardless of whether the custodian was speaking with the individual in his or her capacity as an executive of a corporate defendant. Thus, this demand is vastly overbroad.

Moreover, this demand is unduly burdensome. Ascertaining who may have spoken with an executive of a corporate defendant on any subject over a long period of time will be quite difficult. Many of the custodians are not even regularly coming into NAR as a result of the pandemic or are no longer employed by NAR. They are unlikely to recall conversations from years ago. Indeed, a custodian may not even know whether an NAR member with whom that custodian spoke is an executive of a corporate defendant.

In any event, the process of redacting personal information from their calendars would itself be quite burdensome. Contrary to plaintiffs' assumption, many people do not keep one calendar for business purposes and a second calendar for personal use. And even if there were a separate calendar limited to business meetings, virtually every entry on that calendar will have to be redacted to eliminate references to meetings having no bearing on this litigation.

Finally, production of these calendars is highly unlikely to lead to any relevant evidence. A discussion by an NAR custodian with an executive of a corporate defendant on a topic not at issue in this litigation does not prove anything about the lawfulness of any challenged NAR rule. In this connection, it is worth noting and there has been no allegation – much less any evidence – that NAR and any corporate defendant entered into any conspiracy beyond promulgation of the challenged rules. Thus there is no adequate reason for demanding calendars that might reveal some conversation between an NAR custodian and an executive of a corporate defendant.

This fact distinguishes each of the cases cited by plaintiffs. None of plaintiffs' cases involves a claim based on a long-existing rule that has always been known by the public, that was undeniably the product of open rule-making procedures, and that was adopted after a vote of the governing body of an association.

This is not to say that a reasonable compromise cannot be worked out. NAR would consider a request for calendars of a small number of specific custodians who are likely to have spoken to an executive of a corporate defendant – as long as the time period is limited and the topic is confined to discussions about a challenged rule. But plaintiffs have given NAR no opportunity to meet and confer on this issue. At a minimum, therefore, therefore, a ruling on this dispute at this time would be premature. However, if the Court determines to rule now, this demand by plaintiffs should be denied.

## V.     NAR RECORDINGS

Plaintiffs seek the production of certain NAR "major event" audio and audiovisual recordings.  NAR objects.

### **Plaintiffs' Position**

Plaintiffs seek the production from NAR of audio and audiovisual recordings of "major events" identified as relevant and responsive following the application of the parties' existing agreed search terms to transcripts of those recordings.[12]

There is little doubt that the recordings include materials that is relevant to this litigation. Indeed, Plaintiffs previously located certain of the major event recordings at issue in the public record and introduced them as exhibits during depositions.  Following those depositions, NAR removed or made private many of these previously publicly accessible recordings—possibly to deprive Plaintiffs of the ability to further review and use them.  *See, e.g.*, https://www.youtube.com/watch?v=NfShMRQlx3o (a previously publicly accessible NAR recording that is now reflected as "Video unavailable; this video is private").

NAR previously advised Plaintiffs that its primary concern with searching its event recordings was the price of generating written transcripts for searching.

In response, Plaintiffs have proposed and would be willing to accept either of two avenues for generating and searching the recording transcripts.  The first option that Plaintiffs proposed is that Plaintiffs generate the recording transcripts and perform the search ourselves at no cost to NAR.  The document review platform Plaintiffs are using in this case (Everlaw) has a built-in automated speech-to-text transcription function.  Plaintiffs have proposed that NAR provide the recordings to Plaintiffs, who would (i) generate transcripts; (ii) search those transcripts using the agreed search terms; (iii) create a production set reflecting any responsive transcripts; and (iv) delete from the Everlaw platform any non-responsive recordings.  Plaintiffs' counsel have successfully worked with Defendants in other cases using cooperative procedures (including, for instance, in the context of obtaining sensitive personal information from third parties about defendant employees, redacting the sensitive information, and then deleting the original unredacted set of documents).

Alternatively, Plaintiffs have attempted to assist NAR in locating affordable options for obtaining automated speech-to-text transcriptions on its own.  NAR previously advised that it had been quoted a transcription cost of $10/hour.  In response, Plaintiffs identified several additional options that are as much as one-tenth the cost of the quotes NAR obtained.  NAR subsequently advised Plaintiffs that it was investigating these additional options, but despite Plaintiffs' recent prompting, NAR has provided no additional information on whether it is willing to use these much discounted options.

---

[12] NAR has agreed to produce recordings reflecting meetings and events of its board of directors and certain relevant committees and other groups to the extent such recordings exist.  As a result, such recordings are not at issue.

