**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

CHRISTOPHER MOEHRL, et al., )
on behalf of themselves and all others )
similarly situated, )
)
       Plaintiffs, )
) No. 19-cv-01610
       v. )
) Judge Andrea R. Wood
THE NATIONAL ASSOCIATION OF )
REALTORS, et al., )
)
       Defendants. )

<u>**MEMORANDUM OPINION AND ORDER**</u>

Plaintiffs are seven individuals who sold their homes utilizing a local database of

properties for sale known as a Multiple Listing Service ("MLS"). As a condition of listing their

home on an MLS, each Plaintiff's listing had to include a set offer of compensation to any broker

who found a buyer for their home. Each Plaintiff then paid that offer amount in connection with

the sale of their home. According to Plaintiffs, the rules implementing and governing the

requirement that an MLS listing include a set commission offer to the successful buyer-broker

are anticompetitive and caused them to pay artificially inflated, supracompetitive commission

rates. They have therefore brought the present antitrust action alleging that Defendant National

Association of Realtors ("NAR"), along with Defendants Realogy Holdings Corp.,

HomeServices of America, Inc., HSF Affiliates, LLC, The Long & Foster Companies, Inc., BHH

Affiliates, LLC, RE/MAX LLC, and Keller Williams Realty, Inc. (collectively, "Corporate

Defendants"), engaged in a conspiracy in restraint of trade in violation of § 1 of the Sherman

Act, 15 U.S.C. § 1. Now before the Court are Plaintiffs' motion to certify two classes of similarly

situated home sellers (Dkt. No. 301), and Defendants' motion to exclude the opinions of two

expert witnesses on which Plaintiffs rely in seeking class certification (Dkt. No. 318). For the reasons that follow, Defendants' motion is denied and Plaintiffs' motion is granted.

## BACKGROUND

The following facts are taken from the record and are uncontested unless otherwise noted.

In the United States, most individuals buying and selling residential property do so with the assistance of a real estate brokerage professional. Defendant NAR is a professional association of real estate brokers and agents whose members are referred to as "Realtors," a term the NAR has registered as a trademark. The NAR's members belong to one or more of about 1,200 local associations or boards, and 54 state and territory associations. Realtors cannot join the NAR without also joining one of the state or local associations, and Realtors cannot join one of the state or local associations without also joining the NAR.

The vast majority of homes for sale in the United States are listed on an MLS, which is a local or regional database of for-sale properties. There are hundreds of MLSs across the country, each serving a specific local or regional market. Nearly 97% of MLSs are owned or operated by one or more local Realtor associations. Those NAR-affiliated MLSs are governed by rules promulgated by the NAR in its Handbook on Multiple Listing Policies ("MLS Rules"). The MLS Rules are adopted and enforced by the MLSs. Given the prominent role MLSs have in the home-selling process, participation in a local MLS is a practical necessity for real estate brokers. In turn, to join an NAR-affiliated MLS, brokers must agree to follow the MLS Rules. Brokers who violate the MLS Rules may face fines or the suspension or termination of their MLS access.

In addition, the NAR issues a Code of Ethics and its Standards of Practice and Case Interpretations ("Case Interpretations"), both of which all brokers and local associations must comply with as a condition of NAR membership. Violations of the Code of Ethics or the Case Interpretations are punishable by fines and potentially expulsion from the NAR. Because most

NAR-affiliated MLSs require NAR membership as a condition for participation, participants in those MLSs necessarily must comply with the NAR's Code of Ethics and the Case Interpretations. And even for the MLSs that allow non-NAR members to participate, those non-Realtors are nonetheless bound by a separate MLS Standards of Conduct that mirrors the provisions of the Code of Ethics and Case Interpretations relevant here.

At issue in this lawsuit are several rules set forth in the MLS Rules, Code of Ethics, and Case Interpretations that, together, allegedly work to artificially inflate the commissions paid to buyer-brokers ("Challenged Restraints"). Most prominently, Policy Statement 7.23 of the MLS Rules requires that, when listing a home for sale on an MLS, the listing seller-broker must "make blanket unilateral offers of compensation to" buyer-brokers ("Buyer-Broker Commission Rule"). (Pls.' Corrected Mem. in Supp. of Class Certification, Ex. 26, 2021 MLS Rules at 37–39, Dkt. No. 306-3.) The seller-broker's offer must be expressed as either a fixed percentage of the home's gross sales price or a definite dollar amount. (*Id.* at 38.) Moreover, the listing cannot "include general invitations by listing brokers to other participants to discuss terms and conditions of possible cooperative relationships." (*Id.*) Under the Buyer-Broker Commission Rule, a seller-broker is not allowed to submit, and an MLS is not allowed to publish, a listing that does not include a blanket unilateral offer of compensation to the broker that finds a buyer for the home. (*Id.*)

As a result of the Buyer-Broker Commission Rule, the seller rather than the buyer pays the buyer-broker's commission. Accordingly, a seller's listing agreement with their seller-broker will typically provide that the seller will pay a total commission to the seller-broker, often expressed as a percentage of the home's sales price, with a portion of that commission earmarked to compensate the successful buyer's broker. For example, a seller's listing agreement might

require the seller to pay the seller-broker a total commission equal to 6% of their home's sales price, with half that amount going to the buyer-broker such that the seller-broker and buyer-broker both ultimately receive 3% commissions.

Further, the Challenged Restraints include at least three NAR rules that Plaintiffs contend effectively prevent any negotiations over the commission paid to the successful buyer-broker. First, the Code of Ethics's Standard of Practice 16-16 prohibits buyer-brokers from "us[ing] the terms of an offer to purchase[] to attempt to modify the listing broker's offer of compensation." (Pls.' Corrected Mem. in Supp. of Class Certification, Ex. 31, 2022 Code of Ethics at 13, Dkt. No. 306-3.) Thus, the buyer-broker cannot attempt to condition the purchase of a home on the seller-broker's agreement to adjust the amount of compensation offered to the buyer-broker. Second, the Code of Ethics's Standard of Practice 3-2 requires that any modification in the compensation offered to the buyer-broker "must be communicated to the [buyer-broker] prior to the time that [buyer-broker] submits an offer to purchase . . . the property." (*Id.* at 7.) And once a buyer-broker "has submitted an offer to purchase . . . property, the listing broker may not attempt to unilaterally modify the offered compensation." (*Id.*) Third, Case Interpretation #16-15 advises that any negotiations regarding the buyer-broker's commission "should be completed prior to the showing of the property."[1] (Pls.' Corrected Mem. in Supp. of Class Certification, Ex. 115, Case Interpretations at 92, Dkt. No. 306-4.)

---

[1] While Plaintiffs assert that Case Interpretation #16-15 requires that negotiations of buyer-broker commissions take place before the property is shown, Defendants contend that Plaintiffs misinterpret the Case Interpretation. According to Defendants, the Case Interpretation provides only that the best practice is to complete commission negotiations before showing the property. Nonetheless, Defendants emphasize that "commissions may be negotiated at any point in the transaction." (Defs.' Opp'n to Class Certification, Ex. 35, Gansho Decl. ¶ 19, Dkt. No. 322-36.)

The remaining Challenged Restraints consist of the NAR rules that, in conjunction, create one-sided transparency with respect to commission offers. As a result of the Buyer-Broker Commission Rule, buyer-broker commission offers are necessarily visible to all MLS participants. But Sections 18.2.4 and 19.12 of the MLS Rules go further and also permit buyer-brokers to select the listings that they display to consumers (*i.e.*, display on their personal websites) based on buyer-broker commission offers. (2021 MLS Rules at 84, 91.) By contrast, other NAR rules prevent consumers from viewing the universe of buyer-broker commissions offered on the MLS. In particular, Sections 18.3.1 and 19.15 of the MLS Rules prohibit MLS participants from displaying buyer-broker commission offers to consumers. (2021 MLS Rules at 85, 91.) Moreover, until January 1, 2020, the Code of Ethics permitted buyer-brokers to represent to their clients that their services were free, "provided that all terms governing availability of the offered . . . service are clearly disclosed at the same time" and the potential for the broker "to obtain a benefit from a third party is clearly disclosed at the same time." (Pls.' Corrected Mem. in Supp. of Class Certification, Ex. 119, 2019 Code of Ethics, Standard of Practice 12-1, 12-2, Dkt. No. 306-4.)[2]

According to Plaintiffs, the combined effect of the Challenged Restraints is to maintain and extend an anticompetitive market for real estate broker services by causing home sellers to pay supracompetitive rates of commission to buyer-brokers. At the center of the antitrust conspiracy alleged by Plaintiffs is the NAR, which promulgates the MLS Rules, the Code of Ethics, and Case Interpretations. The NAR allegedly offers the following deal to co-conspirators: in exchange for adhering to and enforcing the Challenged Restraints, the co-conspirators will be

---

[2] The relevant Standards of Practice in the Code of Ethics were amended, effective January 1, 2020, such that now a buyer-broker cannot advertise their services as free unless they, in fact, will not receive financial compensation from any source for their services. (2022 Code of Ethics at 10.)

allowed to participate in the MLSs and gain the attendant benefits of supracompetitive commission rates and protection from competition. Plaintiffs claim that Corporate Defendants are among the offerees that have accepted the NAR's offer, thereby entering into an antitrust conspiracy with the NAR.

Each Corporate Defendant is a franchisor or owner of residential real estate brokerage firms. Collectively, Corporate Defendants' various brands own, operate, and franchise brokerage firms throughout the United States. Most of Corporate Defendants' revenues are derived from the royalties they receive from their affiliated brokerages in the form of a percentage of the brokerages' commissions. Plaintiffs claim that Corporate Defendants participate in the conspiracy by requiring their brokerages, franchisees, or affiliated agents to join a local Realtor association, participate in an MLS, or follow the Code of Ethics, each of which entails an obligation to comply with and enforce the Challenged Restraints, among other NAR rules. Plaintiffs further allege that Corporate Defendants participate in the antitrust conspiracy through their extensive involvement with the NAR. In particular, Plaintiffs highlight evidence showing that Corporate Defendants' executives, employees, and affiliated agents have held positions on the NAR's Board of Directors, which is responsible for approving the MLS Rules and Code of Ethics. Individuals associated with Corporate Defendants have also served in key roles on various NAR committees and advisory boards.

Plaintiffs contend that together the NAR and Corporate Defendants have engaged in a continuing contract, combination, or conspiracy to unreasonably restrain price competition among real estate brokers in violation of § 1 of the Sherman Act, 15 U.S.C. § 1. Each Plaintiff sold a home on an MLS that implemented the Challenged Restraints and therefore paid a purportedly inflated commission to the successful buyer-broker. Plaintiffs seek to represent two

classes consisting of homeowners who sold or intend to sell a home on one of twenty NAR-affiliated MLSs covering various regions across the United States. ("Covered MLS").

Specifically, Plaintiffs propose the following "Damages Class" pursuant to Federal Rule of Civil Procedure 23(b)(3):

> Home sellers who paid a commission between March 6, 2015, and December 31, 2020, to a brokerage affiliated with a Corporate Defendant in connection with the sale of residential real estate listed on a Covered MLS and in a covered jurisdiction. Excluded from the class are (i) sales of residential real estate for a price below $56,500, (ii) sales of residential real estate at auction, and (iii) employees, officers, and directors of defendants, the presiding Judge in this case, and the Judge's staff.

