# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT FOR THE**
**WESTERN DISTRICT OF MISSOURI**
**WESTERN DIVISION**

| | |
|---|---|
| RHONDA BURNETT, JEROD BREIT, HOLLEE ELLIS, FRANCES HARVEY, and JEREMY KEEL, on behalf of themselves and all others similarly situated,<br><br>        Plaintiffs,<br><br>    v.<br><br>THE NATIONAL ASSOCIATION OF REALTORS, REALOGY HOLDINGS CORP., HOMESERVICES OF AMERICA, INC., BHH AFFILIATES, LLC, HSF AFFILIATES, LLC, RE/MAX LLC, and KELLER WILLIAMS REALTY, INC.,<br><br>        Defendants. | Case No. 19-CV-00332-SRB |

**PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL**
**OF SETTLEMENTS WITH ANYWHERE REAL ESTATE AND RE/MAX,**
**CERTIFICATION OF SETTLEMENT CLASS, AND APPOINTMENT OF**
**SETTLEMENT CLASS COUNSEL**

# TABLE OF CONTENTS

I.    INTRODUCTION .................................................................................................. 1

II.   BACKGROUND ................................................................................................... 2

   A.   THE LITIGATION ......................................................................................... 2
   B.   SETTLEMENT NEGOTIATIONS AND MEDIATION.................................... 4
   C.   SUMMARY OF THE SETTLEMENT AGREEMENTS................................... 5
      1.   Settlement Class ............................................................................... 5
      2.   Settlement Amounts ......................................................................... 6
      3.   Changes to Business Practices ......................................................... 6
         a.   Anywhere ............................................................................... 6
         b.   RE/MAX ................................................................................. 9
      4.   Cooperation Requirements................................................................ 11
      5.   Release of Claims Against Anywhere and RE/MAX ........................ 12
      6.   Application for Award of Attorneys' Fees, Costs and Class Representative Incentive Awards ......................................................................................................... 13

III.   THE CLASS DEFINITION CONTEMPLATED BY THE SETTLEMENTS SATISFIES RULE 23, AND THE CLASS SHOULD BE CERTIFIED ........................................... 13

   A.   CLASS DEFINITION ..................................................................................... 13
   B.   LEGAL STANDARD FOR MODIFYING THE CLASS DEFINITION ............. 15
   C.   THE PROPOSED SETTLEMENT CLASS SATISFIES RULE 23(A).............. 17
      1.   Numerosity ....................................................................................... 18
      2.   Commonality..................................................................................... 18
      3.   Typicality.......................................................................................... 19
      4.   Adequacy .......................................................................................... 20
   D.   THE PROPOSED SETTLEMENT CLASS SATISFIES RULE 23(B)(3). ........ 21
      1.   Predominance.................................................................................... 21
      2.   Superiority of a Class Action ........................................................... 24

IV.  THE COURT SHOULD PRELIMINARILY APPROVE THE SETTLEMENTS............. 26

   A.   THE MERITS OF THE PLAINTIFFS' CASES, WEIGHED AGAINST THE TERMS OF THE SETTLEMENTS ............................................................................................... 27
   B.   DEFENDANTS' FINANCIAL CONDITIONS ................................................. 29
   C.   THE COMPLEXITY AND EXPENSE OF FURTHER LITIGATION ............... 31
   D.   THE AMOUNT OF OPPOSITION TO THE SETTLEMENT .......................... 32
   E.   THE SETTLEMENTS ALSO SATISFY THE RULE 23(E) FACTORS. .......... 32

V.   THE COURT SHOULD APPOINT CO-LEAD CLASS COUNSEL FOR THE CERTIFIED CLASSES IN BURNETT AND MOEHRL AS CO-LEAD COUNSEL FOR THE SETTLEMENT CLASS ........................................................................................... 34

VI.  DEFERRING CLASS NOTICE IS APPROPRIATE IN THIS CASE ............................... 34

VII.   CONCLUSION.................................................................................................... 36

# TABLE OF AUTHORITIES

## Cases

*Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997) .................................................... 20, 22, 25

*Bishop v. DeLaval Inc.*, 2022 WL 18957112 (W.D. Mo. July 20, 2022) .................................... 33

*Burnett v. Nat'l Ass'n of Realtors*, 2022 WL 1203100 (W.D. Mo. Apr. 22, 2022) .............. Passim

*Cohn v. Nelson*, 375 F. Supp. 2d 844 (E.D. Mo. 2005) ................................................. 27

*Comcast Corp. v. Behrend*, 569 U.S. 27 (2013) ........................................................ 17

*D&M Farms v. Birdsong Corp.*, 2020 WL 7074140 (E.D. Va. Dec. 1, 2020) ........................... 18

*DeBoer v. Mellon Mortg. Co.*, 64 F.3d 1171 (8th Cir. 1995) ................................. 19, 27

*Donaldson v. Pillsbury Co.*, 554 F.2d 825 (8th Cir. 1977) ........................................... 19

*Ebert v. Gen. Mills, Inc.*, 823 F.3d 472 (8th Cir. 2016) ............................................. 21

*Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147 (1982) .................................................. 20

*Grunin*, 513 F.2d ........................................................................................ 27

*Gunnells*, 348 F.3d ..................................................................................... 20

*Hand v. Beach Entertainment KC, LLC*, 456 F. Supp. 3d 1099 (W.D. Mo. 2020) ................... 17

*Heldt v. Payday Fin., LLC*, 2016 WL 96156 (D.S.D. Jan. 8, 2016) ............................... 16

*Hesse v. Sprint Corp.*, 598 F.3d 581 (9th Cir. 2010) .................................................. 16

*Holt v. CommunityAmerica Credit Union*, 2020 WL 12604383 (W.D. Mo. Sept. 4, 2020) .. 21, 33

*Horton v. USAA Cas. Ins. Co.*, 266 F.R.D. 360 (D. Ariz. 2009) ................................... 15

*Hughes v. Baird & Warner, Inc*, 1980 WL 1894 (N.D. Ill. Aug. 20, 1980) .............................. 19

*Hyland v. Homeservices of Am., Inc.*, 2008 WL 4858202 (W.D. Ky. Nov. 7, 2008) ................. 19

*In re Ampicillin Antitrust Litig.*, 82 F.R.D. 652 (D.D.C. 1979) ................................... 28

*In re Cardizem CD Antitrust Litig.*, 218 F.R.D. 508 (E.D. Mich. 2003) .......................... 27

*In re Corrugated Container Antitrust Litig.*, 643 F.2d 195 (5th Cir. 1981) ................................ 20

*In re Hyundai & Kia Fuel Econ. Litig.*, 926 F.3d 539 (9th Cir. 2019) .......................................... 21

*In re Ikon Office Solutions, Inc., Sec. Litig.*, 194 F.R.D. 166 ..................................................... 16

*In re IPO Sec. Litig.*, 226 F.R.D. 186 (S.D.N.Y. 2005)................................................................ 28

*In re MicroStrategy, Inc. Sec. Litig.*, 148 F. Supp. 2d 654 (E.D. Va. 2001) ............................... 16

*In re Nexium Antitrust Litig.*, 777 F.3d 9 (1st Cir. 2015) ........................................................... 23

*In re Pre-Filled Propane Tank Antitrust Litig.*, 2019 WL 7160380 (W.D. Mo. Nov. 18, 2019) 21, 33

*In re Serzone Prods. Liab. Litig.*, 231 F.R.D. ................................................................................ 25

*In re TFT-LCD (Flat Panel) Antitrust Litig.*, 2011 WL 13152270 (N.D. Cal. Aug. 24, 2011)... 15, 16

*In re TRS Recovery Servs., Inc. & Telecheck Servs., Inc., Fair Debt Collection Pracs. Act (FDCPA) Litig.*, 2016 WL 543137 (D. Me. Feb. 10, 2016) ....................................................... 15

*In re Uponor, Inc., F1807 Plumbing Fittings Products Liab. Litig.*, 716 F.3d 1057 (8th Cir. 2013)................................................................................................................................................ 26

*In re Zurn Pex Plumbing Prod. Liab. Litig.*, 2013 WL 716088 (D. Minn. Feb. 27, 2013) .......... 22

*In re Zurn Pex Plumbing Prods. Liab. Litig.*, 644 F.3d 604 (8th Cir. 2011) ................................ 21

*Little Rock Sch. Dist. v. Pulaski County Special Sch. Dist. No.*, 921 F.2d 1371 (8th Cir. 1990) . 26

*Marcus v. Kansas*, 209 F. Supp. 2d 1179 (D. Kan. 2002) ............................................................ 29

*Marshall v. Nat'l Football League*, 787 F.3d 502 (8th Cir. 2015) ............................................... 26

*McKinney v. U.S. Postal Serv.*, 292 F.R.D. 62 (D.D.C. 2013) ..................................................... 35

*Moehrl v. Nat'l Ass'n of Realtors*, 2023 WL 2683199 (N.D. Ill. Mar. 29, 2023) ................Passim

*Paxton v. Union Nat'l Bank*, 688 F.2d 552 (8th Cir. 1982)................................................... 17, 18

*Petrovic v. Amoco Oil Co.*, 200 F.3d 1140 (8th Cir. 1999) ............................................ 22, 23, 26

*Rannis v. Rechia*, 380 Fed. App'x 646 (9th Cir. 2010) ............................................................... 17

*Sanderson v. Unilever Supply Chain, Inc.*, 2011 WL 5822413 (W.D. Mo. Nov. 16, 2011) ........ 26

*Temp. Servs. v. Am. Int'l Grp.*, 2012 WL 2370523 (D.S.C. June 22, 2012) ................................ 25

*Van Horn v. Trickey*, 840 F.2d 604 (8th Cir. 1988) ................................................................ 27

*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011) ............................................................ 18

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96 (2d Cir. 2005) ...................................... 16

*Wireless*, 396 F.3d ................................................................................................................ 27

**Statutes**

15 U.S.C. § 1 ............................................................................................................................ 2

**Rules**

Fed. R. Civ. P. 23(c)(1)(C) ...................................................................................................... 15

Fed. R. Civ. P. 23(e)(1)(B) ...................................................................................................... 26

Fed. R. Civ. P. 23(e)(2) ............................................................................................................ 33

Fed. Rule Civ. Proc. 23(b)(3)(D) ............................................................................................ 25

Fed R. Civ. P. 23(g) ................................................................................................................ 33

Federal Rule of Civil Procedure 23(b)(2) ................................................................................ 14

Federal Rule of Civil Procedure 23(b)(3) .................................................................... 14, 21, 24

Federal Rule of Civil Procedure 23(e) .............................................................................. 26, 34

Rule 23 ................................................................................................................................ 15, 16

Rule 23(a) ................................................................................................................................ 17

Rule 23(a) and 23(b)(3) .......................................................................................................... 15

Rule 23(a) and (b)(3) .............................................................................................................. 17

Rule 23(a)(1) ...................................................................................................................... 17, 18

Rule 23(a)(2) ............................................................................................................................ 18

Rule 23(a)(3) ................................................................................................................... 19

Rule 23(b) ....................................................................................................................... 17

Rule 23(b)(3)(A–D) ........................................................................................................ 22

Rule 23(c)(2)(B) ....................................................................................................... 34, 35

**Other Authorities**

4 Newberg on Class Actions § 11.41 ............................................................................. 26

## I.   INTRODUCTION

After extensive litigation and arms-length negotiations, Plaintiffs Rhonda Burnett, Jerod Breit, Hollee Ellis, Frances Harvey, and Jeremy Keel ("*Burnett* Plaintiffs") and Plaintiffs Christopher Moehrl, Daniel Umpa, Jane Ruh, Jack Ramey, Steve Darnell, Michael Cole ("*Moehrl* Plaintiffs") (collectively "Plaintiffs"), on behalf of themselves and the proposed Settlement Class (defined herein), have reached agreements with Defendants Anywhere Real Estate, Inc. (f/k/a Realogy Holdings Corp.) ("Anywhere") and RE/MAX LLC ("RE/MAX") (together the "Settling Defendants") to settle and resolve on a national basis, Plaintiffs' claims for damages and injunctive relief against the Settling Defendants for their alleged anticompetitive trade practices within the market for residential real estate brokerage services, including the claims in this case and the *Moehrl* case. The settlements are fair, reasonable, and beneficial to the Settlement Class, and thus Plaintiffs respectfully move this Court for preliminary approval of the Settlements.

As the Court is aware, both the *Burnett* litigation and the *Moehrl* litigation (*Moehrl v National Association of Realtors*, Case No. 1:19-cv-01610-ARW (Northern District of Illinois)), raise similar claims against the same set of Defendant families. Burnett and Moehrl Plaintiffs worked together to achieve a comprehensive, nationwide resolution.

*Burnett* Plaintiffs, *Moehrl* Plaintiffs, and the Settling Defendants have entered into settlements that would recover $138.5 million for the Settlement Class. Specifically, Plaintiffs have entered into a Settlement with Anywhere for $83.5 million and a Settlement with RE/MAX for $55 million (together the "Settlement Agreements"). Both Settlements were the product of extensive negotiations over the course of many years, including intensive negotiations over the last many months, facilitated by experienced mediators. The Settlements were informed by the risks, cost, and delay of litigation, and the financial terms were informed by a thorough analysis of each Defendant's ability to pay. Settling Defendants have also agreed to implement meaningful

Practice Changes and to provide cooperation to Plaintiffs in the litigation against the remaining Defendants.

Accordingly, Plaintiffs respectfully request that the Court enter an order: (1) preliminarily approving the Settlements; (2) certifying a Settlement Class for settlement purposes only; (3) appointing Plaintiffs as Settlement Class Representatives; (4) appointing Settlement Class Counsel as defined below; and (5) deferring notice of the Settlement Agreements to the Settlement Class until an appropriate future date.

## II.    BACKGROUND

### A.   The Litigation

The *Moehrl* class action was filed in the Northern District of Illinois on March 6, 2019, on behalf of home sellers who paid a broker commission in connection with the sale of residential real estate listed on one of 20 Covered Multiple Listing Services ("MLSs") spanning 19 states. (Moehrl Doc. 1) The *Burnett* action was filed in this Court on April 29, 2019, on behalf of home sellers who paid a broker commission in connection with the sale of residential real estate listed on one of four Subject MLSs in Missouri. (Burnett Doc. 1).

Plaintiffs in both actions alleged that the National Association of Realtors ("NAR") and the nation's largest real estate brokerage firms entered into an unlawful agreement in violation of the Sherman Act, 15 U.S.C. § 1, to artificially inflate the cost of commissions in residential real estate transactions. Specifically, Plaintiffs alleged a longstanding conspiracy among Defendants to agree to NAR rules (a) requiring home sellers to make blanket unilateral offers of compensation to real estate brokers working with buyers; (b) restraining negotiation of those offers; (c) denying buyers information on the commissions being offered; (d) allowing buyer agents to represent that their services are "free;" and (e) incentivizing and facilitating steering by brokers towards high commission listings and away from discounted listings (together, the "Challenged Rules").

Plaintiffs claim that the Challenged Rules are anticompetitive and caused them to pay artificially inflated broker commissions when they sold their homes. Defendants have denied Plaintiffs' allegations.

Defendants filed motions to dismiss the *Burnett* action on August 5, 2019, and this Court denied their motions on October 16, 2019. (Burnett Doc. 131) Similarly, Defendants filed motions to dismiss the *Moehrl* action on August 9, 2019, and the Court in that action denied their motions on October 2, 2020. (Moehrl Doc. 184). The parties proceeded with discovery.

On April 22, 2022, this Court granted *Burnett* Plaintiffs' motion for class certification; appointed Scott and Rhonda Burnett, Jerod Breit, Ryan Hendrickson, Jeremy Keel, and Scott Trupiano as class representatives[1]; and appointed their counsel as co-lead class counsel. (Burnett Doc. 741) Hollee Ellis and Frances Harvey joined as class representatives in *Burnett* with the Third Amended Complaint (Burnett Doc. 759) On March 29, 2023, Judge Wood granted the plaintiffs' motion for class certification in the *Moehrl* action, appointed Christopher Moehrl, Michael Cole, Steve Darnell, Jack Ramey, Daniel Umpa, and Jane Ruh as class representatives; and appointed Cohen Milstein Sellers & Toll PLLC, Hagens Berman Sobol Shapiro LLP, and Susman Godfrey LLP as co-lead class counsel. (Moehrl Doc. 403).

The parties in both actions completed over four years of extensive fact and expert discovery, including propounding and responding to multiple sets of interrogatories and requests for production, followed by the production of well over 5 million pages of documents from the parties and dozens of non-parties across both actions. Plaintiffs briefed numerous discovery motions and disputed items in order to obtain important evidence to support their claims. The

---

[1] With the Court's permission, three class representatives were withdrawn from the lawsuit as litigation class representatives: Scott Burnett, Ryan Hendrickson, and Scott Trupiano. They remain absent members of the class.

parties conducted around 100 depositions in the *Moehrl* action and over 80 depositions in the *Burnett* action. *Moehrl* Plaintiffs engaged six experts and *Burnett* Plaintiffs engaged five experts to support their claims and to rebut claims from the nine experts retained by Defendants in each case. Most experts in the case were deposed after the submission of 24 expert reports in *Moehrl* and 19 expert reports in *Burnett*. *Burnett* Plaintiffs also briefed summary judgment and began preparing for trial, including against the Settling Defendants. (Berman Decl. ¶ 11; Dameron Decl. ¶¶ 3-6).

### B.  Settlement Negotiations and Mediation

Plaintiffs' Co-Lead Counsel and counsel for Anywhere engaged in extensive arm's-length settlement negotiations that lasted nearly three and a half years, including several telephonic and in-person mediations with a nationally recognized and highly experienced mediator, two mediations with a retired federal court judge, and a mediation with a federal magistrate judge, leading to this Settlement Agreement. Plaintiffs' Co-Lead Counsel and counsel for Anywhere also participated in dozens of one-on-one calls as part of the settlement negotiations. Plaintiffs' Co-Lead Counsel and counsel for RE/MAX further held several mediations over nearly three and a half years, including remote mediations with a nationally recognized and highly experienced mediator, two mediations with a retired federal court judge, and a remote mediation with a federal magistrate judge, as well as numerous direct communications. (Berman Decl. ¶ 9; Dameron Decl. ¶ 12).

The Settling Parties reached the Settlement Agreements after considering the risks and costs of litigation. Plaintiffs and Class Counsel believe the claims asserted have merit and that the evidence developed to date supports the claims. Plaintiffs and counsel, however, also recognize the myriad risks and delay of further proceedings in a complex case like this, and believe that the

Settlements confer substantial benefits upon the Settlement Class Members. (Berman Decl. ¶¶ 10, 12; Dameron Decl. ¶¶ 9-11).

Moreover, Plaintiffs and counsel conducted a thorough financial analysis of the limited ability to pay of both Anywhere and RE/MAX, and whether Anywhere and RE/MAX could withstand a greater monetary judgment, which directly affected the monetary amounts that it was feasible to recover from both Settling Defendants through settlement. (Berman Decl. ¶ 13; Dameron Decl. ¶ 8).

The Settling Defendants have indicated that they deny Plaintiffs' claims and deny any wrongdoing but wish to avoid the uncertainty and risk attendant with further litigation.

**C. Summary of the Settlement Agreements**

**1. Settlement Class**

The proposed Settlement Class in the Settlement Agreements with both Anywhere and RE/MAX is as follows: All persons who sold a home that was listed on a multiple listing service anywhere in the United States where a commission was paid to any brokerage in connection with the sale of the home in the following date ranges:

a.     Moehrl MLSs: March 6, 2015 to date of notice;

b.     Burnett MLSs: April 29, 2014 to date of notice;

c.     MLS PIN: December 17, 2016 to date of notice;

d.     All other MLSs: four years prior to (i) the date a new or amended complaint (if any) is filed in the Actions reflecting any MLSs aside from the Moehrl MLSs, Burnett MLSs, and MLS PIN or (ii) the date of notice, whichever is earlier, up to the date of notice. (Anywhere Agreement ¶ 18; RE/MAX Agreement ¶ 18).

## 2. Settlement Amounts

The proposed Settlement Agreement provides that Anywhere will pay a Total Settlement Amount of eighty-three million five hundred thousand U.S. dollars ($83,500,000) for the benefit of the Settlement Class. This amount is inclusive of all costs of settlement, including payments to class members, attorneys' fees and costs, service awards for current and former class representatives (including Settlement Class Representatives), and costs of notice and administration. (Anywhere Agreement ¶ 21).

The proposed Settlement Agreement provides that RE/MAX will pay a total Settlement Amount of fifty-five million U.S. dollars ($55,000,000) for the benefit of the Settlement Class. This amount is likewise inclusive of all costs of settlement, including payments to class members, attorneys' fees and costs, service awards to current and former class representatives, and costs of notice and administration. (RE/MAX Agreement ¶ 21). Both Total Settlement Amounts are non-reversionary; once the Settlements with Anywhere and RE/MAX are finally approved by the Court and after administrative costs, litigation expenses, and attorneys' fees are deducted, the net funds will be distributed to Settlement Class Members with no amount reverting back to Anywhere or RE/MAX, regardless of the number of Opt-Out Sellers or claims made. (Anywhere Agreement ¶ 40; RE/MAX Agreement ¶ 40).

