PUBLIC - REDACTED COPY

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| CHRISTOPHER MOEHRL, MICHAEL COLE, STEVEN DARNELL, JACK RAMEY, DANIEL UMPA, and JANE RUH, on behalf of themselves and all others similarly situated, | Case No.: 1:19-cv-01610 |
| Plaintiffs, | Judge Andrea R. Wood |
| v. | |
| THE NATIONAL ASSOCIATION OF REALTORS, REALOGY HOLDINGS CORP., HOMESERVICES OF AMERICA INC., BHH AFFILIATED, LLC, HSF AFFILIATED, LLC, THE ONG & FOSTER COMPANIES INC., RE/MAX LLC, AND KELLER WILLIAMS REALTY, INC., | |
| Defendants. | |

## DEFENDANT THE NATIONAL ASSOCIATION OF REALTORS'®
## MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

### ORAL ARGUMENT REQUESTED

# <u>TABLE OF CONTENTS</u>

**Page**

INTRODUCTION ...................................................................................................... 1

FACTUAL BACKGROUND .................................................................................... 3

I.      THE ROLE OF NAR AND MLSS...................................................................... 3

II.     NAR HAS PROMULGATED MODEL RULES, A CODE OF ETHICS, AND
        OTHER REQUIREMENTS TO FURTHER ITS PURPOSE OF PRESERVING,
        PROTECTING, AND ADVANCING THE RIGHT TO REAL PROPERTY FOR
        ALL........................................................................................................................ 4

LEGAL STANDARD................................................................................................. 7

ARGUMENT ............................................................................................................. 8

I.      THERE IS NO EVIDENCE OF A CONSPIRACY. ......................................... 9

        A.      NAR's Model Rules and Policies Are Not Conspiracies........................ 9

        B.      There Is No Evidence That NAR Conspired with the Other Defendants. .......... 10

II.     PLAINTIFFS LACK STANDING BECAUSE THEY ARE NOT DIRECT
        PURCHASERS................................................................................................... 14

III.    THE NAR MODEL RULES ARE NOT UNREASONABLE RESTRAINTS OF
        TRADE. ............................................................................................................. 16

        A.      The NAR Model Rules Do Not Require Plaintiffs to Do or Pay Anything,
                Nor Do They Limit Plaintiffs in Any Way. ........................................... 16

        B.      Plaintiffs' Economic Expert Agrees the NAR Model Rules on Offers of
                Compensation Have No Impact on Competition or Commission Amounts........ 17

IV.     THE NAR MODEL RULES DID NOT HARM PLAINTIFFS OR SELLERS. ............ 18

        A.      The NAR Model Rules Do Not Cause Listing Brokers to Offer
                Compensation to Cooperating Brokers or Increase Commission Rates
                Agreed to By Sellers. .............................................................................. 19

        B.      The NAR Model Rules Benefit Sellers.................................................... 21

        C.      The NAR Model Rules Benefit Buyers. .................................................. 23

CONCLUSION......................................................................................................... 25

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*AD/SAT, Div. of Skylight, Inc. v. Associated Press*,
181 F.3d 216 (2d Cir. 1999) ........................................................................... 11

*Am. Dental Ass'n v. Cigna Corp.*,
605 F. 3d 1283 (11th Cir. 2010) ....................................................................... 9

*Apple Inc. v. Pepper*,
139 S. Ct. 1514 (2019) .................................................................................... 14

*In re Beef Indus. Antitrust Litig.*,
600 F.2d 1148 (5th Cir. 1979) ......................................................................... 15

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ................................................................................... 10, 11

*Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*,
152 F.3d 588 (7th Cir. 1998) ........................................................................... 23

*In re Brand Name Prescription Drugs Antitrust Litig.*,
123 F.3d 599 (7th Cir. 1999) ........................................................................... 15

*Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*,
441 U.S. 1 (1979) ............................................................................................. 8

*Campos v. Ticketmaster Corp.*,
140 F.3d 1166 (8th Cir. 1998) ......................................................................... 15

*Consol. Metal Prods., Inc. v. Am. Petroleum Inst.*,
846 F. 2d 284 (5th Cir. 1988) ........................................................................... 9

*In re Dairy Farmers of Am., Inc., Cheese Antitrust Litig.*,
60 F. Supp. 3d 914 (N.D. Ill. 2014) ................................................................. 12

*Deaktor v. Fox Grocery Co.*,
475 F.2d 1112 (3d Cir. 1973) ........................................................................... 19

*Five Smiths, Inc. v. Nat'l Football League Players Ass'n*,
788 F. Supp. 1042 (D. Minn. 1992) ................................................................... 9

*Greater Rockford Energy & Tech. Corp. v. Shell Oil Co.*,
998 F.2d 391 (7th Cir. 1993) ................................................................. 17, 18, 21

*Hyland v. HomeServices of Am., Inc.*,
  771 F.3d 310 (6th Cir. 2014) ........................................................................12, 13

*Ill. Brick Co. v. Ill.*,
  431 U.S. 720 (1977) ...............................................................................................14

*Isaksen v. Vt. Castings, Inc.*,
  825 F.2d 1158 (7th Cir. 1987) ........................................................................18, 19

*L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*,
  791 F.2d 1356 (9th Cir. 1986) ..............................................................................19

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
  475 U.S. 574 (1986) ..........................................................................7, 8, 10, 13

*Messner v. Northshore Univ. HealthSystem*,
  669 F.3d 802 (7th Cir. 2012) ................................................................................18

*Mkt. Force Inc. v. Wauwatosa Realty Co.*,
  906 F.2d 1167 (7th Cir. 1990) ..............................................................................12

*Monsanto Co. v. Spray Rite Serv. Corp.*,
  465 U.S. 752 (1984) ..............................................................................................10

*Nat'l Collegiate Athletic Assn. v. Board of Regents of Univ. of Okla.*,
  468 U.S. 85 (1984) ..........................................................................................11, 12

*Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*,
  472 U.S. 284 (1985) ..............................................................................................11

*O'Riordan v. Long Island Bd. of Realtors, Inc.*,
  707 F. Supp. 111 (E.D.N.Y. 1988) .........................................................................8

*Ohio v. Am. Express Co.*,
  138 S. Ct. 2274 (2018) ....................................................................................23, 24

*Omnicare, Inc. v. UnitedHealth Grp., Inc.*,
  629 F.3d 697 (7th Cir. 2011) ................................................................................10

*Reifert v. S. Cent. Wis. MLS Corp.*,
  450 F.3d 312 (7th Cir. 2006) ..................................................................................8

*Standard Oil Co. of N.J. v. United States*,
  221 U.S. 1 (1911) ..................................................................................................16

*Supermarket of Homes, Inc. v. San Fernando Valley Bd. of Realtors*,
  No. CV 80-1888, 1983 WL 2199 (C.D. Cal. Sept. 1, 1983) ............................8, 13

*Texaco Inc. v. Dagher*,
   547 U.S. 1 (2006) ........................................................................................................9

*United States v. Realty Multi-List, Inc.*,
   629 F.2d 1351 (5th Cir. 1980) ....................................................................................8

*Wilk v. Am. Med. Ass'n*,
   895 F. 2d 352 (7th Cir. 1990) ....................................................................................9

**Statutes**

225 ILCS 454/10-5 ..........................................................................................................11

15 U.S.C. § 1 .......................................................................................................... *passim*

Colo. Rev. Stat. Ann. § 12-10-410(1) ............................................................................11

