**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| CHRISTOPHER MOEHRL, MICHAEL COLE, STEVE DARNELL, VALERIE NAGER, JACK RAMEY, SAWBILL STRATEGIC, INC., DANIEL UMPA, and JANE RUH, on behalf of themselves and all others similarly situated, | ) ) ) ) ) ) ) ) | Civil Action No.: 1:19-cv-01610  Judge Andrea R. Wood |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | |
| THE NATIONAL ASSOCIATION OF REALTORS, REALOGY HOLDINGS CORP., HOMESERVICES OF AMERICA, INC., BHH AFFILIATES, LLC, HSF AFFILIATES, LLC, THE LONG & FOSTER COMPANIES, INC., RE/MAX, LLC, and KELLER WILLIAMS REALTY, INC., | ) ) ) ) ) ) ) ) ) | **ORAL ARGUMENT REQUESTED** |
| Defendants. | ) ) ) | |

**THE HOMESERVICES DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

I.    Introduction ........................................................................................................... 1

II.    Statement of Facts ................................................................................................. 1

    **A.**    Overview of the HomeServices Defendants ............................................ 2

    **B.**    The HomeServices Defendants Played No Role in the Challenged NAR
    Rule. ......................................................................................................... 3

    **C.**    The HomeServices Defendants Do Not Require Affiliated Agents to
    Follow the Buyer Broker Commission Rule or to Join NAR or Any MLS. ........... 3

III.    Legal Standard ...................................................................................................... 4

IV.    Argument ............................................................................................................... 5

    **A.**    There Is No Triable Evidence of a Conspiracy. ...................................... 5

        **1.**    There is No Evidence that any HomeServices Defendant Conspired
        to Force Brokerage Affiliates to Follow and Enforce the Rule. ................. 7

        **2.**    There Is No Evidence that the HomeServices Defendants Even
        Require Brokerage Affiliates to Follow or Enforce the Rule. .................. 12

        **3.**    There is No Evidence that the HomeServices Defendants
        Participated in the Alleged Conspiracy Through Leadership Roles
        at NAR ..................................................................................................... 14

    **B.**    The HomeServices Defendants Are Not Liable For Affiliate Conduct. .............. 17

V.    Conclusion ........................................................................................................... 19

# TABLE OF AUTHORITIES

Page(s)

Cases

*AD/SAT, Div. of Skylight, Inc. v. Associated Press,*
  181 F.3d 216 (2d Cir. 1999) ................................................................................ 15

*Bartolotta v. Dunkin' Brands Grp., Inc.,*
  No. 16-cv-4137, 2016 WL 7104290 (N.D. Ill. Dec. 6, 2016) ................................. 18

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007) ........................................................................................ 17

*Gracia v. Volvo Europa Truck, N.V.,*
  112 F.3d 291 (7th Cir. 1997) ................................................................................ 4

*In re Broiler Chicken Antitrust Litig.,*
  No. 16-C-8637, 2023 U.S. Dist. LEXIS 196869 (N.D. Ill. Nov. 2, 2023) ..................... 7, 10, 11

*In re High Fructcose Corn Syrup Antitrust Litigation,*
  295 F.3d 651 (7th Cir. 2002) ................................................................................ 7

*In re Outpatient Med. Ctr. Emp. Antitrust Litig.,*
  630 F. Supp. 3d 968 (N.D. Ill. 2022) ..................................................................... 18

*In re Text Messaging Antitrust Litigation,*
  782 F.3d 867 (7th Cir. 2015) ................................................................... 7, 8, 9, 16

*Johnson v. Advoc. Health & Hosps. Corp.,*
  892 F.3d 887 (7th Cir. 2018) ................................................................................ 4

*Kendall v. Visa U.S.A., Inc.,*
  518 F.3d 1042 (9th Cir. 2008) .............................................................................. 17

*Kleen Prod. LLC v. Georgia-Pac. LLC,*
  910 F.3d 927 (7th Cir. 2018) ................................................................................ 4

*Kleen Prods. LLC v. Int'l Paper,*
  276 F. Supp. 3d 811 (N.D. Ill. 2017) ..................................................................... 15

*Marrese v. Am. Acad. of Orthopedic Surgeons,*
  No. 80 C 1405, 1991 WL 5827 (N.D. Ill. Jan. 15, 1991) ........................................... 15

*Mkt. Force Inc. v. Wauwatosa Realty Co.,*
  906 F.2d 1167 (7th Cir. 1990) ............................................................................... 4

*Monsanto Co. v. Spray-Rite Serv. Corp.,*
  465 U.S. 752 (1984) ........................................................................................... 4

*N. Am. Soccer League, LLC v. United States Soccer Fed'n, Inc.,*
  296 F. Supp. 3d 442 (E.D.N.Y. 2017) ..................................................................... 16

*SD3, LLC v. Black & Decker (U.S.) Inc.,*
  801 F.3d 412 (4th Cir. 2015) ......................................................................... 16, 17

*United States v. Bestfoods,*
  524 U.S. 51 (1998) ....................................................................................... 17, 18

*Wagner v. Magellan Health Servs., Inc.,*
  121 F. Supp. 2d 673 (N.D. Ill. 2000) ..................................................................... 11

*Wilk v. Am. Med. Ass'n,*
  895 F.2d 352 (7th Cir. 1990) ................................................................................ 15

ii

## I.      Introduction

The stakes in this case cannot be overstated. At root, Plaintiffs assert that the HomeServices

Defendants are members of an antitrust conspiracy simply because independent contractor sales

agents affiliated with their real estate companies use a multiple listing service ("MLS") and abide

by MLS rules. But if that were enough, every real estate agent and brokerage company (as well as

their parent companies or franchisors) across the country who use an MLS to sell a house is a co-

conspirator and each is liable for annihilating damages. That is not—and cannot be—the law.

