# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| CHRISTOPHER MOEHRL, MICHAEL COLE, STEVEN DARNELL, JACK RAMEY, DANIEL UMPA, and JANE RUH, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>THE NATIONAL ASSOCIATION OF REALTORS, REALOGY HOLDINGS CORP., HOMESERVICES OF AMERICA INC., BHH AFFILIATED, LLC, HSF AFFILIATED, LLC, THE ONG & FOSTER COMPANIES INC., RE/MAX LLC, AND KELLER WILLIAMS REALTY, INC.,<br><br>Defendants. | Case No.: 1:19-cv-01610<br><br>Judge Andrea R. Wood |

**DEFENDANT THE NATIONAL ASSOCIATION OF REALTORS'®
LOCAL RULE 56.1(a)(2) STATEMENT OF MATERIAL FACTS IN SUPPORT OF
<u>MOTION FOR SUMMARY JUDGMENT</u>**

**ORAL ARGUMENT REQUESTED**

Pursuant to Local Rule 56.1(a)(2), Defendant the National Association of REALTORS® ("NAR") submits the following material facts in support of its Motion for Summary Judgment:

## NAR AND MULTIPLE LISTING SERVICES

1. NAR is a non-profit trade association for real estate brokers. Ex. 35, ECF No. 325-36, Gansho Decl. ¶ 2; Ex. 9, NAR Webpage: Who We Are, https://www.nar.realtor/about-nar.

2. NAR does not list homes for sale, broker home sales, nor charge or receive any commissions. Ex. 8, NAR Webpage: Home, https://www.nar.realtor/; Ex. 1, 2021 MLS Handbook, NARMOEHRL0000031195 at -230.

3. NAR's mission is to empower REALTORS® as they preserve, protect, and advance the right to real property for all. Ex. 35, ECF No. 325-36, Gansho Decl. ¶ 3; Ex. 9, NAR Webpage: Who We Are, https://www.nar.realtor/about-nar.

4. NAR members include residential and commercial brokers, salespeople, property managers, appraisers, counselors, and others engaged in the real estate industry. *See* Ex. 9, NAR Webpage: Who We Are, https://www.nar.realtor/about-nar.

5. Most NAR members also belong to one or more of approximately 1,200 local associations/boards and 54 state and territory associations of REALTORS®. Ex. 35, ECF No. 325-36 Gansho Decl. ¶ 2; Ex. 9, NAR Webpage: Who We Are, https://www.nar.realtor/about-nar.

6. Some of those local associations of REALTORS® own multiple listing services ("MLSs"), but not all MLSs are owned by REALTOR® associations. *See* Ex. 20, Stiroh Merits Report ¶ 129; Ex. 6, Gansho Dep. Tr. 54:9–11.

7. MLSs are companies that allow real estate professionals to learn about and share local property listings in support of the interests of clients and consumers. Ex. 35, ECF No. 325-36, Gansho Decl. ¶ 10.

8. MLSs are joint ventures of real estate professionals that are intended to provide their members with accurate and up-to-date information on properties that are for sale, to encourage the sale and purchase of such properties, and thereby to make the relevant transactions efficient for the benefit of both buyers and sellers. Ex. 35, ECF No. 325-36, Gansho Decl. ¶ 11.

9. All of the MLSs at issue in this case are owned by local REALTOR® associations, and the other Defendants do not own or operate any of these MLSs. Ex. 36, ECF 324, Plaintiffs' Corrected Class Certification Mem. at 20 n.9.

## THE NAR MODEL RULES

10. There are hundreds of MLSs across the country that have adopted rules based on the model rules promulgated by NAR to enable a smooth exchange of information. Ex. 10, NAR Webpage: MLS & Online Listings, https://www.nar.realtor/mls-online-listings; Ex. 1, 2021 MLS Handbook, NARMOEHRL0000031195, at -198.

11. Those rules are based on the model rules found in NAR's Handbook on Multiple Listing Policy, which is provided as a guide for MLSs that are wholly owned by local REALTOR® associations to permit optimum service and efficiency. Ex. 35, ECF No. 325-36, Gansho Decl. ¶¶ 5–6; Ex. 1, 2021 MLS Handbook, NARMOEHRL0000031195, at -198, 217.