Instead, NAR has proposed that Plaintiffs identify a subset of the recordings to be transcribed and then searched using the file names reflected in a spreadsheet that NAR has provided. The problem with this approach is that, while there are exceptions, most of the file names reflected in the spreadsheet provide insufficient information to determine whether the associated recording is likely to contain relevant information. Representative examples of filenames include the following:

- NAR2101-202.mp4
- MAY 14 0607AM.WAV
- Capture0006.mov
- 360 Cam 1 ISO Final.m4v

Finally, the only objection that NAR has raised to Plaintiffs conducting the search at no cost to NAR is that NAR would still need to conduct a privilege review. But there would be no need to conduct a privilege review of the full universe of recordings because no human being would review them prior to culling them through search terms. It is also exceedingly unlikely that recordings of NAR's major events attended by thousands of people would reflect privileged communications. And, in the extremely unlikely event that any recording did contain a privileged communication, NAR could avail itself of the parties' agreed clawback order.

### NAR's Position

Plaintiffs claim (at p, 15) that they are seeking recordings only of "major event(s)". But their definition of "major events" is extremely broad – encompassing meetings of a large number of NAR committees and other groups. NAR has already produced several audio/visual recordings at: NARMOEHRL000002280 - NARMOEHRL000002296. We anticipate producing a small number of additional audio/visual recordings in the next MOEHRL-bates labelled productions. NAR has no reason to believe that any other recording of meetings for a period of more than ten years are relevant to the rules challenged in this case. And plaintiffs have offered no such reason. Quite to the contrary, for many, if not most, meetings, there is sufficient information to determine that the recordings are likely to be irrelevant to this litigation.

Tacitly acknowledging the burden that this demand imposes, plaintiffs propose that NAR turn over all recordings of all so-called "major event" meetings that NAR possesses for a period of more than a decade – and that plaintiffs then transcribe those recordings at their cost. While this proposal reduces the cost to NAR, it would give plaintiffs access to a large number of recordings of meetings which are entirely irrelevant to this case and which plaintiffs are not entitled to receive. Moreover, NAR would face an enormous burden in going through every transcript and redacting irrelevant or privileged material. And contrary to what plaintiffs say, it is quite possible that some of these meetings may contain discussions that are protected by the attorney-client privilege.

Plaintiffs assert that NAR's only objection to this demand is burden. But that is not accurate. Beyond burden, NAR objects to this demand because it gives plaintiffs access to all sorts of material that have nothing to do with this case – and that plaintiffs have no right to receive.

Once again, NAR did not hear from plaintiffs on this issue between March 25 and June 13. It is possible that the parties can work out a compromise through the meet and confer process. In that process, NAR would ask plaintiffs' counsel to identify any specific meetings that such counsel has reason to believe includes a discussion of the rules at issue in this case. If such meetings can reasonably be identified, it is quite possible that a resolution can be reached without the intervention of this Court. So it is premature for the Court to rule on this issue at this time.

However, as noted above, the current demand of plaintiffs will lead to production of large numbers of recordings to which plaintiffs have no right. It will create an undue burden on NAR to have to review and redact substantial portions of every transcript. And it is highly unlikely to lead to the production of relevant evidence in the absence of reason to believe that recording of particular meetings contain discussions of the rules challenged in this case. For these reasons, NAR should not be required to comply with this demand. At a minimum, the Court should require the parties to meet and confer before issuing any ruling on this demand.

## VI. PRODUCTION OF DOCUMENTS FROM NAMED PLAINTIFF DANIEL UMPA

The parties have been negotiating, but potentially may reach an impasse, regarding Defendants' request for certain transaction records and related emails that Defendants believe are in the custody and control of named Plaintiff Daniel Umpa.

### Plaintiffs' Position

Plaintiffs strenuously object to Defendants' inclusion of this issue in the joint status report as premature and inconsistent with the parties' obligation to cooperate in good faith before raising issues with the Court.

Plaintiff Daniel Umpa produced documents in response to Defendants documents requests on June 15, 2021, and supplemented that production on October 15, 2021. Those productions followed a reasonable and diligent search. Mr. Umpa also responded to Defendants' first set of interrogatories on April 2, 2021, and supplemented those responses on June 18, 2021. All the while Plaintiffs consistently maintained objections to certain discovery requested. *See, e.g.*, July 1, 2021 correspondence from Rio Pierce to Suzanne Wahl. ("Plaintiffs reiterate that documents related to Plaintiffs' home purchases are not relevant and Plaintiffs will not, in general, produce documents in response to Requests for Production, such as Defendants' Requests for Production 11 & 12, that seek such documents."). The parties met and conferred and reached agreements concerning the scope of discovery.