In addition, pursuant to Federal of Civil Procedure Rule 23(b)(2), Plaintiffs seek to represent an "Injunctive Relief Class," which would consist of:

> Current and future owners of residential real estate in the covered jurisdictions who are presently listing or will in the future list their home for sale on a Covered MLS. Excluded from the class are (i) sales of residential real estate for a price below $56,500, (ii) sales of residential real estate at auction, and (iii) employees, officers, and directors of defendants, the presiding Judge in this case, and the Judge's staff.

## DISCUSSION

Before the Court are Plaintiffs' motion for class certification as well as Defendants' motion to exclude the expert testimony of Plaintiffs' two class certification experts. Because Plaintiffs' motion for class certification relies on the opinions of the two challenged experts, the Court begins by addressing the admissibility of those experts' opinions. *See Am. Honda Motor Co. v. Allen*, 600 F.3d 813, 815–16 (7th Cir. 2010) ("[W]hen an expert's report or testimony is critical to class certification . . . a district court must conclusively rule on any challenge to the expert's qualifications or submissions prior to ruling on a class certification motion."). The Court will then decide whether to certify Plaintiffs' two proposed classes.

## I.     Defendants' Motion to Exclude Plaintiffs' Class Certification Experts

To support certification of their proposed classes, Plaintiffs rely on the expert opinions of Professor Einer Elhauge and Dr. Nicholas Economides. Defendants move to exclude both experts.

Federal Rule of Evidence 702 and the Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), govern the admissibility of expert testimony. *Ervin v. Johnson & Johnson, Inc.*, 492 F.3d 901, 904 (7th Cir. 2007). Rule 702 states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

"In *Daubert*, the Supreme Court interpreted Rule 702 to require the district court to act as an evidentiary gatekeeper, ensuring that an expert's testimony rests on a reliable foundation and is relevant to the task at hand." *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 778 (7th Cir. 2017) (internal quotation marks omitted). The district court's gatekeeping function requires the court to engage in a three-step analysis before admitting expert testimony. *Id.* at 779. Specifically, it must evaluate: "(1) the proffered expert's qualifications; (2) the reliability of the expert's methodology; and (3) the relevance of the expert's testimony." *Id.* The proponent of the expert bears the burden of demonstrating by a preponderance of the evidence that the expert's testimony satisfies the *Daubert* standard. *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009).

### A.     Professor Einer Elhauge

Plaintiffs have retained Professor Einer Elhauge to conduct an economic analysis of the evidence and provide his expert opinion on whether common economic evidence can answer questions related to market definition, market power, liability, and impact. Elhauge is a professor at Harvard Law School where he teaches antitrust law, among other subjects. In addition, he has authored or coauthored multiple books and articles on antitrust law and economics. Elhauge has testified as an expert in dozens of cases and states that he has "been qualified as an expert in antitrust economics by all twenty-one court opinions to rule on that question." (Defs.' Mem. in Supp. of Mot. to Exclude Experts, Ex. E, Elhauge Report ¶ 12, Dkt. No. 319-6.)

There is no question that Elhauge is qualified to opine on antitrust matters, and Defendants do not contend otherwise. Multiple district courts before which he has testified have gone so far as to describe Elhauge as "an antitrust titan." *Castro v. Sanofi Pasteur Inc.*, 134 F. Supp. 3d 820, 830 (D.N.J. 2015) (quoting *In re Mushroom Direct Purchaser Antitrust Litig.*, No. 06-0620, 2015 WL 5767415, at *4 (E.D. Pa. July 29, 2015)). Nor is there any question that Elhauge's opinions are relevant. Thus, Defendants focus on the reliability of Elhauge's methodology to challenge the admissibility of several of his conclusions.

To be deemed reliable, it is not enough that an expert be qualified to opine on a particular matter. *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000). Rather, even with respect to the most well-qualified of experts, a district court must also be satisfied that the expert employed a reliable methodology in reaching his conclusions. *Id.* That assessment "is generally limited to assessing the reliability of the methodology—the framework—of the expert's analysis." *Manpower, Inc. v. Ins. Co. of Pa.*, 732 F.3d 796, 808 (7th Cir. 2013). By contrast, "[t]he soundness of the factual underpinnings of the expert's analysis and the correctness of the

expert's conclusions based on that analysis are factual matters to be determined by the trier of fact, or, where appropriate, on summary judgment." *Smith*, 215 F.3d at 718. While the reliability inquiry is "flexible," at bottom, it requires ensuring "that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141, 152 (1999). Accordingly, an expert's "work is admissible only to the extent it is reasoned, uses the methods of the discipline, and is founded on data. Talking off the cuff—deploying neither data nor analysis—is not an acceptable methodology." *Lang v. Kohl's Food Stores, Inc.*, 217 F.3d 919, 924 (7th Cir. 2000). A district court "enjoys broad latitude both in deciding how to determine reliability and in making the ultimate reliability determination." *Bryant v. City of Chicago*, 200 F.3d 1092, 1098 (7th Cir. 2000).

Broadly speaking, Defendants attack Elhauge's opinions as purely speculative and not based on any methodology whatsoever. In particular, they assert that Elhauge fails to connect adequately his conclusions to the evidence or the basic economic principles he draws upon in reaching them. Where an expert's "opinion evidence . . . is connected to existing data only by the *ipse dixit* of the expert[, a] court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). At the same time, the Seventh Circuit has "recognized that the line between conclusions and methodology is not always an easy line to draw." *Gopalratnam*, 877 F.3d at 781 (internal quotation marks omitted). Ultimately, the question is whether there is "a rational connection between the data and the opinion." *Id.* (internal quotation marks omitted). Where, as here, an expert is providing economic testimony, assessing reliability "presents some unique challenges, as the *Daubert* rules were not developed with either antitrust or economics in mind." *In re*

*Dealer Mgmt. Sys. Antitrust Litig.*, 581 F. Supp. 3d 1029, 1049 (N.D. Ill. Jan. 21, 2022) (internal quotation marks omitted). Thus, "[a]ntitrust courts have generally responded to questionable or novel economic testimony by being fairly reluctant to exclude it under *Daubert* rules, while at the same time scrutinizing admitted testimony carefully and often harshly under summary judgment rules." *Id.* (internal quotation marks omitted). Despite Defendants' request that Elhauge's opinions be stricken in their entirety, their contentions regarding the analytical gap between the evidence and Elhauge's conclusions require the Court to consider the admissibility of each challenged opinion individually.

First, Elhauge opines that the Challenged Restraints encourage overuse of buyer-brokers by separating the consumer of buyer-broker services (*i.e.*, the home buyer) from the payment for those services. On the other hand, in a "but-for world" without the Challenged Restraints, buyer-broker use would be rare. Defendants argue that this opinion is based on an overly simplistic assumption that if buyers were forced to internalize the cost of buyer-broker services, they would question the value of such services and many would opt against using a buyer-broker. Notably, "[t]he reliability of . . . assumptions used in applying a methodology is tested by the adversarial process and determined by the jury." *Manpower*, 732 F.3d at 808. Further, "[i]n an *ipse dixit* opinion, the expert asserts a 'bottom line' conclusion, but lacks any articulable facts to substantiate that conclusion or completely fails to explain the reasoning or methods employed to reach that conclusion." *In re Fluidmaster, Inc., Water Connector Components Prods. Liab. Litig.*, No. 14-cv-5696, 2017 WL 1196990, at *7 (N.D. Ill. Mar. 31, 2017). Here, contrary to Defendants' contentions, Elhauge fully explains his reasons for believing that the Challenged Restraints encouraged overconsumption of buyer-brokers. For example, he cites a study showing that a buyer's perception of a product as having a lower price than its true price

disproportionately influences demand for that product. (Elhauge Report ¶ 148 & n.276.) He then connects that research to Defendants' former practice of advertising buyer-brokers as free to the buyer and highlights a real-estate industry publication explaining to buyers that it is smart for them to use a buyer-broker because they are not the ones paying their broker's commission. (*Id.* ¶ 148.)

In an effort to demonstrate the unreliability of Elhauge's opinion, Defendants fault him for failing to consider all the reasons cited by their own expert, Dr. Lauren Stiroh, for why buyers would continue using buyer-brokers even if they paid for those services directly. But that argument speaks only to the correctness of Elhauge's conclusion and is a matter properly addressed by cross-examination of both experts before a jury, not exclusion. *Burton v. E.I. du Pont de Nemours & Co., Inc.*, 994 F.3d 791, 826 (7th Cir. 2021) ("[V]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."); *Stollings v. Ryobi Techs., Inc.*, 725 F.3d 753, 766 (7th Cir. 2013) ("An expert may provide expert testimony based on a valid and properly applied methodology and still offer a conclusion that is subject to doubt. It is the role of the jury to weigh these sources of doubt."); *In re Dealer Mgmt. Sys.*, 581 F. Supp. 3d at 1060 ("[B]attle of the experts' issues . . . should be resolved through cross-examination, not *Daubert* motions."). In short, the Court finds no yawning methodological gap in Elhauge's opinion that buyer-broker use would be rare in the but-for world and therefore declines to exclude that opinion.

Relatedly, Elhauge concludes that sellers would almost always refuse to shoulder the cost of buyer-broker commissions in the but-for world. He explains in detail how the Buyer-Broker Commission Rule and the other Challenged Restraints incentivize sellers to offer

supracompetitive commission rates to buyer-brokers, lest they risk buyer-brokers steering potential buyers away from the seller's home. Absent the Challenged Restraints, according to Elhauge, those steering incentives would disappear and sellers' natural inclination to maximize the net sales price of their home would result in few continuing to pay for their buyers' brokers. And those few who did so would pay significantly reduced commissions than what they pay in the actual world. Notably, Defendants do not take issue with the concept of steering or the other economic principles informing Elhauge's opinion. Instead, Defendants again turn to the opinions of their own expert to show all the reasons why sellers would have an economic incentive to cover the successful buyer's broker costs, even in the but-for world. While it is possible that Defendants' expert has the stronger argument, that is a matter for the jury to decide and not a basis to exclude Elhauge's competing views.

Finally, Defendants challenge Elhauge's conclusion that buyer-broker commissions in the but-for world would be lower than those enjoyed by buyer-brokers in the present world. They claim that Elhauge makes an entirely speculative leap from the general economic principle that consumers want to pay lower prices to his conclusion that those few buyers who retained buyer-brokers would pay less in a but-for world without the Challenged Restraints. The Court disagrees. In fact, Elhauge fully explains the reasoning underlying his conclusion. For example, he predicts that there would be decreased demand for buyer-brokers in the real world and supports his prediction by considering how technological advances have decreased the value of buyer-broker services. In particular, he notes that buyers can find homes without the assistance of a buyer-broker through websites like Zillow. Elhauge then observes how, in more competitive markets, the increasing use of the internet has reduced consumer costs, highlighting how increases in the number of consumers using the internet to book air travel and to trade stocks has

been accompanied by corresponding decreases in commissions for travel agents and

stockbrokers. By contrast, buyer-broker commissions have increased in the face of technological

advances. Moreover, Elhauge notes that his opinion is reinforced by NAR's own internal studies

that reveal the real estate industry's concerns about how technological advances risk reducing

demand for broker services. From there, Elhauge applies the undisputed economic principle that

decreased demand results in lower prices. Thus, far from making an unsupported extrapolation

from a general economic concept, Elhauge considers numerous pieces of evidence and data,

applies his knowledge of antitrust law and economics, and explains each step of his reasoning.

Elhauge provides similarly fulsome explanations as to other factors that would tend to lower

buyer-broker commissions in the but-for world.

Defendants also point to multiple factors that Elhauge purportedly failed to consider that

suggest that buyer-broker commissions would remain the same in the but-for world. "Experts

who engage in cherry-picking of the evidence fail to satisfy the scientific method and *Daubert*."