## 3. Changes to Business Practices

### a. Anywhere

The proposed Settlement provides for Anywhere Real Estate, Inc. and its subsidiaries and company-owned brokerages ("Anywhere") to make the following Practice Changes within six months after the Settlements become effective:

      i.    refrain from adopting any Anywhere requirements that company owned brokerages, franchisees, or agents (i) belong to NAR or (ii) follow NAR's Code of Ethics

or MLS Handbook. (This provision automatically terminates if NAR reaches a settlement agreement or is subject through court order to injunctive relief in these matters.);

      ii.     advise and periodically remind the Anywhere company owned brokerages, franchisees, and their agents that there is no Anywhere requirement that they must make offers to or must accept offers of compensation from cooperating brokers or that, if made, such offers must be blanket, unconditional, or unilateral;

      iii.     require that any Anywhere company owned brokerages and their agents (and recommend and encourage that any franchisees and their agents) disclose to prospective home sellers and buyers and state in conspicuous language that broker commissions are not set by law and are fully negotiable (i) in their listing agreement if it is not a government or MLS-specified form, (ii) in their buyer representation agreement if there is one and it is not a government or MLS-specified form, and (iii) in pre-closing disclosure documents if there are any and they are not government or MLS-specified forms. In the event that the listing agreement, buyer representation agreement, or pre-closing disclosure documents are a government or MLS-specified form, then Anywhere will require that any company owned brokerages and their agents (and recommend and encourage that any Anywhere franchisees and their agents) include a disclosure with conspicuous language expressly stating that broker commissions are not set by law and are fully negotiable;

      iv.     prohibit the Anywhere company owned brokerages and their agents acting as buyer representatives (and recommend and encourage that franchisees and their agents acting as buyer representatives refrain) from advertising or otherwise representing that their services are free;

v.      to the extent allowed by MLS rules and/or the capabilities of third-party platforms that operate websites for Anywhere, require that the Anywhere company owned brokerages and their agents include, at the earliest possible moment, the listing broker's offer of compensation in each active listing shared with prospective buyers through IDX or VOW displays, or through any other form or format;

vi.      prohibit the Anywhere company owned brokerages and their agents (and recommend and encourage that any franchisees and their agents refrain) from utilizing any technology or taking manual actions to filter out or restrict MLS listings that are searchable by and displayed to consumers based on the level of compensation offered to any cooperating broker unless directed to do so by the client (and eliminate any internal systems or technological processes that may currently facilitate such practices);

vii.      advise and periodically remind the Anywhere company owned brokerages and their agents of their obligation to (and recommend and encourage that any franchisees and their agents) show properties regardless of the existence or amount of cooperative compensation offered provided that each such property meets the buyer's articulated purchasing priorities;

viii.      for Anywhere company owned brokerages eliminate any minimum client commission requirements; and

ix.      for each of the above points, for the Anywhere company owned brokerages, franchisees, and their agents, develop training materials consistent with the above relief and eliminate any contrary training materials currently used. (Anywhere Agreement ¶ 51). If not automatically terminated earlier by their own terms, these practice changes will sunset 5 years after the effective date.

### b. RE/MAX

The proposed Settlement provides for RE/MAX to make the following Practice Changes within six months after the Settlements become effective:

     i.     make clear and periodically remind franchisees and agents affiliated with those franchisees that it does not require them to make offers of compensation to or accept offers of compensation from cooperating brokers or that, if made, does not require such offers to be blanket, unconditional, or unilateral;

     ii.     RE/MAX will make clear that (i) franchisees and affiliated agents must be transparent to prospective home sellers and buyers that broker commissions are not set by law and are negotiable and (ii) buyer-side brokers and agents must be transparent regarding the cooperative compensation offered on any listings for which a client requests information. Toward that end, RE/MAX will recommend and encourage that any franchisees and their agents disclose to prospective home sellers and buyers and state in conspicuous language that broker commissions are not set by law and are fully negotiable (i) in their listing agreement if it is not a government or MLS-specified form, (ii) in their buyer representation agreement if there is one and it is not a government or MLS-specified form, and (iii) in pre-closing disclosure documents if there are any and they are not government or MLS-specified forms. RE/MAX will further recommend and encourage that, in the event that the listing agreement, buyer representation agreement, or pre-closing disclosure documents is a government or MLS-specified form, franchisees and their agents include a disclosure with conspicuous language expressly stating that broker commissions are not set by law and are fully negotiable.

iii.      make clear that franchisees and affiliated agents acting as buyer-side brokers or agents must be transparent with their clients in accurately disclosing their compensation structure in connection with each transaction and must refrain from advertising or otherwise representing that their services are free (unless they are, in fact, not receiving any compensation for those services from any party);

iv.      display offers of compensation made by listing brokers or agents, where such data is available and/or provided to REMAX for all active listings shared on REMAX.com and recommend and encourage that franchisees and agents include cooperative compensation offers (if any) on any listings that they publicly display or share with prospective buyers through IDX or VOW displays, or through any other form or format;

v.      not provide software that permits franchisees and affiliated agents to filter out or restrict MLS listings that are searchable by and displayed to consumers based on the level of compensation offered to any cooperating broker and recommend and encourage that any franchisees and their agents refrain from utilizing any technology or taking manual actions to filter out or restrict MLS listings that are searchable by or displayed to consumers based on the level of compensation offered to any cooperating broker unless directed to do so by the client (and eliminate any internal systems or technological processes that may currently facilitate such practices);

vi.      expressly advise and periodically remind franchisees and affiliated agents of their obligation to show and market properties regardless of the existence or amount of cooperative compensation offered;

vii.     not express or imply a minimum commission requirement in franchise agreements, training materials or other policies;

viii.     develop educational materials that reflect and are consistent with each provision in this injunction, and eliminate educational materials, if any, that are contrary to it;

ix.     not require franchisees and their affiliated agents to join or be members of the National Association of Realtors or follow NAR's Code of Ethics or MLS Handbook. (RE/MAX Agreement ¶ 51).

## 4. Cooperation Requirements

In addition to providing substantial monetary payments and meaningful injunctive relief, the Settlement Agreements obligate the Settling Defendants to cooperate with Plaintiffs in the further prosecution of their claims against the remaining Defendants, which remaining Defendants each remain jointly and severally liable for *all* damages caused by the members of the alleged conspiracy. Both Anywhere and RE/MAX's cooperation includes the following: (1) providing up to three current officers or employees of the Settling Defendant or its subsidiaries to participate as witnesses at trial in *Moehrl* and providing access via counsel to those witnesses prior to trial for up to two hours (if requested by Plaintiffs); (2) withdrawing expert designations and obtaining agreement with any separately retained experts that they will not testify at trial as a retained expert for any other Defendant in the Actions; (3) using reasonable efforts to authenticate documents produced by the Settling Defendants and establish that those documents are admissible; and (4) using reasonable efforts to provide relevant class member data and answer questions about the data to support the provision of class notice. (Anywhere Agreement ¶ 55; RE/MAX Agreement ¶ 55).

### 5. Release of Claims Against Anywhere and RE/MAX

In exchange for the Settlement Amounts, Practice Changes, and Cooperation commitments from Anywhere and RE/MAX, upon entry of a final judgment approving the Settlement Agreements, Plaintiffs and the Settlement Class will release and discharge Anywhere and RE/MAX, and all of their respective subsidiaries, related entities, affiliated franchisees, and independent contractors, from any and all claims arising from or relating to "conduct that was alleged or could have been alleged in the Actions based on any or all of the same factual predicates for the claims alleged in the Actions, including but not limited to commissions negotiated, offered, obtained, or paid to brokerages in connection with the sale of any residential home." (Anywhere Agreement ¶¶ 14-15, 30–32; RE/MAX Agreement ¶ 14-15, 30–32). The actual terms of the releases are contained in the Settlement Agreements.

The Settlement Agreements with Anywhere and RE/MAX, however, do nothing to abrogate the rights of any member of the Settlement Class to recover from any other Defendant. (Anywhere ¶ 62; RE/MAX ¶ 62). The Settlement Agreements also expressly exclude from the Release a variety of individual claims that Class Members may have concerning product liability, breach of warranty, breach of contract, or tort of any kind (other than a breach of contract or tort based on any factual predicate in this Action). Also exempted are any "individual claims that a class member may have against his or her own broker or agent based on a breach of contract, breach of fiduciary duty, malpractice, negligence, or other tort claim, other than a claim that a Class Member paid an excessive commission or home price due to the claims at issue in these Actions." (Anywhere Agreement ¶ 32; RE/MAX Agreement ¶ 32).

6.   **Application for Award of Attorneys' Fees, Costs and Class Representative Incentive Awards**

The Settlements authorize Settlement Class Counsel to seek to recover their attorneys' fees and costs incurred in prosecuting the Actions, as well as to seek service awards for current and former class representatives, including the Settlement Class Representatives. (Anywhere Agreement ¶ 33, 37; RE/MAX Agreement ¶ 33, 37). Following the Court's preliminary approval of the Settlements, Class Counsel will submit an application to the Court for an award of attorneys' fees, costs, and potentially for service awards, to be paid out of the Settlement Fund.

**III.   THE CLASS DEFINITION CONTEMPLATED BY THE SETTLEMENTS SATISFIES RULE 23, AND THE CLASS SHOULD BE CERTIFIED**

Certifying a nationwide Settlement Class is appropriate here, where the additional class Members are home sellers who suffered the same or similar harms as *Burnett* and *Moehrl* Plaintiffs from the same defendants—but in other parts of the country.

**A.   Class Definition**

***This Court*** previously certified the following classes pursuant to Rule 23(b)(3):

(1) the "Subject MLS Class," asserting Count I, defined as:

> All persons who, from April 29, 2015 through the present, used a listing broker affiliated with Home Services of America, Inc., Keller Williams Realty, Inc., Realogy Holdings Corp., RE/MAX LLC, HSF Affiliates, LLC, or BHH Affiliates, LLC, in the sale of a home listed on the Heartland MLS, Columbia Board of Realtors, Mid America Regional Information System, or the Southern Missouri Regional MLS, and who paid a commission to the buyer's broker in connection with the sale of the home;

(2) the "Missouri Antitrust Law-Subject MLS Class," asserting Count III, defined as:

> All persons who, from April 29, 2015 through the present, used a listing broker affiliated with Home Services of America, Inc., Keller Williams Realty, Inc., Realogy Holdings Corp., RE/MAX LLC, HSF Affiliates, LLC, or BHH Affiliates, LLC, in the sale of a home in Missouri listed on the Heartland MLS, Columbia Board of Realtors, Mid America Regional Information System, or the Southern

- 13 -

Missouri Regional MLS, and who paid a commission to the buyer's broker in connection with the sale of the home;

and (3) the "MMPA Class," asserting Count II, defined as:[2]

All persons who, from April 29, 2014 through the present, used a listing broker affiliated with Home Services of America, Inc., Keller Williams Realty, Inc., Realogy Holdings Corp., RE/MAX LLC, HSF Affiliates, LLC, or BHH Affiliates, LLC, in the sale of a residential home in Missouri listed on the Heartland MLS, Columbia Board of Realtors, Mid America Regional Information System, or the Southern Missouri Regional MLS, and who paid a commission to the buyer's broker in connection with the sale of the home. (Burnett Doc. 741).

The Subject MLSs in the ***Burnett*** action were four MLSs in Missouri.

**The Moehrl Court** previously certified the following damages class under Federal Rule of

Civil Procedure 23(b)(3):

Home sellers who paid a commission between March 6, 2015, and December 31, 2020, to a brokerage affiliated with a Corporate Defendant in connection with the sale of residential real estate listed on a Covered MLS and in a covered jurisdiction. Excluded from the class are (i) sales of residential real estate for a price below $56,500, (ii) sales of residential real estate at auction, and (iii) employees, officers, and directors of defendants, the presiding Judge in this case, and the Judge's staff. (Moehrl Doc. 403).

In addition, ***the Moehrl Court*** previously certified the following injunctive relief class

under Federal Rule of Civil Procedure 23(b)(2):

Current and future owners of residential real estate in the covered jurisdictions who are presently listing or will in the future list their home for sale on a Covered MLS. Excluded from the class are (i) sales of residential real estate for a price below $56,500, (ii) sales of residential real estate at auction, and (iii) employees, officers, and directors of defendants, the presiding Judge in this case, and the Judge's staff. (*Id*.)

The Covered MLSs in the Moehrl action are 20 MLSs spanning 19 states across the United

States.

---

[2] With leave of Court, Plaintiffs in *Burnett* recently dismissed the Missouri state law claims in advance of trial as to the non-settling Defendants. (Burnett Doc. 1142, 1144).

The Settlements are conditioned upon the Court certifying a class ***for settlement purposes only*** that is broader than the litigation classes certified in *Moehrl* and *Burnett*, as to Anywhere and RE/MAX only, including in the following respects: (a) persons who sold homes that were listed on all MLSs in the United States (rather than just a subset); (b) sellers regardless of the broker used (rather than only those affiliated with the Defendants); and (c) a date range that generally extends to the date of notice. The proposed Settlement Class definition, pursuant to Rule 23(b)(3) is as follows:

> All persons who sold a home that was listed on a multiple listing service anywhere in the United States where a commission was paid to any brokerage in connection with the sale of the home in the following date ranges:
>
> a. Moehrl MLSs: March 6, 2015 to date of notice;
>
> b. Burnett MLSs: April 29, 2014 to date of notice;
>
> c. MLS PIN: December 17, 2016 to date of notice;
>
> d. All other MLSs: (i) four years prior to the date a new or amended complaint (if any) is filed in the Actions reflecting any MLS aside from the Moehrl MLSs, Burnett MLSs, and MLS PIN, or (ii) the date of notice, whichever is earlier, up to the date of notice.
>
> Excluded from the Settlement Class are those who opt out of the Settlements in a timely manner.

(Anywhere ¶¶ 13 and 18; RE/MAX ¶¶ 13 and 18).

The Settlement Class definition satisfies the requirements of Rule 23(a) and 23(b)(3). Accordingly, Plaintiffs request that the Court certify the Settlement Class for settlement purposes only.

**B. Legal Standard for Modifying the Class Definition**

The Court can amend or alter the class definition at any time before a decision on the merits. Fed. R. Civ. P. 23(c)(1)(C). When analyzing whether to certify a broader class definition than was initially certified, courts conduct the standard Rule 23 class certification analysis. *See,*

- 15 -

*e.g.*, *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. 07-1827, 2011 WL 13152270, at *5 (N.D. Cal. Aug. 24, 2011) ("Rule 23 explicitly empowers a federal court to certify a class in every case that satisfies its criteria."); *Horton v. USAA Cas. Ins. Co.*, 266 F.R.D. 360, 364 (D. Ariz. 2009) (a "federal court applying Rule 23 of the Federal Rules of Civil Procedure may certify a nationwide class if the requirements for certification are satisfied."). If the Rule 23 requirements are met, a nationwide class should be certified, regardless of whether a narrower class was pled or certified earlier in the litigation. *See, e.g.*, *In re TRS Recovery Servs., Inc. & Telecheck Servs., Inc., Fair Debt Collection Pracs. Act (FDCPA) Litig.*, No. 2:13-MD-2426, 2016 WL 543137, at *2–5 (D. Me. Feb. 10, 2016) (approving the expansion of a class of Maine residents to a nationwide class where it satisfied the Rule 23 requirements).

Courts around the country acknowledge that to achieve settlement, it is often necessary to broaden the class and/or the scope of the claims. *See, e.g.*, *Hesse v. Sprint Corp.*, 598 F.3d 581 (9th Cir. 2010) (explaining that class settlements that include a broad release of claims are permissible, and that the scope of released claims may exceed those actually brought in the underlying action, and may even exceed the scope of claims that could have been brought in a lawsuit); *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 106 (2d Cir. 2005) ("Practically speaking, [c]lass action settlements simply will not occur if parties cannot put limits on defendant's liability."); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 2011 WL 13152270, at *9 ("For the history of class certifications, courts have generally certified settlement classes broader than the previously-certified litigation classes; the claims released are typically more extensive than the claims stated.").

Courts routinely certify settlement classes that are broader than previously pled or certified in the litigation. *See, e.g.*, *In re MicroStrategy, Inc. Sec. Litig.*, 148 F. Supp. 2d 654, 661 (E.D. Va.

2001) (certifying settlement class broader than previously certified litigation class); *In re Ikon Office Solutions, Inc., Sec. Litig.*, 194 F.R.D. 166, 172 (same). The interests of fairness, equity, and justice are often better served by a broader class than a narrower class. *See, e.g.*, *Heldt v. Payday Fin., LLC*, No. 3:13-cv-03023, 2016 WL 96156, at *10 (D.S.D. Jan. 8, 2016) (observing that "[i]t would be ideal to include the Intervenors and their counsel in another round of negotiation to get broader class representation to evaluate whether $7 million is an appropriate settlement fund given the financial standing of the Defendants"); Nancy Morawetz, *Underinclusive Class Actions*, NYU Law Review 402–438 (April–May 1996), https://www.nyulawreview.org/wp-content/uploads/2018/08/NYULawReview-71-1-Morawetz.pdf ("The principal harm caused by defining a class narrowly is the potential of denying similarly situated persons the same opportunity for relief for similar claims." (p.420) . . . "Inclusion in the class may be expected to be in the interest of the potential class members when it is unlikely that they will be able to litigate their claims independently." (p.430)).

## C. The Proposed Settlement Class Satisfies Rule 23(a).

The Settlement Class must satisfy the four requirements of Rule 23(a) and one of the subsections of Rule 23(b). *See Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013); *Burnett v. Nat'l Ass'n of Realtors*, No. 19-cv-00332, 2022 WL 1203100, at *4 (W.D. Mo. Apr. 22, 2022). The Court should grant provisional certification here because the proposed Settlement Class satisfies Rule 23(a) and (b)(3). Provisional certification will allow the Settlement Class to receive notice of the Settlement and its terms, including the rights of Class Members to submit a claim and recover a class award if the Settlements are finally approved, to object to and/or be heard on the Settlements' fairness at the Fairness Hearing, or to opt out of the Settlements.

### 1. Numerosity

As set forth in *Burnett* Plaintiffs' previous class certification briefing before this Court, Rule 23(a)(1) requires "the class be so numerous that joinder of all members is impracticable." "[A] plaintiff does not need to demonstrate the exact number of class members as long as a conclusion is apparent from good faith estimates." *Hand v. Beach Entertainment KC, LLC*, 456 F. Supp. 3d 1099, 1140 (W.D. Mo. 2020). Although the Eighth Circuit has not established strict requirements regarding the size of a proposed class, *see Paxton v. Union Nat'l Bank*, 688 F.2d 552, 559 (8th Cir. 1982), class sizes as small as forty have satisfied this requirement. *Rannis v. Rechia*, 380 Fed. App'x 646, 651 (9th Cir. 2010).

Here, Plaintiffs estimate that Settlement Class Members number in the tens of millions, dispersed across the United States. Moreover, this Court and the *Moehrl* Court have previously held that litigation classes that are smaller than the Settlement Class at issue here satisfied the numerosity requirement. *See Burnett*, 2022 WL 1203100, at *19; *Moehrl v. Nat'l Ass'n of Realtors*, No. 19-cv-01610, 2023 WL 2683199, at *11 (N.D. Ill. Mar. 29, 2023). Thus, the Settlement Class plainly satisfies Rule 23(a)(1)'s numerosity requirement.

### 2. Commonality

Rule 23(a)(2) requires that there be "questions of law or fact common to the class." Plaintiffs must show that resolution of an issue of fact or law "is central to the validity of each" class member's claim; "[e]ven a single [common] question will" satisfy the commonality requirement. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350, 359 (2011); *see also Paxton*, 688 F.2d at 561 (8th Cir. 1982) ("[t]he rule does not require that every question of law or fact be common to every member of the class"). "In the antitrust context, courts have generally held that an alleged conspiracy or monopoly is a common issue that will satisfy Rule 23(a)(2) as the singular

question of whether defendants conspired to harm plaintiffs will likely prevail." *D&M Farms v. Birdsong Corp.*, No. 2:19-cv-463, 2020 WL 7074140, at *3 (E.D. Va. Dec. 1, 2020).

Here, the Court previously held that there are many issues common to the *Burnett* classes, including (1) whether defendants engaged in a conspiracy to artificially inflate the cost of commissions in residential real estate transactions; (2) whether the conspiracy violates Section 1 of the Sherman Act; (3) the duration, scope, extent, and effect of the conspiracy; (4) whether a per se or rule of reason analysis should apply; and (5) whether Plaintiffs and other members of the Classes are entitled to, among other things, damages, and/or injunctive relief. *See Burnett*, 2022 WL 1203100, at *5. Similarly, the *Moehrl* Court found that the commonality requirement was met based on the common question "whether Defendants conspired to artificially inflate the buyer-broker commissions paid by the class by adopting the Challenged Restraints, in violation of § 1 of the Sherman Act." *Moehrl*, 2023 WL 2683199, at *11. These common issues exist with respect to the Settlement Class as they did with respect to the classes initially certified in the *Burnett* and *Moehrl* actions. *See, e.g.*, *Hughes v. Baird & Warner, Inc*, No. 76-cv-3929, 1980 WL 1894, at *2 (N.D. Ill. Aug. 20, 1980) ("The obvious question of fact common to the entire class is whether or not a conspiracy existed. This question will most probably predominate the entire lawsuit."). In particular, the conduct of Anywhere and RE/MAX that is being challenged generally centers on rules adopted nationwide that each Defendant had with respect to participation in both NAR and non-NAR MLSs and compliance with NAR's Code of Ethics, which applies to Realtors nationwide.

### 3. Typicality

Rule 23(a)(3) requires that the class representatives' claims be "typical" of Class Members' claims. "The burden of demonstrating typicality is fairly easily met so long as other class members have claims similar to the named plaintiff." *DeBoer v. Mellon Mortg. Co.*, 64 F.3d 1171, 1174 (8th

Cir. 1995); *Burnett*, 2022 WL 1203100, at *6. Rule 23(a)(3) "requires a demonstration that there are other members of the class who have the same or similar grievances as the plaintiff." Donaldson v. Pillsbury Co., 554 F.2d 825, 830 (8th Cir. 1977). "In the antitrust context, typicality is established when the named plaintiffs and all class members alleged the same antitrust violations by defendants. Specifically, named plaintiffs' claims are typical in that they must prove a conspiracy, its effectuation, and damages therefrom – precisely what the absent class members must prove to recover." *Hyland v. Homeservices of Am., Inc.*, No. 3:05-cv-612, 2008 WL 4858202, at *4 (W.D. Ky. Nov. 7, 2008) (internal citations and quotations omitted); *Burnett*, 2022 WL 1203100, at *6.

This Court previously held that *Burnett* Plaintiffs' claims are typical of members of the *Burnett* classes. Similarly, here, Plaintiffs' claims are typical of members of the proposed Settlement Class. Each Settlement Class Member sold a home that was listed on an MLS in the United States. Settlement Class Members' claims arise out of a common course of misconduct by Defendants, and each paid a commission when they sold their homes that was inflated by Defendants' conduct. As such, Rule 23(a)(3) is satisfied.

### 4. Adequacy

Rule 23(a)(4) requires that, for a case to proceed as a class action, the court must find that "the representative parties will fairly and adequately protect the interests of the class." This inquiry "serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997) (citing *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157–58 n.13 (1982)). For a conflict to defeat class certification, the conflict "must be more than merely speculative or hypothetical," but rather "go to the heart of the litigation." *Gunnells*, 348 F.3d at 430-31 (citation omitted).