D.C. Code Ann. § 42-1703(f) .........................................................................................11

Del. Code Ann. tit. 24, § 2930 ........................................................................................11

Md. Code Ann. Bus. Occ. & Prof 17-534........................................................................11

Minn. Stat. Ann. § 82.70 .................................................................................................11

N.J. Admin. Code 11:5-6.2 ..............................................................................................11

**Other Authorities**

Brief for the United States et al. as Amici Curiae, *Campos v. Ticketmaster Corp.*,
   525 U.S. 1102 (1999), *cert. denied* ..........................................................................15

Chapter 9: Private Antitrust Suites, 1 Antitrust Law Developments,
   (Am. Bar Ass'n 9th ed. 2022) .............................................................................15, 20

David S. Evans, *Antitrust Economics of Two-Sided Markets*, 20 Yale J. on Regul.
   (2003), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=332022 .....................24

FTC & Dep't of Justice, *Antitrust Guidelines for Collaborations Among*
   *Competitors* at 1 (Apr. 2020),
   https://www.ftc.gov/sites/default/files/documents/public_events/joint-venture-
   hearings-antitrust-guidelines-collaboration-among-
   competitors/ftcdojguidelines-2.pdf ..........................................................................10

FTC & Dep't of Justice, *Competition in the Real Estate Brokerage Industry* (Apr.
   2007), https://www.ftc.gov/sites/default/files/documents/reports/competition-
   real-estate-brokerage-industry-report-federal-trade-commission-and-
   u.s.department-justice/v050015.pdf ..........................................................................13

Jean-Charles Rochet & Jean Tirole, *Platform Competition in Two-Sided Markets*,
1 J. of the European Econ. Ass'n (June 1, 2003),
https://doi.org/10.1162/154247603322493212 ...................................................................23

Jean-Charles Rochet & Jean Tirole, *Cooperation among Competitors: Some
Economics of Payment Card Associations*, 33 The RAND J. of Econs. (Feb.
2002),
https://www.researchgate.net/publication/24049191_Cooperation_Among_Co
mpetitors_Some_Economics_Of_Payment_Card_Associations ....................................23

Jean-Charles Rochet & Jean Tirole, *Two-sided markets: a progress report*, 37 The
RAND J. of Econs. (2006),
https://edisciplinas.usp.br/pluginfile.php/7585351/mod_resource/content/1/Tir
ole.pdf ............................................................................................................................23

Maisy Wong & Panle Barwick, *Competition in the real estate brokerage industry:
A critical review*, Brookings Institute (Dec. 2019),
https://www.brookings.edu/wp-content/uploads/2019/12/ES-12.12.19-
Barwick-Wong.pdf .........................................................................................................22

Maisy Wong et al, *Conflicts of Interest and the Realtor Commission Puzzle*, The
Wharton Sch. Research Paper No. 93 (Nov. 18, 2015),
https://ssrn.com/abstract=2797346. ................................................................................22

## **INTRODUCTION**

National Association of REALTORS® policies unambiguously prohibit the exact conduct Plaintiffs complain is anticompetitive and the following material facts are undisputed, any one of which is sufficient to dispose of Plaintiffs' claim as a matter of law.

***No Conspiracy.*** NAR's only conduct was to adopt its own policies. Trade associations may adopt rules, and those rules themselves cannot be an antitrust conspiracy. Plaintiffs must show, and there is no evidence of, any conspiracy between NAR and the other Defendants—who are not NAR members, are not multiple listing services, and do not follow NAR's policies. The other Defendants have nothing to do with the NAR model rules and other policies at issue in this case, and there are no documents or testimony showing otherwise. Plaintiffs not only misread the NAR model rules and other policies, they also ignore the policies that expressly prohibit price fixing and other anticompetitive conduct regarding commissions.

***No Standing.*** Under the NAR model rules and the listing agreements between Plaintiffs and listing brokers, home sellers do not make offers of compensation to buyer brokers—listing brokers do. This fact is indisputable and makes Plaintiffs indirect purchasers. Plaintiffs will likely try to point to settlement statements, which disburse the proceeds of home sales, as evidence to the contrary. But the settlement statements are irrelevant. The NAR model rules challenged here are about listing, not settlement. The settlement statements do not provide that sellers pay buyer brokers. The settlement statements simply show two actions at once (the sellers paying their listing broker a commission and that the listing broker has agreed to share some of that commission with a buyer broker). The settlement statements show that sellers only pay the listing broker—and do not pay Defendants, making them indirect purchasers.

***No Restraint.*** Listing brokers make offers of compensation to buyer brokers because of market forces, and not anything NAR has done. State real estate laws have long allowed that exact practice; brokers made offers of compensation for *generations* before the NAR model rules and offers of compensation remain standard practice in cities where the NAR model rules have not been adopted by MLSs and do not apply. Listing brokers can comply with the NAR model rules adopted by MLSs by offering a single penny, or for some MLSs, even zero dollars. Plaintiffs claim that listing brokers usually offer much more—but the NAR model rules do not force anyone to do anything they do not want to do, as these higher offers are not required by the NAR model rules. In fact, Plaintiffs' own economic expert has claimed that broker and consumer conduct would be the same with or without the model rules. And if sellers do not like the rules in their MLS, they can avoid them by selling their homes off the MLS, which is commonplace and accounts for at least one-out-of-six home sales.

***No Harm.*** The NAR model rules on offers of compensation—and NAR's other transparency policies—do not harm market participants, but instead benefit them. The NAR model rules benefit both sellers and buyers by ensuring that all brokers and their clients know how much the brokers are being paid and by whom, by encouraging buyer brokers to find buyers for listings and by helping all buyers to have representation. In fact, Plaintiffs' theory that we should have a system where buyers do not have representation is worse for all consumers and was rejected by the United States marketplace and consumer protection advocates in the 1990s. Finally, both the DOJ and FTC have found that "by stating up-front the compensation being offered to a cooperating broker, the MLS can reduce the costs associated with listing brokers having to negotiate separately with each potential cooperating broker. As a result, the use of an MLS can substantially reduce transaction costs."

2

Plaintiffs' antitrust claims fail as a matter of law for each of these reasons.[1]

## FACTUAL BACKGROUND

I.    THE ROLE OF NAR AND MLSs.

NAR is a non-profit trade association. NAR Statement of Material Facts ("SMF") ¶ 1. NAR does not list homes for sale, broker home sales, or charge or receive any commissions. *Id.* ¶ 2. Nor does NAR own or operate multiple listing services ("MLSs"). *Id.* ¶¶ 8–9. Instead, NAR's "mission is to empower REALTORS® as they preserve, protect and advance the right to real property for all." *Id.* ¶ 3. NAR's membership is composed of residential and commercial brokers, salespeople, property managers, appraisers, counselors, and others engaged in the real estate industry—and with business models of all shapes and sizes. *Id.* ¶ 4. The other Defendants are not brokers; they are real estate corporations. As such, they are not members of NAR.

In addition to NAR, members belong to one or more of approximately 1,200 local associations/boards and 54 state and territory associations of REALTORS®. *Id.* ¶ 5. Some of those local associations of REALTORS® own MLSs, but not all MLSs are owned by REALTOR® associations. *Id.* ¶ 6. MLSs are companies that allow real estate professionals to learn about and share local property listings in support of the interests of clients. *Id.* ¶ 7. MLSs provide an economical, efficient system of sharing real property information and facilitating cooperative transactions that gives clients access to the most accurate and up-to-date property information available. *Id.* ¶ 8. All of the MLSs at issue in this case are owned by local REALTOR® associations, and the other Defendants do not own or operate any of these MLSs. *Id.* ¶ 9.