Section 1 of the Sherman Act does not prohibit unilateral conduct. Yet that is all this case

is about. After years of scouring documents and taking dozens of depositions, Plaintiffs have no

evidence that any HomeServices Defendant entered into an unlawful agreement with anyone.

There is no evidence that any HomeServices Defendant made an agreement with NAR; there is no

evidence that any HomeServices Defendant made an agreement with Keller Williams; there is no

evidence that any HomeServices Defendant made an agreement with Realogy; and there is no

evidence that any HomeServices Defendant made an agreement with RE/MAX. Instead, the

evidence shows that the HomeServices Defendants set their own policies unilaterally, making

rational decisions to further their own business objectives. And there is nothing wrong with that.

The HomeServices Defendants did not participate in a conspiracy. They did not violate the

Sherman Act. They are not liable to Plaintiffs. And clear Seventh Circuit precedent mandates

summary judgment in the HomeServices Defendants' favor.

## II.      Statement of Facts

As required by Local Rule 56.1(d), the HomeServices Defendants[1] have filed a separate

---

[1] The HomeServices Defendants are HomeServices of America, Inc. ("HomeServices"), BHH Affiliates, LLC ("BHH Affiliates"), HSF Affiliates, LLC ("HSF") and The Long & Foster Companies, Inc. ("Long &

1

Statement of Material Facts, along with the supporting evidence. For the Court's convenience, we briefly summarize the facts most pertinent to this motion here.

### A. Overview of the HomeServices Defendants

Defendant HomeServices is a holding company formed in 1998. SUMF ¶ 1. Its business is to passively own various local real estate-related businesses around the country, with a particular focus on strategic acquisitions to facilitate a "one-stop-shopping" model, allowing homebuyers and sellers to obtain real estate brokerage, mortgage, title insurance, and other related services from affiliated local providers. *Id.* ¶ 2. Today, HomeServices' holdings include indirect ownership of approximately a dozen real brokerage companies that operate in the Covered MLS markets ("HomeServices Brokerage Subsidiaries"). *Id.* ¶ 5.

Plaintiffs have also sued three HomeServices affiliates: Long & Foster Companies, BHH Affiliates, and HSF. Long & Foster Companies, like HomeServices, is a holding company. *Id.* ¶¶ 3, 4. BHH Affiliates is different; it is a franchisor. BHH Affiliates enters into franchise agreements with local real estate brokerage companies allowing those companies to operate under the "Berkshire Hathaway HomeServices" brand. *Id.* ¶ 4. HSF, while also a holding company, supplies the employees that run the franchise networks that it owns, including BHH Affiliates.

None of the HomeServices Defendants are themselves actual real estate brokerages. *Id.* ¶ 6. They do not sell real estate; they do not enter into agreements with consumers; they do not charge or collect commissions from consumers; they do not make offers of cooperative compensation to other brokers; they are not members of NAR; and they do not participate in any MLS or abide by any MLS rules. *Id.*

---

Foster") (collectively, the "HomeServices Defendants").

### B. The HomeServices Defendants Played No Role in the Challenged NAR Rule.

Plaintiffs' claims derive from a model rule enacted by NAR that governs the information agents must include in listings posted on NAR-affiliated MLSs. But the HomeServices Defendants had nothing to do with that Rules. The HomeServices Defendants are not members of NAR, they are not members of any local REALTOR® association, and they are not members of any MLS. *Id*. ¶ 7. Indeed, the Buyer Broker Commission Rule challenged in this case was first enacted in 1993 – five (5) years before HomeServices was first formed and nineteen (19) years before HSF and BHH Affiliates were formed. *Id*. ¶¶ 14, 15. Any HomeServices-related involvement in NAR has been modest and wholly unrelated to the Buyer Broker Commission Rule. *Id*. ¶ 17. And there is zero evidence that any of the HomeServices Defendants entered into any type of agreement with any competitor with respect to any challenged NAR rules.

### C. The HomeServices Defendants Do Not Require Affiliated Agents to Follow the Buyer Broker Commission Rule or to Join NAR or Any MLS.

The HomeServices Defendants do not employ the individual real estate agents who work with consumers and who join NAR and/or use MLS. *Id*. ¶¶ 18, 19. Instead, the agents work for local real estate brokerage companies, which are independently owned by third parties (as with most Berkshire Hathaway HomeServices franchisees) and/or independently operated by separate, local management (in the case of HomeServices subsidiaries, some of which are also Berkshire Hathaway HomeServices franchisees). *Id*. ¶ 19. In either case, the HomeServices Defendants themselves do not control the day-to-day operations of any affiliated real estate brokerage. *Id*.