12. MLS rules are adopted and enforced by the MLSs themselves; NAR does not enforce any MLS rules at all. Ex. 1, 2021 MLS Handbook, NARMOEHRL0000031195, at -198, 329; Ex. 6, Gansho Dep. Tr. at 206:8–14.

13. MLSs are not required to follow the NAR model rules. However, if Association-owned MLSs want to receive NAR's errors and omissions insurance coverage, they need to comply with NAR's policies and model rules. *See* Ex. 1, 2021 MLS Handbook, NARMOEHRL0000031195, at -198; Ex. 6, Gansho Dep. Tr. 51:16–52:10.

14. Many MLSs do not follow the NAR model rules, including the MLS in Chicago (Midwest Real Estate Data LLC), and the MLSs in Seattle, Pittsburgh, New York, and Boston. Ex. 20, Stiroh Merits Report ¶ 38.

15. However, NAR provides insurance for Association-owned MLSs that adopt its mandatory model rules and comply with its mandatory policies. Ex. 1, 2021 MLS Handbook, NARMOEHRL0000031195 at -357; Ex. 6, Gansho Dep. Tr. 51:16–52:10.

## THE NAR CODE OF ETHICS

16. NAR also promulgates a Code of Ethics that was adopted in 1913, one of the first codifications of ethical duties adopted by any business group. Ex. 35, ECF No. 325-36, Gansho Decl. ¶¶ 7–8.

17. Article I of NAR's Code of Ethics provides that the "obligation to the client is primary" and "[w]hen representing a buyer, seller, landlord, tenant, or other client as an agent, REALTORS® pledge themselves to protect and promote the interests of their client. This obligation to the client is primary, but it does not relieve REALTORS® of their obligation to treat all parties honestly." Ex. 2, 2021 Code of Ethics, NARMOEHRL0000030614 at -614.

18. NAR explains: "A duty of loyalty is one of the most fundamental fiduciary duties owed by an agent to his principal. This duty obligates a real estate broker to act at all times solely in the best interests of his principal to the exclusion of all other interests, including the broker's own self-interest." Ex. 11, NAR Handout: Fiduciary Duties, https://www.nar.realtor/sites/default/files/handouts-and-brochures/2014/nar-fiduciary-duty-032213.pdf.

19. Article 3 of NAR's Code of Ethics provides that "REALTORS® shall cooperate with other brokers except when cooperation is not in the client's best interest. The obligation to

3

cooperate does not include the obligation to share commissions, fees, or to otherwise compensate another broker." Ex. 2, 2021 Code of Ethics, NARMOEHRL0000030614 at -616.

20. NAR also requires all members to advise their clients about broker commission amounts and who is paying whom. Ex. 2, 2021 Code of Ethics, NARMOEHRL0000030614 at -614.

21. On the seller side, NAR's Code of Ethics mandates that, "[w]hen entering into listing contracts, REALTORS® must advise sellers/landlords of . . . the REALTOR®'s company policies regarding cooperation and the amount(s) of any compensation that will be offered to subagents, buyer/tenant agents, and/or brokers acting in legally recognized non-agency capacities." Ex. 2, 2021 Code of Ethics, NARMOEHRL0000030614 at -615.

22. Similarly, on the buyer's side, NAR's Code of Ethics mandates, "[w]hen entering into buyer/tenant agreements, REALTORS® must advise potential clients of . . . the REALTOR®'s company policies regarding cooperation . . . the amount of compensation to be paid by the client . . . the potential for additional or offsetting compensation from other brokers, from the seller or landlord, or from other parties." Ex. 2, 2021 Code of Ethics, NARMOEHRL0000030614 at -615.

## MANY HOMES ARE SOLD OFF MLSs

23. If a seller does not like any of the mandatory rules adopted by the local MLS, the seller can market her property off the multiple listing service, where the MLS's rules do not apply. *See* Ex. 6, Gansho Dep. Tr. 54:3–11.