The upshot is that Defendants have had Mr. Umpa's discovery for the better part of a year and have been aware of Plaintiffs' positions on any objectionable discovery. Defendants voiced no objection and declined to raise any concerns until very recently. A mere week before Mr. Umpa's scheduled deposition in April, Defendants sent Plaintiffs a letter raising a host of purported "issues" for the first time. Plaintiffs agreed to reschedule Mr. Umpa's deposition and to supplement Mr. Umpa's production and interrogatory responses as a reasonable accommodation.

Mr. Umpa supplemented his production and interrogatory responses and was deposed more than one month ago. Plaintiffs again heard nothing further from Defendants on these issues. Then, the day before this status report was due, and with no advance warning, Defendants sent Plaintiffs a letter with various requests for documents that Defendants claim Mr. Umpa has in his possession and demanded that Plaintiffs provide immediate responses.

Plaintiffs explained that it would take more than a few hours for them to review Defendants' various representations about Mr. Umpa's deposition testimony, the scope of his prior productions, and the existence of certain documents that Defendants claim were not included in Mr. Umpa's productions (not least because one of the primary attorneys who has been involved with Mr. Umpa's discovery is on vacation). Plaintiffs also committed to responding as quickly as possible, and objected to including any discussion of these issues in the status report other than to note that the parties were continuing to meet and confer and would raise any disputes with the Court.

Defendants nevertheless insisted on including this issue in the parties' joint status report. Plaintiffs continue to object to Defendants' efforts to raise these issues at the eleventh hour without allowing Plaintiffs adequate time to review and respond. And Plaintiffs disagree with Defendants' characterizations of Mr. Umpa's production and deposition testimony.

### **Defendants' Position**

Named Plaintiff Umpa has engaged in numerous residential real estate transactions: approximately eight home purchases and four home sales, all since 2014. Yet, other than with respect to Mr. Umpa's 2017 sale of a condominium in Washington, D.C. that is referenced in the Consolidated Amended Complaint, Plaintiffs have produced few (or in some cases no) transactional documents or emails regarding such real estate activity by Mr. Umpa.

On April 21, 2022, in advance of Mr. Umpa's deposition in this case, the HSDs alerted Mr. Umpa to their concerns regarding such deficiencies. Although Mr. Umpa then supplemented his responses on May 9, 2022, the production of transactional documents and emails regarding Mr. Umpa's property transactions remained spotty. Defendants took Mr. Umpa's deposition on May 13, 2022. Mr. Umpa's testimony established that he possesses paper and email records pertaining to each of his property transactions and that Mr. Umpa made all such records and his email account available to his attorneys as part of document collection in this case. Defendants held open the deposition based on the possibility that withheld materials (i.e., Mr. Umpa's property records) might necessitate further questioning. On June 15, 2022, HomeServices reiterated to Mr. Umpa that his responses continued to be deficient and that his objections were meritless.

Regarding Plaintiffs' objection to our presentation of this matter in the status report, this issue has not been adequately addressed since Defendants first raised it almost two months ago on April 21 by letter; these unresolved issues were reiterated in a letter of this week. Plaintiffs agreed to include language in the status report reflecting that the Parties are conferring about Mr. Umpa's discovery. Defendants, however, believe that it is important to address this issue with the Court at the upcoming status conference if the Parties cannot resolve it by then, including because of the impending substantial completion deadline that Plaintiffs propose and because they hindered Mr.

Umpa's deposition (the date for which was adjusted based on Plaintiffs' unilateral request). Further, the importance of this discovery issue was further magnified by Mr. Umpa's testimony confirming the ready availability of these requested documents, as Defendants laid out in their recent letter.

The parties have been trying in good faith to negotiate a resolution to this issue and plan to meet and confer about these issues in the coming week, prior to the Court's status conference. If significant progress is made or the issues are resolved, Defendants will not press them at the conference.