*Van v. Ford Motor Co.*, 332 F.R.D. 249, 269 (N.D. Ill. 2019). Such impermissible cherry-picking

occurs where the expert "arbitrarily pick[s] and choose[s] among the same kind of scientific data

when formulating their opinions." *In re Fluidmaster*, 2017 WL 1196990, at *21. But here,

Defendants only point to facts (or, more accurately, their interpretation of facts) that they believe

undermine Elhauge's conclusion, and "their challenge goes to the weight of his opinion, and not

its admissibility." *In re Allstate Corp. Sec. Litig.*, No. 16 C 10510, 2022 WL 842737, at *14

(N.D. Ill. Jan. 10, 2022); *see also Cates v. Whirlpool Corp.*, No. 15-CV-5980, 2017 WL

1862640, at *15 (N.D. Ill. May 9, 2017) ("[F]ailing to account for supposedly contradictory

information often is a question going to the weight of the evidence rather than its admissibility,

which a lawyer can address on cross-examination . . . ."); *Jordan v. Dominick's Finer Foods*, 115

F. Supp. 3d 950, 963 (N.D. Ill. 2015) ("[O]bjections as to whether an expert considered certain factors that the opposing side deems irrelevant generally go to the weight of the expert's opinion, not its admissibility."). Despite their claims regarding Elhauge's supposed lack of methodology, Defendants' arguments boil down to attacks on the soundness of his conclusions. At this stage in the proceedings, such arguments do not provide a basis to exclude Elhauge's expert opinions.

In one final attempt at excluding the above contested opinions, Defendants fault Elhauge for stating that analysis from Plaintiff's other expert, Dr. Nicholas Economides, confirms his own predictions regarding the but-for world. According to Defendants, since Economides based his analysis, in part, on Elhauge's predictions, Elhauge's claim that Economides's analysis confirms his predictions is circular. However, Elhauge does not rely on Economides's analysis in making his predictions; rather, he makes his predictions independent of Economides's work and then makes a concluding observation that his own opinions are consistent with and supported by Economides's analysis. The Court sees no issue with Elhauge citing Economides's analysis as further supporting and reinforcing his own opinions. *See, e.g.*, *Gopalratnam*, 877 F.3d at 789 ("[A]s a general matter, there is nothing objectionable about an expert relying upon the work [of] a colleague.").

In short, the Court finds that Elhauge's methodology is sufficiently reliable, as his opinions are derived from his application of his extensive knowledge of antitrust law and economics to the evidence in this case. *See Forth Worth Emps. Ret. Fund v. J.P. Morgan Chase & Co.*, 301 F.R.D. 116, 129 (S.D.N.Y. 2014) (admitting expert opinion "based in [the expert's] general knowledge of economic principles and of the market for mortgage-backed securities, and his application of that understanding to the specific facts of the . . . case"). Further, Elhauge does not rely on the type of unrealistic assumptions or cherry-picked facts that would call his

reliability into question. Defendants are free to attack the accuracy of his opinions at a later stage of the case but, for now, they have given this Court no reason to exclude Elhauge as an expert.

### B.    Dr. Nicolas Economides

Plaintiffs offer Dr. Nicholas Economides as an expert witness to opine on whether common evidence can prove antitrust impact and damages. Economides is a professor of economics at New York University's Stern School of Business. He has a master's degree and a Ph.D. in economics, both from the University of California at Berkeley. Economides specializes in industrial organization and antitrust, and he has published numerous articles on those topics. As with Elhauge, Defendants' arguments focus on the reliability of Economides's methodology; they do not dispute either Economides's qualifications or the relevance of his opinions. And the Court is satisfied both that Economides is qualified to testify as to impact and damages and that such testimony is relevant.

In his report, Economides begins by reviewing Elhauge's findings regarding the relevant market and the but-for world. He then turns to consider which markets to use as "yardsticks" to compare against the markets served by the Covered MLSs. The goal of such a yardstick analysis is to measure the impact of alleged anticompetitive conduct by comparing markets affected by the challenged anticompetitive restraints against sufficiently comparable markets unaffected by those restraints. As yardsticks, Economides looks to markets outside the United States. In particular, he begins his analysis by identifying countries with similar levels of economic and institutional development, which he measures using gross domestic product (or "GDP") per capita and corruption level[3] as proxies. Economides also narrows potential yardsticks to

---

[3] To measure corruption, Economides relies on Transparency International's Corruption Perceptions Index. *See generally Corruption Perceptions Index 2021*, Transparency International, https://www.transparency.org/en/cpi/2021 (last visited Mar. 20, 2023).

countries with populations above 10 million inhabitants. That initial screen leaves him with seven countries: Australia, Belgium, Canada, Germany, the Netherlands, Sweden, and the United Kingdom. Then, Economides further narrows down that list by examining each country's real estate market and eliminating those that featured restraints similar to the Challenged Restraints or other confounding characteristics. Based on that analysis, he concludes that Australia, the Netherlands, and the United Kingdom, serve as appropriate comparator markets.

Having identified his yardsticks, Economides goes on to find that in the three comparator markets, only about 5–20% of home buyers used buyer-brokers as compared to 87% in the United States. Moreover, those buyers who did employ buyer-brokers in the yardstick markets paid only about 1–2% in commissions versus the 2–3% paid by buyers in the United States. Further, sellers in the yardstick markets paid the same or less for seller-broker services, usually about 1–3% whereas sellers in the United States paid 2–3%. Based on the evidence from the yardsticks, Economides puts together two statistical models to explore whether a class member would have paid lower commissions in the but-for world than what they paid in the actual world. His models compare the distribution of buyer-broker commissions paid in the actual world to the distribution of commissions (including 0% commissions) in the yardsticks to estimate the percentage of all class transactions that were impacted and the likelihood that any given transaction was impacted. From those models, Economides concludes that 99.4–99.9% of all class members were harmed by the Challenged Restraints.

Finally, to estimate damages, Economides creates a yardstick estimate of the rate paid to buyer-brokers in the but-for world. To do that, Economides estimates for each yardstick country the average rate paid to buyer-brokers in transactions involving them. He then averages the estimates for all three countries to construct a single yardstick estimate of 1.55% commission

paid to buyer-brokers. Economides uses that yardstick estimate to calculate total damages for the class equal to the total commissions paid in the actual world on all class transactions with commission rates above 1.55% minus the total sales price multiplied by the 1.55% yardstick commission rate. That formula estimates the total damages for the class at $13.7 billion. And to calculate transaction level damages, Economides proposes multiplying the sales price by the 1.55% yardstick commission and subtracting that figure from the commission actually paid by the class member.

As an initial matter, the Court finds that "the yardstick approach is a well-established methodology" in antitrust actions and Defendants "cannot complain that the methodology itself is unreliable." *In re Dealer Mgmt. Sys.*, 581 F. Supp. 3d at 1073 (internal quotation marks omitted); *see also Fishman v. Est. of Wirtz*, 807 F.2d 520, 551 (7th Cir. 1986) ("The concept of a 'yardstick' measure of damages, that is, linking the plaintiff's experience in a hypothetical free market to the experience of a comparable firm in an actual free market, is . . . well accepted."). Nonetheless, for a particular yardstick analysis to be considered reliable, the plaintiff bears the burden of demonstrating the comparability of the proposed yardsticks. *Loeffel Steel Prods., Inc. v. Delta Brands, Inc.*, 387 F. Supp. 2d 794, 812 (N.D. Ill. 2005); *In re Blood Reagents Antitrust Litig.*, MDL No. 09-2081, 2015 WL 6123211, at *21 (E.D. Pa. Oct. 19, 2015). "Of course, exact correlation is not necessary but the samples must be fair congeners." *Loeffel*, 387 F. Supp. 2d at 812.

Here, Defendants argue that Economides's yardstick methodology is unreliable because he failed to analyze whether the factors he used to select his yardstick countries were relevant to predicting a country's real estate brokerage practices. Typically, an expert's yardstick analysis will only be thrown out where the "expert has failed to perform any substantive analysis of those

factors most relevant to comparability." *In re Blood Reagents Antitrust Litig.*, 2015 WL
6123211, at *22. Otherwise, "[a]rguments about how the selection of data inputs affect the
merits of the conclusions produced by an accepted methodology should normally be left to the
jury." *Elorac, Inc. v. Sanofi-Aventis Can., Inc.*, No. 14 C 1859, 2017 WL 3592775, at *10 (N.D.
Ill. Aug. 21, 2017) (quoting *Manpower*, 732 F.3d at 808); *see also In re Prograf Antitrust Litig.*,
1:11-md-02242-RWZ, 2014 WL 7641156, at *3 (D. Mass. Dec. 23, 2014) ("Cases employing
the yardstick approach have recognized that product, firm, and market comparability are all
relevant factors in the selection of a proper yardstick. Because evaluating those factors generally
involves weighing facts, deciding whether the plaintiff has met this burden of showing
comparability ordinarily is a question for the trier of fact." (internal quotation marks and citation
omitted)).

The Court disagrees with Defendants' contention that Economides completely failed to
explain why he used a country's per capita GDP, corruption perceptions index, and population as
initial screening factors for potential yardsticks. On the contrary, Economides explains that he
uses the first two factors to measure a country's economic and institutional development, which
is important in identifying comparators since "[r]eal estate transactions take place in the context
of: (a) buyers' and sellers' willingness to pay, and (b) the risk and difficulty of transacting."
(Defs.' Mem. in Supp. of Mot. to Exclude Experts, Ex. F, Economides Report ¶¶ 22–23, Dkt.
No. 319-7.) Further, Economides states that he included the requirement that a comparator
country have a population of 10 million or more to ensure that his yardsticks encompassed a mix
of residential properties of different types and in different density settings.

Notably, five of the seven countries identified as potential yardsticks following
Economides' initial screening were used as comparators by the NAR in an internal report

discussing the increasing pressure on real estate brokers to reduce commission rates. (Pl.'s Resp. to Defs.' Mot. to Exclude Experts, Ex. 4, D.A.N.G.E.R. Report at 22, Dkt. No. 346-5.) In particular, the internal NAR report notes that many brokers "fear . . . a realignment of fees as charged in other countries in the world," and then cites the average commission rates in the United Kingdom, the Netherlands, Australia, Belgium, and Germany.[4] (*Id.*) To demonstrate the reliability of his methodology for choosing comparators, all Economides was required to do was make a "rational connection" between the screening criteria and his selection of comparable markets. *Elorac*, 2017 WL 3592775, at *10; *see also In re Blood Reagents Antitrust Litig.*, 2015 WL 6123211, at *22 ("[A] proposed yardstick must be rejected as inadmissible where the expert testimony is so deficient that 'the comparison is manifestly unreliable and cannot logically advance a material aspect of the proposing party's case.'" (quoting *Loeffel*, 387 F. Supp. 2d at 813)). The Court concludes that he does so. While Defendants may genuinely believe that Economides's screening criteria are flawed, such claims of "reliance on faulty information is a matter to be explored on cross-examination; it does not go to admissibility." *Manpower*, 732 F.3d at 809; *see also Koehler v. Infosys Techs. Ltd.*, No. 13-cv-885-pp, 2022 WL 4234946, at *34 (E.D. Wis. Sept. 14, 2022) ("The defendants' criticism[] that [the expert] incorrectly defined the relevant labor market for comparison purposes [is] not [a] criticism[] that warrants exclusion of his opinions.").