As with the classes earlier certified in the Actions, *Burnett*, 2022 WL 1203100, at *1; *Moehrl*, 2023 WL 2683199, at *11, there is no conflict here; the interests of Plaintiffs are aligned with those of Settlement Class Members. Plaintiffs, like all Settlement Class Members, share an overriding interest in obtaining the largest possible monetary recovery, the most effective business practice changes, and the most helpful cooperation from Settling Defendants. *See In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 208 (5th Cir. 1981) ("[S]o long as all class members are united in asserting a common right, such as achieving the maximum possible recovery for the class, the class interests are not antagonistic for representation purposes."). Moreover, because any non-nationwide settlement would have left Anywhere and RE/MAX exposed to litigation involving claims exceeding each Settling Defendant's ability to pay, the only feasible means for Plaintiffs to obtain *any* settlement *at all* was to settle on a nationwide basis on behalf of the entire Settlement Class. Finally, Plaintiffs are not afforded any special or unique compensation by the proposed Settlement Agreements. As such, Rule 23(a)(4) is satisfied.

### D. The Proposed Settlement Class Satisfies Rule 23(b)(3).

Once Rule 23(a)'s four prerequisites are met, Plaintiffs must demonstrate that the proposed Settlement Class satisfies Rule 23(b)(3). Specifically, Plaintiffs must show that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Plaintiffs have done so.

#### 1. Predominance

"The predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation . . . and goes to the efficiency of a class action as an alternative to individual suits." *Ebert v. Gen. Mills, Inc.*, 823 F.3d 472, 479 (8th Cir. 2016) (internal citations omitted). The predominance question at class certification is not whether Plaintiffs have

already proven their claims through common evidence. *In re Zurn Pex Plumbing Prods. Liab. Litig.*, 644 F.3d 604, 618 (8th Cir. 2011). Rather it is whether questions of law or fact capable of resolution through common evidence predominate over individual questions. *Id.*

"[W]hether a proposed class is sufficiently cohesive to satisfy Rule 23(b)(3) is informed by whether certification is for litigation or settlement." *In re Hyundai & Kia Fuel Econ. Litig.*, 926 F.3d 539, 558 (9th Cir. 2019). "[T]he predominance requirement is relaxed in the settlement context." *In re Pre-Filled Propane Tank Antitrust Litig.*, No. 14-02567, 2019 WL 7160380, at *4 (W.D. Mo. Nov. 18, 2019); *see also Holt v. CommunityAmerica Credit Union*, No. 4:19-cv-00629, 2020 WL 12604383, at *4 (W.D. Mo. Sept. 4, 2020). When a class is being certified for settlement, "a district court need not inquire whether the case, if tried, would present intractable management problems." *Amchem*, 521 U.S. 591 at 620. Therefore, as courts in this circuit recognize, "When a class is being certified for settlement, the court need only analyze the predominance of common questions of law and the superiority of class action for fairly and effectively resolving the controversy; it need not examine Rule 23(b)(3)(A–D) manageability issues, because it will not be managing a class action trial." *In re Zurn Pex Plumbing Prod. Liab. Litig.*, No. 08-MDL-1958, 2013 WL 716088, at *5 (D. Minn. Feb. 27, 2013). For example, in *Zurn Pex*, the district court found that common issues predominated because class representatives and members of the settlement class all sought to remedy a "shared legal grievance." *Id.*

Indeed, the Eighth Circuit, in rejecting objections to another class action settlement, stated that "the interests of the various plaintiffs do not have to be identical to the interests of every class member." *Petrovic v. Amoco Oil Co.*, 200 F.3d 1140, 1148 (8th Cir. 1999). Instead, the Eighth Circuit emphasized that certification of a settlement class was appropriate where "all of the plaintiffs seek essentially the same things: compensation for damage already incurred, restoration

of property values to the extent possible, and preventive steps to limit the scope of future damage." *Id.*

Here, all Plaintiffs seek to remedy the same shared legal grievance—widespread conduct by Defendants throughout the United States that has resulted in supracompetitive broker commission rates. This conduct includes nationwide policies enacted by the various Defendants to perpetuate the challenged conduct—including requirements that agents and brokerages affiliated with Defendants belong to NAR, participate in both NAR-affiliated and non-NAR affiliated MLSs and/or follow NAR's Code of Ethics and MLS Handbook. It also includes nationwide policies enacted by NAR, including NAR's Code of Ethics. Indeed, Defendants' requirements that their subsidiaries and franchises comply with relevant NAR rules and/or belong to NAR raise issues that are common to the Settlement Class. *See id.* Such evidence comes from Defendants' own files, statements, policies, contracts, records, and employees, and is not specific to individual Class Members. Also at issue are specific MLS rules, including rules mandating blanket unilateral offers of compensation to cooperating brokers, that are present in MLSs throughout the entire United States— including in MLSs that are not directly or indirectly affiliated with NAR.[3] All Plaintiffs seek the same relief—compensation for the higher broker rates that they have had to pay, as well as systemic reforms that address the underlying conduct.

---

[3] Consistent with this conclusion, Plaintiffs and their experts conducted an extensive analysis of both NAR and non-NAR MLSs throughout the United States, determining that they were subject to the same or similar rules challenged here. *See, e.g.*, Moehrl Doc. 324-6, Redacted Elhauge Class Certification Expert Report, App. C (reflecting that around 97% of the several hundred MLSs nationwide are NAR-affiliated and thus subject to all of the mandatory NAR MLS rules challenged in this litigation, and that even for the few non-NAR MLSs it was "was common among these MLSs to adopt restraints that were identical or similar to those imposed by NAR."). Moreover, several of the challenged rules are reflected in NAR's Code of Ethics, which applies to Realtors nationwide, including those operating in non-NAR MLSs. *Id.* ¶ 25 (finding that, "even in non-NAR MLSs, Realtors are—by definition—required to comply with NAR's Code of Ethics").

Common issues also predominate for each element that Plaintiffs must prove to prevail in an antitrust case: (1) a violation of the antitrust laws; (2) the impact of the unlawful activity; and (3) measurable damages. *See, e.g.*, *Burnett*, 2022 WL 1203100, at \*10. First, as discussed above, all members of the Settlement Class share the same legal grievance—a violation of the antitrust laws by Defendants. Second, this Court has already recognized that "the fact of antitrust impact can be established through common proof . . . ." *Burnett*, 2022 WL 1203100, at \*11 (quoting *In re Nexium Antitrust Litig.*, 777 F.3d 9, 18 (1st Cir. 2015). *Burnett* and *Moehrl* Plaintiffs have already "shown the existence of common questions concerning antitrust impact that can be answered with common evidence" (*Moehrl*, 2023 WL 2683199, at \*19; *Burnett*, 2022 WL 1203100, at \*12), including expert opinions, analysis of residential real estate transactions in foreign benchmark countries, and transaction data from defendants and MLSs. At bottom, evidence of impact from the fact that commissions in the United States are higher than international markets is evidence common to the nationwide settlement class. Third, all members of the Settlement Class have been damaged by paying inflated commissions as a result of the Challenged Rules or other similar rules or by paying any commission to a buyer broker. The experts in *Burnett* and *Moehrl* presented reliable methods of measuring damages as the difference between the amount Class Members paid for buyer agent commissions in the actual world versus what they would have paid in the but-for world. The same type of methodology could be used for the broader Settlement Class.

## 2. Superiority of a Class Action

In addition to the predominance of common questions, Rule 23(b)(3) requires a finding that "a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Factors relevant to the superiority of a class action under Rule 23(b)(3) include: "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or

against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3).

In this case, the first three factors weigh heavily in favor of class certification. First, Class Members have little economic incentive to sue individually based on the amount of potential recovery involved, and any Settlement Class Member who wishes to opt out will have an opportunity to do so. Second, there are no known existing *individual* lawsuits filed by Settlement Class Members; no Class Member has demonstrated any interest in litigating individually. Third, judicial efficiency is served by approving the Settlements. It would be inefficient—for both the Court and the parties—to engage in millions of individual trials involving similar claims. "Requiring individual Class Members to file their own suits would cause unnecessary, duplicative litigation and expense, with parties, witnesses and courts required to litigate time and again the same issues, possibly in different forums." *In re Serzone Prods. Liab. Litig.*, 231 F.R.D. at 240.

Moreover, "the expense of individual actions, weighed against the potential individual recovery of the vast majority of class members here, would be prohibitive." *Temp. Servs. v. Am. Int'l Grp.*, 2012 WL 2370523, at *5 (D.S.C. June 22, 2012); *see also Amchem Prods., Inc.*, 521 U.S. at 617 (stating that certification is especially important in cases with relatively small recoveries per class member "to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights"). Because it would be economically unreasonable for Settlement Class Members to adjudicate their separate claims individually, the superiority of a class action is evident. Proceeding as a class action, rather than a host of separate individual trials, would provide significant economies in time, effort, and expense,

and permit Settlement Class Members to seek damages that would otherwise be too costly to pursue.

Finally, the Supreme Court has found that when certifying a settlement class "a district court need not inquire whether the case, if tried, would present intractable management problems, *see* Fed. Rule Civ. Proc. 23(b)(3)(D), for the proposal is that there be no trial." *Amchem*, 521 U.S. at 620. Such is the case here. If approved, the Settlement Agreements would obviate the need for a trial against the Settling Defendants, and thus questions concerning that trial's manageability are irrelevant. Accordingly, the Court should certify the Settlement Class.

## IV.  THE COURT SHOULD PRELIMINARILY APPROVE THE SETTLEMENTS

Federal Rule of Civil Procedure 23(e) sets out a two-part process for approving class settlements. This case is at the first stage of the approval process, often called "preliminary approval," where the Court decides if it is "likely" to approve the settlements such that notice of the settlements should be sent to the class. Fed. R. Civ. P. 23(e)(1)(B). At this stage, the Court does not make a final determination of the merits of the proposed settlements. Full evaluation is made at the final approval stage, after notice of the Settlements has been provided to the members of the Settlement Class and those class members have had an opportunity to voice their views of the settlements. At this first stage, the parties request that the Court grant "preliminary approval" of the Settlements.

As a general matter, "the law strongly favors settlements. Courts should hospitably receive them." *Little Rock Sch. Dist. v. Pulaski County Special Sch. Dist. No. 1*, 921 F.2d 1371, 1383 (8th Cir. 1990) (noting it is especially true in "a protracted, highly divisive, even bitter litigation"). Courts adhere to "an initial presumption of fairness when a proposed class settlement, which was negotiated at arm's length by counsel for the class, is presented for court approval." 4 Newberg on Class Actions § 11.41; *see also Petrovic*, 200 F.3d at 1148 (8th Cir. 1999) ("A strong public policy

favors [settlement] agreements, and courts should approach them with a presumption in their favor."); *Marshall v. Nat'l Football League*, 787 F.3d 502, 508 (8th Cir. 2015) ("A settlement agreement is 'presumptively valid.'" (quoting *In re Uponor, Inc., F1807 Plumbing Fittings Products Liab. Litig.*, 716 F.3d 1057, 1063 (8th Cir. 2013)); *Sanderson v. Unilever Supply Chain, Inc.*, 10-cv-00775-FJG, 2011 WL 5822413, at *3 (W.D. Mo. Nov. 16, 2011) (crediting the judgment of experienced class counsel that settlement was fair, reasonable, and adequate). The presumption in favor of settlements is particularly strong "in class actions and other complex cases where substantial judicial resources can be conserved by avoiding formal litigation." *Cohn v. Nelson*, 375 F. Supp. 2d 844, 852 (E.D. Mo. 2005).

The standard for reviewing a proposed settlement of a class action is whether it is "fair, reasonable, and adequate." *Wireless II*, 396 F.3d at 932. The Eighth Circuit has set forth four factors that a court should review in determining whether to approve a proposed class action settlement: "(1) the merits of the plaintiff's case, weighed against the terms of the settlement; (2) the defendant's financial condition; (3) the complexity and expense of further litigation; and (4) the amount of opposition to the settlement." *Id.* (citing *Grunin*, 513 F.2d at 124; *Van Horn v. Trickey*, 840 F.2d 604, 607 (8th Cir. 1988)). "The views of the parties to the settlement must also be considered." *DeBoer v. Mellon Mortg. Co.*, 64 F.3d 1171, 1178 (8th Cir. 1995).

**A.  The merits of the Plaintiffs' cases, weighed against the terms of the Settlements**

The parties naturally dispute the strength of their claims and defenses. The Settlements reflect a compromise based on the parties' educated assessments of their best-case and worst-case scenarios, and the likelihood of various potential outcomes. Plaintiffs' best-case scenario is prevailing and recovering on the merits at trial, and upholding their award on appeal. But "experience proves that, no matter how confident trial counsel may be, they cannot predict with

100% accuracy a jury's favorable verdict, particularly in complex antitrust litigation." *In re Cardizem CD Antitrust Litig.*, 218 F.R.D. 508, 523 (E.D. Mich. 2003).

Against this risk, the Settlements provide for recovery of $138.5 million from just two of the five defendants in the Actions. As discussed in detail below, these settlements are supported by the financial condition of the Settling Defendants, who lack the ability to pay the cumulative damages alleged and sought in the *Burnett* and *Moehrl* litigations.

The Settlements further provide meaningful changes to the Settling Defendants' business practices to protect Class Members who sell homes in the future. Among other things, the Settling Defendants have committed to take steps to educate their affiliated agents that (a) the companies do not require listing agents to make offers of compensation to buyer agents; (b) commissions are negotiable; (c) buyer agents may not represent that their services are free; (d) offers of compensation to buyer brokers should be disclosed to buyers; (e) buyer agents should not filter listings based on level of compensation offered unless instructed by buyer clients to do so; (f) buyer agents are obligated to show relevant properties to their clients regardless of the level of compensation offered; and (g) that Anywhere company owned brokerages may not require minimum client commissions. (Anywhere ¶ 51(i)–(ix); RE/MAX ¶ 51(i)–(ix)). Crucially, nothing in the Settlements precludes the *Burnett* and *Moehrl* Plaintiffs from obtaining additional injunctive relief—including changes to the rules being challenged in both cases—from NAR or the other non-Settling Defendants through trial or further settlements.

Toward that end, Plaintiffs further secured cooperation from the Settling Defendants to assist Plaintiffs with prosecuting their claims against the remaining Defendants at trial where Plaintiffs will strive to secure additional monetary and non-monetary relief from the remaining defendants, including necessary changes to NAR rules. As courts recognize, this is a significant

factor in approving settlements. *See In re Ampicillin Antitrust Litig.*, 82 F.R.D. 652, 654 (D.D.C. 1979) (approving settlement in light of settling defendant's "assistance in the case against [a non-settling defendant]"); *see generally In re IPO Sec. Litig.*, 226 F.R.D. 186, 198–99 (S.D.N.Y. 2005) (recognizing the value of cooperating defendants in complex class action litigation).

Finally, the Settlements' terms were reached as the product of arm's length negotiations over a period of multiple years, including nearly a year of intensive negotiations, and involved the assistance of multiple well-respected mediators. Plaintiffs held several in-person mediation sessions with Anywhere over a span of months from December of last year through August of this year. Plaintiffs also held virtual mediation sessions with RE/MAX, which were attended by senior RE/MAX executives including its General Counsel and Chief Financial Officer. (Berman Decl. ¶ 9; Dameron Decl. ¶ 12). "When a settlement is reached by experienced counsel after negotiations in an adversarial setting, there is an initial presumption that the settlement is fair and reasonable." *Marcus v. Kansas*, 209 F. Supp. 2d 1179, 1182 (D. Kan. 2002).

**B.  Defendants' financial conditions**

The Settlements are fair and reasonable in light of the financial condition of Settling Defendants, Anywhere and RE/MAX, and the limited resources available to each to satisfy a settlement as compared to the size of the potential damages. (Berman Decl. ¶ 13; Dameron Decl. ¶¶ 7-9).

With respect to Settling Defendant Anywhere Real Estate, ***the settlement of $83.5 million represents a significant proportion (more than 13%) of the company's total market capitalization value of approximately $634 million***.[4] Further, the company's June 30, 2023

---

[4]  https://finance.yahoo.com/quote/HOUS?p=HOUS&.tsrc=fin-srch (last viewed Oct. 5, 2023 at 1:50pm).

financial statements (the statements that had been filed with the Securities and Exchange Commission most recently prior to the mediation) further demonstrate that the company is unable to pay a materially higher amount.[5] These reported financial results show that the company had total cash and equivalents of $179 million and few other tangible assets that could be used to satisfy a judgment. *Id*. at 8. Any company needs some cash on hand to fund its operations, and the Settlement captures a large proportion of this cash, without depleting the working capital the company requires to operate. The Settlement is also significant in light of Anywhere's lack of total cumulative income. Over the last three years, according to generally accepted accounting principles, Anywhere's total net income has been negative $297 million. *See* Anywhere Real Estate, Inc. Form 10-K at F-8 (p. 86) (February 24, 2023).

Further, the declining real estate market has caused the company to suffer a decrease in revenues of 32.4% from the first six months of 2022. *Id*. The decrease in revenues led to a loss of $119 million for the first six months of 2023, when the company had reported a profit of $111 million for the first six months of the previous year. *Id*. There is no indication that residential real estate sales will increase significantly in the near future, and any continued losses suffered by the company in future periods would only create more risk for the classes in delaying settlement. This is particularly concerning because Anywhere has a significant debt load of more than $2.8 billion dollars, far in excess of its market capitalization. *See* Anywhere Real Estate, Inc. Form 10-Q at p. 8 (August 4, 2023). In short, the Settlement captures the highest amount that the Class could reasonably expect at the current date, and the company's financial condition makes it unlikely that a higher amount could be paid in the future even if Plaintiffs were to obtain a successful trial verdict against Anywhere.

---

[5] Anywhere Real Estate, Inc. Form 10-Q (Aug. 4, 2023).

The Settlement with RE/MAX is similarly fair and reasonable in light of its financial condition. ***The settlement of $55 million represents approximately 14.2% of the company's total market capitalization value of approximately $386 million***.[6] Further, the company's June 30, 2023 financial statements (the statements that had been filed with the Securities and Exchange Commission most recently prior to the mediation) further demonstrate that the company is unable to pay a materially higher amount, with the Settlement Amount capturing 56.9% of the company's total cash and equivalents of $96.8 million.[7] *Id.* at 8. RE/MAX also has debt covenants that significantly limit the ability of RE/MAX to draw on financing sources, such as their revolver, to fund the Settlement Amount. The Settlement Amount is also fair and reasonable in light of RE/MAX's cumulative total net income over the three years ended December 31, 2022 of approximately $6.7 million total dollars. The Settlement Amount represents more than eight times RE/MAX's total cumulative net income during that period.

Further, the Settlement captures the entirety of the company's reported net equity (total assets less total liabilities), which was only $24 million on June 30, 2023. Similar to Anywhere, RE/MAX's net income fell 80.6% from the first six months of 2022 to the first six months of 2023 and its cash position declined from $108.7 million on December 31, 2022 to $96.8 million on June 30, 2023. *Id.* at 3–4.

## C. The Complexity and Expense of Further Litigation

Plaintiffs' claims raise numerous complex legal and factual issues under antitrust law. This is reflected in the parties' voluminous briefing to date, which includes extensive class certification

---

[6] https://finance.yahoo.com/quote/RMAX?p=RMAX&.tsrc=fin-srch (last viewed Oct. 5, 2023 at 1:50pm).
[7] RE/MAX Holdings, Inc., Quarterly Report (Form 10-Q), at 3 (Aug. 2, 2023). A true and correct copy can be downloaded at: https://www.sec.gov/Archives/edgar/data/1581091/000155837023 012941/0001558370-23-012941-index.htm.

briefing in both *Moehrl* and *Burnett*, as well as summary judgment briefing in *Burnett*. In addition, the parties have engaged in extensive appellate briefing, including (rejected) Rule 23(f) petitions in both *Moehrl* and *Burnett* as well as two separate appeals in the *Burnett* litigation concerning arbitration issues. The *Burnett* litigation is nearing trial, but trial itself promises to be a complex and laborious event. Furthermore, in the event that the *Burnett* Plaintiffs are successful at trial, they anticipate that any remaining Defendants would pursue appellate review of the jury verdict. In *Moehrl*, the Plaintiffs still have to navigate both a complex summary judgment process, including six different experts that may testify on behalf of defendants at trial. By contrast, the Settlement ensures recovery to the Class that will be allocated and distributed in an equitable manner. In light of the many uncertainties still pending in the litigation, an equitable and certain recovery is highly favorable, and weighs in favor of approving the proposed Settlement. (Berman Decl. ¶¶ 8, 12-13; Dameron Decl. ¶ 9).

**D. The Amount of Opposition to the Settlement**

The Settlement Class Representatives in both *Moehrl* and *Burnett* have been provided the Settlement Agreements for review and approved the terms of the Settlements. (Berman Decl. ¶ 14; Dameron Decl. ¶ 13). Notice regarding the Settlements has not yet been distributed. In the event any objections are received after notice is issued, they will be addressed by counsel as part of the final approval process.

**E. The Settlements Also Satisfy the Rule 23(e) Factors.**

In addition to the *Van Horn* factors set forth by the Eighth Circuit, courts in this district also routinely consider the overlapping Rule 23(e)(2) factors:

(A) the Class Representatives and Class Counsel have adequately represented the class;

(B) the proposal was negotiated at arm's length;

(C) the relief provided for the Class is adequate, taking into account:

      (i)      the costs, risks, and delay of trial and appeal;

      (ii)     the effectiveness of any proposed method of distributing relief to the Class, including the method of processing Class-Member claims;

      (iii)    the terms of any proposed award of attorney's fees, including timing of payment; and

      (iv)    any agreement required to be identified under Rule 23(e)(3); and

(D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2).[8]

The Settlements also satisfy each of these factors. First, Settlement Class Representatives and Class Counsel have adequately represented the Class. Indeed, both this Court and the *Moehrl* Court previously appointed Settlement Class Counsel as class counsel on behalf of the *Burnett* and *Moehrl* classes at the class certification stage. Both courts have also previously appointed the proposed Settlement Class Representatives as representatives on behalf of the respective classes. (*Burnett*, 2022 WL 1203100; *Moehrl*, 2023 WL 2683199). Second, as discussed above, the Settlements were negotiated at arm's length, with the assistance of professional mediators, over an extended period across multiple mediations. Third, for the reasons stated above, the relief provided to the Class is adequate. The Settlements provide significant financial recovery for the Settlement Class, considering the limited financial resources that both Defendants had available. Furthermore, the Settlements include remedies for the challenged conduct with relief that meaningfully changes Defendants' business practices. Fourth, the Settlements treat Class Members fairly and equitably relative to each other. Furthermore, as part of Final Approval, an allocation plan will be submitted

---

[8] *See generally Bishop v. DeLaval Inc.*, No. 5:19-cv-06129, 2022 WL 18957112, at *1 (W.D. Mo. July 20, 2022) (Judge Bough); *Holt v. CommunityAmerica Credit Union*, No. 4:19-cv-00629, 2020 WL 12604383, at *2 (W.D. Mo. Sept. 4, 2020); *In re Pre-Filled Propane Tank Antitrust Litig.*, No. 14-02567, 2019 WL 7160380, at *1–2 (W.D. Mo. Nov. 18, 2019).

for approval by the Court that ensures an equitable distribution of monetary funds amongst the Settlement Class.