---

[1] Plaintiffs may try to bypass these issues by relying on the non-precedential summary judgment decision in the *Burnett v. National Association of Realtors*, No. 4:19-cv-00332 (W.D. Mo. Apr. 29, 2019) case, which considered similar claims. However, not only was that a district court decision decided on a different record, but its holding will be under appeal with the Eighth Circuit. This Court should instead consider the present record, Seventh Circuit authority, and the record in this case—these considerations show that summary judgment should be granted.

## II. NAR HAS PROMULGATED MODEL RULES, A CODE OF ETHICS, AND OTHER REQUIREMENTS TO FURTHER ITS PURPOSE OF PRESERVING, PROTECTING, AND ADVANCING THE RIGHT TO REAL PROPERTY FOR ALL.

In pursuit of its mission, NAR requires its members to adhere to certain policies and a Code of Ethics and promulgates model rules for MLSs owned by REALTOR® associations.

***NAR Code of Ethics.*** The NAR Code of Ethics, adopted in 1913, was one of the first codifications of ethical duties adopted by any business group. *Id.* ¶ 16. The Code serves consumers by requiring REALTORS® to cooperate with each other in furthering clients' best interests. Specifically, Article 1 requires, "[w]hen representing a buyer, seller, landlord, tenant, or other client as an agent, REALTORS® pledge themselves to protect and promote the interests of their client. This obligation to the client is primary, but it does not relieve REALTORS® of their obligation to treat all parties honestly." *Id.* ¶ 17. Article 3 provides that "REALTORS® shall cooperate with other brokers ***except when cooperation is not in the client's best interest. The obligation to cooperate does not include the obligation to share commissions, fees, or to otherwise compensate another broker.***" *Id.* ¶ 19 (emphasis added).

NAR's Code of Ethics also requires all members to advise their clients about broker commission amounts and who is paying whom. *Id.* ¶ 20. On the seller side, NAR provides that, "[w]hen entering into listing contracts, REALTORS® must advise sellers/landlords of . . . the REALTOR®'s company policies regarding cooperation and the amount(s) of any compensation that will be offered to subagents, buyer/tenant agents, and/or brokers acting in legally recognized non-agency capacities." *Id.* ¶ 21. Similarly, on the buyer side, NAR provides, "[w]hen entering into buyer/tenant agreements, REALTORS® must advise potential clients of . . . the REALTOR®'s company policies regarding cooperation . . . the amount of compensation to be paid by the client . . . the potential for additional or offsetting compensation from other brokers, from the seller or landlord, or from other parties." *Id.* ¶ 22. In fact, each named Plaintiff signed a

listing agreement that provided this exact information. *Id.* ¶ 55.

**Handbook on Multiple Listing Policy.** There are hundreds of MLSs across the country, namely those owned by REALTOR® associations, that choose to use a common set of model rules to enable a smooth exchange of information in their local communities. *Id.* ¶ 10. Those model rules are found in NAR's Handbook on Multiple Listing Policy. *Id.* ¶ 11. There also are MLSs that have chosen a different structure and thus do not follow the NAR model rules—and there is no penalty for that; NAR provides insurance for those MLSs that adopt the NAR model rules, as NAR can be sure that MLSs that do so are operating according to best practices. *Id.* ¶¶ 13, 15. In fact, many MLSs are not wholly owned by local REALTOR® associations and do not follow the NAR model rules, including the MLS in Chicago (Midwest Real Estate Data LLC), and the MLSs in Seattle, Pittsburgh, New York, and Boston. *Id*. ¶ 14. Whether wholly owned by a REALTOR® association or not, all MLS rules are promulgated and enforced by the MLSs themselves—NAR does not enforce any MLS rules. *Id.* ¶ 12.

The NAR model rules and other policies prohibit price fixing on commissions. **First**, the NAR model rules contain an MLS Antitrust Compliance Policy, which provides that "Boards and associations of REALTORS® and their MLSs shall not: 1. Fix, control, recommend, or suggest the commissions or fees charged for real estate brokerage services[.] 2. Fix, control, recommend, or suggest the cooperative compensation offered by listing brokers to potential cooperating brokers." *Id*. ¶¶ 37–38. **Second**, the NAR model rules require MLSs to post a notice to association members that requires commissions and offers of compensation to be determined in a manner consistent with the antitrust laws:

| Section 18 Compilation of Current Listing Information (Policy Statement 7.39) | Any compilation of current listing information shall display the following notice in a conspicuous manner: |
|---|---|

*Notice to Association Members*

*Under the long-established policy of this association, the (state) association of REALTORS®, and the NATIONAL ASSOCIATION OF REALTORS®:*

1. *The broker's compensation for services rendered in respect to any listing is solely a matter of negotiation between the broker and his or her client, and is not fixed, controlled, recommended, or maintained by any persons not a party to the listing agreement.*

2. *The compensation paid by a listing broker to a cooperating broker in respect to any listing is established by the listing broker and is not fixed, controlled, recommended, or maintained by any persons other than the listing broker. (Amended 4/92)*

In addition, it is recommended that all associations publish this notice to their general membership at least annually. Every association operating a multiple listing service is required to certify to the National Association that the notice to association members concerning the negotiability of brokerage commissions, subagency compensation, and compensation to buyer's agents has been reproduced in their compilation of current listing information. Further, associations that do not operate an MLS shall publish the notice to association members in their newsletter or other vehicle for membership information dissemination and shall so certify to the National Association. *(Amended 11/88)* **M**

*Id.* ¶¶ 38–39. ***Third***, in addition to these provisions, NAR has myriad antitrust compliance guides, all instructing members on how to comply with the antitrust laws. *See id.* ¶¶ 37–38.

While the NAR model rules and other policies require transparency of commissions and offers of compensation, they are not the reason listing brokers offer to compensate cooperating brokers. In fact, this form of commission sharing long predates NAR itself and continues even where the NAR model rules have not been adopted and do not apply. *Id.* ¶¶ 27, 41. And there is no evidence that commission rates or splits are higher or different where the NAR model rules have been adopted, as compared to where they have not. *Id.* ¶ 42. Indeed, the model rule that Plaintiffs focus on, Policy Statement 7.23, says nothing about an offer being any specific amount:

> In filing property with the multiple listing service, participants make blanket unilateral offers of compensation to the other MLS participants and shall therefore specify on each listing filed with the service the compensation being offered by the listing broker to the other MLS participants. This is necessary because cooperating participants have the right to know what their compensation will be prior to commencing their efforts to sell.* (Revised 11/04)

6

*Id.* ¶ 46.  In other words, the offer may be any amount, and recently some MLSs have even allowed an offer of zero.  *Id.* ¶ 35.  Sellers can even avoid having their listing agent make a nominal offer of compensation by selling their homes off the multiple listing service, which is commonplace and accounts for at least one-out-of-six home sales.  *Id.* ¶¶ 23–26.  This concept has been in the NAR model rules for over 50 years, and the model rules have been substantively the same for over 30 years, when NAR modified Policy Statement 7.23 in response to market demand for buyer brokers.  *Id.* ¶¶ 29–33.  Prior to 1992, buyers typically did not have their own representatives in real estate transactions.  *Id.* ¶ 30.  NAR commissioned a Presidential Advisory Group ("PAG") in 1992 that undertook extensive research on buyer representation and ultimately recommended modifying Policy Statement 7.23 to provide consumers with freedom of choice by allowing offers of compensation to buyer representatives, which NAR's Board of Directors approved.  *See Id.* ¶ 32––33 ("The recommendations in this report are founded on the principles of informed consent and freedom of choice.  Buyers and sellers should be able to select from a range of options that relationship that best meets their needs.").  The other Defendants had nothing to do with creating Policy Statement 7.23, and there are no documents or testimony showing otherwise.