None of the HomeServices Defendants require any of their affiliated brokerages or those brokerages' sales agents to adhere to the Buyer Broker Commission Rule. *Id*. ¶¶ 20, 21. Nor do the HomeServices Defendants dictate that their affiliated brokerages or those brokerages' sales

3

agents must join NAR or any MLS. *Id*. ¶ 22. In fact, all HomeServices-affiliated brokerages are independently managed, with their own leadership and personnel who run their companies day-to-day. *Id*. ¶ 42. And the evidence shows that the local real estate brokerage companies were already using the MLS and their agents were already following the challenged rules before those companies were acquired and/or franchised by a HomeServices Defendant because, as Plaintiffs concede, it in those companies' unilateral interest to do so. *Id*. ¶ 23.

## III.    Legal Standard

Upon the filing of a motion for summary judgment, "the burden shifts to the non-moving party to demonstrate with specific evidence that a triable issue of fact remains on issues on which the non-movant bears the burden of proof at trial." *Gracia v. Volvo Europa Truck, N.V.*, 112 F.3d 291, 294 (7th Cir. 1997). In so doing, the non-movant must come forward with "specific, admissible evidence showing that there is a genuine dispute of material fact for trial." *Johnson v. Advoc. Health & Hosps. Corp.*, 892 F.3d 887, 894 (7th Cir. 2018) (internal quotation marks and citation omitted). "Inferences supported only by speculation or conjecture will not suffice [and] … [n]either will the mere scintilla of evidence." *Id.*

To survive summary judgment in a Section 1 case, plaintiffs must show that defendants had "a conscious commitment to a common scheme" and present "evidence that tends to exclude the possibility of independent action by the defendants." *Mkt. Force Inc. v. Wauwatosa Realty Co.*, 906 F.2d 1167, 1171 (7th Cir. 1990) (cleaned up) (quoting *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764, 68 (1984)). ***Evidence of conduct that is "just as consistent with independent action as with collusion" is not sufficient to withstand summary judgment.*** See *Kleen Prod. LLC v. Georgia-Pac. LLC*, 910 F.3d 927, 937 (7th Cir. 2018).

4

Plaintiffs have not come close to satisfying their burden in this case, and the Court should enter summary judgment in favor of the HomeServices Defendants.

## IV. Argument

### A. There Is No Triable Evidence of a Conspiracy.

Plaintiffs' case turns on the HomeServices Defendants' supposed conspiracy to adopt, implement, enforce and adhere to a model rule promulgated by NAR, namely, the Buyer Broker Commission Rule. *See* CAC ¶¶ 1, 3, 7, 22, 102. That Rule states that, "[i]n filing property with the [MLS], participants make blanket unilateral offers of compensation to the other [MLS] participants and shall therefore specify on each listing filed with the service the compensation being offered by the listing broker to the other MLS participants." SUMF ¶¶ 7, 8 (citing NAR Handbook on Multiple Listing Policy, Section 2-G-1). In reality, this is but a model rule that NAR puts out for MLSs affiliated with local REALTOR® associations to consider, but each Covered MLS ultimately adopts and enforces its own rules. And it is the rules of the individual MLS that a given MLS participant must follow. *See id.*

But Plaintiffs' antitrust theory (albeit flawed) is that the model Rule applies to every member of nearly every MLS in the United States, and that somehow the Defendants are responsible for enforcing this supposed system. Yet it is undisputed that joining an MLS, which is the best way to distribute home sale information, is essential for industry participants. *See* CAC ¶ 137 ("Brokers cannot compete effectively without access to a listing service."); SUMF ¶ 21. Thus, Plaintiffs have alleged a conspiracy theory that by its own (flawed) terms implicates nearly every real estate agent and brokerage nationwide, regardless of size, structure, or conduct (or lack thereof). Given the extraordinary breadth of this theory, one would expect to see substantial

evidentiary support showing direct agreement by the HomeServices Defendants in the hundreds of thousands of produced documents and scores of depositions. ***But no such evidence exists.***

As this Court noted in its class certification decision, Plaintiffs attempt to connect the HomeServices Defendants to the challenged NAR model Rule through two paths. First, Plaintiffs "claim that [the HomeServices] Defendants participate in the conspiracy by requiring their brokerages, franchisees, or affiliated agents to join a local Realtor association, participate in an MLS, or follow the Code of Ethics . . . ." Class Cert. Opinion, Dkt. 403, at 6. Second, "Plaintiffs further allege that [the HomeServices] Defendants participate in the antitrust conspiracy through their extensive involvement with the NAR." *Id.*

But the summary judgment record now shows that neither of these theories is viable. As a preliminary matter, with respect to any requirements imposed by the HomeServices Defendants on affiliated brokers and agents, ***there is no evidence*** that the HomeServices Defendants imposed any such requirements at all, much less as part of an agreement with NAR, Keller Williams, Realogy, RE/MAX, or anyone else. Thus, even if the HomeServices Defendants require their subsidiaries and franchisees to join NAR, local REALTOR® associations, or MLSs and follow the Rule (SUMF ¶ 46) – which, as discussed below, they did not – any such unilateral conduct cannot form the basis of a Section 1 conspiracy claim. For this reason alone, the HomeServices Defendants are entitled to summary judgment on the antitrust conspiracy claim.

Likewise, with respect to the second theory—that the HomeServices Defendants were involved in NAR leadership—the record evidence similarly disproves Plaintiffs' allegations. *Id.* ¶ 47. Indeed, the HomeServices Defendants are not even members of NAR, and neither they nor any of their employees played any role in adopting, implementing, enforcing, or taking any other action with respect to the Buyer Broker Commission Rule or related rules. *Id.* ¶¶ 16, 17, 18.