24. Marketing off the MLS is common: according to NAR's research, 11% of sellers do not use a broker at all, and of those who used a broker, only 91% said they used an MLS. Ex. 12, NAR 2021 Home Buyers & Sellers Generational Trends Report at 118, 132,

https://www.nar.realtor/sites/default/files/documents/2021-home-buyers-and-sellers-generational-trends-03-16-2021.pdf.

25. In a study independent of NAR, discount real estate broker Redfin found that from 2013 to 2021, between 19% and 24% of sales were off MLSs. Ex. 16, Lily Katz & Ben Walzer, *2 in 5 Real Estate Agents Say Pocket Listings Are Becoming More Common*, Redfin (December 8, 2021), https://www.redfin.com/news/real-estate-pocket-listings-q3-2021/.

26. Another study by Bright MLS identified that 26% of transactions take place off MLSs. Ex. 17, *On/Off MLS Study*, Bright MLS at 10, https://assets.ctfassets.net/1g8q1frp41ix/69PEVCSSUVfYRCqrSpKKEd/35da1493a4976e721947ccbbbe4c44d8/Bright_MLS_On-Off_MLS_Study.pdf. (reporting on a study by the multiple listing service for the Mid-Atlantic that "[a]pproximately 115,760 (26%) transactions from 2019 through 2020 were identified as being sold off-MLS . . . .").

## **THE HISTORY OF OFFERS OF COMPENSATION**

27. Both the practice of multiple listing and the practice of MLS participants making offers of compensation to brokers who find a purchaser for a listed home date back more than a century, long before NAR or its predecessors adopted any model rules requiring such an offer of compensation. Ex. 35, ECF No. 325-36, Gansho Decl. ¶ 12.

28. In the 1960s, even though the NAR Handbook did not have a model rule regarding offers of compensation, brokers still were regularly sharing commissions. Ex. 5, NAR's Responses and Objections to Plaintiffs' Second Set of Interrogatories at 7 (citing a 1966 survey that showed that listing brokers were most often sharing commissions 50/50 or 60/40).

29. In 1972, NAR first created a model requirement that the listing broker make an offer to cooperating brokers by adding the following provision to the Handbook on Multiple

5

Listing Policy: "The listing broker shall specify, on each listing submitted to the Multiple Listing Service, the split of commission which is applicable to such listing." Ex. 5, NAR's Responses and Objections to Plaintiffs' Second Set of Interrogatories at 9.

30. NAR modified this model rule in 1993 to give consumers the option to have buyer brokers, in response to market demand for buyer brokers and calls from consumer protection advocates for buyers to have their own representation. *See* Ex. 1, 2021 MLS Handbook, NARMOEHRL0000031195 at -246; Ex. 4, NAR's Responses and Objection to Plaintiffs' First Set of Interrogatories at 17–19 (Exhibit A); Ex. 37, Millett Dep. Tr. at 277:12–25. Prior to the modification, buyers typically did not have their own representation. Ex. 37, Millett Dep. Tr. 277:12–25.

31. In 1992, NAR commissioned a Presidential Advisory Group ("PAG") which conducted a series of hearings on buyer representation and obtained testimony from various industry participants over the course of a year. Ex. 37, Millett Dep. Tr. 257:5–258:22; Ex. 38, PAG Report, NARSITZER0000005797 at 802–03.

32. The PAG ultimately recommended modifying the language of Policy Statement 7.23 to allow listing brokers to make offers of compensation to buyer representatives. *See* Ex. 38, PAG Report, NARSITZER0000005797 at -817. The PAG concluded its report by stating its recommendations were founded on the principles of informed consent and freedom of choice so that buyers could have their own representation. *Id*. ("The recommendations in this report are founded on the principles of informed consent and freedom of choice. Buyers and sellers should be able to select from a range of options that relationship that best meets their needs.").

33. In 1992, NAR's Board of Directors ultimately voted to accept the PAG's recommendations and modify the model rule to be effective on January 1, 1993. Ex. 39, Board of Directors Meeting Minutes dated April 28, 1992, NARSITZER0000006700 at -700–01.