Dated: June 16, 2022               Respectfully submitted,

**Co-Lead Counsel for Plaintiffs**

/s/     Alexander W. Aiken
Marc M. Seltzer
 mseltzer@susmangodfrey.com
Steven G. Sklaver
 ssklaver@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, California 90067
Telephone: (310) 789-3100

Beatrice C. Franklin
 bfranklin@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1301 Avenue of the Americas
32nd Floor
New York, New York 10019
Telephone: (212) 336-8330

Matthew R. Berry
 mberry@susmangodfrey.com
Floyd Short
 fshort@susmangodfrey.com
Alexander W. Aiken
 aaiken@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1201 Third Avenue, Suite 3800
Seattle, Washington 98101
Telephone: (206) 516-3880

Daniel A. Small
 dsmall@cohenmilstein.com
Kit A. Pierson

**Counsel for HomeServices of America, Inc., BHH Affiliates, LLC, HSF Affiliates, LLC, The Long & Foster Companies, Inc.**

/s/     Robert D. MacGill
Robert D. Macgill
 robert.macgill@macgilllaw.com
Matthew T. Ciulla
 matthew.ciulla@macgilllaw.com
MACGILL PC
55 Monument Circle, Suite 1200C
Indianapolis, IN 46204
(317) 721-1253

Jay N. Varon
 jvaron@foley.com
Jennifer M. Keas
 jkeas@foley.com
FOLEY AND LARDNER LLP
3000 K Street NW, Suite 600
Washington, DC 20007
(202) 672-5436

James D. Dasso
 jdasso@foley.com
FOLEY & LARDNER LLP
321 N. Clark St., Suite 2800
Chicago, IL 60654
(312) 832-4588

kpierson@cohenmilstein.com
Benjamin D. Brown
 bbrown@cohenmilstein.com
Robert A. Braun
  rbraun@cohenmilstein.com
COHEN MILSTEIN SELLERS & TOLL
PLLC
1100 New York Ave. NW, Fifth Floor
Washington, DC 20005
Telephone: (202) 408-4600

Carol V. Gilden (Bar No. 6185530)
 cgilden@cohenmilstein.com
COHEN MILSTEIN SELLERS & TOLL
PLLC
190 South LaSalle Street, Suite 1705
Chicago, IL 60603
Telephone: (312) 357-0370

Steve W. Berman (Bar No. 3126833)
 steve@hbsslaw.com
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292

Daniel Kurowski
 dank@hbsslaw.com
Jeannie Evans
 jeannie@hbsslaw.com
Whitney Siehl
 wsiehl@hbsslaw.com
HAGENS BERMAN SOBOL SHAPIRO LLP
455 North Cityfront Plaza Drive, Suite 2410
Chicago, IL 60611
Telephone: (708) 628-4949

Rio S. Pierce
 riop@hbsslaw.com
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000

***Counsel for Realogy Holdings Corp.***

/s/      *Kenneth Kliebard*
Kenneth Michael Kliebard
 kenneth.kliebard@morganlewis.com
Heather Nelson
 heather.nelson@morganlewis.com
MORGAN LEWIS & BOCKIUS LLP
110 North Wacker Drive
Chicago, IL 60606
(312) 324-1000

Stacey Anne Mahoney
 stacey.mahoney@morganlewis.com
MORGAN, LEWIS & BOCKIUS LLP
101 Park Avenue
New York, NY 10178
(212) 309-6000

William T. McEnroe
 william.mcenroe@morganlewis.com
MORGAN, LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, PA 19103
(215) 963-5000

***Counsel for Keller Williams Realty, Inc.***

/s/ *Timothy Ray*
Timothy Ray
 Timothy.Ray@hklaw.com

HOLLAND & KNIGHT LLP
150 N. Riverside Plaza, Suite 2700
Chicago, IL 60603
(312) 263-3600

David C. Kully
 david.kully@hklaw.com
Anna P. Hayes
 anna.hayes@hklaw.com
HOLLAND & KNIGHT LLP
800 17th Street NW, Suite 1100
Washington, DC 20530
(202) 469-5415

**Counsel for RE/MAX, LLC**

/s/ _Jeffrey LeVee_
Jeffrey A. LeVee
  jlevee@jonesday.com
Eric P. Enson
  epenson@jonesday.com
JONES DAY
555 S. Flower Street, 50th Floor
Los Angeles, CA 90071
(213) 243-2572

Eddie Hasdoo
  ehasdoo@jonesday.com
JONES DAY
110 North Wacker Drive
Chicago, IL 60606
(312) 782-3939

**Counsel for Defendant**
**National Association of Realtors®**

/s/ _Jack R. Bierig_
Jack R. Bierig
  jbierig@schiffhardin.com
Adam J. Diederich
  adiederich@schiffhardin.com
SCHIFF HARDIN LLP
233 South Wacker Drive, Suite 7100
Chicago, IL 60606
312-258-5500 (Phone)
312-258-5600 (Fax)

Robert J. Wierenga
  rwierenga@schiffhardin.com
Suzanne L. Wahl
  swahl@schiffhardin.com
SCHIFF HARDIN LLP
350 S. Main Street, Suite 210
Ann Arbor, MI 48104
(734) 222-1517