Most of Defendants' remaining reliability arguments are similarly flawed. Defendants argue that Economides's analysis does not sufficiently account for the variation in brokerage practices across his chosen yardsticks and does not control for the unique attributes of the market

---

[4] The report also cites the rates in Singapore, which was not in Economides's initial set of potential comparators.

in the United States that predate the adoption of the Challenged Restraints. Those arguments concern the factual underpinnings of Economides's analysis and the quality of his conclusions, and therefore implicate the probative weight of his opinions not their admissibility. Defendants also criticize Economides's analysis for using the nationwide averages from his comparator countries as his yardsticks instead of some more narrowly tailored metric and for comparing commission rates instead of commission amounts. But again, "[i]t is for the fact finder to determine whether [an expert's] choice of data inputs render his analysis either more or less persuasive than that which is offered by Defendants." *In re Allstate*, 2022 WL 842737, at *9; *see also Manpower*, 732 F.3d at 809 ("That the reasoning behind [the expert's data selection] could be challenged as incomplete or faulty does not make it any less grounded in real data.").

Finally, Defendants claim that Economides's use of a 1.55% yardstick buyer-broker commission rate to calculate damages is arbitrary and does not fit Plaintiffs' theory of liability. In particular, Defendants assert that Plaintiffs cannot argue, on one hand, that buyer-broker usage would be rare and sellers would generally not compensate them when used in the but-for world and then turn around and, on the other hand, have an expert testify to a damages theory that assumes that every home buyer in the but-for world will retain a buyer-broker who is compensated by the seller at a 1.55% rate of commission. But Plaintiffs' contention that buyer-brokers would rarely be used and would generally be paid by buyers in the but-for world implicitly acknowledges that a small number of but-for world transactions would involve a buyer-broker whose commissions were covered by the seller. Thus, in calculating damages, Economides explains that he adopted the "extremely conservative" assumptions that all class member transactions would be among those rare transactions in the but-for world involving a buyer-broker and that the buyer-broker would be paid by the seller. (Economides Report ¶ 81.)

Essentially, Economides adopts these conservative assumptions to avoid potentially overestimating damages. For now, the Court concludes that Economides's conservative assumptions do not render his damages model unreliable. Whether that damages model is nonetheless irreconcilable with Plaintiffs' theory of liability (*i.e.* impact) is asserted by Defendants as a basis for opposing certification of the Damages Class. The Court believes the issue is better addressed in that context and will therefore discuss it further below.

To sum up, there is no question that Economides's use of the established yardstick methodology is reliable. And he sufficiently explains why his chosen yardsticks are comparable to the relevant markets in this case. Although Defendants claim that Economides's methodology is unreliable, all they can do is point out weaknesses in his analysis. "Whether an expert might have done a better job is not the test for the admissibility of his testimony." *Traharne v. Wayne/Scott Fetzer Co.*, 156 F. Supp. 2d 697, 712 (N.D. Ill. 2001). Thus, the Court concludes that Economides opinions are admissible. And because the Court is satisfied that both Elhauge and Economides are qualified to testify as experts, employed a reliable methodology, and offer relevant opinions, the Court denies Defendants' motion to exclude them as experts in support of class certification.

## II. Plaintiffs' Motion for Class Certification

The Court next turns to Plaintiffs' motion for class certification, which is governed by Federal Rule of Civil Procedure 23. To be certified, a proposed class must first satisfy the requirements of Rule 23(a), which allows certification only if:

(1) the class is so numerous that joinder of all members is impracticable;

(2) there are questions of law or fact common to the class;

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a); *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 811 (7th Cir. 2012). If Rule 23(a) is satisfied, then the proposed class must also fall within one of the three alternatives set out in Rule 23(b). *Lacy v. Cook County*, 897 F.3d 847, 864 (7th Cir. 2018). In this case, Plaintiffs seek to certify a Damages Class under Rule 23(b)(3), which requires that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." They also seek to certify an Injunctive Relief Class under Rule 23(b)(2), which applies where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."

Plaintiffs have the burden of showing by a preponderance of the evidence that Rule 23 has been satisfied. *Lacy*, 897 F.3d at 863. Moreover, Rule 23 is not "a mere pleading standard." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (internal quotation marks omitted). Rather, a plaintiff "must affirmatively demonstrate his compliance with Rule 23" through evidentiary proof. *Id.* (internal quotation marks omitted). And a district court must conduct a "rigorous analysis" before determining whether a plaintiff has satisfied each of Rule 23's requirements. *Id.* (internal quotation marks omitted). "Frequently that rigorous analysis will entail some overlap with the merits of the plaintiff's underlying claim [because] [t]he class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011).

### A.     Rule 23(a)

Of the Rule 23(a) factors, Defendants only challenge Plaintiffs' ability to satisfy the commonality and typicality requirements. Nonetheless, the Court briefly notes that the numerosity requirement is undoubtedly satisfied, as the proposed classes include individuals who sold homes listed on one of the twenty Covered MLSs during the nearly six-year class period. Thus, the membership of each proposed class can be expected to number in the thousands, at minimum. *E.g.*, *Barnes v. Air Line Pilots Ass'n, Int'l*, 310 F.R.D. 551, 557 (N.D. Ill. 2015) (explaining that classes with at least forty members are generally found to satisfy the numerosity requirement and that district courts can make evidence-based "common sense assumptions" in assessing numerosity). As to the adequacy of representation requirement, there is no suggestion that any Plaintiff's interests are adverse to those of the class. *See Starr v. Chi. Cut Steakhouse, LLC*, 75 F. Supp. 3d 859, 874 (N.D. Ill. 2014) ("To be an adequate representative, the named Plaintiffs must not have 'antagonistic or conflicting claims.'" (quoting *Retired Chi. Police Ass'n v. City of Chicago*, 7 F.3d 584, 598 (7th Cir. 1993)). Further, class counsel have demonstrated that they are experienced, qualified, and will adequately represent the interests of the class.[5] Accordingly, the Court finds that the adequacy of representation requirement has been met. Having found that Plaintiffs meet those two Rule 23(a) requirements, the Court considers Plaintiffs' showing as to the commonality and typicality requirements.

### 1.     Commonality

For purposes of Rule 23(a)(2)'s requirement that there be questions of law or fact common to the class, "even a single common question will do." *Wal-Mart*, 564 U.S. at 359

---

[5] This Court previously determined that Plaintiffs' class counsel was adequate to represent the interests of the class in granting Plaintiffs' motion for appointment of interim co-lead class counsel. (Dkt. No. 171.) Defendants raise no argument casting doubt on that conclusion.

(internal quotation marks and alterations omitted). However, "superficial common questions—like whether . . . each class member 'suffered a violation of the same provision of law'—are not enough." *Jamie S. v. Milwaukee Pub. Schs.*, 668 F.3d 481, 497 (7th Cir. 2012) (quoting *Wal-Mart*, 564 U.S. at 350). Rather, commonality requires the plaintiff to "assert a common injury that is 'capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.'" *Lacy*, 897 F.3d at 865 (quoting *Wal-Mart*, 564 U.S. at 350). Put differently, "the key to commonality is 'not the raising of common questions but, rather, the capacity of a classwide proceeding to generate common **answers** apt to drive the resolution of the litigation.'" *Id.* (quoting *Wal-Mart*, 564 U.S. at 350). "The critical point is the need for **conduct** common to members of the class." *Phillips v. Sheriff of Cook Cnty.*, 828 F.3d 541, 553 (7th Cir. 2016) (internal quotation marks omitted).

Although Defendants contend that Plaintiffs fail to satisfy Rule 23(a)'s commonality requirement, their arguments on this point simply incorporate their arguments as to Rule 23(b)(3)'s predominance inquiry. Courts regularly observe that there is "a significant overlap between the commonality requirement . . . and the predominance requirement." *Flanagan v. Allstate Ins. Co.*, 242 F.R.D. 421, 429 (N.D. Ill. 2007). Yet, at the same time, "[p]redominance . . . is a standard far more demanding than the commonality requirement." *Reed v. Adv. Health Care*, 268 F.R.D. 573, 580 (N.D. Ill. 2009) (internal quotation marks omitted). Indeed, the commonality "requirement has been characterized as a low hurdle, easily surmounted." *Smith v. Aon Corp.*, 238 F.R.D. 609, 614 (N.D. Ill. 2006) (internal quotation marks omitted).

Here, the Court finds that there is at least one central, common question in this case: whether Defendants conspired to artificially inflate the buyer-broker commissions paid by the class by adopting the Challenged Restraints, in violation of § 1 of the Sherman Act. *See Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 756 (7th Cir. 2014) ("Where the same conduct or practice by the same defendant gives rise to the same kind of claims from all class members, there is a common question."); *In re High-Tech Emp. Antitrust Litig.*, 985 F. Supp. 2d 1167, 1180 (N.D. Cal. 2013) ("Where an antitrust conspiracy has been alleged, courts have consistently held that the very nature of a conspiracy antitrust action compels a finding that common questions of law and fact exist." (internal quotation marks omitted)). Indeed, because proof of the alleged conspiracy focuses on the defendants' standardized conduct as opposed to the conduct of individual class members, "[a]ntitrust liability alone constitutes a common question that 'will resolve an issue that is central to the validity' of each class member's claim 'in one stroke.'" *In re High-Tech Emp. Antitrust Litig.*, 985 F. Supp. 2d at 1180 (quoting *Wal-Mart*, 564 U.S. at 350)). The existence of this common question is sufficient to satisfy the commonality requirement.

### 2. Typicality

A plaintiff's claim will satisfy Rule 23(a)(3)'s typicality requirement where it "arises from the same event or practice or course of conduct that gives rise to the claims of other class members and is based on the same legal theory." *Lacy*, 897 F.3d at 866 (internal quotation marks and alteration omitted). "This requirement is meant to ensure that the named representative's claims have the same essential characteristics as the claims of the class at large." *Id.* (internal quotation marks omitted). In the antitrust context, typicality "will be established by plaintiffs and all class members alleging the same antitrust violation by the defendants." *In re Ready-Mixed*

*Concrete Antitrust Litig.*, 261 F.R.D. 154, 168 (S.D. Ind. Sept. 9, 2009) (internal quotation marks omitted).

According to Defendants, typicality is lacking here because Plaintiffs listed their homes on only five of the twenty Covered MLSs and therefore Plaintiffs' claims are not typical of the class members whose homes were listed on the other fifteen Covered MLSs. However, such "'factual distinctions between the claims of the named class members and those of other class members' do not necessarily defeat a finding of typicality." *In re Sulfuric Acid Antitrust Litig.*, No. 03 C 4576, 2007 WL 898600, at *4 (N.D. Ill. Mar. 21, 2007) (quoting *De La Fuente v. Stokely-Van Camp, Inc.*, 713 F.2d 225, 232 (7th Cir. 1983)). That some class members listed their homes on different MLSs than Plaintiffs does not create a typicality issue because all Covered MLSs implemented the Challenged Restraints. *See In re Ready-Mixed Concrete*, 261 F.R.D. at 168 ("If the named class members' claims are based on the same legal theory or arise from the same course of conduct, factual differences in date, size, manner, or conditions of purchase, the type of purchaser, or other concerns do not make plaintiffs atypical." (internal quotation marks omitted)). As a result, Plaintiffs' claims share the same essential characteristics as the rest of the class and typicality is established.

### B. Rule 23(b)(3)

With Plaintiffs having established the requirements of Rule 23(a), the Court next looks to whether they have also met Rule 23(b)(3)'s predominance and superiority requirements such that the Damages Class can be certified. The decision to certify a Rule 23(b)(3) class "is one that depends on a careful assessment of the facts, of potential differences among class members, and of the overall importance of the common issues of law or fact to the ultimate outcome." *Riffey v. Rauner*, 910 F.3d 314, 318 (7th Cir. 2018).