## V. THE COURT SHOULD APPOINT CO-LEAD CLASS COUNSEL FOR THE CERTIFIED CLASSES IN BURNETT AND MOEHRL AS CO-LEAD COUNSEL FOR THE SETTLEMENT CLASS

Fed R. Civ. P. 23(g) requires a court certifying a case as a class action to appoint class counsel. Plaintiffs respectfully request that the Court appoint *Burnett* and *Moehrl* Lead Counsel as Settlement Class Counsel, namely Ketchmark & McCreight, Boulware Law LLC, Williams Dirks Dameron LLC, Cohen Milstein Sellers & Toll PLLC, Hagens Berman Sobol Shapiro LLP, and Susman Godfrey LLP.[9] Proposed Settlement Class Counsel are highly experienced in the areas of antitrust and class action litigation. They have tried antitrust class actions to verdict and prosecuted and settled numerous others. (Berman Decl. ¶¶ 3-4). Moreover, as detailed above, they have diligently prosecuted this case for over four years, handling, among other things, motions to dismiss, protracted fact discovery from parties and non-parties, review and synthesis of millions of pages of documents, expert discovery, discovery disputes, class certification, and depositions of fact and expert witnesses. (Berman Decl. ¶ 11.; Dameron Decl. ¶¶ 3-7). Both this Court and the *Moehrl* Court have already recognized Lead Counsels' diligent prosecution of their cases by appointing them as Class Counsel for the *Burnett* and *Moehrl* Classes, respectively, as part of their rulings on class certification. Class Counsel have participated in a lengthy mediation process to achieve the best possible result for the classes.

## VI. DEFERRING CLASS NOTICE IS APPROPRIATE IN THIS CASE

---

[9] This appointment is solely with respect to the Settlement Class. *Moehrl* Lead Counsel are not seeking appointment as Counsel on behalf of the *Burnett* Class in any way with respect to the still pending litigation claims in *Burnett*. *Burnett* Lead Counsel are likewise not seeking appointment as Counsel on behalf of the *Moehrl* Class in any way with respect to the still pending litigation in *Moehrl*.

Rule 23(e) requires that, prior to final approval of a settlement, notice must be provided to class members who would be bound by it. Rule 23(c)(2)(B) requires that notice of a settlement be "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort."

Plaintiffs seek to defer formal notice of the Settlement Agreements to the Settlement Class.[10] In light of the proposed nationwide Settlement Class consisting of over 30 million home sellers, Plaintiffs are working to gather additional Class Member contact information from defendants and other sources. (Berman Decl. ¶ 15). As part of the Settlement Agreements, the Settling Defendants have agreed to use reasonable efforts at their expense to provide Class Member data in support of the provision of class notice. (Anywhere Agreement ¶ 55(iii); RE/MAX Agreement ¶ 55(iii)). If necessary, pursuant to Federal Rule of Civil Procedure 23(c)(2)(B), Plaintiffs may also seek permission to serve subpoenas for the limited purpose of collecting Class Member contact information in order to facilitate notice.

After pursuing additional Class Member contact information, Plaintiffs intend to file a motion to direct notice. *See, e.g.*, *McKinney v. U.S. Postal Serv.*, 292 F.R.D. 62, 68 (D.D.C. 2013) (court deferred the issuance of class notice "pending the completion of [an] additional six-month search period" that would "allow [party's] counsel to locate more accurate information" regarding class members). The proposed notice plan will, pursuant to Rule 23(c)(2)(B), provide the "best notice practicable" to all potential Settlement Class Members who will be bound by the proposed

---

[10] Plaintiffs and Settling Defendants have agreed that the timing of a request to disseminate notice to the Settlement Class of the Settlement Agreement is at the discretion of proposed Co-Lead Class Counsel, and may be combined with notice of other settlements in this action. (Anywhere ¶ 26; RE/MAX ¶ 26).

Settlement Agreements. Plaintiffs anticipate submitting a proposed notice plan promptly following the completion of the trial in this case against the non-settling Defendants.

## VII.    CONCLUSION

The Settlement Agreements provide an immediate, substantial, and fair recovery for the Settlement Class. Accordingly, Plaintiffs respectfully request that the Court enter an order: (1) preliminarily approving the Settlements; (2) certifying the Settlement Class for settlement purposes only; (3) appointing Plaintiffs as Settlement Class Representatives; (4) appointing *Burnett* Class Counsel and *Moehrl* Class Counsel as Settlement Class Counsel; and (5) deferring notice of the Settlement Agreements to the Settlement Class until an appropriate future date.

Dated: October 5, 2023

Respectfully submitted by:

**WILLIAMS DIRKS DAMERON LLC**

_____/s/ Matthew L. Dameron_____
Matthew L. Dameron    MO Bar No. 52093
Eric L. Dirks    MO Bar No. 54921
1100 Main Street, Suite 2600
Kansas City, Missouri 64105
Tel:   (816) 945-7110
matt@williamsdirks.com
dirks@williamsdirks.com

**KETCHMARK AND MCCREIGHT P.C.**
Michael Ketchmark    MO Bar No. 41018
Scott McCreight    MO Bar No. 44002
11161 Overbrook Rd. Suite 210
Leawood, Kansas 66211
Tel:   (913) 266-4500
mike@ketchmclaw.com
smccreight@ketchmclaw.com

**BOULWARE LAW LLC**
Brandon J.B. Boulware    MO Bar No. 54150
Jeremy M. Suhr    MO Bar No. 60075
Erin D. Lawrence    MO Bar No. 63021
1600 Genessee, Suite 416
Kansas City, Missouri 64102
Tel:   (816) 492-2826
brandon@boulware-law.com
jeremy@boulware-law.com
erin@boulware-law.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 5th day of October 2023, the foregoing was electronically filed through the Court's ECF system which will send notification of the same to all counsel of record.

_____/s/ Matthew L. Dameron_____
Attorney for Plaintiffs

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

RHONDA BURNETT, JEROD BREIT,
HOLLEE ELLIS, FRANCES, HARVEY, and
JEREMY KEEL, on behalf of themselves and
all others similarly situated,

        Plaintiffs,

    v.

THE NATIONAL ASSOCIATION OF
REALTORS, REALOGY HOLDINGS
CORP., HOMESERVICES OF AMERICA,
INC., BHH AFFILIATES, LLC, HSF
AFFILIATES, LLC, RE/MAX LLC, and
KELLER WILLIAMS REALTY, INC.,

        Defendants.

Civil Action No. 19-CV-00332-SRB

**DECLARATION OF STEVE W. BERMAN
IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF
SETTLEMENTS WITH ANYWHERE REAL ESTATE AND RE/MAX LLC,
CERTIFICATION OF SETTLEMENT CLASS,
AND APPOINTMENT OF SETTLEMENT CLASS COUNSEL**

I, Steve W. Berman, state under oath, as follows:

1.      I am the Managing Partner of Hagens Berman Sobol Shapiro LLP ("Hagens Berman"). The Court in *Moehrl v National Association of Realtors*, Case No. 1:19-cv-01610-ARW (Northern District of Illinois) ("Moehrl") appointed my firm, together with Cohen Milstein Sellers & Toll PLLC ("Cohen Milstein"), and Susman Godfrey LLP ("Susman Godfrey"), as Co-Lead Class Counsel in the *Moehrl* litigation.

2.      I submit this declaration in support of Plaintiffs' Motion for Preliminary Approval of Settlements with Anywhere Real Estate and RE/MAX, Certification of Settlement Class, and Appointment of Settlement Class Counsel. Based on personal knowledge or discussions with counsel in my firm and co-counsel regarding the matters stated herein, if called upon, I could and would testify competently thereto.

3.      I have served as lead or co-lead counsel in antitrust, securities, consumer, products liability, and employment class actions, and other complex litigation matters throughout the country. For example, I have represented thousands of plaintiffs in large antitrust cases and have achieved favorable results for them. I was the lead trial lawyer in *In re National Collegiate Athletic Association Athletic Grant-In-Aid Cap Antitrust Litigation*, MDL No. 2541 (N.D. Cal.) where the class obtained injunctive relief following a bench trial. As co-lead counsel in *In re Visa Check/Mastercard Antitrust Litigation*, No. 96-cv-05238 (E.D.N.Y.), I obtained the then largest antitrust settlement in history for consumers while challenging alleged anti-competitive agreements among U.S. banks, Visa, and Mastercard, regarding ATM fees. I also represented consumers in *In re Optical Disk Drive Products Antitrust Litigation*, No. 10-md-2143-RS (N.D. Cal.), *In re Electronic Books Antitrust Litigation*, No. 11-md-02293 (DLC) (S.D.N.Y.), and *In re Lithium Ion Batteries Antitrust Litigation*, No. 13-md-02430 (N.D. Cal.), obtaining court-approved settlements for class members in all three cases. I was approved as co-lead counsel to represent a certified class of thousands of consumers in *In re Broiler Chicken Antitrust Litigation*, No. 1:16-cv-08637 (N.D. Ill. May 27, 2022), ECF No.5644. I have negotiated numerous settlements in class and non-class cases during my decades of practice.

4. Proposed Settlement Class Counsel are highly experienced in the areas of antitrust and class action litigation. They have tried antitrust class actions to verdict and prosecuted and settled numerous others. Hagens Berman, Cohen Milstein, and Susman Godfrey—Co-Lead Class Counsel in *Moehrl*—each have extensive antitrust class action experience and have successfully prosecuted some of the most complex private antitrust cases in the last two decades. Each has a history of winning landmark verdicts and negotiating favorable settlements for their clients. Their collective and individual litigation experience—discussed in the memorandum of law and exhibits filed in Support of Plaintiff's Motion to Appoint Interim Co-Lead Class Counsel in the *Moehrl* action,—amply demonstrates that these three firms have extensive knowledge of the relevant law, as well as the resources for effective representation of Settlement Class Plaintiffs, and the proven ability to reach superior results for parties injured by anticompetitive practices. (*Moehrl* Docs. 50-1 – 50-14)

5. On behalf of Plaintiffs, other Co-Lead Counsel and I personally conducted intensive settlement negotiations with counsel for Anywhere Real Estate, Inc. (f/k/a Realogy Holdings Corp.) ("Anywhere") and RE/MAX, LLC ("RE/MAX") (collectively "Settling Defendants") over the course of nearly a year.

6. Plaintiffs and Anywhere executed a Settlement Agreement on October 5, 2023. Attached as Exhibit A is a true and accurate copy of the Settlement Agreement between Plaintiffs and Anywhere.

7. Plaintiffs and RE/MAX likewise executed a Settlement Agreement on October 5, 2023. Attached as Exhibit B is a true and accurate copy of the Settlement Agreement between Plaintiffs and RE/MAX.

8. In my opinion, and in that of highly experienced Co-Lead Counsel, the proposed Settlement Agreements are fair, reasonable, and adequate. They provide substantial monetary and non-monetary benefits to the Settlement Class, and they avoid the risks, costs, and delay of continuing protracted litigation against Settling Defendants. Details of the agreed monetary relief, changes to the Settling Defendants' business practices, and cooperation in Plaintiffs

- 2 -

Case: 1:19-cv-01610 Document #: 441-1 Filed: 11/20/23 Page 48 of 123 PageID #:26168

ongoing litigation against the non-settling defendants are set forth in the Settlement Agreements attached as Exhibits A and B.

9.     Plaintiffs' Co-Lead Counsel and counsel for Anywhere engaged in extensive arm's-length settlement negotiations that lasted nearly a year, from December 2022 through August 2023, including several telephonic and in-person mediations with a nationally recognized and highly experienced mediator, two mediations with a retired federal court judge, and a mediation with a federal magistrate judge, leading to the Settlement Agreement with Anywhere. Plaintiffs' Co-Lead Counsel and counsel for Anywhere also participated in dozens of one-on-one calls as part of the settlement negotiations. Plaintiffs' Co-Lead Counsel and counsel for RE/MAX further held several mediations over a multi-month process, including a mediation with a nationally recognized and highly experienced mediator, as well as numerous direct communications. The mediation sessions with RE/MAX were attended by senior RE/MAX executives including its general counsel and chief financial officer.

10.     There was no collusion among counsel for the parties at any time during these settlement negotiations.  To the contrary, the negotiations were contentious, hard fought, and fully informed.  Plaintiffs sought to obtain the largest possible monetary recovery, as well as the most impactful changes to the Settling Defendants' business practices, to avert anticompetitive conduct going forward.  Plaintiffs further sought the most helpful cooperation possible from Settling Defendants.

11.     When the Settlement Agreements were executed, Co-Lead Counsel were fully aware of the strengths and weaknesses of each side's positions.  The parties in both actions completed over four years of extensive fact and expert discovery, including propounding and responding to multiple sets of interrogatories and requests for production, followed by the production of well over 5 million pages of documents from the parties and dozens of non-parties across both actions. Plaintiffs briefed numerous discovery motions and disputed items in order to obtain important evidence to support their claims. The parties conducted over 100 depositions in the *Moehrl* action and over 80 depositions in the *Burnett* action. *Moehrl* Plaintiffs engaged six

- 3 -
Case 4:19-cv-00332-SRB   Document 1192-1   Filed 10/05/23   Page 4 of 6

experts and *Burnett* Plaintiffs engaged five experts to support their claims and to rebut claims from the nine experts retained by Defendants in each case. Most experts in the case were deposed after the submission of 24 expert reports in *Moehrl* and 19 expert reports in *Burnett*. The *Burnett* Plaintiffs also briefed summary judgment and began preparing for trial, including against the Settling Defendants. Based on their extensive investigative and analytical efforts, Co-Lead Counsel were well informed of the value and consequences of the Settlement Agreements.

12.     Plaintiffs and Class Counsel reached the Settlement Agreements after considering the risk and cost of litigation. Plaintiffs and Class Counsel believe the claims asserted are meritorious and that the evidence developed to date supports the claims, but also recognize the risk and delay of further proceedings in a complex case like this, and believe that the Settlements confer substantial benefits upon the Settlement Class Members.

13.     Moreover, Plaintiffs and counsel conducted a thorough financial analysis of the limited ability to pay of both Anywhere and RE/MAX, and whether Anywhere and RE/MAX could withstand a greater monetary judgment, which directly affected the monetary amounts that it was feasible to recover from both Settling Defendants through settlement. In my opinion, the Settlements are fair and reasonable in light of the financial condition of Anywhere and RE/MAX.

14.     The Settlement Class Representatives in *Moehrl* have been provided the Settlement Agreements for review and approved the terms of the Settlements.

15.     Plaintiffs seek to defer formal notice of the Settlement Agreements to the Settlement Class. In light of the proposed nationwide Settlement Class consisting of over 30 million home sellers, Plaintiffs are working to gather additional Class Member contact information from defendants and other sources. As part of the Settlement Agreements, the Settling Defendants have agreed to use reasonable efforts at their expense to provide Class Member data in support of the provision of class notice. If necessary, Plaintiffs may also seek permission to serve subpoenas for the limited purpose of collecting Class Member contact

information in order to facilitate notice. After pursuing additional Class Member contact information, Plaintiffs intend to file a motion to direct notice with the Court.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed October 5, 2023, at Seattle, Washington.

/s/ Steve W. Berman
STEVE W. BERMAN

## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
## WESTERN DIVISION

RHONDA BURNETT, JEROD BREIT,
HOLLEE ELLIS, FRANCES HARVEY, and
JEREMY KEEL, on behalf of themselves and
all others similarly situated,

                    Plaintiffs,

      v.

                                    Case No. 19-CV-00332-SRB

THE NATIONAL ASSOCIATION OF
REALTORS, REALOGY HOLDINGS CORP.,
HOMESERVICES OF AMERICA, INC., BHH
AFFILIATES, LLC, HSF AFFILIATES, LLC,
RE/MAX LLC, and KELLER WILLIAMS
REALTY, INC.,

                    Defendants.

## <u>DECLARATION OF MATTHEW L. DAMERON</u>

I, Matthew L. Dameron, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 as follows:

1.      I respectfully submit this declaration in support of Plaintiffs' Motion for Preliminary Approval of Settlements.

2.      I am a partner at Williams Dirks Dameron LLC. Along with Ketchmark & McCreight P.C. and Boulware Law, my firm was one of three firms appointed as Class Counsel by this Court.

3.      The proposed Settlements are the product of protracted, lengthy litigation between the Settlement Class and the Settling Defendants (Anywhere and RE/MAX). During the nearly five years of litigation, the parties have engaged in dozens of depositions and numerous hearings related to discovery and other matters.

1

4.      Moreover, in *Burnett*, the parties have navigated several substantive and significant litigation thresholds, including motions to dismiss, class certification (including an unsuccessful interlocutory appeal under Rule 23(f)), and summary judgment.

5.      *Burnett* also implicated the complex issue of arbitration, and the parties in *Burnett* twice engaged in lengthy appellate proceedings related to arbitration—proceedings that required full appellate briefing and oral argument before the U.S. Court of Appeals for the Eighth Circuit.

6.      *Burnett* is also on the eve of trial, and the Settling Defendants engaged in lengthy pretrial litigation in *Burnett*, including competing jury instructions, multiple motions in limine, and other trial-related matters.

7.      Based on this lengthy and involved litigation background, Class Counsel in *Burnett* can evaluate the value of the proposed Settlements and their multiple benefits to the Settlement Class, particularly where those benefits are weighed against the risks associated with further litigation and the financial wherewithal of the Settling Defendants.

8.      Regarding the latter point—the Settling Defendants' financial ability to pay any judgment—Class Counsel, along with the counsel in *Moehrl*, carefully scrutinized the financial conditions of Anywhere and RE/MAX, including their available funds to pay any settlement, their current and prospective financial conditions, and their ability to withstand a judgment if Plaintiffs prevail at trial.

9.      Based on this review and the Settling Defendants' financial condition, Class Counsel in *Burnett* have concluded that the proposed Settlements represent fair and reasonable Settlements under the circumstances.

10.     This is particularly true when the Court considers the non-monetary terms of the proposed Settlements and the meaningful relief those terms offer to consumers on a going-forward basis.

11.     Class Counsel in *Burnett* reached these conclusions based on the knowledge we acquired about the real estate industry through the litigation, as well as our knowledge of the issues affecting the potential outcome of the litigation and trial.

12.     Moreover, we came to our conclusions based on lengthy and various dispute resolution efforts over the course of the case, including multiple mediations with a nationally recognized mediator; mediations with a retired federal judge; and a mediation with a federal magistrate judge from this District. The parties also engaged in ongoing informal discussions with the mediators, as well as direct conversations.

13.     We have provided the proposed Settlement Agreements to the Settlement Class Representatives in *Burnett* and discussed the terms with them; the Settlement Class Representatives approve of the proposed Settlements.

I declare under penalty of perjury that the foregoing is true and correct.


DATED: October 5, 2023

_____
MATTHEW L. DAMERON

3

# Declaration of Steve W. Berman

# Exhibit A

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

RHONDA BURNETT, JEROD BREIT, HOLLEE ELLIS,
FRANCES HARVEY, and JEREMY KEEL, on behalf of
themselves and all others similarly situated,

        Plaintiffs,

      v.

THE NATIONAL ASSOCIATION OF REALTORS,
REALOGY HOLDINGS CORP., HOMESERVICES OF
AMERICA, INC., BHH AFFILIATES, LLC, HSF
AFFILIATES, LLC, RE/MAX LLC, and KELLER
WILLIAMS REALTY, INC.,

        Defendants.

Case No. 19-CV-00332-SRB

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS EASTERN DIVISION

CHRISTOPHER MOEHRL, MICHAEL COLE, STEVE
DARNELL, JACK RAMEY, DANIEL UMPA and JANE RUH
on behalf of themselves and all others similarly situated,

        Plaintiffs,

      v.

THE NATIONAL ASSOCIATION OF REALTORS,
REALOGY HOLDINGS CORP., HOMESERVICES OF
AMERICA, INC., BHH AFFILIATES, LLC, HSF
AFFILIATES, LLC, THE LONG & FOSTER COMPANIES,
INC., RE/MAX LLC, and KELLER WILLIAMS REALTY,
INC.,

        Defendants.

Case No. 1:19-cv-01610
Judge Andrea R. Wood

SETTLEMENT AGREEMENT

This Settlement Agreement ("Settlement Agreement") is made and entered into this 5th day of October, 2023 (the "Execution Date"), by and between defendant Anywhere Real Estate, Inc. (f/k/a Realogy Holdings Corp.) ("Anywhere") and plaintiffs Rhonda Burnett, Jerod Breit, Hollee Ellis, Frances Harvey, Jeremy Keel, Christopher Moehrl, Michael Cole, Steve Darnell, Jack Ramey, Daniel Umpa, and Jane Ruh, (collectively "Plaintiffs"), who filed suit in the above captioned actions ("the Actions"), both individually and as representatives of one or more classes of home sellers. Plaintiffs enter this Settlement Agreement both individually and on behalf of the Settlement Class, as defined below.

WHEREAS, in the Actions Plaintiffs allege that Anywhere participated in a conspiracy to raise, fix, maintain, or stabilize real estate commissions in violation of Section 1 of the Sherman Act and corresponding state laws;

WHEREAS, Anywhere denies Plaintiffs' allegations in the Actions and has asserted defenses to Plaintiffs' claims;

WHEREAS, extensive arm's-length settlement negotiations have taken place between Plaintiffs' Co-Lead Counsel and counsel for Anywhere, including several telephonic and in-person mediations with a nationally recognized and highly experienced mediator, two mediations with a retired federal court judge, and a mediation with a federal magistrate judge, leading to this Settlement Agreement;

WHEREAS, the Actions will continue against the Non-Anywhere Defendants unless Plaintiffs separately settle with any of the Non-Anywhere Defendants;

WHEREAS, Plaintiffs have conducted an extensive investigation into the facts and the law regarding the claims asserted in the Actions, including more than four years of fact and expert discovery, and have concluded that a settlement with Anywhere according to the terms set forth below is fair, reasonable, and adequate and in the best interest of Plaintiffs and the Settlement Class;

WHEREAS, Anywhere believes that it is not liable for the claims asserted and has good defenses to Plaintiffs' claims, but nevertheless has decided to enter into this Settlement Agreement to avoid further expense, inconvenience, and the distraction of burdensome and protracted litigation, to obtain the releases, orders, and judgment contemplated by this Settlement Agreement, and to put to rest with finality all claims that Plaintiffs and Settlement Class Members have or could have asserted against the Released Parties, as defined below; and

WHEREAS, Anywhere, in addition to the settlement payments set forth below, has agreed to cooperate with Plaintiffs and to implement certain practice changes, each as set forth in this Settlement Agreement.