Finally, while broker commissions cannot be unilaterally changed, they are negotiable at all times.  *Id.* ¶ 45.  In fact, NAR has unambiguously told its members that it "never prohibits negotiations between the listing broker and a cooperating broker at any time during the transaction."  *Id.* ¶ 47.

## **LEGAL STANDARD**

To survive NAR's motion for summary judgment, Plaintiffs bear the burden of showing there is a genuine issue of material fact.  Fed. R. Civ. P. 56(e); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986).  The court must "pierce the pleadings and to assess the

proof in order to see whether there is a genuine need for trial." *Matsushita*, 475 U.S. at 587 (quoting Rule 56(e) advisory committee's note on 1963 amendments). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (citation omitted)*.*

## **ARGUMENT**

Plaintiffs' theory of liability requires them to show a violation of the Sherman Act through a rule of reason analysis. *See Reifert v. S. Cent. Wis. MLS Corp.*, 450 F.3d 312, 321 (7th Cir. 2006) (applying the rule of reason to case about MLS and NAR policies).[2] However, the Court need not apply the rule of reason at summary judgment because the arguments NAR raises are the same whether the claim is governed by *per se* or rule of reason standards. Specifically, Plaintiffs (1) fail to show a coherent conspiracy at all; (2) lack standing because they are not direct purchasers; (3) cannot demonstrate that the NAR model rules are an unreasonable restraint on trade; and (4) were not harmed. Summary judgment should be granted for each of these reasons independently.

---

[2] The mere label of price fixing "does not alone establish that this particular practice is one of those types or that it is 'plainly anticompetitive' and very likely without 'redeeming virtue.'" *Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 9 (1979). Therefore, "the Supreme Court has refused to accord per se treatment to practices literally comprehended within the term when, viewed in its full context, the practice appeared potentially to be reasonably ancillary to procompetitive, efficiency-creating endeavors and therefore not a naked restraint of trade." *United States v. Realty Multi-List, Inc.*, 629 F.2d 1351, 1365 (5th Cir. 1980). And federal courts have repeatedly found that the rule of reason applies to cases about the operation of multiple listing services. *See O'Riordan v. Long Island Bd. of Realtors, Inc.*, 707 F. Supp. 111, 115 (E.D.N.Y. 1988) (noting that "there appears [to be] no federal case in which a court has applied a per se analysis to an MLS") (emphasis omitted); *Supermarket of Homes v. San Fernando Valley Bd. of Realtors*, No. CV 80-1888, 1983 WL 2199, at *7 (C.D. Cal. Sept. 1, 1983), aff'd, 786 F.2d 1400 (9th Cir. 1986) (applying the rule of reason to antitrust claims regarding MLS). For example, the rule of reason was applied to an antitrust challenge to multiple listing practices because the operation of the multiple listing services "helps reduce 'information and communication barriers,'" aids the market and the seller, provides "buyer benefits" and overall provides "clear competitive benefits to all parties." *Realty Multi-List*, 629 F.2d at 1368 (citations omitted). As a result of these "enormously procompetitive objectives," rules governing multiple listing services "are not subject to out-of-hand condemnation" under the *per se* rule. *Id.*

I.   **THERE IS NO EVIDENCE OF A CONSPIRACY.**

Absent facts showing a conspiracy, Plaintiffs' Section 1 claim cannot survive summary judgment.  *See* 15 U.S.C. § 1 (requiring a "contract, combination . . . or conspiracy").

A.   **NAR's Model Rules and Policies Are Not Conspiracies.**

The undisputed facts show that NAR has done nothing more than promulgate model rules and other policies based on its extensive industry expertise and with the aim of achieving its mission "[t]o empower REALTORS® as they preserve, protect and advance the right to real property for all."  SMF ¶ 3.  But trade associations are not "walking conspirac[ies]" and their rules are not automatically anticompetitive.  *Wilk v. Am. Med. Ass'n*, 895 F. 2d 352, 374 (7th Cir. 1990) (holding a trade association is not a "walking conspiracy"); *see also Consol. Metal Prods., Inc. v. Am. Petroleum Inst.*, 846 F. 2d 284, 293–94 (5th Cir. 1988) ("[A] trade association is not by its nature a 'walking conspiracy.'"); *Five Smiths, Inc. v. Nat'l Football League Players Ass'n*, 788 F. Supp. 1042, 1049 n.5 (D. Minn. 1992) (same).  Moreover, "participation in trade organizations provides no indication of conspiracy."  *Am. Dental Ass'n v. Cigna Corp.*, 605 F. 3d 1283, 1295 (11th Cir. 2010).  In fact, in *Wilk*, the Seventh Circuit rejected Plaintiffs' argument that a trade association "acts as a conspiracy or combination every time it promulgates industry standards [which unreasonably restrain competition]."  895 F.2d at 374.  Here too, there is no evidence that the trade association's policy "is merely a ploy to obscure a conspiracy."  *Id*. (citation omitted).

Just as NAR itself is not a walking conspiracy, neither are the MLSs.  In fact, the MLSs are joint ventures, and the Supreme Court has gone as far as holding that in many circumstances joint ventures cannot price fix in violation of the Sherman Act, even if they *literally* set prices.  *Texaco Inc. v. Dagher*, 547 U.S. 1, 6 (2006) ("Equilon's pricing policy may be price fixing in a literal sense, it is not price fixing in the antitrust sense."); SMF ¶ 8.  Clearly, MLSs do not violate

the Sherman Act merely by requiring transparency in commission splitting, without setting the rates of such splits. Instead, "competitor collaborations" like MLSs, which help organize the market and ensure transparency and consistency, are *pro-competitive*. *See generally*, FTC & Dep't of Justice, *Antitrust Guidelines for Collaborations Among Competitors* at 1 (Apr. 2020), https://www.ftc.gov/sites/default/files/documents/public_events/joint-venture-hearings-antitrust-guidelines-collaboration-among-competitors/ftcdojguidelines-2.pdf. ("Such [competitor] collaborations often are not only benign but procompetitive.").

### B. There Is No Evidence That NAR Conspired with the Other Defendants.

Not only is there no evidence that Association-owned MLSs are conspiracies, *there is no evidence that NAR conspired with any other Defendant* or that the other Defendants conspired with each other.