6

1.    **There is No Evidence that any HomeServices Defendant Conspired to Force Brokerage Affiliates to Follow and Enforce the Rule.**

Proof of an actual unlawful ***agreement*** is the key element of a Section 1 claim under the Sherman Act. It is perfectly lawful for competitors in a market to copy each other's actions. They can even monitor and copy each other's prices, raising and lowering them in lockstep. Such conduct would not violate Section 1 of the Sherman Act, as long as the competitors did not enter into an actual agreement with each other to do so. As the Seventh Circuit warned in the *In re High Fructose Corn Syrup Antitrust Litigation*, "***an agreement involving actual, verbalized communication, must be proved in order for a price-fixing conspiracy to be actionable under the Sherman Act***." 295 F.3d 651, 654 (7th Cir. 2002) (emphasis added). *See also In re Broiler Chicken Antitrust Litig.,* No. 16-C-8637, 2023 U.S. Dist. LEXIS 196869, at *108 (N.D. Ill. Nov. 2, 2023) ("As the Seventh Circuit explained in *Fructose,* non-economic evidence of express agreement is generally necessary to prove a Sherman Act violation.").

The Seventh Circuit's opinion in *In re Text Messaging Antitrust Litigation* explains in detail that merely pointing to similar conduct by defendant competitors and then asserting that there must have been collusion is not enough. In *Text Messaging*, plaintiffs sued four wireless network providers and their trade association for conspiring to fix prices for text messaging. 782 F.3d 867, 870 (7th Cir. 2015). Plaintiffs alleged that (1) the defendants had exchanged price information through their trade association; (2) the defendants subsequently implemented a uniform pricing structure and uniform price increases; (3) these price increases occurred even though the costs of providing wireless service had fallen; and (4) there were a small number of wireless providers, thus making it easy for them to conspire to control the market. *Id.* As the Seventh Circuit observed, "[t]he challenge to the plaintiffs in discovery was thus to find evidence that the defendants had

7

colluded expressly—that is, had explicitly agreed to raise prices—rather than tacitly ('follow the leader' or 'consciously parallel' pricing)." *Id.* at 872.

To meet this challenge, the *Text Messaging* plaintiffs offered a so-called "smoking gun" pair of emails in which a T-Mobile executive made two supposedly incriminating statements. *See id.* First, he wrote that "my gut says raising messaging pricing again is nothing more than price gouge on consumers . . . I know the other guys are doing it but that doesn't mean we have to follow." *Id.* Second, he wrote: "The move [the latest price increase by T-Mobile] was collusive [*sic*] and opportunistic." *Id.* (alterations in original).

The Seventh Circuit held that these email statements were ***not*** sufficient to survive summary judgment on the conspiracy claim. With respect to the first email, the court explained that the email stated only that the author disagreed with the price increase, and his statement that T-Mobile "doesn't . . . have to follow" the "other guys" suggested there was no agreement with competitors requiring T-Mobile to raise its prices. *Id.* And with respect to the second email, the court noted that the term "collusion" could have been referring to "tacit" collusion, as opposed to "express" collusion, and therefore also did not necessarily indicate an illegal conspiracy. *Id.* The court summarized: "Nothing in any of [the executive's] emails suggests that he believed there was a conspiracy among the carriers. There isn't even evidence that he had ever communicated on any subject with any employee of any of the other defendants." *Id.* at 873.

The court then continued by emphasizing that, contrary to plaintiffs' theory, the antitrust laws do not impose a duty on defendants to affirmatively compete with each other; the law only prohibits agreements ***not*** to compete:

> The problems with the plaintiffs' case go beyond the inconclusiveness of the "collusive" email on which their briefs dwell at such length. The point that

> they have particular difficulty accepting is that the Sherman Act imposes no
> duty on firms to compete vigorously, or for that matter at all, in price.

*Id.* The court also refused to infer express collusion from the fact that the defendants had often met

together at trade association meetings and thus had an opportunity to conspire: "This evidence

would be more compelling if the immediate sequel to any of these meetings had been a

simultaneous or near-simultaneous price increase by the defendants. Instead, there were substantial

lags. And as there is no evidence of what information was exchanged at these meetings, there is

no basis for an inference that they were using the meetings to plot prices increases." *Id.* at 878.

Judge Posner then concluded with a warning to practitioners on the importance of offering

evidence of an actual express agreement and the need for them to be precise in their use of the

term "collusion" in antitrust cases:

> It is of course difficult to prove illegal collusion without witnesses to an
> agreement. And there are no such witnesses in this case. We can, moreover,
> without suspecting illegal collusion, expect competing firms to keep close
> track of each other's pricing and other market behavior and often to find it in
> their self-interest to imitate that behavior rather than try to undermine it—the
> latter being a risky strategy, prone to invite retaliation. The plaintiffs have
> presented circumstantial evidence consistent with an inference of collusion,
> but that evidence is equally consistent with independent parallel behavior.
>
> We hope this opinion will help lawyers understand the risks of invoking
> "collusion" without being precise about what they mean. Tacit collusion, also
> known as conscious parallelism, does not violate section 1 of the Sherman
> Act. Collusion is illegal only when based on agreement. Agreement can be
> proved by circumstantial evidence, and the plaintiffs were permitted to
> conduct and did conduct full pretrial discovery of such evidence. Yet their
> search failed to find sufficient evidence of express collusion to make a prima
> facie case. The district court had therefore no alternative to granting summary
> judgment in favor of the defendants.