34. While NAR has modified the language of the model compensation requirement over time to comport with how real estate is bought and sold in the United States, the fundamental model requirement has not changed in the last 50 years: the listing broker must make an offer of compensation expressed as a percentage of the gross selling price or as a definite dollar amount. *See* Ex. 1, 2021 MLS Handbook, NARMOEHRL0000031195 at -246–47.

### **DISCLOSURE OF COMPENSATION OFFERS UNDER THE NAR MODEL RULES**

35. The offer of compensation required under the NAR model rules may be any amount, and recently some MLSs have even allowed an offer of zero. *See* Ex. 19, Brooklee Han, *NAR to allow listing brokers to offer $0 commission*, Housingwire (Oct. 6, 2023), https://www.housingwire.com/articles/nar-to-allow-listing-brokers-to-offer-0-commission/; *see also* Ex. 18, *Can Listing Agents Offer $0 for Cooperative Compensation?*, Bright MLS (Aug. 18, 2023), https://support.brightmls.com/s/article/Can-Listing-Agents-Offer-0-for-Cooperative-Compensation.

36. But for the entire 50 years that the NAR model rule requiring disclosure of a compensation offer in listings has existed, a listing broker could comply with the requirement by offering one penny or one dollar to cooperating brokers. Ex. 6, Gansho Dep. Tr. 67:2–4; Ex. 3, NARMOEHRL0000002562; *see also* ECF 325-36, Gansho Decl. ¶ 13.

37. NAR has no rules that fix, control, recommend, or suggest the commissions or fees charged for real estate brokerage services, or the cooperative compensation offered by listing brokers to potential cooperating brokers, and NAR's MLS Antitrust Compliance Policy expressly

7

forbids Boards and associations of REALTORS® and their MLSs from making such recommendation or rule. Ex. 35, ECF No. 325-36, Gansho Decl. ¶ 14.

38.     NAR rules and policies prohibit members, MLSs, and anyone affiliated with NAR from "[f]ix[ing], control[ling], recommend[ing], or suggest[ing] the cooperative compensation offered by listing brokers to potential cooperating brokers" and set other antitrust policies. Ex. 1, 2021 MLS Handbook, NARMOEHRL0000031195 at -216; *see also* Ex. 13, *Antitrust Compliance Guide for REALTORS®*, NAR (2014), https://www.mainerealtors.com/wp-ontent/uploads/2019/02/AntitrustComplianceGuideforREALTORS2015.pdf.

39.     NAR also requires all MLSs that follow its model rules to post a notice to association members that requires commissions and offers of compensation to be determined in a manner consistent with the antitrust laws. Ex. 1, 2021 MLS Handbook, NARMOEHRL0000031195 at -230.

| Section 18 Compilation of Current Listing Information (Policy Statement 7.39) | Any compilation of current listing information shall display the following notice in a conspicuous manner: |
|---|---|
| | **Notice to Association Members** |
| | Under the long-established policy of this association, the (state) association of REALTORS®, and the NATIONAL ASSOCIATION OF REALTORS®: |
| | 1. The broker's compensation for services rendered in respect to any listing is solely a matter of negotiation between the broker and his or her client, and is not fixed, controlled, recommended, or maintained by any persons not a party to the listing agreement. |
| | 2. The compensation paid by a listing broker to a cooperating broker in respect to any listing is established by the listing broker and is not fixed, controlled, recommended, or maintained by any persons other than the listing broker. (Amended 4/92) |
| | In addition, it is recommended that all associations publish this notice to their general membership at least annually. Every association operating a multiple listing service is required to certify to the National Association that the notice to association members concerning the negotiability of brokerage commissions, subagency compensation, and compensation to buyer's agents has been reproduced in their compilation of current listing information. Further, associations that do not operate an MLS shall publish the notice to association members in their newsletter or other vehicle for membership information dissemination and shall so certify to the National Association. (Amended 11/88) **M** |

## THE NAR MODEL RULES ON COMPENSATION OFFERS APPLY ONLY IN SOME CITIES

40. The NAR model rules have not been adopted by MLSs everywhere in the United States. Ex. 20, Stiroh Merits Report ¶ 129.