### 1. Predominance

As discussed above, Rule 23(b)(3)'s predominance requirement is similar to, but more

demanding than, Rule 23(a)'s commonality requirement. "[W]hereas Rule 23(a)(2) requires the

existence of a common question, Rule 23(b)(3) requires the common question(s) to

'predominate' over the individual ones." *Howard v. Cook Cnty. Sheriff's Office*, 989 F.3d 587,

607 (7th Cir. 2021). The predominance "'inquiry trains on the legal or factual questions that

qualify each class member's case as a genuine controversy,' with the purpose being to determine

whether a proposed class is 'sufficiently cohesive to warrant adjudication by representation.'"

*Messner*, 669 F.3d at 814 (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997)).

The requirement will be satisfied "when common questions represent a significant aspect of a

case and can be resolved for all members of a class in a single adjudication." *Id.* at 815 (internal

quotation marks and alterations omitted). Put differently, "common questions can predominate if

a common nucleus of operative facts and issues underlies the claims brought by the proposed

class." *Id.* (internal quotation marks omitted). It is not necessary, however, that "***every*** issue be

common" and "classes are routinely certified under Rule 23(b)(3) where common questions exist

and predominate, even though other individual issues will remain after the class phase." *Kleen*

*Prods. LLC v. Int'l Paper Co.*, 831 F.3d 919, 922 (7th Cir. 2016).

In undertaking the predominance inquiry, "the court must understand what the plaintiffs

will need to prove and must evaluate the extent to which they can prove their case with common

evidence." *In re Allstate Corp. Sec. Litig.*, 966 F.3d 595, 603 (7th Cir. 2020). The analysis

"requires the court to engage with the merits of the case, yet without deciding the merits." *Id.*

Thus, "a court weighing class certification must walk a balance between evaluating evidence to

determine whether a common question exists and predominates, without weighing that evidence

28

to determine whether the plaintiff class will ultimately prevail on the merits." *Bell v. PNC Bank, N.A.*, 800 F.3d 360, 377 (7th Cir. 2015). "Analysis of predominance under Rule 23(b)(3) 'begins, of course, with the elements of the underlying cause of action.'" *Messner*, 669 F.3d at 815 (quoting *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011)). For a cause of action arising under the Sherman Act, the essential elements are: "(1) a violation of antitrust law; (2) individual injury, or impact, caused by that violation; and (3) measurable damages." *In re Steel Antitrust Litig.*, No. 08 C 5214, 2015 WL 5304629, at *5 (N.D. Ill. Sept. 9, 2015) (internal quotation marks omitted). Defendants contend that individual issues predominate as to each element of Plaintiffs' antitrust claim.

### a.    Antitrust Conspiracy

To prove a violation of § 1 of the Sherman Act, a plaintiff must establish the existence of a "contract, combination, or conspiracy" and "a resultant unreasonable restraint of trade in a relevant market." *Agnew v. Nat'l Collegiate Athletic Ass'n*, 683 F.3d 328, 335 (7th Cir. 2012). The Court determined above that the question of whether Defendants engaged in a conspiracy to violate antitrust law is a common question that is central to all class members' claims. Yet Defendants contend that Plaintiffs cannot prove that Defendants entered into a conspiracy with common classwide evidence.

At issue in this case are the standardized rules promulgated by the NAR and then adopted by Corporate Defendants, which, in turn, enforce those rules against their affiliated brokers throughout the nation. Plaintiffs' evidence includes Defendants' own policies and representations that reflect how the NAR and Corporate Defendants work together to implement and enforce the MLS Rules, Code of Ethics, and Case Interpretations. Plaintiffs also highlight evidence showing how various senior executives from each Corporate Defendant were extensively involved in the

NAR's governance. That evidence regarding Defendants' conduct in joining and advancing a single agreement is undoubtedly common across the class, and the existence of the alleged conspiracy will be one of the predominate issues in the litigation. *See Amchem*, 521 U.S. at 625 ("Predominance is a test readily met in certain cases alleging . . . violations of the antitrust laws."); *Rohlfing v. Manor Care, Inc.*, 172 F.R.D. 330, 336–37 (N.D. Ill. 1997) ("The weight of authority in antitrust cases indicates that the question of the existence of a conspiracy in restraint of trade is one that is common to all potential plaintiffs, and the importance of this question usually warrants treating them as a class."). Indeed, the existence of a conspiracy in violation of antitrust laws "is the prototypical example of an issue where common questions predominate, because it is much more efficient to have a single trial on the alleged conspiracy rather than thousands of identical trials all alleging identical conspiracies based on identical evidence." *Kleen Prods. LLC v. Int'l Paper*, 306 F.R.D. 585, 594 (N.D. Ill. 2015), *aff'd*, 831 F.3d 919 (7th Cir. 2016).

Defendants insist that there are numerous individual issues as to when, where, and how each Defendant participated in the alleged conspiracy that preclude a finding of predominance. The Court finds two flaws in Defendants' arguments on this point. First, Defendants improperly conflate the existence of individualized proof as to each Defendant's conduct with the need for individualized inquiries. While the evidence might vary as to the nature of each Defendant's participation in the conspiracy, the same evidence will be relied upon by Plaintiffs and members of the class. *See, e.g.*, *Messner*, 669 F.3d at 815 ("If, to make a prima facie showing on a given question, the members of a proposed class will need to present evidence that varies from member to member, then it is an individual question. If the same evidence will suffice for each member to make a prima facie showing, then it becomes a common question." (internal quotation marks

omitted)); *In re Air Cargo Shipping Servs. Antitrust Litig.*, No. 06-MD-1175 (JG)(VVP), 2014 WL 7882100, at *38 (E.D.N.Y. 2014) ("[E]vidence is indisputably 'common' [where] it focuses on the allegedly unlawful actions of the defendants, not the actions of individual plaintiffs."). Second, Defendants' arguments bear more on whether a conspiracy actually existed; they are merits arguments that "might entitle them to summary judgment or a verdict in their favor" but are inapplicable at the class certification stage. *Kleen Prods.*, 306 F.R.D. at 594. At this stage, it is enough "that the evidence either proving *or disproving* a conspiracy will be common to the entire class." *Id.* (emphasis added).

As to whether the Challenged Restraints are an unreasonable restraint of trade, there is no dispute that the question is common to the class and susceptible to classwide proof. Plaintiffs have pleaded that the Challenged Restraints are unreasonable restraints of trade under both the *per se* and Rule of Reason modes of analysis.[6] The Court expresses no view on the proper mode of analysis at this stage. For class certification purposes, it is enough that the issue can be decided by evidence common to the class regardless of the applicable mode of analysis.

### b. Impact

In addition to proving a combination or conspiracy in restraint of trade, a successful antitrust plaintiff must also show that they suffered an individual injury, or impact, from the violation. "[I]ndividual injury (also known as antitrust impact) is an element of [§ 1 of the Sherman Act's] cause of action; to prevail on the merits, every class member must prove at least

---

[6] Under the Rule of Reason analysis, "the plaintiff carries the burden of showing that an agreement or contract has an anticompetitive effect on a given market within a given geographic area." *Agnew*, 683 F.3d at 335. By contrast, the *per se* analysis applies where "experience with a particular kind of restraint enables the Court to predict with confidence that the rule of reason will condemn it" such that it can apply "a conclusive presumption that the restraint is unreasonable." *Arizona v. Maricopa Cnty. Med. Soc'y*, 457 U.S. 332, 344 (1982).

some antitrust impact resulting from the alleged violation." *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 311 (3d Cir. 2008). Antitrust "impact is often critically important for the purpose of evaluating Rule 23(b)(3)'s predominance requirement because it is an element of the claim that may call for individual, as opposed to common, proof." *Id.* Thus, under Rule 23(b)(3), Plaintiffs must be able to show using common evidence that the Challenged Restraints injured the members of the proposed Damages Class. *Messner*, 669 F.3d at 816. At the same time, their "burden at the class certification stage [is] not to prove the element of antitrust impact, but only to demonstrate that the element of antitrust impact ***is capable of proof at trial*** through evidence that is common to the class rather than individual to its members." *Id.* at 818 (internal quotation marks omitted). Further, "[d]emonstrating that impact can be proved commonly is a separate showing from demonstrating that the amount of damages can be proved commonly." *Reed*, 268 F.R.D. at 582.

Plaintiffs' theory of antitrust impact is that the Challenged Restraints maintain and extend an anticompetitive equilibrium that result in sellers paying inflated commissions in each of the Covered MLSs. As common evidence of classwide impact, Plaintiffs primarily rely on the expert opinions of Elhauge and Economides. Among other things, they use Elhauge's opinions to show how the Buyer-Broker Commission Rule's requirement that sellers make blanket unilateral offers of fixed compensation to buyer-brokers works in conjunction with the other Challenged Restraints that constrain negotiations over buyer-broker compensation to create steering incentives that, in turn, cause sellers to offer and pay uniform and supracompetitive commission rates to buyer-brokers. Then, Economides uses his yardstick methodology to demonstrate how the seller has paid a supracompetitive rate of commission in at least 99.4% of the class transactions. Taken together, Plaintiffs contend that Elhauge and Economides's analyses can be

used to show that the Challenged Restraints have impacted nearly all the individual class transactions.

Defendants nonetheless contend there remain too many individualized issues as to impact. They largely attack various aspects of Plaintiffs' experts' analyses to argue that those opinions fail to establish that the Challenged Restraints cause an anticompetitive equilibrium that affects the entire class.[7] The Court addresses each of Defendants' arguments in turn.

### i.    *Insufficiency of Plaintiffs' Steering Theory*

Defendants criticize Plaintiffs for their reliance on a steering theory to prove classwide impact. Briefly, Plaintiffs' contend that the Challenged Restraints incentivize home sellers and their listing brokers to offer uniformly supracompetitive rates of commission because buyer-brokers will steer their clients away from listings that offer less than the standard, artificially inflated rates. Yet Defendants claim that Plaintiffs have no basis to assert that such steering incentives would not exist absent the Challenged Restraints. Instead, they claim that even in the but-for world, buyer-brokers would continue to want to be paid more rather than less, and therefore sellers would continue to offer similar rates of commission to ensure an adequate pool of potential buyers for their home.

For purposes of the predominance inquiry, the Court must "investigate[] the realism of [Plaintiffs'] injury . . . model in light of [Defendants'] counterarguments, and to that end [take] evidence." *Parko v. Shell Oil Co.*, 739 F.3d 1083, 1086 (7th Cir. 2014). At best, Defendants identify reasons to doubt Plaintiffs' steering theory; such doubts go to the merits and are not a

---

[7] At times, Defendants seem to suggest that Plaintiffs must have common evidence showing impact to every single member of the class. Any such suggestion is incorrect. *Suchanek*, 764 F.3d at 757 ("If the court thought that no class can be certified until proof exists that every member has been harmed, it was wrong.").

basis to deny class certification. Even in the abstract, it makes sense that the Challenged Restraints would facilitate steering not only by requiring all MLS listings to include a single, set offer of compensation, but also by allowing buyer-brokers to filter listings based on the offered compensation while keeping buyers in the dark and severely restricting negotiations over buyer-broker commissions.