NOW, THEREFORE, in consideration of the agreements and releases set forth herein and other good and valuable consideration, and intending to be legally bound, it is agreed by and between Anywhere and the Plaintiffs that the Actions be settled, compromised, and dismissed with prejudice as to Anywhere only, without costs to Plaintiffs, the Settlement Class or Anywhere except as provided for herein, subject to the approval of the Court, on the following terms and conditions:

**A.**     **<u>Definitions</u>**

The following terms, as used in this Settlement Agreement, have the following meanings:

1.     "Burnett" means Western District of Missouri Case No. 4:19-cv-00332-SRB, which is currently pending.

2.     "Burnett MLSs" means the multiple listing services at issue in Burnett.

3.     "Corporate Defendants" means HomeServices of America, Inc., BHH Affiliates, LLC, HSF Affiliates, LLC, The Long & Foster Companies, Inc., RE/MAX LLC, and Keller Williams Realty, Inc.

4.     "Co-Lead Counsel" means the following law firms:

KETCHMARK AND MCCREIGHT P.C.
11161 Overbrook Road, Suite 210

Leawood, KS 66211

BOULWARE LAW LLC
1600 Genessee, Suite 416
Kansas City, MO 64102

WILLIAMS DIRKS DAMERON LLC
1100 Main Street, Suite 2600
Kansas City, MO 64105

HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101

COHEN MILSTEIN SELLERS & TOLL PLLC
1100 New York Ave. NW, Fifth Floor
Washington, DC 20005

SUSMAN GODFREY LLP
1201 Third Avenue, Suite 3800
Seattle, Washington 98101

5.    "Court" means the U.S. District Court for the Western District of Missouri.

6.    "Defendants" means the National Association of Realtors, Realogy Holdings Corp.,

HomeServices of America, Inc., BHH Affiliates, LLC, HSF Affiliates, LLC, The Long & Foster

Companies, Inc., RE/MAX LLC, and Keller Williams Realty, Inc.

7.    "Effective" means that all conditions set forth below in the definition of "Effective

Date" have occurred.

8.    "Effective Date" means the date when: (a) the Court has entered a final judgment

order approving the Settlement set forth in this Settlement Agreement under Rule 23(e) of the

Federal Rules of Civil Procedure and a final judgment dismissing the Actions against Anywhere

with prejudice has been entered; and (b) the time for appeal or to seek permission to appeal from

the Court's approval of the Settlement and the entry of a final judgment has expired or, if appealed,

approval of the Settlement and the final judgment have been affirmed in their entirety by the Court

of last resort to which such appeal has been taken and such affirmance is no longer subject to further

appeal or review; excluding, however, any appeal or other proceedings unrelated to this Settlement Agreement initiated by any Non-Anywhere Defendant or any person or entity related to the Non-Anywhere Defendant, and any such appeal or other proceedings shall not delay the Settlement Agreement from becoming final and shall not apply to this section; nor shall this section be construed as an admission that such parties have standing or other rights of objection or appeal with respect to this Settlement. It is agreed that neither the provisions of Federal Rule of Civil Procedure 60 nor the All Writs Act, 28 U.S.C. § 1651, shall be considered in determining the above-stated times.

9.    "Moehrl" means Northern District of Illinois Case No. 1:19-cv-01610-ARW, which is currently pending.

10.    "Moehrl MLSs" means the multiple listing services at issue in Moehrl.

11.    "MLS PIN" means the multiple listing service at issue in District of Massachusetts Case No. 1:20-cv-12244-PBS, which is currently pending.

12.    "Non-Anywhere Defendants" means the National Association of Realtors, HomeServices of America, Inc., BHH Affiliates, LLC, HSF Affiliates, LLC, The Long & Foster Companies, Inc., RE/MAX LLC, and Keller Williams Realty, Inc.

13.    "Opt-Out Sellers" means members of the Settlement Class who have timely exercised their rights to be excluded from the Settlement Class or have otherwise obtained Court approval to exercise such rights.

14.    "Released Claims" means any and all manner of claims regardless of the cause of action arising from or relating to conduct that was alleged or could have been alleged in the Actions based on any or all of the same factual predicates for the claims alleged in the Actions, including but not limited to commissions negotiated, offered, obtained, or paid to brokerages in connection with the sale of any residential home.

15.     "Released Parties" means Anywhere and all of its respective past, present and future, direct and indirect corporate parents (including holding companies), subsidiaries, related entities and affiliates, associates (all as defined in SEC Rule 12b-2 promulgated pursuant to the Securities Exchange Act of 1934), predecessors, and successors (collectively, together with franchisees, the "Anywhere Entities"), and all of their respective franchisees, officers, directors, managing directors, employees, agents, contractors, independent contractors, attorneys, legal or other representatives, accountants, auditors, experts, trustees, trusts, heirs, beneficiaries, estates, executors, administrators, insurers, and assigns, and all of the franchisees' officers, directors, managing directors, employees, agents, and independent contractors. Notwithstanding this definition, "Released Parties" shall not include the Non-Anywhere Defendants, or their past, present and future, direct and indirect corporate parents (including holding companies), subsidiaries, related entities and affiliates, associates (all as defined in SEC Rule 12b-2 promulgated pursuant to the Securities Exchange Act of 1934), predecessors, and successors, and all of their respective franchisees, officers, directors, managing directors, employees, agents, contractors, independent contractors, attorneys, legal or other representatives, accountants, auditors, experts, trustees, trusts, heirs, beneficiaries, estates, executors, administrators, insurers, and assigns. For the avoidance of doubt, individuals who were members of the National Association of Realtors are not thereby excluded from being Released Parties, and entities and individuals that were sometimes associated with the Anywhere Entities and other times associated with a different Corporate Defendant are included as Released Parties for the periods of time they were associated with the Anywhere Entities and excluded for the periods of time they were associated with a different Corporate Defendant.

16.     "Releasing Parties" means Plaintiffs and any Settlement Class Members (including any of their immediate family members, heirs, representatives, administrators, executors, devisees, legatees, and estates, acting in their capacity as such; and for entities including any of their past,

present or future officers, directors, insurers, general or limited partners, divisions, stockholders, agents, attorneys, employees, legal representatives, trustees, parents, associates, affiliates, joint ventures, subsidiaries, heirs, executors, administrators, predecessors, successors and assigns, acting in their capacity as such) solely with respect to the claims based on or derived from claims of the Plaintiffs or Settlement Class Members.

17. "Settlement" means the settlement of the Actions contemplated by this Settlement Agreement.

18. "Settlement Class" means the class of persons that will be certified by the Court for settlement purposes only, namely, all persons who sold a home that was listed on a multiple listing service anywhere in the United States where a commission was paid to any brokerage in connection with the sale of the home in the following date ranges:

      a.    Moehrl MLSs: March 6, 2015 to date of notice;

      b.    Burnett MLSs: April 29, 2014 to date of notice;

      c.    MLS PIN: December 17, 2016 to date of notice;

      d.    All other MLSs: four years prior to (i) the date a new or amended complaint (if any) is filed in the Actions reflecting any MLSs aside from the Moehrl MLSs, Burnett MLSs, and MLS PIN or (ii) the date of notice, whichever is earlier, up to the date of notice.

19. "Settlement Class Member" means a member of the Settlement Class who does not file a valid request for exclusion from the Settlement Class.

20. "Settling Parties" means Plaintiffs and Anywhere.

21. "Total Monetary Settlement Amount" means $83.5 million in United States currency. All costs of settlement, including all payments to class members, all attorneys' fees and costs, all service awards to current and former class representatives, and all costs of notice and administration,

will be paid out of the Total Monetary Settlement Amount, and Anywhere will pay nothing apart from the Total Monetary Settlement Amount.

**B.     Stipulation to Class Certification**

22.     The Settling Parties hereby stipulate for purposes of this Settlement only that the requirements of Federal Rules of Civil Procedure 23(a) and 23(b)(3) are satisfied and, subject to Court approval, the Settlement Class shall be certified for settlement purposes as to Anywhere.  The Settling Parties stipulate and agree to the conditional certification of the Settlement Class for purposes of this Settlement only.  Should, for whatever reason, the Settlement not become Effective, the Settling Parties' stipulation to class certification as part of the Settlement shall become null and void.

23.     Neither this Settlement Agreement, nor any statement, transaction, or proceeding in connection with the negotiation, execution, or implementation of this Settlement Agreement should be intended to be, construed as, or deemed to be evidence of an admission or concession by Anywhere that a class should be or should have been certified for any purposes other than settlement, and none of them shall be admissible in evidence for any such purpose in any proceeding.

**C.     Approval of this Settlement Agreement and Dismissal of the Actions**

24.     The Settling Parties agree to make reasonable best efforts to effectuate this Settlement Agreement, including, but not limited to, seeking the Court's approval of procedures (including the giving of class notice under Federal Rules of Civil Procedure 23(c) and (e); scheduling a final fairness hearing) to obtain final approval of the Settlement and the final dismissal with prejudice of the Actions as to Anywhere; and **Anywhere's cooperation** by identifying public information reflecting its ability to pay limitations.  The Settling Parties further agree that Co-Lead Counsel may seek whatever approvals are required by the court in *Moehrl* related to obtaining approval of and effectuating his Settlement Agreement.

25.     By October 5, 2023, Plaintiffs will submit to the Court a motion requesting that the Court preliminarily approve the Settlement (the "Motion"). The Motion shall include: (a) a proposed form of order preliminarily approving the Settlement; and (b) a proposed form of final judgment order. Within a reasonable time in advance of submission to the Court, the papers in support of the Motion for preliminary approval shall be provided by Co-Lead Counsel to Anywhere for its review. To the extent that Anywhere objects to any aspect of the Motion, it shall communicate such objection to Co-Lead Counsel and the Settling Parties shall meet and confer to resolve any such objection. The Settling Parties shall take all reasonable actions as may be necessary to obtain preliminary approval of the Settlement. To the extent the Court finds that the Settlement does not meet the standard for preliminary approval, the Settling Parties will negotiate in good faith to modify the Settlement Agreement directly or with the assistance of mediator Greg Lindstrom and will endeavor to resolve any issues to the satisfaction of the Court.

26.     After preliminary approval, and subject to approval by the Court, the Settling Parties will agree on a method or methods of providing notice of this Settlement to the Settlement Class and for claim administration that meet the requirements of due process and Federal Rule of Civil Procedure 23. The Settling Parties will also agree on a claim administrator after receiving multiple competing bids. The timing of any request to disseminate notice to the Settlement Class will be at the discretion of Co-Lead Counsel.

27.     Within ten (10) calendar days after the filing with the Court of this Settlement Agreement and the accompanying motion papers seeking its preliminary approval, the claims administrator, if one has been selected, or Anywhere if a claims administrator has not yet been selected shall at Anywhere's expense to be credited against the Total Monetary Settlement Amount cause notice of the Settlement Agreement to be served upon appropriate State and Federal officials as provided in the Class Action Fairness Act, 28 U.S.C. § 1715.

DocuSign Envelope ID: E834464B-2B9E-47E9-A1B9-C2EBA0D9195

28.     If the Settlement is preliminarily approved by the Court, Plaintiffs shall timely seek final approval of the Settlement and entry of a final judgment order as to Anywhere:

(a) certifying the Settlement Class under Federal Rule of Civil Procedure 23(b)(3), solely for purposes of this Settlement;

(b) granting final approval of the Settlement as fair, reasonable, and adequate within the meaning of Federal Rules of Civil Procedure 23(e) and directing the consummation of the Settlement according to its terms;

(c) directing that, as to Anywhere only, the Actions be dismissed with prejudice and, except as provided for herein, without costs;

(d) reserving exclusive jurisdiction over the Settlement and this Settlement Agreement, including reserving exclusive jurisdiction over the administration and consummation of this Settlement to the United States District Court for the Western District of Missouri; and

(e) determining under Federal Rule of Civil Procedure 54(b) that there is no just reason for delay and directing entry of final judgment as to Anywhere.

29.     This Settlement Agreement will become Effective only after the occurrence of all conditions set forth above in the definition of the Effective Date.

## D.     Releases, Discharge, and Covenant Not to Sue

30.     Upon the occurrence of the Effective Date, the Releasing Parties expressly and irrevocably waive, and fully, finally, and forever settle, discharge, and release the Released Parties from, any and all manner of claims, demands, actions, suits, and causes of action, whether individual, class, representative, or otherwise in nature, for damages, restitution, disgorgement, interest, costs, expenses, attorneys' fees, fines, civil or other penalties, or other payment of money, or for injunctive, declaratory, or other equitable relief, whenever incurred, whether directly, indirectly, derivatively,

or otherwise, whether known or unknown, suspected or unsuspected, in law or in equity, that any Releasing Party ever had, now has, or hereafter can, shall, or may have and that have accrued as of the date of preliminary approval of the Settlement arising from or related to the Released Claims. In connection therewith, upon the Effective Date of Settlement, each of the Releasing Parties (i) shall forever be enjoined from prosecuting in any forum any Released Claims against any of the Released Parties from the beginning of time through the date of preliminary approval of the Settlement; and (ii) agrees and covenants not to sue any of the Released Parties with respect to any Released Claims. For avoidance of doubt, this release extends to, but only to, the fullest extent permitted by law.

31.     The Releasing Parties may hereafter discover facts other than or different from those which they now know or believe to be true with respect to the subject matter of the Released Claims. Nevertheless, the Releasing Parties expressly, fully, finally, and forever settle and release, and, upon the Effective Date, shall be deemed to have, and by operation of the Final Judgment and Order of Dismissal shall have, fully, finally, and forever settled and released, any and all Released Claims, without regard to the subsequent discovery or existence of such other, different, or additional facts, as well as any and all rights and benefits existing under (i) Cal. Civ. Code Section 1542, which provides as follows:

> A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY.

DocuSign Envelope ID: E834464B-2B9E-47E9-A1B9-C2EBA0D9195?

or any equivalent, similar or comparable present or future law or principle of law of any jurisdiction, including but not limited to Section 20-7-11 of the South Dakota Codified Laws, which provides that "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM MUST HAVE MATERIALLY AFFECTED HIS SETTLEMENT WITH THE DEBTOR;" or (ii) any law or principle of law of any jurisdiction that would limit or restrict the effect or scope of the provisions of the release set forth above, without regard to the subsequent discovery or existence of such other, different, or additional facts. The Releasing Parties acknowledge that the inclusion of unknown claims in the definition of Released Claims was separately bargained for and was a material element of the Agreement.

32. The Releasing Parties intend by this Settlement Agreement to settle with and release only the Released Parties, and the Settling Parties do not intend this Settlement Agreement, or any part hereof, or any other aspect of the proposed Settlement or release, to release or otherwise affect in any way any claims concerning product liability, breach of warranty, breach of contract or tort of any kind (other than a breach of contract or tort based on any factual predicate in this Action), a claim arising out of violation of the Uniform Commercial Code, or personal or bodily injury. The release does not extend to any individual claims that a class member may have against his or her own broker or agent based on a breach of contract, breach of fiduciary duty, malpractice, negligence or other tort claim, other than a claim that a class member paid an excessive commission or home price due to the claims at issue in these Actions.

E. **Payment of the Settlement Amount**

33. Plaintiffs will open a special interest-bearing settlement escrow account or accounts, established for that purpose as a qualified settlement fund as defined in Section 1.468B-1(a) of the U.S. Treasury Regulations (the "Escrow Account"). Within 14 business days after the Escrow

Account has been opened and preliminary approval is granted, Anywhere will deposit $10 million into the Escrow Account. Within 14 business days after the district court awards fees and costs, Anywhere will deposit into the Escrow Account an additional $20 million. Anywhere will pay the remaining balance of the Total Monetary Settlement Amount into the Escrow Account within 21 business days after the Effective Date. The Escrow Account will be administered in accordance with the provisions of Section F of this Settlement Agreement.

F.     **The Settlement Fund**

34.     The Total Monetary Settlement Amount and any interest earned thereon shall be held in the Escrow Account and constitute the "Settlement Fund." The full and complete cost of the settlement notice, claims administration, Settlement Class Members' compensation, current and former class representatives' incentive awards, attorneys' fees and reimbursement of all actual expenses of the Actions, any other litigation costs of Plaintiffs (all as approved by the Court), and all applicable taxes, if any, assessable on the Settlement Fund or any portion thereof, will be paid out of the Settlement Fund. In no event will Anywhere's monetary liability with respect to the Settlement exceed the Total Monetary Settlement Amount.

35.     The Settling Parties and their counsel will not have any responsibility, financial obligation, or liability for any fees, costs, or expenses related to providing notice to the Settlement Class or administering the settlement except as provided in Paragraph 55(iii). Such fees, costs, or expenses shall be paid solely from the Settlement Fund with Court approval. The balance of the Settlement Fund shall be disbursed to Settlement Class Members as provided in a Plan of Allocation (as defined below) approved by the Court. The Settling Parties shall have the right to audit amounts paid from the Settlement Fund.

36.     After preliminary approval of the Settlement and approval of a class notice plan, Co-Lead Counsel may utilize a portion of the Settlement Fund to provide notice of the Settlement to

potential members of the Settlement Class. Anywhere will not object to Plaintiffs' counsel withdrawing from the Settlement Fund, subject to any necessary Court approval, up to $3,500,000 to pay the costs for notice. If Plaintiffs settle with one (or more) Non-Anywhere Defendants and notice of one or more other settlements is included in the notice of the Anywhere settlement, then the cost of such notice will be apportioned equitably between (or among) the Anywhere Settlement Fund and the other settling Defendant(s)' settlement funds. The amount spent or accrued for notice and notice administration costs is not refundable to Anywhere in the event the Settlement Agreement is disapproved, rescinded, or otherwise fails to become Effective.

37.     Subject to Co-Lead Counsel's sole discretion as to timing, except that the timing must be consistent with rules requiring that Settlement Class Members be given the opportunity to review fee applications, Co-Lead Counsel may apply to the Court for a fee award, plus expenses, and costs incurred, and current and former class representative service awards to be paid out of the Settlement Fund. Within 14 business days after any order by the Court awarding attorneys' fees, expenses, or class representative incentive awards, the escrow agent for the Settlement Fund shall pay any approved attorneys' fees, expenses, costs, and class representative service awards up to the amount specified in Paragraph 33 above for such fees, expenses, costs, and class representative service award by wire transfer as directed by Co-Lead Counsel in accordance with and attaching the Court's Order, provided that each Co-Lead Counsel receiving payment signs an assurance, in the form attached hereto as Appendix A, attesting that they will repay all awarded amounts if this Settlement Agreement does not become Effective.

38.     The Settlement Fund will be invested in United States Government Treasury obligations or United States Treasury money market funds.

39.     Anywhere will not have any responsibility, financial obligation, or liability whatsoever with respect to the investment, distribution, use, or administration of the Settlement Fund,

including, but not limited to, the costs and expenses of such investment, distribution, use or administration except as expressly otherwise provided in this Settlement Agreement. **Anywhere's** only payment obligation is to pay the Total Monetary Settlement Amount.

40. There will be no reduction of the Total Monetary Settlement Amount based on Opt-Out Sellers. The Settlement will be non-reversionary except as set forth below in Section H. If the Settlement becomes Effective, no proceeds from the Settlement will revert to Anywhere regardless of the claims that are made.

41. No disbursements shall be made from the Settlement Fund prior to the Effective Date of this Settlement Agreement except as described in Paragraphs 36 and 37 above and 44 below.

42. The distribution of the Settlement Fund shall be administered pursuant to a plan of allocation (the "Plan of Allocation") proposed by Co-Lead Counsel in their sole and absolute discretion and subject to the approval of the Court. Anywhere will have no participatory or approval rights with respect to the Plan of Allocation. It is understood and agreed by the Settling Parties that any proposed Plan of Allocation, including, but not limited to, any adjustments to an authorized claimant's claim, is completely independent of and is not a part of this Stipulation and is to be considered by the Court separately from the Court's consideration of the fairness, reasonableness, and adequacy of the Settlement Agreement. The Settlement Class, Plaintiffs, and Anywhere shall be bound by the terms of the Settlement Agreement, irrespective of whether the Court or any other court, including on any appeal, disapproves or modifies the Plan of Allocation, and any modification or rejection of the Plan of Allocation shall not affect the validity or enforceability of this Settlement Agreement or otherwise operate to terminate, modify, or cancel that Agreement.

43. The Releasing Parties will look solely to the Settlement Fund for settlement and satisfaction against the Released Parties of all Released Claims and shall have no other recovery against Anywhere or the Released Parties.

G.    **Taxes**

44.    Co-Lead Counsel is solely responsible for filing all informational and other tax returns necessary to report any net taxable income earned by the Settlement Fund and shall file all informational and other tax returns necessary to report any income earned by the Settlement Fund and shall be solely responsible for taking out of the Settlement Fund, as and when legally required, any tax payments, including interest and penalties due on income earned by the Settlement Fund. All taxes (including any interest and penalties) due with respect to the income earned by the Settlement Fund shall be paid from the Settlement Fund. Anywhere has no responsibility to make any filings relating to the Settlement Fund and will have no responsibility to pay tax on any income earned by the Settlement Fund or to pay any taxes on the Settlement Fund unless the Settlement does not become Effective and the Settlement Fund is returned to Anywhere. In the event the Settlement does not become Effective and any funds including interest or other income are returned to Anywhere, Anywhere will be responsible for the payment of all taxes (including any interest or penalties), if any, on said interest or other income. Anywhere makes no representations regarding, and will not be responsible for, the tax consequences of any payments made pursuant to this Settlement Agreement to Co-Lead Counsel or to any Settlement Class Member.

H.    **Rescission**

45.    If the Court does not certify the Settlement Class as defined in this Settlement Agreement, or if the Court does not approve this Settlement Agreement in all material respects, or if such approval is modified or set aside on appeal, or if the Court does not enter final approval as provided for in Paragraph 28 herein, or if any judgment approving this Settlement Agreement is materially modified or set aside on appeal, or if all of the conditions for the Effective Date do not occur, then this Settlement Agreement may be rescinded by Anywhere or by Plaintiffs on behalf of the Settlement Class by written notice to the Court and to counsel for the other Settling Party filed

and served within ten (10) business days of the entry of an order not granting court approval or having the effect of disapproving or materially modifying the terms of the Settlement Agreement. A modification or reversal on appeal of any amount of the Settlement Fund that the Court authorizes to be used to pay Plaintiffs' fees or litigation expenses shall not be deemed a modification of all or a part of the terms of this Settlement Agreement or such final judgment order. The decision of certain Settlement Class Members to opt out of the Settlement shall not be a basis for Anywhere to rescind or terminate the Settlement Agreement.