"[A]t the summary judgment stage a § 1 plaintiff's offer of conspiracy evidence must tend to rule out the possibility that the defendants were acting independently." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 554 (2007) (citing *Matsushita*, 475 U.S. at 587). Otherwise stated, "conduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy." *Matsushita*, 475 U.S. at 588. Under *Monsanto* and *Matsushita*, the Court has an important gatekeeper function at the summary judgment stage. *Monsanto Co. v. Spray Rite Serv. Corp.*, 465 U.S. 752, 763–64 (1984); *Matsushita*, 475 U.S. at 587–88. While complaints can survive motions to dismiss if they are plausible on their face, the hurdle is significantly higher at summary judgment. *Matsushita*, 475 U.S. at 588. Because "antitrust law limits the range of permissible inferences from ambiguous evidence," *Matsushita*, 475 U.S. 697, 588 (7th Cir. 2011), a plaintiff "must show that the inference of conspiracy is reasonable in light of the competing inference of independent action." *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 706–07 (7th Cir. 2011). The evidence must show "parallel

behavior that would probably not result from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties." *Twombly*, 550 U.S. at 557 n.4 (quoting 6 Areeda & Hovenkamp, Antitrust Law ¶ 1425, at 167 (2d ed. 2003)) (internal quotation marks omitted).

Plaintiffs here failed to show what they must: "evidence tending to show that association members, in their individual capacities, consciously committed themselves to a common scheme designed to achieve an unlawful objective." *AD/SAT, Div. of Skylight, Inc. v. Associated Press*, 181 F.3d 216, 234 (2d Cir. 1999). While Plaintiffs' case seems to hinge on REALTORS® cooperating to sell a home, there is nothing wrong with that. In fact, such cooperation is authorized by state and federal law. For example, Minnesota law expressly provides that "[t]he seller may, in the listing agreement, authorize the seller's broker to disburse part of the broker's compensation to other brokers, including the buyer's brokers solely representing the buyer." Minn. Stat. Ann. § 82.70. Similarly, Colorado law states that "[i]n any real estate transaction, the broker's compensation may be paid by the seller, the buyer, the landlord, the tenant, a third party, or by the sharing or splitting of a commission or compensation between brokers." Colo. Rev. Stat. Ann. § 12-10-410(1). Many other states also expressly authorize broker cooperation and commission splitting. *See*, *e.g.*, 225 ILCS 454/10-5 (Illinois); Del. Code Ann. tit. 24, § 2930 (Delaware); Md. Code Ann. Bus. Occ. & Prof 17-534 (Maryland); N.J. Admin. Code 11:5-6.2 (New Jersey); D.C. Code Ann. § 42-1703(f) (Washington D.C.). As the Supreme Court recognized long ago, every commercial transaction requires some cooperation between the buyer and seller. *See, e.g.*, *Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284, 289 (1985) ("[E]very commercial agreement restrains trade."); *Nat'l Collegiate Athletic Assn. v. Board of Regents of Univ. of Okla.*, 468 U.S. 85, 98 (1984) ("[E]very contract is a restraint of trade, and as we have

repeatedly recognized, the Sherman Act was intended to prohibit only unreasonable restraints of trade."). This is no different in real estate, where the existence of every transaction depends on buyers and sellers—and the brokers that assist them—cooperating with one another.

And importantly, there is no direct or circumstantial evidence that the Defendants agreed with each other to require offers of compensation or to have listing brokers pay cooperating brokers a particular amount, or agreed to any other unlawful objective. To the contrary, there is evidence showing no such conspiracy. For example, NAR's MLS Handbook first included a model rule requiring an offer of compensation in 1972. SMF ¶ 29. "It is difficult to support an inference of conspiracy almost solely with conduct similar to that engaged in by [Defendant] before its alleged participation in the conspiracy began[.]" In *re Dairy Farmers of Am., Inc., Cheese Antitrust Litig.*, 60 F. Supp. 3d 914, 953 (N.D. Ill. 2014), *aff'd sub nom. In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, 801 F.3d 758 (7th Cir. 2015) (granting summary judgment to defendant based on failure to establish conspiracy).

For these reasons, the dynamics in the modern real estate market, including offers of compensation from listing brokers to cooperating brokers, are organic and no conspiracy was required to set them in motion. Courts have rejected arguments just like Plaintiffs' theory because the alleged conduct could just as easily (and here did) result from independent action as from a conspiracy. *See Mkt. Force Inc. v. Wauwatosa Realty Co.*, 906 F.2d 1167, 1174 (7th Cir. 1990) ("Market Force has not met its burden of providing specific factual support for its allegations of conspiracy tending to show that the defendant was not acting independently.") (internal quotation marks and citation omitted); *Hyland v. HomeServices of Am., Inc.*, 771 F.3d 310, 319-21 (6th Cir. 2014) (affirming summary judgment because circumstantial evidence of parallel pricing, including brokerages' policy of charging a 6% minimum commission, prevalence of the 6% rate, evidence

of the inelastic nature of commission rates, awareness of competitors commission rates, cooperation between buyers and sellers agents, trade association meetings, and a common motive to conspire, was all equally consistent with independent conduct). For example, in *Supermarket of Homes*, the Ninth Circuit affirmed summary judgment for defendants against a plaintiff who "originally alleged a conspiracy of licensed brokers to stabilize commissions in the San Fernando Valley," but who "later conceded that the brokers acted in self interest in refusing to show 'low commission' residential properties." 786 F.2d at 1407. In its order deciding Defendants' motion to dismiss here (ECF No. 184 at 22–23), this Court in passing referred to the district court decision in *Supermarket of Homes* as "inapposite" because it predates the era of cooperating brokers acting as buyers' agents. But the Ninth Circuit's analysis in *Supermarket of Homes* remains relevant here to the question of whether a plaintiff has established conduct that is not explained by independent self-interest. Summary judgment is appropriate where, as here, plaintiffs challenge "conduct [which is] as consistent with permissible competition as with illegal conspiracy." *Matsushita*, 475 U.S. at 588. Listing brokers make offers of compensation to cooperating brokers due to independent self-interest and permissible competition, not any conspiracy.

In fact, the DOJ and FTC wrote in their report on competition in real estate that offers of compensation and NAR's model rules are pro-competitive. "[B]rokers using the MLS reduce the costs of matching buyers and sellers and can market their service to a large set of potential clients. Further, by stating up-front the compensation being offered to a cooperating broker, the MLS can reduce the costs associated with listing brokers having to negotiate separately with each potential cooperating broker. As a result, the use of an MLS can substantially reduce transaction costs." FTC & Dep't of Justice, *Competition in the Real Estate Brokerage Industry* at 12 (Apr. 2007), https://www.ftc.gov/sites/default/files/documents/reports/competition-real-estate-brokerage-

industry-report-federal-trade-commission-and-u.s.department-justice/v050015.pdf.  The benefits

of offers of compensation and the NAR model rules regarding such offers are well-recognized.

## II.  PLAINTIFFS LACK STANDING BECAUSE THEY ARE NOT DIRECT PURCHASERS.

The undisputed facts show that Plaintiffs are not direct purchasers of cooperating brokers'

services, and therefore, Plaintiffs lack standing to bring this action.  It is axiomatic that only direct

purchasers have standing to sue for damages.  *Ill. Brick Co. v. Ill.*, 431 U.S. 720, 728–29, 740

(1977).  The Supreme Court has "incorporate[ed] principles of proximate cause into" the antitrust

laws, ruling that "indirect purchasers who are two or more steps removed from the violator in a

distribution chain may not sue" and explained the "decision in *Illinois Brick* established a bright-

line rule that authorizes suits by direct purchasers but bars suits by indirect purchasers."  *Apple*

*Inc. v. Pepper*, 139 S. Ct. 1514, 1520 (2019) (emphases omitted).  "For example, if manufacturer

A sells to retailer B, and retailer B sells to consumer C, then C may not sue A.  But B may sue A

if A is an antitrust violator.  And C may sue B if B is an antitrust violator."  *Id*. at 1521.  Therefore,

Plaintiffs must allege that they purchased something from Defendants.  *Id.*

Here, however, the listing brokers are the direct purchasers of cooperating brokers'

services, not Plaintiffs or other sellers.  SMF ¶¶ 54–57.  According to the NAR model rules and

listing agreements, Plaintiffs did not directly pay NAR; sellers only directly pay their listing

brokers and only directly receive services from their listing brokers.  *Id.*

While Plaintiffs likely will point to the settlement statements, those are irrelevant.  First,

the NAR model rules challenged here are about listing, not settlement.  Many events and

negotiations occur between the two, and whether sellers agree to pay for something at settlement

does not trump the unambiguous language of the NAR model rules and the listing agreements.