*Id.* at 879.

This Court recently applied this type of analysis to grant summary judgment to multiple

defendants in the *In re Broiler Chicken Antitrust Litigation* case. There, the plaintiffs first

submitted economic evidence (*i.e.*, statistical analysis) showing that the defendants had decreased production of broiler chickens in parallel with each other. *In re Broiler Chicken Antitrust Litig.*, 2023 U.S. Dist. LEXIS 196869,at *104-5. The *Broiler* Court found that such economic evidence of similar production decreases was particularly strong evidence of a conspiracy. *Id.* at *108-9*. **But that was not enough to survive summary judgment.** Instead, the court proceeded to the second step in the analysis: whether there was "some non-economic evidence specifically indicating express agreement . . . [such that] a reasonable jury could find by a preponderance of the evidence that Defendants agreed to reduce production thereby increasing the price of Broilers." *Id.* at *109.

Assessing the non-economic evidence of an actual agreement required the *Broiler Chicken* court to evaluate the evidence on a defendant-by-defendant basis. After a two-day evidentiary hearing, the court found that evidence of an actual, express agreement was lacking with respect to several defendants. For example, the court considered Wayne Farms, which, like the other defendants, had reduced its chicken supply. *Id.* at *145. Wayne Farms had also attended industry meetings; had knowledge that "most of the industry was reducing supply and [that] at least the 'larger' companies had communicated and were working together in that regard;" and had certain proprietary information of a competitor in its possession. *Id.* at *145-47. Yet the court found such evidence to be ***insufficient*** to raise a triable issue as to whether Wayne Farms had expressly agreed with competitors to reduce its production. As the court explained, while "[i]t is possible that a producer who knows that its competitors are conspiring would want to join that conspiracy[,] . . . it is equally possible that the producer would decide to remain on the sidelines and reap the benefits of decreased supply without risking the legal peril of joining the conspiracy." *Id.* at *146.

Similarly, the *Broiler Chicken* court granted summary judgment to defendant Fries-Claxton even though an internal text message relayed a conversation he had with an employee from a

different defendant about pricing. *Id.* at \*143-44. The court noted that the pricing conversation did not relate to the alleged conspiracy because the alleged conspiracy concerned production volume, not pricing. *Id.* Moreover, the timing of the text message did not align with the alleged conspiracy: "the jury would be required to infer that a communication from the end of 2012 is indicative of an agreement that is alleged to have been established at least a year earlier. . . . This one text message is simply an insufficient basis for a reasonable jury [to] make such a finding." *Id.* at \*144.

Here—as in *Text Messaging* and *Broiler Chicken*—Plaintiffs have **no** evidence that any supposed "requirements" imposed by the HomeServices Defendants on franchisees or subsidiaries were the product of an agreement with the other Defendants in this case. There is no evidence that any HomeServices Defendant ever discussed such matters with NAR, Keller Williams, Realogy, RE/MAX, or anyone else. Similarly, there is no evidence that the HomeServices Defendants imposed any of their requirements after some meeting with NAR or another Corporate Defendant. Indeed, there is no evidence of any kind that the HomeServices Defendants coordinated with anyone in connection with the requirements they (allegedly) impose on Berkshire Hathaway HomeServices franchisees or HomeServices subsidiaries. And without such evidence, there is no basis for a conspiracy claim under Section 1 of the Sherman Act. *See Wagner v. Magellan Health Servs., Inc.*, 121 F. Supp. 2d 673, 679 (N.D. Ill. 2000) ("Solely unilateral conduct, regardless of its anti-competitive effects, is not prohibited by Section 1.").

Plaintiffs cannot sidestep their burden to come forth with triable evidence of an agreement with a purely speculative theory that NAR somehow "invited" the HomeServices Defendants to join a conspiracy. (CAC ¶ 58.) There was not a single communication between NAR and any of the HomeServices Defendants in which such an invitation was made. SUMF ⁋ 7. And there certainly is no indication that any HomeServices Defendant "accepted" any such fictional

invitation. *See id.* ¶¶ 8. Indeed, Plaintiffs claim that the conspiracy here began in 1996, before the HomeServices Defendants even existed, and cannot point to any specific action that any HomeServices Defendant later took to "join" any supposed existing conspiracy. Proving a conspiracy requires evidence, and there is simply no evidence of what the alleged original conspiracy was, when anyone joined it, who was involved in it, or how it was formed. Nor is there any evidence that the HomeServices Defendants learned of this alleged pre-existing conspiracy or took affirmative steps to join it. The record is devoid of support even for Plaintiffs' speculative and baseless theory that HomeServices Defendant representatives periodically voted to reissue the NAR Handbook. *See* SUMF ¶¶ 16-17 (no one from HSF, BHH Affiliates, or Long & Foster Companies has been identified in a relevant NAR role and there is no evidence that anyone was asked to, or did, cast such a vote at NAR; indeed, the sole HomeServices officer who served on NAR's board disclaims any such action).