41. In cities in the United States where the NAR model rules have not been adopted and do not apply, listing brokers still make offers of compensation of the same magnitude. Ex. 20, Stiroh Merits Report ¶¶ 130, 136.

42. In fact, there is no evidence that commission rates or splits are higher or different where the NAR model rules have been adopted, as compared to where they have not. Ex. 20, Stiroh Merits Report ¶ 154 n.290.

43. For example, even two and a half years after the cooperating commission rule was removed in one MLS, 99 percent of transactions included commission offers to buyer agents. Ex. 20, Stiroh Merits Report ¶ 156.

44. In approximately 95 percent of the listings in that MLS, the offer of compensation is greater than two percent. Ex. 20, Stiroh Merits Report ¶ 133.

## COMPENSATION OFFERS ARE ALWAYS NEGOTIABLE

45. Moreover, since at least 1994, NAR has expressly told its members that offers of compensation are negotiable at all times prior to closing, expressly providing that "Standard of Practice 3-2 [limiting unilateral changes to offers of compensation] does not preclude the listing broker and cooperating broker from entering into an agreement to change cooperative compensation." Ex. 2, 2021 Code of Ethics, NARMOEHRL0000030614 at -616.

46. Policy Statement 7.23 reads: "In filing property with the multiple listing service, participants make blanket unilateral offers of compensation to the other MLS participants and shall therefore specify on each listing filed with the service the compensation being offered by the listing

broker to the other MLS participants. This is necessary because cooperating participants have the right to know what their compensation will be prior to commencing their efforts to sell. (Revised 11/04)." Ex. 1, 2021 MLS Handbook, NARMOEHRL0000031195 at -246.

47. NAR expressly states it "never prohibits negotiations between the listing broker and a cooperating broker at any time during the transaction." Ex. 15, NAR Brochure, *Code Comprehension: Article 16 Commissions are Negotiable*, https://cdn.nar.realtor//sites/default/files/documents/Code-of-Comprehension-Article-16-2021.pdf?_gl=1*1l07edf*_gcl_au*NTUzNjAxMjI2LjE3MDE3MzUwNDQ.

48. In 2019, NAR issued guidance stating: "Standard of Practice 3-3 expressly authorizes the listing broker and cooperating broker to come to an agreement to change cooperative compensation, and that can happen before a property is shown, after showing, or even after an offer is accepted." Ex. 14, NAR Webpage, *Code of Ethics, Code Comprehension: Article 16 — Commissions Are Negotiable*, https://www.nar.realtor/about-nar/governing-documents/code-of-ethics/code-comprehension-article-16-commissions-are-negotiable.

49. Thus, NAR policies and model rules require that listing agreements, and any provisions specifying the commission and amount the listing broker will pay the cooperating brokers, are negotiable and can be modified. Ex. 1, 2021 MLS Handbook, NARMOEHRL0000031195 at -230; Ex. 14, NAR Webpage, *Code of Ethics, Code Comprehension: Article 16 — Commissions Are Negotiable*, https://www.nar.realtor/about-nar/governing-documents/code-of-ethics/code-comprehension-article-16-commissions-are-negotiable; Ex. 15, NAR Brochure, *Code Comprehension: Article 16 Commissions are Negotiable*, https://cdn.nar.realtor//sites/default/files/documents/Code-of-Comprehension-Article-16-2021.pdf?_gl=1*1l07edf*_gcl_au*NTUzNjAxMjI2LjE3MDE3MzUwNDQ.

50. In practice, brokers regularly negotiate the listing commission. Ex. 20, Stiroh Merits Report ¶ 162.

51. The result is that within the Covered MLSs as Plaintiffs point out, commissions vary. Ex. 20, Stiroh Merits Report ¶ 74.

52. While in some MLSs the most commonly offered buyer broker commission rate is three percent, there are a number of MLSs where this is not the case. Ex. 20, Stiroh Merits Report ¶ 74. For example, the most commonly offered buyer broker commission rate in the Metro and Triangle MLSs is 20 percent lower, at 2.40 percent. Ex. 20, Stiroh Merits Report ¶ 74.