Moreover, contrary to Defendants' characterization of Plaintiffs' steering theory as abstract economic theorizing, Plaintiffs offer real-world evidence supporting the presence of steering in residential real estate transactions. Most prominently, Elhauge analyzes data regarding commission rates in the Covered MLSs and observes that commissions clustered around standard rates in each Covered MLS. During the class period, at least 90% of home sales in 17 of the 20 Covered MLSs featured buyer-broker commissions clustered around three standard rates. (Elhauge Report ¶ 201 & tbl. 8.) And 94% of sales in all Covered MLSs compensated buyer-brokers at rates of between 2.4% and 3.0%, with 85.5% of commissions in the Covered MLSs paid at one of four rates within that range: 2.4%, 2.5%, 2.8%, and 3.0%. (Pls.' Resp. to Defs.' Mot. to Exclude Experts, Ex. 2, Elhauge Rebuttal Report ¶ 109, Dkt. No. 346-3.)

In response, Defendants point to variations in the data across the Covered MLSs to claim that Elhauge's clustering data actually evidences the individualized nature of the purported steering incentives. For example, Defendants observe that the most common rate of commission is offered in about 95% of transactions in the MLS serving Houston, whereas the most common rate in the MLS serving Ohio and West Virginia is offered in only 39% of transactions. (Elhauge Report ¶ 201 & tbl. 8.) Further, Defendants note that the median buyer-broker commission rate in a given Covered MLS ranges from 2.4% to 3.0%, and assert that those variations show that

individual sellers value buyer-brokers differently. Yet, by themselves, those variations do not create individualized issues of impact. "Neither a variety of prices nor negotiated prices is an impediment to class certification if it appears that plaintiffs may be able to prove at trial that . . . the price range was affected generally." *In re NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. 493, 523 (S.D.N.Y. 1996); *see also In re Bromine Antitrust Litig.*, 203 F.R.D. 403, 415 (S.D. Ind. 2001) ("A wide range of . . . prices does not make it impossible to use common proof to demonstrate impact."). Consequently, that the effects of the alleged steering manifest themselves somewhat differently across Covered MLS does not detract from Plaintiffs' evidence tending to show that steering inflates the commission-rate baseline across all Covered MLSs, which Economides estimates caused an impact to at least 99% of the class.

Plaintiffs also note that Elhauge's expert opinions regarding steering incentives in the residential real estate industry have been echoed by the Department of Justice and the Federal Trade Commission. (Elhauge Report ¶¶ 191–92.) Finally, Plaintiffs highlight evidence showing that Corporate Defendants themselves train brokers to wield the risk of steering against those sellers who seek to pay lower rates of commission. Consistent with that training, Plaintiffs have proffered evidence that tends to show that brokers affiliated with Corporate Defendants' brands do, in fact, tell sellers that reducing commissions below the standard rates for their market could result in buyer-brokers avoiding their homes.

Thus, the Court finds that the evidence supports the plausibility of Plaintiffs' contention that the Challenged Restraints create steering incentives. Further, the evidence is common to the class, since all class members sold their homes in MLSs subject to the Challenged Restraints.

ii.     *Predictions of Buyer-Broker Use in the But-For World*

Next, Defendants argue that Plaintiffs' theory of impact improperly relies on Elhauge's

unfounded predictions regarding buyer-broker use in a but-for world lacking the Challenged

Restraints. Specifically, Defendants assert that Plaintiffs cannot prove on a classwide basis that

buyers would stop using buyer-brokers in the but-for world and, similarly, cannot prove that

sellers would no longer pay for their buyers' brokers.

As an initial matter, Defendants mischaracterize Elhauge as predicting that buyer-brokers

would never be used in a but-for world and that sellers would never pay for them. As discussed

above in connection with Defendants' *Daubert* motion, Elhauge only opines that the Challenged

Restraints encouraged overconsumption of buyer-brokers and that buyers would use buyer-

brokers less frequently in the but-for world. And for those buyers in the but-for world who did

use buyer-brokers, sellers would either not pay those buyers' commissions or would pay a

significantly reduced rate. Elhauge adequately explains the reasoning behind his predictions as to

both buyers' use of buyer-brokers and sellers' willingness to pay for those services on the

buyers' behalf. And Plaintiffs' theory of classwide impact is not that class members were forced

to pay commissions that they would not have paid absent the Challenged Restraints; it is only

that the Challenged Restraints artificially inflated the commissions above what the class would

have paid in the but-for world.

To argue that the prevalence of buyer-brokers in the but-for world presents an

individualized question, Defendants tout the invaluable services provided by buyer-brokers that

buyers need but cannot receive from online services such as Zillow. Defendants also discuss the

reasons why sellers in the but-for world may still be inclined to pay for their buyers' brokers. A

jury may well find compelling Defendants' evidence and arguments regarding the benefits of

buyer-brokers and sellers' incentives to cover those costs. But that simply underscores the point that the correctness of Elhauge's predictions regarding buyer-broker use in the but-for world is a matter for the jury. Notably, Defendants' evidence that buyer-broker use would be unchanged in the but-for world is itself common to the class. That Defendants rely on common evidence to disprove Elhauge's predictions demonstrates the existence of a common question. *See, e.g.*, *Kleen Prods.*, 306 F.R.D. at 594 (explaining that the defendants did not demonstrate a lack of common proof where their own evidence disproving an issue is common to the class); *Foreman v. PRA III, LLC*, No. 05 C 3372, 2007 WL 704478, at *11 (N.D. Ill. Mar. 5, 2007) (explaining that the predominance requirement "is met when there exists generalized evidence that proves **or disproves** an element on a simultaneous, classwide basis" (emphasis added) (internal quotation marks omitted)).

### iii.     Historical Broker Compensation Practices

Prior to its adoption of the Challenged Restraints, the NAR's rules codified the practice of subagency whereby real estate agents for buyers acted as subagents of seller-brokers and were paid for by the sellers. But in the decades before the NAR formalized the practice, the subagency system was widely used for residential real estate sales throughout the United States. While Elhauge acknowledges that history, Defendants fault him for failing to square the long-standing practice of sellers paying for their buyers' brokers with his conclusion that sellers would no longer bear those costs in the but-for world.

Defendants' history of broker compensation practices conveniently elides the NAR's involvement in shaping historical compensation practices in the real estate market. Moreover, those earlier practices were themselves subject to antitrust scrutiny. *See, e.g.*, *United States v. Nat'l Ass'n of Real Estate Bds.*, 339 U.S. 485 (1950). In any case, whether historical broker

compensation practice disproves Plaintiffs' contention that most sellers would not compensate buyer-brokers in the but-for world goes to the merits of Plaintiffs' claims. For purposes of the predominance requirement, it is enough that evidence of broker compensation practices in the United States is common to a class consisting of homeowners who sold homes in various markets in the United States.

### iv.    Hogging Provisions

In his expert report, Elhauge discusses how the Challenged Restraints resulted in the adoption of so-called "hogging" provisions in listing agreements between sellers and seller-brokers. Where a listing contains a hogging provision, the seller-broker may keep any portion of the commission that is not paid to the buyer-broker. Going back to the example of a listing agreement calling for a 6% total commission to be split evenly between the buyer and seller brokers, if the buyer managed to negotiate their broker's commission down from 3% to 1% , the 2% difference would not go back to the seller—who might then be inclined to reduce the home's sales price accordingly. Instead, the difference is retained by the seller-broker who now receives a 5% commission. Elhauge opines that such hogging provisions further reduce the incentive to negotiate commissions even within narrow bounds permitted by the Challenged Restraints. Yet he also acknowledges that the listing agreements for around 11% of transactions in the Covered MLSs did not contain a hogging provision but instead actually provided for variable rate commissions based on whether the buyer used a buyer-broker.[8] (Elhauge Report ¶ 208.)

Defendants claim that Elhauge's discussion of the variable-rate commission provisions reveals that individualized inquiries would be necessary to determine which class members'

---

[8] Elhauge notes that while 11% of Covered MLS transactions featured listing agreements with variable-rate commission provisions, the data also reflects that only 1.6% of Covered MLS transactions featured variable-rate commissions *and* no separate buyer-broker. (Elhauge Report ¶ 208.)

listing agreements would have included a variable-rate provision in the but-for world. But if Elhauge is correct that hogging provisions are a byproduct of the Challenged Restraints, it would be self-evident that provisions allocating unpaid buyer-broker commissions would not be widely used in a but-for world without the Challenged Restraints.

*v.*      *Economides's Analysis of Classwide Impact*

Largely reviving their (now rejected) arguments regarding Economides's reliability, Defendants claim that Economides's yardstick analysis cannot show classwide impact. Because the Court has already found Economides's opinions admissible, Defendants' criticisms of his choice of yardsticks or other aspects of his methodology should be presented to the jury and do not stand in the way of class certification.

Defendants also argue that Economides's assumption that all class members would have paid a 1.55% buyer-broker commission fails to account for real-world variations both within and among the Covered MLSs and cannot be used to show common proof of impact. However, Economides's 1.55% yardstick commission rate was calculated for use in Economides's damages model. He separately analyzed impact by comparing the distribution of buyer-broker commissions paid across the Covered MLSs with those paid in the yardsticks, which led him to conclude that nearly all class transactions were impacted. Again, Economides's methodology is sufficiently reliable and capable of measuring classwide impact. That showing suffices at the class certification stage.

*vi.*      *Contradictory Evidence*

Defendants assert that Plaintiffs' claim that the Challenged Restraints artificially inflate buyer-broker commission rates is contradicted by the evidence from the Northwest MLS. The Northwest MLS is a non-NAR affiliated MLS (and thus not one of the Covered MLSs), that

39

recently stopped requiring listings to include an offer of compensation to buyer-brokers. Since that rule change went into effect, 99.75% of sellers continue to offer compensation to buyer-brokers, and 95% of those offers are at rates exceeding 2%. A similar outcome can be seen with respect to the West Penn MLS, which has not required sellers to offer compensation to buyer-brokers since 2013. Defendants claim that the data from these U.S.-based MLSs reveal the individualized nature of the inquiries concerning why a given seller offers compensation to buyer-brokers and the rates at which they do so.

While Defendants accuse Plaintiffs' experts of ignoring evidence from the Northwest MLS and West Penn MLS, Elhauge's rebuttal report does address Defendants' expert's discussion of the outcomes in those MLSs and explains why he found the evidence unpersuasive. Among other things, Elhauge notes that the Northwest MLS did not entirely drop its version of the Buyer-Broker Commission Rule but instead modified its requirement that listings contain a non-zero offer of buyer-broker compensation to allow $0 offers. (Elhauge Rebuttal Report ¶¶ 40–41.) In other words, the Northwest MLS still requires sellers to make offers of compensation, it just allows them to offer nothing whereas they previously had to offer at least 1 cent. The same is true as to the West Penn MLS. (*Id.* ¶ 59.)

The Court does not find the evidence of modest modifications made by two MLSs to one of the Challenged Restraints to be fatal to Plaintiffs' ability to demonstrate classwide impact through common proof. Certainly, Defendants may rely on evidence and expert opinions regarding the Northwest MLS and West Penn MLS to rebut Plaintiffs' claims as to the Challenged Restraints' impact. But even if that evidence proves persuasive, it reflects not the existence of individual questions as to impact but rather the lack of impact—*i.e.*, that the Challenged Restraints do not cause the artificial inflation of buyer-broker commissions. Put

another way, if the rule changes in the Northwest MLS and West Penn MLS demonstrate the absence of anticompetitive effect, that finding would apply equally across the class. And again, a question that is subject to common disproof is itself a common question.

<em>vii.       Benefits to the Class from the Challenged Restraints</em>

Finally, Defendants contend that Plaintiffs fail to propose a method that accounts for the fact that the Challenged Restraints may actually benefit individual class members. They assert that, under the Challenged Restraints, the cost of buyer-brokers is effectively added to the sales price, whereas if buyers had to finance that cost on their own, it could cause a reduction in housing prices. In addition, Defendants note that many class members may have been both buyer and seller, such that any harm those class members incurred in paying buyer-broker commissions would be cancelled out by the benefit they received as buyer.