46.     If the Settlement or Settlement Agreement is rescinded for any reason, then the balance of the Total Monetary Settlement Amount in the Settlement Fund will be returned to Anywhere. In the event that the Settlement Agreement is rescinded, the funds already expended from the Settlement Fund for the costs of notice and administration will not be returned to Anywhere. Funds to cover notice and administration expenses that have been incurred but not yet paid from the Settlement Fund will also not be returned to Anywhere.

47.     If the Settlement or Settlement Agreement is rescinded for any valid reason before payment of claims to Settlement Class Members, then the Settling Parties will be restored to their respective positions in the Actions as of September 5, 2023. Plaintiffs and Anywhere agree that any rulings or judgments that occur in the Actions after September 5, 2023 and before this Settlement Agreement is rescinded will not bind Plaintiffs, Anywhere or any of the Released Parties. Plaintiffs and Anywhere agree to waive any argument of claim or issue preclusion against Plaintiffs or Anywhere arising from such rulings or judgments. In the event of rescission, the Actions will proceed as if this Settlement Agreement had never been executed and this Settlement Agreement, and representations made in conjunction with this Settlement Agreement, may not be used in the Actions or otherwise for any purpose. Anywhere and Plaintiffs expressly reserve all rights if the Settlement Agreement does not become Effective or if it is rescinded by Anywhere or the Plaintiffs.

48.     Anywhere warrants and represents that it is not "insolvent" within the meaning of applicable bankruptcy laws as of the time the Settlement Agreement is executed. In the event of a final order of a court of competent jurisdiction, not subject to any further proceedings, determining the transfer of the Total Monetary Settlement Amount, or any portion thereof, by or on behalf of Anywhere to be a preference, voidable transfer, fraudulent transfer or similar transaction under Title 11 of the U.S. Code (Bankruptcy) or applicable state law and any portion thereof is required to be refunded and such amount is not promptly deposited in the Escrow Account by or on behalf of Anywhere, then, at the election of Co-Lead Counsel, the Settlement Agreement may be terminated and the releases given and the judgment entered pursuant to the Settlement shall be null and void.

49.     The Parties' rights to terminate this Settlement Agreement and withdraw from this Settlement Agreement are a material term of this Settlement Agreement.

50.     Anywhere reserves all of its legal rights and defenses with respect to any claims brought by potential Opt-Out Sellers.

## I. **Practice Changes**

51.     As soon as practicable, and in no event later than six months after the Effective Date, Anywhere (defined for purposes of this paragraph to include present and future, direct and indirect corporate subsidiaries, related entities and affiliates, predecessors, and successors, but not franchisees) will implement the following practice changes:

i.     refrain from adopting any Anywhere requirements that Anywhere company owned brokerages, franchisees, or agents (i) belong to NAR or (ii) follow NAR's Code of Ethics or MLS Handbook. (This provision automatically terminates if NAR reaches a settlement agreement or is subject through court order to injunctive relief in these matters.);

ii.     advise and periodically remind the Anywhere company owned brokerages, franchisees, and their agents that there is no Anywhere requirement that they must make

offers to or must accept offers of compensation from cooperating brokers or that, if made, such offers must be blanket, unconditional, or unilateral;

      iii.     require that any Anywhere company owned brokerages and their agents (and recommend and encourage that any franchisees and their agents) disclose to prospective home sellers and buyers and state in conspicuous language that broker commissions are not set by law and are fully negotiable (i) in their listing agreement if it is not a government or MLS-specified form, (ii) in their buyer representation agreement if there is one and it is not a government or MLS-specified form, and (iii) in pre-closing disclosure documents if there are any and they are not government or MLS-specified forms. In the event that the listing agreement, buyer representation agreement, or pre-closing disclosure documents are a government or MLS-specified form, then Anywhere will require that any company owned brokerages and their agents (and recommend and encourage that any Anywhere franchisees and their agents) include a disclosure with conspicuous language expressly stating that broker commissions are not set by law and are fully negotiable.

      iv.     prohibit the Anywhere company owned brokerages and their agents acting as buyer representatives (and recommend and encourage that franchisees and their agents acting as buyer representatives refrain) from advertising or otherwise representing that their services are free;

      v.     to the extent allowed by MLS rules and/or the capabilities of third-party platforms that operate websites for Anywhere, require that the Anywhere company owned brokerages and their agents include, at the earliest possible moment, the listing broker's offer of compensation in each active listing shared with prospective buyers through IDX or VOW displays, or through any other form or format;

vi. prohibit the Anywhere company owned brokerages and their agents (and recommend and encourage that any franchisees and their agents refrain) from utilizing any technology or taking manual actions to filter out or restrict MLS listings that are searchable by and displayed to consumers based on the level of compensation offered to any cooperating broker unless directed to do so by the client (and eliminate any internal systems or technological processes that may currently facilitate such practices);

vii. advise and periodically remind the Anywhere company owned brokerages and their agents of their obligation to (and recommend and encourage that any franchisees and their agents) show properties regardless of the existence or amount of cooperative compensation offered provided that each such property meets the buyer's articulated purchasing priorities;

viii. for Anywhere company owned brokerages eliminate any minimum client commission requirements; and

ix. for each of the above points, for the Anywhere company owned brokerages, franchisees, and their agents, develop training materials consistent with the above relief and eliminate any contrary training materials currently used.

52. If not automatically terminated earlier by their own terms, the obligations set forth in Paragraph 51 will sunset 5 years after the Effective Date.

53. If a Corporate Defendant settles with the Settlement Class or any similarly situated class of plaintiffs on different practice changes terms than those set forth in Paragraph 51, then Anywhere can choose to adopt the practice changes agreed to by another settling Corporate Defendant instead of the practice changes in this agreement.

54. Anywhere acknowledges that the practice changes set forth here are a material component of this Settlement Agreement and agrees to use its reasonable best efforts to implement

the practice changes specified in this Section.

## J. **Cooperation**

    55.    Anywhere (defined for purposes of this paragraph to include present and future, direct and indirect corporate subsidiaries, related entities and affiliates, predecessors, and successors but not franchisees) will provide valuable cooperation to Plaintiffs as follows:

        i.    use reasonable efforts to authenticate documents and/or things produced by it in the Actions where the facts indicate that the documents and/or things at issue are authentic, by declarations or affidavits if possible, or at hearings or trial if necessary;

        ii.    use reasonable efforts to provide the facts necessary to establish that documents and/or things produced by it in the Actions are "business records," a present sense impression, an excited utterance, a recorded recollection, or are otherwise admissible under the Federal Rules of Evidence, by declarations or affidavits if possible, or at hearings or trial if necessary;

        iii.    use reasonable efforts at Anywhere's expense to provide relevant class member data and answer questions about that data to support the provision of class notice;

        iv.    provide up to three (3) current officers or employees of Anywhere, to be identified and agreed to via a good faith meet and confer process, to participate as witnesses in the *Moehrl* action at *Moehrl* Plaintiffs' determination, and provide access via counsel to those witnesses prior to trial testimony for up to two (2) hours.

        v.    submit a withdrawal of expert designations and obtain agreement with any separately retained experts that they will not testify at trial as a retained expert for any Non-Anywhere Defendant in the Actions;

        vi.    decline to waive any conflict that its counsel may have with respect to representing any parties in the Actions aside from Anywhere and their employees;

viii.    if a Non-Anywhere Defendant includes a witness on a witness list in the Actions who is then a current officer or employee of Anywhere, Anywhere will cooperate in providing access via counsel to that witness prior to trial testimony.

56.    Anywhere's cooperation obligations, as set forth in Paragraph 55, shall be limited to the production of information, testimony, and/or documents that are not protected from disclosure by the attorney-client privilege, work product doctrine, joint defense privilege, or any other applicable privilege or doctrine.

57.    Anywhere's obligation to cooperate will not be affected by the release set forth in this Settlement Agreement or the final judgment orders with respect to Anywhere. Unless this Settlement Agreement is rescinded, disapproved, or otherwise fails to become Effective, the obligation to cooperate as set forth here will continue until the date that final judgment has been entered in the Actions against all Defendants and the time for appeal or to seek permission to appeal from the entry of a final judgment has expired or, if appealed, any final judgment has been affirmed in its entirety by the Court of last resort to which such appeal has been taken and such affirmance is no longer subject to further appeal or review.

58.    Anywhere acknowledges that the cooperation set forth here is a material component of this Settlement Agreement and agrees to use its reasonable best efforts to provide the cooperation specified in this Section.

## K.  Miscellaneous

59.    This Settlement Agreement and any actions taken to carry out the Settlement are not intended to be, nor may they be deemed or construed to be, an admission or concession of liability, or of the validity of any claim, defense, or point of fact or law on the part of any party. Anywhere denies the material allegations of the complaints in the Actions. Neither this Settlement Agreement, nor the fact of Settlement, nor settlement proceedings, nor the settlement negotiations, nor any related

document, shall be used as an admission of any fault or omission by Anywhere, or be offered in evidence as an admission, concession, presumption, or inference of any wrongdoing by Anywhere in any proceeding.

60.     This Settlement Agreement was reached with the assistance of counsel after arm's-length negotiations before a neutral mediator, Greg Lindstrom, of Phillips ADR Enterprises, P.C. The Settling Parties also participated in mediation sessions with two other mediators. The Settling Parties reached the Settlement Agreement after considering the risks and costs of litigation. The Settling Parties agree to continue to maintain the confidentiality of all settlement discussions and materials exchanged during the settlement negotiation. The terms of the settlement continue to be subject to mediation privilege and must be kept strictly confidential until a motion for preliminary approval is filed—except to the extent reflected in the notices of settlement filed in *Burnett* and *Moehrl* or as necessary for Anywhere to meet its securities reporting obligations.

61.     Any disputes relating to this Settlement Agreement will be governed by Missouri law without regard to conflicts of law provisions.

62.     This Settlement Agreement does not settle or compromise any claim by Plaintiffs or any other Settlement Class Member against (a) any Non-Anywhere Defendant or (b) any alleged co-conspirator or other person or entity other than the Released Parties. All rights of any Settlement Class Member against any Non-Anywhere Defendant or an alleged co-conspirator or other person or entity other than the Released Parties are specifically reserved by Plaintiffs and the other Settlement Class Members.

63.     This Settlement Agreement constitutes the entire agreement among Plaintiffs and Anywhere pertaining to the Settlement of the Actions against Anywhere. This Settlement Agreement may be modified or amended only by a writing executed by Plaintiffs and Anywhere.

64. This Settlement Agreement may be executed in counterparts by Plaintiffs and Anywhere, and a facsimile or pdf signature shall be deemed an original signature for purposes of executing this Settlement Agreement.

65. Neither Plaintiffs nor Anywhere shall be considered the drafter of this Settlement Agreement or any of its provisions for the purpose of any statute, the common law, or rule of interpretation that would or might cause any provision of this Settlement Agreement to be construed against the drafter.

66. The provisions of this Settlement Agreement shall, where possible, be interpreted in a manner to sustain their legality and enforceability.

67. The Court shall retain jurisdiction over the implementation and enforcement of this Settlement Agreement and the Settlement.

68. Any disputes between Anywhere and Co-Lead Counsel concerning this Settlement Agreement shall, if they cannot be resolved by the Settling Parties, be presented first to Greg Lindstrom for his assistance in mediating a resolution and, if a resolution is not reached, to the Court.

69. Each Settling Party acknowledges that he, she or it has been and is being fully advised by competent legal counsel of such Settling Party's own choice and fully understands the terms and conditions of this Settlement Agreement, and the meaning and import thereof, and that such Settling Party's execution of this Settlement Agreement is with the advice of such Settling Party's counsel and of such Settling Party's own free will. Each Settling Party represents and warrants that it has sufficient information regarding the transaction and the other parties to reach an informed decision and has, independently and without relying upon the other parties, and based on such information as it has deemed appropriate, made its own decision to enter into this Settlement Agreement and was not fraudulently or otherwise wrongfully induced to enter into this Settlement Agreement.

70. Each of the undersigned attorneys represents that he or she is fully authorized to

enter into the terms and conditions of, and to execute, this Settlement Agreement.

_____
Hagens Berman Sobol Shapiro LLP

_____
Cohen Milstein Sellers & Toll PLLC

_____
Susman Godfrey LLP

_____
Ketchmark & McCreight PC

_____
Boulware Law LLC

_____
Williams Dirks Dameron LLC

_____
Timothy Gustavson
Senior Vice President, Chief Accounting Officer, and Corporate Controller
Anywhere Real Estate, Inc.

enter into the terms and conditions of, and to execute, this Settlement Agreement.


_____
Hagens Berman Sobol Shapiro LLP


_____
Cohen Milstein Sellers & Toll PLLC


_____
Susman Godfrey LLP


_____
Ketchmark & McCreight PC


_____
Boulware Law LLC


_____
Williams Dirks Dameron LLC


_____
Timothy Gustavson
Senior Vice President, Chief Accounting Officer, and Corporate Controller
Anywhere Real Estate, Inc.

enter into the terms and conditions of, and to execute, this Settlement Agreement.

_____
Hagens Berman Sobol Shapiro LLP


_____
Cohen Milstein Sellers & Toll PLLC


_____
Susman Godfrey LLP

_____
Ketchmark & McCreight PC


_____
Boulware Law LLC


_____
Williams Dirks Dameron LLC

enter into the terms and conditions of, and to execute, this Settlement Agreement.

_____

Hagens Berman Sobol Shapiro LLP

_____

Cohen Milstein Sellers & Toll PLLC

_____

Susman Godfrey LLP

_____

Ketchmark & McCreight PC

_____

Boulware Law LLC

_____

Williams Dirks Dameron LLC

## APPENDIX A

### UNITED STATES DISTRICT COURT
### WESTERN DISTRICT OF MISSOURI WESTERN DIVISION

| | |
|---|---|
| RHONDA BURNETT, JEROD BREIT, HOLLEE ELLIS, FRANCES HARVEY, and JEREMY KEEL, on behalf of themselves and all others similarly situated,<br><br>       Plaintiffs,<br><br>   v.<br><br>THE NATIONAL ASSOCIATION OF REALTORS, REALOGY HOLDINGS CORP., HOMESERVICES OF AMERICA, INC., BHH AFFILIATES, LLC, HSF AFFILIATES, LLC, RE/MAX LLC, and KELLER WILLIAMS REALTY, INC.,<br><br>       Defendants. | Case No. 19-CV-00332-SRB |

### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF ILLINOIS EASTERN DIVISION

| | |
|---|---|
| CHRISTOPHER MOEHRL, MICHAEL COLE, STEVE DARNELL, JACK RAMEY, DANIEL UMPA and JANE RUH on behalf of themselves and all others similarly situated,<br><br>       Plaintiffs,<br><br>   v.<br><br>THE NATIONAL ASSOCIATION OF REALTORS, REALOGY HOLDINGS CORP., HOMESERVICES OF AMERICA, INC., BHH AFFILIATES, LLC, HSF AFFILIATES, LLC, THE LONG & FOSTER COMPANIES, INC., RE/MAX LLC, and KELLER WILLIAMS REALTY, INC.,<br><br>       Defendants. | Case No. 1:19-cv-01610<br>Judge Andrea R. Wood |

Plaintiffs Rhonda Burnett, Jerod Breit, Hollee Ellis, Frances Harvey, Jeremy Keel, Christopher Moehrl, Michael Cole, Steve Darnell, Jack Ramey, Daniel Umpa, and Jane Ruh, (collectively "Plaintiffs") and defendant Anywhere Real Estate, Inc. (f/k/a Realogy Holdings Corp.) ("Anywhere") (collectively, "the Parties"), by and through and including their undersigned counsel, stipulate and agree as follows:

WHEREAS, each firm defined in the Settlement Agreement as Co-Lead Counsel desires to give an undertaking (the "Undertaking") for repayment of the award of attorneys' fees, costs, and expenses approved by the Court, and

WHEREAS, the Parties agree that this Undertaking is in the interests of all Parties and in service of judicial economy and efficiency.

NOW, THEREFORE, the undersigned counsel, individually and as agent for his/her law firm, hereby submits both to the jurisdiction of the Court for the purpose of enforcing the provisions of this Undertaking.

Capitalized terms used herein without definition have the meanings given to them in the Settlement Agreement.

By receiving any payments pursuant to the Settlement Agreement, Co-Lead Counsel and their shareholders, members, and/or partners submit to the jurisdiction of the United States District Court for the Western District of Missouri for the enforcement of and any and all disputes relating to or arising out of the reimbursement obligation set forth herein and the Settlement Agreement.

In the event that the Settlement Agreement does not receive final approval or any part of the final approval is vacated, overturned, reversed, or rendered void as a result of an appeal, or the Settlement Agreement is voided, rescinded, or otherwise terminated for any other reason, Co-Lead Counsel shall, within thirty (30) days repay to Anywhere, based upon written instructions provided

by Anywhere, the full amount of the attorneys' fees and costs paid to Co-Lead Counsel from the Settlement Fund, including any accrued interest.

In the event the Settlement Agreement becomes Effective, but the attorneys' fees, costs, and expenses awarded by the Court or any part of them are vacated, overturned, modified, reversed, or rendered void as a result of an appeal, Co-Lead Counsel shall within thirty (30) days repay to the Settlement Fund, based upon written instructions provided by the settlement administrator, the attorneys' fees and costs paid to Co-Lead Counsel from the Settlement Fund in the amount vacated or modified, including any accrued interest.

This Undertaking and all obligations set forth herein shall expire upon finality of all appeals of the final settlement order and judgment pertaining to attorneys' fees, such that the finality of those fees no longer remains in doubt.

In the event Co-Lead Counsel fails to repay to Anywhere any of attorneys' fees and costs that are owed to it pursuant to this Undertaking, the Court shall, upon application of Anywhere, and notice to Co-Lead Counsel, summarily issue orders, including but not limited to judgments and attachment orders against Co-Lead Counsel.

The undersigned stipulate, warrant, and represent that they have both actual and apparent authority to enter into this stipulation, agreement, and undertaking on behalf of each firm identified as Co-Lead Counsel. This agreement will only be effective upon its execution by each firm identified in the Settlement Agreement as Co-Lead Counsel.

Co-Lead Counsel acknowledge that this Undertaking is a material component of the Settlement Agreement and agree to use its reasonable efforts to timely effect the terms specified in this Undertaking.

This Undertaking may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.

Signatures by facsimile shall be as effective as original signatures.

The undersigned declare under penalty of perjury under the laws of the United States and the

State of Missouri that they have read and understand the foregoing and that it is true and correct.

IT IS SO STIPULATED THROUGH COUNSEL OF RECORD:


_____

Hagens Berman Sobol Shapiro LLP


_____

Cohen Milstein Sellers & Toll PLLC


_____

Susman Godfrey LLP


_____

Ketchmark & McCreight PC


_____

Boulware Law LLC


_____

Williams Dirks Dameron LLC

Signatures by facsimile shall be as effective as original signatures.

The undersigned declare under penalty of perjury under the laws of the United States and the State of Missouri that they have read and understand the foregoing and that it is true and correct.

IT IS SO STIPULATED THROUGH COUNSEL OF RECORD:


_____

Hagens Berman Sobol Shapiro LLP


_____

Cohen Milstein Sellers & Toll PLLC


_____

Susman Godfrey LLP


_____

Ketchmark & McCreight PC


_____

Boulware Law LLC


_____

Williams Dirks Dameron LLC

Signatures by facsimile shall be as effective as original signatures.

The undersigned declare under penalty of perjury under the laws of the United States and the State of Missouri that they have read and understand the foregoing and that it is true and correct.

IT IS SO STIPULATED THROUGH COUNSEL OF RECORD:


_____

Hagens Berman Sobol Shapiro LLP


_____

Cohen Milstein Sellers & Toll PLLC


_____

Susman Godfrey LLP


_____

Ketchmark & McCreight PC


_____

Boulware Law LLC


_____

Williams Dirks Dameron LLC

# Declaration of Steve W. Berman

# Exhibit B

## UNITED STATES DISTRICT COURT
### WESTERN DISTRICT OF MISSOURI
### WESTERN DIVISION

| | |
|---|---|
| RHONDA BURNETT, JEROD BREIT, HOLLEE ELLIS, FRANCES HARVEY, and JEREMY KEEL, on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> THE NATIONAL ASSOCIATION OF REALTORS, REALOGY HOLDINGS CORP., HOMESERVICES OF AMERICA, INC., BHH AFFILIATES, LLC, HSF AFFILIATES, LLC, RE/MAX, LLC, and KELLER WILLIAMS REALTY, INC., <br><br> Defendants. | Case No. 19-CV-00332-SRB |

## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF ILLINOIS EASTERN DIVISION

| | |
|---|---|
| CHRISTOPHER MOEHRL, MICHAEL COLE, STEVE DARNELL, JACK RAMEY, DANIEL UMPA and JANE RUH on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> THE NATIONAL ASSOCIATION OF REALTORS, REALOGY HOLDINGS CORP., HOMESERVICES OF AMERICA, INC., BHH AFFILIATES, LLC, HSF AFFILIATES, LLC, THE LONG & FOSTER COMPANIES, INC., RE/MAX, LLC, and KELLER WILLIAMS REALTY, INC., <br><br> Defendants. | Case No. 1:19-cv-01610 <br> Judge Andrea R. Wood |

## SETTLEMENT AGREEMENT

This Settlement Agreement ("Settlement Agreement") is made and entered into this 5th day of October, 2023 (the "Execution Date"), by and between defendant RE/MAX, LLC ("RE/MAX") and plaintiffs Rhonda Burnett, Jerod Breit, Jeremy Keel, Hollee Ellis, Frances Harvey, Christopher Moehrl, Michael Cole, Steve Darnell, Jack Ramey, Daniel Umpa, and Jane Ruh, (collectively "Plaintiffs"), who filed suit in the above captioned actions ("the Actions"), both individually and as representatives of one or more classes of home sellers. Plaintiffs enter this Settlement Agreement both individually and on behalf of the Settlement Class, as defined below.