Second, the settlement statements do not even provide that sellers pay Defendants or buyer

brokers.  The sellers pay their listing broker a commission, and their settlement statements reflect

that the listing broker has agreed to share some of that commission with a buyer broker. Regardless, the sellers only pay the local brokers, and do not pay Defendants, making them indirect purchasers even if the settlement statements were relevant.

At best, Plaintiffs might claim that they paid their listing brokers (who are not parties to this case) who, only then, paid buyer brokers. But Plaintiffs cannot avoid the indirect purchaser doctrine by claiming the Defendants conspired with the listing brokers to whom Plaintiffs paid commissions, without naming the listing brokers as parties. "[B]ecause of the risk of multiple liability[] most courts have held that proof of a vertical conspiracy will not overcome the *Illinois Brick* bar unless the intermediary coconspirators are named as parties." *Chapter 9: Private Antitrust Suites*, 1 Antitrust Law Developments 823 (Am. Bar Ass'n 9th ed. 2022) (citing *In re Beef Indus. Antitrust Litig.*, 600 F.2d 1148, 1163 (5th Cir. 1979) and other cases); *see also Campos v. Ticketmaster Corp.*, 140 F.3d 1166, 1169 (8th Cir. 1998) (holding that *Illinois Brick* requires joinder of the persons from whom plaintiffs actually purchased). Here, the intermediaries are the listing brokers. Those are the people with whom Plaintiffs and all sellers contract and pay for brokerage services. SMF ¶¶ 54–57.

While the Seventh Circuit has not decided whether alleged co-conspirators must be named for a Plaintiff to avoid the indirect purchaser doctrine, it has at least implicitly endorsed this view by favorably citing *In re Beef Indus. Antitrust Litig.*, 600 F.2d at 1163, with a parenthetical that states, "requiring that the direct sellers, here the wholesalers, be joined as defendants—but that requirement is satisfied." *In re Brand Name Prescription Drugs Antitrust Litig.*, 123 F.3d 599, 605 (7th Cir. 1999). Moreover, the United States Department of Justice did the same in its brief regarding certiorari in the *Campos* case. Brief for the United States et al. as Amici Curiae at 17, *Campos v. Ticketmaster Corp.*, 525 U.S. 1102 (1999) (No. 98-127), *cert. denied* (citing *In re Beef*

*Industry* to support argument that the *Illinois Brick* rule prevents multiple liability for conspirators sued by both direct and indirect purchasers).

### III. THE NAR MODEL RULES ARE NOT UNREASONABLE RESTRAINTS OF TRADE.

Rules governing commercial transactions do not generally violate antitrust laws—only unreasonable restraints of trade do. *Standard Oil Co. of N.J. v. United States*, 221 U.S. 1, 62 (1911) (limiting Section 1 of the Sherman Act to unreasonable restraints of trade).

#### A. The NAR Model Rules Do Not Require Plaintiffs to Do or Pay Anything, Nor Do They Limit Plaintiffs in Any Way.

The NAR model rules cannot restrain sellers as they only apply to listing brokers. Even listing brokers are not restrained as they can offer to share as much or little of their commissions as they want. NAR model rules do not require listing brokers to make any specific offer—or even set a minimum offer—and offers are always negotiable. Rather than following some predetermined or obligatory commission rate, listing brokers respond to market forces when they decide how much to offer cooperating brokers. Listing brokers, understanding the way the market works, make offers that balance (1) incentivizing cooperating brokers and (2) minimizing the compensation the listing brokers are required to share. The result is that the amounts offered by listing brokers to cooperating brokers vary across and within cities, despite the same NAR model rules applying, proving that these offers are ultimately set by market dynamics. SMF ¶¶ 51–53.

Moreover, because the model rules are optional, they are not a restraint of trade. Brokers have choices. They can choose to not use the MLS, they can (with the other regional brokers) choose to have their MLS not subject to NAR model rules, and they can choose to not join NAR. Many brokers choose these options. Sellers likewise can avoid the NAR model rules altogether by avoiding listing on MLSs, as a significant proportion of sellers do. Between 11% and 26% of homes are sold off-MLS (*e.g.*, homes "for sale by owner") and therefore without NAR model rules

applying. SMF ¶¶ 23–26. Given that sellers can—and frequently do—opt to participate in the real estate market in a manner that avoids NAR model rules altogether, NAR model rules are not a requisite for market participation and therefore cannot be a restraint on trade. *Greater Rockford Energy & Tech. Corp. v. Shell Oil Co.*, 998 F.2d 391, 397 (7th Cir. 1993) (finding no antitrust claim where satisfying trade association's certification standards was "not required to compete in the market"). Rather, many sellers and listing brokers choose to use MLSs because of the pro-competitive advantages they offer, such as encouraging buyer interest and supplying market information (but are not required to).

**B.     Plaintiffs' Economic Expert Agrees the NAR Model Rules on Offers of Compensation Have No Impact on Competition or Commission Amounts.**

The undisputed facts show that the NAR model rules do not create or constitute an "unreasonable restraint of trade" because there is no evidence that the NAR model rules impact competition for real estate broker services or the levels of commission rates.

Defendants' economic expert, Dr. Lauren Stiroh, criticized Plaintiffs' economic experts (Drs. Elhauge and Economides) for ignoring (i) real estate commission data from the United States before the NAR model rules, and (ii) real estate commission data from every MLS in the United States that does not follow the NAR model rules—the two most obvious comparisons for study; instead, Plaintiffs' economic experts looked solely to select foreign countries. SMF ¶ 66. Dr. Stiroh showed that commissions in those comparator markets in the United States, which were ignored by Plaintiffs' experts, are in fact higher than in the 20 MLSs at issue in this case. *Id.* ¶ 68. To explain why they ignored the available United States options for comparison, Plaintiffs' experts admitted that the alleged harm was also present in these contexts, therefore reducing their value as but-for comparators. *Id.* ¶ 69. That is, Plaintiffs' experts argued that ████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████████ *Id*. ¶ 70.  In other words, Plaintiffs' experts explained that they believe the *same* harm they purported to measure in markets that use NAR model rules existed before the NAR model rules and continues to exist in geographies where the NAR model rules have not been adopted and do not apply.  But this admits that the supposed impact Plaintiffs challenge as anticompetitive occurs *even absent the NAR model rules*, proving that the NAR model rules are not the cause of any such impact.

This proves that the NAR model rules do not have any impact on commissions, let alone an anticompetitive impact.