As *Text Messaging* and *Broiler Chicken* make plain, it is not enough for Plaintiffs to point to similar conduct and then ask the Court to infer express collusion. On this record, and under governing antitrust case law, the Court need not proceed any further. Section 1 of the Sherman Act prohibits conspiratorial agreements that unreasonably restrain trade. Without evidence of a conspiracy, there can be no Section 1 liability. The HomeServices Defendants are entitled to an award of summary judgment on Plaintiffs' Sherman Act claim.

### 2. There Is No Evidence that the HomeServices Defendants Even Require Brokerage Affiliates to Follow or Enforce the Rule.

While the foregoing is dispositive of Plaintiffs' Section 1 claim, the record also dispels any notion that the HomeServices Defendants require their affiliates to follow the Buyer Broker Commission Rule or otherwise enforce it. There is zero evidence that any HomeServices

Defendant directed any subsidiary or franchisee, or their respective agents, to follow the Rule or to join NAR, a local REALTOR® association, or any MLS. SUMF ¶¶ 20, 46. The consistent and unrefuted testimony is to the contrary. *Id*. ¶¶ 21, 46. Moreover, NAR's Handbook does not apply to brokers at all; rather, it is a manual for REALTOR® associations and their affiliated MLSs to use in the administration of MLS operations. *Id*. ¶ 8. Regardless, the record shows that HomeServices-affiliated brokerages make such decisions on their own. *Id*. ¶¶ 22, 46.[2]

Attempting to manufacture a fact issue on this point, Plaintiffs point to two provisions in the BHH Affiliates franchise agreement. But neither supports Plaintiffs' conspiracy theory.

First, BHH Affiliates requires its franchisees to provide it with access to their MLS data feeds. *Id*. ⸿ 31. But the BHH Affiliates' listing feed requirement has nothing to do with the Rule or requiring franchisees to join an MLS. To the contrary, on its face the provision merely requires franchisees to provide BHH Affiliates with access to data from whatever MLS the franchisee *may already be using*; it is not a requirement to join an MLS. *See id*. ⸿ 31. And the record shows that the franchisees independently decide what MLSs to join—and did so well before any affiliation with a HomeServices Defendant. *Id*. ⸿ 23. Moreover, the provision is rationally designed to allow BHH Affiliates' to use the data on its successful national consumer-facing website and generate business leads for its franchisees. *Id*. ⸿ 31. Plaintiffs' listing feed theory is a red herring.

---

[2] The mere fact that the practice of cooperative compensation is widespread does not support an inference that the HomeServices Defendants required their subsidiaries and franchisees to follow the Rule. Brokers have offered compensation to other brokers for helping them sell a home since the late 1800s, a custom and practice that has existed independent of and well before the Buyer Broker Commission Rule. SUMF ¶ 18. Multiple executives from HomeServices-affiliated brokerages have offered their credible belief that cooperative compensation is common not because of any NAR MLS rule but instead because it is helpful to the transaction, including to sellers. *Id*. ¶ 21. Indeed, many such nonparty witnesses have testified that they were not even aware that cooperative compensation was addressed by a NAR MLS rule. *Id*. ¶ 46.

Second, BHH Affiliates requires its Franchisees to comply with the NAR Code of Ethics. *Id.* ¶ 32. But that is another red herring. The Code of Ethics has nothing to do with colluding to enforce the Rule, either. NAR's Code of Ethics calls for Realtors® first and foremost to have loyalty to their clients, placing the interests of their clients above their own. *See id.* ¶ 33 (Article 1 provides that this "obligation to the client is primary"). Encouraging franchisees to be upstanding and ethical was the reason BHH Affiliates included that requirement in its franchise agreement, doing so as part of a section requiring franchisees to comply with law generally. *Id.* ¶ 32. There is no evidence that this requirement caused any real estate agent to take action regarding cooperative compensation or caused a Plaintiff harm. And the Rule is contained in NAR's separate MLS Handbook, whereas the Code of Ethics expressly states that Realtors® need ***not*** share commission:

> REALTORS® shall cooperate with brokers ***except when cooperation is not in the client's best interest.*** <u>***The obligation to cooperate does not include the obligation to share commissions, fees, or to otherwise compensate another broker.***</u>

*Id.* ¶ 33, at Article 3 (emphasis added).[3]

In summary, there is no triable evidence that the HomeServices Defendants "imposed" the Buyer Broker Commission Rule on any of their subsidiaries or franchisees at all—much less as part of a claimed unlawful agreement with an unidentified competitor.

### 3. There is No Evidence that the HomeServices Defendants Participated in the Alleged Conspiracy Through Leadership Roles at NAR

Plaintiffs also allege that the HomeServices Defendants and their officers "implement the conspiracy … by serving on the boards and committees that enforce compliance with NAR's rule."

---

[3] To the extent Plaintiffs point to certain training materials that BHH Affiliates makes available to franchisees, it is important to note that such training materials are optional, are infrequently used by franchisees and their sales agents, have nothing to do with the Buyer Broker Commission Rule and no evidence exists to indicate that BHH Affiliates coordinated with any other Defendant. *See* SUMF ¶¶ 34-35.