53. Further, even among the Covered MLSs where the most frequently offered buyer broker commission rate was three percent, there was substantial variation in the frequency with which this rate occurred, and this was despite identical MLS rules. Ex. 20, Stiroh Merits Report ¶ 74.

## **LISTING BROKERS PAY COMPENSATION TO COOPERATING BROKERS**

54. Because offers of compensation to cooperating brokers are made by the listing broker, sellers do not directly pay offers of compensation: "In filing property with the multiple listing service, participants [brokers who participate in multiple listing services] make blanket unilateral offers of compensation to the other MLS participants and shall therefore specify on each listing filed with the service the compensation being offered by the listing broker to the other MLS participants." Ex. 1, 2021 MLS Handbook, NARMOEHRL0000031195 at -212–13, -239, -246–47, -276. *See also* Ex. 6, Gansho Dep. Tr. 55:24–56:9.

55. That sellers do not pay cooperating brokers is also reflected in the listing agreements. Exs. 22–34.[1] As these agreements show, sellers commit only to paying the listing broker the amount specified in the listing agreement, and it is the listing broker who commits to compensating the cooperating broker who finds a buyer. Exs. 22–34.[2]

56. These agreements also demonstrate that NAR has not sold anything to Plaintiffs. Exs. 22–34.[3]

57. Sellers agree that their listing broker can share commissions with the cooperating broker because doing so benefits the sellers, and Plaintiffs agree that offers of compensation incentivize brokers to find buyers for the listing, and thus become cooperating brokers. Ex. 20, Stiroh Merits Report ¶ 214.

### THE BENEFITS OF OFFERS OF COMPENSATION

58. Offers of compensation to cooperating brokers benefit sellers by bringing the most potential buyers to the home, which increases selling price and decreases time-on-market. Ex. 20, Stiroh Merits Report ¶¶ 156, 214.

---

[1] Ex. 22 is an excerpt of Moehrl-000011, Plaintiff Moehrl Listing Contract: Exclusive Right to Sell (Moehrl-000013 - Moehrl-000018); Ex. 23, Moehrl-009097, Plaintiff Cole Exclusive Right-to-Sell-Listing Contract; Ex. 24, Moehrl-005649, Plaintiff Darnell Exclusive Right to Sell Agreement; Ex. 25 is an excerpt of C21_New Millennium-000078, Plaintiff Ramey Exclusive Right to Sell Residential Brokerage Agreement (C21_New Millennium-000078 - C21_New Millennium-000085); Ex. 26 is an excerpt of LF-ILh-001872, Plaintiff Umpa Listing Agreement for Improved Real Property and Co-operatives (LF-ILh-001874 - LF-ILh-001880); Ex. 27, Moehrl-005353, Plaintiff Ruh WB-1 Residential Listing Contract – Exclusive Right to Sell; Ex. 28 is an excerpt of Moehrl-000006, Plaintiff Moehrl Settlement Statement (Moehrl-000006 - Moehrl-000008); Ex. 29, Moehrl-001165, Plaintiff Cole Settlement Statement; Ex. 30 is an excerpt of Moehrl-001375, Plaintiff Cole Settlement Statement (Moehrl-001377 - Moehrl-001378); Ex. 31, Moehrl-006166, Plaintiff Darnell Settlement Statement; Ex. 32, Moehrl-001437, Plaintiff Ramey Settlement Statement; Ex. 33 is an excerpt of LF-ILh-001808, Plaintiff Umpa Settlement Statement (LF-ILh-001808 - LF-ILh-001810); and Ex. 34, Moehrl-005361, Plaintiff Ruh Settlement Statement.
[2] *Supra* note 1.
[3] *Supra* note 1.

59. In the absence of offers of compensation, prospective buyers will need to pay out-of-pocket for their own brokers, which can be anticipated to decrease participation of buyers in the market, either through fewer offers or less available capital with which to make offers. Ex. 20, Stiroh Merits Report ¶¶ 79(k)(i), 234.