All of Defendants' arguments as to the benefits to the class are grounded in the class members' ability to pass on the cost of buyer-broker commissions to the buyer by including that cost in their home's sales price. But the Supreme Court has barred antitrust violators from relying on such a "passing-on defense." *Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481, 494 (1968). Building on *Hanover*, the Supreme Court concluded in *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 736 (1977), that antitrust plaintiffs may not recover on a pass-on theory of damages. Under *Illinois Brick*, "only a purchaser who purchased goods directly from the monopolist (or cartel member) can claim damages" and "[t]hat purchaser is entitled to the full value of the damages stemming from the overcharge, even if it passed on some or all of the overcharge to downstream purchasers and consequently mitigated the damage it suffered." *Marion Healthcare, LLC v. Becton Dickinson & Co.*, 952 F.3d 832, 838 (7th Cir. 2020).

As this Court explained in a related antitrust challenge to the Challenged Restraints brought by home buyers, it is the home sellers who are direct purchasers of buyer-broker services, and any commission costs borne by buyers are simply "passed through" to them by virtue of those costs being "baked into" their home's purchase price. *Leeder v. Nat'l Ass'n of Realtors*, 601 F. Supp. 3d 301, 309 (N.D. Ill. 2022). *Hanover Shoe* and *Illinois Brick* demonstrate that there is no need for any individualized inquiries as to how the Damages Class, consisting of direct purchasers, may have been able to benefit from their ability to pass on the cost of buyer-broker commissions. *See Messner*, 669 F.3d at 823 & n.12 ("[U]nder *Illinois Brick*, the ability of a direct purchaser to pass on higher costs to others does not undermine its ability to sue under the Clayton Act."). Rather, antitrust impact "occurs and is complete when the defendant sells at the illegally high price (even if the buyer is only an intermediate buyer)." *Sports Racing Servs., Inc. v. Sports Car Club of Am., Inc.*, 131 F.3d 874, 883 (10th Cir. 1997) (citing *Hanover Shoe*, 392 U.S. at 489)); *see also Hawaii v. Standard Oil Co.*, 405 U.S. 251, 262 n.14 (1972) ("Courts will not go beyond the fact of . . . injury to determine whether the victim of the overcharge has partially recouped its loss in some other way . . . .").

*viii.*      *Common Issues Regarding Impact Predominate*

The Court concludes that Plaintiffs have shown the existence of common questions concerning antitrust impact that can be answered with common evidence such as Elhauge and Economides's expert opinions. Defendants fail to identify any individualized issues to rebut a finding of predominance, as their arguments mostly concern the merits or otherwise address issues that do not pose an obstacle to class certification.

Further, the two cases relied upon by Defendants to show that the issue of impact cannot be resolved on a classwide basis are inapposite. First, *Nichols v. Mobile Board of Realtors, Inc.*,

675 F.2d 671 (5th Cir. 1982), similar to here, alleged an antitrust conspiracy to fix prices in the real estate brokerage services market. However, the Fifth Circuit upheld a district court's order decertifying a class whose members paid purportedly inflated commissions to a broker, finding a "fatal defect" preventing class certification in the "absence of any viable theory of generalized proof for the fact of damage." *Id.* at 678–79. There is no similar defect here, as Plaintiffs have demonstrated that they can show classwide impact through Elhauge's and Economides's opinions. Second, in *Blades v. Monsanto Co.*, 400 F.3d 562 (8th Cir. 2005), the Eighth Circuit found that class certification was not warranted despite evidence of a price-fixing agreement where the defendants' performance of the alleged agreement was "not across the board" and the plaintiffs' expert could not fill in the resulting gap. *Id.* at 573–75. By contrast, Plaintiffs' evidence in this case tends to show that the Challenged Restraints inflated commission rates in all Covered MLSs, and Elhauge is able to show a high risk of impact in nearly all individual class transactions.

In short, Defendants cannot show that individual questions regarding impact predominate over the common issues capable of common proof identified by Plaintiffs. Consequently, the Court finds that Plaintiffs have satisfied the predominance requirement as to antitrust impact.

### c. Damages

Defendants claim that there are flaws in Plaintiffs' theory of damages that preclude class certification. Of course, "[i]t is well established that the presence of individualized questions regarding damages does not prevent certification under Rule 23(b)(3)." *Messner*, 669 F.3d at 815. Rather, at the class certification stage, Plaintiffs simply need to show that "there is a classwide method for proving damages, and if not, whether individual damage determinations will overwhelm the common questions on liability and impact." *Kleen Prods.*, 831 F.3d at 929.

And the Seventh Circuit has recognized that "in complicated antitrust cases plaintiffs are permitted to use estimates and analysis to calculate a reasonable approximation of their damages." *Loeb Indus., Inc. v. Sumitomo Corp.*, 306 F.3d 469, 493 (7th Cir. 2002).

Here, Plaintiffs intend to calculate damages using Economides's formula employing the 1.55% yardstick commission. The Court has already found Economides's methodology sufficiently reliable in declining to exclude Economides's opinions. But here, Defendants go on to claim that Economides's damages model cannot be used to measure classwide damages because of a mismatch between Plaintiffs' theory of impact that claims buyer-broker use would be rare in the but-for world and their theory of damages that assumes all buyers would have used buyer-brokers and all class members would have paid their commissions at the 1.55% yardstick rate.

The Supreme Court has held that "any model supporting a plaintiff's damages case must be consistent with its liability case, particularly with respect to the alleged anticompetitive effects of the violation." *Comcast*, 569 U.S. at 35 (internal quotation marks omitted). Put differently, "*Comcast* holds that a damages suit cannot be certified to proceed as a class action unless the damages sought are the result of the class-wide ***injury*** that the suit alleges." *Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 799 (7th Cir. 2013). Yet, in *Comcast*, the Supreme Court was confronted with a situation where the plaintiffs had proposed four theories of antitrust impact but the district court only accepted one of those theories and rejected the rest. *Comcast*, 569 U.S. at 31. Nonetheless, the district court found that damages could be established using an expert's model that "did not isolate damages resulting from any one theory of antitrust impact" but instead "assumed the validity of all four theories of antitrust impact initially advanced" by the plaintiffs. *Id.* at 32, 36. After the Third Circuit affirmed the decision to certify the class, the

Supreme Court reversed it, finding that the expert's "model failed to measure damages resulting from the particular antitrust injury" on which liability was premised. *Id.* at 36.

By contrast, here, Plaintiffs have only a single theory of impact: that the Challenged Restraints maintained and extended an anticompetitive equilibrium and caused the class to pay supracompetitive buyer-broker commissions. No *Comcast* problem arises where the plaintiff "asserts only **one** theory of liability that cuts across the entire class." *Ploss as Tr. for Harry Ploss Tr. DTD 8/16/1993 v. Kraft Foods Grp., Inc.*, 431 F. Supp. 3d 1003, 1018 (N.D. Ill. 2020). All members of the Damages Class claim to have been damaged by paying inflated commissions as a result of the Challenged Restraints, and Economides's damages model aims to measure the extent of their overpayment. *See Butler*, 727 F.3d at 800 ("[I]t was not the existence of multiple theories in [*Comcast*] that precluded class certification; it was the plaintiffs' failure to base all damages they sought on the antitrust impact—the injury—of which the plaintiffs were complaining."). In turn, Plaintiffs seek to recover damages equivalent to the amount of the class's overpayment as opposed to a full refund of the buyer-broker commissions. That choice is fully consistent with the bottom line of Plaintiffs' theory of impact that nearly all class members paid overinflated buyer-broker commissions, notwithstanding the fact that their theory also suggests that most members were further harmed by having to pay any buyer-broker commissions at all.

Certainly, in conservatively assuming that all class members would have both sold to buyers using buyer-brokers and covered the buyer-brokers' commissions, Economides's model likely leaves some damages on the table when viewed in conjunction with Plaintiffs' theory of impact. Nonetheless, Plaintiffs make a permissible strategic choice to seek only the damages that they believe they can efficiently prove with certainty—the supracompetitive portion of the

class's commission payments—and forgo the more complex task of determining which class members are entitled to a full refund.[9] Perhaps Plaintiffs' choice might give a class member reason to opt out of the class if they believe they are entitled to recover the entirety of the buyer-broker commission. *Smith v. Fam. Video Movie Club, Inc.*, 311 F.R.D. 469, 475 (N.D. Ill. 2015) ("[A]ny putative class member who wants to seek compensation [not captured by the damages model] will be free to opt out of the class and pursue those claims on an individual basis, and the class notice should contain language informing the putative class members that this is the case."). But Defendants cannot defeat class certification by insisting that, if found liable, they should owe the class more money than the figure produced by Economides's damages model. *See BCS Servs., Inc. v. BG Invs., Inc.*, 728 F.3d 633, 640 (7th Cir. 2013) ("Once the plaintiff proves injury, broad latitude is allowed in quantifying damages, especially when the defendant's own conduct impedes quantification." (internal quotation marks omitted)); *Smith*, 311 F.R.D. at 481–82 (rejecting the defendant's contention that the plaintiffs "are obligated to seek compensation for every minute they may have worked without pay" in holding that predominance was met, even though the plaintiffs' method for calculating the class's underpaid wages failed to capture compensation for unrecorded off-the-clock work). Had Plaintiffs relied on a damages model that assumed all class members would have paid nothing to buyer-brokers, Defendants would likely have protested that Plaintiffs' damages figure was excessive.

Defendants' remaining contentions as to individual damages issues do not preclude a finding of predominance either. They argue that Economides's model fails to account for the fact

---

[9] Had Plaintiffs chosen to seek damages in the form of a full refund of buyer-broker commissions, class certification would not be precluded simply because individual inquiries might be necessary to identify those few class members that would have paid buyer-broker commissions in the but-for world. *See Bell*, 800 F.3d at 379 ("The fact that the plaintiffs might require individualized relief or not share all questions in common does not preclude certification of a class.").

that the buyer-broker commissions are usually incorporated into a home's sales price, such that there would be a commensurate decrease in home prices in a but-for world where buyers pay their own commissions, thereby leaving sellers in the same financial position. That claim is simply a version of the passing-on defense barred by *Hanover Shoe*. Next, Defendants fault Economides's model for failing to account for variations among buyer-broker commission rates within and across the Covered MLSs. But that does not appear to be the case. Economides's formulas measure the difference between the commissions actually paid and the amount the class would have paid in the but-for world. Thus, under the formulas, class members who paid a higher rate of commission will have higher damages and vice versa. Finally, Defendants claim that Economides's 1.55% yardstick rate is overly reliant on averaging. As already noted, the use of estimates or analysis does not render a damages calculation unreasonable, and the quality of the data inputs is a matter for the jury to consider.

At bottom, Defendants' issues with Plaintiffs' damages model go to the merits and do not prevent certification of the Damages Class. And because Plaintiffs have shown that common questions predominate as to each element of their claim under § 1 of the Sherman Act, the Court finds that they have met Rule 23(b)(3)'s predominance requirement.

### 2. Superiority

In addition to predominance, Rule 23(b)(3) also requires that the Court determine whether a class action is the superior way to resolve Plaintiffs' lawsuit. "The superiority inquiry requires courts to assess the fairness and efficiency of class adjudication 'with an eye toward other available methods.'" *Quinn v. Specialized Loan Servicing, LLC*, 331 F.R.D. 126, 133 (N.D. Ill. 2019) (quoting *Mullins v. Direct Digit., LLC*, 795 F.3d 654, 664 (7th Cir. 2015)). Superiority will be found "when a class action would achieve economies of time, effort, and expense, and

promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *Wilkins v. Just Energy Grp., Inc.*, 308 F.R.D. 170, 190 (N.D. Ill. 2015) (internal quotation marks and alteration omitted).