WHEREAS, in the Actions Plaintiffs allege that RE/MAX participated in a conspiracy to raise, fix, maintain, or stabilize real estate commissions in violation of Section 1 of the Sherman Act and corresponding state laws;

WHEREAS, RE/MAX denies Plaintiffs' allegations in the Actions and has asserted defenses to Plaintiffs' claims;

WHEREAS, extensive arm's-length settlement negotiations have taken place between Plaintiffs' Co-Lead Counsel and counsel for RE/MAX, including several telephonic mediations with a nationally recognized and highly experienced mediator, two mediations with a retired federal court judge, and a mediation with a federal magistrate judge, leading to this Settlement Agreement;

WHEREAS, the Actions will continue against the Non-RE/MAX Defendants unless Plaintiffs separately settle with any of the Non-RE/MAX Defendants;

WHEREAS, Plaintiffs have conducted an extensive investigation into the facts and the law regarding the claims asserted in the Actions, including more than four years of fact and expert discovery, and have concluded that a settlement with RE/MAX according to the terms set forth below is fair, reasonable, and adequate and in the best interest of Plaintiffs and the Settlement Class;

WHEREAS, RE/MAX believes that it is not liable for the claims asserted and has good defenses to Plaintiffs' claims, but nevertheless has decided to enter into this Settlement Agreement

to avoid further expense, inconvenience, and the distraction of burdensome and protracted litigation, to obtain the nationwide releases, orders, and judgment contemplated by this Settlement Agreement, and to put to rest with finality all claims that Plaintiffs and Settlement Class Members have or could have asserted against the Released Parties, as defined below; and

WHEREAS, RE/MAX, in addition to the settlement payments set forth below, has agreed to cooperate with Plaintiffs and to implement certain practice changes, each as set forth in this Settlement Agreement.

NOW, THEREFORE, in consideration of the agreements and releases set forth herein and other good and valuable consideration, and intending to be legally bound, it is agreed by and between RE/MAX and the Plaintiffs that the Actions be settled, compromised, and dismissed with prejudice as to RE/MAX only, without costs to Plaintiffs, the Settlement Class or RE/MAX except as provided for herein, subject to the approval of the Court, on the following terms and conditions:

**A.**     **Definitions**

The following terms, as used in this Settlement Agreement, have the following meanings:

1.     "Burnett" means Western District of Missouri Case No. 4:19-cv-00332-SRB, which is currently pending.

2.     "Burnett MLSs" means the multiple listing services at issue in Burnett.

3.     "Corporate Defendants" means HomeServices of America, Inc., BHH Affiliates, LLC, HSF Affiliates, LLC, The Long & Foster Companies, Inc., RE/MAX, LLC, Realogy Holdings Corp. (including its successor Anywhere Real Estate Inc.), and Keller Williams Realty, Inc.

4.     "Co-Lead Counsel" means the following law firms:

KETCHMARK AND MCCREIGHT P.C.
11161 Overbrook Road, Suite 210
Leawood, KS 66211

BOULWARE LAW LLC
1600 Genessee, Suite 416

Kansas City, MO 64102

WILLIAMS DIRKS DAMERON LLC
1100 Main Street, Suite 2600
Kansas City, MO 64105

HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101

COHEN MILSTEIN SELLERS & TOLL PLLC
1100 New York Ave. NW, Fifth Floor
Washington, DC 20005

SUSMAN GODFREY LLP
1201 Third Avenue, Suite 3800
Seattle, Washington 98101

5.  "Court" means the U.S. District Court for the Western District of Missouri.

6.  "Defendants" means the National Association of Realtors, Realogy Holdings Corp. (including its successor Anywhere Real Estate Inc.), HomeServices of America, Inc., BHH Affiliates, LLC, HSF Affiliates, LLC, The Long & Foster Companies, Inc., RE/MAX, LLC, and Keller Williams Realty, Inc.

7.  "Effective" means that all conditions set forth below in the definition of "Effective Date" have occurred.

8.  "Effective Date" means the date when: (a) the Court has entered a final judgment order approving the Settlement set forth in this Settlement Agreement under Rule 23(e) of the Federal Rules of Civil Procedure and a final judgment dismissing the Actions against RE/MAX with prejudice has been entered; and (b) the time for appeal or to seek permission to appeal from the Court's approval of the Settlement and the entry of a final judgment has expired or, if appealed, approval of the Settlement and the final judgment have been affirmed in their entirety by the Court of last resort to which such appeal has been taken and such affirmance is no longer subject to further appeal or review; excluding, however, any appeal or other proceedings unrelated to this Settlement

Agreement initiated by any Non-RE/MAX Defendant or any person or entity related to the Non-RE/MAX Defendant, and any such appeal or other proceedings shall not delay the Settlement Agreement from becoming final and shall not apply to this section; nor shall this section be construed as an admission that such parties have standing or other rights of objection or appeal with respect to this Settlement. It is agreed that neither the provisions of Federal Rule of Civil Procedure 60 nor the All Writs Act, 28 U.S.C. § 1651, shall be considered in determining the above-stated times.

9.      "Moehrl" means Northern District of Illinois Case No. 1:19-cv-01610-ARW, which is currently pending.

10.     "Moehrl MLSs" means the multiple listing services at issue in Moehrl.

11.     "MLS PIN" means the multiple listing service at issue in District of Massachusetts Case No. 1:20-cv-12244-PBS, which is currently pending.

12.     "Non-RE/MAX Defendants" means the National Association of Realtors, HomeServices of America, Inc., BHH Affiliates, LLC, HSF Affiliates, LLC, The Long & Foster Companies, Inc., Realogy Holdings Corp. (including its successor Anywhere Real Estate Inc.), and Keller Williams Realty, Inc.

13.     "Opt-Out Sellers" means members of the Settlement Class who have timely exercised their rights to be excluded from the Settlement Class or have otherwise obtained Court approval to exercise such rights.

14.     "Released Claims" means any and all manner of claims regardless of the cause of action arising from or relating to conduct that was alleged or could have been alleged in the Actions based on any or all of the same factual predicates for the claims alleged in the Actions, including but not limited to commissions negotiated, offered, obtained, or paid to brokerages in connection with the sale of any residential home.

15.     "Released Parties" means RE/MAX and all of its respective past, present and future, direct and indirect corporate parents (including holding companies), subsidiaries, related entities and affiliates, associates (all as defined in SEC Rule 12b-2 promulgated pursuant to the Securities Exchange Act of 1934), predecessors, and successors (collectively, together with franchisees, the "RE/MAX Entities"), and all of their respective franchisees, sub-franchisors, officers, directors, managing directors, employees, agents, contractors, independent contractors, attorneys, legal or other representatives, accountants, auditors, experts, trustees, trusts, heirs, beneficiaries, estates, executors, administrators, insurers, and assigns, and all of the franchisees' and sub-franchisors' officers, directors, managing directors, employees, agents, and independent contractors. Notwithstanding this definition, "Released Parties" shall not include the Non-RE/MAX Defendants, or their past, present and future, direct and indirect corporate parents (including holding companies), subsidiaries, related entities and affiliates, associates (all as defined in SEC Rule 12b-2 promulgated pursuant to the Securities Exchange Act of 1934), predecessors, and successors, and all of their respective franchisees, officers, directors, managing directors, employees, agents, contractors, independent contractors, attorneys, legal or other representatives, accountants, auditors, experts, trustees, trusts, heirs, beneficiaries, estates, executors, administrators, insurers, and assigns. For the avoidance of doubt, individuals who were members of the National Association of Realtors are not thereby excluded from being Released Parties, and entities and individuals that were sometimes associated with the RE/MAX Entities and other times associated with a different Corporate Defendant are included as Released Parties for the periods of time they were associated with RE/MAX and excluded for the periods of time they were associated with a different Corporate Defendant.

16.     "Releasing Parties" means Plaintiffs and any Settlement Class Members (including any of their immediate family members, heirs, representatives, administrators, executors, devisees, legatees, and estates, acting in their capacity as such; and for entities including any of their past,

present or future officers, directors, insurers, general or limited partners, divisions, stockholders, agents, attorneys, employees, legal representatives, trustees, parents, associates, affiliates, joint ventures, subsidiaries, heirs, executors, administrators, predecessors, successors and assigns, acting in their capacity as such) solely with respect to the claims based on or derived from claims of the Plaintiffs or Settlement Class Members.

17. "Settlement" means the settlement of the Actions contemplated by this Settlement Agreement.

18. "Settlement Class" means the class of persons that will be certified by the Court for settlement purposes only, namely, all persons who sold a home that was listed on a multiple listing service anywhere in the United States where a commission was paid to any brokerage in connection with the sale of the home in the following date ranges:

    a.    Moehrl MLSs: March 6, 2015 to date of notice;

    b.    Burnett MLSs: April 29, 2014 to date of notice;

    c.    MLS PIN: December 17, 2016 to date of notice;

    d.    All other MLSs: four years prior to (i) the date a new or amended complaint (if any) is filed in the Actions reflecting any MLSs aside from the Moehrl MLSs, Burnett MLSs, and MLS PIN or (ii) the date of notice, whichever is earlier, up to the date of notice.

For avoidance of doubt, Plaintiffs and RE/MAX intend this Settlement Agreement to provide for a nationwide class with a nationwide settlement and release.

19. "Settlement Class Member" means a member of the Settlement Class who does not file a valid request for exclusion from the Settlement Class.

20. "Settling Parties" means Plaintiffs and RE/MAX.

21.     "Total Monetary Settlement Amount" means $55.0 million in United States currency. All costs of settlement, including all payments to class members, all attorneys' fees and costs, all service awards to current and former class representatives, and all costs of notice and administration, will be paid out of the Total Monetary Settlement Amount, and RE/MAX will pay nothing apart from the Total Monetary Settlement Amount.

**B.      Stipulation to Class Certification**

22.     The Settling Parties hereby stipulate for purposes of this Settlement only that the requirements of Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3) are satisfied and, subject to Court approval, the Settlement Class shall be certified for settlement purposes as to RE/MAX. The Settling Parties stipulate and agree to the conditional certification of the Settlement Class for purposes of this Settlement only. Should, for whatever reason, the Settlement not become Effective, the Settling Parties' stipulation to class certification as part of the Settlement shall become null and void.

23.     Neither this Settlement Agreement, nor any statement, transaction, or proceeding in connection with the negotiation, execution, or implementation of this Settlement Agreement should be intended to be, construed as, or deemed to be evidence of an admission or concession by RE/MAX that a class should be or should have been certified for any purposes other than settlement, and none of them shall be admissible in evidence for any such purpose in any proceeding.

**C.      Approval of this Settlement Agreement and Dismissal of the Actions**

24.     The Settling Parties agree to make reasonable best efforts to effectuate this Settlement Agreement, including, but not limited to, seeking the Court's approval of procedures (including the giving of class notice under Federal Rules of Civil Procedure 23(c) and (e); scheduling a final fairness hearing) to obtain final approval of the Settlement and the final dismissal with prejudice of the Actions as to RE/MAX; and RE/MAX's cooperation by providing information reflecting its ability

to pay limitations and, if requested by Co-Lead Counsel, a declaration describing and attesting to those limitations. The Settling Parties further agree that Co-Lead Counsel may seek whatever approvals are required by the court in *Moehrl* related to obtaining approval of and effectuating his Settlement Agreement.

25.     On or before October 5, 2023, Plaintiffs will submit to the Court a motion requesting that the Court preliminarily approve the Settlement (the "Motion"). The Motion shall include: (a) a proposed form of order preliminarily approving the Settlement; and (b) a proposed form of final judgment order. Within a reasonable time in advance of submission to the Court, and no fewer than one court day, the papers in support of the Motion for preliminary approval shall be provided by Co-Lead Counsel to RE/MAX for its review. To the extent that RE/MAX objects to any aspect of the Motion, it shall communicate such objection to Co-Lead Counsel and the Settling Parties shall meet and confer to resolve any such objection. The Settling Parties shall take all reasonable actions as may be necessary to obtain preliminary approval of the Settlement. To the extent the Court finds that the Settlement does not meet the standard for preliminary approval, the Settling Parties will negotiate in good faith to modify the Settlement Agreement directly or with the assistance of mediator Greg Lindstrom and will endeavor to resolve any issues to the satisfaction of the Court.

26.     After preliminary approval, and subject to approval by the Court, the Settling Parties will agree on a method or methods of providing notice of this Settlement to the Settlement Class and for claim administration that meet the requirements of due process and Federal Rule of Civil Procedure 23. The Settling Parties will also agree on a claim administrator after receiving multiple competing bids. The timing of any request to disseminate notice to the Settlement Class will be at the discretion of co-Lead Counsel.

27.     Within ten (10) calendar days after the filing with the Court of this Settlement Agreement and the accompanying motion papers seeking its preliminary approval, the claims

administrator, if one has been selected, or RE/MAX if a claims administrator has not yet been selected, shall at RE/MAX's expense to be credited against the Total Monetary Settlement Amount cause notice of the Settlement Agreement to be served upon appropriate State and Federal officials as provided in the Class Action Fairness Act, 28 U.S.C. § 1715.

28.      If the Settlement is preliminarily approved by the Court, Plaintiffs shall timely seek final approval of the Settlement and entry of a final judgment order as to RE/MAX:

(a) certifying the Settlement Class under Federal Rule of Civil Procedure 23(b)(2) and (b)(3), solely for purposes of this Settlement;

(b) granting final approval of the Settlement as fair, reasonable, and adequate within the meaning of Federal Rules of Civil Procedure 23(e) and directing the consummation of the Settlement according to its terms;

(c) directing that, as to RE/MAX only, the Actions be dismissed with prejudice and, except as provided for herein, without costs;

(d) reserving exclusive jurisdiction over the Settlement and this Settlement Agreement, including reserving exclusive jurisdiction over the administration and consummation of this Settlement to the United States District Court for the Western District of Missouri; and

(e) determining under Federal Rule of Civil Procedure 54(b) that there is no just reason for delay and directing entry of final judgment as to RE/MAX.

29.      This Settlement Agreement will become Effective only after the occurrence of all conditions set forth above in the definition of the Effective Date.

D.      **Releases, Discharge, and Covenant Not to Sue**

30.      Upon the occurrence of the Effective Date, the Releasing Parties expressly and irrevocably waive, and fully, finally, and forever settle, discharge, and release the Released Parties

from, any and all manner of claims, demands, actions, suits, and causes of action, whether individual, class, representative, or otherwise in nature, for damages, restitution, disgorgement, interest, costs, expenses, attorneys' fees, fines, civil or other penalties, or other payment of money, or for injunctive, declaratory, or other equitable relief, whenever incurred, whether directly, indirectly, derivatively, or otherwise, whether known or unknown, suspected or unsuspected, in law or in equity, that any Releasing Party ever had, now has, or hereafter can, shall, or may have and that have accrued as of the date of preliminary approval of the Settlement arising from or related to the Released Claims. The Released Claims include but are not limited to the antitrust and consumer protection claims brought in the Actions and similar state and federal statutes. In connection therewith, upon the Effective Date of Settlement, each of the Releasing Parties (i) shall forever be enjoined from prosecuting in any forum any Released Claims against any of the Released Parties from the beginning of time through the date of preliminary approval of the Settlement; and (ii) agrees and covenants not to sue any of the Released Parties with respect to any Released Claims. For avoidance of doubt, this release extends to, but only to, the fullest extent permitted by law.

31.     The Releasing Parties may hereafter discover facts other than or different from those which they now know or believe to be true with respect to the subject matter of the Released Claims. Nevertheless, the Releasing Parties expressly, fully, finally, and forever settle and release, and, upon the Effective Date, shall be deemed to have, and by operation of the Final Judgment and Order of Dismissal shall have, fully, finally, and forever settled and released, any and all Released Claims, without regard to the subsequent discovery or existence of such other, different, or additional facts, as well as any and all rights and benefits existing under (i) Cal. Civ. Code Section 1542, which provides as follows:

A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS
THAT THE CREDITOR OR RELEASING PARTY DOES

NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER
FAVOR AT THE TIME OF EXECUTING THE RELEASE
AND THAT, IF KNOWN BY HIM OR HER, WOULD
HAVE MATERIALLY AFFECTED HIS OR HER
SETTLEMENT WITH THE DEBTOR OR RELEASED
PARTY.

or any equivalent, similar or comparable present or future law or principle of law of any jurisdiction,
including but not limited to Section 20-7-11 of the South Dakota Codified Laws, which provides that
"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES
NOT KNOW OR SUSPECT TO EXIST IN HIS FAVOR AT THE TIME OF EXECUTING THE
RELEASE, WHICH IF KNOWN BY HIM MUST HAVE MATERIALLY AFFECTED HIS
SETTLEMENT WITH THE DEBTOR;" or (ii) any law or principle of law of any jurisdiction that
would limit or restrict the effect or scope of the provisions of the release set forth above, without
regard to the subsequent discovery or existence of such other, different, or additional facts. The
Releasing Parties acknowledge that the inclusion of unknown claims in the definition of Released
Claims was separately bargained for and was a material element of the Agreement.

32. The Releasing Parties intend by this Settlement Agreement to settle with and release
only the Released Parties, and the Settling Parties do not intend this Settlement Agreement, or any
part hereof, or any other aspect of the proposed Settlement or release, to release or otherwise affect
in any way any claims concerning product liability, breach of warranty, breach of contract or tort of
any kind (other than a breach of contract or tort based on any factual predicate in this Action), a claim
arising out of violation of the Uniform Commercial Code, or personal or bodily injury. The release
does not extend to any individual claims that a class member may have against his or her own broker
or agent based on a breach of contract, breach of fiduciary duty, malpractice, negligence or other tort

claim, other than a claim that a class member paid an excessive commission or home price due to the claims at issue in these Actions.

E.      **Payment of the Settlement Amount**

33.     Plaintiffs will open a special interest-bearing settlement escrow account or accounts, established for that purpose as a qualified settlement fund as defined in Section 1.468B-1(a) of the U.S. Treasury Regulations (the "Escrow Account"). Within 10 business days after the term sheet already executed by the parties, RE/MAX will deposit twenty-five percent of the Settlement Amount into the qualified settlement fund. Within 10 business days following preliminary approval of the settlement by the district court, RE/MAX will deposit twenty-five percent of the Settlement Amount into the qualified settlement fund. RE/MAX will deposit the remaining fifty percent of the Settlement Amount into the qualified settlement fund within 10 business days after the district court issues final approval of the settlement. All accrued interest shall be for the benefit of the plaintiff classes unless the Settlement is not approved, in which case the interest shall be for the benefit of RE/MAX.

F.      **The Settlement Fund**

34.     The Total Monetary Settlement Amount and any interest earned thereon shall be held in the Escrow Account and constitute the "Settlement Fund." The full and complete cost of the settlement notice, claims administration, Settlement Class Members' compensation, current and former class representatives' incentive awards, attorneys' fees and reimbursement of all actual expenses of the Actions, any other litigation costs of Plaintiffs (all as approved by the Court), and all applicable taxes, if any, assessable on the Settlement Fund or any portion thereof, will be paid out of the Settlement Fund. In no event will RE/MAX's monetary liability with respect to the Settlement exceed the Total Monetary Settlement Amount.

35.     The Settling Parties and their counsel will not have any responsibility, financial obligation, or liability for any fees, costs, or expenses related to providing notice to the Settlement

Class or administering the settlement except in Paragraph 55. Such fees, costs, or expenses shall be paid solely from the Settlement Fund with Court approval. The balance of the Settlement Fund shall be disbursed to Settlement Class Members as provided in a Plan of Allocation (as defined below) approved by the Court. The Settling Parties shall have the right to audit amounts paid from the Settlement Fund.

36.     After preliminary approval of the Settlement and approval of a class notice plan, Co-Lead Counsel may utilize a portion of the Settlement Fund to provide notice of the Settlement to potential members of the Settlement Class. RE/MAX will not object to Plaintiffs' counsel withdrawing from the Settlement Fund, subject to any necessary Court approval, up to $3,500,000 to pay the costs for notice. If Plaintiffs settle with one (or more) Non-RE/MAX Defendants and notice of one or more other settlements is included in the notice of the RE/MAX settlement, then the cost of such notice will be apportioned equitably between (or among) the RE/MAX Settlement Fund and the other settling Defendant(s)' settlement funds. The amount spent or accrued for notice and notice administration costs is not refundable to RE/MAX in the event the Settlement Agreement is disapproved, rescinded, or otherwise fails to become Effective.

37.     Subject to Co-Lead Counsel's sole discretion as to timing, except that the timing must be consistent with rules requiring that Settlement Class Members be given the opportunity to review fee applications, Co-Lead Counsel may apply to the Court for a fee award, plus expenses, and costs incurred, and current and former class representative service awards to be paid out of the Settlement Fund. Within 14 business days after any order by the Court awarding attorneys' fees, expenses, or class representative incentive awards, the escrow agent for the Settlement Fund shall pay any approved attorneys' fees, expenses, costs, and class representative service award up to the amount specified in Paragraph 21 above for such fees, expenses, costs, and class representative service award by wire transfer as directed by Co-Lead Counsel in accordance with and attaching the Court's Order,

provided that each Co-Lead Counsel receiving payment signs an assurance, in the form attached hereto as Appendix A, attesting that they will repay all awarded amounts if this Settlement Agreement does not become Effective.

38.     The Settlement Fund will be invested in United States Government Treasury obligations or United States Treasury money market funds.

39.     RE/MAX will not have any responsibility, financial obligation, or liability whatsoever with respect to the investment, distribution, use, or administration of the Settlement Fund, including, but not limited to, the costs and expenses of such investment, distribution, use or administration except as expressly otherwise provided in this Settlement Agreement. RE/MAX's only payment obligation is to pay the Total Monetary Settlement Amount.

40.     There will be no reduction of the Total Monetary Settlement Amount based on Opt-Out Sellers. The Settlement will be non-reversionary except as set forth below in Section H. If the Settlement becomes Effective, no proceeds from the Settlement will revert to RE/MAX regardless of the claims that are made.

41.     No disbursements shall be made from the Settlement Fund prior to the Effective Date of this Settlement Agreement except as described in Paragraphs 36 and 37 above and 44 below.

42.     The distribution of the Settlement Fund shall be administered pursuant to a plan of allocation (the "Plan of Allocation") proposed by Co-Lead Counsel in their sole and absolute discretion and subject to the approval of the Court. RE/MAX will have no participatory or approval rights with respect to the Plan of Allocation. It is understood and agreed by the Settling Parties that any proposed Plan of Allocation, including, but not limited to, any adjustments to an authorized claimant's claim, is completely independent of and is not a part of this Stipulation and is to be considered by the Court separately from the Court's consideration of the fairness, reasonableness, and adequacy of the Settlement Agreement. The Settlement Class, Plaintiffs, and RE/MAX shall be

bound by the terms of the Settlement Agreement, irrespective of whether the Court or any other court, including on any appeal, disapproves or modified the Plan of Allocation, and any modification or rejection of the Plan of Allocation shall not affect the validity or enforceability of this Settlement Agreement or otherwise operate to terminate, modify, or cancel that Agreement.