## IV.  THE NAR MODEL RULES DID NOT HARM PLAINTIFFS OR SELLERS.

Any plaintiff bringing a federal antitrust claim must prove that the defendant "violated federal antitrust law," that "the antitrust violation caused them some injury," and "must show damages."  *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 815 (7th Cir. 2012) (citations omitted).  Plaintiffs "must establish, with a fair degree of certainty, that the violation was a material element of, and substantial factor in producing, the injury."  *Greater Rockford Energy*, 998 F.2d at 401.  In other words, it must be clear that "'but for' the alleged violation, the injuries would not have occurred."  *Id*.  But Plaintiffs have failed to isolate any harm attributable to just the NAR model rules.  Instead, Plaintiffs simply ***assume*** damages are the entire amount of any commission paid by listing brokers above what is paid in an average of foreign countries.  This is impermissible.  "We do not allow antitrust plaintiffs or any other plaintiffs to obtain damage awards without proving what compensable damages were actually suffered as a result of the defendant's unlawful conduct."  *Isaksen v. Vt. Castings, Inc.*, 825 F.2d 1158, 1165 (7th Cir. 1987).

"*Post hoc ergo propter hoc* is not a valid methodology of damage calculation, especially when it is apparent that other causal factors are at work." *Id.*

Moreover, any calculation of antitrust damages must "take into account any benefits which would not have been received by plaintiff 'but for' the defendant's anticompetitive conduct." *L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 791 F.2d 1356, 1367 (9th Cir. 1986). That is, "if benefits accrued to [the plaintiffs] because of an antitrust violation, those benefits must be deducted from the gross damages caused by the illegal conduct." *Id.* And Plaintiffs bear the burden of establishing the size of their net harm, after adequately computing and deducting such benefits. *See Deaktor v. Fox Grocery Co.*, 475 F.2d 1112, 1116–17 (3d Cir. 1973) (affirming directed verdict for antitrust defendant where plaintiffs failed to produce "evidence concerning the factors essential to establish net profit" and thus "did not meet their burden of establishing the quantum of damages"). Plaintiffs have failed to do so here, as they have ignored altogether that offers of compensation specifically, and NAR model rules generally, benefit both sellers and buyers. *See infra* Sections IV.B & C.

### A. The NAR Model Rules Do Not Cause Listing Brokers to Offer Compensation to Cooperating Brokers or Increase Commission Rates Agreed to By Sellers.

Plaintiffs claim that listing brokers make offers of compensation to buyer brokers because of a conspiracy among Defendants regarding the NAR model rules. But there is no evidence that this assertion is true, and the undisputed evidence shows that sellers and cooperating brokers make commission decisions based on market conditions, not NAR policies or model rules.

***First***, Plaintiffs' experts agree that competition and commissions would be the same without the NAR model rule on offers of compensation, (SMF ¶¶ 69–70), and Dr. Stiroh proved that. SMF ¶¶ 68–70. ***Second***, offers of compensation are authorized expressly by real estate laws. Therefore, with or without the NAR model rules, listing brokers can and do make offers of

compensation to buyer brokers. **Third**, no NAR policy or model rule requires sellers, such as Plaintiffs, to make an offer of compensation or any payment to anyone. *Id.* ¶¶ 54–57. NAR model rules instead require that *listing brokers*, who voluntarily participate, in Association-owned MLSs make an offer of compensation. *Id.* ¶¶ 13–14, 41, 54. As the contracts produced by Plaintiffs set out, sellers commit only to paying their listing broker his or her commission; listing brokers separately agree to compensation with cooperating brokers. *Id.* ¶¶ 55, 57. **Fourth**, there is no restraint because the NAR model rules leave the amount of the offer to the discretion of the listing broker—and it can be as low as one penny or nothing at all in several MLSs. *Id.* ¶¶ 35–36. **Fifth**, there is no harm even after a listing broker makes an offer of compensation because those offers are always negotiable prior to closing, and, in practice, brokers regularly negotiate the listing commission. *Id.* ¶¶ 45–51. And, as contracts produced by Plaintiffs show, sellers know about and freely approve of the amount their listing broker offers cooperating brokers. *Id.* ¶ 55. **Sixth**, if a seller does not like any of the NAR model rules—including if she does not want her listing broker to pay the cooperating broker anything—the seller can avoid the rules entirely by marketing her property off the MLS, where the NAR MLS Handbook does not apply. *Id.* ¶¶ 23–26.

Moreover, the evidence that listing brokers share their commissions with cooperating brokers *regardless of whether NAR model rules apply* proves that the NAR model rules do not cause the harm that Plaintiffs contend. *Id.* ¶¶ 37–41. A central method of determining whether conduct restrains trade is to study behavior "during the period" with the alleged restraint and compare it to behavior "prior to the beginning of the violation or after its termination." *Chapter 9: Private Antitrust Suits*, 1 Antitrust Law Developments 823 (Am. Bar Ass'n 9th ed. 2022) at 762. This analysis can show that an alleged restraint had no effect, thereby proving it was not a restraint on trade. *Id.* Here, it is undisputed that commission-sharing existed in the real estate

industry *for decades* before NAR adopted a model rule requiring that a listing broker offer compensation. SMF ¶¶ 27-29; *see also id.* ¶ 66. This "before and after" comparison shows that the NAR model rules did not restrain trade *as they did not change the behavior of brokers*.

The Court need not only compare the "before and after" periods, but also can compare contemporaneous behavior in cities in the United States where the NAR model rules do and do not apply. *See Greater Rockford Energy*, 998 F.2d at 402 (comparing impact on the market of different state laws to determine the likelihood of anticompetitive conduct). Critically, in cities where NAR model rules do not apply, listing brokers *still make offers of compensation*, and these offers are *of the same magnitude*. SMF ¶¶ 41–42. For example, even two and a half years after one MLS stopped using the NAR model rules, 99 percent of transactions include commission offers to buyer agents, at similar levels. *Id*. ¶ 43–44.

For these reasons, the NAR model rules do not cause listing brokers to offer compensation to cooperating brokers, or even influence the amount of such offers. Rather, compensation offers are a function of market forces and competition, and the NAR model rules operate as no more than a transparency requirement for brokers who want to enjoy the advantages of listing on an MLS. For all these reasons, the NAR model rules are not a restraint on trade at all.

### B. The NAR Model Rules Benefit Sellers.

An offer of compensation from a listing broker to cooperating brokers—like any marketing the listing broker does to sell a home—benefits the seller by attracting more potential buyers. Simply stated, an offer of compensation incentivizes cooperating brokers to look for and find buyers for the listing, the core reason that listing brokers make such offers. SMF ¶¶ 58–64. Notably, listing brokers have looked to incentivize cooperating brokers in this way since long before the NAR model rules were drafted and still do so even where those rules do not apply. *Id*. ¶¶ 27, 41. This is because these incentives result in more brokers looking for bidders. *Id*. ¶¶ 60–

62. Buyer representation also prevents the sale from falling through by ensuring buyers are well-prepared to close on a home. (Cooperating brokers, for example, work with buyers and ensure financing is set so the buyer does not encounter last-minute surprises that could risk the deal. *See Id*. ¶ 63.) This not only benefits sellers, but also is ***critical*** to the success of a listing, as it drives the most potential buyers to the home, which increases the selling price, ensures transactions close, and decreases time-on-market, the most important goals for almost all sellers. *Id*. ¶¶ 58, 62. This model is also efficient because only the cooperating broker who represents the ultimate buyer is paid compensation. This ensures the incentives for cooperating brokers are properly set—namely matching buyers to listings they may actually buy—and avoids any incentive for cooperating brokers to show listings to buyers that they cannot, or are unlikely to want to, close on—dynamics that sellers benefit from. *Id*. ¶¶ 63–64.