CAC ¶¶ 7, 103–105. Importantly, however, the law is clear that "[m]ere membership in a trade association, attendance at trade association meetings, and participation in trade association activities are not, in and of themselves, condemned or even discouraged by the antitrust laws." *Kleen Prods. LLC v. Int'l Paper*, 276 F. Supp. 3d 811, 834 (N.D. Ill. 2017), *aff'd sub nom. Kleen Prods. LLC v. Georgia-Pac. LLC*, 910 F.3d 927 (7th Cir. 2018) (quotation and citation omitted).

Instead, to hold the HomeServices Defendants liable based on their participation in the leadership of NAR or local REALTOR® associations, Plaintiffs would have to "present evidence tending to show that association members, ***in their individual capacities***, consciously committed themselves to a common scheme designed to achieve an unlawful objective." *AD/SAT, Div. of Skylight, Inc. v. Associated Press*, 181 F.3d 216, 234 (2d Cir. 1999) (emphasis added); *see also Marrese v. Am. Acad. of Orthopedic Surgeons*, No. 80 C 1405, 1991 WL 5827, at *6 (N.D. Ill. Jan. 15, 1991), *aff'd*, 977 F.2d 585 (7th Cir. 1992) ("[T]o hold individual members of an association liable for antitrust violations, there must be some evidence of, and participation in, an illegal scheme.") (internal quotation marks and citation omitted); *Wilk v. Am. Med. Ass'n*, 895 F.2d 352, 374 (7th Cir. 1990) ("[A] trade association is not, just because it involves collective action by competitors, a walking conspiracy.") (internal quotation marks and citation omitted).

On summary judgment, Plaintiffs cannot meet this standard. First, no HomeServices Defendant employees participated in amending the Rule in 1993—indeed, the HomeServices Defendants did not even exist at that time. *See id.* ¶¶ 16, 17. Second, not one of the HomeServices Defendants is a corporate member of NAR or any local REALTOR® association. SUMF ¶ 7. Third, there has been very little HomeServices-related involvement in NAR at all, much less in NAR "leadership" or the Rule. *See id.* ¶ 17. The record shows not one person who has *ever* represented HSF, BHH Affiliates, or Long & Foster Companies at NAR. *See id.* And for most of

15

HomeServices's history, only a single HomeServices representative was on NAR's 900-plus member board, and that person rarely attended board meetings and testified that he did not address the Rule in any way. *Id.* As far as the few HomeServices executives who have participated in NAR's RES group, there is no evidence that the group (a mere advisory group for non-Realtor® persons who have no vote at NAR) ever discussed or addressed a single topic relevant to Plaintiffs' conspiracy theory. *Id. See Text Messaging*, 782 F. 3d at 878 ("[A]s there is no evidence of what information was exchanged at these meetings, there is no basis for an inference that [the defendants] were using the meetings to plot price increases.").

There is simply no triable evidence that any HomeServices Defendant executive who was involved in NAR committed to a scheme with competitors (*i.e.*, fellow board or committee members) to adopt, implement, or enforce the Rule. While Plaintiffs resort to claiming that NAR's board periodically voted to republish the NAR MLS Handbook generally (CAC ¶¶ 103, 107), there is no showing that the Board—as opposed to NAR staff—even ministerially republished the Handbook. Nor is there any indication, to the extent NAR's Board was consulted at all, that any HomeServices Defendant executive participated in any such issue. *See* SUMF ¶¶ 16, 17.

And even if, *arguendo* and contrary to the record, some HomeServices executive on NAR's Board voted to reissue the Rule, that in and of itself would not be sufficient to establish a conscious commitment to a conspiracy by HomeServices. *See, e.g., N. Am. Soccer League, LLC v. United States Soccer Fed'n, Inc.*, 296 F. Supp. 3d 442, 461 (E.D.N.Y. 2017), *aff'd*, 883 F.3d 32 (2d Cir. 2018) ("At the very least, Plaintiff must provide evidence that there was an *agreement to agree* to vote a particular way, compromising each individual Board member's independence.") (emphasis in the original); *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 437 (4th Cir. 2015), *as*

16

*amended on reh'g in part* (Oct. 29, 2015) (holding that "consistent votes," absent additional evidence, are best viewed as "parallel conduct ... equally consistent with legal behavior").

At bottom, Plaintiffs' theory rests on evidence that certain HomeServices Defendant employees once served on NAR boards or committees, nothing more. *Id.* ¶ 104, 106. That is not enough to prove the HomeServices Defendants' conscious commitment to violate federal antitrust law. *See Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1048 (9th Cir. 2008) ("Even participation on the association's board of directors is not enough by itself" to create liability) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)).

### B.     The HomeServices Defendants Are Not Liable For Affiliate Conduct.

Tacitly recognizing the lack of evidence that HomeServices Defendants had anything to do with the Rule, Plaintiffs repeatedly cite to subsidiary or franchisee independent involvement with NAR and local MLSs, as if that conduct could be attributed to the HomeServices Defendants. *See, e.g.*, CAC ¶ 104. Likewise, in discovery, Plaintiffs pursued long lines of questioning of subsidiary company employees on their internal policies, wrongly positing that such policies are attributable to the HomeServices Defendants.  These theories are improper for two reasons.

First, there is no evidence that anyone associated with any HomeServices-affiliated franchisee or subsidiary had anything to do with the Buyer Broker Commission Rule or entered into any unlawful agreement with NAR or any Corporate Defendant.