60. When the listing broker makes the offer of compensation to cooperating brokers, that means buyers get representation without having to pay for broker services out of their pocket. Ex. 20, Stiroh Merits Report ¶¶ 79(k)(i), 234.

61. Because these offers eliminate the need for buyers to pay money for their broker up front, they facilitate the buyer's purchase and make it possible for buyers to make offers for properties that they may not otherwise have been able to afford. Ex. 20, Stiroh Merits Report ¶¶ 234–35.

62. This increases the number of buyers and how much those buyers can pay. Ex. 20, Stiroh Merits Report ¶¶ 234–35.

63. Similarly, buyer representation ensures that buyers are well-prepared to close on a home—buyer agents assist buyers in identifying lenders, preparing attractive offers for sellers, and more. Ex. 20, Stiroh Merits Report ¶ 105 n.99.

64. In the real estate context, the presence of many buyers and sellers in the same location is beneficial to both, so the participants in the industry benefit from investing in a structure that facilitates the best matches possible. Ex. 20, Stiroh Merits Report ¶ 17.

65. Finally, the NAR rules make the multiple listing service more efficient by facilitating consistency and transparency. Ex. 20, Stiroh Merits Report ¶¶ 116, 240.

# THE PARTIES' EXPERT REPORTS

66. Defendants' economic expert Dr. Lauren Stiroh criticized Plaintiffs' economic experts for ignoring (i) real estate commission data from the United States before the NAR model rules and (ii) real estate commission data from every MLS in the United States that has not adopted the NAR model rules—instead, Plaintiffs' economic experts looked solely to select foreign countries. Ex. 20, Stiroh Merits Report ¶¶ 53–58.

67. Stiroh noted that services provided by buyer brokers in the United States are different from those provided in the yardstick countries (Australia, the Netherlands, and the United Kingdom) chosen by Plaintiffs' expert Economides: buyer brokers in the United States conduct additional services such as home tours, whereas in the yardstick countries that service is provided by the lister. Ex. 20, Stiroh Merits Report ¶ 127.

68. Further, commissions in those natural experiments in the United States are higher than in the 20 MLSs at issue in this case. Ex. 20, Stiroh Merits Report ¶¶ 53–58.

69. To explain why Plaintiffs' experts ignored United States options for comparison, Plaintiffs' experts said the alleged harm was also present in these contexts, therefore reducing their value as but-for comparators. Ex. 20, Stiroh Merits Report ¶¶ 53–58.

70. Plaintiffs' experts argued that ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ Ex. 21, Economides Rebuttal ¶ 95.

71. Other buyers who forgo a broker due to cost but who still try to buy homes may become intimidated by the complex nature of house buying and may also be less likely to find and

consider purchase opportunities that a broker would have been able to help them find. Ex. 20,

Stiroh Merits Report ¶¶ 99–108 (explaining valuable services provided by buyer brokers).

Dated: December 19, 2023

Respectfully submitted,

/s/ Ethan Glass
Ethan Glass (*pro hac vice*)
Dee Bansal (*pro hac vice*)
Samantha Strauss (*pro hac vice*)
COOLEY LLP
1299 Pennsylvania Avenue, NW
Suite 700
Washington, DC 20004-2400
(202) 776-2244
eglass@cooley.com
dbansal@cooley.com
sastrauss@cooley.com

Beatriz Mejia (*pro hac vice*)
COOLEY LLP
3 Embarcadero Center, 20th Floor
San Francisco, CA 94111
(415) 693-2000
mejiab@cooley.com

Elizabeth Wright (*pro hac vice*)
COOLEY LLP
500 Boylston Street
Boston, MA 02116
(617) 937-2300
ewright@cooley.com

Jack R. Bierig
ARENTFOX SCHIFF LLP
233 South Wacker Drive, Suite 7100
Chicago, IL 60606
(312) 258-5500
jack.bierig@afslaw.com

Suzanne L. Wahl
ARENTFOX SCHIFF LLP
350 S. Main Street, Suite 210
Ann Arbor, MI 48104
(734) 222-1517
suzanne.wahl@afslaw.com

***Attorneys for Defendant the NATIONAL ASSOCIATION OF REALTORS®***