Defendants' sole basis for opposing superiority is their contention that mini-trials will be necessary for each class member to resolve the various individual issues they raised in connection with the predominance requirement. But the Court has already found that such individualized inquiries will not be necessary or will not predominate. "[T]he predominance and superiority inquiry are intertwined: generally, the more that common issues predominate, the more likely that a class action is the superior vehicle for deciding the controversy." *In re Evanston Nw. Corp. Antitrust Litig.*, No. 07-cv-04446, 2013 WL 6490152, at *3 (N.D. Ill. Dec. 10, 2013). Consequently, the Court's findings above as to predominance weigh strongly in favor of finding that a class action is the superior format for the litigation. *Johnson v. Diakon Logistics*, No. 16-cv-06776, 2020 WL 405636, at *7 (N.D. Ill. Jan. 23, 2020). Moreover, the large number of potential class members indicates the superiority of the class action device here. *In re Steel Antitrust Litig.*, 2015 WL 5304629, at *12. For these reasons, the Court finds that Plaintiffs have satisfied the superiority requirement.[10]

Because certification is proper pursuant to Rule 23(b)(3), the Court grants Plaintiffs' motion to certify the Damages Class.

---

[10] In finding that Plaintiffs have satisfied each of Rule 23(a)'s four requirements and Rule 23(b)(3)'s predominance and superiority requirements, this Court's decision is in accord with the decision of the district court in *Burnett v. National Association of Realtors*, No. 19-CV-00332-SRB, 2022 WL 1203100 (W.D. Mo. Apr. 22, 2022), which also involved an alleged antitrust conspiracy based on the adoption and enforcement of the Challenged Restraints. There, the district court granted the plaintiffs' motion to certify classes compromised of home sellers who sold a home listed on one of four MLSs covering the Missouri region and paid a commission to the buyer-broker. The district court's decision in *Burnett* provides additional support for class certification here.

### C. Rule 23(b)(2)

The Court next considers Plaintiffs' request for certification of an Injunctive Relief Class pursuant to Rule 23(b)(2). "The key to the (b)(2) class is the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them." *Wal-Mart*, 564 U.S. at 360 (internal quotation marks omitted). Thus, a Rule 23(b)(2) class may only be certified "when a single injunction or declaratory judgment would provide relief to each member of the class." *Id.* On the other hand, "[i]t does not authorize class certification when each individual class member would be entitled to a ***different*** injunction or declaratory judgment against the defendant." *Id.*

Through the Injunctive Relief Class, Plaintiffs hope to obtain an injunction barring Defendants from continuing to violate the antitrust laws by maintaining and enforcing the Challenged Restraints. Unlike the Damages Class, which consists of home sellers who sold their homes during the class period, the Injunctive Relief Class consists of current homeowners whose homes are currently listed for sale or intend to list their homes for sale in the future. Yet Defendants contend that Plaintiffs, each past home sellers, do not have standing to represent a class consisting of present or future home sellers. To obtain injunctive relief, however, an antitrust plaintiff "need only demonstrate a significant threat of injury from an impending violation of the antitrust laws or from a contemporary violation likely to continue or recur." *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 395 U.S. 100, 130 (1969). All but one of the named Plaintiffs here have expressly indicated that they are likely to sell homes on a Covered MLS again in the near future. (Pls.' Corrected Mem. in Supp. of Class Certification, Ex. 5, Class

Representative Decls., Dkt. No. 306-5.) They therefore have standing to represent the Injunctive Relief Class.

Certification pursuant to Rule 23(b)(2) would seemingly be appropriate given that Plaintiffs request a single injunction that provides an equal benefit to every member of the class. And courts have found that Rule 23(b)(2) is particularly applicable "when members of a putative class seek uniform injunctive or declaratory relief from policies or practices that are generally applicable to the class as a whole." *B.K. by next friend Tinsley v. Snyder*, 922 F.3d 957, 971 (9th Cir. 2019). Nonetheless, Defendants contend that certification pursuant to Rule 23(b)(2) is improper because Plaintiffs are primarily seeking damages in this lawsuit rather than injunctive relief.

It is true that Rule 23(b)(2) "does not extend to cases in which the appropriate final relief relates exclusively or predominantly to money damages." Fed. R. Civ. P. 23(b)(2) advisory committee's note to 1966 amendment; *see also Wal-Mart*, 564 U.S. at 360 (holding that claims for monetary relief may not be certified under Rule 23(b)(2) where "the monetary relief is not incidental to the injunctive or declaratory relief"). However, Plaintiffs emphasize that the Injunctive Relief Class seeks no monetary damages; that form of relief is sought only by the Damages Class, for which Plaintiffs have sought and now been granted certification pursuant to Rule 23(b)(3). While the Supreme Court stated in *Wal-Mart* that Rule 23(b)(2) "does not authorize class certification when each class member would be entitled to an individualized award of monetary damages," 564 U.S. at 360–61, it was addressing a class that attempted to use Rule 23(b)(2) as a vehicle to obtain both injunctive and monetary relief. *Jermyn v. Best Buy Stores, LP*, 276 F.R.D. 167, 173 (S.D.N.Y. 2011). *Wal-Mart* does not speak to the certification of separate Rule 23(b)(2) and Rule 23(b)(3) classes. *Jermyn*, 276 F.R.D. at 174 ("In this case,

unlike [*Wal-Mart*], a (b)(2) class is not seeking monetary relief, but only an injunction against further statutory violations. It is a separately certified (b)(3) class that seeks money damages."). Moreover, the Seventh Circuit has indicated its approval of separate certification of damages and injunctive relief classes. *See, e.g.*, *Chi. Teachers Union, Loc. No. 1 v. Bd. of Educ. of City of Chi.*, 797 F.3d 426, 443 (7th Cir. 2015) (approving certification of a Rule 23(b)(2) class and a request for certification of a Rule 23(b)(3) class that "siphoned th[e] portion of the complaint that requested monetary relief and individual remedies"); *Lemon v. Int'l Union of Operating Eng'rs, Loc. No. 139*, 216 F.3d 577, 581 (7th Cir. 2000) ("The district court could certify a Rule 23(b)(2) class for the portion of the case addressing equitable relief and a Rule 23(b)(3) class for the portion of the case addressing damages.").

Thus, because the Injunctive Relief Class asks only for a single injunction that applies generally to the class and there are Plaintiffs with standing to represent the class, certification is proper under Rule 23(b)(2). Moreover, the existence of a separate Damages Class seeking monetary relief does preclude certification. For these reasons, the Court grants Plaintiffs' motion to certify the Injunctive Relief Class.

### D.    Class Definition

Earlier in this case, Defendants HomeServices of America, Inc., HSF Affiliates, LLC, BHH Affiliates, LLC, and The Long & Foster Companies, Inc. (collectively, "HomeServices") moved to strike from the class definition those class members who had signed a listing agreement with a HomeServices-owned brokerage containing an arbitration provision. This Court denied HomeServices's motion, finding that the matter would be better addressed at the class certification stage. Accordingly, Defendants' opposition to class certification reasserts

HomeServices's contention that the class definitions should exclude those members whose listing agreements contained arbitration provisions.[11]

HomeServices does not dispute that none of the constituent HomeServices entities are signatories to the unnamed class members' listing agreements; those agreements are between the seller and a HomeServices-affiliated brokerage firm. As a result, whether to exclude those unnamed class members from the class definitions raises three main questions. First, can the Court decide the threshold issue of whether the unnamed class members agreed to arbitrate this dispute or did the arbitration agreements delegate this determination to an arbitrator? Second, can HomeServices enforce the arbitration agreements against the unnamed class members even though they are nonsignatories to the relevant agreements? And third, even if HomeServices can enforce the arbitration agreements, does that compel exclusion of the unnamed class members from participating in a class action that would hold jointly and severally liable not only HomeServices but the other alleged co-conspirator Defendants with whom the unnamed class members have no colorable relationship?  Both parties frame these questions as susceptible to a single, "all or nothing" answer. But the issue is not so simple.

Although the parties often argue as if the facts and the applicable law are the same across the unnamed class members, that is not the case. Rather, the relevant arbitration provisions are not identical and many vary materially in language and substance. Further, the brokerages that included arbitration provisions in their listing agreements are located throughout the United States. Thus, the answer to any one of the above three questions could vary depending on the language of the particular arbitration provision and the applicable state's contract law. *See, e.g.*, *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) ("[C]ourts must place arbitration

---

[11] None of the named Plaintiffs' listing agreements contained an arbitration provision.

agreements on an equal footing with other contracts and enforce them according to their terms." (citations omitted)); *Sosa v. Onfido, Inc.*, 8 F.4th 631, 637 (7th Cir. 2021) ("A nonparty's right to enforce an arbitration agreement is governed by state law."). Neither Plaintiffs nor Defendants grapple with these important factual and legal differences in any real depth.[12]

In Defendants' opposition to class certification, they state that HomeServices is willing to file a separate motion regarding their request to exclude from the class definitions the unnamed members whose listing agreements contained an arbitration provision. The Court believes that is the best course. *See, e.g.*, *Garcia v. Jcpenney Corp.*, No. 12-cv-3687, 2016 WL 878203, at *7 (N.D. Ill. Mar. 8, 2016) ("[T]he sensible course in this case is to decide whether to certify the class without considering the possibility of arbitration and then allow [the defendant], if it so chooses, to file its motion to compel arbitration."). Thus, the Court will certify Plaintiffs' Damages Class and Injunctive Relief Class, but if HomeServices wishes to narrow one or both classes, it may do so by separate motion. And, of course, the parties' briefs in support of that motion should be responsive to the concerns laid out by the Court here.

## CONCLUSION

For the foregoing reasons, Defendants' motion to exclude the expert opinions of Elhauge and Economides (Dkt. No. 318) is denied, and Plaintiffs' motion for class certification (Dkt. No. 301) is granted. The Court certifies the following class under Federal Rule of Civil Procedure 23(b)(3):

> Home sellers who paid a commission between March 6, 2015, and December 31, 2020, to a brokerage affiliated with a Corporate Defendant in connection with the sale of residential real estate listed on a Covered MLS and in a covered jurisdiction. Excluded from the class are (i) sales of residential real estate for a price below

---

[12] The Court does not exclude the possibility that the issue can be resolved the same as to all unnamed class members. At this time, the Court simply requires further elaboration of the issue before it can decide.

$56,500, (ii) sales of residential real estate at auction, and (iii) employees, officers, and directors of defendants, the presiding Judge in this case, and the Judge's staff.

In addition, the Court certifies the following class under Federal Rule of Civil Procedure 23(b)(2):

Current and future owners of residential real estate in the covered jurisdictions who are presently listing or will in the future list their home for sale on a Covered MLS. Excluded from the class are (i) sales of residential real estate for a price below $56,500, (ii) sales of residential real estate at auction, and (iii) employees, officers, and directors of defendants, the presiding Judge in this case, and the Judge's staff.

The Court appoints Plaintiffs Christopher Moehrl, Michael Cole, Steve Darnell, Jack Ramey, Daniel Umpa, and Jane Ruh as class representatives and appoints Cohen Milstein Sellers & Toll PLLC, Hagens Berman Sobol Shapiro LLP, and Susman Godfrey LLP as co-lead class counsel.

ENTERED:

Dated: March 29, 2023

_____
Andrea R. Wood
United States District Judge