43.     The Releasing Parties will look solely to the Settlement Fund for settlement and satisfaction against the Released Parties of all Released Claims and shall have no other recovery against RE/MAX or the Released Parties.

## G.     Taxes

44.     Co-Lead Counsel is solely responsible for filing all informational and other tax returns necessary to report any net taxable income earned by the Settlement Fund and shall file all informational and other tax returns necessary to report any income earned by the Settlement Fund and shall be solely responsible for taking out of the Settlement Fund, as and when legally required, any tax payments, including interest and penalties due on income earned by the Settlement Fund. All taxes (including any interest and penalties) due with respect to the income earned by the Settlement Fund shall be paid from the Settlement Fund. RE/MAX has no responsibility to make any filings relating to the Settlement Fund and will have no responsibility to pay tax on any income earned by the Settlement Fund or to pay any taxes on the Settlement Fund unless the Settlement does not become Effective and the Settlement Fund is returned to RE/MAX. In the event the Settlement does not become Effective and any funds including interest or other income are returned to RE/MAX, RE/MAX will be responsible for the payment of all taxes (including any interest or penalties), if any, on said interest or other income. RE/MAX makes no representations regarding, and will not be responsible for, the tax consequences of any payments made pursuant to this Settlement Agreement to Co-Lead Counsel or to any Settlement Class Member.

## H.     Rescission

45.    If the Court does not certify the Settlement Class as defined in this Settlement Agreement, or if the Court does not approve this Settlement Agreement in all material respects, or if such approval is modified or set aside on appeal, or if the Court does not enter final approval as provided for in Paragraph 28 herein, or if any judgment approving this Settlement Agreement is materially modified or set aside on appeal, or if all of the conditions for the Effective Date do not occur, then this Settlement Agreement may be rescinded by RE/MAX or by Plaintiffs on behalf of the Settlement Class by written notice to the Court and to counsel for the other Settling Party filed and served within ten (10) business days of the entry of an order not granting court approval or having the effect of disapproving or materially modifying the terms of the Settlement Agreement. A modification or reversal on appeal of any amount of the Settlement Fund that the Court authorizes to be used to pay Plaintiffs' fees or litigation expenses shall not be deemed a modification of all or a part of the terms of this Settlement Agreement or such final judgment order. The decision of certain Settlement Class Members to opt out of the Settlement shall not be a basis for RE/MAX to rescind or terminate the Settlement Agreement.

46.    If the Settlement or Settlement Agreement is rescinded for any reason, then the balance of the Total Monetary Settlement Amount in the Settlement Fund will be returned to RE/MAX. In the event that the Settlement Agreement is rescinded, the funds already expended from the Settlement Fund for the costs of notice and administration will not be returned to RE/MAX. Funds to cover notice and administration expenses that have been incurred but not yet paid from the Settlement Fund will also not be returned to RE/MAX.

47.    If the Settlement or Settlement Agreement is rescinded for any valid reason before payment of claims to Settlement Class Members, then the Settling Parties will be restored to their respective positions in the Actions as of September 15, 2023. Plaintiffs and RE/MAX agree that any rulings or judgments that occur in the Actions after September 15, 2023 and before this Settlement

Agreement is rescinded will not bind Plaintiffs, RE/MAX or any of the Released Parties. Plaintiffs and RE/MAX agree to waive any argument of claim or issue preclusion against Plaintiffs or RE/MAX arising from such rulings or judgments. In the event of rescission, the Actions will proceed as if this Settlement Agreement had never been executed and this Settlement Agreement, and representations made in conjunction with this Settlement Agreement, may not be used in the Actions or otherwise for any purpose. RE/MAX and Plaintiffs expressly reserve all rights if the Settlement Agreement does not become Effective or if it is rescinded by RE/MAX or the Plaintiffs.

48.     RE/MAX warrants and represents that it is not "insolvent" within the meaning of applicable bankruptcy laws as of the time the Settlement Agreement is executed. In the event of a final order of a court of competent jurisdiction, not subject to any further proceedings, determining the transfer of the Total Monetary Settlement Amount, or any portion thereof, by or on behalf of RE/MAX to be a preference, voidable transfer, fraudulent transfer or similar transaction under Title 11 of the U.S. Code (Bankruptcy) or applicable state law and any portion thereof is required to be refunded and such amount is not promptly deposited in the Escrow Account by or on behalf of RE/MAX, then, at the election of Co-Lead Counsel, the Settlement Agreement may be terminated and the releases given and the judgment entered pursuant to the Settlement shall be null and void.

49.     The Parties' rights to terminate this Settlement Agreement and withdraw from this Settlement Agreement are a material term of this Settlement Agreement.

50.     RE/MAX reserves all of its legal rights and defenses with respect to any claims brought by potential Opt-Out Sellers.

## I. **Practice Changes**

51.     As soon as practicable, and in no event later than six months after the Effective Date, RE/MAX (defined for purposes of this paragraph to include present and future, direct and indirect corporate subsidiaries, related entities and affiliates, predecessors, and successors but not

franchisees) will implement the following practice changes:

        i.       make clear and periodically remind franchisees and agents affiliated with those franchisees that it does not require them to make offers of compensation to or accept offers of compensation from cooperating brokers or that, if made, does not require such offers to be blanket, unconditional, or unilateral;

        A.       RE/MAX will make clear that (i) franchisees and affiliated agents must be transparent to prospective home sellers and buyers that broker commissions are not set by law and are negotiable and (ii) buyer-side brokers and agents must be transparent regarding the cooperative compensation offered on any listings for which a client requests information. Toward that end, RE/MAX will recommend and encourage that any franchisees and their agents disclose to prospective home sellers and buyers and state in conspicuous language that broker commissions are not set by law and are fully negotiable (i) in their listing agreement if it is not a government or MLS-specified form, (ii) in their buyer representation agreement if there is one and it is not a government or MLS-specified form, and (iii) in pre-closing disclosure documents if there are any and they are not government or MLS-specified forms. RE/MAX will further recommend and encourage that, in the event that the listing agreement, buyer representation agreement, or pre-closing disclosure documents is a government or MLS-specified form, franchisees and their agents include a disclosure with conspicuous language expressly stating that broker commissions are not set by law and are fully negotiable.

        ii.       make clear that franchisees and affiliated agents acting as buyer-side brokers or agents must be transparent with their clients in accurately disclosing their compensation structure in connection with each transaction and must refrain from advertising or otherwise

representing that their services are free (unless they are, in fact, not receiving any compensation for those services from any party);

iii.     display offers of compensation made by listing brokers or agents, where such data is available and/or provided to REMAX for all active listings shared on REMAX.com and recommend and encourage that franchisees and agents include cooperative compensation offers (if any) on any listings that they publicly display or share with prospective buyers through IDX or VOW displays, or through any other form or format;

iv.     not provide software that permits franchisees and affiliated agents to filter out or restrict MLS listings that are searchable by and displayed to consumers based on the level of compensation offered to any cooperating broker and recommend and encourage that any franchisees and their agents refrain from utilizing any technology or taking manual actions to filter out or restrict MLS listings that are searchable by or displayed to consumers based on the level of compensation offered to any cooperating broker unless directed to do so by the client (and eliminate any internal systems or technological processes that may currently facilitate such practices);

v.     expressly advise and periodically remind franchisees and affiliated agents of their obligation to show and market properties regardless of the existence or amount of cooperative compensation offered;

vi.     not express or imply a minimum commission requirement in franchise agreements, training materials or other policies;

vii.     develop educational materials that reflect and are consistent with each provision in this injunction, and eliminate educational materials, if any, that are contrary to it;

viii.    not require franchisees and their affiliated agents to join or be members of the

National Association of Realtors or follow NAR's Code of Ethics or MLS Handbook.

52.    If not automatically terminated earlier by their own terms, the obligations set forth in

Paragraph 51 will sunset 5 years after the Effective Date.

53.    If a different Corporate Defendant settles with the Settlement Class or any similarly

situated class of plaintiffs on different practice changes terms than those set forth in Paragraph 51,

then RE/MAX can choose to adopt the practice changes agreed to by another settling Corporate

Defendant instead of the practice changes in this agreement.

54.    RE/MAX acknowledges that the practice changes set forth here are a material

component of this Settlement Agreement and agrees to use its best efforts to implement the practice

changes specified in this Section.

## J.    Cooperation

55.    RE/MAX (defined for purposes of this paragraph to include present and future, direct

and indirect corporate subsidiaries, related entities and affiliates, predecessors, and successors but

not franchisees) will provide valuable cooperation to Plaintiffs as follows:

i.    use best efforts to authenticate documents and/or things produced by it in the

Actions where the facts indicate that the documents and/or things at issue are authentic, by

declarations or affidavits if possible, or at hearings or trial if necessary;

ii.    use best efforts to provide the facts necessary to establish that documents

and/or things produced by it in the Actions are "business records," a present sense impression,

an excited utterance, a recorded recollection, or are otherwise admissible under the Federal

Rules of Evidence, by declarations or affidavits if possible, or at hearings or trial if necessary;

iii.    use reasonable efforts at RE/MAX's expense to provide relevant class member

data and answer questions about that data to support the provision of class notice;

     iv.    provide up to three (3) current officers or employees of RE/MAX, to be identified and agreed to via a good faith meet and confer process, to participate as witnesses in the *Moehrl* action at *Moehrl* Plaintiffs' determination, and provide access via counsel to those witnesses prior to trial testimony for up to two (2) hours.

     v.    submit a withdrawal of expert designations and obtain agreement with any separately retained experts that they will not testify at trial as a retained expert for any Non-RE/MAX Defendant in the Actions;

     vi.    decline to waive any conflict that its counsel may have with respect to representing any parties in the Actions aside from RE/MAX and its subsidiaries and their employees;

     viii.    if a Non-RE/MAX Defendant includes a witness on a witness list in the Actions who is then a current officer or employee of RE/MAX or its subsidiaries, RE/MAX will cooperate in providing access via counsel to that witness prior to trial testimony.

56.    RE/MAX's cooperation obligations, as set forth in Paragraph 55, shall not require the production of information, testimony, and/or documents that are protected from disclosure by the attorney-client privilege, work product doctrine, joint defense privilege, or any other applicable privilege or doctrine.

57.    RE/MAX's obligation to cooperate will not be affected by the release set forth in this Settlement Agreement or the final judgment orders with respect to RE/MAX. Unless this Settlement Agreement is rescinded, disapproved, or otherwise fails to become Effective, the obligation to cooperate as set forth here will continue until the date that final judgment has been entered in the Actions against the non-RE/MAX Defendants and the time for appeal or to seek permission to appeal from the from the entry of a final judgment has expired or, if appealed, any final judgment has been affirmed in its entirety by the Court of last resort to which such appeal has been taken and such

affirmance is no longer subject to further appeal or review.

58.    RE/MAX acknowledges that the cooperation set forth here is a material component of this Settlement Agreement and agrees to use its best efforts to provide the cooperation specified in this Section.

**K. Miscellaneous**

59.    This Settlement Agreement and any actions taken to carry out the Settlement are not intended to be, nor may they be deemed or construed to be, an admission or concession of liability, or of the validity of any claim, defense, or point of fact or law on the part of any party. RE/MAX denies the material allegations of the complaints in the Actions. Neither this Settlement Agreement, nor the fact of Settlement, nor settlement proceedings, nor the settlement negotiations, nor any related document, shall be used as an admission of any fault or omission by RE/MAX, or be offered in evidence as an admission, concession, presumption, or inference of any wrongdoing by RE/MAX in any proceeding.

60.    This Settlement Agreement was reached with the assistance of counsel after arm's-length negotiations before a neutral mediator, Greg Lindstrom, of Phillips ADR Enterprises, P.C. The Settling Parties also participated in mediation sessions with two other mediators. The Settling Parties reached the Settlement Agreement after considering the risks and costs of litigation. The Settling Parties agree to continue to maintain the confidentiality of all settlement discussions and materials exchanged during the settlement negotiation. The terms of the settlement continue to be subject to mediation privilege and must be kept strictly confidential until a motion for preliminary approval is filed—except as necessary for RE/MAX to meet its securities reporting obligations.

61.    Any disputes relating to this Settlement Agreement will be governed by Missouri law without regard to conflicts of law provisions.

62.    This Settlement Agreement does not settle or compromise any claim by Plaintiffs or

any other Settlement Class Member against (a) any Non-RE/MAX Defendant or (b) any alleged co-conspirator or other person or entity other than the Released Parties. All rights of any Settlement Class Member against any Non-RE/MAX Defendant or an alleged co-conspirator or other person or entity other than the Released Parties are specifically reserved by Plaintiffs and the other Settlement Class Members.

63.    This Settlement Agreement constitutes the entire agreement among Plaintiffs and RE/MAX pertaining to the Settlement of the Actions against RE/MAX. This Settlement Agreement may be modified or amended only by a writing executed by Plaintiffs and RE/MAX.

64.    This Settlement Agreement may be executed in counterparts by Plaintiffs and RE/MAX, and a facsimile or pdf signature shall be deemed an original signature for purposes of executing this Settlement Agreement.

65.    Neither Plaintiffs nor RE/MAX shall be considered the drafter of this Settlement Agreement or any of its provisions for the purpose of any statute, the common law, or rule of interpretation that would or might cause any provision of this Settlement Agreement to be construed against the drafter.

66.    The provisions of this Settlement Agreement shall, where possible, be interpreted in a manner to sustain their legality and enforceability.

67.    The Court shall retain jurisdiction over the implementation and enforcement of this Settlement Agreement and the Settlement.

68.    The terms of the Settlement Agreement are and shall be binding upon and inure to the benefit of, to the fullest extent possible, each of the Releasing Parties and the Released Parties, and upon all other Persons claiming any interest in the subject matter hereto through any of the Settling Parties, Releasing Parties, Released Parties, and any Settlement Class Members.

69.     Any disputes between RE/MAX and Co-Lead Counsel concerning this Settlement Agreement shall, if they cannot be resolved by the Settling Parties, be presented first to Greg Lindstrom for his assistance in mediating a resolution and, if a resolution is not reached, to the Court.

70.     Each Settling Party acknowledges that he, she or it has been and is being fully advised by competent legal counsel of such Settling Party's own choice and fully understands the terms and conditions of this Settlement Agreement, and the meaning and import thereof, and that such Settling Party's execution of this Settlement Agreement is with the advice of such Settling Party's counsel and of such Settling Party's own free will. Each Settling Party represents and warrants that it has sufficient information regarding the transaction and the other parties to reach an informed decision and has, independently and without relying upon the other parties, and based on such information as it has deemed appropriate, made its own decision to enter into this Settlement Agreement and was not fraudulently or otherwise wrongfully induced to enter into this Settlement Agreement.

71.     Each of the undersigned attorneys represents that he or she is fully authorized to enter into the terms and conditions of, and to execute, this Settlement Agreement.

_____
Hagens Berman Sobol Shapiro LLP


_____
Cohen Milstein Sellers & Toll PLLC


_____
Susman Godfrey LLP

_____
Ketchmark & McCreight PC

69.     Any disputes between RE/MAX and Co-Lead Counsel concerning this Settlement Agreement shall, if they cannot be resolved by the Settling Parties, be presented first to Greg Lindstrom for his assistance in mediating a resolution and, if a resolution is not reached, to the Court.

70.     Each Settling Party acknowledges that he, she or it has been and is being fully advised by competent legal counsel of such Settling Party's own choice and fully understands the terms and conditions of this Settlement Agreement, and the meaning and import thereof, and that such Settling Party's execution of this Settlement Agreement is with the advice of such Settling Party's counsel and of such Settling Party's own free will. Each Settling Party represents and warrants that it has sufficient information regarding the transaction and the other parties to reach an informed decision and has, independently and without relying upon the other parties, and based on such information as it has deemed appropriate, made its own decision to enter into this Settlement Agreement and was not fraudulently or otherwise wrongfully induced to enter into this Settlement Agreement.

71.     Each of the undersigned attorneys represents that he or she is fully authorized to enter into the terms and conditions of, and to execute, this Settlement Agreement.

_____
Hagens Berman Sobol Shapiro LLP

_____
Cohen Milstein Sellers & Toll PLLC

_____
Susman Godfrey LLP

_____
Ketchmark & McCreight PC

Boulware Law LLC
_____

Williams Dirks Dameron LLC
_____

RE/MAX, LLC

By: _____
       Karri Callahan
       Chief Financial Officer

_____
Boulware Law LLC

_____
Williams Dirks Dameron LLC

## APPENDIX A

### UNITED STATES DISTRICT COURT
### WESTERN DISTRICT OF MISSOURI WESTERN DIVISION

| | |
|---|---|
| RHONDA BURNETT, JEROD BREIT, HOLLEE ELLIS, FRANCES HARVEY, and JEREMY KEEL, on behalf of themselves and all others similarly situated,<br><br>        Plaintiffs,<br><br>   v.<br><br>THE NATIONAL ASSOCIATION OF REALTORS, REALOGY HOLDINGS CORP., HOMESERVICES OF AMERICA, INC., BHH AFFILIATES, LLC, HSF AFFILIATES, LLC, RE/MAX LLC, and KELLER WILLIAMS REALTY, INC.,<br><br>        Defendants. | Case No. 19-CV-00332-SRB |

### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF ILLINOIS EASTERN DIVISION

| | |
|---|---|
| CHRISTOPHER MOEHRL, MICHAEL COLE, STEVE DARNELL, JACK RAMEY, DANIEL UMPA and JANE RUH on behalf of themselves and all others similarly situated,<br><br>        Plaintiffs,<br><br>   v.<br><br>THE NATIONAL ASSOCIATION OF REALTORS, REALOGY HOLDINGS CORP., HOMESERVICES OF AMERICA, INC., BHH AFFILIATES, LLC, HSF AFFILIATES, LLC, THE LONG & FOSTER COMPANIES, INC., RE/MAX LLC, and KELLER WILLIAMS REALTY, INC.,<br><br>        Defendants. | Case No. 1:19-cv-01610<br>Judge Andrea R. Wood |

Plaintiffs Rhonda Burnett, Jerod Breit, Jeremy Keel, Hollee Ellis, Frances Harvey,

Christopher Moehrl, Michael Cole, Steve Darnell, Jack Ramey, Daniel Umpa, and Jane Ruh, (collectively "Plaintiffs") and defendant RE/MAX, LLC ("RE/MAX") (collectively, "the Parties"), by and through and including their undersigned counsel, stipulate and agree as follows:

WHEREAS, each firm defined in the Settlement Agreement as Co-Lead Counsel desires to give an undertaking (the "Undertaking") for repayment of the award of attorneys' fees, costs, and expenses approved by the Court, and

WHEREAS, the Parties agree that this Undertaking is in the interests of all Parties and in service of judicial economy and efficiency.

NOW, THEREFORE, the undersigned counsel, individually and as agent for his/her law firm, hereby submits both to the jurisdiction of the Court for the purpose of enforcing the provisions of this Undertaking.

Capitalized terms used herein without definition have the meanings given to them in the Settlement Agreement.

By receiving any payments pursuant to the Settlement Agreement, Co-Lead Counsel and their shareholders, members, and/or partners submit to the jurisdiction of the United States District Court for the Western District of Missouri for the enforcement of and any and all disputes relating to or arising out of the reimbursement obligation set forth herein and the Settlement Agreement.

In the event that the Settlement Agreement does not receive final approval or any part of the final approval is vacated, overturned, reversed, or rendered void as a result of an appeal, or the Settlement Agreement is voided, rescinded, or otherwise terminated for any other reason, Co-Lead Counsel shall, within thirty (30) days repay to RE/MAX, based upon written instructions provided by RE/MAX, the full amount of the attorneys' fees and costs paid to Co-Lead Counsel from the Settlement Fund, including any accrued interest.

In the event the Settlement Agreement becomes Effective, but the attorneys' fees, costs, and expenses awarded by the Court or any part of them are vacated, overturned, modified, reversed, or rendered void as a result of an appeal, Co-Lead Counsel shall within thirty (30) days repay to the Settlement Fund, based upon written instructions provided by the settlement administrator, the attorneys' fees and costs paid to Co-Lead Counsel from the Settlement Fund in the amount vacated or modified, including any accrued interest.

This Undertaking and all obligations set forth herein shall expire upon finality of all appeals of the final settlement order and judgment pertaining to attorneys' fees, such that the finality of those fees no longer remains in doubt.

In the event Co-Lead Counsel fails to repay to RE/MAX any of attorneys' fees and costs that are owed to it pursuant to this Undertaking, the Court shall, upon application of RE/MAX, and notice to Co-Lead Counsel, summarily issue orders, including but not limited to judgments and attachment orders against Co-Lead Counsel.

The undersigned stipulate, warrant, and represent that they have both actual and apparent authority to enter into this stipulation, agreement, and undertaking on behalf of each firm identified as Co-Lead Counsel. This agreement will only be effective upon its execution by each firm identified in the Settlement Agreement as Co-Lead Counsel.

Co-Lead Counsel acknowledge that this Undertaking is a material component of the Settlement Agreement and agree to use its reasonable efforts to timely effect the terms specified in this Undertaking. Each undersigned warrants and represents that it is not "insolvent" within the meaning of applicable bankruptcy laws as of the time this Undertaking is executed.

This Undertaking may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.

Signatures by facsimile shall be as effective as original signatures.

The undersigned declare under penalty of perjury under the laws of the United States and the State of Missouri that they have read and understand the foregoing and that it is true and correct.

IT IS SO STIPULATED THROUGH COUNSEL OF RECORD:


_____

Hagens Berman Sobol Shapiro LLP


_____

Cohen Milstein Sellers & Toll PLLC


_____

Susman Godfrey LLP


_____

Ketchmark & McCreight PC


_____

Boulware Law LLC


_____

Williams Dirks Dameron LLC

The undersigned declare under penalty of perjury under the laws of the United States and the State of Missouri that they have read and understand the foregoing and that it is true and correct.

IT IS SO STIPULATED THROUGH COUNSEL OF RECORD:


Hagens Berman Sobol Shapiro LLP


Cohen Milstein Sellers & Toll PLLC


Susman Godfrey LLP


Ketchmark & McCreight PC


Boulware Law LLC


Williams Dirks Dameron LLC

The undersigned declare under penalty of perjury under the laws of the United States and the

State of Missouri that they have read and understand the foregoing and that it is true and correct.

IT IS SO STIPULATED THROUGH COUNSEL OF RECORD:


_____

Hagens Berman Sobol Shapiro LLP



_____

Cohen Milstein Sellers & Toll PLLC



_____

Susman Godfrey LLP



_____

Ketchmark & McCreight PC



_____

Boulware Law LLC



_____

Williams Dirks Dameron LLC