Sellers are not injured for the further reason that commissions paid to cooperating brokers have been directly offset by higher home prices for sellers—that is, because these commissions may incentivize more bids and ensure deals close with less transaction risk, sales prices may go up. *Id.* ¶¶ 58, 61–64. That was the finding in the core academic article upon which Plaintiffs experts rely: Barwick and Wong. Barwick and Wong found that "we should expect housing prices to decrease by about 2 to 3% when half of the financial burden of commissions is shifted to the buyer." Maisy Wong & Panle Barwick, *Competition in the real estate brokerage industry: A critical review*, Brookings Institute (Dec. 2019), https://www.brookings.edu/wp-content/uploads/2019/12/ES-12.12.19-Barwick-Wong.pdf. In a previous work, the same authors found that "if a property has a buying commission rate less than 2.5 percent, it is 5 percent less likely to be sold and takes 12 percent longer to sell, compared to properties that offer buying agents 2.5 percent or more." Maisy Wong et al, *Conflicts of Interest and the Realtor Commission Puzzle*,

The Wharton Sch. Research Paper No. 93, 2 (Nov. 18, 2015), https://ssrn.com/abstract=2797346.

Yet Plaintiffs have failed to adduce any evidence of the amount of the benefit to Plaintiffs attributable to the NAR model rules, *e.g.*, how much the price of their home was increased by commission sharing. Without such evidence, Plaintiffs cannot meet their burden to show a genuine issue of material fact that they were damaged by the NAR model rules—given they cannot rule out that these sales price increases they benefited from exceeded any alleged damages. *See Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*, 152 F.3d 588, 593 (7th Cir. 1998) ("Statistical studies that fail to correct for salient factors, not attributable to the defendant's misconduct, that may have caused the harm of which the plaintiff is complaining do not provide a rational basis for a judgment.").

### C. The NAR Model Rules Benefit Buyers.

Buyer benefits are relevant here because MLSs are two-sided platforms. *See generally Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2286 (2018). A two-sided platform is one that connects two groups of customers, where each side benefits from a greater number of participants on the other side. *Id.* at 2281. In the real estate context, the presence of many buyers and sellers in the same location is beneficial to both, so the participants in the industry benefit from investing in a structure that facilitates the best matches possible. SMF ¶ 64. In fact, brokerage services in real estate are a quintessential example of such a two-sided market. *See* Jean-Charles Rochet & Jean Tirole, *Cooperation among Competitors: Some Economics of Payment Card Associations*, 33 The RAND J. of Econs. 549–70 (Feb. 2002), https://www.researchgate.net/publication/24049191_Cooperation_Among_Competitors_Some_E conomics_Of_Payment_Card_Associations; Jean-Charles Rochet & Jean Tirole, *Platform Competition in Two-Sided Markets*, 1 J. of the European Econ. Ass'n 990–1029 (June 1, 2003), https://doi.org/10.1162/154247603322493212; and Jean-Charles Rochet & Jean Tirole, *Two-sided*

*markets: a progress report*, 37 The RAND J. of Econs. 645–67 (2006), https://edisciplinas.usp.br/pluginfile.php/7585351/mod_resource/content/1/Tirole.pdf; David S. Evans, *Antitrust Economics of Two-Sided Markets*, 20 Yale J. on Regul. (2003), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=332022 (describing real estate brokerage services and related services as a classic example of a two-sided market where buyers and sellers collectively benefit from a price structure that allows maintenance of an efficient platform). The sale to the buyer, the payment by the seller, and the payment of commissions are made simultaneously, further showing a two-sided market. *Am. Express*, 138 S. Ct. at 2286 ("[T]wo-sided transaction platforms . . . facilitate a single, simultaneous transaction between participants.").

This means offers of compensation to cooperating brokers cannot be lowered or eliminated "without risking a feedback loop of declining demand" in which fewer buyers enter or succeed in the market, thereby reducing demand, which in turn reduces seller incentives to list, which then further deters buyers. *See id*. at 2285–86 (To optimize two-sided markets, "the network must find the balance of pricing that encourages the greatest number of matches between cardholders and merchants."). This means the benefits accruing to buyers are key to determining whether NAR model rules are an unreasonable restraint. *Id.* at 2286 (holding that where conduct impacts a two-sided platform, the analysis "must include both sides of the platform"). Because the purpose of the antitrust laws is to prevent harm to *competition*, rather than harm to individual competitors, for two-sided platforms with strong indirect network effects like MLSs (*i.e.*, benefits to both sides of the platform from the other side), "[p]rice increases on one side of the platform . . . do not suggest anticompetitive effects without some evidence that they have increased the overall cost of the platform's services." *Id.* at 2285–86.

24

However, Plaintiffs fail to follow the Supreme Court's instruction in *American Express*, and present only allegations regarding one side of the platform—the alleged harm to sellers of listing brokers having to make an offer of compensation to cooperating brokers. Plaintiffs do not grapple with the impact on buyers of forgoing offers of compensation, meaning Plaintiffs do not consider the impact on the market as a whole. In fact, offers of compensation not only benefit sellers, but also buyers. In the absence of such offers, prospective buyers would have to pay their brokers (*e.g.*, in the form of a flat fee, per hour, or as a proportion of the sales price). This in turn decreases participation of buyers in the market: Buyers may never enter the market if they must pay out-of-pocket for a broker. Other buyers who forgo a broker due to cost but who still try to buy homes may become intimidated by the complex nature of house buying. SMF ¶ 71. These brokerless buyers may also be less likely to find and consider purchase opportunities that a broker would have been able to help them find. *Id*. When the listing broker makes the offer of compensation to cooperating brokers, buyers get representation without having to pay for broker services out of their pocket. *Id*. ¶ 60. Thus, offers of compensation help buyers enter the market and make it more likely that buyers are assisted by brokers that can help them find listings and close transactions. *Id.* ¶¶ 58, 61–63. Accordingly, Plaintiffs cannot show that NAR's conduct caused harm.

## **CONCLUSION**

NAR respectfully requests summary judgment on Plaintiffs' claim.

Dated:  December 19, 2023

Respectfully submitted,

*/s/ Ethan Glass*
Ethan Glass (*pro hac vice*)
Dee Bansal (*pro hac vice*)
Samantha Strauss (*pro hac vice*)
COOLEY LLP
1299 Pennsylvania Avenue, NW
Suite 700
Washington, DC  20004-2400
(202) 776-2244
eglass@cooley.com
dbansal@cooley.com
sastrauss@cooley.com

Beatriz Mejia (*pro hac vice*)
COOLEY LLP
3 Embarcadero Center, 20th Floor
San Francisco, CA 94111
(415) 693-2000
mejiab@cooley.com

Elizabeth Wright (*pro hac vice*)
COOLEY LLP
500 Boylston Street
Boston, MA 02116
(617) 937-2300
ewright@cooley.com

Jack R. Bierig
ARENTFOX SCHIFF LLP
233 South Wacker Drive, Suite 7100
Chicago, IL 60606
(312) 258-5500
jack.bierig@afslaw.com

Suzanne L. Wahl
ARENTFOX SCHIFF LLP
350 S. Main Street, Suite 210
Ann Arbor, MI 48104
(734) 222-1517
suzanne.wahl@afslaw.com

**Attorneys for Defendant the NATIONAL ASSOCIATION OF REALTORS®**