Second, even if such evidence existed, attempting to attribute such conduct to the HomeServices Defendants would run afoul of bedrock corporate separateness principles. As the Supreme Court has held, "[i]t is a general principle of corporate law deeply ingrained in our economic and legal systems that a parent corporation . . . is not liable for the acts of its subsidiaries." *United States v. Bestfoods*, 524 U.S. 51, 61 (1998) (internal quotation marks

omitted). Courts, including this one, have applied *Bestfoods* in the antitrust context. In *In re Outpatient Med. Ctr. Emp. Antitrust Litig.*, this Court held that "[n]ormally, a parent company cannot be held liable for the acts of its subsidiaries" and dismissed a complaint against a parent not "directly involved in the alleged antirust conspiracy." 630 F. Supp. 3d 968, 991-92 (N.D. Ill. 2022) (Wood, J.) (citing *Bestfoods*, 524 U.S. at 61). The Court noted that to find a parent's direct involvement in an antitrust conspiracy, plaintiffs must show that the parent "directed, controlled, or encouraged its subsidiary's participation in the scheme." *Id.* at 991.

Plaintiffs here cannot make this showing. The HomeServices Defendants do not dictate policies that individual HomeServices brokerage subsidiaries adopt or the subjects addressed by those policies. SUMF ¶¶ 39, 40, 41. More importantly, the HomeServices Defendants were not involved in the subsidiaries' claimed anticompetitive conduct and did not impose the Buyer Broker Commission Rule on the subsidiaries or otherwise dictate how they should handle cooperative offers of compensation. *See* Section IV.A.2, *supra*; SUMF ¶¶ 19-23.[4]

Similarly, the HomeServices Defendants are not liable for the conduct of Berkshire Hathaway HomeServices franchisees. A franchisor can only "be held vicariously liable for the torts or other wrongdoing of a franchisee when the franchisor controls or has a right to control the specific policy or practice resulting in harm to the plaintiff." *Bartolotta v. Dunkin' Brands Grp., Inc.*, No. 16-cv-4137, 2016 WL 7104290, at *2 (N.D. Ill. Dec. 6, 2016). The agreements between BHH Affiliates and its franchisees specifically disclaim such control by the BHH Affiliates, providing that the "Franchisor *shall have no authority to exercise control over . . . the day-to-day activities* of such persons, except to the extent necessary to protect the Service Marks." SUMF ¶

---

[4] It also is not unlawful for a company to develop its own policy on how it wishes to price its services.

27; *see also id*. ¶ 28. Consistent with the contract, the HomeServices Defendants do not control franchisee daily operations. *Id*. ¶¶ 27, 37, 42. Nor is there any evidence to support Plaintiffs' allegation that the HomeServices Defendants required franchisees to follow the Rule. The consistent and unrefuted testimony in this case is that the HomeServices Defendants have ***never*** issued any directive to franchisees regarding the Rule. *See id.* ¶¶ 19-22.

To the extent Plaintiffs seek to hold the HomeServices Defendants liable for franchisee individual commission policies, the HomeServices Defendants have nothing to do with such policies or the amount of commissions that agents may negotiate and agree to. *See id.* ¶¶48-50.

## V. Conclusion

In sum, Plaintiffs claim that the conspiracy began in the mid-1990s, before any of the HomeServices Defendants existed. Despite extensive discovery over the course of many years, they cannot point to any action taken by any HomeServices Defendant to join the supposed conspiracy. They cannot identify a single relevant communication with NAR or a competitor. Their theories about HomeServices Defendant enforcement of the challenged rules on subsidiaries and franchisees is utterly refuted by the record, as is their assertion about HomeServices "leadership" at NAR. Plaintiffs cannot proceed to a trial by relying on unilateral, self-interested conduct by the HomeServices Defendants or activities taken by independently managed, local nonparty entities and their independent contractor sales agents. Summary judgment should be awarded to the HomeServices Defendants.

Dated: December 19, 2023   Respectfully submitted,

          *Counsel for HomeServices of America, Inc., BHH Affiliates, LLC, HSF Affiliates, LLC, The Long & Foster Companies, Inc.*

          */s/ Robert D. MacGill*
          Jay N. Varon
          jvaron@foley.com
          Jennifer M. Keas
          jkeas@foley.com
          **FOLEY & LARDNER LLP**
          3000 K Street NW
          Washington, DC 20007
          (202) 672-5436

          James D. Dasso
          jdasso@foley.com
          FOLEY & LARDNER LLP
          321 N. Clark St., Suite 2800
          Chicago, IL 60654
          (312) 832-4588

          Robert D. MacGill
          **Robert D. MacGill**
          robert.macgill@macgilllaw.com
          Scott E. Murray
          scott.murray@macgilllaw.com
          Matthew T. Ciulla
          matthew.ciulla@macgilllaw.com
          Patrick J. Sanders
          Patrick.sanders@macgilllaw.com
          MACGILL PC
          156 E. Market St. Suite 1200
          Indianapolis, IN 46204
          (317) 961-5085

4857-7548-1201.21

**CERTIFICATE OF SERVICE**

I hereby certify that on this 19th day of December 2023, I electronically filed the foregoing **HomeServices Defendants' Suggestions in Support of their Motion for Summary Judgment** with the Clerk of the Court using the CM/ECF system, which will send a notice of electronic filing to counsel of record for this case.

/s/ *Robert D. MacGill*
Robert D. MacGill